**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAN SILLS and GEORGE DICK, Individually and on Behalf of All Others Similarly Situated,<br><br>       Plaintiffs,<br><br>  v.<br><br>UNITED NATURAL FOODS, INC., J. ALEXANDER MILLER DOUGLAS, JOHN W. HOWARD, and CHRISTOPHER P. TESTA,<br><br>       Defendants. | Case No. 1:23-cv-02364-JGLC<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

# TABLE OF CONTENTS

I.  NATURE OF THE ACTION AND OVERVIEW ................................................................ 1

II.  JURISDICTION AND VENUE ................................................................................. 5

III.  PARTIES ....................................................................................................... 6

    A.  Plaintiffs .................................................................................................... 6

    B.  Defendants ................................................................................................. 6

    C.  Relevant Non-Parties .................................................................................. 8

IV.  BACKGROUND ................................................................................................. 8

    A.  Overview Of The Company ......................................................................... 8

    B.  Overview Of UNFI's Inventory Accounting ................................................ 10

    C.  UNFI's Pre-Class Period Transformation Into America's Premier Grocery
        Wholesaler And Focus On Cost Savings ..................................................... 11

    D.  Adjusted EBITDA, Gross Profit, And Gross Margin Were Important Metrics To
        Investors ................................................................................................ 13

    E.  The Impact Of Inflation On UNFI's Business ............................................. 14

    F.  Food Distributors Can Improve Gross Margin By Forward Buying .................. 16

    G.  Prior To The Class Period, Defendants Were Aware Of Impending Cost Price
        Increases From Their Suppliers ................................................................. 17

V.  SUBSTANTIVE ALLEGATIONS ......................................................................... 18

    A.  During The Class Period, Defendants Reported Positive EBITDA And Gross
        Margin Results That Gave The (Misleading) Appearance That UNFI Was
        Successfully Weathering A Difficult Macroeconomic Environment .................. 18

    B.  On March 8, 2023, Defendants Shocked Investors By Revealing That UNFI's
        Reported EBITDA Had Been "Significantly" Inflated By Undisclosed
        "Procurement Gains" That Had Masked Other Challenges ............................. 22

    C.  Analysts' Reactions To The March 8, 2023 Disclosures Confirm That UNFI's Class
        Period Financial Results Were Misleading .................................................. 24

D.     Defendants Continue To Issue Materially Misleading Statements, Including Fiscal 2023 Guidance That Purports To Account For The Decline In Forward Buying Opportunities...................................................................................... 27

E.     On June 7, 2023, Defendants Again Shocked Investors By Further Slashing UNFI's EBITDA Guidance And Further Revealing Problems That Had Been Masked By UNFI's "Strategic Forward Buying" Practices During The Class Period ........... 28

F.     Defendants Do Not Dispute That They Were Aware Of And Had Visibility Into UNFI's Undisclosed "Substantial" "Strategic" Forward Buying During The Class Period ................................................................................................................ 31

G.     The Individual Defendants Were Incentivized To Use Forward Buying To Improve Gross Margin And Adjusted EBITDA ................................................................ 34

      1.     The Individual Defendants' Performance Based Compensation Was Heavily Impacted By The Company's Adjusted EBITDA For Fiscal 2022 ............................................................................................ 34

      2.     The Individual Defendants Engaged In "Strategic" Forward Buying To Hedge Against Macro Challenges The Company Faced ......................... 36

      3.     A Substantial Amount Of The Cash Compensation Paid To The Individual Defendants For 2022 Was "Earned" By Forward Buying ....................... 39

      4.     Defendants Knowingly Issued Fiscal 2023 Guidance Despite Knowing About The Lack Of Real-Time Visibility ................................................. 40

VI.     MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD.................................................................................................. 41

A.     1Q22 Results........................................................................................... 41

B.     2Q22 Results........................................................................................... 48

C.     3Q22 Results........................................................................................... 53

D.     4Q22 and Year-End Results..................................................................... 61

E.     2022 Proxy .............................................................................................. 69

F.     1Q23 Results........................................................................................... 70

G.     2Q23 Results........................................................................................... 76

H.     Defendants Violated Item 303 of Regulation S-K .................................. 78

VII.     LOSS CAUSATION.......................................................................................... 80

VIII.   ADDITIONAL SCIENTER ALLEGATIONS ................................................................. 81

IX.   CLASS ACTION ALLEGATIONS ................................................................. 82

X.   UNDISCLOSED ADVERSE FACTS ................................................................. 84

XI.   APPLICABILITY OF PRESUMPTION OF RELIANCE ................................................................. 85

XII.   NO SAFE HARBOR ................................................................. 87

XIII.   CLAIMS FOR RELIEF ................................................................. 88

XIV.   PRAYER FOR RELIEF ................................................................. 92

XV.   JURY TRIAL DEMANDED ................................................................. 92

Lead Plaintiff Dan Sills and additional plaintiff George Dick (together, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by United Natural Foods, Inc. ("UNFI" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by UNFI; and (c) review of other publicly available information concerning UNFI.

## I.      NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired UNFI securities between December 8, 2021 and June 6, 2023, inclusive (the "Class Period"). Plaintiffs pursue claims against the Defendants (as defined herein) under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      UNFI is the largest publicly-traded wholesale distributor of natural, organic, specialty, produce, and conventional grocery and non-food products in North America.  After completing a landmark acquisition at the end of 2018 for $2.9 billion, Defendants claimed to integrate the two companies ahead of schedule, and by the end of 2020, stated that they would focus on a data driven approach, "using higher level data analytics to drive decision-making and generate these incremental operating efficiencies." Also, in December 2020, Defendants announced a Value Path initiative as part of the Company's shift from integration to "transformational initiatives," which was a "***a holistic approach*** to driving more value throughout [the] business, ***including across key elements of pricing, procurement, operations, and***

*administrative functions.*"[1] Thus, Defendants purportedly had visibility into key drivers of the Company's profitability, including the inventory costs.

3.     Defendants' self-proclaimed visibility and focus on operational efficiencies was important because investors and analysts were focused on the Company's profitability measures, including gross margin and adjusted EBITDA. In fact, the Individual Defendants themselves were keenly aware of profitability drivers because their incentive compensation was substantially based on whether the Company hit a predetermined target set for adjusted EBITDA.

4.     Beginning in late 2021, inflation was rapidly increasing, fueled by the consumer pantry-stocking during the pandemic and the governments monetary policies in response thereto. The grocery and food-at-home business was certainly not immune to rising inflation, and food prices skyrocketed. For UNFI, inflation increases the cost of inputs used in production. However, Defendants claimed that inflation had a marginal benefit to the Company because "Generally in an inflationary environment as a wholesaler, rising vendor costs result in higher Net sales driven by higher vendor prices when other variables such as quantities sold and vendor promotions are constant."  In essence, there was a marginal benefit from the increase in pricing that occurs due to inflation in the ordinary course of business between the time of purchase of inventory from the supplier and the time of sale of the good to the customer. Inflation could have other impacts on UNFI's business as its own costs increased or customers changed their purchasing behavior.

5.     Intent on ensuring they hit incentive compensation targets, Defendants leveraged rising inflation during the Class Period through undisclosed "strategic" forward buying, which is the practice of buying product in excess of demand ahead of known price increases.[2]  The profit

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

[2] Good candidates for forward buying are non-perishable goods or perishable goods with a long shelf life (*i.e.*, they will not be out of date within 30 to 60 days).

from such forward buying is referred to as procurement gains. Since UNFI "get[s] notification 60, 90 days in advance" price increase, Defendants were able to take advantage of the atypical and substantial (in number and magnitude of) forward buying opportunities throughout the Class Period, unbeknownst to investors.

6.     During the Class Period, Defendants failed to disclose that UNFI's profitability benefited "significantly" from forward buying in advance of known price increases; that these "significant" benefits masked the Company's challenges, including labor challenges or wage inflation; and that there was a risk that the forward buying opportunities would decrease when inflation normalized, which would in turn materially impact the Company's profitability.

7.     On March 8, 2023, before the market opened, UNFI shocked the market by reporting a $6 million year-over-year decline in gross profit, *despite* a 6% increase in net sales and slashing the Company's adjusted EBITDA guidance by approximately $115 million (or approximately 13.3%). The Company explained that the gross profit rate decline in 2Q23 to 13.7% (compared to 14.5% in the prior year period) was "***primarily driven by lower current period procurement gains*** due to the decelerating rate of inflation and lower inventory gains." Defendant Howard further confirmed that "[t]he largest drivers of this decline in gross profit rate were lower procurement and inventory gains, resulting from, among several things, supply chain volatility, and a deceleration in the sequential rate of inflation."

8.     On this news, the Company's share price fell $11.49, or 28.1%, to close at $29.47 per share on March 8, 2023, on unusually heavy trading volume.

9.     In response to this news, analysts questioned the Individual Defendants' credibility and explained that investors had no indication that the prior gains had even existed, much less their material impact, and that without these procurement gains that the prior reported profitability

would have been much worse. Guggenheim Partners, a global investment and advisory financial services firm that provides regular analyst coverage of the Company's financial results, confirmed that procurement gains "meaningfully offset" UNFI's challenges in fiscal 2022 but had not been identified as a material factor that impacted financial results. Similarly, analyst firm BMO Capital inferred that "[t]he 13% cut to EBITDA guidance (at the mid-point) *suggests that procurement gains account for at least ~10-15% of EBITDA*," but "the company has not disclosed the magnitude of EBITDA that is typically attributed to procurement gains[.]"

10.    On March 8, 2023, the Company also provided revised guidance for fiscal 2023 and withdrew its previously issued guidance for fiscal 2024. For fiscal 2023, Defendants revised guidance for net income and EPS by more than 50% and significantly lowered guidance for adjusted EBITDA too. Defendant Douglas claimed that the revised guidance reflected the sharp "*sequential deceleration in the number and magnitude of vendor product cost increases* as compared to the first quarter of fiscal 2023," that resulted in significantly lower procurement gains. In spite of this, analysts were not convinced that Defendants, whose credibility had already taken a massive hit, had revealed the whole picture, doubting whether UNFI had misrepresented other drivers of its business.

11.    Analysts' skepticism was well-founded because on June 7, 2023, the Company disclosed that lower procurement gains eroded gross margins even further, reporting in a press release that 3Q23 gross profit decreased $12 million due to "lower inflationary benefits *primarily related to reduced procurement gains*, as well as higher shrink." The Company further explained that the gross profit rate declined to 13.3%, which was "primarily driven by the volatile macroeconomic environment, which led to lower inflationary benefits and reduced procurement

gains" and that as a result of the "pressure" on margins, the Company reduced its fiscal 2023 outlook again.

12.     On this news, the Company's stock price fell $4.11, or 14.9%, to close at $23.46 per share on June 7, 2023, on unusually heavy trading volume. The stock continued to fall the next trading day by $1.56, or 6.6%, to close at $21.90 per share on June 8, 2023.

13.     Despite previously claiming in March 2023 that they now "fully" understood the magnitude of procurement gains, Defendants reported that UNFI had missed the fiscal 2023 had guidance issued just three months earlier—in the middle of third quarter 2023—because, "relative to our expectations at the end of Q2, the decline was greater than anticipated," according to Defendant Howard.  And Defendant Douglas finally admitted that procurement gains was a "tremendous source of margin expansion" during fiscal 2022: "Last year, in fiscal '22, we saw a big upswing in value that we got as inflation took hold and our inventory was valued lower than the market price, and we strategically forward-[b]ought. And it was a tremendous source of margin expansion."

## II.    JURISDICTION AND VENUE

14.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein,

including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

17.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

### A.    Plaintiffs

18.     Lead Plaintiff Dan Sills, as set forth in the accompanying certification, incorporated by reference herein, purchased UNFI securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

19.     Additional Plaintiff George Dick, as set forth in the accompanying certification, incorporated by reference herein, purchased UNFI securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

### B.    Defendants

20.     Defendant UNFI, Inc. is incorporated under the laws of Delaware with its principal executive offices located in Providence, Rhode Island. UNFI's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "UNFI."

21.     Defendant  J. Alexander Miller Douglas ("Douglas") has been the Company's CEO since August 9, 2021. Prior to joining UNFI, Douglas served as the CEO of Staples, Inc., leading the North American business-to-business distribution platform's strategic transformation and guiding the company throughout the COVID-19 pandemic. Prior to Staples, Douglas had served

as President of Coca-Cola North America (a subsidiary of The Coca-Cola Company) since 2006, overseeing its $10 billion revenue business, encompassing all aspects of its consumer and business-to-business operations. During Douglas' 30-year tenure at Coca-Cola, he also served as Senior Vice President and Global Chief Customer Officer, and held a variety of leadership positions across sales and marketing. Douglas began his career at The Proctor & Gamble Company in sales and sales management positions. Since May 2020, Douglas has served as a member of the board of directors of Wawa Inc., a convenience retailer in the Eastern United States. Douglas received an undergraduate degree from the University of Virginia.

22.     Defendant John W. Howard ("Howard") has served as the Company's Chief Financial Officer ("CFO") since February 2020. He had previously served as interim CFO beginning in August 2019. Howard first joined UNFI in July 2019 as Senior Vice President of Finance. Prior to UNFI, Howard served as interim CFO of Prime Therapeutics from July 2018 to May 2019, and as Vice President, Corporate Finance of Valspar Corporation from August 2014 July 2017, where he led the company's global accounting, tax, treasury, regional CFOs and corporate financial planning and analysis. Howard began his career as a tax consultant with Arthur Anderson and PricewaterhouseCoopers. Howard received a B.S. and Master of Accounting, Tax degree, both from the University of Virginia.

23.     Defendant Christopher P. Testa ("Testa") has served as the Company's President and Chief Marketing Officer ("CMO") since August 1, 2018. In March 2020, Testa assumed additional oversight of the Company's supplier services, professional services, Brands+ business, and Canadian business. From August 2016 to August 2018, Testa served as the Company's President, Atlantic Region. He had previously served as President of the Company's Woodstock

Farms Manufacturing from September 2012 to August 2016, and prior to that, as President of the Company's Blue Marble Brands from August 2009 to August 2016.

24.     Defendants Douglas, Howard, and Testa (collectively the "Individual Defendants") because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## C.     Relevant Non-Parties

25.     Steven L. Spinner ("Spinner") was the Company's Chief Executive Officer ("CEO") from 2008 to August 9, 2021.

26.     Sean F. Griffin ("Griffin") served as the Company's COO from September 2014 to July 2020. In September 2018, the Company named Griffin as the incoming CEO of SuperValu, which the Company acquired in October 2018. Griffin was also one of the leading members of the integration team for the SuperValu acquisition.

## IV.    BACKGROUND

### A.     Overview Of The Company

27.     Since its founding in 1976, UNFI has become the largest publicly traded wholesale distributor of natural, organic, specialty, produce, and conventional grocery and non-food products

in North America. The Company offers nearly 300,000 brand products to more than 30,000 unique retail customer locations throughout the U.S. and Canada. The Company's product offerings include national, regional, and private label brands grouped into six categories: grocery and merchandise; produce; perishables and frozen foods; nutritional supplements and sports nutrition; bulk and food service products; and personal care items. The Company purchases its products from nearly 12,000 suppliers – the majority of which are based in the U.S. and Canada.

28.     The Company has two reportable business segments: Wholesale and Retail. The Company describes these segments as "two distinct businesses, each with a different customer base, marketing strategy and management structure."

29.     Wholesale is the Company's largest segment and is the aggregation of its U.S. and Canada Wholesale operations, which include distributing and selling grocery and non-food products, as well as providing retail support services. These support services include pass-through programs in which vendors provide services directly to the Company's Wholesale customers, as well as services and solutions the Company develops and provides directly – namely, retail store support, pricing strategy, shelf and planogram management, advertising, couponing, eCommerce, consumer convenience services, store design, equipment sourcing, electronic payments processing, network and data hosting solutions, and administrative back-office solutions.

30.     The Retail reportable segment includes over 70 Company-operated retail stores and derives revenue from the sale of grocery and non-food products at these stores.

31.     The Company also has non-reportable operating segments, which include a manufacturing division engaged in the importing, roasting, packaging, and distributing of nuts, dried fruit, seeds, trail mixes, granola, natural and organic snack items, and confections; and a branded product line division primarily consisting of the Company's "Blue Marble Brands."

32.     For fiscal 2021, Wholesale accounted for more than 95% of UNFI's net sales, with reported net sales of $25.87 billion and adjusted EBITDA of $654 million, whereas Retail accounted for approximately 1% of the Company's net sales, with reported net sales of $2.44 billion and adjusted EBITDA of $96 million.

33.     The Company classifies its customers into five "channels": (a) "Chains," which consists of customer accounts that typically have more than 10 operating stores (and exclude stores included within the Supernatural and Other channels defined below); (b) "Independent Retailers," which consists of smaller size accounts and includes single store and multiple store locations, and group purchasing entities (but are not classified within Chains defined above or "Other" defined below); (c) "Supernatural," which consists of chain accounts that are national in scope and carry primarily natural products, and which currently consists solely of Whole Foods Market; (d) "Retail," which consists of the Company's Retail segment, including the Cub Foods business and the Shoppers locations; and (e) "Other," which includes the Company's international customers outside of Canada, foodservice, eCommerce, conventional military business and other sales.

**B.      Overview Of UNFI's Inventory Accounting**

34.     Public companies must comply with generally accepted accounting principles ("GAAP"), which is the official standard for accounting accepted by the SEC. The Financial Accounting Standards Board ("FASB") promulgates standards referred to as Accounting Standards Codifications ("ASC"). GAAP governs the recording of financial results, such as revenue and inventory.

