**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

---

DAN SILLS *and* GEORGE DICK, *individually
and on behalf of all others similarly situated,*

        Plaintiffs,

  vs.

UNITED NATURAL FOODS, INC., J.
ALEXANDER MILLER DOUGLAS, JOHN W.
HOWARD, *and* CHRISTOPHER P. TESTA,

        Defendants.

No. 1:23-cv-02364-JGLC

---

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION ...............................................................................................................1

BACKGROUND ...............................................................................................................5

      A.     UNFI And Its Business. ...............................................................................5

      B.     Inflation, Forward Buying, And Margin. .....................................................6

      C.     UNFI Reports Positive Financial Results Throughout Fiscal Year 2022 And Q1 2023, Repeatedly Noting The Impact Of Inflation On Its Business. ..............................................................................................9

      D.     UNFI Announces Negative Financial Results In Q2 And Q3 Of 2023, And Issues Revised Earnings Guidance. .........................................11

      E.     Plaintiffs' Claims. ....................................................................................14

ARGUMENT ...................................................................................................................14

I.     PLAINTIFFS FAIL TO ALLEGE PARTICULARIZED FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER. .........................................15

      A.     Plaintiffs' Allegations Regarding Incentive Compensation Do Not Establish A Strong Inference Of Scienter. ..................................................18

      B.     Plaintiffs' Allegations Regarding "Access To Information" Do Not Establish A Strong Inference Of Scienter. ..................................................19

      C.     The Core Operations Doctrine Is Insufficient To Establish Scienter And Does Not Apply In Any Event. ...........................................................23

      D.     Plaintiffs Fail To Plead That Any Defendant Acted With Conscious Recklessness. ........................................................................24

II.    PLAINTIFFS HAVE FAILED TO PLEAD ANY ACTIONABLE MISSTATEMENT. ..................................................................................................27

      A.     Plaintiffs Fail To Plead A False Or Misleading Statement. ......................28

      B.     UNFI's Forward-Looking Statements Are Not Actionable. ......................33

      C.     Generic Statements Are Not Actionable. ..................................................36

      D.     UNFI Did Not Violate Item 303 Of Regulation S-K. ...............................38

III.    THE COMPLAINT DOES NOT STATE A CLAIM FOR CONTROL
        PERSON LIABILITY UNDER SECTION 20(A). ...............................................39

CONCLUSION................................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995)......................................................................................................26

*In re Adient plc Sec. Litig.*,
  2020 WL 1644018, at \*20 (S.D.N.Y. Apr. 2, 2020)..............................................................36

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)......................................................................................................5

*Avon Pension Fund v. GlaxoSmithKline PLC*,
  343 F. App'x 671 (2d Cir. 2009) ...........................................................................................16

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
  980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).......................32

*In re Barrick Gold Corp. Sec. Litig.*,
  341 F. Supp. 3d 358 (S.D.N.Y. 2018)................................................................................22, 36

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)................................................................................................................28

*City of Birmingham Fireman's & Policeman's Supplemental Pension Sys. v.
  Ryanair Holdings PLC*,
  2020 WL 2834857 (S.D.N.Y. June 1, 2020) .....................................................................15, 23

*City of Omaha Civ. Emps.' Ret. Sys. v. CBS Corp.*,
  679 F.3d 64 (2d Cir. 2012)......................................................................................................25

*In re Diebold Nixdorf, Inc. Sec. Litig.*,
  2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) .......................................................................38

*ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009).....................................................................................................14

*In re FBR Inc. Sec. Litig.*,
  544 F. Supp. 2d 346 (S.D.N.Y. 2008)......................................................................................36

*In re Federated Dep't Stores, Inc. Sec. Litig.*,
  2004 WL 444559 (S.D.N.Y. Mar. 11, 2004) .........................................................................24

*Fogel v. Vega*,
  759 F. App'x 18 (2d Cir. 2018) ..............................................................................................30

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011)............................................................................16

*Gray v. Wesco Aircraft Holdings, Inc.*,
   454 F. Supp. 3d 366 (S.D.N.Y. 2020)......................................................................35, 36

*Hensley v. IEC Elecs. Corp.*,
   2014 WL 4473373 (S.D.N.Y. Sept. 11, 2014)..............................................................24

*In re HEXO Corp. Sec. Litig.*,
   524 F. Supp. 3d 283 (S.D.N.Y. 2021)............................................................18, 20, 25

*Hutchinson v. Perez*,
   2013 WL 1775374 (S.D.N.Y. Apr. 25, 2013), *aff'd sub nom. Jones v. Perez*,
   550 F. App'x 24 (2d Cir. 2013) ....................................................................................26

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016)............................................................................................38

*Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*,
   445 F. App'x 368 (2d Cir. 2011) ..................................................................................22

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001)..........................................................................................19

*Kleinman v. Elan Corp.*,
   706 F.3d 145 (2d Cir. 2013)..........................................................................................33

*Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*,
   724 F. Supp. 2d 447 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011)........................16

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014)......................................................................17, 30

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
   26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015)........................27

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
   518 F. Supp. 3d 772 (S.D.N.Y. 2021)......................................................21, 22, 23

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)........................................................................................................28

*In re MBIA, Inc. Sec. Litig.*,
   700 F. Supp. 2d 566 (S.D.N.Y. 2010)..............................................................................5

*Nandkumar v. AstraZeneca PLC*,
   2023 WL 3477164 (2d Cir. May 16, 2023) ..................................................................18

ii

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
11 F.4th 90 (2d Cir. 2021) ......................................................................................29, 30, 31

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*,
694 F. Supp. 2d 287 (S.D.N.Y. 2010)......................................................................23, 26, 39

*Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*,
2023 WL 3569068 (S.D.N.Y. May 19, 2023) ........................................................................39

*In re Progress Energy, Inc.*,
371 F. Supp. 2d 548 (S.D.N.Y. 2005)....................................................................................32

*Ret. Bd. of Policemen's Annuity & Benefit Fund v. FXCM Inc.*,
767 F. App'x 139 (2d Cir. 2019) ...........................................................................................26

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
573 F.3d 98 (2d Cir. 2009)..............................................................................................18, 25

*Schwab v. E\*Trade Fin. Corp.*,
285 F. Supp. 3d 745 (S.D.N.Y.), *aff'd*, 752 F. App'x 56 (2d Cir. 2018)................................18

*In re Skechers USA, Inc. Sec. Litig.*,
444 F. Supp. 3d 498 (S.D.N.Y. 2020)......................................................................24, 34, 38

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010).............................................................................................34, 35

*Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*,
2022 WL 17587853 (2d Cir. Dec. 13, 2022) ........................................................................30

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015)..............................................................................................28, 38

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
531 F.3d 190 (2d Cir. 2008)....................................................................................................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)....................................................................................................3, 15, 35

*Tyler v. Liz Claiborne, Inc.*,
814 F. Supp. 2d 323 (S.D.N.Y. 2011).....................................................................................24

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016).............................................................................................28, 36

*In re Wachovia Equity Sec. Litig.*,
753 F. Supp. 2d 326 (S.D.N.Y. 2011).....................................................................................20

iii

*Woolgar v. Kingstone Cos.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020)..........................................................................20, 23, 24

**Statutes, Rules & Regulations**

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ..................................14

Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) ............................14, 39

Private Securities Litigation Reform Act of 1995,

    15 U.S.C. § 78u-4 ....................................................................................................................3, 15

    15 U.S.C. § 78u-5 ..................................................................................................................34, 35

17 C.F.R. § 229.303 .......................................................................................................................38

17 C.F.R. § 240.10b-5......................................................................................................................14, 28

Defendants United Natural Foods, Inc. ("UNFI" or the "Company"), J. Alexander Miller Douglas, John W. Howard, and Christopher P. Testa (the "Individual Defendants," and, together with the Company, "Defendants") respectfully submit this Memorandum in Support of Their Motion to Dismiss the Amended Complaint (the "Complaint" or "AC").

## INTRODUCTION

UNFI, a large publicly traded wholesale distributor of natural and conventional grocery products, confronted numerous COVID-related economic challenges throughout 2021 and 2022: labor shortages, supply chain volatility, rising inflation, and changing consumer preferences and habits. These challenges were compounded because UNFI simultaneously was managing the continued integration of the largest acquisition in its history. One analyst following the Company called it "the most unpredictable operating environment ever," which carried with it "unprecedented forecasting and operational challenges."

Against this backdrop, the Company accurately reported positive financial results throughout late 2021 and 2022. Although inflation raised numerous challenges, it also benefited UNFI. As UNFI worked to manage supply shortages, it bought what inventory it could procure from suppliers. In the meantime, prices continued to increase, and UNFI often was then able to sell the inventory it already procured to retailers at a higher price, resulting in a higher profit margin. The procurement gains resulting from this differential—also called "forward buying"— were made possible by rising inflation triggering repeated price increases.

Throughout this period, UNFI repeatedly and accurately disclosed that its financial performance was benefitting from inflationary gains. It also explicitly warned investors that there was a risk that there may be "moderated supplier promotional activity"—another phenomenon that created forward-buying opportunities, because supplier promotions enabled UNFI to realize procurement gains through purchasing inventory at a lower-than-ordinary cost—and "decreased

forward buying opportunities," and that the "relatively low margins of [its] business" were "sensitive to inflationary and deflationary pressures."

