**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

DAN SILLS *and* GEORGE DICK, *individually and on behalf of all others similarly situated*,

                Plaintiffs,

    vs.

UNITED NATURAL FOODS, INC., J. ALEXANDER MILLER DOUGLAS, JOHN W. HOWARD, *and* CHRISTOPHER P. TESTA,

                Defendants.

No. 1:23-cv-02364-JGLC

---

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ......................................................................................................................1

BACKGROUND .......................................................................................................................5

      A.      UNFI And Its Business. ..............................................................................5

      B.      Inflation, Forward Buying, And Margin. ....................................................5

      C.      UNFI Reports Positive Financial Results Throughout Fiscal Year 2022 And Q1 2023, Repeatedly Noting The Impact Of Inflation On Its Business. .....................................................................................................8

      D.      UNFI Announces Negative Financial Results In Q2, Q3, And Q4 Of 2023, And Issues Revised Earnings Guidance In Q2 And Q3 2023. ...........10

      E.      Plaintiffs' Claims. .....................................................................................13

ARGUMENT ..........................................................................................................................13

I.      PLAINTIFFS FAIL TO ALLEGE PARTICULARIZED FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER. .............................................15

      A.      Plaintiffs Fail To Plead Adequately That Defendants Were Motivated to Commit Fraud. .....................................................................................16

      B.      Plaintiffs' Allegations Regarding "Access To Information" Do Not Establish A Strong Inference Of Scienter. ...............................................21

      C.      The Core Operations Doctrine Is Insufficient To Establish Scienter And Does Not Apply In Any Event. ................................................................26

      D.      Plaintiffs Fail To Plead That Any Defendant Acted With Conscious Recklessness. ...........................................................................................27

II.      PLAINTIFFS FAIL TO PLEAD ANY ACTIONABLE MISSTATEMENT. .................30

      A.      Plaintiffs Fail To Plead A False Or Misleading Statement. ....................31

      B.      UNFI's Forward-Looking Statements Are Not Actionable. ...................35

      C.      Generic Statements Are Not Actionable. .................................................37

      D.      UNFI Did Not Violate Item 303 Of Regulation S-K. ............................38

III.      THE COMPLAINT DOES NOT STATE A CLAIM FOR CONTROL PERSON LIABILITY UNDER SECTION 20(A). ...........................................................40

i

CONCLUSION...............................................................................................................40

**TABLE OF AUTHORITIES**

**Cases**                                                                                                                     **Page(s)**

*Acito v. IMCERA Grp., Inc.*,
   47 F.3d 47 (2d Cir. 1995) ...................................................................................................29

*In re Adient plc Sec. Litig.*,
   2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) ......................................................................37

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
   28 F.4th 343 (2d Cir. 2022) ...............................................................................................19

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ...................................................................................................5

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
   980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).......................34

*In re Barrick Gold Corp. Sec. Litig.*,
   341 F. Supp. 3d 358 (S.D.N.Y. 2018)................................................................................24

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ............................................................................................................31

*City of Birmingham Fireman's & Policeman's Supplemental Pension Sys. v.*
   *Ryanair Holdings PLC*,
   2020 WL 2834857 (S.D.N.Y. June 1, 2020) ................................................................ 14, 26

*City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*,
   565 F. Supp. 3d 478 (S.D.N.Y. 2021).................................................................................21

*City of Omaha Civ. Emps.' Ret. Sys. v. CBS Corp.*,
   679 F.3d 64 (2d Cir. 2012) .................................................................................................28

*Constr. Laborers Pension Tr. for S. Ca. v. CBS Corp.*,
   433 F. Supp. 3d 515 (S.D.N.Y. 2020).................................................................................18

*Dfinity Found. v. New York Times Co.*,
   2023 WL 7526458 (S.D.N.Y. Nov. 13, 2023)....................................................................18

*In re Diebold Nixdorf, Inc. Sec. Litig.*,
   2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ....................................................................38

*In re DraftKings Inc. Sec. Litig.*,
   650 F. Supp. 3d 120 (S.D.N.Y. 2023).................................................................................19

*ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) ...............................................................................................13

*In re eSpeed, Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006) .............................................................................. 20, 21

*In re Federated Dep't Stores, Inc. Sec. Litig.*,
    2004 WL 444559 (S.D.N.Y. Mar. 11, 2004) .......................................................................... 27

*Fogel v. Vega*,
    759 F. App'x 18 (2d Cir. 2018) ............................................................................................. 32

*In re Gildan Activewear, Inc. Sec. Litig.*,
    636 F. Supp. 2d 261 (S.D.N.Y. 2009) ................................................................................... 20

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011) .............................................................................. 15, 20

*Gray v. Wesco Aircraft Holdings, Inc.*,
    454 F. Supp. 3d 366 (S.D.N.Y. 2020) ................................................................................... 37

*Hensley v. IEC Elecs. Corp.*,
    2014 WL 4473373 (S.D.N.Y. Sept. 11, 2014) ....................................................................... 27

*In re HEXO Corp. Sec. Litig.*,
    524 F. Supp. 3d 283 (S.D.N.Y. 2021) ....................................................................... 17, 22, 28

*Hutchinson v. Perez*,
    2013 WL 1775374 (S.D.N.Y. Apr. 25, 2013), *aff'd sub nom. Jones v. Perez*,
    550 F. App'x 24 (2d Cir. 2013) ............................................................................................. 29

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016) .................................................................................................... 39

*Inter-Loc. Pension Fund GCC/IBT v. Gen. Elec. Co.*,
    445 F. App'x 368 (2d Cir. 2011) ...................................................................................... 23, 24

*Jackson v. Halyard Health, Inc.*,
    2018 WL 1621539 (S.D.N.Y. Mar. 30, 2018) ....................................................................... 23

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) .................................................................................................. 17

*Kleinman v. Elan Corp.*,
    706 F.3d 145 (2d Cir. 2013) .................................................................................................. 35

*Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011) ....................... 15

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014) ................................................................................. 19, 33

*Macquarie Infrastructure v. Moab Partners, L.P.*,
  2022 WL 17815767 (2d Cir. 2022), *cert. granted*, — S. Ct. —, 2023 WL
  6319659 ............................................................................................................................. 39

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
  26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015) ....................... 29

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
  518 F. Supp. 3d 772 (S.D.N.Y. 2021) ........................................................................ 23, 24, 26

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ............................................................................................................... 31

*In re MBIA, Inc. Sec. Litig.*,
  700 F. Supp. 2d 566 (S.D.N.Y. 2010) ................................................................................... 5

*Nandkumar v. AstraZeneca PLC*,
  2023 WL 3477164 (2d Cir. May 16, 2023) ........................................................................... 16

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) .............................................................................................. 39

*In re Plug Power, Inc. Sec. Litig.*,
  2022 WL 4631892 (S.D.N.Y. Sept. 29, 2022) ...................................................................... 20

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
  11 F.4th 90 (2d Cir. 2021) ............................................................................................. 32, 33

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of
  Com.*,
  694 F. Supp. 2d 287 (S.D.N.Y. 2010) ....................................................................... 26, 29, 40

*Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*,
  2023 WL 3569068 (S.D.N.Y. May 19, 2023) ....................................................................... 40

*In re Progress Energy, Inc.*,
  371 F. Supp. 2d 548 (S.D.N.Y. 2005) ................................................................................... 34

*Ret. Bd. of Policemen's Annuity & Benefit Fund v. FXCM Inc.*,
  767 F. App'x 139 (2d Cir. 2019) .......................................................................................... 29

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ................................................................................................. 14

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
  573 F.3d 98 (2d Cir. 2009) .............................................................................................. 17, 28

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
75 F.3d 801 (2d Cir. 1996) .................................................................................................21

*Schwab v. E\*Trade Fin. Corp.*,
285 F. Supp. 3d 745 (S.D.N.Y.), *aff'd*, 752 F. App'x 56 (2d Cir. 2018) ..............................17

*In re Skechers USA, Inc. Sec. Litig.*,
444 F. Supp. 3d 498 (S.D.N.Y. 2020) ................................................................... 26, 36, 39

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010) ...............................................................................................36

*Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*,
2022 WL 17587853 (2d Cir. Dec. 13, 2022) .......................................................................33

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015) ............................................................................................ 31, 39

*Sun v. TAL Educ. Grp.*,
2023 WL 6394413 (S.D.N.Y. Sept. 29, 2023) ......................................................... 17, 20, 21

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
531 F.3d 190 (2d Cir. 2008) ...............................................................................................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ....................................................................................................... 3, 14

*Tyler v. Liz Claiborne, Inc.*,
814 F. Supp. 2d 323 (S.D.N.Y. 2011) .................................................................................27

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016) .......................................................................................... 31, 37

*In re Wachovia Equity Sec. Litig.*,
753 F. Supp. 2d 326 (S.D.N.Y. 2011) ............................................................................ 22, 23

*Woolgar v. Kingstone Cos.*,
477 F. Supp. 3d 193 (S.D.N.Y. 2020) ............................................................................ 21, 26

**Statutes, Rules, and Regulations**

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) .......................... 13, 39

Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) .......................... 13, 40

iv

Private Securities Litigation Reform Act of 1995,

    15 U.S.C. § 78u-4.................................................................................................3, 14

    15 U.S.C. § 78u-5......................................................................................................36

17 C.F.R. § 229.303 .........................................................................................................38

17 C.F.R. § 240.10b-5 ............................................................................................ 13, 31, 39

17 C.F.R. § 240.10b5-1(c)................................................................................................19

Fed. R. Civ. P. 9(b) .........................................................................................................14

Defendants United Natural Foods, Inc. ("UNFI" or the "Company"), J. Alexander Miller Douglas, John W. Howard, and Christopher P. Testa (the "Individual Defendants," and, together with the Company, "Defendants") respectfully submit this Memorandum in Support of Their Motion to Dismiss the Second Amended Complaint (the "Complaint" or "SAC").

## INTRODUCTION

UNFI, a large publicly traded wholesale distributor of natural and conventional grocery products, confronted numerous COVID-related economic challenges throughout 2021 and 2022: labor shortages, supply chain volatility, rising inflation, and changing consumer preferences and habits. These challenges were compounded because UNFI simultaneously was managing the continued integration of the largest acquisition in its history. One analyst following the Company called it "the most unpredictable operating environment ever," which carried with it "unprecedented forecasting and operational challenges."

Against this backdrop, the Company accurately reported positive financial results throughout late 2021 and 2022. Although inflation raised numerous challenges, it also benefited UNFI. As UNFI worked to manage supply shortages, it bought what inventory it could procure from suppliers. In the meantime, prices continued to increase, and UNFI often was then able to sell the inventory it already procured to retailers at a higher price, resulting in a higher profit margin. The procurement gains resulting from this differential—also called "forward buying"— were made possible by rising inflation triggering repeated price increases.

