# Exhibit 36

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

## SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No. )

Filed by the Registrant ☒
Filed by a Party other than the Registrant ☐
Check the appropriate box:

☐　Preliminary Proxy Statement
☐　Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))
☒　Definitive Proxy Statement
☐　Definitive Additional Materials
☐　Soliciting Material Pursuant to Rule 14a-11(c) or Rule 14a-12

# United Natural Foods, Inc.

(Name of Registrant as Specified in its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒　No fee required.

☐　Fee paid previously with preliminary materials.

☐　Fee computed on table in exhibit required by Item 25(b) per Exchange Act Rules 14a-6(i)(1) and 0-11

Table of Contents





## Letter from Our Independent Chair of the Board

**Dear Fellow Stockholders,**

I have been honored to serve as the Independent Chair of our Board over the last year as we have begun to execute against our Fuel the Future strategy and have built on our strong foundation to position our Company for future growth. We continue to elevate and execute our programs and policies related to good corporate governance practices, including our robust board refreshment efforts, our environmental, social and governance (ESG) initiatives, human capital management matters, and our commitment to diversity and inclusion. For the fifth consecutive year, we have engaged with our investors to hear their feedback and respond in a manner that allows us to deliver for our associates and stockholders.

**Board Evaluation and Refreshment.** We are committed to maintaining a diverse Board with relevant skills and experience to oversee our strategy. After thoughtful evaluation of our Board composition and with the help of a third-party recruiter, we appointed Shamim Mohammad to our Board in February 2022. We believe that Mr. Mohammad's experience in strategic leadership and development of forward-thinking technology solutions make him a valuable addition to our Board. Part of our Board's commitment to strong oversight is a robust Board and Committee evaluation process. In fiscal 2022, we engaged a third party to facilitate that process, something we do every two to three years to ensure we get a fresh perspective and objective feedback.

**Better For All.** Our 2021 Better for All Report, issued in March of 2022, expanded on our six impact focus areas to provide a more in-depth look at our direct and indirect impacts across our value chain. This approach better reflects how our long-term, ambitious ESG goals align with our operations and strategy. We are also extremely proud that in April 2022 our emissions reduction targets were validated by the Science Based Targets initiative, and we are excited to have launched our Climate Action Hub to foster engagement with our suppliers on these important issues.

**Stockholder Engagement and Commitment to Good Governance.** We continue to be committed to engaging with, and responding to feedback from, you, our stockholders. This summer we conducted our fifth annual stockholder engagement program. We are happy to report that once again we spoke with holders of over 50% of our outstanding common shares across a broad spectrum of matters. These sessions provide us the opportunity to discuss a wide variety of topics with our stockholders, and we have made several enhancements to our executive compensation and governance programs over the years as a result of these conversations. For example, in fiscal 2022, we separated the role of CEO and Chair of the Board, revised our Corporate Governance Principles to include a diverse slate requirement for all director appointments and rotational guidelines for leadership positions, and made several design changes to our executive incentive compensation programs. As a matter of good governance, we also recently updated our stock ownership guidelines to exclude unexercised in-the-money options and unearned performance awards in ownership calculations and, in October 2022, updated our Code of Conduct to align statements and provisions with our Company values and mission and our commitment to diversity and inclusion, safety and ESG matters.

On behalf of the entire Board of Directors, I would like to thank you for your continued investment and trust as we deliver long-term value for our customers and for you, our stockholders.

Sincerely,

*Jack Stahl*

**Jack Stahl**
*Independent Chair*

Table of Contents



# Letter from Our CEO

**Dear Stockholders,**

This past year as CEO of UNFI has been both productive and rewarding. During a year of significant industry and economic uncertainty, we produced strong results through our commitment to delivering value for our customers, suppliers and associates, while supporting our communities and our planet. We added seasoned executives to our leadership team who I'm confident will help us enhance our capabilities and improve our end-to-end execution. I am honored to lead this strong, diverse and focused team.

**Fuel the Future.** We completed our first year of our Fuel the Future strategy, and are laser focused on creating value for our customers, suppliers and associates, while contributing to our communities. We want to be a value-additive partner to our customers, leverage our insights to create value for our suppliers and attract, retain and develop talent, while simultaneously contributing to our communities and achieving our ESG goals. I believe we have made important progress on these areas in fiscal 2022, and I am excited and energized for what's next.

**A Focus on our People.** We recognize that our associates are critical to supporting our values and achieving our strategic vision. To that end, we are focused on associate engagement, empowerment and safety to foster innovation and bring best-in-class solutions to our customers and suppliers in an ever-changing retail landscape. We have implemented policies and procedures that focus on associate wellbeing, and we remain committed to creating a diverse and inclusive environment to drive accountability and results. We're extremely focused on enhancing engagement with our associates across the Company, and we achieved progress on this front in fiscal 2022 as our associate engagement scores improved during the year. We launched innovative new programs to provide, among other things, flexibility with scheduling and pay frequency, improved career development and education assistance programs, and wellness offerings. We also added two new diversity and inclusion goals to further our commitment to providing a dynamic and rewarding work environment for all of our associates.

I am extremely proud of the hard work and resiliency demonstrated by our teams in a challenging operating environment, and I believe we are well positioned to continue to improve our execution and drive high value for our customers, suppliers, associates and our stockholders. On behalf of our Board of Directors, and everyone at UNFI, thank you for your continued support of this great Company.

Sincerely,

**Sandy Douglas**
*Chief Executive Officer*

**Please vote. Stockholders may vote through the Internet, by telephone or by mail. Please refer to your proxy card or the notice of proxy availability distributed to you on or about November 22, 2022 for information on how to vote through the Internet, by telephone or by mail.**

Table of Contents

# Notice of Annual Meeting of Stockholders

## Meeting Information

Tuesday, January 10, 2023, 4:00 p.m. EST, with log-in at 3:45 p.m. EST.

You may attend our annual meeting of stockholders in January 2023 (Annual Meeting) through the Internet by virtual web conference at *www.virtualshareholdermeeting.com/unfi2023*. The meeting will be a virtual-only meeting, consistent with prior years. We believe the virtual meeting allows greater access for stockholders to participate in the meeting, hear from Management and ask questions than an in-person meeting in one geographic location.

## Items to be Voted on

1. The election of eleven nominees as directors to serve until the next annual meeting of stockholders.
2. The ratification of the selection of KPMG LLP as our independent registered public accounting firm for the fiscal year ending July 29, 2023.
3. The approval, on an advisory basis, of our executive compensation.
4. The approval of the Second Amended and Restated 2020 Equity Incentive Plan.
5. Consideration of such other matters as may properly come before the meeting or any adjournments or postponements thereof.

## Record Date

Only stockholders of record on our books at the close of business on Monday, November 14, 2022, will be entitled to vote at the Annual Meeting and any adjournments or postponements of the Annual Meeting.

## Proxy Voting

Your vote is important. If you do not attend the Annual Meeting, we encourage you to vote your shares through the Internet, by telephone or by completing, dating, signing and promptly returning your proxy card to us in the envelope provided. The proxy materials provide you with details on how to vote by these three methods. If you decide to attend the Annual Meeting through the Internet, you may revoke your proxy and cast your vote during the meeting.

## Proxy Materials

In accordance with rules approved by the Securities and Exchange Commission, we furnish proxy materials to our stockholders over the Internet. On or about November 22, 2022, we mailed to all stockholders of record as of the close of business on November 14, 2022, a notice containing instructions on how to access our Annual Report to Stockholders, which contains our audited consolidated financial statements for the fiscal year ended July 30, 2022; our proxy statement; proxy card; and other items of interest to stockholders on the Internet website indicated in our notice, at www.proxyvote.com, as well as instructions on how to vote your shares of common stock in connection with the Annual Meeting. That notice also provided instructions on how you can request a paper copy of our proxy materials and Annual Report to Stockholders if you desire.

By Order of the Board of Directors,

**Mahrukh Hussain, Esq.**

*General Counsel and Corporate Secretary*
November 22, 2022

Table of Contents

# Table of Contents

| | |
|---|---|
| **PROXY STATEMENT SUMMARY** | **1** |
| **CORPORATE GOVERNANCE** | **6** |
| Governance Highlights | 6 |
| Director Independence | 7 |
| Independent Chair | 8 |
| Board Leadership Structure | 8 |
| Risk Oversight | 9 |
| Anti-Hedging and Insider Trading Policies | 9 |
| Committees of the Board of Directors | 9 |
| Board Meetings | 11 |
| Stockholder Engagement | 11 |
| Board Evaluation and Refreshment | 12 |
| Environmental, Social and Governance Practices | 14 |
| Human Capital Management | 15 |
| **PROPOSAL 1-ELECTION OF DIRECTORS** | **18** |
| Directors and Nominees for Director | 18 |
| Majority Vote Standard for Election of Directors | 23 |
| Nomination of Directors | 23 |
| Stockholder Director Recommendations and Proxy Access | 24 |
| Communication with the Board of Directors | 24 |
| **DIRECTOR COMPENSATION** | **25** |
| Non-Employee Director Compensation | 25 |
| Director Compensation Table-Fiscal 2022 | 25 |
| Stock Ownership Guidelines | 26 |
| Certain Relationships and Related Transactions | 26 |
| **AUDIT COMMITTEE REPORT** | **28** |
| **EXECUTIVE OFFICERS OF THE COMPANY** | **29** |
| **EXECUTIVE COMPENSATION** | **31** |
| Compensation Discussion and Analysis | 31 |
| *Overview* | 31 |
| *Business and Performance Highlights* | 31 |
| *Say on Pay Vote, Investor Engagement and Responsive Action* | 32 |
| *Executive Compensation Program Philosophy* | 34 |
| *Executive Compensation Program Highlights* | 34 |
| *How We Make Decisions Regarding Executive Pay* | 35 |
| *Components of Our Executive Compensation Program for Fiscal 2022* | 38 |
| *Components of Our Executive Compensation Program for Fiscal 2023* | 44 |
| *Consulting, Retention, Severance and Change in Control Agreements* | 45 |
| *Other Programs, Policies and Considerations* | 46 |
| **REPORT OF THE COMPENSATION COMMITTEE** | **48** |
| **EXECUTIVE COMPENSATION TABLES** | **49** |
| Summary Compensation Table-Fiscal Years 2020-2022 | 49 |
| Grants of Plan-Based Awards in Fiscal 2022 | 50 |
| Outstanding Equity Awards at Fiscal 2022 Year-End | 51 |
| Option Exercises and Stock Vested-Fiscal 2022 | 53 |
| Pension Benefits | 54 |
| Nonqualified Deferred Compensation-Fiscal 2022 | 54 |

Table of Contents

| | |
|---|---|
| CEO Pay Ratio | 54 |
| Potential Payments Upon Termination or Change-in-Control | 55 |
| Securities Authorized for Issuance Under Equity Compensation Plans | 58 |
| **PROPOSAL 2-RATIFICATION OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM** | **59** |
| Fees Paid to KPMG LLP | 59 |
| Policy on Audit Committee Pre-Approval of Audit and Permissible Non-Audit Services | 60 |
| **PROPOSAL 3-ADVISORY APPROVAL OF OUR EXECUTIVE COMPENSATION** | **61** |
| **PROPOSAL 4-APPROVAL OF THE SECOND AMENDED AND RESTATED 2020 EQUITY INCENTIVE PLAN** | **62** |
| Background | 62 |
| Summary of the Second Amended and Restated 2020 Equity Incentive Plan | 63 |
| Certain Federal Income Tax Consequences | 68 |
| New Plan Benefits | 70 |
| Historical Grants and Share Usage | 70 |
| **OTHER MATTERS** | **72** |
| Stock Ownership of Certain Beneficial Owners and Management | 72 |
| Stockholder Proposals and Director Nominations for the Next Annual Meeting of Stockholders | 73 |
| **INFORMATION ABOUT THE MEETING** | **75** |
| Record Date and Share Ownership | 75 |
| Submitting and Revoking Your Proxy | 75 |
| How to Vote | 75 |
| Broker Non-Votes and Proxy Solicitation | 76 |
| Quorum | 76 |
| Votes Required | 76 |
| Attending the Annual Meeting | 77 |
| Householding | 77 |
| **ANNEX A - SECOND AMENDED AND RESTATED 2020 EQUITY INCENTIVE PLAN** | **A-1** |
| **ANNEX B - RECONCILIATION OF NON-GAAP PERFORMANCE METRICS** | **B-1** |

**Forward Looking Statements**

This proxy statement contains forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. Our actual results may differ from our expectations, estimates and projections, and consequently, you should not rely on these forward-looking statements as predictions of future events. Words such as "expect," "estimate," "project," "budget," "forecast," "anticipate," "intend," "plan," "may," "will," "could," "should," "believes," "predicts," "potential," "might," "continues," and similar expressions are intended to identify such forward-looking statements. These forward-looking statements include, without limitation, our expectations with respect to our future performance and the drivers of that performance. These forward-looking statements involve significant risks and uncertainties that could cause actual results to differ materially from expected results. Most of these factors are outside our control and are difficult to predict. Factors that may cause such differences include, but are not limited to: (1) our dependence on principal customers; (2) the relatively low margins of our business, which are sensitive to inflationary and deflationary pressures; (3) the impact and duration of the COVID-19 pandemic; (4) our ability to operate, and rely on third parties to operate, reliable and secure technology systems; (5) labor and other workforce shortages and challenges; (6) our ability to realize anticipated benefits of our strategic initiatives, including any acquisitions; (7) the addition or loss of significant customers or material changes to our relationships with these customers; (8) our sensitivity to general economic conditions including inflation, changes in disposable income levels and consumer spending trends; and (9) other risks and uncertainties identified in our filings with the Securities and Exchange Commission (SEC). More information about other potential factors that could affect our business and financial results is included under the captions "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our Annual Report on Form 10-K for the year ended July 30, 2022 filed with the SEC.

Table of Contents



# Proxy Statement Summary

**For the Annual Meeting of Stockholders, January 10, 2023**

## Voting Matters

| Proposal | Board Recommendation | Page |
|---|---|---|
| Proposal 1-Election of Directors | **FOR** | 18 |
| Proposal 2-Ratification of Independent Auditor | **FOR** | 59 |
| Proposal 3-Say on Pay Resolution | **FOR** | 61 |
| Proposal 4-Approval of the Second Amended and Restated 2020 Equity Incentive Plan | **FOR** | 62 |

## Director Nominees

Our business and affairs are managed under the direction of the Board of Directors (the Board). The Board currently consists of eleven (11) Directors, ten (10) of whom are independent.

Information about our Directors and the Committees on which they serve is set forth below. Each Director serves a one-year term and has been nominated for re-election.

| Name | Director Since | Audit | Compensation | Nominating and Governance |
|---|---|---|---|---|
| **Eric F. Artz** <br> *Independent* | Oct 2015 | - | ✓ | ✓ |
| **Ann Torre Bates** <br> *Independent* | Oct 2013 | **CHAIR** | - | - |
| **Gloria R. Boyland** <br> *Independent* | Jan 2021 | ✓ | - | ✓ |
| **Denise M. Clark** <br> *Independent* | Feb 2013 | - | - | **CHAIR** |
| **J. Alexander (Sandy) Miller Douglas** <br> *Chief Executive Officer* | Aug 2021 | - | - | - |
| **Daphne J. Dufresne** <br> *Independent* | Oct 2016 | - | **CHAIR** | - |
| **Michael S. Funk** <br> *Independent* | Feb 1996 | - | - | - |
| **Shamim Mohammad** <br> *Independent* | Feb 2022 | ✓ | - | - |
| **James L. Muehlbauer** <br> *Independent* | Apr 2019 | ✓ | ✓ | - |
| **Peter A. Roy** <br> *Independent* | Jun 2007 | - | ✓ | ✓ |
| **Jack Stahl** <br> *Independent Chair* | Jun 2019 | ✓ | - | - |

1

Table of Contents

## Year in Review

### Fuel the Future in Action

UNFI is a leading distributor of grocery and non-food products, and support services provider to retailers in the United States and Canada. We believe we are uniquely positioned to provide the broadest array of products and services to customers throughout North America. Through our Fuel the Future strategy, we are building a food ecosystem that is better for all by delivering great food, more choices and fresh thinking for our customers and suppliers. Our Fuel the Future strategy consists of six pillars: Fulfill Power in Scale, Unlock the Customer Experience, Taste the Future, UNFI Pride, Retail Optimized and Earn Results.

We are executing our strategy through four focus areas:

- *Customers*: Utilizing our scale, insights and innovative offerings to develop a differentiated value proposition that helps our customers grow and gain share.

- *Suppliers*: Strengthening our capabilities, especially those driven by technology, to deliver value creating programs to our suppliers.

- *Associates*: Building a culture that inspires pride and enables associates to do their best work.

- *Communities*: Supporting our communities and the planet through our wide-ranging and ambitious ESG initiatives.



2

Table of Contents

**ESG - Better For All**



- Advanced on our Better for All ESG agenda, which includes long-term goals meant to make the world, our communities and our people better
- Science-based emissions reduction targets addressing scopes 1, 2 and 3 emissions validated by the Science Based Targets initiative
- Launched Climate Action Hub to foster collaboration across our supply chain on ESG issues
- Enhanced ESG disclosure and made information increasingly accessible through the release of our 2021 Better for All Report
- Added two new goals to further our diversity and inclusion initiatives
- Achieved LEED Gold certification for a California distribution center
- ESG matters overseen by Nominating and Governance Committee; supported by ESG Executive Committee

**Board Refreshment and Expansion of Executive Leadership Team**

- Appointed Sandy Douglas as CEO and member of the Board
- Separated our Chair and CEO roles and appointed Jack Stahl as Independent Chair
- Appointed Shamim Mohammad to the Board in February 2022 and to the Audit Committee in June 2022
- Created two new executive leadership roles to add capabilities to achieve our strategic initiatives:
  - Chief Strategy and Transformation Officer
  - Chief Corporate Affairs Officer
- Hired a new General Counsel and Corporate Secretary

**Governance Updates**

- Updated our Corporate Governance Principles to add a diverse slate requirement and rotational guidelines for Board and Committee leadership positions, and to reflect our shift to an Independent Chair leadership structure
- Revised our stock ownership guidelines in March 2022 for Directors and executive officers to exclude unexercised in-the-money options and unearned performance awards in ownership calculations
- Hired a third-party facilitator to conduct our fiscal 2022 Board evaluations
- Effective in October 2022, amended our Code of Conduct to reflect recent updates to certain policies, including our Company values and mission, diversity and inclusion, safety and social and environmental matters
- Updated our Social Media Policy to align with our diversity and inclusion commitments

Table of Contents

**Board Refreshment**

| Assess | → | Identify | → | Evaluate and Recommend |
|---|---|---|---|---|
| • Review desired skills against our current strategy and Board composition<br>• Consider our Director eligibility guidelines, including independence and diversity considerations<br>• Create a director candidate profile | | • Third-party recruiter identifies potential candidates<br>• Any director slate must include diverse candidates<br>• Stockholders have ability to present candidates to our Board for consideration | | • Nominating and Governance Committee reviews skills, qualifications, diversity, independence and potential conflicts<br>• Candidates meet with full Board<br>• Nominating and Governance Committee recommends selected candidates to full Board |

**Results**

⬇

5 new directors (4 Independent) appointed over the last 5 years (including 2 in fiscal 2022)

We are committed to actively refreshing our Board and each Committee to maintain a mix of short-, medium- and long-tenured directors, which we believe promotes strong Board governance. We also proactively manage potential vacancies due to retirement. The Board engages a top tier third-party recruiter to identify and recommend diverse candidates that will complement the existing skill set and qualifications of our current Board, our strategic vision and our corporate values.

In February 2022, upon the recommendation of our third-party recruiter, the Board appointed Shamim Mohammad to serve as a Director. Mr. Mohammad is currently a member of the Audit Committee. His appointment adds significant experience in strategic leadership and development of forward-thinking technology solutions to our Board. The addition of Mr. Mohammad furthers our commitment to ongoing Board refreshment, resulting in the addition of five Directors (four independent) over the last five years.

**2022 Stockholder Outreach**

| Met with holders of over 50% of our stock | Fifth consecutive year of robust engagement | Formal Engagement Policy |
|---|---|---|

We engaged with holders of over 50% of our outstanding stock again this year. In these meetings, we discussed significant Company updates, such as our refined strategy under an expanded leadership team; our corporate governance, including Board refreshment and Board oversight; our commitments to human capital management and diversity and inclusion; our ESG programs and initiatives, including our third-party validated climate targets and progress on ESG goals; our supply chain engagement; and our executive compensation. Investors were complimentary of the changes made to our executive compensation program in fiscal 2022 in response to stockholder feedback and our demonstrated responsiveness to stockholder feedback overall. We also generally seek investor feedback about how we can further enhance our good governance principles. Overall, the feedback we received was positive and Management provided a summary of comments received to the Board for discussion.

**Responsive Actions to Feedback**

| Revised several components of Executive Compensation Program | Enhanced disclosure | Strengthened governance policies |
|---|---|---|

See *"Corporate Governance-Stockholder Engagement"* and *"Executive Compensation-Compensation Discussion and Analysis-Say on Pay Vote, Investor Engagement and Responsive Action"* for more discussion of actions we have taken in response to our conversations with stockholders.

4

Table of Contents

**Governance Highlights**

✓ **Ten of eleven directors are independent; Mixed tenure with three Directors added since January 2021**

✓ **Board oversight of ESG; Launched Climate Action Hub and Science-based targets validated**

✓ **Active stockholder engagement five consecutive years - strong responsiveness to executive compensation feedback**

✓ **Strong risk oversight at Board and committee level, including regular review of Enterprise Risk Management (ERM)**

✓ **Recently enhanced stock ownership guidelines for directors, executive officers and additional senior officers**

✓ **Robust Board refreshment process - five new Directors in last five years**

✓ **Strong Executive Compensation Policies:**
- **Fully independent Compensation Committee**
- **Long-term incentive compensation capped and aligned with predetermined financial metrics**
- **Strong responsiveness to stockholder feedback reflected by high Say On Pay support**
- **No gross ups or excessive perquisites**
- **Robust Stock Ownership Guidelines and Recoupment Policy**

**How to Vote:**

| Phone | Internet before meeting | Mail | During the meeting |
|---|---|---|---|
| 1-800-690-6903 | www.proxyvote.com | Vote Processing c/o Broadridge 51 Mercedes Way Edgewood, NY 11717 | *www.virtualshareholdermeeting.com/unfi2023* |

**How to attend and ask questions at the meeting:**

- Attend the Annual Meeting online, including to vote and/or submit questions at *www.virtualshareholdermeeting.com/unfi2023*
- The Annual Meeting will begin at approximately 4:00 p.m. EST (log-in at 3:45 p.m.) on Tuesday, January 10, 2023
- You may submit questions for the meeting in advance at www.proxyvote.com
- You may submit live questions during the meeting at *www.virtualshareholdermeeting.com/unfi2023*

**For more information about voting and attending the meeting, see "*Information About the Meeting*," beginning on page 75.**

5

Table of Contents

# Corporate Governance

**Governance Highlights**

> We are committed to best practices in corporate governance. Some of our key corporate governance programs are summarized below, with further information provided throughout this proxy statement.

**Independent Oversight**

- Independent Board Chair and annual review of optimal leadership structure with guidelines for Board leadership rotation
- Ten out of eleven director nominees are independent
- Regular executive sessions of independent directors at Board and Committee meetings
- 100% independent Board Committees, with strong Committee mandates and rotating leadership terms
- Comprehensive Board oversight of strategy development and execution
- Active Board oversight of the Company's compliance and risk management, including regular review of enterprise risk management (ERM)
- Board and Committees may hire outside advisors independent of Management
- Board oversight of ESG and political contributions policies and commitments through Nominating and Governance Committee
- Board oversight of human capital management through Compensation Committee

**Board Skills and Qualifications**

- Regular Board refreshment and mixed tenure
- Diverse backgrounds, ages, experiences and qualifications, with a view to making changes as needed to continue to add value and meet our evolving strategic needs
- Diverse gender, race, ethnicity, sexual orientation and veteran status, with further commitment to Board diversity demonstrated through formal adoption of diverse slate requirement
- Deep industry expertise
- Annual Board and Committee self-evaluations, conducted by a third-party in fiscal 2022
- Mandatory director retirement age of 75
- Orientation program for new directors and ongoing director education programs for all directors
- Limitations on other board positions; Directors and executive officers must notify the Chair of the Nominating and Governance Committee and the CEO of potential appointments in advance for review by the Committee

**Good Governance Practices**

- Annual comprehensive review of governance policies leading to the following updates in 2022:
  - In October 2022, amended our Code of Conduct to reflect recent updates to certain policies, including our Company values and mission, diversity and inclusion, safety and social and environmental matters
  - Corporate Governance Principles amended to require a diverse initial pool of director candidates, reflect separation of Chair and CEO roles, and provide for rotational guidelines for Board and Committee leadership positions
  - Director and executive stock ownership policies requiring meaningful levels of ownership, revised in fiscal 2022 to exclude vested options and unvested performance-based restricted stock units
  - Social Media Policy updated to align with our diversity and inclusion commitments
  - Hired a third-party facilitator to conduct our fiscal 2022 Board evaluations
  - ESG matters overseen by Nominating and Governance Committee, supported by our ESG Executive Committee
    - Launched Climate Action Hub to facilitate engagement across our supply chain on climate matters
    - Implemented a policy to present a diverse candidate slate for all employee roles that are director-level and above
- Human capital management

6

Table of Contents

- ◦ Compensation Committee oversight of human capital management matters with a focus on associate wellbeing across a variety of measures
- ◦ Offer associates several benefit programs, including:
  - ▪ Comprehensive health and welfare benefit programs
  - ▪ No-cost wellness program
  - ▪ Paid time off, including parental paid leave
  - ▪ Employee assistance program
  - ▪ 401(k) plan
  - ▪ Back-up childcare program
  - ▪ Recently strengthened employee education assistance program
- ◦ Include human capital management and diversity and inclusion as key elements of our people first strategy
- ◦ Added two new ESG goals in fiscal 2022 to enhance our diversity and inclusion initiatives
- ◦ Continued focus on associate engagement, empowerment and safety to allow for innovation and best-in-class solutions for our customers and suppliers
- ◦ Elevated our safety lead to SVP role to further enhance our focus on the safety of our associates
- • Prohibition on hedging or pledging of Company stock by directors and executive officers included in stock ownership guidelines and insider trading policy
- • Strong policies restricting trading by insiders, including discussion-based preclearance process
- • Ongoing Board oversight of robust data and cyber security programs

**Stockholder Rights**

- • Annual election of all directors
- • Majority vote and director resignation policy for directors in uncontested elections
- • Bylaws provide proxy access right for stockholders (3% ownership threshold continuously held for 3 years/2 director nominees or 20% of the Board/20 stockholder aggregation limit)
- • Stockholder right to call special meeting by stockholders owning at least 25% of the outstanding shares
- • One class of shares, with each share entitled to one vote
- • No poison pill

We maintain a corporate governance section on our corporate UNFI website that includes key information about our corporate governance initiatives and our Code of Conduct. The corporate governance information can be found at www.unfi.com, by clicking on "Governance" listed under "Investors" at the bottom of our website. Copies of our Corporate Governance Principles, our Code of Conduct, our Social and Environmental Policy and the charters for each of the Board's Committees can be found on our website. During fiscal 2022, we revised and updated our Corporate Governance Principles and in October 2022, we amended our Code of Conduct, each in connection with our ongoing comprehensive review of our governance practices. Information contained on our website is not incorporated by reference in this proxy statement or considered to be part of this document.

### Director Independence

Our Corporate Governance Principles require a majority of the members of the Board to be independent directors as such term is defined in the New York Stock Exchange (NYSE) listing standards. The Board, upon the recommendation of the Nominating and Governance Committee, has determined that ten of its eleven current members are independent. Our ten independent directors are Eric F. Artz, Ann Torre Bates, Gloria R. Boyland, Denise M. Clark, Daphne J. Dufresne, Michael S. Funk, Shamim Mohammad, James L. Muehlbauer, Peter A. Roy and Jack Stahl. Sandy Douglas is our CEO. Mr. Funk previously was not an independent director because he was an employee of the Company until shortly after the Company's acquisition of SUPERVALU INC. (Supervalu) in 2018. The Board's 2022 determination of Mr. Funk's independence in accordance with NYSE standards was made in light of it being more than three years since he has been an employee of the Company. In addition, the Board recognized that since Mr. Funk's service as CEO of the Company from October 2005 to September 2008, the Company's strategic initiatives and leadership team have changed significantly. The current leadership team is not the same team that operated the Company under Mr. Funk's leadership. Taking all of these factors into account, the Board determined that Mr. Funk is an independent director.

7

Table of Contents

Our Corporate Governance Principles and the charter for each of the Board's standing Committees-the Audit Committee, the Compensation Committee, and the Nominating and Governance Committee-require all members of such Committees to be independent within the meaning of the NYSE listing standards and the SEC's rules. The charter of the Audit Committee requires each of its members to meet the definition of independence under Section 10A of the Securities Exchange Act of 1934, as amended (the Exchange Act), and the SEC's rules thereunder. The charter of the Compensation Committee requires each of its members to be a non-employee director within the meaning of Rule 16b-3 under the Exchange Act.

## Independent Chair

The Independent Chair is elected annually by the independent Directors of the Board. In September 2022, the independent Directors appointed Mr. Stahl to serve as the Board's Independent Chair for a second term. In accordance with our Corporate Governance Principles, the Board must elect an Independent Chair annually and will consider rotation of the Independent Chair every three to five years based on the best interests of the Company at that time. The Independent Chair is responsible for coordinating the activities of the other Directors and for performing such other duties and responsibilities as the Board may determine from time to time, which are set forth in our Corporate Governance Principles, including:

- Providing leadership of the Board;
- Serving as principal liaison between the Directors and senior Management, and particularly the CEO;
- Providing input to the Board and the Nominating and Governance Committee on the membership of various committees;
- Advising and assisting the chairs of the Board's Committees in fulfilling such individual's roles and responsibilities;
- Suggesting an appropriate schedule of and agenda for the Board's meetings and including the Board's and CEO's input into the agenda for the Board's meetings;
- Leading the independent Directors in their role in the annual evaluation of the performance of the CEO, providing any feedback to the Chair of the Nominating and Governance Committee and overseeing actions to address the outcomes of such evaluations;
- Overseeing the process for CEO succession in coordination with the Nominating and Governance Committee;
- Determining the retention of advisors and consultants who report directly to the Board;
- Chairing regular and special Board meetings and shareholder meetings; and
- Presiding at meetings in executive session.

A description of the duties of the Independent Chair is included in the Corporate Governance Principles, a copy of which can be found in the "Governance" section of our website at www.unfi.com.

## Board Leadership Structure

As of August 2021, our Board is led by an Independent Chair, Mr. Stahl. Upon the appointment of Mr. Douglas as CEO, the Board determined that the positions of CEO and Chair should be separated and that the two roles, with separate and delineated accountabilities, were most appropriate for the Company at that time. In making this decision, the Board also considered the input of certain stockholders reflecting a desire for the separation of the Chair and CEO roles. The Board reevaluated this structure in September 2022, and determined that a separate CEO and Chair best serves the Company and its stockholders at this time.

Our Corporate Governance Principles do not require the Chair of the Board to be independent and do not specify whether the positions of Chair of the Board and the CEO must be separated. The Board will regularly consider the appropriate leadership structure for the Company at any given time and has determined that the Company and its stockholders are best served by the Board retaining discretion to determine whether the same individual should serve as both CEO and Chair, or whether the roles should be separated. The Board believes that it is important to retain the flexibility to make this determination at any point in time based on what it believes will provide the best leadership structure for the Company, in light of the prevailing facts and circumstances at such time.

8

Table of Contents

## Risk Oversight

### Full Board

The Board has overall responsibility for risk oversight. The Board exercises its oversight responsibilities with respect to strategic, operational and competitive risks, as well as risks related to the succession planning of our CEO and other members of senior Management. The Board has delegated responsibility for the oversight of certain risks to its Committees. All Committees report to the full Board as appropriate, including when a matter rises to the level of a material or enterprise-level risk. Certain risks are overseen by the full Board directly, such as strategic, cyber, other operational and macro-environment risks.

| Audit Committee | Compensation Committee | Nominating & Governance Committee |
|---|---|---|
| The Audit Committee and full Board receive Management's quarterly ERM report and the Audit Committee discusses significant financial risk exposures and the steps Management has taken to monitor, control and report such exposures with Management, the Company's internal audit department and our independent auditor. | The Compensation Committee is responsible for developing and maintaining compensation policies and programs that are aligned with pay for performance, stockholder interests and the other elements of the executive compensation philosophy developed and maintained by the Committee. Embedded in this philosophy and foundational to these programs is that they mitigate any unnecessary and excessive risks in our compensation plans and programs that could threaten our long-term value. For more discussion of risk considerations in our compensation programs, see *"Executive Compensation-Compensation Discussion and Analysis-Compensation Risk Assessment."* | The Nominating and Governance Committee oversees our compliance programs, including those under our Chief Compliance Officer, who reports to our General Counsel, and our ESG programs. This Committee also participates extensively in our ERM and compliance programs generally, actively considering assessment and mitigation for risks that do not fall within the purview of the Audit Committee or the Compensation Committee, as well as overseeing other risks that fall within the matters covered by its charter. |

Committees may address other risks on an ad hoc basis, as appropriate. We believe the division of risk management responsibilities described above is an effective approach for addressing the risks facing our Company, allowing the consideration of key risks to be allocated across Committees so that sufficient time, attention and expertise are directed to the respective risks the Company faces.

### Anti-Hedging and Insider Trading Policies

Our stock ownership guidelines and our Policy Regarding Trading in Company Securities (Insider Trading Policy) include prohibitions against speculative trading activities in relation to Company securities. Senior employees, including executive officers and non-employee directors, are strictly prohibited from entering into any transaction that would operate as a hedge against their stock ownership position or that would hedge against the financial effect of their building up stock ownership to reach the requirements set forth in our stock ownership guidelines. Under our Insider Trading Policy, directors, certain employees (including executive officers) and other individuals with access to material non-public information about the Company are prohibited from engaging in transactions in Company securities during blackout periods (other than in accordance with a pre-approved Rule 10b5-1 trading plan), and such persons are required to preclear (through discussion) any transactions in Company securities with a member of our legal department who is trained in these conversations. Certain insiders who have been identified as regularly having access to material nonpublic information are restricted to trading during quarterly open window periods, and then may trade only after preclearance. Under our policy governing 10b5-1 trading plans, we permit all directors and employees, including executive officers, to enter into 10b5-1 plans during an open window period when they are not in possession of material nonpublic information. All plans must have a 30-day "cooling-off" period between entering into a plan and the start of trading under that plan, and no plan may be shorter than six months or longer than 18 months.

### Committees of the Board of Directors

The Board currently has three standing committees: the Compensation Committee, the Audit Committee and the Nominating and Governance Committee. Upon recommendation of the Nominating and Governance Committee, the full Board appoints members of each committee. Each committee is responsible for appointing its chair.

Table of Contents

**Compensation Committee**

The Compensation Committee establishes or approves all policies and procedures related to our human resources function with respect to our executive officers, including employee compensation, incentive programs, and the 401(k) Plan, and administers our stock incentive plans. Additionally, this Committee evaluates and establishes the respective compensation of our executive officers on an individual basis, including our Chief Financial Officer (CFO), and recommends compensation of our CEO for approval by the Board. The Compensation Committee also reviews the compensation of certain other members of our senior management team and recommends to the Board the compensation for our non-employee directors. For a description of the role of the Compensation Committee, its consultants and Management in setting executive compensation, see "*Executive Compensation-Compensation Discussion and Analysis-How We Make Decisions Regarding Executive Pay.*" The Compensation Committee also approves our compensation discussion and analysis included in our annual proxy statements. The Compensation Committee oversees our leadership development and management succession planning (although the Nominating and Governance Committee oversees the CEO succession planning process), as well as our diversity initiatives. Additionally, the Compensation Committee oversees human capital management matters, including reviewing and overseeing key diversity and inclusion initiatives and Human Resources policies and practices.

The agenda for meetings of the Compensation Committee is determined by its Chair with the assistance of our CEO, CFO, Chief Human Resources Officer (CHRO) and General Counsel and Secretary. Compensation Committee meetings are regularly attended by the CEO, the CFO, the CHRO and the General Counsel and Secretary. At certain meetings during fiscal 2022, including each of its regular meetings, the Compensation Committee met in executive session. The Compensation Committee's Chair reports the Committee's recommendations on CEO executive compensation to the Board, which sets the CEO's compensation, and reports its determinations on other executive compensation to the Board. Independent advisors and our finance, human resources, benefits and legal departments support the Compensation Committee in its duties and may be delegated authority to fulfill certain administrative duties regarding the compensation programs. The Compensation Committee has authority under its charter to retain, approve fees for (and, as may be necessary or advisable, change or terminate) a compensation consultant, legal counsel or other advisor as it deems necessary to assist in the fulfillment of its responsibilities. The Compensation Committee annually evaluates the independence of its consultants, assesses their performance and establishes annual scope of work and fees for the consultants pursuant to a pre-approval policy. The Compensation Committee engages Frederic W. Cook & Co. (FW Cook) as its compensation consultant.

The Compensation Committee's charter is available on our website, www.unfi.com. The charter was most recently amended in March 2021. The Compensation Committee held four meetings during fiscal 2022. The current members of the Compensation Committee are Ms. Dufresne (chair) and Messrs. Artz, Muehlbauer and Roy, each of whom is an independent director under the SEC rules and NYSE listing standards applicable to compensation committee members.

**Audit Committee**

The Audit Committee is responsible for monitoring the integrity of our financial reporting process and systems of disclosure controls and internal controls over financial reporting; monitoring the independence and performance of our independent registered public accounting firm; and overseeing our internal audit department. Among the Audit Committee's duties are to review the results and scope of the audit and other services provided by our independent registered public accounting firm. The Audit Committee is also responsible for overseeing the finance and accounting matters regarding related party transactions under our Related Party Transaction Policy and certain compliance matters under our Code of Conduct.

The Audit Committee's charter is available on our website, www.unfi.com. The charter was most recently amended in March 2021. The Audit Committee held four meetings during fiscal 2022. The current members of the Audit Committee are Mses. Bates (chair) and Boyland and Messrs. Mohammad, Muehlbauer and Stahl, each of whom is an independent director under SEC rules and the NYSE listing standards applicable to audit committee members. The Board has determined that all members of the Audit Committee are financially literate, and Ms. Bates is an audit committee financial expert, as defined by the rules and regulations of the SEC.

**Nominating and Governance Committee**

The Nominating and Governance Committee is responsible for developing, reviewing and recommending to the Board for adoption our Corporate Governance Principles; identifying and nominating candidates for election to the Board; assessing and making recommendations to the Board regarding the size and composition of the Board; making recommendations to the Board regarding the size, composition, scope of authority, responsibilities and reporting obligations of each of the Board's Committees; assisting the Board in facilitating performance reviews of the Board and its Committees and members; oversight of our ESG programs; oversight of our CEO succession planning process; and other duties and responsibilities. The Nominating and Governance Committee is also responsible for reviewing related party transactions under our Related Party Transaction Policy and oversees certain compliance matters under our Code of Conduct that are not related to finance or accounting (which are overseen by the Audit Committee), and provides oversight of general risk and compliance areas not falling under the Audit Committee or Compensation Committee. Additionally, the Nominating and Governance Committee oversees our political

10

Table of Contents

contributions, policies and commitments. Our Political Activities and Government Relations Policy, together with our Code of Conduct, provide for oversight of political contributions, including that any corporate contributions must be reviewed and approved in writing by our General Counsel, be in compliance with applicable law and be properly disclosed.

For information regarding the director nomination process undertaken by the Nominating and Governance Committee, please refer to *"Proposal 1-Election of Directors-Nomination of Directors."*

The Nominating and Governance Committee's charter is available on our website, www.unfi.com. The charter was most recently amended in March 2021. The Nominating and Governance Committee held four meetings during fiscal 2022. The current members of the Nominating and Governance Committee are Mses. Clark (chair) and Boyland and Messrs. Artz and Roy, each of whom is an independent director under SEC rules and NYSE listing standards.

## Board Meetings

During fiscal 2022, the Board met seven times and following each of the Board's regularly scheduled quarterly meetings, the non-employee directors met in executive session without the presence of Management. All directors attended at least 75% of the aggregate number of meetings of the Board and of the committees on which they served. We encourage each member of the Board to attend our annual meeting of stockholders. All ten of our directors standing for re-election who were directors at that time attended our last annual meeting. Mr. Mohammad was appointed after our annual meeting of stockholders.

## Stockholder Engagement

Stockholder engagement is an important and regular part of the Company's strategy so that the Board and Management are aware of and respond to stockholder input on a broad spectrum of business and governance matters. Members of Management, including our General Counsel and Secretary, CHRO, head of Investor Relations, and head of our Sustainability and Social Impact team, as primary participants, have engaged in discussions with stockholders as part of our efforts to gain an understanding of stockholder views. Directors are generally available to participate in our engagement meetings upon request from stockholders, and this year Mr. Stahl, our Independent Chair, joined an investor call. For the fifth consecutive year, the Company reached out to a significant percentage of its stockholders, and we met with holders representing more than 50% of our outstanding shares. The Company has found its outreach efforts over the past five years to be very helpful in understanding our investors' perspectives on various business and governance matters and intends to maintain ongoing discussions with a large number of investors each year. Additionally, members of our ESG team engaged in ESG-focused meetings with certain investors, upon request.

Topics of discussion included business performance; our refined strategy under an expanded leadership team; our corporate governance, including Board refreshment and Board oversight; our commitments to human capital management and diversity and inclusion; our ESG programs and initiatives, including our third-party validated climate targets and progress on ESG goals; our supply chain engagement; and our executive compensation. Investors were complimentary of the changes made to our executive compensation program in fiscal 2022 in response to stockholder feedback and our demonstrated responsiveness to stockholder feedback overall.

After our engagement discussions, Management provides the feedback received from our stockholders to the Board. Since the beginning of 2021, we have taken the following governance actions directly responsive to our stockholder conversations:

11

Table of Contents

| WHAT WE HEARD | | WHAT WE DID |
|---|---|---|
| *Include reputational harm as a clawback trigger* | → | Enhanced our recoupment policy to include misconduct and reputational harm and provide for forfeiture of incentive compensation in certain cases of misconduct resulting in financial harm and to require disclosure in certain circumstances |
| *Disclose metrics of Board composition and individual diversity* | → | Included Board composition metrics in our proxy statement disclosure and, beginning this year, individual diversity metrics in our Director skills matrix |
| *Separate role of CEO and Chair* | → | Upon appointing a new CEO, we separated the role of CEO and Chair of the Board and appointed an Independent Chair |
| *Enhance HCM disclosure* | → | Added disclosure in our proxy statement about programs offered to employees for recruiting, engagement and career development |
| *Expand ESG disclosure* | → | Expanded ESG disclosure in our proxy statement, ESG Report and through the launch of our Better for All campaign |
| *Continue Board evaluation and refreshment* | → | Continuously evaluate our Board and refreshment efforts (added four new independent directors in last five years, including one in 2022) |
| *Disclose EEO-1 Report* | → | In addition to the diversity disclosures in our Better for All Report, we intend to disclose our EEO-1 report beginning with our 2023 filing |

See *"Executive Compensation-Compensation Discussion and Analysis-Say on Pay Vote, Investor Engagement and Responsive Action"* for a discussion of actions we took in response to conversations regarding executive compensation.

## Board Evaluation and Refreshment

Our Board regularly evaluates its performance and composition, assessing individual director's skills, qualifications and experience to align the overall Board composition to best meet the needs of the Company's evolving long-term business strategy. Each year, the Board undertakes a thorough Board and Committee evaluation process, including peer feedback on individual directors, using a comprehensive set of questionnaires requesting quantitative and qualitative input from directors. The Board uses a skills matrix to assess the contributions, background and experience of each director with those sought-after skills. In 2022, the Board engaged a third-party to conduct the Board and Committee assessment, working with the Chair of the Nominating and Governance Committee. The Nominating and Governance Committee also considers any additional skills, qualifications and experience that may be needed to meet the evolving strategic needs of the Company. The Nominating and Governance Committee is committed to considering a facilitated, third-party assessment every two to three years.

The Committee considers prospective candidates and identifies appropriate individuals for the Board's further consideration. The Nominating and Governance Committee also assesses the proper mix of skills and expertise for directors serving on the Board's committees. The Board is highly skilled and qualified, and committed to the Company's success, as indicated by the high attendance rate and robust discussion and debate that occurs during each Board and committee meeting.

In early fiscal 2022, upon the appointment of Mr. Douglas as our new CEO and board member, the Board, upon the recommendation of the Nominating and Governance Committee, appointed Mr. Stahl as Independent Chair of the Board and Mr. Roy stepped down as Lead Independent Director. Additionally, Ms. Dufresne was appointed as Chair of the Compensation Committee. Further, in fiscal 2022, our Board, upon the recommendation of the Nominating and Governance Committee, revised the composition of the Compensation Committee and the Nominating and Governance Committee. The current composition of each committee is disclosed above.

In fiscal 2022, the Board and Nominating and Governance Committee considered additional skills and experience that would be desirable in light of our strategy and focused on adding a director with strategic leadership and information technology experience. At the recommendation of our third-party search firm, the Board appointed Shamim Mohammad to the Board in February 2022. Mr. Mohammad is also a member of the Audit Committee.

12

Table of Contents

**Board Tenure**

We aim to maintain a mix of short-, medium- and long-tenured directors, which we believe promotes strong Board governance.



**Board Diversity**

Our Board is diverse in gender and ethnic background, as well as having a broad range of experience. The Nominating and Governance Committee charter provides for the consideration of diversity, including gender, race, ethnicity, sexual orientation and veteran status, when considering Board candidates. As provided below, our Director skills matrix now includes individual diversity metrics as requested by our stockholders. In fiscal 2022, the Board amended our Corporate Governance Principles to formally require the initial pool of director candidates for any director search to include qualified diverse candidates to further support our commitment to a diverse and qualified Board.



13

Table of Contents

**Summary of Board Skills, Experiences and Qualifications**

| Skills, Experiences and Qualifications | Director | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Artz | Bates | Boyland | Clark | Douglas | Dufresne | Funk | Mohammad | Muehlbauer | Roy | Stahl |
| Significant experience in business, education, the professions or public service | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Commitment to areas aligned with the Company's public interest commitments | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Service as an executive officer for another public company | ✓ | ✓ | | | ✓ | | | ✓ | ✓ | ✓ | ✓ |
| Experience in the Company's industry | | | | | ✓ | ✓ | ✓ | | | ✓ | |
| Experience with risk oversight | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ |
| Experience with stockholder engagement | | ✓ | | | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ |
| Information technology experience | | ✓ | ✓ | ✓ | | | | ✓ | | | |
| Experience in leadership development | | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Experience with mergers and acquisitions | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| eCommerce experience | | | | ✓ | ✓ | | | ✓ | | | |
| Supply chain management experience | ✓ | | ✓ | | ✓ | | ✓ | | ✓ | ✓ | ✓ |
| Consumer products/retail experience | ✓ | | | ✓ | ✓ | | | ✓ | ✓ | | ✓ |
| Senior operations management/CEO | ✓ | ✓ | | | ✓ | | ✓ | | | ✓ | ✓ |
| Strategic thinking, planning and execution | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Operating financial expertise (CFO) | ✓ | ✓ | | | | | | | ✓ | | ✓ |
| Senior operations experience in industry or adjacent industry | | | | | ✓ | | ✓ | | | ✓ | ✓ |
| Large-scale transformation/innovation experience | | | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ | | ✓ |
| Diversity | | Female | Female Racially Diverse | Female LGBTQ+ Veteran | | Female Racially Diverse | | Ethnically Diverse | | | |

## Environmental, Social and Governance Practices

At UNFI, we are committed to being good stewards of our planet, our communities and our people through tangible action. We seek to lead by example on social and environmental issues of critical important to society and strive to be a force for positive change in the food system. This commitment is described in our Social and Environmental Policy, which was most recently updated in September 2020 and is available on our website, www.unfi.com. Our Nominating and Governance Committee has direct oversight of our policies and strategies addressing ESG matters, including sustainability, corporate social responsibility and political contributions, and is responsible for reporting to the Board on such matters at least annually. The ESG Executive Committee, an executive steering committee formed in 2020 to oversee implementation of our ESG initiatives, provides executive sponsorship for our ESG strategy and goals. We also developed emissions reduction targets, which were validated by the Science Based Targets initiative in April 2022.

In March 2022, we issued our 11th annual report on our social and environmental impacts, and the first update to our Better for All plan, which seeks to build a food system that is better for our people, our communities and our world. The Better for All Report, available on our website, www.betterforall.unfi.com, expands upon the six impact focus areas announced last

14

Table of Contents

year to provide a more in-depth look at our direct and indirect impacts at multiple points along our value chain. Our key focus areas now include Diversity and Inclusion, Responsible Procurement, Community Development, Governance, Associate Safety and WellBeing, Climate Action, Waste Reduction, Customer Health and Safety and Energy Efficiency. Our Better for All Report highlights our progress toward achieving our ESG goals and references Global Reporting Initiative (GRI), Sustainability Accounting Standards Board (SASB) standards and Task Force on Climate Related Financial Disclosures (TCFD). The GRI and SASB tables are available on our website. The Better for All Report and its disclosures are not incorporated by reference into this proxy statement.

> Our "Better for All" Report takes a more holistic view of the Company's value chain and demonstrates accountability for the critical role we play, given our position and scale, to drive change across the food industry. Our plan includes expanding and enhancing our policies and practices related to climate change, waste reduction, food access, safety and wellbeing and diversity and inclusion.

We're on a mission to make the world a better place, not just for one, but for all. Our key highlights and achievements toward attaining our ambitious long-term goals include the following:

### Governance

- Board receives regular ESG updates.
- Added two new goals in furtherance of our diversity and inclusion strategic plan.
- Launched 'Missions' platform to promote awareness of our goals and actively promote associate engagement of our ESG programs.

### Upstream

- Climate targets covering scopes 1, 2 and 3 validated by the Science Based Targets initiative in April 2022.
- Launched the UNFI Climate Action Hub, providing tools and resources to our suppliers to help innovate and scale climate solutions across the food system.
- Revamped supplier diversity program and hired a new Manager of Supplier Diversity in April 2022.

### Operations

- Elevated lead safety to SVP role to further enhance our focus on the safety of our associates.
- Achieved LEED® Gold certification for Riverside, CA distribution center.
- Received a score of 100 on the Human Rights Campaign Foundation's 2022 Corporate Equality Index and a score of 100 against the Disability Index.
- Established Diversity Council and launched six associate-led Belonging and Innovation Groups

### Downstream

- Launched UNFI Food Equity Project, a program of the UNFI Foundation, which aims to invest in community-led solutions that create more equitable access to fresh, healthy food.
- Expansion of relationship with Too Good to Go, an innovative food waste reduction app and the largest business-to-consumer marketplace for surplus food.

## Human Capital Management

A major part of our ESG initiatives and key element of our UNFI Pride strategic pillar is creating a diverse and inclusive workplace. Our employees are critical to supporting our values and achieving our strategic vision. We are focused on associate engagement, empowerment and safety to foster innovation and bring best-in-class solutions to our customers and suppliers in an ever-changing retail landscape, including new ways of work scheduling and productivity investments. Our Compensation Committee oversees human capital management matters with a focus on associate wellbeing across a variety of measures.

We discuss our dedication to human capital management, including disclosure of certain diversity metrics, in our 2021 Better for All Report, which can be found on our ESG website, www.betterforall.unfi.com. More information regarding human capital management may be found in our recently filed Annual Report on Form 10-K.

Table of Contents

### Diversity and Inclusion

We pledge to promote equity, celebrate diversity, dismantle systemic racism and support justice and inclusion for all. Our Board is diverse in gender and ethnic background, as well as having a broad range of experience. Four out of eleven directors are female, with two members identifying as African American, one member identifying as Asian American, one member identifying as LGBTQ+ and one member identifying as a veteran. We recognize that innovation thrives when there is unity and respect for diverse backgrounds and perspectives. Additionally, we aim to foster a culture of belonging, equity and empathy through open dialogues, educational opportunities and by honoring the experiences and special events that speak to our associates' many identities. Over the last three years, we are actively working on the following initiatives to promote our pledge of creating an equitable, diverse and inclusive environment for all:

- Ongoing member of CEO Action for diversity and inclusion.
- Launched six Belonging and Innovation Groups for associates.
- Adopted a diverse slate requirement for director candidates in September 2021 to further support diversity among our Board.
- Built a diversity and inclusion team and created a diversity and inclusion strategy, including:
  - Hiring a Vice President of Diversity and Inclusion;
  - Establishing a diversity council which has taken an active role in advocating for and celebrating diversity;
  - Providing helpful diversity and inclusion information on our associate platforms, including diversity and inclusion training; and
  - Implementing a policy to present a diverse candidate slate for all director and above roles.
- Matched associate donations to organizations fighting for racial justice and reform, including the NAACP Legal Defense and Educational Fund and the American Civil Liberties Union (ACLU) Foundation.
- Included discussion of gender, ethnicity, tenure and generation statistics into our year-end performance review discussions for leaders to mitigate against unconscious bias.

### Developing Talent

Attracting and retaining talent is one of our top priorities. Our goal is to differentiate ourselves in the market by offering unprecedented flexibility to associates. To reduce turnover, we have an emphasized focus on and commitment to our associates, their experiences and their engagement. As a result, in fiscal 2022 our associate engagement scores improved over the prior year. We are committed to the continued support and development of our associates and provide access to robust leadership development programming, role-based training and other career development opportunities at every stage of an associate's tenure. Designed to enhance the leadership capabilities of our people, the Emerge program for front-line leaders and the Evolve program for our mid-level managers invite participants from all departments to come together to learn and practice their management skills and identify opportunities to lead more effectively. The Elevate program for director-level and above associates, as well as the Operations Leadership Academy for leaders in our distribution centers, work to solidify our talent pipeline and promote the success of the organization's future leaders. In addition, we partner with key groups within the organization, such as Sales and Risk & Safety, to develop role-based training to drive greater productivity and safety. We also offer associates additional learning and career development opportunities that extend from skills-based training deployed electronically through our BetterU learning system, to mentorship programs and career development discussions and beyond. We also provide flex-shift and quarterly performance check-ins.

### Compensation and Benefits

Our compensation and benefits programs are designed to promote a culture of wellbeing and recognize our associates for their outstanding achievements and dedication to serving our customers and keeping them safe during even the most challenging of times. We are committed to offering market competitive pay programs which reward high levels of performance, and behaviors that challenge convention and drive company success. Our short-term incentive programs model the Company's financial goals and are intended to align our eligible associates' rewards with our financial success. Long-term incentives, including restricted stock units and performance awards, are designed to attract and retain innovative leaders and align their financial interests with those of our stockholders and other stakeholders. As part of our commitment to recognize our associates' "whole self" - health, finances and overall wellbeing - we offer the following benefits to eligible associates:

16

Table of Contents

- Comprehensive health and welfare benefit program providing a variety of medical, dental and vision options
- Revamped employee education assistance program to provide for prepayment rather than reimbursement benefit and to no longer require that the program be related to the associate's position at UNFI
- Voluntary benefits like long-term disability and optional life insurance
- No-cost wellness program
- Paid time off programs, including parental paid leave
- Employee assistance program
- 401(k) plan
- Back-up childcare program

### Creating a Safe Environment

Safety is at the forefront of everything we do. We continue to focus on the safety of our associates, customers and communities with enhanced sanitation and increased safety measures. We also have invested in several initiatives, including the development and implementation of a new safety brand and pledge, Every Moment Matters, that is designed to foster a caring culture. We have implemented interactive and proven training programs, which were rolled out across our network, and include ergonomic experts and interactive training. In fiscal 2022, we created a new role and hired a new Senior Vice President, overseeing occupational and food safety. We also cultivate a culture of openness to foster an emotionally safe environment and continue to strive for zero workplace injuries.

Table of Contents

## Proposal 1-Election of Directors

**Directors and Nominees for Director**

The Board currently consists of eleven directors, each of whose terms will expire at the Annual Meeting.

Mses. Bates, Boyland, Clark and Dufresne and Messrs. Artz, Douglas, Funk, Mohammad, Muehlbauer, Roy and Stahl have been nominated to stand for election as directors at the Annual Meeting to hold office until the next annual meeting of stockholders and until their successors are duly elected and qualified. Each nominee has indicated his or her willingness to continue to serve if elected by our stockholders. If any nominee should be unable to serve, the person acting under the proxy may vote the proxy for a substitute nominee. We have no reason to believe any of the nominees will be unable to serve if elected.

We have included below information concerning the business experience and qualifications, and the age as of November 14, 2022, of each of our director nominees.

> **The Board unanimously recommends that stockholders vote "FOR" each of the director nominees. Proxies received by the Board will be voted "FOR" each of the nominees unless a contrary choice is specified in the proxy.**

**Nominees for Election as Directors for a Term Expiring at the Next Annual Meeting**



**Eric F. Artz**
Age: 55
Board Member since October 2015
Compensation Committee Member
Nominating & Governance Committee Member

Mr. Artz previously served on the Compensation Committee from December 2015 to September 2020. Mr. Artz has served as President and Chief Executive Officer, as well as on the board of directors, of Recreational Equipment, Inc. (REI), an American retail and outdoor recreation services corporation, since May 2019. He served as Executive Vice President and Chief Operating Officer of REI from August 2014 to May 2019. In addition to this role, Mr. Artz also served as Executive Vice President, Chief Financial Officer and Treasurer of REI from May 2012 to December 2015. Prior to REI, Mr. Artz served as Chief Financial Officer for Urban Outfitters, Inc. from February 2010 to April 2012. From August 1992 until January 2010, Mr. Artz served in various positions of increasing responsibility at VF Corporation.

*Skills and Qualifications:* Mr. Artz's professional experience brings valuable knowledge and insight to our Board. The Board values his experience as a Chief Executive Officer, Chief Operating Officer and Chief Financial Officer, which provides him with valuable knowledge and insight regarding operations of retailers as well as the background and experience in overseeing the audits of financial statements, communicating with independent auditors and assisting with the general oversight of accounting and financial reporting processes.



**Ann Torre Bates**
Age: 64
Board Member since October 2013
Chair of the Audit Committee

Ms. Bates has served as a member of the board of directors of Ares Capital Corporation since 2010 and currently chairs its Audit Committee. Since September 2022, Ms. Bates has served as a director and member of the audit committee of Ares

18

Table of Contents

Strategic Income Fund. She held a directorship at Allied Capital Corporation until it was acquired by Ares Capital Corporation in 2010. Ms. Bates also serves as director or trustee of 17 investment companies in the Franklin Templeton Group of mutual funds, and sits on those audit committees. Ms. Bates was a strategic and financial consultant from 1997 to 2012. From 1995 to 1997, Ms. Bates served as Executive Vice President, Chief Financial Officer and Treasurer of NHP, Inc., a national real estate services firm. Ms. Bates previously served as a member of the board of directors of Navient Corporation from April 2014 to August 2016, and she served on the board of directors of Navient's predecessor, SLM Corporations, from 1997 to 2014.

*Skills and Qualifications:* Ms. Bates' professional experience and service on other boards brings valuable knowledge and insight to our Board. The Board values her experience serving on audit committees, which the Board believes her service on other audit committees provides her with the background and experience in overseeing the audits of financial statements, communicating with independent auditors and assisting with the general oversight of accounting and financial reporting processes.



**Gloria R. Boyland**
Age: 62
Board Member since January 2021
Audit Committee Member
Nominating & Governance Committee Member

Ms. Boyland is a retired senior executive of the FedEx Corporation, where she served as Corporate Vice President, Operations and Service Support (beginning in 2015). Ms. Boyland led advanced operations technology initiatives, electro mobility, network and fleet automation, service quality and customer experience improvements, and new service offerings for the company. Prior to her tenure at FedEx, Ms. Boyland held leadership positions in various functions at GE Capital Corporation, including Six Sigma Quality, mergers and acquisitions and acquisition integration. She also practiced for eight years as a commercial transactions and investment attorney at GE. Ms. Boyland currently serves on the boards of directors of Vontier Corporation and Memphis Brooks Museum of Art, and previously served as a member of the boards of Chesapeake Energy Corporation and UMRF Ventures, Inc. In 2016, Ms. Boyland was appointed to the U.S. DOT Advisory Committee on Automation in Transportation. Ms. Boyland also served as a strategic advisor of Aurora Technologies, LLC.

*Skills and Qualifications:* Ms. Boyland's extensive experience leading operational transformation at global companies and customer service, coupled with her leading-edge, future-focused logistics and supply chain knowledge, make her a valuable addition to our Board.



**Denise M. Clark**
Age: 64
Board Member since February 2013
Chair of the Nominating & Governance Committee

Ms. Clark served as Senior Vice President and Global Chief Information Officer for The Estée Lauder Companies Inc. from November 2012 until her retirement in March 2017. Prior to that role, Ms. Clark served as Senior Vice President and Chief Information Officer for Hasbro Inc. from October 2007 to November 2012. Ms. Clark also served at Mattel, Inc., where she was Global Chief Technology Officer and later Chief Information Officer for the Fisher Price brand between January 2000 and February 2007. Ms. Clark's previous experience includes two other consumer goods companies, Warner Music Group, formerly a division of Time Warner Inc., and Apple Inc. Ms. Clark has over 20 years of experience in the delivery of enterprise resource planning, digital platforms and innovative business transformation initiatives. Ms. Clark previously served as a director of Six Flags Entertainment Corporation from August 2021 to August 2022 and as a member of the board of directors of Caesars Entertainment Corporation and as chair of its compensation committee from October 2018 to July 2020.

Table of Contents

*Skills and Qualifications:* Ms. Clark's extensive background, particularly her expertise involving information technology and transformation initiatives, allows her to provide the Board valuable guidance on our strategic initiatives, especially as it relates to information technology solutions.



**J. Alexander Miller Douglas**
Age: 61
Board Member since August 2021
UNFI Chief Executive Officer

Mr. Douglas, was appointed as our CEO in August 2021 and most recently served as the Chief Executive Officer of Staples, Inc., an office retail company, from April 2018 to June 2021, which included leading that company's business-to-business distribution platform. Prior to Staples, Mr. Douglas served as President of Coca-Cola North America until February 2018, where he led the $10 billion revenue business, encompassing all aspects of its consumer and business-to-business operations. During Mr. Douglas' 30-year tenure at Coca-Cola, he also served as Global Chief Customer Officer, and held a variety of positions across sales and marketing. Mr. Douglas began his career at The Procter & Gamble Company in sales and sales management positions. Since May 2020, Mr. Douglas has served as a member of the board of directors of Wawa Inc., a leading convenience retailer in the Eastern United States.

*Skills and Qualifications:* Mr. Douglas's experience at large public companies, including his extensive experiences leading consumer and business-to-business-to-consumer distribution operations, brings valuable insight to the Board beyond the knowledge and insight he brings from being our Chief Executive Officer.



**Daphne J. Dufresne**
Age: 50
Board Member since October 2016
Chair of the Compensation Committee

Ms. Dufresne served on the Nominating and Governance Committee until September 2021. Ms. Dufresne has been a Managing Partner of GenNx360 Capital Partners, a venture capital firm that specializes in acquisition, buyouts, and turnaround of underperforming businesses, since January 2017. Ms. Dufresne was previously a Managing Director of RLJ Equity Partners, a private equity fund, from December 2005 to June 2016. Ms. Dufresne participated in building the RLJ investment team, raising capital to fund its operations and constructing a partnership with The Carlyle Group, a global private equity firm. Prior to that role, Ms. Dufresne was a Venture Partner during 2005 with Parish Capital Advisors, an investment fund for emerging and experienced institutional investors and a Principal from 1999 to 2005 at Weston Presidio Capital, a private equity organization. She also served as Associate Director in 1997 in the Bank of Scotland's Structured Finance Group. Ms. Dufresne has been a director of Condor Hospitality Trust, Inc. since June 2015, and was appointed chair in May 2019.

*Skills and Qualifications:* Ms. Dufresne's professional experience, including her role as an equity investor for over 23 years, brings valuable knowledge and insight to our Board. Ms. Dufresne is very familiar with conducting due diligence, negotiating purchase and sale agreements and leading the board during these processes. She possesses experience in owning and managing enterprises like our Company and is familiar with corporate finance, strategic business planning activity and general issues involving various types of stockholders.

20

Table of Contents



**Michael S. Funk**
Age: 68
Board Member since February 1996

Mr. Funk served as Chair of the Board from January 2003 to December 2003, and again from September 2008 to December 2016. Mr. Funk served as our President and Chief Executive Officer from October 2005 to September 2008. Mr. Funk also served as Vice Chair of the Board from February 1996 until December 2002, as our Chief Executive Officer from December 1999 until December 2002 and as our President from October 1996 until December 1999. Until January 1, 2019, Mr. Funk served as an executive advisor to us. From its inception in July 1976 until April 2001, Mr. Funk served as President of Mountain People's Warehouse, Inc., now known as United Natural Foods West, Inc., one of our wholly-owned subsidiaries.

*Skills and Qualifications:* Mr. Funk's extensive knowledge of our industry through his past service as our Chief Executive Officer brings to the Board valuable insight and a strong understanding of the natural and organic products distribution business. His deep institutional knowledge of our business and industry is valuable to the Board.



**Shamim Mohammad**
Age: 53
Board Member since February 2022
Audit Committee Member

Mr. Mohammad currently serves as Executive Vice President and Chief Information and Technology Officer of CarMax Inc., the largest used car retailer in the United States, third largest wholesaler of used cars in the United States and a leading auto finance company, a position he has held since April 2021. He has held various senior technology roles of increasing responsibility since 2012. Prior to joining CarMax, Mr. Mohammad held information technology leadership roles at BJ's Wholesale Club Inc., Blockbuster, Inc. and TravelClick, Inc. In 2020, MIT Sloan selected Mr. Mohammad as the recipient of the CIO Leadership Award, which recognizes CIOs who lead their organizations to deliver exemplary levels of business value through the innovative use of technology. Mr. Mohammad is a registered CPA.

*Skills and Qualifications:* Mr. Mohammad has strong financial oversight experience and brings with him a wealth of financial expertise. Mr. Mohammad's proven track record in strategic leadership, development of forward-thinking technology solutions and business transformation make him a valuable addition to our Board.



**James L. Muehlbauer**
Age: 61
Board Member since April 2019
Audit Committee Member
Compensation Committee Member

Mr. Muehlbauer previously served as a member of the Nominating and Governance Committee from May 2019 to September 2020. Mr. Muehlbauer served as the Executive Vice President, Chief Financial and Administrative Officer for The Valspar

Table of Contents

Corporation from 2013 to 2017. Prior to that role, Mr. Muehlbauer served as Executive Vice President and Chief Financial Officer of Best Buy Co., Inc. from 2007 to 2013.

*Skills and Qualifications:* Mr. Muehlbauer's extensive finance, commercial and leadership experience with complex, multinational organizations provide him with background and experience in strategic planning, financial oversight, and large-scale business transformations. Mr. Muehlbauer's knowledge and experience in broad strategic transitions and large-scale integration efforts are a valuable addition to our Board.



**Peter A. Roy**
Age: 66
Board Member since June 2007
Compensation Committee Member
Nominating & Governance Committee Member

Mr. Roy served as the Lead Independent Director of the Board from September 2019 until August 2021. Mr. Roy is an entrepreneur and since 1999, Mr. Roy has served as a strategic advisor to North Castle Partners, a private equity firm focused on healthy living and aging investments. Mr. Roy has worked with many iconic brands such as Stonyfield Farms and Applegate. From 1993 to 1998, Mr. Roy served as President of Whole Foods Market, Inc. and, for five years prior to that, served as President of that company's West Coast Region. Since April 2021, Mr. Roy serves on the board of Thrive Acquisition Corp.

*Skills and Qualifications:* Mr. Roy's experience as the President of Whole Foods Market, Inc. allows him to provide the Board essential insight and guidance into the day-to-day operations of natural and organic products retailers, including our largest customer. In addition, his experience in the healthy lifestyle industry provides valuable insights and helps the Board maintain its focus on our core values, including our sustainability goals.



**Jack Stahl**
Age: 69
Board Member since June 2019
Independent Chair
Audit Committee Member

Mr. Stahl previously served as a member of the Compensation Committee and as Chair of the Compensation Committee from September 2020 to August 2021. Mr. Stahl has served as a member of the Board and the Lead Director of Catalent, Inc., a contract manufacturing and development company for drugs, biologics and consumer health products since August 2014. Mr. Stahl served as President and Chief Executive Officer of Revlon Inc., a multinational cosmetics, skin care, fragrance and personal care company, from 2002 until his retirement in 2006. Prior to joining Revlon, Mr. Stahl served as President and Chief Operating Officer of The Coca-Cola Company from 2000 to 2001, after previously serving in various management positions of increasing responsibility, including Chief Financial Officer, during a tenure with Coca-Cola which began in 1979. Today, Mr. Stahl also serves on the U.S. board of advisors of CVC Capital, a private equity firm. Additionally, he formerly served on the boards of Advantage Solutions LLC, Schering Plough Corporation, Dr Pepper Snapple Group, Saks, Inc., Coty Inc. and Ahold Delhaize, and was chairman of the board of managers of New Avon LLC.

*Skills and Qualifications:* Mr. Stahl has extensive leadership and significant Board experience. Mr. Stahl has a long-term record of profit and value driving performance in both stable and turnaround operating environments; and significant experience with complex, large, and dynamic organizations. At The Coca-Cola Company and Revlon, he gained significant skills and general management experience in building brands, maximizing customer relationships, and reducing costs.

22

Table of Contents

**Majority Vote Standard for Election of Directors**

Our Bylaws provide for a majority voting standard for the election of directors in an uncontested election. If the number of nominees exceeds the number of directors to be elected in an election (a contested election), directors will be elected by a plurality standard. When the number of nominees does not exceed the number of directors to be elected (an uncontested election), however, as is the case for this Annual Meeting, our Bylaws require each of the directors to be elected by a majority of the votes cast (that is, the number of shares voted "for" a director must exceed the number of shares voted "against" that director). If a nominee who is serving as a director is not elected at the Annual Meeting, under Delaware law the director would continue to serve on the Board as a "holdover director." However, under our Bylaws, any director who fails to be elected must offer to tender his or her resignation to the Board. The Nominating and Governance Committee would then make a recommendation to the Board whether to accept or reject the resignation, or whether other action should be taken. The Board will act on the Nominating and Governance Committee's recommendation and publicly disclose its decision and the rationale behind it within 90 days from the date the election results are certified. The director who offers to tender his or her resignation will not participate in the Board's decision or the Nominating and Governance Committee's deliberations (if the director is a member of that committee). All nominees for election as directors at the Annual Meeting are currently serving on the Board.

**Nomination of Directors**

The Nominating and Governance Committee reviews the qualifications of every person recommended as a nominee to the Board, including potential nominees recommended by our third-party recruiting firm, to determine whether the recommended nominees are qualified to serve on the Board. The Nominating and Governance Committee has adopted standards by which it identifies nominees and determines if nominees are qualified to serve on the Board. Additionally, in September 2021, the Board revised the Corporate Governance Principles to expressly state that any initial list of candidates for a new director appointment shall include qualified diverse candidates. The Nominating and Governance Committee evaluates recommended nominees in accordance with the following criteria:

- **Personal Characteristics.** The Nominating and Governance Committee considers the personal characteristics of each nominee, including the nominee's integrity, accountability, ability to make informed judgments, financial literacy, professionalism and willingness to meaningfully contribute to the Board (including by possessing the ability to communicate persuasively and address difficult issues). In addition, the Nominating and Governance Committee evaluates whether the nominee's previous experience reflects a willingness to establish and meet high standards of performance, both for him or herself and for others.

- **Core Competencies.** The Nominating and Governance Committee considers whether the nominee's knowledge and experience would contribute to the Board possessing certain core competencies. The Nominating and Governance Committee believes that the Board, as a whole, should possess competencies in accounting and finance, business judgment, management best practices, senior leadership, crisis response, industry knowledge, strategy and vision, and broad-scale transition and transformation, and it periodically reassesses the specific skill sets that are needed by the Board.

- **Board Independence.** The Nominating and Governance Committee considers whether the nominee would qualify as "independent" under SEC rules and the NYSE listing standards.

- **Director Commitment.** The Nominating and Governance Committee expects that each of our directors will prepare for and actively participate in meetings of the Board and its committees, provide advice and counsel to our Management, develop a broad knowledge of our business and industry and, with respect to an incumbent director, substantially maintain the expertise that led the Nominating and Governance Committee to initially select the director as a nominee. The Nominating and Governance Committee evaluates each nominee on his or her ability to provide this level of commitment if elected to the Board.

- **Additional Considerations.** Each nominee also is evaluated based on the overall needs of the Board and the diversity of experience he or she can bring to the Board, whether in terms of specialized knowledge, skills or expertise. Our Nominating and Governance Committee charter provides for the consideration of gender, race and ethnic diversity when considering Board candidates, and the Committee is committed to maintaining a diverse Board. The Nominating and Governance Committee strives to nominate directors with a variety of complementary skills so that, as a group, the Board will possess the appropriate talent, skills and expertise to oversee our businesses and add value to strategic plans and initiatives.

Following this evaluation, the Nominating and Governance Committee will ultimately make recommendations for membership on the Board and review such recommendations with the Board, which will decide whether to appoint the candidate to the Board.

Table of Contents

## Stockholder Director Recommendations and Proxy Access

### Stockholder Director Recommendations

The Nominating and Governance Committee evaluates nominees recommended by stockholders on the same basis as nominees recommended by any other sources, including determining whether the candidate is qualified to serve on the Board based on the qualitative standards described above. To have a nominee considered by the Nominating and Governance Committee, a stockholder must follow the procedures in our Bylaws related to director nominations described under "*Other Matters-Stockholder Proposals for the Next Annual Meeting of Stockholders.*" Written notice must be delivered or sent by first class U.S. mail addressed to Corporate Secretary, United Natural Foods, Inc., 313 Iron Horse Way, Providence, RI 02908.

### Proxy Access

We have also adopted a proxy access provision in our Bylaws that permits a stockholder, or a group of up to 20 stockholders, owning, continuously for at least three years, shares of our stock representing an aggregate of at least 3% of the voting power entitled to vote in the election of directors, to nominate and include in our proxy materials director nominees, provided that the stockholder(s), the nominee(s), and the notice satisfy the requirements in our Bylaws. The number of potential proxy access nominees nominated by all eligible stockholders shall not exceed the greater of (A) two or (B) 20% of the directors then in office. Under our Bylaws, to be timely, notice of proxy access director nominations must be received by our Corporate Secretary at the address specified above no earlier than 150 days and no later than 120 days prior to the first anniversary of the date the Company mailed its proxy statement for the preceding year's annual meeting; provided, however, that if (A) the annual meeting is not within 30 days before or after the anniversary date of the preceding year's annual meeting, or (B) no annual meeting was held during the preceding year, to be timely the stockholder notice must be received no later than 120 days prior to such annual meeting or, if later, the tenth day after the day on which notice of the date of the meeting was mailed or public disclosure of the date of the annual meeting is first made, whichever occurs first.

## Communication with the Board of Directors

Anyone who would like to communicate with, or otherwise make his or her concerns known directly to, the Board may do so. All communications should be in written form and directed to our Corporate Secretary, United Natural Foods, Inc., 313 Iron Horse Way, Providence, RI 02908, who will forward such communications to the appropriate party. All correspondence will be compiled and summarized by the Corporate Secretary and periodically submitted to the Board, individual directors or Management, as appropriate. The Corporate Secretary may also forward certain correspondence elsewhere within the Company for review by a subject matter expert and for a response, as appropriate.

Table of Contents

# Director Compensation

The Board and the Compensation Committee review and determine compensation for our non-employee directors, based in part on a review of the annual Director Compensation Survey prepared by the National Association of Corporate Directors and other reputable sources, as well as with the input from the Compensation Committee's independent consultant, based on benchmarking of comparable peer company director compensation. The Compensation Committee and the Board believe that we should fairly compensate non-employee directors for work required in a company of our size and scope and that our compensation program for non-employee directors should be designed to drive long-term value creation for our stockholders. Our non-employee director stock ownership guidelines, which are discussed in greater detail below, require directors to hold a substantial amount of our stock during their tenure as directors, thereby directly aligning the interests of our non-employee directors with those of our stockholders. Mr. Spinner, our former CEO, did not, and Mr. Douglas, our current CEO, does not, receive separate compensation for service on our Board.

## Non-Employee Director Compensation

The components of our non-employee director compensation are annual cash retainers and awards of time-based restricted stock units (RSUs), which will vest one-year from the date of grant of the award. Each non-employee director is also reimbursed for direct expenses (e.g. travel, hotel, and meals) incurred in connection with his or her attendance at meetings of the Board and its committees.

In September 2021, the Compensation Committee amended the Director compensation to reflect the shift to an Independent Chair-based leadership structure. After reviewing the Independent Chair compensation for our peer companies and certain other benchmark data, the Compensation Committee recommended, and the Board approved, an additional annual cash retainer for the Independent Chair. Further, in December 2021, the Compensation Committee, after reviewing certain benchmarking information and in consideration of when the Board last approved an increase, recommended, and the Board approved, an increase in the annual cash retainer for non-employee directors of $10,000. Accordingly, non-employee director compensation is as follows:

- Annual cash retainer of:
    - $100,000 for serving as a director;
    - $100,000 for serving as Independent Chair;
    - $30,000 for serving as the chair of the Audit Committee;
    - $20,000 for serving as chair of the Compensation Committee; and
    - $20,000 for serving as chair of the Nominating and Governance Committee.
- Annual equity grants of RSUs having a value, based on the stock price on the date of grant, of $162,000 for serving as a director.

Additionally, in September 2021, the Compensation Committee and Board approved payments to certain of the Company's Directors for chair and member service on the CEO Succession Planning Committee to reflect the special nature of the Committee and the time and effort involved, as follows: $25,000 for service as a chair, $10,000 for service as a member on the Committee and $20,000 for continuing members. In addition, the Compensation Committee and Board determined that additional payments of $10,000 for one Board member, and $15,000 for another Board member, should be made given the extended service, time and effort expended by these two individuals in their capacities as Board members on the nearly year-long CEO succession and search process.

## Director Compensation Table-Fiscal 2022

The following table summarizes compensation provided to each individual who served as a non-employee director during fiscal 2022.

25

Table of Contents

**Director Compensation**

| Name | Fees Earned or Paid in Cash ($)[1] | Stock Awards ($)[2] | Option Awards ($)[3] | Total ($) |
|---|---|---|---|---|
| Eric F. Artz | 98,322 | 162,000 | - | 260,322 |
| Ann Torre Bates | 128,322 | 162,000 | - | 290,322 |
| Gloria R. Boyland[4] | 108,322 | 282,279 | - | 390,601 |
| Denise M. Clark[5] | 158,322 | 162,000 | - | 320,322 |
| Daphne J. Dufresne | 121,202 | 162,000 | - | 283,202 |
| Michael S. Funk[5] | 118,322 | 162,000 | - | 280,322 |
| Shamim Mohammad[6] | 65,833 | - | - | 65,833 |
| James L. Muehlbauer[5] | 108,322 | 162,000 | - | 270,322 |
| Peter A. Roy[5] | 108,322 | 162,000 | - | 270,322 |
| Jack Stahl[5] | 219,844 | 162,000 | - | 381,844 |

(1) This column shows the amount of cash compensation earned in fiscal 2022 for service on the Board and its committees.

(2) The amounts contained in this column represent the grant date fair value for the RSUs granted in fiscal 2022 calculated in accordance with Financial Accounting Standards Board Accounting Standards Codification 718, Stock Compensation (ASC 718). The grant date fair value for RSUs is calculated based on the closing price of our common stock on the NYSE on the date of grant.

(3) As of July 30, 2022, no directors held options to purchase shares of common stock. As of July 30, 2022, each director held 3,500 unvested RSUs, other than Ms. Boyland, who held 6,099 unvested RSUs and Mr. Mohammad, who was not a member of our Board at the time of the fiscal 2022 annual grant, and therefore did not receive a grant in fiscal 2022.

(4) Ms. Boyland was appointed to the Board in January 2021. Accordingly, this grant amount is reflective of proration of the annual equity award for Ms. Boyland's service as a director for the service period prior to the grant date. Additionally, Ms. Boyland received a payment of $10,000 for her service as a member on the ad hoc CEO Succession Planning Committee, which was approved and paid during the first quarter of fiscal 2022.

(5) Includes the following additional compensation for services on the ad hoc CEO Succession Planning Committee, which was approved and paid in the first quarter of fiscal 2022: Ms. Clark received a payment of $40,000 for her service as a member and chair of the Committee, Mr. Funk received a payment of $20,000 for his service as a member of the Committee, and Messrs. Muehlbauer, Roy and Stahl received payments of $10,000 of their service as members of the Committee.

(6) Mr. Mohammad joined the Board in February 2022 and did not receive a grant of equity for fiscal 2022.

## Stock Ownership Guidelines

All non-employee directors are required to hold shares of our stock in an amount that is determined in accordance with the requirements of our stock ownership guidelines. The guidelines provide that each of our non-employee directors must acquire and hold shares of our common stock valued at five times the annual cash retainer, not including supplemental retainers for committee leadership. Our stock ownership guidelines require that each new non-employee director is expected to comply with the policy by the end of the fifth year after he or she becomes a member of the Board. Compliance with the guidelines is tested once per year for as long as the director serves on the Board. Vested and unvested restricted stock and RSUs are also included in ownership. In March 2022, we updated our stock ownership guidelines to exclude vested stock options and stock appreciation rights in calculating compliance. Pursuant to our stock ownership guidelines and insider trading policy, Directors are not allowed to hedge their interests in the stock held. Given the sustained decline in our stock price at the level specified in our stock ownership guidelines for 18 months, the five-year accumulation period was reset for our directors as of August 1, 2020, in accordance with the terms of the guidelines, and they will be required to accumulate shares to reach the required ownership level by the end of that accumulation period. As of July 30, 2022, each of our directors was in compliance.

## Certain Relationships and Related Transactions

### Review and Approval of Related Party Transactions

Pursuant to our Related Party Transaction Policy, our Nominating and Governance Committee reviews all transactions in which the Company or any of its subsidiaries is a participant if a "related party" will have a direct or indirect material interest and the amount involved or expected to be involved in any fiscal year exceeds $120,000. The transaction will not be approved unless, after a consideration of all relevant circumstances, the Committee determines that the transaction is in the best interests of the Company. The Nominating and Governance Committee reports any transaction that has been approved to the Audit Committee and the full Board. For purposes of this policy, "related parties" include our directors, nominees for director,

Table of Contents

executive officers, greater than 5% beneficial owners, any of their immediate family members (as defined in the policy, which includes additional family members beyond the SEC's related person disclosure rules) or any entity in which they have a material interest. Among the factors that must be considered in making the determination of whether the transaction is appropriate are: the nature of the related party's interest in the transaction; the material terms of the transaction, including whether the terms of the transaction are fair to the Company and on the same basis as would apply if the transaction did not involve a related party; the significance of the transaction to the related party and the Company; whether the transaction would impair the judgment of a director or executive officer to act in the best interests of the Company; compliance with applicable law; and any other factors deemed appropriate by our Nominating and Governance Committee. As required under SEC regulations, transactions involving amounts in excess of $120,000 in which we are a participant and as to which a related person has a direct or indirect material interest are disclosed in this proxy statement.

Each of our executive officers, directors and nominees for director is required to complete and deliver to us an annual questionnaire that includes, among other things, a request for information relating to any transactions in which (i) any executive officer, director, nominee, beneficial owner or any of their respective immediate family members or affiliates, on the one hand, and (ii) the Company or any of its subsidiaries, on the other hand, participates. We review the responses to these questionnaires as part of our process for determining whether disclosure is required to be made under the SEC's related person disclosure rules. Based on such responses, there are no related person transactions to report.

Table of Contents

# Audit Committee Report

The Audit Committee of the Board consists solely of independent directors, as defined by the NYSE listing standards and Section 10A of the Exchange Act and SEC rules thereunder, and it operates under a written charter adopted by the Board. The composition of the Audit Committee, the attributes of its members and its responsibilities, as reflected in its charter, are intended to be in accordance with applicable requirements for corporate audit committees. The Audit Committee reviews and assesses the adequacy of its charter on an annual basis. A copy of the Audit Committee's current charter can be found in the Investors section of our website, www.unfi.com. The Board has determined that all members of the Audit Committee are financially literate and Ms. Bates qualifies as an "audit committee financial expert" within the meaning of SEC regulations.

The Audit Committee has prepared the following report on its activities with respect to the audited consolidated financial statements for the fiscal year ended July 30, 2022 (for purposes of this report, the "audited financial statements" or "consolidated financial statements"). The following report of the Audit Committee does not constitute soliciting material and should not be deemed filed or incorporated by reference into any other of our filings under the Securities Act of 1933, as amended (the Securities Act) or the Exchange Act, except to the extent we specifically incorporate this report by reference in the specified filing.

As part of its delineated duties, the Audit Committee reviews the Company's financial reporting process on behalf of the Board; reviews the financial information issued to stockholders and others, including a discussion of the quality, and the acceptability, of our accounting principles, the reasonableness of significant judgments, and the clarity of discussions in the financial statements; and monitors our systems of internal control over financial reporting and the audit process. Management is responsible for the preparation, presentation and integrity of our financial statements, accounting and financial reporting principles, and disclosure controls and procedures designed to drive compliance with accounting standards and applicable laws and regulations. Management also is responsible for objectively reviewing and evaluating the adequacy, effectiveness and quality of our own systems of internal control over financial reporting. Our independent registered public accounting firm, KPMG LLP, is responsible for performing an independent integrated audit of the consolidated financial statements and the effectiveness of internal control over financial reporting and expressing an opinion as to whether the consolidated financial statements conform with accounting principles generally accepted in the United States (GAAP) and as to whether the Company maintained effective internal control over financial reporting.

The Audit Committee has met and held discussions with Management and KPMG LLP. In our discussions, Management has represented to the Audit Committee that the Company's consolidated financial statements were prepared in conformity with GAAP. The Audit Committee has reviewed and discussed the audited financial statements with Management and KPMG LLP. The Audit Committee meets with our internal auditors and KPMG LLP, with and without Management present, to discuss the results of their examinations, the evaluations of the Company's internal controls and the overall quality of the Company's financial reporting.

The Audit Committee held four formal meetings in fiscal 2022. The Audit Committee discussed with KPMG LLP all matters required to be discussed in accordance with auditing standards, including the statement on Public Company Accounting Oversight Board Auditing Standard No. 1301, Communications with Audit Committees.

KPMG LLP has also provided to the Committee the written disclosures and the letter required by the Public Company Accounting Oversight Board regarding the independent accountant's communications with the Audit Committee concerning independence, and the Audit Committee has considered and discussed with KPMG LLP the firm's independence and the compatibility of any non-audit services provided by the firm with its independence.

Based on the Audit Committee's review of the audited financial statements and the review and discussions noted above, the Audit Committee recommended that the Board include the audited financial statements in the Company's Annual Report on Form 10-K for the year ended July 30, 2022, for filing with the SEC.

Ann Torre Bates, Chair
Gloria R. Boyland
Shamim Mohammad
James L. Muehlbauer
Jack Stahl

Table of Contents

# Executive Officers of the Company

Our executive officers are elected on an annual basis and serve at the discretion of our Board. Our executive officers and their ages as of November 14, 2022 are listed below:

| Name | Age | Position |
|---|---|---|
| J. Alexander (Sandy) Miller Douglas | 61 | Chief Executive Officer |
| John W. Howard | 53 | Chief Financial Officer |
| Danielle Benedict | 50 | Chief Human Resources Officer |
| Eric A. Dorne | 62 | Chief Operating Officer (retired effective October 29, 2022) |
| Matthew Echols | 50 | Chief Corporate Affairs Officer |
| Mahrukh Hussain | 50 | General Counsel and Corporate Secretary |
| Louis Martin | 52 | Chief Strategy and Transformation Officer |
| Michael C. Stigers | 64 | Chief Executive Officer, Cub |
| Christopher P. Testa | 52 | President |

We have included below information concerning the business experience and qualifications of each of our executive officers, except Mr. Douglas whose business experience and qualifications are described above in the section "*Proposal 1-Election of Directors*."

*John W. Howard* was appointed Chief Financial Officer in February 2020. Mr. Howard previously served as our Interim Chief Financial Officer from August 2019 to February 2020. Mr. Howard joined us in July 2019 as Senior Vice President, Finance. Prior to that, Mr. Howard served as Interim Chief Financial Officer for Prime Therapeutics from July 2018 to May 2019. From August 2014 to July 2017, Mr. Howard was Vice President, Corporate Finance for Valspar Corporation leading the global accounting, tax, treasury, regional CFOs and corporate financial planning and analysis. Prior to that, Mr. Howard held a number of finance and tax roles at Celanese Corporation and Reichhold, Inc. Mr. Howard began his career as a tax consultant with Arthur Anderson and PricewaterhouseCoopers. Mr. Howard holds a Bachelor of Science and Master of Accounting, Tax, both from University of Virginia.

*Danielle Benedict* was appointed as our Chief Human Resource Officer in September 2017. Ms. Benedict previously served as our Senior Vice President, Human Resources from May 2016 to September 2017 and as our National Vice President, Human Resources from August 2014 to May 2016 and Director, Compensation & Benefits from April 2013 to August 2014. Prior to joining us, Ms. Benedict was Vice President, Human Resources & Leadership Development at Clean Harbors Environmental Services from 2007 to 2013. She began her career with Dunkin Brands, Inc. in 1999. Since September 2022, Ms. Benedict serves on the board of The Food Project, a non-profit organization.

*Eric A. Dorne* served as our Chief Operating Officer from March 2020 until his retirement on October 29, 2022. He also served as our Chief Administrative Officer and Chief Information Officer from September 2016 to March 2020. Mr. Dorne previously served as our Senior Vice President, Chief Information Officer from September 2011 to September 2016. Prior to joining us, Mr. Dorne was Senior Vice President and Chief Information Officer for The Great Atlantic & Pacific Tea Company, Inc., the parent company of the A&P, Pathmark, SuperFresh, Food Emporium and Waldbaum's supermarket chains located in the Eastern United States from January 2011 to August 2011, and Vice President and Chief Information Officer from 2005 to 2011. In his more than 30 years at The Great Atlantic & Pacific Tea Company, Mr. Dorne held various executive positions including Vice President of Enterprise IT Application Management and Development, Vice President of Store Operations Systems and Director of Retail Support Services.

*Matthew Echols* has served as our Chief Corporate Affairs Officer since March 2022. Prior to joining us, Mr. Echols served as Global Vice President for Public Affairs, Communications and Sustainability at The Coca-Cola Company. Mr. Echols held several positions during his 24 years at Coca-Cola including Senior Vice President of Public Affairs, Communications and Sustainability for North America from 2015 to 2019, and from 2019-2021 a similar role in Asia Pacific based in Singapore. Before joining Coca-Cola, Mr. Echols worked on Capitol Hill for several members of the U.S. Congress. He holds a master's degree in marketing communications from Johns Hopkins University's Carey Business School, where he currently serves on the Dean's Advisory Board, and a bachelor's degree from the University of West Georgia.

*Mahrukh Hussain* has served as our General Counsel and Corporate Secretary since May 2022. Prior to joining us, Ms. Hussain served as Senior Vice President, Chief Commercial and Privacy Officer for McDonald's Corporation since January 2022. During her tenure with McDonald's, Ms. Hussain held a range of legal positions with increasing responsibility. She served as the Interim Global General Counsel and Corporate Secretary from October 2020 until April 2021. From July

Table of Contents

2013 through October 2020, Ms. Hussain served as McDonald's U.S. General Counsel; from May 2011 through May 2013 she served as the Europe General Counsel; from February 2009 through May 2011 she served as the Central Division General Counsel; and from December 2000 through February 2009 she served as Managing Counsel/Senior Counsel/Counsel U.S. Real Estate Practice Groups. Prior to working with McDonald's, she was an Associate at the law firm of Schwartz, Cooper, Greenberger, and Krauss and served one year as a judicial clerk for Justice Rita Garman. Ms. Hussain holds a bachelor's degree in Political Science from the University of Chicago and a J.D. from the University of Illinois at Urbana-Champaign.

*Louis Martin* has served as our Chief Strategy and Transformation Officer since March 2022. Prior to joining us, Mr. Martin served as President of the Global Walmart Customer Team at The Coca-Cola Company since April 2016. Mr. Martin held several positions during his 15 years at Coca-Cola including Senior Vice President of System Evolution for Coca-Cola North America (May 2014-April 2016). Prior to working with Coca-Cola, Mr. Martin was with McKinsey & Company and previously with E.D. & F. Man, a British Sugar Trade House. He holds a Bachelor's degree in English from Princeton University as well as an MBA in Finance and Management from the Stern School of Business at New York University.

*Michael C. Stigers* has served as the Chief Executive Officer, Cub and Executive Vice President of UNFI since 2019. Previously, he served as Executive Vice President of UNFI Fresh and CEO of Cub Foods, Minnesota's largest retail grocery chain, since November 2018. Prior to its acquisition by UNFI, Mr. Stigers served as Supervalu's Executive Vice President of Wholesale Supply Chain Services and Logistics since 2016. Mr. Stigers prior experience included serving as President of Shaw's / Star Markets; Regional Vice President of Sterilox Fresh, a food safety company; and Chief Operating Officer of PW Supermarkets. Mr. Stigers began his grocery career as a part-time courtesy clerk at Safeway and has been active in several trade associations, including the California Grocers Association, past president of Western Association of Food Chains, and immediate past Chair of National Grocers Association.

*Christopher P. Testa* has served as our President, United Natural Foods, Inc. since August 1, 2018. In March 2020, Mr. Testa assumed additional oversight of supplier services, professional services, our Brands+ business, and our Canadian business. From August 2016 to August 2018, he served as our President, Atlantic Region. Mr. Testa previously served as President, Woodstock Farms Manufacturing, from September 2012 to August 2016 and President, Blue Marble Brands, from August 2009 until August 2016. Mr. Testa served as Vice President of Marketing for Cadbury Schweppes Americas Beverages from 2002 to 2005 and as CEO of Wild Waters, Inc. from 2005 to 2009.

Table of Contents

# Executive Compensation

## Compensation Discussion and Analysis

### Overview

In this section, we describe the principles, policies and practices that form the basis for our executive compensation program and how they were applied to our Named Executive Officers (NEOs) in fiscal 2022, as well as changes we have made for fiscal 2023. For purposes of this Compensation Discussion and Analysis, the following individuals were our NEOs for fiscal 2022:

- Chief Executive Officer (J. Alexander (Sandy) Miller Douglas);
- Chief Financial Officer (John W. Howard);
- Chief Operating Officer (Eric A. Dorne);
- Chief Executive Officer, Cub (Michael C. Stigers);
- President (Christopher P. Testa);
- Former Chief Executive Officer and Board Chairman (Steven L. Spinner); and
- Former Chief Legal Officer, General Counsel and Corporate Secretary (Jill E. Sutton).

Our compensation policies and programs are designed to support the achievement of our strategic business plans by motivating, retaining and attracting exceptional talent to develop and execute our key objectives. Our ability to compete effectively in the marketplace depends on the knowledge, capabilities and integrity of our leaders. Our compensation programs help create a high-performance, outcome-driven and principled culture by holding leaders accountable for delivering results, developing our employees and exemplifying our core values. In addition, we believe our compensation policies and programs for leaders and employees are appropriately balanced and incentivize the achievement of short- and long-term results, and therefore drive behavior that is aligned with our overall objectives of delivering long-term growth and stockholder value for UNFI.

In fiscal 2022, we adopted further changes in our executive compensation policies to reflect best practices and in response to stockholder input. We proactively sought the views of our stockholders through our annual stockholder engagement program and adopted changes that responded to stockholder feedback. As further described below, we continue to value and respond to the preferred practices and guidelines of our stockholders on executive compensation, including the feedback received in our engagement conversations.

### Business and Performance Highlights

UNFI is a leading distributor of grocery and non-food products, and support services provider to retailers in the United States and Canada. We believe we are uniquely positioned to provide the broadest array of products and services to customers throughout North America. We are a coast-to-coast distributor with customers in all 50 states as well as all ten provinces in Canada, making us a desirable partner for retailers and consumer product manufacturers. We believe our total product assortment and service offerings are unmatched by our wholesale competitors. We plan to continue to pursue new business opportunities with independent retailers that operate diverse formats, regional and national chains, as well as international customers with wide-ranging needs.

Fiscal 2022 was another strong year for UNFI as we continued to leverage our scale and extensive customer offering to deliver full-year results that were at, or above, our initial expectations. We appointed a new CEO, Sandy Douglas, early in the year, and during the year, added several new executive roles focused on driving our Fuel the Future strategy and the six underlying pillars that we believe will drive growth in the years to come. We continued to put the safety and welfare of our associates at the forefront of everything we do. We also issued our 2021 ESG Report that includes an update on our progress against our ambitious goals meant to make the world, our communities, and our people better.

31

Table of Contents

**Key Business Highlights from Fiscal 2022**

**Key Business Highlights from Fiscal 2022**

- Net sales of approximately $29 billion; 7.3% growth from the prior year.
- Adjusted earnings before interest, taxes, depreciation and amortization (adjusted EBITDA) of $829 million; 7.7% growth from the prior year. (See Annex B for reconciliation of adjusted EBITDA to the most comparable GAAP metric).
- Net debt reduction of $174 million in fiscal 2022.
- Mr. Douglas added several new strategic executive roles to support execution of our strategy, which is designed to make our customers stronger, our supply chain better, and our food solutions more inspired.
- Opened and commenced operations at our new Allentown, PA distribution center.
- Disclosed the addition of two new goals aimed at enhancing our diversity and inclusion initiatives in our 2021 Better for All Report and reported progress of our other human capital management initiatives around wellness, financial wellbeing and flexibility.
- Science-based emissions reduction targets validated by the Science Based Targets initiative.
- Elevated our safety lead to SVP role in our effort of continued focus on the safety of our associates.

Note: During fiscal 2022, the Company revised its definition of Adjusted EBITDA to exclude the impact of non-cash LIFO charges or benefits. Prior periods have been revised to conform to the current year presentation.

### Say on Pay Vote, Investor Engagement and Responsive Action

Our annual say-on-pay vote is one of our opportunities to understand stockholder perspectives regarding our executive compensation program. At our annual meeting of stockholders in January 2022, we submitted a proposal to our stockholders to approve, on an advisory basis, our executive compensation for our NEOs, and 92.6% of our stockholders voted for that proposal, as compared to 60.2% in January 2021, which we believe reflects our responsiveness to the feedback we heard through engagement in connection with and following our January 2021 annual meeting. In response to that feedback, we made several changes to our compensation program for fiscal 2022, as described below.

In fiscal 2022, we conducted our fifth annual stockholder outreach program, and we met with stockholders representing more than 50% of our outstanding common stock over the summer of 2022. In addition to discussing our Say on Pay results and our executive compensation program generally, we shared relevant information and solicited feedback from our stockholders on our corporate governance practices, including recent changes, our business priorities, our Fuel the Future strategy and our robust ESG program, including our Better for All campaign. See "*Corporate Governance-Stockholder Engagement*" for discussions of governance actions we took in response to these conversations.

In recent years, we have made several changes to our executive compensation programs in response to our investor engagement activities. Overall, the investors we met with viewed the changes we have made to our compensation program and governance program and practices positively, which is reflected in our 92.6% favorable vote at our 2022 annual meeting. Based on the feedback we heard with respect to our Say on Pay vote results at our last annual meeting, we believe the results were driven by our demonstrated responsiveness to stockholder feedback on our program and practices following our 2021 annual meeting, which include the following changes:

32

Table of Contents

| WHAT WE HEARD | WHAT WE DID |
|---|---|
| | → We have entered into severance agreements with limited terms (three years) and other policies and programs that specify the benefits payable to executive officers upon a separation of employment, which have been fully disclosed to our stockholders |
| *Viewed special severance arrangements with departing executive officers entered into in fiscal 2020 as problematic* | → Did not enter into an employment agreement with our new CEO, whose terms and conditions of employment generally align with those in place for our other executive officers and plan participants, except as specifically disclosed with respect to retirement years of service and multiples for severance and change in control payments |
| | → No employment agreements, and no intention of entering into any special employment agreements, with any of our NEOs |
| *Preference for performance-based, at-risk compensation* | → Beginning in fiscal 2022, equity grants are more heavily weighted to performance at 60% performance-based restricted stock units (PSUs) and 40% RSUs (compared to 50%/50% in prior years) |
| *Add second metric to short-term incentive (STI) plan aligned to strategic priorities* | → Added Net Sales metric to STI plan, which, balanced with the existing adjusted EBITDA metric, aligns with our strategy to grow sales profitably |
| *Continue to align long-term incentive plan metrics with strategic priorities* | → Removed leverage metric given significant progress on this metric in recent years and long-term nature of the target, reweighted adjusted EPS and adjusted ROIC metrics |
| *Consider the addition of ESG-related metrics in compensation programs* | → Evaluating and tracking various ESG-related metrics to better understand our data and identify appropriate metrics |
| *Consideration of the dilutive impact of equity awards* | → We are mindful of the effect of our comparatively low number of outstanding shares on the dilutive impact of our equity awards<br>→ As our stock price has increased, we have maintained disciplined grant practices reflective of market practices, resulting in decreasing dilution year-over-year. See *"Executive Compensation Tables - Securities Authorized for Issuance under our Equity Compensation Plans"* for more information. |
| | → In September 2022, our Board approved a share buyback program that will provide an opportunity to help offset dilution. |

**Other Actions Responsive to Stockholder Feedback in Recent Years**

We regularly review our compensation program to align with best practices and to confirm that our program supports our pay for performance philosophy. We have a history of listening and responding to feedback from our stockholders, and we intend to continue our stockholder outreach activities to understand investor perspectives and incorporate that direct input into our program. Below are some of the other compensation actions we have implemented in recent years in response to perspectives shared with us by our stockholders:

• **Strengthened our recoupment policy** to permit the Board to require forfeiture of incentive compensation in the event of certain misconduct causing reputational harm, and to provide for reporting of any required recoupment or forfeiture thereunder in certain circumstances;

• Tied all payouts under the short-term incentive plan to **pre-established financial goals** that are **aligned with strategic initiatives** - for fiscal 2022, this was adjusted EBITDA and Net Sales to support a balanced approach of growing both top and bottom line results;

• **Revised payout levels at threshold and maximum of 50% and 150%**, respectively, (previously 200% maximum) for annual cash incentive plan to **limit potential maximum payments**;

• Aligned long-term incentive awards to market by extending to a **3-year cliff-vesting** for performance share units, or PSUs, and reducing to a **3-year ratable annual vesting** for time-based restricted share units, or RSUs;

Table of Contents

- Implemented a **new stock plan** in 2020 that includes the addition of robust restrictive covenants, payment of dividends only upon vesting, one-year minimum vesting period and better defined death, disability and retirement treatment to create a uniform approach for equity participants;
- **Aligned pay programs competitively**, both internally and externally with the market;
- **Use of tally sheets** (showing all forms of compensation for each officer) and measurements of internal pay equity;
- **Aligned metrics in the long-term incentive program to key strategic priorities;** for grants in fiscal 2022, that included adjusted EPS and adjusted ROIC, which we believe were the most important drivers of the Company's long-term success;
- **Removed duplicative performance metric** from STI and LTI plans;
- **Enhanced disclosures** of compensation program and pay-for-performance, including the "why" for each component;
- **Reduced payment multiples in change in control and severance agreements**, limited the number of executives covered, and limited agreements to established terms, which we intend to maintain going forward; and
- Amended equity award agreements for all participants, including executives, to provide for the **continuous vesting of awards in retirement**, to keep executives focused on long-term performance through their retirement date and limit the need for discretion.

**Executive Compensation Program Philosophy**



**Our executive compensation program is designed to:**

✓ Attract and retain individuals with the skills to develop and execute the strategy and advance the culture necessary for us to achieve long-term growth;

✓ Maintain a strong pay for performance work environment;

✓ Motivate our executives and align their interests with those of our stockholders by delivering more at-risk pay for senior executives;

✓ Reward our executives fairly over time for performance that enhances stockholder value;

✓ Emphasize consistent and sustainable top- and bottom-line growth; and

✓ Avoid incentives encouraging excessive risk taking.

Our executive compensation program is also designed to reinforce a sense of ownership in the Company and overall entrepreneurial spirit. The program links rewards, including both short- and long-term awards, as well as cash and non-cash awards, to measurable corporate performance metrics established by the Compensation Committee designed to incentivize actions to execute and achieve the objectives of our long-term strategy.

The program measures achievement of corporate financial goals. These goals support our short- and long-term business strategies and are aligned with the interests of our stockholders. By aligning all executives to corporate financial goals, we encourage a shared focus and collaborative work toward strong, long-term operating performance. In addition, our executive compensation program is designed to balance our growth strategies with a managed approach to risk tolerance. Our compensation programs provide assurances of stability and a focus on the long term, upon a solid foundation that requires personal accountability, integrity and compliance.

**Executive Compensation Program Highlights**

Our executive compensation program is designed to align our executive compensation with long-term stockholder interests and incorporates the following best practices:

| WHAT WE DO |
| --- |

✓ Our NEO pay is aligned with financial performance, with variable, performance-based pay constituting 71% - 84% of NEO compensation at target in fiscal 2022

✓ We grant incentive compensation based on rigorous performance conditions and peer group comparisons

✓ Performance-based incentive awards are tied 100% to pre-established financial goals; any adjustments to performance targets and conditions impacting payouts are considered by the Compensation Committee in accordance with pre-established guidelines

✓ Our Compensation Committee utilizes the services of an independent compensation consultant; engaged a new consultant in fiscal 2021 after comprehensive search process

✓ Our change in control severance benefits are double-trigger and provide for market multiples of 2 to 2.5 (CEO only) and cover only executive officers and small groups of officers under pre-existing agreements

✓ Severance agreements for executives other than CEO are limited to 1x multiple of base and bonus and to three-year terms (compared to prior unlimited terms) and cover only executive officers and a small group of officers under pre-existing agreements in exchange for non-compete and no solicitation covenants

34

Table of Contents

✓ We have a policy for recoupment of performance-based compensation applicable to our NEOs and other senior officers, which we most recently enhanced in fiscal 2021 to permit the Board to require forfeiture of incentive compensation in the event of misconduct causing reputational harm

✓ We have robust stock ownership guidelines (that we strengthened in fiscal 2022) for NEOs and certain other officers

✓ Equity awards continue to vest through qualifying retirement, with proration of awards granted in year of retirement to match service period

✓ We require employment and post-employment covenants (including non-compete, non-solicitation and assignment of intellectual property) for executive officers and all equity and bonus participants

## WHAT WE DON'T DO

✗ No employment agreements with any executive officers (including CEO)

✗ No uncapped incentive opportunities

✗ No change in control agreements are expected to be extended beyond key executive officers and the existing group

✗ No severance agreements are expected to be extended beyond existing group and are time-bound

✗ No tax gross-ups of severance or change in control payments

✗ No hedging or short sales of our stock; no pledging

✗ No excessive perquisites

✗ No supplemental retirement benefits

✗ No guaranteed bonuses

✗ No incentives that motivate excessive risk-taking

✗ No acceleration of equity awards expected for executive officers

### How We Make Decisions Regarding Executive Pay

The Compensation Committee, Management and the Compensation Committee's independent compensation consultant, Frederic W. Cook and Co. (FW Cook), each play a role in designing our executive compensation program and determining performance levels and associated payouts. We also look at market data and take into consideration stockholder views about executive compensation expressed in our stockholder engagement process, as described above.

#### Role of the Compensation Committee

The Compensation Committee is responsible for establishing, implementing and monitoring our executive compensation program and its adherence to our compensation philosophy. The Compensation Committee approves the performance thresholds and the financial and strategic performance metrics applicable to executive officers under our annual cash incentive plan as described in *"Components of Our Executive Compensation Program for Fiscal 2022-Performance-Based Annual Cash Incentive Compensation"* and sets performance metrics applicable to the performance-based component of our long-term equity incentive plan as described in *"Components of Our Executive Compensation Program for Fiscal 2022-Long-Term Equity-Based Incentive Program"*. The Compensation Committee is responsible for approving our employment policies and agreements impacting executive officers. The Compensation Committee also evaluates actual performance against the established goals and determines appropriate levels of compensation for our executives. The Compensation Committee makes all decisions with respect to, and approves, compensation for our executive officers, including base salary, annual cash incentive, long-term equity incentive, and benefits, except that the compensation of our CEO is further reviewed and approved by the independent members of our Board.

As part of the compensation approval process for our executive officers, the Compensation Committee considers the views and recommendations of Management, particularly our CEO. For our CEO, we have established an annual performance evaluation process, which includes a self-assessment by the CEO and a formal performance assessment by the full Board consisting of both quantitative and qualitative assessments, which is considered in setting the CEO's annual compensation. In setting the nature, type and level of compensation for all of our executive officers, the Compensation Committee considers the recommendation of its independent compensation consultant as described in greater detail below.

#### Role of Management

Our CEO and CHRO provide the Compensation Committee with an assessment of our corporate performance, market pay practices, and the performance of our executive officers and make recommendations for the compensation of our other executive officers based on this assessment, including recommendations for pay mix and the nature of performance metrics that best support our business objectives. Additionally, our CEO, CHRO and CFO discuss with the Compensation Committee Management's internal projections with respect to a variety of performance metrics and operational goals for future fiscal years on which performance-based compensation will be based. The General Counsel and Corporate Secretary advises on the

Table of Contents

foregoing matters and provides guidance on governance principles and practices, investor perspectives and regulatory trends and analyses in the context of executive compensation determinations.

No executive officer makes any decision on any element of his or her own compensation, and our CEO does not participate in deliberations regarding his compensation, which is recommended by the Compensation Committee to the full Board and considered and determined by the full Board in conjunction with the CEO's performance evaluation in executive session.

**Role of Independent Compensation Consultant**

Late in fiscal 2021, following a thorough review process, the Compensation Committee selected FW Cook as its independent compensation consultant. The Compensation Committee selected and directly retained FW Cook to provide independent, third-party advice and expertise on all aspects of executive compensation and related corporate governance matters, including designing and establishing our executive compensation program for fiscal 2022. FW Cook provided input and guidance related to our incentive plan design, reviewed our Compensation Discussion and Analysis and associated disclosures, and summarized and provided perspectives on market developments related to executive compensation, including regulatory requirements and related disclosures. FW Cook only provides services to the Compensation Committee. It does not provide any services to Management. The Compensation Committee assessed the independence of FW Cook pursuant to SEC and NYSE rules, as described below, and concluded that no conflict of interest exists that would prevent FW Cook from serving as an independent consultant to the Compensation Committee.

As mentioned above, the Compensation Committee analyzed whether the work of FW Cook as its compensation consultant raises any conflict of interest, taking into consideration the following factors: (i) FW Cook does not provide any other services to the Company; (ii) the amount of fees the Company paid to FW Cook represents less than 1% of FW Cook's total revenues; (iii) FW Cook maintains policies and procedures designed to prevent conflicts of interest; (iv) FW Cook does not have any business or personal relationship with any executive officer of the Company; (v) neither FW Cook nor any member of its consulting team directly owns any stock of the Company; and (vi) FW Cook's consulting team for UNFI does not have any known business or personal relationship with any member of the Committee. The Committee determined, based on its analysis of the above factors, that the work of FW Cook and the individual compensation advisors employed by FW Cook as compensation consultant to the Committee does not create any conflict of interest. The Committee will continue to monitor the independence of its compensation consultant on an annual basis. The Compensation Committee also annually evaluates the independence, performance, scope of work and fees, and other key elements of this relationship under a pre-approval policy pursuant to which fees are ultimately approved. In the future, the Compensation Committee may retain other similar consultants.

**Compensation Risk Assessment**

Our Compensation Committee charter requires the Compensation Committee to assess, on an annual basis, whether the Company's compensation policies and practices encourage the Company's executive officers or other key employees to take unnecessary and excessive risks that could threaten the value of the Company. The Compensation Committee believes that our compensation policies do not encourage the taking of unnecessary and excessive risks. Our compensation and governance practices are designed to align the interests of our executive officers with the interests of stockholders and the achievement of the Company's strategic objectives. For example:

- A substantial portion of our executive officers' compensation is "at risk," including compensation paid in the form of common stock;
- Total executive officer compensation is substantially weighted to long-term equity, 60% of which is performance-based and tied to long-term, strategic performance targets;
- The short-term bonus program has established performance metrics (adjusted EBITDA and Net Sales for fiscal 2022) that reduces risk and supports the Fuel the Future strategy with a focus on bottom- and top-line growth;
- We set a maximum level of compensation; there is no uncapped compensation for our executive officers in any element of executive compensation;
- Our executive officers are required to maintain certain levels of stock ownership, which are tested each year based on the then-current price of our common stock;
- Our executive officers are prohibited from hedging and pledging shares of Company common stock;
- The Compensation Committee periodically reviews and oversees key diversity and inclusion initiatives and Human Resources policies and practices, including those related to overall business performance and the relationship of such performance to executive officer compensation, including as relating to recruiting, learning and talent development programs; and
- All performance-based compensation is subject to our robust recoupment policy. In the event of a restatement of the Company's financial statements or a material inaccuracy in the performance metrics used to measure

36

Table of Contents

performance-based compensation, such performance-based compensation is subject to recoupment. Additionally, performance-based compensation may be forfeited in the case of misconduct in violation of law or Company policy, including through failure of an executive's oversight responsibilities, that results in material financial or reputational harm to the Company.

**Competitive Marketplace Assessment**

In making compensation decisions, the Compensation Committee periodically, generally once annually in August or September, reviews all elements of total compensation for our executive officers compared to those in similar positions with substantially similar responsibilities at "peer" organizations, i.e. those organizations with similar characteristics to our Company generally (Comparator Group). Due to the nature of our business, there are ongoing challenges in developing an appropriate mix of companies to include in our Comparator Group, including that few of our direct peers are publicly traded, the complex nature of our business, and the structure of our Management team and their responsibilities. In developing our Comparator Group, we include companies in the same or similar industries, companies with comparable revenues, firms with similar business models, and companies from which we would consider recruiting talent.

In setting compensation for NEOs for fiscal 2022, the Compensation Committee also considered Willis Towers Watson Retail/Wholesale survey data for companies in the retail/wholesale distribution sector with revenues comparable to ours, in addition to the companies in the table below, the Comparator Group. There were no changes to this group from prior year, other than the two mergers highlighted in the table. The Committee believes this group of companies, together with consideration of the industry survey data referenced above, provides a meaningful perspective of current pay practices and levels, as well as overall compensation trends.

| Food- and Distribution-Related Companies of Comparable Size | | | |
| --- | --- | --- | --- |
| Company | GICS Sub-Industry | Revenue ($ in millions) | Market Value ($ in millions) |
| Arrow Electronics | Technology Distributors | 36,063 | 8,464 |
| Avnet | Technology Distributors | 24,311 | 4,676 |
| C.H. Robinson Worldwide | Air Freight and Logistics | 26,380 | 13,714 |
| CDW Corporation | Technology Distributors | 22,932 | 24,528 |
| Core-Mark Holding Company | Distributors | N/A - Acquired by Performance Food Group September 1, 2021 | |
| Genuine Parts Company | Distributors | 20,519 | 21,621 |
| Henry Schein, Inc. | Health Care Distributors | 12,718 | 10,883 |
| Performance Food Group Company | Food Distributors | 47,194 | 7,705 |
| Pilgrim's Pride Corporation | Packaged Foods and Meats | 16,738 | 7,499 |
| SpartanNash Company | Food Distributors | 9,204 | 1,167 |
| Sysco Corporation | Food Distributors | 68,636 | 43,254 |
| TD SYNNEX Corporation [1] | Technology Distributors | 51,558 | 9,625 |
| US Foods Holding Corp. | Food Distributors | 32,154 | 7,053 |
| *Summary Statistics (n=13)* | | | |
| 75th Percentile | | 38,846 | 15,691 |
| **Median** | | **25,346** | **9,045** |
| 25th Percentile | | 19,574 | 7,388 |
| *United Natural Foods, Inc.* | Food Distributors | *28,928* | *2,478* |
| *Percentile Rank* | | *59P* | *3P* |

Source: S&P CapIQ. Peer Total Revenue = trailing 12 months; Market Value as of July 31, 2022.

(1) SYNNEX completed a merger with Tech Data on September 1, 2021, creating an entity named TD SYNNEX.

Market data is only one factor that the Compensation Committee considers when making determinations regarding executive compensation. Other factors considered include individual performance, internal pay equity, scope of responsibilities, tenure, criticality of the position and executive retention concerns, and the need to recruit new officers. The Compensation Committee does not target a specific positioning versus the market for each role and takes into account all the above factors in determining the competitiveness of our compensation.

Table of Contents

**Components of Our Executive Compensation Program for Fiscal 2022**

Our executive compensation philosophy is reflected in the principal elements of our executive compensation program. The four key components of our executive compensation program in fiscal 2022 and how each component supports our compensation philosophy are set forth in the table below.

| Component | | How It Supports Our Compensation Philosophy |
|---|---|---|
| Base Salary | → | Provides competitive level of compensation to attract and retain top talent |
| Performance-based annual cash incentive | → | At-risk, variable pay to motivate our executives to achieve short-term (annual) business objectives within appropriate risk parameters |
| Long-term equity awards in the form of time-based vesting restricted stock units, or RSUs, and performance-based vesting restricted stock units, or PSUs | → | At-risk, variable pay that motivates our executives to focus on multi-year operational performance and increasing stockholder value; also a long-term retention tool |
| Other compensation and benefits, including minimal perquisites and participation in benefit plans generally available to all our employees, such as the 401(k) Plan | → | Assist in attracting and retaining top talent by providing competitive benefits, with minimal perquisites |

**Pay Mix**

When setting or recommending target total compensation for fiscal 2022 for the NEOs, the Compensation Committee determined that total target compensation should be weighted toward variable, at-risk pay, and a significant percentage should consist of equity-based compensation. We believe this approach appropriately aligns executive compensation with financial results and provides a balance between managing risk and incentivizing our Management team to create short- and long-term stockholder value by achieving pre-established financial performance objectives directly tied to achievement of our strategic priorities. The Compensation Committee determined that a separate pay structure for our CEO is necessary to deliver competitive pay while even more heavily weighting at-risk incentives within the design. The charts below illustrate the mix of pay elements for 2022 at target for our CEO (84% at-risk pay) and the average for our other NEOs, excluding the two former NEOs, (76% at-risk pay).



**Base Salary**

As described above, for fiscal 2022, the Compensation Committee considered data from the Willis Towers Watson Retail/Wholesale survey as well as proxy statement data from the Comparator Group for the second-highest paid executive and CFO roles. Base salaries were generally targeted at the median of these data sources taking into account other factors mentioned above. Mr. Douglas' salary was set early in the fiscal year upon his hire and was aligned with market midpoint for the Comparator Group. Given Mr. Spinner's anticipated retirement, he did not receive any increase to his pay. There was no increase to Mr. Stigers base salary in fiscal 2022 as it is well aligned with survey data. For Messrs. Howard, Dorne, Testa and Ms. Sutton, the competitive market assessment determined that their base salaries were below market for an executive

Table of Contents

performing comparable duties, and their salary increases reflect our attempt to close this gap with modest merit increases while also recognizing their outstanding performance during the year.

Set forth below are the fiscal 2021 and fiscal 2022 base salaries for the NEOs and the percentage change between periods.

| Named Executive Officer | Fiscal 2021 Base Salary[1] | | Fiscal 2022 Base Salary [2] | Percentage Change |
|---|---|---|---|---|
| Sandy Douglas | $ | - | $ 1,050,000 | n/a |
| John W. Howard | $ | 625,000 | $ 675,000 | 8% |
| Eric A. Dorne | $ | 750,000 | $ 787,500 | 5% |
| Michael C. Stigers | $ | 575,000 | $ 575,000 | -% |
| Christopher P. Testa | $ | 750,000 | $ 810,000 | 8% |
| Steven L. Spinner | $ | 1,200,000 | $ 1,200,000 | -% |
| Jill E. Sutton | $ | 580,000 | $ 614,800 | 6% |

(1) Reflects annual rate at the end of fiscal 2021.
(2) Reflects changes made by the Compensation Committee during its annual review, effective October 31, 2021.

**Performance-Based Compensation Metrics**

The Compensation Committee is responsible for setting the minimum, target and maximum or "stretch" performance levels (objectives that must be achieved) and related payout levels from $0 to maximum payout for our performance-based compensation discussed below. Receipt of this compensation is contingent upon satisfaction of corporate-wide metrics established by the Compensation Committee at the beginning of the performance period.

The Compensation Committee retains the ability to adjust targets in certain circumstances, including in the event that unbudgeted or unforeseen events would impact a metric, such that it is not reflective of actual underlying operating performance that it was designed to assess. In making any such adjustment, consistent with established guidelines that allow for consistency in consideration from year to year, the Compensation Committee reviews, among other things, the original target and the budget upon which the target was based, whether the events giving rise to a potential adjustment had occurred or were contemplated at the time the performance targets were established, whether these factors were related to our core operating performance and the impact of any change in accounting or financial policy or methodology. After consideration of these factors, the Compensation Committee may determine to make adjustments to metrics or payouts where, absent such adjustment, the payout would not, in the Compensation Committee's determination, be reflective of the level of operating performance driven by the executive officers.

In fiscal 2022, we revised our definition of adjusted EBITDA and Adjusted EPS to exclude the impact of the non-cash charge or benefit resulting from the last-in, first out (LIFO) accounting methodology on most of our inventory. This change was made to better reflect the operating performance of the business, since the LIFO charge has created significant non-cash volatility due to high inflation, which is out of Executives' control. This change is also consistent with how most of our peers treat LIFO charges or benefits in their reported results. When targets were set for outstanding short- and long-term incentive program, modest LIFO charges were assumed. In fiscal 2022, concurrently with the reporting change, the Compensation Committee aligned the definitions of adjusted EBITDA, Adjusted EPS, ROIC and Leverage for outstanding awards under our short- and long-term incentive plans and increased the targets to reflect the expectations for business growth at the time the targets were set absent the impact of the budgeted non-cash LIFO charge. These changes better align with how we communicate results externally to our stockholders, since the impact of LIFO is not indicative of our underlying business performance.

**Performance-Based Annual Cash Incentive Compensation**

*Performance Metrics.* For fiscal 2022 annual cash incentive compensation, the Compensation Committee selected adjusted EBITDA, a key metric tied to our long-term business performance as well as the addition of Net Sales to drive top-line growth in support of the Fuel the Future strategy. We believe using adjusted EBITDA and Net Sales as performance metrics focuses our executive officers on growth in core operational performance and rewards all officers for achievement of this important driver of overall financial performance while also growing market share through scale and customer experience. For information on how we calculate adjusted EBITDA, a non-GAAP measure, and a reconciliation of adjusted EBITDA to net income, see Annex B.

*Performance-Based Annual Cash Incentive Targets (Potential Payouts).* For our NEOs, the annual cash award targets, or potential payouts, for fiscal 2022 at threshold, target and stretch Company-wide performance levels were set as percentages of base salary earned, and prorated if applicable to changes in base salary over the fiscal year, as follows:

39

Table of Contents

| Named Executive Officer | Applicable Targets as % of Fiscal 2022 Salary | | |
| --- | --- | --- | --- |
| | Threshold (50%) | Target (100%) | Stretch (150%) |
| Sandy Douglas | 75.0% | 150.0% | 225.0% |
| John W. Howard | 50.0% | 100.0% | 150.0% |
| Eric A. Dorne | 50.0% | 100.0% | 150.0% |
| Michael C. Stigers | 37.5% | 75.0% | 112.5% |
| Christopher P. Testa | 50.0% | 100.0% | 150.0% |
| Steven L. Spinner [1] | | n/a | |
| Jill E. Sutton | 42.5% | 85.0% | 127.5% |

(1) Mr. Spinner was not eligible for a bonus in fiscal 2022 per his agreement and retirement on August 8, 2021.

For example, if the Company achieved its targets at the threshold level, Mr. Douglas' cash incentive would be an amount equal to 75% of his base salary; at target level, he would receive a cash incentive in an amount equal to 150% of his base salary; and at the stretch level he would receive an award equal to 225% of his base salary. The actual payout depends, however, on whether the Company met the threshold performance level. If performance were below the threshold level, there would be no payout.

*Performance Target.* In setting the performance targets for fiscal 2022, the Compensation Committee reviewed historical levels of performance, expected initiatives in connection with ongoing transformation and productivity initiatives, a desire to support our growth and long-term operating results, the competitive environment and the heightened uncertainty given the ongoing COVID-19 pandemic and labor market challenges. In establishing the intended degree of difficulty of the payout level for adjusted EBITDA, the Compensation Committee set the performance targets at levels that required successful implementation of corporate operating objectives for meaningful payouts to occur. The Compensation Committee believed that the initial targets related to "threshold" performance were achievable in light of budgeted expectations, but the payouts for "target" performance and "stretch" performance each required significant improvement over the prior year's comparable performance, after taking into account the factors noted above.

*Determination of Performance-Based Annual Cash Incentive Plan Payouts.* Annual cash incentive plan goals for NEOs for fiscal 2022 were set by the Compensation Committee at the following amounts for Messrs. Douglas, Howard, Dorne and Testa and Ms. Sutton:

| Performance Measure | Weight | Threshold | Target | Stretch | Threshold Payout | Target Payout | Stretch Payout |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Adjusted EBITDA *in $000's* | 75% | $ 688,390 | $ 809,871 | $ 931,351 | 50% | 100% | 150% |
| Net Sales *in $000's* | 25% | $ 26,931,515 | $ 28,053,661 | $ 29,175,808 | 50% | 100% | 150% |

For Mr. Stigers, his annual cash incentive included total Company Adjusted EBITDA plus Retail Net Sales and Retail Adjusted EBITDA to drive performance in his specific business unit metrics:

| Performance Measure | Weight | Threshold | Target | Stretch | Threshold Payout | Target Payout | Stretch Payout |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Adjusted EBITDA *in $000's* | 15% | $ 688,390 | $ 809,871 | $ 931,351 | 50% | 100% | 150% |
| Retail Net Sales *in $000's* | 25% | $ 2,357,596 | $ 2,455,830 | $ 2,554,063 | 50% | 100% | 150% |
| Retail Adjusted EBITDA *in $000's* | 60% | $ 78,633 | $ 92,509 | $ 106,386 | 50% | 100% | 150% |

In September 2022, the Compensation Committee reviewed with Management our financial results for fiscal 2022. The Compensation Committee determined the level of achievement against each of the metrics as set forth below.

For Messrs. Douglas, Howard, Dorne and Testa and Ms. Sutton, final payouts were based on the following metrics:

| Performance Metric *(in millions)* | Weight | Target | Actual | Performance as a Percentage of Target | Weighted Payout |
| --- | --- | --- | --- | --- | --- |
| Adjusted EBITDA | 75% | $ 810 | $ 829 [1] | 102% | 80.8% |
| Net Sales | 25% | $ 28,054 | $ 28,928 | 103% | 34.7% |

(1) See Annex B for a reconciliation to the most comparable GAAP metric

40

Table of Contents

For Mr. Stigers, his final payout is based on the following metrics:

| Performance Metric *(in millions)* | Weight | Target | Actual | Performance as a Percentage of Target | Weighted Payout |
|---|---|---|---|---|---|
| Adjusted EBITDA | 15% | $ 810 | $ 829 [1] | 102% | 16.2% |
| Retail Net Sales | 25% | $ 2,456 | $ 2,468 | 100% | 26.4% |
| Retail Adjusted EBITDA | 60% | $ 93 | $ 98 | 105% | 70.8% |

(1)  See Annex B for a reconciliation to the most comparable GAAP metric.

The Company exceeded its adjusted EBITDA, Retail Adjusted EBITDA, Net Sales and Retail Net Sales targets for fiscal 2022. The payout amounts below were linearly interpolated for results between target and maximum or "stretch" performance, which resulted in a 115.54% payout as a percent of target for Messrs. Douglas, Howard, Dorne and Testa and Ms. Sutton and a 113.40% payout as a percentage of target for Mr. Stigers. The payout amounts reflect performance in fiscal 2022 that exceeded the established performance objective, demonstrating the effectiveness of our pay for performance incentive plans.

| Named Executive Officer | Performance-Based Annual Incentive | |
|---|---|---|
| | Target | Actual |
| **Sandy Douglas** | $ 1,544,712 | $ 1,784,744 |
| **John W. Howard** | $ 662,500 | $ 765,446 |
| **Eric A. Dorne** | $ 778,125 | $ 899,038 |
| **Michael C. Stigers** | $ 431,250 | $ 489,046 |
| **Christopher P. Testa** | $ 795,000 | $ 918,535 |
| **Steven L. Spinner** [1] | $ - | $ - |
| **Jill E. Sutton** [2] | $ 183,548 | $ 212,069 |

(1)  Mr. Spinner was not eligible for a bonus in fiscal 2022 per his agreement and retirement on August 8, 2021.
(2)  Ms. Sutton's target was prorated based on her qualifying termination on December 10, 2021.

**Long-Term Equity-Based Incentive Program**

*2022 Grant of Time- and Performance-Based Vesting Restricted Stock Units.* Our long-term equity-based incentive program in fiscal 2022 for our NEOs consisted of RSUs and PSUs. Approximately 40% of the aggregate grant date fair value of these units awarded to NEOs represented RSUs that vest ratably over three years and 60% were PSUs that cliff-vest at the end of a three-year performance period.

The Compensation Committee considered stockholder feedback, as well as recommendations from its advisor, FW Cook, to adjust the long-term incentive (LTI) program for fiscal 2022 to better align with best practice. First, LTI awards are now a fixed dollar value rather than a percent of base salary, which no longer results in automatic LTI increases when base salary adjustments are made. Second, the mix of awards is now more heavily weighted to PSUs at 60%, with RSUs at 40%, and maximum payout aligned with peers at 200%. The Committee believes a mix of time- and performance-based vesting restricted stock units provides a NEO with an incentive to improve our stock price performance and a direct alignment with stockholders' interests, as well as a continuing stake in our long-term success. Lastly, the Committee simplified the PSU program to only two metrics after the removal of the Leverage metric given the significant progress the Company has made in paying down debt.

As stated above, in fiscal 2022, the Compensation Committee determined the target grant date fair value of equity awards for our compensation program was to be a fixed value that will be benchmarked annually and used as a lever to align executives overall target direct compensation and/or reward executives for outstanding performance. Other LTI award recipients were already receiving a fixed dollar value by level. For our NEOs, the fiscal 2022 grant values were:

Table of Contents

| Named Executive Officer | Target Annual LTI $ |
|---|---|
| Sandy Douglas [1] | $5,900,000 |
| John W. Howard | $1,500,000 |
| Eric A. Dorne | $1,800,000 |
| Michael C. Stigers | $1,000,000 |
| Christopher P. Testa | $1,800,000 |
| Steven L. Spinner [2] | n/a |
| Jill E. Sutton [3] | $1,000,000 |

(1) Includes one-time inducement award to join the Company valued at $2,000,0000 and issued 60% in PSUs and 40% in RSUs.
(2) Mr. Spinner was not eligible for an LTI grant in fiscal 2022 per his agreement and retirement on August 8, 2021.
(3) Ms. Sutton's target is shown in full, but upon her qualifying termination on December 10, 2021, she forfeited a pro rata amount of her award.

These grants were made in October 2021, following approval by the Compensation Committee.

*Performance-Metrics for Performance Units.* PSUs granted in fiscal 2022 (October 2021) are subject to two metrics that the Compensation Committee believes are critical to our long-term strategy. The performance criteria and weighting of these PSUs are as follows: fiscal 2022-2024 adjusted EPS growth, weighted at 75%; and fiscal 2024 adjusted return on invested capital (adjusted ROIC), weighted at 25%, as described below.

*Adjusted EPS Growth.* At the end of 3 years, adjusted EPS growth is based on the average achievement against the 3-year performance goals and metrics. Adjusted EPS growth rate targets are set at the time of grant for each year as a targeted rate of growth applied to the prior-year actual adjusted EPS. This design is intended to keep Management engaged throughout the three-year cycle even if there is under-performance in one year; or, conversely, if the maximum growth is achieved in one year, Management must still meet predetermined growth rate goals in subsequent years. For example, if our executives were to significantly outperform relative to the year-one adjusted EPS growth target, they must still achieve the predetermined growth rate targets in the second and third years to attain an above-target payout because the contribution of the first year to total payout is effectively capped. If our target were a cumulative three-year growth target, maximum payout could be achieved with one year of significant out performance. The Compensation Committee believes that including an adjusted EPS metric aligns executives' interest with long-term stockholder interests.

*Fiscal 2024 Adjusted ROIC.* Adjusted ROIC is defined as net adjusted operating profit after income taxes, divided by the sum of the average outstanding debt (including finance lease obligations) and average stockholders' equity, plus or minus certain adjustments falling into categories approved by the Compensation Committee. The Compensation Committee believes this metric, which is set at the grant date, drives long-term value by emphasizing prudent investments and effective capital management over the full 3-year performance period.

In addition to the performance criteria tied to the two financial metrics described above, the Compensation Committee approved a feature pursuant to which the number of units that will vest will be adjusted upward or downward by up to 10% depending on how our common stock price performs relative to the S&P Mid Cap 400 Index (Relative TSR) over the three-year performance period ending on the close of fiscal 2024.

The Compensation Committee believes this design focuses our Management team on improving core operational performance and long-term value creation. Targets were based on long-term projections for all three fiscal years, taking into account investments in growth opportunities and ongoing uncertainty in the macro-environment. The applicable NEOs are eligible to earn between 0% and 200% of their targeted award, depending on our performance during the relevant measurement period. Each metric must meet a minimum threshold level of performance for any payout to occur with respect to that metric (shown below). The table below does not include the actual forward targets. We generally do not disclose forward-looking goals for our long-term incentive plan because we do not consistently provide long-range guidance on all metrics and it is competitively sensitive information. We disclose performance goals for our incentive programs in full after completion of the performance period.

| Performance Measures | Weight | Threshold | Target | Stretch | Threshold Payout [1] | Target Payout [1] | Stretch Payout [1] |
|---|---|---|---|---|---|---|---|
| Fiscal 2022-2024 Adjusted EPS Growth | 75% | 70% | 100% | 130% | 50% | 100% | 200% |
| Fiscal 2024 Adjusted ROIC | 25% | 90% | 100% | 110% | 50% | 100% | 200% |

(1) Aggregate payout subject to 10% adjustment based on Relative TSR.

42

Table of Contents

**Prior Long-Term Equity-Based Incentive Program, Results and Payouts**

*Fiscal 2020-2022.* The PSUs granted in fiscal 2020 (October 2019) have three weighted metrics: fiscal 2020 to 2022 adjusted EPS growth (60%), fiscal 2022 adjusted ROIC (20%), and fiscal 2022 Leverage, or Net Debt/Adjusted EBITDA (20%). The applicable NEOs were eligible to earn between 50% and 150% of their targeted award, depending on our performance during the relevant measurement period across the threshold, target and maximum levels below. Adjusted EBITDA, adjusted ROIC and Leverage are non-GAAP metrics. A reconciliation to the nearest GAAP metrics is provided in Annex B.

| Performance Measure | Weight | Threshold | Target | Stretch | Threshold Payout | Target Payout | Stretch Payout |
|---|---|---|---|---|---|---|---|
| Fiscal 2020-2022 Adjusted EPS Growth | 60% | 42% 84% 84% | F20 60% F21 120% F22 120% | 78% 156% 156% | 50% | 100% | 150% |
| Fiscal 2022 Adjusted ROIC | 20% | 4.78% | 5.31% | 5.84% | 50% | 100% | 150% |
| Fiscal 2022 Leverage (Net Debt/Adj. EBITDA) | 20% | 4.30x | 3.91x | 3.52x | 50% | 100% | 150% |

In addition to the performance criteria tied to adjusted EPS growth, adjusted ROIC and Leverage, the grants included a provision for adjustment of the number of units that will vest upward or downward by up to 10% depending on the Relative TSR over the three-year performance period. The number of units that will vest is adjusted up or down proportionally by up to 10% based on the number of basis points difference between our performance and the performance of the S&P Mid Cap 400 Index.

In September 2022, the Compensation Committee reviewed performance against the three-year performance period ending in fiscal 2022 with the following results, performance to target and final weighted payout of 90%.

| Performance Metric | Weight | Target | Actual | Performance as a Percentage of Target | Weighted Payout |
|---|---|---|---|---|---|
| Fiscal 2020-2022 Adjusted EPS Growth | 60% | F20 60% F21 120% F22 120% | F20 121% F21 48% F22 16% | 201% 40% 13% | 30.0% |
| Fiscal 2022 Adjusted ROIC | 20% | 5.31% | 10.2% | 193% | 30.0% |
| Fiscal 2022 Leverage (Net Debt/Adj. EBITDA) | 20% | 3.91x | 2.6x | 153% | 30.0% |

The number of earned PSUs was then adjusted upward by 10% as a result of application of the Relative TSR modifier, which was 37,362 basis points, for a final payout of 99%. The table below shows the number of shares earned compared to target.

| Named Executive Officer | Shares at Target | Metric Payout % | Shares at Metric Payout | Final Shares After +10% TSR Modifier |
|---|---|---|---|---|
| Sandy Douglas | n/a | | 0 | 0 |
| John W. Howard | 18,820 | 90.0% | 16,938 | 18,631 |
| Eric A. Dorne | 47,051 | 90.0% | 42,346 | 46,580 |
| Michael C. Stigers | 54,109 | 90.0% | 48,698 | 53,567 |
| Christopher P. Testa | 56,461 | 90.0% | 50,815 | 55,896 |
| Steven L. Spinner | 319,949 | 90.0% | 287,954 | 316,749 |
| Jill E. Sutton[1] | 34,452 | 90.0% | 31,007 | 34,107 |

(1) Ms. Sutton's target shares were prorated for her time served in the 3-year performance period, given her qualifying termination in December 2021.

The payouts under the 2020 PSUs reflect our executive compensation program's pay for performance structure. Despite exceeding the adjusted EPS maximum growth target in fiscal 2020, the Company did not meet the predetermined threshold adjusted EPS growth performance over fiscal 2020 actual performance in fiscal 2021 or 2022, which demonstrates that consistent financial performance over the performance period is required to achieve the robust targets set by our Compensation Committee. The adjusted ROIC and Leverage metrics exceeded stretch performance expectations resulting in a higher payout for those metrics.

Table of Contents

**Other Compensation and Benefits**

The NEOs are eligible for the same level and type of benefits that we make available to other employees, including our 401(k) plan, health care plan, life insurance plans, other welfare benefit programs and equity treatment upon retirement or a separation from service event. We do not have any defined benefit pension plans available to our NEOs.

*Additional Benefits.* We provide certain NEOs with additional benefits that we believe are reasonable and consistent with our overall executive compensation program. The costs of these benefits constitute only a small portion of each NEO's total compensation and have included items such as relocation expenses and, for our former CEO, commuting air and travel reimbursement or security detail. We offer perquisites and other benefits that we believe to be competitive with benefits offered by companies with whom we compete for talent for purposes of recruitment and retention. In September 2022, the Committee approved a perquisite for senior vice presidents and above to pay for tax preparation fees beginning in 2023 in recognition of increased tax reporting obligations due to business travel.

*Retirement.* To recognize significant years of service to the Company and to incentivize employees who might consider retiring to remain focused on the long-term best interests of the Company regardless of their personal retirement plans, which could otherwise create bias toward short-term performance, the Committee has established a retirement policy that provides that time-based RSUs will continue to vest during retirement on the same terms as they would if the executive had not retired, but without the requirement that they remain employed. PSUs will be treated similarly on retirement, but subject to actual performance at the time when achievement of performance objectives are measured. In addition, an executive's equity awards granted in the year of retirement will be prorated to reflect the service period prior to the date of retirement. Qualified retirement is defined as retirement by an employee who has reached age 59 or older and who has achieved at least 10 years of service to the Company. This policy applies to all participants, provided that, as described below, our CEO will be eligible for retirement treatment upon achievement of six years of service to the Company.

**Components of Our Executive Compensation Program for Fiscal 2023**

Our Compensation Committee made the following changes to base salary for the NEOs, effective October 30, 2022.

| Named Executive Officer | Fiscal 2022 Base Salary [1] | Fiscal 2023 Base Salary[2] | % Change |
|---|---|---|---|
| Sandy Douglas | $ 1,050,000 | $ 1,050,000 | -% |
| John W. Howard | $ 675,000 | $ 722,250 | 7% |
| Eric A. Dorne | $ 787,500 | $ 787,500 | -% |
| Michael C. Stigers | $ 575,000 | $ 598,000 | 4% |
| Christopher P. Testa | $ 810,000 | $ 810,000 | -% |

(1) Reflects annual rate as of the end of fiscal 2022.

(2) Effective as of October 30, 2022.

Mr. Stigers annual cash incentive plan target for fiscal 2023 was increased to 85% of his base salary to align internally with other officers and in recognition of his accomplishments this past year. There were no other changes to annual incentive targets. The Committee did approve changes to the long-term incentive plan targets for certain NEOs. The fiscal 2023 award amounts reflect increases based on the results of benchmarking, recognition of accomplishments in fiscal 2022 and/or increased responsibilities of our executive officers as we continue to grow the business and execute against our Fuel the Future strategy. For Mr. Douglas, this is in recognition of his strong leadership and continued focus on expanding and strengthening the executive team to drive results, in addition to maintaining comparable total compensation that is aligned with market. For Mr. Howard this included, among other things, his accomplishments regarding debt and leverage reduction, capital structure foundation and revolving credit facility refinancing.

| Named Executive Officer | Target Fiscal 2022 LTI $ | Target Fiscal 2023 LTI $ | % Change |
|---|---|---|---|
| Sandy Douglas | $3,900,000 | $5,000,000 | 28.2% |
| John W. Howard | $1,500,000 | $1,800,000 | 20.0% |
| Eric A. Dorne | $1,800,000 | $1,800,000 | -% |
| Michael C. Stigers | $1,000,000 | $1,000,000 | -% |
| Christopher P. Testa | $1,800,000 | $1,800,000 | -% |

As a reminder, the Committee took several actions in fiscal 2022, which incorporates investor feedback in connection with last year's meeting and during our annual engagement:

44

Table of Contents

- Added a second metric to our short-term incentive plan. We believe the addition of a revenue metric (weighted at 25%) along with adjusted EBITDA (weighted at 75%) creates a balance between top- and bottom- line growth and aligning incentives with our Fuel the Future strategy to grow sales profitably;

- Adjusted the design of long-term incentive awards to have a heavier weighting of performance-based awards; mix in fiscal 2022 will now be 60% PSUs and 40% RSUs (from 50%/50%); in connection with this change, the Committee also aligned maximum payout with market and peers at 200% (from 150%);

- Simplified the long-term incentive plan PSUs for FY22-FY24 by removing the Leverage metric and re-weighting the remaining two metrics, adjusted EPS Growth and adjusted ROIC; and

- Reduced change in control multiple for our CEO to 2.5x from prior CEO's 2.99x.

**Consulting, Retention, Severance and Change in Control Agreements**

**Consulting Agreement with Eric A. Dorne**

Mr. Dorne retired from his position as Chief Operation Officer of the Company, effective October 29, 2022. The Company and Mr. Dorne entered into a consulting agreement pursuant to which Mr. Dorne has agreed to provide no more than 16 hours per month of consulting services for up to 12 months at a rate of $757 per hour.

**Severance Agreements and Change in Control Agreements**

As of July 30, 2022, we were a party to severance agreements and change in control agreements with each of Messrs. Douglas, Howard, Dorne and Testa. The capitalized terms "Cause," "Good Reason" and "Change in Control" in this section are used as defined in those agreements. The Compensation Committee believes that the protections afforded in these severance and change in control agreements are reasonable and are an important element in retaining our executive officers. Each of the severance agreements includes non-solicitation, non-competition and intellectual property assignment provisions, which apply during the employment period and continue for a one-year period following termination of employment for any reason.

On September 21, 2022, the Compensation Committee approved an updated form of severance agreement with each of the current NEOs (other than the CEO, whose severance agreement was executed in August 2021). The updated severance agreements were effective on October 23, 2022 and expire on the third anniversary of that effective date, subject to extension by mutual agreement of the company and the individual executive officer. In addition to the terms described below, the updated severance agreements provide for the payment of an amount equal to such executive's target bonus upon a qualifying termination, and revised restrictive covenant provisions, including to clarify the provisions and definitions regarding competitors, competition and the restricted period.

The change in control agreements also include non-solicitation and non-competition provisions, which apply during the employment period and continue for a two-year period, and intellectual property assignment provisions, which apply during the employment period and continue for a one-year period, following a termination of employment that occurs in contemplation of or within two years after a Change in Control. The severance and change in control agreements also contain confidentiality provisions that are not subject to a term. None of our executives is a party to an agreement providing for "gross up" payments for excise taxes imposed upon termination following a change in control. Any benefits to be paid upon a Change in Control under the change in control agreements are "double trigger," which requires both a Change in Control and a termination of a the executive's employment in contemplation of or within two years of the date of the Change in Control, either by us for a reason other than Cause, death or disability or by the executive for Good Reason.

The key benefits provided for in these agreements are summarized below:

| Executive | Benefit or Payment [1] | Severance [2] | Change in Control [2] |
|---|---|---|---|
| **CEO** | Base Multiple | 2X, continued pay | 2.5X, lump sum |
| | Bonus Multiple | 2X target $, lump sum | 2.5X target $, lump sum |
| | Prorated Bonus | Yes, prorated and based on actual performance | Yes, prorated and based on actual performance |
| | Medical Benefits | $70,000 lump sum | $87,500 lump sum |
| **Other Executives** | Base Multiple | 1X, continued pay | 2X, lump sum |
| | Bonus Multiple | None[3] | 2X target $, lump sum |
| | Prorated Bonus | Yes, prorated and based on actual performance | Yes, prorated and based on actual performance |
| | Medical Benefits | $35,000 lump sum | $105,000 lump sum payment |

(1) The provision of any such benefits will be subject to any restrictions under applicable law, including under Section 409A of the Internal Revenue Code of 1986, as amended from time to time (Code).
(2) The treatment of equity awards upon separation is governed by the terms of the 2020 Equity Incentive Plan and respective award agreements.

45

Table of Contents

(3) At the Committee's September 2022 meeting, it approved an updated form of severance agreement, effective October 23, 2022, which provides for a payment equal to one time such executive's target bonus payment based in part on benchmarking data provided by its independent compensation consultant.

In establishing the multiples of base salary and bonus that a terminated executive would be entitled to receive following termination without Cause or for Good Reason following a Change in Control, the Compensation Committee considered the need to be able to competitively recruit and retain talented executive officers who often times seek protection against the possibility that they might be terminated without Cause or be forced to resign for Good Reason following a Change in Control, while taking into account the views of our stockholders on appropriate multiples.

Mr. Stigers is party to a Transition Agreement entered into originally on October 22, 2018, between Supervalu and United Natural Foods, Inc., at the time of the acquisition. The agreement was amended on March 27, 2019 then on May 12, 2020 and finally on March 9, 2021. The final amendment extends his ability to exercise Good Reason to July 31, 2023 by providing at least 9 months' notice. This agreement provides for his original Change in Control benefits signed in December of 2015 at Supervalu. Benefits include a 2X base and target bonus payment paid in lump sum, plus a prorated bonus earned based on actual performance, outplacement services up to $25,000 and continued medical, dental and life insurance for up to 18 months.

Upon Ms. Sutton's qualifying termination, the Committee and the Board agreed to additional severance benefits equal to six months of her base salary and 1.5x her annual bonus, at target. The Committee believed the payments to Ms. Sutton to be reasonable, market competitive, reflective of Ms. Sutton's contributions to the Company, as well as necessary for a smooth transition through the Company's organizational restructuring of areas that were previously under her oversight. Ms. Sutton received benefits payments as explained in the table below in "*Potential Payments Upon Termination or Change-in-Control*".

**Other Programs, Policies and Considerations**

Recoupment (Clawback) Policy

We have in place a recoupment policy applicable to our executive officers, including our NEOs, other principal officers and certain key employees or former employees designated by the Board or our CEO. Under the policy, if the Company's financial statements are required to be restated for any reason, except when due to a change in accounting policy that has a retroactive effect, the Board will review all performance-based compensation awarded or earned for all periods materially affected by such restatement. In addition, the Board will review all performance-based compensation awarded or earned that is based on performance metrics that appear to be materially inaccurate or affected in any way by fraud, regardless of whether a restatement of the Company's financial statements is required.

The policy provides that the Board may, to the extent permitted by applicable law, seek the following actions with respect to compensation:

- After conducting the review described above, the Board may seek recoupment from the persons covered by the policy for the extent of such performance-based compensation as it deems appropriate if it determines that:

  ◦ the payment of such performance-based compensation was predicated upon the achievement of certain financial statement results that were subsequently corrected, or upon material inaccuracy or fraud, and a lower incentive payment or award would been made based upon the restated financial results or corrected performance metrics; or

  ◦ a person covered by the policy has engaged in conduct that will cause damage to the Company or is inimical or in any manner contrary to the best interests of the Company, and if the conduct resulted in a material inaccuracy in the Company's financial statements or performance metrics which affects such person's compensation.

- The Board may also require forfeiture of incentive compensation in the case of misconduct in violation of law or Company policy, including through failure of an executive's oversight responsibilities, that results in material financial or reputational harm to the Company.

The policy was also amended in fiscal 2021 to require disclosure in the event the Board seeks recoupment or forfeiture pursuant to the recoupment policy, provided that, among other things, the related facts and circumstances giving rise to the recovery have been publicly disclosed.

46

Table of Contents

Section 304 of the Sarbanes-Oxley Act of 2002 (SOX) requires the recovery of incentive awards from our Chief Executive Officer and Chief Financial Officer if we are required to restate our financials due to material noncompliance with any financial reporting requirement as a result of misconduct. Additionally, in October 2022, the SEC adopted final rules requiring the securities exchanges to adopt listing standards regarding recovery of incentive compensation, which listing standards may require the Board to update our recoupment policy. The Board is aware of the requirements under SOX and the updated SEC regulations and will consider each in addition to the current recoupment policy in contemplation of any clawbacks. The Board intends to make any necessary updates to the recoupment policy upon finalization of the required listing standards by NYSE.

**Stock Ownership Guidelines**

The Compensation Committee believes stock ownership guidelines are a key vehicle for aligning the interests of Management and our stockholders. A meaningful ownership stake by our officers demonstrates to our stockholders a strong commitment to our success. Accordingly, the Board has adopted stock ownership guidelines that require our executive officers to hold shares of our common stock having an aggregate market value from time to time which equals or exceeds the below multiples:

| Associates Subject to Guidelines | Multiple of Base Salary |
| --- | --- |
| Chief Executive Officer (CEO) | 6X |
| Other Executive Officers | 3X |
| Other Senior Officers (SVPs and above) | 1X |

Each covered officer is expected to comply with the policy by the fifth year after he or she became subject to the guidelines. Compliance with the guidelines is tested once per year for as long as the officer is employed by the Company. When calculating whether an officer owns a sufficient number of shares under these guidelines, vested and unvested restricted stock and restricted stock units are included. Starting in fiscal 2021, the Compensation Committee strengthened this policy to provide that only 50% of the value of an executive officer's unvested restricted stock units will count towards ownership, to further align leaders with stockholders and tie their interests to long-term stock price appreciation. Further, in fiscal 2022, the Committee amended the policy to provide that vested stock options and stock appreciation rights will not be counted in determining compliance. Officers are not allowed to hedge their interests in the stock held pursuant to the guidelines. Our guidelines provide that, once in compliance, an officer shall be deemed to remain in compliance despite a subsequent reduction in stock price that may otherwise cause non-compliance. Given the sustained decline in our stock price at the level specified in our stock ownership guidelines for 18 months, the five-year accumulation period was reset as of the end of fiscal 2020. Each of our executive officers was in compliance as of July 30, 2022.

**Hedging and Insider Trading Policy**

Our Insider Trading Policy prohibits our Directors and certain employees, including executive officers, from engaging in certain speculative transactions in our equity securities, including short sales, hedging transactions and pledging our stock as security.

**Tax Deductibility of Compensation**

When it reviews compensation matters, the Compensation Committee considers, among other matters, the anticipated tax and accounting treatment of payments and benefits with respect to us and, when relevant, to the executive. Section 162(m) of the Code imposes an annual deduction limit of $1 million on the amount of compensation paid to each of the Chief Executive Officer and certain other NEOs. Prior to the effectiveness of the Tax Cuts and Jobs Act, this deduction limit did not apply to compensation that qualified as "performance-based compensation" (as defined in Section 162(m)). The Tax Cuts and Jobs Act eliminated the qualified "performance-based compensation" exemption from Section 162(m), subject to an exception for compensation paid pursuant to a written binding contract that was in effect on November 2, 2017 and has not been modified in any material respect after such date. The Compensation Committee also approved, and may continue to approve, compensation that exceeds the $1 million limitation and is non-deductible. While accounting and tax treatment are relevant issues to consider, the Compensation Committee believes that stockholder interests are best served by not restricting flexibility in designing compensation programs, even though such programs may result in non-deductible compensation expenses for tax purposes.

47

Table of Contents

## Report of the Compensation Committee

We have reviewed and discussed the foregoing Compensation Discussion and Analysis with Management. Based on our review and discussion with Management, we have recommended to the Board that the Compensation Discussion and Analysis be included in this proxy statement and the Company's Annual Report on Form 10-K for the fiscal year ended July 30, 2022.

Daphne J. Dufresne, Chair
Eric F. Artz
James L. Muehlbauer
Peter A. Roy

48

Table of Contents

## Executive Compensation Tables

**Summary Compensation Table-Fiscal Years 2020-2022**

The following table sets forth for each of the NEOs for each fiscal year indicated: (i) the dollar value of base salary, retention bonuses and non-equity incentive compensation earned; (ii) the aggregate grant date fair value related to all equity-based awards made to the NEO; (iii) non-qualified deferred compensation earnings, where applicable; (iv) all other compensation; and (v) the dollar value of total compensation.

**Summary Compensation Table**

| Name and Principal Position | Year | Salary | Bonus | Stock Awards[1] | Option Awards | Non-Equity Incentive Plan Compensation[2] | Change in Pension Value and Nonqualified Deferred Compensation Earnings[3] | All Other Compensation[4] | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Sandy Douglas[8]** | 2022 | $1,029,808 | - | $5,899,913 | - | $1,784,744 | - | $7,827 | $8,722,292 |
| Chief Executive Officer | 2021 | - | - | - | - | - | - | - | - |
| | 2020 | - | - | - | - | - | - | - | - |
| **John W. Howard** | 2022 | 662,500 | - | 1,499,935 | - | 765,446 | - | 10,250 | 2,938,131 |
| Chief Financial Officer | 2021 | 618,750 | - | 1,199,989 | - | 717,453 | - | 9,923 | 2,546,115 |
| | 2020 | 567,308 | - | 849,987 | - | 794,985 | - | 9,577 | 2,221,857 |
| **Eric A. Dorne** | 2022 | 778,125 | - | 1,799,968 | - | 899,038 | - | 10,075 | 3,487,206 |
| Chief Operating Officer | 2021 | 750,000 | - | 1,499,969 | - | 869,640 | - | 7,742 | 3,127,351 |
| | 2020 | 614,808 | - | 749,993 | - | 752,274 | - | 8,767 | 2,125,842 |
| **Michael C. Stigers[8]** | 2022 | 575,000 | - | 999,972 | - | 489,046 | - | 9,952 | 2,073,970 |
| Chief Executive Officer, Cub | 2021 | - | - | - | - | - | - | - | - |
| | 2020 | - | - | - | - | - | - | - | - |
| **Christopher P. Testa** | 2022 | 795,000 | 675,000 [5] | 1,799,968 | - | 918,535 | - | 10,250 | 4,198,753 |
| President | 2021 | 750,000 | - | 1,499,969 | - | 869,640 | - | 9,750 | 3,129,359 |
| | 2020 | 605,769 | - | 899,988 | - | 742,774 | 266 | 10,942 | 2,259,739 |
| **Steven L. Spinner** | 2022 | 267,276 | - | - | - | - | - | 6,044,738 [6] | 6,312,014 |
| Former Chief Executive Officer and Chairman | 2021 | 1,200,000 | - | 5,099,985 | - | 2,087,136 | - | 16,258 | 8,403,365 |
| | 2020 | 1,200,000 | - | 5,099,987 | - | 2,522,394 | 12,612 | 29,175 | 8,864,168 |
| **Jill E. Sutton** | 2022 | 215,938 | - | 999,972 | - | 212,069 | - | 1,139,214 [7] | 2,567,193 |
| Former Chief Legal Officer, General Counsel and Secretary | 2021 | 562,500 | - | 1,264,970 | - | 539,612 | - | 8,608 | 2,375,690 |
| | 2020 | 498,750 | - | 697,487 | - | 524,185 | - | 8,631 | 1,729,053 |

(1)  Amounts shown represent the grant date fair value of awards of RSUs and PSUs at the target level as computed under ASC 718 granted during the fiscal year indicated. For PSUs, grant date fair value is calculated based on the probable outcome of the performance result (i.e., target level of performance) for each of the performance periods, excluding the effect of estimated forfeitures. These amounts do not necessarily reflect the actual amounts that were paid to, or may be realized by, the NEO for any of the fiscal years reflected. Refer to footnotes 1 and 13 to the consolidated financial statements in our Annual Report on Form 10-K for the year ended July 30, 2022 for a discussion of the relevant assumptions used to determine the grant date fair value of these awards. The grant date fair value of PSUs awarded to Mr. Douglas in fiscal 2022, assuming stretch, or maximum, level performance, was $4,679,926 (annual grant) and $2,399,988 (inducement grant), respectively. The grant date fair value of PSUs awarded to Mr. Howard in fiscal 2022, 2021 and 2020, assuming stretch, or maximum, level performance, was $1,799,922, $899,992 and $224,993, respectively. The grant date fair value of PSUs awarded to Mr. Dorne in fiscal 2022, 2021 and 2020, assuming stretch, or maximum, level performance, was $2,159,980, $1,124,968 and $562,495, respectively. The grant date fair value of PSUs awarded to Mr. Stigers in fiscal 2022, assuming stretch, or maximum, level performance, was $1,199,948. The grant date fair value of PSUs awarded to Mr. Testa in fiscal 2022, 2021 and 2020, assuming stretch, or maximum, level performance, was $2,159,980, $1,124,968 and $674,991, respectively. The grant date fair value of PSUs awarded to Mr. Spinner in fiscal 2021 and fiscal 2020, assuming stretch, or maximum, level performance, was $3,824,978 and $3,824,990, respectively. He was not eligible for a fiscal 2022 award. The grant date fair value of PSUs awarded to Ms. Sutton in fiscal 2022, 2021 and 2020, assuming stretch, or maximum, level performance, was $1,199,948, $1,073,727 and $523,115, respectively; Ms Sutton's amounts reflect full grant value prior to proration upon her qualifying termination in December 2021.

(2)  Amounts shown for fiscal 2022 reflect payments made in fiscal 2023 under our annual cash incentive plan related to fiscal 2022 performance. Amounts shown for fiscal 2021 and 2020 reflect payments under our annual cash incentive plan for those fiscal years in fiscal 2022 and fiscal 2021, respectively. For a discussion regarding the annual cash incentive plan, see "*Executive Compensation*

49

Table of Contents

-*Compensation Discussion and Analysis-Components of our Executive Compensation Program for Fiscal 2022-Performance-Based Annual Cash Incentive Compensation.*"

(3) The Deferred Compensation Plan and the Deferred Stock Plan were frozen in 2019 and paid out in fiscal 2020.

(4) Represents our contributions to 401(k) accounts to Messrs. Douglas, Howard, Dorne, Stigers and Testa.

(5) Represents a retention payment under an agreement entered into on March 10, 2021 during the CEO search and transition process, and particularly in recognition of Mr. Testa's important internal and external relationships.

(6) Represents Mr. Spinner's 2x base salary and bonus multiple plus COBRA payments per his employment agreement upon retirement ($6,035,000), our contributions to a 401(k) account ($508) and earned paid time off days ($9,230) for which payment was due upon retirement.

(7) Represents Ms. Sutton's 1x base salary multiple paid bi-weekly through the end of fiscal 2022 ($319,223) plus her COBRA payment ($35,000) per her Severance Agreement, plus a lump sum payment equal to 1.5x her target bonus opportunity ($783,870) approved by the Committee and our contributions to a 401(k) account ($1,121).

(8) Messrs. Douglas and Stigers were not NEOs in fiscal 2021 or fiscal 2020. Accordingly, compensation information for those years is not provided.

## Grants of Plan-Based Awards in Fiscal 2022

The following table reflects the equity-based awards approved by the Compensation Committee on September 22, 2021 and granted by the Company in fiscal 2022:

| Name | Grant Date | Estimated Future Payouts Under Non-Equity Incentive Plan Awards[1] | | | Estimated Future Payouts Under Equity Incentive Plan Awards[2] | | | All Other Stock Awards (#)[3] | All Other Option Awards (#) | Exercise Price of Option Awards ($/sh) | Grant Date Fair Value of Stock and Option Awards ($)[4] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Threshold ($) | Target ($) | Maximum ($) | Threshold (#) | Target (#) | Maximum (#) | | | | |
| **Sandy Douglas** | 10/12/2021 | - | - | - | 25,280 | 50,561 | 101,122 | - | - | - | 2,339,963 |
| | 10/12/2021 | - | - | - | 12,964 | 25,929 [5] | 51,858 | - | - | - | 1,199,994 |
| | 10/12/2021 | - | - | - | - | - | - | 33,707 | - | - | 1,559,960 |
| | 10/12/2021 | - | - | - | - | - | - | 17,286 [5] | - | - | 799,996 |
| | N/A | 772,356 | 1,544,712 | 2,317,067 | - | - | - | - | - | - | - |
| **John W. Howard** | 10/12/2021 | - | - | - | 9,723 | 19,446 | 38,892 | - | - | - | 899,961 |
| | 10/12/2021 | - | - | - | - | - | - | 12,964 | - | - | 599,974 |
| | N/A | 331,250 | 662,500 | 993,750 | - | - | - | - | - | - | - |
| **Eric A. Dorne** | 10/12/2021 | - | - | - | 11,668 | 23,336 | 46,672 | - | - | - | 1,079,990 |
| | 10/12/2021 | - | - | - | - | - | - | 15,557 | - | - | 719,978 |
| | N/A | 389,062 | 778,125 | 1,167,187 | - | - | - | - | - | - | - |
| **Michael C. Stigers** | 10/12/2021 | - | - | - | 6,482 | 12,964 | 25,928 | - | - | - | 599,974 |
| | 10/12/2021 | - | - | - | - | - | - | 8,643 | - | - | 399,998 |
| | N/A | 215,625 | 431,250 | 646,875 | - | - | - | - | - | - | - |
| **Christopher P. Testa** | 10/12/2021 | - | - | - | 11,668 | 23,336 | 46,672 | - | - | - | 1,079,990 |
| | 10/12/2021 | - | - | - | - | - | - | 15,557 | - | - | 719,978 |
| | N/A | 397,500 | 795,000 | 1,192,500 | - | - | - | - | - | - | - |
| **Steven L. Spinner** [6] | 10/12/2021 | - | - | - | - | - | - | - | - | - | - |
| | 10/12/2021 | - | - | - | - | - | - | - | - | - | - |
| | N/A | - | - | - | - | - | - | - | - | - | - |
| **Jill E. Sutton** | 10/12/2021 | - | - | - | 6,482 | 12,964 | 25,928 | - | - | - | 599,974 |
| | 10/12/2021 | - | - | - | - | - | - | 8,643 | - | - | 399,998 |
| | N/A | 91,774 | 183,548 | 275,322 | - | - | - | - | - | - | - |

(1) This column shows separately the possible payouts to the NEOs under our annual cash incentive plan for the fiscal year ended July 30, 2022 for "threshold", "target" and "maximum" performance. Actual amounts paid for these incentives are reflected in the table included under "*Summary Compensation Table-Fiscal Years 2020-2022*" under the column "Non-Equity Incentive Plan Compensation."

(2) These awards were granted on October 12, 2021 under the Amended and Restated 2020 Equity Incentive Plan and represent the number of PSUs that may be earned over a three-year performance period at "threshold," "target" and "maximum" levels of performance. Vesting of these PSUs is linked to our attaining certain levels of adjusted EPS growth for each year during fiscal 2022 through 2024, and adjusted ROIC for fiscal 2024. In addition, the number of PSUs earned may be increased or decreased by up to 10% based on our Relative TSR for the three-year performance period. At the conclusion of the three-year performance period, the PSUs may vest based on our results of these financial metrics. The PSUs earned by each NEO will be settled in the same number of shares. These PSUs are described in more detail in "*Executive Compensation-Compensation Discussion and Analysis-*

50

Table of Contents

*Components of Our Executive Compensation Program for Fiscal 2022-Long-term Equity-Based Incentive Program-2022 Grant of Time- and Performance-Based Vesting Restricted Stock Units.*"

(3)   Represents RSUs granted in fiscal 2022 to each of the NEOs. The RSUs vest in three equal annual installments beginning on October 12, 2022.

(4)   For grants during fiscal 2022, the amount shown with respect to each award represents the grant date fair value of the award calculated using the assumptions described in footnote (1) of the table included under "*Summary Compensation Table-Fiscal Years 2020-2022*." The grant date fair value of PSUs was calculated based on the probable outcome of the performance result (i.e., target level of performance) for each of the performance periods, excluding the effect of estimated forfeitures.

(5)   Represents an inducement award granted to Mr. Douglas upon hire consisting of 60% PSUs and 40% RSUs. At the conclusion of the three-year performance period, the PSUs may vest based on our results of the financial metrics described above in footnote 2. These PSUs are described in more detail in *"Executive Compensation-Compensation Discussion and Analysis-Components of Our Executive Compensation Program for Fiscal 2022-Long-term Equity-Based Incentive Program-2022 Grant of Time- and Performance-Based Vesting Restricted Stock Units."* The RSUs vest in three equal annual installments beginning on October 12, 2022.

(6)   Mr. Spinner was not eligible for a payout under our annual cash incentive plan or long-term incentive grants due to his retirement in early fiscal 2022

**Outstanding Equity Awards at Fiscal 2022 Year-End**

The following table summarizes information with respect to holdings of stock options and stock awards by the NEOs as of July 30, 2022. This table includes unexercised stock options, unvested RSUs and unvested PSUs. Each equity grant is shown separately for each NEO, except that incentive stock options and non-qualified stock options granted on the same date with the same material terms, including exercise price, vesting period and expiration date, are combined.

51

Table of Contents

**Outstanding Equity Awards at Fiscal Year-End**

| Name | Grant Date | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#)[1] | Market Value of Shares or Units of Stock That Have Not Vested ($)[2] | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#)[3] | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| Sandy Douglas | 10/12/2021 | - | - | - | - | 33,707 | 1,432,885 | - | - |
| | 10/12/2021 | - | - | - | - | 17,286 | 734,828 | - | - |
| | 10/12/2021 | - | - | - | - | - | - | 101,122 | 4,298,696 |
| | 10/12/2021 | - | - | - | - | - | - | 51,858 | 2,204,484 |
| | Totals: | - | - | - | - | 50,993 | 2,167,713 | 152,980 | 6,503,180 |
| John W. Howard | 10/4/2019 | - | - | - | - | 73,825 | 3,138,301 [5] | - | - |
| | 12/19/2019 | - | - | - | - | 6,274 | 266,708 | - | - |
| | 10/12/2020 | - | - | - | - | 23,028 | 978,920 | - | - |
| | 10/12/2021 | - | - | - | - | 12,964 | 551,100 | - | - |
| | 12/19/2019 | - | - | - | - | - | - | 18,820 | 800,038 |
| | 10/12/2020 | - | - | - | - | - | - | 51,813 | 2,202,571 |
| | 10/12/2021 | - | - | - | - | - | - | 38,892 | 1,653,299 |
| | Totals: | - | - | - | - | 116,091 | 4,935,029 | 109,525 | 4,655,908 |
| Eric A. Dorne | 9/13/2012 | 7,700 | - | 58.98 | 9/13/2022 | - | - | - | - |
| | 9/16/2013 | 4,280 | - | 67.48 | 9/16/2023 | - | - | - | - |
| | 9/19/2014 | 4,630 | - | 64.55 | 9/19/2024 | - | - | - | - |
| | 9/25/2018 | - | - | - | - | 2,582 | 109,761 | - | - |
| | 12/11/2018 | - | - | - | - | 1,059 | 45,018 | - | - |
| | 12/19/2019 | - | - | - | - | 15,684 | 666,727 | - | - |
| | 10/12/2020 | - | - | - | - | 28,785 | 1,223,650 | - | - |
| | 10/12/2021 | - | - | - | - | 15,557 | 661,328 | - | - |
| | 12/19/2019 | - | - | - | - | - | - | 47,051 | 2,000,138 |
| | 10/12/2020 | - | - | - | - | - | - | 64,765 | 2,753,160 |
| | 10/12/2021 | - | - | - | - | - | - | 46,672 | 1,984,027 |
| | Totals: | 16,610 | - | - | - | 63,667 | 2,706,484 | 158,488 | 6,737,325 |
| Michael C. Stigers | 5/16/2014 | 15,377 | - | 48.58 | 5/16/2024 | - | - | - | - |
| | 4/30/2015 | 8,050 | - | 56.94 | 4/30/2025 | - | - | - | - |
| | 12/19/2019 | - | - | - | - | 31,253 | 1,328,565 | - | - |
| | 10/12/2020 | - | - | - | - | 16,552 | 703,626 | - | - |
| | 10/12/2021 | - | - | - | - | 8,643 | 367,414 | - | - |
| | 12/19/2019 | - | - | - | - | - | - | 54,109 | 2,300,174 |
| | 10/12/2020 | - | - | - | - | - | - | 37,240 | 1,583,072 |
| | 10/12/2021 | - | - | - | - | - | - | 25,928 | 1,102,199 |
| | Totals: | 23,427 | - | - | - | 56,448 | 2,399,605 | 117,277 | 4,985,445 |

52

Table of Contents

| Name | Grant Date | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#)(1) | Market Value of Shares or Units of Stock That Have Not Vested ($)(2) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#)(3) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($)(4) |
| Christopher P. Testa | 9/13/2012 | 4,100 | - | 58.98 | 9/13/2022 | - | - | - | - |
| | 9/16/2013 | 3,510 | - | 67.48 | 9/16/2023 | - | - | - | - |
| | 9/19/2014 | 3,800 | - | 64.55 | 9/19/2024 | - | - | - | - |
| | 9/25/2018 | - | - | - | - | 3,645 | 154,949 | - | - |
| | 12/19/2019 | - | - | - | - | 18,821 | 800,081 | - | - |
| | 10/12/2020 | - | - | - | - | 28,785 | 1,223,650 | - | - |
| | 10/12/2021 | - | - | - | - | 15,557 | 661,328 | - | - |
| | 12/19/2019 | - | - | - | - | - | - | 56,461 | 2,400,157 |
| | 10/12/2020 | - | - | - | - | - | - | 64,765 | 2,753,160 |
| | 10/12/2021 | - | - | - | - | - | - | 46,672 | 1,984,027 |
| | Totals: | 11,410 | - | - | - | 66,808 | 2,840,008 | 167,898 | 7,137,344 |
| Steven L. Spinner | 9/13/2012 | 23,160 | - | 58.98 | 9/13/2022 | - | - | - | - |
| | 9/16/2013 | 13,130 | - | 67.48 | 9/16/2023 | - | - | - | - |
| | 9/19/2014 | 14,770 | - | 64.55 | 9/19/2024 | - | - | - | - |
| | 12/19/2019 | - | - | | | - | - | 319,949 | 13,601,032 |
| | 10/12/2020 | - | - | | | - | - | 220,206 | 9,360,957 |
| | Totals: | 51,060 | - | - | - | - | - | 540,155 | 22,961,989 |
| Jill E. Sutton | 12/19/2019 | - | - | - | - | - | - | 34,452 | 1,464,555 |
| | 10/12/2020 | - | - | - | - | - | - | 13,060 | 555,181 |
| | 10/12/2020 | - | - | - | - | - | - | 14,985 | 637,012 |
| | 10/12/2021 | - | - | - | - | - | - | 3,092 | 131,441 |
| | Totals: | - | - | - | - | - | - | 65,589 | 2,788,189 |

(1) All awards granted through 2018 vest in four equal annual installments beginning on the first anniversary of the date of grant. All awards granted in 2019 or later vest in three equal annual installments beginning on the date set forth in the applicable award agreement.

(2) Market value reflects the number of unvested RSUs multiplied by $42.51 per share, the closing price of our common stock on the NYSE on July 29, 2022, the last business day of fiscal year 2022.

(3) Represents the number of shares that may be issued pursuant to PSUs at the applicable level of performance. The PSUs granted in 2019 are shown at target performance, while the PSUs granted in 2020 & 2021 are shown at maximum performance.

(4) Market value reflects the number of shares that may be issued pursuant to the applicable level of performance, multiplied by $42.51 per share, the closing price of our common stock on the NYSE on July 29, 2022, the last business day of fiscal year 2022.

(5) Mr. Howard's sign-on grant awarded on October 4, 2019 cliff vested on the third anniversary of the date of grant.

**Option Exercises and Stock Vested-Fiscal 2022**

The following table summarizes information for the NEOs concerning exercise of stock options and vesting of RSUs and PSUs during the fiscal year ended July 30, 2022, including the (i) number of shares of stock underlying options exercised in fiscal 2022; (ii) aggregate dollar value realized upon such exercises of stock options utilizing the actual sales price for same-day sale transactions and the closing price for any exercise and hold transactions; (iii) number of shares of stock received from the vesting of RSUs during fiscal 2022 and any PSUs earned based on fiscal 2022 performance; and (iv) aggregate dollar value realized upon the vesting of such RSUs and PSUs.

Table of Contents

**Option Exercises and Stock Vested**

| Name | Option Awards | | Stock Awards | |
| | Number of Shares Acquired on Exercise (#) | Value Realized on Exercise ($) | Number of Shares Acquired on Vesting (#)[1] | Value Realized on Vesting ($)[2] |
|---|---|---|---|---|
| Sandy Douglas | - | - | - | - |
| John Howard | - | - | 36,418 [4] | 1,489,015 [4] |
| Eric A. Dorne | - | - | 82,108 [5] | 3,258,496 [5] |
| Michael C. Stigers | 35,157 | 448,765 [3] | 93,094 [6] | 5,403,361 [6] |
| Christopher P. Testa | - | - | 94,098 [7] | 3,719,460 [7] |
| Steven L. Spinner | - | - | 829,671 [8] | 32,575,723 [8] |
| Jill E. Sutton | - | - | 89,691 [9] | 3,828,589 [9] |

(1) In connection with the vesting of RSUs and PSUs, our NEOs surrendered shares of stock to cover withholding taxes, which reduced the actual value received upon vesting. The number of shares surrendered but included in this table is as follows: Mr. Howard-14,855; Mr. Dorne-31,902; Mr. Stigers-42,466; Mr. Testa-40,149; Mr. Spinner-377,551; and Ms. Sutton-39,264.
(2) Represents the product of the number of shares or shares underlying units vested and the closing price of our common stock on the NYSE on the vesting date.
(3) Represents the cash proceeds received by Mr. Stigers as a result of the exercise of 35,157 vested stock options.
(4) Mr. Howard was awarded PSUs during fiscal 2020, of which 18,631 PSUs were earned for the three-year performance period ended July 30, 2022 and the like number of shares of our common stock issued in settlement of these units in fiscal 2023 are included herein.
(5) Mr. Dorne was awarded PSUs during fiscal 2020, of which 46,580 PSUs were earned for the three-year performance period ended July 30, 2022 and the like number of shares of our common stock issued in settlement of these units in fiscal 2023 are included herein.
(6) Mr. Stigers was awarded PSUs during fiscal 2020, of which 53,567 PSUs were earned for the three-year performance period ended July 30, 2022 and the like number of shares of our common stock issued in settlement of these units in fiscal 2023 are included herein. Mr. Stigers had a converted cash-settled award that settled at a fixed $32.50 per share value from the Supervalu acquisition. There were no shares received as a result of the vesting but the value is included herein.
(7) Mr. Testa was awarded PSUs during fiscal 2020, of which 55,896 PSUs were earned for the three-year performance period ended July 30, 2022 and the like number of shares of our common stock issued in settlement of these units in fiscal 2023 are included herein.
(8) Mr. Spinner was awarded PSUs during fiscal 2020, of which 316,749 PSUs were earned for the three-year performance period ended July 30, 2022 and the like number of shares of our common stock issued in settlement of these units in fiscal 2023 are included herein. Also includes Mr. Spinner's distribution of deferred shares for PSUs that were deferred until his retirement.
(9) Ms. Sutton was awarded PSUs during fiscal 2020, of which 34,107 prorated PSUs were earned for the three-year performance period ended July 30, 2022 and the like number of shares of our common stock issued in settlement of these units in fiscal 2023 are included herein

**Pension Benefits**

We do not maintain any defined benefit pension plans for NEOs.

**Nonqualified Deferred Compensation-Fiscal 2022**

Until February 2019, our executive officers and directors were eligible to participate in a deferred compensation plan and a deferred stock plan. These deferral plans were terminated in February 2019 and amounts therein were distributed in March 2020. Therefore, there is nothing to report for fiscal 2022.

**CEO Pay Ratio**

SEC rules require us to disclose the total annual compensation of Sandy Douglas, our CEO for fiscal 2022, to the median of the total annual compensation of all employees other than Mr. Douglas, as well as the ratio of such amounts to each other (referred to as the "CEO pay ratio"). We chose to use Mr. Douglas as he was the primary executive officer in that role at the time we identified our median employee. Total compensation for Mr. Douglas and our median employee is calculated in accordance with SEC rules applicable to the Summary Compensation Table. We calculated this information for the twelve (12) months ended July 30, 2022. For such period, Mr. Douglas' total compensation was $8,722,292, based on information disclosed in the Summary Compensation Table. However, given Mr. Douglas' hire date was in fiscal week two, we have annualized his salary and 401k match, for an adjusted total of $8,742,796 . Based on the adjusted total compensation for the CEO and our median employee's total compensation of $59,523, the ratio of Mr. Douglas's total compensation to the median employee's total compensation was 147 to 1.

54

Table of Contents

To identify the median employee, we obtained payroll data for all active employees (full-time, part-time, active and seasonal) as of June 11, 2022, utilizing cash compensation as our consistently applied compensation measure. This date was moved up two weeks from last year's date purely for administrative ease purposes and has no material impact on the process. Canadian wages were converted to U.S. dollars using an average annual exchange rate for the 12 months ended June 29, 2022. Earnings for permanent employees who did not work for the entire year (i.e., new hires) were annualized. The wages of temporary employees were not annualized.

**Potential Payments Upon Termination or Change-in-Control**

The information below describes and quantifies the compensation that would become payable to each of our NEOs if the NEO's employment had terminated on July 30, 2022, given the NEO's compensation and service levels as of such date and, if applicable, based on our closing stock price on that date. These benefits are in addition to benefits generally available to salaried employees. Due to the number of factors that affect the nature and amount of any benefits provided upon the events discussed below, any actual amounts paid or distributed may be different. Factors that could affect these amounts include the timing during the year of any such event and our stock price at the time of such event.

If an associate, including any of our NEOs, were to die or become disabled, target bonus would be paid, any unvested restricted stock units would become immediately vested (with performance units vesting at target levels of performance), and any unexercisable stock options would be cancelled and forfeited. Any vested stock options exercisable at the time of death or disability would be exercisable at any time on or before the earlier to occur of the date that is one year after such separation or the grant's expiration date.

For a description of termination provisions in the severance and change in control agreements, see "*Executive Compensation-Compensation Discussion and Analysis-Employment, Severance and Change in Control Agreements.*" In addition, the Amended and Restated 2020 Equity Incentive Plan and award agreements for long-term equity incentive awards also address some of these circumstances. The following table describes the potential payments as of July 30, 2022 upon termination of the NEOs. For Mr. Spinner, the values represent his severance payments owed per his Employment Agreement that were triggered upon his retirement in fiscal 2022 and any other payments and stock vestings earned during the year. Similarly, Ms. Sutton's values represent the actual payments made upon her departure in fiscal 2022.

Table of Contents

| Payments Upon Termination | Separation from Service Without Cause, including Resignation for Good Reason[1] | Termination without Cause not qualifying as a Separation from Service without Cause[1] | Termination Without Cause or Resignation for Good Reason following Change in Control[2] | Termination as a result of Death or Disability | Retirement | Termination for Cause, or Resignation for Other Than Good Reason |
|---|---|---|---|---|---|---|
| **Sandy Douglas** | | | | | | |
| Cash Severance Pay | $ 7,034,744 [3] | $ 7,034,744 [3] | $ 8,347,244 [4] | $ 1,544,712 [5] | $ - | $ - |
| Medical Benefits | 70,000 [6] | 70,000 [6] | 87,500 [6] | - | - | - |
| Acceleration of Stock Options | - | - | - | - | - | - |
| Acceleration of Stock Awards | 1,651,018 [7] | - | 5,419,302 [8] | 5,419,302 [8] | - | - |
| **Total** | **$ 8,755,762** | **$ 7,104,744** | **$ 13,854,046** | **$ 6,964,014** | **$ -** | **$ -** |
| **John W. Howard** | | | | | | |
| Cash Severance Pay | $ 1,440,446 [9] | $ 1,440,446 [9] | $ 3,465,446 [10] | $ 662,500 [5] | $ - | $ - |
| Medical Benefits | 35,000 [6] | 35,000 [6] | 105,000 [6] | - | - | - |
| Acceleration of Stock Options | - | - | - | - | - | - |
| Acceleration of Stock Awards | 6,092,661 [7] | - | 8,030,096 [8] | 8,030,096 [8] | - | - |
| **Total** | **$ 7,568,107** | **$ 1,475,446** | **$ 11,600,542** | **$ 8,692,596** | **$ -** | **$ -** |
| **Eric A. Dorne** | | | | | | |
| Cash Severance Pay | $ 1,686,538 [9] | $ 1,686,538 [9] | $ 4,049,038 [10] | $ 778,125 [5] | $ - | $ - |
| Medical Benefits | 35,000 [6] | 35,000 [6] | 105,000 [6] | - | - | - |
| Acceleration of Stock Options | - | - | - | - | - | - |
| Acceleration of Stock Awards | 7,198,813 [7] | - | 7,534,090 [8] | 7,534,090 [8] | 7,198,813 [7] | - |
| **Total** | **$ 8,920,351** | **$ 1,721,538** | **$ 11,688,128** | **$ 8,312,215** | **$ 7,198,813** | **$ -** |
| **Michael C. Stigers** | | | | | | |
| Cash Severance Pay | $ 2,526,546 [11] | $ 2,526,546 [11] | $ 2,526,546 [11] | $ 431,250 [5] | $ - | $ - |
| Medical Benefits | - | - | 105,000 [6] | - | - | - |
| Acceleration of Stock Options | - | - | - | - | - | - |
| Acceleration of Stock Awards | 6,119,995 [7] | - | 6,306,273 [8] | 6,306,273 [8] | 6,119,995 [7] | - |
| **Total** | **$ 8,646,541** | **$ 2,526,546** | **$ 8,937,819** | **$ 6,737,523** | **$ 6,119,995** | **$ -** |
| **Christopher P. Testa** | | | | | | |
| Cash Severance Pay | $ 1,728,535 [9] | $ 1,728,535 [9] | $ 4,158,535 [10] | $ 795,000 [5] | $ - | $ - |
| Medical Benefits | 35,000 [6] | 35,000 [6] | 105,000 [6] | - | - | - |
| Acceleration of Stock Options | - | - | - | - | - | - |
| Acceleration of Stock Awards | 5,693,704 [7] | - | 8,067,633 [8] | 8,067,633 [8] | - | - |
| **Total** | **$ 7,457,239** | **$ 1,763,535** | **$ 12,331,168** | **$ 8,862,633** | **$ -** | **$ -** |
| **Steven L. Spinner** [3] | | | | | | |
| Cash Severance Pay | $ - | $ - | $ - | $ - | 6,000,000 [12] | $ - |
| Medical Benefits | - | - | - | - | 35,000 [6] | - |
| Acceleration of Stock Options | - | - | - | - | - | - |
| Acceleration of Stock Awards | - | - | - | - | 33,532,483 [13] | - |
| **Total** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 39,567,483** | **$ -** |
| **Jill E. Sutton** | | | | | | |
| Cash Severance Pay | $ 1,918,139 [14] | $ - | $ - | $ - | $ - | $ - |
| Medical Benefits | 35,000 [6] | - | - | - | - | - |
| Acceleration of Stock Options | - | - | - | - | - | - |
| Acceleration of Stock Awards | 3,427,666 [7] | - | - | - | - | - |
| **Total** | **$ 5,380,805** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** |

(1) The Amended and Restated 2020 Equity Incentive Plan provides for certain prorated or partial vesting of shares upon Separation from Service without Cause (as defined in the Amended and Restated 2020 Equity Incentive Plan). The severance agreements provide for cash severance benefits only, including for certain terminations without Cause that do not qualify as a Separation from Service without Cause under the Amended and Restated 2020 Equity Incentive Plan.

(2) Amounts presented in this column assume that the NEO is terminated without Cause or resigns for Good Reason in contemplation of or within two years following a Change in Control (each as defined in the NEO's applicable change in control agreement).

56

Table of Contents

(3) Amount represents the sum of (i) 2 times the CEO's target base salary as of July 30, 2022, (ii) 2 times the CEO's annual cash incentive payment based on target performance for the fiscal year in which the executive is terminated and (iii) the amount of the CEO's annual cash incentive payment that he would have earned during the fiscal year in which the executive was terminated.

(4) Amount represents the sum of (i) 2.5 times the CEO's base salary as of July 30, 2022, (ii) 2.5 times the CEO's annual cash incentive payments based on target performance for the fiscal year in which the executive is terminated, and (iii) the amount of the CEO's annual cash incentive payment he would have earned during the fiscal year in which his employment was terminated

(5) Represents the target bonus opportunity paid upon death or disability.

(6) Represents the amount that the Company would be required to pay in lieu of post-termination medical benefits for the executive and the executive's dependents.

(7) Amount represents the intrinsic value of each share that will vest upon a Separation from Service without Cause, which reflects shares underlying RSUs expected to vest within 365 days of the separation date (prorated with respect to any awards granted within 365 days of the separation date) and a prorated portion of unearned PSUs that are outstanding on July 30, 2022, which vest on an accelerated basis following the relevant termination date (as defined in the 2012 Equity Incentive Plan or the Amended and Restated 2020 Equity Incentive Plan, as applicable), with unearned PSUs vesting based on the "target" level of performance. These amounts are calculated by multiplying (i) the aggregate number of equity awards which vest on an accelerated basis by (ii) $42.51 per share, the closing price of our common stock on the NYSE on July 29, 2022 (the last business day of fiscal 2022). See *"Compensation Discussion and Analysis-Components of Executive Compensation Program for Fiscal 2022-Other Compensation and Benefits"* for more information.

(8) Amount represents the intrinsic value of each share underlying a RSU or unearned PSU outstanding on July 30, 2022, and which vests on an accelerated basis following the relevant termination date (as defined in the 2012 Equity Incentive Plan or the Amended and Restated 2020 Equity Incentive Plan, as applicable), with unearned PSUs vesting based on the "target" level of performance. These amounts are calculated by multiplying (i) the aggregate number of equity awards which vest on an accelerated basis by (ii) $42.51 per share, the closing price of our common stock on the NYSE on July 29, 2022 (the last business day of fiscal 2022).

(9) Amount represents the sum of (i) the NEO's base salary, as in effect as of July 30, 2022 and (ii) the prorated portion of the amount of the NEO's annual cash incentive payment that the executive would have earned during the fiscal year in which the executive's employment was terminated. Amounts in the table reflect a full year bonus amount due to the assumption of a termination at year end. If an executive were terminated during the fiscal year, this amount would be prorated.

(10) Amount represents the sum of (i) 2 times the NEO's base salary as of July 30, 2022, (ii) 2 times the NEO's annual cash incentive payments based on target performance for the fiscal year in which the executive is terminated, and (iii) the amount of the NEO's annual cash incentive payment he or she would have earned during the fiscal year in which his or her employment was terminated.

(11) Per Mr. Stigers Transition Agreement last amended on March 9, 2021, amount represents the sum of (i) 2 times the NEO's base salary as of July 30, 2022 (the assumed termination date), (ii) 2 times the NEO's annual cash incentive payments based on target performance for the fiscal year in which the executive is terminated, and (iii) the amount of the NEO's annual cash incentive payment he would have earned during the fiscal year in which his employment was terminated. Cash Severance also includes $25,000 in outplacement services per his agreement.

(12) Per Mr. Spinner's Employment Agreement, the amount represents the sum of (i) 2 times Mr. Spinner's base salary as of July 30, 2022, and (ii) 2 times his annual cash incentive payments based on target performance for the fiscal year in which the executive was terminated, and (iii) the amount of the annual cash incentive payment, which was $0 as he was not eligible due to his pending retirement.

(13) Per Mr. Spinner's Employment Agreement, represents the intrinsic value of each share underlying a RSU or unearned PSU outstanding on July 30, 2022, with unearned PSUs vesting on an accelerated basis based on the "target" level of performance, plus Mr. Spinner's distribution of deferred shares for PSUs that were deferred until his retirement. These amounts are calculated by multiplying (i) the aggregate number of equity awards which vest on an accelerated basis by (ii) $42.51 per share, the closing price of our common stock on the NYSE on July 29, 2022 (the last business day of fiscal 2022).

(14) Upon Ms. Sutton's departure, the Committee and the Board agreed to extend base salary payments to Ms. Sutton for an additional six months (to 1.5 times in total) and to pay Ms. Sutton an additional severance amount equal to 1.5 times her annual bonus, at target, included herein, plus the prorated portion of her bonus earned in fiscal 2022.

57

Table of Contents

**Securities Authorized for Issuance Under Equity Compensation Plans**

The following table provides certain information with respect to equity awards under our equity compensation plans as of July 30, 2022.

| Plans Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | | Weighted-average exercise price of outstanding options | | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in the second column) |
| --- | --- | --- | --- | --- | --- |
| Plans approved by stockholders | 5,409,338 [1] | $ | 54.11 [1] | | 2,862,679 [2] |
| Plans not approved by stockholders | 106,892 [3] | | - | | - |
| Total | 5,516,230 | $ | 54.11 | | 2,862,679 |

(1)  Includes 361,481 stock options constituting replacement options issued in connection with our acquisition of Supervalu, 3,281,035 RSUs under the Amended and Restated 2020 Equity Incentive Plan, 68,255 stock options under the 2012 Plan, 57,380 stock options under the United Natural Foods, Inc. Amended and Restated 2004 Equity Incentive Plan, and 1,748,079 PSUs under the Amended and Restated 2020 Equity Incentive Plan. RSUs and PSUs do not have an exercise price because their value is dependent upon continued employment over a period of time or the achievement of certain performance goals and are to be settled for shares of common stock. Accordingly, they have been disregarded for purposes of computing the weighted-average exercise price.

(2)  All shares were available for issuance under the Amended and Restated 2020 Equity Incentive Plan. The Amended and Restated 2020 Equity Incentive Plan authorizes grants in the form of stock options, stock appreciation rights, restricted stock, restricted stock units, performance shares, performance units or a combination thereof but includes limits on the number of awards that may be issued in the form of restricted shares or units. The number of shares remaining available for future issuances assumes that, with respect to outstanding PSUs, the vesting criteria will be achieved at the target level.

(3)  Includes shares to be issued pursuant to inducement grants of RSUs and PSUs granted to 5 new hires between December 11, 2020 and March 11, 2022.

Table of Contents

## Proposal 2-Ratification of Independent Registered Public Accounting Firm

The Board, upon the recommendation of the Audit Committee, has selected KPMG LLP as our independent registered public accounting firm for the fiscal year ending July 29, 2023, subject to ratification by stockholders at the Annual Meeting. Stockholder ratification of the selection of KPMG LLP as our independent registered public accounting firm is not required by law or otherwise. However, the Board is submitting the selection of KPMG LLP to stockholders for ratification as a matter of good corporate governance. If stockholders do not ratify the selection of KPMG LLP, the Board will consider whether to appoint KPMG LLP despite the stockholder vote or to select another independent registered public accounting firm for fiscal 2023 and possibly future years.

Representatives of KPMG LLP, which served as our independent registered public accounting firm for the fiscal year ended, July 30, 2022, will be present at the Annual Meeting to respond to appropriate questions and to make such statements as they may desire.

**The Board unanimously recommends that stockholders vote "FOR" ratification of the selection of KPMG LLP as our independent registered public accounting firm for fiscal 2023. Proxies received by the Board will be voted "FOR" the proposal unless a contrary choice is specified in the proxy.**

### Fees Paid to KPMG LLP

In addition to retaining KPMG LLP to audit our financial statements for fiscal 2022, we engaged the firm from time to time during the year to perform other services. The following table sets forth the aggregate fees billed by KPMG LLP in connection with services rendered during the last two fiscal years.

| Fee Category | Fiscal 2022 | Fiscal 2021 |
|---|---|---|
| Audit Fees | $ 4,694,554 | $ 4,725,996 |
| Audit-Related Fees | - | 32,663 |
| Tax Fees | 704,000 | 752,838 |
| All Other Fees | 8,125 | - |
| | $ 5,406,679 | $ 5,511,497 |

*Audit Fees* consist of fees billed for professional services rendered in connection with the audit of our annual financial statements, including fees related to KPMG LLP's assessment of internal control over financial reporting, the review of the interim financial statements included in quarterly reports and services that are normally provided by KPMG LLP in connection with statutory and regulatory filings or engagements.

*Audit-Related Fees* consist of fees billed for assurance and related services that are reasonably related to the performance of the audit or review of our financial statements and are not reported under "Audit Fees." For fiscal 2021, these services primarily related to fees associated with employee benefit plan audits.

*Tax Fees* consist of fees billed for professional services for tax compliance, tax advice and tax planning. These services include assistance regarding federal and state tax compliance, cost segregation studies, tax audit defense and mergers and acquisitions.

*All Other Fees* consist of fees for services other than the services reported above.

The Audit Committee has considered whether the provision of the non-audit services described above by KPMG LLP is compatible with maintaining auditor independence and determined that KPMG LLP's provision of non-audit services did not compromise its independence as our independent registered public accounting firm.

Table of Contents

**Policy on Audit Committee Pre-Approval of Audit and Permissible Non-Audit Services**

Our Audit Committee has adopted a written Pre-Approval Policy, under which the Audit Committee pre-approves all audit and permissible non-audit services provided by KPMG LLP. These services may include audit services, audit-related services, tax services and other related services. Pre-approval is generally provided for up to twelve months and any pre-approval is detailed as to the particular service or category of services and is generally subject to a specific budget. KPMG LLP and Management are required to report periodically to the Audit Committee regarding the extent of services provided by KPMG LLP in accordance with this pre-approval, and the fees for the services performed to date. The Audit Committee may also pre-approve particular services on a case-by-case basis. Under the Pre-Approval Policy, the Audit Committee has delegated pre-approval authority (subject to certain exceptions and dollar limits) to the chair of the Audit Committee who shall report any pre-approval decisions to the Audit Committee for ratification at its next scheduled meeting. During fiscal 2022, all services provided to us by KPMG LLP were pre-approved either by the Audit Committee or the chairperson of the Audit Committee acting pursuant to delegated authority in accordance with the Pre-Approval Policy.

Table of Contents

## Proposal 3-Advisory Approval of Our Executive Compensation

We made several enhancements to our executive compensation program after our 2021 Annual Meeting, informed by engagement with several of our stockholders, and, as a result, we received a 92.6% Say on Pay at our last annual meeting. During our 2022 engagement discussions, our stockholders were complimentary of our responsiveness and our compensation program in light of the changes made in fiscal 2022. We continue to have a strong executive compensation program that we believe is appropriate and effective in aligning the interests of our executives with those of our stockholders. Our compensation program is designed to reinforce a sense of ownership in our Company and foster an entrepreneurial spirit. Our program drives urgency with respect to delivering significant value; and alignment of compensation incentives, including both short- and long-term awards, as well as cash and non-cash awards, to measurable pre-established corporate performance metrics. We believe we have developed a compensation program designed to deliver our Fuel the Future strategic objectives and to align our executives' interests with those of our stockholders. Our compensation program includes the following:

✔ No employment agreements with any of our NEOs and clearly outlined terms for treatment of compensation upon termination of employment.

✔ Equity grants are weighted more heavily toward performance, with 60% PSUs and 40% RSUs (compared to 50%/50% in prior years).

✔ STI plan includes a revenue metric, which, balanced with the existing adjusted EBITDA metric, aligns with our strategy to grow sales profitably.

✔ LTI plan no longer includes a leverage metric, given significant progress on this metric in recent years toward our long-term goal. Adjusted EPS and adjusted ROIC incentivize prudent capital investments in our business that aligns with an increase in stockholder value.

✔ Maintain disciplined equity grant practices.

You are urged to read the Compensation Discussion and Analysis, which discusses how our compensation policies and procedures implement our compensation objectives and philosophies, as well as the table under *"Executive Compensation Tables-Summary Compensation Table-Fiscal Years 2020-2022"* and other related compensation tables and narrative disclosure, which describe the compensation of our NEOs in fiscal 2022.

The Compensation Committee and the Board believe that the policies and procedures articulated in the Compensation Discussion and Analysis are effective in aligning the interests of our executives with those of our stockholders and incentivizing performance that supports our short- and long-term strategic objectives, and that the compensation of the NEOs in fiscal 2022 reflects and supports these compensation policies and procedures.

As required by Section 14A of the Exchange Act and as a matter of good corporate governance, stockholders will be asked at the Annual Meeting to approve the following advisory resolution:

RESOLVED, that the compensation paid to the Company's Named Executive Officers, as disclosed pursuant to Item 402 of Regulation S-K, including the Compensation Discussion and Analysis, compensation tables and narrative discussion is hereby APPROVED.

This advisory vote, commonly referred to as a "say-on-pay" advisory vote, is non-binding on the Board. Although non-binding, the Board and the Compensation Committee will review the voting results and take them into consideration when making future decisions regarding our executive compensation programs. The Board has adopted, and stockholders have approved, a policy of providing for annual advisory votes by stockholders on executive compensation. The next such vote will occur at the next annual meeting.

**The Board unanimously recommends that stockholders vote "FOR" the advisory approval of our executive compensation. Proxies received by the Board will be voted "FOR" the proposal unless a contrary choice is specified in the proxy.**

61

Table of Contents

## Proposal 4-Approval of the Second Amended and Restated 2020 Equity Incentive Plan

**Background**

On November 17, 2022, our Board approved the Second Amended and Restated 2020 Equity Incentive Plan (Second Amended and Restated Plan) to (i) increase the number of shares available for issuance under the Amended and Restated 2020 Equity Incentive Plan by 5,000,000 shares; (ii) update the limitation on non-employee director awards to include a cap on total director compensation (including cash compensation) and set that cap at $800,000 per year (iii) remove the restrictive covenants language from the Second Amended and Restated Plan and include it in each award agreement; (iv) extend the term of the plan from seven years to 10 years; (v) require the execution of a release in connection with the vesting of any shares as a result of a separation from service without cause (as defined in the plan); and (vi) certain other clarifying and conforming changes. The 2020 Equity Incentive Plan was originally approved by stockholders in December 2019, and an amendment thereto was approved by stockholders on January 12, 2021. The Board believes that equity compensation is an essential component of our corporate strategy and recommends that you vote to approve the Second Amended and Restated Plan.

The Second Amended and Restated Plan permits the grant of incentive and non-qualified stock options, stock appreciation rights (SARs), restricted shares, RSUs, performance awards, and other stock-based awards to current or prospective officers, employees, directors and consultants. The Second Amended and Restated Plan includes terms and conditions that reflect governance best practices, including, among other things, double trigger change in control provisions; minimum vesting provisions; prohibitions on repricing; provision for treatment upon death, disability, retirement and certain separation of service events; provisions regarding performance-based awards; no liberal share recycling; and limits on grant amounts to outside directors and per participant limits.

**Best Practices**

As further described below in "*Summary of the Second Amended and Restated 2020 Equity Incentive Plan*", the Second Amended and Restated Plan includes terms and conditions that reflect best practices in governance and compensation:

- Grants under the plan are subject to our recoupment policy and stock ownership guidelines as in effect from time to time (including any changes that may be implemented to comply with listing requirements). Awards are not transferable (other than upon death);

- Change in control provisions are "double trigger" (requiring both a change in control and a termination of employment), with a market-standard definition of change in control;

- The plan specifically describes the treatment of awards upon death, disability, retirement and certain separation events, thus limiting the need for exercise of administrative discretion and, in the case of retirement, maintaining incentives to focus the executives that are nearing retirement (a time of heightened risk for short-term initiatives), on long-term performance;

- The plan contains a one-year minimum vesting requirement, with exceptions for death, disability and change in control;

- The minimum vesting requirement does not apply with respect to awards representing no more than 5% of the share reserve;

- The plan prohibits repricing of options and SARs;

- The plan includes detailed provisions for performance awards, which generally terminate upon termination of employment (other than terminations upon death, disability and retirement);

- The plan does not contain "liberal share recycling" provisions (shares surrendered upon payment of the option exercise price or used to pay tax withholding on any award are not added back to the number of shares that are available for awards, and any SARs that are settled in shares will be deemed to use the full amount of shares underlying the award);

- The plan contains limits on grant amounts and total compensation to outside directors and per participant award limits; and

- Dividends (if any) payable on unvested awards are not available until the award has vested.

**Shares Available and Outstanding Awards**

As of November 14, 2022, there were 59,902,801 shares of our common stock outstanding, with a closing price of $45.29 per share. As of such date, we had outstanding awards under the Amended and Restated 2020 Equity Incentive Plan and the Company's prior equity incentive plan (the Amended and Restated 2012 Equity Incentive Plan, or Prior Plan), and we had

62

Table of Contents

outstanding replacement awards made to Supervalu employees to replace awards denominated in shares of Supervalu when we acquired Supervalu in October 2018. The table below shows the shares available for issuance under the Second Amended and Restated Plan or reserved for issuance under outstanding awards as of November 14, 2022:

| Types of Shares | Number of Shares |
|---|---|
| Available for New Grants under the Amended and Restated 2020 Equity Incentive Plan | 1,580,981 Shares |
| Shares Underlying Existing Awards Granted under the Amended and Restated 2020 Equity Incentive Plan | 2,334,781 shares under time-vesting "full value" awards (restricted shares and restricted stock units) 2,045,796 performance-vesting restricted stock awards (at maximum levels of performance)[1] |
| Shares Underlying the Prior Plan | Options to purchase 68,605 shares (with a weighted average price of $65.95 per share and weighted average remaining term of 1.3 years |
| Supervalu Replacement Options | Replacement options to purchase 357,481 shares (with a weighted average price of $51.22 and average remaining term of 1.7 years |
| **Total Shares Available for Grant or Underlying Existing Awards** | **6,387,644** |

(1) The performance units consist of awards granted in October 2020, 2021 and 2022, which will vest or be forfeited based on company performance metrics tied to pre-established financial metrics over three-year performance periods (fiscal 2021-2023, fiscal 2022-2024 and fiscal 2023-2025, respectively). The number of shares issued upon vesting may be higher or lower than target depending on our performance during the relevant measurement period, subject to further adjustment based on Relative TSR. For more information about these performance awards, see "*Executive Compensation-Compensation Discussion and Analysis-Long Term Equity-Based Incentive Program*".

For more information concerning the grants made by the Company in fiscal 2020 through fiscal 2022, see "*Historical Grants and Share Usage*" below.

We are asking stockholders to approve the Second Amended and Restated Plan, so that we can effectively maintain the vital equity component of our compensation program going forward. Our equity compensation program, which furthers our executive compensation philosophy, provides our executives and non-executive employees with an incentive to deliver our long-term strategic objectives. In addition, we believe these awards allow us to attract, retain and reward key employees and directors and to align the interests of our employees with those of our stockholders over the long term.

Our Board recognizes the impact of dilution on stockholders and believes that it has prudently managed equity awards, giving proper consideration to the dilutive impact of stock awards on stockholder equity. Recently, our Board approved a share repurchase program, which will give us the opportunity to partially offset dilution. Our Compensation Committee reviews benchmark data in setting equity compensation levels and believes that grant amounts to our executive officers and other employees are sufficiently competitive to attract and retain top talent while remaining consistent with market levels of equity compensation.

Total dilution after giving effect to the proposed amendment would be 19.0%. We calculated our dilution rate as the sum of grants outstanding and shares available for future awards (numerator) divided by basic common shares outstanding, in each case as of November 14, 2022.

Our total number of outstanding shares is significantly lower than that of other companies of similar size, as measured by revenues. In fact, as of the end of fiscal 2022, our outstanding share count was approximately 43% of the median number of the outstanding shares most recently reported of the Comparator Group of wholesale distribution companies with similar revenues that we use for benchmarking executive compensation. Assuming a normalized number of outstanding shares given the industry benchmarks just described, our total dilution would be 6.2%. Unless we can offer comparable packages of equity compensation, we will be at a disadvantage when competing for executive talent with companies with operations similar to ours in size and complexity, and we will be required to replace the equity award mix with cash-based incentives, which may not represent the same level of alignment with the interests of stockholders as equity awards. As our stock price has increased, we have maintained disciplined equity grant practices, which is evidenced by the normalized dilution discussed above and a 79% decrease in shares granted from fiscal 2020 to fiscal 2022. Further, we do not sell shares withheld to cover taxes, and do not recycle these as available shares. Accordingly, actual dilution upon vesting of outstanding awards is less than reflected above.

The 1,580,981 shares remaining available under the Amended and Restated 2020 Equity Incentive Plan may not be sufficient to allow us to continue to make equity grants to our employees and directors. If stockholders do not approve this request for additional authorized shares, our ability to grant new equity-based compensation, and thus attract and retain valuable employees, would be significantly diminished, and retention of key employees is vital to achieving our business strategy. We believe that it is in the best interests of our stockholders for our leadership to be stockholders and to be compensated in shares of our common stock. We strive to align our executive compensation packages to market, with the result that a significant

Table of Contents

portion of our executive officers' total pay opportunities are in equity-based incentives: 60% of the total opportunity for our CEO, and an average of 52% for our other NEOs. We generally grant equity awards to employees at and above the director level, because the performance of employees at that level and above has the most direct impact on achievement of the Company's long-term strategic goals. Grants to associates other than executive officers represented 69% of the total equity dollars in fiscal 2022. To continue our long-term incentive program, if we do not have sufficient shares available, we may be required to issue cash-based awards which, as mentioned above, would be less favorable to stockholders. For information about grants made under our equity plans, see "*Historical Grants and Share Usage*", below.

### Summary of the Second Amended and Restated 2020 Equity Incentive Plan

The following summary of the material terms of the Second Amended and Restated Plan is qualified in its entirety by reference to the complete text of the Second Amended and Restated Plan, as proposed to be amended, as set forth in Annex A to this proxy statement. You should read the complete text of the Second Amended and Restated Plan for more details regarding the operation of the Second Amended and Restated Plan. Capitalized terms used but not defined in this section shall have the meaning ascribed to such term in the Second Amended and Restated Plan.

#### Purpose

The purpose of the Second Amended and Restated Plan is to promote our interests and those of our stockholders by attracting and retaining key officers, employees, directors and consultants; motivating such individuals by means of performance-related incentives to achieve long-range performance goals; enabling such individuals to participate in our long-term growth and financial success; encouraging ownership of our stock by such individuals; and linking their compensation to our long-term interests and those of our stockholders.

#### Administration

The Second Amended and Restated Plan must be administered by a committee composed of at least two "non-employee directors," within the meaning of Section 16 of the Exchange Act, and Rule l 6b-3 thereunder, each whom will be "independent" within the meaning of the NYSE listing standards and the rules and regulations of the SEC. The Board has appointed the full Compensation Committee to serve as the administrator of the Second Amended and Restated Plan. The Compensation Committee determines eligibility for and designates participants of the Second Amended and Restated Plan; determines the type and number of awards to be granted; determines the timing, terms and conditions of any award; and makes other determinations as provided in the Second Amended and Restated Plan. All decisions and interpretations made by the Compensation Committee with respect to the Second Amended and Restated Plan will be binding on us and participants. Subject to certain limitations under the Second Amended and Restated Plan, the Compensation Committee may delegate its authority to our officers to grant, modify or cancel awards, other than with respect to participants who are subject to Section 16 of the Exchange Act; any resolution delegating such authority shall specify the maximum amount that may be granted under such delegated authority.

#### Prohibition on Repricing without Stockholder Approval

The Second Amended and Restated Plan provides that, without the approval of our stockholders, the Compensation Committee may not lower the option price of a stock option after it is granted, lower the grant price of a SAR after it is granted, cancel a stock option in exchange for a replacement stock option or SAR with a lower exercise price or grant price when the option price exceeds the fair market value of the underlying shares (other than in certain limited situations involving a Change in Control), cancel a SAR in exchange for a replacement stock option or SAR with a lower exercise price or grant price when the grant price exceeds the fair market value of the underlying shares (other than in certain limited situations involving a Change in Control), or take any action with respect to a stock option or SAR that would be treated as a repricing under the rules and regulations of the principal securities exchange on which shares of our common stock are traded.

#### Minimum Vesting Period

Except for Substitute Awards, as determined by the Compensation Committee following the grant of an Award in connection with the death, disability (as defined in Section 409A of the Code) of the Participant, or in the event of a Change in Control or Separation from Service without Cause, Awards granted hereunder shall have a Vesting Period of not less than one (1) year from the date of grant; provided, that the Compensation Committee under the Second Amended and Restated Plan has the discretion to waive this requirement with respect to an Award at the time of granting such Award so long as the total number of Shares that are issued under this Plan pursuant to Awards having an originally stated Vesting Period of less than one year from the date of grant (or, in the case of vesting of Performance Awards or other Awards the vesting of which is subject to the achievement of performance-based objectives, over a period of less than one year measured from the commencement of the period over which performance is evaluated) shall not exceed 5% of the share reserve.

Table of Contents

**Eligible Participants**

Any current or prospective officer, employee, director or consultant of ours or one of our subsidiaries is eligible to be designated as a participant by the Compensation Committee. However, the granting, vesting and exercise of an award to a prospective employee, director or consultant are conditioned upon such individual attaining such status. The Board must approve awards to directors who are not also employees of ours. As of November 14, 2022, approximately 526 employees and 10 non-employee directors would have been eligible to participate in the Second Amended and Restated Plan if such plan was effective.

**Shares Subject to the Second Amended and Restated 2020 Equity Incentive Plan**

The maximum number of shares of our common stock that may be issued pursuant to awards under the Second Amended and Restated Plan following its approval by the stockholders is expected to be 11,030,163 shares (Authorized Shares). This represents 5,000,000 additional shares, plus the number of shares remaining available for grant under the existing Plan as of the 2023 annual meeting, including shares that are expected to be forfeited and returned to the existing Plan by such time. The actual number may be higher or lower depending on actual grants and forfeitures made after the record date. The maximum number of awards that we may issue as restricted shares, restricted share units or performance share units (i.e., full-value awards) is equal to the number of Authorized Shares. The maximum number of shares with respect to which incentive stock options may be granted under the Second Amended and Restated Plan is 1,000,000. Each share issued pursuant to an award will reduce the share reserve by one share. If any award granted under the Second Amended and Restated Plan or the Prior Plan expires, terminates, is settled in cash or otherwise is forfeited or canceled for any reason without the delivery of shares, the shares no longer subject to such award will again be available for awards under the Second Amended and Restated Plan. Notwithstanding the foregoing, if a stock option or SAR is exercised, in whole or in part, by tender or withholding of shares or if our tax withholding obligation for any award under the Second Amended and Restated Plan is satisfied by the tender or withholding shares, the number of shares deemed to have been issued under the Second Amended and Restated Plan will be the number of shares that were subject to the award or portion thereof and not the net number of shares actually issued. SARs to be settled in shares will be counted in full against the number of shares reserved regardless of the number of shares issued in settlement of the SAR. The number of shares subject to the Second Amended and Restated Plan may be adjusted in the event of certain changes in our capital structure.

**Per Participant Limitations**

The maximum number of shares in respect of which stock option and SARs that may be granted to a participant under the Second Amended and Restated Plan for any fiscal year is 900,000. The grant date maximum value of restricted shares, RSUs and performance awards denominated in shares that may be granted under the Second Amended and Restated Plan to one individual in any fiscal year is $10,000,000. These limitations are cumulative. In other words, to the extent that shares or cash for which awards are permitted to be granted to a participant during a fiscal year are not covered by an award to such participant in that fiscal year (such shortfall, the "Shortfall Amount"), the number of shares (or amount of cash, as the case may be) available for awards to such participant will automatically increase in the subsequent fiscal years during the term of the Plan until the earlier of the time the Shortfall Amount has been granted to the participant, or the end of the third fiscal year following the year to which such Shortfall Amount relates (determined on a "first-in-first-out" basis). The aggregate grant date fair value of equity grants to any non-employee director in any calendar year plus the total cash compensation paid to such director for services rendered for such calendar year may not exceed $800,000.

**Terms and Conditions of Awards**

The Second Amended and Restated Plan permits the grant of stock options, SARs, restricted shares, restricted share units, performance awards (including performance shares and performance units), and other stock-based awards. Stock options granted under the Second Amended and Restated Plan may be either incentive stock options complying with Section 422 of the Code or nonqualified stock options. Incentive stock options may be granted only to employees. All other awards may be granted to current or prospective officers, employees, directors and consultants. All awards under the Second Amended and Restated Plan must be evidenced by an award agreement specifying the terms and conditions of the award and any rules applicable thereto.

*Stock Options.* A stock option represents the right to purchase a specified number of shares during a specified period of up to ten years. The award agreement will set forth the number of shares subject to the stock options, the option price, and the conditions and limitations applicable to the exercise of the stock options as determined by the Compensation Committee. The option price of stock options may not be less than the fair market value on the date that such stock options are granted under the Second Amended and Restated Plan. With respect to incentive stock options, the terms and conditions of such stock options will be subject to and comply with Section 422 of the Code. To the extent that the aggregate fair market value (determined at the time the incentive stock option is granted) of the shares with respect to which all incentive stock options are exercisable for the first time by an employee during any calendar year exceeds $100,000, or if and to the extent stock options fail to qualify as incentive stock options for any other reason, such stock options will constitute non-qualified stock options. Incentive stock

65

Table of Contents

options may not be granted to any individual who, at the time of grant owns stock possessing more than 10% of the total combined voting power of all of our outstanding common stock or any of our subsidiaries, unless the exercise price is not less than 110% of the fair market value of the common stock on the date of the grant and the exercise of such option is prohibited by its terms after the expiration of five years from the date of grant of such option.

*SARs.* Unless otherwise set forth in the award agreement, SARs represent the right to receive an amount of cash equal, or shares of common stock having a value equal, to the increase in the fair market value of a specified number of shares between the grant date of the SARs and the date on which they are exercised. The award agreement will set forth the number of shares subject to the award, the grant price, and the conditions and limitations applicable to the exercise of the SARs as determined by the Committee. The grant price of SARs may not be less than the fair market value on the date that such SARs are granted under the Second Amended and Restated Plan.

*Restricted Shares.* The award agreement for restricted shares will set forth the number of shares subject to the award, the period during which, and the conditions under which, the restricted shares may be forfeited to us, and the other terms and conditions of the award. Restricted shares may not be sold, transferred, or otherwise encumbered or disposed of until the expiration of the restricted period and the fulfillment of any other conditions to the award. The award agreement will set forth a period of time during which the participant must remain in the continuous employment (or other service-providing capacity) for the forfeiture and transfer restrictions to lapse. If provided in the award agreement, an award will continue to vest and be exercisable after retirement. Unless otherwise provided in the award agreement, the participant receiving restricted shares will have the right to vote such shares and receive dividends, but any dividends paid on unvested shares of restricted stock will be escrowed and not paid to the participant until the shares of restricted stock on which the dividends were paid vest, and the participant will forfeit any dividends paid on restricted shares that are later forfeited by the participant. At the end of the restricted period and provided that any other restrictive conditions of the award are met, a stock certificate will be delivered to the participant free of the restricted stock legend (or restrictions on book-entry shares will be removed).

*Restricted Share Units.* Each RSU will have a value equal to the fair market value of a share on the date such RSU granted under the Second Amended and Restated Plan. RSUs may be paid in cash, shares, other securities or property (as determined by the Compensation Committee) upon the lapse of restrictions applicable to the award and otherwise in accordance with the award agreement. RSUs will be subject to transfer restrictions similar to those of restricted shares, except that no shares are awarded to a participant who is granted RSUs on the date of grant, and such participant will have no rights of a stockholder with respect to the RSUs until the restrictions set forth in the award agreement lapse. The award agreement for RSUs will set forth the number of shares subject to the award, the period during which, and the conditions under which, the RSUs may be forfeited to us, and the other terms and conditions of the award. The award agreement will set forth a period of time during which the participant must remain in the continuous employment (or other service-providing capacity) for the forfeiture and transfer restrictions to lapse. The award agreement may also set forth performance or other conditions (including, but not limited to, performance goals based on the criteria listed in the Second Amended and Restated Plan) that will subject the shares to forfeiture and transfer restrictions. Unless otherwise determined by the Compensation Committee or as provided in the award agreement, all of the RSUs (and any dividend equivalent rights with respect thereto) will terminate unless the participant remains in continuous employment for the entire restricted period and unless the other restrictive conditions of the award are met.

*Performance Award.* The Compensation Committee may grant performance awards, which will consist of a right that is denominated in cash or shares (including but not limited to restricted shares and restricted share units), valued, as determined by the Compensation Committee, in accordance with the achievement of such performance goals during such performance periods as the Compensation Committee may establish, and payable at such time and in such form as the Compensation Committee determines. Subject to the terms of the Second Amended and Restated Plan and any applicable award agreement, the Compensation Committee will determine the performance goals to be achieved during any performance period, the length of any performance period, the amount of any performance award and the amount and kind of any payment or transfer to be made pursuant to any performance award, and may amend specific provisions of the performance award; however, any such amendment may not adversely affect existing performance awards made within a performance period commencing prior to implementation of the amendment. Performance awards may be paid in a lump sum or in installments following the close of the performance period or, in accordance with the procedures established by the Compensation Committee, on a deferred basis. Separation from service prior to the end of any performance period, other than for reasons of death, disability, retirement or separation from service without cause (as defined in the Second Amended and Restated Plan), will result in the forfeiture of the performance award, and no payments will be made. If provided in the applicable award agreement or in accordance with any determination of the Compensation Committee, performance awards granted in the year in which retirement occurs will be pro-rated to reflect the length of service during the applicable performance period prior to retirement. Notwithstanding the foregoing, the Compensation Committee may, in its discretion, waive any performance goals and/or other terms and conditions relating to a performance award.

66

Table of Contents

The Compensation Committee must, in writing, select the performance goal(s) applicable to the performance period, establish the various targets and bonus amounts which may be earned for such performance period, and specify the relationship between performance goals and targets and the amounts to be earned for such performance period. Following the completion of each performance period, the Compensation Committee must certify in writing whether the applicable performance targets have been achieved and the amounts, if any, payable for such performance period. The Compensation Committee may adjust the amount of cash or number of shares payable to take into account additional factors that it might deem relevant affecting performance.

The Compensation Committee may appropriately adjust any evaluation of performance to exclude any of the following events that occurs during a performance period: (i) asset impairments or write-downs, (ii) litigation or claim judgments or settlements, (iii) the effect of changes in tax law, accounting principles or other such laws or provisions affecting reported results, (iv) accruals for reorganization and restructuring programs, (v) any items that are unusual in nature or infrequently occurring and/or described in management's discussion and analysis of financial condition and results of operations appearing in the Company's annual report to stockholders on Form 10-K for the applicable year, (vi) the effect of adverse federal, governmental or regulatory action, or delays in federal, governmental or regulatory action; (vii) any other event either not directly related to our operations or not within the reasonable control of our management; and (viii) any other event, condition or circumstance for which the Compensation Committee determines that an adjustment would be appropriate based on Compensation Committee guidelines, prior practice or other considerations.

*Other Stock-Based Awards.* The Compensation Committee may grant stock-based awards other than stock options, SARs, restricted shares, RSUs and performance awards. Such other stock-based awards will consist of an award of shares or an award denominated or payable in, or valued in whole or part by reference to, shares, and will have terms determined by the Compensation Committee to be consistent with the purposes of the Second Amended and Restated Plan.

**Separation from Service**

The Compensation Committee will determine the terms and conditions that will apply to any award upon a participant's separation from service and may provide such terms and conditions in the award agreement or in such rules and regulations as it may prescribe. Unless provided in the award agreement, awards will fully vest on death or disability. Unless otherwise provided in the Second Amended and Restated Plan, an award agreement or a written employment or similar agreement between us and a participant, if a participant's employment with or service to us terminates before the restrictions imposed on the award lapse, the performance goals have been satisfied or the award otherwise vests, such award will be forfeited. Except as otherwise provided in an award agreement or a written employment agreement or similar agreement between us and a participant, if a participant's employment terminates prior to a Change in Control (as defined in the Second Amended and Restated Plan), for any reason other than death or disability, the vesting of any unvested award will not be triggered by such termination of employment or service. Notwithstanding the foregoing, termination of employment or service without Cause or for Good Reason that takes place within four (4) months prior to a Change in Control and that is made at the behest of the acquirer or in contemplation of such Change in Control will be treated as if such termination of employment or service took place after such Change in Control provided that the change in control actually occurs.

In the case of an employee participant who is not a party to an employment agreement or separate agreement which is governing the treatment of equity awards, the following treatment will apply with respect to awards (subject to the exercise of committee discretion). Upon a qualifying Separation from Service without Cause (as defined in the Second Amended and Restated Plan), a prorated portion of outstanding awards of RSUs shall vest upon such separation and a prorated portion of outstanding PSUs shall continue to vest subject to actual performance. The remainder of RSUs and PSUs not vesting in accordance with the terms of the Second Amended and Restated Plan will be forfeited. Pursuant to the Second Amended and Restated Plan, the Compensation Committee has authority to make determinations as to the timing, conditions and acceleration of vesting of equity awards granted, including in regard to any separation of service. Additionally, such prorated vesting is subject to the participant's execution and non-revocation of release.

The Second Amended and Restated Plan permits awards to continue to vest in retirement (defined as a termination of active employment after the participant has attained 59 years of age and provided ten (10) years of service), if so provided in the award agreement. Performance awards granted in the year in which retirement takes place are pro-rated to reflect the length of the participant's service during the applicable performance period prior to retirement. As a matter of policy, the Company expects all award agreements under the Plan to include provisions allowing for vesting through retirement.

**Change in Control**

In the event of a Change in Control, the successor or purchasing entity may, without the consent of any participant, either assume or continue our rights and obligations under any award outstanding immediately prior to the Change in Control or substitute for any such outstanding award a substantially equivalent award with respect to the successor's or purchasing entity's stock. The Compensation Committee may in its discretion and without the consent of any participant, determine that, upon the occurrence of a Change in Control, each or any award or a portion thereof outstanding immediately prior to the Change in

Table of Contents

Control and not previously exercised or settled will be canceled in exchange for a payment with respect to each vested share subject to such award in cash, shares, shares of a corporation or other business entity a party to the Change in Control, or other property which, in any such case, will be in an amount having a fair market value equal to the fair market value of the consideration to be paid per share in the Change in Control, reduced by the exercise or purchase price per share, if any, under such award.

Unless otherwise expressly provided in the award agreement, an employment agreement or other written agreement between us and a participant, or the definitive transaction agreement governing such Change in Control, in the event of a Change in Control in which the acquiror does assume or continue outstanding awards upon the Change in Control, if a participant's employment with or service to us is terminated involuntarily for any reason other than Cause (as defined in the Second Amended and Restated Plan), or a participant terminates his or her employment or service for Good Reason (as defined in the Second Amended and Restated Plan) within twelve (12) months of such Change in Control: (a) stock options and SARs will become fully vested as of the termination date, and exercisable no later than 30 days following such termination date (or such other date permitted by Section 409A of the Code); (b) restricted shares and RSUs will become fully vested as of such termination date, and will be delivered no later than 30 days following such termination date; and (c) any then-in-progress performance awards will become fully vested at target performance levels as of such termination date, and will be delivered no later than 30 days following such termination date. Any outstanding performance awards relating to performance periods ending prior to the termination date which have been earned but not paid will become immediately payable.

Unless otherwise expressly provided in the award agreement, an employment agreement or similar written agreement with us, or the definitive transaction agreement governing such Change in Control, in the event of a Change in Control in which the acquiror does not assume or continue outstanding awards upon the Change in Control, all outstanding awards that are not assumed or continued will be treated as follows (to the extent permitted by Section 409A of the Code): (a) stock options and stock appreciation rights will become fully vested and exercisable as of date and time immediately prior to the Change in Control; (b) restricted shares and RSUs will become fully vested as of the date and time immediately prior to the Change in Control and shall settle immediately following the Change in Control; and (c) unless otherwise determined by the Compensation Committee, any performance awards relating to performance periods that have not ended as of the date of a Change in Control will automatically vest and become payable at the target level of performance.

### Transferability of Awards

Except as otherwise permitted in an award agreement or by the Compensation Committee, awards under the Second Amended and Restated Plan are not transferable other than by a participant's will or the laws of descent and distribution.

### Term and Amendment

No new awards may be granted under the Second Amended and Restated Plan after the tenth anniversary of the effective date, which shall be January 10, 2023, subject to approval of our stockholders. The Board may amend, alter, suspend, discontinue or terminate the Second Amended and Restated Plan at any time; however, no amendment, alteration, suspension, discontinuation or termination may be made without stockholder approval if approval is necessary to comply with any tax or regulatory requirement for which or with which the Board deems it necessary or desirable to comply.

### Restrictive Covenants

Agreement to the restrictive covenants that shall be set forth in the applicable award agreement under the Second Amended and Restated Plan, including confidentiality, non-competition, non-solicitation and cooperation, is a condition to receipt of an award. The Committee may waive any conditions or rights under, amend the terms of or alter, suspend, discontinue, cancel or terminate any award granted (including retroactively) provided that any such action does not materially or adversely affect the rights of the participant without his or her consent.

### Certain Federal Income Tax Consequences

The following is a brief summary of certain Federal income tax laws in effect on the date hereof with applicability to the Second Amended and Restated Plan. This summary is not intended to be exhaustive and the exact tax consequences to any participant will depend on his or her particular circumstances and other factors. The Second Amended and Restated Plan participants are encouraged to consult their own tax advisors with respect to any state tax consequences or particular federal tax implications of awards granted under the Second Amended and Restated Plan. The Second Amended and Restated Plan is not intended to be qualified under Section 40l(a) of the Code.

### Stock Options

A participant will not recognize income, and we will not be entitled to take a deduction, upon the grant of stock options. Upon exercising a non-qualified option, the participant generally will recognize ordinary income equal to the difference between the exercise price and fair market value of the shares acquired on the date of exercise, and we will be

68

Table of Contents

entitled to a deduction for the same amount. Any ordinary income of the participant will be subject to tax withholding by us. We generally will have no tax consequence in connection with the later disposition of shares acquired pursuant to non-qualified stock options. A participant generally will not recognize income, and we will not be entitled to take a deduction, upon the exercise of an incentive stock option (except that the alternative minimum tax may apply). If shares acquired upon the exercise of an incentive stock option are held for the longer of two years from the grant date of the stock options and more than one year after the date they were exercised, the difference between the sale price and the exercise price generally will be taxed as long-term capital gain or loss, and we will not be entitled to any deduction. We generally will have no tax consequence in connection with the later disposition of shares acquired pursuant to incentive stock options if such holdings periods are met. If the participant does not satisfy these holding periods, then the participant will recognize ordinary income equal to the excess of the lesser of the amount realized upon such disposition and the fair market value of such shares on the date of exercise, over the exercise price, and we should be entitled to take a corresponding deduction.

### SARs

A participant will not recognize income, and we will not be entitled to take a deduction, upon the grant of SARs. Upon exercising a SAR, the participant generally will recognize ordinary income in the amount by which the fair market value of the shares on the date of exercise exceeds the SAR exercise price, if any, and we will be entitled to a deduction for the same amount. Any ordinary income of the participant will be subject to tax withholding by us. Any additional gain or loss recognized upon the later disposition of the shares will be capital gain or loss, which may be long- or short-term capital gain or loss depending on the holding period. We generally will have no tax consequence in connection with the later disposition of shares acquired pursuant to a SAR.

### Restricted Shares

The award of restricted shares will not result in taxable income to the participant, and we will not be entitled to take a deduction, at the time of grant unless the participant makes an election under Section 83(b) of the Code to be taxed at such time. If such election is not made, upon the lapse of the restrictions upon restricted shares, the participant will recognize ordinary income in the amount equal to the fair market value of the shares at the time the restricted shares vest (less any amount paid for the shares), and we will be entitled to a deduction for the same amount.

Prior to the lapse of the restrictions on restricted shares, any dividends received on such shares will be treated as ordinary income to the participant. If an effective election under Section 83(b) of the Code is made, the participant will recognize ordinary income in the year that the restricted shares are awarded in an amount equal to the fair market value of the shares on the date of such award determined as if the restricted shares were not subject to restrictions, and we will be entitled to a deduction for the same amount. If the election is made, the participant will not recognize income at the time that the restrictions actually lapse. Any dividends received after the election is made generally will constitute qualified dividend income. If the restricted shares subject to the election are subsequently forfeited, the participant will not be entitled to a deduction or tax refund. Any ordinary income of the participant will be subject to tax withholding by us. We generally will have no tax consequence in connection with the later disposition of shares acquired pursuant to vested restricted shares.

### Restricted Share Units

With respect to a grant of RSUs, the participant will recognize ordinary income on the amount of cash (for units payable in cash) or the fair market value of the common stock (for units settled in stock) at the time such payments are made available to the participant under the terms of the RSU award, and we will be entitled to a deduction for the same amount. The participant also is subject to capital gains treatment on the subsequent sale of any shares acquired through the settlement of the RSU. For this purpose, the participant's basis in the common stock is his or her fair market value at the time the RSUs are settled (unless delivery of the shares has been validly deferred). Any ordinary income of the participant will be subject to tax withholding by us. We generally will have no tax consequence in connection with the later disposition of shares acquired pursuant to RSU. A Section 83(b) election is not available with respect to RSUs.

### Performance Awards

A participant will not recognize income, and we will not be entitled to take a deduction, upon the grant of performance awards unless the participant makes an effective election under Section 83(b) of the Code to be taxed at the time of the grant. A Section 83(b) election may not be available with respect to certain forms of performance awards (e.g., those denominated as units). With respect to performance awards settled in shares, a participant will recognize ordinary income equal to the fair market value of the shares received as the performance goals are met and such awards vest or are settled (depending on the type of the award), less any amount paid by the participant for the performance awards. With respect to performance awards settled in cash, participants will recognize ordinary income in such amount at the time the performance goals are attained, and the payments are made available to the participant. Any additional gain or loss recognized upon the later disposition of shares acquired upon the vesting of performance awards will be capital gain or loss, which may be long- or short-term capital gain or loss depending on the holding period. Unless a participant makes an effective Section 83(b) election, the

69

Table of Contents

participant's basis in the stock will be its fair market value at the time the performance goals are met and the performance awards become vested or, if applicable, upon settlement of performance share units. We generally will have no tax consequence in connection with the later disposition of shares acquired pursuant to a performance award.

### Substitute Payments

Substitute payments for dividends made to participants upon the vesting of restricted shares or certain performance awards payable in our stock will be taxed as ordinary income. After vesting, dividend payments may be qualified dividend income subject to federal capital gains tax treatment provided that the stockholder meets certain other requirements with respect to those shares. If a participant makes an effective Section 83(b) election with respect to restricted shares or certain eligible performance awards, these payments may be qualified dividend income, provided that the other requirements are met. We recommend that participants consult with their tax advisors to determine whether such dividends are qualified dividend income.

### Section 409A

Section 409A of the Code provides generally that nonqualified deferred compensation that does not meet certain requirements will subject the recipients of such compensation to accelerated taxation, enhanced underpayment interest and an additional twenty percent tax. Although we intend to administer the Second Amended and Restated Plan so that awards will be exempt from, or will comply with, the requirements of Section 409A of the Code, we do not warrant that any award under the Second Amended and Restated Plan will qualify for favorable tax treatment under Section 409A of the Code or any other provision of federal, state, local or foreign law. We will not be liable to any participant for any tax, interest, or penalties that such participant might owe as a result of the grant, holding, vesting, exercise, or payment of any award under the Second Amended and Restated Plan.

### New Plan Benefits

The Second Amended and Restated Plan does not provide for set benefits or amounts of awards, and we have not approved any awards that are conditioned on stockholder approval of the increase in available shares under the Second Amended and Restated Plan. Any future awards granted to eligible participants under the Second Amended and Restated Plan will be subject to the discretion of the Compensation Committee and, therefore, the total number of awards that will be granted under the Second Amended and Restated Plan is not determinable at this time.

### Historical Grants and Share Usage

The following table displays the number of full value awards (restricted share units and performance share units) and stock options outstanding as of the last day of each of the Company's most recently completed three fiscal years and as of November 14, 2022 as well as additional information with respect to the average exercise price and remaining term for stock options, along with the shares available for issuance under the Amended and Restated 2020 Equity Incentive or the Prior Plan as of such dates and the total number of the Company's shares then outstanding:

| Fiscal Year | Options Outstanding [1] | Weighted Average Exercise Price of Stock Options | Weighted Average Remaining Term (years) | Full Value Awards Outstanding[2] | Shares Available for Issuance | Common Shares Outstanding |
|---|---|---|---|---|---|---|
| 2020 | 1,130,073 | $46.46 | 4.4 | 7,416,649 | 2,865,124 | 54,603,757 |
| 2021 | 764,310 | $49.02 | 2.2 | 6,891,764 | 3,932,349 | 56,284,144 |
| 2022 | 487,116 | $54.11 | 1.6 | 5,029,114 | 2,862,679 | 58,308,537 |
| 11/14/2022 | 426,086 | $53.59 | 1.7 | 3,473,351 | 1,580,981 | 59,902,801 |

(1)  Fiscal 2020, fiscal 2021, fiscal 2022 and November 14, 2022 include 932,309, 601,662, 361,481 and 357,481 of Supervalu replacement options, respectively.
(2)  Fiscal 2020 and fiscal 2021 include 301,717 and 50,514 of replacement awards issued in connection with the Supervalu acquisition, respectively, which we settled in cash upon vesting.

The following table sets forth information related to stock options and RSUs (excluding performance shares and performance units) granted by the Company under the Amended and Restated 2020 Equity Incentive Plan and the Prior Plan and forfeited in fiscal years 2020, 2021, 2022 and through November 14, 2022 for fiscal 2023:

Table of Contents

| Fiscal Year | Option Shares Granted | Option Shares Forfeited[1] | Restricted Share Units Granted [2] | Restricted Share Units Forfeited |
|---|---|---|---|---|
| 2020 | - | 429,225 | 5,081,497 | 385,481 |
| 2021 | - | 312,461 | 2,128,307 | 350,870 |
| 2022 | - | 65,986 | 945,991 | 258,434 |
| 11/14/2022 | - | 57,030 | 1,166,283 | 63,636 |
| **Total** | **-** | **864,702** | **9,322,078** | **1,058,421** |

(1) Excludes options cancelled upon expiration of exercise period.
(2) Number of RSUs granted decreased 81% from fiscal 2020 to fiscal 2022.

The following table sets forth information related to the PSU awards granted under the Amended and Restated 2020 Equity Incentive Plan, as applicable, in fiscal 2020, 2021 and 2022, and through November 14, 2022 for fiscal 2023, and the portion of those awards that vested or were forfeited following completion of the applicable performance period (if such performance period has ended):

| Grant Date | Performance Period | Performance Awards Granted at Target Level of Performance (# of shares)[1] | Performance Awards Vested (# of shares)[2] | Performance Awards Forfeited (as a % of total award)[1][2] |
|---|---|---|---|---|
| 12/19/2019 | Fiscal 2020 - 2022 | 977,860 | 955,511 | 2% |
| 10/12/2020 | Fiscal 2021 - 2023 | 545,054 | - | - |
| 10/12/2021 | Fiscal 2022 - 2024 | 297,588 | - | - |
| 10/6/2022 | Fiscal 2023 - 2025 | 363,040 | - | - |

(1) Excludes awards forfeited prior to vesting due to separation of service; Number of PSUs granted decreased 70% from fiscal 2020 to fiscal 2022.
(2) The performance periods for the awards granted on October 12, 2020, October 12, 2021 and October 6, 2022 are not completed.

**The Board unanimously recommends that stockholders vote "FOR" the approval of the Second Amended and Restated 2020 Equity Incentive Plan. Proxies received by the Board will be voted "FOR" the proposal unless a contrary choice is specified in the proxy.**

71

Table of Contents

## Other Matters

**Stock Ownership of Certain Beneficial Owners and Management**

This table includes information regarding the amount of our common stock beneficially owned as of November 14, 2022 by (i) each of our directors, (ii) each of our executive officers named in the "*Executive Compensation Tables-Summary Compensation Table-Fiscal Years 2020-2022*," (iii) all of our current directors and executive officers as a group and (iv) each person or entity known to us to own more than 5% of our outstanding common stock.

| Name and Address of Beneficial Owner[1] | Number of Shares Beneficially Owned[2][3] | Percentage Ownership |
|---|---:|---:|
| **Directors and Named Executive Officers:** | | |
| J. Alexander Miller Douglas[4] | 15,683 | ** |
| Eric F. Artz | 50,872 | ** |
| Ann Torre Bates | 11,470 | ** |
| Gloria R. Boyland | 6,099 | ** |
| Denise M. Clark | 57,824 | ** |
| Daphne J. Dufresne | 47,542 | ** |
| Michael S. Funk[5] | 67,270 | ** |
| Shamim Mohammad | - | ** |
| James L. Muehlbauer | 72,340 | ** |
| Peter A. Roy | 73,595 | ** |
| Jack Stahl | 38,776 | ** |
| Eric A. Dorne | 74,875 | ** |
| John W. Howard | 84,083 | ** |
| Jill E. Sutton[6] | 18,642 | ** |
| Michael C. Stigers[7] | 125,449 | |
| Christopher P. Testa | 114,916 | ** |
| Steven L. Spinner[8] | 169,965 | ** |
| All current directors and executive officers, as a group (18 persons)[9] | 823,022 | 1.4% |
| **Other Stockholders:** | | |
| BlackRock, Inc.[10] | 8,816,181 | 14.7% |
| The Vanguard Group[11] | 6,567,828 | 11.0% |
| Dimensional Fund Advisors LP[12] | 3,896,345 | 6.5% |
| Kiltearn Partners LLP[13] | 3,047,034 | 5.1% |

** Less than 1%

(1) The address for each listed director and executive officer is c/o United Natural Foods, Inc., 313 Iron Horse Way, Providence, Rhode Island 02908. The address for BlackRock, Inc. is 55 East 52nd Street, New York, New York 10055. The address for The Vanguard Group, Inc. is 100 Vanguard Boulevard, Malvern, Pennsylvania 19355. The address for Dimensional Fund Advisors LP is 6300 Bee Cave Road, Building One, Austin, Texas 78746. The address for Kiltearn Partners LLP, Kiltearn Limited and Murdoch Murchison is Exchange Place 3, 3 Semple Street, Edinburgh, United Kingdom EH3 8BL.

(2) The number of shares of common stock beneficially owned by each stockholder is determined under SEC rules, and the information is not necessarily indicative of beneficial ownership for any other purpose. Under such rules, beneficial ownership includes any shares as to which a person has sole or shared voting power or investment power and also any shares which a person has the right to acquire within 60 days after November 14, 2022, through the vesting and/or exercise of any equity award or other right. The inclusion herein of such shares, however, does not constitute an admission that the named stockholder is a direct or indirect beneficial owner of such shares. Unless otherwise indicated, each person named in the table has sole voting power and investment power (or shares such power with his or her spouse) with respect to all shares of common stock listed as owned by such person.

(3) The shares of common stock shown in the table include the following numbers of shares that are issuable upon the exercise of stock options and that are exercisable within 60 days after November 14, 2022: Mr. Dorne-8,910; Mr. Testa-7,310; and Mr. Stigers-23,427. All directors and executive officers as a group-39,647.

The shares of common stock shown in the table do not include any shares issuable pursuant to restricted stock units, as no restricted stock units will vest within 60 days after November 14, 2022.

(4) Includes 600 shares held by Mr. Douglas's spouse.

(5) Includes 100 shares held by a minor child.

72

Table of Contents

(6) Ms. Sutton left the Company in December 2021. The number of shares is based on information disclosed in Ms. Sutton's director and officer questionnaire, which she completed in August 2022, and the Company's record of PSUs that vested and were delivered on October 6, 2022.

(7) Includes 10,000 shares held by a revocable family trust.

(8) Mr. Spinner retired from his position as CEO and Chair of the Board effective August 9, 2021. The number of shares is based on information disclosed in Mr. Spinner's director and officer questionnaire, which he completed in August 2022, and the Company's record of PSUs that vested and were delivered on October 6, 2022.

(9) Excludes Mr. Dorne, Mr. Spinner and Ms. Sutton, as at they were not officers of the Company as of November 22, 2022.

(10) Beneficial ownership information based solely on a Schedule 13G/A filed with the SEC on February 7, 2022 by BlackRock, Inc. BlackRock, Inc. reported sole voting power with respect to 8,647,556 shares and sole dispositive power with respect to 8,816,181 shares. Includes shares beneficially owned by BlackRock Life Limited, BlackRock Advisors, LLC, Aperio Group, LLC, BlackRock (Netherlands) B.V., BlackRock Fund Advisors, BlackRock Institutional Trust Company, National Association, BlackRock Asset Management Ireland Limited, BlackRock Financial Management, Inc., BlackRock Japan Co., Ltd., BlackRock Asset Management Schweiz AG, BlackRock Investment Management, LLC, BlackRock Investment Management (UK) Limited, BlackRock Asset Management Canada Limited, BlackRock Investment Management (Australia) Limited, BlackRock Fund Managers Ltd. BlackRock Fund Advisors beneficially owns 5% or greater of the outstanding shares reported on the Schedule 13G.

(11) Beneficial ownership information based solely on a Schedule 13G/A filed with the SEC on February 10, 2022 by The Vanguard Group. The Vanguard Group reported shared voting power with respect to 57,316 shares, sole dispositive power with respect to 6,469,247 shares and shared dispositive power with respect to 98,581 shares.

(12) Beneficial ownership information based solely on a Schedule 13G/A filed with the SEC on February 8, 2022 by Dimensional Fund Advisors LP. Dimensional Fund Advisors LP reported sole voting power with respect to 3,820,729 shares and sole dispositive power with respect to 3,896,345 shares. Dimensional Fund Advisors LP, an investment adviser registered under Section 203 of the Investment Advisors Act of 1940, furnishes investment advice to four investment companies registered under the Investment Company Act of 1940, and serves as investment manager or sub-adviser to certain other commingled funds, group trusts and separate accounts (such investment companies, trusts and accounts, collectively referred to as the "Funds"). In certain cases, subsidiaries of Dimensional Fund Advisors LP may act as an adviser or sub-adviser to certain Funds. In its role as investment advisor, sub-adviser and/or manager, Dimensional Fund Advisors LP or its subsidiaries (collectively, "Dimensional") may possess voting and/or investment power over the securities of the Issuer that are owned by the Funds, and may be deemed to be the beneficial owner of the shares of the Issuer held by the Funds. However, all securities reported in this schedule are owned by the Funds. Dimensional disclaims beneficial ownership of such securities.

(13) Beneficial ownership information based solely on a Schedule 13G/A jointly filed with the SEC on February 10, 2022 by Kiltearn Partners LLP, Kiltearn Limited and Murdoch Murchison. Kiltearn Partners LLP, Kiltearn Limited and Murdoch Murchison each reported shared voting power and shared dispositive power with respect to 3,047,034 shares.

## Stockholder Proposals and Director Nominations for the Next Annual Meeting of Stockholders

### Stockholder Proposal

Any proposal that a stockholder wishes to be considered for inclusion in our proxy statement for the next annual meeting of Stockholders must be submitted to our Corporate Secretary at 313 Iron Horse Way, Providence, Rhode Island 02908, no later than the close of business on July 25, 2023. We strongly encourage stockholders interested in submitting a proposal to contact legal counsel with regard to the detailed requirements of applicable securities laws. Submitting a stockholder proposal does not guarantee that we will include it in our proxy statement.

### Proxy Access Nominee

We have also adopted a proxy access right that permits a stockholder, or a group of up to 20 stockholders, owning continuously for at least three years shares of our stock representing an aggregate of at least 3% of the voting power entitled to vote in the election of directors, to nominate and include in our proxy materials director nominees, provided that the stockholder(s) and the nominee(s) satisfy the requirements in our Fourth Amended and Restated Bylaws (the Bylaws). For the next annual meeting of stockholders, notice of proxy access director nominations must be submitted to the Corporate Secretary at the address specified above no earlier than June 25, 2023 and no later than July 25, 2023.

### Advanced Notice Provisions for Proposal or Nominee

Our Bylaws also establish an advance notice procedure with regard to stockholder proposals and director nominations. If a stockholder wishes to present a proposal before the next annual meeting of stockholders or to nominate a director for election, but does not wish (or is not entitled) to have the proposal or director nomination considered for inclusion in our proxy statement, such stockholder must give written notice to our Corporate Secretary at the address noted above, which notice must be received by our Corporate Secretary no earlier than August 13, 2023 and no later than September 12, 2023. The stockholder's submission must include certain specified information concerning the proposal or director nominee and the stockholder, including such stockholder's ownership of our common stock, as described in more detail in our Bylaws. As we will not entertain any proposals at the annual meeting that do not meet these requirements, we strongly encourage stockholders to seek advice from legal counsel before submitting a proposal.

Table of Contents

See "*Proposal 1-Election of Directors-Stockholder Director Recommendations and Proxy Access*" for further information on the requirements in our Bylaws related to proxy access and our advance notice procedures.

**Universal Proxy Rules**

In addition to satisfying the foregoing requirements under our Bylaws, to comply with the universal proxy rules, stockholders who intend to solicit proxies in support of director nominees other than the Company's nominees must provide notice that sets forth the information required by Rule 14a-19 under the Securities Exchange Act of 1934, as amended, which notice must be postmarked or transmitted electronically to UNFI at its principal executive offices no later than 60 calendar days prior to the anniversary date of the Annual Meeting (for the 2023 Annual Meeting (to be held in calendar year 2024), no later than November 11, 2023). However, if the date of the 2023 Annual Meeting is changed by more than 30 calendar days from such anniversary date, then notice must be provided by the later of 60 calendar days prior to the date of the 2023 Annual Meeting or the 10th calendar day following the day on which public announcement of the date of the 2023 Annual Meeting is first made by the Company.

74

Table of Contents

## Information About the Meeting

### Record Date and Share Ownership

Only stockholders of record on our books at the close of business on Monday, November 14, 2022 (the Record Date) will be entitled to vote at the Annual Meeting and any adjournments or postponements of the Annual Meeting. As of the close of business on November 14, 2022, we had 59,902,801 shares of common stock outstanding. Each share of common stock entitles the record holder to one vote on each matter to be voted upon at the Annual Meeting. Copies of the Notice of Annual Meeting of Stockholders, this proxy statement, the proxy card and our Annual Report to Stockholders for the fiscal year ended July 30, 2022, were first made available to stockholders of record as of the Record Date on or about November 14, 2022. The Board is making these materials available to you on the Internet or, upon your request, is delivering printed versions of these materials to you without charge by mail. On or about November 22, 2022, we mailed to all stockholders of record as of the Record Date the Notice of Proxy Availability, which contains instructions on how to access these materials and vote. Stockholders of record who have previously elected to receive a full set of proxy materials in hard copy will receive such materials in lieu of the Notice of Proxy Availability.

We will, upon written request of any stockholder, furnish without charge a copy of our Annual Report on Form 10-K for the fiscal year ended July 30, 2022, as filed with the SEC, without exhibits. Please address all such requests to United Natural Foods, Inc., 11840 Valley View Road, Eden Prairie, MN 55344, Attn: Investor Relations or via email to InvestorRelations@unfi.com. Exhibits will be provided upon written request and payment of an appropriate processing fee.

### Submitting and Revoking Your Proxy

If you complete and submit a proxy, the persons named as proxies will vote the shares represented by your proxy in accordance with your instructions. If you submit a proxy but do not complete the voting instructions, the persons named as proxies will vote the shares represented by your proxy as follows:

**FOR** the election of Eric F. Artz, Ann Torre Bates, Gloria R. Boyland, Denise M. Clark, J. Alexander Miller Douglas, Daphne J. Dufresne, Michael S. Funk, Shamim Mohammad, James L. Muehlbauer, Peter A. Roy and Jack Stahl as directors to serve until the next annual meeting of stockholders (Proposal 1);

**FOR** the ratification of the selection of KPMG LLP as our independent registered public accounting firm for the fiscal year ending July 29, 2023 (Proposal 2);

**FOR** the approval, on an advisory basis, of our executive compensation (Proposal 3); and

**FOR** the approval of our amended and restated equity incentive plan (Proposal 4).

If other matters come before the Annual Meeting, the persons named as proxies will vote on such matters in accordance with their best judgment. We have not received notice of other matters that may properly be presented at the Annual Meeting.

You may revoke or revise your proxy at any time before it is exercised by (1) delivering to us a signed proxy card with a date later than your previously delivered proxy, (2) voting via the Internet while attending the virtual Annual Meeting, (3) granting a subsequent proxy through the Internet or telephone, or (4) sending a written revocation to our corporate secretary at 313 Iron Horse Way, Providence, Rhode Island 02908. Attendance at the Annual Meeting virtually through the Internet will not itself be deemed to revoke your proxy unless you vote via the Internet while attending the Annual Meeting. Your latest dated proxy card or telephone or Internet proxy at the time of the meeting is the one that is counted.

### How to Vote

For Proposal 1, you may vote "FOR" or "AGAINST" each of the nominees to the Board. You may also abstain from voting "FOR" or "AGAINST" any nominee. For Proposals 2, 3 and 4 you may vote "FOR" or "AGAINST" or abstain from voting.

#### Stockholders of Record

If you are a stockholder of record, there are four ways to vote:

- by completing, signing, dating and returning your proxy card by mail, if you request a paper copy of the proxy materials;
- by making a toll-free telephone call within the United States or Canada using a touch-tone telephone to the toll-free number provided on your Notice of Proxy Availability;
- by voting on the Internet before the meeting; or

Table of Contents

- by voting on the Internet during the meeting.

To vote on the Internet before the meeting, go to the website address indicated on your Notice of Proxy Availability to complete an electronic proxy card prior to the Annual Meeting. You will be asked to provide the 16-digit control number from the Notice of Proxy Availability. You may also vote on the Internet while attending the meeting virtually through the Internet.

If you plan to vote by telephone or Internet in advance of the meeting, your vote must be received by 11:59 p.m., Eastern Standard Time, on January 9, 2023 to be counted. Internet voting during the Annual Meeting is also permissible through the virtual web meeting hosted at *www.virtualshareholdermeeting.com/unfi2023*. If you wish to vote at the Annual Meeting while attending virtually, you must have your 16-digit control number from your Notice of Proxy Availability.

**Street Name Holders**

If you hold your shares of common stock in a stock brokerage account or through a bank or other nominee, you are considered to be the beneficial owner of shares held in "street name." If you hold your shares in street name, these proxy materials will be forwarded to you by your broker, bank or other nominee and you should follow the voting instructions provided by your broker, bank or other nominee. However, the organization that holds your shares is considered the stockholder of record for purposes of voting at the Annual Meeting. You may not vote directly any shares you beneficially own that are held in street name; however, as the beneficial owner of the shares, you have the right to direct your broker, bank or other nominee on how to vote your shares. You may complete and return a voting instruction card to your broker, bank or other nominee. Please check your Notice of Proxy Availability or contact your bank, broker or other nominee for more information. If you hold your shares in street name and wish to vote while attending the virtual Annual Meeting, you must have your 16-digit control number from your Notice of Proxy Availability.

**We provide Internet proxy voting to allow you to vote your shares online both before and during the meeting, with procedures designed to confirm the authenticity and correctness of your proxy vote instructions. However, please be aware that you must bear any costs associated with your Internet access, such as usage charges from Internet access providers and telephone companies.**

**Broker Non-Votes and Proxy Solicitation**

If you do not provide your broker instructions on how to vote your shares on non-discretionary items, a "broker non-vote" will occur. Proposals 1, 3 and 4 are non-discretionary items for which your broker will not be able to vote your shares without your instructions. Proposal 2 (ratification of the selection of KPMG LLP) is a discretionary item, and your broker may vote your shares in its discretion even without voting instructions from you. In the case of a broker non-vote, your shares would be included in the number of shares considered present at the meeting for the purpose of determining whether there is a quorum but will not otherwise have any effect on the outcome of the vote on Proposals 1, 3 and 4.

In addition to solicitations by mail and the Internet, our directors, officers and employees may, without additional remuneration, solicit proxies by telephone, facsimile and personal interviews. In addition, we have retained Saratoga Proxy Consulting, LLC, to assist in the solicitation of proxies for a fee of $15,000 plus associated costs and expenses. We will request brokerage houses, banks, and nominees to forward copies of the proxy materials to those persons for whom they hold shares and request instructions for voting the proxies. We will reimburse such brokerage houses, banks and other nominees for their reasonable expenses in connection with this distribution.

**Quorum**

Presence by attendance through the virtual Annual Meeting, or by proxy, of a majority of the shares of common stock outstanding at the close of business on the Record Date and entitled to vote at the Annual Meeting will be required for a quorum at the meeting. Shares of common stock present by attendance through the virtual Annual Meeting or represented by proxy (including shares that abstain or do not vote with respect to one or more of the matters presented for stockholder approval) will be counted for purposes of determining whether a quorum exists at the Annual Meeting.

**Votes Required**

Proposal 1 (election of a total of eleven nominees as directors) is an uncontested director election. In uncontested elections, our Bylaws require that each nominee be elected by a majority of votes cast with respect to such nominee. Therefore, a director will be elected if the number of shares voted "FOR" the director exceeds the number of shares voted "AGAINST" the director. Since each nominee is already a director, our Bylaws require any nominee who does not receive the affirmative vote of at least a majority of the votes cast to offer to tender his or her resignation to the Board. The Nominating and Governance Committee of the Board will make a recommendation to the Board on whether to accept or reject the director's resignation, or whether other action should be taken. The Board will act on such recommendation within 90 days from the date of the certification of the election results. Abstentions and broker non-votes will have no effect on this item because they are not considered votes cast.

76

Table of Contents

For each of Proposal 2 (ratification of the selection of KPMG LLP), Proposal 3 (advisory approval of our executive compensation) and Proposal 4 (approval of the Second Amended and Restated 2020 Equity Incentive Plan), the affirmative vote of a majority of votes cast on the proposal is necessary for approval. Abstentions (in the case of Proposals 2, 3 and 4) and broker non-votes (in the case of Proposal 3 and 4) will have no effect on the results because they are not considered votes cast.

### Attending the Annual Meeting

We will be hosting a fully virtual Annual Meeting, as we have done for several years, live via the Internet. There will be no in-person meeting. We believe that hosting the Annual Meeting via the Internet encourages greater attendance and participation, including from investors who could not otherwise travel to attend our meeting, by providing virtual access and the ability to submit questions to be answered by Management or directors online during and prior to the Annual Meeting. In addition, this format eliminates certain costs associated with holding an in-person meeting.

A summary of the information you need to attend the Annual Meeting online is provided below:

- Any stockholder as of the Record Date can attend the Annual Meeting virtually through the Internet at *www.virtualshareholdermeeting.com/unfi2023.*

- Meeting starts at 4:00 p.m. Eastern Standard Time, with log-in at 3:45 p.m. on Tuesday, January 10, 2023.

- If attending the Annual Meeting virtually through the Internet, please have your 16-digit control number provided on your Notice of Proxy Availability to enter the Annual Meeting.

- If you hold your shares in street name and wish to vote while attending the virtual Annual Meeting, you must have your 16-digit control number from your Notice of Proxy Availability.

- Instructions on how to attend and participate via the Internet, including how to demonstrate proof of stock ownership, are posted at *www.virtualshareholdermeeting.com/unfi2023.*

- Stockholders may vote and, subject to any rules of conduct posted on the Annual Meeting website, submit questions while attending the Annual Meeting through the Internet. If your question is properly submitted during the relevant portion of the meeting agenda, we will do our best to respond to your question during the live webcast as time permits. We may consolidate answers to similar questions and will prioritize questions from stockholders who identify themselves by name. We will post responses to questions that we do not have sufficient time to answer during the meeting on our website.

- If we experience technical difficulties during the meeting (e.g., a temporary or prolonged power outage), we will determine whether the meeting can be promptly reconvened (if the technical difficulty is temporary) or whether the meeting will need to be reconvened on a later day (if the technical difficulty is more prolonged). In either of these situations, we will promptly notify stockholders of the decision via *www.virtualshareholdermeeting.com/unfi2023.* If you encounter technical difficulties accessing our meeting or asking questions during the meeting, a support line will be available on the login page of the virtual meeting website.

- Webcast replay of the Annual Meeting will be available at *www.virtualshareholdermeeting.com/unfi2023* until January 10, 2024.

Before the meeting, you may post any questions to be answered at the meeting at www.proxyvote.com. You may also ask questions during the meeting, as described above.

### Householding

We have adopted a procedure for stockholders whose shares are held in street name called "householding," pursuant to which stockholders of record who have the same address and the same last name will receive only one Notice of Proxy Availability each and, as applicable, one set of any additional proxy materials that are delivered, unless one or more of these stockholders notifies us that they wish to continue receiving multiple copies. This procedure provides extra convenience for stockholders and a cost savings for us. Currently, we are not providing householding to stockholders of record.

If at any time you no longer wish to participate in householding and would prefer to receive a separate Notice of Proxy Availability and, as applicable, any additional proxy materials that are delivered, or if your shares are held in street name and you are receiving multiple copies of our Notice of Proxy Availability and, as applicable, any additional proxy materials that are delivered and wish to receive only one, please notify your bank, broker or other nominee. We will promptly deliver, upon oral or written request, a separate copy of the proxy statement to any stockholder residing at an address to which only one copy was mailed. Requests for additional copies for the current year or future years should be directed to our Investor Relations Department at (952) 828-4144 or United Natural Foods, Inc., 11840 Valley View Road, Eden Prairie, MN 55344, Attn: Investor Relations.

Table of Contents

Stockholders who participate in householding will continue to receive separate control numbers for use in voting their shares, and, if requested, separate proxy cards.

**The Board hopes that stockholders will attend the Annual Meeting on the Internet through a virtual web conference. Regardless of whether you plan to attend the Annual Meeting, you are urged to vote via the Internet, by telephone, or by completing, signing, dating and returning the enclosed proxy card as soon as possible so that your shares are represented at the Annual Meeting. Stockholders of record, or beneficial stockholders named as proxies by their stockholders of record, who attend the Annual Meeting may revoke their proxies and cast their votes electronically over the Internet through the virtual Annual Meeting.**

By Order of the Board of Directors,

Jack Stahl
*Independent Chair of the Board*

November 22, 2022

78

Table of Contents

**Annex A**

**SECOND AMENDED AND RESTATED UNITED NATURAL FOODS, INC.**
**2020 EQUITY INCENTIVE PLAN**

**(EFFECTIVE AS OF JANUARY 10, 2023)**

Table of Contents

**TABLE OF CONTENTS**

| | |
|---|---|
| TABLE OF CONTENTS | A-2 |
| Section 1. Purpose | A-3 |
| Section 2. Definitions | A-3 |
| Section 3. Administration | A-7 |
| Section 4. Shares Available for Awards | A-9 |
| Section 5. Eligibility | A-10 |
| Section 6. Stock Options and Stock Appreciation Rights | A-11 |
| Section 7. Restricted Shares and Restricted Share Units | A-13 |
| Section 8. Performance Awards | A-15 |
| Section 9. Other Stock-Based Awards | A-16 |
| Section 10. Non-Employee Director and Outside Director Awards | A-16 |
| Section 11. Separation from Service | A-17 |
| Section 12. Change in Control | A-20 |
| Section 13. Amendment and Termination | A-22 |
| Section 14. General Provisions | A-22 |
| Section 15. Term of The Plan | A-25 |

Table of Contents

**SECOND AMENDED AND RESTATED UNITED NATURAL FOODS, INC.
2020 EQUITY INCENTIVE PLAN**

**(EFFECTIVE AS OF JANUARY 10, 2023)**

**Section 1. History and Purpose.**

The United Natural Foods, Inc. 2020 Equity Incentive Plan (the "**Plan**") was established by United Natural Foods, Inc. (the "**Company**") to promote the interests of Company and its stockholders by fulfilling one or more of the following objectives: (i) attracting and retaining key officers, employees and directors of, and consultants to, the Company and its Subsidiaries; (ii) motivating such individuals by means of performance-related incentives to achieve long-term performance goals; (iii) enabling such individuals to participate in the long-term growth and financial success of the Company; (iv) encouraging ownership of stock in the Company by such individuals; and (v) aligning their compensation with the long-term interests of the Company and its stockholders. The Plan has been amended from time to time and the following provisions constitute an amendment and restatement of the Plan as in effect immediately prior to the Effective Date.

**Section 2. Definitions.**

As used in the Plan, the following terms shall have the meanings set forth below:

2.1 "**Acquiror**" has the meaning provided in Section 12.1.

2.2 "**Affiliate**" means (i) any entity that, directly or indirectly, is controlled by the Company, (ii) any entity in which the Company has a significant equity interest, (iii) an affiliate of the Company, as defined in Rule 12b-2 promulgated under Section 12 of the Exchange Act; and (iv) any entity in which the Company has at least twenty percent (20%) of the combined voting power of the entity's outstanding voting securities, in each case as designated by the Board as being a participating employer in the Plan.

2.3 "**Award**" means any Option, Stock Appreciation Right, Restricted Share Award, Restricted Share Unit, Performance Award, or Other Stock-Based Award granted under the Plan, whether singly, in combination or in tandem, to a Participant by the Committee (or the Board) pursuant to such terms, conditions, restrictions and/or limitations, if any, as the Committee (or the Board) may establish, or any similar award under the Prior Plan.

2.4 "**Award Agreement**" means any written agreement, contract or other instrument or document evidencing any Award, which may, but need not, be executed or acknowledged by a Participant.

2.5 "**Board**" means the Board of Directors of the Company.

2.6 "**Cause**" means, unless otherwise defined in the applicable Award Agreement, (i) conviction of the Participant under applicable law of (A) any felony or (B) any misdemeanor involving moral turpitude; (ii) unauthorized acts intended to result in the Participant's personal enrichment at the material expense of the Company or any Subsidiary or Affiliate or their reputation; (iii) any violation of the Participant's duties or responsibilities to the Company or a Subsidiary or Affiliate which constitutes willful misconduct or dereliction of duty; or (iv) material breach of the covenants described in Section 14.8 of this Plan.

Table of Contents

2.7 "**Change in Control**" means, unless otherwise provided in the applicable Award Agreement, the happening of one of the following:

(a) any "person", including a "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act, but excluding the Company, any of its Affiliates, or any employee benefit plan of the Company or any of its Affiliates) is or becomes the "beneficial owner" (as defined in Rule 13(d)(3) under the Exchange Act), directly or indirectly, of securities of the Company representing the greater of 30% or more of the combined voting power of the Company's then outstanding securities;

(b) the stockholders of the Company shall approve a definitive agreement and a transaction is consummated (1) for the merger or other business combination of the Company with or into another corporation if (A) a majority of the directors of the surviving corporation were not directors of the Company immediately prior to the effective date of such merger or (B) the stockholders of the Company immediately prior to the effective date of such merger own less than 60% of the combined voting power in the then outstanding securities in such surviving corporation or (2) for the sale or other disposition of all or substantially all of the assets of the Company;

(c) the purchase of 30% or more of the combined voting power of the Company's then outstanding securities pursuant to any tender or exchange offer made by any "person", including a "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act), other than the Company, any of its Affiliates, or any employee benefit plan of the Company or any of its Affiliates; or

(d) the disposal of any line of business representing at least 15% of the Company's consolidated net sales for the then-most recently completed fiscal year; provided, however, that such disposal shall only be deemed a "Change in Control" for Participants primarily employed in the line of business disposed of.

Notwithstanding the foregoing, in the case of any Award that is subject to Section 409A of the Code, a Change in Control must also constitute a change in control event within the meaning of Section 409A.

2.8 "**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

2.9 "**Committee**" means a committee of the Board composed of not less than two Non-Employee Directors, each of whom shall be (i) a "non-employee director" for purposes of Exchange Act Section 16 and Rule 16b-3 thereunder and (ii) "independent" within the meaning of the listing standards of the New York Stock Exchange and the rules and regulations of the SEC.

2.10 "**Company**" means United Natural Foods, Inc., a Delaware corporation, and its successors and assigns.

2.11 "**Consultant**" means any consultant to the Company or its Subsidiaries.

2.12 "**Director**" means a member of the Board.

2.12A "**Director Limit**" has the meaning provided in Section 10.3 of the Plan.

2.13 "**Disability**" means, unless otherwise defined in the applicable Award Agreement, a disability that would qualify as a total and permanent disability under the Company's then current long-term disability plan. With respect to Awards subject to Section 409A of the Code, unless otherwise defined in the applicable Award Agreement, the term "Disability" shall have the meaning set forth in Section 409A of the Code.

2.14 "**Effective Date**" has the meaning provided in Section 15.1 of the Plan.

A-4

Table of Contents

2.15 "**Employee**" means a current or prospective officer or employee of the Company or of any Subsidiary.

2.16 "**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time.

2.17 "**Fair Market Value**" with respect to the Shares, means, for purposes of a grant of an Award as of any date, (i) the reported closing sales price of the Shares on the New York Stock Exchange, or any other such market or exchange as is the principal trading market for the Shares, on such date, or in the absence of reported sales on such date, the closing sales price on the immediately preceding date on which sales were reported or (ii) in the event there is no public market for the Shares on such date, the fair market value as determined, in good faith and by the reasonable application of a reasonable valuation method (as applicable), by the Committee in its sole discretion, and for purposes of a sale of a Share as of any date, the actual sales price on that date.

2.18 RESERVED.

2.19 "**Good Reason**" means, unless otherwise provided in an Award Agreement, the occurrence of any one or more of the following without the Participant's express written consent: (i) the assignment of duties to a Participant that are materially adversely inconsistent with the Participant's duties immediately prior to a Change in Control, and failure to rescind such assignment within thirty (30) days of receipt of notice from the Participant; (ii) a material reduction in a Participant's title, authority or reporting status following a Change in Control as compared to such title, authority or reporting status immediately prior to a Change in Control, (iii) the Company's requirement that a Participant relocate more than fifty (50 miles from the Participant's place of employment prior to the Participant performed such duties prior to the Change in Control; (iv) a material reduction in the Participant's base salary as in effect immediately prior to a Change in Control or the failure of the Company to pay or cause to be paid any compensation or benefits when due, and failure to restore such annual base salary or make such payments within five (5) days of receipt of notice from the Participant; (v) failure to include the Participant in any new employee benefit plans established by the Company for similarly-situated executives or a material reduction in the Employee's level of participation in any benefit plans of the Company in which the Employee participated immediately prior to the Change in Control provided that a reduction or elimination of such plans with respect to all similarly-situated executives or a Company-wide reduction or elimination of such plans shall not constitute "Good Reason" for purposes of this Plan; or (vi) the failure of the Company to obtain a satisfactory agreement from the Acquiror to assume and perform the Award Agreement; provided that, in each case, (A) within sixty (60) days of the initial occurrence of the specified event the Participant has given the Company or any successor to the Company at least thirty (30) days to cure the Good Reason, (B) the Company or any such successor has not cured the Good Reason within the thirty (30) day period and (C) the Participant resigns within ninety (90) days from the initial occurrence of the event giving rise to the Good Reason.

2.20 "**Grant Price**" means the price established at the time of grant of an SAR pursuant to Section 6 hereof used to determine whether there is any payment due upon exercise of the SAR.

2.21 "**Incentive Stock Option**" means an option to purchase Shares from the Company that is granted under Section 6 of the Plan and that is intended to meet the requirements of Section 422 of the Code or any successor provision thereto, or a similar Award under the Prior Plan.

2.22 "**Non-Employee Director**" means a member of the Board who is not an officer or employee of the Company or any Subsidiary.

2.23 "**Non-Qualified Stock Option**" means an option to purchase Shares from the Company that is granted under Sections 6 or 10 of the Plan and is not intended to be an Incentive Stock Option, or a similar Award under the Prior Plan.

A-5

Table of Contents

2.24 "**Option**" means an Incentive Stock Option or a Non-Qualified Stock Option.

2.25 "**Option Price**" means the purchase price payable to purchase one Share upon the exercise of an Option.

2.26 "**Other Stock-Based Award**" means any Award granted under Sections 9 or 10 of the Plan or the Prior Plan. An Other Stock-Based Award that is not settled in cash shall be treated as a Restricted Share Award.

2.27 "**Outside Director**" means, with respect to the grant of an Award, a member of the Board then serving on the Committee.

2.28 "**Participant**" means any Employee, Director, Consultant who receives an Award under the Plan.

2.29 "**Performance Award**" means any Award granted under Section 8 of the Plan or a similar Award under the Prior Plan. A Performance Award that is not settled in cash shall be treated as a Restricted Share Award.

2.30 "**Person**" means any individual, corporation, partnership, limited liability company, association, joint-stock company, trust, unincorporated organization, government or political subdivision thereof or other entity.

2.30A "**Prior Effective Date**" means December 18, 2019.

2.31 "**Prior Plan**" means the United Natural Foods, Inc. Second Amended and Restated 2012 Equity Incentive Plan.

2.32 "**Relocation**" has the meaning provided in Section 11.3 hereof.

2.33 "**Restricted Share**" means any Share granted under Sections 7 to 10 of the Plan, or solely for the purposes of Section 4.1, a similar Award under the Prior Plan.

2.34 "**Restricted Share Unit**" means any unit granted under Sections 7 to 10 of the Plan, or solely for the purposes of Section 4.1, a similar Award under the Prior Plan.

2.35 "**Retirement**" means the termination of the Participant's employment with the Company and all of its Subsidiaries and Affiliates on or after the date on which both of the following have occurred: (i) the Participant has attained 59 years of age and (ii) the Participant has provided ten (10) years of service to 's employment with the Company or any of its Subsidiaries or Affiliates. Years of service will be calculated as full years since the Participant's most recent "hire date" or "rehire date," which shall mean the applicable date on file for the Participant in the Company's human resources books and records, determined in the Company's sole discretion.
2.36 "**SEC**" means the Securities and Exchange Commission or any successor thereto.

2.37 "**Section 16**" means Section 16 of the Exchange Act and the rules promulgated thereunder and any successor provision thereto as in effect from time to time.

2.38 RESERVED.

2.39 "**Separation from Service**" or "**Separates from Service**" shall have the meaning ascribed to such term pursuant to Section 409A of the Code and the regulations promulgated thereunder. In the event an Award is not subject to Section 409A of the Code, the term "**Separation from Service**" or "**Separates from Service**" shall mean the termination of employment or service with the Company, the Subsidiaries and the Affiliates.

2.40 "**Separation from Service without Cause**" has the meaning provided in Section 11.3 hereof.

A-6

Table of Contents

2.41 "**Share Reserve**" has the meaning set forth in Section 4.1 hereof.

2.42 "**Shares**" means shares of the common stock, par value $0.01 per share, of the Company, or any security into which such shares may be converted by reason of any event of the type referred to in Sections 4.2, 12.1, and 13.3.

2.43 "**Specified Employee**" has the meaning ascribed to such term pursuant to Section 409A of the Code and the regulations promulgated thereunder.

2.44 "**Stock Appreciation Right**" or "**SAR**" means a stock appreciation right granted under Sections 6, 8 or 10 of the Plan, or a similar Award under the Prior Plan, that entitles the holder to receive, with respect to each Share subject to the SAR the amount determined by the Committee and specified in an Award Agreement. If the Award Agreement fails to specify the amount to be received by the holder, the holder shall be entitled to receive, with respect to each Share encompassed by the exercise of such SAR, the excess of the fair market value of such Share on the date of exercise over the Grant Price.

2.45 "**Subsidiary**" means any Person (other than the Company) of which 50% or more of its voting power or its equity securities or equity interest is owned directly or indirectly by the Company.

2.46 "**Substitute Awards**" means Awards granted solely in assumption of, or in substitution for, outstanding awards previously granted by a company acquired by the Company or any Subsidiary or with which the Company or a Subsidiary combines.

2.47 "**Vesting Period**" means the period of time specified by the Committee during which vesting restrictions for an Award are applicable.

**Section 3. Administration.**

3.1 *Authority of Committee.* The Plan shall be administered by a Committee, which shall be appointed by and serve at the pleasure of the Board; provided, however, with respect to Awards to Outside Directors, all references in the Plan to the Committee shall be deemed to be references to the Board. Subject to the terms of the Plan and applicable law, and in addition to other express powers and authorizations conferred on the Committee by the Plan, the Committee shall have full power and authority in its discretion (and in accordance with Section 409A of the Code with respect to Awards subject thereto) to:

(a) designate Participants;

(b) determine eligibility for participation in the Plan and decide all questions concerning eligibility for and the amount of Awards under the Plan;

(c) determine the type or types of Awards to be granted to a Participant;

(d) determine the number of Shares to be covered by, or with respect to which payments, rights or other matters are to be calculated in connection with Awards;

(e) determine the timing, terms, and conditions, including performance objectives, as applicable, and any adjustments thereto, of any Award;

(f) accelerate the time at which all or any part of an Award may be vested, settled or exercised;

Table of Contents

(g) determine whether, to what extent, and under what circumstances Awards may be settled or exercised in cash, Shares, other securities, other Awards or other property, or canceled, forfeited or suspended and the method or methods by which Awards may be settled, exercised, canceled, forfeited or suspended;

(h) determine whether, to what extent, and under what circumstances cash, Shares, other securities, other Awards, other property, and other amounts payable with respect to an Award shall be deferred either automatically or at the election of the holder thereof or of the Committee;

(i) grant Awards as an alternative to, or as the form of payment for grants or rights earned or payable under, other bonus or compensation plans, arrangements or policies of the Company or a Subsidiary or Affiliate;

(j) grant Substitute Awards on such terms and conditions as the Committee may prescribe, subject to compliance with the Incentive Stock Option rules under Section 422 of the Code and the nonqualified deferred compensation rules under Section 409A of the Code, where applicable;

(k) make all determinations under the Plan concerning any Participant's Separation from Service, including whether such separation occurs by reason of Cause, Good Reason, Disability, or Retirement, and whether a leave of absence constitutes a Separation from Service;

(l) make all determinations under the Plan, including by setting a policy, concerning the treatment of a leave of absence that the Committee determines not to constitute a Separation from Service;

(m) conclusively interpret and administer the Plan, any Award Agreement and any instrument or agreement relating to the Plan or an Award made under the Plan;

(n) except to the extent otherwise prohibited by the Plan, including Section 6.2 of the Plan, amend or modify the terms of any Award at or after grant with the consent of the holder of the Award, or in the case of an amendment or modification that is to the Participant's benefit, without the consent of the holder of the Award;

(o) establish, amend, suspend or waive such policies, processes, rules and regulations and, if desired, appoint such agents as it shall deem appropriate for the proper administration of the Plan;

(p) adopt special guidelines and provisions for Persons who are residing in, employed in or subject to the taxes of any domestic or foreign jurisdiction to comply with applicable tax and securities laws of such domestic or foreign jurisdiction;

(q) correct any defect, supply any omission, or reconcile any inconsistency in the Plan or in any agreement related thereto; and

(r) make any other determination and take any other action that the Committee deems necessary or desirable for the administration of the Plan, subject to the exclusive authority of the Board under Section 13 hereunder to amend or terminate the Plan.

3.2 *Committee Discretion Binding*. Unless otherwise expressly provided in the Plan, all designations, determinations, interpretations, and other decisions under or with respect to the Plan or any Award shall be within the sole discretion of the Committee, may be made at any time and shall be final, conclusive, and binding upon all Persons, including the Company, any Subsidiary or Affiliate, any Participant and any holder or beneficiary of any Award. The Committee shall have no obligation to treat Participants or eligible Participants uniformly, and the Committee may make determinations

Table of Contents

under the Plan selectively among Participants who receive, or Employees or Directors who are eligible to receive, Awards (whether or not such Participants or eligible Employees or Directors are similarly situated). A Participant or other holder of an Award may contest a decision or action by the Committee with respect to such person or Award only on the grounds that such decision or action was arbitrary or capricious or was unlawful, and any review of such decision or action shall be limited to whether the Committee's decision or action was arbitrary or capricious or was unlawful

3.3 *Delegation*. Subject to the terms of the Plan and applicable law, the Committee may delegate to one or more officers of the Company or to a Committee of such officers, the authority, subject to such terms and limitations as the Committee shall determine, to grant Awards to or to cancel, modify or waive rights with respect to, or to alter, discontinue, suspend or terminate Awards held by Participants who are not officers or directors of the Company for purposes of Exchange Act Section 16 or who are otherwise not subject to Section 16. Any resolution delegating authority to grant Awards shall specify the maximum number of Shares underlying Awards that may be granted pursuant to such delegated authority.

3.4 *No Liability*. No member of the Board or Committee shall be liable for any action taken or determination made in good faith with respect to the Plan or any Award granted hereunder.

**Section 4. Shares Available for Awards.**

4.1 *Shares Available; Assumption of Prior Plan Awards*. Subject to adjustment under Section 4.3 and the provisions of Section 4.2 below, the maximum aggregate number of Shares reserved and available for distribution under the Plan shall not exceed 11,030,163[1] Shares, (such aggregate amount, the "***Share Reserve***"). Awards made under the Prior Plan were assumed as of the Prior Effective Date. The number of Shares with respect to which Incentive Stock Options may be granted under this Plan shall be no more than 1,000,000. If any Award granted under this Plan or the Prior Plan (whether before or after the Effective Date of this Plan) shall expire, terminate, be settled in cash or otherwise be forfeited or canceled for any reason without the delivery of Shares, then the Shares covered by such Award, or to which such Award relates, or the number of Shares otherwise counted against the Share Reserve, to the extent of any such forfeiture, termination, settlement, expiration or cancellation, shall be added back to the Share Reserve. The Committee may make such other determinations regarding the counting of Shares issued pursuant to this Plan or the Prior Plan as it deems necessary or advisable, provided that such determinations shall be permitted by law. Notwithstanding the foregoing, if an Option or SAR is exercised, in whole or in part, by tender or withholding of Shares, or if the Company's tax withholding obligation for any Award (including Awards granted prior to the Effective Date) is satisfied by the tender or withholding Shares, the number of Shares deemed to have been issued for purposes of the limitation set forth in this Section 4.1 shall be the number of Shares that were subject to the Award or portion thereof, and not the net number of Shares actually issued, and any SARs to be settled in Shares shall be counted in full against the number of Shares available for issuance under the Plan, regardless of the number of Shares issued upon the settlement of the SAR.

4.2 *Per Participant Limitations*. The maximum number of Shares in respect of which Options and SARs may be granted to a Participant during any fiscal year under the Plan is 900,000. The maximum value of Restricted Share Awards, Restricted Share Unit Awards and Performance Awards denominated in Shares that may be granted to any Participant during any fiscal year under the Plan is $10,000,000, excluding, for this purpose, the value of any dividends or dividend equivalents payable in accordance with the Plan on any Award. The value of such Awards shall be based on the grant date fair value. For Performance Awards denominated in Shares, the value shall be the grant date fair value of the target number of Shares. For Performance Awards that are denominated in cash, the maximum value that may be granted to any Participant during any fiscal year under the Plan is $10,000,000. The individual Participant limitations set forth in this Section 4.2 shall be cumulative; that is, to the extent that Shares or cash for which Awards are permitted to be granted to a Participant during a fiscal year are not covered by an Award to such Participant in that fiscal year (such shortfall, the "***Shortfall Amount***"), the number of Shares (or amount of cash, as the case may be) available for Awards to

---

[1] 5,000,000 additional shares, plus the number of shares remaining available for grant under the existing Plan as of the 2023 annual meeting, including shares that are expected to be forfeited and returned to the existing Plan by such time.

A-9

Table of Contents

such Participant shall automatically increase in the subsequent fiscal years during the term of the Plan until the earlier of the time the Shortfall Amount has been granted to the Participant, or the end of the third fiscal year following the year to which such Shortfall Amount relates (determined on a "first-in-first-out" basis).

4.3 *Adjustments*. Without limiting the Committee's discretion as provided in Section 12 hereof, if there shall occur any change in the capital structure of the Company by reason of any extraordinary dividend or other distribution (whether in the form of cash, Shares, other securities or other property, and other than a normal cash dividend), recapitalization, stock split, reverse stock split, reorganization, merger, consolidation, split-up, spin-off, combination, repurchase or exchange of Shares or other securities of the Company, issuance of warrants or other rights to purchase Shares or other securities of the Company, or other corporate transaction or event having an effect similar to the foregoing, then the Committee shall, in an equitable and proportionate manner as determined by the Committee (and, as applicable, in such manner as is consistent with Sections 422 and 409A of the Code and the regulations thereunder), take action as provided in clauses (i), (ii) or (iii) of this Section 4.3, as follows:

(i) adjust any or all of (1) the aggregate number of Shares or other securities of the Company (or number and kind of other securities or property) with respect to which Awards (or any particular type of Awards) may be granted under the Plan, in the aggregate or on a per Participant basis,; (2) the number of Shares or other securities of the Company (or number and kind of other securities or property) subject to outstanding Awards under the Plan, provided that the number of Shares subject to any Award shall always be a whole number; (3) the grant or exercise price with respect to any Award under the Plan, and (4) the limits on the number of Shares or Awards that may be granted to Participants under the Plan in any period;

(ii) provide for an equivalent award in respect of securities of the Acquiror or surviving entity of any merger, consolidation or other transaction or event having a similar effect; or

(iii) make provision for a cash payment to the holder of an outstanding Award.

Any such adjustments to outstanding Awards shall be effected in a manner that precludes the material enlargement or dilution of rights and benefits under such Awards.

4.4 *Substitute Awards*. Any Shares issued by the Company as Substitute Awards in connection with the assumption or substitution of outstanding grants from any acquired corporation shall not reduce the Share Reserve to the extent that the rules and regulations of any stock exchange or other trading market on which the Shares are listed or traded provide an exemption from shareholder approval for assumption, substitution, conversion, adjustment, or replacement of outstanding awards in connection with mergers, acquisitions, or other corporate combinations.

4.5 *Sources of Shares Deliverable under Awards*. Any Shares delivered pursuant to an Award may consist, in whole or in part, of authorized and unissued Shares or of issued Shares which have been reacquired by the Company.

**Section 5. Eligibility.**

Any current or prospective Employee, Director or Consultant shall be eligible to be designated a Participant; provided, however, that Outside Directors shall only be eligible to receive Awards granted consistent with Section 10 and Awards to Non-Employee Directors shall be subject to Section 10.3. The granting, vesting and exercise of an Award to a prospective Employee, Director or Consultant shall be conditioned upon such individual attaining such status.

A-10

Table of Contents

**Section 6. Stock Options and Stock Appreciation Rights.**

6.1 *Grant*. Subject to the provisions of the Plan, the Committee shall have sole and complete authority to determine the Participants to whom Options and SARs shall be granted, the number of Shares subject to each Award, the Option Price or Grant Price and the conditions and limitations applicable to the exercise of each Option and SAR. An Option may be granted with or without a related SAR. An SAR may be granted with or without a related Option. The grant of an Option or SAR shall occur when the Committee by resolution, written consent or other appropriate action determines to grant such Option or SAR for a particular number of Shares to a particular Participant at a particular Option Price or Grant Price, as the case may be, or such later date as the Committee shall specify in such resolution, written consent or other appropriate action. The Committee shall have the authority to grant Incentive Stock Options and to grant Non-Qualified Stock Options; provided, however, that an Option will be deemed to be a Non-Qualified Stock Option unless it is specifically designated by the Committee as an Incentive Stock Option (and/or to the extent that it does not otherwise satisfy the requirements for an Incentive Stock Option). In the case of Incentive Stock Options, the terms and conditions of such grants shall be subject to and comply with Section 422 of the Code. An Employee who has been granted an Option under the Plan may be granted additional Options under the Plan if the Committee shall so determine; provided, however, that to the extent the aggregate fair market value (determined at the time the Incentive Stock Option is granted) of the Shares with respect to which all Incentive Stock Options are exercisable for the first time by an Employee during any calendar year (under all plans described in Section 422(d) of the Code of the Employee's employer corporation and its parent and Subsidiaries) exceeds $100,000, or if and to the extent the Options fail to qualify as Incentive Stock Options for any other reason, such Options shall constitute Non-Qualified Stock Options. No dividends or dividend equivalents shall be paid or accrue on any Option.

6.2 *Price*. The Committee in its sole discretion shall establish the Option Price at the time each Option is granted and the Grant Price at the time each SAR is granted. Except in the case of Substitute Awards, the Option Price of an Option may not be less than the Fair Market Value of a Share on the date such Option is granted, and the Grant Price of an SAR may not be less than the Fair Market Value of a Share on the date such SAR is granted. In the case of Substitute Awards or Awards granted in connection with an adjustment provided for in Section 4.3 hereof in the form of Options or SARs, such grants shall have an Option Price (or Grant Price) per Share that is intended to maintain the economic value of the Award that was replaced or adjusted as determined by the Committee determined in a manner that conforms to Section 409A of the Code and other applicable law. Notwithstanding the foregoing and except as permitted by the provisions of Section 4.3 hereof, neither the Board nor the Committee shall have the authority to (i) lower the Option Price of an Option after it is granted, (ii) lower the Grant Price of an SAR after it is granted, (iii) cancel an Option when the Option Price exceeds the Fair Market Value of the underlying Shares in exchange for the grant of a replacement Option or SAR with a lower Option Price or Grant Price (as applicable) or cash or another Award (other than in connection with a Change in Control or a Substitute Award), (iv) cancel an SAR when the Grant Price exceeds the Fair Market Value of the underlying Shares in exchange for the grant of a replacement SAR or Option with a lower Grant Price of Option Price (as applicable) or cash or another Award (other than in connection with a Change in Control or a Substitute Award), or (v) take any other action with respect to an Option or SAR that would be treated as a repricing under the rules and regulations of the principal securities exchange on which the Shares are traded, in each case without the approval of the Company's stockholders.

6.3 *Term*. Subject to the Committee's authority under Section 3.1 and the provisions of Section 6.6 hereof, each Option and SAR and all rights and obligations thereunder shall expire on the date determined by the Committee and specified in the Award Agreement. The Committee shall be under no duty to provide terms of like duration for Options or SARs granted under the Plan. Notwithstanding the foregoing, but subject to Section 6.4(a) hereof, no Option or SAR shall be exercisable after the expiration of ten (10) years from the date such Option or SAR was granted.

6.4 *Exercise*.

(a) Each Option and SAR shall be exercisable at such times and subject to such terms and conditions as the Committee may, in its sole discretion, specify in the applicable Award Agreement or thereafter. The Committee shall have full and complete authority to determine whether an Option or SAR will be exercisable in full at any time or from time to time during the term of the Option or SAR, or to provide for the exercise thereof in such installments, upon the occurrence of such events and at such times during the term of the Option or SAR as the Committee may determine. The Committee may provide, at or after the grant, that the period of time over which an Option, or SAR may be exercised shall be automatically extended if on the scheduled expiration of such Award, the Participant's exercise of such Award would violate applicable securities law; provided, however, that during the extended exercise period the Option or SAR may only be exercised to the extent such Award was exercisable in accordance with its terms immediately prior to such scheduled expiration date; provided further, however, that such extended exercise period shall end not later than thirty (30) days after the exercise of such Option or SAR first would no longer violate such laws.

A-11

Table of Contents

(b) The Committee may impose such conditions with respect to the exercise of Options or SARs, including without limitation, any relating to the application of federal, state or foreign securities laws or the Code, as it may deem necessary or advisable.

(c) An Option or SAR may be exercised in whole or in part at any time, with respect to whole Shares only, within the period permitted thereunder for the exercise thereof, and shall be exercised by written notice of intent to exercise the Option or SAR, delivered to the Company at its principal office, and payment in full to the Company at the direction of the Committee of the amount of the Option Price for the number of Shares with respect to which the Option is then being exercised. Notwithstanding the foregoing, an Award Agreement may provide, or be amended to provide, that if on the last day of the term of an Option or SAR the Fair Market Value of one Share exceeds the Option Price or Grant Price, as applicable, of such Award by an amount as may be determined by the Committee, the Participant has not exercised the Option or SAR and the Option or SAR has not otherwise expired, the Option or SAR shall be deemed to have been exercised by the Participant on such day with payment of the Option Price made by withholding Shares otherwise issuable in connection with the exercise of the Option. In such event, the Company shall deliver to the Participant the number of Shares for which the Option was deemed exercised, less the number of Shares required to be withheld for the payment of the total purchase price and required withholding taxes, and any fractional Share shall be settled in cash; and in the case of an SAR, the net number of Shares that the Participant would have received had the Participant actually exercised such SAR on such date.

(d) Payment of the Option Price shall be made in (i) cash or cash equivalents, (ii) at the discretion of the Committee, by transfer, either actually or by attestation, to the Company of unencumbered Shares previously acquired by the Participant, valued at the fair market value of such Shares on the date of exercise (or next succeeding trading date, if the date of exercise is not a trading date), together with any applicable withholding taxes (which taxes may be satisfied in accordance with Section 14.6 of the Plan), such transfer to be upon such terms and conditions as determined by the Committee, (iii) by a combination of (i) or (ii), or (iv) by any other method approved or accepted by the Committee in its sole discretion, including, if the Committee so determines, (x) a cashless (broker-assisted) exercise that complies with applicable laws or (y) withholding Shares (net-exercise) otherwise deliverable to the Participant pursuant to the Option having an aggregate fair market value at the time of exercise equal to the total Option Price together with any applicable withholding taxes (which taxes may be satisfied in accordance with Section 14.6). Until the Participant (or other Person exercising the Option) has been issued the Shares subject to such exercise, he or she shall possess no rights as a stockholder with respect to such Shares. The Company reserves, at any and all times in the Company's sole discretion, the right to establish, decline to approve or terminate any program or procedures for the exercise of Options by means of a method set forth in subsection (iv) above, including with respect to one or more Participants specified by the Company notwithstanding that such program or procedures may be available to other Participants.

(e) At the Committee's discretion, the amount payable as a result of the exercise of an SAR may be settled in cash, Shares or a combination of cash and Shares. A fractional Share shall not be deliverable upon the exercise of a SAR but a cash payment will be made in lieu thereof.

6.5 *Separation from Service*. Except as otherwise provided in the applicable Award Agreement, an Option or SAR may be exercised only to the extent that it is then exercisable, and if at all times during the period beginning with the effective date of Award and ending on the date of exercise of such Award the Participant is an Employee, Non-Employee Director or Consultant, and shall terminate immediately upon a Separation from Service by the Participant. Notwithstanding the foregoing provisions of this Section 6.5 to the contrary, the Committee may determine in its discretion that an Option or SAR may be exercised following any such Separation from Service, whether or not exercisable at the time of such separation; provided, however, that in no event may an Option or SAR be exercised after the expiration date of such Award specified in the applicable Award Agreement, except as provided in Section 6.4(a). If provided in the applicable Award Agreement or in accordance with any determination of the Committee at or after grant, an Award shall continue to vest and be exercisable after Retirement.

6.6 *Ten Percent Stock Rule.* Notwithstanding any other provisions in the Plan, if at the time an Incentive Stock Option is otherwise granted pursuant to the Plan, the employee owns directly or indirectly (within the meaning of Section 424(d) of the Code) Shares of the Company possessing more than ten percent (10%) of the total combined voting power of all classes of stock of the Company or its parent or Subsidiary corporations (within the meaning of Section 422(b)(6) of the Code), then any Incentive Stock Option to be granted to such Employee pursuant to the Plan shall satisfy the requirement of Section 422(c)(5) of the Code, and the Option Price shall be not less than one hundred ten percent (110%) of the Fair Market Value of the Shares, and such Incentive Stock Option by its terms shall not be exercisable after the expiration of five (5) years from the date such Option is granted.

A-12

Table of Contents

**Section 7. Restricted Shares and Restricted Share Units.**

7.1 *Grant.*

(a) Subject to the provisions of the Plan, the Committee shall have sole and complete authority to determine the Participants to whom Restricted Shares and Restricted Share Units shall be granted, the number of Restricted Shares and/or the number of Restricted Share Units to be granted to each Participant, the duration of the period during which, and the conditions under which, the Restricted Shares and Restricted Share Units may be forfeited to the Company, and the other terms and conditions of such Awards. The Restricted Share and Restricted Share Unit Awards shall be evidenced by Award Agreements in such form as the Committee shall from time to time approve, which agreements shall comply with and be subject to the terms and conditions provided hereunder and any additional terms and conditions established by the Committee that are consistent with the terms of the Plan.

(b) Each Restricted Share Award and Restricted Share Unit Award made under the Plan shall be for such number of Shares as shall be determined by the Committee and set forth in the Award Agreement containing the terms of such Restricted Share Award or Restricted Share Unit Award. Such agreement shall set forth a period of time during which the Participant receiving such Award must remain in the continuous employment (or other service-providing capacity) of the Company in order for the forfeiture and transfer restrictions to lapse. If the Committee so determines, the restrictions may lapse during such restricted period in installments with respect to specified portions of the Shares covered by the Restricted Share or Restricted Share Unit Award. As provided in this Plan, in an applicable Award Agreement or in accordance with any determination of the Committee at or after grant, an Award shall continue to vest and be exercisable after Retirement and may vest in part upon Separation from Service without Cause. The Award Agreement may also, in the discretion of the Committee, set forth performance or other conditions that will subject the Shares to forfeiture and transfer restrictions (whether in addition to or separately from any service-based requirement). The Committee may, at its discretion, waive all or any part of the restrictions applicable to any or all outstanding Restricted Share and Restricted Share Unit Awards.

7.2 *Delivery of Shares and Transfer Restrictions.*

(a) At the time a Restricted Share Award is granted, a certificate representing the number of Shares awarded thereunder shall be registered in the name of the Participant receiving such Award. Such certificate shall be held by the Company or any custodian appointed by the Company for the account of the Participant receiving such Award subject to the terms and conditions of the Plan, and shall bear such a legend setting forth the restrictions imposed thereon as the Committee, in its discretion, may determine. The foregoing to the contrary notwithstanding, the Committee may, in its discretion, provide that a Participant's ownership of Restricted Shares prior to the lapse of any transfer restrictions or any other applicable restrictions shall, in lieu of such certificates, be evidenced by a "book entry" (i.e., a computerized or manual entry) in the records of the Company or its designated agent in the name of the Participant who has received such Award, and confirmation and account statements sent to the Participant with respect to such book-entry Shares may bear the restrictive legend referenced in the preceding sentence. Such records of the Company or such agent shall, absent manifest error, be binding on all Participants who receive Restricted Share Awards evidenced in such manner. The holding of Restricted Shares by the Company or such an escrow holder, or the use of book entries to evidence the ownership of Restricted Shares, in accordance with this Section 7.2(a), shall not affect the rights of Participants as owners of the Restricted Shares awarded to them, nor affect the restrictions applicable to such shares under the Award Agreement or the Plan, including the transfer restrictions.

(b) Unless otherwise provided in the applicable Award Agreement, the Participant receiving an Award of Restricted Shares shall have all rights of a stockholder with respect to the Restricted Shares, including the right to receive dividends and the right to vote such Shares, subject to the following restrictions: (i) the Participant shall not be entitled to delivery of the stock certificate until the expiration of the restricted period and the fulfillment of any other restrictive conditions set forth in the Award Agreement with respect to such Shares; (ii) none of the Shares may be sold, assigned, transferred, pledged, hypothecated or otherwise encumbered or disposed of during such restricted period or until after the fulfillment of any such other restrictive conditions; (iii) dividends payable on Restricted Shares for which the forfeiture restrictions have not yet lapsed shall be held in escrow and shall not be payable to the Participant until the expiration of the restricted period and the fulfillment of any other restrictive conditions set forth in the Award Agreement with respect to such Restricted Shares and any dividends paid with respect to Restricted Shares for which the restricted period shall not expire or for which any other restrictive conditions shall not be fulfilled shall be forfeited by the Participant; and (iv) except as otherwise set forth in this Plan, the applicable Award Agreement, or as otherwise determined by the Committee at or after grant, all of the Shares shall be forfeited and all rights of the Participant to such Shares shall terminate, without further obligation on the part of the Company, unless the Participant remains in the continuous employment or service of the Company for the entire restricted period in relation to which such Shares were granted and unless any other restrictive conditions relating to the Restricted Share Award are met. Restricted Share Units (and any dividend equivalent rights with respect thereto) shall be subject to similar transfer (and payment) restrictions as

A-13

Table of Contents

Restricted Share Awards, except that no Shares are actually awarded to a Participant who is granted Restricted Share Units on the date of grant, and such Participant shall have no rights of a stockholder with respect to such Restricted Share Units until the restrictions set forth in the applicable Award Agreement have lapsed.

7.3 *Termination of Restrictions*. At the end of the restricted period and provided that any other restrictive conditions of the Restricted Share Award are met, or at such earlier time as otherwise determined by the Committee, all restrictions set forth in the Award Agreement relating to the Restricted Share Award or in the Plan shall lapse as to the Restricted Shares subject thereto, and a stock certificate for the appropriate number of Shares, free of the restrictions and restricted stock legend, shall be delivered to the Participant or the Participant's beneficiary or estate, as the case may be (or, in the case of book-entry Shares, such restrictions and restricted stock legend shall be removed from the confirmation and account statements delivered to the Participant or the Participant's beneficiary or estate, as the case may be, in book-entry form).

7.4 *Payment of Restricted Share Units*. Each Share subject to a Restricted Share Unit shall have a value equal to the fair market value of a Share. Restricted Share Units may be paid in cash, Shares, other securities or other property, as determined in the sole discretion of the Committee, upon the lapse of the restrictions applicable thereto, or otherwise in accordance with the applicable Award Agreement. If the applicable Award Agreement specifies that a Participant will be entitled to dividend equivalent rights, the amount of any such dividend equivalent right (i) shall equal the amount that would be payable to the Participant as a stockholder in respect of a number of Shares equal to the number of Shares then subject to the Restricted Share Units then credited to the Participant, (ii) shall not be payable to the Participant until the fulfillment of any restrictive conditions set forth in the Award Agreement with respect to such Restricted Share Units and any dividends equivalent rights with respect to Restricted Share Units for which the restrictive conditions shall not be fulfilled shall be forfeited by the Participant, and (iii) shall otherwise be payable in accordance with Section 409A of the Code with regard to Awards subject thereto. Restricted Share Units may not be sold, assigned, transferred, pledged, hypothecated or otherwise encumbered or disposed of. Except as otherwise determined by the Committee at or after grant, or as provided in this Plan or the applicable Award Agreement, all Restricted Share Units and all rights of the grantee to such Restricted Share Units (and any dividend equivalents with respect thereto) shall terminate, without further obligation on the part of the Company, unless the Participant remains in continuous employment or service of the Company for the entire restricted period in relation to which such Restricted Share Units were granted and unless any other restrictive conditions relating to the Restricted Share Unit Award are met.

Table of Contents

**Section 8. Performance Awards.**

8.1 *Grant*. The Committee shall have sole and complete authority to determine the Participants who shall receive a Performance Award, which shall consist of a right that is (i) denominated in cash or Shares (including but not limited to Restricted Shares and Restricted Share Units), (ii) valued, as determined by the Committee, in accordance with the achievement of such performance goals during such performance periods as the Committee shall establish, and (iii) payable at such time and in such form as the Committee shall determine.

8.2 *Terms and Conditions*. Subject to the terms of the Plan and any applicable Award Agreement, the Committee shall determine the performance goals to be achieved during any performance period, the length of any performance period, the amount of any Performance Award and the amount and kind of any payment or transfer to be made pursuant to any Performance Award, and may amend specific provisions of the Performance Award; provided, however, that such amendment may not adversely affect existing Performance Awards made within a performance period commencing prior to implementation of the amendment.

8.3 *Payment of Performance Awards*. Performance Awards may be paid in a lump sum or in installments following the close of the performance period or, in accordance with the procedures established by the Committee, on a deferred basis. Separation from Service prior to the end of any performance period, other than for reasons of death, Disability, or Retirement or Separation from Service without Cause, will result in the forfeiture of the Performance Award, and no payments will be made. As set forth in accordance with the terms of this Plan, the applicable Award Agreement, or in accordance with any determination of the Committee at or after grant, Performance Awards shall continue to vest after Retirement or Separation from Service without Cause, but Performance Awards granted in the year in which Retirement occurs and Performance Awards held by a Participant upon a Separation from Service without Cause shall be pro-rated to reflect the length of the Participant's service during the applicable performance period prior to such Retirement or Separation from Service without Cause. Notwithstanding the foregoing, the Committee may in its discretion, waive any performance goals and/or other terms and conditions relating to a Performance Award. A Participant's rights to any Performance Award may not be sold, assigned, transferred, pledged, hypothecated or otherwise encumbered or disposed of in any manner, except by will or the laws of descent and distribution, and/or except as the Committee may determine at or after grant.

8.4 *Establishment of Performance Criteria*. In the case of grants of Performance Awards, the Committee shall, in writing, (1) select the performance goal or goals applicable to the performance period, (2) establish the various targets and bonus amounts which may be earned for such performance period, and (3) specify the relationship between performance goals and targets and the amounts to be earned by each Participant for such performance period. The Committee shall make such determination within 90 days after the commencement of the performance period, unless the Committee determines that it is necessary or appropriate to extend the time for determining the performance criteria. Following the completion of each performance period, the Committee shall certify in writing (which may be set forth in the minutes of the Committee) whether the applicable performance targets have been achieved and the amounts, if any, payable for such performance period. In determining the amount earned by a Participant for a given performance period, the Committee shall have the right to adjust the amount of cash or number of Shares payable at a given level of performance to take into account additional factors that the Committee may deem relevant in its sole discretion to the assessment of individual or corporate performance for the performance period.

8.5 *Adjustment of Performance Criteria*. The Committee may appropriately adjust any evaluation of performance to exclude any of the following events that occurs during a performance period: (i) asset impairments or write-downs, (ii) litigation or claim judgments or settlements, (iii) the effect of changes in tax law, accounting principles or other such laws or provisions affecting reported results, (iv) accruals for reorganization and restructuring programs, (v) any items that are unusual in nature or infrequently occurring (within the meaning of applicable accounting standards or otherwise in the reasonable determination of the Committee) and/or described in management's discussion and analysis of financial condition and results of operations appearing in the Company's annual report to stockholders for the applicable year, (vi) the effect of adverse federal, governmental or regulatory action, or delays in federal, governmental or regulatory action; (vii) any other event either not directly related to the operations of the Company or not within the reasonable control of the Company's management; and (viii) any other event, condition or circumstance for which the Committee determines that an adjustment would be appropriate based on Committee guidelines, prior practice or other considerations.

A-15

Table of Contents

**Section 9. Other Stock-Based Awards.**

The Committee shall have the authority to determine the Participants who shall receive an Other Stock-Based Award, which shall consist of any right that is (i) not an Award described in Sections 6, 7 or 8 above and (ii) an Award of Shares or an Award denominated or payable in, valued in whole or in part by reference to, or otherwise based on or related to, Shares (including, without limitation, securities convertible into Shares), as deemed by the Committee to be consistent with the purposes of the Plan. Subject to the terms of the Plan and any applicable Award Agreement, the Committee shall determine the terms and conditions of any such Other Stock-Based Award.

**Section 10. Non-Employee Director and Outside Director Awards.**

10.1 *Non-Employee Director Awards*. The Board may provide that all or a portion of a Non-Employee Director's annual retainer, meeting fees and/or other awards or compensation as determined by the Board, be payable (either automatically or at the election of a Non-Employee Director) in the form of Non-Qualified Stock Options, Restricted Shares, Restricted Share Units and/or Other Stock-Based Awards, including, subject to Section 14.17, unrestricted Shares. The Board shall determine the terms and conditions of any such Awards, including the terms and conditions which shall apply upon a Non-Employee Director's Separation from Service as a member of the Board, and shall have full power and authority in its discretion to administer such Awards, subject to the terms of the Plan and applicable law.

10.2 *Outside Director Awards*. The Board may also grant Awards to Outside Directors pursuant to the terms of the Plan, including any Award described in Sections 6, 7 and 9 above. With respect to such Awards, all references in the Plan to the Committee shall be deemed to be references to the Board.

10.3 *Limits to Directors*. Notwithstanding anything in the Plan to the contrary, the aggregate grant date fair value (computed as of the date of grant in accordance with applicable financial accounting rules) of all Awards granted to any Non-Employee Director during any single calendar year, plus the total cash compensation paid to such director for services rendered for such calendar year, shall not exceed $800,000 (the "**Director Limit**"); and further provided that the Director Limit for any Non-Employee Director shall be determined without regard to amounts paid to the Non-Employee Director for any period in which such individual was an employee or consultant (other than grants of awards paid for service in their capacity as a Non-Employee Director), and any severance and other payments such as consulting fees paid to a Non-Employee Director for such individual's prior or current service to the Company or any Affiliate other than serving as a director shall not be taken into account in applying the Director Limit. For the avoidance of doubt, any compensation that is deferred shall be counted toward this limit for the year in which it was first earned, and not when paid or settled if later.

10.4 *Post-Service Vesting*. If a Non-Employee Director ceases to serve as a director for any reason, other than an involuntary removal during the pendency of a term as director, any Award made to such Non-Employee Director may continue to vest if so provided in the Award Agreement or in accordance with any determination of the Board at or after grant.

A-16

Table of Contents

**Section 11. Separation from Service.**

11.1 *Impact on Awards*. Except as provided in Section 11.2 of this Plan, the Committee shall have the full power and authority to determine the terms and conditions that shall apply to any Award upon a Separation from Service, including a Separation from Service with or without Cause, by a Participant voluntarily, including for Good Reason, or by reason of death, Disability, or Retirement, and may provide such terms and conditions in the Award Agreement or in such rules and regulations as it may prescribe. Unless otherwise provided in the Award Agreement, Awards shall fully vest on death or Disability.

11.2 *Forfeiture of Performance Awards on Separation from Service; No Acceleration of Vesting*. Unless otherwise provided in (i) this Plan or (ii) an Award Agreement or a written employment or similar agreement between the Company or a Subsidiary and a Participant, if a Participant's Separation from Service occurs before the restrictions imposed on the Award lapse, the performance goals have been satisfied or the Award otherwise vests, such Award shall be forfeited. Except as otherwise provided in this Plan, an Award Agreement or a written employment agreement or similar agreement between the Company or a Subsidiary and a Participant, if a Participant's employment with or service to the Company or a Subsidiary terminates prior to a Change in Control, for any reason other than death or Disability, the vesting of any unvested Award shall not be triggered by such Separation from Service. Notwithstanding the foregoing, a Separation from Service without Cause or for Good Reason that takes place within four (4) months prior to a Change in Control and that is made at the behest of an Acquiror or in contemplation of such Change in Control shall be treated as if such Separation From Service took place after such Change in Control, if such Change in Control actually occurs.

11.3 *Separation from Service without Cause*.

(a) The provisions of this Section 11.3 shall apply with respect to Participants who are Employees but are not party to an employment agreement or separate written agreement with the Company governing equity treatment upon Separation from Service.

(b) With respect to Restricted Share Units, provided that a Participant signs and does not revoke a release of claims, as more fully described in Section 11.3(g), upon the date such release becomes irrevocable (the "Release Finalization Date"),:

(i) any Restricted Share Units that were scheduled to vest within 365 days from the date of Separation from Service without Cause and were granted more than 365 days preceding the date of Separation from Service without Cause, shall vest effective as of the Release Finalization Date;

(ii) the RSU Separation Pro-Rated Number (as defined below) of Restricted Share Units that were scheduled to vest within 365 days from the date of Separation from Service without Cause, and were granted less than 365 days prior to the date of Separation from Service without Cause, shall vest effective as of the Release Finalization Date; and

(iii) any remaining time-vesting Restricted Share Units not vesting as provided herein shall be forfeited effective as of the date of Separation from Service without Cause.

The "***RSU Separation Pro-Rated Number***" for time-vesting Restricted Share Units shall be the product of (A) the total number of time-vesting Restricted Share Units granted under the Award Agreement less than 365 days prior to the date of Separation from Service without Cause and (B) the quotient of (1) the number of days from the grant date of such award to the date of Separation from Service without Cause and (2) 365.

(c) With respect to performance-based Restricted Share Units, provided that a Participant signs and does not revoke a release of claims, as more fully described in Section 11.3(g), upon the Release Finalization Date:

(i) the PSU Separation Pro-Rated Number (as defined below) of performance-based Restricted Share Units shall continue to vest, on the same terms that such performance-based Restricted Share Units would have vested had the Participant remained an Employee, but without the requirement of continued employment, provided, however, that if the vesting date under such terms is earlier than the Release Finalization Date, the performance-based Restricted Share Units shall vest on the Release Finalization Date; and

(ii) any remaining performance-based Restricted Share Units not vesting as provided herein above shall be forfeited effective as of the date of Separation from Service without Cause.

The "***PSU Separation Pro-Rated Number***" for performance-based Restricted Share Units shall be the product of (A) the total number of performance-based Restricted Share Units and (B) the quotient of (1) the number of days beginning on the first day

A-17

Table of Contents

of the performance period and ending on the date of Separation from Service without Cause, and (2) the total number of days in the performance period (for example 1,095 days for a three-year performance period).

(d) With respect to Other Stock-based Awards, as contemplated by Section 9 of this Plan, the Committee shall have the authority to determine the terms and conditions of any such Other Stock-Based Award, including without limitation, the treatment of such awards upon a Participant's Retirement or Separation from Service without Cause at the time of grant of such Other Stock-Based Awards.

(e) A "*Separation from Service without Cause*" shall mean a Separation from Service that meets the following criteria:
(i) The Company provides written notice to the Participant that the Separation from Service results from one or more of the following:

(A) Workforce reduction or reorganization;

(B) A significant reduction in job responsibilities, accountabilities or authorities;

(C) A determination by the Company that the Participant's qualifications, experience or abilities, are not sufficient to meet the demands and requirements of the job consistently at the nature and level expected for the title, role, authority, or position;

(D) a material reduction equal to ten percent (10%) or more in the Participant's total target compensation (including base, bonus and equity) (other than as a result of an across-the-board reduction affecting substantially all Employees with similar authority, status, or job title); or

(E) the Participant's job being relocated to a location that is more than 50 miles from the Participant's then current job location ("*Relocation*") and the Participant declines Relocation;

(ii) at the time of the Separation from Service, the Participant has been actively at work (or on an approved leave of absence) during the six-month period immediately preceding the date of the Separation from Service and continues working through the date designated by the Company as the Participant's Separation from Service date or any earlier date that is designated by the Company as the Participant's release from duty date;

(iii) the Separation from Service is not for "Cause" as defined in this Plan;

(iv) the Separation from Service does not qualify as Retirement;

(v) the Company has not determined that the Separation from Service was for failure to meet the performance requirements of the Participant's position, including violations of the UNFI Code of Conduct and/or UNFI stated values or commitments, as documented in written performance feedback previously provided to the Participant;

(vi) except as otherwise determined by the Authorized Officers (as defined below), the Participant has not accepted another position with (or to perform work for) the Company or a Subsidiary or Affiliate (whether as an associate, consultant, or agent) following the Separation from Service;

(vii) except as otherwise determined by the Authorized Officers, if the Participant was employed at a business unit of the Company that was sold or otherwise transferred to a new employer, (A) the Participant has not, within 120 days following such sale or other transfer, accepted a position of employment from the new employer at such business unit, or received an offer of a position from the new employer that does not require Relocation and with base pay that is not less than the Participant's then current rate of base pay, even if the Participant has not accepted such offer, and (B) the Participant's position with such business unit has not been continued immediately following the closing of that transaction by operation of law or otherwise. For purposes of this subparagraph (vii), "business unit" shall mean any subunit of the Company as defined at the discretion of the Company (by way of example, a subsidiary, district, region, or cost center may be "business units" under this subparagraph);

(viii) except as otherwise determined by the Authorized Officers, if the Participant's job at a facility is involuntarily terminated because the Company ceases operations at that facility, but another employer commences operations at that facility, and, prior to such Separation from Service, (A) that other employer has not offered the Participant a position at that facility with base pay that is not less than the Participant's current base pay from the Company, even if the Participant does not accept such offer, and (B) the Participant has not accepted any position with that other employer;

A-18

Table of Contents

(ix) except as otherwise determined by the Authorized Officers, if the Company has outsourced the Participant's job function, the Participant has not accepted any position with the outsource vendor and the outsource vendor has not offered the Participant a position that does not require Relocation and with base pay that is not less than the Participant's current base pay, even if the Participant has not accepted such offer; and

(x) except as otherwise determined by the Authorized Officers, the Participant has not failed to return Company property on or before the Participant's last day of work.

(f) The determination by any two of the Chief Executive Officer, Chief Human Resources Officer, or Chief Legal Officer (the "*Authorized Officers*") of the Company that a Separation from Service constitutes a Separation from Service without Cause for purposes of the foregoing shall constitute a final determination of such status for purposes of the vesting provisions described herein with no further action required by the Committee; the decisions of such two officers, taken together shall be recorded and retained with the books and records relative to equity awards of the Company.

(g) To receive the vesting treatment described in this section 11.3, Participants must sign and not revoke a release of claims and such other agreements as may be requested by the Company. Any release of claims must be in the form and manner prescribed by the Company. The decision whether any other agreements, including but not limited to restrictive covenants, are included shall be made in the discretion of the Company. To the extent any Award vesting in accordance with this Section 11.3 is subject to Section 409A of the Code, and the period for the Participant to consider and/or revoke a release of claims spans two calendar years, then the settlement/payment of Shares pursuant to that Award shall in all cases occur in the second calendar year.

A-19

Table of Contents

**Section 12. Change in Control.**

12.1 *Assumption, Continuation or Substitution*. In the event of a Change in Control, the surviving, continuing, successor, or purchasing corporation or other business entity or parent thereof, as the case may be (the "***Acquiror***"), may (in accordance with Section 409A, to the extent applicable), without the consent of any Participant, either assume or continue the Company's rights and obligations under each or any Award or portion thereof outstanding immediately prior to the Change in Control or substitute for each or any such outstanding Award or portion thereof a substantially equivalent award with respect to the Acquiror's stock, as applicable; provided, that in the event of such an assumption, the Acquiror must grant the rights set forth in Section 12.2 of this Plan to the Participant in respect of such assumed Awards. For purposes of this Section, an Award denominated in Shares shall be deemed assumed if, following the Change in Control, the Award (as adjusted, if applicable, pursuant to Section 4.3 hereof) confers the right to receive, subject to any vesting or other terms and conditions of the Plan and the applicable Award Agreement, for each Share subject to the Award immediately prior to the Change in Control, the consideration (whether stock, cash, other securities or property or a combination thereof) to which a holder of a Share on the effective date of the Change in Control was entitled; provided, however, that if such consideration is not solely common stock of the Acquiror, the Committee may, with the consent of the Acquiror, provide for the consideration to be received upon the exercise or settlement of the Award, for each Share subject to the Award, to consist solely of common stock of the Acquiror equal in fair market value to the per share consideration received by holders of Shares pursuant to the Change in Control.

12.2 *Vesting of Assumed or Continued Awards*. Unless otherwise expressly provided in (i) the Award Agreement, (ii) an employment agreement or other written agreement with the Company or a Subsidiary and a Participant, or (iii) the definitive transaction agreement governing such Change in Control, in the event of a Change in Control in which the Acquiror does assume or continue outstanding Awards upon the Change in Control, if the Participant's employment with or service to the Company or a Subsidiary (or any of their successors) is terminated involuntarily for any reason other than Cause, or a Participant terminates his or her employment or service for Good Reason, within twelve (12) months of such Change in Control:

(a) Stock Options and Stock Appreciation Rights shall become fully vested as of the Participant's Separation from Service, and exercisable no later than 30 days following such Separation from Service termination date;

(b) Restricted Shares and Restricted Share Units shall become fully vested as of such Separation from Service, and shall be delivered no later than 30 days following such Separation from Service (or such other date permitted by Section 409A of the Code); and

(c) Any then-in-progress Performance Awards shall become fully vested at target performance levels as of such Separation from Service, and shall be delivered no later than 30 days following such Separation from Service (or such other date permitted by Section 409A of the Code). Any outstanding Performance Awards relating to performance periods ending prior to the Separation from Service which have been earned but not paid shall become immediately payable (unless otherwise required to be paid on a different date pursuant to Section 409A of the Code).

12.3 *No Assumption or Continuation of Awards*. Unless otherwise expressly provided in (i) the Award Agreement, (ii) an employment agreement or similar written agreement with the Company or a Subsidiary, or (iii) the definitive transaction agreement governing such Change in Control, in the event of a Change in Control in which the Acquiror does not assume or continue outstanding Awards upon the Change in Control, all outstanding Awards that are not assumed or continued shall be treated as follows (to the extent permitted by Section 409A of the Code):

(a) Stock Options and Stock Appreciation Rights shall become fully vested and exercisable as of date and time immediately prior to the Change in Control;

(b) Restricted Shares and Restricted Share Units shall become fully vested as of the date and time immediately prior to the Change in Control and shall settle immediately following the Change in Control (or such other date permitted by Section 409A of the Code); and

(c) Unless otherwise determined by the Committee pursuant to Section 12.5, to the extent permitted by Section 409A of the Code, any Performance Awards relating to performance periods that will not have ended as of the date of a Change in Control shall automatically vest and become payable at the target level of performance. Any outstanding Performance Awards relating to performance periods ending prior to the Change in Control date which have been earned but not paid shall become immediately payable.

Table of Contents

12.4 *Cash-Out of Awards*. Notwithstanding Sections 12.2 and 12.3, the Committee may (in accordance with Section 409A, to the extent applicable), in its discretion at or after grant and without the consent of any Participant, determine that, upon the occurrence of a Change in Control, each or any Award or a portion thereof outstanding immediately prior to the Change in Control and not previously exercised or settled shall be canceled in exchange for a payment with respect to each Share subject to such Award, whether vested or unvested, in (i) cash, (ii) stock of the Company or of a corporation or other business entity a party to the Change in Control, or (iii) other property which, in any such case, shall be in an amount having a fair market value equal to the fair market value of the consideration to be paid per Share in the Change in Control, reduced by the exercise or purchase price per share, if any, under such Award (which payment may, for the avoidance of doubt, be $0, in the event the per share exercise or purchase price of an Award is greater than the per share consideration in connection with the Change in Control). In the event such determination is made by the Committee, the amount of such payment (reduced by applicable withholding taxes, if any), if any, shall be paid to Participants in respect of the vested portions of their canceled Awards as soon as practicable following the date of the Change in Control and may be paid in respect of the unvested portions of their canceled Awards in accordance with the vesting schedules applicable to such Awards.

12.5 *Performance Awards*. The Committee may (in accordance with Section 409A, to the extent applicable), in its discretion at or after grant, provide that in the event of a Change in Control, (i) any outstanding Performance Awards relating to performance periods ending prior to the Change in Control which have been earned but not paid shall become immediately payable, (ii) all then-in-progress performance periods for Performance Awards that are outstanding shall end, and either (A) any or all Participants shall be deemed to have earned an award equal to the relevant target award

opportunity for the performance period in question, or (B) at the Committee's discretion, the Committee shall determine the extent to which performance criteria have been met with respect to each such Performance Award, if at all, but not above target, and (iii) the Company shall cause to be paid to each Participant such Performance Awards, in cash, Shares or other property as determined by the Committee, within thirty (30) days of such Change in Control, based on the Change in Control consideration, which amount may be zero if applicable. In the absence of such a determination, any Performance Awards relating to performance periods that will not have ended as of the date of a Change in Control shall be terminated and canceled for no further consideration.

Table of Contents

**Section 13. Amendment and Termination.**

13.1 *Amendments to the Plan*. The Board may amend, alter, suspend, discontinue or terminate the Plan or any portion thereof at any time (and in accordance with Section 409A of the Code with regard to Awards subject thereto); provided that no such amendment, alteration, suspension, discontinuation or termination shall be made without stockholder approval if such approval is necessary to comply with any tax or regulatory requirement for which or with which the Board deems it necessary or desirable to comply.

13.2 *Amendments to Awards*. Subject to the restrictions of the Plan, including Section 6.2 hereof, the Committee may waive any conditions or rights under, amend any terms of or alter, suspend, discontinue, cancel or terminate, any Award theretofore granted, prospectively or retroactively in time (and in accordance with Section 409A of the Code with regard to Awards subject thereto); provided that any such waiver, amendment, alteration, suspension, discontinuance, cancellation or termination that would materially and adversely affect the rights of any Participant or any holder or beneficiary of any Award theretofore granted shall not to that extent be effective without the consent of the affected Participant, holder or beneficiary (other than to the extent necessary to conform to Section 409A).

13.3 *Adjustments of Awards upon the Occurrence of Certain Unusual or Nonrecurring Events*. The Committee is hereby authorized to make equitable and proportionate adjustments in the terms and conditions of, and the criteria included in, Awards in recognition of unusual or nonrecurring events (and shall make such adjustments for the events described in Section 4.2 hereof) affecting the Company or any Subsidiary or Affiliate, or the financial statements of the Company or any Subsidiary or Affiliate, or of changes in applicable laws, regulations or accounting principles.

13.4 *Foreign Employees*. In order to facilitate the making of any Award or combination of Awards under the Plan, the Committee may provide for such special terms for Awards to Participants who are foreign nationals or who are employed by the Company or any Subsidiary outside of the United States of America as the Committee may consider necessary or appropriate to accommodate differences in local law, tax policy or custom. Moreover, the Committee may approve such supplements to or amendments, restatements or alternative versions of the Plan as it may consider necessary or appropriate for such purposes, without thereby affecting the terms of the Plan as in effect for any other purpose, and the Corporate Secretary or other appropriate officer of the Company may certify any such document as having been approved and adopted in the same manner as the Plan. No such special terms, supplements, amendments or restatements, however, shall include any provisions that are inconsistent with the terms of the Plan as then in effect unless the Plan could have been amended to eliminate such inconsistency without further approval by the shareholders of the Company.

**Section 14. General Provisions.**

14.1 *Limited Transferability of Awards*. Except as otherwise provided in the Plan, an Award Agreement or by the Committee at or after grant, no Award shall be assigned, alienated, pledged, attached, sold or otherwise transferred or encumbered by a Participant, except by will or the laws of descent and distribution. No transfer of an Award by will or by laws of descent and distribution shall be effective to bind the Company unless the Company shall have been furnished with written notice thereof and an authenticated copy of the will and/or such other evidence as the Committee may deem necessary or appropriate to establish the validity of the transfer. No transfer of an Award for value shall be permitted under the Plan.

14.2 *Dividend Equivalents*. In the sole and complete discretion of the Committee, but subject to any conditions set forth in this Plan, an Award (other than an Option or SAR) may provide the Participant with dividends or dividend equivalents, payable in cash, Shares, other securities or other property, but only when the related Award vests. In the case of dividends or dividend equivalents credited in connection with Awards , such amounts shall be subject to the same restrictions as apply to dividends or dividend equivalents payable with respect to the applicable Performance Award type (such as Restricted Shares or Restricted Share Units). The total number of Shares available for grant under Section 4 shall not be reduced to reflect any dividends or dividend equivalents until payment thereof. Notwithstanding the foregoing, with respect to an Award subject to Section 409A of the Code, the payment, deferral or crediting of any dividends or dividend equivalents shall conform to the requirements of Section 409A of the Code and such requirements shall be specified in writing.

14.3 *Compliance with Section 409A of the Code*. No Award (or modification thereof) shall provide for deferral of compensation that does not comply with Section 409A of the Code unless the Committee, at the time of grant, specifically provides that the Award is not intended to comply with Section 409A of the Code. Notwithstanding any provision of this Plan to the contrary, if one or more of the payments or benefits received or to be received by a Participant pursuant to an Award would cause the Participant to incur any additional tax or interest under Section 409A of the Code, the Committee may reform such provision to maintain to the maximum extent practicable the original intent of the applicable provision without violating the provisions of Section 409A of the Code. In addition, if a Participant is a Specified Employee at the time of his or her

A-22

Table of Contents

Separation from Service, to the extent necessary to avoid the imposition of taxes under Section 409A, any payments with respect to any Award subject to Section 409A of the Code to which the Participant would otherwise be entitled by reason of such Separation from Service shall be made on the date that is six months after the Participant's Separation from Service (or, if earlier, the date of the Participant's death). Although the Company intends to administer the Plan so that Awards will be exempt from, or will comply with, the requirements of Section 409A of the Code, the Company does not warrant that any Award under the Plan will qualify for favorable tax treatment under Section 409A of the Code or any other provision of federal, state, local or foreign law. The Company shall not be liable to any Participant for any tax, interest, or penalties that Participant might owe as a result of the grant, holding, vesting, exercise, or payment of any Award under the Plan.

14.4 *No Rights to Awards*. No Person shall have any claim to be granted any Award, and there is no obligation for uniformity of treatment of Participants or holders or beneficiaries of Awards. The terms and conditions of Awards need not be the same with respect to each Participant.

14.5 *Share Certificates*. All certificates for Shares or other securities delivered under the Plan pursuant to any Award or the exercise thereof shall be subject to such stop transfer orders and other restrictions as the Committee may deem advisable under the Plan or the rules, regulations and other requirements of the SEC or any state securities commission or regulatory authority, any stock exchange or other market upon which such Shares or other securities are then listed, and any applicable Federal or state laws, and the Committee may cause a legend or legends to be put on any such certificates to make appropriate reference to such restrictions.

14.6 *Tax Withholding*. A Participant may be required to pay to the Company or any Subsidiary or Affiliate, and the Company or any Subsidiary or Affiliate shall have the right and is hereby authorized to withhold from any Award, from any payment due or transfer made under any Award or under the Plan, or from any compensation or other amount owing to a Participant the amount (in cash, Shares, other securities, other Awards or other property) of any applicable withholding or other tax-related obligations in respect of an Award, its exercise or any other transaction involving an Award, or any payment or transfer under an Award or under the Plan and to take such other action as may be necessary in the opinion of the Company to satisfy all obligations for the payment of such taxes. Without limiting the generality of the foregoing, the Committee may in its discretion permit a Participant to satisfy or arrange to satisfy, in whole or in part, the tax obligations incident to an Award by: (a) electing to have the Company withhold Shares or other property otherwise deliverable to such Participant pursuant to the Award (provided, however, that the amount of any Shares so withheld shall not exceed the amount necessary to satisfy required federal, state local and foreign withholding obligations using the maximum statutory withholding rates for federal, state, local and/or foreign tax purposes, including payroll taxes, that are applicable to supplemental taxable income) and/or (b) tendering to the Company Shares owned by such Participant (or by such Participant and his or her spouse jointly) and purchased or held for the requisite period of time, if any, as may be required to avoid the Company's or the Subsidiaries' or Affiliates' incurring an adverse accounting charge, based, in each case, on the fair market value of the Shares on the payment date as determined by the Committee. All such elections shall be irrevocable, made in writing, signed by the Participant, and shall be subject to any restrictions or limitations that the Committee, in its sole discretion, deems appropriate.

14.7 *Award Agreements*. Each Award hereunder shall be evidenced by an Award Agreement that shall be delivered (including, but not limited to, through an online equity incentive plan management portal) to the Participant and may specify the terms and conditions of the Award and any rules applicable thereto. In the event of a conflict between the terms of the Plan and any Award Agreement, the terms of the Plan shall prevail. The Committee shall, subject to applicable law, determine the date an Award is deemed to be granted. The Committee or, except to the extent prohibited under applicable law, its delegate(s) may establish the terms of agreements or other documents evidencing Awards under this Plan and may, but need not, require as a condition to any such agreement's or document's effectiveness that such agreement or document be executed by the Participant, including by electronic signature or other electronic indication of acceptance, and that such Participant agree to such further terms and conditions as specified in such agreement or document. The grant of an Award under this Plan shall not confer any rights upon the Participant holding such Award other than such terms, and subject to such conditions, as are specified in this Plan as being applicable to such type of Award (or to all Awards) or as are expressly set forth in the agreement or other document evidencing such Award.

14.8 *Restrictive Covenants*. Each Award Agreement shall include, or be deemed to include, restrictive covenants as determined by the Committee or its delegate and each Participant shall agree to adhere to such covenants as a condition to receipt of an Award.

14.9 *Other Compensation Arrangements*. Nothing contained in the Plan shall prevent the Company or any Subsidiary or Affiliate from adopting or continuing in effect other compensation arrangements, which may, but need not, provide for the grant of Options, Restricted Shares, Restricted Share Units, Other Stock-Based Awards or other types of Awards provided for hereunder. No payment under the Plan shall be taken into account in determining any benefits under any pension, retirement,

A-23

Table of Contents

savings, profit sharing, group insurance, welfare or benefit plan of the Company or any Subsidiary or Affiliate unless provided otherwise in such other plan.

14.10 *No Right to Employment or Other Service*. The grant of an Award shall not be construed as giving a Participant the right to be retained in the employ or other service of the Company or any Subsidiary or Affiliate. Further, the Company or a Subsidiary or Affiliate may at any time dismiss a Participant from employment or service, free from any liability or any claim under the Plan, unless otherwise expressly provided in an Award Agreement.

14.11 *No Rights as Stockholder*. Subject to the provisions of the Plan and the applicable Award Agreement, no Participant or holder or beneficiary of any Award shall have any rights as a stockholder with respect to any Shares to be distributed under the Plan until such person has become a holder of such Shares. Notwithstanding the foregoing, in connection with each grant of Restricted Shares hereunder, the applicable Award Agreement shall specify if and to what extent the Participant shall not be entitled to the rights of a stockholder in respect of such Restricted Shares.

14.12 *Governing Law*. The validity, construction and effect of the Plan and any rules and regulations relating to the Plan and any Award Agreement shall be determined in accordance with the laws of the State of Delaware without giving effect to conflicts of laws principles.

14.13 *Severability*. If any provision of the Plan or any Award is, or becomes, or is deemed to be invalid, illegal or unenforceable in any jurisdiction or as to any Person or Award, or would disqualify the Plan or any Award under any law deemed applicable by the Committee, such provision shall be construed or deemed amended to conform to the applicable laws, or if it cannot be construed or deemed amended without, in the determination of the Committee, materially altering the intent of the Plan or the Award, such provision shall be stricken as to such jurisdiction, Person or Award and the remainder of the Plan and any such Award shall remain in full force and effect.

14.14 *Other Laws*. The Company will not be obligated to issue, deliver or transfer any Shares pursuant to the Plan or to remove restrictions from Shares previously delivered pursuant to the Plan until: (a) all conditions of the applicable Award Agreement have been met or removed to the satisfaction of the Committee; (b) all other legal matters, including receipt of consent or approval of any regulatory body and compliance with any state or federal securities or other law, in connection with the issuance and delivery of such Shares have been satisfied; (c) the Participant or holder or beneficiary of the Shares or Award has executed and delivered to the Company such representations or agreements as the Committee may consider appropriate to satisfy the requirements of any state or federal securities or other law; and (d) such issuance would not entitle the Company to recover amounts under Section 16(b) of the Exchange Act from such Participant or holder or beneficiary of the Shares or Award. The inability of the Company to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Company's counsel necessary to the lawful issuance of any Shares hereunder, shall relieve the Company of any liability in respect of the failure to issue the Shares as to which such requisite authority shall not have been obtained.

14.15 *No Trust or Fund Created*. Neither the Plan nor any Award shall create or be construed to create a trust or separate fund of any kind or a fiduciary relationship between the Company or any Subsidiary and a Participant or any other Person. To the extent that any Person acquires a right to receive payments from the Company or any Subsidiary or Affiliate pursuant to an Award, such right shall be no greater than the right of any unsecured general creditor of the Company or any Subsidiary.

14.16 *No Fractional Shares*. No fractional Shares shall be issued or delivered pursuant to the Plan or any Award, and any obligation to deliver fractional Shares shall be deemed fully satisfied by the delivery of the next lower number of whole Shares.

14.17 *Clawback; Cancellation of Awards*. Each Award granted to a Participant under the Plan shall be subject to forfeiture or repayment pursuant to the terms of any applicable compensation recovery policy adopted by the Company as in effect from time to time, including any such policy that may be adopted or amended to comply with the Dodd-Frank Wall Street Reform and Consumer Protection Act or any rules or regulations issued by the SEC or the New York Stock Exchange. In addition, the Committee or the Board may cancel unpaid Awards held by a Participant from whom the Committee or the Board would be entitled to recover compensation under any compensation recovery policy then in effect.

14.18 *Minimum Vesting Requirements*. Except for Substitute Awards, as determined by the Committee following the grant of an Award in connection with the death or Disability of the Participant, or in the event of a Change in Control or a Separation from Service without Cause, Awards granted hereunder shall have a Vesting Period of not less than one (1) year from the date of grant; provided, that the Committee has the discretion to waive this requirement with respect to an Award at the time of granting such Award so long as the total number of Shares that are issued under this Plan pursuant to Awards having an originally stated Vesting Period of less than one year from the date of grant (or, in the case of vesting of Performance Awards or other Awards the vesting of which is subject to the achievement of performance-based

Table of Contents

objectives, over a period of less than one year measured from the commencement of the period over which performance is evaluated) shall not exceed 5% of the Share Reserve.

14.19 *Headings*. Headings are given to the sections and subsections of the Plan solely as a convenience to facilitate reference. Such headings shall not be deemed in any way material or relevant to the construction or interpretation of the Plan or any provision thereof.

**Section 15. Term of The Plan.**

15.1 *Effective Date*. The Plan, as amended and restated as set forth herein, shall be effective upon the date that it is approved by the Company's stockholders at a meeting duly held in accordance with applicable law (the "**Effective Date**"). If the Plan is not approved as set forth in this section, this amendment and restatement of the Plan will not become effective and any Awards granted under the Plan shall be subject to the terms of the Plan as in effect prior to the amendment and restatement.

15.2 *Expiration Date*. No new Awards shall be granted under the Plan after the tenth (10th) anniversary of the Effective Date. Unless otherwise expressly provided in the Plan or in an applicable Award Agreement, any Award granted hereunder may, and the authority of the Board or the Committee to amend, alter, adjust, suspend, discontinue or terminate any such Award or to waive any conditions or rights under any such Award shall, continue after the tenth (10th) anniversary of the Effective Date.

Table of Contents

**Annex B**

**Reconciliation of Non-GAAP Performance Metrics**

This proxy statement refers to the non-GAAP financial measure of Adjusted EBITDA, Adjusted ROIC (return on invested capital), Adjusted EPS (earnings per diluted share), and Adjusted EBITDA leverage ratio. These metrics are used by the Company in evaluating our performance for purposes of our executive compensation program. We believe the non-GAAP financial measure provides investors with useful supplemental information about the performance of our business and insight into the metrics we use for executive compensation purposes.

Non-GAAP financial measures have no standardized meaning prescribed by U.S. GAAP and therefore may not be comparable with calculations of similar measures for other companies. Management does not intend these items to be considered in isolation or as a substitute for the related GAAP measure.

Capitalized terms used in the notes to this table but not defined in this proxy statement are used as defined in the notes to the financial statements included in the Company's Annual Report on Form 10-K for the fiscal year ended July 30, 2022 (the Annual Report), to which you should refer for further information.

**Reconciliation of net income from continuing operations and income from discontinued operations, net of tax to Adjusted EBITDA (unaudited)**

*(in millions)*

|  | Fiscal Year Ended July 30, 2022 (52 weeks) | Fiscal Year Ended July 31, 2021 (52 weeks) | Fiscal Year Ended August 1, 2020 (52 weeks) |
|---|---|---|---|
| Net income (loss) from continuing operations | $ 254 | $ 149 | $ (251) |
| Adjustments to continuing operations net income (loss): | | | |
| Less net income attributable to noncontrolling interests | (6) | (6) | (5) |
| Net periodic benefit income, excluding service cost[1] | (40) | (85) | (39) |
| Interest expense, net | 155 | 204 | 192 |
| Other, net | (2) | (8) | (4) |
| Provision (benefit) for income taxes[2] | 56 | 34 | (91) |
| Depreciation and amortization | 285 | 285 | 282 |
| Share-based compensation | 43 | 49 | 34 |
| Goodwill impairment charges[3] | - | - | 425 |
| LIFO charge[4] | 158 | 24 | 18 |
| Restructuring, acquisition and integration related expenses[5] | 21 | 56 | 87 |
| (Gain) loss on sale of assets[6] | (87) | (4) | 18 |
| Multiemployer pension plan withdrawal (benefit) charges[7] | (8) | 63 | - |
| Notes receivable charges[8] | - | - | 13 |
| Legal reserve charge, net of settlement income[9] | - | - | 1 |
| Other retail expense[10] | - | 5 | $ 1 |
| Adjusted EBITDA of continuing operations | 829 | 766 | 681 |
| Adjusted EBITDA of discontinued operations[11] | - | 4 | 10 |
| Adjusted EBITDA | $ 829 | $ 770 | $ 691 |
|  | | | |
| Income (loss) from discontinued operations, net of tax[11] | $ - | $ 6 | $ (18) |
| Adjustments to discontinued operations net income (loss): | | | |
| Benefit for income taxes | - | (1) | (5) |
| Restructuring, store closure and other charges, net[12] | - | (1) | 33 |
| Adjusted EBITDA of discontinued operations[11] | $ - | $ 4 | $ 10 |

Table of Contents

(1)  Fiscal 2021 includes a postretirement settlement gain of $17 million associated with the termination of remaining corporate plans. Fiscal 2020 includes a lump sum defined pension plan settlement expense of $11 million.
(2)  Fiscal 2020 includes the tax benefit from the Coronavirus Aid, Relief, and Economic Security (CARES) Act, which includes the impact of tax loss carrybacks to 35% tax years allowed under the CARES Act.
(3)  Fiscal 2020 primarily reflects a goodwill impairment charge attributable to a reorganization of our reporting units and a sustained decrease in market capitalization and enterprise value of the Company, resulting in a decline in the estimated fair value of the U.S. Wholesale reporting unit. In addition, this charge includes a goodwill finalization charge attributable to the SUPERVALU acquisition and an asset impairment charge.
(4)  During fiscal 2022, the Company revised its definition of Adjusted EBITDA to exclude the impact of the non-cash LIFO charge. Prior periods have been revised to conform to the current year presentation.
(5)  Fiscal 2022 and fiscal 2021 primarily reflects costs associated with advisory and transformational activities to position our business for further value-creation. In addition, fiscal 2021 includes costs associated with distribution center consolidations. Fiscal 2020 primarily reflects Shoppers asset impairment charges, closed property and distribution center impairment charges and costs, and administrative fees associated with integration activities. Refer to Note 4-Restructuring, Acquisition and Integration Related Expenses in Part II, Item 8 of the Annual Report on Form 10-K for additional information.
(6)  Fiscal 2022 primarily reflects the gain on sale of our Riverside, California distribution center in the third quarter of fiscal 2022. Fiscal 2020 primarily reflects a $50 million accumulated depreciation and amortization charge related to the requirement to move Retail from discontinued operations to continuing operations, partially offset by $32 million of gains on the sale of distribution centers and other assets.
(7)  Fiscal 2022 reflects an adjustment to multiemployer withdrawal charge estimates. Fiscal 2021 includes charges related to withdrawal liabilities from three Retail multiemployer pension plans.
(8)  Reflects reserves and charges for notes receivable issued by the SUPERVALU business prior to its acquisition to finance the purchase of stores by its customers.
(9)  Reflects a charge to settle a legal proceeding and income received to settle a separate legal proceeding.
(10)  Reflects expenses associated with event-specific damages to certain retail stores.
(11)  We believe the inclusion of discontinued operations results within Adjusted EBITDA provides investors a meaningful measure of total performance.
(12)  Amounts represent store closure charges and costs, operational wind-down and inventory charges, and asset impairment charges related to discontinued operations. Fiscal 2021 also reflects income related to a severance benefit amount.

Adjusted EBITDA is a non-GAAP performance metric. We define Adjusted EBITDA as a consolidated measure inclusive of continuing and discontinued operations results, which we reconcile by adding Net income (loss) from continuing operations, less Net income attributable to noncontrolling interests, plus Non-operating income and expenses, including Net periodic benefit income, excluding service cost, Interest expense, net and Other, net, plus Provision (benefit) for income taxes and Depreciation and amortization all calculated in accordance with GAAP, plus adjustments for Share-based compensation, non cash LIFO charge or benefit, Restructuring, acquisition and integration related expenses, Goodwill impairment charges, (Gain) loss on sale of assets, certain legal charges and gains, certain other non-cash charges or other items, as determined by management, plus Adjusted EBITDA of discontinued operations calculated in a manner consistent with the results of continuing operations, outlined above.

Table of Contents

**Reconciliation of Non-GAAP Financial Measures-Adjusted Return on Invested Capital**
*(in millions, except percentages)*

| | Fiscal 2022 As Reported[1] | | LIFO Charge[2] | | Restructuring, Acquisition and Integration Related Expenses[3] | | Gain on Sale of Assets[4] | | Pension Income | | Multiemployer Pension Plan Withdrawal Benefit[5] | | Adjust Invested Capital to Averages[6] | | Fiscal 2022 As Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Operating income (loss) | $ | 423 | $ | 158 | $ | 21 | $ | (87) | $ | 40 | $ | (8) | $ | - | $ | 547 |
| Effective tax rate[7] | | 26.1 % | | 26.1% | | 26.1% | | 26.1% | | 26.1% | | 26.1% | | 26.1% | | 26.1 % |
| Tax on operating Income | | (111) | | (41) | | (6) | | 23 | | (10) | | 2 | | - | $ | (143) |
| **Net operating profit after tax** | $ | **312** | $ | **117** | $ | **15** | $ | **(64)** | $ | **30** | $ | **(6)** | $ | **-** | $ | **404** |
| | | | | | | | | | | | | | | | | |
| Total debt and finance lease obligations | $ | 2,159 | $ | - | $ | - | $ | - | $ | - | $ | - | $ | 131 | | 2,290 |
| Total stockholder's equity | | 1,792 | | - | | - | | - | | - | | - | | (139) | | 1,653 |
| **Total invested capital** | $ | **3,951** | $ | **-** | $ | **-** | $ | **-** | $ | **-** | $ | **-** | $ | **(8)** | $ | **3,943** |
| | | | | | | | | | | | | | | | | |
| **Return on invested capital** | | **7.9 %** | | | | | | | | | | | | | | **10.2 %** |

(1) All "As Reported" financial data below is shown as it was filed within our Annual Report on Form 10-K for the fiscal year ended July 30, 2022.
(2) During fiscal 2022, the Company revised its definition of Adjusted ROIC to exclude the impact of the non-cash LIFO charge.
(3) Primarily reflects costs associated with advisory and transformational activities to position our business for further value-creation. Refer to Note 4-Restructuring, Acquisition and Integration Related Expenses in Part II, Item 8 of the Annual Report on Form 10-K for additional information.
(4) Primarily reflects the gain on sale of our Riverside, California distribution center in the third quarter of fiscal 2022.
(5) Reflects an adjustment to previously multiemployer withdrawal charge estimates.
(6) Calculated based on total debt and equity utilizing the average of fiscal 2021 and fiscal 2022 ending balances.
(7) The adjusted effective tax rate is calculated based on adjusted net income before tax, and its impact reflects the exclusion of changes to uncertain tax positions, valuation allowances, tax impacts related to the exercise of share-based compensation awards and discrete GAAP tax items which could impact the comparability of the operational effective tax rate.

Adjusted ROIC is a non-GAAP performance metric.

We define adjusted ROIC as Adjusted EBITDA (as publicly disclosed, plus or minus any other one-time adjustments made by management), less Depreciation & Amortization expense, excluding the impact of pension income/expense, plus Other income, less Stock-based comp expense,
1. Tax-effected by our adjusted tax rate,
2. Divided by the average invested capital balance, comprised of the sum of
    a. The average quarter-ending debt (face value) balances, and
    b. The average quarter-ending book value of equity balances

Table of Contents

**Reconciliation of Net income (loss) per Diluted Common Share to Adjusted Net income per Diluted Common Share**

| | Fiscal Year Ended July 30, 2022 (52 weeks) | Fiscal Year Ended July 31, 2021 (52 weeks) | Fiscal Year Ended August 1, 2020 (52 weeks) |
|---|---|---|---|
| Net income (loss) attributable to UNFI per diluted common share | $ 4.07 | $ 2.48 | $ (5.10) |
| Goodwill impairment charges[1] | - | - | 7.91 |
| Restructuring, acquisition, and integration related expenses[2] | 0.34 | 0.93 | 1.62 |
| (Gain) loss on sale of assets[3] | (1.42) | (0.06) | 0.32 |
| LIFO charge[4] | 2.59 | 0.41 | 0.33 |
| Benefit plan settlement (gain) charges[5] | - | (0.28) | 0.21 |
| Surplus property depreciation and interest expense[6] | 0.05 | 0.05 | 0.15 |
| Multiemployer pension plan withdrawal (benefit) charges[7] | (0.13) | 1.05 | - |
| Notes receivable charges[8] | - | - | 0.23 |
| Loss on debt extinguishment[9] | 0.10 | 0.51 | - |
| Legal reserve charge, net of settlement income[10] | - | - | 0.02 |
| Other retail expense[11] | - | 0.06 | 0.03 |
| Discontinued operations store closures and other charges, net[12] | - | (0.07) | 0.63 |
| Tax impact of adjustments and adjusted effective tax rate[13] | (0.77) | (0.90) | (2.99) |
| Impact of diluted shares | - | - | (0.09) |
| Adjusted net income per diluted common share (Retail in Discontinued Operations)[14] | 4.83 | 4.18 | 3.27 |
| Depreciation and amortization adjustment[15] | - | - | (0.31) |
| Adjusted net income per diluted common share (Retail in Continuing Operations) | $ 4.83 | $ 4.18 | $ 2.96 |

(1) Primarily reflects a goodwill impairment charge attributable to a reorganization of our reporting units and a sustained decrease in market capitalization and enterprise value of the Company, resulting in a decline in the estimated fair value of the U.S. Wholesale reporting unit. In addition, this charge includes a goodwill finalization charge attributable to the SUPERVALU acquisition and an asset impairment charge.

(2) Primarily reflects costs associated with advisory and transformational activities to position our business for further value-creation. Refer to Note 4-Restructuring, Acquisition and Integration Related Expenses in Part II, Item 8 of the Annual Report on Form 10-K for additional information.

(3) Fiscal 2022 primarily reflects the gain on sale of our Riverside, California distribution center in the third quarter. Fiscal 2020 primarily reflects a $50 million accumulated depreciation and amortization charge related to the requirement to move Retail from discontinued operations to continuing operations, partially offset by $34 million of gains on the sale of distribution centers and other assets.

(4) During fiscal 2022, the Company revised its definition of Adjusted EPS to exclude the impact of the non-cash LIFO charge. Prior periods have been revised to conform to the current year presentation.

(5) Fiscal 2021 includes an other postretirement settlement gain of $17 million associated with the termination of remaining corporate plans. Fiscal 2020 includes a lump sum defined benefit pension plan settlement expense of $11 million associated with the acceleration of a portion of the accumulated unrecognized actuarial loss as a result of the lump sum settlement payments.

(6) Reflects surplus, non-operating property depreciation and interest expense, including accelerated depreciation related to a location on which we recognized a gain that is included in Restructuring, acquisition and integration related expenses.

(7) Fiscal 2022 reflects an adjustment to multiemployer withdrawal charge estimates. Fiscal 2021 includes charges related to withdrawal liabilities from three Retail multiemployer pension plans.

(8) Reflects reserves and charges for notes receivable issued by the SUPERVALU business prior to its acquisition to finance the purchase of stores by its customers.

(9) Reflects non-cash charges related to the acceleration of unamortized debt issuance costs from debt prepayments.

(10) Reflects a charge to settle a legal proceeding and income received to settle a separate legal proceeding.

(11) Reflects expenses associated with event-specific damages to certain retail stores.

(12) Amounts represent store closure charges and costs, operational wind-down and inventory charges, and asset impairment charges related to discontinued operations. Fiscal 2021 also reflects the impact of a severance benefit amount.

(13) Represents the tax effect of the pre-tax adjustments using an adjusted effective tax rate. The adjusted effective tax rate is calculated based on adjusted net income before tax, and its impact reflects the exclusion of changes to uncertain tax positions, valuation allowances, tax impacts related to the exercise of share-based compensation awards and discrete GAAP tax items which could impact the comparability of the operational effective tax rate. The Company believes using this adjusted effective tax rate will provide better consistency across the interim reporting periods since each of these discrete items can cause volatility in the GAAP tax rate that is not indicative of the true operations of the Company. By providing this non-GAAP measure, management intends to provide investors with a meaningful, consistent comparison of the Company's effective tax rate on ongoing operations.

B-4

Table of Contents

(14) The computation of diluted earnings per share is calculated using diluted weighted average shares outstanding, which includes the net effect of dilutive stock awards.

(15) In fiscal 2020 the Company recorded a pre-tax charge of $50.0 million related to the change in presentation of Retail to continuing operations. This charge was calculated under GAAP as the depreciation and amortization expense that would have been recognized had Retail been included in continuing operations for the full time period since the SUPERVALU acquisition date. This adjustment attributes the pro rata amount of the non-cash charge recognized in the fourth quarter of fiscal 2020 to the applicable time periods in which it would have been recognized had Retail been included within continuing operations since the acquisition date. UNFI believes the inclusion of this adjustment is a useful indicator of performance to both management and investors, as it provides a relative comparison to how UNFI's results of operations will be reported on an ongoing basis.

B-5

Table of Contents

**Calculation of Net Debt to Adjusted EBITDA leverage ratio**
*(in millions, except ratios)*

| | Fiscal Year Ended July 30, 2022 (52 weeks) | Fiscal Year Ended July 31, 2021 (52 weeks) | Fiscal Year Ended August 1, 2020 (52 weeks) |
|---|---|---|---|
| Current portion of long-term debt and finance lease liabilities | $ 27 | $ 120 | $ 83 |
| Long-term debt | 2,109 | 2,175 | 2,427 |
| Long-term finance lease liabilities | 23 | 35 | 143 |
| Less: Cash and cash equivalents | (44) | (41) | (47) |
| Net carrying value of debt and finance lease liabilities | 2,115 | 2,289 | 2,606 |
| Adjusted EBITDA[1] | $ 829 | $ 770 | $ 691 |
| Adjusted EBITDA leverage ratio | 2.6x | 3.0x | 3.8x |

(1) During fiscal 2022, the Company revised its definition of Adjusted EBITDA to exclude the impact of the non-cash LIFO charge. Prior periods have been revised to conform to the current year presentation.

B-6

Table of Contents





**VOTE BY INTERNET**
*Before The Meeting* - Go to **www.proxyvote.com** or scan the QR Barcode above

Use the Internet to transmit your voting instructions and for electronic delivery of information. Vote by 11:59 P.M. ET on January 9, 2023. Have your proxy card in hand when you access the web site and follow the instructions to obtain your records and to create an electronic voting instruction form.

*During The Meeting* - Go to **www.virtualshareholdermeeting.com/unfi2023**

You may attend the meeting via the Internet and vote during the meeting. Have the information that is printed in the box marked by the arrow available and follow the instructions.

**VOTE BY PHONE - 1-800-690-6903**
Use any touch-tone telephone to transmit your voting instructions. Vote by 11:59 P.M. ET on January 9, 2023. Have your proxy card in hand when you call and then follow the instructions.

**VOTE BY MAIL**
Mark, sign and date your proxy card and return it in the postage-paid envelope we have provided or return it to Vote Processing, c/o Broadridge, 51 Mercedes Way, Edgewood, NY 11717.

TO VOTE, MARK BLOCKS BELOW IN BLUE OR BLACK INK AS FOLLOWS:

D93334-P81247                    KEEP THIS PORTION FOR YOUR RECORDS

DETACH AND RETURN THIS PORTION ONLY

THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED.

**UNITED NATURAL FOODS, INC.**

**The Board of Directors recommends you vote FOR the following:**

1. Election of Directors

| Nominees: | For | Against | Abstain |
|---|---|---|---|
| 1a. Eric F. Artz | ☐ | ☐ | ☐ |
| 1b. Ann Torre Bates | ☐ | ☐ | ☐ |
| 1c. Gloria R. Boyland | ☐ | ☐ | ☐ |
| 1d. Denise M. Clark | ☐ | ☐ | ☐ |
| 1e. J. Alexander Douglas | ☐ | ☐ | ☐ |
| 1f. Daphne J. Dufresne | ☐ | ☐ | ☐ |
| 1g. Michael S. Funk | ☐ | ☐ | ☐ |
| 1h. Shamim Mohammad | ☐ | ☐ | ☐ |
| 1i. James L. Muehlbauer | ☐ | ☐ | ☐ |
| 1j. Peter A. Roy | ☐ | ☐ | ☐ |
| 1k. Jack Stahl | ☐ | ☐ | ☐ |

**The Board of Directors recommends you vote FOR proposals 2, 3 and 4.**

| | For | Against | Abstain |
|---|---|---|---|
| 2. The ratification of the selection of KPMG LLP as our independent registered public accounting firm for the fiscal year ending July 29, 2023. | ☐ | ☐ | ☐ |
| 3. To approve, on an advisory basis, our executive compensation. | ☐ | ☐ | ☐ |
| 4. The approval of the Second Amended and Restated 2020 Equity Incentive Plan. | ☐ | ☐ | ☐ |

**NOTE:** In their discretion, the proxies are authorized to vote upon such other business as may properly come before the annual meeting or any adjournment or postponement thereof.

Please sign exactly as your name(s) appear(s) hereon. When shares are held by joint owners, both should sign. When signing as attorney, executor, administrator, or other fiduciary, please give full title as such. If a corporation or partnership, please sign in full corporate or partnership name by authorized officer.

Signature [PLEASE SIGN WITHIN BOX]          Date

Signature (Joint Owners)          Date

Table of Contents

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting:**
The Notice and Proxy Statement and 2022 Annual Report on Form 10-K are available at www.proxyvote.com.

D93335-P81247

### UNITED NATURAL FOODS, INC.
### Annual Meeting of Stockholders
### January 10, 2023, 4:00 PM EST
### This proxy is solicited by the Board of Directors

The stockholder(s) hereby appoint(s) each of J. Alexander Miller Douglas and Mahrukh Hussain as proxies, each with the power to appoint his substitute, and hereby authorize(s) J. Alexander Miller Douglas and Mahrukh Hussain to represent and to vote, as designated on the reverse side of this proxy card, all of the shares of common stock of UNITED NATURAL FOODS, INC. that the stockholder(s) is/are entitled to vote at the Annual Meeting of Stockholders to be held on Tuesday, January 10, 2023 at 4:00 PM Eastern Standard time on the internet through a virtual web conference at www.virtualshareholdermeeting.com/unfi2023.

THIS PROXY, WHEN PROPERLY EXECUTED WILL BE VOTED AS INDICATED. IF NO CONTRARY INDICATION IS MADE, THE PROXY WILL BE VOTED IN FAVOR OF ELECTING THE ELEVEN NOMINEES TO THE BOARD OF DIRECTORS, FOR EACH OF PROPOSALS 2, 3 AND 4, AND IN ACCORDANCE WITH THE JUDGMENT OF THE PERSONS NAMED AS PROXIES HEREIN, ON ANY OTHER MATTERS THAT MAY PROPERLY COME BEFORE THE ANNUAL MEETING.

Continued and to be marked, signed and dated on reverse side