**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAN SILLS and GEORGE DICK, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:23-cv-02364-JGLC |
| Plaintiffs, | |
| v. | |
| UNITED NATURAL FOODS, INC., J. ALEXANDER MILLER DOUGLAS, JOHN W. HOWARD, and CHRISTOPHER P. TESTA, | |
| Defendants. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION**
**TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ...............................................................................................3

    A.    UNFI, A Grocery Wholesale Distributor, Focused On Cost Savings Measures To Drive Profitability ..............................................................3

    B.    Defendants Told The Market That UNFI Passed Inflationary Cost Increases To Its Customers ........................................................................3

    C.    During The Class Period, UNFI Strategically Bought Ahead Of Known Price Increases .........................................................................4

    D.    During The Class Period, Defendants Misleadingly Attributed Positive EBITDA And Gross Margin Results To Inflation And The Company's Efficiency Initiatives, While Omitting To Disclose The "Substantial" And Atypical Benefit Of Forward Buying ...............................................5

    E.    Over The Course Of Nine Months, UNFI Slowly Reveals That It Had Benefited From Massive Forward Buying That It Could No Longer Sustain As Inflation Eased, Causing Plaintiffs' Losses ............................................7

        1.    On December 7, 2022, UNFI's Profitability Shows Signs Of Weakness When Defendants Report A Gross Margin Decline ...................7

        2.    On March 8, 2023, Defendants Admit That 2Q22 Had Benefited From Significant Procurement Gains And Revised Fiscal 2023 Guidance That Purports To Reflect The Decline In Forward Buying Opportunities.............................................................................8

        3.    On June 7, 2023, Defendants Disclose Further Margin Erosion And Reveal The Magnitude Of The Forward Buying Benefit To Prior Results........................................................................9

        4.    On September 26, 2023, Defendants Reveal That An "Out-of-Pattern Increase In Procurement Gains" Benefited Profitability By At Least $275 Million Within A 12-Month Period ..................................10

ARGUMENT.................................................................................................................11

I.    APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION..........11

II.    DEFENDANTS' MISSTATEMENTS AND OMISSIONS ARE ACTIONABLE ..........11

i

A.    Defendants' Statements About The Drivers Of UNFI's Improved Profitability Were Materially Misleading ...............................................................13

    1.    Defendants' Attribution Of UNFI's Improved Profitability To Inflation And The ValuePath Initiative, While Failing To Disclose The Atypical And Elevated Levels Of Procurement Gains, Presented A Materially Misleading Impression Of The Sources Of UNFI's Success ..................................................................................13

    2.    Defendants' Arguments Concerning About The Profitability Driver Statements All Fail...............................................................................16

B.    Defendants' Statements About The Sustainability Of UNFI's Profits Were Materially Misleading ............................................................................18

C.    The "Impact of Inflation" Statements Were Materially Misleading.....................20

D.    UNFI's Risk Factor Statements Were Materially Misleading ..............................21

E.    Defendants' Statements About UNFI's Guidance Were Materially Misleading....................................................................................................23

F.    Defendants Had A Duty To Disclose The Magnitude And Impact Of Their Forward Buying Pursuant To Item 303 ................................................................24

G.    Defendants Fail To Identify "Puffery" With Requisite Specificity ......................27

H.    Defendants' Misstatements And Omissions Are Not Protected By The Safe Harbor ......................................................................................................27

    1.    The Safe Harbor Does Not Protect Defendants' Material Omissions..............................................................................................28

    2.    The Safe Harbor Does Not Protect Present Or Historical Statements............................................................................................29

    3.    The Forward-Looking Statements Were Not Accompanied By Meaningful Cautionary Language ...........................................................30

    4.    Any Forward-Looking Statements Were Made With Actual Knowledge Of Their Falsity ...................................................................32

III.    THE SAC PLEADS A STRONG INFERENCE OF SCIENTER....................................32

A.    Defendants Knew The Company Engaged In "Strategic" Forward Buying..........33

B.    The Magnitude Of The Forward Buying Activity And Its Impact On UNFI's EBITDA Supports A Strong Inference Of Scienter.............................................34

C.      Defendants' Statements Concerning UNFI's Data Analytics And Value Path Initiative Support A Strong Inference Of Scienter ....................................355

D.      The Individual Defendants Personally Benefited From The Fraud .......................37

E.      Additional Facts Strengthen An Inference Of Scienter .........................................39

F.      Balancing Of The Inferences Supports A Strong Inference Of Scienter ...............41

CONCLUSION ...........................................................................................................................43

# TABLE OF AUTHORITIES

CASES

*Akerman v. Arotech Corp.*,
   608 F. Supp. 2d 372 (E.D.N.Y. 2009) ................................................................. 33

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .............................................................................................. 11

*Azar v. Yelp, Inc.*,
   2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ...................................................... 20

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) .............................................................................................. 11

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .............................................................................................. 11

*Boston Ret. Sys. v. Alexion Pharm., Inc.*,
   556 F. Supp. 3d 100 (D. Conn. 2021) ................................................................... 33

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
   866 F. Supp. 2d 223 (S.D.N.Y. 2012) ................................................................... 27

*Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
   2018 WL 2382600 (S.D.N.Y. May 24, 2018) ....................................................... 29

*City of Providence v. Aeropostale, Inc.*,
   2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ....................................................... 28

*Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
   794 F.3d 297 (2d Cir. 2015).................................................................... 11, 33, 39

*Florida State Bd. Of Admin. v. Green Tree Fin. Corp.*,
   370 F.3d 645 (8th Cir. 2001) ................................................................................ 38

*Francisco v. Abengoa, S.A.*,
   559 F. Supp. 3d 286 (S.D.N.Y. 2021).................................................................... 44

*Freudenberg v. E\*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010).................................................................... 12

*Gagnon v. Alkermes PLC*,
   368 F. Supp. 3d 750 (S.D.N.Y. 2019).................................................................... 16

*Galestan v. OneMain Holdings, Inc.*,
  348 F. Supp. 3d 282 (S.D.N.Y. 2018)...................................................................... 28

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000)........................................................................... 12, 27

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) ................................................................................. 15

*In re Bear Stearns Cos., Inc. Sec., Deriv. and ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011)................................................................ 23, 31

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001) ...................................................................... 16

*In re Carter-Wallace, Inc. Sec. Litig.*,
  1999 WL 1029713 (S.D.N.Y. Nov. 10, 1999)........................................................ 38

*In re CPI Card Grp., Inc. Sec. Litig.*,
  2017 WL 4941597 (S.D.N.Y. Oct. 30, 2017) ........................................................ 25

*In re Dentsply Sirona, Inc. Sec. Litig.*,
  665 F. Supp. 3d 255 (E.D.N.Y. Mar. 29, 2023)................................................. 14, 40

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
  469 F. Supp. 2d 88 (S.D.N.Y. 2006)..................................................................... 30

*In re Gen. Elec. Co. Sec. Litig.*,
  857 F. Supp. 2d 367 (S.D.N.Y. 2012)................................................................... 32

*In re Guilford Mills, Inc. Sec. Litig.*,
  1999 WL 33248953 (S.D.N.Y. July 21, 1999) ....................................................... 39

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
  20 F.4th 131 (2d Cir. 2021) ................................................................................ 17

*In re Hal Luftig Co.*,
  655 B.R. 508 (Bankr. S.D.N.Y. 2023).................................................................... 25

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
  2015 WL 3852089 (D.C. Cir. June 23, 2015)......................................................... 31

*In re Henry Schein, Inc.*,
  2019 WL 8638851 (S.D.N.Y. Sept. 27, 2019)........................................................ 17

*In re HEXO Corp. Sec. Litig.*,
    524 F. Supp. 3d 283 (S.D.N.Y. 2021)....................................................................... 38

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ............................................................ 39

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
    251 F. Supp. 3d 596 (S.D.N.Y. 2017)................................................................. 12, 18

*In re Marsh & McLennan Cos. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006)................................................................ 12, 16

*In re MF Global Holdings Secs. Litig.*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013)..................................................................... 30

*In re Mylan N.V. Sec. Litig.*,
    2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ........................................................ 40

*In re Oxford Health Plans, Inc.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) ............................................................................ 39

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015)..................................................................... 27

*In re Plantronics, Inc. Sec. Litig.*,
    2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) ....................................................... 35

*In re Regeneron Pharm. Inc. Sec. Litig.*,
    2005 WL 225288 (S.D.N.Y. Feb. 1, 2005)............................................................. 29

*In re Sadia, S.A. Sec. Litig.*,
    643 F. Supp. 2d 521 (S.D.N.Y. 2009)..................................................................... 41

*In re Salix Pharm., Ltd.*,
    2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)..................................................... 15, 28

*In re Scottish Re Grp. Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007)..................................................................... 34

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ........................................................ 27

*In re Silvercorp Metals, Inc. Sec. Litig.*,
    26 F. Supp. 3d 266 (S.D.N.Y. 2014)....................................................................... 37

vi

*In re STEC Inc. Sec. Litig.*,
2011 WL 2669217 (C.D. Cal. June 17, 2011) ................................................................ 15

*In re Top Tankers, Inc. Sec. Litig.*,
528 F. Supp. 2d 408 (S.D.N.Y. 2007) .......................................................................... 42

*In re Tower Auto. Sec. Litig.*,
535 F. Supp. 2d 445 (S.D.N.Y. 2008) .......................................................................... 35

*In re U.S. Bioscience Sec. Litig.*,
806 F. Supp. 1197 (E.D. Pa. 1992) .............................................................................. 15

*In re Vale S.A. Sec. Litig.*,
2020 WL 2610979 (E.D.N.Y. May 20, 2020) .............................................................. 29

*In re Van der Moolen Holding N.V. Sec. Litig.*,
405 F. Supp. 2d 388 (S.D.N.Y. 2005) .................................................................... 16, 20

*In re Virtus Inv. Partners, Inc.*,
195 F. Supp. 3d 528 (S.D.N.Y. 2016) .......................................................................... 16

*In re Vivendi Universal, S.A. Sec. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011) .......................................................................... 30

*In re Vivendi Universal, S.A.*,
381 F. Supp. 2d 158 (S.D.N.Y. 2003) .......................................................................... 37

*In re Zillow Grp., Inc. Sec. Litig.*,
2019 WL 1755293 (W.D. Wash. Apr. 19, 2019) .......................................................... 36

*Ind. Pub. Ret. Ret. Sys. v. SAIC*,
818 F.3d 85 (2d Cir. 2016) ......................................................................................... 25

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ....................................................................................... 43

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*,
2011 WL 2444675 (D. Del. June 14, 2011) ................................................................. 37

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015) ....................................................................................... 43

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ...................................................................................... 41

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
  518 F. Supp. 3d 772 (S.D.N.Y. 2021)................................................................. 40

*Marks v. CDW Computer Centers, Inc.*,
  122 F.3d 363 (7th Cir. 1997) ............................................................................ 27

*Mateo v. Bristow*,
  2013 WL 3863865 (S.D.N.Y. July 16, 2013) ................................................... 11

*Matrix Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)............................................................................................ 11

*Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings, Inc.*,
  2012 WL 4049953 (S.D.N.Y. Sept. 14, 2012)................................................... 36

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014).............................................................................. 12

*Moab Partners, L.P. v. Macquarie Infrastructure Corp.*,
  2022 WL 17815767 (2d Cir. Dec. 20, 2022) .................................................... 25

