# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STADIUM CAPITAL LLC,<br><br>                         Plaintiff,<br><br>  -against-<br><br>CO-DIAGNOSTICS, INC., et al.,<br><br>                       Defendants. | 22-cv-6978 (AS)<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

ARUN SUBRAMANIAN, United States District Judge.

## BACKGROUND

Defendant Co-Diagnostics makes tests to diagnose diseases. When the COVID-19 pandemic hit, its business skyrocketed. After $215,000 in revenue in 2019, it made $74.5 million in 2020 and $97.9 million in 2021. Am. Compl. ¶¶ 32, 36, Dkt. 31. From the second quarter of 2020 through the first quarter of 2022, it made at least $20 million per quarter. ¶ 36. Then came the falloff. For the second quarter of 2022, Co-Diagnostics reported revenue of just $5 million. *Id.*

Shortly after those earnings were reported in August 2022, Plaintiff Stadium Capital brought this putative class action for securities fraud. The class period runs from May 12, 2022, to August 11, 2022. ¶ 1. The complaint says Co-Diagnostics, its CEO Dwight Egan, and its CFO Brian Brown (also defendants) made false or misleading statements in May and June 2022, violating §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 as well as SEC Rule 10b-5(b). ¶¶ 85–93. Stadium points to several statements from a May 12 press release, an earnings call that same day, Co-Diagnostics' first-quarter 2022 10-Q also filed the same day, and a June 15 presentation to investors:

| Setting/Speaker | Statement |
|---|---|
| May 12, 2022, Co-Diagnostics, press release | "While we remain very confident about the long-term potential of our business, our ability to accurately forecast Logix Smart™ COVID-19 Test sales through the balance of the year has diminished due to decreased mask mandates in the United States, continued emergence and spread of new variants, and persistently low vaccination rates in many parts of the world. As a result, it has become difficult to predict with any level of precision the cumulative impact of these and other factors on our future financial results. For these reasons, we are not providing quarterly guidance at this time and will reassess this position in the future." ¶ 44. |
| May 12, 2022, Brown, earnings call | "Turning now to our visibility around the outlook for the balance of the year. While we experienced strong demand for our products during the first quarter of 2022, changes in our operating environment and markets have restricted our near term visibility. We will continue to navigate the near term |

| | environment with caution, but as a result, we'll not be providing quarterly guidance at this time. |
|---|---|
| | To be clear, we remain very confident about the long-term potential of our business and the demand for our products. Our ability to accurately forecast Logix Smart COVID-19 test sales through the balance of the year has diminished due to decreased mask mandates in the United States, continued emergence and spread of new variants and persistently low vaccination rates in many parts of the world. |
| | Furthermore, we are experiencing sizable fluctuations in order patterns from our customers that are not cleanly captured in a particular quarter as testing requirements continue to vary across the many geographic regions we serve. As a result, it has become difficult to predict with an expected level of precision the cumulative impact of these and other factors on our future financial results." ¶ 45. |
| May 12, 2022, Brown, earnings call | [Analyst]: "So with the Logix Smart detection test, are you already seeing a decline in customer orders? Or are you refraining from providing a guidance mainly because it's tough to like predict the environment moving forward?" |
| | Brown: "It's more about the timing and being able to forecast the timing of orders is the bigger issue. It's not necessarily a demand issue that we're seeing. It's more of just timing of being able to accurately forecast what's coming in." ¶ 46 |
| May 12, 2022, Brown, earnings call | [Analyst]: "I just want to be clear on the guidance. I mean based on all the factors you laid out, it sounds like you don't expect demand for COVID-19 testing [to] go away in 2022. You're just not sure the timing of when you will get the orders, but you still think there will be some level of demand for the remainder of the year. Is that accurate?" |
| | Brown: "Yes, you're absolutely right." ¶ 47 |
| May 12, 2022, Co-Diagnostics, 10-Q filing | "For the three months ended March 31, 2022, we generated revenues of $22,699,044, compared to revenues of $20,024,769 for the three months ended March 31, 2021. The increase in revenue of $2,674,275 was primarily due to sales of our Logix Smart™ COVID-19 test developed in response to the current COVID-19 pandemic." ¶ 49. |
| June 15, 2022, Brown, presentation to investors | Brown presented a slide entitled "Financial Status Q1 2022" that included "growth from Q1 to Q1 2021 to 2022 in revenue" and "in 2021 we had $20.0 million in revenue for Q1 and in Q1 of 2022 we had $22.7 [million] which represents about a 13.5% increase in revenue quarter over quarter, year over year." ¶ 53. |
| June 15, 2022, Brown, presentation to investors | Brown presented a slide showing that the company's adjusted EBITDA was "$11.4 million for both Q1 of '21 and Q1 of 2022." Brown said these earnings were "one of the most impressive things that we've been able to do; take on a significant amount of additional expenses but still continue to maintain our adjusted EBITDA for the company and I think this information |

