**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAN SILLS *and* GEORGE DICK, *individually and on behalf of all others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED NATURAL FOODS, INC., J. ALEXANDER MILLER DOUGLAS, JOHN W. HOWARD, *and* CHRISTOPHER P. TESTA, <br><br> Defendants. | No. 1:23-cv-02364-JGLC |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR**
**<u>MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................................................................1

ARGUMENT...................................................................................................................................4

I.    THE OPPOSITION IDENTIFIES NO PARTICULARIZED FACTS GIVING
      RISE TO A STRONG INFERENCE OF SCIENTER. ......................................................4

      A.    Plaintiffs Fail To Plead That Defendants Were Motivated To Commit
            Fraud. ........................................................................................................................5

      B.    Plaintiffs' Allegations Regarding "Access To Information" Do Not
            Establish A Strong Inference Of Scienter. ...............................................................8

      C.    The Magnitude Of Forward Buying And Its Impact On UNFI's EBITDA
            Do Not Support A Strong Inference Of Scienter.....................................................16

      D.    A Non-Culpable Inference Is Far More Compelling. ..............................................17

II.   PLAINTIFFS FAIL TO PLEAD ANY ACTIONABLE MISSTATEMENT. .................18

      A.    Plaintiffs Fail To Plead A False Or Misleading Statement. ....................................18

          1.    Defendants' Statements About the Drivers of UNFI's Profitability
                  Were Not Misleading....................................................................................19

          2.    Mr. Douglas's Responses to Analyst Questions in Q3 2022 and Q1
                  2023 Were Not Misleading. ..........................................................................21

          3.    Defendants' "Impact of Inflation" Statements Were Not
                  Misleading.....................................................................................................22

          4.    Defendants' Risk Factor Statements Were Not Misleading. ....................23

      B.    UNFI's Forward-Looking Statements Are Not Actionable. ...............................24

      C.    Generic Statements Are Not Actionable. ...............................................................27

      D.    Item 303 Of Regulation S-K Does Not Provide Any Basis For Liability
            Here. ........................................................................................................................28

III.  THE COMPLAINT DOES NOT STATE A CLAIM FOR CONTROL PERSON
      LIABILITY UNDER SECTION 20(A). .........................................................................30

IV.   PLAINTIFFS SHOULD NOT BE GIVEN LEAVE TO REPLEAD. ............................30

CONCLUSION..............................................................................................................................30

## TABLE OF AUTHORITIES

**Cases**                                                                                  **Page(s)**

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Meyers Squibb Co.*,
    28 F.4th 343 (2d Cir. 2022) ...........................................................................................4

*Azar v. Yelp, Inc.*,
    2018 WL 6182756 (N.D. Cal. Nov. 27, 2018....................................................................22

*In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011)...............................................................................24

*In re Carter-Wallace Inc. Sec. Litig.*,
    1999 WL 1029713 (S.D.N.Y. Nov. 10, 1999), *aff'd*, 220 F.3d 36 (2d Cir.
    2000)...................................................................................................................................6

*City of Providence v. Aeropostale, Inc.*,
    2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ...................................................................24

*In re CPI Card Grp., Inc. Sec. Litig.*,
    2017 WL 4941597 (S.D.N.Y. Oct. 30, 2017)....................................................................29

*In re Dentsply Sirona, Inc. Sec. Litig.*,
    665 F. Supp. 3d 255 (E.D.N.Y. Mar. 29, 2023)........................................................... 16, 19

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase*,
    553 F.3d 187 (2d Cir. 2009) ......................................................................................... 5, 29

*Emps. Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
    794 F.3d 297 (2d Cir. 2015) ........................................................................................... 5, 8

*Endovasc, Ltd. v. J.P. Turner & Co., LLC*,
    169 F. App'x 655 (2d Cir. 2006) .......................................................................................30

*In re FBR Inc. Sec. Litig.*,
    544 F. Supp. 2d 346 (S.D.N.Y. 2008)...............................................................................21

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
    270 F.3d 645 (8th Cir. 2001) ..............................................................................................6

*Gagnon v. Alkermes PLC*,
    368 F. Supp. 3d 750 (S.D.N.Y. 2019)...............................................................................21

*Galestan v. OneMain Holdings, Inc.*,
    348 F. Supp. 3d 282 (S.D.N.Y. 2018)...............................................................................25

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000) ..............................................................................................29

ii

*Glazer v. Formica Corp.*,
   964 F.2d 149 (2d Cir. 1992) ................................................................................................19

*Gregory v. ProNAi Therapeutics Inc.*,
   297 F. Supp. 3d 372 (S.D.N.Y.), *aff'd*, 757 F. App'x 35 (2d Cir. 2018) ..............................11

*In re Guilford Mills, Inc. Sec. Litig.*,
   1999 WL 33248953 (S.D.N.Y. July 21, 1999) ........................................................................8

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
   20 F.4th 131 (2d Cir. 2021) ................................................................................................21

*Halperin v. eBanker USA.com, Inc.*,
   295 F.3d 352 (2d Cir. 2002) ..............................................................................................26

*In re Henry Schein, Inc. Sec. Litig.*,
   2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) ......................................................................21

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ........................................................................17

*Ill. State Bd. of Inv. v. Authentidate Holding Corp.*,
   369 F. App'x 260 (2d Cir. 2010) ........................................................................................26

*In re Van der Moolen Holding N.V. Sec. Litig.*,
   405 F. Supp. 2d 388 (S.D.N.Y. 2005) ............................................................................21, 22

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016) ................................................................................................29

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) ................................................................................................8

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*,
   2011 WL 2444675 (D. Del. June 14, 2011) ........................................................................15

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
   518 F. Supp. 3d 772 (S.D.N.Y. 2021) ............................................................................14, 15

*Marcu v. Cheetah Mobile Inc.*,
   2020 WL 4016645 (S.D.N.Y. July 16, 2020) ....................................................................21, 30

*In re Marsh & Mclennan Cos. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006) ..................................................................................21

*Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings, Inc.*,
   2012 WL 4049953 (S.D.N.Y. Sept. 14, 2012) ......................................................................15

iii

*Moab Partners, L.P. v Macquarie Infrastructure Corp.*,
2022 WL 17815767 (2d Cir. Dec. 20, 2022), *cert. granted*, 144 S. Ct. 479
(2023) ................................................................................................................29

*In re Mylan N.V. Sec. Litig.*,
2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ...................................................16

*Nadoff v. Duane Reade, Inc.*,
107 F. App'x 250 (2d Cir. 2004) .......................................................................20

*Nguyen v. New Link Genetics Corp.*,
297 F. Supp. 3d 472 (S.D.N.Y. 2018), *aff'd in part, vacated in part, remanded
sub nom. Abramson v. Newlink Genetics Corp.*, 965 F.3d 165 (2d Cir. 2020) ........................8

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019)..................................................................17

*In re Oxford Health Plans, Inc.*,
187 F.R.D. 133 (S.D.N.Y. 1999) .........................................................................8

*In re Plantronics, Inc. Sec. Litig.*,
2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) ..................................................16

*Plumber & Steamfitters Loc. 773 Pension Fund v. Dankse Bank A/S*,
11 F.4th 90 (2d Cir. 2021) .................................................................................18

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) ...................................................15

*Proshares Tr. II Sec. Litig.*,
2020 WL 71007 (S.D.N.Y. Jan. 3, 2020)...........................................................26

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ..............................................................................25

*In re Sadia S.A. Sec. Litig.*,
643 F. Supp. 2d 521 (S.D.N.Y. 2009)................................................................11

*In re Sanofi Sec. Litig.*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015)............................................................22, 26

*In re Sanofi Sec. Litig.*,
155 F. Supp. 3d 386 (S.D.N.Y. 2016)................................................................20

*Schaeffer v. Nabriva Therapeutics plc*,
2020 WL 7701463 (S.D.N.Y. Apr. 28, 2020) ...................................................24

*Schwab v. E\*Trade Fin. Corp.*,
   285 F. Supp. 3d 745 (S.D.N.Y.), *aff'd*, 752 F. App'x 56 (2d Cir. 2018) ................................5

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)......................................................................28

*In re Skechers USA, Inc. Sec. Litig.*,
   444 F. Supp. 3d 498 (S.D.N.Y. 2020)...................................................................................30

*Solomon v. Sprint Corp.*,
   2022 WL 889897 (S.D.N.Y. Mar. 25, 2022) ........................................................................21

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
   2024 WL 456745 (S.D.N.Y. Feb. 5, 2024)...................................................................... 13, 14

*Stratte-McClure v. Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015) ...................................................................................................29

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ................................................................................................................5

*In re Tower Auto. Sec. Litig.*,
   535 F. Supp. 2d 445 (S.D.N.Y. 2008) ..................................................................................16

*In re Turquoise Hill Resources Ltd. Sec. Litig.*,
   2014 WL 7176187 (S.D.N.Y. Dec. 16, 2014) ......................................................................16

*In re Virtus Inv. Partners, Inc.*,
   195 F. Supp. 3d 528 (S.D.N.Y. 2016)...................................................................................21

*In re Vivendi Universal, S.A. Sec. Litig.*,
   381 F. Supp. 2d 158 (S.D.N.Y. 2003)....................................................................................6

*Wilson v. LSB Indus., Inc.*,
   2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) ........................................................................25

*In re Zillow Grp., Inc. Sec. Litig.*,
   2019 WL 1755293 (W.D. Wash. Apr. 19, 2019)...................................................................15

**INTRODUCTION**

Plaintiffs' Opposition leaves no doubt this lawsuit is an attempt to plead fraud by hindsight. Not once do Plaintiffs grapple with the unprecedented challenges facing UNFI throughout 2021 and 2022, including labor shortages, supply chain volatility, skyrocketing inflation, and the continued integration of the largest acquisition in its history. Plaintiffs selectively quote analyst coverage, claiming that analysts' reactions support their allegations of fraud, but without acknowledging that those same analysts recognized that the Company was operating in "the most unpredictable operating environment ever," and that the "primary culprit" of the Company's earnings misses was "an IT-oriented lack of real-time data visibility," which made it "difficult to track the precise amount of profit" attributable to forward buying, "especially in a rapidly-escalating inflationary backdrop."

