UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DAN SILLS and GEORGE DICK, individually and on behalf of all others similarly situated,

 Plaintiffs,

-against-

UNITED NATURAL FOODS, INC., J. ALEXANDER MILLER DOUGLAS, JOHN W. HOWARD, and CHRISTOPHER P. TESTA,

 Defendants.

---

23-CV-2364 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

Amidst soaring inflation stemming from the COVID-19 pandemic, United Natural Foods, Inc. ("UNFI" or the "Company"), the largest publicly traded grocery wholesaler in North America, learned of supplier price increases 60 to 90 days in advance of those price increases taking effect. UNFI leveraged this knowledge to stock up on inventory at the lower prices while immediately passing along price increases to retailers. This practice is called "forward buying." This practice significantly propped up UNFI's earnings in 2022. Those profits, however, were not sustainable. UNFI's earnings decreased significantly in 2023. UNFI's stock price tumbled when in March 2023, UNFI revealed the extent to which its profits had been driven by no-longer-sustainable forward buying gains the prior year.

At issue in this case is whether the Company and its executives knew that the unsustainable profits from this practice, and their eventual evaporation when inflation decelerated, were a key driver of the Company's margins. Plaintiffs, purchasers of UNFI's securities, bring this putative class action. They allege that Defendants knew of the impact of the aberrational level of inflation-related forward buying and Defendants' public statements omitting

this information were misleading. Defendants plead ignorance, stating that they did not know because of their own antiquated IT systems. At this stage, the more compelling and cogent inference is that Defendants did know, and that some of their statements talking around this issue were misleading half-truths. Thus, Defendants' motion to dismiss is largely denied.

## BACKGROUND

The facts are primarily set forth as alleged in the Second Amended Complaint ("SAC"). The Court also considers documents incorporated into the SAC by reference, "documents publicly filed with the Securities Exchange Commission, transcripts of relevant earnings calls, and other matters of which a Court may take judicial notice." *Rein v. Dutch Bros, Inc.*, No. 23-CV-1794 (PAE), 2024 WL 3105004, at *1 n.1 (S.D.N.Y. June 24, 2024) (cleaned up).

### A.  The Class Period

Plaintiffs represent a putative class of those who acquired securities of UNFI between December 8, 2021, when the Company released its financial results for Q1 2022, and September 25, 2023, when the Company released its financial results for Q4 2023 (the "Class Period"). ECF No. 39 ("SAC") ¶¶ 1, 22, 125, 254.

### B.  UNFI's Business

UNFI is the largest publicly traded grocery wholesaler in North America. *Id*. ¶ 33. At least 95% of the Company's net sales are from its Wholesale segment. *Id.* ¶ 38. Wholesale includes distributing and selling grocery and non-food products to national grocery chains and independent retailers throughout the U.S. and Canada. *Id*. ¶¶ 35–38. In 2018, UNFI acquired SuperValu, one of the largest wholesalers and retailers in North America. *Id*. ¶ 44. Shortly thereafter, UNFI's then-Chief Marketing Officer, Defendant Testa, stated that "[g]oing forward, we'll be placing a heavy emphasis on . . . using higher level data analytics to drive decision-

making and generate these incremental operating efficiencies." *Id.* ¶¶ 44–45. In December 2020, the Company announced what it called a "Value Path" initiative. *Id.* ¶ 46. The goal of it was to generate $70 to $100 million in cost efficiencies "across key elements of pricing, procurement, operations, and administrative functions." *Id.*

### C.  UNFI Profits from Undisclosed Inflation-Related Forward-Buying

From late 2021 through 2022, the U.S. economy experienced rapid inflation. *Id.* ¶¶ 53–54. Food and grocery prices soared. *Id.* ¶¶ 57–58. Defendants leveraged rising inflation through substantial undisclosed forward buying. *Id.* ¶¶ 61, 69, 85, 221. Forward buying is the practice of buying product in excess of demand ahead of known price increases. *Id.* ¶ 61. Forward buying does not pass on the discounted cost of inventory to retailers. Rather, the distributor increases the price of the goods right away before the known increase goes into effect, allowing the distributor to increase its profits in the short term. *Id.* UNFI later referred to the profit from such forward buying as "procurement gains." *Id.*

Plaintiffs' allegations pertain to the practice of "inflation-related forward buying," where inflation is the cause of the known-in-advance price increases. ECF No. 53 ("Opp.") at 22. Plaintiffs do not allege that Defendants made misleading statements about the practice of "promotion-related forward buying,"[1] which occurs when a company acquires inventory at a lower-than-normal cost during a supplier sales promotion. *Id.*; ECF No. 49 ("Mot.") at 6.

In the months leading up to the start of the Class Period, Defendants were aware of and expecting supplier price increases. SAC ¶¶ 66, 223. In June 2021, Testa stated that UNFI had "received notice from many suppliers indicating they will be taking price increases in the coming

---

[1] Unless otherwise noted, all further references herein to forward buying refer to inflation-related forward buying.

months" and that these price increases were "higher than normal." *Id.* ¶ 223. Testa explained that UNFI has a "process for CPG [consumer-packaged goods] increases, our suppliers increases where we get notification 60, 90 days in advance" and that the Company engages in "[d]aily conversations with [its] suppliers." *Id.* ¶¶ 66, 223. For each forward buying opportunity, Defendants had to conduct a cost-benefit analysis to determine whether the potential savings from buying ahead of the known price increase outweighed the higher carrying costs incurred by holding inventory in excess of demand. *Id.* ¶¶ 63–64.

The Company made significant profits from forward buying: during the Class Period, UNFI leveraged forward buying ahead of known price increases to increase its earnings before interest, taxes, depreciation, and amortization ("EBITDA") by at least 25% to 47%. *Id.* ¶¶ 70, 118, 125; *see also* Opp. at 34, n.16.

