**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAN SILLS and GEORGE DICK, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:23-cv-02364-JGLC-VF |
| Plaintiffs, | ORAL ARGUMENT REQUESTED |
| v. | |
| UNITED NATURAL FOODS, INC., J. ALEXANDER MILLER DOUGLAS, JOHN W. HOWARD, and CHRISTOPHER P. TESTA, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION**
**FOR CLASS CERTIFICATION AND APPOINTMENT OF**
**<u>CLASS REPRESENTATIVES AND CLASS COUNSEL</u>**

**TABLE OF CONTENTS**

I.   PRELIMINARY STATEMENT ................................................................................................ 1

II.  SUMMARY OF PLAINTIFFS' ALLEGATIONS ................................................................. 4

III. THE CLASS SHOULD BE CERTIFIED.............................................................................. 6

    A.   Applicable Standards Favor Class Certification ...................................................... 6

    B.   The Proposed Class Is Ascertainable And Satisfies Rule 23(a)'s
        Requirements ........................................................................................................... 7

        1.   The Class Satisfies Rule 23(a)(1): Numerosity .......................................... 7

        2.   The Class Satisfies Rule 23(a)(2): Commonality ...................................... 8

        3.   Plaintiffs Satisfy Rule 23(a)(3): Typicality............................................... 9

        4.   Plaintiffs Satisfy Rule 23(a)(4): Adequacy............................................. 10

    C.   The Requirements Of Rule 23(b)(3), Predominance And Superiority,
        Are Met ................................................................................................................. 11

        1.   Common Questions Of Law And Fact Predominate ................................ 11

            a)   Plaintiffs Are Entitled To The *Basic* Presumption Of
                Reliance...................................................................................... 12

                (i)   UNFI Traded On The NYSE ........................................... 13

                (ii)   The *Cammer* And *Unger/Krogman* Factors
                      Demonstrate Market Efficiency ...................................... 13

            b)   The *Affiliated Ute* Presumption Of Reliance Applies................... 19

        2.   Potential Individual Questions Of Damages Do Not Predominate........... 21

        3.   A Class Action Is Superior To Other Available Methods For The
        Fair And Efficient Adjudication Of This Action ..................................... 22

IV.  CONCLUSION.................................................................................................................... 23

i

# TABLE OF AUTHORITIES

## CASES

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972).................................................................................................. 3, 19, 20

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)................................................................................................... 6, 11, 23

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)..................................................................................................... 1, 6, 11

*Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*,
   879 F.3d 474 (2d Cir. 2018)....................................................................................................... 21

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)....................................................................................................................... 3

*Brown v. Kelly*,
   609 F.3d 467 (2d Cir. 2010)........................................................................................................ 11

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) ....................................................................... 13, 14, 15, 16

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   310 F.R.D. 69 (S.D.N.Y. 2015) ......................................................................................... 14, 15

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)......................................................................................................................... 22

*Dodona I, LLC v. Goldman, Sachs & Co.*,
   296 F.R.D. 261 (S.D.N.Y. 2014) .................................................................................................. 6

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011).............................................................................................................. 2, 6, 11

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)...................................................................................................................... 12

*Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Entm't Holdings, Inc.*,
   338 F.R.D. 205 (S.D.N.Y. 2021) ......................................................................................... 20, 21

*In re Alstom SA Sec. Litig.*,
   253 F.R.D. 266 (S.D.N.Y. 2008) ................................................................................................ 15

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
689 F.3d 229 (2d Cir. 2012).................................................................................... 2

*In re Aphria, Inc. Sec. Litig.*,
342 F.R.D. 199 (S.D.N.Y. 2022) .................................................................... *passim*

*In re Barrick Gold Sec. Litig.*,
314 F.R.D. 91 (S.D.N.Y. 2016) ...................................................................... 12, 21

*In re Beacon Assocs. Litig.*,
282 F.R.D. 315 (S.D.N.Y. 2012) ........................................................................ 21

*In re Blech Sec. Litig.*,
187 F.R.D. 97 (S.D.N.Y. 1999) .......................................................................... 23

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ................................................ 8, 9, 23

*In re Dynex Capital, Inc. Sec. Litig.*,
2011 WL 781215 (S.D.N.Y. Mar. 7, 2011) .......................................................... 21

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
986 F. Supp. 2d 428 (S.D.N.Y. 2013)................................................................... 20

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
2015 WL 5613150 (S.D.N.Y. Sept. 24, 2015)....................................................... 21

*In re Initial Pub. Offering Sec. Litig.*,
260 F.R.D. 81 (S.D.N.Y. 2009) .......................................................................... 15

*In re Interpublic Sec. Litig.*,
2003 WL 22509414 (S.D.N.Y. Nov. 6, 2003)....................................................... 23

*In re Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.*,
2013 WL 396117 (D.N.J. Jan. 30, 2013) ............................................................. 22

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
241 F.R.D. 435 (S.D.N.Y. 2007) ........................................................................ 22

*In re Petrobras Sec.*,
862 F.3d 250 (2d Cir. 2017)........................................................................ *passim*

*In re Pfizer Inc. Sec. Litig.*,
282 F.R.D. 38 (S.D.N.Y. 2012) ...................................................................... 2, 11

iii

*In re Smith Barney Transfer Agent Litig.*,
   290 F.R.D. 42 (S.D.N.Y. 2013) ........................................................................ 6, 20

*In re Teva Sec. Litig.*,
   2021 WL 872156 (D. Conn. Mar. 9, 2021) ............................................................ 9

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
   2017 WL 2062985 (S.D.N.Y. May 15, 2017) ......................................................... 6

*In re Winstar Commc'ns Sec. Litig.*,
   290 F.R.D. 437 (S.D.N.Y. 2013) ..................................................................... 10, 14

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) ......................................................................... 14

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*,
   967 F.2d 742 (2d Cir. 1992)................................................................................. 20

*Malriat v. QuantumScape Corp.*,
   2022 WL 17974629 (N.D. Cal. Dec. 19, 2022) .................................................... 16

