**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DAN SILLS *and* GEORGE DICK, *individually and on behalf of all others similarly situated*,

Plaintiffs,

vs.

UNITED NATURAL FOODS, INC., J. ALEXANDER MILLER DOUGLAS, JOHN W. HOWARD, *and* CHRISTOPHER P. TESTA,

Defendants.

No. 1:23-CV-02364-JGLC

ORAL ARGUMENT REQUESTED

**DEFENDANTS' OPPOSITION TO**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND**
**APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

**[REDACTED]**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

    A.    UNFI's Financial Results During The Putative Class Period. ................................ 2

    B.    Plaintiffs' Claims. .................................................................................................. 5

    C.    This Court's Motion To Dismiss Ruling. ............................................................... 6

    D.    Plaintiffs' Class Certification Motion. ................................................................... 7

ARGUMENT ..................................................................................................................... 7

I.    Plaintiffs Have Not Presented A Methodology Capable Of Measuring Damages On A Classwide Basis Consistent With Their Theory Of Liability................................... 8

II.    To The Extent Any Class Is Certified, Defendants Have Rebutted The Presumption Of Reliance For All Statements After March 8, 2023. ................................ 15

    A.    Defendants Can Rebut The Fraud-On-The-Market Presumption Of Reliance By Showing That The Purported Corrective Disclosures Did Not Reveal New, Corrective Information. .................................................................... 16

    B.    Plaintiffs Are Not Entitled To The *Basic* Presumption Of Reliance After March 8, 2023 Because No New, Corrective Information Was Disclosed After That Date. ...................................................................................................... 19

        1.    The Alleged Truth Was Fully Revealed On March 8, 2023. ..................... 21

        2.    The June 2023 And September 2023 Alleged Corrective Disclosures Did Not Reveal New, Corrective Information. ..................... 24

    C.    The *Affiliated Ute* Presumption Does Not Apply. ............................................... 27

III.    The Class Representatives Are Inadequate And Atypical. ............................................. 29

    A.    Plaintiffs Have Not Adequately Supervised This Lawyer-Driven Litigation............................................................................................................. 29

    B.    Lead Plaintiff Sills Is Atypical Because He Is Subject To A Unique Reliance Defense. ................................................................................................ 31

CONCLUSION.................................................................................................................. 33

i

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Abramson v. Newlink Genetics Corp.*,
   965 F.3d 165 (2d Cir. 2020)..................................................................................11

*Acticon AG v. China Ne. Petro. Holdings Ltd.*,
   692 F.3d 34 (2d Cir. 2012)....................................................................................9

*In re Allstate Corp. Sec. Litig.*,
   966 F.3d 595 (7th Cir. 2020) ...............................................................................16

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*,
   663 F. Supp. 3d 334 (S.D.N.Y. 2023)..................................................................28

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013).............................................................................................18

*In re Apache Corp. Sec. Litig.*,
   2024 WL 532315 (S.D. Tex. Feb. 9, 2024) ...............................................20, 24, 26

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*,
   597 F.3d 330 (5th Cir. 2010), *vacated on other grounds by Erica P. John*
   *Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011).................................................19

*Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*,
   77 F.4th 74 (2d Cir. 2023) ..........................................................................16, 18, 19

*Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*,
   222 F.3d 52 (2d Cir. 2000)....................................................................................31

*In re Barrick Gold Sec. Litig.*,
   314 F.R.D. 91 (S.D.N.Y. 2016) ...........................................................................15

*Basic v. Levinson*,
   485 U.S. 224 (1988).............................................................................................16

*In re BP p.l.c. Sec. Litig.*,
   2014 WL 2112823 (S.D. Tex. May 20, 2014) ......................................................11

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
   2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019) ......................................................18

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)......................................................................................... *passim*

*In re Crayfish Co. Sec. Litig.*,
   2002 WL 1268013 (S.D.N.Y. June 6, 2002) .......................................................29

*In re Deloitte & Touche LLP*,
  No. 24-258 (4th Cir. Feb. 13, 2025) .........................................................................15

*In re Dynex Capital Inc. Sec. Litig.*,
  2011 WL 781215 (S.D.N.Y. Mar. 7, 2011) ...............................................................28

*In re FibroGen Sec. Litig.*,
  2024 WL 1064665 (N.D. Cal. Mar. 11, 2024).......................................................18, 22, 23, 24

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
  301 F.R.D. 116, 142 (S.D.N.Y. 2014) ........................................................................9

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  903 F.2d 176 (2d Cir. 1990), *abrogated on other grounds by Microsoft Corp.
  v. Baker*, 582 U.S. 23 (2017) ...............................................................................32, 33

*George v. China Auto. Sys., Inc.*,
  2013 WL 3357170 (S.D.N.Y. July 3, 2013) ...............................................................32

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*,
  594 U.S. 113 (2021)..................................................................................15, 16, 17, 18, 19

*Gordon v. Sonor Cap. Mgmt. LLC*,
  92 F. Supp. 3d 193 (S.D.N.Y. 2015)......................................................................29, 31

*Griffin v. GK Intelligent Sys., Inc.*,
  196 F.R.D. 298 (S.D. Tex. 2000).............................................................................31

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)..............................................................................7, 16, 17, 32

*Hawaii Structural Ironworkers Pension Trust Fund, Inc. v. AMC Entm't
  Holdings, Inc.*,
  338 F.R.D. 205, 216 (S.D.N.Y. 2021) ........................................................................28

*Kamerman v. Ockap Corp.*,
  112 F.R.D. 195 (S.D.N.Y. 1986) ..............................................................................32

*In re Kirkland Lake Gold Sec. Litig.*,
  2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) .......................................................... *passim*

*Maywalt v. Parker & Parsley Petro. Co.*,
  67 F.3d 1072 (2d Cir. 1995)....................................................................................30

*Miller v. Asensio & Co.*,
  364 F.3d 223 (4th Cir. 2004) .................................................................................13

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
 2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ..................................................................1, 14

*Owens v. FirstEnergy Corp.*,
 No. 23-0303 (6th Cir. Nov. 16, 2023)......................................................................................15

*In re Petrobras Sec. Litig.*,
 862 F.3d 250 (2d Cir. 2017)....................................................................................................15

*Pub. Emps.' Ret. Sys. of Miss. v. Amedisys Inc.*,
 769 F.3d 313, 321 (5th Cir. 2014) ..........................................................................................19

*Puddu v. NYGG (Asia) Ltd.*,
 2022 WL 2304248 (S.D.N.Y. June 27, 2022) .........................................................................28

*In re Qualcomm Inc. Sec. Litig.*,
 2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) ...................................................................18, 24

*Ramirez v. Exxon Mobil Corp.*,
 2023 WL 5415315 (N.D. Tex. Aug. 21, 2023).........................................................................18

*Rocco v. Nam Tai Elecs., Inc.*,
 245 F.R.D. 131 (S.D.N.Y. 2007) .......................................................................................32, 33

*Savino v. Computer Credit, Inc.*,
 164 F. 3d 81 (2d Cir. 1998).....................................................................................................31

*Scott v. N.Y.C. Dist. Council of Carpenters Pension Plan*,
 224 F.R.D. 353 (S.D.N.Y. 2004) ......................................................................................29, 31

*Sicav v. James Jun Wang*,
 2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) ............................................................................15

*In re The Boeing Co. Sec. Litig.*,
 No. 25-135 (4th Cir. May 2, 2025) ..........................................................................................15

*In re U.S. Foodservice Inc. Pricing Litig.*,
 729 F.3d 108 (2d Cir. 2013)......................................................................................................8

*Waggoner v. Barclays PLC*,
 875 F. 3d 79 (2d Cir. 2017)...............................................................................................28, 29

*Wal-Mart Stores, Inc. v. Dukes*,
 564 U.S. 338 (2011).............................................................................................................7

*Ward v. Apple Inc.*,
 784 F. App'x 539 (9th Cir. 2019) ..........................................................................................9

iv

*Wells Fargo & Co. v. SEB Inv. Mgmt. AB*,
   No. 25-3021 (9th Cir.) .................................................................................................15

*Yi Xiang v. Inovalon Holdings, Inc.*,
   327 F.R.D. 510 (S.D.N.Y. 2018) ..................................................................................24

*Youngers v. Virtus Inv. Partners Inc.*,
   2017 WL 5991800 (S.D.N.Y. Dec. 4, 2014) ................................................................28

*Z-Seven Fund, Inc. v. Motorcar Parts & Accessories*,
   231 F.3d 1215 (9th Cir. 2000) .....................................................................................29

**Other Authorities**

Charles Alan Wright et al., 7A Federal Practice & Procedure § 1766 (4th ed.
   section updated May 20, 2025)......................................................................................30

Fed. R. Civ. P. 23 ...................................................................................................................8

**INTRODUCTION**

Plaintiffs seek to certify a broad class covering a multiyear period with little more than boilerplate legal argument and bare-bones assertions from their expert. They wrongly treat certification in securities cases as routine, ignore recent Supreme Court and Second Circuit precedent that underscores the difficulties of establishing Rule 23(b)(3) predominance in securities class actions, fail to grapple with the unique facts of this case and of the proposed class representatives, and dodge the hard questions raised by their theory of liability. Indeed, Plaintiffs mostly focus on an issue that Defendants do not even contest—that the market for UNFI securities was efficient. Courts have a duty to ensure that the requirements of Rule 23 are met before certifying a class, and Plaintiffs bear the burden of proving, not simply pleading, that they have satisfied those requirements. Plaintiffs' perfunctory efforts fall well short.