35.     UNFI's fiscal year is not the same as the calendar year. Companies choose a non-standard fiscal year-end for a variety of reasons, including seasonal fluctuations and the availability of supplies that could distort financial results reported according to the calendar year.

The Company's fiscal year ends on the Saturday closest to July 31 and contains either 52 or 53 weeks. For fiscal years 2021 through 2023, the quarters ended on the following dates:

|  | Fiscal 2021 | Fiscal 2022 | Fiscal 2023 |
|---|---|---|---|
| First Quarter ("1Q") | October 31, 2020 | October 30, 2021 | October 29, 2022 |
| Second Quarter ("2Q") | January 30, 2021 | January 29, 2022 | January 28, 2023 |
| Third Quarter ("3Q") | May 1, 2021 | April 30, 2022 | April 29, 2023 |
| Fourth Quarter ("4Q") | July 31, 2021 | July 30, 2022 | July 29, 2023 |

36.     Under GAAP, inventory can be recorded on a "first-in, first-out" ("FIFO") basis or a "last-in, first-out" ("LIFO") basis. Under FIFO, inventory bought earlier is assumed to be sold first, whereas under LIFO, inventory bought more recently is assumed to be sold first. These assumptions affect the costs of goods sold recorded on an accounting basis, which in turn affects the bottom-line.

37.     UNFI uses both FIFO and LIFO, depending on the category of product. For grocery, frozen food, and general merchandize products, UNFI values inventory using LIFO. For meat, dairy, and deli products, UNFI values inventory using FIFO. At least 70% of the Company's revenue is valued on a LIFO-basis.[3]

### C.     UNFI's Pre-Class Period Transformation Into America's Premier Grocery Wholesaler And Focus On Cost Savings

38.     On October 22, 2018, UNFI announced the completion of its landmark acquisition of SuperValu for $2.9 billion. SuperValu was a publicly traded company on the NYSE and one of the largest grocery wholesalers and retailers in North America with annual sales of $14 billion in fiscal 2018. The two companies expected that $175 million would be realized in "cost synergies" over the first three years. In the July 26, 2018 press release announcing the transaction, Spinner

---

[3] The difference between the LIFO inventory balance and what it would have been under FIFO is called "LIFO reserve." The change in the LIFO reserve from one quarter to the next is called the "LIFO charge."

assured that one of the "Compelling Strategic and Financial Benefits" is that the combination "*[e]nhances technology, capacity, and systems: The combined entity plans to leverage scalable systems to streamline its processes, more efficiently meet the needs of its customers and reduce future capital expenditures*."

39.    Defendants claimed that the integration of the two companies proceeded ahead of schedule. Three months after the acquisition closed, Griffin stated that "***prior to closing***, our teams were planning for day one, working to anticipate issues that may arise" and had "broken the integration into four specific areas . . . foundational, customer, supplier, and network." By December 2019, Spinner stated that the Company had completed the "reorganization of our supply chain, logistics, sales, finance, legal, into one centralized organization with four separate and distinct regions." On September 29, 2020, during the fourth quarter fiscal 2020 earnings call, Defendant Testa stated that "Going forward, we'll be placing a heavy emphasis on standardizing processes and ***using higher level data analytics to drive decision-making and generate these incremental operating efficiencies***."

40.    In furtherance of the focus on operational efficiencies, on December 9, 2020, during the first quarter of fiscal 2021 ("1Q21") earnings call, the Company announced its "Value Path" initiative, representing "the next round of productivity and efficiency work streams, ***shifting from integration activities to a series of transformational initiatives*** that will position UNFI for future sales growth and margin expansion." The Company described its Value Path initiative as "***a holistic approach to driving more value throughout [the] business, including across key elements of pricing, procurement, operations, and administrative functions.***" These initiatives would purportedly "drive an additional ***$70 to $100 million [in cost savings] by the end of fiscal***

*2023* and contribute to future bottom line growth, margin expansion and generate meaningfully incremental free cash flow."

### D.    Adjusted EBITDA, Gross Profit, And Gross Margin Were Important Metrics To Investors

41.    There are three measures of profitability that are important to UNFI's investors: adjusted EBITDA, gross profit, and gross margin. Each of these profitability measures is affected by UNFI's inventory costs. The principal components of the Company's cost of goods sold include the amounts paid to suppliers for product sold, plus transportation costs necessary to bring the product to, or move product between, the Company's distribution centers and retail stores, partially offset by consideration from suppliers for the purchase or promotion of the suppliers' products.

42.    Gross profit is net sales less the cost of goods sold. This measure includes variable costs and typically does not include fixed costs. This is a GAAP measure that appears on the Company's income statement.

43.    Gross margin compares gross profit to net sales and is expressed as a percentage. It is calculated by dividing the gross profit by the net sales. Gross margin is one of the key metrics used by the investing public to evaluate a company's financial health and to compare a company with industry peers. It represents the percentage of a sales revenue that a company is able to convert into gross profit, so it assesses how efficiently a company generates a profit from sales.

44.    Adjusted EBITDA refers to earnings before interest, taxes, depreciation, and amortization, subject to certain adjustments. It is a non-GAAP measure, meaning that there is no standard definition to calculate this metric and can vary from one company to the next, and is determined by discretionary add-backs defined by management. For UNFI, as of fiscal 2021, adjusted EBITDA was defined as EBITDA adjusted for share-based compensation, restructuring, acquisition and integration related expenses, goodwill impairment charges, (gain) loss on sale of

assets, certain legal charges and gains, and "certain other non-cash charges or other items, as determined by management," according to the Company's fiscal 2021 Form 10-K filed on September 28, 2021 (the "2021 10-K"). During fiscal 2022, adjusted EBITDA was revised to also exclude the non-cash LIFO charge or benefit.

45.    UNFI considered adjusted EBITDA to be a key metric for the Company's financial health. For example, the 2021 10-K stated that management "***believe[s] Adjusted EBITDA is reflective of factors that affect our underlying operating performance and facilitate operating performance comparisons of our business on a consistent basis over time.***"

46.    That adjusted EBITDA was important to UNFI is reflected in the fact that it was a key component in determining executive incentive compensation. According to the Company's 2022 proxy statement filed on January 10, 2023 (the "2022 Proxy"), UNFI's Compensation Committee selected adjusted EBITDA as a component to earn performance-based compensation because it "focuses our executive officers on growth in core operational performance and rewards all officers for achievement of this ***important driver of overall financial performance*** while also growing market share through scale and customer experience." Fiscal 2022 incentive compensation was determined based on whether the Company's executives achieved targets in adjusted EBITDA and net sales, but adjusted EBITDA was weighted 75%. Thus, most of the Individual Defendants' incentive compensation was determined by whether they improved the Company's adjusted EBITDA.

**E.    The Impact Of Inflation On UNFI's Business**

47.    Throughout late 2021 through calendar 2022, the U.S. experienced rapid inflation after years of steady inflation.

48.    Inflation is a measure of how quickly average prices are increasing for a basket of goods and services. The U.S. Bureau of Labor Statistics publishes its monthly consumer price

index, which measures the cost of items that urban consumers buy out of pocket. In calendar 2022, annual inflation increased to its highest level due to soaring energy costs, labor mismatches, and supply disruptions.[4]

49.     For companies such as UNFI, inflation increases the cost of inputs used in production, such as raw materials, which can cause margins to decline. *Id.* To mitigate the inflationary pressure on margins, companies can pass these increased input costs to consumers by increasing the price of goods sold. *Id.*

50.     However, McKinsey warns that "if price increases are not executed thoughtfully, companies can damage customer relationships, depress sales, and hurt margins." *Id.* McKinsey advises five steps for companies to manage their financial results amid inflation, including changing "other aspects of sales unrelated to the base price, such as lengthened production schedules or surcharges and delivery fees for rush or low-volume orders" and using "'value engineering' to . . . provide cost-reducing alternatives to price increases." *Id.*

51.     The chart below[5] shows the percent increase in food prices on an annual basis, where each figure represents the 12-month period ending that month:

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Ave |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 2020 | 1.8 | 1.8 | 1.9 | 3.5 | 4.0 | 4.5 | 4.1 | 4.1 | 3.9 | 3.9 | 3.7 | 3.9 | 3.4 |
| 2021 | 3.8 | 3.6 | 3.5 | 2.4 | 2.2 | 2.4 | 3.4 | 3.7 | 4.6 | 5.3 | 6.1 | 6.3 | 3.9 |
| 2022 | 7.0 | 7.9 | 8.8 | 9.4 | 10.1 | 10.4 | 10.9 | 11.4 | 11.2 | 10.9 | 10.6 | 10.4 | 9.9 |
| 2023 | 10.1 | 9.5 | 8.5 | 7.7 | 6.7 | 5.7 | 4.9 | *Avail. Sept. 13* | | | | | |

52.     As the chart shows, food inflation increased significantly during calendar 2022, meaning the rate at which food prices increased was significant and reached its highest level in

---

[4] https://www.mckinsey.com/featured-insights/mckinsey-explainers/what-is-inflation

[5] This is an excerpt of a chart available at https://www.usinflationcalculator.com/inflation/food-inflation-in-the-united-states/ (last accessed August 12, 2023).

decades. By September 2022, that rate started to slow – food prices still increased, but at a slower pace.

53.    All else held equal (such as the number of units sold, changes in consumer preferences, and competitive pressures), the Company benefits from inflation. The Company's pricing to its customers "is determined at the time of sale" based on the then-prevailing list base cost, so wholesalers like UNFI benefit in an inflationary environment: rising costs results in higher vendor prices that increase net sales, even "when other variables such as quantities sold and vendor promotions are constant."

### F.    Food Distributors Can Improve Gross Margin By Forward Buying

54.    Separate and apart from inflation, food distributors such as UNFI are able to uniquely benefit any time one of their suppliers increased their costs by purchasing inventory ahead of known price increases. The benefit UNFI achieved from strategically forward buying during the Class Period was later referred to by UNFI as "procurement gains." Forward buying can also mitigate these cost pressures without passing them completely to customers because the bulk purchase effectively delays the price increase's effect on margins for a period of time.

55.    Food retailers may engage in forward buying when their manufacturers are selling product at a discount, and the retailer can make a profit by selling the item purchased earlier at a low price. Good candidates for forward buying are non-perishable goods or perishable goods with a long shelf life (*i.e.*, they will not be out of date within 30 to 60 days).[6]

56.    Analysts posited that forward buying could help the Company's margins. For example, on June 7, 2022, UBS issued a report stating that "[w]e believe UNFI can generate modest adj. op. margin expansion in 4Q. Its ability to forward buy & the cost plus nature of its

---

[6] https://blueridgeglobal.com/articles/when-does-forward-buying-in-supply-chain-make-sense/

contracts should allow for it to grow its GM, even as inflation persists." Similarly, Guggenheim stated on June 20, 2022 that "[w]ith respect to profitability, we believe inflation benefits—pricing and forward buys—could drive modest gross/EBITDA margin upside."

**G.    Prior To The Class Period, Defendants Were Aware Of Impending Cost Price Increases From Their Suppliers**

57.    At the start of the Class Period, Defendants were admittedly aware of and expecting prices increases that were "higher than normal." Moreover, the Individual Defendants demonstrated that they had full visibility and familiarity with changes in their suppliers' expected pricing. Their familiarity stemmed from the fact that UNFI's suppliers were contractually obligated to provide notice 60 to 90 days in advance of a price increase. As Defendant Testa stated during the third quarter 2021 earnings call on June 9, 2021 (the "3Q21 Earnings Call"), "We have a process for CPG [consumer-packaged goods] increases, *our suppliers increases where we get notification 60, 90 days in advance.*"

58.    Moreover, during the 3Q21 Earnings Call, Defendant Testa stated that UNFI had "received notice from many suppliers indicating they will be taking price increases in the coming months." He continued that these prices increases were "higher than normal," which reflected that CPGs had not raised prices during COVID but their labor and transportation costs had increased.

59.    Defendants suggested that these cost increases would be passed through to consumers, benefiting the Company's margins. During the same 3Q21 Earnings Call, Defendant Testa stated that Defendants "expect[ed] inflation to have a larger impact on our business leading into fiscal 2022," but "our contracts generally allow UNFI to pass through manufacturer cost increases." Spinner reiterated that "[i]ncrease in cost of goods is a benefit to us because as we increase cost of goods, we pass it through, and we typically buy into rising markets." He continued

17

that the Company passes "through 100% or pretty damn close to 100% of the cost of goods that get pushed to us."

## V.    SUBSTANTIVE ALLEGATIONS

### A.    During The Class Period, Defendants Reported Positive EBITDA And Gross Margin Results That Gave The (Misleading) Appearance That UNFI Was Successfully Weathering A Difficult Macroeconomic Environment

60.    Unbeknownst to investors, during the Class Period, Defendants were engaging in "strategic" forward buying ahead of substantial (in both the number and magnitude of) price increases to inflate its profitability measures. From the start of the Class Period until March 8, 2023, Defendants knowingly and/or recklessly failed to disclose that UNFI's financial results benefited "significantly" from forward buying in advance of known price increases; that these "significant" benefits masked the effects of other challenges the Company was facing, including labor challenges or wage inflation; and that there was a risk that the forward buying opportunities would return to normal if/when inflation started to subside, which would in turn materially reduce the Company's profitability back to normal. UNFI was experiencing such windfall benefits as early as September 2021.

61.    Instead of disclosing the "significant" benefit of procurement gains resulting from forward buying during the Class Period, Defendants misleadingly attributed the Company's outperformance during the Class Period to inflationary gains (the profit that results merely from continually increasing prices) and to the operational efficiencies generated by the Value Path initiative. However, absent the benefits obtained from forward buying, UNFI's reported profitability during the Class Period would have been substantially reduced or declined.

62.    **1Q22:** On December 8, 2021, the Company announced its first quarter 2022 financial results in a press release (the "1Q22 Press Release"), reporting net sales of $7.0 billion and net income of $76 million. This was a 4.7% increase in net sales from the prior year period,

and was "primarily ***driven by inflation and new business*** from both existing and new customers . . . partially offset by supply chain challenges and expected modest market contraction." The Company also stated that gross margin rate improved to 14.89% from $14.51% in the prior year period, which was "***driven by improvements in the Wholesale segment margin rate, including the impact of inflation and the Company's Value Path initiative***."

63.   Analysts were impressed with these results in their reports on December 8, 2021, with UBS noting that "[m]omentum continues to build for UNFI, which delivered a sizeable 1Q beat with EPS of $0.97 easily topping consensus of $0.58 and DB of $0.54." Wells Fargo applauded UNFI's execution amidst macro challenges, stating: "While UNFI is clearly seeing benefit from current market dynamics, including accelerating inflation and food-at-home demand, ***the company deserves credit for solid execution against a tough backdrop.***"

64.   **2Q22:** On March 7, 2022, Defendants announced the Company's second quarter 2022 financial results in a press release (the "2Q22 Press Release"), including $7.4 billion net sales and adjusted EBITDA of $201 million. They also reported that the gross margin rate had improved 8 basis points year over year to 14.50%, which "was driven by improvements in the Wholesale segment margin rate, ***including the impact of inflation and the Company's ValuePath initiative[.]***" During the earning call held the same day (the "2Q22 Earnings Call"), Defendant Howard elaborated that the "wholesale margin rate was again favorably impacted by our elevated level of cost inflation, ***as our business model and customer contracts generally pass through product cost inflation***, which leads to both revenue and margin gains."

65.   Analysts resoundingly concluded that the Company had passed its product costs entirely to customers in their reports issued on March 7, 2022. UBS stated, prior to the earnings report, that "***UNFI likely benefitted from elevated levels of inflation, particularly when***

*considering its contracts typically allow it to pass along higher costs to its customers*." Deutsche Bank similarly wrote that "[e]levated cost inflation, which is generally passed through to customers, benefitted revenue and margins."

66.    **3Q22:** On June 7, 2022, Defendants announced UNFI's third quarter 2022 financial results in a press release (the "3Q22 Press Release"), including $7.2 billion net sales and adjusted EBITDA of $196 million. During the related conference call, when asked what would happen to margins in the event of deflation, Douglas responded that UNFI's actions would be "approximately the same" regardless of inflation or deflation, and "I think we'll be in strong shape regardless of the scenario."

67.    **4Q22:** Ahead of the Company's announcement of fourth quarter and full year earnings, UBS "expect[ed] UNFI to convey conservative expectations as it laps a challenging inflation comparison & faces continued macro uncertainty," according to its report on September 20, 2022. However, the Company continued to astound the investing public. On September 27, 2022, Defendants announced the Company's fourth quarter and full year 2022 financial results, including fourth quarter net sales of $7.3 billion and adjusted EBITDA of $213 million. It also reported that gross margin rate increased to 14.5% of net sales, which was "***driven by improvements in the Wholesale segment margin rate, including the impact of inflation and the Company's efficiency initiatives***, partially offset by changes in customer mix." During the related earnings call held the same day, Defendant Douglas touted that "[d]elivering these results in the face of such a complex environment ***is a testament to the agility of our team and the strategic value of our business***."

68.    Analysts reacted positively. As Wells Fargo reported in a note on September 27, 2022, UNFI's "top line actually missed" but a "10bps EBIT margin beat offset the sales miss, as

*the continued inflation tailwind drove a slightly better than expected gross margin*." Likewise, Guggenheim wrote on the same day that "the better-than-we-expected 27 basis point FIFO gross margin expansion . . . *reflected the benefit of inflation on inventory* and fixed costs as well as warehouse-level efficiency efforts."