During the second quarter of fiscal year 2023, the rate of inflation dropped and the Company's opportunities for forward buying dried up rapidly. Although the Company had anticipated that the rate of inflation would decline, the Company had not appreciated the degree to which inflationary procurement gains had been driving its margin growth in 2022. Making matters worse, the Company had anticipated that supplier promotions—which had declined during the period of supply chain challenges resulting from the COVID pandemic—would rebound, thereby presenting additional forward-buying opportunities, but they did not bounce back to the degree that the Company had anticipated. These factors together caused the Company's profit margin to contract unexpectedly, which contributed to worse-than-expected financial results for the quarter. The Company announced a $6 million year-over-year decline in gross profit and lowered its previously issued EBITDA guidance by approximately $115 million. This phenomenon continued into the next quarter, and again the Company reported worse-than-expected financial results and lowered its previously issued EBITDA guidance. As UNFI's CFO John Howard explained, UNFI "expected to see [its] year-over-year profit rate decline given the procurement gains [the Company was] cycling from last year," but "relative to our expectations at the end of Q2, the decline was greater than expected, largely due to the impact of the volatile macroeconomic backdrop." After the Company announced earnings on March 8, 2023, and June 7, 2023, the Company's stock price dropped.

Plaintiffs have attempted to spin these developments into an implausible scheme to defraud UNFI's stockholders. They allege that Defendants made a variety of false or misleading statements regarding the Company's profitability during fiscal year 2022 and the first quarter of

2023, which they say artificially inflated the price of UNFI's stock. But they do not allege, nor can they, that any of UNFI's financial results were inaccurate. Rather, they claim that statements regarding the Company's financial results were materially false and misleading because they omitted to disclose additional facts that the securities laws did not require Defendants to disclose: namely, the specific degree and magnitude of forward buying that was occurring, that UNFI's gross profit and adjusted EBITDA benefited significantly from "atypical" forward buying, and that these benefits "masked the extent to which [the] Company's profitability was being negatively impacted by other problems." (*See, e.g.*, AC ¶¶ 5-6, 128.)

Plaintiffs' Complaint, which is subject to the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b), has multiple fatal flaws. *First*, Plaintiffs do not plead particularized facts giving rise to a "strong inference" of an intent to defraud, as the PSLRA requires. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). The Complaint does not allege any internal documents, "confidential witnesses," after-the-fact admissions or regulatory findings, or suspicious stock sales—allegations which themselves repeatedly have been held insufficient to support a strong inference of scienter. Nor does the Complaint contain any cogent or compelling thesis for why any of the Individual Defendants—none of whom sold significant stock holdings in the Company during the putative class period—would deliberately issue incorrect forecasts, only then to suffer significant stock losses themselves. Instead, Plaintiffs rely on generic allegations about incentive-based compensation that apply to all corporate executives at all companies, and which routinely are found by courts in the Second Circuit to be insufficient to establish scienter. Plaintiffs also rely on the generic allegation that Defendants had "access to information" that contradicted the statements Defendants made during the relevant period. But the PSLRA requires

3

particularity with respect to such an allegation, and Plaintiffs do not identify a single specific

contradictory document or piece of information that Defendants knew when they made any

challenged statement. Finally, Plaintiffs claim that Defendants must have known about the

relative impact of forward buying, as opposed to other factors, on the Company's margin rate in

real time, because forward buying had a significant impact on the Company's margin. But this

allegation is conclusory and a *non sequitur*. That Defendants knew forward buying could

increase the Company's margin does not mean they knew its *relative* impact—compared to the

relative impact of other factors—in real time. Indeed, the far more plausible inference is the one

Defendants gave when they announced the financial results for Q2 and Q3 2023: that, due to

extreme volatility during unprecedented times and limited IT analytical capabilities, Defendants

did not understand the relative magnitude of forward buying on the Company's profitability until

the results had changed.

*Second*, the Complaint does not plead that any Defendant made a false or misleading

statement. As the Complaint acknowledges, throughout 2022 and Q1 of 2023, Defendants

accurately explained to the public that the Company's profitability was attributable to inflation as

well as a number of other factors, including incremental volume from new customers, additional

product categories and new store openings, increased item and category penetration with existing

customers, and operational improvements. These statements were factually accurate: inflation is

what allowed the Company to benefit from procurement gains through forward buying, and

Plaintiffs cannot and do not dispute that fact. Instead, the lynchpin of Plaintiffs' theory is that

UNFI failed to disclose the *specific degree* to which forward buying, versus other factors, was

driving the Company's margin. But there was no obligation for UNFI to disclose such

information, particularly where UNFI already disclosed that it was forward buying and already

4

disclosed that changes in the rate of inflation could affect its business. The remaining statements that Plaintiffs challenge likewise are not actionable, because they are forward-looking statements protected by the safe harbor of the PSLRA, or they are generic statements on which no reasonable investor would have relied.

Plaintiffs' theory of fraud is a classic example of alleging fraud by hindsight, brought against a company doing its best to manage through a period of unpredictable and unprecedented challenges. It should be dismissed.

## BACKGROUND

### A.    UNFI And Its Business.

UNFI is the largest publicly traded wholesale distributor of natural, organic, specialty, produce, and conventional grocery and non-food products in North America. (AC ¶ 27.) The Company offers approximately 250,000 products to more than 30,000 unique retail customer locations throughout the United States and Canada. (Ex. 1, 2023 Form 10-K at 1.) The Company's product offerings include national, regional, and private label brands grouped into several categories: grocery and general merchandise; perishables; frozen foods; wellness and personal care items; and bulk and foodservice products. (*Id.*) The Company purchases its products from nearly 11,000 suppliers—the majority of which are based in the United States and Canada. (*Id.* at 5.) It operates 55 distribution centers and warehouses representing approximately 30 million square feet of warehouse space. (*Id.* at 1.)[1]

---

[1] This Court may consider, among other things, "statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 576 (S.D.N.Y. 2010) (taking judicial notice of analyst reports). Copies of relevant documents are attached to the declaration of Francesca Brody.

The Company has two reportable business segments: Wholesale and Retail. (AC ¶ 28.) Wholesale is the Company's largest segment and is the aggregation of its U.S. and Canada wholesale operations, which include distributing and selling grocery and non-food products, as well as providing support services, to retailers. (*Id.* ¶ 29.) Retail includes over 70 Company-operated retail stores and derives revenue from the sale of grocery and non-food products at these stores. (*Id.* ¶ 30.) For fiscal year 2021,[2] Wholesale accounted for more than 95% of UNFI's net sales, with reported net sales of $25.87 billion and adjusted EBITDA of $654 million, whereas Retail accounted for approximately 1% of the Company's net sales, with reported net sales of $2.44 billion and adjusted EBITDA of $96 million. (*Id.* ¶ 32.)

UNFI has grown considerably in the last decade. In particular, in October 2018, UNFI acquired SUPERVALU INC. ("SuperValu"), which was then one of the largest grocery wholesalers and retailers in North America. (*Id.* ¶ 38.) Prior to acquiring SuperValu, UNFI had focused predominantly on distributing natural and organic products. By acquiring SuperValu, which focused on conventional grocery products, UNFI expanded its product offerings and diversified its customer base. (Ex. 2, 2021 Form 10-K at 3.) The acquisition of SuperValu was completed only about 18 months before the COVID pandemic began.

### B.    Inflation, Forward Buying, And Margin.

Throughout late fiscal year 2021 and 2022, the United States economy experienced rapid inflation after years of steady inflation. (AC ¶ 47.) In January 2022, inflation in the United States accelerated to 7.5%, its highest level since February 1982, as a result of soaring energy costs, labor mismatches, and supply disruptions. (McKinsey & Company, "What is inflation?" at p. 3

---

[2] UNFI's fiscal year ends on the Saturday closest to July 31 and contains either 52 or 53 weeks, depending on the year. (AC ¶ 35.)

(August 17, 2022) (cited in AC ¶ 48 n.4); *accord* AC ¶ 48.) Inflation continued to increase to a peak of 9.1% in June 2022.[3]

Inflation had a significant impact on food prices throughout this period. In fact, the rate of food inflation was higher than the general rate of inflation for several months during 2022, including when food inflation peaked at 11.4% in August 2022. (*See id.* ¶ 51.)

A food distributor, like UNFI, may benefit from inflation through "forward buying." (*Id.* ¶ 54.) Forward buying occurs when a company buys units of a product during a particular period, holds some of those units in inventory for a time, and then sells the units during a subsequent period. If the price of a product increases between the time it is procured from the supplier and the time it is sold to a customer, the difference represents additional profit margin. (*See id.* ¶¶ 53-55; *see also* Ex. 2, 2021 Form 10-K at 4 ("The differential between the procured cost … as compared to the net sales price of these products[] generate[s] our gross margin.").)

Forward buying is not unique to UNFI or to the food distribution industry. Many different companies in many different industries forward buy.[4] And there are different ways a company can benefit from forward buying. As noted, acquiring additional inventory before a price increase is one, but a company may also acquire additional inventory at a lower-than-ordinary cost during a sales promotion by the supplier.[5] As long as the differential between the cost at which the company acquired inventory and when it sold that inventory is greater than ordinary, the forward buy can increase the company's margin.

---

[3] *See* TED: The Economics Daily, *available at* https://www.bls.gov/opub/ted/2022/consumer-prices-up-9-1-percent-over-the-year-ended-june-2022-largest-increase-in-40-years.htm.

[4] *See, e.g.*, Preyas S. Desai, Oded Koenigsberg, and DeVarat Purohit, "Forward Buying by Retailers," *Journal of Marketing Research*, volume 47, no. 1 (2010), at pp. 90-102, *available at* https://www0.gsb.columbia.edu/mygsb/faculty/research/pubfiles/3191/Forward_Buying.pdf.