Throughout this period, UNFI repeatedly and accurately disclosed that its financial performance was benefitting from inflationary gains. It also explicitly warned investors of the risk of "moderated supplier promotional activity"—another phenomenon that, in a typical economic environment, could create forward-buying opportunities, because supplier promotions enabled UNFI to purchase inventory at a lower-than-ordinary cost—and "decreased forward

1

buying opportunities," and that the "relatively low margins of [its] business" were "sensitive to inflationary and deflationary pressures."

During the second quarter of fiscal year 2023, the rate of inflation decelerated and—with supplier promotions still not rebounding—the Company's opportunities for forward buying dried up rapidly. Although the Company had anticipated that inflation would decline, it had not appreciated the degree to which inflationary procurement gains had been driving margin growth in 2022. Indeed, promotion-related forward buying, and not inflation-related forward buying, had accounted for the vast majority of the Company's forward-buy-related procurement gains in the past. The Company had anticipated that supplier promotions—which had declined during COVID-era high demand—would return, thereby mitigating the impact of inflation deceleration on forward-buying opportunities. But that did not occur. The Company announced a $6 million year-over-year decline in gross profit and lowered its previously issued EBITDA guidance. This continued into the next quarter, and again the Company reported worse-than-expected results and lowered its previously issued EBITDA guidance. As UNFI's CFO John Howard explained, UNFI "expected to see [its] year-over-year profit rate decline given the procurement gains [the Company was] cycling from last year," but "relative to our expectations at the end of Q2, the decline was greater than expected, largely due to the impact of the volatile macroeconomic backdrop." The following quarter, the Company announced another decline in its gross profit rate, but its financial results were in line with the Company's revised EBITDA guidance.

This is Plaintiffs' third attempt—after amending their most recent prior complaint in response to Defendants' motion to dismiss in a tacit admission that they did not state a claim—to spin these developments into an implausible scheme to defraud UNFI's stockholders. They allege that Defendants made a variety of false or misleading statements regarding the Company's

2

profitability during fiscal year 2022 and the first quarter of 2023, which they say artificially inflated the price of UNFI's stock. But they do not allege, nor can they, that any of UNFI's financial results were inaccurate. Rather, they claim that statements regarding the Company's financial results were materially false and misleading because they omitted to disclose additional facts that the securities laws did not require Defendants to disclose: namely, the specific degree and magnitude of forward buying that was occurring, that UNFI's gross profit and adjusted EBITDA benefited significantly from "atypical" forward buying, and that these benefits "masked the extent to which [the] Company's profitability was being negatively impacted by other problems." (*See, e.g.*, SAC ¶¶ 5-6, 144.)

Plaintiffs' Complaint, which is subject to the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b), has multiple fatal flaws. *First*, Plaintiffs do not plead particularized facts giving rise to a "strong inference" of an intent to defraud, as the PSLRA requires. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). Like their prior complaint, this Complaint still does not allege any "confidential witnesses," after-the-fact admissions, or adverse regulatory findings. Nor does it contain any cogent or compelling thesis for why any of the Individual Defendants—all of whom continue to hold substantial UNFI stock—would deliberately issue incorrect forecasts, only then to suffer significant stock losses themselves. Indeed, the only differences between the prior complaint and this Complaint are a misguided allegation about a stock sale by one Defendant pursuant to a pre-authorized, non-discretionary trading plan, as well as a generic allegation that Defendants had "access to information" that contradicted the statements Defendants made during the relevant period. Both allegations fail.

Indeed, Plaintiffs do not identify a single specific contradictory document or piece of

3

information that Defendants knew when they made any challenged statement, instead referencing reports provided to UNFI's suppliers that do not contain any information contradicting Defendants' statements. Plaintiffs also claim that Defendants must have known about the relative impact of forward buying on the Company's margin rate in real time because forward buying had a significant impact on that rate. But this allegation is conclusory and a *non sequitur*. That Defendants knew forward buying could increase the Company's margin does not mean they knew its *relative* impact—compared to the relative impact of other factors—in real time. Indeed, the far more plausible inference is the one Defendants gave when they announced the financial results for Q2 and Q3 2023: that, due to extreme volatility during unprecedented times and limited IT analytical capabilities, Defendants did not understand the relative magnitude of forward buying on the Company's profitability until results deviated from expectations.

*Second*, the Complaint does not plead that any Defendant made a false or misleading statement. As the Complaint acknowledges, throughout 2022 and Q1 of 2023, Defendants accurately explained to the public that the Company's profitability was attributable to inflation as well as other factors, including incremental volume from new retail customers, additional product categories, new store openings, and operational improvements. These statements were factually accurate: inflation is what allowed the Company to benefit from procurement gains through forward buying, and Plaintiffs cannot and do not dispute that fact. Instead, the lynchpin of Plaintiffs' theory is that UNFI failed to disclose the *specific degree* to which forward buying, versus other factors, was driving the Company's margin. But there was no obligation for UNFI to disclose such information, particularly where UNFI already disclosed that it was forward buying and already disclosed that changes in the rate of inflation could affect its business. The remaining statements that Plaintiffs challenge likewise are not actionable, because they are

4

forward-looking statements protected by the safe harbor of the PSLRA, or they are generic statements on which no reasonable investor would have relied.

Plaintiffs' Complaint represents their third attempt improperly to plead fraud by hindsight. It should be dismissed with prejudice.

## BACKGROUND

### A.    UNFI And Its Business.

UNFI is the largest publicly traded wholesale distributor of natural, organic, specialty, produce, and conventional grocery and non-food products in North America. (SAC ¶ 33.) The Company offers approximately 250,000 products to more than 30,000 unique retail customer locations. (Ex. 1, Q1 2024 Form 10-Q at 25.)[1] Its product offerings include national, regional, and private label brands grouped into several categories: grocery and general merchandise; perishables; frozen foods; wellness and personal care items; and bulk and foodservice products. (*Id.*) The Company purchases its products from nearly 11,000 suppliers. (Ex. 2, 2023 Form 10-K at 5.) It operates 54 distribution centers and warehouses. (Ex. 1, 2024 Q1 Form 10-Q at 25.)

UNFI has grown considerably in the last decade. In October 2018—only about 18 months before the COVID pandemic began—UNFI acquired SUPERVALU INC. ("SuperValu"), which was then one of the largest grocery wholesalers and retailers in North America. (SAC ¶ 44.)

### B.    Inflation, Forward Buying, And Margin.

Throughout late fiscal year 2021 and 2022,[2] the United States economy experienced unusually rapid inflation. (*Id.* ¶ 53.) In January 2022, inflation accelerated to 7.5%, its highest

---

[1] This Court may consider, among other things, "statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 576 (S.D.N.Y. 2010) (taking judicial notice of analyst reports). Copies of relevant documents are attached to the declaration of Francesca Brody.

[2] UNFI's fiscal year ends on the Saturday closest to July 31. (SAC ¶ 41.)

level since February 1982, as a result of soaring energy costs, labor mismatches, and supply

disruptions. (McKinsey & Co., "What is inflation?" at 3 (Aug. 17, 2022) (cited in SAC ¶ 54 n.4);

*accord* SAC ¶ 54.) Inflation continued to increase to a peak of 9.1% in June 2022.[3] Inflation had

a particularly pronounced impact on food prices: the rate of food inflation was higher than the

general rate of inflation for several months during 2022, including when food inflation peaked at

11.4% in August 2022. (*See* SAC ¶¶ 57-58 (chart listing inflation rates by month).)

A food distributor like UNFI may benefit from inflation through "forward buying," but

forward buying is not unique to UNFI or to food distributors.[4] Forward buying occurs when a

company buys units of a product during a particular period, holds some of those units in

inventory for a time, and then sells the units during a subsequent period. If the price increases

between the time a product is procured from the supplier and the time it is sold to a customer, the

difference represents additional profit margin. (*See id.* ¶ 62; *see also* Ex. 3, 2021 Form 10-K at 4

("The differential between the procured cost … as compared to the net sales price of these

products[] generate[s] our gross margin.").) A company may also benefit from forward buying

by acquiring inventory at a lower-than-ordinary cost during a supplier sales promotion.[5]

Even before the period of rapid inflation in late 2021 and 2022, UNFI—like many

companies—benefited from forward buying, both as a result of sales promotions and supplier

price increases. Supplier price increases allow for forward-buying opportunities because UNFI,

upon being notified of supplier price increases 60-90 days before they took effect, was generally

contractually able to pass through those price increases immediately to retailers—thus resulting

in a greater-than-ordinary differential between the price at which UNFI purchased inventory and

---

[3] *See* TED: The Economics Daily, *available at* http://tinyurl.com/4t5a2bvf.

[4] *See, e.g.*, Preyas S. Desai *et al.*, "Forward Buying by Retailers," *Journal of Marketing Research*, volume 47, no. 1 (2010), at pp. 90-102, *available at* http://tinyurl.com/4pw4b6hj.

[5] *See id.*

sold it. (*See* Ex. 4, Q3 2021 Earnings Call Tr. at 12 (UNFI would get notification of supplier price increases typically "60, 90 days in advance"); *id.* at 15 (explaining that UNFI is typically able to "pass through 100% or pretty … close to 100% of the cost of goods that get pushed to" UNFI, which can be "a source of gross margin" for the Company); *accord* SAC ¶¶ 66, 223.)

The COVID pandemic affected UNFI in numerous ways. UNFI, like many food distributors, faced challenges in procuring inventory in order to satisfy high demand from its retail customers, which were in turn responding to unprecedented demand from consumers (*i.e.*, grocery store shoppers). For example, UNFI's President, Christopher Testa, explained that the Company "continue[d] to be constrained by deteriorating fill rates caused primarily from upstream supply chain challenges."[6] (Ex. 5, Q2 2022 Earnings Call Tr. at 6.) "Deteriorating fill rates were driven by high demand[,] the impact of [O]micron on the availability of freight and labor[,] … as well as continuing raw materials and packaging shortages." (*Id*.) These challenges continued throughout fiscal year 2022. (*See* Ex. 6, Q1 2022 Earnings Call Tr. at 3 ("continued challenges across the industry, including ongoing supply chain difficulties, declining fill rates and rising inflation"); Ex. 5, Q2 2022 Earnings Call Tr. at 8 ("So we saw improving fill rates right up until the end of the summer, … and it has deteriorated sequentially since then."); Ex. 7, Q4 2022 Earnings Call Tr. at 3 ("Fill rates continue to be pressured and labor market tightness persist[s].").) The Company described these challenges as so acute that it was effectively in "survival" mode in trying to fill its customers' orders. (*See, e.g.*, Ex. 8, ICR Conference 2023 Tr. at 2 ("as we get ready to I hope emerge from what has been three years of survival in the supply chain business with fill rates improving").) During the Q2 2022 earnings call, UNFI CEO "Sandy" Douglas summarized the complicated set of challenges facing the Company:

---

[6] A "fill rate" refers to the percentage of customer orders that can be fulfilled by available stock.