*Nguyen v. New Link Genetics Corp.*,
  297 F. Supp. 3d 472 (S.D.N.Y. 2018)............................................................... 39

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000).............................................................................. 33

*Oklahoma Firefighters Pension & Ret. Sys v. Lexmark Int'l, Inc.*,
  367 F. Supp. 3d 16 (S.D.N.Y. 2019)................................................................. 40

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
  2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020).............................................. 2, 41

*Schaeffer v. Nabriva Therapeutics plc*,
  2020 WL 7701463 (S.D.N.Y. Apr. 28, 2020).................................................... 23

*Schwab v. E*Trade Fin. Corp.*,
  285 F. Supp. 3d 745 (S.D.N.Y. 2018)............................................................... 38

*Set Capital LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021)................................................................................ 12

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010)......................................................... 28, 30, 31, 32

*Solomon v. Sprint Corp.*,
   2022 WL 889897 (S.D.N.Y. Mar. 25, 2022) ........................................................... 18

*Spitzberg v. Hous. Am. Energy Corp.*,
   758 F.3d 676 (5th Cir. 2014) ................................................................................. 37

*Stratte-McClure v. Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015) ............................................................................... 12, 25

*Sun v. TAL Educ. Grp.*,
   2023 WL 6394413 (S.D.N.Y. Sept. 29, 2023) ....................................................... 38

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ......................................................................................... 33, 37

*Wilson v. LSB Indus., Inc.*,
   2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) ......................................................... 28

STATUTES

15 U.S.C. §78u-4(b)(1)(B) ............................................................................................ 12

15 U.S.C. §78u-5(c) ..................................................................................................... 28

15 U.S.C. §78u–5(c)(1)(B) ........................................................................................... 32

15 U.S.C. § 78u-4(b)(2) .......................................................................................... 11, 32

15 U.S.C. §78j ............................................................................................................. 11

RULES

Fed. R. Civ. Proc. 12(g) ............................................................................................... 11

Fed. R. Civ. Proc. 15(a)(2) ........................................................................................... 43

REGULATIONS

17 C.F.R. §240.10b-5 ................................................................................................... 11

17 C.F.R. §240.10b5-1(c)(1)(i)(A) ............................................................................... 39

17 C.F.R. § 229.303(b)(2)(i) ........................................................................................ 25

17 C.F.R. § 229.303(b)(2)(ii) ....................................................................................... 24

**PRELIMINARY STATEMENT**

UNFI, a distributor of grocery and non-food products, bought inventory ahead of known price increases and did not pass those "discounts" to retailers, a practice called forward buying. The difference between the discounted inventory and the sale price to retailers was a source of at least $275 million of profits during the Class Period and was later called "procurement gains."[1] Forward buying involves a cost-benefit analysis by management based on, among other things, the Company's inventory levels, shelf life, and expected demand. For example, tomatoes are not a good candidate because they have a short shelf life, whereas personal care items such as shaving cream are high-value items, easy to store, and have a long shelf life. But if the Company already has 700 pallets of shaving cream and only anticipates selling 500 pallets within the next quarter, it is unlikely that buying an additional 300 pallets ahead of a price increase will be beneficial, thus limiting how much UNFI forward buys.

During the Class Period, Defendants attributed profit growth to inflation and to long-term efficiency initiatives intended to streamline the Company's processes, but failed to disclose that atypical and highly elevated levels of forward buying were the principal driver of the Company's growth. This omission was material to investors because the Company's forward buying strategy was unsustainable and based on a unique economic environment of continually and rapidly increasing inflation: at some point, forward buying would no longer be a sound decision, whether due to the amount of inventory already on hand, cost of capital, warehouse limitations, customer

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed in Plaintiffs' Second Amended Class Action Complaint for Violations of the Federal Securities Laws (the "SAC," ECF 39). Unless otherwise indicated, citations in the form of "¶_" are to the SAC, references to "MTD" are to Defendants' Memorandum of Law in Support of their Motion to Dismiss Plaintiffs' Second Amended Complaint (ECF 49), all emphasis has been added, and all internal citations, quotation marks, and alterations have been removed.

1

demand changes or—as is the case here—fewer price increases. In a series of disclosures between December 7, 2022 and September 26, 2023, Defendants slowly revealed that UNFI had profited from "significant" procurement gains resulting from "out of pattern" forward buying but that these unusual profits could no longer be expected because "[t]he number of price increases that are happening now is reduced by about 2/3 from last year." Analysts commented that "absent [forward buying], profitability would have been much worse." As a result, the Company's stock price fell from a Class Period high of $55.61 per share to close at $13.73 per share on September 26, 2023, wiping out billions in market capitalization.

Defendants do not dispute that UNFI was forward buying at a materially elevated level during the Class Period. Rather, they claim that they did not have a duty to disclose the forward buying or the degree to which it affected the Company's growth. Defendants' Class Period statements identifying the supposed reasons for UNFI's success, however, were materially misleading in light of these omissions. Defendants knew the extent to which forward buying aided UNFI's profits, or at the very least they were severely reckless in not knowing that more than 25.5% of UNFI's reported profits were due to significant, unusual forward buying.

The magnitude of the procurement gains and their impact on UNFI's profitability, along with Defendants' representations that they were monitoring operational efficiencies through UNFI's Value Path initiative, substantially undermine Defendants' narrative that they were unaware of UNFI's dependence on the inflation-related procurement gains. "Although Defendants may have hoped that [UNFI] would uncover new sources of future [profit] and thus that the risk of lower future [profit] . . . would not materialize, [Plaintiffs have] plausibly alleged facts that give rise to a strong inference that the decision not to disclose this information was nonetheless reckless." *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *13

(S.D.N.Y. Apr. 14, 2020). Defendants' motion to dismiss should be denied in its entirety.

## STATEMENT OF FACTS

### A.    UNFI, A Grocery Wholesale Distributor, Focused On Cost Savings Measures To Drive Profitability

UNFI is the largest publicly traded grocery wholesaler in North America. ¶33. At least 95% of the Company's net sales are from its Wholesale segment, which includes distributing and selling grocery and non-food products to national grocery chains and independent retailers throughout the U.S. and Canada. ¶¶35-38. Following the 2018 acquisition and subsequent integration of SuperValu, one of the largest wholesalers and retailers in North America, UNFI's then-Chief Marketing Officer, Defendant Christopher Testa ("Testa"), stated that "Going forward, we'll be placing a heavy emphasis on . . . using higher level data analytics to drive decision-making and generate these incremental operating efficiencies." ¶¶44-46. In December 2020, the Company announced its "Value Path" initiative to generate $70 to $100 million in cost efficiencies "across key elements of pricing, procurement, operations, and administrative functions." ¶46. To improve profitability, management was focused on operational efficiencies, including reducing inventory costs. ¶47.

Investors and analysts were also keenly focused on UNFI's profitability. Specifically, they were focused on three measures: (i) gross profit, which is net sales less the cost of goods sold; (ii) gross margin, which represents the percentage of sales that UNFI is able to convert into gross profit; and (iii) adjusted EBITDA, which is a non-GAAP measure that reflects earnings before interest, taxes, depreciation, and amortization, subject to certain adjustments. ¶¶47-50.

### B.    Defendants Told The Market That UNFI Passed Inflationary Cost Increases To Its Customers

From late 2021 through 2022, the U.S. experienced rapid inflation after years of steady inflation, fueled by consumer pantry-stocking during the pandemic, that reached historic levels.

¶¶53-54. The grocery and food-at-home business was not immune to rising inflation, and food prices skyrocketed. ¶¶57-58. Inflation may result in declining margins and reduced profits due to the increase in the cost of inputs used in production. ¶55. According to the Company, the rising costs in an inflationary environment lead to higher sales, but prolonged inflation "may have a negative impact on our profit margins and results of operations to the extent that we are unable to pass on all or a portion of such product cost increases to our customers." ¶¶59-60.

### C.    During The Class Period, UNFI Strategically Bought Ahead Of Known Price Increases

Faced with increasing industry volatility and an uncertain macroeconomic environment in the wake of the pandemic, unbeknownst to investors, Defendants leveraged rising inflation through massive undisclosed "strategic" forward buying. ¶¶61, 69, 85, 221. Forward buying is the practice of buying product in excess of demand ahead of known price increases. ¶61. Forward buying does not pass on the discounted cost of inventory to retailers; rather, the distributor implements a price increase concurrently with its supplier's price increase, "so that the amount of the price increase is captured as additional margin on goods purchased before the increase goes into effect." *Id.* UNFI later referred to the profit from such forward buying as "procurement gains." *Id.*

In the months leading up to the start of the Class Period, Defendants were admittedly aware of and expecting price increases. ¶¶66, 223. In June 2021, Defendant Testa stated that UNFI had "received notice from many suppliers indicating they will be taking price increases in the coming months" and that these price increases were "higher than normal." ¶67. He explained that UNFI has a "process for CPG [consumer-packaged goods] increases, our suppliers increases where we get notification 60, 90 days in advance" and that the Company engages in "[d]aily conversations with [its] suppliers." ¶¶66, 223.

For each forward buying opportunity, Defendants had to conduct a cost-benefit analysis to

determine whether the potential savings from buying ahead of the known price increase outweighed the higher carrying costs incurred by holding inventory in excess of demand. ¶¶63-64. Defendants' forward buying practices came with significant undisclosed risks: if the market demand were to change, UNFI could be overloaded with inventory and would have to sell through its inventory at fire-sale prices or write-off units entirely. ¶65.

The Company made huge profits from procurement gains. During the Class Period, UNFI was able to use massive amounts of forward buying ahead of known price increases to increase its EBITDA by at least 25% to 47%. ¶¶70, 118, 125. Instead of disclosing this crucial driver of profitability, Defendants misleadingly attributed the Company's outperformance during the Class Period to inflationary gains and to operational efficiencies from Value Path. ¶70. However, without the benefits from forward buying, UNFI's profitability would have been materially lower. *Id.*

**D.    During The Class Period, Defendants Misleadingly Attributed Positive EBITDA And Gross Margin Results To Inflation And The Company's Efficiency Initiatives, While Omitting To Disclose The "Substantial" And Atypical Benefit Of Forward Buying**

The Class Period starts on December 8, 2021, when Defendants announced the Company's 1Q22[2] financial results, reporting net sales of $7.0 billion and net income of $76 million. ¶71. The Company also stated that gross margin rate improved to 14.89% as compared to 14.51% in 1Q21, which was "driven by improvements in the Wholesale segment margin rate, including the impact of inflation and the Company's Value Path initiative." *Id.*

UNFI reported similarly improved results for each of the next three quarters in fiscal 2022, each time attributing the positive financials to the general "impact of inflation" and UNFI's

---

[2] The Company's fiscal year ends on Saturday closest to July 31 and contains either 52 or 53 weeks. ¶41. Hereinafter, a given quarter within a fiscal year is denoted as "_Q__." For example, "1Q22" means the first quarter of fiscal year 2022, which is the three-month period ending on October 30, 2021.

efficiency initiatives without disclosing that the improvements were due to highly elevated procurement gains. ¶¶73-82. Even worse, Defendants falsely represented that this heightened level of profitability was sustainable irrespective of whether inflation continued to increase or even whether deflation occurred. For example, in response to an analyst asking how deflation would impact the margin structure, Defendant J. Alexander Miller Douglas ("Douglas"), UNFI's CEO, stated that the Company had planned for "multiple potential scenarios, and interestingly enough, the actions that we would take in virtually every scenario are approximately the same." ¶77. He falsely assured investors that "I think we'll be in strong shape regardless of the scenario," while failing to disclose that the Company's profitability hinged on a continuation of rapid inflation and a corresponding continuation of heightened levels of forward buying. *Id.*

Ahead of the Company's announcement of fourth quarter and full year 2022 earnings, UBS "expect[ed] UNFI to convey conservative expectations as it laps a challenging inflation comparison & faces continued macro uncertainty." ¶80. However, the Company continued to surprise the investing public, reporting on September 27, 2022 that UNFI's 4Q22 gross margin rate increased to 14.5% of net sales, which was "driven by improvements in the Wholesale segment margin rate, including the impact of inflation and the Company's efficiency initiatives, partially offset by changes in customer mix." ¶80.