2

| | we've provided here on the company from a financial perspective really shows the strength of what we've done and what we've built here at Co-diagnostics" because "at the end of 2021 we acquired two companies that were helping develop our new product that we're launching. And, in Q1 of 2021 we did not have any expenses related to those two entities, where in Q1 of 2022 we had a full quarter's worth of twice as many employees and a significant increase in R&D." ¶ 54. |
|---|---|
| June 15, 2022, Egan, presentation to investors | [Analyst]: "And if you look at the other side of the business - the centralized lab test that you're selling now. Do you think there will be demand for covid type testing for at least the next year or two?" |
| | Egan: "Well, you know the experts tell us that covid testing is gonna be – and, you know, the covid virus is gonna be with us until the end of time, and so, you know, we've had, I think we're gonna have continued demand, where every kind of technology, the centralized lab type approach as well as the at home point of care, they're all [be] gonna used to their highest and best use, and they're gonna be complementary to each other. So we don't, in fact, view that the introduction of our testing technology will obviate the need for centralized Labs." ¶ 51. |

## LEGAL STANDARDS

"Any complaint alleging securities fraud must satisfy the heightened pleading requirements" of the Private Securities Litigation Reform Act of 1995 (PSLRA) and Federal Rule of Civil Procedure 9(b). *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 304 (2d Cir. 2015). "As relevant here, the PSLRA specifically requires a complaint to demonstrate that the defendant made misleading statements and omissions of a material fact, and acted with the required state of mind." *Id.* at 305. As usual, the Court accepts the complaint's allegations as true. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). But those allegations must be pleaded with particularity.

For the misleading-statement element, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Blanford*, 794 F.3d at 305; *see also* 15 U.S.C. § 78u-4(b)(1)–(2). "[D]raw[ing] all reasonable inferences in the plaintiff's favor," the complaint must plausibly allege a misleading statement. *Blanford*, 794 F.3d at 304, 307.

On the scienter element, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). To decide whether an inference is "strong," the Court "must consider the complaint in its entirety" and "must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 323. A "complaint will survive … only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

On a motion to dismiss, the Court may "consider any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference, as well as

3

public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015) (cleaned up). Any judicially noticed documents can be considered for the fact that certain statements were made, but not for the truth of those statements. *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352 (2d Cir. 2022).

Before getting to the merits, the Court will first deal with Co-Diagnostics' "request for full context review and/or judicial notice." Dkt. 35. It asks the Court to consider thirteen documents outside the complaint. *Id.* at 5–6. Although Co-Diagnostics frames this issue as a clash between substantive securities law and the federal rules, all these documents fall in the categories just described: SEC filings, publicly available documents used for the fact that statements were made, and documents incorporated by reference or integral to the complaint. So the Court can consider them for certain limited purposes, but they ultimately make little difference.

## DISCUSSION

"To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection with the purchase or sale of securities; (4) reliance; (5) economic loss; and (6) loss causation." *Ark. Pub. Emps.*, 28 F.4th at 351–52. Co-Diagnostics says Stadium has failed to allege elements one and two.