Plaintiffs concede they are not pursuing any claim that Defendants made any affirmatively false statement of material fact. Rather, they argue that Defendants misleadingly *omitted* information about the Company's financial performance. Even though Defendants repeatedly and conspicuously disclosed the impact of inflation (which directly allowed for inflationary forward buying), Plaintiffs contend that Defendants did not disclose the specific *degree* of forward buying that was occurring and the relative impact of forward buying, as compared to other factors, on the Company's margin. No such duty of disclosure exists under the federal securities laws, and Plaintiffs do not identify one. Instead, Plaintiffs trot out a series of oft-tried and repeatedly rejected theories of scienter and false or misleading statements, apparently hoping that the number of arguments will obscure that each and every one lacks merit.

As to scienter, although Plaintiffs continue to focus on the Individual Defendants' annual bonuses, courts repeatedly have held that such allegations are simply too generic to constitute a

1

motive. In fact, Plaintiffs' allegations regarding the Individual Defendants' compensation and stock holdings raise the opposite inference. And judicially-noticeable facts further undermine Plaintiffs' argument in this case: because the Individual Defendants' compensation packages were weighted toward multiyear performance, they were incentivized to ***not*** commit the type of short-term fraud that Plaintiffs allege. Moreover, all of the Individual Defendants ***increased*** their net holdings in the Company throughout the putative class period, and ultimately lost millions more in stock value than they gained in annual bonuses for a single year in 2022. These facts— which Plaintiffs do not even bother to discuss in their Opposition—not only fail to support a motive, they instead cut ***against*** any inference of scienter and support an innocent inference.

Because they cannot allege motive, Plaintiffs' burden to plead circumstantial evidence of conscious misbehavior or recklessness is even higher. Yet the Opposition confirms Plaintiffs have nothing. They do not identify one document or other piece of information that shows that any Defendant, in real time, understood the relative impact of forward buying on the Company's margin during the relevant period. And because they cannot plead particularized facts, they mischaracterize the record and rely on conclusory allegations that have been repeatedly rejected in this Circuit. For example, they assert that Defendants were "actively monitoring and calculating procurement gains using advanced data analytics as part of the Value Path initiative." (Opp. 36.) The only support they cite is a statement from September 2020—more than a year before the alleged class period—that referred only to general "decision making" and "incremental operating efficiencies," not procurement gains. (*See* Ex. 47, Q4 2020 Earnings Call Tr. at 6; SAC ¶ 45.) Plaintiffs also claim that the magnitude of forward-buying procurement gains suggests scienter. But courts in the Second Circuit have repeatedly rejected this as a basis for inferring scienter. And the inference Plaintiffs seek is particularly weak because there are no

2

well-pleaded factual allegations showing that it would have been easy to tease out the relative impact of one variable among many on the Company's financial performance during a period of once-in-decades inflation and extreme macroeconomic volatility.

The PSRLA requires this Court to weigh competing inferences on a motion to dismiss, and here, the far more compelling inference is the non-culpable one, supported by the Defendants' own statements and analyst comments: after a long period of stable inflation and numerous quarters in which forecasts had been achieved (which gave Defendants no reason to suspect something was amiss), UNFI lacked a sufficient data analytics system to provide the real-time information regarding the precise impact of inflationary forward buying on its margin, which became apparent only after things suddenly changed when inflation decelerated and offsetting gains that were expected did not materialize. This is not fraud.

Nor have Plaintiffs pleaded an actionable misstatement. Conceding that they have no claim that any of UNFI's financial results were inaccurate, Plaintiffs try to position this case within a narrow line of cases holding that a statement regarding a company's profits or revenues can be misleading if the statement states or implies something affirmatively misleading about the sources of those profits or revenues—for example, suggesting that customer demand was up when in fact customer demand was down. *See* pp. 19-20, *infra*. But that is not this case. Throughout the relevant period, UNFI ***accurately*** disclosed that its margin was benefiting from inflation, and there is no allegation that UNFI publicly disclosed a source or cause that was not having some impact on its profitability. Plaintiffs try to sidestep this problem by baldly asserting that the benefits of inflation were "wholly distinct" from the procurement gains associated with forward buying during the putative class period. (Opp. 14.) But that is simply not true, as Plaintiffs concede—they repeatedly acknowledge that forward buying resulted in "***inflation-***

3

*related* procurement gains." (*E.g.*, *id.* at 34 (emphasis added).) Indeed, inflation directly drove procurement gains from forward buying: inflation triggered repeated atypical price increases, which resulted in margin gains because UNFI was able to sell inventory it already had acquired at a higher-than-ordinary price differential. Thus, this is not a case where the description of the drivers of a company's profits or revenues was inaccurate. Plaintiffs' claim is, instead, a claim that Defendants should have disclosed *more detail*. But the federal securities laws did not require UNFI to disclose the details that Plaintiffs seek. And where, as here, none of Defendants' affirmative statements were rendered misleading by the omission of those additional details, there has been no misstatement under Section 10(b).

Plaintiffs have already had three chances to plead their claim, including once after seeing a full motion to dismiss. They ask for a fourth opportunity, but do not identify any facts they could allege that would cure these problems. The Complaint should be dismissed with prejudice.

## ARGUMENT

### I.    THE OPPOSITION IDENTIFIES NO PARTICULARIZED FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER.

Plaintiffs concede, as they must, that to establish a "strong inference" of scienter, they must allege facts showing (1) that defendants had both motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness. (Opp. 32.) Where, as here, "no motive or opportunity (other than a generalized business motive) is shown, the circumstantial evidence of conscious misbehavior must be correspondingly greater and show highly unreasonable behavior or that which evinces an extreme departure from the standards of ordinary care." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Meyers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022) (cleaned up). And unlike motions to dismiss in other contexts, the court must compare competing inferences when evaluating scienter under Section 10(b). (Br. 14.) Plaintiffs'

4

allegations are sufficient "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).[1]

Plaintiffs' allegations do not raise a cogent inference of scienter, and any such inference is far less compelling than the opposing, innocent inference. On this basis alone, the Court should dismiss this action.

### A.    Plaintiffs Fail To Plead That Defendants Were Motivated To Commit Fraud.

Plaintiffs' half-hearted attempt, buried deep in the Opposition (*see* Opp. 37-39), to rehabilitate the Complaint's allegations regarding the Individual Defendants' alleged motive to commit fraud does not withstand even minimal scrutiny. Plaintiffs allege that the Individual Defendants had a motive because they "collectively received about $3.3 million in annual bonuses that were awarded primarily due to the achievement of the adjusted EBITDA target." (*Id.* at 37.) Yet they ignore several problems with their compensation allegations.

*First*, as Defendants explained (Br. 16-17), "motives … common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *Schwab v. E\*Trade Fin. Corp.*, 285 F. Supp. 3d 745, 756 (S.D.N.Y.) (cleaned up), *aff'd*, 752 F. App'x 56 (2d Cir. 2018); *see also* Br. 16-17 (citing cases). Plaintiffs do not even attempt to reconcile their position with this principle. (*See* Opp. 37-39.)

---

[1] Plaintiffs assert that "[e]ven in cases subject to the [PSLRA], on a motion to dismiss, a court must … 'draw all reasonable inferences in the plaintiff's favor.'" (Opp. 11 (quoting *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015).) That is not true for the scienter element. "While [courts] normally draw reasonable inferences in the non-movant's favor on a motion to dismiss, the PSLRA establishes a more stringent rule for inferences involving scienter because the PSLRA requires particular allegations giving rise to a strong inference of scienter." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase*, 553 F.3d 187, 196 (2d Cir. 2009) (cleaned up). Plaintiffs' quoted case was discussing the misstatement element, not scienter. *See Blanford*, 794 F.3d at 307.