### D.  Defendants' Statements During the Class Period

The Class Period starts on December 8, 2021, when Defendants announced the Company's 1Q22 financial results. The Company reported net sales of $7.0 billion and net income of $76 million. *Id.* ¶¶ 1, 71. The Company also stated that the gross margin rate improved to 14.89% as compared to 14.51% in 1Q21, which was "driven by improvements in the Wholesale segment margin rate, including the impact of inflation and the Company's Value Path initiative." *Id.* ¶ 71; *see also* ECF No. 50 ("Brody Decl."), Ex. 10 at 3 (reporting a 4.7% increase in net sales from the prior year period that was "primarily driven by inflation and new business from both existing and new customers, . . . partially offset by supply chain challenges and expected modest . . . contraction."). UNFI reported similarly improved results for each of the next three quarters in fiscal 2022, each time attributing the positive financials to the "impact of inflation" and UNFI's efficiency initiatives without disclosing that the improvements were

substantially due to forward buying. SAC ¶¶ 73–82. Without the benefits from this practice, UNFI's profitability would have been materially lower during the Class Period. *Id.* ¶ 70.

For each quarter in 2022, and Q1 of 2023, UNFI similarly reported that inflation contributed to its results. *Id.* ¶¶ 73–82. During the Class Period, the Company made multiple other disclosures about the impact of inflation on its business. Brody Decl., Ex. 16 at 28 (disclosing that the Company experienced "a mix of inflation across product categories" and that "[c]hanges in merchandising, customer buying habits and competitive pressures create inherent difficulties in measuring the impact of inflation on Net sales and Gross profit"); *id.*, Ex. 17 at 30 ("Absent any changes in units sold or the mix of units sold, inflation generally has the effect of increasing sales."). The Company also disclosed that its business was characterized by "relatively low margins" that "are sensitive to inflationary and deflationary pressures" and advised that there may be "moderated supplier promotional activity, including decreased forward buying opportunities" in the future. *Id.*, Ex. 16 at 25.

On June 7, 2022, in response to an analyst asking how deflation would impact margin structure, Defendant Douglas, UNFI's CEO, stated that the Company had planned for "multiple potential scenarios, and interestingly enough, the actions that we would take in virtually every scenario are approximately the same." SAC ¶ 77. He assured investors that "I think we'll be in strong shape regardless of the scenario." *Id.*

Ahead of the Company's announcement of fourth quarter and full year 2022 earnings, it was expected that UNFI would "convey conservative expectations as it laps a challenging inflation comparison & faces continued macro uncertainty." *Id.* ¶ 80. However, the Company reported on September 27, 2022 that UNFI's 4Q22 gross margin rate increased to 14.5% of net sales, which was "driven by improvements in the Wholesale segment margin rate, including the

impact of inflation and the Company's efficiency initiatives, partially offset by changes in customer mix." *Id.*

Based on UNFI's performance in fiscal 2022 and expected momentum in fiscal 2023, Defendants provided fiscal 2023 guidance on September 27, 2022, including adjusted EBITDA between $850 million and $880 million, which represented 4% growth over fiscal 2022. *Id.* ¶ 81. Given the better-than-expected profitability and the promising financial outlook, analysts reacted positively. *Id.* ¶ 82. One report noted the results "reflected the benefit of inflation on inventory" and lauded management's "warehouse-level efficiency efforts." *Id.*

Soon after the Company provided fiscal 2023 guidance, inflation began to slow. *Id.* ¶¶ 9, 214. On December 7, 2022, Defendants reported that UNFI's gross profit rate for 1Q23 decreased to 14.6% of net sales (compared to 14.8% in 1Q22) due to "changes in customer mix as we continue to grow sales with larger customers." *Id.* ¶ 83. UNFI's stock price dropped 14.7% that day as a result. *Id.* ¶¶ 84–85.

On December 7, 2022, in response to an analyst question during the 1Q23 earnings call about whether there was "anything specific about this quarter" that impacted gross margins or whether customer mix would pressure margins throughout the year, Douglas responded that "I would describe what you saw in the first quarter as minor and just more a function of the temporary growth drivers in our customer file." *Id.* ¶ 86.

Defendants failed to disclose that UNFI's gross profit and adjusted EBITDA during the past year had benefitted significantly from, and was substantially dependent on, forward buying. *Id.* ¶ 89. As such, the Company's underlying profitability was much worse than investors were led to believe. *Id.* On the 1Q23 earnings call, Defendants assured investors that the margin

decline was temporary and that the Company was on track to deliver its 2023 full year guidance provided in September 2022. *Id*. ¶ 86, 87.

### E. UNFI Disclosures of Inflation-Related Forward Buying and Ensuing Fallout

On March 8, 2023, UNFI reported a $6 million year-over-year decline in gross profit for 2Q23, despite a 6% increase in net sales. *Id*. ¶ 91. The Company revealed that the gross profit rate declined to 13.7% (compared to 14.5% in the prior year period), which was "primarily driven by lower current period procurement gains due to the decelerating rate of inflation and lower inventory gains." *Id*. ¶ 91, 92. On this news, the Company's share price fell $11.49, or 28.1%, to close at $29.47 per share that same day. *Id*. ¶ 102. March 8, 2023 was the Company's first mention that UNFI had benefited from a "significant level of procurement gains" during the Class Period. *Id*. ¶ 93. Defendant Howard, UNFI's CFO, noted that "[t]he number of price increases that are happening now is reduced by about 2/3 from last year," thereby reducing the number of forward buying opportunities. *Id*. ¶ 99.