*McIntire v. China MediaExpress Holdings, Inc.*,
   38 F. Supp. 3d 415 (S.D.N.Y. 2014).............................................................. *passim*

*Pearlstein v. BlackBerry Ltd.*,
   2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ..................................................... 7, 10

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*,
   277 F.R.D. 97 (S.D.N.Y. 2011) ....................................................................... 9, 10

*Puddu v. NYGG (Asia) Ltd.*,
   2022 WL 2304248 (S.D.N.Y. June 27, 2022) ...................................................... 21

*Robidoux v. Celani*,
   987 F.2d 931 (2d Cir. 1993)................................................................................... 9

*Sills v. United Nat. Foods, Inc.*,
   2024 WL 4188324 (S.D.N.Y. Sept. 13, 2024)............................................. 4, 12, 20

*Strougo v. Barclays PLC*,
   312 F.R.D. 307 (S.D.N.Y. 2016) ................................................................... 11, 16

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
   546 F.3d 196 (2d Cir. 2008)................................................................................. 13

iv

*Trinidad v. Breakaway Courier Sys., Inc.*,
    2007 WL 103073 (S.D.N.Y. Jan. 12, 2007) ................................................................................ 9

*Unger v. Amedisys Inc.*,
    401 F.3d 316 (5th Cir. 2005) ...................................................................................................... 14

*Wallace v. IntraLinks*,
    302 F.R.D. 310 (S.D.N.Y. 2014) ........................................................................................... 21, 22

*Wilson v. LSB Indus., Inc.*,
    2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018)........................................................................... 19

## **RULES**

Federal Rule of Civil Procedure 23 ......................................................................................... *passim*

Court-appointed lead plaintiff Dan Sills ("Lead Plaintiff") and additional plaintiff George Dick (together with Lead Plaintiff, "Plaintiffs") submit this memorandum in support of their motion pursuant to Federal Rule of Civil Procedure 23, seeking (i) certification of the Class as defined herein; (ii) the appointment of Plaintiffs as Class Representatives; and (iii) the appointment of Glancy Prongay & Murray LLP ("GPM") as Class Counsel.

## I.    PRELIMINARY STATEMENT

Plaintiffs, on behalf of themselves and similarly situated investors, are pursing claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") against defendants United Natural Foods, Inc. ("UNFI" or the "Company"), UNFI's CEO Alexander Miller Douglas, UNFI's CFO John W. Howard, and UNFI's Class Period Chief Marketing Officer Christopher P. Testa (collectively, "Individual Defendants," and with UNFI, "Defendants"). Plaintiffs now seek certification of the proposed Class defined as:

> All persons and entities who or which purchased or otherwise acquired the publicly traded common stock of UNFI, and/or purchased publicly traded call options on such stock, and/or wrote publicly traded put options on such stock, between December 8, 2021 and September 25, 2023, inclusive (the "Class Period").[1]

Both the Supreme Court and the Second Circuit have long held that securities cases are well suited to class-wide adjudication, and the class action mechanism is an important tool for enforcing securities laws. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 478 (2013) ("Congress, the Executive Branch, and this Court . . . have recognized that meritorious

---

[1] Excluded from the Class are: (a) persons and entities that suffered no compensable losses; and (b)(i) Defendants; (ii) any person who served as an officer and/or director of UNFI during the Class Period, and members of their immediate families; (iii) present and former parents, subsidiaries, assigns, successors, affiliates, and predecessors of UNFI; (iv) any entity in which any excluded person or entity has or had a controlling interest; (v) any trust of which an Individual Defendant is the settlor or which is for the benefit of an Individual Defendant and/or member(s) of their immediate families; and (vi) the legal representatives, heirs, successors, predecessors, and assigns of any person or entity excluded under provisions (i) through (v) hereof.

1

private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions"); *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 240 (2d Cir. 2012) (Rule 23 predominance is "readily met" in securities cases).[2]

The proposed Class satisfies each of the requirements of certification under Fed. R. Civ. P. 23. UNFI's common stock and options were widely held and traded on the New York Stock Exchange ("NYSE") during the Class Period, and the proposed Class numbers in the many thousands, readily satisfying the numerosity requirement. The nature of the proposed Class Representatives' claims, which results from Defendants' common course of conduct, is identical to that of the other proposed Class members such that no Class Representative suffers from a conflict of interest that would impede the vigorous prosecution of this action, satisfying the commonality, typicality, and adequacy requirements of Rule 23(a)(2)-(4). Moreover, GPM has the skill, experience, and resources to successfully prosecute this action, further supporting adequacy under Rule 23(a)(4), and justifying its appointment as Class Counsel under Rule 23(g).

This action also satisfies Rule 23(b)(3)'s requirements of predominance and superiority. The Section 10(b) elements of falsity, materiality, scienter, and loss causation are subject to class-wide proof. *See In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 52 (S.D.N.Y. 2012) ("save for the issue of reliance . . . plaintiffs' claims are predicated upon a common nucleus of facts and a common course of conduct such that each element necessary to prove defendants' allegedly fraudulent conduct is common to all class members."). Thus, "[w]hether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) ("*Halliburton I*"). Here, reliance may be

---

[2] Unless otherwise indicated, all emphasis is added, all internal citations and quotations are removed, and citations are cleaned up.

presumed under either (a) the fraud-on-the-market presumption of reliance for alleged false statements under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*"), or (b) the presumption of reliance for alleged omissions under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*"). As discussed below, both presumptions apply, and either is independently sufficient to show predominance and satisfy Rule 23(b)(3).

The Class is entitled to a presumption of reliance under *Basic* because UNFI's common stock and options traded in an efficient market. *See generally Basic*, 485 U.S. at 247 ("[W]here materially misleading statements have been disseminated into an impersonal, well-developed market for securities [*i.e.*, an "efficient" market], the reliance of individual plaintiffs on the integrity of the market price may be presumed."). The Class is also entitled to a presumption of reliance under *Affiliated Ute* based on Defendants' concealment of material information from investors, namely, that UNFI's profitability was driven by atypical and substantial forward buying. *See Affiliated Ute*, 406 U.S. at 153 (in cases "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery"). Because two independent bases for a class-wide presumption of reliance apply, any potential individual questions of reliance do not predominate over common issues.