*First*, Plaintiffs fail to meet their burden under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), to offer a methodology capable of measuring damages on a classwide basis consistent with their theory of liability. They rely on an expert who admits that he has not actually performed this calculation or confirmed that a specific methodology even exists that would allow the calculation to be performed, but states he is confident one is possible based on nothing more than conjecture. Multiple courts have rejected this approach from the very same expert, with one court reasoning that this expert's "vague, indefinite, and unspecific" approach to damages "amounts to 'no damages model at all'" and denying the plaintiffs' motion for class certification. *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *19 (N.D. Ohio Aug. 14, 2018). This Court should do the same.

*Second*, to the extent some class is certified, the class period must end on March 8, 2023 because no alleged misstatement subsequently had a price impact and thus classwide reliance cannot be presumed beyond then. This follows from the efficient market hypothesis—which

1

underpins the *Basic* presumption of reliance that Plaintiffs invoke to try to establish predominance under Rule 23(b)(3)—and posits that all new material public information is rapidly incorporated into the price of the security. But the corollary of this principle is that the reiteration of information that *already* has been publicly disclosed will not affect the price of the security. And here, the information that Defendants allegedly concealed—that UNFI's margins were driven by substantial but unsustainable procurement gains from inflationary forward buying—was fully disclosed on or before March 8, 2023. Thus, the two alleged "corrective" disclosures from June 2023 and September 2023 that Plaintiffs injected into this case in a transparent effort to broaden the class period (and thereby increase their damages claim) did not provide new, corrective information on these points, and could not have had a price impact.

*Finally*, Plaintiffs have not met their burden to establish that the proposed class representatives are adequate and typical under Rule 23(a). Neither Lead Plaintiff Dan Sills nor Additional Plaintiff George Dick have adequately supervised this lawyer-driven litigation. And Sills is subject to a unique reliance defense.

Plaintiffs' motion should be denied in full, but, at a minimum, no class should be certified past March 8, 2023. Nor should Sills and Dick be appointed class representatives.

## BACKGROUND

### A.    UNFI's Financial Results During The Putative Class Period.

United Natural Foods, Inc. ("UNFI" or the "Company") is the largest publicly traded wholesale distributor of natural, organic, specialty, produce, and conventional grocery and non-food products in North America. SAC ¶ 33. Like many food distributors, UNFI benefited from forward buying during a period of rapid inflation in the post-COVID economy. Forward buying occurs when a company buys units of a product during a particular period, those units remain in inventory for a time, and then the units are sold during a subsequent period. If the price increases

2

between when a product is procured and the time it is sold, the difference represents additional profit margin. *See id.* ¶ 62; Ex. 1, 2021 Form 10-K at 4. A company may also forward buy by acquiring inventory at a lower-than-ordinary cost during a supplier sales promotion.

Throughout fiscal year 2022,[1] UNFI reported positive financial results and specifically attributed those results in part to the positive impact of inflation, which included inflationary forward buying. For example, on December 8, 2021, the Company announced its first quarter 2022 financial results, reporting an increase in net sales from the prior year that was "primarily *driven by inflation* and new business from both existing and new customers, … partially offset by supply chain challenges and expected modest … contraction." Ex. 2, Q1 2022 Earnings Release at 2 (emphasis added). The Company also stated that gross margin rate improvement was "driven by improvements in the Wholesale segment margin rate, including *the impact of inflation* and the Company's ValuePath initiative."[2] *Id.* (emphasis added).

UNFI reported similar results for each quarter in 2022—each time accurately stating that inflation contributed to those results. *See* Ex. 4, Q2 2022 Earnings Release at 2 (net sales increase "driven by inflation" and other factors; gross margin rate increase driven, in part, by "the impact of inflation"); Ex. 5, Q3 2022 Earnings Release at 2 (same); Ex. 6, Q4 2022 Earnings Release at 2 (same); *accord* SAC ¶¶ 73-80. In Q1 2023, although the gross profit rate decreased slightly,[3] UNFI again reported an increase in net sales, and again attributed the increase in part to inflation. *See* Ex. 7, Q1 2023 Earnings Release at 2; *accord* SAC ¶ 83.

On March 8, 2023, the Company announced worse-than-expected financial results for the

---

[1] UNFI's fiscal year ends on the Saturday closest to July 31. SAC ¶ 41.

[2] "ValuePath," announced in December 2020, was a set of initiatives across the Company designed to "position UNFI for future sales growth and margin expansion." Ex. 3, Q1 2021 Earnings Call Tr. 5, 11.

[3] The decrease in the gross profit rate was attributed to "changes in customer mix as [UNFI] continued to grow sales with larger customers." Ex. 7, Q1 2023 Earnings Release at 2.

second quarter of FY2023, including a year-over-year decline in gross profit. SAC ¶ 91; Ex. 8, Q2 2023 Earnings Release at 1-2. The Company also lowered its EBITDA guidance for FY2023, and withdrew its earnings guidance for FY2024. SAC ¶ 94. UNFI disclosed that its financial performance in the prior year had benefited substantially from unsustainable gains from inflationary forward buying. In particular, CEO Sandy Douglas explained that "[w]hile we expected inflation to decline [and] the supply chain to continue to normalize[, w]e did not fully appreciate the benefit to last year's gross profit from buying inventory in advance of supplier price increases in the sequentially rising inflationary environment. We now realize the magnitude of these benefits last year, which are not repeatable in the current environment." Ex. 9, Q2 2023 Earnings Call Tr. 4. He further explained that UNFI "did not have full visibility and sufficient detail into the commercial drivers of the benefits due to legacy issues with digital infrastructure limiting real-time data which is required to fully understand and forecast these … drivers." *Id.* CFO John Howard explained that these issues were compounded by lower-than-expected supplier promotional activity "that could have offset some of what we experienced." *Id.* at 6.

On June 7, 2023, UNFI again reported a year-over-year decline in gross profit, driven "primarily driven by the volatile macroeconomic environment, which led to lower inflationary benefits and reduced procurement gains," as well as unrelated issues like "higher levels of shrink and costs related to operational improvements."[4] Ex. 10, Q3 2023 Earnings Release at 2. The Company reduced its EBITDA guidance for FY2023 again. SAC ¶¶ 113, 120. Mr. Howard explained that UNFI had "expected to see [its] year-over-year gross profit rate decline given the procurement gains [it had been] cycling from last year," but "relative to our expectations at the end of Q2, the decline was greater than anticipated, largely due to the impact of the volatile

---

[4] "Shrink" refers to any unknown or unaccounted for loss of inventory. Causes of shrink include losing an item, theft, spoilage, and incorrect delivery, among others.

macroeconomic backdrop." Ex. 11, Q3 2023 Earnings Call Tr. 7.

On September 26, 2023, the Company reported results that were in line with the high end of its most recent earnings guidance for FY2023, again attributing the results to declining procurement gains and other unrelated issues. Ex. 12, Q4 2023 Earnings Release at 1-2; *accord* SAC ¶ 125. It explained that the "decrease in gross profit rate … was primarily driven by lower levels of procurement gains, reduced benefits from inflation and higher levels of shrink." Ex. 12, Q4 2023 Earnings Release at 2. During the earnings call, Mr. Howard added: "As we indicated would be the case with our updated outlook [from March], the biggest driver for the decline in Q4 year-over-year profitability was lower levels of procurement gain opportunities resulting from decelerating inflation." Ex. 13, Q4 2023 Earnings Call Tr. 7. He also noted that the Company had "experienced higher levels of shrink compared to last year's fourth quarter." *Id.*

That day, UNFI also released guidance for FY2024. Ex. 12, Q4 2023 Earnings Release at 3-4, 15-16. Analysts observed that the guidance was below consensus and reflected UNFI's continuing difficulties with complex data systems, forecasting challenges, and an elevated level of shrink. *E.g.*, Ex. 14, BTIG Report at UNFI_0006604; Ex. 15, Zurek Report ¶¶ 11, 96, 99-108.

### B.    Plaintiffs' Claims.

Plaintiffs allege that Defendants knew the relative impact of forward buying on the Company's margin throughout FY2022 and Q1 2023, and should have disclosed that the Company's profitability was driven by unsustainable procurement gains from inflationary forward buying. *See, e.g.*, SAC ¶ 6; *accord* Dkt. 66 at 12 ("Plaintiffs' core allegation is that Defendants' challenged statements were misleading because they failed to disclose that forward buying was a substantial driver of the Company's profit margins during the Class Period.").