69.     **1Q23**: On December 7, 2022,  Defendants announced the Company's first quarter 2023 financial results in a press release reporting a slight decrease in gross profit rate to 14.6% of net sales (compared to 14.8% in the prior-year period). This decrease was attributed to "changes in customer mix *as we continue to grow sales with larger customers*." The Company also reported $7.5 billion net sales and adjusted EBITDA of $207 million. During the related conference call held the same day, Defendant Douglas stated that this "solid start to the year keeps us *on track to deliver our full year guidance provided in September*." Defendant Howard also confirmed that the Company was "*affirming [its] full year outlook for fiscal 2023*. This includes [the] expectations for net sales of $29.8 billion to $30.4 billion, adjusted EBITDA of $850 million to $880 million, and adjusted EPS of $4.85 to $5.15 per share."

70.     Analysts recognized that gross margin had contracted as the inflationary benefits started to "moderate," but felt the stock reaction was overblown. In a report on December 7, 2022, Wells Fargo stated that the Company's "[g]ross margin also contracted more than we expected, down 20 bps y/y," and inferred that "it's likely the inflationary benefit that UNFI has experienced over previous quarters is also beginning to moderate." Similarly, looking ahead to second quarter 2023, BTIG expected "the *company to benefit from moderating costs*, as they lap the impact of Omicron last year, which resulted in a significant increase in third-party labor that won't repeat." Guggenheim also found that the gross margin pressure created near-term uncertainty but "regard[ed] the challenges as manageable, especially as (1) omicron-oriented labor costs are cycled

and (2) a healthy existing account revenue pipeline helps drive a volume recovery." Guggenheim continued that "omicron-related labor productivity pressures will be cycled in January, thus contributing to margin improvement in the 3Q."

**B.**    **On March 8, 2023, Defendants Shocked Investors By Revealing That UNFI's Reported EBITDA Had Been "Significantly" Inflated By Undisclosed "Procurement Gains" That Had Masked Other Challenges**

71.    On March 8, 2023, before the market opened, UNFI shocked the market by reporting a $6 million year-over-year decline in gross profit, *despite* a 6% increase in net sales. In the press release announcing 2Q23 financial results (the "2Q23 Press Release"), the Company revealed that in 2Q23 the gross profit rate declined to 13.7% (compared to 14.5% in the prior year period) and considerably lowered its profitability expectations by slashing its previously issued adjusted EBITDA guidance ($850 - $880 million) by approximately $115 million (or approximately 13.3%) to a new range of $715 to $785 million. The drastic reduction in the Company's guidance was even more shocking considering that the Company had just recently provided the prior guidance in December 2022, more than 40% of the way into 2Q23.

72.    Even though UNFI had not previously disclosed that its reported gross margin and gross profit from 1Q22 through 1Q23 had been materially inflated by "significant" procurement gains resulting from "strategic forward buying," the 2Q23 Press Release disclosed that the decrease in the Company's 2Q23 gross profit rate had been "***primarily driven by lower current period procurement gains*** due to the decelerating rate of inflation and lower inventory gains."

73.    By attributing the 2Q23 earnings miss to lower procurement gains, the Company admitted that its prior year period (that is, 2Q22) had materially benefited from "significant" procurement gains. Specifically, in the 2Q23 Press Release, the Company stated that its profits "were challenged as ***we did not repeat the significant level of procurement gains*** from rapidly

accelerating inflation and inventory gains, due to supply chain volatility, ***that we experienced in the second quarter of last year***."

74.     That same day, the Company held an earnings call (the "2Q23 Earnings Call"), to discuss its 2Q23 financial results with analysts and investors. Ahead of the 2Q23 Earnings Call, an analyst from UBS issued a report that stated the obvious: "The [Company's] initial print ***brings up more questions than answers***."

75.     Recognizing that UNFI had just blindsided investors by simultaneously disclosing a massive deterioration in profitability and revealing that the Company's prior results had been inflated by procurement gains, Defendant Douglas started the 2Q23 earnings call by apologetically stating, "[L]et me address our performance directly, by explaining what happened, how it happened, what we're doing about it." As Defendant Howard explained, "Our reduced profitability this quarter was primarily driven by a lower gross profit rate, as we did not repeat the level of significant procurement and inventory gains experienced last year."

76.     Defendant Howard conceded that "[l]ike other food distribution companies, a portion of our gross margin is derived from buying into known price increases." However, Defendant Howard effectively admitted that (unlike its peers) UNFI had been intentionally using (and not disclosing) strategic forward buying in advance of substantial price increases over the past several quarters as an "opportunity" to materially "improve" UNFI's gross profit rate:  "The quantity and amount of these increases decreased year-over-year which provided less opportunity to improve gross profit rates."

77.     When asked during the 2Q23 Earnings Call by an analyst who was "a little bit confused," Defendant Douglas conceded that suppliers were "obligated" to give the Company 60 to 90 day advance notice and that the "the forward-buy impact happens in that cycle." In other

words, UNFI's forward buying was an intentional practice in response to the expected price increases. Defendant Howard further explained that "[t]he number of price increases that are happening now is reduced by about 2/3 from last year."

78.    Importantly, Defendant Howard effectively admitted that the Individual Defendants had access to information to understand the extent of UNFI's strategic forward buying practices during the Class Period. During the 2Q23 Earnings Call an analyst specifically asked Defendant Howard "did you guys just not have the systems in place to understand how much forward buy you were doing?" Although Defendant Howard avoided directly answering the question, his answer inherently acknowledged that they did possess such information even though he attempted to downplay the information as not "strong":

> Great question. Our systems, the way they're structured now, **do a very good job of aggregating [distribution center] data each period and they do it accurately and it's very controlled**. However, the granularity of that data and the real-time ability to analyze it **is not strong**.

79.    On this news, the Company's share price fell $11.49, or 28.1%, to close at $29.47 per share on March 8, 2023, on unusually heavy trading volume.

### C.    Analysts' Reactions To The March 8, 2023 Disclosures Confirm That UNFI's Class Period Financial Results Were Misleading

80.    As explained by BTIG in a research note on March 8, 2023: "**[M]ost forward buying was non-perishable items** . . . . Put simply, UNFI benefited from strategically purchasing inventory (mostly non-perishables) ahead of scheduled price hikes **over the past 12-18 months**, and is now lapping those gains." The "past 12-18 months" spans the entire Class Period.

81.    Guggenheim confirmed that procurement gains "meaningfully offset" UNFI's challenges in 2Q22 but had not been identified as a material factor that impacted financial results. In a research note issued on March 12, 2023, Guggenheim succinctly observed: "FIFO gross margin was the sole source of the significant 2Q bottom-line shortfall. . . . It is attributed to the

cycling of elevated 'inventory profit' a year ago . . . . ***The company did not call out unusual profit during last year's call***."

82.     The March 12, 2023 Guggenheim note illustrated that 2Q22's "Omicron-Related Labor Challenges Were, ***As It Turns Out, Meaningfully Offset By Inflation-Centric Inventory Procurement Gains***" but "It Is Difficult To Find These Gains In Gross Or EBITDA Margins." The procurement gains masked the challenges UNFI was experiencing, but the Company did not disclose their "significant" benefit:



Exhibit 4: 2Q 2022's Omicron-Related Labor Challenges Were, As It Turns Out, Meaningfully Offset By Inflation-Centric Inventory Procurement Gains…

Source: Company Data and Guggenheim Securities, LLC. Estimates.

83.     Investors had no indication that the gains even existed, much less their material impact, but without the procurement gains "Profitability Would Have Been Much Worse" in 2Q22, according to the March 12, 2023 Guggenheim note:



**Exhibit 5: …But It Is Difficult to Find These Gains In Gross Or EBITDA Margins—However, Absent Them, Profitability Would Have Been Much Worse**

Source: Company Data and Guggenheim Securities, LLC. Estimates.

84.    Other analysts echoed that Defendants had not disclosed the "unsustainable procurement gains" in connection with 2Q22 financial results and that this misled the investing public. For example, a March 8, 2023 BMO Capital report stated that "[T]his profit re-set [in 2Q23] should merely get the company back to more normalized profit levels that ***had been boosted by unsustainable procurement gains during the elevated inflationary environment.***" BMO Capital posited that "[t]he 13% cut to EBITDA guidance (at the mid-point) ***suggests that procurement gains account for at least ~10-15% of EBITDA***." BMO Capital continued that "the company has not disclosed the magnitude of EBITDA that is typically attributed to procurement gains and therefore it is difficult to gauge whether this is conservative enough and/or what other elements of the company's growth have not been properly attributed to the appropriate drivers (synergies, initiatives, etc)."

85.    Similarly, the same day, BTIG wrote: "***We are surprised by how severely the bottom fell out of the story today and exposed so many weaknesses***, especially when comparing

against a quarter with modest EBITDA growth. . . . Given the still-healthy sales environment, *we are surprised by the magnitude of the profit impact* and guidance revision . . . ."

86.     Though forward buying is used by other companies, even those within the food distribution industry, the earnings miss was unique to UNFI. Multiple analysts sought to quell fears that UNFI's results signaled weakness across the industry, with BMO Capital writing "[W]e do <u>not</u> expect this to be a broader downside surprise issue for the food service distributors." Similarly, Wells Fargo stated in a March 8, 2023 note that the "inflation cycle created procurement gain opportunity across food distribution and retail," but "[t]here seems to be *a company-specific dynamic at play* (no systems in place to properly quantify this issue and incorporate in guidance)." Guggenheim also found that "no peer has had, to-date, similar inventory profit challenges."

87.     One thing was clear, however. "*Credibility takes a material hit*, given the issue seems to have blindsided management," wrote Wells Fargo. Similarly, Roth Capital was in disbelief that Defendants simply did not know or expect the lower procurement gains, writing in a March 8, 2023 report: "Speaking three months ago, UNFI indicated that former guidance had 'flexibility' to meet any arising customer needs. . . . [T]*he diminished procurement gains should have been better anticipated (caused by decelerating rate of inflation).*"

    **D.**    **Defendants Continue To Issue Materially Misleading Statements, Including Fiscal 2023 Guidance That Purports To Account For The Decline In Forward Buying Opportunities**

88.     The 2Q23 Press Release also provided revised guidance for fiscal 2023 and withdrew previously issued guidance for fiscal 2024. Specifically, it stated:

**Fiscal 2023 Outlook** [(1)]

The Company has withdrawn its long-term fiscal year 2024 financial targets and updated its full year outlook to the following:

| Fiscal Year Ending July 29, 2023 | Previous Full Year Outlook | Updated Full Year Outlook | % Change Over FY22 at Midpoint |
|---|---|---|---|
| Net sales (*$ in billions*) | $29.8 - $30.4 | $30.1 - $30.5 | 5% |
| Net income (*$ in millions*) | $247 - $266 | $90 - $142 | (53)% |
| EPS [(2)] | $3.95 - $4.25 | $1.50 - $2.35 | (53)% |
| Adjusted EPS [(2)(3)(4)] | $4.85 - $5.15 | $3.05 - $3.90 | (28)% |
| Adjusted EBITDA [(4)] (*$ in millions*) | $850 - $880 | $715 - $785 | (10)% |
| Capital expenditures (*$ in millions*) | ~ $350 | ~ $350 | 39% |

89.     During the 2Q23 Earnings Call, Defendant Douglas claimed that the revised guidance reflected the sharp decline in procurement gains from forward buying. Specifically, he stated that Defendants "were able to understand these issues toward the end of the quarter due to the significant intra-period volatility, which has led us to a different set of financial expectations for fiscal 2023 compared to our December earnings call."

**E.     On June 7, 2023, Defendants Again Shocked Investors By Further Slashing UNFI's EBITDA Guidance And Further Revealing Problems That Had Been Masked By UNFI's "Strategic Forward Buying" Practices During The Class Period**

90.     On June 7, 2023, before the market opened, UNFI revealed that lower procurement gains eroded gross margins even further, reporting in a press release that 3Q23 gross profit decreased $12 million due to "lower inflationary benefits ***primarily related to reduced procurement gains***, as well as higher shrink" (the "3Q23 Press Release"). Therein, Defendants stated that gross profit rate declined to 13.3%, which was "primarily driven by the volatile macroeconomic environment, which led to lower inflationary benefits and reduced procurement gains." As a result of the "pressure" on margins, the Company reduced its fiscal 2023 outlook again.

91.     On this news, the Company's stock price fell $4.11, or 14.9%, to close at $23.46 per share on June 7, 2023, on unusually heavy trading volume. The stock continued to fall the next trading day by $1.56, or 6.6%, to close at $21.90 per share on June 8, 2023.

92.     Despite previously claiming that they now "fully" understood the magnitude of procurement gains, Defendants reported that UNFI had missed the fiscal 2023 had guidance issued just three months earlier—in the middle of third quarter 2023—because, "relative to our expectations at the end of Q2, the decline was greater than anticipated," according to Defendant Howard during the conference call held in connection with the 3Q23 earnings (the "3Q23 Earnings Call") held on June 7, 2023.

93.     During the 3Q23 Earnings Call, Defendant Howard acknowledged that management "expected to see [the Company's] year-over-year gross profit rate decline given the procurement gains we're cycling from last year." When an analyst sought clarification as to why the Company still felt short of those expectations, Defendant Howard replied that "***there still continues to be softness within the forward buy and the opportunities that are presented as well as the magnitude of those opportunities when they do come through.***"

94.     Procurement gains were belatedly identified as a "tremendous source of margin ***expansion***" during fiscal 2022. During the 3Q23 Earnings Call, Defendant Douglas stated that "***Last year, in fiscal '22,*** we saw a big upswing in value that we got as inflation took hold and our ***inventory was valued lower than the market price, and we strategically forward-[b]ought. And it was a tremendous source of margin expansion.***" Defendants admitted that the Company's gross margins were aided by procurement gains specifically in 3Q22. Defendant Howard stated the Defendants engaged in forward-buying during 3Q23 by observing the sequential acceleration in inflation: "***we saw that inflation rising as we moved through Q3, providing that forward-buy***

*opportunity* as well as commodity inflation and a *tailwind last year*. And then we're just seeing the inverse of that this year with the deceleration of inflation from Q2 to Q3 this year."

95.    Similarly, in UNFI's Form 10-Q for the period ended April 29, 2023 (the "3Q23 10-Q"), Defendants stated that 3Q23 was negatively impacted by the "significant" year-over-year decline in forward-buying: "In the third quarter of fiscal 2023, we experienced fewer and less significant vendor product cost increases as compared to the third quarter of fiscal 2022. *These decreases negatively impacted our gross profit rate when comparing the third quarter of fiscal 2023 to the third quarter of fiscal 2022.*"

96.    Defendants revised their guidance for fiscal 2023. In the 3Q23 Press Release, UNFI drastically cut its expectations for net income and adjusted EPS and EBITDA:

| Fiscal Year Ending July 29, 2023 | Previous Full Year Outlook Provided March 8, 2023 | Updated Full Year Outlook |
|---|---|---|
| Net sales *($ in billions)* | $30.1 - $30.5 | $30.1 - $30.5 |
| Net income *($ in millions)* | $90 - $142 | $11 - $41 |
| EPS [2] | $1.50 - $2.35 | $0.20 - $0.70 |
| Adjusted EPS [2][3][4] | $3.05 - $3.90 | $1.80 - $2.30 |
| Adjusted EBITDA [4] *($ in millions)* | $715 - $785 | $610 - $650 |
| Capital expenditures *($ in millions)* | ~ $350 | ~ $350 |

97.    This revision reflected "an assumption that procurement gain opportunities continue to decline" and that "supplier promotional activity [will] remain below pre-pandemic levels," Defendant Howard explained during the 3Q23 Earnings Call.

98.    The Company also announced "immediate cost mitigation actions" to improve profitability that would result in "over $100 million of annualized benefits," according to the 3Q23 Press Release. These benefits would "help offset margin challenges that we expect in fiscal 2024, including lower procurement gains in the first half and the normalization of incentive compensation accruals," Defendant Douglas stated during the 3Q23 Earnings Call. This revealed

that the Company would continue to face fewer forward-buying opportunities than it had in 2Q22, which underscored the extent of the benefit of procurement gains in fiscal 2022.

99.    But after multiple quarters of Defendants blindsiding investors with revelations about the extent to which their gross profit had been juiced by strategic forward buying, the investing public had lost confidence in Defendants statements, and analysts were wary of the potential benefits of the cost-saving initiative. As BMO Capital recognized in a research note on June 8, 2023, the Company had not even provided the specific impact of the Value Path initiative announced two years prior: "Given internal allocation & visibility challenges, a continued challenging volume outlook for UNFI's key customer base, and UNFI's track record on disclosing the magnitude of impact from savings/efficiency measures, we see continued risk for UNFI."

100.    As with the prior quarter, analysts noted that these issues were unique to UNFI. For example, Guggenheim stated on June 25, 2023 that "UNFI is the only consumables-oriented company in our coverage facing this degree of difficulty, adversely impacting investor confidence in the N-T [near-term] outlook." Likewise, Wells Fargo noted in a report on June 7, 2023 that "*Credibility at UNFI is about as low as it gets, as it's shocking how the company seemed caught off guard by these issues given their magnitude.*"

F.    **Defendants Do Not Dispute That They Were Aware Of And Had Visibility Into UNFI's Undisclosed "Substantial" "Strategic" Forward Buying During The Class Period**

101.    During the 2Q23 Earnings Call, Defendants suggested claimed that they did not previously report the "significant" impact from procurement gains in 2Q22 because they had not "*fully* appreciate[d]" it. Specifically, Defendant Douglas stated that they "*did not fully appreciate the benefit to last year's gross profit from buying inventory in advance of supplier price increases in a sequentially rising inflationary environment.*" He continued that Defendants "now

realize[d] the magnitude of these benefits last year, which are not repeatable in the current environment."