[5] *See id.*

Even before the period of rapid inflation in late 2021 and 2022, UNFI—like many companies—benefited from forward buying, both as a result of sales promotions and supplier price increases. Supplier price increases allow for forward-buying opportunities because UNFI, upon being notified of supplier price increases 60-90 days before they took effect, was generally contractually able to pass through those price increases immediately to retailers—thus resulting in a greater-than-ordinary differential between the price at which UNFI purchased inventory and sold it. (*See* Ex. 3, Q3 2021 Earnings Call Tr. at 12 (noting that UNFI would get notification of supplier price increases typically "60, 90 days in advance"); *id.* at 15 (explaining that UNFI is typically able to "pass through 100% or pretty [] close to 100% of the cost of goods that get pushed to" UNFI, which can be "a source of gross margin" for the Company).)

The COVID-19 pandemic affected UNFI in numerous ways. UNFI, like many food distributors, faced challenges in procuring inventory in order to satisfy high demand from retailers, which were in turn responding to unprecedented levels of demand from their customers (*i.e.*, the end users—those buying products at grocery stores). For example, UNFI's President, Christopher Testa, explained that, although UNFI was "encouraged by the growth [it was] experiencing," the Company "continue[d] to be constrained by deteriorating fill rates caused primarily from upstream supply chain challenges."[6] (Ex. 4, Q2 2022 Earnings Call Tr. at 6.) "Deteriorating fill rates were driven by high demand[,] the impact of [O]micron on the availability of freight and labor[,] … as well as continuing raw materials and packaging shortages." (*Id*.)

Against this backdrop of supply chain volatility and "product availability issues" (*see* AC ¶ 135), inflation skyrocketed, which caused two offsetting changes. First, suppliers repeatedly

---

[6] A "fill rate" refers to the percentage of customer orders that can be fulfilled by available stock.

increased the prices of their products, and many of these increases were larger than usual. (*See* Ex. 5, Q2 2023 Earnings Call Tr. at 13 (explaining that "the accumulation of all the price increases that [had] happened in the last 12 months" was significantly higher than in Q2 2023).) In cases where UNFI was able to pass the price increases onto their customers, this change provided an inflationary gain. (*See* Ex. 3, Q3 2021 Earnings Call Tr. at 5 (explaining that "inflation [had] historically been a positive tailwind to [UNFI's] wholesale business as [its] contracts generally allow UNFI to pass through manufacturer cost increases").) Second, because demand for grocery products was so high in the post-COVID environment, many suppliers cut back on the number and magnitude of sales promotions they offered to their customers.[7]

### C. UNFI Reports Positive Financial Results Throughout Fiscal Year 2022 And Q1 2023, Repeatedly Noting The Impact Of Inflation On Its Business.

Throughout fiscal year 2022, UNFI reported positive financial results and specifically attributed those results in part to the positive impact of inflation. For example, on December 8, 2021, the Company announced its first quarter 2022 financial results in a press release, reporting net sales of $7.0 billion and net income of $76 million. (AC ¶ 62; Ex. 6, Q1 2022 Earnings Press Release at 1.) This constituted a 4.7% increase in net sales from the prior year period, and was "primarily *driven by inflation* and new business from both existing and new customers, … partially offset by supply chain challenges and expected modest contraction." (Ex. 6, Q1 2022 Earnings Press Release at 2 (emphasis added).) The Company also stated that gross margin rate improved from 14.51% to 14.89%, an increase "driven by improvements in the Wholesale

---

[7] *See* Nick Carey, Richa Naidu, and Siddharth Cavale, "Coffee, Ketchup and Nike Air Max: It's the COVID Consumer Economy," *Reuters* (Sept. 1, 2020) (explaining that retailers had "cut[] back on promotions" for in-demand products, while "[r]ising demand … as well as global supply-chain disruptions" had "driven up prices"), *available at* https://www.reuters.com/article/us-health-coronavirus-consumer-pricing-i-idCAKBN25S4SB.

segment margin rate, including *the impact of inflation* and the Company's ValuePath initiative."[8] (*Id.* at 2 (emphasis added).)

UNFI reported similar results for each quarter in 2022—each time attributing the increases in part to the impact of inflation. (*See* Ex. 8, Q2 2022 Earnings Press Release at 2-3 (net sales increase "driven by inflation" and other factors; gross margin rate increase driven, in part, by "the impact of inflation"); Ex. 9, Q3 2022 Earnings Press Release at 2 (same); Ex. 10, Q4 2022 Earnings Press Release at 2 (same); *accord* AC ¶¶ 64-67.) In Q1 of 2023, although gross profit rate decreased slightly (from 14.8% to 14.6%), UNFI again reported an increase in net sales, and again attributed the increase in part to inflation. (*See* Ex. 11, Q1 2023 Earnings Press Release at 2; *accord* AC ¶ 69.)

Throughout this entire period, the Company included robust public disclosures about the impact of inflation on its business. In addition to the statements from the earnings press releases discussed above, UNFI repeatedly disclosed in its annual and quarterly financial reports that the Company experienced "a mix of inflation across product categories," that "[c]hanges in merchandising, customer buying habits and competitive pressures create inherent difficulties in measuring the impact of inflation on Net sales and Gross profit," and that "[a]bsent any changes in units sold or the mix of units sold, inflation generally has the effect of increasing sales." (*See, e.g.*, Ex. 12, Q1 2022 Form 10-Q at 28; Ex. 13, 2022 Form 10-K at 30.) The Company also explicitly warned investors that its business was characterized by "relatively low margins" that "are sensitive to inflationary and deflationary pressures." (*See, e.g.*, Ex. 12, Q1 2022 Form 10-Q at 25; Ex. 13, 2022 Form 10-K at 27.) It also specifically warned investors of the risk that there

---

[8] "Value Path" was a set of initiatives announced in December 2020 designed to "position UNFI for future sales growth and margin expansion." (Ex. 7, Q1 2021 Earnings Call Tr. at 5.) The initiatives included planned improvements across several areas in the Company. (*Id.* at 11.)

may be "moderated supplier promotional activity" and "decreased forward buying opportunities" in the future. (*See, e.g.*, Ex. 12, Q1 2022 Form 10-Q at 25; Ex. 13, 2022 Form 10-K at 28.)

Given these robust disclosures, it is no surprise that the market understood that the Company's profitability was benefiting from inflationary gains caused by forward buying. For example, in September 2021, even before the alleged class period began, Northcoast Research issued a report noting that in "the current selling environment UNFI should continue to benefit from … higher food inflation, presenting the company with forward buying opportunities." (Ex. 14, Northcoast Research September 24, 2021 Rpt. at 1.) Similarly, in October 2021, the same analyst commented on "the potential for forward buying opportunities" for UNFI. (Ex. 15, Northcoast Research October 5, 2021 Rpt. at 3.) In March 2022, during the class period, Wells Fargo stated that "[i]nflation has clearly also provided a benefit given the structure of [UNFI's] contracts with customers and ability to forward buy," and also noted that "eventual disinflation is likely to be a headwind to earnings." (Ex. 16, Wells Fargo March 17, 2022 Rpt. at 3.) In June 2022, Guggenheim observed that "[w]ith respect to profitability, we believe inflation benefits—pricing and forward buys—could drive modest gross/EBITDA margin upside." (Ex. 17, Guggenheim June 20, 2022 Rpt. at 1.) And in July 2022, UBS commented that "[i]nflation can help support sales [and] UNFI can preserve its gross margin by forward buying." (Ex. 18, UBS July 13, 2022 Rpt. at 1; *see also* Ex. 19, UBS June 7, 2022 Rpt. at 1 (UNFI's "ability to forward buy … should allow for it to grow its [gross margin]").)

**D.    UNFI Announces Negative Financial Results In Q2 And Q3 Of 2023, And Issues Revised Earnings Guidance.**

During the second quarter of fiscal year 2023, inflation decelerated, and the Company announced worse-than-expected financial results for the period. Specifically, on March 8, 2023, UNFI reported a $6 million year-over-year decline in gross profit. (AC ¶ 71; Ex. 20, Q2 2023

11

Earnings Press Release at 1.) The Company explained that the gross profit rate declined from 14.5% in the prior-year period to 13.7% in Q2 2023. (AC ¶ 71.) The Company also lowered its previously issued EBITDA guidance by approximately $115 million. (*Id.*)

During the earnings call, UNFI CEO "Sandy" Douglas explained the negative result:

> Our reduced profitability this quarter was primarily driven by a lower gross profit rate, as we did not repeat the level of significant procurement and inventory gains experienced last year. … While we expected inflation to decline [and] the supply chain to continue to normalize[, w]e did not fully appreciate the benefit to last year's gross profit from buying inventory in advance of supplier price increases in the sequentially rising inflationary environment. We now realize the magnitude of these benefits last year, which are not repeatable in the current environment.

(Ex. 5, March 8, 2023 Earnings Call Tr. at 4.) Mr. Douglas further explained that UNFI "did not have full visibility and sufficient detail into the commercial drivers of the benefits due to legacy issues with digital infrastructure limiting real-time data which is required to fully understand and forecast these [] drivers." (*Id.*) UNFI's CFO John Howard agreed, highlighting that lower-than-expected promotional activity from suppliers also contributed to the result:

> Like other food distribution companies, a portion of our gross margin is derived from buying into known price increases. The quantity and amount of these increases decreased year-over-year which provided less opportunity to improve gross profit rates. … [T]he state of our legacy data management and infrastructure … severely limited our ability to fully assess and forecast the impact of these dynamics, both last year and this year. Additionally and importantly, we did not benefit from increased supply or promotions that could have offset some of what we experienced.

(*Id.* at 6.)