Our performance this quarter came during a time of heightened uncertainty across the economy. Continuing supply chain challenges are at the heart of the issues which continue to create short and long-term impacts on UNFI and our customers. Accelerating inflation along with varying degrees of negative unit elasticity, lower inbound fill rates, increased fuel expense, labor shortages, increasing wages, and increased use of third-party labor to manage stress points are all impacts on our business and our customers' businesses this past quarter. (Ex. 5, Q2 2022 Earnings Call Tr. at 3.)

Against this backdrop of supply chain volatility and product availability issues, inflation skyrocketed, which caused two offsetting changes. First, suppliers repeatedly increased the prices of their products, and many of these increases were larger than usual. (*See* Ex. 9, Q2 2023 Earnings Call Tr. at 13 (explaining that "the accumulation of all the price increases that [had] happened in the last 12 months" was significantly higher than in Q2 2023).) Where UNFI was able to sell inventory it acquired at the old (lower) price to customers at the new, higher price, this provided an inflationary gain. (*See* Ex. 4, Q3 2021 Earnings Call Tr. at 5 (explaining that "inflation [had] historically been a positive tailwind to [UNFI's] wholesale business as [its] contracts generally allow UNFI to pass through manufacturer cost increases").) But UNFI also lost forward-buying opportunities because many suppliers cut back on the number and magnitude of sales promotions they offered due to heightened product demand.[7]

C.     **UNFI Reports Positive Financial Results Throughout Fiscal Year 2022 And Q1 2023, Repeatedly Noting The Impact Of Inflation On Its Business.**

Throughout fiscal year 2022, UNFI reported positive financial results and specifically attributed those results in part to the positive impact of inflation. For example, on December 8, 2021, the Company announced its first quarter 2022 financial results in a press release, reporting a 4.7% increase in net sales from the prior year period that was "primarily *driven by inflation* and new business from both existing and new customers, … partially offset by supply chain

---

[7] *See* Nick Carey *et al.*, "Coffee, Ketchup and Nike Air Max: It's the COVID Consumer Economy," *Reuters* (Sept. 1, 2020) (retailers had "cut[] back on promotions" for in-demand products, while "[r]ising demand … [and] global supply-chain disruptions" had "driven up prices"), *available at* http://tinyurl.com/bdd27cv4.

challenges and expected modest … contraction." (Ex. 10, Q1 2022 Earnings Press Release at 2 (emphasis added).) The Company also stated that gross margin rate improved from 14.51% to 14.89%, an increase "driven by improvements in the Wholesale segment margin rate, including *the impact of inflation* and the Company's ValuePath initiative."[8] (*Id.* (emphasis added).)

UNFI reported similar results for each quarter in 2022—each time accurately stating that inflation contributed to those results. (*See* Ex. 12, Q2 2022 Earnings Press Release at 2-3 (net sales increase "driven by inflation" and other factors; gross margin rate increase driven, in part, by "the impact of inflation"); Ex. 13, Q3 2022 Earnings Press Release at 2 (same); Ex. 14, Q4 2022 Earnings Press Release at 2 (same); *accord* SAC ¶¶ 73-80.) In Q1 of 2023, although the gross profit rate decreased slightly (from 14.8% to 14.6%), UNFI again reported an increase in net sales, and again attributed the increase in part to inflation. (*See* Ex. 15, Q1 2023 Earnings Press Release at 2; *accord* SAC ¶ 83.)

Throughout this entire period, the Company made robust public disclosures about the impact of inflation on its business. In addition to the statements discussed above, UNFI repeatedly disclosed in its annual and quarterly financial reports that the Company experienced "a mix of inflation across product categories," that "[c]hanges in merchandising, customer buying habits and competitive pressures create inherent difficulties in measuring the impact of inflation on Net sales and Gross profit," and that "[a]bsent any changes in units sold or the mix of units sold, inflation generally has the effect of increasing sales." (*See, e.g.*, Ex. 16, Q1 2022 Form 10-Q at 28; Ex. 17, 2022 Form 10-K at 30.) The Company also explicitly warned investors that its business was characterized by "relatively low margins" that "are sensitive to inflationary and deflationary pressures." (*See, e.g.*, Ex. 16, Q1 2022 Form 10-Q at 25; Ex. 17, 2022 Form 10-

---

[8] "ValuePath" was a set of initiatives announced in December 2020 designed to "position UNFI for future sales growth and margin expansion." (Ex. 11, Q1 2021 Earnings Call Tr. at 5.) The initiatives included planned improvements across several areas in the Company. (*Id.* at 11.)

K at 27.) It also specifically warned investors of the risk that there may be "moderated supplier promotional activity" and "decreased forward buying opportunities" in the future. (*See, e.g.*, Ex. 16, Q1 2022 Form 10-Q at 25; Ex. 17, 2022 Form 10-K at 28.)

Given these disclosures, the market understood that the Company's profitability was benefiting from inflationary gains caused by forward buying. For example, in September 2021, even before the alleged class period began, Northcoast Research issued a report noting that in "the current selling environment UNFI should continue to benefit from … higher food inflation, presenting the company with forward buying opportunities." (Ex. 18, Northcoast Research September 24, 2021 Rpt. at 1.) Similarly, in October 2021, the same analyst commented on "the potential for forward buying opportunities" for UNFI. (Ex. 19, Northcoast Research October 5, 2021 Rpt. at 3.) In March 2022, during the putative class period, Wells Fargo stated that "[i]nflation has clearly also provided a benefit given the structure of [UNFI's] contracts with customers and ability to forward buy," and also noted that "eventual disinflation is likely to be a headwind to earnings." (Ex. 20, Wells Fargo March 17, 2022 Rpt. at 3.) In June 2022, Guggenheim observed that "[w]ith respect to profitability, we believe inflation benefits—pricing and forward buys—could drive modest gross/EBITDA margin upside." (Ex. 21, Guggenheim June 20, 2022 Rpt. at 1.) And in July 2022, UBS commented that "[i]nflation can help to support sales [and] UNFI can preserve its gross margin by forward buying." (Ex. 22, UBS July 13, 2022 Rpt. at 1; *see also* Ex. 23, UBS June 7, 2022 Rpt. at 1 (UNFI's "ability to forward buy … should allow for it to grow its [gross margin]").)

**D.      UNFI Announces Negative Financial Results In Q2, Q3, And Q4 Of 2023, And Issues Revised Earnings Guidance In Q2 And Q3 2023.**

During the second quarter of fiscal year 2023, inflation decelerated, and the Company announced worse-than-expected financial results for the period. Specifically, on March 8, 2023,

UNFI reported a $6 million year-over-year decline in gross profit, explaining that the gross profit rate declined from 14.5% in Q2 2022 to 13.7% in Q2 2023. (SAC ¶ 91; Ex. 24, Q2 2023 Earnings Press Release at 1-2.) The Company also lowered its previously issued EBITDA guidance by approximately $115 million. (SAC ¶ 94.)

During the earnings call, Mr. Douglas explained that "[w]hile we expected inflation to decline [and] the supply chain to continue to normalize[, w]e did not fully appreciate the benefit to last year's gross profit from buying inventory in advance of supplier price increases in the sequentially rising inflationary environment. We now realize the magnitude of these benefits last year, which are not repeatable in the current environment." (Ex. 9, Q2 2023 Earnings Call Tr. at 4.) Mr. Douglas continued that UNFI "did not have full visibility and sufficient detail into the commercial drivers of the benefits due to legacy issues with digital infrastructure limiting real-time data which is required to fully understand and forecast these … drivers." (*Id.*) UNFI's CFO John Howard explained that these issues were compounded by lower-than-expected promotional activity from suppliers "that could have offset some of what we experienced." (*Id.* at 6.)

Analysts reacted to the news, noting that "an IT-oriented lack of real-time data visibility was the primary culprit—it was difficult to track the precise amount of profit, especially in a rapidly-escalating inflationary backdrop." (Ex. 25, Guggenheim March 12, 2023 Rpt. at 1; *see also* Ex. 26, BTIG March 8, 2023 Rpt. at 1 ("Forward buying during outsized inflation this time last year inflated gross profit, which the company's antiquated systems failed to fully identify."); Ex. 27, BMO March 8, 2023 Rpt. at 1 ("We see the challenges stemming from a lack of internal analytical capabilities, exasperated by running on five different [IT] systems.").) And UNFI was not the only company that experienced a decline in margin driven by declining inflationary forward-buy opportunities. Analysts also noted that one of UNFI's peer companies,

11

SpartanNash, "call[ed] out a similar dynamic [with respect to forward buying] in its guidance two weeks [earlier]." (Ex. 26, BTIG March 8, 2023 Rpt. at 1; *see also* Ex. 27, BMO March 8, 2023 Rpt. at 1 (SPTN also "had its share of inventory gain comparisons").)

On June 7, 2023, UNFI reported a $12 million year-over-year decline in gross profit for Q3 2023, driven "primarily driven by the volatile macroeconomic environment, which led to lower inflationary benefits and reduced procurement gains," as well as "higher levels of shrink and costs related to operational improvements."[9] (Ex. 28, Q3 2023 Earnings Press Release at 2.) The Company reduced its EBITDA guidance again. (SAC ¶¶ 113, 120.) During the earnings call, Mr. Howard explained that UNFI had "expected to see [its] year-over-year gross profit rate decline given the procurement gains [it had been] cycling from last year," but "relative to our expectations at the end of Q2, the decline was greater than anticipated, largely due to the impact of the volatile macroeconomic backdrop." (Ex. 29, Q3 2023 Earnings Call Tr. at 7.)

Analysts reacted to the news, highlighting additional challenges facing UNFI:

Simply put, integrating the largest acquisition in its history during the most unpredictable operating environment ever has created unprecedented forecasting and operational challenges. This was made more difficult by the fact that [SuperValu] was integrating several acquisitions of its own. UNFI is operating with seven separate IT platforms and a still relatively new consolidated operating structure. Reduced visibility into real-time changes in the business has prevented proactive mitigation actions. (Ex. 30, Guggenheim June 25, 2023 Rpt. at 2.)