Based on UNFI's performance in fiscal 2022 and expected momentum in fiscal 2023, Defendants provided fiscal 2023 guidance on September 27, 2022, including adjusted EBITDA between $850 million and $880 million, which represented 4% growth over fiscal 2022. ¶81. Given the better-than-expected profitability (despite a sales miss) and the promising financial outlook, analysts noted the results "reflected the benefit of inflation on inventory" and lauded management's "warehouse-level efficiency efforts." ¶82.

6

**E.**    **Over The Course Of Nine Months, UNFI Slowly Reveals That It Had Benefited From Massive Forward Buying That It Could No Longer Sustain As Inflation Eased, Causing Plaintiffs' Losses**

Soon after the Company provided fiscal 2023 guidance, inflation began to slow and UNFI's profitability began to crumble. The truth that had been concealed by Defendants' misrepresentations was gradually revealed to the market in a series of four disclosure events constituting partial corrective disclosures and/or partial materializations of concealed risks. ¶213.

**1.**    **On December 7, 2022, UNFI's Profitability Shows Signs Of Weakness When Defendants Report A Gross Margin Decline**

On December 7, 2022, Defendants reported that UNFI's gross profit rate for 1Q23 decreased to 14.6% of net sales (compared to 14.8% in 1Q22) due to "changes in customer mix as we continue to grow sales with larger customers." ¶83. While this decline may appear modest in absolute terms, UNFI's performance was significantly worse than the market expected, and its stock price dropped 14.7% that day as a result. ¶¶84-85.

Defendants, however, continued to conceal the root of the problem. In response to an analyst question during the 1Q23 earnings call about whether there was "anything specific about this quarter" that impacted gross margins or whether customer mix would pressure margins throughout the year, Defendant Douglas responded that "I would describe what you saw in the first quarter as minor and just more a function of the *temporary* growth drivers in our customer file." ¶86. Defendants failed to disclose that UNFI's gross profit and adjusted EBITDA during the past year had benefitted significantly from (and was substantially dependent on) atypical procurement gains due to elevated forward buying and that the Company's underlying profitability was much worse than investors were led to believe. ¶89. Defendants assured investors that the margin decline was "temporary" and that the Company was "*on track* to deliver [its 2023] full year guidance provided in September." ¶87.

7

**2.** **On March 8, 2023, Defendants Admit That 2Q22 Had Benefited From Significant Procurement Gains And Revised Fiscal 2023 Guidance That Purports To Reflect The Decline In Forward Buying Opportunities**

On March 8, 2023, UNFI reported a $6 million year-over-year decline in gross profit for 2Q23, despite a 6% increase in net sales. ¶91. The Company revealed that the gross profit rate declined to 13.7% (compared to 14.5% in the prior year period), which was "primarily driven by lower current period procurement gains due to the decelerating rate of inflation and lower inventory gains." *Id.* On this news, the Company's share price fell $11.49, or 28.1%, to close at $29.47 per share that same day. ¶102.

This was the first mention that UNFI had benefited from a "significant level of procurement gains" during the Class Period. ¶93. Defendant John Howard ("Howard"), UNFI's CFO, noted that "[t]he number of price increases that are happening now is reduced by about 2/3 from last year," thereby reducing the number of forward buying opportunities. ¶99. Investors and analysts were blindsided by the news of an "*unusual profit during last years'* call," and BMO Capital stated that UNFI's profitability "had been boosted by *unsustainable procurement gains* during the elevated inflationary environment." ¶¶104, 107-08. In fact, Guggenheim surmised that the Company's "profitability would have been much worse" without the benefit of procurement gains. ¶¶105-06. In a March 8, 2023 note, Roth Capital was in disbelief that Defendants did not know or expect lower procurement gains, stating: "The diminished procurement gains should have been better anticipated (caused by decelerating rate of inflation)." ¶110.

Also on March 8, 2023, the Company provided revised guidance for fiscal 2023 and withdrew its previously issued guidance for fiscal 2024. ¶111. For fiscal 2023, Defendants lowered guidance for net income and EPS by more than 50% and also significantly lowered guidance for adjusted EBITDA, now expecting between $715 and $785 million (as compared to the previously

8

issued guidance of $850 million and $880 million). *Id.* Though the prior guidance had been affirmed more than 40% of the way through 2Q23, Defendant Douglas claimed that the revised guidance reflected the sharp decline in procurement gains from forward buying as management was now "able to understand these issues." ¶¶94, 112.

### 3.    On June 7, 2023, Defendants Disclose Further Margin Erosion And Reveal The Magnitude Of The Forward Buying Benefit To Prior Results

On June 7, 2023, the Company shocked investors by disclosing that lower procurement gains eroded gross margins even further, reporting in a press release that 3Q23 gross profit decreased $12 million due to "lower inflationary benefits primarily related to reduced procurement gains, as well as higher shrink." ¶113. The Company reported that the gross profit rate declined to 13.3%, which was "primarily driven by the volatile macroeconomic environment, which led to lower inflationary benefits and reduced procurement gains" and, as a result of the "pressure" on margins, the Company reduced its fiscal 2023 outlook again. *Id.* On this news, the Company's stock price fell $4.11, or 14.9%, to close at $23.46 per share that same day. ¶114. The stock continued to fall the next trading day by $1.56, or 6.6%, to close at $21.90 per share on June 8, 2023. *Id.*

These results missed the guidance provided just three months earlier, and Defendant Howard claimed that "relative to our expectations at the end of Q2, the decline was greater than anticipated." ¶115. Defendant Douglas also admitted that procurement gains were a "tremendous source of margin expansion" during fiscal 2022: "Last year, in fiscal '22, we saw a big upswing in value that we got as inflation took hold and our inventory was valued lower than the market price, and we strategically forward-[b]ought. And it was a tremendous source of margin expansion." ¶117. Defendant Howard explained that the Company "saw that inflation rising as we moved through Q3 [2022], providing that forward-buy opportunity," leading to procurement gains

9

exceeding $50 million in 3Q22. ¶¶117-18. Wells Fargo wrote in its June 7, 2023 report that "Credibility at UNFI is about as low as it gets, as it's shocking how the company seemed caught off guard by these issues given their magnitude." ¶124.

> **4.    On September 26, 2023, Defendants Reveal That An "Out-of-Pattern Increase In Procurement Gains" Benefited Profitability By At Least $275 Million Within A 12-Month Period**

On September 26, 2023, UNFI announced disappointing 4Q23 financial results, reporting a 56.3% decline in adjusted EBITDA to $93 million. ¶125. The "more than $100 million" decline in gross profit year-over-year was attributed to "lower levels of procurement gain opportunities resulting from decelerating inflation." *Id.* Defendant Douglas admitted that UNFI "saw an out of-pattern increase in procurement gains beginning in January of '22" but that the "high number of price events [providing forward buying opportunities] have kind of returned back to normal levels." ¶129. On this news, the Company's stock price fell $5.19, or 27%, to close at $13.73 per share. ¶128.

The Company also provided fiscal 2024 outlook, which "reflects approximately $125 million in lower anticipated procurement gains, primarily in last year's first and second quarters, resulting from the continued decline in the number of supplier price increases compared to the first half of fiscal 2023." ¶127. The presentation accompanying the 4Q23 results showed that procurement gains exceeded $94 million for 4Q22. ¶130.

All told, procurement gains exceeded $275 million for the one-year period spanning second half of fiscal 2022 and the first half of fiscal 2023 (given at least $50 million in 3Q22, at least $100 million in 4Q22, and at least $125 in first half of fiscal 2023). ¶132. As Guggenheim expressed: "To be honest, we continue to be very surprised by the magnitude of the procurement gains. By our estimate, they totaled $250 million during 2H 2022/1H 2023 and have shrunk to virtually nothing." ¶132.

10

**ARGUMENT**

**I.    APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION**

Even in cases subject to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), on a motion to dismiss, a court must "accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015). While pleading scienter is subject to a "strong inference" standard,[3] every other element of a securities fraud claim is subject to the "plausibility" standard of *Twombly* and *Iqbal*.[4] *See Blanford*, 794 F.3d at 304, 307 (applying plausibility standard to falsity).

To state a claim under Section 10(b) and Rule 10b-5 promulgated thereunder, a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Matrix Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). Here, Defendants only contest falsity and scienter. As to these and all required elements, the SAC is adequately pled.[5]

**II.    DEFENDANTS' MISSTATEMENTS AND OMISSIONS ARE ACTIONABLE**

The "fundamental purpose" of the Exchange Act was to implement "a philosophy of full disclosure." *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988). Under Section 10(b) and SEC Rule 10b-5, defendants are liable for both material misstatements and omissions. 15 U.S.C. §78j; 17 C.F.R. §240.10b-5. An omission is actionable if "a statute or regulation requir[es] disclosure," or

---

[3] 15 U.S.C. § 78u-4(b)(2).

[4] *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 5770 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[5] Defendants waived their right to challenge the other elements of Section 10(b), and these non-contested elements are not addressed herein. *See* Fed. R. Civ. Proc. 12(g); *Mateo v. Bristow*, 2013 WL 3863865, at *8 (S.D.N.Y. July 16, 2013).

11

if "a corporate statement … would otherwise be inaccurate, incomplete, or misleading." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015).

"Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014). Indeed, "the law is well settled that so-called 'half-truths'—literally true statements that create a materially misleading impression—will support claims for securities fraud." *Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021). Thus, "[w]hen a corporation does make a disclosure—whether it be voluntary or required—there is a duty to make it complete and accurate." *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006).

Under the PSLRA and Rule 9(b), falsity is alleged if the plaintiff "specif[ies] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B). "A statement is misleading if a reasonable investor would have received a false impression from the statement." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010). To assess whether falsity is adequately alleged, "the proper inquiry requires an examination of defendants' misrepresentations, taken together and in context." *Jinkosolar*, 761 F.3d at 250-51.

Whether a statement is materially false or misleading "is generally a question reserved for the trier of fact." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017). Disputes concerning falsity cannot be decided on a motion to dismiss, "unless the Court, drawing all reasonable inferences in favor of the plaintiff, determines that ***reasonable minds could not differ*** on the question of whether the statements alleged in the complaint were misleading in light of the circumstances under which they were made." *Id.*; *see Ganino v. Citizens Utils. Co.*, 228 F.3d

154, 162 (2d Cir. 2000) (same rule applies to materiality).