## I.    At least some of Co-Diagnostics' statements were misleading

"[T]here is no duty to disclose a fact … merely because a reasonable investor would very much like to know that fact." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) (internal quotation marks omitted). But "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Id.* That obligation is triggered once a defendant puts the topic "in play," based on "an examination of defendants' representations, taken together and in context." *Setzer*, 968 F.3d at 214 n.15; *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (internal quotation marks omitted). For example, if a company is warning investors about future risks and the company's efforts to deal with them, a reasonable investor would infer that those risks have not yet happened. *See Meyer*, 761 F.3d at 251–52. If the "risk" has already happened or is then happening, the company has a duty to say so. *Id.* Omitting that information makes the statements misleading. *Id.*

Here, some of the statements fit that mold. The press release and Brown's statements during the earnings call put both current demand and risks to future demand on the table:

- "[C]hanges in our operating environment and markets have restricted our near term visibility." ¶ 45.

- "Our ability to accurately forecast Logix Smart COVID-19 test sales through the balance of the year has diminished due to decreased mask mandates in the United States,

- continued emergence and spread of new variants and persistently low vaccination rates in many parts of the world." ¶¶ 44, 45.

- "Furthermore, we are experiencing sizable fluctuations in order patterns from our customers that are not cleanly captured in a particular quarter as testing requirements continue to vary across the many geographic regions we serve. As a result, it has become difficult to predict with an expected level of precision the cumulative impact of these and other factors on our future financial results." ¶ 45.

References to "near term visibility" and "fluctuations" imply current or potential volatility, not that sales have already cratered. And if anything, the statement in the second bullet point refers to trends that a reasonable investor would expect to prop up sales. Fewer masks, new COVID variants, and low vaccination rates are things that one would think would lead to more COVID and greater demand for tests. Despite warnings of uncertainty, that statement would have provided "comfort to investors." *Meyer*, 761 F.3d at 251.

But Stadium plausibly alleges that by May 12, it was clear that something was up (or down, rather) with demand. Although Co-Diagnostics says there was no such thing as a normal quarter during the pandemic, it had earned more than $20 million in every quarter since the pandemic began—eight quarters straight. May 12 was the midpoint in the quarter, so one would expect Co-Diagnostics to have earned about $10 million by that time. But Co-Diagnostics ended up earning just $5 million for the whole quarter. Even if it had earned every dime by May 12, it still would have been at half its usual pace. So it was misleading to describe the situation as "fluctuations" or to disclose the company's difficulty in forecasting near-term demand without disclosing that demand was already declining rapidly. (Whether Brown and Egan knew that demand was already declining rapidly is the subject of the next section.)

At best, the statements above are ambiguous: a reasonable investor could have taken Co-Diagnostics at its word, or they could have interpreted its statements as corporate-speak for "we're in trouble." Drawing the inference that favors the plaintiff, the statements were plausibly misleading. *In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *17 (S.D.N.Y. Sept. 30, 2021). But Brown also played down the latter interpretation. One investor specifically asked whether Co-Diagnostics was "already seeing a decline in customer orders," and Brown said that it was "more about the timing and being able to forecast the timing of orders.… It's not necessarily a demand issue that we're seeing." ¶ 46. This statement was itself plausibly misleading and is part of the context for the other statements, reinforcing their plausible deceptiveness.

Co-Diagnostics says these statements are not actionable because they were opinions or puffery. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183–84 (2015). They were not. Brown's description of "fluctuations in order patterns" was a "determinate, verifiable statement." *Id.* at 184. And though some of the other statements were cryptic, their opacity doesn't make them opinions. Consider, for example, Brown's answer to the direct question about whether sales had declined. He dodged slightly, but he also clearly picked a side, emphasizing the "timing" issue and downplaying the "demand" issue. A reasonable investor would take that

statement as a description of or at least informed by facts on the ground. *See id.* at 188–89 ("[A] reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion."). And even if the statement about Co-Diagnostics' ability to forecast demand was an opinion (though "ability" might be verifiable), the statement's explanation included an "embedded statement[] of fact." *Id.* at 185. That is, the statement said forecasting was difficult "due to" specific trends. ¶¶ 44, 45. By listing some potentially positive trends but omitting the negative elephant in the room, the statement was plausibly misleading. *See Omnicare*, 575 U.S. at 188–90.