*Second*, as Defendants also explained (Br. 17-18), Plaintiffs' compensation allegations simply do not make sense, and the far more compelling inference is an innocent one, because the "scheme" they allege caused the Individual Defendants far more financial harm than good. Each of the Individual Defendants received yearly bonus compensation *and* long-term stock grants intended to motivate a "focus on multi-year operational performance and increasing shareholder value." (*Id.* (citing SAC ¶ 250).) The value of the Individual Defendants' long-term equity awards *dwarfed* the value of their short-term bonuses. (*Id.* at 18.)[2]

The numbers speak for themselves. ***No*** annual bonuses were paid to UNFI's executives in 2023 when inflation decelerated and earnings fell. (*Id.* at 18 n.13.) And because the Individual Defendants' compensation packages were weighted toward long-term stock grants, the Individual Defendants—all of whom increased their net holdings throughout the course of the class period[3]—sustained heavy losses that far outweighed the collective $3.3 million in 2022 bonuses that Plaintiffs seize on. Based on the Individual Defendants' Form 4s,[4] the value of the

---

[2] Plaintiffs' reliance on *Florida State Board of Administration v. Green Tree Financial Corp.* (Opp. 38) is misplaced. There, the defendant had a "remarkable contract" that awarded him "2.5% of [the company]'s pre-tax income" and was set to expire at the end of the year, "making it urgent for [him] to maximize [the company's] earnings for that [specific] year." 270 F.3d 645, 650, 661 (8th Cir. 2001). No such unusual contractual arrangement is alleged here. *In re Vivendi Universal, S.A. Securities Litigation* (Opp. 37) is similarly distinguishable. 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) (defendant executives were "motivated to inflate company stock prices as a means to effectuate a specific acquisition that would not otherwise be possible without fraudulently inflating stock prices"). And in *In re Carter-Wallace Inc. Securities Litigation* (Opp. 38), the court **rejected** a scienter argument based on an allegedly suspicious stock sale, and noted that generic allegations of motive "do not suffice, alone or in combination." 1999 WL 1029713, at *5 (S.D.N.Y. Nov. 10, 1999), *aff'd*, 220 F.3d 36 (2d Cir. 2000). So too here.

[3] *See* Br. 20-21; *compare* Ex. 48, Oct. 14, 2021 Howard Form 4, *and* Ex. 38, Oct. 14, 2021 Testa Form 4, *and* Ex. 49, Mar. 14, 2022 Douglas Form 4, *with* Ex. 50, Sept. 28, 2023 Howard Form 4, *and* Ex. 39, Sept. 28, 2023 Testa Form 4, *and* Ex. 51, Oct. 5, 2023 Douglas Form 4.

[4] UNFI's stock price closed at $49.12 the day before the putative class period, and opened at $15.09 the day after the putative class period. *See* UNFI Stock Price, Historical Data, http://tinyurl.com/ys6a29ra; UNFI Stock Price, Historical Data, http://tinyurl.com/4wuvsr25. At the close of the period, Mr. Howard owned 117,648 shares (worth $1,775,308.32), Mr. Testa owned 124,848 shares (worth $1,883,956.32), and Mr. Douglas owned 150,936 shares ($2,277,624.24). (Ex. 50, Sept. 28, 2023 Howard Form 4; Ex. 39, Sept. 28, 2023 Testa Form 4; Ex. 51, Oct. 5, 2023 Douglas Form 4.)

Individual Defendants' stock holdings *dropped* by more than a collective $13 million—well in excess of the "collective[] $3.3 million in annual bonuses" that they allegedly received as a result of the putative scheme:

| Defendant | Post-Class Holdings at Pre-Class Price | Post-Class Holdings | Difference Between Post-Class Holdings and Post-Class Holdings at Pre-Class Price |
|---|---|---|---|
| Howard | $5,778,869.76 | $1,775,308.32 | ($4,003,561.44) |
| Testa | $6,132,533.76 | $1,883,956.32 | ($4,248,577.44) |
| Douglas | $7,413,976.32 | $2,277,624.24 | ($5,136,352.08) |
| Totals: | $19,325,379.84 | $5,936,888.88 | ($13,388,490.96) |

Plaintiffs, apparently recognizing that their motive theory makes little sense, seek to downplay the issue by noting that "motive is not necessary to plead scienter." (Opp. 37.) But Plaintiffs miss the point. That the Individual Defendants *lost* far more money than they gained due to the alleged fraud cuts *against* an inference of scienter, and supports an innocent inference.

Finally, as to Mr. Testa's single-day stock sales pursuant to a Rule 10b5-1 trading plan, Plaintiffs ignore the caselaw cited in Defendants' Opening Brief explaining the factors that courts consider to determine whether a stock sale is suspicious. (*Compare id.*, *with* Br. 20-21.) They double-down on their allegation regarding the "proceeds" of Mr. Testa's sales, even though the relevant factor under the law is net profits, not proceeds. (Opp. 39; *see* Br. 20.) They fail to distinguish cases where a larger percentage of the holdings sold were found not to be suspicious. (Br. 20.) They ignore that two of the three Individual Defendants—the Company's CEO and CFO, the individuals who made the vast majority of the challenged statements—did not make purportedly suspicious stock sales during the putative class period, which undermines any inference of scienter. (*Id.* at 21.)[5] And although they argue that Mr. Testa's 10b5-1 trading plan

---

[5] The only challenged statements by Mr. Testa are two that precede the putative class period (SAC ¶¶ 45, 67-68), which Plaintiffs contend were *accurate*, and a single statement from Q3 of 2022—which Plaintiffs do not even address in their Opposition—that "there were … specific items that we're cycling in '22 that we've talked about before, including that monetization of Riverside, which creates a rent expense, which didn't exist last year." (*Id.*

provides no defense against scienter because he entered into the plan during the putative class period, they do not and cannot identify any information, much less non-public information, about the relative impact of forward buying on the Company's margin that Mr. Testa had in his possession before entering into his plan. (*Id.* at 19-20.) These problems are insurmountable.[6]

**B.    Plaintiffs' Allegations Regarding "Access To Information" Do Not Establish A Strong Inference Of Scienter.**

Because Plaintiffs cannot establish motive, "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (cleaned up). Yet Plaintiffs fall far short on this dimension, too.

They start with the premise that "Defendants knew that forward buying benefited UNFI's profitability during the Class Period." (Opp. 34.) That is a straw man. Defendants disclosed, and the market understood, that UNFI's profitability was benefiting from inflationary gains caused by forward buying during the putative class period. (*See* Br. 9-10.) What Plaintiffs accuse Defendants of concealing is not that forward buying was occurring or that it was benefiting the Company, but rather the ***specific contribution*** of forward buying, as opposed to other factors, on the Company's margin. And there are no particularized allegations showing that any of the Defendants knew ***those facts*** at the time they made any of the challenged statements.

Plaintiffs ignore the extremely complicated environment in which UNFI operated and the

---

¶ 167.) That statement has nothing to do with the impact of forward buying on margin, and appears to have been lobbed into the Complaint solely as a pretext for Mr. Testa's inclusion as a defendant.

[6] Plaintiffs' other cases (Opp. 38-39) are all plainly distinguishable. *See In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139-40 (S.D.N.Y. 1999) (multiple executives made sales during an ongoing investigation for a total profit of over $78 million); *Blanford*, 794 F.3d at 308-09 (multiple executives exhibited a "pattern[]" of making sales within days of making misleading announcements and "reaped a total of over $49 million from the sales"); *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 494 (S.D.N.Y. 2018) (multiple executives engaged in series of suspiciously timed trades, and each ultimately liquidated over 80% of their shares and netted over $12 million in profits), *aff'd in part, vacated in part, remanded sub nom. Abramson v. Newlink Genetics Corp.*, 965 F.3d 165 (2d Cir. 2020); *In re Guilford Mills, Inc. Sec. Litig.*, 1999 WL 33248953, at *5 (S.D.N.Y. July 21, 1999) (multiple officers and directors made suspicious stock sales).

many different cross-cutting variables that could have and did affect the Company's financial performance during this post-COVID period. (Br. 7-8; *see, e.g.*, Ex. 5, Q2 2022 Earnings Call Tr. at 3 ("[c]ontinuing supply chain challenges," "[a]ccelerating inflation with varying degrees of negative unit elasticity," "lower inbound fill rates," "increased fuel expense," "labor shortages," "increasing wages," and "increased use of third-party labor to manage stress points").) Throughout this period, the combination of intense consumer demand and ongoing supply chain volatility was so acute that the Company was effectively in "survival" mode trying to fill its customers' orders. (Ex. 8, ICR Conference 2023 Tr. at 2.) Even forward buying was not a straightforward phenomenon, because there were two countervailing forces at play: inflation-related forward buying associated with supplier price increases, which drove margin up, and promotion-related forward buying associated with supplier sales promotions, the absence of which during the class period created a headwind for margin. (*See* Br. 1-2, 6-8.) And on top of all of this, UNFI was also continuing to manage the integration of its largest acquisition in the history of the Company, which left UNFI operating "seven separate IT platforms and a … relatively new consolidated operating structure." (Ex. 30, Guggenheim June 25, 2023 Rpt. at 2.)