During the March 8, 2023 earnings call, Defendant Douglas explained:

> While we expected inflation to decline [and] the supply chain to continue to normalize[, w]e did not fully appreciate the benefit to last year's gross profit from buying inventory in advance of supplier price increases in the sequentially rising inflationary environment. We now realize the magnitude of these benefits last year, which are not repeatable in the current environment.

Brody Decl., Ex. 9 at 4. Douglas stated that UNFI "did not have full visibility and sufficient detail into the commercial drivers of the benefits due to legacy issues with digital infrastructure limiting real-time data which is required to fully understand and forecast these profitability drivers." *Id*. Howard explained that these issues were compounded by lower-than-expected promotional activity from suppliers "that could have offset some of what we experienced." *Id.* at 6.

Investors and analysts reacted to the news. On March 8, 2023, BMO Capital stated that UNFI's profitability "had been boosted by unsustainable procurement gains during the elevated inflationary environment." SAC ¶¶ 107–08. On March 8, 2023, Roth Capital noted that "[t]he diminished procurement gains should have been better anticipated (caused by decelerating rate of inflation)." *Id*. ¶ 110. On March 12, 2023, Guggenheim surmised that the Company's "profitability would have been much worse" without the benefit of procurement gains. *Id*. ¶¶ 105–06.

Analysts also noted that UNFI's antiquated systems apparently contributed to the Company's problems. *See* Brody Decl., Ex. 25 at 1 (noting that "an IT-oriented lack of real-time data visibility was the primary culprit—it was difficult to track the precise amount of profit, especially in a rapidly-escalating inflationary backdrop."); *id*., Ex. 26 at 1 ("Forward buying during outsized inflation this time last year inflated gross profit, which the company's antiquated systems failed to fully identify."); *id*., Ex. 27 at 1 ("We see the challenges stemming from a lack of internal analytical capabilities, exasperated by running on five different [IT] systems.").

On March 8, 2023, the Company provided revised guidance for fiscal 2023 and withdrew its previously issued guidance for fiscal 2024. SAC ¶ 111. For fiscal 2023, Defendants lowered guidance for net income and EPS by more than 50% and also significantly lowered guidance for adjusted EBITDA, now expecting between $715 and $785 million (as compared to the previously issued guidance of $850 million and $880 million). *Id*. Though the prior guidance had been affirmed more than 40% of the way through 2Q23, Douglas claimed that the revised guidance reflected the sharp decline in procurement gains from forward buying as management was now "able to understand these issues." *Id.* ¶¶ 94, 112.

On June 7, 2023, the Company disclosed that lower procurement gains eroded gross margins even further. *Id*. ¶ 113. It reported in a press release that 3Q23 gross profit decreased $12 million due to "lower inflationary benefits primarily related to reduced procurement gains, as well as higher shrink." *Id*. The Company also reported that its gross profit rate declined to 13.3%, which was "primarily driven by the volatile macroeconomic environment, which led to lower inflationary benefits and reduced procurement gains" and, as a result of the "pressure" on margins, the Company reduced its fiscal 2023 outlook again. *Id*. On this news, the Company's stock price fell $4.11, or 14.9%, to close at $23.46 per share that same day. *Id*. ¶ 114. The stock continued to fall the next trading day by $1.56, or 6.6%, to close at $21.90 per share on June 8, 2023. *Id*.

The 3Q23 results missed the guidance provided three months earlier, and Howard stated that "relative to our expectations at the end of Q2, the decline was greater than anticipated." *Id*. ¶ 115. Douglas stated that "[l]ast year, in fiscal '22, we saw a big upswing in value that we got as inflation took hold and our inventory was valued lower than the market price, and we strategically forward-[b]ought. And it was a tremendous source of margin expansion." *Id*. ¶ 117. Howard explained that the Company "saw that inflation rising as we moved through Q3 [2022], providing that forward-buy opportunity," leading to procurement gains exceeding $50 million in 3Q22. *Id*. ¶¶ 117–18. Wells Fargo wrote in its June 7, 2023 report that "[c]redibility at UNFI is about as low as it gets, as it's shocking how the company seemed caught off guard by these issues given their magnitude." *Id*. ¶ 124.

On September 26, 2023, UNFI announced 4Q23 financial results, reporting a 56.3% decline in adjusted EBITDA to $93 million. *Id*. ¶ 125. The "more than $100 million" decline in gross profit year-over-year was attributed to "lower levels of procurement gain opportunities

resulting from decelerating inflation." *Id*. Douglas stated that UNFI "saw an out-of-pattern increase in procurement gains beginning in January of '22" but that the "high number of price events [providing forward buying opportunities] have kind of returned back to normal levels." *Id*. ¶ 129. On this news, the Company's stock price fell $5.19, or 27%, to close at $13.73 per share. *Id*. ¶ 128.

The Company provided a fiscal 2024 outlook, which "reflects approximately $125 million in lower anticipated procurement gains, primarily in last year's first and second quarters, resulting from the continued decline in the number of supplier price increases compared to the first half of fiscal 2023." *Id*. ¶ 127. The presentation accompanying the 4Q23 results showed that procurement gains exceeded $94 million for 4Q22. *Id*. ¶ 130.

In total, Plaintiffs allege that procurement gains exceeded $275 million for the one-year period spanning second half of fiscal 2022 and the first half of fiscal 2023. *Id*. ¶ 132. Guggenheim stated, "To be honest, we continue to be very surprised by the magnitude of the procurement gains. By our estimate, they totaled $250 million during 2H 2022/1H 2023 and have shrunk to virtually nothing." *Id*. ¶ 132.

### F.  Procedural History

The Complaint alleges that Defendants' failure to disclose the impact of forward-buying on the Company's margins during the Class Period was materially misleading. *See* SAC. On December 21, 2023, Defendants filed the instant motion to dismiss. ECF No. 48.