Moreover, the calculation of damages is susceptible to a Class-wide methodology, further supporting the predominance of common issues. *See* Declaration of Kara M. Wolke submitted herewith ("Wolke Decl."), Ex. 1 (Report on Market Efficiency and Damages Methodology by Professor Steven P. Feinstein, Ph.D., CFA, the "Feinstein Report") ¶¶200-15. Finally, a class action is a superior means of litigating Class members' claims because it is manageable and provides redress to investors who would otherwise be unable to pursue individual claims.

Accordingly, Plaintiffs' motion should be granted.

## II.    SUMMARY OF PLAINTIFFS' ALLEGATIONS

UNFI is the largest publicly traded grocery wholesaler in North America. ¶33.[3] During the Class Period, Defendants made "strategic" decisions to forward buy, *i.e.*, buying inventory in excess of demand ahead of known price increases, amid elevated inflation. ¶¶53, 57, 61; *see also* ¶62 ("For [a company] to practice forward buying, it must be experiencing some unusual, changing, or unstable market condition."). The Company was able to boost profits by implementing price increases concurrently with its suppliers' price increases, *i.e.*, UNFI was not passing through its discounts to retailers. ¶61. The difference between the discounted inventory cost and the higher sale price to retailers generated profits of at least $275 million for the Company, which Defendants later characterized as "procurement gains." ¶¶61, 132.

Throughout the Class Period, Defendants made false and misleading statements and omissions that concealed the extent of UNFI's substantial forward buying and its impact on the Company's financial results. As the Court held, Defendants misled investors when "they purported to disclose the drivers of the Company's profits while omitting material facts that rendered those statements misleading. The Company put the drivers of its margins in play by speaking on the issue. But it failed to disclose that forward buying was a significant and aberrational driver of its profit margins." *See Sills v. United Nat. Foods, Inc.*, 2024 WL 4188324, at *8 (S.D.N.Y. Sept. 13, 2024).[4] The Court also held that Defendants misled investors when they "spoke to the impact of a deflationary environment on UNFI's margins and whether the causes of a decline in margins were temporary" but "they conspicuously failed to disclose the impact of forward buying on the decline" and omitted "the crucial context that forward buying opportunities had all but evaporated." *Id.* at

---

[3] Unless otherwise indicated, citations to "¶__" are to the Second Amended Complaint (the "Complaint," Dkt. 39).

[4] *See also* ¶¶143, 147, 153-55, 163, 171, 175, 181, 193.

*9.[5] Similarly, UNFI's risk factors purporting to warn that actual results could differ from expectations due to factors such as "moderated supplier promotional activity, including decreased forward buying opportunities," were misleading because they "did not mention the separate risk of decreased opportunities for inflation-related forward buying." *Id.*[6]

Investors were thus stunned when the truth about UNFI's substantial, "strategic" forward buying, and its financial impact, was partially revealed and/or materialized over a series of disclosures. First, on December 7, 2022, Defendants reported that UNFI's gross profit rate for Q1 2023 decreased to 14.6% of net sales due to "changes in customer mix as we continue to grow sales with larger customers," causing UNFI's stock price to fall 14.7%. ¶¶83-85. Defendants tried to reassure investors by characterizing the profit decline as "minor" and "just more a function of the temporary growth drivers in our customer file." ¶86. However, on March 8, 2023, Defendants revealed that gross profit rate further declined, to 13.7%, citing "lower current period procurement gains due to the decelerating rate of inflation and lower inventory gains." ¶91. Defendants admitted for the first time that UNFI's profitability was "challenged" because UNFI "did not repeat the significant level of procurement gains" experienced in the prior year period, thus partially revealing the Company's previous reliance on, and "unsustainable" benefits of, forward buying. ¶¶93, 104, 107-08. Amid declining profit rates, Defendants lowered UNFI's fiscal 2023 net income guidance by 53%, to $90-$142 million. ¶111. Following the news, UNFI's stock price fell 28% on March 8, 2023. ¶102. Still, investors did not know the full extent of UNFI's reliance on unsustainable forward buying. Then, on June 7, 2023, Defendants disclosed that lower-than-expected procurement gains had further eroded gross margins and slashed fiscal 2023 net income

---

[5] *See also* ¶165.

[6] *See also* ¶¶151, 161, 173, 191, 201.

guidance to $11-$41 million, causing a 6.6% stock price drop. ¶¶113-14, 120. Finally, on September 26, 2023, Defendants revealed a 56.3% year-over-year decrease in adjusted EBITDA "due to a decrease in inflation driven procurement gains and elevated shrink," causing the stock price to fall 27%. ¶¶125, 128.

## III.   THE CLASS SHOULD BE CERTIFIED

### A.   Applicable Standards Favor Class Certification

The Supreme Court has long recognized that securities fraud claims are particularly well suited for class treatment. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (predominance of common issues "is a test readily met in certain cases alleging . . . securities fraud"); *see also Halliburton I*, 563 U.S. at 812-13 (vacating appellate court denial of class certification); *Amgen*, 568 U.S. at 464-67 (affirming class certification). Courts in this Circuit also favor class certification in securities fraud cases. *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 45 (S.D.N.Y. 2013) ("Generally, claims alleging violations of Section 10(b) of the Exchange Act are especially amenable to class certification.").

Moreover, "[i]n light of the importance of the class action device in securities fraud suits, [the Rule 23] factors are to be construed liberally." *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2017 WL 2062985, at *2 (S.D.N.Y. May 15, 2017); *accord Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 266 (S.D.N.Y. 2014) ("The Second Circuit has directed courts to adopt a liberal interpretation of Rule 23 in order to maximize the benefits to private parties and, in cases such as this that involve alleged manipulation of public markets, to maximize the benefits to the public provided by class actions.").

6

**B.    The Proposed Class Is Ascertainable And Satisfies Rule 23(a)'s Requirements**

Rule 23(a) of the Federal Rules of Civil Procedure establishes four requisite elements for class certification:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of those of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

The proposed Class meets each of these requirements, as set forth herein.