Plaintiffs' initial complaint was filed on March 20, 2023, two weeks after the March 8, 2023 earnings announcement. *See* Dkt. 1. In that complaint, Plaintiffs alleged that the

5

Company's March 8, 2023 disclosures revealed the alleged truth. *See id.* ¶¶ 33-34, 44-45.

Plaintiffs subsequently amended their complaint twice, each time extending the end of the

putative class period to capture an additional quarter of financial results. *See* Dkt. 24 (adding Q3

2023); Dkt. 39 (adding Q4 2023). Although Plaintiffs amended the complaint to capture stock

price drops on June 7, 2023, and September 26, 2023, they do not actually allege that Defendants

made any false or misleading statements between March 8, 2023 and September 26, 2023. *See*

SAC ¶¶ 203-04 (last challenged statement found in Q2 2023 Earnings Release). When asked

why the end of the alleged class period had been extended beyond March 8, 2023, Lead Plaintiff

Dan Sills testified that he did not know. Ex. 16, Sills Dep. Tr. 47:12-23, 135:12-17.

       **C.**       **This Court's Motion To Dismiss Ruling.**

       In the operative complaint, Plaintiffs alleged that five categories of statements made by

UNFI or its officers were false or misleading. SAC ¶¶ 143-203. This Court dismissed two

categories of statements as not actionable: those relating to the Company's FY2023 earnings

guidance (*id.* at ¶¶ 145, 177, 183, 185, 187, 193, 195, 203) and UNFI's "Impact of Inflation"

statements (*id.* at ¶¶ 149, 157, 169, 189, 199). *See* Dkt. 66 at 29.[5] The challenged statements that

survived the motion to dismiss fall into three categories and are listed in full in Appendix I:

| Category | Challenged Statements | SAC ¶¶ |
|---|---|---|
| Profit Driver | 10 statements discussing the drivers of UNFI's gross margin without mention of inflation-related forward buying. | 143, 147, 153, 155, 159, 163, 171, 175, 179, 181 |
| Profit Sustainability | 2 statements about whether the decline in margin due to deflation was temporary. | 165, 197 |
| Risk Statement | 5 generic statements that UNFI's financial results "could differ materially from those anticipated" due to "moderated supplier promotional activity, including decreased forward buying opportunities." | 151, 161, 173, 191, 201 |

---

[5] The Court also dismissed the sole statement attributed to Defendant Testa (SAC ¶ 167). Dkt. 66 at 22 n.2.

**D.      Plaintiffs' Class Certification Motion.**

Plaintiffs move to certify a broad class of all investors who purchased or otherwise acquired UNFI common stock, purchased publicly traded call options, or wrote publicly traded put options between December 8, 2021 and September 25, 2023. Dkt. 98 at 1. Their motion does not attempt to show that either proposed class representative, Lead Plaintiff Dan Sills or Additional Plaintiff George Dick, directly relied on any alleged misrepresentation. Instead, they invoke the *Basic* presumption of classwide reliance, arguing that the markets for UNFI securities were efficient and therefore would have incorporated all material public information, including the alleged misrepresentations. *Id.* at 12. They proffer an expert report from Dr. Steven Feinstein, who opines that the markets for UNFI common stock and options were efficient, but he offers no opinion on whether any of the alleged misstatements actually had a price impact. Dkt. 99-1, Feinstein Report ¶¶ 18-23; Ex. 17, Feinstein Dep. Tr. 185:24-186:23.

Dr. Feinstein also opines that he will be able to calculate damages on a classwide basis. Dkt. 99-1, Feinstein Report ¶¶ 24, 200. But he has not done so, and he admitted during his deposition that there may be complications in this case that will require a "case-specific analysis" that he has not yet attempted. Ex. 17, Feinstein Dep. Tr. 236:4-12.

## ARGUMENT

Class certification is no routine matter. It is the "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast*, 569 U.S. at 33 (cleaned up). Plaintiffs "wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) ("*Halliburton II*"). Thus, courts must engage in a "rigorous analysis" of the evidence bearing on Rule 23's requirements, even if that "overlap[s] with the merits." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-52 (2011); *In re*

7

*U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013) ("To certify a class, a district court must make a definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues, ... and must find that each requirement is established by at least a preponderance of the evidence." (cleaned up)). Plaintiffs fail to meet their burden in three ways.

*First*, Plaintiffs have not proven "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Instead, individual questions predominate because Plaintiffs fail to provide a classwide damages methodology consistent with their theory of liability.

*Second*, even if some class is certified, the class period must end on March 8, 2023, because the alleged truth that Plaintiffs say was concealed was fully revealed by then. Because there was no new, corrective information disclosed after that date, Defendants have rebutted the presumption of reliance for the period between March 9, 2023 and September 26, 2023, and therefore classwide reliance cannot be presumed for that portion of the putative class period.

*Finally*, Plaintiffs have not shown they will adequately represent the class and that their claims are typical of the putative class. *See* Fed. R. Civ. P. 23(a). Neither Plaintiff has adequately supervised this lawyer-driven litigation, and Lead Plaintiff Sills is atypical because he is subject to a unique reliance defense. Consequently, the proposed class cannot be certified.

## I.   Plaintiffs Have Not Presented A Methodology Capable Of Measuring Damages On A Classwide Basis Consistent With Their Theory Of Liability.

In *Comcast*, the Supreme Court held that a plaintiff cannot satisfy Rule 23(b)(3)'s requirement that common issues predominate over individual issues without "evidentiary proof" of a classwide damages methodology consistent with the plaintiff's theory of liability. *Comcast*, 569 U.S. at 33, 35. To satisfy this requirement, a plaintiff cannot rely on the "say-so" of an expert "that there is a damages model that will permit the calculation of damages on a classwide

8

basis" at a later stage in the litigation. *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014); *see also Ward v. Apple Inc.*, 784 F. App'x 539, 540 (9th Cir. 2019) (a plaintiff's expert cannot "merely assert[] that he [will] be able to develop a model at some point in the future"). But that is precisely what Plaintiffs' expert has done here.

Plaintiffs seek to certify a vast class of securityholders across a multiyear period based on the assertion of their expert, Dr. Steven Feinstein, that the so-called "out of pocket" damages method can be utilized across the putative class. But "out of pocket damages" is not a damages methodology at all. As Dr. Feinstein's report admits, "[o]ut-of-pocket damages are the amount the investor overpaid for the security on account of the fraud, less any artificial inflation they recovered upon sale or disposition of the security" (Dkt. 99-1, Feinstein Report ¶ 206)—in other words, "out of pocket" damages is merely a definitional description of the damages any plaintiff is entitled to recover in a securities case under Section 10(b), *Acticon AG v. China Ne. Petro. Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012), not a method for *computing* those damages. This is no different from a breach of contract plaintiff claiming that "benefit of the bargain" is a methodology. And multiple courts have rejected Dr. Feinstein's approach precisely because it does not answer the question of whether there actually exists a way to compute damages on a classwide basis consistent with any given plaintiff's theory of liability. *See* pp. 14-15, *infra*.

Dr. Feinstein himself concedes that he has not identified whether any particular methodology actually exists that would allow for the computation of classwide damages in this case. As he admitted at his deposition, the out-of-pocket damages model "doesn't necessarily tell you how you're going to operationalize it." Ex. 17, Feinstein Dep. Tr. 194:19-195:8. Nor does Dr. Feinstein deny that complicating facts and circumstances may exist in this case. Dkt. 99-1, Feinstein Report ¶¶ 202-13. Instead, his report states that "[t]o the extent there may be specific

issues complicating the quantification of artificial inflation encountered in the execution of the out-of-pocket damages methodology due to any potentially unique facts and circumstances of this case," he will apply "the standard tools of valuation analysis" to figure it out. *Id.* ¶ 208. But he does not identify which specific tool he would use or explain how he would use it. And he admitted at his deposition that his basis for believing that one of these tools actually *can* be used is speculative and based on analysts' use of some of these tools for entirely different purposes:

> Q: I'm not asking what you know, sir. I'm asking what you did. Have you actually applied any of these tools to compute damages on a classwide basis consistent with plaintiffs' theory of liability?
>
> A: In this case?
>
> Q: Correct.
>
> A: Well, you know, I answered that question earlier today. I have not conducted the loss causation or damages analysis, but I have opined that it absolutely can be done because I see analysts using the same valuation tools one would need to operationalize the out-of-pocket damages model is being used by analysts.
>
> Q: When you say that you see analysts using these tools, have you seen any analyst try to compute classwide damages consistent with plaintiffs' theory of liability in this case?
>
> A: You know the answer to that.
>
> A: I mean, of course, there's no analyst calculating damages for this case. Nobody's calculated damages for this case yet.

Ex. 17, Feinstein Dep. Tr. 200:13-201:17 (objections omitted). Dr. Feinstein also testified that "out-of-pocket damages" includes every conceivable valuation methodology that exists. *See id.* 244:10-20. That is not a methodology, but instead a tactic designed to *avoid* having to specify any actual methodology. Allowing a class to be certified based on an expert's promise that he will later derive a model would "reduce Rule 23(b)(3)'s predominance requirement to a nullity" in every securities case. *Comcast*, 569 U.S. at 36.