102.     Defendants also claimed that they "did not have full visibility and sufficient detail" to identify the benefit of procurement gains because of outdated data infrastructure. During the 2Q23 Earnings Call, Defendant Howard stated that "the state of our legacy data management and infrastructure, which we are addressing in our transformation agenda, severely limited our ability *to fully address and forecast the impact* of these dynamics, both last year and this year." Defendant Douglas likewise stated: "At the time, *we did not have full visibility and sufficient detail into the commercial drivers of the benefits due to legacy issues with digital infrastructure limiting real-time data,* which is *required to fully understand* and forecast these profitability drivers." Defendant Douglas continued: "We were able to understand these issues toward the end of the quarter due to the significant intra-period volatility, which has led us to a different set of financial expectations for fiscal 2023 compared to our December earnings call."

103.     But these carefully qualified statements betray one fact: Defendants do not dispute that they had *some* understanding of UNFI's "strategic forward buying" and its "substantial" impact. Moreover, Defendants Douglas and Howard signed the 2021 10-K, stating that the Company's results "could" be materially impacted by "decreased forward buying opportunities," demonstrating their knowledge that changes (*i.e.*, increases or decreases) in forward buying would have a material impact on UNFI' financial results. Therefore, the Individual Defendants not only knew of forward buying opportunities, but also were aware that they were "strategic" initiatives that could materially impact financial results.

104.     That Defendants had visibility as to these issues is also apparent from their previous statements about the efficiencies from the integration of SuperValu and the Value Path initiative.

In fact, Defendant Testa had stated nearly a year before the start of the Class Period that Defendants were focused on using **"*higher level data analytics to drive decision-making and generate these incremental operating efficiencies.*"**

105.    Moreover, the sharp decline in the "number and magnitude" of forward buying opportunities was "sequential," not year-over-year, so Defendants had reason to know of the negative impact by the time of the 1Q23 earnings report. Specifically, on March 8, 2023, after the market closed, Defendants filed the Form 10-Q for the period ended January 28, 2023 (the "2Q23 10-Q"), admitting: "In the second quarter of fiscal 2023, we experienced a *sequential deceleration in the number and magnitude of vendor product cost increases as compared to the first quarter of fiscal 2023*, which negatively impacted our gross profit rate." Similarly, Defendant Howard stated during the 2Q23 Earnings Call that "there was a *significant sequential change* at the end of the quarter."

106.    Regardless of whether they were aware of the precise magnitude of forward buying opportunities, they had clear visibility into the number and magnitude of supplier price increases, yet throughout fiscal 2022 did not disclose that they were "strategically" forward buying to inflate the Company's reported gross margin.

107.    Finally, the substantial magnitude of the decrease in the Company's fiscal 2023 EBITDA guidance (approximately $230 million or 26%)[7] demonstrates that UNFI's strategic forward buying provided a massive benefit to the Company's fiscal 2022 financial results. Given the magnitude of this revision, any suggestion that Defendants were not aware of the impact of procurement gains or forward buying is not credible.

---

[7] Both the upper and lower bounds of the EBITDA guidance were lowered by approximately $230 million on June 7, 2023, compared to the guidance provided on September 27, 2022 and reaffirmed on December 7, 2022.

G.    **The Individual Defendants Were Incentivized To Use Forward Buying To Improve Gross Margin And Adjusted EBITDA**

1.    **The Individual Defendants' Performance Based Compensation Was Heavily Impacted By The Company's Adjusted EBITDA For Fiscal 2022**

108.    The Individual Defendants were keenly focused on the Company's profitability measures, including gross margin and adjusted EBITDA. In fact, during the third quarter of fiscal 2022, Defendants revised the definition of adjusted EBITDA "to exclude the impact of the non-cash LIFO charge or benefit," claiming that this change "provides a better indicator of the underlying operating performance and permits better comparability between periods" in the 3Q22 Press Release. During the 3Q22 Earnings Call, Defendant Howard elaborated that this change "more closely aligns UNFI with how our industry peers treat LIFO," stating in relevant part:

> *Historically, the effect of LIFO has been relatively small, stable and predictable, but the recent inflationary environment has driven it meaningfully higher because we believe the volatility in this year's noncash LIFO expense meaningfully distorts our underlying operating performance.* Beginning with this quarter, we will adjust LIFO expense out of GAAP net income and GAAP EPS in computing adjusted EBITDA and adjusted EPS. This revision has no impact on the economics, cash flows or GAAP results of our business. *It more closely aligns UNFI with how our industry peers treat LIFO, and we believe better reflects the company's underlying operating performance.* We also believe it will help investors assess our underlying performance in a manner consistent with how we make business decisions.

Defendants' statements in the 3Q22 Press Release and during the 3Q22 Earnings Call illustrate that the Individual Defendants were focused on adjusted EBITDA and specifically understood the impact of inventory costs on the Company's profitability measures.

109.    The change to the Adjusted EBITDA definition also impacted the performance-based compensation that the Individual Defendants could receive. According to the 2022 Proxy, UNFI's Compensation Committee "aligned the definitions of adjusted EBITDA, Adjusted EPS, ROIC, and Leverage for outstanding awards under [its] short- and long-term incentive plans and

increased the targets." Thus, the Company's Compensation Committee understood that inventory costs during an inflationary period would have a positive impact on profitability regardless of the Individual Defendants' actions. The 2022 Proxy stated, in greater part:

> In fiscal 2022, we revised our definition of adjusted EBITDA and Adjusted EPS to exclude the impact of the non-cash charge or benefit resulting from the last-in, first out (LIFO) accounting methodology on most of our inventory. ***This change was made to better reflect the operating performance of the business, since the LIFO charge has created significant non-cash volatility due to high inflation, which is out of Executives' control.*** This change is also consistent with how most of our peers treat LIFO charges or benefits in their reported results. When targets were set for outstanding short- and long-term incentive program, modest LIFO charges were assumed. In fiscal 2022, concurrently with the reporting change, the Compensation Committee aligned the definitions of adjusted EBITDA, Adjusted EPS, ROIC and Leverage for outstanding awards under our short- and long-term incentive plans and increased the targets to reflect the expectations for business growth at the time the targets were set absent the impact of the budgeted non-cash LIFO charge. These changes better align with how we communicate results externally to our stockholders, since the impact of LIFO is not indicative of our underlying business performance.

110.    However, the fiscal 2022 incentive compensation targets also reflected the "competitive environment and the heightened uncertainty given the ongoing COVID-19 pandemic and labor market challenges." The 2022 Proxy stated that "the Compensation Committee set the performance targets at levels that required successful implementation of corporate operating objectives for meaningful payouts to occur." Adjusted EBITDA was given 75% weight to the determination of fiscal 2022 incentive compensation.

111.    As a result, the Individual Defendants were incentivized to increase the benefit to adjusted EBITDA caused by inventory costs amid inflation because it could offset the uncertainty and costs caused by other macroeconomic factors. In fact, Defendant Douglas stated during the 1Q23 Earnings Call that management "***remain[s] focused on growing gross profit dollars*** and further improving our supply chain execution, ***which will enable us to, over time, grow adjusted EBITDA*** and capital returns faster than sales."

### 2. The Individual Defendants Engaged In "Strategic" Forward Buying To Hedge Against Macro Challenges The Company Faced

112. Defendants saw an opportunity to use known, impending price increases to hedge against the risks of uncertainty caused by macroeconomic factors such as COVID-19 comparisons and labor challenges, thus ensuring they could reach their incentive compensation targets— forward buying.

113. The investing public was told that UNFI would experience some benefit from food inflation. For example, then-CEO Spinner stated on June 9, 2021 that "pretty damn close to 100% of the cost of goods that get pushed to us" will be passed through to customers and that rising costs is "a big tailwind for us because if the cost of goods go up, we finance a rising inventory and pass-through the price." These benefits would be inflationary gains: the inventory costs would impact gross margins purely because the sale price included the increased inventory costs (that the Company was passing through) as well as the additional inflation (that occurred between the time the Company acquired and sold a particular unit of inventory). As Defendants stated in SEC filings: "Generally in an inflationary environment as a wholesaler, rising vendor costs result in higher Net sales driven by higher vendor prices when other variables such as quantities sold and vendor promotions are constant."

114. However, forward buying provided an additional benefit because Defendants could leverage known price increases. Defendants, by their own admission, knew of the impending price increases no later than June 9, 2021. During the 3Q21 Earnings Call, Defendant Testa stated that Defendants had "received notice from many suppliers indicating they will be taking price increases in the coming months" and that these price increases were "higher than normal." Throughout the Class Period, Defendants continued to receive notice of impending price increases from suppliers. As Defendant Testa stated during the 3Q21 Earnings Call, UNFI has a "process for CPG increases,

our suppliers increases where we get notification 60, 90 days in advance." He also stated during the 2Q22 Earnings Call that Defendants have "[d]aily conversations with our suppliers."

115. The Individual Defendants not only knew of forward buying opportunities, but also were aware that they were "strategic" initiatives that could materially impact financial results. Defendants Douglas and Howard signed the Form 10-K for fiscal 2021 stating that UNFI's "profit margins depend on **strategic investment buying initiatives**, such as discounted bulk purchases, which require spending significant amounts of working capital up-front to purchase products that we then sell over a multi-month time period." Similarly, Defendants Douglas and Howard purported to warn that the Company's results "could" be materially impacted by "decreased forward buying opportunities," which necessarily means that they were aware of the converse: that increased forward buying opportunities would materially improve financial results.

116. In fact, Defendants admitted that they were aware of these forward buying opportunities in real time. Defendant Howard stated during the 3Q23 Earnings Call that "**we saw that inflation rising as we moved through Q3 [2022], providing that forward-buy opportunity** as well as commodity inflation and **a tailwind last year**." Similarly, as Defendant Douglas explained during the 2Q23 Earnings Call, the Company engaged in forward buying during these "narrow[]" 60- or 90- cycles after suppliers provided notice. During the 3Q22 Earnings Call, Defendant Douglas stated "We spend 100% of our billable hours looking at how we can get better for our customers," and that Defendants had "to **keep our cost structure tight** so that we stay agile in the face of whatever the scenario is."

117. Defendants also knew or recklessly disregarded the magnitude of the impact of forward-buying. The magnitude of the late-stage bottom-line miss in 2Q23 indicates that procurement gains had been a material factor for 2Q22 success—as Guggenheim surmised. In its

March 12, 2023 report, Guggenheim analyzed previously reported financial results and found that but-for forward buying, UNFI's profitability in 2Q22 would have been much worse, stating: "It is difficult to find these [procurement] gains in gross or EBITDA margins—however, absent them, profitability would have been much worse." (capitalization altered). Guggenheim also stated that the procurement gains from forward buying "meaningfully offset" the omicron-related labor challenges that the Company had experienced in 2Q22.

118.    Defendants' own statements confirm that the impact of forward buying was "significant." The 2Q23 Press Release stated that the prior year period included a "significant level of procurement gains." Moreover, during the 2Q23 Earnings Call, Defendant Howard claimed that the "insight into it [i.e., impact of procurement gains] came as we lapped it" in the "final period of the quarter," so analysts "can model it there from that point on for about 12 months." To have "lapped" the procurement gains during the "final period" of 2Q23 means that those gains had occurred late during 2Q22. And if procurement gains (or the lack thereof) were "significant" enough to swing the margins negatively in 2Q23, then it is reasonable to infer that they had an equal magnitude benefit at about the same time in the prior year period.

119.    Therefore, the Individual Defendants knew or recklessly disregarded the "significant" benefit from procurement gains resulting from forward buying during fiscal 2022. They knew of price increases 60 to 90 days before they took effect; they knew that forward buying could improve gross margins; and they were incentivized to do so because the "strategic" forward buying could mitigate the uncertainty of other challenges the Company was facing. Forward buying boosted UNFI's margins for "the past 12-18 months," according to BTIG's March 8, 2023 report, confirming that procurement gains positively impacted the Company's results throughout fiscal 2022.

120.     Defendants repeatedly emphasized in the March 8, 2023 disclosure that they did not "fully" understand the impact of procurement gains until the Company lapped them, but their statements fall short of claiming that they did not know at all that forward buying benefited UNFI. For example, Defendant Douglas stated during the 2Q23 Earnings Call that executives "did not *fully appreciate* the benefit to last year's gross profit" from forward buying but that they "now realize the *magnitude* of these benefits from last year, which are not repeatable in the current environment." Defendant Howard stated during the same call that they could not "fully assess" the impact of forward buying due to the state of its data management infrastructure. Neither statement claims that the Individual Defendants were not aware of forward buying.

121.     To suggest that Defendants were unaware of the magnitude of the impact of forward buying flies in the face of their statements throughout the Class Period that they were monitoring inflation and planned to "keep [UNFI's cost structure tight" for "virtually every scenario." More than a year before the start of the Class Period, on September 29, 2020, Defendant Testa had stated the Individual Defendants were "placing a *heavy emphasis* on standardized processes and using *higher level data analytics to drive decision-making*" and that this applies to "both the revenue and the expense side of the business." Given this data-driven decision-making, it would be absurd to suggest that the Individual Defendants did not understand the "significant" role of procurement gains in driving the Company's profitability in fiscal 2022.

### 3.     A Substantial Amount Of The Cash Compensation Paid To The Individual Defendants For 2022 Was "Earned" By Forward Buying

122.     the procurement gains resulting from forward buying during fiscal 2022 helped the Individual Defendants achieve their performance targets and enabled them to receive millions in incentive compensation. According to the 2022 Proxy, the Individual Defendants' incentive compensation was paid out because UNFI achieved 102% of the target for adjusted EBITDA:

For Messrs. Douglas, Howard, Dorne and Testa and Ms. Sutton, final payouts were based on the following metrics:

| Performance Metric (in millions) | Weight | | Target | | Actual | | Performance as a Percentage of Target | Weighted Payout |
|---|---|---|---|---|---|---|---|---|
| Adjusted EBITDA | 75 % | $ | 810 | $ | 829 | (1) | 102 % | 80.8 % |
| Net Sales | 25 % | $ | 28,054 | $ | 28,928 | | 103 % | 34.7 % |

(1)  See Annex B for a reconciliation to the most comparable GAAP metric

123.    Indeed, the Individual Defendants would not have hit their "target" of $810 million of adjusted EBITDA for fiscal 2022 but for the substantial forward buying in 2022. As a result, the 2022 Proxy stated that Defendant Douglas received $1,784,744, Defendant Howard received $765,446, and Defendant Testa received $918,535 in annual incentive compensation. These amounts account for more than half of these executives' cash compensation for annual performance in fiscal 2022, *i.e.*, excluding the long-term equity awards are intended to "motivate[] out executives to focus on **multi-year** operational performance and increasing shareholder value."[8]

### 4.    Defendants Knowingly Issued Fiscal 2023 Guidance Despite Knowing About The Lack Of Real-Time Visibility

124.    By their own admission, the Individual Defendants lacked a reasonable basis to issue a fiscal forecast. During the 2Q23 Earnings Call, Defendants Douglas and Howard stated that their legacy infrastructure did not provide sufficient visibility into the Company's benefits "to fully understand and forecast these profitability drivers." Defendant Douglas stated that "[a]t the time, we did not have full visibility and sufficient detail into the commercial drivers of the benefits due to legacy issues with digital infrastructure limiting real-time data, which is required to fully understand and forecast these profitability drivers." Similarly, Defendant Howard stated that "[t]he

---

[8]  Specifically, for fiscal 2022, Defendant Douglas received $2,814,552, Defendant Howard received $1,427,946, and Defendant Testa received $1,773,535. Testa also received a $675,000 bonus as a retention payment for his "important internal and external relationships" during the Company's CEO search and transition process.

state of our legacy data management and infrastructure . . . severely limited our ability to fully assess and forecast the impact of these dynamics, both last year and this year."

125.    The Individual Defendants knew of these limitations for at least six months, which is before the December 7, 2022 earnings release providing a financial outlook for fiscal 2023. Defendant Douglas stated during the 2Q23 Earnings Call that it "has become increasingly clear to [him] in the last 18 months since [he] joined UNFI that we need more scalable and streamlined capabilities and attendant cost structures." He stated that, as a result, Defendants had "been building a plan for the last six month to take advantage of the opportunity to finish the integrations of past acquisitions . . . and in the middle of that is an opportunity to get much more effective, a granular and real-time analysis, which would have really helped in this situation." The transformation plan was approved by the Board in 2Q23.

126.    That the Individual Defendants recognized they needed to improve their data systems to understand their profitability measures is an admission that they did not know that material factors impacting prior quarters' financial performance would continue. Therefore, the Individual Defendants lacked a reasonable basis to believe that forward buying would continue and at the same degree, yet they knowingly  issued fiscal 2023 guidance that assumed it would.

## VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A.    1Q22 Results

127.    On December 8, 2021, Defendants issued a press release announcing the Company's 1Q22 financial results. The press release stated:

*First Quarter Fiscal 2022 Highlights (comparisons to first quarter fiscal 2021)*

• Net sales of $7.0 billion, an increase of 4.7% (+10.7% on a two-year stack basis)

• Net income of $76 million, an increase of $77 million

- Adjusted EBITDA of $189 million, an increase of 18.9%

- Earnings per diluted share (EPS) of $1.25

- Adjusted EPS of $0.97, an increase of 90.2%

- Company affirms fiscal 2022 full-year outlook

\*        \*        \*

Net sales increased 4.7% in the first quarter of fiscal 2022 compared to the same period last year *primarily driven by inflation* and new business from both existing and new customers, including the benefit of cross selling, partially offset by supply chain challenges and expected modest market contraction.

\*        \*        \*

Gross margin rate in the first quarter of fiscal 2022 was 14.89% of net sales compared to 14.51% of net sales for the first quarter of fiscal 2021. The increase in gross margin rate was driven by improvements in the Wholesale segment margin rate, *including the impact of inflation and the Company's ValuePath initiative*.

\*        \*        \*

**Operating income** in the first quarter of fiscal 2022 was $107 million and included $3 million of restructuring, acquisition and integration related expenses. When excluding this item, operating income in the first quarter of fiscal 2022 was $110 million, or 1.57% of net sales. Operating income in the first quarter of fiscal 2021 was $50 million and included $16 million of restructuring, acquisition and integration related expenses. When excluding the restructuring, acquisition and integration expenses, operating income in the first quarter of fiscal 2021 was $66 million, or 0.99% of net sales. The increase in adjusted operating income, as a percent of net sales, was primarily driven by a higher gross margin rate and leveraging fixed operating and administrative expenses.

\*        \*        \*

**Adjusted EBITDA** for the first quarter of fiscal 2022 was $189 million compared to $159 million for the first quarter of fiscal 2021. The increase primarily reflects the items discussed in operating income.

128.    The statements identified in ¶127 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) there was a substantial increase in the number and magnitude of supplier price increases that presented forward buying opportunities; (ii) UNFI intentionally engaged in

"strategic" forward buying ahead of substantial (in both the number and magnitude of) known supplier price increases to inflate its profitability measures; (iii) UNFI's gross profit and adjusted EBITDA from 1Q22 to 1Q23 benefited "significantly" from forward buying in advance of known price increases; (iv) these "significant" benefits created the misleading impression that the Company was successfully weathering a difficult macroeconomic environment; (v) these "significant" benefits from forward buying masked the extent to which Company's profitability was being negatively impacted by other problems; and (vi) there was a risk that the atypical increase in forward buying opportunities would decrease (or return to normal levels) if/when inflation subsides.

129.    Also on December 8, 2021, the Company held a conference call in connection with the 1Q22 financial results (the "1Q22 Earnings Call"), during which Defendant Howard explained, in relevant part, that inflation was expected to continue but its impact on sales would be offset by continued supply challenges:

> First quarter gross margin rate increased 38 basis points compared to last year's first quarter. Our wholesale margin rate was impacted by this quarter's elevated inflation as well as the **continued benefits from our ValuePath initiatives**.
>
> *        *        *
>
> Let's turn to our outlook for fiscal 2022. We are reaffirming our full year outlook for net sales, which we continue to expect to be in the range of $27.8 billion to $28.3 billion. ***Our outlook for adjusted EBITDA remains unchanged with a range of $760 to $790 million. And finally, our outlook for adjusted EPS is also unchanged and expected to finish between $3.90 and $4.20 per share.*** We now believe that inflation will be above the 1% level we provided on our last call but that more prolonged challenges across the supply chain will offset potential sales impacts. Our base measure of inflation is the increase to our landed cost of goods, which was approximately 4% for the quarter. However, we believe the inflation impact to our net sales, as Chris discussed, was approximately 2.5% to 3% when we factor in changes in consumer buying habits, including mix shifts in certain fresh categories. Although our sales were impacted by inflation, there are offsets in our P&L that include a higher LIFO charge and an increase in certain operating expenses.

130.    The statements identified in ¶129 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶128. Additionally, the above statements were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the Company's reported earnings (including gross profit, gross margin, and adjusted EBITDA) only met or exceeded initial expectations because of a sudden and substantial increase in "strategic forward buying" opportunities; and (ii) absent the "significant benefits from procurement gains," UNFI's adjusted EBITDA would not have grown as much and may have actually declined from the prior year.

131.    Also on the 1Q22 Earnings Call, Defendant Testa elaborated, in relevant part, that the Company was working with suppliers to offset inflation-related price hikes by increasing promotional activity:

> Regarding inflation. We saw inflation impact our wholesale net sales by 2.5% to 3%, net of volume and mix changes. Due to the cost-plus nature of the majority of our pricing agreements, inflation is typically a positive driver of top line revenue and margin gains. For Q1, our growth can be looked at as roughly half coming from new business wins, net of expected market contraction, and half coming from inflation. At least for the next several months, we don't see inflation easing. ***Our procurement and merchandising teams are working closely with our suppliers to offset some of these price hikes with increased promotional activity to help our customers manage through this period.***

132.    The statements identified in ¶131 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶128.

133.    During the 1Q22 Earnings Call, Defendant Testa explained that the second quarter of the Company's fiscal year is typically the "highest inventory build" due to the holidays, and this year was no different. Specifically, he stated in response to an analyst question:

Analyst: More so than normal, it sounds like customers ordered early for the holidays and maybe expanded their inventories. So I guess how big of a benefit was that? Or how abnormal was that inventory load relative to other periods? And does it reverse out here in later in 2Q? Do their inventories come back down at your customers?

Testa: . . . I think you're talking about for the November and Thanksgiving season and the December season. So this is always – this quarter, Q2 that we're in right now, always represents our highest inventory build because of the inventory – sorry, because of the holidays. ***So it's in line with what we've seen for prior years. Nothing dramatically lower, nothing dramatically bigger.***

As far as the order early, I mean, we started talking about Thanksgiving in July. And that was just to work really closely with our customers and our suppliers to make sure we had those high-demand items on their shelves. So we feel pretty good about our performance in Thanksgiving. There's always opportunities to do better, and we're focused on the December holidays right now.

134.    The statements identified in ¶133 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶128.

135.    During the 1Q22 Earnings Call, Defendant Testa stated that he expected increased benefits from promotional activity, but Defendants were currently experiencing "product availability issues." Specifically, in response to an analyst question:

Analyst: Yes. So I would like to dig a little bit more, maybe just a question for Chris, into the promotional environment. Obviously, the manufacturers are taking prices up aggressively, looks like they might even need another round due to higher costs. So traditionally, that's been a good profit center for you as they increase their promotional discount rates during promotional periods. So has that kicked in fully yet here, Chris? Or do you still expect increased benefits going forward on that?

Testa: So I will say that it has not kicked in fully. And although we are getting those promotions, to your point, that behavior is staying consistent. And what's preventing it from fully kicking in is the product supply, right? So I mean if you think about promotions, promotions are based on transactions and number of transactions. And when you have less SKUs, when you're on allocation, when you're not launching new product, those transaction levels are lower. The promotions are there, the programs are there, ***but I would -- to your question directly about fully kicking in, no, I don't think it has. I think there's been some headwinds because of the product availability issues that we're having.***

136. The statements identified in ¶135 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶128.

137. On December 8, 2021, after the market closed, Defendants filed the Company's quarterly report for first quarter 2022 (the "1Q22 10-Q"). Therein, the Company described its adjusted EBITDA for its Wholesale division, in relevant part:

*Adjusted EBITDA*

Wholesale's Adjusted EBITDA increased 33.3% for the first quarter of fiscal 2022 as compared to the first quarter of fiscal 2021. ***The increase was driven by gross margin rate expansion, partially offset by a slight increase in operating expenses. Wholesale's gross profit dollar growth for the first quarter of fiscal 2022 was $82 million with a gross profit rate increase of approximately 68 basis points primarily driven by margin rate expansion from the benefits of inflation and the Company's ValuePath initiative.*** Wholesale's operating expense increased $41 million, which excludes depreciation and amortization, stock-based compensation and other adjustments as outlined in Note 14—Business Segments. Wholesale's operating expense rate increased 17 basis points driven by higher transportation expenses and the temporary, voluntary closure of a distribution center and the investment in distribution center labor to better support our customers, partially offset by lower year-over-year distribution center start-up and consolidation costs in fiscal 2021. Wholesale's depreciation expense decreased $7 million compared to last year.

138. The statements identified in ¶137 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶128. Additionally, the above statements were materially false and misleading and omitted material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the Company's reported earnings (including gross profit, gross margin, and adjusted EBITDA) only met or exceeded initial expectations because of a sudden and substantial increase in "strategic forward buying" opportunities; and (ii) absent the "significant benefits from procurement gains," UNFI's adjusted EBITDA would not have grown as much and may have actually declined from the prior year.

139.    The 1Q22 10-Q further described the impact of inflation on the Company as follows:

**Impact of Inflation**

We experienced a mix of inflation across product categories during the first quarter of fiscal 2022. In the aggregate across our businesses, including the mix of products, management estimates our business experienced cost inflation of approximately four percent in the first quarter of fiscal 2022. Cost inflation estimates are based on individual like items sold during the periods being compared. Changes in merchandising, customer buying habits and competitive pressures create inherent difficulties in measuring the impact of inflation on Net sales and Gross profit. Absent any changes in units sold or the mix of units sold, inflation generally has the effect of increasing sales. Under the last-in, first out ("LIFO") method of inventory accounting, product cost increases are recognized within Cost of sales based on expected year-end inventory quantities and costs, which has the effect of decreasing Gross profit and the carrying value of inventory during periods of inflation.

140.    The statements identified in ¶139 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶128.

141.    The 1Q22 10-Q purported to warn that the Company's financial results "could differ materially from those anticipated" due to factors such as "moderated supplier promotional activity, ***including decreased forward buying opportunities***."

142.    The statements identified in ¶141 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶128. The above statements were materially false and misleading because the risk warning was stale and the risk had materially changed and even materialized. Specifically, (i) there had been an unusual and substantial increase in both the number and magnitude of forward buying opportunities; (ii) UNFI's profitability was substantially inflated by Defendants' "strategic" forward buying in advance of known price increases; and (iii) the risk was that UNFI could not

47

continue to maintain its inflated profitability if the atypically high number of forward buying opportunities was to return to a normalized level or decreased because supplier cost increases slowed.

      **B.**    **2Q22 Results**

      143.    On March 9, 2022, Defendants issued a press release announcing UNFI's second quarter 2022 financial results that stated, in relevant part:

> **<u>Second Quarter Fiscal 2022 Highlights (comparisons to second quarter fiscal 2021)</u>**
>
> - **Net sales of $7.4 billion, an increase of 7.5% (+14.6% on a two-year stack basis)**
>
> - **Net income of $66 million, an increase of 11.9%**
>
> - **Adjusted EBITDA of $201 million, a decrease of 2.4%**
>
> *    *    *
>
> **<u>Second Quarter Fiscal 2022 Summary</u>**
>
> **Net sales** increased 7.5% in the second quarter of fiscal 2022 compared to the same period last year, primarily driven by inflation and new business from both existing and new customers, including the benefit of cross selling, partially offset by supply chain challenges and modest market contraction.
>
> **Gross margin rate** in the second quarter of fiscal 2022 was 14.50% of net sales compared to 14.42% of net sales for the second quarter of fiscal 2021. ***The increase in gross margin rate was driven by improvements in the Wholesale segment margin rate, including the impact of inflation and the Company's ValuePath initiative, partially offset by changes in customer mix and a higher LIFO charge.*** Retail gross margin rate increased modestly compared to last year.

      144.    The statements identified in ¶143 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) there was a substantial increase in the number and magnitude of supplier price increases that presented forward buying opportunities; (ii) UNFI intentionally engaged in "strategic" forward buying ahead of substantial (in both the number and magnitude of) known

supplier price increases to inflate its profitability measures; (iii) UNFI's gross profit and adjusted EBITDA from 1Q22 to 1Q23 benefited "significantly" from forward buying in advance of known price increases; (iv) these "significant" benefits created the misleading impression that the Company was successfully weathering a difficult macroeconomic environment; (v) these "significant" benefits from forward buying masked the extent to which Company's profitability was being negatively impacted by other problems; and (vi) there was a risk that the atypical increase in forward buying opportunities would decrease (or return to normal levels) if/when inflation subsides.

145.    Also on March 9, 2022, the Company held a conference call in connection with the second quarter 2022 financial results (the "2Q22 Earnings Call"). Therein, Defendant Howard explained that the Company's margin rate was favorably impacted by inflation, stating in relevant part:

> Second quarter gross margin rate increased 8 basis points compared to last year's second quarter. ***Our wholesale margin rate was again favorably impacted by our elevated level of cost inflation, as our business model and customer contracts generally pass through product cost inflation***, which leads to both revenue and margin gains. The continued benefits from our transformational Value Path initiatives also contributed to our gross margin expansion in the quarter, which was partly offset by a higher noncash LIFO charge.

146.    The statements identified in ¶145 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶144. Additionally, the above statements were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the Company's reported earnings (including gross profit, gross margin, and adjusted EBITDA) only met or exceeded initial expectations because of a sudden and substantial increase in "strategic forward buying" opportunities; and (ii) absent the "significant

benefits from procurement gains," UNFI's adjusted EBITDA would not have grown as much and may have actually declined from the prior year.

147.    During the 2Q22 Earnings Call, Defendant Howard also increased UNFI's net sales guidance based in part on the belief that inflation will remain elevated:

> Given our performance year-to-date, our momentum with new and existing customers, and ***our belief that inflation will remain at elevated levels, we are increasing our full year expectation for net sales*** to a new range of $28.2 billion to $28.7 billion, a $400 million increase to the top and bottom end of the range. Due to the unpredictable operating environment and a potential for further operating investments to service our customers, ***we're not changing the ranges for adjusted EBITDA, which remains at $760 million to $790 million, or for adjusted EPS, which remains at $3.90 to $4.20 per share.***

148.    The statements identified in ¶147 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶144. Additionally, the above statements were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the UNFI's guidance was premised on the continuation of "strategic" forward buying; and (ii) the guidance lacked a reasonable basis and Defendants were aware of and/or had possession of facts that tended to seriously undermine the accuracy of the Company's outlook.

149.    Also on the 2Q22 Earnings Call, an analyst asked about fill rates and whether "that at all [could] be a benefit to your cross-selling initiative as other suppliers deal with fill rate challenges? And does that maybe open up the doors for you in terms of cross-selling and items that maybe you have better in stock?" Defendant Testa replied:

> Yes, it's a great question. The short answer is yes, and I'll point to an example, and that's our brands group. Our brands portfolio does over $1 billion at wholesale. In other words, it's a very large portfolio. And our fill rates on our brands are at 500 to 1,000 bps better than the national brands. So when we anticipate, or we see a

long-term out-of-stock SKU, we quickly try to pivot the customer to SKU that is in -- higher in stock, and in many cases, that is our brands business.

**So look, it's a difficult environment. And the winners in this environment are the ones that can navigate quickly. And we have a sales team and a merchandising team and our procurement team that's doing that. We've had to change our behavior to be quick and nimble to secure high-demand SKUs. And again, this is where having a very big team that is in constant daily contact with suppliers helps a lot.**

150.    The statements identified in ¶149 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶144.

151.    Also on March 9, 2022, after the market closed, Defendants filed the Company's quarterly report on Form 10-Q for second quarter 2022 (the "2Q22 10-Q"), which described the impact of inflation on UNFI as follows:

**Impact of Inflation**

We experienced a mix of inflation across product categories during the second quarter of fiscal 2022. In the aggregate across our businesses, including the mix of products, management estimates our business experienced cost inflation of approximately five percent in the second quarter of fiscal 2022. Cost inflation estimates are based on individual like items sold during the periods being compared. Changes in merchandising, customer buying habits and competitive pressures create inherent difficulties in measuring the impact of inflation on Net sales and Gross profit. Absent any changes in units sold or the mix of units sold, inflation generally has the effect of increasing sales. Under the last-in, first out ("LIFO") method of inventory accounting, product cost increases are recognized within Cost of sales based on expected year-end inventory quantities and costs, which has the effect of decreasing Gross profit and the carrying value of inventory during periods of inflation.

152.    The statements identified in ¶151 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶144. Additionally, the above statements were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that, separate and apart from the inflationary environment, Defendants had

intentionally engaged in "strategic" forward buying ahead of substantial (in number and magnitude) known supplier price increases.

153.    The 2Q22 10-Q further stated, regarding cost of sales and gross profit:

Our gross profit increased $80 million, or 8.0%, to $1,075 million for the second quarter of fiscal 2022, from $995 million for the second quarter of fiscal 2021. Our gross profit as a percentage of net sales increased to 14.50% for the second quarter of fiscal 2022 compared to 14.42% for the second quarter of fiscal 2021. The *increase in gross profit rate was primarily driven by improvements in the Wholesale segment margin rate, including the impact of inflation and the Company's ValuePath initiative*, partially offset by changes in customer mix and a higher LIFO charge. Retail gross margin rate increased modestly compared to last year.

Our gross profit increased $152 million, or 7.7%, to $2,117 million for fiscal 2022 year-to-date, from $1,965 million for fiscal 2021 year-to-date. Our gross profit as a percentage of net sales increased to 14.69% for fiscal 2022 year-to-date compared to 14.47% for fiscal 2021 year-to-date. The increase *in gross profit rate was driven by improvements in the Wholesale segment margin rate, including the impact of inflation and the Company's ValuePath initiative*, partially offset by changes in customer mix and a higher LIFO charge. Retail gross margin rate declined modestly compared to last year.