Analysts reacted to the news, noting that "an IT-oriented lack of real-time data visibility was the primary culprit—it was difficult to track the precise amount of profit, especially in a rapidly-escalating inflationary backdrop." (Ex. 21, Guggenheim March 12, 2023 Rpt. at 1; *see also* Ex. 22, BTIG March 8, 2023 Rpt. at 1 ("Forward buying during outsized inflation this time

12

last year inflated gross profit, which the company's antiquated systems failed to fully identify."); Ex. 23, BMO March 8, 2023 Rpt. at 1 ("We see the challenges stemming from a lack of internal analytical capabilities, exasperated by running on five different [IT] systems.").) And UNFI was not the only company that experienced this phenomenon. Analysts also noted that one of UNFI's peer companies, SpartanNash, "call[ed] out a similar dynamic [with respect to forward buying] in its guidance two weeks [earlier]." (Ex. 22, BTIG March 8, 2023 Rpt. at 1; *see also* Ex. 23, BMO March 8, 2023 Rpt. at 1 (SPTN also "had its share of inventory gain comparisons").)

On June 7, 2023, UNFI reported a $12 million year-over-year decline in gross profit for Q3 2023. (AC ¶ 90; Ex. 24, Q3 2023 Earnings Press Release at 1.) The Company explained that this additional decline in gross profit rate was "primarily driven by the volatile macroeconomic environment, which led to lower inflationary benefits and reduced procurement gains," as well as "higher levels of shrink and costs related to operational improvements." (Ex. 24, Q3 2023 Earnings Press Release at 2.) The Company reduced its previously issued EBITDA guidance again. (AC ¶ 90.) During the earnings call, Mr. Howard explained that UNFI had "expected to see [its] year-over-year profit rate decline given the procurement gains [the Company had been] cycling from last year," but "relative to our expectations at the end of Q2, the decline was greater than anticipated, largely due to the impact of the volatile macroeconomic backdrop." (Ex. 25, Q3 2023 Earnings Call Tr. at 7.)

Analysts reacted to the news, highlighting the unique challenges facing UNFI:

> Simply put, integrating the largest acquisition in its history during the most unpredictable operating environment ever has created unprecedented forecasting and operational challenges. This was made more difficult by the fact that [SuperValu] was integrating several acquisitions of its own. UNFI is operating with seven separate IT platforms and a still relatively new consolidated operating structure. Reduced visibility into real-time changes in the business has prevented proactive mitigation actions.

13

(Ex. 26, Guggenheim June 25, 2023 Rpt. at 2.)

After the Company reported its financial results for Q2 and Q3 2023, its stock price dropped. (AC ¶¶ 8, 12.)

### E.    Plaintiffs' Claims.

Plaintiffs argue that, despite the unprecedented volatility of the macroeconomic environment and all of the substantial information already disclosed regarding the impact of inflation as well as the specific warnings the Company offered about the risk of decreased forward-buying opportunities in the future, Defendants must have known the relative impact of forward buying, as opposed to other factors, on the Company's margin throughout 2022 and Q1 2023, and should have disclosed the precise extent to which the Company's profitability was being driven by the inflationary gains from forward buying during this period. (*See, e.g.*, AC ¶ 128.) They bring claims against all Defendants for a violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, alleging that they made false or misleading statements about the Company's financial performance, and against the Individual Defendants under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), for "control person liability," alleging that they exercised control over the content and dissemination of the allegedly false and misleading statements. Plaintiffs seek to represent a class of those who acquired UNFI securities between December 8, 2021, when the Company released its financial results for Q1 2022, and June 6, 2023, when the Company released its financial results for Q3 2023.

### ARGUMENT

To state a claim for securities fraud, Plaintiffs must allege, among other things, (1) a false or misleading statement, and (2) scienter on the part of the person making the misstatement. *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir.

14

2009). On a motion to dismiss, the Complaint must be assessed by reference to both the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and also the requirements of the PSLRA, 15 U.S.C. § 78u-4(b). *Tellabs*, 551 U.S. at 319-21.

As to falsity, the complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *Id.* at 321 (quoting 15 U.S.C. § 78u-4(b)(1)).

As to scienter, Plaintiffs must adequately allege that the alleged misstatements were made with "'a mental state embracing intent to deceive, manipulate, or defraud.'" *Id.* at 319 (citation omitted). The PSLRA requires Plaintiffs to "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). This is a demanding standard. "To qualify as 'strong' … an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. This is an "inherently comparative" inquiry, and "the court must take into account plausible opposing inferences." *Id.* at 323. Plaintiffs' allegations are sufficient "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference." *Id.* at 324. And Plaintiffs must plead particularized facts supporting a strong inference with regard to each defendant and each statement. *City of Birmingham Fireman's & Policeman's Supplemental Pension Sys. v. Ryanair Holdings PLC*, 2020 WL 2834857, at *4 (S.D.N.Y. June 1, 2020).

I.    **PLAINTIFFS FAIL TO ALLEGE PARTICULARIZED FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER.**

Plaintiffs allege that Defendants knowingly concealed the impact of forward buying on the Company's profitability and, in turn, knew that the Company's financial results as reported

15

throughout 2022 were misleading. The Complaint falls far short of pleading particularized facts giving rise to a strong inference of scienter on the part of any Defendant.

As an initial matter, despite its length, the Complaint is notable for what it does *not* allege. For instance, although plaintiffs seeking to plead a claim for securities fraud often rely on the account of so-called "confidential witnesses" to meet the steep burden of pleading scienter, the Complaint identifies no first-hand source regarding Defendants' purported "knowledge."[9] Nor does it describe non-public internal information reviewed by the Individual Defendants that contradicted the financial results that the Company publicly reported.[10] Plaintiffs also do not allege that the Company or its outside independent auditor determined that it was necessary to restate the Company's financial results, as would be required if the Company's financial statements were materially false or misleading. And Plaintiffs do not allege any adverse regulatory or criminal findings against the Company, or any admissions made by Defendants in other proceedings, or any allegedly suspicious stock sales made by the Individual Defendants, that could serve as a basis for Plaintiffs' scienter allegations. In fact, between the Company's announcements of its Q2 2023 and Q3 2023 financial results, Defendant Douglas *purchased* over $1 million in stock (*see* Ex. 27, SEC Form 4 (March 24, 2023 purchase))—a purchase that undermines any inference of intent to defraud. *See, e.g.*, *Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009) (stock purchases "during the relevant period signals only confidence in the future" of the company and is inconsistent with fraudulent intent).

---

[9] "Confidential witness" allegations are themselves frequently held to be insufficient to allege a strong inference of scienter. *See, e.g.*, *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 594-95 (S.D.N.Y. 2011) (allegations from four confidential witnesses insufficient to establish scienter); *Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 459-63 (S.D.N.Y. 2010) (allegations from twelve confidential witnesses insufficient), *aff'd*, 430 F. App'x 63 (2d Cir. 2011).

[10] *See, e.g.*, *Loc. No. 38*, 724 F. Supp. 2d at 462 (allegations regarding "credit and performance data" compiled and reported by risk management system "insufficient to establish scienter").

16

Unable to set forth these sorts of allegations (which themselves have frequently been found to be insufficient), Plaintiffs resort instead to three types of conclusory allegations: (1) that the Individual Defendants had an alleged motive to hide the impact of forward buying on earnings because doing so increased their annual bonuses; (2) that Defendants purportedly had "access to information" suggesting that their public statements were not accurate; and (3) the "core operations doctrine," pursuant to which Plaintiffs argue that Defendants must have been aware of the impact of forward buying on UNFI's earnings given the size of the effect. Perhaps recognizing that none of these allegations come close to satisfying their burden, Plaintiffs also make a halfhearted attempt to plead scienter by alleging that Defendants "recklessly" issued financial forecasts that lacked a reasonable basis.

As discussed below, Plaintiffs' allegations do not come close to establishing scienter under the PSLRA. They also defy common sense: the notion that senior management of UNFI deliberately would have issued incorrect financial forecasts—causing the price of UNFI's stock, of which the Individual Defendants are significant holders,[11] to decline substantially, and causing bonuses not to be paid for any executives in 2023 (*see* p. 19 n.13, *infra*)—is far less likely than the countervailing, innocent inference that the Individual Defendants, consistent with their public statements, did not have prior insight into the magnitude of the impact that forward buying had on the Company's margin in 2022, causing its forecast to be incorrect in 2023 when inflation decelerated. Because Plaintiffs have failed to plead facts establishing a strong inference of scienter for any Defendant,[12] their claim must be dismissed.

---

[11] *See* Ex. 27, Form 4 for Douglas; Ex. 28, Form 4 for Howard; Ex. 29, Form 4 for Testa. Howard and Testa sold some stock during the alleged class period, but only pursuant to Rule 10b5-1 trading plans, which does "not give rise to a strong inference of scienter." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 585 (S.D.N.Y. 2014).

[12] To allege scienter against a corporation, Plaintiffs must either allege "facts that give rise to a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter" or establish that this is one of the "exceedingly rare instances" in which a statement is "so dramatic that collective corporate scienter may

17

### A.    Plaintiffs' Allegations Regarding Incentive Compensation Do Not Establish A Strong Inference Of Scienter.

Plaintiffs argue that the Individual Defendants had a motive to hide the impact of forward buying on earnings because doing so increased their annual bonuses. (AC ¶¶ 122-23, 230.) Courts in the Second Circuit routinely hold that such allegations are insufficient:

> To raise a strong inference of scienter through motive and opportunity to defraud, a plaintiff must allege that the defendants benefitted in some concrete and personal way from the purported fraud. However, motives … common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute "motive" for purposes of this inquiry.

*Schwab v. E*Trade Fin. Corp.*, 285 F. Supp. 3d 745, 756 (S.D.N.Y.), *aff'd*, 752 F. App'x 56 (2d Cir. 2018) (cleaned up); *see also In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 313 (S.D.N.Y. 2021) ("[I]ncentive-based compensation is typically insufficient to support an inference of scienter.").