On September 26, 2023, UNFI reported a decline in gross profit of 9.6%. (Ex. 31, Q4 2023 Earnings Press Release at 1-2; *accord* SAC ¶ 125.) The results were in line with the high end of the Company's most recent earnings guidance, which anticipated declines. (Ex. 31, Q4 2023 Earnings Press Release at 1.) The Company explained that the "decrease in gross profit rate … was primarily driven by lower levels of procurement gains, reduced benefits from inflation

---

[9] "Shrink" refers to any unknown or unaccounted for loss of inventory. Causes of shrink include losing an item, theft, spoilage, and incorrect delivery, among others.

and higher levels of shrink." (*Id.* at 2.) During the earnings call, Mr. Howard added: "As we indicated would be the case with our updated outlook, the biggest driver for the decline in Q4 year-over-year profitability was lower levels of procurement gain opportunities resulting from decelerating inflation." (Ex. 32, Q4 2023 Earnings Call Tr. at 7.) He also noted that the Company had "experienced higher levels of shrink compared to last year's fourth quarter." (*Id.*)

After the Company reported its financial results for Q2, Q3, and Q4 2023, its stock price dropped. (SAC ¶¶ 12, 16, 18.)

### E.    Plaintiffs' Claims.

Plaintiffs argue that, despite unprecedented economic volatility, Defendants must have known the relative impact of forward buying, as opposed to other factors, on the Company's margin throughout 2022 and Q1 2023, and should have disclosed the precise extent to which the Company's profitability was being driven by inflationary gains from forward buying during this period. (*See, e.g.*, SAC ¶ 6.) They bring claims against all Defendants for a violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, alleging that they made false or misleading statements about the Company's financial performance, and against the Individual Defendants under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), for "control person liability," alleging that they exercised control over the content and dissemination of the allegedly false and misleading statements. Plaintiffs seek to represent a class of those who acquired UNFI securities between December 8, 2021, when the Company released its financial results for Q1 2022, and September 25, 2023, when the Company released its financial results for Q4 2023. (SAC ¶¶ 1, 254.)

### ARGUMENT

To state a claim for securities fraud, Plaintiffs must allege, among other things, (1) a false or misleading statement, and (2) scienter on the part of the person making the misstatement. *ECA*

13

& *Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009). On a motion to dismiss, the Complaint must be assessed under both the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and also the requirements of the PSLRA, 15 U.S.C. § 78u-4(b). *Tellabs*, 551 U.S. at 319-21.

As to falsity, the complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *Id.* at 321 (quoting 15 U.S.C. § 78u-4(b)(1)). Accordingly, Plaintiffs "must do more than say that the statements … were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).

As to scienter, Plaintiffs must adequately allege that the alleged misstatements were made with "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (citation omitted). The PSLRA requires Plaintiffs to "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). This demanding standard requires that the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. This is an "inherently comparative" inquiry, and "the court must take into account plausible opposing inferences." *Id.* at 323. Plaintiffs' allegations are sufficient "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference." *Id.* at 324. And Plaintiffs must plead particularized facts supporting a strong inference with regard to each defendant and each statement. *City of Birmingham Fireman's & Policeman's Supplemental Pension Sys. v. Ryanair Holdings PLC*, 2020 WL 2834857, at *4 (S.D.N.Y. June 1, 2020).

14

I.    **PLAINTIFFS FAIL TO ALLEGE PARTICULARIZED FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER.**

Plaintiffs allege that Defendants knowingly concealed the impact of forward buying on the Company's profitability and, in turn, knew that the Company's financial results as reported throughout 2022 were misleading. The Complaint falls far short of pleading particularized facts giving rise to a strong inference of scienter on the part of any Defendant.

Despite its length and the fact that this is Plaintiffs' third attempt, the Complaint notably does *not* identify non-public internal information reviewed by the Individual Defendants that actually contradicted Defendants' statements. And although plaintiffs seeking to plead a claim for securities fraud often rely on the account of so-called "confidential witnesses" to meet the steep burden of pleading scienter, the Complaint identifies no first-hand source regarding Defendants' purported "knowledge." Nor do Plaintiffs allege that the Company or its outside independent auditor determined that it was necessary to restate the Company's financial results, as would be required if the Company's financial statements were materially false or misleading. And Plaintiffs do not allege any adverse regulatory or criminal findings against the Company, or any admissions made by Defendants in other proceedings.

Unable to set forth these sorts of allegations (which themselves have frequently been found to be insufficient),[10] Plaintiffs resort instead to three types of conclusory allegations: (1) that the Individual Defendants had an alleged motive to hide the impact of forward buying on earnings because doing so increased their annual bonuses and one of the Individual Defendants, Mr. Testa, made an allegedly "suspicious stock sale"; (2) that Defendants purportedly had

---

[10] *See, e.g.*, *Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 459-63 (S.D.N.Y. 2010) (allegations regarding "credit and performance data" compiled and reported by risk management system "insufficient to establish scienter"), *aff'd*, 430 F. App'x 63 (2d Cir. 2011). "Confidential witness" allegations are themselves frequently held to be insufficient to allege a strong inference of scienter. *See, e.g.*, *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 594-95 (S.D.N.Y. 2011).

15

"access to information" provided by UNFI to its suppliers; and (3) the "core operations doctrine," pursuant to which Plaintiffs argue that Defendants must have been aware of the impact of forward buying on UNFI's earnings given the size of the effect. Perhaps recognizing that none of these allegations come close to satisfying their burden, Plaintiffs also make a halfhearted attempt to plead scienter by alleging that Defendants "recklessly" issued financial forecasts that lacked a reasonable basis.

Plaintiffs' allegations do not come close to establishing scienter under the PSLRA. They also defy common sense: the notion that senior management deliberately would have issued incorrect financial forecasts—causing the price of UNFI's stock, of which they are significant holders,[11] to decline substantially and causing bonuses not to be paid for any executives in 2023 (*see* p. 18 n.13, *infra*)—is far less likely than the countervailing, innocent inference that the Individual Defendants, consistent with their public statements, did not have prior insight into the magnitude of the impact that forward buying had on the Company's margin in 2022, causing its forecast to be incorrect in 2023 when inflation decelerated against the backdrop of unprecedented macroeconomic volatility. Because Plaintiffs have failed to plead facts establishing a strong inference of scienter for any Defendant,[12] their claim must be dismissed.

A.       **Plaintiffs Fail To Plead Adequately That Defendants Were Motivated to Commit Fraud.**

Plaintiffs argue that the Individual Defendants had a motive to hide the impact of forward buying on earnings because doing so increased their annual bonuses. (SAC ¶¶ 249-50.) Courts in

---

[11] *See* Ex. 33, Mar. 27, 2023 Form 4 for Douglas; Ex. 34, Feb. 8, 2023 Form 4 for Howard; Ex. 35, Jan. 25, 2023 Form 4 for Testa.

[12] To allege scienter against a corporation, Plaintiffs must either allege "facts that give rise to a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter" or establish that this is one of the "exceedingly rare instances" in which a statement is "so dramatic that collective corporate scienter may be inferred." *Nandkumar v. AstraZeneca PLC*, 2023 WL 3477164, at *4 (2d Cir. May 16, 2023) (cleaned up). As explained *infra*, Plaintiffs do not establish a strong inference of scienter as to any individuals, nor do Plaintiffs identify any statement that is "so dramatic that collective corporate scienter may be inferred."

16

the Second Circuit routinely hold that such allegations are insufficient: "motives … common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *Schwab v. E\*Trade Fin. Corp.*, 285 F. Supp. 3d 745, 756 (S.D.N.Y.) (cleaned up), *aff'd*, 752 F. App'x 56 (2d Cir. 2018); *see also In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 313 (S.D.N.Y. 2021) ("[I]ncentive-based compensation is typically insufficient to support an inference of scienter.").

Here, Plaintiffs merely allege that the Individual Defendants had an incentive to keep UNFI's earnings high. But that incentive is "possessed by virtually all corporate insiders," and "it is not sufficient" to allege scienter. *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (citation omitted); *see also Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (plaintiffs' "proffered motive is the same desire to maintain the appearance of profitability that we have consistently rejected as insufficient"); *Sun v. TAL Educ. Grp.*, 2023 WL 6394413, at \*31 (S.D.N.Y. Sept. 29, 2023) (rejecting as evidence of scienter allegations that defendants "desire[d] to optimize their bonuses" and other compensation). "If scienter could be pleaded on [this] basis alone, virtually every company … that experiences a downturn in stock price could be forced to defend securities fraud actions." *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) (cleaned up).

Plaintiffs' compensation allegations also fail because they do not make sense. Plaintiffs allege a scheme that, at most, could inflate UNFI's earnings for the short period when inflation accelerated at an atypical pace, but would result in a large stock price drop when inflation inevitably decelerated. As Plaintiffs recognize, each of the Individual Defendants received both yearly bonus compensation *and* long-term stock grants intended to motivate a "focus on *multi-*

17

*year* operational performance and increasing shareholder value." (SAC ¶ 250.) In fact, the value of the Individual Defendants' long-term equity awards *dwarfed* the value of their short-term bonuses. (Ex. 36, 2022 Proxy at 38 (showing that CEO Douglas received 59.8% of compensation via long-term equity awards and 24% via short-term bonus; other named executive officers received an average of 52.3% of compensation via long-term equity awards and 23% via short-term bonus).) It is not plausible that the Individual Defendants, whose compensation was heavily weighted towards long-term stock grants, had an incentive to engage in a short-term fraud.[13]

In a last-ditch effort, Plaintiffs also newly argue in this Complaint (despite the public availability of this information since January 2023) that Mr. Testa made "suspicious stock sales." (SAC ¶¶ 239-44.) The two stock sales at issue, which were made on the same day pursuant to a Rule 10b5-1 trading plan, do not establish a strong inference of scienter. On December 22, 2022, Mr. Testa entered into a Rule 10b5-1 trading plan that included a sell order for 27,931 shares of UNFI to be sold between January 23, 2023, and September 29, 2023, if the stock was trading at $35 or higher. (Ex. 37, Testa 10b5-1 Trading Plan at 3; *accord* SAC ¶ 242.)[14] The plan also included sell orders for additional shares if the price traded at certain prices *higher* than $35. (*See* Ex. 37, Testa 10b5-1 Trading Plan at 4-6.) On January 23, 2023, when the plan took effect, UNFI's stock price exceeded $35,[15] and the sell order was required to be executed. Accordingly, Mr. Testa's broker sold 27,931 shares. (SAC ¶ 241; *see also* Ex. 35, Jan. 25, 2023 Testa Form 4.) No other trades were executed based on this trading plan, as none of the other conditions were

---

[13] Plaintiffs' allegations also do not make sense because Plaintiffs allege a scheme to obtain bonuses for fiscal year 2022, at the expense of fiscal year 2023 bonuses, when inflation decelerated and earnings fell. Indeed, bonuses were not awarded for 2023. (*See* Ex. 29, Q3 2023 Earnings Call Tr. at 7 ("We don't expect to pay any employee bonuses this year as projected results are below our threshold targets for fiscal 2023 adjusted EBITDA … .").)