>    **A.    Defendants' Statements About The Drivers Of UNFI's Improved Profitability Were Materially Misleading**
>
>       **1.    Defendants' Attribution Of UNFI's Improved Profitability To Inflation And The ValuePath Initiative, While Failing To Disclose The Atypical And Elevated Levels Of Procurement Gains, Presented A Materially Misleading Impression Of The Sources Of UNFI's Success**

Throughout the Class Period, Defendants made misleading statements about the causes of improvement in UNFI's financial performance and profitability metrics, attributing those improvements to the general effects of inflation and UNFI's ValuePath initiative, without disclosing the most critical driver of the results: a highly elevated and unsustainable level of procurement gains due to strategic forward buying. For example, on December 8, 2021, UNFI reported that its gross margin rate for 1Q22 improved to 14.89% as compared to 14.51% for 1Q21, stating that the increase was "***driven by improvements in the Wholesale segment margin rate, including the impact of inflation and the Company's ValuePath initiative***." ¶143. Defendants made similar statements concerning UNFI's results for 2Q22, 3Q22, and 4Q22.[6]

These statements were misleading because the principal driver of the improvements in UNFI's gross margin rate and gross profit rate was an atypical and highly elevated level of procurement gains. *E.g.*, ¶118 (June 7, 2023 disclosure that procurement gains had accounted for at least 25.5% of adjusted EBITDA for 3Q22); ¶125 (at least 47% for 4Q22).[7] These gains are

---

[6] *See* ¶153 ("increase in gross margin rate was driven by improvements in the Wholesale segment margin rate, including the impact of inflation and the Company's ValuePath initiative"); ¶159 (same); ¶163 ("increase in gross margin rate, excluding the LIFO charge, was driven by improvements in the Wholesale segment margin rate, including the impact of inflation and the Company's ValuePath initiative"); ¶171 (same); ¶175 ("increase in gross margin rate, excluding the LIFO charge, was driven by improvements in the Wholesale segment margin rate, including the impact of inflation and the Company's efficiency initiatives, partially offset by changes in customer mix").

[7] Def. Ex. 9 at 13 (March 8, 2023 statement that "as the year went on, margins continued to improve

wholly distinct from the general impact of inflation, and the failure to disclose them created a misleading impression about the causes and nature of UNFI's financial performance. ¶74 (company passed inflationary cost increases to customers, but did not pass along forward buying "discounts;" latter expanded margins significantly); *see also* ¶129 (September 26, 2023 statement attributing procurement gains to "frequency and depth" of "actual price increase events," not inflation).[8] By omitting to disclose the Company's reliance on forward buying, Defendants deprived investors of the ability to assess whether this improved profitability was sustainable. *Cf. In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 283 (E.D.N.Y. Mar. 29, 2023) (statements attributing sales growth to increased demand "could plausibly mislead a reasonable investor to believe that sales growth was driven by end-market demand when, in fact, it was driven by . . . minimum purchase requirements").

One confirmation of the misleading nature of Defendants' statements is the reaction of the analyst community when the truth was revealed. Multiple analysts expressed shock at the elevated levels of procurement gains and criticized Defendants for failing to disclose this material information earlier, concluding that management credibility was severely damaged. ¶¶103-10, 123-24. For example, after UNFI announced on March 8, 2023 that its gross profit rate declined due to "lower current period procurement gains" (¶92), BTIG wrote, "***We are surprised by how severely the bottom fell out of the story today and exposed so many weaknesses***." ¶108. BMO Capital explained that the Company's new disclosure revealed that UNFI's profitability "had been boosted by ***unsustainable procurement gains*** during the elevated inflationary environment" and

---

as a result of forward buying").

[8] Further supporting that forward buying was distinct from inflation, the impact of procurement gains was not commensurate with the change in inflation. *Compare, e.g.*, ¶57 (1.5% increase in inflation during 3Q22)*, with* ¶118 (at least 25.5% profit benefit from forward buying in same period).

that the "13% cut to EBITDA guidance (at the mid-point) suggests that procurement gains account

for at least ~10-15% of EBITDA." ¶107. Guggenheim emphasized that the Company "*did not call*

*out unusual profit during last year's call*." ¶104. Following UNFI's announcement of a further

profitability decline on June 7, 2023, Wells Fargo commented that "*Credibility at UNFI is about*

*as low as it gets, as it's shocking how the company seemed caught off guard by these issues*

*given their magnitude*." ¶124.

These reactions support the conclusion that (1) the analysts covering UNFI had no idea

about the extreme levels of forward buying and procurement gains that underpinned UNFI's

profitability and (2) Defendants' prior statements about the causes of improvements in UNFI's

profitability had created a materially misleading impression to the market about the sources and

nature of UNFI's financial performance. An analyst's reaction to a defendant's public statements

can provide probative evidence of whether those statements were misleading to a reasonable

investor. *See, e.g.*, *In re U.S. Bioscience Sec. Litig.*, 806 F. Supp. 1197, 1206 (E.D. Pa. 1992)

("analysts' reactions . . . are indicia . . . of the materially misleading nature of the statements").[9]

Furthermore, the sharp price declines following UNFI's partial corrective disclosures bolsters the

inference that the omitted information was material. *See* ¶¶214-17 (relevant stock drops ranged

between 14% and 28%); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) ("market

reaction" to disclosure of security vulnerabilities "support[ed] the materiality of the misleading

---

[9] *See also In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *8 (C.D. Cal. June 17, 2011) ("Particular statements made by analysts underscore the plausibility and reasonableness of the false impression that Plaintiffs allege Defendants' statements conveyed. . . . [T]he third-party analyst statements comport with Plaintiffs' mosaic and the Court's conclusion that Defendants' statements could have been misleading to a reasonable investor."); *In re Salix Pharm., Ltd.*, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) ("that several different analysts understood Defendants as describing current inventory levels provides support for the Court's conclusion that Defendants' statements are reasonably interpreted as such").

omission"); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 588-89 (D.N.J. 2001) (16% stock drop "determinative" of materiality).

### 2. Defendants' Arguments Concerning About The Profitability Driver Statements All Fail

Defendants raise a host of arguments concerning the challenged statements about UNFI's profitability improvements. Each of these fails. First, Defendants argue that their statements were not misleading because they merely provided an accurate description of UNFI's historical results. MTD at 32. This argument misapprehends the nature of Plaintiffs' allegations. Plaintiffs do not challenge Defendants' statements for their reporting of UNFI's historical results; rather, Plaintiffs allege that Defendants' statements about the ***drivers*** of UNFI's profitability and the ***causes of changes*** in its profitability were misleading because they provided a deceptive and incomplete impression of the material factors underlying UNFI's performance.

Once a defendant chooses to speak about the sources of its success, it opens the door to the topic, and it needs to provide a materially complete and accurate disclosure, rather than a misleading half-truth. *See, e.g.*, *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) (if a defendant "puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information"); *In re Virtus Inv. Partners, Inc.*, 195 F. Supp. 3d 528, 536-37 (S.D.N.Y. 2016) (defendant's statement that fund's performance was "a key driver of our high levels of sales and net flows" was misleading half-truth where certain returns were based on hypothetical back testing rather than actual asset management);[10] *see generally In re Marsh & McLennan*, 501 F. Supp. 2d

---

[10] *See also Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 768-69 (S.D.N.Y. 2019) ("by speaking about the sources of Vivitrol's increasing sales, Defendants had a duty to fully and accurately disclose the facts pertaining to its marketing of Vivitrol to stakeholders in the criminal justice

at 469 ("corporations have a duty to disclose all facts necessary to ensure the completeness and accuracy of their public statements").

Second, Defendants argue that disclosure of UNFI's forward buying practices was not required because those practices were not illegal or otherwise improper. MTD at 33. Once again, Defendants miss the point. The pertinent question is not whether forward buying is illegal or improper, but whether Defendants' statements presented a misleading impression about the causes and sustainability of UNFI's financial performance. In an analogous context involving channel stuffing allegations, the Second Circuit has held that plaintiffs need not allege that the underlying channel stuffing was itself illegal or a fraudulent scheme. *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137 (2d Cir. 2021). Instead, the Second Circuit explained, for purposes of a claim for false or misleading statements under Rule 10b-5(b) (as opposed to a claim for a fraudulent scheme or practice under Rule 10b-5(a) or 10b-5(c)), plaintiffs only needed to show that defendants' statements attributing high sales to strong consumer demand were materially misleading in light of unsustainable channel stuffing practices. *Id.*

Third, Defendants argue that their statements "allowed" for the possibility of procurement gains through forward buying and that "the market broadly understood" this. MTD at 33. But there is a world of difference between a statement that "allows" for the possibility of procurement gains and a statement that identifies procurement gains as a principal driver of a company's profitability. That Defendants identified "the impact of inflation" as one driver of UNFI's results does not correct the misleading impression left by their statements because forward buying provides a

---

system and the role that those efforts played in Vivitrol's financial success"); *In re Henry Schein, Inc.*, 2019 WL 8638851, at *15 (S.D.N.Y. Sept. 27, 2019) ("In speaking about the sources of Schein's success, Defendants left out a material basis for the company's achievements — Schein's alleged collusion with its competitors . . . to fix prices and margins.")

17

separate benefit that is independent from the general impact of inflation, and the market had no idea that UNFI was engaging in materially elevated levels of forward buying. The response of the analyst community following UNFI's disclosure of the unusual procurement gains belies Defendants' assertion that "the market broadly understood" UNFI's practices and instead supports an inference that the market was misled about the factors driving UNFI's profitability. *See supra* at 14-15. At the very least, reasonable minds can differ as to whether Defendants' statements, read fairly and in context, provided an accurate representation of the drivers of UNFI's profitability or whether they were deceptive half-truths. Under those circumstances, dismissal is not appropriate. *See In re Inv. Tech. Grp.*, 251 F. Supp. 3d at 609; *Solomon v. Sprint Corp.*, 2022 WL 889897, at *6 (S.D.N.Y. Mar. 25, 2022) ("possibility" that "technically true" statements "could mislead the market . . . . is sufficient to defeat a motion to dismiss").

Finally, Defendants argue that their statements were not misleading because Defendants provided risk warnings stating that the company might face decreased forward buying opportunities in the future. MTD at 34. But whatever effect those warnings might have on Defendants' forward-looking statements, *see infra* at Sec. II.H.3, they cannot insulate Defendants from liability as to their **historical** statements about the factors driving UNFI's **past** results. Moreover, as explained below, Defendants' risk warnings failed to meaningfully describe the nature and the magnitude of the risks, and, in fact, those warnings themselves were affirmatively misleading. *See infra* at II.D. Accordingly, the risk warnings do not correct the misleading impression left by Defendants' driver statements.

**B.    Defendants' Statements About The Sustainability Of UNFI's Profits Were Materially Misleading**

The second category of challenged statements consists of Defendants' statements suggesting that the improvements in UNFI's profitability were sustainable and durable,

irrespective of whether inflation continued at elevated levels. For example, on June 7, 2022, Defendant Douglas was asked by an analyst how long he expected elevated levels of inflation to last and whether a change to a deflationary environment would have an effect on UNFI's margin structure. ¶165. Douglas responded by assuring the analyst that UNFI was planning on a full range of scenarios with respect to the level of inflation and that, whatever the scenario, UNFI would be well-positioned to remain profitable:

> They [the rates of inflation] certainly are elevated right now, and we don't see a real change. Having said that, as you would expect, *we scenario plan multiple potential scenarios*, and interestingly enough, *the actions that we would take in virtually every scenario are approximately the same*. . . . [W]e've got to keep our cost structure tight so that we stay agile in the face of whatever the scenario. And that's been our focus as we prepare for next year. And *I think we'll be in strong shape regardless of the scenario*.