Nor do the statements fall under the safe harbor for forward-looking statements. Under § 78u-5(c), a speaker "shall not be liable with respect to any forward-looking statement" so long as it is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." Forward-looking statements are also protected if they are immaterial or if the plaintiff fails to show that the defendant made them with "actual knowledge" that they were false or misleading. *Id.*

At the threshold, some of Co-Diagnostics' statements are simply not forward-looking. As discussed, statements about "fluctuations," "near term visibility," and the response to whether the company was "already seeing a decline in customer orders" would all be interpreted as describing present conditions. And even if the other statements were forward-looking, they were not accompanied by "meaningful" cautionary statements. Here, Co-Diagnostics says it supplied cautionary statements through its boilerplate warning about "risks and uncertainties" in its Form 10-K. Dkt. 34-3 at 4. But Stadium's allegation is that the risk had already become reality. Because the cautionary language here was "misleading in light of historical fact," it "cannot be meaningful." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 770 (2d Cir. 2010). As for the other parts of the safe harbor, Co-Diagnostics doesn't argue that the statements were immaterial. And as addressed in the next section, Stadium has alleged facts giving rise to a strong inference that the defendants had actual knowledge that their statements were misleading. *See id.* at 773.

Finally, Stadium has also plausibly alleged a § 10(b) claim based on an Item 303 violation. Although the issue is currently under review at the Supreme Court, current Second Circuit law holds that "a violation of Item 303's disclosure requirements can … sustain a claim under Section 10(b)" so long as materiality and scienter are satisfied. *Stratte-McClure*, 776 F.3d at 103. "That is, a plaintiff must first allege that the defendant failed to comply with Item 303 in a 10-Q or other filing." *Id.* If the defendant materially violates Item 303, the statement, "in this case the Form 10-Q[]," is misleading. *Id.*

Item 303 requires companies to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues." 17 C.F.R. § 229.303(b)(2)(ii). That description "requires not only a discussion but also an analysis of known material trends, and that disclosure is necessary to an understanding of a company's performance, and the extent to which reported financial information is indicative of future

6

results." *Stratte-McClure*, 776 F.3d at 105 (internal quotation marks omitted). And the analysis "must be of the [company's] financial statements and other statistical data." 17 C.F.R. § 229.303(a). Stadium says Co-Diagnostics failed to disclose (let alone analyze) in its May 2022 10-Q that federal funding for COVID testing ran out in March 2022. ¶ 50.

Co-Diagnostics argues that this "trend" was immaterial and was "widely publicized." Dkt. 33 at 21. The materiality argument is weak. Although the complaint doesn't specify the share of sales attributable to federal funding, Co-Diagnostics' rebuttal is that "close to half of the Company's revenue was derived from foreign sales." *Id.* It is plausible that a substantial portion of the other half was tied to federal funding, and that inference is confirmed by Egan's August 2022 statement that reduced government funding was one of two "primar[y]" factors that torpedoed sales. ¶ 56. Even if the question were close, "materiality is a mixed question of law and fact, rarely resolved at the motion to dismiss stage." *Setzer*, 968 F.3d at 213 n.12. The "widely publicized" argument fails for similar reasons. Even if the end of funding was widely known, the magnitude of its effect on Co-Diagnostics was not. And this defense is also "intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000).

The complaint plausibly pleads that these statements were materially misleading[1] to a reasonable investor, so the motion is denied with respect to them. But the motion is granted with respect to the other statements.

Not every discussion of the company's past or future earnings requires a full disclosure of its current position. Egan's June statement about "continued demand" was responding to a specific question about the relative demand for two different tests. A reasonable investor would not interpret that statement to say anything about the company's overall demand. Similarly, Brown's discussion of EBITDA was simply comparing the first quarters of 2021 and 2022. A reasonable investor would understand that comparison as a historical account, not a description of present demand or a forecast of future performance. *See Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250, 252 (2d Cir. 2004) ("Accurate statements about past performance are self evidently not actionable under the securities laws …."). The same goes for Brown's affirming that "there will be some level of demand for the remainder of the year." That statement is likely a protected forward-looking statement, but it also doesn't imply anything about current sales.