Plaintiffs ignore all of this nuance, suggesting that teasing out the precise impact of one form of forward buying on the Company's margin during this period of unprecedented turbulence would have been obvious. But that defies reality. And the Complaint pleads no particularized facts suggesting it is true. Plaintiffs do not cite any document or source of information suggesting that any of the Defendants knew the portion of gross margin attributable to inflation-related forward buying for even one product or one supplier, much less across all of UNFI's approximately 250,000 products and more than 10,000 suppliers. (Br. 5, 23.)

Unable to allege particularized facts, Plaintiffs resort to mischaracterizing the record and conclusory assertions. They claim that "Defendants were actively monitoring and calculating procurement gains using advanced data analytics as part of the Value Path initiative." (Opp. 36.) But the statement they cite—*from more than a year before the putative class period*—says nothing about procurement gains. Mr. Testa merely said that "Going forward, we'll be placing a heavy emphasis on standardizing processes and using higher level data analytics to drive decision making and generate these incremental operating efficiencies." (Ex. 47, Q4 2020 Earnings Call Tr. at 6; *see also* SAC ¶ 45.) Plaintiffs also assert in conclusory fashion that "Defendants repeatedly attributed UNFI's improvements in its profitability metrics to the Value Path initiative (*e.g.*, [SAC] ¶¶ 143, 153, 159, 163, 171, 175), suggesting that this program was ongoing, that it was working, and that Defendants had a reliable basis for measuring the effectiveness of the initiative and calculating the benefits of UNFI's procurement strategies." (Opp. 36.) But again, the actual statements said no such thing. The paragraphs Plaintiffs cite are quotations from certain of UNFI's earnings press releases and Forms 10-Q, none of which say anything about whether UNFI—through the Value Path initiative or any other mechanism—was capable of monitoring the relative impact of inflation-related forward buying on the Company's margin. (*See* SAC ¶¶ 143, 153, 159, 163, 171, 175.) And there is nothing to suggest—*anywhere* in the Complaint—that UNFI had this capability during the relevant period.[7]

Plaintiffs also rely on a single statement by Mr. Testa that he was aware of "higher than normal" supplier price increases, suggesting that this shows he was aware of the magnitude of

---

[7] Plaintiffs assert that, if UNFI did not have the capability to monitor the relative impact of inflation-related forward buying on UNFI's margin during the relevant time, then "they were incredibly reckless in making the representations that they made concerning the ongoing benefits of the Value Path initiative." (Opp. 36.) This is a blatant non sequitur. UNFI accurately disclosed that its financial results were driven by, among other things, "the impact of inflation *and* the Company's Value Path initiative." (*See, e.g.*, Ex. 10, Q1 2022 Earnings Press Release at 2 (emphasis added).) Plaintiffs do not and cannot plead that Value Path had anything to do with forward buying.

inflation-related forward buying during the putative class period. (*See* Opp. 4, 26, 33; SAC ¶ 223.) Again, this statement does not come close to supporting the inference Plaintiffs seek to draw. This statement was made in June 2021, *six months before the start of the alleged class period*, and does not show that Mr. Testa knew anything about the relative impact of inflation-related forward buying on the Company's margin during the class period. It discusses one wave of supplier price increases that "haven't quite hit yet," specifically notes that it was difficult to aggregate the price increases across UNFI's thousands of suppliers, and says nothing about procurement gains, much less the relative impact of procurement gains on the Company's margin.[8] (*See* Ex. 4, Q3 2021 Earnings Call Tr. at 12-13 ("we service so many suppliers that it's hard to say in aggregate where they come in").)

Plaintiffs also cite Mr. Douglas's statement from the Q2 2023 earnings call when he stated that "forward buy opportunities happen in much narrower cycles" because suppliers "are obligated in one format to give [UNFI] 60 days and the other 90" days' notice of a price increase. (Opp. 33 (citing SAC ¶ 227); Ex. 9, Q2 2023 Earnings Call Tr. at 12.) This statement also says nothing about the relative impact of inflation-related forward buying on the Company's margin. That Mr. Douglas was aware of supplier price increases and the cycle during which forward buying for any particular product or supplier theoretically could happen shows nothing about whether he was aware, in real time, of the aggregate effect of atypical inflation-related forward buying on the Company's profitability across all its many products and suppliers. Knowing that forward buying is possible is not the same as knowing its *actual* financial *impact*

---

[8] Mr. Testa's departure was part of UNFI's "effort to better align and simplify [its] organizational structure." (Ex. 52, Oct. 3, 2023 Form 8-K at 2.) Because Plaintiffs allege no particularized facts linking Mr. Testa's departure to the alleged fraud (*see* Opp. 41), Mr. Testa's departure is irrelevant. *Compare Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 415 (S.D.N.Y.), *aff'd*, 757 F. App'x 35 (2d Cir. 2018), *with In re Sadia S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 534-35 (S.D.N.Y. 2009) (CFO was fired and two other defendants resigned, company initiated internal investigation, and plaintiffs' scienter allegations supported by confidential witness statements).

11

on the Company's margin, much less its relative impact as compared to the many other factors that could have and did affect the Company's profitability during this unprecedented period.[9]

The only other source of information that Plaintiffs cite are the so-called ClearVue reports, which get short shrift in Plaintiffs' Opposition. Plaintiffs assert that "the Individual Defendants had access to a wealth of relevant information with which to determine the significant, atypical impact of forward buying" during the putative class period, citing the ClearVue reports. (Opp. 40 (citing SAC ¶¶ 229-30).) But the ClearVue reports self-evidently contain no information contradicting any of Defendants' statements. (*See* Br. 22-23.) They contain no information about procurement gains or gross margin for even one product or one supplier, much less the portion of gross margin attributable to inflation-related forward buying across all of UNFI's thousands of products and suppliers. (*Id.* at 23.) Plaintiffs do not dispute any of this, relying instead on the conclusory assertion that the information "enabled" the Defendants to "quantify the forward buying benefit during the Class Period." (Opp. 40.) Plaintiffs do not and cannot explain how this is so. Indeed, the ClearVue reports underscore the opposite inference: given the complexity of UNFI's business, it would ***not*** have been evident to the Individual Defendants—even assuming they were in possession of this data, which Plaintiffs do not allege—what margin was being realized on the thousands upon thousands of product purchases that were being made by the Company, particularly during a period when supply chain

---

[9] Plaintiffs speculate that "For each forward buying opportunity, Defendants had to conduct a cost-benefit analysis to determine whether the potential savings from buying ahead of the known price increase outweighed the higher carrying costs incurred by holding inventory in excess of demand." (Opp. 4-5 (citing SAC ¶¶ 63-64).) But there is no particularized factual allegation that ***anyone,*** much less the Individual Defendants, conducted a "cost-benefit analysis" of inflationary forward buying during the putative class period, much less that they did so for "each forward buying opportunity." Paragraphs 63-64 rely on generic articles about forward buying (a third-party LinkedIn post and a 1978 academic article (*see* SAC ¶¶ 63-64 & nn.9-10)), which say nothing about Defendants' knowledge or actions. Plaintiffs' allegations also ignore that forward buying can occur passively, as it did here, when UNFI bought whatever inventory it could during the pandemic, and happened to benefit from rising prices during a period of once-in-decades inflation. (*See* Br. 1-2, 6-8.)

challenges led the Company simply to purchase whatever inventory it could get. (Br. 7-8.)

*Stadium Capital LLC v. Co-Diagnostics, Inc.*, which Plaintiffs submitted as a supplemental authority (Dkt. 54), does not support their case. There, the defendants publicly denied there was a demand problem for their key product, COVID tests, telling investors they were experiencing only demand "fluctuations," when in reality demand had cratered, in part because federal funding for COVID testing ran out two months before the statements were made.[10] 2024 WL 456745, at *4, *6 (S.D.N.Y. Feb. 5, 2024). The court held that the plaintiff had adequately alleged scienter based on several facts: (1) one of the individual defendants admitted that **"We are … able to monitor the daily influx of demand for our tests" and that the company "keep[s] a close eye on [it] every day"**; (2) the individual defendants had full access to the company's books and records, which would have shown demand levels for its key product; and (3) the product "accounted for more than 99% of the company's revenue." *Id.* at *5. Here, by contrast, (1) none of the Individual Defendants stated they were "monitoring" and "keeping a close eye" on the magnitude of inflation-related forward buying and its relative impact on the Company's margin across the Company's hundreds of thousands of products and tens of thousands of suppliers; (2) the Complaint does not plead that any of the Individual Defendants had access to records showing the impact of forward buying on margin during fiscal year 2022, and to the contrary, the Individual Defendants stated—and analysts agreed—that the Individual Defendants *did not* have access to such information; and (3) inflation-related forward buying did not account for anything close to 99% of UNFI's revenue. In addition, the Individual Defendants had a powerful economic incentive to avoid the type of short-term fraud alleged

---

[10] In *Stadium Capital*, for example, in response to the question "[A]re you already seeing a decline in customer orders?", the CFO stated: "It's more about the timing and being able to forecast the timing of orders is the bigger issue. *It's not necessarily a demand issue that we're seeing*." 2024 WL 456745, at *1, *3 (emphasis added).