### LEGAL STANDARD

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Goldstein v. Pataki*, 516

F.3d 50, 56 (2d Cir. 2008) (internal citation omitted). A claim will survive a Rule 12(b)(6) motion only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

Plaintiffs alleging securities fraud claims must the satisfy "heightened pleading requirements" of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Federal Rule of Civil Procedure 9(b) to withstand a motion to dismiss. *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 304 (2d Cir. 2015). As relevant here, the PSLRA specifically requires a complaint to demonstrate that the defendant "made misleading statements and omissions of a material fact, and acted with the required state of mind." *Id*. at 305 (internal citations and quotation marks omitted). As usual, the Court accepts the complaint's allegations as true; however, allegations must be pleaded with particularity. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).

For the misleading-statement element, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Blanford*, 794 F.3d at 305 (internal citations and quotation marks omitted); *see also* 15 U.S.C. § 78u-4(b)(1)–(2). "[D]raw[ing] all reasonable inferences in the plaintiff's favor," the complaint must plausibly allege a misleading statement. *Blanford*, 794 F.3d at 304, 307.

The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). To decide

whether an inference is "strong," the Court "must consider the complaint in its entirety" and "must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 322–23. A "complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 324.

## DISCUSSION

"To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection with the purchase or sale of securities; (4) reliance; (5) economic loss; and (6) loss causation." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 351–52 (2d Cir. 2022) (citing *Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013)). Defendants contest only the first two requirements: falsity and scienter. The Court addresses both requirements in turn, finding that some of Defendants statements were plausibly misleading and that Plaintiffs have pled a strong inference of scienter with respect to Defendants UNFI, Douglas, and Howard.

## I.    Some of Defendants' Statements Were Plausibly Misleading

Plaintiffs' core allegation is that Defendants' challenged statements were misleading because they failed to disclose that forward buying was a substantial driver of the Company's profit margins during the Class Period. Opp. at 22, 28, 31; ECF No. 57 ("Reply") at 18, 24. Plaintiffs aver that this global defect rendered all of the challenged statements misleading. Opp. at 26. Specifically, Plaintiffs challenge the following categories of statements as misleading:

1. **Profit Driver Statements** (*see* Opp. at 13–14). UNFI represented for 1Q21, 2Q22, 3Q22 and 4Q22 that the Company's "increase in gross margin rate was driven by improvements in the Wholesale segment margin rate, including the impact of inflation and the Company's ValuePath initiative," without mention of inflation-related forward buying. SAC ¶¶ 143, 159, 163, 171, 175.

2. **Profit Sustainability Statements** (*see* Opp. at 18–20).

   o Douglas responded to analyst question about how long he expected elevated levels of inflation to last and whether a change to a deflationary environment would have an effect on UNFI's margin structure: "[The rates of inflation] certainly are elevated right now, and we don't see a real change. Having said that, as you would expect, we scenario plan multiple potential scenarios, and interestingly enough, the actions that we would take in virtually every scenario are approximately the same. . . . [W]e've got to keep our cost structure tight so that we stay agile in the face of whatever the scenario. And that's been our focus as we prepare for next year. And I think we'll be in strong shape regardless of the scenario." SAC ¶ 165.

   o An analyst asked Douglas about the decline in gross margins and asked whether investors should "think about that pressure kind of persisting throughout the year." *Id*. ¶¶ 86, 197. Douglas responded that "there'll be some fluctuation, but I would describe what you saw in the first quarter as minor and just more a function of the temporary growth drivers in our customer file." *Id*.

   o On the 1Q23 earnings call, Douglas and Howard assured investors that the margin decline was temporary and that the Company was on track to deliver its 2023 full year guidance provided in September 2022. *Id*. ¶¶ 86–87.

3. **Risk Factor Statements** (*see* Opp. at 21–22). The Company made several statements in SEC filings from 1Q22 to 1Q23 stating that UNFI's financial results "could differ materially from those anticipated" due to "moderated supplier promotional activity, including decreased forward buying opportunities." SAC ¶¶ 151, 161, 173, 191, 201.

4. **FY23 Guidance Statements** (*see* Opp. at 23–24). In multiple instances during the Class Period, Defendants provided guidance for UNFI's fiscal 2023 adjusted EBITDA. SAC ¶ 177 (September 27, 2022); ¶¶ 193, 195 (December 7, 2022); ¶ 203 (March 8, 2023); *see also* ¶ 145 (reaffirming fiscal 2022 outlook on December 8, 2021). To explain their guidance, Defendants stated on the 4Q22 Earnings Call:

   o Douglas stated, "I think the way to think about our guidance for '23 is that there's a fair amount of market uncertainty out there, and the way we have developed our guidance is to be pragmatic and make sure that we have the flexibility during the year to provide good returns, and at the same time be flexible enough to meet whatever needs our customers have. That was our strategy in '22, and it worked well for us, and we intend to repeat it in '23." *Id*. ¶ 183.

   o Howard stated, "when we think about guidance, what we're thinking about is trying to balance inflation, the impact on fuel rates, the labor market,

new business wins. All of those aspects that we try to bake into our guidance to try to come up with a number that we believe is reasonable given the economic backdrop . . . ." *Id.* ¶ 185.

o Douglas stated*, "*looking into my crystal ball, what I believe is that continued double-digit inflation is not sustainable. . . . But to drive sales, we would expect suppliers to start to invest in promotions, and promotions will drive units." *Id.* ¶ 187.

5. **General Impact of Inflation Statements** (*see* Opp. at 20–21). The Company made several statements in SEC filings from 1Q22 to 1Q23 stating that inflation generally has the effect of increasing sales. SAC ¶¶ 149, 157, 169, 189, 199. These statements did not mention inflation-related forward buying. *Id.*

The challenged statements in the first, second and third categories are actionable because they are plausibly misleading half-truths about topics that Defendants put into play. These statements commented on the drivers of the Company's margins but never disclosed the Company's substantial reliance on gains from unsustainable inflation-based forward buying. By listing potentially positive trends and downplaying potentially negative ones as temporary or discrete, while omitting the elephant in the room, these statements were plausibly misleading.