In addition, to evaluate Rule 23(a)'s requirements, the Second Circuit imposes an implied requirement that the Class is ascertainable. *In re Aphria, Inc. Sec. Litig.*, 342 F.R.D. 199, 203-04 (S.D.N.Y. 2022). Ascertainability is a "modest threshold" that is met when the "proposed class is defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec.*, 862 F.3d 250, 269 (2d Cir. 2017) (certification precluded "only" when "class definition is indeterminate in some fundamental way"). Ascertainability is readily established in securities fraud cases because "securities purchases identified by subject matter, timing, and location [] are clearly objective." *Aphria*, 342 F.R.D. at 205. The proposed Class is ascertainable because the Class Period is clearly defined and includes only investors who traded the public common stock and options of UNFI during the Class Period. Thus, the identity of Class members can be objectively determined.

**1.    The Class Satisfies Rule 23(a)(1): Numerosity**

Rule 23(a)(1) is satisfied when a class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *7 (S.D.N.Y. Jan. 26, 2021).

During the Class Period, UNFI common stock and options were actively traded on the NYSE with an average of 58.68 million shares outstanding and approximately 98.7% of UNFI's common stock was in its public float (*i.e.*, available for trading). Feinstein Report ¶105. The average weekly trading volume was approximately 4.87% of all outstanding UNFI stock. *Id.* at ¶68. Thus, it is reasonable to conclude that thousands of geographically dispersed individuals purchased UNFI securities during the Class Period, easily satisfying numerosity. *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, *10 (S.D.N.Y. Mar. 23, 2020).

### 2.    The Class Satisfies Rule 23(a)(2): Commonality

Rule 23(a)(2) is satisfied when "there are questions of law or fact common to the class." In securities class actions, this requirement is a "low hurdle" that is met "when plaintiffs allege that class members have been injured by similar material misrepresentations and omissions." *Aphria*, 342 F.R.D. at 204. Plaintiffs' claims readily meet this standard as all Class members were injured similarly and the Complaint raises numerous questions common to the Class, including whether:

(a)    Defendants misleadingly omitted or misrepresented material facts about the extent of UNFI's forward buying, its financial impact, and/or related risks during the Class Period;

(b)    the extent of UNFI's forward buying during the Class Period, and the decrease in forward buying opportunities, constituted a known trend, event, or uncertainty under Item 303;

(c)    Defendants acted with scienter in making misleading statements or omissions during the Class Period;

(d)    the prices of the UNFI's common stock and call options were artificially inflated (or depressed, in the case of put options) during the Class Period;

(e)    Defendants' conduct caused Class members to suffer damages when relevant truths were revealed and/or risks materialized on December 7, 2022, March 8, 2023, June 7, 2023, and/or September 26, 2023; and

(f)    Individual Defendants controlled UNFI to be liable under Section 20(a) of the Exchange Act.

Because all Class members' claims depend on the answers to these common questions, commonality is established. *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 97, 105 (S.D.N.Y. 2011) ("[C]ourts in this Circuit have held that the . . . commonality requirement is plainly satisfied where the alleged misrepresentations . . . relate to all the investors, as the existence and materiality of such misrepresentations obviously present important common issues."); *Chicago Bridge*, 2020 WL 1329354, *11 (similar).

### 3.    Plaintiffs Satisfy Rule 23(a)(3): Typicality

Rule 23(a)(3) is satisfied when the claims of the representative parties are "typical" of those of the class. Fed. R. Civ. P. 23(a)(3). "In securities actions, in particular, typicality is not demanding." *In re Teva Sec. Litig.*, 2021 WL 872156, at *4 (D. Conn. Mar. 9, 2021). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993). Thus, typicality "should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members." *Trinidad v. Breakaway Courier Sys., Inc.*, 2007 WL 103073, at *6 (S.D.N.Y. Jan. 12, 2007).

Here, Plaintiffs traded UNFI's common stock and/or call options during the Class Period at prices that were artificially inflated by Defendants' alleged omissions and misstatements and suffered damages when the truth about the Company's forward buying practices was partially revealed, and/or the risks thereof materialized, causing UNFI's share price to fall. Wolke Decl., Exs. 2-3; Dkt. 96-1 (amended Sills certification reflecting common stock and call option transactions during the Class Period); Dkt. 96-2 (amended Dick certification reflecting common stock transactions during the Class Period).

Therefore, the typicality requirement is satisfied. *In re Winstar Commc'ns Sec. Litig.*, 290

9

F.R.D. 437, 443 (S.D.N.Y. 2013) ("In securities cases alleging dissemination of allegedly false or misleading statements, the nature of the common injury generally satisfy typicality.").[7]

### 4.    Plaintiffs Satisfy Rule 23(a)(4): Adequacy

The final requirement of Rule 23(a) is that the class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "In assessing this requirement, courts make two principal inquiries: whether (1) plaintiff's interests are antagonistic to the interest of other members of the class; and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Aphria*, 342 F.R.D. at 204-05. Both prongs are satisfied here.

Plaintiffs' interests are entirely aligned with those of the Class. And Plaintiffs have demonstrated a commitment to vigorously prosecute this action on behalf of absent Class members, including by producing documents in discovery and supervising and monitoring the progress of the litigation. *See generally* Wolke Decl., Exs. 2-3. Furthermore, Plaintiffs understand that by seeking appointment as Class Representatives, they have a fiduciary duty to act in the best interests of the Class, they are committed to continue to actively participate in the case, and they share an interest in trying to maximize any potential Class-wide recovery. *See id.*

"Moreover, as is always the case, in securities fraud class actions the best measure of whether a plaintiff will adequately represent the interests of a class is whether his lawyers are equipped to handle the matter." *BlackBerry*, 2021 WL 253453, at *13. Plaintiffs retained counsel who "are qualified, experienced and able to conduct the litigation." *Aphria*, 342 F.R.D. at 204-05. GPM has extensive experience in the field of securities litigation, and its vigorous pursuit of the

---

[7] "Factual differences involving the date of acquisition, type of securities purchased and manner by which the investor acquired the securities will not destroy typicality if each class member was the victim of the same material misstatements and the same fraudulent course of conduct." *Merrill Lynch*, 277 F.R.D. at 109.