Moreover, there are at least four reasons why Plaintiffs' liability theory in this case

10

plainly presents challenges with calculating damages on a classwide basis.

*First*, Plaintiffs have alleged a "materialization of the risk" theory—i.e., a theory that the alleged misstatements were revealed to be false or misleading not by a public disclosure specifically correcting those earlier statements, but by the occurrence of the risk that was allegedly concealed. SAC ¶¶ 214-17; *see also Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179-80 (2d Cir. 2020) (describing a materialization-of-the-risk theory). Specifically, Plaintiffs allege that the earnings announcements on December 7, 2022, March 8, 2023, June 7, 2023, and September 26, 2023 were "corrective" because they represented a materialization of the risk that procurement gains from inflationary forward buying would decline. *See* SAC ¶¶ 214-17; Ex. 15, Zurek Report ¶¶ 123-30.

But there is an important distinction between the market's reaction to the public disclosure of a risk (i.e., the reaction to a disclosure of the possibility that an outcome *could* occur) and the market's reaction to the materialization of that risk (i.e., the reaction to learning that an outcome *did* occur). Ex. 15, Zurek Report ¶¶ 126-27. When a risk of an adverse outcome materializes, a company's stock price will generally decline even if that risk was fully disclosed to market participants, because at that point the negative outcome is guaranteed. *See id.* That is, the price will decline even if there was no prior inflation in the stock price. Thus, measuring artificial inflation by reference to the *full* stock price decline when the risk materializes will overstate any declines attributable to the alleged underdisclosure of a risk, and will therefore also overstate artificial inflation. *See id.*; *accord In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *10 (S.D. Tex. May 20, 2014) ("when the corrective event is the materialization of an understated risk, the stock price movement on the date of correction (i.e., on the date that the risk materialized) will not equate to inflation on the date of purchase unless the probability of the risk

11

materializing was 100 percent," which Plaintiffs do not allege here).

As applied here, this means that any alleged artificial inflation in UNFI's stock cannot be measured simply by evaluating the price declines following the December 7, 2022, March 8, 2023, June 7, 2023, and September 26, 2023 disclosures, even after eliminating sector-specific issues: that would still overstate any alleged inflation. Dr. Feinstein *agreed* that the stock price inflation attributable to the understatement of a risk may be different from the stock price impact attributable to the materialization of that risk, and he admitted that such a situation would "call[] for a case-specific analysis." Ex. 17, Feinstein Dep. Tr. 236:4-237:12. But he did not conduct that "case-specific analysis" here, and never established that a methodology accounting for this issue is even possible in this case.

*Second*, Plaintiffs alleged that the market learned new information about the allegedly under-disclosed risk that UNFI's financial performance would decline due to a loss of procurement gains through a series of partial corrective disclosures on four different dates (*see* SAC ¶¶ 214-18), but Dr. Feinstein has failed to provide a methodology that would account for these incremental disclosures. To measure damages in a manner consistent with Plaintiffs' alleged liability theory, any reliable damages methodology would need to be able to quantify how the incremental information disclosed affected the market's assessment of that risk going forward, as compared to the market's assessment if Defendants had made the additional disclosures that Plaintiffs argue should have been made earlier during the putative class period. Ex. 15, Zurek Report ¶ 129. For example, Plaintiffs allege that the market learned on March 8, 2023 that procurement gains had been driving gross margin and were not repeatable. The market's assessment of the risk that decreasing procurement gains would negatively impact UNFI was much higher after March 8. Yet Dr. Feinstein has offered no methodology for

12

isolating the amount of alleged artificial inflation, if any, that, under Plaintiffs' theory, still purportedly remained after March 8. Nor has he established that it could be done.

*Third*, there was entirely unrelated (i.e., "confounding") information disclosed to the market on the same day as each alleged corrective disclosure, including UNFI's announcements of earnings guidance misses (which have been dismissed from the case), changes in customer mix, elevated levels of shrink, and other Company-specific information that had nothing to do with procurement gains, but which negatively impacted UNFI's stock price. But Dr. Feinstein has not provided a methodology to eliminate the impact of that confounding information on the Company's stock price. Ex. 15, Zurek Report ¶ 130. Under Section 10(b), "a plaintiff will be allowed to recover only damages actually caused by the misrepresentation," and thus, "in determining recoverable damages," all other "contributing forces must be isolated and removed." *Miller v. Asensio & Co.*, 364 F.3d 223, 233 (4th Cir. 2004). Dr. Feinstein agreed that his damages model would need to be able to separate out any negative information about UNFI unrelated to the alleged fraud. Ex. 17, Feinstein Dep. Tr. 231:2-232:12. But he has not done that, and again has not established that it could be done here.

*Fourth*, Plaintiffs' proposed class includes both common stock and options, and Dr. Feinstein has provided no methodology for measuring classwide options damages. There are two distinct problems. First, Dr. Feinstein's "methodology" for options damages ties the value of the stock options to the value of the underlying UNFI stock, so his purported options methodology suffers from the same deficiencies described above. Ex. 15, Zurek Report ¶¶ 133-34. Second, as explained in Dr. Zurek's report, Dr. Feinstein's options "methodology" fails for the independent reason that he has failed to provide a reliable methodology capable of estimating stock price volatility. *Id.* at ¶¶ 135-46. This failure is critical because expected stock price volatility is an

13

important input to estimating the value of UNFI call and put options, as Dr. Feinstein conceded in his deposition. *Id.* at ¶ 136; Ex. 17, Feinstein Dep. Tr. 261:10-12. Nor did Dr. Feinstein explain how *any* approach would even be feasible on a classwide basis here given that implied volatilities for UNFI options vary across option types and over time, which would potentially necessitate the calculation of hundreds of volatility measures. Ex. 15, Zurek Report ¶¶ 138-46.

It is precisely because of issues like these that Dr. Feinstein's reliance on the general legal concept of "out of pocket damages," without specification of any particular damages methodology, has been rejected. *Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corp.*, where the court denied the plaintiffs' motion for class certification, is a case in point. 2018 WL 3861840, at *18-20 (N.D. Ohio Aug. 14, 2018). There, like here, Dr. Feinstein "describe[d] in his report various techniques he believes he could use to calculate out-of-pocket damages based on inflation that can be applied on a classwide basis to determine damages" under Section 10(b). *Id.* at *19. And there, like here, he asserted that there were "'valuation tools' available to measure damages" even though he had not actually identified any specific tools appropriate for the facts of the case, had not applied any particular tools, and had not performed the damages calculation. *Id.* The court recognized that this sort of "vague, indefinite, and unspecific" approach to damages "amounts to 'no damages model at all,'" and held that a "class cannot be certified." *Id.* (quoting *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 552 (C.D. Cal. 2014), and citing *Fort Worth Emps.'*, 301 F.R.D. at 142 (denying class certification in securities case: "without assurance beyond [plaintiffs' proffered expert]'s say-so, the Court cannot conclude that there is a damages model that will permit the calculation of damages on a classwide basis")).[6]

---

[6] At his deposition, Dr. Feinstein suggested that his UNFI report is different than in *Federal Home Loan Mortgage*, but the differences he identified are not material. In his UNFI report, Dr. Feinstein listed examples of "valuation

Judge Engelmayer reached the same conclusion in another securities case, *Sicav v. James Jun Wang*, 2015 WL 268855 (S.D.N.Y. Jan. 21, 2015). Although that plaintiff's theory of liability was different than Plaintiffs' here,[7] the analytical flaw in Dr. Feinstein's approach was the same: Dr. Feinstein did "not undertake a close analysis, or indeed any analysis, of the [specific facts] at issue *in this case*." *Id.* at *4 (emphasis in original). In addition, Dr. Feinstein and the plaintiffs had "not shown or explained, concretely, how damages would be calculated as to any individual purchaser," thus failing to satisfy their burden under *Comcast*. *Id.* at *6. Because Dr. Feinstein had not identified an actual methodology applicable to the facts of the case, the court could not "understand, concretely, how plaintiffs propose to reliably establish damages." *Id.* So too here.[8]

Plaintiffs have not presented a methodology capable of measuring damages on a classwide basis consistent with their theory of liability. At most, Dr. Feinstein has speculated that he *might* be able to do it at some later point in the litigation. That is not enough.

## II.    To The Extent Any Class Is Certified, Defendants Have Rebutted The Presumption Of Reliance For All Statements After March 8, 2023.

Plaintiffs argue that they are entitled to the fraud-on-the-market presumption to establish

---

tools" by name, such as "valuation multiple models," "discounted cash flow (DCF) models," and "event study analysis," whereas in *Federal Home Loan Mortgage* he simply said "valuation tools." *See* Ex. 17, Feinstein Dep. Tr. 249:24-253:22; Dkt. 99-1, Feinstein Report ¶ 210. But merely listing examples of valuation tools that *could* be appropriate does not establish whether one of those tools *would* be appropriate here.