154.    The statements identified in ¶153 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶144. Additionally, the above statements were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the Company's reported earnings (including gross profit, gross margin, and adjusted EBITDA) only met or exceeded initial expectations because of a sudden and substantial increase in "strategic forward buying" opportunities; and (ii) absent the "significant benefits from procurement gains," UNFI's adjusted EBITDA would not have grown as much and may have actually declined from the prior year.

155.    The 2Q22 10-Q purported to warn that the Company's financial results "could differ materially from those anticipated" due to factors such as "moderated supplier promotional activity, ***including decreased forward buying opportunities***."

156.    The statements identified in ¶155 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶144. The above statements were materially false and misleading because the risk warning was stale and the risk had materially changed and even materialized. Specifically, (i) there had been an unusual and substantial increase in both the number and magnitude of forward buying opportunities; (ii) UNFI's profitability was substantially inflated by Defendants' "strategic" forward buying in advance of known price increases; and (iii) the risk was that UNFI could not continue to maintain its inflated profitability if the atypically high number of forward buying opportunities was to return to a normalized level or decreased because supplier cost increases slowed.

## C.    3Q22 Results

157.    On June 7, 2022, Defendants issued a press release announcing the Company's third quarter 2022 financial results, stating in relevant part:

### Third Quarter Fiscal 2022 Highlights (comparisons to third quarter fiscal 2021)

- Net sales of $7.2 billion, an increase of 9.2%

- Net income of $67 million, an increase of 39.6%

- Earnings per diluted share (EPS) of $1.10, an increase of 37.5%

- Revises definitions of Adjusted EBITDA and Adjusted EPS to exclude the non-cash LIFO charge or benefit

- Adjusted EBITDA of $196 million, an increase of 5.9%

- Adjusted EPS of $1.10, an increase of 10.0%

- Updates full-year outlook for Net sales, Net income, EPS, Adjusted EBITDA and Adjusted EPS

\*      \*      \*

### Third Quarter Fiscal 2022 Summary

**Net sales** increased 9.2% in the third quarter of fiscal 2022 compared to the same period last year, primarily driven by inflation and new business from both existing and new customers, including the benefit of cross selling, partially offset by supply chain challenges and modest market contraction.

**Gross margin rate** in the third quarter of fiscal 2022 was 14.0% of net sales and included a $72 million, or 1.0% of net sales, LIFO charge. Excluding this non-cash charge, gross margin rate was 15.0% of net sales. Gross margin rate in the third quarter of fiscal 2021 was 14.6% of net sales and included a $5 million, or 0.1% of net sales, LIFO charge. Excluding this non-cash charge, gross margin rate in the third quarter of fiscal 2021 was 14.7% of net sales. ***The increase in gross margin rate, excluding the LIFO charge, was driven by improvements in the Wholesale segment margin rate, including the impact of inflation and the Company's ValuePath initiative***, partially offset by changes in customer mix.

\*      \*      \*

**Operating expenses** in the third quarter of fiscal 2022 were $969 million, or 13.4% of net sales, compared to $868 million, or 13.1% of net sales, in the third quarter of fiscal 2021. The increase in operating expenses as a percent of net sales resulted from continued investments in servicing our customers, which led to higher transportation and distribution center labor costs in this year's third quarter, and occupancy-related inflation, which were partially offset by leveraging fixed costs and benefits of the Company's ValuePath initiative.

\*      \*      \*

**Adjusted EBITDA** for the third quarter of fiscal 2022 was $196 million compared to $185 million for the third quarter of fiscal 2021. The increase primarily reflects the items discussed above under gross margin rate and operating expenses.

158.    The statements identified in ¶157 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) there was a substantial increase in the number and magnitude of supplier price increases that presented forward buying opportunities; (ii) UNFI intentionally engaged in "strategic" forward buying ahead of substantial (in both the number and magnitude of) known

supplier price increases to inflate its profitability measures; (iii) UNFI's gross profit and adjusted EBITDA from 1Q22 to 1Q23 benefited "significantly" from forward buying in advance of known price increases; (iv) these "significant" benefits created the misleading impression that the Company was successfully weathering a difficult macroeconomic environment; (v) these "significant" benefits from forward buying masked the extent to which Company's profitability was being negatively impacted by other problems; and (vi) there was a risk that the atypical increase in forward buying opportunities would decrease (or return to normal levels) if/when inflation subsides.

159. Also on June 7, 2022, the Company held a conference call in connection with its 3Q22 financial results (the "3Q22 Earnings Call"), during which Defendant Howard stated: "adjusted EBITDA for the third quarter totaled $196 million, a 5.9% increase compared to the $185 million in last year's third quarter when computed on the same basis."

160. The statements identified in ¶159 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶158. Additionally, the above statements were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the Company's reported earnings (including gross profit, gross margin, and adjusted EBITDA) only met or exceeded initial expectations because of a sudden and substantial increase in "strategic forward buying" opportunities; and (ii) absent the "significant benefits from procurement gains," UNFI's adjusted EBITDA would not have grown as much and may have actually declined from the prior year.

161. Also on the 3Q22 Earnings Call, Defendant Douglas responded to an analyst's question asking about the impact of inflation, replying:

Obviously, inflation continues to be elevated, and it's a complicated topic through the P&L that drives topline and margin, but it has a negative impact on sales less (inaudible). It's really a direct result of continuing fill rates. And then you've got the whole dynamic with promotions. ***Our focus is really on how we can help out customers through it and help them stay competitive by working to ensure that they have the most possible lead time on price increases***. And then specifically through the summer, working with our suppliers to give our customers good sharp promotional price points, particularly in key value items I'd also mention owned products. Chris mentioned, the consumer energy around own brands and our focus on providing the best possible offer there. And then finally as it relates to any margin that's moving around, we have our Value Path initiative, which the company fielded to yield a gross margin of $70 million to $100 million of savings by 2023, so that we can make it all work as the different parts of the external environment move around.

162.    The statements identified in ¶161 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶158.

163.    During the 3Q22 Earnings Call, an analyst inquired about how Defendants expected deflation would affect the Company's margins, and Defendant Douglas replied that they would take "approximately the same" actions in "virtually every scenario. Specifically:

Analyst: [A]nother follow-up on inflation. I know there's a ton of variability, but if you plan out your business, how are you now expecting for these kinds of elevated rates to last? And then if we do start to a year from now, we see deflation, how much of an impact could that have on your margin structure?

.Douglas: Yes. ***We spend 100% of our billable hours looking at how we can get better for our customers*** and very little at playing amateur economist. They certainly are elevated right now, and we don't see a real change. Having said that, as you would expect, ***we scenario plan multiple potential scenarios, and interestingly enough, the actions that we would take in virtually every scenario are approximately the same***. We have to make sure that we're showing up for our customers and buying right and keeping them competitive. We have to work hard on our execution so that we're a partner of choice. And then we've got to keep our cost structure tight so that we stay agile in the face of whatever the scenario. And that's been our focus as we prepare for next year. And I think we'll be in strong shape regardless of the scenario.

164.    The statements identified in ¶163 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons

discussed in ¶158. Additionally, the above statements were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the UNFI's guidance was premised on the continuation of "strategic" forward buying; and (ii) the guidance lacked a reasonable basis and Defendants were aware of and/or had possession of facts that tended to seriously undermine the accuracy of the Company's outlook.

165.    During the 3Q22 Earnings Call, Defendants were asked to expound on the factors affecting the Company's profitability measures, and Defendants Douglas and Testa cited supply chain investments and additional expenses that UNFI had not incurred in the prior year period. Specifically:

> Analyst: [C]an you also just expand on the factors driving the EBITDA margin rate decline there? You mentioned some of these investments, but can you help unpack that between gross margin, SG&A? Were these planned or how reactionary were these 2 – the need to maybe do some more promotions?

> Douglas: Yes. No, I think, in general, one of our KPIs is to expand EBITDA margin, and we expect to do that and have actually year-to-date. In the quarter, we invested in the supply chain as we continue to make sure that we're giving our customers the best possible service in what continues to be a pretty dynamic operating environment and the operating margin contraction was really minor. ***That said, we have a number of initiatives through Value Path, and we expect, as we look forward, and there's a little bit of a crystal ball, but our strategy to continue to make our operating expense more efficient should be back on track as we go ahead.***

> Testa: And Sandy [Douglas], if I can build on that a little bit, there were some specific items that we're cycling in '22 that we've talked about before, including that monetization of Riverside, which creates a rent expense, which didn't exist last year. We knew health and wellness expense was going to come back on us in '22 as more people are going back for medical procedures. And we've been open about the Save A Lot transaction that service fee that we were providing them for the past 5 years that also ended in FY '22.

166.    The statements identified in ¶165 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons

discussed in ¶158. Additionally, the above statements were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the Company's reported earnings (including gross profit, gross margin, and adjusted EBITDA) only met or exceeded initial expectations because of a sudden and substantial increase in "strategic forward buying" opportunities; and (ii) absent the "significant benefits from procurement gains," UNFI's adjusted EBITDA would not have grown as much and may have actually declined from the prior year.

167.    During the 3Q22 Earnings Call, Defendant Douglas emphasized that the company's volume growth has "been fairly consistent for the past couple of quarters." Specifically:

> Analyst: And maybe a quick follow-up. You talked about volume up 2.5%, right, which would include new customers. Is there any way to tell on a comp basis what volume or cases are doing? And is it possible if inflation stays elevated that volume could be, I don't know, flat to down on a comp basis? And I guess as long as drop sizes up, that would really impact the economics right off the drop.

> Douglas: Yes. We're not going to talk on a forward basis about that, John. But what I would say is, ***I think our volume growth has stayed pretty consistent through the second and third quarter that we just reported.*** And our focus, as I mentioned, around inflation is to work really hard with suppliers to give our customers the right kind of merchandising opportunities and price points to support their unit volume as they compete. So we'll continue to watch that and report out each quarter, but it's been fairly consistent for the past couple of quarters.

168.    The statements identified in ¶167 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶158.

169.    Also on June 7, 2022, after the market closed, Defendants filed the Company's quarterly report on Form 10-Q for the third quarter 2022 (the "3Q22 10-Q"), describing the impact of inflation as follows:

**Impact of Inflation**

We experienced a mix of inflation across product categories during the third quarter of fiscal 2022. In the aggregate across our businesses, including the mix of products, management estimates our business experienced cost inflation of approximately seven percent in the third quarter of fiscal 2022. Cost inflation estimates are based on individual like items sold during the periods being compared. ***Changes in merchandising, customer buying habits and competitive pressures create inherent difficulties in measuring the impact of inflation on Net sales and Gross profit. Absent any changes in units sold or the mix of units sold, inflation generally has the effect of increasing sales.*** Under the last-in, first out ("LIFO") method of inventory accounting, product cost increases are recognized within Cost of sales based on expected year-end inventory quantities and costs, which has the effect of decreasing Gross profit and the carrying value of inventory during periods of inflation.

***Our pricing to our customers is determined at the time of sale primarily based on the then prevailing vendor listed base cost, and include discounts we offer to our customers. Generally in an inflationary environment as a wholesaler, rising vendor costs result in higher Net sales driven by higher vendor prices when other variables such as quantities sold and vendor promotions are constant.***

170.    The statements identified in ¶169 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶158. Additionally, "when other variables such as quantities sold and vendor promotions are constant" was materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that, separate and apart from the inflationary environment, Defendants had intentionally engaged in "strategic" forward buying ahead of substantial (in number and magnitude) known supplier price increases.

171.    As to its profitability measures, the Company stated in the 3Q22 10-Q, in relevant part:

Our gross profit increased $42 million, or 4.3%, to $1,012 million for the third quarter of fiscal 2022, from $970 million for the third quarter of fiscal 2021. Our gross profit as a percentage of net sales decreased to 14.0% for the third quarter of fiscal 2022 compared to 14.6% for the third quarter of fiscal 2021. The LIFO charge was $72 million and $5 million in the third quarter of fiscal 2022 and 2021, respectively. Excluding the non-cash LIFO charge, gross margin rate was 15.0% of net sales and 14.7% of net sales for the third quarter of fiscal 2022 and 2021, respectively. ***The increase in gross margin rate, excluding the LIFO charge, was driven by improvements in the Wholesale segment margin rate, including the***

*impact of inflation and the Company's ValuePath initiative*, partially offset by changes in customer mix.

Our gross profit increased $194 million, or 6.6%, to $3,129 million for fiscal 2022 year-to-date, from $2,935 million for fiscal 2021 year-to-date. Our gross profit as a percentage of net sales decreased to 14.4% for fiscal 2022 year-to-date compared to 14.5% for fiscal 2021 year-to-date. The LIFO charge was $102 million and $19 million for fiscal 2022 year-to-date and for fiscal 2021 year-to-date, respectively. Excluding the non-cash LIFO charge, gross margin rate was 14.9% of net sales and 14.6% of net sales for fiscal 2022 year-to-date and fiscal 2021 year-to-date, respectively. *The increase in gross margin rate, excluding the LIFO charge, was driven by improvements in the Wholesale segment margin rate, including the impact of inflation and the Company's ValuePath initiative*, partially offset by changes in customer mix.

*    *    *

*Wholesale's Adjusted EBITDA increased 3.0% for the third quarter of fiscal 2022 as compared to the third quarter of fiscal 2021*. The increase was driven by gross profit expansion excluding the LIFO charge, in excess of higher operating costs. *Wholesale's gross profit increase excluding the LIFO charge for the third quarter of fiscal 2022 was $105 million with a gross profit rate increase of approximately 41 basis points primarily driven by margin rate expansion from the benefits of inflation and the Company's ValuePath initiative*, which was partially offset by changes in customer mix. Wholesale's operating expense increased $101 million, which excludes depreciation and amortization, share-based compensation and other adjustments as outlined in Note 14—Business Segments. Wholesale's operating expense rate increased 58 basis points driven by the decision to invest in higher transportation expenses and distribution center labor to better support our customers in this year's third quarter, partially offset by leveraging fixed expenses. Wholesale's depreciation expense increased $6 million compared to last year.

172.    The statements identified in ¶171 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶158. Additionally, the above statements were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the Company's reported earnings (including gross profit, gross margin, and adjusted EBITDA) only met or exceeded initial expectations because of a sudden and substantial increase in "strategic forward buying" opportunities; and (ii) absent the "significant

60

benefits from procurement gains," UNFI's adjusted EBITDA would not have grown as much and may have actually declined from the prior year.

173. The 3Q22 10-Q purported to warn that the Company's financial results "could differ materially from those anticipated" due to factors such as "moderated supplier promotional activity, *__including decreased forward buying opportunities__*."

174. The statements identified in ¶173 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶158. The above statements were materially false and misleading because the risk warning was stale and the risk had materially changed and even materialized. Specifically, (i) there had been an unusual and substantial increase in both the number and magnitude of forward buying opportunities; (ii) UNFI's profitability was substantially inflated by Defendants' "strategic" forward buying in advance of known price increases; and (iii) the risk was that UNFI could not continue to maintain its inflated profitability if the atypically high number of forward buying opportunities was to return to a normalized level or decreased because supplier cost increases slowed.

### D.    4Q22 and Year-End Results

175. On September 27, 2022, Defendants announced UNFI's fourth quarter and full year financial results in a press release (the "4Q22 Press Release"), stating in relevant part:

> **Fiscal 2022 Full Year Highlights**
>
> •**Net sales increased 7.3% to $28.9 billion**
>
> •**Net income increased 66.4% to $248 million; Earnings per diluted share (EPS) increased 64.1% to $4.07**
>
> •**Adjusted EBITDA increased 7.7% to $829 million**
>
> •**Adjusted EPS increased 15.6% to $4.83**

•**Net debt reduction of $174 million; adjusted EBITDA leverage ratio finished year under 2.6x**

**Fourth Quarter Fiscal 2022 Highlights**

•**Net sales increased 8.0% to $7.3 billion**

•**Net income decreased 9.3% to $39 million; EPS decreased 8.7% to $0.63**

•**Adjusted EBITDA increased 3.4% to $213 million**

•**Adjusted EPS increased 1.6% to $1.27**

*      *      *

**Net sales** increased 8.0% in the fourth quarter of fiscal 2022 compared to the same period last year, primarily driven by inflation and new business from both existing and new customers, including the benefit of cross selling, partially offset by supply chain challenges and reduced unit sales growth.

**Gross margin rate** in the fourth quarter of fiscal 2022 was 14.5% of net sales and included a $56 million LIFO charge. Excluding this non-cash charge, gross margin rate was 15.2% of net sales. Gross margin rate in the fourth quarter of fiscal 2021 was 14.9% of net sales and included a $5 million LIFO charge. Excluding this non-cash charge, gross margin rate in the fourth quarter of fiscal 2021 was 15.0% of net sales. The increase in gross margin rate, excluding the LIFO charge, was driven by improvements in the Wholesale segment margin rate, including the impact of inflation and the Company's efficiency initiatives, partially offset by changes in customer mix.

176.    The statements identified in ¶175 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) there was a substantial increase in the number and magnitude of supplier price increases that presented forward buying opportunities; (ii) UNFI intentionally engaged in "strategic" forward buying ahead of substantial (in both the number and magnitude of) known supplier price increases to inflate its profitability measures; (iii) UNFI's gross profit and adjusted EBITDA from 1Q22 to 1Q23 benefited "significantly" from forward buying in advance of known price increases; (iv) these "significant" benefits created the misleading impression that the Company was successfully weathering a difficult macroeconomic environment; (v) these

"significant" benefits from forward buying masked the extent to which Company's profitability was being negatively impacted by other problems; and (vi) there was a risk that the atypical increase in forward buying opportunities would decrease (or return to normal levels) if/when inflation subsides.