Here, Plaintiffs have merely alleged that the Individual Defendants had an incentive to keep UNFI's earnings high. But "the desire to … sustain the appearance of corporate profitability" is a goal "possessed by virtually all corporate insiders," and "it is not sufficient" to allege scienter. *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (citation omitted); *see also Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (plaintiffs' "proffered motive is the same desire to maintain the appearance of profitability that we have consistently rejected as insufficient"). As the Second Circuit has repeatedly explained, "If scienter could be pleaded on [this] basis alone, virtually

---

be inferred." *Nandkumar v. AstraZeneca PLC*, 2023 WL 3477164, at *4 (2d Cir. May 16, 2023) (cleaned up). As explained *infra*, none of the facts to which Plaintiffs point establish scienter on the part of any individuals, nor do Plaintiffs point to any statement that is "so dramatic that collective corporate scienter may be inferred."

every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) (cleaned up).

Plaintiffs' compensation-related allegations also fail because they do not make sense. Plaintiffs allege a scheme that, at most, could inflate UNFI's earnings for the short period when inflation accelerated at an atypical pace, but it would have no long-term benefit and would have risked large stock price drops and earnings misses when inflation inevitably decelerated. As Plaintiffs recognize, each of the Individual Defendants received both yearly bonus compensation *and* long-term stock grants intended to motivate a "focus on *multi-year* operational performance and increasing shareholder value." (AC ¶ 123.) In fact, UNFI's 2022 Proxy shows that the value of the Individual Defendants' long-term equity awards dwarfed the value of their short-term bonuses. (Ex. 30, 2022 Proxy at 38 (showing that CEO Douglas received 59.8% of compensation via long-term equity awards and 24% via short-term bonus; other named executive officers received an average of 52.3% of compensation via long-term equity awards and 23% via short-term bonus).) It is not plausible to conclude that the Individual Defendants, whose compensation was heavily weighted towards stock grants that vested over a period of years, had an incentive to engage in the conduct Plaintiffs allege. [13]

**B.      Plaintiffs' Allegations Regarding "Access To Information" Do Not Establish A Strong Inference Of Scienter.**

Plaintiffs also claim that Defendants had "access to information" that contradicted or "undermined" statements they made. (*See* AC ¶ 78; *accord id.* ¶¶ 24, 148, 164, 178, 184, 186, 188, 200, 204, 214.) These allegations are conclusory and do not establish scienter.

---

[13] Plaintiffs' allegations also do not make sense because Plaintiffs allege a scheme to obtain bonuses for fiscal year 2022, at the expense of fiscal year 2023 bonuses, when inflation decelerated and earnings fell. (*See* Ex. 25, Q3 2023 Earnings Call Tr. at 7 ("We don't expect to pay any employee bonuses this year as projected results are below our threshold targets for fiscal 2023 adjusted EBITDA … .").)

19

To meet the PSLRA's stringent requirements, Plaintiffs cannot, as here, simply point to general information that Defendants might have known at the time they made the allegedly misleading statements:

> Where plaintiffs allege that defendants knew about or had access to contrary facts … they must **specifically identify** the reports or statements containing this information. … Second Circuit cases uniformly rely on allegations that [1] **specific contradictory information** was available to the defendants [2] **at the same time** they made their misleading statements.

*Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 237 (S.D.N.Y. 2020) (cleaned up) (emphases added).

Plaintiffs have not identified any specific, contemporaneous reports or information to which each of the Defendants had access and which rendered Defendants' statements false or misleading, much less explain how the content of any such reports or information contradicted any particular statement. This is fatal. *See, e.g.*, *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 351-52 (S.D.N.Y. 2011) (plaintiffs alleged that defendants "received reports detailing significant and widespread problems," but failed "to adequately identify the particular reports at issue" and failed to explain how information in those reports "contradicted the public declarations" of defendants); *HEXO*, 524 F. Supp. 3d at 314 (Plaintiffs' "abject failure to identify any reports or statements containing adverse facts to which defendants had access at the time the statements … were made is itself fatal to plaintiffs' … claims.").

Plaintiffs attempt to plug this hole in their theory by arguing that "Defendants do not dispute that they had *some* understanding of UNFI's 'strategic forward buying' and its 'substantial' impact." (AC ¶ 103.) But that is a far cry from pleading particularized facts showing a strong inference of scienter with respect to any of the challenged statements here. That Defendants had "some" understanding that the Company was benefiting from forward buying

20

does not mean that they understood—in real time—the relative magnitude of forward buying on the Company's profitability versus other factors, much less that their financial forecasts lacked a reasonable basis at the time they were issued.

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.* shows why the Complaint falls far short of establishing a strong inference of scienter. There, the company had reported strong sales numbers for two consecutive quarters at the beginning of the putative class period. 518 F. Supp. 3d 772, 776 (S.D.N.Y. 2021). Then, in the next quarter, the company abruptly reversed course, announcing a "comparable store sales decrease for the first time in five years." *Id.* One executive attributed the decline to "issues with the company's supply chain and inventory, stating that the company had 'underestimated the impact of [] accelerated new store growth on [its] operations.'" *Id.* at 776-77. Another executive disclosed that "a 'bottleneck issue' had existed in the supply chain 'for most all of Q2 and was corrected basically in the last week of the quarter.'" *Id.* at 777. The plaintiffs, relying in part on testimony from confidential witnesses, alleged that the company's executives had access to facts that undermined their statements because they had access to a specific daily sales report that tracked store sales, they "assessed inventory on a weekly basis," and "the company 'had technology in place to provide real-time information to its senior executive team regarding its inventory.'" *Id.* at 780 (cleaned up).

The court held that these allegations—which are *more specific* than the allegations here—did not establish scienter. The plaintiffs failed to "specify exactly what information was contained in the [daily sales] report or how said information 'contradicted Defendants' public statements[.]'" *Id.* at 781 (citation omitted). "Even if the report did reflect a decline in inventory, it [was] not clear that such a decline would have undermined [the company's] overall sales projections or meant that '[the company's] inventory pipeline and deal flow were not as

21

described.'" *Id.* And the allegations that the executives regularly assessed inventory or had access to real-time data were "too vague to support an inference of scienter." *Id.*; *see also Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*, 445 F. App'x 368, 370 (2d Cir. 2011) ("vague and general averments" that executives had access to "real-time customer and sales information" insufficient); *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 373 (S.D.N.Y. 2018) ("broad allegations" that defendants had access to "expense and capital cost data" did not support inference of scienter).

Many of Plaintiffs' allegations fall short of even claiming that any Defendant had access to contradictory information. Instead, Plaintiffs allege that Defendants *should have* had access to such information. For example, Plaintiffs allege that in September 2020, UNFI had announced a program to improve its use of "data analytics to drive decision-making and generate these incremental operating efficiencies." (AC ¶ 2.) Plaintiffs further note that in September 2020, Mr. Testa stated on an earnings call that "Going forward, we'll be placing a heavy emphasis on standardizing processes and using higher level data analytics to drive decision-making and generate these incremental operating efficiencies." (*Id.* ¶ 39 (emphasis omitted).)

According to Plaintiffs, these initiatives meant that Defendants had "visibility into the number and magnitude of [] price increases." (AC ¶ 106.) But Defendants said no such thing— instead referring only generally to data regarding "decision making." Plaintiffs' claim in this regard not only is conclusory, but also is contradicted by their own allegations elsewhere in the Complaint. Indeed, Plaintiffs specifically allege that these initiatives did *not* provide Defendants with real-time insight into the impact of forward buying on UNFI's earnings. As Plaintiffs acknowledge, during the Q2 2023 earnings call, in response to the question whether UNFI had "the systems in place to understand how much forward buy [the Company was] doing," Mr.

Howard responded: "Our systems, the way they're structured now, do a very good job of aggregating [distribution center] data each period, and they do it accurately and it's very controlled. However, ***the granularity of that data and the real-time ability to analyze it is not strong***." (AC ¶ 78 (emphasis changed); *see also* Ex. 5, Q2 2023 Earnings Call Tr. at 13.) At most, Plaintiffs have alleged that the Company's ability to analyze the data in real time *should have* been better and that Individual Defendants *should have* possessed the capabilities accurately to forecast the impact of forward buying on the Company's margins. But such allegations do not establish an intent to defraud. *See, e.g.*, *Woolgar*, 477 F. Supp. 3d at 237 (rejecting allegations "that a defendant merely ought to have known" contradictory information); *Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 303 (S.D.N.Y. 2010) ("[E]ven an egregious failure to gather information will not establish ... liability as long as the defendants did not deliberately shut their eyes to the facts." (citation omitted)).[14] Plaintiffs' theory is classic fraud-by-hindsight.

### C.  The Core Operations Doctrine Is Insufficient To Establish Scienter And Does Not Apply In Any Event.

Plaintiffs invoke the "core operations" doctrine, which some courts have held permits an inference that a company and its senior executives have knowledge concerning the "core operations" of a business, arguing that Defendants must have been aware of the impact of forward buying on UNFI's earnings, given the magnitude of its impact. (AC ¶ 107.) But this doctrine, which many courts have suggested did not survive enactment of the PSLRA,[15] "does

---

[14] Plaintiffs also claim that Defendants "had reason to know of the negative impact [of the decline in forward-buying opportunities] by the time of the 1Q23 earnings report" because UNFI's Form 10-Q filed on March 8, 2023 stated that the decline was "sequential." (AC ¶ 105.) A statement that a retrospective analysis of data revealed a "sequential" trend does not indicate any awareness of that fact during the period that the data was being generated.

[15] *See, e.g.*, *Maloney*, 518 F. Supp. 3d at 781; *City of Birmingham*, 2020 WL 2834857, at *4 (collecting cases).

not independently establish scienter." *Woolgar*, 477 F. Supp. 3d at 239 (cleaned up). Where, as here, there is an "utter absence of any other evidence of fraudulent intent, the doctrine itself is insufficient to give rise to the necessary inference." *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 528 (S.D.N.Y. 2020).