[14] Courts may consider Rule 10b5-1 trading plans on a motion to dismiss. *See, e.g.*, *Constr. Laborers Pension Tr. for S. Ca. v. CBS Corp.*, 433 F. Supp. 3d 515, 544 (S.D.N.Y. 2020). The same is true for historical stock prices. *See, e.g.*, *Dfinity Found. v. New York Times Co.*, 2023 WL 7526458, at *1 n.6 (S.D.N.Y. Nov. 13, 2023).

[15] UNFI Stock Price, Historical Data, *available at* http://tinyurl.com/5hcdst8v.

18

met. Mr. Testa retained over 82% of his total shares available for sale. (*See* SAC ¶ 244.)

Stock sales made pursuant to a Rule 10b5-1 trading plan generally do not raise a strong inference of scienter. *See* 17 C.F.R. § 240.10b5-1(c); *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 176 (S.D.N.Y. 2023) ("Sales conducted pursuant to a 10b5-1 trading plan or executed for procedural purposes … could not be timed suspiciously, and, as a general matter, do not give rise to a strong inference of scienter." (cleaned up)). Plaintiffs seek an exception to this general rule by insinuating that Mr. Testa entered into the plan knowing the Company's stock price would decline due to the relative impact of inflation-related forward buying on the Company's margin. (*See* SAC ¶¶ 240-43.) But Plaintiffs do not allege that Mr. Testa had *any* information, much less "non-public information" about this relationship before entering into the trading plan, which is fatal to Plaintiffs' theory. *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 585 (S.D.N.Y. 2014).

Plaintiffs assert that Mr. Testa "made public statements indicating he had knowledge of the trends in price increases and of the Company's response to these increases." (SAC ¶ 242 (citing ¶¶ 66-68).) But Mr. Testa only said that the Company received notification of price increases, and that UNFI's contracts allowed the Company to pass price increases to customers. (*See id.* ¶¶ 66-68.) Plaintiffs do not plead that Mr. Testa was knowledgeable about forward buying, much less the relative impact of inflationary forward buying on the Company's margin. *See Lululemon*, 14 F. Supp. 3d at 585 (rejecting scienter argument involving 10b5-1 trading plan; "broad allegations about [insider's] involvement in the company … generally" were "insufficient"). More generally, Plaintiffs plead no facts suggesting "that the purpose of the plan was to take advantage of an inflated stock price." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 356 n.4 (2d Cir. 2022); *see also DraftKings*, 650 F. Supp. at 175-77

(rejecting scienter argument where complaint did "not plead facts giving rise to an inference that the plans themselves were suspect"). Indeed, Mr. Testa's trading plan was structured in a way that strongly suggests the *opposite*—additional stock sales would be triggered only if UNFI's stock price continued to rise. And, importantly, Mr. Testa's net holdings also ***increased*** over the course of the alleged class period. (*Compare* Ex. 38, Oct. 14, 2021 Testa Form 4 (holding 52,470 shares), *with* Ex. 39, Sept. 28, 2023 Testa Form 4 (showing total shares of 148,163 after an acquisition of 23,315, which implies Mr. Testa held 124,848 shares on the last day of the class period).) *See In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 290 n.182 (S.D.N.Y. 2006) ("[D]ozens of cases dismiss complaints … where motive allegations were undermined by increases in total holdings[.]" (cleaned up)).

Nor is the sale suspicious based on other factors that courts consider. The Complaint pleads "total proceeds" from the sales (*see* SAC ¶ 244), but not net profits, and it is the latter that is relevant. *See, e.g.*, *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011) ("Plaintiffs must allege not only the insider defendants' selling activity during the relevant period, but also those defendants' net profits as opposed to gross proceeds … ."); *Sun*, 2023 WL 6394413, at *29 ("proceeds alone say nothing about a seller's motive"). The percentage of holdings sold was small (17.01%)—even smaller than in other cases where courts found that scienter had not been adequately alleged. *See, e.g.*, *In re Plug Power, Inc. Sec. Litig.*, 2022 WL 4631892, at *13 (S.D.N.Y. Sept. 29, 2022) (collecting cases where sales of 43%, 40%, 100%, 36%, and 26% were all found to be insufficient); *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 271 (S.D.N.Y. 2009) (stock sale of "only 22.5%" was "relatively small in volume" and did not support a finding of scienter); *eSpeed*, 457 F. Supp. 2d at 291 (sale of 17.4% not suspicious). The timing of Mr. Testa's two sales over a single day was not suspicious: they took place pursuant to

20

a pre-authorized plan executed on December 22, 2022, just two weeks after the Company had

released its Q1 2023 results (which were consistent with its guidance), and more than two

months before the announcement of the Company's Q2 2023 financial results. *See, e.g.*, *Sun*,

2023 WL 6394413, at *29 (S.D.N.Y. Sept. 29, 2023) ("Because the sales took place more than a

month prior to the corrective disclosures, the Court declines to find trading on such a timeline

inherently suspicious." (cleaned up)); *accord City of Coral Springs Police Officers' Ret. Plan v.

Farfetch Ltd.*, 565 F. Supp. 3d 478, 489 (S.D.N.Y. 2021) (when stock sales are made pursuant to

a 10b5-1 trading plan, the date of entry into the plan is what matters, not the date of the sales).

Finally, Plaintiffs do not allege that any other Defendant engaged in purportedly suspicious stock

sales.[16] "[T]he fact that other defendants did not sell their shares during the relevant class period

sufficiently undermines plaintiffs' claim regarding motive." *San Leandro Emergency Med. Grp.

Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996); *see also eSpeed*,

457 F. Supp. at 291 (same).

> **B.**     **Plaintiffs' Allegations Regarding "Access To Information" Do Not Establish A Strong Inference Of Scienter.**

Plaintiffs also claim that Defendants had "access to information" that contradicted or

"undermined" their statements. (*See* SAC ¶ 101; *accord id.* ¶¶ 30, 166, 178, 184, 186, 188, 196,

198, 204, 228.) These conclusory allegations do not establish scienter. "Where plaintiffs allege

that defendants knew about or had access to contrary facts … they must *specifically identify* the

reports or statements containing this information. … Second Circuit cases uniformly rely on

allegations that [1] *specific contradictory information* was available to the defendants [2] *at the

same time* they made their misleading statements." *Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d

---

[16] Mr. Howard sold a very small percentage of his shares during the putative class period pursuant to his 10b5-1 trading plan. Plaintiffs do not allege that this sale was suspicious, nor could they. Mr. Howard sold only 7,000 shares, which was less than 6% of his total holdings; his net holdings increased over the class period; and his sale was not suspiciously timed. (*See* Ex. 34, Feb. 8, 2023 Howard Form 4; Ex. 40, Oct. 10, 2023 Howard Form 4.)

193, 237 (S.D.N.Y. 2020) (cleaned up) (emphases added).

Rather than identify any specific, contemporaneous reports or information contradicting Defendants' statements to which Defendants had access, Plaintiffs instead argue that "Defendants do not dispute that they had *some* understanding of UNFI's 'strategic forward buying' and its 'substantial' impact." (SAC ¶ 136.) But an allegation that Defendants had "some" understanding that the Company was benefiting from forward buying does not mean that Defendants understood—in real time—the relative magnitude of forward buying on the Company's profitability during a period of unprecedented economic volatility, much less that UNFI's financial forecasts lacked a reasonable basis when issued. *See, e.g.*, *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 351-52 (S.D.N.Y. 2011) (allegation that defendants "received reports detailing significant and widespread problems" failed "to adequately identify the particular reports at issue" and failed to explain how information in those reports "contradicted the public declarations" of defendants); *HEXO*, 524 F. Supp. 3d at 314 (Plaintiffs' "abject failure to identify any reports or statements containing adverse facts to which defendants had access at the time the statements … were made is itself fatal to plaintiffs' … claims.").

After Defendants identified this weakness with Plaintiffs' "access to information" allegations in their first motion to dismiss (*see* Dkt. 33 at 19-23), Plaintiffs amended their Complaint to add conclusory allegations regarding so-called "ClearVue reports," which Plaintiffs insinuate would have given Defendants information about the relative impact of forward buying on the Company's profitability during the class period. (*See* SAC ¶¶ 228-30 & n.18.) There are two fatal problems with Plaintiffs' allegations.

*First*, the ClearVue reports do not contain information that renders the public statements false or misleading. Plaintiffs do not even attempt to explain how the information in these reports

22

contradicted any of Defendants' statements, instead simply dropping a footnote with a hyperlink to a video from UNFI's website that discusses the reports. (*See id.* ¶ 229 n.18.) As screenshots from that video show, none of the reports contain information about procurement gains. (*See* Ex. 41, Screenshots of Video.) *See, e.g.*, *Wachovia*, 753 F. Supp. 2d at 351-52 (lack of specificity failed to provide any "inference of access to contrary facts"). Instead, as the screenshots confirm, the reports, which are designed to be shared externally with the Company's suppliers (*see* SAC ¶ 229), merely show inventory levels (quantity on hand and quantity on order)—which were challenged during the COVID era, *see* pp. 7-8, *supra*—raw sales figures, manufacturer chargeback amounts, and service levels broken down by product and by distribution center for each supplier. They do not show gross margin, much less the portion of gross margin attributable to forward buying, for even one product or one supplier, much less across all of UNFI's approximately 250,000 products and more than 10,000 suppliers. *See* p. 5, *supra*.

*Second*, although the Complaint alleges that the Defendants "had access to the amount of inventory on hand and sales trends," Plaintiffs do not even allege that the Defendants had access to or reviewed these *particular* reports. (*See* SAC ¶¶ 228-29.) "[V]ague and general averments" that the defendants "had access to internal corporate documents and data during the class period, including real-time customer and sales information," do not support an inference of scienter. *Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*, 445 F. App'x 368, 370 (2d Cir. 2011); *see also Jackson v. Halyard Health, Inc.*, 2018 WL 1621539, at *8-9 (S.D.N.Y. Mar. 30, 2018) (rejecting an inference of scienter, in part, because plaintiffs failed to allege that defendants "personally received" a damaging report).

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.* shows why the Complaint falls far short of establishing a strong inference of scienter. There, the company had reported strong sales

23

numbers for two consecutive quarters at the beginning of the putative class period. 518 F. Supp. 3d 772, 776 (S.D.N.Y. 2021). Then, in the next quarter, the company abruptly reversed course, announcing a "comparable store sales decrease for the first time in five years." *Id.* One executive attributed the decline to "issues with the company's supply chain and inventory, stating that the company had 'underestimated the impact of … accelerated new store growth on [its] operations.'" *Id.* at 776-77. Another executive disclosed that "a 'bottleneck issue' had existed in the supply chain 'for most all of Q2 and was corrected basically in the last week of the quarter.'" *Id.* at 777. The plaintiffs, relying in part on testimony from confidential witnesses (not pleaded here), alleged that the company's executives had access to facts that undermined their statements because they had access to a specific daily sales report that tracked store sales, they "assessed inventory on a weekly basis," and "the company 'had technology in place to provide real-time information to its senior executive team regarding its inventory.'" *Id.* at 780 (cleaned up).