*Id.*

This statement was materially misleading because it suggested that UNFI's margin structure would be roughly the same regardless of whether the rate of inflation was increasing or decreasing or even if *deflation* was occurring and that UNFI's profitability was sustainable in each of these scenarios. Of course, this suggestion was wildly off the mark because UNFI's improved profitability hinged on highly elevated levels of procurement gains due to forward buying, and a slowing of the rate of inflation (let alone deflation) would materially decrease the opportunities for such gains and have a devastating effect on UNFI's profitability. This statement, therefore, was inconsistent with the true state of affairs at UNFI, in which atypical and highly elevated procurement gains accounted for an enormous portion of UNFI's profitability.

Even after inflation began to slow, Defendants continued to maintain that UNFI's profitability could be sustained. On December 7, 2022, Defendants announced a *decrease* in UNFI's gross profit rate during 1Q23, but assured the market that this drop was "driven by changes in customer mix as we continued to grow sales with larger customers" and only "temporary."

19

¶¶193, 197; *see also* ¶¶83-89. An analyst asked Douglas about the decline in gross margins and asked whether investors should "think about that pressure kind of persisting throughout the year." ¶197. Douglas responded that "there'll be some fluctuation, but I would describe what you saw in the first quarter as ***minor*** and ***just more a function of the temporary growth drivers in our customer file***." *Id.* By characterizing the decline in profitability as "temporary" and related only "changes in customer mix," Defendants misled investors as to the true nature of the problem: that the UNFI's impressive profitability during the Class Period was dependent on atypical and highly elevated procurement gains due to forward buying, that these gains in turn depended on a continuing high rate of inflation, and that slowing inflation threatened to seriously undermine UNFI's profitability. *Cf. Azar v. Yelp, Inc.*, 2018 WL 6182756, at \*11 (N.D. Cal. Nov. 27, 2018) (defendants' attribution of slowdown to election and vacation time "conveyed the impression that these were one-off aberrations rather than any kind of a systemic problem"); *Van der Moolen Holding*, 405 F. Supp. 2d at 408 (sustaining allegation that "instead of disclosing the real reason for the decline in [company's] revenue, [defendants] falsely represented that such declines were temporary and due to poor market conditions").[11]

### C.    The "Impact of Inflation" Statements Were Materially Misleading

The third set of challenged statements consists of a series of statements in UNFI's Forms 10-Q and its 2022 Form 10-K with a heading called "Impact of Inflation" and a general description of the impact of inflation on UNFI's business.[12] These statements vary slightly, but each says that

---

[11] Defendants argue that the challenged statements in ¶165 and ¶197 are forward-looking statements protected by the PSLRA safe harbor. MTD at 35 n.24. As discussed below, however, these statements are not protected because, *inter alia*, (1) the statements are challenged for making omissions of historical fact, not for making forward-looking predictions, (2) they were not accompanied by meaningful cautionary language, and (3) they were made with actual knowledge of their falsity. *See* Sec. II.H., *infra*.

[12] *See* ¶149 (1Q22 10-Q); ¶157 (2Q22 10-Q); ¶169 (3Q22 10-Q); ¶189 (2022 10-K); ¶199 (1Q23

inflation generally has the effect of increasing net sales. None of statements makes any mention of the separate benefits of forward buying, which can provide procurement gains in an inflationary environment.

Defendants argue that these statements were not misleading because they "merely provide general information regarding the impact of inflation on UNFI" and the statements were not required to disclose UNFI's forward buying because "there is no actionable omission where the challenged statement says nothing about the omitted information." MTD at 35. However, even a general discussion of the impacts of inflation on UNFI's business is materially incomplete and misleading without a disclosure of forward buying and procurement gains, particularly during the Class Period where a heightened and atypical level of procurement gains was the key driver of improvements in the Company's profitability.

In any event, even if these statements are not independently actionable, they provide important context for assessing the misleading nature of Defendants' statements concerning the drivers of UNFI's profitability. *See* Sec. II.A.1., *supra*. Those statements, discussed above, attributed improvements in UNFI's profitability metrics to the "impact of inflation," in addition to UNFI's ValuePath initiative. *See* ¶¶143, 153, 163, 175. Defendants' discussion of the "Impact of Inflation" in UNFI's SEC filings, however, contained no mention of procurement gains, which means there is no basis for investors to have interpreted the references to the "impact of inflation" in the driver statements to include procurement gains, let alone a highly material level of procurement gains that were the principal driver of the results.

## D.    UNFI's Risk Factor Statements Were Materially Misleading

The fourth set of challenged statements consists of certain risk warnings in UNFI's Forms

---

10-Q) (with a slightly revised heading of "Impact of Product Cost Inflation").

10-Q and 2022 Form 10-K. Each of these identical statements warned that UNFI's financial results "could differ materially from those anticipated" due to "moderated supplier promotional activity, ***including decreased forward buying opportunities***." ¶¶151, 161, 173, 191, 201. While Defendants argue that these risk warnings shield their other misrepresentations from liability (MTD at 34, 37, 40), in fact, these risk warnings were themselves affirmatively misleading and an independent basis for liability.

The risk warnings at issue mischaracterized the nature of the risk and failed to disclose critical information necessary to understand the magnitude of the risk. First, the risk warning described the possibility of decreased forward buying opportunities merely as a subset of a risk of moderated supplier promotional activity. In other words, the warning was about the possibility that UNFI's suppliers might decrease their offers of promotions to distributors like UNFI and that UNFI would therefore face decreased opportunities to engage in forward buying. But that was not the risk that transpired, and that was not the principal risk at issue. Indeed, in their motion to dismiss, Defendants admit that there is a fundamental distinction between "promotion-related forward buying" and "inflation-related forward buying." MTD at 2.

The relevant risk here, about which Defendants misled the market, was the likelihood of a decrease in "inflation-related forward buying," not in "promotion-related forward buying." UNFI faced a serious risk that inflation would slow and that UNFI would therefore no longer be able to achieve supernormal procurement gains, upon which UNFI's profitability depended. UNFI's forward buying opportunities did not decrease because suppliers moderated their promotional activity; rather, UNFI's forward buying opportunities fell off a cliff because UNFI had engaged in a massive undisclosed campaign of inflation-related forward buying, and UNFI's ability to continue this atypical level of forward buying depended on a unique set of economic conditions—

namely, a continuation of rapidly increasing inflation. UNFI's risk warning failed to disclose that the highly elevated level of inflation-related forward buying during the Class Period was masking the extent to which Company's profitability was being negatively impacted by other problems. By failing to disclose these material facts, the risk warning misled investors as to the magnitude and nature of the risk and caused investors to materially underestimate the Company's reliance on atypical forward buying conditions as the principal driver of its profitability.

"Warnings of specific risks do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described." *In re Bear Stearns Cos., Inc. Sec., Deriv. and ERISA Litig.*, 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011). Moreover, a risk warning may itself be actionable if it presents a misleading impression of the status of that risk (or a related risk) and the likelihood that it will materialize. *See, e.g.*, *Schaeffer v. Nabriva Therapeutics plc*, 2020 WL 7701463, at \*11 (S.D.N.Y. Apr. 28, 2020) (risk warning that failure to comply with regulatory requirements could lead to FDA warning letters was materially misleading because defendant already had received a Form 483 letter; even though warning letters and Form 483 letters are very different and the specific risk had therefore not yet materialized, the risk warning could "could plausibly mislead a reasonable investor as to the status of Nabriva's interactions with the FDA up to that point"). In this case, UNFI's risk warning about promotion-related forward buying presented a misleading impression of the more pressing risk—a massive decrease in inflation-related forward buying opportunities, which could (and did) have a devastating effect on UNFI's financial performance.

**E.    Defendants' Statements About UNFI's Guidance Were Materially Misleading**

In three instances during the Class Period, Defendants provided guidance for UNFI's fiscal 2023 adjusted EBITDA. ¶177 (September 27, 2022); ¶¶193, 195 (December 7, 2022); ¶203 (March 8, 2023); *see also* ¶145 (reaffirming fiscal 2022 outlook on December 8, 2021). On September 27,

23

2022, Defendants also made statements purporting to explain the basis for this outlook. ¶183 ("our guidance for '23 . . . make[s] sure that we have the flexibility during the year to provide good returns"); ¶185 (the "number . . . is reasonable given the economic backdrop"); ¶187 (fiscal 2023 guidance reflects "that continued double-digit inflation is not sustainable" and "to drive sales, we would expect suppliers to start to invest in promotions"). These statements were false and/or misleading because they failed to disclose that the guidance was premised on the continuation of atypical, significant procurement gains due to forward buying and that, if inflation did not continue to increase, those gains were likely to decrease and UNFI's adjusted EBITDA would be materially lower. ¶¶146, 178, 184, 186, 188, 194, 196, 204. Defendants argue that these statements are protected by the PSLRA safe harbor, which they are not. *See* Sec. II.H.2, *infra*. In the March 8, 2023 statement, Defendants reduced the midpoint of adjusted EBITDA guidance by 10% based on the performance during 2Q23, but the revised guidance still failed to reflect that the number of forward buying opportunities were continuing to decline during 3Q23 "as compared to the third quarter of fiscal 2022." ¶¶112, 119, 203. Defendants continued to withhold information about the forward buying impact, so the March 8, 2023 statement did ***not*** reveal that the risk of decreased forward buying opportunities had materialized. *Cf.* MTD at 35 n.23.

F.      **Defendants Had A Duty To Disclose The Magnitude And Impact Of Their Forward Buying Pursuant To Item 303**

Even if the Court were to hold that Defendants made no false or misleading statements, Defendants would still be liable under Section 10(b) for a failure to make required disclosures under Item 303 of Regulation S-K. Item 303 requires issuers to disclose in their Forms 10-K and 10-Q "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). In the Second Circuit, a violation of Item 303's

24

disclosure requirements can "sustain a claim under Section 10(b) and Rule 10b–5 if the allegedly omitted information satisfies *Basic*'s test for materiality." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 103 (2d Cir. 2015); *accord Ind. Pub. Ret. Ret. Sys. v. SAIC*, 818 F.3d 85, 94 n.7 (2d Cir. 2016) (same); *Moab Partners, L.P. v. Macquarie Infrastructure Corp.*, 2022 WL 17815767, at *2 (2d Cir. Dec. 20, 2022) (same), *cert. granted*, 2023 WL 6319659 (Sept. 29, 2023).[13]

As detailed in the SAC, Defendants failed to disclose: (1) the number and magnitude of "strategic" and "substantial" forward buying opportunities; (2) that these opportunities materially improved UNFI's margins; and (3) that these opportunities were due to unique macroeconomic events that were not likely to continue or be repeatable. ¶¶206-11. Each of these omissions constituted known trends or uncertainties requiring disclosure. Moreover, that the forward buying opportunities arose from historically rising inflation levels constituted an "unusual or infrequent event" requiring disclosure. 17 C.F.R. § 229.303(b)(2)(i). Indeed, for several quarters starting in January 2022, UNFI's profits were unsustainably elevated due to massive undisclosed forward buying ahead of known price increases. ¶129. But a change in the rate of increasing prices would (and did) impact the number of forward buying opportunities, which necessitated disclosure of UNFI's reliance on unusual forward buying. *See In re CPI Card Grp., Inc. Sec. Litig.*, 2017 WL 4941597, at *3 (S.D.N.Y. Oct. 30, 2017) (Item 303 trend alleged where company's largest customers were significantly over-inventoried and initial rise in sales was unsustainable).