## II.    Stadium has pleaded a strong inference of scienter

To establish a strong inference of scienter, Stadium "must allege facts showing (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of

---

[1] As discussed above, omitted information concerning the expiration of government funding is plausibly material, and the defendants don't argue that declining sales would be immaterial.

conscious misbehavior or recklessness. If no motive or opportunity (other than a generalized business motive) is shown, the circumstantial evidence of conscious misbehavior must be correspondingly greater and show highly unreasonable behavior or that which evinces an extreme departure from the standards of ordinary care." *Ark. Pub. Emps.*, 28 F.4th at 355 (cleaned up). That extreme departure "approximat[es] actual intent, and not merely a heightened form of negligence." *Stratte-McClure*, 776 F.3d at 106. "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Setzer*, 968 F.3d at 215.

Stadium has gone the recklessness route. It says Brown and Egan had knowledge or access to facts contradicting their statements. (And though the only remaining statements attributable to Egan are the press release and 10-Q, the defendants haven't distinguished those statements for scienter purposes.) Stadium alleges that Brown and Egan had "full access to the Company's books and records," ¶ 66, and it points to statements Egan made before and after the class period. In May 2021, Egan said on an earnings call, "We are also, of course, able to monitor the daily influx of demand for our tests." ¶ 66. And in August 2022, in response to an investor's question about distributor inventory, Egan said the company "keep[s] a close eye on [it] every day. And we certainly saw the—as the second quarter progressed[—]the falloff." *Id.* From these statements, Stadium infers that Egan and Brown either knew that demand had fallen by May 12 or at least had access to that information.

Bolstering its inference is the so-called core-operations doctrine. Though the sweep of that doctrine is contested, it simply reflects the commonsense assumption that executives are likely to know more about things central to their business. *See Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011). Here, Brown and Egan were likely to know whether demand had fallen substantially for the product that accounted for more than 99% of the company's revenue. ¶ 36 & n.2.

The statements themselves also support this inference. The specific reference to "sizable fluctuations in order patterns" reveals that sales were being monitored. And more generally, Co-Diagnostics flagged that it was varying from its usual practice of "providing quarterly guidance" due to its restricted "near term visibility." One cogent and compelling inference to draw from this change is that they knew demand was down, but hoped they could mask that fact until it rebounded. That scenario would support a claim of recklessness.

The complaint also alleges a strong inference of scienter with respect to the Item 303 violation. Some of the same allegations as above apply. To the extent that Brown and Egan monitored demand and federal funding accounted for a substantial chunk of it, Stadium says the effects of the end of federal funding were already obvious by May 2022. ¶ 50. But there is more. The defendants themselves argue that the end of federal funding was "widely publicized." Dkt. 33 at 21. And in August 2022, Egan connected the end of "public funding of testing initiatives" to "the falloff" that the defendants "saw … as the second quarter progressed." ¶ 57. Plus, in March 2022, Egan acknowledged that "it would have an impact on us" if the "U.S. government does not reauthorize

any additional money for COVID testing." Dkt. 34-5 at 14. So the allegations give rise to a strong inference that expiration of federal funding was a "known" trend under Item 303 and that its omission was at least reckless under the PSLRA.

Co-Diagnostics has three objections. First, it says that "even assuming the Company kept a close eye on sales, no specific factual allegations link Defendants to the alleged fraud." Dkt. 40 at 5 (cleaned up) (citing *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *24 (S.D.N.Y. Sept. 21, 2021)). But the complaint specifically alleges that Egan and Brown had access to the company's books and records, and Egan said that "we keep a close eye" on orders and "we are … able to monitor the daily influx of demand." ¶ 66. Although Egan didn't specifically say that "we" included Brown, that inference is natural—Brown was the CFO and was one of the three representatives of Co-Diagnostics (the other two were Egan and the company's head of investor relations) on those calls. Dkt. 34-5 at 4; Dkt. 34-6 at 4.