13

here. *See* pp. 6-7, *supra*.

Plaintiffs assert that Defendants admitted "they 'saw' the impact of forward buying" on the Company's margin in real time. (Dkt. 54 at 1.) That is not true, and the statements they cite do not support it. (*See id.* at 1-2.) As explained above, Mr. Testa's June 2021 statement about "higher than normal" price increases was made six months before the alleged class period and said nothing about inflationary forward buying or its impact on margin. Mr. Testa's September 2020 statement that the Company would use "data analytics" to drive "decision making" was made more than a year before the alleged class period and also says nothing about inflationary forward buying or its impact on margin. And Mr. Douglas's September 26, 2023 statement that "we saw an out-of-pattern increase in procurement gains beginning in January '22" was made at the **end** of the class period *after the Company had conducted an extensive analysis of why the Company's margin had changed*. (*See* Br. 10-13, 25-26; *accord* Ex. 9, Q2 2023 Earnings Call Tr. at 4 ("At the time, we did not have full visibility and sufficient detail into the commercial drivers of the benefits due to legacy issues with digital infrastructure … . We were able to understand these issues towards the end of the quarter due to the significant intra-period volatility … .").) Here, unlike in *Stadium Capital*, there are no particularized factual allegations that Mr. Douglas—or any Defendant—understood these facts when any of the challenged statements were made.

Given the many problems with Plaintiffs' "access to information" allegations, it is not surprising that Plaintiffs are unable to distinguish the cases Defendants cited. (*See* Br. 21-26.) For example, their only attempt to distinguish *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772 (S.D.N.Y. 2021), is the claim that the *Maloney* complaint "did not allege as strong a relationship between the access to relevant information and the alleged omission." (Opp.

14

40 n.19.) But Plaintiffs here have not pleaded *any* particularized facts showing that any of the Defendants had real-time access to information about the relative impact of forward buying on the Company's margin. Indeed, in *Maloney*, the scienter allegations were *more* specific: confidential witnesses (not alleged here) stated that the company's executives had access to a specific daily sales report that tracked store sales, they "assessed inventory on a weekly basis," and "the company 'had technology in place to provide real-time information to its senior executive team regarding its inventory.'" 518 F. Supp. 3d at 780 (cleaned up). Plaintiffs claim that the "access to inventory and sales information was insufficient [in *Maloney*] because a decline in inventory would not necessarily cause a sales miss." (Opp. 40 n.19.) But the *Maloney* plaintiffs *also* alleged access to daily sales information (not just inventory levels), and the relationship between inventory levels and sales figures was the precise issue alleged to have been concealed. *See* 518 F. Supp. 3d at 780 ("According to Plaintiffs, … the Individual Defendants had access to certain information concerning Ollie's *sales and inventory*—and thus knew or should have known that 'the *inventory* shortage was negatively affecting comparable store *sales*.'" (cleaned up) (emphases added)). Plaintiffs' purported distinction therefore fails. As in *Maloney*, Plaintiffs' vague and conclusory allegations regarding "access to information" do not establish scienter.[11]

---

[11] Plaintiffs' cases are nothing like this case. *See Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *3, *13-14 (S.D.N.Y. Apr. 14, 2020) (defendants concealed sales strategy with "Ponzi Scheme-like quality," which was laid out "in emails, presentations, board meetings"; some defendants were "personally involved in the abusive practices"; company was subject to multiple investigations by regulators and Audit Committee; and company's outside auditor refused to certify financial statements (cleaned up)); *Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings, Inc.*, 2012 WL 4049953, at *2-3 (S.D.N.Y. Sept. 14, 2012) (defendants "consistently represented … they had conducted sufficient due diligence" to verify subject matter of alleged fraud and made such representations in seeking "substantial management fees"); *In re Zillow Grp., Inc. Sec. Litig.*, 2019 WL 1755293, at *19-20 (W.D. Wash. Apr. 19, 2019) (defendants were familiar with how program was "structured," were aware of a consent judgment that program was used to violate law, one defendant "performed detailed due diligence" on the program, and company altered program in the midst of a CFPB investigation but did not disclose the change); *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, 2011 WL 2444675, at *12 (D. Del. June 14, 2011) (complaint alleged particularized facts, supported by confidential witnesses and defendants' admissions, that defendants had access to information contradicting their statements, including internal reports and meetings and

15

C.    **The Magnitude Of Forward Buying And Its Impact On UNFI's EBITDA Do Not Support A Strong Inference Of Scienter.**

Plaintiffs argue that the "size of [the] procurement gains and their effect on UNFI's profitability supports a strong inference that Defendants were aware of the forward buying practices and their centrality to UNFI's financial performance." (Opp. 35.) They also invoke the "core operations" doctrine—discredited in this Circuit in light of the PSLRA—suggesting that Defendants must have known about the relative impact of forward buying because it was a large source of profits for the Wholesale segment of UNFI's business. (*Id.* at 39.) None of these allegations establishes a strong inference of scienter.

Even in the context of a restatement of a Company's financial statements, the size of the error alone does not create an inference of scienter. *In re Turquoise Hill Resources Ltd. Sec. Litig.*, 2014 WL 7176187, at *7 (S.D.N.Y. Dec. 16, 2014) ("The fact of an error, even a large error, does not suggest knowledge or intent to misstate when the financial results were originally published[.]"). Here, there was no restatement and therefore even less reason to infer scienter. Plaintiffs' cases are distinguishable. Both hinged on scienter allegations not pleaded here. *See In re Tower Auto. Sec. Litig.*, 535 F. Supp. 2d 445, 447 (S.D.N.Y. 2008) (multiple confidential witnesses stated that the allegedly nondisclosed information concerned the "life blood" of the company and was "routinely discussed at Board meetings"); *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *14-15, *18-19 (N.D. Cal. Aug. 17, 2022) (multiple confidential witnesses stated that the allegedly nondisclosed channel stuffing strategy was well-known by management,

---

calls with company insiders); *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *12 (S.D.N.Y. Mar. 28, 2018) (complaint alleged particularized facts suggesting that defendants "almost certainly had access" to information contradicting their statements and had been notified of a DOJ investigation); *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 283, 290-91 (E.D.N.Y. Mar. 29, 2023) (complaint alleged particularized facts regarding a variety of non-public documents contradicting defendants' public statements, including presentation delivered to the board).

16

there was evidence that management knowingly adopted the strategy, and the individual who implemented the policy left the company around the time inculpatory findings were presented to the Audit Committee).

As to Plaintiffs' "core operations" argument, Plaintiffs ignore the cases within this Circuit concluding that the doctrine is inconsistent with the PSLRA. (*Compare* Opp. 39-40, *with* Br. 26 & n.20.) And their argument for why the doctrine should apply here rests on a misunderstanding of the law. The doctrine, even if viable post-PSLRA, applies only to the "core operations" of a business, which must "constitute nearly all of a company's business" or be essential to the company's survival. (Br. 27 (quoting *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011).) Plaintiffs have not and cannot allege that inflationary forward buying constitutes nearly all of UNFI's business or that it was essential to the Company's survival. (*Id.*) It obviously is not, given that UNFI operated successfully for decades before the skyrocketing inflation in the COVID era. In any event, because there is no other basis to infer scienter, Plaintiffs' attempt to invoke this doctrine fails.[12] (Br. 26 (not independent basis of scienter).)

### D.    A Non-Culpable Inference Is Far More Compelling.

The inference that the Individual Defendants, each significant stockholders, deliberately issued incorrect financial forecasts—causing UNFI's stock price to decline and eliminating executive bonuses in 2023—is far less compelling than the countervailing inference that the Individual Defendants lacked prior insight into the relative impact of inflation-related forward buying on the Company's margin, causing UNFI's forecast to be incorrect when inflation

---

[12] Plaintiffs' cases do not support them. *See In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *1, *26 (S.D.N.Y. Dec. 2, 2013) (plaintiffs alleged that defendants were aware of "serious contract dispute with a large customer" that was "critical to the long term viability" of the company); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37-38 (S.D.N.Y. 2019) (plaintiffs "pointed to specific numbers in CEO Call slide decks throughout the class period," which permitted inference that defendants knew about undisclosed channel-stuffing scheme; plaintiffs' "core operations" allegations merely "buttressed" other scienter allegations).

decelerated and supplier promotions did not bounce back as expected. As Defendants explained, and as analysts noted, UNFI was operating in the "most unpredictable operating environment ever" and did not have the analytical capabilities that would have allowed the Company to identify this effect in real time. (*Id.* at 9-13.) Plaintiffs have failed to plead particularized facts undermining this innocent explanation.

## II.    PLAINTIFFS FAIL TO PLEAD ANY ACTIONABLE MISSTATEMENT.

### A.    Plaintiffs Fail To Plead A False Or Misleading Statement.

Plaintiffs concede they are not alleging that any of UNFI's statements were false (Opp. 28). Instead, as Plaintiffs put it, UNFI's statements about its financial performance "were misleading because the principal driver of the improvements in UNFI's gross margin rate and gross profit rate was an atypical and highly elevated level of procurement gains" that Defendants did not disclose. (*Id.* at 13.) Although Plaintiffs' Opposition attempts to break out their challenged statements into different buckets—statements "about the drivers of UNFI's improved profitability" (*id.* at 13-18), statements about the "sustainability of UNFI's profits" (*id.* at 18-20), UNFI's "impact of inflation" statements (*id.* at 20-21), UNFI's risk factor disclosures (*id.* at 21-23), and UNFI's guidance statements (*id.* at 23-24)—the essential premise of Plaintiffs' argument is the same: UNFI's statements were misleading because they failed to disclose the specific degree of forward buying and its relative impact, as opposed to the relative impact of other factors, on the Company's margin.

This premise fails because Plaintiffs fail to explain how any of the statements that UNFI did make were rendered misleading by the omission of these details. As the Second Circuit has explained, "accurately reported financial statements do not automatically become misleading by virtue of the company's nondisclosure of suspected []conduct that may have contributed to the financial results." *Plumber & Steamfitters Loc. 773 Pension Fund v. Dankse Bank A/S*, 11 F.4th

90, 98-99 (2d Cir. 2021); *see also Glazer v. Formica Corp.*, 964 F.2d 149, 156 (2d Cir. 1992) ("Even if information is material, there is no liability under Rule 10b-5 unless there is a duty to disclose it." (citation omitted)). Plaintiffs have failed to plead an actionable misstatement.

### 1. Defendants' Statements About the Drivers of UNFI's Profitability Were Not Misleading.

Because Plaintiffs have no answer for this principle, they attempt to invoke a narrow exception. According to Plaintiffs, UNFI's indisputably true statements about the "drivers" of its financial performance were nevertheless misleading because UNFI "cho[se] to speak about the sources of its success," and was therefore required to provide more information about forward buying. (Opp. 16.) But the cases Plaintiffs cite underscore why this narrow exception does not apply here. Plaintiffs' cases, unlike here, involve situations where the defendant said something *inaccurate* about the sources of its financial success, falsely attributing its success to one cause when in fact the success was driven by other causes.

For example, in *In re Dentsply Sirona, Inc. Securities Litigation* (Opp. 14), the company stated that its revenues were driven by strong end-user demand, while omitting that its sales were in fact "driven by … minimum purchase requirements" with intermediaries, which artificially inflated sales despite a known *decline* in end-user demand. 665 F. Supp. 3d 255, 283 (E.D.N.Y. 2023). Given that the company had specifically attributed its financial performance to strong end-user demand, it was misleading to omit that the reality was exactly the opposite.[13] *Id.*

Here, by contrast, UNFI did not attribute its financial performance to a false cause. It stated accurately that its financial performance was driven by, among other things, the "impact of

---

[13] The minimum purchase requirements were part of an alleged antitrust conspiracy designed to exclude competitors from the market for professional dental products. *Dentsply Sirona*, 665 F. Supp. 3d at 270-72. The company eventually announced a series of impairments that reduced its goodwill by $2.5 billion, and was investigated by and eventually entered into a settlement with the SEC. *Id.* at 272-74.

19

inflation." (*See* Br. 32-34.) These accurate disclosures are not actionable. *See In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016) ("[T]his Court agrees that 'a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data.'" (citation omitted)); *Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250, 252 (2d Cir. 2004) ("Accurate statements about past performance are self evidently not actionable … .").

In an effort to avoid this reality, Plaintiffs baselessly assert that procurement gains were "wholly distinct from the general impact of inflation." (Opp. 13-14.) But that is simply not true (and Plaintiffs cite nothing to support it). As Defendants explained, the procurement gains from forward buying that Plaintiffs claim Defendants misleadingly failed to disclose ***resulted directly from, and went hand-in-hand with,*** inflation. (Br. 1-2, 6-8.) Inflation triggered atypical supplier price increases that, though they did not take effect for 60 to 90 days, contractually were passed on to UNFI's retail customers, thus resulting in an inflationary gain. (*Id.* at 8.) Indeed, Plaintiffs do not and cannot explain how inflation would have contributed to margin *other than* because of inflationary forward buying: if inflation had not created the opportunity to pass higher prices onto customers from inventory acquired at a lower cost, holding all else constant, margin would have remained precisely the same. Thus, there was nothing misleading about Defendants' statements that the Company's profitability was benefiting from inflationary gains: inflationary gains and forward-buying inflationary gains were one and the same. The market understood that, as analysts confirmed. (*See, e.g.*, Ex. 20, Wells Fargo March 17, 2022 Rpt. at 3 ("*Inflation* has clearly also provided a benefit given the structure of [UNFI's] contracts with customers and *ability to forward buy* … ." (emphases added)); Br. 10.) There is no reasonable dispute about this. Plaintiffs concede the point throughout their Opposition when they acknowledge that forward buying caused "***inflation-related*** procurement gains." (Opp. 34 (emphasis added); *see*

20

*also id.* at 2 ("inflation-related procurement gains"), 22-23 ("inflation-related forward buying"),

31 n.15 ("inflation-related forward buying or elevated procurement gains").)[14]

> ### 2.    Mr. Douglas's Responses to Analyst Questions in Q3 2022 and Q1 2023 Were Not Misleading.

Plaintiffs also claim that two responses by Mr. Douglas to analyst questions in Q3 2022

and Q1 2023 were misleading because they were "inconsistent with the true state of affairs at

UNFI, in which atypical and highly elevated procurement gains accounted for an enormous

portion of UNFI's profitability." (Opp. 19.) These statements were not misleading.

In the first, Mr. Douglas stated that "we scenario plan multiple potential scenarios[, a]nd

interestingly enough, the actions that we [would take in] virtually[] every scenario are

approximately the same." (Ex. 44, Q3 2022 Earnings Call Tr. at 17.) In addition, he explained

that UNFI needed to "keep [its] cost structure tight so that we stay agile in the face of

whatever … scenario," and that "I think we'll be in strong shape, regardless of the scenario."

---

[14] Plaintiffs' other cases (Opp. 16-17 & n.10) are distinguishable for the same reason. *See In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 132-33 (2d Cir. 2021) (company publicly stated that growing sales were due to "strong consumer demand," when in fact demand was declining and its sales were driven by "channel stuffing"); *In re Virtus Inv. Partners, Inc.*, 195 F. Supp. 3d 528, 533, 535 (S.D.N.Y. 2016) (company stated that its historical record was based on trading live client assets since 2001, when in fact returns were based on index created in 2008 and all pre-2008 returns were based on "back-tested, hypothetical assets," not live client assets); *In re Marsh & Mclennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 463-64, 474 (S.D.N.Y. 2006) (company stated that it received commissions for services provided, when in fact commissions were illegal kickbacks); *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 760, 768-69 (S.D.N.Y. 2019) (company stated that sales growth was attributable to particular subpopulation and "organic growth," when in fact it was driven by fraudulent marketing); *In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *2-5, *15 (E.D.N.Y. Sept. 27, 2019) (company stated that success of distribution business was based on location of distribution centers and customer service, when in fact it was based on anticompetitive practices); *Solomon v. Sprint Corp.*, 2022 WL 889897, at *6 (S.D.N.Y. Mar. 25, 2022) (company stated that postpaid net additions drove growth and that company expected continued accretion, when in fact postpaid net additions were down year-over-year and company did not expect future growth); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 391-93, 400-01 (S.D.N.Y. 2005) (company stated that its financial success was determined by "trading volumes and price volatility," when in fact it was based on illegal trading). To the extent *Van der Moolen* contains arguably broader language, it should not be read that way, as multiple judges in this District have recognized. *See, e.g.*, *Marcu v. Cheetah Mobile Inc.*, 2020 WL 4016645, at *4 n.1 (S.D.N.Y. July 16, 2020) ("The Court is not inclined to adopt that reading of *Van der Moolen* for the reasons ably stated by other judges in this District.") (Furman, J.); *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 356 (S.D.N.Y. 2008) (Holwell, J.); *Marsh*, 501 F. Supp. 2d at 470-71 (Kram, J.).

(*Id.*) Plaintiffs allege nothing to support that the Company did not scenario-plan, with the actions taken in the planned-for scenarios being the same. Nor did Mr. Douglas say or imply anything about the level of forward buying, or the relative impact of procurement gains on the Company's margin. And Plaintiffs do not allege that Mr. Douglas did not sincerely believe that the Company would be in "strong shape regardless of the scenario." *See, e.g.*, *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 547 (S.D.N.Y. 2015) (opinion statement not false or misleading where plaintiff failed to allege that opinion was "other than sincerely held").

The second statement was Mr. Douglas's response to an analyst's question about the relationship between customer mix on gross margins, not forward buying, and Mr. Douglas's answer logically addressed customer mix: "A lot of our growth in the first quarter came with some of our bigger customers. But over time, I think you saw that all of our channels grew. And so, there'll be some fluctuation, but I would describe what you saw in the first quarter as minor and just more a function of the temporary growth drivers in our customer file." (Ex. 45, Q1 2023 Earnings Call Tr. at 9.) Again, Mr. Douglas's statement did not say anything about the level of forward buying that was happening, or the relative impact of procurement gains on the Company's margin, and was therefore not misleading.[15]

### 3.  Defendants' "Impact of Inflation" Statements Were Not Misleading.

Plaintiffs also contend that a series of statements in UNFI's Forms 10-Q and 2022 Form 10-K within the "Trends and Other Factors Affecting Our Business" section about the "Impact of Inflation" were misleading because they did not disclose that "a heightened and atypical level of

---

[15] Plaintiffs' cases (Opp. 20) are distinguishable. In *Azar v. Yelp, Inc.*, the statement found to be false "directly addressed local advertising," which was the subject matter of the fraud, and "conveyed the impression that [problems] were one-off aberrations" despite the defendants possessing actual knowledge of longer-term issues. 2018 WL 6182756, at *10-11, *2 (N.D. Cal. Nov. 27, 2018). And in *Van der Moolen*, the defendant falsely attributed the cause of a decline in revenue to one cause ("poor market conditions") when in fact it was due to another cause (the cessation of "abusive trading practices"). 405 F. Supp. 2d at 408.

procurement gains was the key driver of improvements in the Company's profitability." (Opp. 21.) But again, Plaintiffs identify no statute or regulation requiring the disclosure of these details, and they fail to explain how any affirmative statement was rendered misleading by their omission. The disclosures provided undisputedly true information about the impact of inflation on UNFI's business and said nothing about the level of forward buying that was occurring, or its relative impact on the Company's margin. (*See, e.g.*, Ex. 17, 2022 Form 10-K at 30.)

### 4.   *Defendants' Risk Factor Statements Were Not Misleading.*

Plaintiffs similarly argue that certain risk warnings in UNFI's Forms 10-Q and 10-K "were themselves affirmatively misleading and an independent basis of liability." (Opp. 22.) In particular, they claim that UNFI's warning to investors that its financial results "could differ materially from those anticipated" due to "moderated supplier promotional activity, including decreased forward buying opportunities" was misleading because it did not specifically mention the risk of decreased "inflation-related forward buying." (*Id.* at 22.) This argument relies on a mishmash of UNFI's risk warnings and provides no basis for liability here.

The risk of "moderated supplier promotional activity" is a real risk facing UNFI, and in fact it is an important part of understanding what happened to the Company. Disclosing it as a risk factor was therefore entirely appropriate. As Defendants explained in their Opening Brief, a company can benefit from forward buying in different ways, including (1) by selling inventory to a retailer at a higher price than when initially obtained from the supplier and passing the price increase onto the retailer, and (2) by taking advantage of supplier promotions that enable a distributor to purchase inventory at a lower-than-ordinary cost. (Br. 1-2, 6-7.) When inflation rapidly decelerated in Q2 2023, the inflation-related forward-buy opportunities that UNFI had benefited from during a once-in-decades period of rapid inflation quickly dried up, but the Company expected supplier promotions to bounce back, which did not happen. (*See* Ex. 9, Q2

23

2023 Earnings Call Tr. at 6.) This contributed to UNFI's financial results in Q2 2023: the Company understood that inflation could decelerate, but expected some offsetting gain from the return of supplier promotions. Thus, the risk factor that Plaintiffs challenge disclosed the very risk that happened here.[16] And, contrary to Plaintiffs' suggestion (*see* Opp. 23), UNFI's warning did not downplay the risk that changes in inflation might cause the Company's financial results to differ from those anticipated. In fact, another of the Company's risk warnings warned of the exact opposite. (*See* Ex. 17, 2022 Form 10-K at 27 (UNFI's business was subject to "relatively low margins … , which are sensitive to inflationary and deflationary pressures").)

### B.    UNFI's Forward-Looking Statements Are Not Actionable.

In kitchen-sink fashion, Plaintiffs' Complaint included a significant number of forward-looking statements, including paradigmatic examples of forward-looking projections about future earnings. (*See* Br. 35 & n.24 (citing, for example, SAC ¶ 145 ("our outlook for adjusted EPS is also unchanged and expected to finish between $3.90 and $4.20 per share")).) In their Opposition, Plaintiffs abandon those statements and instead claim that "[t]he gravamen of Plaintiffs' allegations with respect to each category of challenged statements is that Defendants omitted material facts rendering those statements materially misleading." (Opp. 28.) But they concede that in order to prevail on an "omissions" theory, the PSLRA still requires them to plead that the affirmative statements made were rendered false or misleading as a result of the purported omissions. (*See id.* at 28-29.)[17] Plaintiffs present no unique argument as to why any of the

---

[16] *In re Bear Stearns Cos., Inc. Securities, Derivative & ERISA Litigation* (Opp. 23) concerns a different issue. There, the complaint alleged that the defendants *knew* that the risk identified in the risk factor disclosure had already come to pass. 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011) (company provided risk warning that "models might not accurately predict the future" when it already knew that its "models were fundamentally flawed and could *never* produce accurate information" (emphasis added)). The same is true for *Schaeffer v. Nabriva Therapeutics plc*, 2020 WL 7701463, at *11 (S.D.N.Y. Apr. 28, 2020) (risk factor disclosed risk of regulatory noncompliance but failed to acknowledge that company had already received letter from FDA listing "significant" problems).

[17] Plaintiffs' cases (Opp. 28) do not support them. *See City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at

forward-looking statements identified in Defendants' Opening Brief (*see* Br. 35-37) are false or misleading, resorting again to the argument that the Company wrongfully omitted the precise impact of inflationary forward buying on the Company's margin. These statements should be dismissed for the same reasons as discussed above and in Defendants' Opening Brief.

Plaintiffs also claim in passing that some of the forward-looking statements identified in Defendants' Opening Brief are "mixed statements that … include representations of historical or present fact." (Opp. 29.) But the only examples they give are two statements that the "increase in gross margin rate *was driven* by improvements in the Wholesale segment margin rate." (*See id.* (citing SAC ¶¶ 143, 163).) Plaintiffs offer no reason why these aspects of the statements are false or misleading. (*See id.*) That alone is fatal. *See Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (Plaintiffs "must do more than say that the statements … were false and misleading; they must demonstrate with specificity why and how that is so."). And these statements were indisputably true. No one disputes that the Company's gross margin rate was expanding because of improvements in the Company's Wholesale segment margin rate.

Similarly, Plaintiffs assert in a single sentence that "the revised fiscal 2023 outlook provided on March 8, 2023 failed to disclose then-existing facts about the year-over-year decline in forward buying opportunities." (Opp. 30 (citing ¶¶ 203, 119).) Again, Plaintiffs do not specify what then-existing facts should have been disclosed, which is fatal. *See Rombach*, 355 F.3d at 174. Moreover, the actual statements belie Plaintiffs' claim. In both cases, the Company

---

*11-12 (S.D.N.Y. Mar. 25, 2013) (company stated that inventory problem was temporary and limited to one line of products, when in fact inventory problem was broader and continuing); *Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at *2-3 (S.D.N.Y. Mar. 2, 2017) (company made detailed statements about engineering plans, including specific "dollar amounts and deadlines for each of the estimates they publicly announced," when in fact company had not performed any detailed engineering analysis); *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 287-94, 298-99, 304 (S.D.N.Y. 2018) (statements regarding success of integrating another company, including about combined company's productivity, delinquency rates, and growth, were contradicted by ongoing problems and specific reports).

accurately disclosed that it had experienced fewer and less significant forward-buying

opportunities than in the prior-year quarter. (*See* Ex. 53, Q2 2023 Form 10-Q at 28 ("In the

second quarter of fiscal 2023, we experienced a sequential deceleration in the number and

magnitude of vendor product cost increases as compared to the first quarter of fiscal 2023 … .");

Ex. 54, Q3 2023 Form 10-Q at 28 ("In the third quarter of fiscal 2023, we experienced fewer and

less significant vendor product cost increases as compared to the third quarter of fiscal

2022 … .").)

Plaintiffs also argue that UNFI's forward-looking statements were not accompanied by

meaningful cautionary language. They claim that the language was "boilerplate," noting that it

was repeated verbatim over time. (*See* Opp. 31-32.) But the language is not "boilerplate"; it

identifies substantive, company-specific information about the risks facing UNFI's business.

*Compare, e.g.*, *Ill. State Bd. of Inv. v. Authentidate Holding Corp.*, 369 F. App'x 260, 264 n.3

(2d Cir. 2010) (warning that forward-looking statements were "subject to certain risks and

uncertainties" was boilerplate), *with Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 360 (2d

Cir. 2002) (warning that securities were not presently and might not ever be registered for resale

was meaningful cautionary language, not boilerplate). Indeed, it "conveyed substantive

information about the risk that ultimately materialized." *Sanofi*, 87 F. Supp. 3d at 536. And the

fact that the warning was repeated over time is of no moment, because there is no well-pleaded

factual allegation that circumstances had changed *before* the Company's announcements in Q2

and Q3 of 2023. Plaintiffs assert that circumstances had changed "as of the Company's 1Q23

disclosures on December 7, 2022, causing a decline in procurement gains and the Company's

gross profit rate." (Opp. 31-32.) But they cite nothing to substantiate that assertion. *See*

*Proshares Trust II Sec. Litig.*, 2020 WL 71007, at *8 (S.D.N.Y. Jan. 3, 2020) (rejecting

26

argument that risk factors were not meaningful because they were repeated "verbatim" where complaint failed to plead a relevant change in circumstance). And in fact, the Company's Q1 2023 disclosures do not support it. The Company's gross profit rate declined that quarter, but not due to a decline in procurement gains. (*See* Ex. 15, Q1 2023 Earnings Press Release at 2 ("The decrease in gross profit rate … was driven by changes in customer mix … .").)

Finally, Plaintiffs argue that UNFI's forward-looking statements are not protected by the safe harbor because they were made with actual knowledge of their falsity. (Opp. 32.) They cite nothing to support this claim, simply referring generically to "the facts alleged in the Complaint." (*Id.*) The Complaint's allegations do not establish recklessness, much less the stricter standard of actual knowledge. (Br. 36; *see* pp. 4-18, *supra*.)

### C.    Generic Statements Are Not Actionable.

Defendants moved to dismiss several alleged misstatements as too generic to support reliance by a reasonable investor, quoting and identifying the statements by paragraph number in the Complaint. (*See* Br. 37-38 (citing SAC ¶¶ 183, 80, 197).) Notwithstanding these citations—to Plaintiffs' ***own*** lengthy block-quotes within their Complaint—Plaintiffs ironically accuse Defendants of failing to identify the inactionable statements with the "requisite specificity," ignoring that is ***Plaintiffs' burden***, and then abandon portions of two statements that were pleaded in the Complaint. (*See* Opp. 27 & n.14.) Plaintiffs ultimately defend only one alleged misstatement (from SAC ¶ 183), which stated in relevant part that "the way [we] think about our guidance for '23 is that there's a fair amount of market uncertainty out there, and the way we have developed our guidance is to be pragmatic and make sure that we have flexibility during the year to provide good returns, and at the same time be flexible enough to meet whatever needs our customers have." (*See id.* at 27; *accord* Br. 37-38.) Plaintiffs argue that this statement is actionable, because "it was in response to an analyst inquiring as to the basis for UNFI's fiscal

27

2024 guidance." (Opp. 27.) But that does not transform a generic statement into one that a reasonable investor would rely on. As Defendants explained, this statement said nothing about forward buying and the magnitude of procurement gains, nor did it guarantee any specific results. (Br. 38.) In fact, it expressly cautioned investors regarding a "fair amount of market uncertainty." (*Id.*) No reasonable investor would have read this statement as a guarantee regarding the Company's future profit margin.[18]

### D.    Item 303 Of Regulation S-K Does Not Provide Any Basis For Liability Here.

Plaintiffs argue that even if this Court were to hold that Defendants made no false or misleading statements, Defendants would still be liable under Section 10(b) for a failure to make disclosures required by Item 303 of Regulation S-K. (Opp. 24.) This argument is meritless.

*First*, the failure to make a disclosure required under Item 303 should not be sufficient to support a private claim under Section 10(b) and Rule 10b-5. As Plaintiffs acknowledge, this is an issue the Supreme Court is poised to decide. (*See* Br. 39; Opp. 25 & n.13.)

*Second*, the Complaint fails to plead that management actually knew the degree to which inflationary procurement gains were driving the Company's margin. (Br. 39.) Plaintiffs respond that "Item 303 does not require that Defendants knew the precise degree to which the inflationary procurement gains were driving UNFI's margin" (Opp. 26), but that is the only information that Plaintiffs claim UNFI failed to disclose. It is undisputed that UNFI disclosed that it was benefiting from inflation, that inflationary gains were contributing to margin expansion, that UNFI was engaging in forward buying, and that there were "higher than normal" supplier price increases—in other words, each and every trend actually known. (*See id.* at 26.)

---

[18] *In re Signet Jewelers Ltd. Securities Litigation* (Opp. 27) is inapposite. There, the statements unequivocally touted the health of an investment portfolio, including that it was "very strong" and "very stringently controlled," with "consistent" underwriting and "minimized risk." 2018 WL 6167889, at *11 (S.D.N.Y. Nov. 26, 2018).

Thus, Plaintiffs' concession that Item 303 does not require disclosure of the specific degree of forward buying and its relative impact on the Company's margin forecloses Plaintiffs' claim.[19]

*Third*, in the Second Circuit, the failure to make a required Item 303 disclosure cannot serve as a basis for liability under Section 10(b) unless "all of the other requirements to sustain an action under Section 10(b) are fulfilled." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015). Plaintiffs' failure to plead a "strong inference" of scienter is thus fatal to their Item 303 claim as well. *See* pp. 4-18, *supra*; *Stratte-McClure*, 776 F.3d at 106-07 (affirming dismissal of Item 303-based claim on scienter grounds: facts did not show "actual intent to mislead investors by failing to make Item 303 disclosures" (cleaned up)).

*Finally*, any "omission" is not material given the Company's clear cautionary statements warning of the risks of deflation and decreased forward-buying opportunities and public information about inflation. (Br. 40.) Plaintiffs assert that "materiality cannot be resolved on the pleadings." (Opp. 27 (citing *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000).) But Plaintiffs' own Second Circuit case shows otherwise. *Ganino*, 228 F.3d at 162 ("[W]hen presented with a Rule 12(b)(6) motion, 'a complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material *unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance*.'" (emphasis added) (citation omitted)); *accord ECA, Loc. 134 IBEW*, 553 F.3d at 205 (affirming Rule 12(b)(6) dismissal of challenged misstatements as immaterial).

---

[19] Plaintiffs' cases (Opp. 25) are distinguishable because the defendants in those cases knew of a specific trend that was not disclosed. *See Stratte-McClure*, 776 F.3d at 104-05 (defendants were aware of, actively monitoring, and initiated a task force to respond to trend); *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95-96 & n.8 (2d Cir. 2016) (defendant was aware that it faced "serious, ongoing criminal and civil investigations"); *Moab Partners, L.P. v Macquarie Infrastructure Corp.*, 2022 WL 17815767, at *3 (2d Cir. Dec. 20, 2022) (impending "significant restriction of [major profit source] was known to Defendants"), *cert. granted*, 144 S. Ct. 479 (2023); *In re CPI Card Grp., Inc. Sec. Litig.*, 2017 WL 4941597, at *4 (S.D.N.Y. Oct. 30, 2017) (defendant admitted it could detect trend, and confidential witness alleged that defendants knew of trend).

**III.    THE COMPLAINT DOES NOT STATE A CLAIM FOR CONTROL PERSON LIABILITY UNDER SECTION 20(A).**

Plaintiffs do not dispute that their Section 20(a) claim for control person liability necessarily depends on their ability to state a claim under Section 10(b). (*See* Opp. 43 n.22.) Because they do not adequately allege a violation of Section 10(b), the Section 20(a) claim fails as well.

**IV.    PLAINTIFFS SHOULD NOT BE GIVEN LEAVE TO REPLEAD.**

Plaintiffs request a fourth opportunity to replead if this Court were to grant Defendants' motion. But they identify no facts they could allege that would cure the problems Defendants repeatedly have identified. (*See* Opp. 43.) Moreover, Plaintiffs have already amended twice, including once after having the benefit of reviewing a prior motion to dismiss. *See, e.g.*, *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 530 n.19 (S.D.N.Y. 2020) (denying request for leave to amend in securities case); *Marcu*, 2020 WL 4016645, at *9 (same); *Endovasc, Ltd. v. J.P. Turner & Co., LLC*, 169 F. App'x 655, 657-58 (2d Cir. 2006) (denial of leave to amend appropriate where plaintiff had been given "an opportunity to amend … in light of defendants' dismissal papers"). And this Court's individual rules put them on notice that they needed to allege whatever facts they could to respond to the deficiencies identified in Defendants' prior motion. *Cf.* Individual Rules and Practices § 4(e). That Plaintiffs made no material changes when they filed this Complaint shows they have no basis to seek yet another opportunity to replead.

**CONCLUSION**

This Court should dismiss Plaintiffs' Complaint with prejudice.

Respectfully submitted,

*/s/ Francesca Brody*
Francesca Brody
SIDLEY AUSTIN LLP
787 Seventh Avenue

30

New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
fbrody@sidley.com

Nilofer I. Umar (admitted *pro hac vice*)
Neil H. Conrad (admitted *pro hac vice*)
William J. Lawrence (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
numar@sidley.com
nconrad@sidley.com
bill.lawrence@sidley.com

31