"[T]here is no duty to disclose a fact . . . merely because a reasonable investor would very much like to know that fact[.]" *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) (internal citations and quotation marks omitted). But "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Id.* That obligation is triggered once a defendant puts the topic "in play," based on "an examination of defendants' representations, taken together and in context." *Id.* at 250–51 & n.2 (internal citations and quotation marks omitted); *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 214 n.15 (2d Cir. 2020); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010); *see also In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) (finding that once a company "puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success, since reasonable investors would find that such information

would significantly alter the mix of available information" (internal citations and quotations marks omitted)). "[H]alf-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 188 (2016). Even if "literally true," affirmative statements may be rendered false by what they fail to disclose. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016) (internal citation omitted).

Such misleading statements are actionable if there is a "substantial likelihood that a reasonable investor would find the . . . [omitted information] important in making an investment decision." *United States v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015) (internal citation omitted); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (finding that materiality requirement "is satisfied when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available" (internal citations and quotation marks omitted)). Whether an alleged misstatement meets the materiality requirement is a fact-specific inquiry that "necessarily depends on all relevant circumstances" of that specific case. *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).

To allege a material misrepresentation at the pleading stage, the plaintiff need only offer sufficient evidence of "a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Litwin v. Blackstone Grp.*, 634 F.3d 706, 716–17 (2d Cir. 2011) (internal citations omitted). Materiality is a fact-intensive inquiry more appropriate for summary judgment or trial. At this stage, courts are loath to dismiss a securities fraud complaint on materiality grounds unless the omitted material is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their

importance." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000). For example, in

*Oklahoma Firefighters Pension & Retirement System v. Lexmark International, Inc.*, the court

found that a company's statements about sales revenue, even if "literally true," were plausibly

misleading to investors by failing to disclose that those sales numbers were primarily driven by

unsustainable inventory practices during the class period. 367 F. Supp. 3d 16, 31 (S.D.N.Y.

2019).

 The Court addresses each category of challenged statements in turn, finding that the first,

second and third categories are actionable while the fourth and fifth categories are not.

 **A.  The Profit Driver Statements Are Actionable**

 The Profit Driver Statements are actionable because they purported to disclose the drivers

of the Company's profits while omitting material facts that rendered those statements misleading.

The Company put the drivers of its margins in play by speaking on the issue. But it failed to

disclose that forward buying was a significant and aberrational driver of its profit margins.

Assuming this undisclosed fact is true, as the Court must at this juncture, its omission was

plausibly misleading.

 Defendants aver that the Profit Driver Statements were not misleading. They argue that

the inflationary gains that the Company disclosed were "one and the same" with forward buying.

Reply at 20. Plaintiffs argue that the procurement gains from forward buying were distinct. Opp.

at 13–14, 17–18. While some market analysts may have inferred that inflationary gains meant a

substantial amount of forward-buying, *see* Reply at 20, it does not follow that those phenomena

are necessarily wholly overlapping. And the facts alleged suggest that the market was blindsided

by the eventual revelation of the significant and unsustainable level of procurement gains that

drove profit margins during the Class Period. The Court, after drawing all reasonable inferences

in Plaintiffs' favor, is satisfied that a reasonable investor could view the impact of forward buying on profit margins, which these statements omitted, as significantly altering the total mix of information available.

### B. The Profit Sustainability Statements Are Actionable

The Profit Sustainability Statements are plausibly misleading for similar reasons as the Profit Driver Statements. The Profit Sustainability Statements spoke to the impact of a deflationary environment on UNFI's margins and whether the causes of a decline in margins were temporary. Defendants put the drivers of the decline in margins in play by speaking on the issue. However, they conspicuously failed to disclose the impact of forward buying on the decline. By downplaying negative trends as temporary or discrete, these statements were plausibly misleading. They omit the crucial context that forward buying opportunities had all but evaporated. Defendants aver that the Profit Sustainability Statements did not say anything about procurement gains from forward buying. Reply at 21–22. Assuming that such gains were a significant and unsustainable driver or profit margins, it is this very omission that renders the statements misleading.

### C. The Risk Factor Statements Are Actionable

The Risk Factor Statements put in play the sensitivity of the Company's margins to deflationary and inflationary pressures, as well as the risk of decreased opportunities for promotion-related forward buying. *See* Brody Decl., Ex. 16 at 25, 28. These cautionary statements did not mention the separate risk of decreased opportunities for inflation-related forward buying. All parties recognize that promotion-related forward buying is not at issue in this litigation and is distinct from inflation-related forward buying. *See* Mot. at 6; Opp. at 22. That this separate forward buying risk was disclosed – but inflation-related forward buying was not – supports the conclusion that such omission was plausibly misleading. If Plaintiffs'

17

allegations are credited, inflation-related forward buying presented the bigger risk to the Company's margins. *See* Opp. at 30–31 ("The principal risk facing UNFI was not a risk of decreased forward buying opportunities as a function of moderated supplier promotional activity but a decrease of inflation-related forward buying due to a change in the inflationary environment." (cleaned up)). By circling that issue "but omitting the negative elephant in the room," the Risk Factor Statements were plausibly misleading. *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, No. 22-CV-6978 (AS), 2024 WL 456745, at *3 (S.D.N.Y. Feb. 5, 2024).

That the Company seemingly expected that gains from promotion-related forward buying would offset some of the disappearing (or already disappeared) gains from inflation-related forward buying, *see* Reply at 2, 18, 23–24, suggests a hope that the drying up of the undisclosed inflation-related forward buying gains would not come to light. The implication that Defendants knew the latter gains were down "but hoped they could mask that fact" with other procurement gains supports that these statements were plausibly misleading. *Stadium Cap.*, 2024 WL 456745, at *5.

In sum, the challenged statements in the first, second and third categories were plausibly misleading because they omitted past or presently existing material facts about topics that Defendants put in play.

### D.  The FY23 Guidance Statements Are Not Actionable

Plaintiffs claim that Defendants' statements about the Company's guidance were misleading because they failed to disclose that the "guidance was premised on the continuation of atypical, significant procurement gains due to forward buying and that, if inflation did not continue to increase, those gains were likely to decrease and UNFI's adjusted EBITDA would be materially lower." Opp. at 24. The FY23 Guidance Statements, which expressed optimistic

opinions in the face of market uncertainty, are simply too general to be actionable. *See Solomon v. Sprint Corp.*, 19-CV-05272 (MKV), 2022 WL 889897, at *8 (S.D.N.Y. Mar. 25, 2022) ("None of the forward-looking statements of optimism that Plaintiffs allege are statements of fact that could be proven false. Instead, optimistic statements about future 'continued prosperity' are merely 'puffery' that is nonactionable." (citing *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996))). Accordingly, these statements cannot serve as a basis for Plaintiffs' claims.

### E.  The General Impact of Inflation Statements Are Not Actionable

The General Impact of Inflation Statements are also not actionable. These statements simply noted that the Company "experienced a mix of inflation across product categories," that "[c]hanges in merchandising, customer buying habits and competitive pressures create inherent difficulties in measuring the impact of inflation on Net sales and Gross profit," and that "[a]bsent any changes in units sold or the mix of units sold, inflation generally has the effect of increasing sales." SAC ¶ 157. Plaintiffs do not contend that any of these factual representations are untrue. Moreover, Plaintiffs submit that the general impact of inflation on the Company – the topic these statements address – is distinct from the impact of inflation-related forward buying on the Company's margins. Opp. at 13–14, 17–18. The Impact of Inflation statements do not address forward buying or the drivers or sustainability of the Company's profit margins. Plaintiffs do not plausibly allege that these statements were misleading.

* * *

Accordingly, the SAC plausibly pleads that the Profit Driver Statements, Profit Sustainability Statements, and Risk Factor Statements were materially misleading to a reasonable investor; thus, the motion to dismiss is denied with respect to those statements. The motion is

granted with respect to the FY23 Guidance Statements and the General Impact of Inflation Statements.

## II.    Plaintiffs Have Pleaded a Strong Inference of Scienter

The Court sets forth the legal framework governing the scienter analysis, then concludes that Plaintiffs satisfy their burden at this stage.

### A.  Legal Framework

In assessing whether Plaintiffs have adequately established scienter, the Court considers "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323. "To determine whether the plaintiff has alleged facts that give rise to the requisite strong inference of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id*. at 323–24 (internal quotations marks omitted). An inference of scienter need not be "irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Id*. at 324 (internal quotation marks and citation omitted); *see also City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) ("[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff."). In sum, "[t]he inquiry on a motion to dismiss is as follows: 'When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'" *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 383 (S.D.N.Y. 2007) (quoting *Tellabs*, 551 U.S. at 326).

To establish a strong inference of scienter, Plaintiffs "must allege facts showing (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial

evidence of conscious misbehavior or recklessness. If no motive or opportunity (other than a generalized business motive) is shown, the circumstantial evidence of conscious misbehavior must be correspondingly greater and show highly unreasonable behavior or that which evinces an extreme departure from the standards of ordinary care." *Ark. Pub. Emps.*, 28 F.4th at 355 (cleaned up). That extreme departure from the standards of ordinary care "approximat[es] actual intent, and not merely a heightened form of negligence." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 105 (2d Cir. 2015)*, abrogated on other grounds by Macquarie Infrastructure Corp. v. Moab Partners, LP*, 601 U.S. 257 (2024). "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Setzer*, 968 F.3d at 215 (internal citation and quotation marks omitted).

"To determine whether a plaintiff has specifically alleged defendants' knowledge of facts or access to information contradicting their public statements . . . Second Circuit cases uniformly rely on allegations that (1) specific contradictory information was available to the defendants (2) at the same time they made their misleading statements." *Oklahoma Firefighters*, 367 F. Supp. 3d at 37 (cleaned up).

"To establish scienter in misrepresentation cases, facts must be alleged which particularize how and why each defendant actually knew, or was reckless in not knowing, that the statements were false at the time made, and similarly, in omission cases, facts must be alleged which show that each defendant knew, or was reckless in not knowing, the information the plaintiff alleges the defendant failed to disclose." *Gruber v. Gilbertson*, No. 16-CV-9727 (WHP), 2021 WL 2482109, at *12 (S.D.N.Y. June 17, 2021) (cleaned up); *see also In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 378 (S.D.N.Y. 2007) ("In order for a statement to

be false or misleading, a plaintiff must allege that the speaker was aware of adverse information at the time he spoke." (citing *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998))). "In a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009). "In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

### B. Application

The challenged statements that are plausibly misleading were made by UNFI, Douglas, and Howard. *See supra* section I. Plaintiffs failed to oppose the motion to dismiss with respect to any statement by Testa during the Class Period,[2] and his statements before the Class Period are not actionable. *See In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 610 (S.D.N.Y. 2017) ("[I]n the Second Circuit, a defendant is liable only for those statements made during the class period." (internal citations and quotation marks omitted)). Thus, the Court focuses its analysis of scienter on Douglas and Howard.

Plaintiffs have taken the "recklessness" approach to pleading scienter rather than the "motive and opportunity to commit fraud" approach. *See Ark. Pub. Emps.*, 28 F.4th at 355. Plaintiffs allege that Douglas and Howard had knowledge or access to facts that contradicted, were adverse to, or undermined the accuracy of their statements. *See* Opp. at 33–36. Although Plaintiffs argue that Defendants' motive to commit fraud (including Testa's purportedly

---

[2] The only challenged statement by Testa during the Class Period is that "there were . . . specific items that we're cycling in '22 that we've talked about before, including that monetization of Riverside, which creates a rent expense, which didn't exist last year." SAC ¶ 167. That statement has nothing to do with the impact of inflation or forward buying, and Plaintiffs make no attempt to defend why it was misleading.

suspicious stock sales) supports the inference of scienter, they stop short of asserting motive and opportunity as an independent basis for scienter. *Id*. at 37. Thus, in analyzing scienter, the Court focuses on what information was available to the Defendants at the time they made their plausibly misleading statements. The Court finds that Plaintiffs have pleaded a strong inference of scienter based on recklessness.

First, Plaintiffs have plausibly alleged that Defendants knew the Company was engaged in a substantial amount of forward buying during the Class Period. In the months leading up to the start of the Class Period, Defendants were aware of and expecting higher-than-normal price increases by suppliers. SAC ¶¶ 66–67, 223. Defendants knowingly leveraged these price increases to reap procurement gains. For each forward buying opportunity, Defendants had to conduct a cost-benefit analysis to determine whether the potential savings from buying ahead of the known price increase outweighed the higher carrying costs incurred by holding inventory in excess of demand. *Id*. ¶¶ 63–64. Recognizing the opportunity, Defendants engaged in substantial forward buying, from which the Company reaped significant profits. *Id*. ¶¶ 61, 69, 70, 85, 118, 125, 221.

Second, Defendants' revelations on March 8, 2023 and thereafter support the inference that they knew that forward buying had a substantial impact on margins during the Class Period (December 8, 2021 to September 25, 2023). Howard and Douglas' statements that they did not "fully appreciate" or "fully understand" the magnitude of the benefits of inflation-based forward buying until the last quarter of 2022 reasonably suggest that they had some appreciation or understanding of its impact before then. *Id*. ¶¶ 100, 134, 135, 237, 251.

Defendants harp that they did not contemporaneously know the precise of impact of the Company's inflation-based forward buying on margin. Mot. at 13, 29, 32; Reply at 1, 3, 9, 15.

Defendants plead ignorance, blaming their own antiquated IT systems and the complicated economic environment for obscuring their ability to know the impact of their own forward buying on margins. Mot. at 11, 25, 28 29; Reply at 1, 14, 17. At this stage, Defendants' self-serving explanation is less compelling than the culpable inference. It strains credulity to suppose that the leaders of the largest publicly traded grocery wholesaler in North America were as ignorant as they now claim. This is particularly true when Defendants emphasized their reliance on data analytics to drive decision-making and their new "Value Path" initiative that was created to generate cost efficiencies across pricing and procurement. SAC ¶¶ 45, 100, 136, 238. The more compelling inference is that these sophisticated Defendants knew that a substantial and aberrational amount of forward buying was a significant (even if not fully quantified) driver in the rise and fall of profit margins at the time that they made the plausibly misleading statements.

Third, the impact forward buying had on UNFI's earnings supports an inference that Defendants knew what was happening. Plaintiffs allege that during the Class Period, UNFI leveraged forward buying ahead of known price increases to increase its EBITDA by at least 25% to 47%. SAC ¶¶ 70, 118, 125; *see also* Opp. at 34, n.16. Given the scale of the gains reaped from their forward buying strategy, it is reasonable to infer that Defendants knew this strategy, and the drying up of such forward-buying opportunities, appreciably impacted the Company's margins. *See Oklahoma Firefighters*, 367 F. Supp. 3d at 38 ("Simply put, the magnitude of the aftershock suggests more than a careless mistake or trivial miscalculation by [the company] and its executives.").

Fourth, as discussed in the previous section, UNFI seemingly expected that gains from promotion-related forward buying would offset some of the disappearing (or already disappeared) gains from inflation-related forward buying, *see* Reply at 2, 18, 23–24. This

allegation suggests a hope that the drying up of the undisclosed inflation-related forward buying gains would not come to light. Defendants' belief that a rebound in supplier promotions would offset fewer inflation-related forward buying opportunities implies they knew the latter was a boon to profits. The implication that Defendants knew that inflation-related forward buying gains were down "but hoped they could mask that fact" with other procurement gains supports a claim of recklessness. *Stadium Cap.*, 2024 WL 456745, at *5.

Fifth, the core operations doctrine bolsters the inference of scienter. "Though the sweep of that doctrine is contested, it simply reflects the commonsense assumption that executives are likely to know more about things central to their business." *Stadium Cap.*, 2024 WL 456745, at *5; *see also Oklahoma Firefighters*, 367 F. Supp. 3d at 37 ("Under the core operations theory, a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue." (internal quotation marks omitted)). UNFI's wholesale segment accounts for at least 95% of the Company's net sales. SAC ¶ 38. The most reasonable inference is that Defendants knew their aberrational levels of forward buying in the wholesale segment, to capitalize on once in decades levels of inflation, had a significant effect on the Company's margins, even if they did not precisely quantify that effect until later.

Sixth, Plaintiffs allege that Defendants had access to granular information on the amount of inventory on hand and sales trends, which UNFI provided to suppliers in regular reports. SAC ¶¶ 228–230. It is reasonable to infer that Defendants used such information to conduct the cost-benefit analysis necessary to execute each forward buying opportunity. *Id.* ¶¶ 63–64, 231–32. While Defendants demand that Plaintiffs identify which Defendants reviewed which particular reports, Mot. at 49, such exacting precision "typically applies when plaintiffs allege an

'unsupported general claim of the existence of confidential company sales reports.'" *Stadium Cap.*, 2024 WL 456745, at *6 (quoting *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir. 1996)). This rule makes sense because "[a] plaintiff who alleges that a company had secret reports that prove the plaintiff's claim might be taking a shot in the dark and doesn't meet the heightened pleading requirements." *Id.* Moreover, while these reports did not address procurement gains from forward buying, they support the inference that Defendants knew, at the time they made plausibly misleading statements, that the Company was profiting from elevated levels of inflation-related forward buying.

Seventh, Defendants plausibly had at least some motivation to mislead. For fiscal 2022, annual bonuses were awarded primarily due to the achievement of the adjusted EBITDA target. SAC ¶ 250. As a result, Douglas received $1.78 million, Howard received $765,446, and Testa received $918,535 in bonuses. *Id.* ¶¶ 249–50. Plaintiffs allege that the profits from undisclosed and unsustainable inflation-related forward buying were key to hitting this benchmark. Opp. at 37–38. While there is reason for skepticism that a defendant can "refute a recklessness claim by showing that he hurt himself too," *Stadium Cap.*, 2024 WL 456745, at *6, Defendants aver that UNFI executives' long-term compensation structure disincentivized short-term fraud and that the hit to stock prices dwarfed the value of Defendants' bonuses. Mot. at 17–18; Reply at 6–7. Although the law does not support that this motive, without more, provides an independent basis for scienter, it provides at least a plausible explanation for Defendants' recklessness.

Eighth, the complaint alleges a strong inference of scienter with respect to the Item 303 violation. Item 303 requires companies to "describe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). Plaintiffs

initially claimed that Defendants would be independently liable under Section 10(b) for failure to disclose information required by Item 303 even if they made no false or misleading statements. Opp. at 24. This argument is no longer viable. *See Macquarie Infrastructure*, 601 U.S. at 265 (2024) ("Today, this Court confirms that the failure to disclose information required by Item 303 can support a Rule 10b–5(b) claim only if the omission renders affirmative statements made misleading."). However, because Plaintiffs have plausibly pled misleading "half-truths" rather than "pure omissions," *see supra* section I, Item 303 provides a basis for the claims they assert. *Id.* at 263. For the reasons stated in the preceding paragraphs, Plaintiffs' allegations at minimum give rise to a strong inference that the explosion then evaporation of inflation-related forward buying gains (and a resulting substantial impact on margins) was "a 'known' trend under Item 303 and that its omission was at least reckless under the PSLRA." *Stadium Cap.*, 2024 WL 456745, at *5.

The more cogent and compelling inference to draw from all the facts pled, taken together, is that Douglas and Howard knew that procurement gains from inflation-based forward buying was a key driver in the rise and fall of profit margins at the time that they made the plausibly misleading statements. Although there is no smoking gun, the competing inference – that Defendants were simply ignorant – is not as cogent or compelling. Because UNFI does not contest that Douglas's scienter and Howard's scienter can be imputed to the corporation, there is also a strong inference for UNFI. *See San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, No. 22-CV-6339 (AS), 2024 WL 1898512, at *11 (S.D.N.Y. May 1, 2024) (permitting the scienter of a corporation's executives to be imputed to the corporation).

## III.    Control Person Liability

Plaintiffs allege that the Individual Defendants violated Section 20(a) of the Securities

Exchange Act. To state a claim under Section 20(a), a plaintiff must allege facts showing: "(1) a

primary violation by the controlled person, (2) control of the primary violator by the defendant,

and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled

person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

Plaintiffs allege that Douglas, Howard and Testa are controlling persons. SAC ¶¶ 280–283. And,

as explained above, Plaintiffs have sufficiently alleged a primary violation of Rule 10b–5 and

Section 10(b) by a controlled person, namely UNFI.

Because "Defendants' argument that the Section 20(a) claim should be dismissed rests

entirely on Plaintiffs' presumptive failure to plead a claim under Section 10(b) and Rule 10b-5,"

the motion to dismiss the Section 20(a) claim is denied. *Oklahoma Firefighters*, 367 F. Supp. 3d

at 39.

## IV.    Leave to Amend

In their opposition, Plaintiffs cursorily seek leave to amend again if the Court grants any

part of the motion, without stating why justice so requires or specifying how they would cure any

pleading deficiencies in the SAC. Opp. at 21. Accordingly, the Court has "firm footing to deny

such leave." *Loc. 3599, NYC Dep't of Env't Prot. Tech. Pro. Emps. v. City of New York*, No. 23-

CV-1035 (JGLC), 2024 WL 966077, at *16 (S.D.N.Y. Mar. 6, 2024) (collecting cases); *see also*

*Rein*, 2024 WL 3105004, at *25. Plaintiffs have already amended the complaint twice, once in

response to a motion to dismiss alerting them to the defects identified herein. Plaintiffs do not

identify how they would replead with respect to FY Guidance Statements or the General Impact

of Inflation Statements, which the Court found to be non-actionable, nor could they because

these statements have already been wholly incorporated into the complaint by reference. Thus, Plaintiffs are denied leave to amend.

## CONCLUSION

For the reasons stated herein, the motion to dismiss is GRANTED in part and DENIED in part. The motion is granted with respect to Plaintiffs' claims based on the FY23 Guidance Statements and the General Impact of Inflation Statements. In all other respects, the motion is denied.

For the reasons stated in Section IV, Plaintiffs are denied leave to amend.

The Clerk of Court is directed to terminate ECF Nos. 32 and 48.

Dated: September 13, 2024
      New York, New York

SO ORDERED.

*Jessica Clarke*

JESSICA G. L. CLARKE
United States District Judge

29