Class's interests has already been demonstrated in its advancement of the Class's claims before this Court. *See* Wolke Decl., Ex. 4 (firm résumé of GPM). For these reasons, and because Lead Counsel have devoted substantial time and resources to the litigation and will continue to do so, GPM also satisfies the considerations of Rule 23(g) and should be appointed Class Counsel.

### C.    The Requirements Of Rule 23(b)(3), Predominance And Superiority, Are Met

#### 1.    Common Questions Of Law And Fact Predominate

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. Predominance exists where "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof." *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010). "Predominance is a test readily met in certain cases . . . alleging securities fraud." *Amchem*, 521 U.S. at 625.

In securities fraud actions, the elements of falsity, materiality, scienter, and loss causation are subject to class-wide proof.[8] Therefore, "[w]hether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Halliburton I*, 563 U.S. at 810. In this case, reliance may be presumed on a class-wide basis under either (a) the fraud-on-the-market presumption under *Basic*, or (b) the presumption of reliance applicable to omission claims under *Affiliated Ute*.[9] Each presumption is independently sufficient for class certification, and both apply here.

---

[8] *See, e.g.*, *Amgen*, 568 U.S. at 459 (materiality "is a question common to all members of the class"); *Pfizer*, 282 F.R.D. at 52 (all elements of a Section 10(b) claim, "other than reliance in cases that are not premised on fraud-on-the-market, are subject to class wide proof in securities litigation").

[9] *See generally Strougo v. Barclays PLC*, 312 F.R.D. 307, 312 (S.D.N.Y. 2016) ("The predominance requirement is typically met in securities fraud class actions by plaintiffs' invocation of one of two presumptions developed by the Supreme Court . . . . the '*Basic*

### a)    Plaintiffs Are Entitled To The *Basic* Presumption Of Reliance

Pursuant to the *Basic* fraud-on-the-market doctrine, a proposed class representative may:

> satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation.

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014) ("*Halliburton II*"). To invoke this presumption, a plaintiff must show: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Id.* at 268. "[W]ith the exception of materiality"—which is a question of fact reserved for the jury—the elements of publicity, market efficiency and market timing "must be satisfied before class certification." *Id.* at 276.

Plaintiffs here readily make the required showing. First, Defendants' statements were publicly known because they were made in UNFI's SEC filings, press releases, and earnings calls. Second, the issues relating to Defendants' fraud would be significant to a reasonable investor. *See Sills*, 2024 WL 4188324, at *8 (pleading-stage inference that the "impact of forward buying on profit margins" is material). Third, Plaintiffs purchased UNFI common stock and/or call options during the Class Period after alleged misrepresentations were made and prior to the corrective disclosures. Fourth, as discussed in detail below, the preponderance of the evidence establishes that UNFI's common stock and options traded in an efficient market. Thus, Plaintiffs are entitled to a presumption of reliance under *Basic*.

---

presumption' of reliance in fraudulent misrepresentation cases, and the '*Affiliated Ute* presumption' of reliance in fraudulent omission cases."); *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 101 (S.D.N.Y. 2016) (similar).

### (i)    UNFI Traded On The NYSE

UNFI's common stock and options trade on the NYSE.[10] Courts routinely hold that a stock's listing on the NYSE creates a presumption that the market is efficient. *See Aphria,* 342 F.R.D. at 206 (collecting cases); *see also Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989) ("at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System."); Feinstein Report ¶¶84-85 ("The NYSE  is one of the most renowned, most liquid, and most efficient forums for trading stocks in the world.").

### (ii)    The *Cammer* And *Unger/Krogman* Factors Demonstrate Market Efficiency

Neither the Supreme Court nor the Second Circuit has adopted a formal test for market efficiency. *Petrobras*, 862 F.3d at 276. Courts in this Circuit and elsewhere, however, routinely consider the non-exhaustive factors derived from *Cammer v. Bloom* to assess market efficiency:

> (1) a large weekly trading volume; (2) analyst coverage; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S–3 registration statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases.

*McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014) (citing *Cammer*, 711 F. Supp. at 1285-87); *see also Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 204 n.11 (2d Cir. 2008) ("The *Cammer* factors have been routinely applied by district courts considering the efficiency of equity markets."). The *Cammer* factors, however, are not exclusive and "are meant to be an analytical tool to assist in the evaluation

---

[10] In addition, UNFI options were also traded on NASDAQ during the Class Period until April 3, 2023 when they were delisted. Feinstein Report ¶37.

of market efficiency, not a rigid checklist." *McIntire*, 38 F. Supp. 3d at 432; *Petrobras*, 862 F.3d at 276 (affirming finding of market efficiency pursuant to *Cammer* factors even where *Cammer* factor five was disputed).[11] Courts have also considered three other factors identified in *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005) and *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001): (6) a high market capitalization, (7) a large float, and (8) a narrow bid-ask spread. *See Petrobras*, 862 F.3d at 276 (acknowledging these "three additional" factors comprised part of the efficiency analysis). An analysis of each of these factors shows that UNFI's common stock and options traded in an efficient market.

**(1) Trading Volume.** During the Class Period, the average weekly trading volume was 4.87% of UNFI's common stock outstanding. Feinstein Report ¶68. That turnover rate exceeds the 2% threshold set by *Cammer* as giving rise to a "strong presumption" of market efficiency. 711 F. Supp. at 1286.

**(2) Analyst Coverage.** Analyst coverage "supports a finding of market efficiency because it permits an inference that financial statements relating to a security are closely watched by investment professionals, who in turn inject their views on the company and the security into the market." *Winstar*, 290 F.R.D. at 446.[12] At least 17 firms published reports on UNFI during the Class Period. Feinstein Report ¶¶72-73. This supports a finding of efficiency. *Winstar*, 290 F.R.D. at 446 (coverage by "at least three analysts" supported efficiency). Moreover, information about UNFI was disseminated to the market through a variety of other means, including buy-side analysis

---

[11] *See also Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 83 (S.D.N.Y. 2015) ("While the Second Circuit endorsed the use of the *Cammer* factors in *Bombardier*, it has not required their use or held that any one of them is dispositive.").

[12] This factor is measured by the number of analysts covering the company or by the number of reports published about the company during the relevant period. *Id*. (noting number of analysts); *McIntire*, 38 F. Supp. 3d at 431 (noting number of analyst reports).

by major institutions,[13] over 1,191 news stories and press releases, and UNFI's own Class Period press releases. Feinstein Report ¶¶77-78, 80; *Carpenters*, 310 F.R.D. at 92 (that "information concerning Barclays was widely disseminated . . . through Bloomberg and other news services" supported efficiency).

**(3) Number of Market Makers.** This factor concerns whether there are sufficient market makers and/or arbitrageurs to facilitate the efficiency of the market. *See McIntire*, 38 F. Supp. 3d at 431-32. Courts have found the fact that a security trades on the NYSE in itself sufficient to satisfy this factor.[14] But even setting that aside, during the Class Period, there were at least 93 market makers active in UNFI common stock, including well-known firms such as Bank of America, Barclays, Citigroup, Goldman Sachs, Morgan Stanley, UBS, and Wells Fargo. Feinstein Report ¶87. That number more than exceeds the ten market makers the *Cammer* court found to justify a substantial presumption of efficiency.[15]

**(4) UNFI Was Eligible To File Form S-3.**[16] Eligibility for Form S-3 registration with the SEC is an indicator of market efficiency because it is associated with characteristics that correlate with efficiency, including size, transparency, and the availability of relevant financial information.

---

[13] At least 601 major institutions owned UNFI stock during the Class Period. Feinstein Report ¶78. This implies that significant buy-side analysis was likely available to institutional investors and bolsters the conclusion that UNFI's stock traded in an efficient market.

[14] *See In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 100 (S.D.N.Y. 2009) (trading on the NYSE "provides the necessary evidence to satisfy this factor"); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) (similar).

[15] *See Cammer*, 711 F. Supp. at 1283 n.30 (noting stock at issue had eleven market makers); *see also id.* at 1293 ("Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.") (quoting BROMBERG & LOWENFELS, 4 SEC. FRAUD & COMMODITIES FRAUD, § 8.6 (Aug. 1988)).

[16] Form S-3, also known as "shelf registration," allows issuers to register securities for future sales. Form S-3 has fewer disclosure requirements than traditional Form S-1 registration statements, but companies must meet float and filing qualifications.

*See Cammer*, 711 F. Supp. at 1284-85. To be eligible for Form S-3 registration, a company must have filed Exchange Act reports with the SEC for twelve months and its public float must be at least $75 million. *See* Feinstein Report ¶96 (citing SEC Release No. 33-8812). With an average float of $2.10 billion during the Class Period, UNFI far exceeded the float requirement for Form S-3 eligibility, supporting a finding of market efficiency. *See* Feinstein Report ¶98.

**(5) UNFI's Stock And Options Reacted To New, Company-Specific Information.** This factor examines whether empirical evidence demonstrates "a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Cammer*, 711 F. Supp. at 1287. This factor often receives special attention from courts because empirical evidence of this kind provides direct evidence of market efficiency, whereas the other *Cammer* factors examine indirect evidence of market efficiency. *See Petrobras*, 862 F.3d at 276-79. This factor, however, is also one of the most fraught, as it often involves dueling expert reports and event studies, in which "methodological constraints limit their utility." *Id.* at 278. For this reason, multiple courts have found markets to be efficient even in the absence of clear empirical evidence under *Cammer 5*, especially where, as here, Plaintiffs' showing as to the other *Cammer* factors is strong.[17] *See Malriat v. QuantumScape Corp.*, 2022 WL 17974629, at *13 (N.D. Cal. Dec. 19, 2022) (recognizing that "plaintiffs may prove market efficiency without satisfying the cause and- effect factor, which suggests that even if this factor undisputedly favored defendants, plaintiffs still may be entitled to the fraud on the market presumption") (collecting cases).

To assess the fifth *Cammer* factor, Dr. Feinstein conducted an event study to determine

---

[17] *See also Aphria*, 342 F.R.D. at 206 (direct and indirect evidence considered holistically and "the burden to prove market efficiency is not an onerous one"); *Strougo*, 312 F.R.D. at 319-23 & n.85 (noting that the court had previously decided that the fifth *Cammer* factor was not necessary to establish efficiency and "in the interim additional courts have reached the same conclusion").

whether a cause-and-effect relationship existed between the release of UNFI-specific information and movements in UNFI's stock price. *See* Feinstein Report ¶¶119-21. Generally speaking, event studies are used to measure how much a firm's security price rises or falls in response to new information, isolated from market-wide or industry sector factors. *See id.* at ¶117.  Based on his analyses, Dr. Feinstein concluded that "UNFI stock reacted to information and therefore the market for UNFI stock demonstrated efficiency during the Class Period." *Id.* at ¶154.

As Dr. Feinstein explained, "[i]f a company's news events collectively exhibit a significantly greater frequency of statistically significant stock price movements than do non- or lesser-news days, this finding establishes that the stock consistently reacts to company-specific information, and it is therefore compelling empirical evidence that the stock trades in an efficient market." *Id.* at ¶119. Here, Dr. Feinstein focused on UNFI's quarterly earnings announcements as the news events his study analyzed. *Id.* at ¶¶124-25 & Table 1. He used a regression model to determine how much of a day's stock price return is explained by market and/or sector effects (the "explained return"). *Id.* at ¶133. Dr. Feinstein then compared the explained returns to actual returns; the difference is the residual return which reflects the impact of company-specific information on the stock price. *Id.* at ¶134. He then conducted a *t*-test to assess the statistical significance of the residual returns. *Id.* at ¶147. As shown in Dr. Feinstein's Exhibit 9, five out of seven (71.4%) of UNFI's earnings announcement event dates during the Class Period caused statistically significant price reactions at the 95% confidence level or higher. *Id.* at ¶149. By comparison, only 4.1% of non- or lesser-news dates were associated with statistically significant returns. *Id.* at ¶¶149, 151. This is strong empirical evidence of efficiency. *Id.* at ¶154.

To test whether UNFI options demonstrated informational market efficiency, Dr. Feinstein conducted an event study utilizing the same methodology he used for UNFI common stock.

Feinstein Report ¶178. Because of the price dynamics of options, Dr. Feinstein combined options with similar characteristics into a portfolio ("synthetic stock") that, consistent with option valuation principles, "behave the same as the underlying stock in an efficient market." *Id.* at ¶¶176-77. He then constructed a time series of prices to test if the synthetic stock responded to the release of new Company-specific information in a statistically significant manner. As shown in Dr. Feinstein's Exhibit 17, six out of seven (85.7%) of the tested news event dates caused statistically significant reactions in the synthetic stock price. *Id.* at ¶186. By comparison, only 4.95% of non- or lesser-news dates were associated with statistically significant returns. *Id.* at ¶187. Based on his analyses, Dr. Feinstein concluded that "UNFI options reacted to information and its market therefore demonstrated information efficiency." *Id.* at ¶188.

**(6) Market Capitalization.** Market capitalization, which is the total value of a company's outstanding shares, is equal to the number of shares outstanding multiplied by the price per share. During the Class Period, the aggregate market value of UNFI's common stock averaged $2.12 billion, placing it in the top 23rd percentile of all publicly traded companies in the U.S. Feinstein Report ¶102. UNFI's market capitalization was sufficiently large to attract analyst and news coverage, and gain the attention of a large number of investors, all of which further promotes market efficiency. *See id.* at ¶¶70-82; *McIntire*, 38 F. Supp. 3d at 433 ($292-$585 million market capitalization during the class period weighed in favor of finding an efficient market).

**(7) Public Float.** A stock's float is the number of shares outstanding, less shares held by insiders and affiliated corporate entities, which is generally the number of shares available for trading by outside investors in the open market. During the Class Period, there were 58.68 million shares outstanding of UNFI's common stock, and only 1.3% was held by UNFI's insiders. *See* Feinstein Report ¶105. As a result, approximately 98.7% of the Company's common stock was

18

held and freely tradeable by outside investors during the Class Period. *Id.*; *McIntire*, 38 F. Supp. 3d at 433 (even a public float of only 31 to 43 percent supported a finding of an efficient market).

**(8) Bid-Ask Spread.** The bid-ask spread is the difference between the price at which market makers are offering to buy or sell the security. Feinstein Report ¶62. If a stock is actively traded and information about the stock is readily available, the bid-ask spread tends to be narrow. Moreover, a "narrow bid-ask spread makes trading in the stock less costly for investors and thereby tends to attract greater interest, greater coverage, and greater volume, all of which, in turn, promote market efficiency." *Id.* Here, the average bid-ask spread for UNFI common stock during the Class Period was 0.05%. *Id.* at ¶108. This factor thus supports market efficiency. *Id.* at ¶110; *McIntire*, 38 F. Supp. 3d at 433 (a bid-ask spread of 0.27% supported a finding of an efficient market).

In sum, the *Cammer* and *Unger/Krogman* factors strongly weigh in favor of finding that UNFI's common stock and options traded in an efficient market. *See, e.g.*, *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *10-16 (S.D.N.Y. Aug. 13, 2018) ("holistic analysis" of the *Cammer* and *Unger/Krogman* factors supported finding of market efficiency).

**b)    The *Affiliated Ute* Presumption Of Reliance Applies**

While Plaintiffs have demonstrated market efficiency to give rise to the *Basic* presumption of reliance, a separate presumption of reliance independently arises here under *Affiliated Ute*. The Supreme Court has instructed that in cases "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute*, 406 U.S. at 153. Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [its] decision." *Id.* at 131. Courts within the Second Circuit have thus consistently held that reliance is presumed where "a plaintiff's claim is based on a defendant's failure to disclose material information." *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 748 (2d Cir. 1992) (citing *Affiliated Ute*, 406 U.S. at 154); *see, e.g.*, *Haw.*

19

*Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Entm't Holdings, Inc.*, 338 F.R.D. 205, 216 (S.D.N.Y. 2021) (applying *Affiliated Ute* to grant class certification).[18]

Reliance here may be presumed because Plaintiffs' claims are rooted in Defendants' material omissions about the significance and extent of UNFI's unsustainable forward buying during the Class Period. This Court has already held that Defendants' omission of UNFI's procurement gains as a "significant and unsustainable driver of profit margins" is actionable. *Sills*, 2024 WL 4188324, at \*8 ("[A] reasonable investor could view the impact of forward buying on profit margins, **which these statements omitted**, as significantly altering the total mix of information available."); *id.* at \*9 (holding Profit Sustainability Statements actionable because "[t]hey **omit the crucial context** that forward buying opportunities had all but evaporated" and "[a]ssuming that [procurement gains from forward buying] were a significant and unsustainable driver or profit margins, **it is this very omission that renders the statements misleading**."); *see also id.* at \*9 (holding Risk Factor Statements actionable because "[b]y circling that issue [of promotion-related forward buying] '**but omitting the negative elephant in the room**,' the Risk Factor Statements were plausibly misleading").

Because the claims at issue here largely involve what Defendants did **not** say, Plaintiffs are entitled to the *Affiliated Ute* presumption of reliance. *See, e.g.*, *In re Dynex Capital, Inc. Sec. Litig.*, 2011 WL 781215, at \*7 (S.D.N.Y. Mar. 7, 2011) (applying *Affiliated Ute* presumption since "the heart of the alleged deception is rooted not in statements, but in the fact that specific information

---

[18] The *Affiliated Ute* presumption is rooted in the reality that "as a practical matter [reliance on an omission] is impossible to prove." *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 428, 469 (S.D.N.Y. 2013). This is because "[w]hen a defendant's fraud consists primarily of omissions, requiring a plaintiff to show a speculative set of facts, *i.e.*, how he would have behaved if omitted material information had been disclosed, places an unrealistic evidentiary burden on the 10(b) plaintiff." *Smith Barney*, 290 F.R.D. at 47.

about the quality of the collateral was withheld, and that information would have been important to a reasonable investor."); *Puddu v. NYGG (Asia) Ltd.*, 2022 WL 2304248, at *4 (S.D.N.Y. June 27, 2022) (certifying the class and holding that "the *Affiliated Ute* presumption can still apply when a complaint alleges both misstatements and omissions"); *AMC Entm't*, 338 F.R.D. at 216 (certifying the class under both *Affiliated Ute* and *Basic* where Section 10(b) claims involved both misstatements and omissions).

### 2.   Potential Individual Questions Of Damages Do Not Predominate

Courts routinely find that damages in securities cases present common questions because they can be calculated by applying a common methodology on a class-wide basis. *See Barrick Gold*, 314 F.R.D. at 106 (damages issues did not defeat predominance because calculation of damages called for the application of a damages model across the entire class); *Wallace v. IntraLinks*, 302 F.R.D. 310, 318 (S.D.N.Y. 2014) (fact that class members who purchased and sold at different times would be entitled to different recoveries does not defeat predominance because "[p]laintiff's proposed determination of damages by event study appears to be a workable methodology of determining damages on a class-wide basis"); *In re Beacon Assocs. Litig.*, 282 F.R.D. 315, 333 (S.D.N.Y. 2012) (common issues predominate even though calculation of each class member's damages will be somewhat individualized).[19]

Here, damages can be readily calculated on a class-wide basis using a generally-accepted event study methodology. Feinstein Report ¶¶211-12. Using an event study, the artificial inflation caused by Defendants' misleading statements and omissions can be measured on a class-wide basis

---

[19] *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2015 WL 5613150, at *8 (S.D.N.Y. Sept. 24, 2015) ("[A]t the class certification stage, Plaintiffs must only show that their damages model 'actually measure[s] damages that result from the class's asserted *theory* of injury.'") (emphasis in original) *vacated and remanded sub nom. Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474 (2d Cir. 2018).

by analyzing the change in the stock price caused by a corrective disclosure. *Id.* at ¶211(i). The artificial inflation in call options (or artificial depression in put options) can be determined using widely used and generally accepted options pricing formulas. *Id.* at ¶207. Once the daily levels of price inflation have been calculated throughout the Class Period, a Class member's actual trading activity in the security can be used to mechanically apply common calculations to arrive at the Class member's damages. *See id.* at ¶211(vi)-(ix). Because this methodology can be applied class-wide and is entirely consistent with the class-wide theory of liability, common issues predominate. *See IntraLinks*, 302 F.R.D. at 318 ("Plaintiff's proposed determination of damages by event study appears to be a workable methodology of determining damages on a class-wide basis that conforms to its theory of liability, thus meeting the requirements of *Comcast Corp. v. Behrend*, [569 U.S. 27 (2013)]").[20]

### 3.    A Class Action Is Superior To Other Available Methods For The Fair And Efficient Adjudication Of This Action

Under Rule 23(b)(3), "[s]uperiority is established when 'a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 241 F.R.D. 435, 449 (S.D.N.Y. 2007) (quoting *Amchem*, 521 U.S. at 615). Securities cases "easily satisfy" this requirement as "the alternatives are either no recourse for thousands of stockholders" or "a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake." *Chicago Bridge*, 2020 WL 1329354 at *11.

---

[20] Plaintiffs' showing above that their § 10(b) claims are entitled to a presumption of reliance applies equally to Plaintiffs' control person claims under § 20(a), and so predominance is satisfied as to these claims as well. *In re Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.*, 2013 WL 396117, at *13 (D.N.J. Jan. 30, 2013) (finding that the same predominance analysis applies to § 20(a) claims as for Rule 10b-5 violations).

The following factors are relevant to the superiority assessment:

A) the class members' interests in individually controlling the prosecution . . . of separate actions; B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). These factors all weigh in favor of class certification in this case.

There is no indication that members of the proposed Class would prefer to prosecute their claims individually, and Lead Counsel are unaware of any other case involving the same claims. The fraud here, like "[m]ost violations of the federal securities laws . . . inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible." *In re Blech Sec. Litig.*, 187 F.R.D. 97, 10 (S.D.N.Y. 1999).[21] Finally, securities class actions like this one generally raise no unusual manageability issues. "[F]ailure to certify an action under Rule 23(b) (3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule." *Petrobras*, 862 F.3d at 268. Thus, a class action is the superior method for the efficient adjudication of the Class's claims.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant this motion in its entirety, certify this case as a class action, appoint Plaintiffs as Class Representatives, and appoint GPM as Class Counsel.

---

[21] The litigation of separate actions "would be wasteful, and potentially result in delay and an inefficient expenditure of judicial resources." *In re Interpublic Sec. Litig.*, 2003 WL 22509414, at *4 (S.D.N.Y. Nov. 6, 2003). It would also "risk disparate results among those seeking redress." *Id.* Moreover, Plaintiffs do not foresee any management difficulties.

Dated: March 7, 2025

By: */s/ Kara M. Wolke*

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay (admitted *pro hac vice*)
Kara M. Wolke (admitted *pro hac vice*)
Casey E. Sadler (admitted *pro hac vice*)
Pavithra Rajesh (admitted *pro hac vice*)
Melissa C. Wright (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
kwolke@glancylaw.com

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Telephone:(212) 682-5340
Facsimile: (212) 884-0988
glinkh@glancylaw.com

*Counsel for Plaintiffs and Lead Counsel for the proposed Class*

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

**LAW OFFICES OF FRANK CRUZ**
Frank Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Additional Counsel*

24

## CERTIFICATE OF COMPLIANCE

The undersigned counsel for Plaintiffs certifies that this brief contains 7,602 words, which complies with the word limit of L.R. 7.1(c).

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On March 7, 2025, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 7, 2025.

*/s/ Kara M. Wolke*
Kara M. Wolke