[7] The *Sicav* plaintiff's claim was based on an insider trading theory. 2015 WL 268855, at *2.

[8] To be sure, some courts have accepted a general reference to "out of pocket damages" at the class certification stage. *See, e.g.*, *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 106 (S.D.N.Y. 2016). But these cases cannot be squared with the best reading of *Comcast* and more recent Supreme Court and Second Circuit cases underscoring the "rigorous analysis" required by Rule 23. *See, e.g.*, *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 594 U.S. 113, 122 (2021) (underscoring the rigorous analysis courts must conduct); *In re Petrobras Sec. Litig.*, 862 F.3d 250, 279, 260 n.11 (2d Cir. 2017) (emphasizing same). And other courts of appeals have recognized the importance of this issue. Both the Fourth and Sixth Circuits have recently certified for interlocutory appeal questions about what "evidentiary proof" is needed for securities plaintiffs to satisfy *Comcast*'s requirements. *See, e.g.*, *In re The Boeing Co. Sec. Litig.*, No. 25-135 (4th Cir. May 2, 2025); *In re Deloitte & Touche LLP*, No. 24-258 (4th Cir. Feb. 13, 2025); *Owens v. FirstEnergy Corp.*, No. 23-0303 (6th Cir. Nov. 16, 2023). And a petition for interlocutory appeal is pending before the Ninth Circuit, as well. *Wells Fargo & Co. v. SEB Inv. Mgmt. AB*, No. 25-3021 (9th Cir.).

reliance. Dkt. 98 at 12. But that presumption is rebutted with respect to every challenged statement after March 8, 2023. As a result, the reliance element must be litigated on an individualized basis after March 8, 2023, precluding class certification after that date.

> **A.** **Defendants Can Rebut The Fraud-On-The-Market Presumption Of Reliance By Showing That The Purported Corrective Disclosures Did Not Reveal New, Corrective Information.**

Whether an investor relies on an alleged misstatement is typically an individualized inquiry. In *Basic v. Levinson*, 485 U.S. 224 (1988), however, the Supreme Court established a presumption to avoid the issue of individualized questions "overwhelm[ing] common ones." *Halliburton II*, 573 U.S. at 276 (2014). Rather than forcing securities plaintiffs to prove reliance as to each class member individually, courts "can instead presume that stock trading in an efficient market incorporates into its price all public, material information—including material misrepresentations—and that investors rely on the integrity of the market price when they choose to buy or sell that stock." *Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 80 (2d Cir. 2023) ("*ATRS*"). But, as the Supreme Court and the Second Circuit have recently reiterated, this presumption is rebuttable. *See Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 594 U.S. 113 (2021); *ATRS*, 77 F.4th at 105 (reversing district court's certification order, concluding that district court failed meaningfully to apply the Supreme Court's guidance in *Goldman*).

The "essential precondition" for the presumption is the legal concept of "price impact."[9] *Halliburton II*, 573 U.S. at 282. If the alleged misrepresentation did not impact the price, there is "no grounding for any contention that the investor indirectly relied on that misrepresentation

---

[9] Price *impact* is not the same thing as price *reaction*. A "price *reaction*" is "the simple movement of the price in response to a given statement," which is "quite different from the legal concept of price *impact*." *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 612 (7th Cir. 2020) (emphases in original). Thus, simply showing that there was a statistically significant price reaction on a certain day does not establish price impact.

through his reliance on the integrity of the market price," and the presumption "completely collapses." *Id.* at 278, 282 (cleaned up). Thus, "[a]ny showing" that "severs the link" between a challenged statement and the stock price will "rebut the presumption" as to that statement. *Goldman*, 594 U.S. at 125. If a misrepresentation did not actually affect the market price, the presumption does "not apply," and certification is "inappropriate." *Halliburton II*, 573 U.S. at 269, 283. And when "assessing price impact at class certification," courts "must" consider "all probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense." *Goldman*, 594 U.S. at 122 (cleaned up). It does not matter "whether the evidence is also relevant to a merits question;" courts "may not use the overlap to refuse to consider the evidence," and cannot refuse "to decide the price impact issue."[10] *Id.* at 122 & n.2.

The content of the statements that allegedly reveal the fraud—i.e., the "corrective" disclosures—is relevant because securities plaintiffs—including Plaintiffs here—commonly try to establish price impact by "point[ing] to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation." *Goldman*, 594 U.S. at 123; *accord* Dkt. 98 at 21-22 ("[T]he artificial inflation caused by Defendants' misleading statements and omissions can be measured on a class-wide basis by analyzing the change in the stock price caused by a corrective disclosure."); Dkt. 99-1, Feinstein Report ¶ 211(ii). Thus, Plaintiffs' ability to establish a link between the alleged misrepresentations and the price at which UNFI securities traded—i.e., a "price impact"—is dependent on the corrective disclosures.

---

[10] Defendants bear the burden of persuasion to rebut the presumption of reliance, but the Supreme Court has emphasized that this fact "is unlikely to make much difference on the ground" because "[t]he district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Goldman*, 594 U.S. at 126-27.

17

A corrective disclosure will have price impact only if it contains information that is both *new* and *corrective*. Courts must analyze both issues before certifying a class. *See, e.g.*, *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *13 (S.D. Cal. Mar. 20, 2023) (no price impact where "there was public information [already] available . . . that mirror[ed] the corrective disclosures"); *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *12 (N.D. Cal. Mar. 11, 2024) ("[a] finding of 'back-end' price impact requires proof that the information disclosed" is both "corrective" and "new"); *Ramirez v. Exxon Mobil Corp.*, 2023 WL 5415315, at *20 (N.D. Tex. Aug. 21, 2023) (alleged corrective disclosure did "not offer any new corrective information").

***Newness.*** The *Basic* presumption is "premised on the understanding that in an efficient market, *all* publicly available information is rapidly incorporated into, and thus transmitted to investors through, the market price." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) (emphasis added). And because all publicly available information is rapidly incorporated into the market price, the reiteration of that same information later will not affect the price of the security. Ex. 15, Zurek Report ¶¶ 40-43; *accord In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2019 WL 5287980, at *39 (S.D.N.Y. Oct. 18, 2019) ("Reviewing this alleged corrective disclosure for 'newness,' I find that there was no new information provided by this alleged corrective disclosure … . [B]ecause there was no new information … this cannot serve as a corrective disclosure."), *report and recommendation adopted in part*, 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020). Thus, assuming an efficient market as Plaintiffs assert, a showing that the alleged corrective disclosure did not provide new information rebuts the *Basic* presumption.

***Correctiveness.*** To permit the inference that a securities plaintiff seeks—"that the back-end price drop equals front-end inflation"—the "contents" of the alleged misrepresentation and the corrective disclosure must match. *Goldman*, 594 U.S. at 123; *see also ATRS*, 77 F.4th at 80-

18

81 (explaining *Goldman*'s "mismatch framework"). To "match" an alleged misrepresentation, an alleged corrective disclosure must actually correct the alleged misrepresentation. That is, a corrective disclosure must release "information that reveals to the market the pertinent truth that was previously concealed … by the company's fraud." *Pub. Emps.' Ret. Sys. of Miss. v. Amedisys Inc.*, 769 F.3d 313, 321 (5th Cir. 2014). If the price decline was caused by something other than the "revelation of the truth," then it does not "raise an inference that the price was actually affected by" the alleged misrepresentation. *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F.3d 330, 336 (5th Cir. 2010), *vacated on other grounds by Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011). Consequently, if a defendant can show that a disclosure did not reveal the pertinent truth that was allegedly concealed by the purported fraud—but instead contained other negative news about the company—there is a "mismatch" that rebuts the existence of price impact. *Goldman*, 594 U.S. at 123; *see also, e.g.*, *In re Kirkland Lake Gold Sec. Litig.*, 2024 WL 1342800, at *11 (S.D.N.Y. Mar. 29, 2024) (denying certification because of a "substantive mismatch" between the "content" of the challenged statements and the alleged corrective disclosure). Moreover, "the generic nature of an alleged misrepresentation often will be important evidence of a lack of price impact." *Goldman*, 594 U.S. at 121-22. "[A] gap in genericness between misrepresentation and corrective disclosure reduces the likelihood that investors would understand the 'specific disclosure [to have] actually corrected the generic misrepresentation.'" *ATRS*, 77 F.4th at 99 (reversing certification order). Requiring a tight fit between the alleged misrepresentation and the alleged corrective disclosure is critical because it "avoids turning securities claims into a game of litigation-by-hindsight." *Id.* at 101.

      **B.     Plaintiffs Are Not Entitled To The *Basic* Presumption Of Reliance After March 8, 2023 Because No New, Corrective Information Was Disclosed After That Date.**

     As this Court recognized in its motion to dismiss ruling, Plaintiffs' theory of fraud is that

"Defendants misled investors" when UNFI "'put the drivers of its margins in play by speaking on the issue" while failing "to disclose that forward buying was a significant and aberrational driver of its margins.'" Dkt. 98 at 4 (quoting *Sills v. United Nat. Foods, Inc.*, 2024 WL 4188324, at *8 (S.D.N.Y. Sept. 13, 2024)); *see also Sills*, 2024 WL 4188324, at *7 ("These statements commented on the drivers of the Company's margins but never disclosed the Company's substantial reliance on gains from unsustainable inflation-based forward buying."). Dr. Feinstein offered a materially similar description of Plaintiffs' fraud theory in his report and during his deposition. *See* Dkt. 99-1, Feinstein Report ¶ 40 ("According to Plaintiffs, Defendants did not disclose that the Company's profitability depended heavily on unsustainable and atypical procurement gains."); Ex. 17, Feinstein Dep. Tr. 203:10-13 ("the but-for scenario would be the scenario where [the market was] told that gross margin was being increased via large-scale and undisclosed inflation-driven forward buying.").

This allegedly concealed information was fully disclosed by March 8, 2023. On that day UNFI disclosed that its margin gains from the prior year had been driven by inflationary forward buying and that those gains were not repeatable. As a result, the June 2023 and September 2023 alleged corrective disclosures did not offer any *new*, *corrective* information. Instead, those alleged corrective disclosures repeated information already disclosed on March 8, 2023, or disclosed new information that was not corrective—i.e., it did not reveal the falsity of any alleged misstatement. Thus, Defendants have severed the link between the alleged misstatements and the market price after March 8, 2023, and if any class is certified, the class period must end on March 8, 2023. *See In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at *7 (S.D. Tex. Feb. 9, 2024) ("In the case of a securities fraud class action … a class period ends when the truth has been disseminated to the market.").

### 1.    *The Alleged Truth Was Fully Revealed On March 8, 2023.*

On March 8, 2023, UNFI disclosed that its profitability had been driven in significant part by procurement gains from inflation-related forward buying and that those gains were not sustainable. Specifically, in its Q2 2023 earnings release, UNFI reported a year-over-year reduction in gross margin, attributable mostly to the loss of "significant" inflation-related forward-buying opportunities that had benefited gross margin over the prior year. Ex. 8, Q2 2023 Earnings Release at 1. In addition, during the earnings conference call, UNFI executives explained that the Company's "reduced profitability this quarter was primarily driven by a lower gross profit rate, as [it] did not repeat the level of significant procurement and inventory gains experienced last year." Ex. 9, Q2 2023 Earnings Call Tr. 4. They further explained that "[p]rofits were challenged as [the Company] did not repeat the significant level of procurement gains from rapidly accelerating inflation and inventory gains." Ex. 8, Q2 2023 Earnings Release at 1.

That same day, UNFI also disclosed that the financial effects of fewer forward-buying opportunities would persist: UNFI executives stated during the earnings conference call that the procurement gains UNFI had experienced from inflationary forward buying in the prior year "are not repeatable in the current environment," and that the Company "expect[ed] to see similar trends in profitability[] for the remainder of the year, as [it] continues to lap periods of significant benefits from procurement gains as price increase activity further decelerates." Ex. 9, Q2 2023 Earnings Call Tr. 4-5. They further disclosed that "the third and fourth quarters will also be adversely impacted by these declining inflation dynamics." *Id.* at 6. And, "[a]s a result of these challenges," the Company was "reducing [its] profitability expectations for fiscal 2023 and withdrawing [its] 2024 targets." Ex. 8, Q2 2023 Earnings Release at 1.

As Defendants' expert Dr. Paul Zurek explains, UNFI's March 8, 2023 disclosures revealed that inflation-related forward buying had been a significant but temporary driver of

21

improvements in UNFI's gross margin in prior quarters. Ex. 15, Zurek Report ¶¶ 54-62. This is the information that Plaintiffs argue should have been disclosed earlier in the proposed class period. *See* Dkt. 66 at 16. And given Plaintiffs' contention that the markets for UNFI securities were efficient, this information would have been fully incorporated into the price of UNFI securities by March 8, 2023, and could not have impacted the prices of any UNFI securities after that date. Ex. 15, Zurek Report ¶ 62. "[D]isclosure of purportedly omitted information before a stock drop demonstrates a lack of price impact." *Fibrogen*, 2024 WL 1064665, at *12.

Plaintiffs concede the allegedly-concealed information was disclosed by March 8, 2023. They allege that the March 8 "Press Release disclosed that the decrease in the Company's 2Q23 gross profit rate had been 'primarily driven by lower current period procurement gains due to the decelerating rate of inflation and lower inventory gains,'" and that by "attributing the 2Q23 earnings miss to lower procurement gains, the Company admitted that its prior year period … had materially benefited from 'significant' procurement gains." SAC ¶¶ 91-93. They also allege that "Defendants admitted … on March 8, 2023 that UNFI had previously benefited from significant procurement gains and that they were 'not repeatable in the current environment,' leading to substantial gross margin decline." *Id.* ¶ 239.

Analyst commentary reinforces the same. *See Kirkland*, 2024 WL 1342800, at *9 (considering analyst commentary in assessing lack of price impact). Multiple analysts, including BTIG, Goldman Sachs, and UBS, echoed that UNFI's March 8, 2023 disclosures revealed that inflation-related forward buying had been a significant but unsustainable driver of UNFI's gross margin. Ex. 15, Zurek Report ¶¶ 65-67. Analysts also noted that the loss of procurement gains from inflation-related forward buying would persist as inflation continued to decelerate. *Id*. For example, Seaport stated: "The primary factor driving lower earnings during [Q2 2023] and over

22

the next 12 months is the lapping of significant inventory gains from surging procurement inflation during 2022. Inflation is now decelerating rapidly, and large, incremental procurement income is not repeatable going forward." Ex. 18, Seaport March 9, 2023 Report at UNFI-0004832; Ex. 15, Zurek Report ¶ 66. Similarly, Goldman Sachs commented that UNFI's gross margin decline was "primarily" attributable "to elevated procurement gains in the prior year related to inventory buying ahead of rising inflation, which is not repeatable in the current disinflationary environment." Ex. 19, Goldman Sachs March 8, 2023 Report at UNFI-0004814; Ex. 15, Zurek Report ¶ 67.

Lead Plaintiff Sills himself understood the March 8, 2023 disclosures the same way. In text messages sent just days after the March 8, 2023 earnings release, Sills said that UNFI was experiencing "a margin reset driven by inflation and pricing that they won't get" in the future. Ex. 20, at PLTF_UNFI_003870. He also recognized that the decline in inflationary forward buying opportunities would cause "issues for some time"—"[a]t least" a "couple quarters"—because UNFI did not "know the scope of the problems yet due to their systems." *Id.* His friend responded similarly, writing to Sills that UNFI "did not fully appreciate the benefit to last year's gross profit from buying inventory in advance of supplier increases in [a] sequentially rising inflationary environment," and "it didn't benefit [UNFI] to commit buying inventory way ahead. That was the biggest factor for gross margin decline." *Id.*

Because the evidence shows that the allegedly-concealed information was fully revealed on or by March 8, 2023, Defendants have rebutted the presumption of reliance for the period after March 8, 2023, and any class should be limited to that end date. *Fibrogen* is instructive. There, the plaintiffs sought to certify a class from December 20, 2018 to July 15, 2021. 2024 WL 1064665, at *1. The defendant did not contest market efficiency, but argued that any class should

23

be cut off at April 6, 2021 because the allegedly-concealed information had been revealed by that date. *Id.* at *9. The court agreed, finding that the information had been disclosed by then and that, under the efficient market hypothesis, it would have been rapidly incorporated into the market price. *Id.* at *13-15. Thus, the defendant "carried its burden to rebut the presumption of reliance" and "the portion of the proposed class after April 6, 2021 is not proper for certification due to a lack of predominance." *Id.* at *15. Other courts have reached the same conclusion. *See, e.g.*, *Apache*, 2024 WL 532315, at *9-11 (limited class period because later purported corrective disclosures did not reveal any new, corrective facts); *Qualcomm*, 2023 WL 2583306, at *13 (limiting class where certain alleged corrective disclosures "only repeated already public information"); *Yi Xiang v. Inovalon Holdings, Inc.*, 327 F.R.D. 510, 521 (S.D.N.Y. 2018) (shortening class period where allegedly-concealed facts had been previously disclosed).

### 2.    *The June 2023 And September 2023 Alleged Corrective Disclosures Did Not Reveal New, Corrective Information.*

Plaintiffs seek to certify a class period through September 25, 2023, and have alleged that UNFI's disclosures on June 7, 2023 and September 26, 2023 are corrective disclosures—even though, unlike in most other cases where a plaintiff argues that "corrective" disclosures occurred across multiple quarters, Plaintiffs here do *not* argue that any false or misleading statement was made on or after March 8, 2023. *See* SAC ¶¶ 216-17. Rather, Plaintiffs overreach by seeking to certify a class—and thereby inflate their claim for damages—for a period that extends well beyond March 8, 2023, based on the argument that the "truth" somehow continued to be revealed on later dates. But neither Plaintiffs' motion nor Dr. Feinstein's report addresses price impact head-on. And none of the information disclosed by UNFI on these days was new, corrective information.

On June 7, 2023, UNFI reported its financial results, which were down year-over-year as

24

compared to Q3 2022. Ex. 10, Q3 2023 Earnings Release at 1. UNFI also revised downward its FY2023 earnings guidance. *Id.* at 3-4, 14-15. It explained that the Company's "profitability was impacted by a greater than expected decline in gross margins reflecting a challenging operating and macroeconomic backdrop, which contributed to lower inflationary benefits primarily related to reduced procurement gains, as well as higher shrink." *Id.* at 1. During the earnings conference call, UNFI executives attributed the Q3 2023 financial results and FY2023 guidance revision to multiple factors, including "a rapidly changing and volatile external environment," "significant and unexpected slowing in wholesale commodity inflation," "higher-than-expected shrink," and "limited ability to understand the recent volatility" due to complex data systems associated with a prior acquisition. Ex. 11, Q3 2023 Earnings Call Tr. 4-5; Ex. 15, Zurek Report ¶ 78.

To the extent these disclosures discussed procurement gains, they simply reiterated what was previously disclosed on March 8, 2023—that UNFI had benefited from significant inflation-related forward-buying opportunities that were not sustainable, which continued to impact its performance compared to the same quarter a year earlier. And to the extent the disclosures discussed factors *other* than procurement gains, they were not corrective of the alleged false or misleading statements. *See, e.g.*, *Kirkland*, 2024 WL 1342800, at *11 ("As the Minimum Standards statement referred to future targets, rather than rigid requirements at the time of acquisition, there is a mismatch in content between the statement and the corrective disclosure … ."). Plaintiffs do not allege that Defendants wrongly concealed anything about shrink or the Company's data systems. And the risk that data systems would limit the Company's forecasting abilities had been disclosed in March 2023 in any event. Ex. 15, Zurek Report ¶ 91.

The same is true for the September 26, 2023 disclosures. On that day UNFI reported its financial results, which were down year-over-year as compared to Q4 2022, but which were in

line with the revised guidance the Company had issued in June 2023. Ex. 12, Q4 2023 Earnings Release at 1. It explained that its "profitability declined primarily due to a decrease in inflation driven procurement gains and elevated shrink." *Id.* The Company also issued guidance for FY2024, explaining that its guidance was influenced by multiple factors, including the impact of moderating inflation and the normalization of performance-based incentive compensation. *Id.* at 3-4. Again, to the extent any of these disclosures discussed procurement gains, the information was not new, and the new information that was disclosed was not corrective.

Plaintiffs try to salvage their elongated class period by arguing that in June 2023 UNFI "reduced its fiscal 2023 outlook again," which "further revealed the extent to which UNFI's prior results had been benefited by UNFI's 'strategic' forward buying and the extent to which the benefit had masked other problems impacting UNFI's profitability" (SAC ¶ 216), and in September 2023 disclosed new FY2024 expectations (SAC ¶ 217). Defendants do not dispute that UNFI downwardly adjusted its FY2023 guidance in June 2023 and issued new FY2024 guidance in September 2023. But this "new" information, regarding the precise degree to which the Company's performance in Q3 2023 was impacted and anticipated performance in FY2024 may be impacted because inflationary forward-buying opportunities had dissipated, does not *match* any challenged statement. *See Apache*, 2024 WL 532315, at *9 ("revealing the depths of Apache's financial struggles did not shed any new light on Apache's alleged misrepresentations"). This Court already found the guidance statements not actionable. *See* Dkt. 66 at 29. And while Plaintiffs assert that the revised FY2023 and new FY2024 guidance provided information on the "extent"—or magnitude—to which inflationary forward buying impacted margin, the challenged statements do not purport to quantify or otherwise address the relative degree to which margin was impacted by any factor, including inflationary forward

26

buying. Thus, these later disclosures do not *match* any challenged statement—the same flaw that required decertification in *ATRS*.

Instead, the challenged statements speak generically about profit drivers, profit sustainability, and risk factors. For example, the challenged profit driver statements explain that "[t]he increase in gross margin rate was driven by improvements in the Wholesale segment margin rate, the impact of inflation and the Company's ValuePath initiative." *See, e.g.*, SAC ¶ 143. Similarly, the profit sustainability statements speak broadly about whether the decrease in gross margin was temporary, describing a decrease in gross margin as "minor and just more a function of the temporary growth drivers in our customer file." *See, e.g.*, *id.* ¶ 197. The risk factor statements likewise speak generally about risks such as "moderated supplier promotional activity, including decreased forward buying opportunities." *See, e.g.*, *id.* ¶ 151. None of the challenged statements purport to speak on the *specific extent* that profit drivers or risk factors impacted margin, or the *specific extent* to which particular drivers impacted profit sustainability. As a result, an "equally generic" substitute for the challenged statements would not speak to the *extent* that inflationary forward buying drove profit margin, impacted profit sustainability, or was a risk. *See Kirkland*, 2024 WL 1342800, at *7. Rather, an equally generic substitute would disclose exactly what UNFI disclosed on March 8, 2023: that inflationary forward buying was a significant but temporary driver of margin.

Because there is a mismatch between the generic challenged statements and the specific new information, the presumption of classwide reliance has been rebutted and individual issues predominate for the June and September 2023 disclosures. *See, e.g.*, *id.* at *8-11 (denying certification where generic challenged statements did not match specific corrective disclosures).

### C.    The *Affiliated Ute* Presumption Does Not Apply.

Plaintiffs argue in the alternative that the *Affiliated Ute* presumption of reliance, rather

27

than the *Basic* presumption, provides an "independently sufficient" basis for class certification because their claims "involve" alleged omissions. Dkt. 98 at 11, 20. They are wrong. *Affiliated Ute* applies in cases involving "*primarily a failure to disclose*" rather than alleged misrepresentations—i.e., "pure omission" claims. *Waggoner v. Barclays PLC*, 875 F. 3d 79, 95-96 (2d Cir. 2017) (quoting *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972)). This presumption applies "sparingly," *Youngers v. Virtus Inv. Partners Inc.*, 2017 WL 5991800, at *8 (S.D.N.Y. Dec. 4, 2014), and does not apply where, as here, Plaintiffs are alleging that Defendants' affirmative statements are false or misleading by omission. *Compare* Dkt. 66 at 14 ("The challenged statements in the first, second and third categories are actionable because they are plausibly misleading half-truths about topics that Defendants put into play."), *with Waggoner*, 875 F.3d at 96 ("The *Affiliated Ute* presumption does not apply to earlier misrepresentations made more misleading by subsequent omissions, or to what has been described as 'half-truths,' nor does it apply to misstatements whose only omission is the truth that the statement misrepresents."); *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 663 F. Supp. 3d 334, 366 n.18 (S.D.N.Y. 2023) (holding *Affiliated Ute* limited to pure-omissions cases).

Plaintiffs' authority does not suggest otherwise. *See* Dkt. 98 at 20-21. *In re Dynex Capital Inc. Securities Litigation*, 2011 WL 781215, at *7 (S.D.N.Y. Mar. 7, 2011), was decided before the Second Circuit's decision in *Waggoner*. In *Hawaii Structural Ironworkers Pension Trust Fund, Inc. v. AMC Entm't Holdings, Inc.*, defendants did not contest that the *Affiliated Ute* presumption applied. 338 F.R.D. 205, 216 (S.D.N.Y. 2021). And in *Puddu v. NYGG (Asia) Ltd.*, the alleged misrepresentations did "not form the 'actionable events' underlying the plaintiffs' claims." 2022 WL 2304248, at *4 (S.D.N.Y. June 27, 2022). Here, they do, because Plaintiffs have alleged that affirmative statements regarding the drivers of margin, profitability

28

sustainability, and risk factors were misleading. *See, e.g.*, SAC ¶¶ 143-44, 151-52, 165-66; Dkt. 66 at 12-18. Thus, as in *Waggoner*, Plaintiffs are "not in a situation in which it is impossible for them to point to affirmative misstatements." 875 F.3d at 96.

## III.    The Class Representatives Are Inadequate And Atypical.

Plaintiffs' motion should also be denied because they fail to establish that the proposed class representatives—Lead Plaintiff Dan Sills and Additional Plaintiff George Dick—are adequate and typical. Neither proposed class representative has adequately supervised this lawyer-driven litigation. And Lead Plaintiff Sills is subject to a unique defense that renders him atypical and inappropriate to represent the interests of absent class members.[11]

### A.    Plaintiffs Have Not Adequately Supervised This Lawyer-Driven Litigation.

Adequacy "is widely considered the most important of the Rule 23(a) factors because it directly implicates the due process rights of absent class members who will be bound by the judgment." *Gordon v. Sonor Cap. Mgmt. LLC*, 92 F. Supp. 3d 193, 198 (S.D.N.Y. 2015). A class representative must have at least "a minimal degree of knowledge regarding the action and also have a general understanding of the nature of class-action litigation." *Scott v. N.Y.C. Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 357 (S.D.N.Y. 2004) (citations omitted) (denying class certification after finding the class representatives inadequate because they "lacked familiarity with the facts and nature of their action," rendering them "essentially superfluous"). Accordingly, certification should be denied "where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys."

---

[11] Rule 23 requires a more rigorous assessment than the early appointment of a lead plaintiff. *See In re Crayfish Co. Sec. Litig.*, 2002 WL 1268013, at *4 (S.D.N.Y. June 6, 2002) (explaining different levels of review); *Z-Seven Fund, Inc. v. Motorcar Parts & Accessories*, 231 F.3d 1215, 1218-19 (9th Cir. 2000) ("a lead plaintiff appointed originally might turn out to be an inadequate class representative").

*Maywalt v. Parker & Parsley Petro. Co.*, 67 F.3d 1072, 1077-78 (2d Cir. 1995) (cleaned up). [12]

Neither Sills nor Dick has demonstrated the requisite familiarity with the most basic facts of this case. Sills did not know when the initial complaint was filed (Ex. 16, Sills Dep. Tr. 47:6-11), and did not decide to amend the claims (*id.* at 48:8-12). He did not select the putative class period or know why his attorneys expanded the class period to capture the stock drops on June 7, 2023, and September 26, 2023. *Id.* at 115:5-117:8, 135:12-17. And he repeatedly admitted that he did not independently verify or investigate the allegations. *Id.* at 112:3-8, 124:25-125:6, 134:16-19. He had never heard of Plaintiffs' expert, Steven Feinstein. *Id.* at 92:22-24. And despite Plaintiffs filing two erratas correcting his list of transactions of UNFI securities as required by the PSLRA, Sills testified that he never authorized any such revisions. *Id.* at 113:14-16 ("Q: Have you ever authorized any revisions to this list of transactions? A: I have not.").

Dick also lacks familiarity with the case. He repeatedly testified that he just defers to "counsel on as to how they go about and prosecute the case" (Ex. 21, Dick Dep. Tr. 206:19-207:2), including deferring to counsel on which statements to allege are false or misleading (*id.* at 207:3-8), how to define the putative class period (*id.* at 207:9-13), and whether to file or respond to motions (*id.* at 207:14-23). In fact, he admitted that he lets the "attorneys handle the legal matters on this, and where I was asked to sign, I signed." *Id.* at 191:6-21; *see also* 204:19-21 ("A: My legal team prepared it. Q: And you just signed off on it? A: Yes.").

Dick admitted that he does not know how many complaints have been filed (*id.* at 141:9-11), when they were filed (*id.* at 137:17-19, 141:17-142:3), or why the complaint was amended multiple times (*id.* at 143:12-144:3). He also admitted that he did not independently investigate

---

[12] In adopting the PSLRA, Congress found that "class counsel too frequently controlled securities class actions leading to various abuses." Charles Alan Wright et al., 7A Federal Practice & Procedure § 1766 (4th ed. section updated May 20, 2025).

or verify the allegations (*id.* at 189:25-190:4, 202:21-24), and does not have an independent understanding of the alleged misstatements (*id.* at 198:6-14, 205:6-16) or the claims (*id.* at 157:10-158:8). He also testified he has "no role in any motions made" or "in reviewing the rulings by the court" (*id.* at 257:23-258:8). As a result, he did not know whether Defendants filed a motion to dismiss (*id.* at 257:7-22), has never seen Plaintiffs' motion for class certification (*id.* at 259:7-16), and also had never heard of Plaintiffs' expert (*id.* at 263:12-18).

Plaintiffs' lack of familiarity with the action reveals they are unable to adequately protect the interests of putative class members. *See, e.g.*, *Gordon*, 92 F. Supp. 3d at 200 (class representative inadequate where they were unfamiliar with key events and case details); *Scott*, 224 F.R.D. at 356 (class representatives inadequate where they displayed an "alarming lack of familiarity with the suit"); *Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298, 302 (S.D. Tex. 2000) (class representatives inadequate where they did "not participate in litigation decisions" and "learn[ed] of activity in the case when they are copied on matters already completed").[13]

### B.    Lead Plaintiff Sills Is Atypical Because He Is Subject To A Unique Reliance Defense.

Class certification should also be denied where, as here, the plaintiff is "subject to unique defenses which threaten to become the focus of the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000) (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990), *abrogated on other grounds by Microsoft Corp. v. Baker*, 582 U.S. 23 (2017)). Lead Plaintiff Sills is atypical because he is subject to a unique defense of non-reliance: he was an idiosyncratic investor who

---

[13] Dick also suffers from character issues. "To judge the adequacy of representation, courts may consider the honesty and trustworthiness of the named plaintiff." *Savino v. Computer Credit, Inc.*, 164 F. 3d 81, 87 (2d Cir. 1998). ██████████████████████████████████████████ *See, e.g.*, Ex. 21, Dick Dep. Tr. 68:19-69:2, 76:19-77:18, 87:6-23, 88:23-89:10, 98:22-99:12, 126:7-11, 131:2-9. ███████ ████████████████████████████████ *Id.* at 78:7-12.

31

believed UNFI's stock price was systematically undervalued, and he purchased UNFI securities even after the alleged truth was revealed on March 8, 2023.

Courts in this Circuit have long held that non-reliance defeats typicality. *See, e.g.*, *Gary Plastic*, 903 F.2d at 179-80 (affirming denial of class certification on typicality grounds where plaintiff was subject to defense of non-reliance); *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) ("[A] named plaintiff who is subject to an arguable defense of non-reliance on the market has been held subject to a unique defense, and therefore, atypical of the class … ." (citation and internal quotation marks omitted)); *Kamerman v. Ockap Corp.*, 112 F.R.D. 195, 198 (S.D.N.Y. 1986) ("[W]here as here, a proposed class representative did not rely on the allegedly misleading [] statement or on the integrity of the market, the proposed representative is subject to unique defenses and may not represent the class.") (collecting cases). This is because the presumption of reliance does not apply where a "plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud." *Halliburton II*, 573 U.S. at 269. Sills's post-disclosure purchases of UNFI stock and contemporaneous statements demonstrate that he is subject to this unique defense.

Sills purchased at least 9,500 shares of UNFI stock, spending nearly $250,000, after the alleged fraud was fully revealed on March 8, 2023. *See* Ex. 16, Sills Dep. Tr. 287:8-290:4; Dkt. 96-1. And he continued to purchase UNFI stock after the putative class period. *See* Ex. 16, Sills Dep. Tr. 235:2-20. His continued purchases after March 8 suggest "the alleged misstatements or omissions were really not a factor in the purchasing decision but rather that other investment considerations drove the decision." *George v. China Auto. Sys., Inc.*, 2013 WL 3357170, at *6 (S.D.N.Y. July 3, 2013) (declining certification on this basis); *see also, e.g.*, *Gary Plastic*, 903 F.2d at 179-80 (affirming denial of class certification where the class representative was subject

32

to unique defenses because of its "continued purchase of CDs through Merrill despite having notice of, and having investigated, the alleged fraud"); *Rocco*, 245 F.R.D. at 136 (declining to certify a class and explaining that "post-class purchases indicate, if anything, that [plaintiff] was relying not on the market, but on his own assessment of the value of the stock").

This unique defense is especially applicable here where Sills's post-disclosure purchases come on the heels of repeated contemporaneous statements that he thought the market for UNFI securities was being manipulated by short sellers and the stock was undervalued. *See* Ex. 16, Sills Dep. Tr. 258:9-262:5, 302:14-304:22, 307:21-312:2; Ex. 20, at PLTF_UNFI_003846, -50, -54; Ex. 22, Stocktwits Profile at 4, 16; Ex. 16, Sills Dep. Tr. 298:17-299:23 (confirming Dan9998 is Sills's username on Stocktwits, a stock message board). In fact, he made purchases just days after acknowledging that inflationary forward buying was a major driver of UNFI's margin and that UNFI's financial performance would continue to decline as a result of this phenomenon, all of which suggests that his investment decisions were not being driven by the challenged statements or the market price. *See* Ex. 20, at PLTF_UNFI_003870 (writing that UNFI was experiencing "a margin reset driven by inflation and pricing that they won't get," that would cause "issues for some time"—"[a]t least" a "couple quarters"). This idiosyncratic investing behavior make him atypical and an inappropriate class representative.

**CONCLUSION**

Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel should be denied. If any class is to be certified, it should be limited to the period from December 8, 2021 to March 8, 2023. Nor should Sills and Dick be appointed class representatives.

Dated: June 13, 2025
     New York, New York

Respectfully submitted,

*/s/ Nilofer I. Umar*
Francesca Brody
Vincent Margiotta
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
fbrody@sidley.com
vmargiotta@sidley.com

Nilofer I. Umar (admitted *pro hac vice*)
Neil H. Conrad (admitted *pro hac vice*)
William J. Lawrence (admitted *pro hac vice*)
Claire G. Lee (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
numar@sidley.com
nconrad@sidley.com
bill.lawrence@sidley.com
claire.lee@sidley.com

*Attorneys for Defendants*

34