177.    The 4Q22 Press Release also provided guidance for fiscal 2023 "[b]ased on [UNFI's] performance in fiscal 2022 and continued momentum in fiscal 2023." Specifically, Defendants stated, in relevant part:

| Fiscal Year Ending July 29, 2023 | | % Growth Over FY22 at Midpoint |
|---|---|---|
| Net sales *($ in billions)* | $29.8 - $30.4 | 4% |
| Net income *($ in millions)* | $247 - $266 | 3% |
| EPS | $3.95 - $4.25 | 1% |
| Adjusted EPS [(2)(3)(4)] | $4.85 - $5.15 | 4% |
| Adjusted EBITDA[(3)] *($ in millions)* | $850 - $880 | 4% |
| Capital Expenditures *($ in millions)* | ~ $350 | 39% |

178.    The statements identified in ¶177 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶176. Additionally, the above statements were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the UNFI's guidance was premised on the continuation of "strategic" forward buying; and (ii) the guidance lacked a reasonable basis and Defendants were aware of and/or had possession of facts that tended to seriously undermine the accuracy of the Company's outlook.

179.    Also on September 27, 2022, the Company held a conference call in connection with the 4Q22 financial results (the "4Q22 Earnings Call"), during which Defendant Douglas stated:

*We broadly exceeded our prior outlook expectations, with adjusted EBITDA and adjusted EPS surpassing their respective midpoints of our outlook*. We broadly exceeded our prior outlook expectations, with adjusted EBITDA and adjusted EPS surpassing their respective midpoints of our outlook. Net leverage also fell slightly more than expected to 102.6x, and we ended the year with approximately $1.7 billion of liquidity.

*We achieved these results despite a challenging industry backdrop. Food and home inflation remains in the double digits, driving consumers to buy fewer items, fuel rates continue to be pressured and labor market tightness persists.* Delivering these results in the face of such a complex environment is a testament to the agility of our team and the strategic value of our business.

180. The statements identified in ¶179 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶176. Additionally, the above statements were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the Company's reported earnings (including gross profit, gross margin, and adjusted EBITDA) only met or exceeded initial expectations because of a sudden and substantial increase in "strategic forward buying" opportunities; and (ii) absent the "significant benefits from procurement gains," UNFI's adjusted EBITDA would not have grown as much and may have actually declined from the prior year.

181. During the 4Q22 Earnings Call, Defendant Howard also claimed that the Company's profitability was improved by inflation and the Value Path initiative. Specifically, he stated in relevant part:

Adjusted EBITDA grew 3.4% compared to the prior year quarter to $213 million, while as expected, our adjusted EBITDA margin fell slightly. Our reported gross margin rate fell about 40 basis points to 14.5% as a result of a higher LIFO impact. A higher gross margin rate before LIFO impact was more than offset by a higher operating expense burden. Our fourth quarter gross margin rate, excluding the LIFO charge from both years, increased by around 20 basis points compared to last year's fourth quarter. *Like last quarter, this growth, excluding LIFO, was driven by the continued impact from inflation and the benefits from our efficiency initiatives.* Our operating expense rate before the impact of pension withdrawal charges in the prior year quarter increased by about 30 basis points compared to last year. This

was primarily driven by continued investments in distribution center and transportation labor to ensure the best service level attainable for our customers as well as higher energy prices. These were partially offset by some leveraging on our fixed costs.

182.    The statements identified in ¶181 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶176.

183.    During the 4Q22 Earnings Call, Defendants were asked about the basis for the Company's fiscal outlook, and Defendant Douglas claimed that UNFI had the "flexibility during the year to provide good returns." In relevant part:

Analyst: I don't think you changed the '24 outlook, right, for either top line or EBITDA, so that sort of implies a step-up – a nice step up in the growth rate in '24 EBITDA growth. Is that a better macro, or the investments start to roll off notably? Or something else?

Douglas: Yes, John. I think *the way to think about our guidance for '23 is that there's a fair amount of market uncertainty out there,* and the way we have developed our guidance is to be pragmatic and *make sure that we have the flexibility during the year to provide good returns,* and at the same time be flexible enough to meet whatever needs our customers have. That was our strategy in '22, and it worked well for us, and we intend to repeat it in '23.

As far as looking out over a multiyear period, it's a dynamic situation. We remain committed to the growth rates that we talked about, and we'll evaluate '24 guidance when we get there. But right now, the way we've laid out our '23 guidance reflects [that] *we're confident we can deliver*, and yet remain flexible to be able to meet the needs of our customers.

184.    The statements identified in ¶183 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶176. Additionally, the above statements were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the UNFI's guidance was premised on the continuation of "strategic" forward buying; and (ii) the guidance lacked a reasonable basis and Defendants were aware of

and/or had possession of facts that tended to seriously undermine the accuracy of the Company's outlook.

185.    Defendant Howard also reiterated that the Company's fiscal 2023 reflected the different "levers within our business." In relevant part:

> Analyst: So taking a step back on the margin guidance for fiscal '23, you're forecasting flat year-over-year margins at the midpoint. Can you just walk us through the different puts and takes in that figure as we think about your assumptions around things like distribution costs, labor mix and other components of your cost structure?

> Howard: Yes. We can talk about it at a high level. The way we think about it, there are a lot of levers. We saw this in FY '22, and I think we're going to see some of this in FY '23, where there's just a lot of levers within our business. ***And when we think about guidance, what we're thinking about is trying to balance inflation, the impact on fuel rates, the labor market, new business wins.*** All of those aspects that we try to bake into our guidance to try to come up with ***a number that we believe is reasonable given the economic backdrop***, particularly given our desire to maintain that flexibility that Sandy mentioned so that we can continue to serve the customer as best as possible.

> So there's a lot of moving pieces buried there, and we've tried to capture it as best we can with the guidance we provided at basically 4% [growth], and that's similar to what we provided at this time last year for FY '22.

186.    The statements identified in ¶185 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶176. Additionally, the above statements were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the UNFI's guidance was premised on the continuation of "strategic" forward buying; and (ii) the guidance lacked a reasonable basis and Defendants were aware of and/or had possession of facts that tended to seriously undermine the accuracy of the Company's outlook.

187.    During the 4Q22 Earnings Call, Defendant Douglas stated that Defendants believed "double-digit inflation is not sustainable" and the Company would rely on promotions to drive units, which was reflected in the guidance. Specifically:

> Analyst: Sandy, I just wanted to go back to the discussion of volume and inflation, and I think you made a comment that the double-digit inflation is driving consumers to buy fewer items. And so just wondering if you think that volume does come back as inflation subsides? I think you commented that you're assuming a modest contraction in volumes in your fiscal '23 outlook. But just how you're seeing that unfold for your customers would be helpful.

> Douglas: Sure, Kelly. You've got -- you laid out the facts that we said correctly. And so now looking into my crystal ball, **what I believe is that continued double-digit inflation is not sustainable.** And as supply chain settles down, there won't be a case for it. Now I don't know when that happens exactly, and I wouldn't want to predict it. But as the situation normalizes in the supply chain, the labor environment and inflation starts to recede, then we'll be dealing with a growth environment where there won't be an accelerating headwind on the value of products.

> **But to drive sales, we would expect suppliers to start to invest in promotions, and promotions will drive units.** That's the whole purpose of them. And that's a healthy thing for suppliers because units represent consumption occasions for brands, and that's the business they're in. It's healthy for our customers because it serves their primary purpose, which is to sell products to their customers. And so how that moderates and what the math will be is dependent on a lot of figures, including the economy. And as I mentioned earlier, our wholesale matrix, which involves new

> customers and new categories. So I wouldn't be able to unpack that for you in a credible way. **But suffice to say, we put all that together and we get to about 4% sales increase for next year or the year we're in now, and we think that's the right guidance given all those factors.**

188.    The statements identified in ¶187 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶176. Additionally, the above statements were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the UNFI's guidance was premised on the continuation of "strategic" forward buying; and (ii) the guidance lacked a reasonable basis and Defendants were aware of

and/or had possession of facts that tended to seriously undermine the accuracy of the Company's outlook.

189.    Also on September 27, 2022, after the market closed, Defendants filed UNFI's annual report on Form 10-K for the period ended July 30, 2022 (the "2022 10-K"). Regarding the impact of inflation, the 2022 10-K stated, in relevant part:

**Impact of Inflation**

We experienced a mix of inflation across product categories during fiscal 2022. In the aggregate across our businesses, including the mix of products, management estimates our businesses experienced product cost inflation of approximately six percent in fiscal 2022. Cost inflation estimates are based on individual like items sold during the periods being compared. Changes in merchandising, customer buying habits and competitive pressures create inherent difficulties in measuring the impact of inflation on Net sales and Gross profit. Absent any changes in units sold or the mix of units sold, inflation generally has the effect of increasing sales. Under the last-in, first out ("LIFO") method of inventory accounting, product cost increases are recognized within Cost of sales based on expected year-end inventory quantities and costs, which has the effect of decreasing Gross profit and the carrying value of inventory during periods of inflation.

***Our pricing to our customers is determined at the time of sale primarily based on the then prevailing vendor listed base cost, and includes discounts we offer to our customers. Generally, in an inflationary environment as a wholesaler, rising vendor costs result in higher Net sales driven by higher vendor prices when other variables such as quantities sold and vendor promotions are constant. In addition, as discussed above, we have experienced higher costs of services from labor, transportation and other services expenses.***

190.    The statements identified in ¶189 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶176. Additionally, "when other variables such as quantities sold and vendor promotions are constant" was materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that, separate and apart from the inflationary environment, Defendants had intentionally engaged in "strategic" forward buying ahead of substantial (in number and magnitude) known supplier price increases.

191.    The 2022 10-K purported to warn that the Company's financial results "could differ materially from those anticipated" due to factors such as "moderated supplier promotional activity, *including decreased forward buying opportunities*."

192.    The statements identified in ¶191 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶176. The above statements were materially false and misleading because the risk warning was stale and the risk had materially changed and even materialized. Specifically, (i) there had been an unusual and substantial increase in both the number and magnitude of forward buying opportunities; (ii) UNFI's profitability was substantially inflated by Defendants' "strategic" forward buying in advance of known price increases; and (iii) the risk was that UNFI could not continue to maintain its inflated profitability if the atypically high number of forward buying opportunities was to return to a normalized level or decreased because supplier cost increases slowed.

**E.    2022 Proxy**

193.    On November 22, 2022, Defendants filed the proxy statement on Schedule 14A (the "2022 Proxy"), stating, in relevant part, "Fiscal 2022 was another strong year for UNFI as we continued to leverage our scale and extensive customer offering to deliver full-year results that were at, or above, our initial expectations."

194.    The 2022 Proxy contained a description of "Key Business Highlights from Fiscal 2022" that falsely stated that in 2022, "Adjusted earnings before interest, taxes, depreciation and amortization (adjusted EBITDA) of $829 million; 7.7% growth from the prior year."

195.    Additionally, the 2022 Proxy represented that the Company's annual adjusted EBITDA of $829 million had exceeded the $810 million "target" tied to the Individual Defendants' performance-based cash compensation.

196.    The above statements were materially false and/or misleading for the same reasons alleged above in ¶¶193-95 and, additionally, because UNFI's proxy statement did not disclose that UNFI only met or exceeded initial expectations because of a sudden and substantial increase in "strategic forward buying" opportunities and that absent the "significant benefits from procurement gains," UNFI's 2022 adjusted EBITDA would not have grown by 7.7% from the prior year and may have actually declined from the prior year. Additionally, the 2022 Proxy was materially false and misleading because it did not disclose that, absent the undisclosed benefit from "strategic" forward buying, the Individual Defendants would not have met their "target" for their 2022 performance-based cash compensation.

**F.    1Q23 Results**

197.    On December 7, 2022, Defendants announced UNFI's first quarter fiscal 2023 results in a press release that stated, in relevant part:

**First Quarter Fiscal 2023 Highlights (comparisons to first quarter fiscal 2022)**

- **Net sales increased 7.6% to $7.5 billion, primarily driven by inflation and new business**

- **Gross profit increased $54 million, or 5.2%, to nearly $1.1 billion; prior to LIFO, gross profit increased 6.1%**

- **Net income decreased 13.2% to $66 million; Earnings per diluted share (EPS) decreased 14.4% to $1.07**

- **Adjusted EBITDA increased 3.5% to $207 million**

- **Adjusted EPS increased 2.7% to $1.13**

*        *        *

**First Quarter Fiscal 2023 Summary**

**Net sales** increased 7.6% in the first quarter of fiscal 2023 compared to the same period last year, primarily driven by inflation and new business. This new business resulted from selling new or expanded categories to existing customers and adding

new customers from our robust pipeline. These increases were partially offset by an expected decrease in unit volume consistent with the overall industry.

**Gross profit** in the first quarter of fiscal 2023 increased $54 million, or 5.2%, compared to the first quarter of fiscal 2022. Excluding the non-cash LIFO charge in both periods, gross profit increased $64 million, or 6.1%. The gross profit rate in the first quarter of fiscal 2023 was 14.6% of net sales and included a $21 million LIFO charge. Excluding this non-cash charge, gross profit rate was 14.8% of net sales. Gross profit rate in the first quarter of fiscal 2022 was 14.9% of net sales and included an $11 million LIFO charge. Excluding this non-cash charge, gross profit rate in the first quarter of fiscal 2022 was 15.0% of net sales. The decrease in gross profit rate, excluding the LIFO charge, was driven by changes in customer mix as we continued to grow sales with larger customers.

\*       \*       \*

***The Company is reaffirming its full-year outlook for fiscal 2023.***

198.    The statements identified in ¶197 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) there was a substantial increase in the number and magnitude of supplier price increases that presented forward buying opportunities; (ii) UNFI intentionally engaged in "strategic" forward buying ahead of substantial (in both the number and magnitude of) known supplier price increases to inflate its profitability measures; (iii) UNFI's gross profit and adjusted EBITDA from 1Q22 to 1Q23 benefited "significantly" from forward buying in advance of known price increases; (iv) these "significant" benefits created the misleading impression that the Company was successfully weathering a difficult macroeconomic environment; (v) these "significant" benefits from forward buying masked the extent to which Company's profitability was being negatively impacted by other problems; and (vi) there was a risk that the atypical increase in forward buying opportunities would decrease (or return to normal levels) if/when inflation subsides.

199.    Also on December 7, 2022, the Company held a conference call in connection with 1Q23 financial results (the "1Q23 Earnings Call"), during which Defendant Douglas stated:

"Importantly, our solid start to the year keeps us on track to deliver our full year guidance provided in September."

200.    The statements identified in ¶199 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶198. Additionally, the above statements were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the UNFI's guidance was premised on the continuation of "strategic" forward buying; and (ii) the guidance lacked a reasonable basis and Defendants were aware of and/or had possession of facts that tended to seriously undermine the accuracy of the Company's outlook.

201.    Also on the 1Q23 Earnings Call, where Defendant Howard stated:

Adjusted EBITDA totaled $207 million, up 3.5% over last year's first quarter. Our gross profit dollars prior to the LIFO charge in both years increased by $64 million over last year's first quarter, and gross profit rate declined to 20 basis points, driven by changes in both wholesale customer and product mix.

202.    The statements identified in ¶201 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶198. Additionally, the above statements were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the Company's reported earnings (including gross profit, gross margin, and adjusted EBITDA) only met or exceeded initial expectations because of a sudden and substantial increase in "strategic forward buying" opportunities; and (ii) absent the "significant benefits from procurement gains," UNFI's adjusted EBITDA would not have grown as much and may have actually declined from the prior year.

203. During the 1Q23 Earnings Call, analysts clarified whether there were unique factors impacting the Company's gross margins, and Defendants assured that the gross profit decline in 1Q23 was "temporary." Specifically:

> Analyst: First, I wanted to start off on gross margins. I saw that they were down a little bit in the quarter. You called out the mix shift to larger customers. Should we think about that pressure kind of persisting throughout the year? Or is there anything specific about this quarter that we should keep in mind?

> Douglas: [E]ffectively, we're focused on driving healthy growth in gross profit dollars. And the reason for that is that we look at every single one of our customer agreements with a disciplined eye for economic returns. A lot of our growth in the first quarter came from some of our bigger customers. But over time, I think you saw that all of our channels grew. *And so there'll be some fluctuation, but I would describe what you saw in the first quarter as minor and just more a function of the temporary growth drivers in our customer file*.

204. The statements identified in ¶203 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶198. Additionally, the above statements were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the UNFI's guidance was premised on the continuation of "strategic" forward buying; and (ii) the guidance lacked a reasonable basis and Defendants were aware of and/or had possession of facts that tended to seriously undermine the accuracy of the Company's outlook.

205. On December 7, 2022, Defendants filed the Company's quarterly report on Form 10-Q for first quarter 2023 (the "1Q23 10-Q") describing the impact of inflation as follows:

**Impact of Product Cost Inflation**

We experienced a mix of inflation across product categories during the first quarter of fiscal 2023. In the aggregate across our businesses, including the mix of products, management estimates our businesses experienced product cost inflation of approximately ten percent in the first quarter of fiscal 2023, as compared to the first quarter of fiscal 2022. Cost inflation estimates are based on individual like items sold during the periods being compared. Changes in merchandising, customer

buying habits and competitive pressures create inherent difficulties in measuring the impact of inflation on Net sales and Gross profit. Absent any changes in units sold or the mix of units sold, inflation generally has the effect of increasing sales. Under the last-in, first out ("LIFO") method of inventory accounting, product cost increases are recognized within Cost of sales based on expected year-end inventory quantities and costs, which has the effect of decreasing Gross profit and the carrying value of inventory during periods of inflation.

Our pricing to our customers is determined at the time of sale primarily based on the then prevailing vendor listed base cost, and includes discounts we offer to our customers. Generally in an inflationary environment as a wholesaler, rising vendor costs result in higher Net sales driven by higher vendor prices when other variables such as quantities sold and vendor promotions are constant.

206.    The statements identified in ¶205 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶198. Additionally, "when other variables such as quantities sold and vendor promotions are constant" was materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that, separate and apart from the inflationary environment, Defendants had intentionally engaged in "strategic" forward buying ahead of substantial (in number and magnitude) known supplier price increases.

207.    The 1Q23 10-Q also stated:

Our gross profit increased $54 million, or 5.2%, to $1,096 million for the first quarter of fiscal 2023, from $1,042 million for the first quarter of fiscal 2022. Our gross profit as a percentage of Net sales decreased to 14.6% for the first quarter of fiscal 2023 compared to 14.9% for the first quarter of fiscal 2022. The LIFO charge was $21 million and $11 million in the first quarter of fiscal 2023 and 2022, respectively. Excluding the non-cash LIFO charge, gross profit rate was 14.8% of Net sales and 15.0% of Net sales for the first quarter of fiscal 2023 and 2022, respectively. The decrease in gross profit rate, excluding the LIFO charge, was driven by changes in customer mix as we continued to grow sales with larger customers.

*    *    *

Wholesale's Adjusted EBITDA decreased 2.3% for the first quarter of fiscal 2023 as compared to the first quarter of fiscal 2022. The decrease was driven by an increase in operating expenses in excess of gross profit growth excluding the LIFO charge. Wholesale's Gross profit increase excluding the LIFO charge for the first

74

quarter of fiscal 2023 was $65 million with a gross profit rate decrease of approximately 4 basis points primarily driven by changes in customer mix. Wholesale's Operating expense increased $69 million, which excludes depreciation and amortization, share-based compensation and other adjustments as outlined in Note 13—Business Segments. Wholesale's operating expense rate increased 18 basis points primarily driven by continued investments in servicing our customers, which led to higher transportation and distribution labor costs in the first quarter of fiscal 2023, and higher occupancy costs. These increases were partially offset by leveraging fixed costs. Wholesale's depreciation and amortization expense increased $3 million compared to the first quarter of fiscal 2022.

208.    The statements identified in ¶207 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶198. Additionally, the above statements were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to disclose that: (i) the Company's reported earnings (including gross profit, gross margin, and adjusted EBITDA) only met or exceeded initial expectations because of a sudden and substantial increase in "strategic forward buying" opportunities; and (ii) absent the "significant benefits from procurement gains," UNFI's adjusted EBITDA would not have grown as much and may have actually declined from the prior year.

209.    The 1Q23 10-Q purported to warn that the Company's financial results "could differ materially from those anticipated" due to factors such as "moderated supplier promotional activity, *__including decreased forward buying opportunities__*."

210.    The statements identified in ¶209 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading for the reasons discussed in ¶198. The above statements were materially false and misleading because the risk warning was stale and the risk had materially changed and even materialized. Specifically, (i) there had been an unusual and substantial increase in both the number and magnitude of forward buying opportunities; (ii) UNFI's profitability was substantially inflated by Defendants' "strategic"

forward buying in advance of known price increases; and (iii) the risk was that UNFI could not continue to maintain its inflated profitability if the atypically high number of forward buying opportunities was to return to a normalized level or decreased because supplier cost increases slowed.

### G.    2Q23 Results

211.    On March 8, 2023, before the market opened, UNFI announced its 2Q23 financial results (the "2Q23 Press Release"), which stated, in relevant part:

**Second Quarter Fiscal 2023 Highlights (comparisons to second quarter fiscal 2022)**

- **Net sales** increased 5.4% to $7.8 billion, primarily driven by inflation and new business

- **Gross profit** decreased $6 million, or 0.6%, to nearly $1.1 billion; prior to LIFO charge, gross profit rose 0.4%

- **Net income** decreased 71.2% to $19 million; Earnings per diluted share (EPS) decreased 71.3% to $0.31

\*        \*        \*

"Our second quarter sales grew over 5% compared to the prior year as more customers bought more categories, private brands, and professional services driving sales to over $7.8 billion," said Sandy Douglas, UNFI's Chief Executive Officer. "While I'm pleased with our continued sales growth, profitability in the quarter was lower than recent levels and our plan. ***Profits were challenged as we did not repeat the significant level of procurement gains from rapidly accelerating inflation and inventory gains, due to supply chain volatility, that we experienced in the second quarter of last year. As a result of these challenges, we are reducing our profitability expectations for fiscal 2023*** and withdrawing our fiscal 2024 targets."

\*        \*        \*

**Second Quarter Fiscal 2023 Summary**

**Net sales** increased 5.4% in the second quarter of fiscal 2023 compared to the same period last year, primarily driven by inflation and new business. This new business resulted from selling new or expanded categories to existing customers and adding

new customers from our robust pipeline. These increases were partially offset by a decrease in units sold.

**Gross profit** in the second quarter of fiscal 2023 was $1.1 billion, a decrease of $6 million, or 0.6%, compared to the second quarter of fiscal 2022. Excluding the non-cash LIFO charge in both periods, gross profit increased $4 million, or 0.4%. The gross profit rate in the second quarter of fiscal 2023 was 13.7% of net sales and included a $29 million LIFO charge. Excluding this non-cash charge, gross profit rate was 14.0% of net sales. Gross profit rate in the second quarter of fiscal 2022 was 14.5% of net sales and included a $19 million LIFO charge. Excluding this non-cash charge, gross profit rate in the second quarter of fiscal 2022 was 14.8% of net sales. ***The decrease in gross profit rate, excluding the LIFO charge, was primarily driven by lower current period procurement gains due to the decelerating rate of inflation and lower inventory gains.***

212.    The statements identified in ¶211 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to fully disclose the extent to which the forward buying practices benefitted the Company's financial results and failed to fully disclose the extent to which the forward buying was masking other problems negatively impacting the Company's profitability.

213.    The 2Q23 Press Release provided a revised outlook for fiscal 2023:

**Fiscal 2023 Outlook** [(1)]

The Company has withdrawn its long-term fiscal year 2024 financial targets and updated its full year outlook to the following:

| Fiscal Year Ending July 29, 2023 | Previous Full Year Outlook | Updated Full Year Outlook | % Change Over FY22 at Midpoint |
|---|---|---|---|
| Net sales *($ in billions)* | $29.8 - $30.4 | $30.1 - $30.5 | 5% |
| Net income *($ in millions)* | $247 - $266 | $90 - $142 | (53)% |
| EPS [(2)] | $3.95 - $4.25 | $1.50 - $2.35 | (53)% |
| Adjusted EPS [(2)(3)(4)] | $4.85 - $5.15 | $3.05 - $3.90 | (28)% |
| Adjusted EBITDA [(4)] *($ in millions)* | $850 - $880 | $715 - $785 | (10)% |
| Capital expenditures *($ in millions)* | ~ $350 | ~ $350 | 39% |

214.    The statements identified in ¶213 were materially false and misleading and omitted to disclose material facts necessary to prevent them from being misleading because they failed to fully factor in the extent UNFI'S prior undisclosed practice of strategic forward buying nor the extent to which this forward buying practices masked other problems negatively impacted the

Company's profitability. Moreover, the guidance lacked a reasonable basis and Defendants were aware of and/or had possession of facts that tended to seriously undermine the accuracy of the Company's outlook.

### H.    Defendants Violated Item 303 of Regulation S-K

215.    Regulation S-K, 17 C.F.R. 229.303 ("Item 303"), obligated Defendants to:

(i)    Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, would be material to an understanding of the registrant's results of operations.

(ii)    Describe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed.

(iii)    If the statement of comprehensive income presents material changes from period to period in net sales or revenue, if applicable, describe the extent to which such changes are attributable to changes in prices or to changes in the volume or amount of goods or services being sold or to the introduction of new products or services.

216.    The Forms 10-Q and 10-K issued for the 2022 fiscal year, as well as 2022 Proxy and 1Q23, were materially false and misleading because they failed to disclose the following infrequent events or transactions and known adverse trends and/or uncertainties that UNFI was required to disclose under Item 303.

217.    First, Defendants failed to disclose both the number and the magnitude of "strategic" and "substantial" undisclosed forward buying opportunities during the Class Period. This was a material trend that Defendants belatedly revealed at the end of the Class Period and was substantial.

218.    The number and the magnitude of strategic forward buying opportunities was information that was known to Defendants during the class period. For example, as Defendant Douglas stated during the 3Q23 Earnings Call, "*Last year, in fiscal '22,* we saw a big upswing in value that we got as inflation took hold and our *inventory was valued lower than the market price, and we strategically forward-[b]ought. And it was a tremendous source of margin expansion.*" Accordingly, Defendants admitted that, during the Class Period, they recognized that his "upswing in value" from strategic forward buying was an unusual and infrequent known trend.

219.    Second, Defendants failed to reveal that these undisclosed "strategic" buying opportunities were increasing or "expanding" UNFI's margins and thus increasing UNFI's earnings. For example, on the 2Q23 Earnings Call, Defendant Howard explained that "*a portion of our gross margin is derived from buying into known price increases*." However, the benefit of this forward buying practice declined, and Defendant Howard reiterated that "[t]he *largest drivers* of this decline in gross profit rate were *lower procurement* and inventory gains, resulting from, among several things, supply chain volatility, and a deceleration in the sequential rate of inflation." While Defendants explained the decline during this 2Q23 Earnings Call, they failed to reveal earlier in the Class Period that such strategic buying was increasing their gross margin, and thus EBITDA and other financials. Accordingly, information about the material impacts of strategic forward buying was an unusual and infrequent known trend.

220.    While Defendants repeatedly emphasized in the March 8, 2023 disclosure that they did not "fully" understand the impact of procurement gains until the Company lapped them, those statements also serve as an admission that they had at least *some* knowledge that strategic forward buying was an unusual and infrequent known trend during the Class Period. Thus, Defendants were obligated to report what they knew about the impact of the procurement gains.

221. Third, Defendants failed to reveal that these strategic forward buying opportunities were due to unique macroeconomic events which were not likely to continue or be repeatable. As Defendant Douglas stated in the 2Q23 Earnings Call, "we did not repeat the level of significant procurement and inventory gains experienced last year. Both of these gains in the previous year came during a time of ***significant industry volatility given the steep acceleration of inflation, continued disruptions in the supply chain and operational complexities***." However, the volatility of the industry, including inflation and disruptions in the supply chain, was well known during the class period. Accordingly, the fact that the procurement and inventory gains were dependent on temporary industry volatility, which was likely to end, was information about an unusual and infrequent known trend that would be material to investors.

## VII. LOSS CAUSATION

222. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

223. The truth regarding the extent of forward buying and the significant impact of procurement gains was partially revealed, and/or the concealed risks materialized, on or about March 8, 2023 and June 7, 2023.

224. On March 8, 2023, before the market opened, Defendants reported a $6 million year-over-year decline in gross profit, despite a 6% increase in net sales, which was "***primarily driven by lower current period procurement gains*** due to the decelerating rate of inflation and lower inventory gains." The Company's profits "were challenged as ***we did not repeat the significant level of procurement gains*** from rapidly accelerating inflation and inventory gains, due to supply chain volatility, ***that we experienced in the second quarter of last year***." On this news, the Company's share price fell $11.49, or 28.1%, to close at $29.47 per share on March 8, 2023, on unusually heavy trading volume.

225.    On June 7, 2023, before the market opened, UNFI revealed that lower procurement gains eroded gross margins even further, reporting that 3Q23 gross profit decreased $12 million due to "lower inflationary benefits ***primarily related to reduced procurement gains***, as well as higher shrink." The Company's gross profit rate declined to 13.3%, which was "primarily driven by the volatile macroeconomic environment, which led to lower inflationary benefits and ***reduced procurement gains.***" As a result of the "pressure" on margins, the Company reduced its fiscal 2023 outlook again. Among others, this further revealed the extent to which UNFI's prior results had been benefited by UNFI's "strategic" forward buying and the extent o which the benefit had masked other problems impacting UNFI's profitability. On this news, the Company's stock price fell $4.11, or 14.9%, to close at $23.46 per share on June 7, 2023, on unusually heavy trading volume. The stock continued to fall the next trading day by $1.56, or 6.6%, to close at $21.90 per share on June 8, 2023.

226.    During the Class Period, Plaintiffs and the Class purchased UNFI's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## VIII.    ADDITIONAL SCIENTER ALLEGATIONS

227.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue

of their receipt of information reflecting the true facts regarding UNFI, their control over, and/or receipt and/or modification of UNFI's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning UNFI, participated in the fraudulent scheme alleged herein.

228.    The Individual Defendants knew or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetuated during the Class Period without the knowledge and complicit or, at least, the reckless disregard of the personnel at the highest level of the Company, including the Individual Defendants.

229.    The fraud alleged herein relating to concealing the positive impact of forward buying and its ability to offset the Company's other challenges involved UNFI's "core operations," and knowledge of the fraud may therefore be imputed to the Individual Defendants.

230.    Similarly, as detailed above, the Individual Defendants had a motive to misstate and omit material facts because, during the Class Period, the extent of forward buying played a substantial role in their ability to adjusted EBITDA targets to receive incentive compensation.

## IX.    CLASS ACTION ALLEGATIONS

231.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired UNFI securities between December 8, 2021 and June 6, 2023, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

232.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, UNFI's shares actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class.  Millions of UNFI shares were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by UNFI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

233.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

234.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

235.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of UNFI; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

236.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.    UNDISCLOSED ADVERSE FACTS

237.    The market for UNFI's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, UNFI's securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired UNFI's securities relying upon the integrity of the market price of the Company's securities and market information relating to UNFI, and have been damaged thereby.

238.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of UNFI's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about UNFI's business, operations, and prospects as alleged herein.

239.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about UNFI's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment

of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE

240.    The market for UNFI's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, UNFI's securities traded at artificially inflated prices during the Class Period.  On December 8, 2021, the Company's share price closed at a Class Period high of $55.61 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of UNFI's securities and market information relating to UNFI, and have been damaged thereby.

241.    During the Class Period, the artificial inflation of UNFI's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about UNFI's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of UNFI and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

242.    At all relevant times, the market for UNFI's securities was an efficient market for the following reasons, among others:

(a)    UNFI shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, UNFI filed periodic public reports with the SEC and/or the NYSE;

(c)    UNFI regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    UNFI was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

243.    As a result of the foregoing, the market for UNFI's securities promptly digested current information regarding UNFI from all publicly available sources and reflected such information in UNFI's share price. Under these circumstances, all purchasers of UNFI's securities during the Class Period suffered similar injury through their purchase of UNFI's securities at artificially inflated prices and a presumption of reliance applies.

244.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse

information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII.  NO SAFE HARBOR

245.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of UNFI who knew that the statement was false when made.

## XIII.   CLAIMS FOR RELIEF

### FIRST CLAIM

**Violation of Section 10(b) of The Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All Defendants**

246.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

247.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase UNFI's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

248.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for UNFI's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

249.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about UNFI's financial well-being and prospects, as specified herein.

250.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of UNFI's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about UNFI and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

251.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

252.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing UNFI's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

253.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of UNFI's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired UNFI's securities during the Class Period at artificially high prices and were damaged thereby.

254.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that UNFI was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their UNFI securities, or,

if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

255.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

256.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

257.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

258.    Individual Defendants acted as controlling persons of UNFI within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

259.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

260.    As set forth above, UNFI and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## XV.    JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: August 15, 2023                 By:  */s/ Gregory B. Linkh*
                                       **GLANCY PRONGAY & MURRAY LLP**
                                       Gregory B. Linkh (GL-0477)
                                       230 Park Ave., Suite 358
                                       New York, NY 10169
                                       Telephone: (212) 682-5340
                                       Facsimile: (212) 884-0988
                                       glinkh@glancylaw.com

                                       Robert V. Prongay
                                       Casey E. Sadler
                                       Pavithra Rajesh
                                       Chase Stern
                                       1925 Century Park East, Suite 2100
                                       Los Angeles, CA 90067
                                       Telephone: (310) 201-9150
                                       Facsimile: (310) 201-9160

                                       *Counsel for Plaintiffs*

                                       **LAW OFFICES OF HOWARD G. SMITH**
                                       Howard G. Smith
                                       3070 Bristol Pike, Suite 112
                                       Bensalem PA 19020
                                       Telephone: (215) 638-4847
                                       Facsimile: (215) 638-4867

                                       **THE LAW OFFICES OF FRANK R. CRUZ**
                                       Frank R. Cruz
                                       1999 Avenue of the Stars, Suite 1100
                                       Los Angeles, CA 90067
                                       Telephone: (310) 914-5007

                                       *Additional Counsel*

## **PROOF OF SERVICE**

I hereby certify that on this 15th day of August, 2023, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*s/ Gregory B. Linkh*
Gregory B. Linkh