In any event, to the extent the doctrine is still viable, it does not apply here. Courts "have required that the operation in question constitute nearly all of a company's business before finding scienter based on [this] doctrine." *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011); *see, e.g.*, *In re Federated Dep't Stores, Inc. Sec. Litig.*, 2004 WL 444559, at *5 (S.D.N.Y. Mar. 11, 2004) (subsidiary worth 10% of defendant's assets not sufficiently "core" to trigger doctrine because it was "not essential to the survival" of the company); *Hensley v. IEC Elecs. Corp.*, 2014 WL 4473373, at *5 (S.D.N.Y. Sept. 11, 2014) (business segment contributing about 15% of company's total revenue not sufficiently "core" to trigger doctrine because it did not constitute "nearly all" of company's business).

Plaintiffs have not alleged—nor could they—that forward buying, which is simply a description of the timing of some of UNFI's purchasing decisions, constitutes nearly all of UNFI's business or that it was essential to the Company's survival. The "core operation" of UNFI's business is distributing groceries, and there is no suggestion that UNFI's ability to perform that operation was threatened by decreased forward-buying opportunities. In fact, UNFI's sales went *up* quarter after quarter, *including* in Q2 2023 and Q3 2023. (*See* Ex. 20, Q2 2023 Earnings Press Release at 1; Ex. 24, Q3 2023 Earnings Press Release at 1.)

**D.    Plaintiffs Fail To Plead That Any Defendant Acted With Conscious Recklessness.**

Plaintiffs finally make a halfhearted attempt to plead scienter by alleging that Defendants recklessly issued financial forecasts that lacked a reasonable foundation. To plead scienter on the

24

basis of recklessness requires showing "reckless disregard for the truth" that amounts to "conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St.*, 573 F.3d at 109 (cleaned up). "Defendants' conduct must be highly unreasonable and ... represent[] an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *HEXO*, 524 F. Supp. 3d at 307 (cleaned up).

Plaintiffs do not even try to meet this demanding standard. All they allege is that Defendants "lacked a reasonable basis to issue a fiscal forecast" because Defendants recognized—with the benefit of hindsight once the Company's margin unexpectedly declined— that prior to Q2 2023, UNFI "did not have full visibility and sufficient detail into the commercial drivers of the benefits due to legacy issues with digital infrastructure limiting real-time data, which is required to fully understand and forecast these profitability drivers." (AC ¶ 124.)[16] A failure to predict the future with complete accuracy, driven by limitations in legacy technology, does not establish "an extreme departure from the standards of care." That is especially true where, as here, Defendants had no prior reason to believe that they did not fully understand the Company's profitability drivers because quarter after quarter through 2022 earnings and margins were ***consistent with predictions***. (*See, e.g.*, AC ¶¶ 62-70.) In fact, courts have found that, even where defendants, unlike here, "were aware of facts that *should* have led them" to doubt their conclusions, such allegations still do not establish scienter because they fall short of satisfying Plaintiffs' burden to plausibly allege that any Defendant "did not believe" their statements were true. *City of Omaha Civ. Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 68 (2d Cir. 2012). Here, by

---

[16] This allegation is also inconsistent with Plaintiffs' allegations that Defendants had actual knowledge of the degree to which forward buying drove earnings throughout fiscal year 2022. (*See, e.g.*, AC ¶¶ 104, 121.)

contrast, Defendants had every reason to feel confident in their forecasting process, because those forecasts were achieved throughout 2022 and the first quarter of 2023. *See Ret. Bd. of Policemen's Annuity & Benefit Fund v. FXCM Inc.*, 767 F. App'x 139, 141-42 (2d Cir. 2019) (no scienter where defendants' predictions had been borne out in the past). That forecasts ultimately were not met for Q2 and Q3 2023, by itself, does not demonstrate that Defendants knew or must have been aware *at the time the forecasts were issued* that the forecasts were wrong.

* * *

Plaintiffs' allegations, whether considered individually or holistically, do not give rise to a strong inference of scienter with regard to any challenged statement. *See Hutchinson v. Perez*, 2013 WL 1775374, at *4 (S.D.N.Y. Apr. 25, 2013) ("[T]he Court cannot combine several insufficient allegations of scienter and, taken together, construct [a] 'strong inference' of recklessness."), *aff'd sub nom. Jones v. Perez*, 550 F. App'x 24 (2d Cir. 2013).

Rather, Plaintiffs' allegations lend themselves to a far more compelling, non-culpable inference: with the benefit of hindsight, and only after seeing that forecasts were missed—after numerous quarters in which forecasts had been achieved—Defendants became aware that UNFI lacked a sufficient data analytics system to provide the real-time information its officers would have needed to precisely understand the impact of once-in-decades rapid acceleration and deceleration of inflation on its earnings. *See Canadian Imperial Bank*, 694 F. Supp. 2d at 301 ("CIBC … could not have been expected to anticipate the crisis with the accuracy Plaintiff enjoys in hindsight[.]"); *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) ("defendants' lack of clairvoyance [] does not constitute securities fraud"). It was not until inflation decelerated, causing a significant decline in profits, that Defendants began to gain insight into the magnitude of the effect of acceleration in inflation—and with it, procurement gains from forward

26

buying—on earnings. *See In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 297-98 (S.D.N.Y. 2014) ("[I]t is equally plausible that defendants were in a constant game of 'Catch up'—acknowledging the company's material weaknesses and disclosing their continued efforts to resolve them, only to learn of yet more."), *aff'd*, 616 F. App'x 442 (2d Cir. 2015). Once Defendants began to understand the magnitude of the effect, they promptly disclosed it. (*See, e.g.*, AC ¶¶ 71-78.) Plaintiffs have failed to plead particularized facts creating a strong inference of scienter. On this basis alone, the Court should dismiss Plaintiffs' Section 10(b) claim.

## II.     PLAINTIFFS HAVE FAILED TO PLEAD ANY ACTIONABLE MISSTATEMENT.

Plaintiffs' Complaint must be dismissed for the additional, independent reason that they have failed to plead that UNFI or the Individual Defendants uttered a materially false or misleading statement. As the Complaint acknowledges (*see* AC ¶¶ 62-70), throughout 2022 and Q1 of 2023, Defendants accurately explained to the public that the Company's profitability was attributable to inflation as well as incremental volume from new customers, additional categories and new store openings, increased item and category penetration with existing customers, and operational improvements. (*See, e.g.*, Ex. 31, Q1 2022 Earnings Call Tr. at 5-6; Ex. 4, Q2 2022 Earnings Call Tr. at 7; Ex. 32, Q3 2022 Earnings Call Tr. at 8-9; Ex. 33, Q4 2022 Earnings Call Tr. at 5-6; Ex. 34, Q1 2023 Earnings Call Tr. at 5-6.) Those statements were factually accurate: inflation is what allowed the Company to benefit from procurement gains through forward buying, and Plaintiffs do not and cannot dispute that fact. Instead, the main thrust of Plaintiffs' argument is that UNFI omitted to disclose the *specific degree* to which forward buying, versus other factors, was driving the Company's margin. But these arguments fail because there was no obligation for UNFI to disclose such information, particularly where UNFI already disclosed that it was forward buying and disclosed that changes in the rate of inflation could affect its business.

27

The remaining statements that Plaintiffs challenge likewise are not actionable because they are forward-looking statements protected by the safe harbor of the PSLRA or generic statements on which no reasonable investor would have relied.

### A.   Plaintiffs Fail To Plead A False Or Misleading Statement.

Under Rule 10b-5, it is unlawful to (1) "make any untrue statement of a material fact," or (2) "omit to state a material fact necessary in order to make the statements … not misleading." 17 C.F.R. § 240.10b-5(b). "Thus, to support a finding of liability, Rule 10b-5 requires an actual *statement*, one that is either 'untrue' outright," *i.e.*, an affirmative misstatement of fact, "or 'misleading' by virtue of what it omits to state." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016).

As to the latter category, omissions are actionable under Section 10(b) and Rule 10b-5 only when a corporation has a duty to disclose. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). These laws "do not create an affirmative duty to disclose any and all material information." *Id.* "Disclosure is required … only when necessary 'to make … statements made, in the light of the circumstances under which they were made, not misleading.'" *Id.* (quoting 17 C.F.R. § 240.10b-5(b)); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."). The duty to speak may also arise when some other statute or regulation requires that specific information be disclosed. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015).

Here, Plaintiffs do not allege any affirmative misstatement of fact. Nor do they allege that any statute or regulation required disclosure of the information Plaintiffs say Defendants concealed—here, the quantification of the specific degree to which various factors contributed to the Company's margin. Instead, Plaintiffs rely on the theory that the failure to disclose this information rendered other statements misleading. (*See, e.g.*, AC ¶ 128 (alleging that statements

28

"omitted to disclose material facts necessary to prevent them from being misleading").) But Plaintiffs cannot plead that the omitted information was necessary to avoid rendering any statement misleading, because those statements were all accurate—the statements correctly stated the Company's financial results and accurately disclosed that inflation was contributing to the Company's margin. Plaintiffs' attempt to manufacture a theory of fraud based on these indisputably true statements fails.

**Statements regarding past financial results.** The majority of the statements that Plaintiffs challenge are true and accurate statements of UNFI's past financial results. Paragraphs 127, 129, 131, 133, 135, 137, 139, 143, 145, 151, 153, 157, 159, 161, 165, 167, 169, 171, 175, 179, 181, 189, 193, 194, 195, 197, 201, 203, 205, 207, and 211 bring a nearly identical rote challenge to statements of UNFI's past financial performance: that UNFI failed to disclose that these results were based on increased forward buying and that there was a risk that these "gains" would decrease if inflation were to subside. In essence, Plaintiffs allege that accurate reporting of UNFI's financial metrics was false or misleading because it failed to quantify the precise degree to which the Company's profit margin benefited from inflation-driven forward buying, "creat[ing] the misleading impression that the Company was successfully weathering a difficult macroeconomic environment." (AC ¶ 128.)

These challenged statements cannot give rise to liability under the Exchange Act. It is black-letter law that "accurately reported financial statements do not automatically become misleading by virtue of the company's nondisclosure of suspected []conduct that may have contributed to the financial results. As the Sixth Circuit concluded in a related context, 'it is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data.'" *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S,*

29

11 F.4th 90, 98-99 (2d Cir. 2021) (quoting *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401

n.3 (6th Cir. 1997)). In *Danske Bank*, the Second Circuit dismissed allegations that a bank's

financial statements were misleading when the statements failed to disclose possible money-

laundering issues leading to "ill-gotten profits" that had been "baked into the bank-wide

numbers." *Id.* at 98; *see also Fogel v. Vega*, 759 F. App'x 18, 24 (2d Cir. 2018). Even though the

bank had suspicions about the activity, its disclosure of accurate historical data was not

actionable. "Such a rule would bring within the sweep of federal securities laws many routine

representations made by [companies]." *Danske Bank*, 11 F.4th at 99 (cleaned up); *Steamfitters*

*Loc. 449 Pension Plan v. AT&T Inc.*, 2022 WL 17587853, at *3 (2d Cir. Dec. 13, 2022) (holding

that, absent a showing that reported numbers are false, it is not misleading to report them).

The same logic applies here. UNFI repeatedly presented its accurate financial reporting,

including unobjectionable statements like:

- "Net sales increased 4.7% in the first quarter of fiscal 2022 compared to the same period last year primarily driven by inflation and new business from both existing and new customers, including the benefit of cross selling, partially offset by supply chain challenges and expected modest market contraction." (AC ¶ 127 (emphasis omitted).)

- "Second quarter gross margin rate increased 8 basis points compared to last year's second quarter. Our wholesale margin rate was again favorably impacted by our elevated level of cost inflation, as our business model and customer contracts generally pass through product cost inflation, which leads to both revenue and margin gains. The continued benefits from our transformational Value Path initiatives also contributed to our gross margin expansion in the quarter, which was partly offset by a higher noncash LIFO charge." (AC ¶ 145.)

Plaintiffs copy and paste the allegation that these financial reports are "false and

misleading," but they fail to explain how and why, as the PSLRA requires. *See In re Lululemon*

*Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) ("The Second Circuit has repeatedly stated

30

that plaintiffs must do more than simply assert that a statement is false—they must demonstrate with specificity why that is so." (cleaned up)), *aff'd*, 604 F. App'x 62 (2d Cir. 2015). The Complaint contains no allegation that these numbers were *inaccurate*; it asserts only that more should have been included with the numbers. But the cases are clear that statements of revenues or profitability are not actionable unless accompanied by a misleading statement about the sources of those revenues or profits. *See, e.g.*, *Danske Bank*, 11 F.4th at 98-99 ("disclosure of accurate historical data," including "year-over-year net profits and revenues," not actionable).

Not only did UNFI not mislead regarding the sources of its financial performance, it repeatedly and accurately identified that inflation—which, as the market broadly understood (*see* pp. 10-11, *supra*), is what allowed for procurement gains through forward buying—was a primary driver:

- "Net sales increased 4.7% in the first quarter of fiscal 2022 compared to the same period last year ***primarily driven by inflation*** and new business from both existing and new customers, including the benefit of cross selling, partially offset by supply chain challenges and expected modest market contraction." (AC ¶ 127.)

- "Gross margin rate in the first quarter of fiscal 2022 was 14.89% of net sales compared to 14.51% of net sales for the first quarter of fiscal 2021. *The increase in gross margin rate was driven by improvements in the Wholesale segment margin rate,* ***including the impact of inflation*** and the Company's ValuePath initiative." (AC ¶ 127 (emphasis changed).)

- "Our gross profit increased $80 million, or 8.0%, to $1,075 million for the second quarter of fiscal 2022, from $995 million for the second quarter of fiscal 2021. Our gross profit as a percentage of net sales increased to 14.50% for the second quarter of fiscal 2022 compared to 14.42% for the second quarter of fiscal 2021. *The increase in gross profit rate was primarily driven by improvements in the Wholesale segment margin rate,* ***including the impact of inflation*** and the Company's ValuePath initiative, partially offset by changes in customer mix … ." (AC ¶ 153 (emphasis changed).)

These accurate disclosures are legion, and are found in every source of challenged statements.

31

Plaintiffs also ignore that UNFI's public filings already warned investors of the precise risks that came to pass. "[I]t is indisputable that there can be no omission where the allegedly omitted facts are disclosed." *In re Progress Energy, Inc.*, 371 F. Supp. 2d 548, 552 (S.D.N.Y. 2005). From the very first allegedly misleading statements, in the press release concerning UNFI's Q1 2022 financial results, UNFI disclosed the risk of "moderated supplier promotional activity" and "*decreased forward buying opportunities*," which ultimately came to pass in Q2 and Q3 of 2023. (*See, e.g.*, Ex. 6, Q1 2022 Earnings Press Release at 5 (emphasis added).) The Company also repeatedly disclosed that its business was characterized by "relatively low margins …, *which are sensitive to inflationary and deflationary pressures*." (*Id.*) This warning appeared in every press release and financial disclosure throughout the relevant period. *See* pp. 9-11, *supra*. And of course the inflation rate is public knowledge. *Cf. In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 576 (S.D.N.Y. 2013) (reasoning that information in the public domain need not be disclosed), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).

**Statements concerning the impact of inflation.** The Complaint also challenges a group of statements from UNFI's SEC filings that concern the impact of inflation on the Company's business. Although they contain different details for the relevant quarter, these statements generally provide:

> We experienced a mix of inflation across product categories during the second quarter of fiscal 2022. In the aggregate across our businesses, including the mix of products, management estimates our business experienced cost inflation of approximately five percent in the second quarter of fiscal 2022. Cost inflation estimates are based on individual like items sold during the periods being compared. Changes in merchandising, customer buying habits and competitive pressures create inherent difficulties in measuring the impact of inflation on Net sales and Gross profit. Absent any changes in units sold or the mix of units sold, inflation generally has the effect of increasing sales. Under the last-in, first out ("LIFO") method of inventory accounting, product cost

32

> increases are recognized within Cost of sales based on expected year-end inventory quantities and costs, which has the effect of decreasing Gross profit and the carrying value of inventory during periods of inflation.

(*See, e.g.,* AC ¶ 151 (quoting Ex. 35, Q2 2022 Form 10-Q at 30).)

Plaintiffs assert that this statement is misleading because, "separate and apart from the inflationary environment," it failed to disclose the *amount* of forward buying in which the Company was engaging. (*See, e.g.*, AC ¶ 152 (complaining that disclosure did not disclose the "number and magnitude" of forward-buying opportunities).) But there was no duty to disclose this specific piece of information. And it is black-letter law that, even if the omitted information "may be relevant or of interest to a reasonable investor," that "circumstance alone does not necessitate its disclosure." *Kleinman v. Elan Corp.*, 706 F.3d 145, 154 (2d Cir. 2013) (citation omitted). Moreover, courts have held that there is no actionable omission where the challenged statement says nothing about the omitted information. *Id.* at 153-54. And here, the statement challenged by Plaintiffs says nothing about the amount of forward buying. Thus, omitting this specific piece of information did not render the statement misleading.[17]

**B.    UNFI's Forward-Looking Statements Are Not Actionable.**

In addition to challenging factually-accurate statements regarding UNFI's past performance, Plaintiffs also challenge numerous forward-looking statements regarding UNFI's predictions about its future performance, such as the statement that "our outlook for adjusted

---

[17] Plaintiffs also challenge the Q2 2023 earnings press release from March 8, 2023, in which UNFI updated its fiscal year 2024 targets, for failing to "fully factor in the extent [of] UNFI's" forward buying. (AC ¶¶ 213-14.) But the press release, far from omitting the impact of forward buying, not only warned that future decreased forward-buying opportunities could have a negative impact on the business, it also explicitly recognized that the risk had materialized: "Profits were challenged as we did not repeat the significant level of procurement gains from rapidly accelerating inflation and inventory gains, due to supply chain volatility, that we experienced in the second quarter of last year. As a result of these challenges, we are reducing our profitability expectations for fiscal 2023 and withdrawing our fiscal 2024 targets." (Ex. 20, Q2 2023 Earnings Press Release at 1.)

EPS is also unchanged and expected to finish between $3.90 and $4.20 per share."[18] (AC ¶ 129.)

These forward-looking statements likewise are not actionable because, in each case, they were

accompanied by meaningful cautionary language warning investors of the risks that UNFI's

predictions would not be realized, and are therefore protected under the PSLRA's "safe harbor."

In addition, Plaintiffs have failed to plead any facts establishing that any forward-looking

statement was made with actual knowledge that it was false or misleading.

Under the PSLRA's safe harbor, "a defendant is not liable if the forward-looking

statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or*

the plaintiff fails to prove that it was made with actual knowledge that it was false or

misleading." *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010); *see also* 15 U.S.C.

§ 78u-5. "To determine whether cautionary language is meaningful, courts first identify the

allegedly undisclosed risk and then read the allegedly fraudulent materials—including the

cautionary language—to determine if a reasonable investor could have been misled into thinking

that the risk that materialized and resulted in his loss did not actually exist." *Skechers*, 444 F.

Supp. 3d at 513 (cleaned up). As to scienter, "because the safe harbor specifies an 'actual

knowledge' standard for forward-looking statements, 'the scienter requirement for forward-

looking statements is stricter than for statements of current fact" and requires "knowing falsity,"

as opposed to recklessness. *Slayton*, 604 F.3d at 773 (citation omitted). All of the aforementioned

challenged statements are protected by the safe harbor.

*First*, these statements plainly are forward-looking. They concern projections of revenues

and earnings, among other financial metrics; predictions about future economic performance;

---

[18] Paragraphs 129, 131, 133, 135, 141, 147, 149, 155, 161, 163, 165, 167, 173, 177, 183, 185, 187, 191, 197, 199, 203, 209, and 213 all contain forward-looking statements.

and "assumptions underlying or relating" to these predictions—all of which fall squarely within the statutory definition of forward-looking statements. *See* 15 U.S.C. § 78u-5(i)(1)(A)–(D); *Slayton*, 604 F.3d at 766-67. In addition, these statements included many additional forward-looking elements, including language like "we continue to expect" (AC ¶ 129), "as we look forward" (*id.* ¶ 165), and "we're going to see some of this in FY '23" (*id.* ¶ 185). This language only underscores the forward-looking nature of the statements.

*Second*, the forward-looking statements were accompanied by meaningful cautionary language. Here, every single challenged press release or periodic report warned of the exact risk of which Plaintiffs complain. (*See, e.g.*, Ex. 12, Q1 2022 Form 10-Q at 25 (warning that the Company's financial results "could differ materially from those anticipated" due to factors such as "moderated supplier promotional activity, *including decreased forward buying opportunities*" (emphasis added)); Ex. 6, Q1 2022 Earnings Press Release at 5 (same); Ex. 13, 2022 Form 10-K at 28 (same).) These warnings also specifically identified the risk of "inflationary and deflationary pressures" on the Company's margins. (*See, e.g.*, Ex. 6, Q1 2022 Earnings Press Release at 5.) Because these warnings listed "substantive company-specific factors" that could realistically cause results to differ materially, they were meaningful. *See, e.g.*, *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 392 (S.D.N.Y. 2020).

Plaintiffs assert that this cautionary language was itself misleading, claiming that "the risk warning was stale and the risk had materially changed and even materialized." (AC ¶¶ 142, 156, 174, 192, 210.) But this allegation is conclusory; the Complaint does not identify which specific risk had materially changed or materialized, nor does it explain how, why, and when. *See Tellabs*, 551 U.S. at 321. Moreover, to the extent the risk was that UNFI could not continue to maintain its margin rates if forward-buying opportunities decreased in the future, that risk did

35

not materialize until Q2 2023, and it was promptly disclosed. *See* pp. at 11-13, *supra*. There are no particularized facts suggesting that the risk had materialized earlier. *See In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008) (rejecting challenge to cautionary language because complaint did not adequately allege particularized facts establishing that the "risk had already transpired"). And far from suggesting that UNFI was not engaged in forward buying, the risk warning said exactly the opposite, making clear that the inability to *continue* forward buying at the same rate could lead to margin declines—which is precisely what occurred in Q2 and Q3 2023. *See Barrick Gold*, 341 F. Supp. 3d at 377 (rejecting challenge to cautionary language where warning disclosed of risk that ultimately materialized).

*Finally*, for all the reasons discussed above, *see* pp. 15-27, *supra*, Plaintiffs have failed to plead particularized facts establishing that any Defendant had "actual knowledge" that any forward-looking statement was false or misleading. *See, e.g.*, *Wesco Aircraft*, 454 F. Supp. 3d at 396-97; *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *20 (S.D.N.Y. Apr. 2, 2020).

### C.    Generic Statements Are Not Actionable.

The remaining statements that Plaintiffs challenge are not actionable because they are too generic for a reasonable investor to have relied upon. *See, e.g.*, *Vivendi*, 838 F.3d at 245 ("Puffery encompasses statements that are too general to cause a reasonable investor to rely upon them, and thus cannot have misled a reasonable investor." (cleaned up)). For example, Plaintiffs challenge the following statement from the Q2 2022 earnings call:

> Yes, it's a great question. The short answer is yes, and I'll point to an example, and that's our brands group. Our brands portfolio does over $1 billion at wholesale. In other words, it's a very large portfolio. And our fill rates on our brands are at 500 to 1,000 bps better than the national brands. So when we anticipate, or we see a long-term out-of-stock SKU, we quickly try to pivot the customer to SKU that is in -- higher in stock, and in many cases, that is our brands business. So look, it's a difficult environment. And the winners in this environment are the ones that can navigate quickly.

36

> And we have a sales team and a merchandising team and our
> procurement team that's doing that. We've had to change our
> behavior to be quick and nimble to secure high-demand SKUs.
> And again, this is where having a very big team that is in constant
> daily contact with suppliers helps a lot.

(AC ¶ 149 (emphasis omitted); *see also id.* ¶¶ 161, 163.)

To begin with, this statement has nothing to do with the impact of procurement gains on the Company's margin: rather, the statement plainly relates to the Company's "fill rates"—*i.e.*, its ability to fulfill customers' orders in full—during a time when there were significant supply chain issues affecting UNFI's ability to stock various products. Plaintiffs do not and cannot explain how this statement is even relevant, let alone false or misleading. Moreover, the statement does not promise any specific results. To the contrary, it acknowledges a "difficult environment" for supply chain issues, and merely states that the Company has sales, merchandising, and procurement teams that have attempted to secure high-demand products quickly. No reasonable investor would have read this statement as a guarantee regarding the Company's future profit margin—a matter to which the statement does not even speak.

Nor would any reasonable investor rely on general statements about the Company's ability to succeed, such as the statement that UNFI would "work really hard with suppliers to give our customers the right kind of merchandising opportunities and price points to support their unit volume" (AC ¶ 167), that "[d]elivering these results in the face of such a complex environment is a testament to the agility of our team and the strategic value of our business" (*id.* ¶ 179), that "we're confident we can deliver, and yet remain flexible to be able to meet the needs of our customers" (*id.* ¶ 183 (emphasis omitted)), and that the Company "look[ed] at every single one of our customer agreements with a disciplined eye for economic returns" (*id.* ¶ 203). "These general and vague statements of corporate optimism are precisely the type of puffery that the

37

Second Circuit and other circuits have consistently held to be nonactionable." *In re Diebold Nixdorf, Inc. Sec. Litig.*, 2021 WL 1226627, at *9 (S.D.N.Y. Mar. 30, 2021) (cleaned up)).

### D.    UNFI Did Not Violate Item 303 Of Regulation S-K.

Plaintiffs also attempt to repackage their "omissions" claim as an alleged violation of Item 303 of Regulation S-K (*see* AC ¶¶ 215-21), but this claim fails in either form. Item 303 requires an issuer of securities to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). The regulation "requires the registrant to disclose only those trends, events, or uncertainties that it actually knows of when it files the relevant report with the SEC. It is not enough that it should have known of the existing trend, event, or uncertainty." *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016). Moreover, liability for failure to make a required Item 303 disclosure can serve as the basis for a claim under Section 10(b) only "if all of the other requirements to sustain an action under Section 10(b) are fulfilled." *Stratte-McClure*, 776 F.3d at 100; *see also Skechers*, 444 F. Supp. 3d at 522. Plaintiffs' claim fails all of these requirements.

*First*, Plaintiffs have failed to plead that management actually knew the degree to which procurement gains were driving the Company's margin—to the contrary, as discussed above, management's statements made clear that they did *not* have the analytical capabilities in order to capture this in real time. *See* pp. 11-13, 15-27, *supra*.

In an attempt to show that UNFI knew in fiscal year 2022 that there was a trend requiring disclosure, Plaintiffs point to after-the-fact statements, including, "Last year, in fiscal '22, we saw a big upswing in value that we got as inflation took hold." (AC ¶ 218 (emphasis omitted).) But Plaintiffs ignore that throughout 2022 Defendants *did* repeatedly disclose that inflation was driving the Company's margin increases. *See* pp. 9-11, 31-32, *supra*. Thus, Defendants disclosed

38

what they knew, and they are not liable under the securities laws for allegedly failing to disclose additional information that they did not know—namely, the *degree* to which inflation-related procurement gains, rather than other factors, were driving the Company's margin.

*Second*, any "omission" was not material given the clear cautionary statements the Company made warning of the possible risks of deflation and decreased forward-buying opportunities and public information about inflation. *See Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*, 2023 WL 3569068, at *19 (S.D.N.Y. May 19, 2023) (holding that failure to disclose the "minutiae" of trends was not material when the market was aware that the company faced a risk from potential market forces and those market forces were in the public domain).

Ultimately, Plaintiffs' Item 303 claim fails for the same reasons that their other Exchange Act claims fail: the Complaint does not plead particularized facts establishing a strong inference of scienter or any actionable misstatement.

## III.  THE COMPLAINT DOES NOT STATE A CLAIM FOR CONTROL PERSON LIABILITY UNDER SECTION 20(A).

The Complaint also does not state a claim against the Individual Defendants for control person liability under Section 20(a) of the Exchange Act. (AC ¶¶ 257-60.) Liability under Section 20(a) depends upon an underlying violation of the securities laws. *See, e.g.*, *Canadian Imperial Bank*, 694 F. Supp. 2d at 303. Plaintiffs have not adequately alleged an underlying violation of Section 10(b), and therefore their Section 20(a) claim must also be dismissed.

### CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss Plaintiffs' Complaint with prejudice.

Respectfully submitted,

/s/ Francesca Brody
Francesca Brody

39

SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
fbrody@sidley.com

Nilofer I. Umar (admitted *pro hac vice*)
Neil H. Conrad (admitted *pro hac vice*)
Rebecca M. Lewis (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
numar@sidley.com
nconrad@sidley.com
rebecca.lewis@sidley.com