These allegations—which are *more specific* than the allegations here—did not establish scienter. The plaintiffs failed to "specify exactly what information was contained in the [daily sales] report or how said information 'contradicted Defendants' public statements[.]'" *Id.* at 781 (citation omitted). "Even if the report did reflect a decline in inventory, it [was] not clear that such a decline would have undermined [the company's] overall sales projections or meant that '[the company's] inventory pipeline and deal flow were not as described.'" *Id.* And the allegations that the executives regularly assessed inventory or had access to real-time data were "too vague to support an inference of scienter." *Id.*; *see also Inter-Local Pension Fund GCC/IBT*, 445 F. App'x at 370 ("vague and general averments" that executives had access to "real-time customer and sales information" insufficient); *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 373 (S.D.N.Y. 2018) ("broad allegations" that defendants had access to "expense and

24

capital cost data" did not support inference of scienter).

Finally, Plaintiffs resort to allegations that Defendants *should have* had access to such information. For example, Plaintiffs allege that in September 2020, UNFI had announced a program to improve its use of "data analytics to drive decision-making and generate these incremental operating efficiencies." (SAC ¶ 2.) Plaintiffs further note that in September 2020, Mr. Testa stated on an earnings call that "Going forward, we'll be placing a heavy emphasis on standardizing processes and using higher level data analytics to drive decision-making and generate these incremental operating efficiencies."[17] (*Id.* ¶ 45 (emphasis omitted)).

According to Plaintiffs, these statements meant that Defendants had "visibility into the number and magnitude of … price increases." (*Id.* ¶ 141.) But Defendants said no such thing—instead referring only generally to data regarding "decision making."[18] Plaintiffs' claim in this regard not only is conclusory, but also is contradicted by their own allegations elsewhere in the Complaint. Indeed, Plaintiffs specifically allege that these initiatives did *not* provide Defendants with real-time insight into the impact of forward buying on UNFI's earnings. (*See, e.g.*, SAC p. 97 (alleging that Defendants "lacked real-time visibility"; *id.* ¶¶ 251-53.) As Plaintiffs acknowledge, during the Q2 2023 earnings call, in response to the question whether UNFI had "the systems in place to understand how much forward buy [the Company was] doing," Mr. Howard responded: "Our systems, the way they're structured now, do a very good job of aggregating [distribution center] data each period, and they do it accurately and it's very controlled. However, ***the granularity of that data and the real-time ability to analyze it is not***

---

[17] Plaintiffs quote or paraphrase this same generic quote about "higher level data analytics" from 2020 repeatedly in boilerplate fashion throughout the Complaint. (*See* SAC ¶¶ 100, 136, 139, 144, 154, 164, 176, 238.)

[18] Likewise, Plaintiffs baldly assert that "Defendants were able to reliably measure the incremental operating efficiencies arising from UNFI's use of higher level data analytics and procurement systems as part of the ValuePath initiative and … Defendants had developed systems and practices to quantify procurement gains." (SAC ¶ 144; *see also id.* ¶¶ 154, 164, 176.) There are no particularized facts that suggest Defendants were able to quantify the relative magnitude of forward buying (or procurement gains) on UNFI's margin during the putative class period.

25

*strong*." (*Id.* ¶ 101 (emphasis changed); *see also* Ex. 9, Q2 2023 Earnings Call Tr. at 13; SAC ¶¶ 251-53.) At most, Plaintiffs have alleged that the Company's ability to analyze the data in real time *should have* been better and that Individual Defendants *should have* possessed the capabilities accurately to forecast the impact of forward buying on the Company's margins. But such allegations do not establish an intent to defraud. *See, e.g.*, *Woolgar*, 477 F. Supp. 3d at 237 (rejecting allegations "that a defendant merely ought to have known" contradictory information); *Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 303 (S.D.N.Y. 2010) ("[E]ven an egregious failure to gather information will not establish ... liability as long as the defendants did not deliberately shut their eyes to the facts." (citation omitted)).[19] Plaintiffs' theory is classic fraud-by-hindsight.

### C. The Core Operations Doctrine Is Insufficient To Establish Scienter And Does Not Apply In Any Event.

Plaintiffs invoke the "core operations" doctrine, which some courts have held permits an inference that a company and its senior executives have knowledge concerning the "core operations" of a business, arguing that Defendants must have been aware of the impact of forward buying on UNFI's earnings given the magnitude of its impact. (SAC ¶¶ 233-38.) But this doctrine, which many courts have suggested did not survive enactment of the PSLRA,[20] "does not independently establish scienter." *Woolgar*, 477 F. Supp. 3d at 239 (cleaned up). Where, as here, there is an "utter absence of any other evidence of fraudulent intent, the doctrine itself is insufficient to give rise to the necessary inference." *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 528 (S.D.N.Y. 2020).

---

[19] Plaintiffs also claim that Defendants "had reason to know of the material adverse impact of reduced forward buying opportunities" "at the time of the 1Q23 earnings report" because UNFI's Form 10-Q filed on March 8, 2023 stated that the decline was "sequential." (SAC ¶ 140.) A statement that a retrospective analysis of data revealed a "sequential" trend does not indicate any awareness of that fact during the period that the data was being generated.

[20] *See, e.g.*, *Maloney*, 518 F. Supp. 3d at 781; *City of Birmingham*, 2020 WL 2834857, at *4 (collecting cases).

In any event, to the extent the doctrine is still viable, it does not apply here. Courts "have required that the operation in question constitute nearly all of a company's business before finding scienter based on [this] doctrine." *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011); *see, e.g.*, *In re Federated Dep't Stores, Inc. Sec. Litig.*, 2004 WL 444559, at \*5 (S.D.N.Y. Mar. 11, 2004) (subsidiary worth 10% of defendant's assets not sufficiently "core" to trigger doctrine because it was "not essential to the survival" of the company); *Hensley v. IEC Elecs. Corp.*, 2014 WL 4473373, at \*5 (S.D.N.Y. Sept. 11, 2014) (similar).

Plaintiffs have not alleged—nor could they—that inflationary forward buying, which is simply a description of the timing of some of UNFI's purchasing decisions, constitutes nearly all of UNFI's business or that it was essential to the Company's survival.[21] The "core operation" of UNFI's business is distributing groceries, and there is no suggestion that UNFI's ability to perform that operation was threatened by decreased inflationary forward-buying opportunities. In fact, UNFI's sales went *up* quarter after quarter, *including* in Q2 2023 and Q3 2023. (*See* Ex. 24, Q2 2023 Earnings Press Release at 1; Ex. 28, Q3 2023 Earnings Press Release at 1.) And UNFI operated successfully for decades before the unprecedented inflation in the COVID era. (*See* Ex. 2, 2023 Form 10-K at 1, 3.)

### D.    Plaintiffs Fail To Plead That Any Defendant Acted With Conscious Recklessness.

Plaintiffs attempt halfheartedly to plead scienter by alleging that Defendants recklessly

---

[21] Plaintiffs misleadingly suggest that Defendants knowingly failed to disclose that "the combined $409 million of adjusted EBITDA that UNFI reported for third quarter 2022 and fourth quarter 2022 included *at least* $150 million of procurement gains, with procurement gains of approximately $100 million comprising nearly half of UNFI's reported $213 million adjusted EBITDA for fourth quarter 2022." (SAC ¶ 6.) There are no particularized facts suggesting that any Defendant knew the magnitude of the procurement gains at any time the challenged statements were made. Moreover, the underlying materials on which Plaintiffs rely do *not* say that the *entire* (approximately) $150 million decrease in adjusted EBITDA was attributable to procurement gains. (*See* Ex. 29, Q3 2023 Earnings Call Tr. at 7 (referring to slide 9 of the presentation); Ex. 42, Q3 2023 Earnings Call Presentation at 9 ("Wholesale Gross Margin *Including* Forward Buy" (emphasis added)); Ex. 32, Q4 2023 Earnings Call Tr. at 7 (referring to slide 10 of the presentation); Ex. 43, Q4 2023 Earnings Call Presentation at 10.)

issued financial forecasts. To plead scienter on the basis of recklessness requires showing "conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St.*, 573 F.3d at 109 (cleaned up). "Defendants' conduct must be highly unreasonable and ... represent[] an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *HEXO*, 524 F. Supp. 3d at 307 (cleaned up).

Plaintiffs do not even try to meet this demanding standard. All they allege is that Defendants "lacked a reasonable basis to issue a fiscal forecast" because Defendants recognized—with the benefit of hindsight once the Company's margin unexpectedly declined— that prior to Q2 2023, UNFI "did not have full visibility and sufficient detail into the commercial drivers of the benefits due to legacy issues with digital infrastructure limiting real-time data, which is required to fully understand and forecast these profitability drivers." (SAC ¶ 251.)[22] A failure to predict the future with complete accuracy, driven by limitations in legacy technology during a period of unprecedented volatility, does not establish "an extreme departure from the standards of care." That is especially true where, as here, Defendants had no prior reason to believe that they did not fully understand the Company's profitability drivers because quarter after quarter through 2022 earnings and margins were ***consistent with predictions***. (*See, e.g.*, *id.* ¶¶ 71-86.) Indeed, even allegations that defendants—unlike here—"were aware of facts that *should* have led them" to doubt their statements *still* do not establish scienter because they fall short of alleging that any Defendant "did not believe" their statements. *City of Omaha Civ. Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 68 (2d Cir. 2012). Here, by contrast, Defendants had every reason to feel confident in their forecasting process because those forecasts were

---

[22] This allegation is also inconsistent with Plaintiffs' allegations that Defendants had actual knowledge of the degree to which forward buying drove earnings throughout fiscal year 2022. (*See, e.g.*, SAC ¶¶ 139, 238.)

consistently achieved throughout 2022 and the first quarter of 2023. *See Ret. Bd. of Policemen's Annuity & Benefit Fund v. FXCM Inc.*, 767 F. App'x 139, 141-42 (2d Cir. 2019) (no scienter where defendants' predictions had been borne out in the past). That forecasts ultimately were not met for Q2 and Q3 2023, by itself, does not demonstrate that Defendants knew or must have been aware *at the time the forecasts were issued* that the forecasts were wrong.

\* \* \*

Plaintiffs' allegations, whether considered individually or holistically, do not give rise to a strong inference of scienter with regard to any challenged statement. *See Hutchinson v. Perez*, 2013 WL 1775374, at \*4 (S.D.N.Y. Apr. 25, 2013) ("[T]he Court cannot combine several insufficient allegations of scienter and, taken together, construct [a] 'strong inference' of recklessness."), *aff'd sub nom. Jones v. Perez*, 550 F. App'x 24 (2d Cir. 2013).

Rather, Plaintiffs' allegations lend themselves to a far more compelling, non-culpable inference: after a long period of stable inflation and numerous quarters in which forecasts had been achieved, UNFI lacked a sufficient data analytics system to provide the real-time information regarding the precise impact of once-in-decades rapid acceleration and deceleration of inflation on its earnings. *See Canadian Imperial Bank*, 694 F. Supp. 2d at 301 ("CIBC … could not have been expected to anticipate the crisis with the accuracy Plaintiff enjoys in hindsight[.]"); *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) ("defendants' lack of clairvoyance … does not constitute securities fraud"). It was not until UNFI missed earnings, and UNFI did extensive analysis to determine the cause, that Defendants began to gain insight into the magnitude of the effect of inflation—and with it, procurement gains from forward buying— on earnings. *Cf. In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 297-98 (S.D.N.Y. 2014) ("[I]t is equally plausible that defendants were in a constant game of 'Catch

29

up'—acknowledging the company's material weaknesses and disclosing their continued efforts to resolve them, only to learn of yet more."), *aff'd*, 616 F. App'x 442 (2d Cir. 2015). Once Defendants began to understand the magnitude of the effect, they promptly disclosed it. (*See, e.g.*, SAC ¶¶ 91-101.) Plaintiffs have failed to plead particularized facts creating a strong inference of scienter. On this basis alone, the Court should dismiss this action.

## II.     PLAINTIFFS FAIL TO PLEAD ANY ACTIONABLE MISSTATEMENT.

Plaintiffs' Complaint must be dismissed for the additional, independent reason that they have failed to plead that UNFI or the Individual Defendants uttered a materially false or misleading statement. As the Complaint acknowledges (*see id.* ¶¶ 71-83), throughout 2022 and Q1 of 2023, Defendants accurately explained to the public that the Company's profitability was attributable to inflation as well as incremental volume from new retail customers, additional categories and new store openings, increased item and category penetration with existing customers, and operational improvements. (*See, e.g.*, Ex. 6, Q1 2022 Earnings Call Tr. at 5-6; Ex. 5, Q2 2022 Earnings Call Tr. at 7; Ex. 44, Q3 2022 Earnings Call Tr. at 8-9; Ex. 7, Q4 2022 Earnings Call Tr. at 5-6; Ex. 45, Q1 2023 Earnings Call Tr. at 5-6.) Those statements were factually accurate: inflation is what allowed the Company to benefit from procurement gains through forward buying, and Plaintiffs do not and cannot dispute that fact. Instead, the main thrust of Plaintiffs' argument is that UNFI omitted to disclose the *specific degree* to which forward buying, versus other factors, was driving the Company's margin. But these arguments fail because there was no obligation for UNFI to disclose such information, particularly where UNFI already disclosed that it was forward buying and disclosed that changes in the rate of inflation could affect its business. The remaining statements that Plaintiffs challenge likewise are not actionable because they are forward-looking statements protected by the safe harbor of the PSLRA or generic statements on which no reasonable investor would have relied.

A.        **Plaintiffs Fail To Plead A False Or Misleading Statement.**

Rule 10b-5 prohibits "mak[ing] any untrue statement of a material fact" or "omit[ting] to state a material fact necessary in order to make the statements … not misleading." 17 C.F.R. § 240.10b-5(b). "Thus, to support a finding of liability, Rule 10b-5 requires an actual *statement*, one that is either 'untrue' outright," *i.e.*, an affirmative misstatement of fact, "or 'misleading' by virtue of what it omits to state." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016).

As to the latter category, omissions are actionable under Section 10(b) and Rule 10b-5 only when a corporation has a duty to disclose. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). These laws "do not create an affirmative duty to disclose any and all material information." *Id.* "Disclosure is required … only when necessary 'to make … statements made, in the light of the circumstances under which they were made, not misleading.'" *Id.* (quoting 17 C.F.R. § 240.10b-5(b)); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."). The duty to speak may also arise when some other statute or regulation requires that specific information be disclosed. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015).

Plaintiffs do not allege any affirmative misstatement of fact. Nor do they cite any statute or regulation that requires disclosure of the information Plaintiffs say Defendants concealed— here, the quantification of the specific degree to which various factors contributed to the Company's margin. Instead, Plaintiffs rely on the theory that the failure to disclose this information rendered other statements misleading. (*See, e.g.*, SAC ¶ 144 (alleging that statements "omitted to disclose material facts necessary to prevent them from being misleading").) But Plaintiffs cannot plead that the omitted information was necessary to avoid rendering any affirmative statement misleading, because those statements were all accurate—the statements correctly stated the Company's financial results and accurately disclosed that inflation was

31

contributing to the Company's margin. Plaintiffs' attempt to manufacture a theory of fraud based on these indisputably true statements fails.

**Statements regarding past financial results.** The majority of the statements that Plaintiffs challenge are true and accurate statements of UNFI's past financial results. Paragraphs 143, 145, 147, 149, 153, 155, 157, 159, 163, 167, 169, 171, 175, 179, 181, 189, 193, 195, 197, and 199 bring a nearly identical rote challenge to statements of UNFI's past financial performance: that UNFI failed to disclose that these results reflected increased forward-buying gains and that there was a risk that these gains would decrease if inflation were to subside. In essence, Plaintiffs allege that accurate reporting of UNFI's financial metrics was false or misleading because it failed to quantify the precise degree to which the Company's profit margin benefited from inflation-driven forward buying, "creat[ing] the misleading impression that the Company was successfully weathering a difficult macroeconomic environment." (SAC ¶ 144.)

These challenged statements cannot give rise to liability under the Exchange Act. It is black-letter law that "accurately reported financial statements do not automatically become misleading by virtue of the company's nondisclosure of suspected []conduct that may have contributed to the financial results. … '[I]t is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data.'" *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 98-99 (2d Cir. 2021) (citation omitted); *see also Fogel v. Vega*, 759 F. App'x 18, 24 (2d Cir. 2018). In *Danske Bank*, the Second Circuit dismissed allegations that a bank's financial statements were misleading when the statements failed to disclose possible money-laundering issues leading to "ill-gotten profits" that had been "baked into the bank-wide numbers." 11 F.4th at 98. Even though the bank had suspicions about the activity, its disclosure of accurate historical data was not actionable.

"Such a rule would bring within the sweep of federal securities laws many routine representations made by [companies]." *Id.* at 99 (cleaned up); *Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*, 2022 WL 17587853, at *3 (2d Cir. Dec. 13, 2022) (holding that, absent a showing that reported numbers are false, it is not misleading to report them).

The same logic applies with even greater force here, given the absence of any alleged illegal conduct. UNFI accurately reported results, including unobjectionable statements like:

> "Gross margin rate in the first quarter of fiscal 2022 was 14.89% of net sales compared to 14.51% of net sales for the first quarter of fiscal 2021. The increase in gross margin rate was driven by improvements in the Wholesale segment margin rate, including the impact of inflation and the Company's ValuePath initiative." (SAC ¶ 143 (emphasis omitted).)

Plaintiffs copy and paste the allegation that these financial reports are "false and misleading," but they fail to explain how and why, as the PSLRA requires. *See Lululemon*, 14 F. Supp. 3d at 571 ("The Second Circuit has repeatedly stated that plaintiffs must do more than simply assert that a statement is false—they must demonstrate with specificity why that is so." (cleaned up)). The Complaint does not and cannot allege that these numbers were *inaccurate*—indeed, UNFI has not restated any of its past financial statements—instead asserting only that more should have been included with the numbers. But the cases are clear that accurate statements of revenues or profitability are not actionable unless accompanied by a misleading statement about the sources of those revenues or profits. *See, e.g.*, *Danske Bank*, 11 F.4th at 98-99 ("disclosure of accurate historical data" not actionable).

Not only did UNFI not mislead investors regarding its financial performance, it repeatedly and accurately identified that inflation—which, as the market broadly understood (*see* p. 10, *supra*), allowed for procurement gains through forward buying—was a primary driver:

- "Net sales increased 7.6% to $7.5 billion, ***primarily driven by inflation*** and new business[.]" (SAC ¶ 193.)

33

- "Gross margin rate in the first quarter of fiscal 2022 was 14.89% of net sales compared to 14.51% of net sales for the first quarter of fiscal 2021. *The increase in gross margin rate was driven by improvements in the Wholesale segment margin rate, **including the impact of inflation** and the Company's ValuePath initiative.*" (SAC ¶ 143 (emphasis changed).)

These accurate disclosures are legion, and are found in every source of challenged statements.

Plaintiffs also ignore that UNFI's public filings warned investors of the precise risks that came to pass. "[I]t is indisputable that there can be no omission where the allegedly omitted facts are disclosed." *In re Progress Energy, Inc.*, 371 F. Supp. 2d 548, 552 (S.D.N.Y. 2005). From the very first allegedly misleading statements, UNFI disclosed the risk that ultimately came to pass—"moderated supplier promotional activity" and "*decreased forward buying opportunities*." (*See, e.g.*, Ex. 10, Q1 2022 Earnings Press Release at 5 (emphasis added).) The Company also repeatedly—in every press release and financial disclosure throughout the relevant period— disclosed that its business was characterized by "relatively low margins …, *which are sensitive to inflationary and deflationary pressures*." (*Id.*; *see also* pp. 8-10, *supra*.) And of course the inflation rate is public knowledge. *Cf. In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 576 (S.D.N.Y. 2013) (reasoning that information in the public domain need not be disclosed), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).

**Statements concerning the impact of inflation.** The Complaint also challenges a group of statements from UNFI's SEC filings that concern the impact of inflation on the Company's business. The details differ for the relevant quarter, but the statements generally provide, *inter alia*, that the Company "experienced a mix of inflation across product categories," that there are "inherent difficulties in measuring the impact of inflation on Net sales and Gross profit," that "inflation generally has the effect of increasing sales," and that the Company utilizes a "last in, first out ('LIFO') method of inventory accounting." (*See, e.g.,* SAC ¶ 157 (quoting Ex. 46, Q2 2022 Form 10-Q at 30).)

34

Plaintiffs assert that these statements—which merely provide general information regarding the impact of inflation on UNFI—are misleading because they failed to disclose the impact of procurement gains from forward buying. (*See, e.g.*, SAC ¶ 158 (complaining that the disclosure "omitted the distinct additional impact of procurement gains arising from massive forward buying").) But the federal securities laws impose no duty to disclose the relative magnitude of every input contributing to a company's margin. And it is black-letter law that, even if the omitted information "may be relevant or of interest to a reasonable investor," that "circumstance alone does not necessitate its disclosure." *Kleinman v. Elan Corp.*, 706 F.3d 145, 154 (2d Cir. 2013) (citation omitted). Moreover, there is no actionable omission where the challenged statement says nothing about the omitted information. *Id.* at 153-54. And here, the statement challenged by Plaintiffs says nothing about the amount of forward buying. Thus, omitting this specific piece of information did not render the statement misleading.[23]

## B.      UNFI's Forward-Looking Statements Are Not Actionable.

In addition to challenging factually-accurate statements regarding UNFI's past performance, Plaintiffs also challenge numerous forward-looking statements regarding UNFI's predictions about its future performance, such as the statement that "our outlook for adjusted EPS is also unchanged and expected to finish between $3.90 and $4.20 per share."[24] (SAC ¶ 145.) These forward-looking statements are not actionable because, in each case, they were

---

[23] Plaintiffs also challenge the Q2 2023 earnings press release from March 8, 2023, in which UNFI updated its fiscal year 2024 targets, for failing to "fully factor in the extent of the year-over-year decline in forward buying opportunities and resulting decrease in procurement gains during 3Q23." (SAC ¶¶ 203-04.) Not only was this a protected forward-looking statement, *see* pp. 36-37, *infra*, but the press release, far from omitting the impact of forward buying, warned that future decreased forward-buying opportunities could have a negative impact on the business, and that the risk had materialized: "Profits were challenged as we did not repeat the significant level of procurement gains from rapidly accelerating inflation and inventory gains, due to supply chain volatility, that we experienced in the second quarter of last year. As a result of these challenges, we are reducing our profitability expectations for fiscal 2023 and withdrawing our fiscal 2024 targets." (Ex. 24, Q2 2023 Earnings Press Release at 1.)

[24] Paragraphs 143, 145, 151, 161, 163, 165, 167, 173, 177, 183, 185, 187, 191, 193, 195, 197, 201, and 203 all contain forward-looking statements.

accompanied by meaningful cautionary language warning investors of the risks that UNFI's predictions would not be realized, and are therefore protected under the PSLRA's "safe harbor." In addition, Plaintiffs have failed to establish that any forward-looking statement was made with actual knowledge that it was false or misleading.

Under the PSLRA's safe harbor, "a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010); *see also* 15 U.S.C. § 78u-5. "To determine whether cautionary language is meaningful, courts first identify the allegedly undisclosed risk and then read the allegedly fraudulent materials—including the cautionary language—to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist." *Skechers*, 444 F. Supp. 3d at 513 (cleaned up). As to scienter, "because the safe harbor specifies an 'actual knowledge' standard for forward-looking statements, 'the scienter requirement for forward-looking statements is stricter than for statements of current fact" and requires "knowing falsity," as opposed to recklessness. *Slayton*, 604 F.3d at 773 (citation omitted). All of the aforementioned challenged statements are protected by the safe harbor.

*First*, these statements plainly are forward-looking. They concern projections of revenues and earnings, among other financial metrics; predictions about future economic performance; and "assumptions underlying or relating" to these predictions—all of which fall squarely within the statutory definition of forward-looking statements. *See* 15 U.S.C. § 78u-5(i)(1)(A)–(D); *Slayton*, 604 F.3d at 766-67. In addition, these statements included many additional forward-looking elements, including language like "we continue to expect" (SAC ¶ 145), "as we look

36

forward" (*id.* ¶ 167), and "we're going to see some of this in FY '23" (*id.* ¶ 185). This language only underscores the forward-looking nature of the statements.

*Second*, every forward-looking statement was accompanied by meaningful cautionary language that warned of the exact risk of which Plaintiffs complain. (*See, e.g.*, Ex. 16, Q1 2022 Form 10-Q at 25 (warning that the Company's financial results "could differ materially from those anticipated" due to factors such as "moderated supplier promotional activity, *including decreased forward buying opportunities*" (emphasis added)); Ex. 17, 2022 Form 10-K at 28 (same).) These warnings also specifically identified the risk of "inflationary and deflationary pressures" on the Company's margin. (*See, e.g.*, Ex. 10, Q1 2022 Earnings Press Release at 5.) Because these warnings listed "substantive company-specific factors" that could realistically cause results to differ materially, they were meaningful. *See, e.g.*, *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 392 (S.D.N.Y. 2020).

*Finally*, for all the reasons discussed above, *see* pp. 15-30, *supra*, Plaintiffs have failed to plead particularized facts establishing that any Defendant had "actual knowledge" that any forward-looking statement was false or misleading. *See, e.g.*, *Wesco Aircraft*, 454 F. Supp. 3d at 396-97; *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *20 (S.D.N.Y. Apr. 2, 2020).

C.    **Generic Statements Are Not Actionable.**

The remaining statements that Plaintiffs challenge are not actionable because they are too generic for a reasonable investor to have relied upon. *See, e.g.*, *Vivendi*, 838 F.3d at 245 ("Puffery encompasses statements that are too general to cause a reasonable investor to rely upon them, and thus cannot have misled a reasonable investor." (cleaned up)). For example, Plaintiffs challenge a statement in response to an analyst's question from the Q4 2022 earnings call that "the way to think about our guidance for '23 is that there's a fair amount of market uncertainty out there, and the way we have developed our guidance is to be pragmatic and make sure that we

37

have the flexibility during the year to provide good returns, and at the same time be flexible enough to meet whatever needs our customers have." (SAC ¶ 183 (emphasis omitted).) Plaintiffs claim that this statement is false and misleading because it failed to disclose that "UNFI's guidance was premised on the continuation of 'strategic' forward buying and the accrual of hundreds of millions of dollars in procurement gains." (*Id.* ¶ 184.) But this statement said nothing about forward buying and the magnitude of procurement gains, and Defendants had no duty under the federal securities laws to disclose such information. Moreover, this statement did not guarantee any specific results, and it explicitly acknowledged that there was "a fair amount of market uncertainty." (*Id.*) No reasonable investor would have read this statement as a guarantee regarding the Company's future profit margin.

Nor would any reasonable investor rely on general statements about the Company's ability to succeed, such as the statement that UNFI's ability to "[d]eliver[] … results in the face of such a complex environment is a testament to the agility of our team and the strategic value of our business" (*id.* ¶ 80), and that the Company "look[ed] at every single one of our customer agreements with a disciplined eye for economic returns" (*id.* ¶ 197). "These general and vague statements of corporate optimism are precisely the type of puffery that the Second Circuit and other circuits have consistently held to be nonactionable." *In re Diebold Nixdorf, Inc. Sec. Litig.*, 2021 WL 1226627, at *9 (S.D.N.Y. Mar. 30, 2021) (cleaned up)).

### D.    UNFI Did Not Violate Item 303 Of Regulation S-K.

Plaintiffs also attempt to repackage their "omissions" claim as an alleged violation of Item 303 of Regulation S-K (*see* SAC ¶¶ 205-11), but this claim fails in either form. Item 303 requires an issuer to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). The regulation "requires the

registrant to disclose only those trends, events, or uncertainties that it actually knows of when it files the relevant report with the SEC. It is not enough that it should have known of the existing trend, event, or uncertainty." *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016). Liability for failure to make a required Item 303 disclosure should not serve as the basis for a claim under Section 10(b) and Rule 10b-5, and in the Second Circuit, it can do so only "if all of the other requirements to sustain an action under Section 10(b) are fulfilled." *Stratte-McClure*, 776 F.3d at 100; *see also Skechers*, 444 F. Supp. 3d at 522. Plaintiffs' claim does not.

*First*, the failure to make a disclosure required under Item 303 should not be sufficient to support a private claim under Section 10(b) and Rule 10b-5. Although Second Circuit precedent holds that a violation of Item 303 can support such a claim, that is inconsistent with other circuits and is currently under review by the Supreme Court. *Compare Stratte-McClure*, 776 F.3d at 101, *with In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014); *see also Macquarie Infrastructure v. Moab Partners, L.P.*, 2022 WL 17815767 (2d Cir. 2022), *cert. granted*, — S. Ct. —, 2023 WL 6319659 (mem.). Section 10(b) and Rule 10b-5 impose liability only for misrepresentations, half-truths, and lies—not pure omissions—and thus a violation of Item 303's reporting obligations should not be the basis for liability under these provisions. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(b).

*Second*, Plaintiffs fail to plead that management actually knew the degree to which inflationary procurement gains were driving the Company's margin. To the contrary, as discussed above, management's statements made clear that they did *not* have the analytical capabilities that would have allowed them to capture this in real time. *See* pp. 25-30, *supra*. In an attempt to show that UNFI knew in fiscal year 2022 that there was a trend requiring disclosure, Plaintiffs point to after-the-fact statements, including, "Last year, in fiscal '22, we saw a big

39

upswing in value that we got as inflation took hold." (SAC ¶ 208 (emphasis omitted).) But Plaintiffs ignore that throughout 2022 Defendants *did* repeatedly disclose that inflation contributed to the Company's margin increases. *See* pp. 8-10, *supra*. Thus, Defendants disclosed what they knew, and they are not liable under the securities laws for allegedly failing to disclose additional information that they did not know—namely, the *degree* to which inflation-related procurement gains, rather than other factors, were driving the Company's margin.

*Third*, any "omission" was not material given the clear cautionary statements the Company made warning of the possible risks of deflation and decreased forward-buying opportunities and public information about inflation. *See, e.g.*, *Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*, 2023 WL 3569068, at *19 (S.D.N.Y. May 19, 2023) (holding that failure to disclose the "minutiae" of trends was not material when the market was aware that the company faced a risk from potential market forces and those market forces were in the public domain).

## III.    THE COMPLAINT DOES NOT STATE A CLAIM FOR CONTROL PERSON LIABILITY UNDER SECTION 20(A).

The Complaint also does not state a claim against the Individual Defendants for control person liability under Section 20(a) of the Exchange Act (*see* SAC ¶¶ 280-83) because Plaintiffs have not adequately alleged the requisite underlying violation of Section 10(b). *See, e.g.*, *Canadian Imperial Bank*, 694 F. Supp. 2d at 303.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that this Court dismiss Plaintiffs' Complaint with prejudice.

Respectfully submitted,

/s/ Francesca Brody
Francesca Brody
SIDLEY AUSTIN LLP
787 Seventh Avenue

40

New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
fbrody@sidley.com

Nilofer I. Umar (admitted *pro hac vice*)
Neil H. Conrad (admitted *pro hac vice*)
William J. Lawrence (admitted *pro hac vice*)
Rebecca M. Lewis (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
numar@sidley.com
nconrad@sidley.com
bill.lawrence@sidley.com
rebecca.lewis@sidley.com

41