Defendants argue that the SAC fails to plead that "management actually knew the degree

---

[13] As Defendants note, the Second Circuit's decision in *Macquarie* is currently under review by the Supreme Court (MTD at 39), but unless and until the Supreme Court reverses that decision, this Court must follow the Second Circuit's binding precedents in *Stratte-McClure* and *SAIC*. *See In re Hal Luftig Co.*, 655 B.R. 508, 531 (Bankr. S.D.N.Y. 2023) (notwithstanding Supreme Court's grant of certiorari as to Second Circuit's decision and its issuance of a stay of mandate, the Second Circuit's decision "remains binding precedent on [the lower court] unless and until it is reversed, overruled, vacated, or otherwise modified by the Supreme Court").

to which inflationary procurement gains were driving the Company's margin." MTD at 39. But Item 303 does not require that Defendants knew the precise degree to which the inflationary procurement gains were driving UNFI's margin; it only requires that Defendants knew that a trend or uncertainty was "reasonably likely" to have a material impact on UNFI's financials. The facts in the SAC more than suffice to satisfy that standard. As discussed in greater detail *infra*, the SAC pleads facts sufficient to give rise to a strong inference that Defendants knew that procurement gains were at atypical and materially elevated levels and that these elevated levels were unlikely to be sustained. Among other things, Defendants knew about the significant price increases well in advance due to UNFI's contracts with suppliers, and Defendants had to engage in a cost-benefit analysis in order to make the forward buying decisions. Moreover, Defendants admitted that they were aware of the increasing forward buying opportunities during the Class Period and that the resulting procurement gains were reasonably likely to (and did) have a material impact on UNFI's financial performance and operations. *See, e.g.*, ¶223 (Testa admitted in June 2021 that he was aware of "higher than normal" CPG price increases).

Defendants further argue that they "*did* repeatedly disclose that inflation contributed to the Company's margin increases." MTD at 40 (emphasis in original). But, there is a critical difference between the general effect of inflation and procurement gains due to forward buying. *See supra* at pp. 13-14. The disclosures that Defendants provided did not identify the relevant known trends and uncertainties and instead obfuscated the highly material and unsustainable role of forward buying on UNFI's margins that Defendants knew about but refused to disclose.

Finally, Defendants argue that their omissions were "not material" in light of UNFI's cautionary statements. The risk disclosures provided by Defendants, however, were themselves misleading, *see supra* at II.D., and they are insufficient to protect Defendants under the PSLRA

safe harbor, *see infra* at II.H.3. Moreover, materiality cannot be resolved on the pleadings because it requires "delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363, 370 (7th Cir. 1997); *accord Ganino*, 228 F.3d at 162.

### G.    Defendants Fail To Identify "Puffery" With Requisite Specificity

Defendants argue that the "remaining statements" are inactionable puffery, but they only identify one. MTD at 38-39 (citing ¶183).[14] That statement reassured investors of Defendants' ability to deliver "good returns" despite "market uncertainty," which is not puffery because it was in response to an analyst inquiring as to the basis for UNFI's fiscal 2024 guidance. *See In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *12 (S.D.N.Y. Nov. 26, 2018) ("response to direct questions [made] to reassure the investing public about the portfolio's health" not puffery). Moreover, "[w]hether a representation is mere puffery depends, in part, on the context in which it is made." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015). Because Defendants fail to identify the purportedly generic statements, Plaintiffs (and the Court) cannot evaluate whether puffery applies. *See also Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012) ("In deeming a statement puffery at the motion to dismiss stage, courts must exercise great caution" because materiality is a "delicate, fact-intensive assessment[] . . . more properly left to the jury").

### H.    Defendants' Misstatements And Omissions Are Not Protected By The Safe Harbor

Defendants seek to avoid liability under the PSLRA's safe harbor for forward-looking

---

[14] Defendants cite the unchallenged portions of two other statements. *See* ¶¶179, 197.

statements. *See* MTD at 35-37. Under the PSLRA safe harbor, a forward-looking statement is generally not actionable if: (i) the statement is identified as forward looking and is accompanied by meaningful cautionary language; or (ii) the plaintiff has failed to plead or prove that the statement was made with "actual knowledge" that it was false and misleading. *See* 15 U.S.C. §78u-5(c); *see also Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010). Here, Defendants' statements are not protected by the safe harbor because (1) the safe harbor does not apply to omissions, (2) many of the challenged statements are statements of present condition or mixed statements, (3) the statements were not accompanied by meaningful cautionary language, and (4) the statements were made with actual knowledge of their falsity.

### 1.    The Safe Harbor Does Not Protect Defendants' Material Omissions

"The safe harbor . . . does not protect material omissions." *Salix*, 2016 WL 1629341, at *16. This is true, "regardless of whether the statements thereby rendered misleading were forward-looking." *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013); *see also Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at *3 (S.D.N.Y. Mar. 2, 2017) (safe harbor did not apply where plaintiff alleged "a material omission based on defendants' failure to disclose that no detailed engineering analysis had been performed" to support their estimates); *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 304 (S.D.N.Y. 2018) ("[C]ourts in the Second Circuit have consistently held that the PSLRA safe harbor provision does not protect material omissions.").

The gravamen of Plaintiffs' allegations with respect to each category of challenged statements is that Defendants omitted material facts rendering those statements materially misleading. Indeed, Defendants assert in their motion to dismiss that "Plaintiffs do not allege any affirmative misstatement of fact. . . . Instead, Plaintiffs rely on the theory that the failure to disclose this [concealed] information rendered other statements misleading." MTD at 31. Accordingly, the

safe harbor does not apply to any of these statements.

### 2.     The Safe Harbor Does Not Protect Present Or Historical Statements

"Representations of historical or current fact do not qualify for the PSLRA's safe harbor." *In re Regeneron Pharm. Inc. Sec. Litig.*, 2005 WL 225288, at *13 (S.D.N.Y. Feb. 1, 2005). Moreover, "it is well recognized that even when an allegedly false statement has both a forward looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply." *Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *8 (S.D.N.Y. May 24, 2018).

Many of the statements that Defendants assert are protected by the safe harbor are mixed statements that include forward-looking include representations of historical or present fact. *See* MTD at 35 n.24. For example, the December 8, 2021 statement that the "increase in gross margin rate *was driven* by improvements in the Wholesale segment margin rate" is a representation of historical fact about the performance of the quarter that ended on October 30, 2021. ¶143. Substantially similar representations of historical fact were made about the 3Q22 performance. ¶163 ("increase in gross margin rate . . . *was driven by*"). These are non-forward-looking elements that are not protected by the PSLRA safe harbor. *See, e.g.*, *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *16 (E.D.N.Y. May 20, 2020) (statement using present-tense and referring to prior damn collapse is not forward-looking).

Guidance premised on the continuation of atypical, substantial forward buying is also not protected. On December 7, 2022, when UNFI was more than halfway through 2Q23, Defendants reaffirmed its adjusted EBITDA guidance for fiscal 2023 based on the Company's performance in 1Q23. ¶193. As was later revealed, during 2Q23, UNFI had "experienced a *sequential* [i.e., quarter-over-quarter] deceleration in the number and magnitude of vendor product cost increases," which translated to fewer forward buying opportunities and significantly lower procurement gains.

29

¶140. Because the December 7, 2022 guidance misled investors as to the then-existing nature of forward buying opportunities, it is not protected by the PSLRA safe harbor. *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 569-70 (S.D.N.Y. 2011) (EBITDA growth projection "is misleading *as a matter of present fact*" because it was premised on undisclosed "huge one-time purchase accounting benefit"). Similarly, the revised fiscal 2023 outlook provided on March 8, 2023 failed to disclose then-existing facts about the year-over-year decline in forward buying opportunities. ¶203; *see also* ¶119 (in 3Q23, UNFI "experienced fewer and less significant vendor product cost increases as compared to the third quarter of fiscal 2022.").

### 3. The Forward-Looking Statements Were Not Accompanied By Meaningful Cautionary Language

"To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Slayton*, 604 F.3d at 772. "To be meaningful, cautionary language must precisely address the substance of the specific statement or omission that is challenged." *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 102 (S.D.N.Y. 2006); *see also In re MF Global Holdings Secs. Litig.*, 982 F. Supp. 2d 277, 304 (S.D.N.Y. 2013) (the cautionary language provided must match the risk addressed). Defendants "carry the burden of demonstrating that they are protected by the meaningful cautionary language prong." *Slayton*, 604 F.3d at 773.

As discussed *supra* at II.D, the cautionary language on which Defendants purport to rely (*i.e.*, that UNFI's financial results "could differ materially from those anticipated" due to "moderated supplier promotional activity, including decreased forward buying opportunities") was itself misleading, because it misrepresented the fundamental nature and gravity of the risk. The principal risk facing UNFI was not a risk of decreased forward buying opportunities as a function

30

of "moderated supplier promotional activity" (¶151), but a decrease of "inflation-related forward buying" (MTD at 2) due to a change in the inflationary environment. Moreover, Defendants failed to disclose the "hard facts critical to appreciating the magnitude of the risks described." *Bear Stearns*, 763 F. Supp. 2d at 495. Specifically, Defendants failed to disclose that UNFI had engaged in a massive level of inflation-related forward buying that was far different in magnitude from the promotion-related forward-buying that UNFI had traditionally engaged in, that this elevated level of forward-buying had led to huge procurement gains, that those procurement gains were the key driver of UNFI's profitability during the Class Period, that those gains masked the extent to which Company's profitability was being negatively impacted by other problems, and that if inflation slowed down, UNFI's profitability would decrease significantly.[15]

Moreover, the "decreased forward buying opportunities" risk disclosure was repeated verbatim in each of UNFI's 10-Qs between 1Q22 and 1Q23 as well as in its 10-K for fiscal 2022. *See* ¶¶151, 161, 173, 191, 201. At no point was this language materially revised for new conditions that were affecting the Company, *e.g.*, the fact that forward buying opportunities had in fact already started to subside as of the Company's 1Q23 disclosures on December 7, 2022, causing a decline

---

[15] Defendants also pointed to another risk factor identified in UNFI's December 8, 2021 press release: "the relatively low margins of our business, which are sensitive to inflationary and deflationary pressures." Def. Ex. 10 at 5; MTD at 37. This risk factor disclosure, however, was entirely boilerplate and did not call out any of the specific risks associated with inflation-related forward buying or elevated levels of procurement gains. Indeed, this risk factor disclosure was consistent with the generic description of the "Impact of Inflation" in UNFI's SEC filings that, as Defendants acknowledge, makes zero mention of forward buying or procurement gains. MTD at 35. That risk warning conveyed no "substantive information," *Slayton*, 604 F.3d at 772, and did nothing to correct the misleading impression generated by Defendant's misleading statements. Moreover, this risk warning was repeated verbatim in every press release during the Class Period, even when forward buying opportunities began to subside. *See* Def. Ex. 10 at 6; Def. Ex. 12 at 6; Def. Ex. 13 at 6; Def. Ex. 14 at 6; Def. Ex. 15 at 6; Def. Ex. 24 at 6; Def. Ex. 28 at 5; Def. Ex. 31 at 6; *see also In re Harman Int'l Indus., Inc. Sec. Litig.*, 2015 WL 3852089, at *14 (D.C. Cir. June 23, 2015) (cautionary language that remained "unchanged despite a significant change in circumstances of material importance to an investor" not sufficiently meaningful).

in procurement gains and the Company's gross profit rate. "The consistency of the defendants'

language over time despite the new information they received . . . belies any contention that the

cautionary language was 'tailored to the specific future projection.'" *Slayton*, 604 F.3d at 773.

### 4. Any Forward-Looking Statements Were Made With Actual Knowledge Of Their Falsity

Finally, the safe harbor does not apply because Defendants had actual knowledge of facts

that rendered their statements misleading. 15 U.S.C. §78u–5(c)(1)(B). In this context, actual

knowledge that a statement is misleading means that "defendants (1) did not genuinely believe the

. . . statement, (2) actually knew that they had no reasonable basis for making the statement, or

(3) were aware of undisclosed facts tending to seriously undermine the accuracy of the statement."

*Slayton*, 604 F.3d at 775; *see also In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 388

(S.D.N.Y. 2012) ("[A] forward-looking statement is made with actual knowledge of falsity if, *inter*

*alia*, a company has actual knowledge of undisclosed facts tending to seriously undermine the

accuracy of the projection."). As detailed *infra*, the facts alleged in the Complaint support a strong

inference that Defendants had actual knowledge of facts tending to seriously undermine their

projections and that they actually knew they had no reasonable basis for making those projections.

## III. THE SAC PLEADS A STRONG INFERENCE OF SCIENTER

To plead scienter, Plaintiffs must allege facts that give rise to a "strong inference" that

defendants acted with "the required state of mind." 15 U.S.C. § 78u-4(b)(2). This is met "either

(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or

(b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or

recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). "Circumstantial evidence can

support an inference of scienter in a variety of ways, including where defendants . . . benefitted in

a concrete and personal way from the purported fraud . . . [or] knew facts or had access to

32

information suggesting that their public statements were not accurate." *Blanford*, 794 F.3d at 306; *see also Boston Ret. Sys. v. Alexion Pharm., Inc.*, 556 F. Supp. 3d 100, 131 (D. Conn. 2021) (scienter adequately pled where plaintiffs alleged facts showing that defendants "knew or had access to information suggesting that their public statements about the source of [company's] strong revenue growth were misleading").

Scienter is adequately alleged if the inference that Defendants intentionally or recklessly misled the public is at least as compelling as the non-culpable inference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "When the competing inferences rest in equipoise, the tie goes to the plaintiff." *Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009). The proper inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. Defendants ignore this mandate and instead ask the Court to consider each allegation in isolation. *See, e.g.*, MTD at 18, 21. When viewed holistically, the SAC pleads a strong inference of scienter.

### A.    Defendants Knew The Company Engaged In "Strategic" Forward Buying

Defendants understood how forward buying works and that it benefited UNFI's profitability. Specifically, forward buying occurs when the Company has notice of impending price increases and chooses to purchase additional product before the price increase goes into effect, with the plan on selling that product in the future at a higher price. On June 9, 2021, Defendant Testa stated that UNFI received notice of impending price increases for consumer-packaged goods ("CPGs") that were "higher than normal." ¶223; *see also* ¶227 (Defendant Douglas stated on March 8, 2023 that forward buying occurs during these "narrow[]" 60- or 90-day cycles after suppliers provided notice).

UNFI management understood that there were a "number of limiters" on the maximum

33

amount to forward buy, including "[w]arehouse space," "shelf life," "the next opportunity to buy the product," three types of storage costs, and spoilage. ¶¶225, 232. By acknowledging that "strategic investment buying initiatives, such as discounted bulk purchases" impacted margins, Defendants Douglas and Howard demonstrated their understanding that forward buying opportunities would materially improve UNFI's financial results. ¶226. As a result, Defendants knew that forward buying benefited UNFI's profitability during the Class Period. *Cf. In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 393-94 (S.D.N.Y. 2007) (due to their demonstrated understanding of deferred tax assets and knowledge of large securitization, officers "knew that a large block of future income would no longer be available to offset the Company's deferred tax assets," supporting scienter as to false financial statements).

### B.    The Magnitude Of The Forward Buying Activity And Its Impact On UNFI's EBITDA Supports A Strong Inference Of Scienter

One factor supporting a strong inference of scienter is the sheer magnitude of UNFI's forward buying activity during the Class Period and its impact on UNFI's EBITDA. In UNFI's 2Q23 Press Release issued on March 8, 2023, Defendants admitted that inflation-related procurement gains provided a "significant" benefit to UNFI during 2Q22. ¶93. This is an understatement. Though Defendants' disclosures do not permit an exact calculation of the magnitude of the forward buying benefit during the Class Period, their disclosures suggest that procurement gains accounted for ***more than 25.5% of the reported adjusted EBITDA in 3Q22 and more than 43.9% in 4Q22***. ¶¶118, 125, 130.[16] In sum, forward buying led to a ***benefit***

---

[16] Plaintiffs are unable to quantify the magnitude of the benefit in 2Q22 based on publicly available information, but on March 8, 2023, BMO Capital noted that the "13% cut to EBITDA guidance (at the mid-point) suggests that procurement gains account for at least ~10-15% of EBITDA," which is still significant. ¶107. The margin impact from the "significant" decline in procurement gains in 2Q23 compared to 2Q22 also suggests that the benefit was highly material to 2Q22 profits. ¶¶234-35.

*exceeding $275 million over a 12-month period*. ¶132.[17]

The size of these procurement gains and their effect on UNFI's profitability supports a strong inference that Defendants were aware of the forward buying practices and their centrality to UNFI's financial performance. *See In re Tower Auto. Sec. Litig.*, 535 F. Supp. 2d 445, 447 (S.D.N.Y. 2008) (the magnitude of a company's early pay programs and their role as "a vital contributor to the company's liquidity" supported a strong inference of conscious misbehavior or recklessness where defendants failed to disclose the existence and magnitude of the programs); *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *18-19 (N.D. Cal. Aug. 17, 2022) (inferring scienter where the "undisclosed sales practice and its effects . . . were significant based on the $65 million channel inventory reduction announced" at end of class period). The inference of scienter is further corroborated by the skepticism of analysts, who expressed incredulity at management's explanation that it had caught unaware by the size of the problem. *See* ¶124 (Wells Fargo report dated June 7, 2023 stated: "Credibility at UNFI is about as low as it gets, as it's shocking how the company seemed caught off guard by these issues given their magnitude."); *see also* ¶110.

**C.   Defendants' Statements Concerning UNFI's Data Analytics And Value Path Initiative Support A Strong Inference Of Scienter**

Prior to the Class Period, on September 19, 2020, Defendant Testa stated that "Going forward, we'll be placing a heavy emphasis on standardizing and processes and using *higher level*

---

[17] Defendants dispute the precise magnitude of the procurement gains but do not deny that it was significant. MTD at 27 n.21 (arguing that the cited materials "do ***not*** say that the ***entire*** (approximately) $150 million decrease in adjusted EBITDA [during 3Q22 and 4Q22] was entirely attributable to procurement gains") (emphasis in original). Plaintiffs need not quantify the procurement gains with exacting precision at this stage, and the facts pled support a strong inference that the undisclosed procurement gains were responsible for the vast majority, if not all, of the decrease in adjusted EBITDA. *See also* ¶130 (4Q23 presentation expressly states that the "Adjusted EBITDA decline [was] ***driven by*** lower gross margin rate ***resulting from reduced Wholesale procurement gains***."). At best, Defendants raise a factual dispute improper for resolution at the pleadings stage.

*data analytics* to drive decision-making and generate these incremental operating efficiencies." ¶45. On December 9, 2020, the Company announced its Value Path initiative, which Defendants stated would drive "$70 million to $100 million [in cost savings] by the end of fiscal 2023" through "a holistic approach . . . across key elements of pricing [and] procurement." ¶46. These statements suggested that Defendants were actively monitoring and calculating procurement gains using advanced data analytics as part of the Value Path initiative. Furthermore, throughout the Class Period, Defendants repeatedly attributed UNFI's improvements in its profitability metrics to the Value Path initiative (*e.g.*, ¶¶143, 153, 159, 163, 171, 175), suggesting that this program was ongoing, that it was working, and that Defendants had a reliable basis for measuring the effectiveness of the initiative and calculating the benefits of UNFI's procurement strategies.

Taken together, these statements support an inference that Defendants were strategically pursuing forward buying opportunities, monitoring procurement gains, and measuring the effects of these activities on UNFI's profitability, or, if not, that they were incredibly reckless in making the representations that they made concerning the ongoing benefits of the Value Path initiative. *See, e.g.*, *Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings, Inc.*, 2012 WL 4049953, at *2-3 (S.D.N.Y. Sept. 14, 2012) (scienter pled where defendants represented "they closely monitored" the subject of allegedly false statements because they either "failed to perform the monitoring they claimed to have performed or . . . knowingly or recklessly misrepresented the circumstances to plaintiffs"); *In re Zillow Grp., Inc. Sec. Litig.*, 2019 WL 1755293, at *19-20 (W.D. Wash. Apr. 19, 2019) ("scienter can be inferred where a corporate officer states that he or she . . . was monitoring the subject of the misleading statements"); *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, 2011 WL 2444675, at *12 (D. Del. June 14, 2011) (defendants' statements that they "closely monitored" advertiser cancellations supported scienter).

**D.    The Individual Defendants Personally Benefited From The Fraud**

Although motive is not necessary to plead scienter, motive allegations can "meaningfully enhance the strength of the inference." *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 685 (5th Cir. 2014); *see also Tellabs*, 551 U.S. at 325 ("The absence of a motive allegation . . . is not fatal."). Even weak allegations of motive, combined with other allegations, can "turn what might be a weak inference standing alone into a strong one." *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 275 (S.D.N.Y. 2014).

For fiscal 2022, the Individual Defendants collectively received about $3.3 million in annual bonuses that were awarded primarily due to the achievement of the adjusted EBITDA target. ¶250; *see In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) ($3 million bonus "for boosting [company's] EBITDA by more than 30%" is "concrete and personal benefit" supporting scienter). The Company set performance targets to incentivize the Individual Defendants to deliver profits amid the uncertainty caused by competition, the COVID-19 pandemic, and labor challenges. ¶247. In June 2022, the adjusted EBITDA definition was revised to ensure that the Company's performance reflected factors within Defendants' control, including strategic forward buying. ¶246 (proxy discussing that adjusted EBITDA was revised to exclude "the LIFO charge [as it] has created significant non-cash volatility due to high inflation, which is out of Executives' control"). Specifically, fiscal 2022 performance-based cash incentive compensation would be awarded if UNFI achieved at least $810 million adjusted EBITDA and $28.05 billion net sales, where adjusted EBITDA was given 75% weight. ¶249. Because UNFI achieved 102% of the targeted adjusted EBITDA and 103% of targeted net sales, Defendant Douglas received $1.78 million, Defendant Howard received $765,446, and Defendant Testa received $918,535 in bonuses. ¶¶249-50.

They would not have received these sums without the massive benefit from forward

buying. *Id.* As was later revealed, UNFI's "profitability would have been ***much worse***" without the "significant" procurement gains realized from forward buying. ¶¶105-06. Indeed, procurement gains accounted for more than 25.5% of the reported adjusted EBITDA in 3Q22 and more than 43.9% in 4Q22. ¶¶118, 125, 130. The adjusted EBITDA target was met by 2%, a margin of error so slight that it is reasonable to infer the target would not have been met without these "significant" procurement gains. *See In re Carter-Wallace, Inc. Sec. Litig.*, 1999 WL 1029713, at *5 (S.D.N.Y. Nov. 10, 1999) ("[I]f specific independent evidence is alleged to support a general motive, then that motive may suffice."); *Florida State Bd. Of Admin. v. Green Tree Fin. Corp.*, 370 F.3d 645, 661-65 (8th Cir. 2001) (link between compensation package and fraudulent statements "is an important part of the overall picture of scienter").[18]

Defendant Testa's suspicious stock sales further bolster the inference of scienter. During 2Q23, forward buying opportunities declined "sequential[ly]" relative to 1Q23 and "reduced by about 2/3" from the 2Q22. ¶¶140, 242. Defendant Testa sold $1.1 million worth of UNFI shares (17% of his holdings) on January 23, 2023, mere days before the close of 2Q23 and roughly six weeks before the corrective disclosure on March 8, 2023. ¶241; *see In re Guilford Mills, Inc. Sec. Litig.*, 1999 WL 33248953, at *5 (S.D.N.Y. July 21, 1999) (sale of 10% of holdings indicative of scienter); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) (trades made two

---

[18] In the cases cited by Defendants, plaintiffs did not plead any such connection between the fraud and the compensation. *See Sun v. TAL Educ. Grp.*, 2023 WL 6394413, at *31 (S.D.N.Y. Sept. 29, 2023) ("the lucrative bonuses received by TAL insiders, considered in tandem with their stock sale proceeds of $458 million," does not support scienter) (cited by MTD at 17); *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 314 (S.D.N.Y. 2021) (that some officers "held options with high strike prices is not enough to support a strong inference of scienter" especially because no defendant "exercised their options") (cited by MTD at 17); *Schwab v. E*Trade Fin. Corp.*, 285 F. Supp. 3d 745, 757-58 (S.D.N.Y. 2018) ("the fact that [undisclosed payments] were a component of the company's revenue, upon which bonuses and compensation were based, does not raise a strong inference of scienter) (cited by MTD at 17).

months before adverse disclosure were suspicious: "Trades made a short time before a negative public announcement are suspiciously timed."). These sales are also suspicious because the proceeds are almost 140% of his base salary for fiscal 2022. ¶144.

That these sales were pursuant to a Rule 10b5-1 trading plan does not diminish the inference of scienter, particularly because Testa's Rule 10b5-1 plan was entered on December 22, 2022, more than a year into the Class Period and more than halfway through 2Q23. ¶242. *See* 17 C.F.R. §240.10b5-1(c)(1)(i)(A) (trading plan provides affirmative defense only if entered into "[b]efore becoming aware of the information"); *Blanford*, 794 F.3d at 309 (sales made pursuant to 10b5-1 plans supported scienter where plans were made "after the Complaint alleges that Green Mountain's fraudulent growth scheme began."). Because UNFI reported a gross margin decline for 2Q23 caused by a substantial decline in the number of forward buying opportunities evident in the "final period of the quarter," it is reasonable to infer that Defendant Testa knew or had reason to know that the gross margins would be negatively impacted by lower procurement gains at the time he entered the trading plan. ¶¶234, 242; *see Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 494 (S.D.N.Y. 2018) (when "10b5-1 trading plans are entered into during the class period, they are not a cognizable defense to scienter allegations on a motion to dismiss").

### E. Additional Facts Strengthen An Inference Of Scienter

In addition to the foregoing factors, the following facts strengthen the inference of scienter.

*First*, the core operations doctrine "permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013). The Wholesale segment accounts for more than 95% of UNFI's business and constitutes the Company's core business. ¶38. As a result, Defendants knew (or were reckless in not knowing) the source of as much as 50% of its profits, which were derived from forward buying. *See*

39

*Oklahoma Firefighters Pension & Ret. Sys v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37-38 (S.D.N.Y. 2019) (scienter pled where region was the "primary profit engine" and "the cumulative effect of Lexmark's channel stuffing . . . suggests more than a careless mistake or trivial miscalculation").

*Second*, the Individual Defendants had access to a wealth of relevant information with which to determine the significant, atypical impact of forward buying. *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *12 (S.D.N.Y. Mar. 28, 2018) (because they "almost certainly had access to the information that Mylan was rebating EpiPen at 13%," officers "were at least reckless" in "false impression [that] EpiPen was being rebated at 23%"). Specifically, UNFI provided granular details to suppliers, including the inventory on hand, product expiration dates, weekly sales, and planned demand, through ClearVue reports. ¶¶229-30. This information enabled the Individual Defendants to assess whether to forward buy and by how much, thus allowing them quantify the forward buying benefit during the Class Period. *See Dentsply Sirona*, 665 F. Supp. 3d at 290 (monthly reports of inventory and sales provided officers with non-public knowledge of excess product).[19]

Defendants attempt to undermine the relevance of these ClearVue reports because they "do not show gross margin." MTD at 22-23. However, Defendants had expected promotions would cover the shortfall from reduced forward buying:[20]

The Company had anticipated that supplier promotions—which had declined

---

[19] The primary case cited in support of Defendants' argument did not allege as strong a relationship between the access to relevant information and the alleged omission. *See* MTD at 23-24 (citing *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 776 (S.D.N.Y. 2021)). There, a "bottleneck issue" in the supply chain existed for most of the quarter and led to a sales decline. 518 F. Supp. 3d at 776-77. The access to inventory and sales information was insufficient because a decline in inventory would not necessarily cause a sales miss. *Id.* at 780-81.

[20] Def. Ex. 4 at 13 ("If the CPGs [consumer-packaged goods] heavily promote the product, we manage the promotion and that turns into gross margin for us.").

during COVID-era high demand—would return, thereby mitigating the impact of inflation deceleration on forward buying opportunities. But that did not occur. The Company announced a $6 million year-over-year decline in gross profit and lowered its previously issued EBITDA guidance.

MTD at 2. Defendants' belief that increased supplier promotions would offset fewer forward buying opportunities necessarily means that Defendants understood forward buying was a boon to UNFI's margins. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been considered, though because of the risk a reckless, gamble."); *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *13 (S.D.N.Y. Apr. 14, 2020) (reckless to omit that rising inventory could reduce future sales, regardless of officers' hope to uncover new sources of revenue).

*Third*, the timing of Defendant Testa's departure is probative of scienter. *See In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 523-24, 534 (S.D.N.Y. 2009) (resignations of chairman and vice chairman within two weeks of revelation of fraud created strong inference of scienter). He left the Company on October 3, 2023, days after the last disclosure revealing the extent of the Company's forward buying. ¶133.

## F. Balancing Of The Inferences Supports A Strong Inference Of Scienter

Faced with these specific facts of actual knowledge and circumstantial evidence of knowledge, Defendants instead focus on what the SAC does not allege. Defendants point to the absence of confidential witnesses, restatements, adverse audit opinions, regulatory action, and criminal findings. MTD at 15. None of these are required to plead scienter.

Given that Defendants knew the Company engaged in forward buying during the Class Period and knew (or were reckless in not knowing) the magnitude of the benefit from forward buying, it is logical to infer that they knowingly failed to disclose this information to the investing

41

public. There is no basis to credit, at the motion to dismiss stage, Defendants' self-serving statement that they did not "fully" understand forward buying or its impact during the Class Period. *See In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 418 (S.D.N.Y. 2007) (defendants' "self-serving statement" cannot "negate any inference of . . . scienter" at pleadings stage); *cf.* MTD at 28 (citing ¶251).[21] Defendants claim that the allegations "do not make sense" because they would not be incentivized to engage in short-term fraud at the expense of fiscal 2023 compensation or long-term awards. MTD at 17-18 & n.13. But Defendants had hoped to rely on promotions to procure discounted inventory when they could no longer rely on forward buying opportunities to propel profits. In fact, the full truth about the magnitude of the procurement gains came to light because promotions did *not* return at the pace Defendants had expected. *See* ¶129 (September 26, 2023 disclosure that UNFI "saw an out-of-pattern increase in procurement gains beginning in January of '22" and "we expect promotions to come back, although they've done so very slowly").

Defendants claim that they did not know the precise magnitude of the effect of inflation and of procurement gains from forward buying until they conducted a post-mortem analysis of UNFI's earnings miss. MTD at 29. However, this non-culpable inference is undermined by Defendant Douglas's response to an analyst asking about how deflation could affect UNFI during

---

[21] The cited statement blames a lack of "real-time data" for Defendants' purported failure " to fully understand and *forecast* these profitability drivers." ¶251. The atypical, massive forward buying went on for six quarters, and "real-time data" is not required to understand how the practice affected several *prior* quarters. ¶137. Defendants argue that they need not investigate results that "were consistent with predictions." MTD at 28. Contrary to Defendants' suggestion, procurement gains were not an accidental blessing such that they were somehow unaware of it. In fact, Defendants Douglas and Howard signed statements acknowledging that they knew "decreased forward buying opportunities" could affect results and that forward buying was "strategic," a word that implies the practice was an intentional, planned action with a purpose. ¶¶138, 226; *see* Strategic, Merriam-Webster ("of great importance within an integrated whole or to a planned effect"). It strains credulity to suggest that Defendants knew of the strategic decision and that it affected financials, yet they failed to determine the relative impact of it. To the extent they failed to inform themselves of the effect of forward buying, it was severely reckless.

the June 7, 2022 earnings call, where he stated that management "spend[s] 100% of our billable hours looking at how we can get better for our customers;" "we don't see a real change [in inflation];" "interestingly enough, the actions that we would take in virtually every scenario are approximately the same;" and "we've got to keep our cost structure tight . . . whatever the scenario is." ¶77. These statements evince a familiarity with the impact of inflation and the actions UNFI would take to constrain costs, and, in light of this, analysts closely following the Company were incredulous that management did not know of the forward buying benefit. ¶124 (June 7, 2023 Wells Fargo report that "Credibility at UNFI is about as low as it gets"). At minimum, the fraudulent inference is at least as compelling as the non-fraudulent inference, which suffices at this stage. *See Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009) (due to "denials of unusual discounting" in response to analyst question, "the possibility that [CFO] was ignorant is not necessarily exculpatory.").

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss must be denied in its entirety.[22] Alternatively, if the Court is inclined to grant any part of the motion, Plaintiffs respectfully request leave to amend. *See* Fed. R. Civ. Proc. 15(a)(2); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190-91 (2d Cir. 2015) (emphasizing the "liberal spirit" of Rule 15 and warning against dismissal with prejudice prior to plaintiffs being given "the benefit of a ruling" that details the "precise defects" in their pleading); *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 313 (S.D.N.Y. 2021) ("As such, courts in this District have ordinarily granted a plaintiff leave to amend at least once after having the benefit of a court's reasoning in dismissing the complaint.").

---

[22] Defendants' only argument as to Section 20(a) is that a primary violation under Section 10(b) has not been sufficiently pled. MTD at 40.

Dated: February 2, 2024

By: ___*/s/ Pavithra Rajesh*___

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay (admitted *pro hac vice*)
Pavithra Rajesh (admitted *pro hac vice*)
Chase M. Stern (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
glinkh@glancylaw.com

*Counsel for Plaintiffs*

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Additional Counsel*

44

**PROOF OF SERVICE**

I hereby certify that on this 2nd day of February, 2024, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*s/ Pavithra Rajesh*
Pavithra Rajesh