Second, Co-Diagnostics says that Stadium has failed to "identify any sales reports or documents" that Egan or Brown reviewed. Dkt. 40 at 5 (citing *Nandkumar v. AstraZeneca PLC*, 2023 WL 3477164, at *3 (2d Cir. May 16, 2023)). But tracing that requirement to its source reveals that it typically applies when plaintiffs allege an "unsupported general claim of the existence of confidential company sales reports." *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 812 (2d Cir. 1996). That rule makes sense. A plaintiff who alleges that a company had secret reports that prove the plaintiff's claim might be taking a shot in the dark and doesn't meet the heightened pleading requirements. Here, by contrast, Egan's statements acknowledged his and Brown's access to and review of sales data.

Third, Co-Diagnostics tries to rebut Stadium's recklessness case by showing its lack of motive. Both the company and the individual defendants say that they increased their holdings during the class period, showing that they didn't think the stock price was inflated. Even if a defendant could refute a recklessness claim by showing that he hurt himself too, that is not this case.

The company increased its holdings through a stock buyback program. But the pattern of buybacks is at least as consistent with the inference that Co-Diagnostics knew that the stock price was inflated. In March 2022, Co-Diagnostics announced its "$30 million share repurchase program." Dkt. 34-1 at 7. In May, it bought about $2 million worth of shares. Dkt. 38-1 at 28. But in June, it bought just $489,396 worth. *Id.* And in July, it bought nothing. Dkt. 38-2 at 28. Then, after the class period, when the price of shares fell, it bought about $7 million worth in August and about $3 million worth in September. *Id.* So even if Co-Diagnostics repurchased some shares during the class period, one inference is that those small-scale purchases were intended just to protect the company's image after it announced the huge buyback plan. And one could infer from its purchasing patterns that Co-Diagnostics timed its repurchases based on the rise and fall of its stock price.

Nor did the individual defendants suffer from the inflated stock price. Brown's and Egan's increased holdings came from the automatic vesting of restricted stock units. Dkt. 34-9 to -10. In other words, they got new shares for free. And each of them sold more than a third of the newly

9

vested units during the class period to cover the resulting tax obligations. *Id.* So, if anything, they might have benefited from the inflated share price.

* * * * *

Defendants try to plead ignorance and fight bad faith with good faith. But the most cogent and compelling inference to draw from all the statements, taken together, is that Brown and Egan knew[2] sales were down by mid-May 2022 and tried to obscure that fact by simply declining to offer quarterly guidance and offering vague assurances regarding "fluctuations," "timing," and "near term visibility." And their supposed evidence of good faith is just as likely to show bad faith or not to be especially probative at all. So Stadium's allegations support a strong inference of scienter.

## III.    The § 20(a) claim also survives

Finally, in one sentence in its brief, Co-Diagnostics asserts that Stadium's § 20(a) claim fails because the complaint "fails to allege any facts showing [Brown or Egan] 'controlled' Co-Diagnostics." Dkt. 33 at 25. "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472–73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2). Perhaps unsurprisingly, Stadium adequately pleaded that the CEO and CFO of the company had "the power to direct … the management and policies of" that company. Stadium says Brown and Egan (1) "had direct and supervisory involvement in the day-to-day operations of the Company" and (2) "were provided with" the statements at issue here and "had the ability to prevent the issuance of the statements or cause the statements to be corrected." ¶¶ 91–92. Those allegations are enough. *See In re Tronox, Inc. Sec. Litig.*, 769 F. Supp. 2d 202, 214 & n.64 (S.D.N.Y. 2011) (so holding and collecting cases).

---

[2] The scienter of Co-Diagnostics' top executives can be imputed to the company. *See Jackson v. Abernathy*, 960 F.3d 94, 98–99 (2d Cir. 2020). Co-Diagnostics doesn't argue otherwise.

10

## CONCLUSION

For these reasons, the motion to dismiss is GRANTED IN PART AND DENIED IN PART. The motion is granted with respect to Stadium's claims based on paragraphs 47, 51, 53, and 54 of the complaint. The motion is denied with respect Stadium's claims based on paragraphs 44, 45, 46, and 50. The Clerk of Court is directed to terminate Dkt. 32.

SO ORDERED.

Dated: February 5, 2024
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge