# Exhibit 17

Page 1

UNITED STATES DISTRCT COURT
SOUTHERN DISTRICT OF NEW YORK


*********************************

DAN SILLS and GEORGE DICK,
individually and on behalf of
all others similarly situated,

Plaintiffs

vs.                    NO. 1:23-cv-02364-JGLC-VF

UNITED NATURAL FOODS, INC.;
J. ALEXANDER MILLER DOUGLAS;
JOHN W. HOWARD; and
CHRISTOPHER P. TESTA,

Defendants

*********************************


VIDEOTAPED DEPOSITION OF:

STEVEN P. FEINSTEIN, PH.D.

SIDLEY AUSTIN LLP

60 State Street

Boston, Massachusetts

May 9, 2025        9:06 a.m.


Darlene M. Coppola, RPR, RMR, CRR

Page 2

APPEARANCES:

Representing the Plaintiffs and the Witness:

GLANCY PRONGAY & MURRAY LLP
1925 Century Park East
Suite 2100
Los Angeles, CA  90067
BY:  KARA WOLKE, ESQUIRE
     MELISSA WRIGHT, ESQUIRE
     CASEY E. SADLER, ESQUIRE
T  310.201.9150
E kwolke@glancylaw.com
  mwright@glancylaw.com
  csadler@glancylaw.com

Representing the Defendants:

SIDLEY AUTSIN LLP
One South Dearborn
Chicago, IL  60603
BY:  NILOFER UMAR, ESQUIRE
     NEIL H. CONRAD, ESQUIRE
T 312.853.7579
E numar@sidley.com
  nconrad@sidley.com

Page 3

Also Present:
Pavithra Rajesh (Via Remote Realtime)
Samer Semann (Via Zoom)

Page 4

INDEX
EXAMINATION

Witness Name                                Page
STEVEN P. FEINSTEIN, PH.D.
  Direct By Ms. Umar ................................ 6

EXHIBITS

Exhibit      Description              Page
Exhibit 1      Expert report of          7
               Steven P. Feinstein, Ph.D.

Exhibit 2      UNFI earnings press       140
               release
Exhibit 3      Court filing              247
Exhibit 4      "Report on Market         275
               Efficiency," Professor
               Steven Feinstein,
               Ph.D., CFA, dated
               May 5, 2021

Page 5

PROCEEDING

(Commencing at 9:06 a.m.)

THE VIDEOGRAPHER:  Good morning. We are now on the record.

This is the videographer speaking, Gayle Ashton with Veritext Legal Solutions. Today's date is May 9, 2025, and the time is 9:06 a.m.  We are here at Sidley Austin, 60 State Street, Boston, Massachusetts, to take the video deposition of Steven P. Feinstein in the matter of Dan Sills, et al., versus United Natural Foods, et al.

Would counsel please introduce themselves for the record.

MS. UMAR:  Nilofer Umar of Sidley Austin for defendants.

MR. CONRAD:  Neil Conrad from Sidley Austin on behalf of defendants.

MS. WOLKE:  Kara Wolke from Glancy Prongay & Murray for plaintiff and the witness.

2 (Pages 2 - 5)

Page 6

MS. WRIGHT: Melissa Wright from Glancy Prongay & Murray for the plaintiff and the witness.

MR. SADLER: Casey Sadler from Glancy Prongay & Murray on behalf of plaintiffs and the witness.

THE VIDEOGRAPHER: Would the court reporter, Darlene Coppola, please swear in the witness.

STEVEN P. FEINSTEIN, PH.D., a witness called for examination by counsel for the Defendants, having been satisfactorily identified by the production of his driver's license and being first duly sworn by the Notary Public, was examined and testified as follows:

THE STENOGRAPHER: Thank you. You may proceed.

DIRECT EXAMINATION

BY MS. UMAR:

Q.  Good morning, sir.  Can you please

Page 7

state your full name for the record?

A.  Steven Philip Feinstein.

Q.  Sir, how many times have you been deposed as an expert?

A.  Many.

Q.  When was the most recent deposition?

A.  Just a couple of weeks ago.

Q.  Okay.  So given your experience with depositions, if you will agree, I'll dispense with the typical instructions.

A.  Sure.

Q.  I will ask that if I pose a question to you that you don't understand, can you please let me know, and I'll endeavor to rephrase it for you?

A.  I will.

MS. WOLKE:  Sir, I'm going to hand you a document that I'm going to mark as Exhibit 1 for today's deposition.

(Exhibit No. 1 marked for identification.)

BY MS. UMAR:

Page 8

Q.  Professor, is this the expert report you prepared in this matter?

A.  Yes, it is.

Q.  And if you turn to page 60, that's your signature, correct?

A.  It is.

Q.  And this report includes Exhibits 1 through 21 and an Appendix 1, correct?

A.  Yes.

Q.  Have you reviewed this report since you filed it?

A.  Yes.

Q.  When was your most recent review?

A.  Yesterday.

Q.  Based on that review, is there anything that you need to amend or supplement?

A.  No.

Q.  Does this report contain a complete statement of the opinions that you're currently offering?

A.  Yes.

Q.  Does it contain the basis and the reasons for those opinions?

Page 9

MS. WOLKE:  Object to form.

A.  I believe so.

BY MS. UMAR:

Q.  Does it contain the facts or data that you considered in offering those opinions?

A.  It cites to the data and documents. There's an exhibit that lists data and documents considered.

Q.  Does this include all of the exhibits that will be used to summarize or support your opinions?

MS. WOLKE:  Object to form.

A.  I don't know.

BY MS. UMAR:

Q.  And why don't you know, sir?

A.  Well, perhaps something will be raised today that I will want to respond to or use to supplement or revise opinions in the report. I know that discovery is ongoing, and as I say in the report, if any information or arguments arise or that I become aware of that would cause me to change any opinions or augment my opinion, I would hope I would have the opportunity to do so.

3 (Pages 6 - 9)

Page 10

Q. Let's focus on the opinions you're offering today as of now, sitting here in the room.

Does this include all of the exhibits that you are using to summarize or support those opinions?

MS. WOLKE: Object to form.

A. Well, contain -- by "contain," I -- well, let me ask.

By "contain," do you mean also refer to? Because the exhibits are not in the report; they're cited in the report.

Q. Correct.

Does it contain or otherwise reference all of the exhibits that are used -- that you are using today to summarize or support your opinions?

A. Yes.

Q. Okay. There are no opinions that you are offering today that are not contained in this report, correct?

MS. WOLKE: Object to the form.

A. Well, that also depends. I mean, if -- I would think so. But if you ask me a

Page 11

question that I know about that's not in the report, I'll do my best to answer it.

BY MS. UMAR:

Q. Okay. And, again, I am simply asking you, sir, to focus on the opinions that you're offering in your report.

You, sitting here right now in this room, don't have any opinions that you intend to offer that are not contained in this report, correct?

A. I think that's correct. But I will endeavor to answer questions, if I can answer them, based on what's in the report even if the answers are not in the report unless you don't want me to. Then I'll do that too.

Q. No, sir. That's not what I'm suggesting.

I simply want to make sure that, to the extent that you are sitting here today offering opinions, those opinions are contained in this report. It's a very basic question.

A. I think the answer is yes.

Q. Okay. Have you been asked to

Page 12

undertake any analysis since the date of your report?

A. No.

Q. Have you done any other work on this case since you submitted the report other than preparing for this deposition?

A. No.

Q. Have you been asked to prepare a rebuttal report in the event that defendants file an expert report with their opposition to plaintiffs' motion for class certification?

MS. WOLKE: Object to form.

A. No.

BY MS. UMAR:

Q. You were hired by the Glancy firm to draft this report, correct?

A. Well, to conduct analysis. I mean, the scope of the engagement is written in the report. I was asked to conduct analysis, answer some questions based on that analysis, and write a report such as this one that has the answers and support for my opinions.

Q. Okay.

A. And a description of the analysis that

Page 13

led to the conclusions.

Q. Fair enough. And I'm just focusing on who engaged you, sir.

Did Glancy engage you in connection with the work that you describe in your report?

A. Yes.

Q. Okay. When were you first contacted in this matter?

A. I was just thinking about that. It was either December or January, last December or last January.

Q. And who from Glancy contacted you?

A. I believe it was Attorney Wolke. But I -- there may have been others on the call. I don't recall specifically.

Q. And when you were contacted by Attorney Wolke or others from Glancy in connection with your potential engagement, what were you asked to do?

MS. WOLKE: Object to form.

A. To consider whether I would have the time to conduct economic analysis to answer the usual questions that are asked at a

4 (Pages 10 - 13)

Page 14

preclass certification in a securities case.
BY MS. UMAR:
Q.  And --
MS. WOLKE:  I just want to --
the scope of his engagement is described in
the report.  And to the extent you're asking
for communications between us and him beyond
what he describes, like --
MS. UMAR:  Yeah, I'm not
intending to delve into the privilege.  I'm
just trying to get into the scope of the
engagement.
MS. WOLKE:  Okay.
MS. UMAR:  So, you know, if you
feel as though any of my questions call for
privileged information, we can talk about
that.  That's not what I'm trying to get into
by any means.  Just trying to get into the
contours of the engagement.
MS. WOLKE:  Okay.  Maybe let's
focus on what's in the report, then, on
that.
MS. UMAR:  Well, I'm entitled to
ask him questions as well.

Page 15

BY MS. UMAR:
Q.  Sir, what are the typical questions
considered at class certification?
A.  Well, they're spelled out in
Paragraphs 1 and 2 of my report.  Usually it's
whether the securities at issue trade in an
efficient market and whether there's a damage
methodology that could be applied commonly for
all class members to calculate damages in a
manner that's consistent with the theory of
liability.
That's what it says in Paragraphs 1
and 2.
BY MS. UMAR:
Q.  And is that a fair description of what
you, in fact, did?
A.  Yes.
Q.  Who's been your primary point of
contact at Glancy?
A.  Oh, frankly, it's all three of these
attorneys.  When I call one, they often all
get on the phone with me.
Q.  Okay.  And by "these three attorneys,"
you're talking about the attorneys who are

Page 16

present in the room today?
A.  Yes.
Q.  Have you worked with any of the other
plaintiffs' attorneys besides the Glancy
lawyers in this case?
A.  No.
MS. WOLKE:  Object to form.
BY MS. UMAR:
Q.  Have you had any dealings with
plaintiffs Dan Sills or George Dick?
A.  No.
Q.  Have you had any communications with
them?
A.  No.
Q.  Have you worked with Glancy on other
matters?
A.  Yes.
Q.  And are all of those matters listed in
what you've labeled as Exhibit 3 to your
report that's at pages 81 through 85?
A.  No.
Q.  Which matters are not listed herein?
A.  Well, this exhibit is testimony
provided in the last four years, and I believe

Page 17

I have not worked with Glancy in the last four
years.  I might be mistaken, but --
Q.  Okay.
A.  -- I recall cases from longer ago than
four years ago.
Now, there also, I should add,
sometimes I see that they're listed as
cocounsel on a case -- on a case where I'm
engaged by a different law firm.  I couldn't
tell you from memory whether that would apply
to any of the cases listed here in this
Exhibit 3.
Q.  So you're not certain, sitting here
today, which, if any, of these cases listed
here on Exhibit 3 involve the Glancy firm?
A.  As cocounsel where they were not the
firm that engaged me to do the work on a case.
Q.  Okay.  Now, let's leave aside these
cases on Exhibit 3.  In how many cases have
you been engaged by the Glancy firm where the
Glancy firm was lead counsel for the
plaintiff?
A.  I don't know for sure.  It would go
back 20, 30 years.

5 (Pages 14 - 17)

Page 18

Q.  Can you give an order of magnitude?

A.  A handful.  Five maybe.  Maybe.  I mean, it could be -- it's probably -- it could be less, could be more.

Q.  Okay.

A.  But not much more or much less.

Q.  Did you opine on market efficiency in any of those matters?

A.  Probably, but I don't recall for sure.

Q.  And did you offer an opinion in each of those matters that the market was -- was efficient?

MS. WOLKE:  Object to form. Foundation.

A.  I'd have to look at the reports, but again, the answer is probably, but I'm not sure.

BY MS. UMAR:

Q.  How many other matters are you currently working on with the Glancy firm?

A.  To the best of my knowledge, none.

Q.  Sir, in how many cases have you been engaged to provide expert testimony in the past?

Page 19

A.  Ever?

MS. WOLKE:  Object to form.

BY MS. UMAR:

Q.  Correct.

A.  Oh, I actually state that in my report.  I first started doing forensic finance economic analysis around 1996.  That's almost 30 years now.  And as I wrote in the report in Paragraph 16, it's certainly more than 200 cases over 30 years.

Q.  And in approximately how many of those did you opine on market efficiency?

A.  Clearly -- the majority for sure, but I couldn't tell you more specifically than that since my specialty is securities litigation and that is an important question that arises in securities litigation.

Q.  And so your belief is that in the majority of the matters in which you were engaged, listed here as more than 200 cases in Paragraph 16, that you rendered an opinion on market efficiency?

MS. WOLKE:  Objection to form.

A.  Yes, majority but not all.

Page 20

BY MS. UMAR:

Q.  And approximately how many of those cases were plaintiff's side engagements.

A.  Virtually all of them.  There are a couple of exceptions earlier on.

Q.  And in how many of those matters did you conclude that the market was efficient?

A.  Well, now I need to get clarification what you mean by the question.

In the matters where I've submitted reports to the court, my reports -- I haven't submitted a report that opined that the market was not efficient.  But I have reached conclusions that it could not be proved to be efficient or was not proved to be efficient.

I think I have submitted some of those to the court actually, and others are results of analysis that I would provide to a party engaging me, and the opinion would not ultimately be submitted to the court.

Q.  Why don't we take this in pieces so that we can make sure that we're on the same page and we're talking about the same thing.

In how many of the 200-some-odd

Page 21

engagements in which you have provided opinions on market efficiency have you submitted a report to the court?

MS. WOLKE:  Object to form.

A.  Okay.  Well, first of all, I did not submit reports 200 times on market efficiency. I said it was the majority of the 200 cases, but it wasn't all of them.

So with that clarified, what was the rest of the question?

BY MS. UMAR:

Q.  In how many of the cases in which you've been engaged to provide an expert opinion have you submitted a report to the Court on market efficiency?

MS. WOLKE:  Object to form.

A.  You asked that before, and I said most or majority but not all.

BY MS. UMAR:

Q.  Sir, and I just -- I want to make sure that we're talking about the same thing, because earlier I had asked about how many of those cases you offered an opinion on market efficiency.  Now I'm focused specifically on

6 (Pages 18 - 21)

Page 22

submitting a report to the court.

So you're saying in virtually all of those 200 cases or so, you have submitted an opinion to the court on the subject matter of market efficiency?

A. No. Actually, I said no.

MS. WOLKE: Object to form.

A. When you asked that, I said no, that's not the case. I have not submitted opinions on market efficiency in every case I've been engaged in.

BY MS. UMAR:

Q. Okay. So, sir, I'm just asking you in how many of the cases in which you have submitted -- let me try that again.

As to the cases in which you have been engaged to provide an expert opinion, in approximately how many of those cases have you provided a report to the court on the subject of market efficiency?

A. Yeah, and I --

MS. WOLKE: Object to form.

A. I thought I heard you ask that question before. I thought I answered that

Page 23

question. But to reiterate, most but not all.

BY MS. UMAR:

Q. Okay. And in the instances in which you have submitted a report to the court, how many of those did you opine that the market was efficient?

MS. WOLKE: Object to form.

A. Most but not all.

BY MS. UMAR:

Q. And when you say "not all," in how many cases did you submit a report to the Court that the market was not efficient?

A. I've never reached that conclusion, but I have reached the conclusion that it was not proved to be efficient, period, full stop.

I've stated to the court before that, in the course of the engagement, the security was not proved to be efficient.

Q. In how many cases have you stated to the court that the market was not proved to be efficient?

A. I don't have an exact count but at least a couple or a few.

Q. And you're saying a couple or a few as

Page 24

compared to the approximately 200 or so cases in which you have submitted reports on the subject matter of market efficiency?

MS. WOLKE: Object to form.

A. I don't think I've submitted 200 reports on market efficiency.

BY MS. UMAR:

Q. How many do you think you've submitted, sir?

A. The majority of the 200 but not all.

Q. So something close to 200, correct?

A. No. I don't know. It's somewhere between 100, and -- actually, I don't know. I would say it's probably more than 100 but certainly not all cases.

Q. Let's take that number, probably more than 100.

A. Okay.

Q. Of the probably more than 100 reports you submitted to the court on the subject matter of market efficiency, you're saying that a handful of those have reached the opinion that you cannot opine on whether the market was efficient?

Page 25

A. That's not what I said.

Q. Okay. What did you say, sir?

A. I said I've submitted to the court the opinion that the securities at issue were not proved to be efficient.

Q. So let's try that again. My apologies for misstating.

Of the over 100 reports that you have submitted to the court on the subject matter of market efficiency, you believe that a handful of those have reached the conclusion that there was not sufficient data in order for the securities to have been -- the market for securities to have been proven to be efficient, correct?

MS. WOLKE: Object to form.

A. Incorrect.

BY MS. UMAR:

Q. Of the more than 100 cases in which you've submitted reports to the court on the subject matter of market efficiencies, there are a handful in which what you submitted to the court contained the opinion that you could not opine on whether -- that the securities at

7 (Pages 22 - 25)

Page 26

issue were not proved to be efficient?

A. Not true.

Q. Sir, why don't you -- I'm repeating back your exact words. So if I --

A. Well, can you please repeat back my exact words?

Q. Yes, I'm trying to do that.

A. Let's do that. I'm trying to answer your questions, and you're rephrasing them in a manner that changes the meaning.

Q. I'm repeating here:

Answer: I said I submitted to the court the opinion that the securities at issue were not proved to be efficient.

A. That's correct.

Q. Is that fair?

A. 100 percent correct.

Q. And so let's try that again because, sir, I'm really not trying to misstate your testimony. I'm just trying to get orders of magnitude here. I want to make sure that we are talking about the same thing. So I appreciate your effort to clarify because I don't want a transcript that's unclear or that

Page 27

doesn't accurately characterize your position.

So of the more than 100 reports you've submitted to a Court on the subject matter of market efficiency, a handful of those are instances in which you reached the opinion that the securities at issue were not proved to be efficient, correct?

A. Okay. I need clarification for the question. When you say reports on the subject of the market efficiency, what do you mean precisely? You mean that that was the primary scope of the report or that there's a market efficiency opinion within the report?

Q. Sir, I'm asking about instances in which you opined on market efficiency whether market is efficient or not.

A. Okay. I have reached the opinion that the security at issue was not proved to be efficient, and I've stated so in my reports and testified to that fact.

Q. And I'm asking about how many cases in which that has occurred.

A. And I said --

MS. WOLKE: Objection. Asked

Page 28

and answered.

A. -- a handful.

BY MS. UMAR:

Q. What do you mean by a handful, sir?

A. Five. I don't know. Maybe a few more, a few less. It could be many more; it could be a few less.

Q. Okay. And you're talking about five of approximately a hundred cases in which you have opined on the subject of market efficiency?

MS. WOLKE: Objection.

A. That's right. That's right.

THE STENOGRAPHER: Give her a second to get the objection on the record, please.

BY MS. UMAR:

Q. Okay. I think we're on the same page now.

All right. Let's move on to a different topic.

Other than this matter, have you been engaged on any matters involving United Natural Foods?

Page 29

A. No.

Q. Actually, sir, before -- I want to go back to one more question that I forgot to ask.

You mentioned, sir, that there's a need to differentiate between cases in which you submitted a report to the court on market efficiency and cases in which you were engaged to conduct analysis involving market efficiency but you did not ultimately submit a report to the court, correct?

A. That's right.

Q. Approximately how many cases were ones in which you were engaged to analyze market efficiency but you did not submit a report to the court?

MS. WOLKE: Object to the form.

A. Well, I mean, sometimes I'll review the facts before there's an engagement letter, and I'll opine that it can't be proved. So that would be a case where I'm not engaged, but I've reached the conclusion that it can't be proved. That's usually what happens, and that happens fairly frequently.

8 (Pages 26 - 29)

Page 30

BY MS. UMAR:

Q. When you say "fairly frequently," what do you mean by that?

A. Several times a year. And that's not to say that the security is not trading in an efficient market, just that I didn't think that I would be able to -- I didn't think the data and documents would allow me to confidently offer the opinion that I proved it.

Q. Okay. Let's switch gears, and let's get back to your report, but I want to ask you some other questions.

Sir, pages 72 through 80 of your report contains your CV, correct?

A. Yes.

Q. Is there anything that you need to change within this?

A. Possibly. Yes, there is. On page 73, the University of Pennsylvania "Journal of Business Law" article is now in print. It says "forthcoming" here. It's in their current offering.

Q. Anything else beyond that?

Page 31

MS. WOLKE: Object to form.

A. Not that I'm aware of.

BY MS. UMAR:

Q. You're not a lawyer, correct?

A. Correct.

Q. And you're currently a finance professor at Babson College, correct?

A. That's right.

Q. You're also the sole owner of a consulting firm called Crowninshield Financial Research, correct?

A. Yes.

Q. And that firm provides economic expert and consulting services in litigation and other matters, correct?

A. That's right.

Q. What are the other matters beyond litigation in which Crowninshield provides expert and consulting services?

A. Oh, valuations, for example. I mean, yeah, we've been asked to do valuations. That's primarily it. Well, I -- sometimes to review other people's valuations or other people's analysis of economic questions,

Page 32

sometimes involving government policy.

Q. And what do you mean by "government policy"?

A. Well, there may be a government office that has engaged another firm to evaluate a policy, and we've been engaged to assist essentially assist and -- well, assist the firm that was engaged to offer the commentary on the government policy.

Q. And would that relate to, like, economic aspects of various government policies?

A. Yes.

Q. Have you -- have you been -- excuse me. Let me rephrase that.

Has Crowninshield been engaged to provide any expert or consulting services in connection with government policies relating to the food industry?

A. No.

Q. What percentage of Crowninshield's work is for litigation matters?

A. Most. It changes from time to time, of course, but I -- more than 90.

Page 33

Q. And as to the litigation work, how much of that is for securities cases?

MS. WOLKE: Object to form.

A. I would say again 90. Of that, 90.

BY MS. UMAR:

Q. Understood.

What percentage of Crowninshield's work comes from the Glancy firm?

MS. WOLKE: Object to form.

A. Very little. I would -- I would say single digit percentage over the last five years, if that.

BY MS. UMAR:

Q. How many people work at Crowninshield?

A. That changes from time to time too.

Q. Okay.

A. But I think the latest count is 12, including our Ph.D. affiliates, which we have a couple of.

Q. And of those 12 people, how many are expert?

A. Well --

MS. WOLKE: Object to form.

A. -- we're all experts, yeah. I mean,

9 (Pages 30 - 33)

Page 34

testifying experts?

BY MS. UMAR:

Q. Yes. So why -- why don't we focus on testifying experts. I understand that we'd all like to consider ourselves experts in some way.

Of the 12 people who work at Crowninshield, how many are testifying experts?

A. Okay. The people that are currently in -- currently employed by Crowninshield, we have two others besides myself who have testified.

Q. And who are those individuals, sir?

A. Luke Stein, he's an affiliate. And Dan Bettencourt, he's essentially our chief operating officer and senior analyst. Oh, I'm sorry. And James Janos testified as well.

Q. And on what matters have those individuals testified?

MS. WOLKE: Object to form.

A. James Janos was an evaluation matter, but it -- it involved litigation, but it was essentially a valuation.

Page 35

Dan Bettencourt and Luke Stein were involved in securities cases.

BY MS. UMAR:

Q. Did they offer opinions to the court on the subject of whether a market was efficient?

MS. WOLKE: Object to form. Foundation.

A. I'm pretty sure that Luke did not, and I'm pretty sure that Dan did. So with the caveat that I'm doing this from memory and didn't come in prepared to answer the question, I -- I think that's accurate, but it might not be.

BY MS. UMAR:

Q. Okay. How many people from Crowninshield assisted you on this engagement?

A. Well, ultimately, before I turn a report in, everybody sits down and helps proofread it. But the primary people -- well, it would be Dan Bettencourt and Parth Hemani and Tina Gu and Miguel Villanueva. They're the primary people that helped me.

Page 36

Q. And what did each of those individuals do?

MS. WOLKE: Object to form.

A. Well, Miguel is a Ph.D. and is our senior quantitative expert and analyst. We worked on the econometrics together. And Parth and Tina would download the data. We have a certain procedure for securing the data and documents that we need. They -- they would start with that, and they would begin reviewing, and then I would discuss with them the contents. We collaborate. It's a very collaborative process.

So we collaborate. I direct them to do certain tasks, like run certain tests or look for certain documents or even, you know, read them and be ready to discuss them before I read them and evaluate them, but then we would discuss them together. It's the sort of work we do.

There are certain sections I would say I anticipate that our description of the collective test in this case will be very similar to our description of the collective

Page 37

test in a previous case we've done, so maybe start setting up the skeleton for the report by including sections that have already been written for other reports that I can then modify. That's -- that's what they help me with.

Q. And how much of this report was drafted by them versus you?

MS. WOLKE: Object to form.

A. Well, it's all mine. These are all my words. I would ask them sometimes to -- like I just said, I would describe that process. But even if they were beginning with some words that were written for a previous report, those would be my words from a previous report, and then I would modify them and adjust them and adapt them to this case.

So it's -- it creates efficiencies to have them do that kind of work so that they spend more time and I can spend less time but still have it all done under my direction and keep the quality high.

BY MS. UMAR:

Q. I believe you mentioned that Dan

10 (Pages 34 - 37)

Page 38

Bettencourt also assisted you with this engagement. What did he do?

A. Well, we have frequent meetings on each case, and we discuss the analysis. He -- he's basically a check to make sure I don't make mistakes.

Q. Did he perform any independent analysis?

A. No. Actually, nobody does. It's all under my direction, every test and ultimately every word in the report.

Q. From 1996 through 2008, you were an expert with the Michel -- I hope I'm pronouncing this correctly -- Shaked Group?

A. They pronounce it Michel-Shaked.

Q. Michel-Shaked.

A. That's how they pronounce it.

Q. Okay. So from 19- -- I just want to make sure I have these dates right.

So from 1996 through 2008, you were an expert with Michel-Shaked Group, correct?

A. Well, again, they pronounce it Michel --

Q. Oh, sorry.

Page 39

A. -- Shaked.

Q. Okay.

A. Michel-Shaked.

Q. That's my mistake. Okay. I'm going to get it right this time.

From 1996 through 2008, you were an expert with the Michael-Shaked Group, correct?

A. Yes.

Q. Okay. And Michael-Shaked Group also provides expert and consulting services for litigation matters, correct?

A. That's right.

Q. Okay. As an expert, how many of your engagements have been for plaintiffs?

MS. WOLKE: Object to form.

A. Most of them.

BY MS. UMAR:

Q. And by "most," are you talking about 90 percent, 95 percent?

A. The vast --

MS. WOLKE: Object to form.

A. The vast majority, with a few exceptions.

Page 40

BY MS. UMAR:

Q. How many of the -- how many of your engagements in which you've been engaged as an expert have been for defendants?

A. A handful, I guess. Single digits.

Q. Okay. Have you ever been retained to provide an expert opinion for defendants in a securities case?

A. Yes, early on.

Q. And when you say "early on" --

A. Around '96, '97, around that time frame.

Q. And how many cases -- I mean, you -- I know you said, sir, that you've been engaged in a handful -- and by which, you meant single digits -- by defendants in all of your expert work. And you said early on you have provided -- you were engaged by defendants in securities cases.

How many cases have you been engaged by defendants in securities litigation?

A. Oh, that was my -- I mean, I -- a few, a few but not zero. I can think of two.

Q. Two. Okay.

Page 41

And what are those cases, sir?

A. Oh, gosh. Presstek was a printing company in New Hampshire. And, oh, gosh, it was -- oh, HSBC involving options.

Q. Sir, turning back to your report, pages 72 through 76 list all of your papers and publications, correct?

A. Correct.

Q. Is there anything to add to this list?

A. Well, just what I said before --

Q. Okay.

A. -- that the most recent article is now in print.

Q. And then Exhibit 3 to your report, which you can find at pages 81 through 85, lists all the cases in which you've testified as an expert within the last four years, correct?

A. No, no, because there was one more since the date of this report.

Q. And what is that additional case?

A. Biogen, Biogen securities litigation.

Q. And when did you provide that

11 (Pages 38 - 41)

Page 42

testimony, sir?

A. I believe it was two weeks ago.

Q. Okay. Of all of the cases in which you've provided expert testimony in the last four years plus the Biogen case, how many have you given deposition testimony?

A. Oh, can you say that again, please?

Q. In all of these cases in which you've provided expert testimony in the past four years plus the Biogen case -- and just for going forward, for the questions I'm asking, when I -- when I -- just -- let's just level set here.

I'm going to ask you some questions about cases in which you've provided expert testimony in the last four years. When I ask you about that, I'm asking about all the cases on this plus-the Biogen case.

Do you understand?

A. Okay. Well, this list is the cases I provided either court or deposition testimony in.

Q. I understand. And so I'm just trying to understand -- I'm going to ask you some

Page 43

questions about this list overall, but I just want to make sure that you understand I'm including Biogen --

A. Oh, sure.

Q. -- among this set.

A. Okay.

Q. Okay?

A. Yes.

Q. All right. In how many of these cases in which you've provided testimony in the past four years have you provided deposition testimony?

A. Well, this is --

MS. WOLKE: Go ahead. It's okay.

A. This is the -- what's in this list are the cases I provided deposition testimony in.

BY MS. UMAR:

Q. I see. Okay.

How many have you provided trial testimony?

A. Well, actual trial, not counting hearings -- in the last four years or ever?

Q. Well, let's start with the last four

Page 44

years.

A. Well, I think Puma, and -- let me find the list.

I'm thinking it's probably at this point just that one case, Puma, because the others would have been more than four years ago. Let me have a look.

Q. Okay. So then why don't we go --

A. I'm not finished looking.

Q. Oh, okay, sir. Just let me know when you're done. I didn't mean to interrupt.

A. (Witness reviews document.)

Right. Is Puma here even? Is Puma more than four years ago?

Well, I think -- Puma was the most recent, and it's not on this list, so it must have been more than four years ago.

Q. Okay. So --

A. So no trial testimony in the last four years.

Q. Okay. Then why don't we talk about your expert engagements in general --

A. Okay.

Q. -- beyond just the past four years.

Page 45

Beyond the Puma case, do you recall other cases in which you have provided trial testimony?

MS. WOLKE: Object to form.

A. Yes.

BY MS. UMAR:

Q. And what are those cases, sir?

A. Well, Puma. I'm racking my brain. University of Phoenix, the parent company of University of Phoenix, that was a trial. And there was a third one. The name eludes me right now, but I'm sure I'll think of it as the day wears on.

Q. And then of the cases in which you've testified as an expert in the past four years, in how many of those cases did you provide testimony at a hearing?

A. Oh, several. Many. Well, several, let's say.

Q. And why don't we go through that list. Can you identify any from this list?

A. Yes.

Q. Which ones, sir?

A. Okay. Valet on page 84.

12 (Pages 42 - 45)

Page 46

Q.  And you're referring to in re Valet S.A. Securities Litigation?

A.  Yes.

Q.  And what was the hearing at which you provided testimony?

A.  About damages, the damages and the damage methodology.  It was an evidentiary hearing.

Q.  And any others that you can see from this list, sir?

A.  I'm looking.

Apparently, that's it for the last four years unless I'm -- unless I didn't see something on the list.

Right.  Anything else would have been more than four years ago.

Q.  How many expert reports do you prepare for the plaintiffs' side each year in securities cases?

MS. WOLKE:  Object to form.

A.  Well, I'm engaged usually by plaintiffs' counsel, but I wouldn't say I'm preparing it for them.  I'm preparing it for the court, submit it to the court.

Page 47

And it varies from year to year.  I mean, recent years there's been an uptick.  I would have to go back and count.  But, I mean, I think this list probably gives a good idea.

BY MS. UMAR:

Q.  Okay.  So in recent years -- let's just say on a per-year basis -- approximately how many times have you been -- how many unique engagements do you have by plaintiffs' firms to provide an expert report to the court?

MS. WOLKE:  Object to form.

A.  I'm estimating, but I think five or six.

BY MS. UMAR:

Q.  Okay.

A.  And that means, like, new engagements because sometimes old engagements will then carry over to another year.

Q.  Okay.  And of those approximate five or six, how many are reports at the class certification stage?

MS. WOLKE:  Object to form.

A.  Some but not all.  Many but not all.

Page 48

BY MS. UMAR:

Q.  Approximately how many are expert reports on the merits?

MS. WOLKE:  Object to form.

A.  Well, I don't know what you mean by "the merits."

BY MS. UMAR:

Q.  Okay.  So allow me to clarify.

When I'm -- approximately how many of the five or six relate to loss causation?

MS. WOLKE:  Object to form.

A.  Well, certainly less than how many relate to -- well, that is not true.  Sometimes I'm brought in only at the loss causation stage.  And oftentimes if a case doesn't settle or goes beyond class certification, I'm asked to then continue with my work and analyze loss causation.

So I would say it's fewer than the number of market efficiency reports but not -- you know, certainly not zero.  A substantial percentage of them, maybe -- I don't know, I'm just guessing -- 50 to 70 percent I would also be asked to -- no, I would think it's closer

Page 49

to 50.  I would say it's closer to 50 percent I would then do the loss causation work after I've done the market efficiency work.

BY MS. UMAR:

Q.  Okay.  You opine in your report that Section 10(b) and Section 20(a) damages in this matter could be computed for all class members and all UNFI securities using a common methodology for each cause of action that's consistent with the plaintiffs' theory of liability, correct?

A.  Yes.

Q.  Have you ever given an expert opinion that there was not a classwide methodology for measuring damages in a securities action?

MS. WOLKE:  Object to form.

A.  I don't think so.  I mean, it's almost every security -- almost every 10(b) case, that's the model that's used.  That's the model that's used by other experts.  That's the model that's used by defendants and plaintiffs when they negotiate and have mediations.  It's been written up in scholarly journals that that's the correct model for

13 (Pages 46 - 49)

Page 50

securities class actions.

So I usually cite to that and -- as I did in this report and concur. I haven't found an exception yet.

BY MS. UMAR:

Q. Okay. So sitting here today, you're not aware of any case in which you gave an expert opinion that there was not a classwide methodology for measuring damages in a securities case, correct?

A. Correct.

Q. Okay. Have you ever had your opinions challenged as inadmissible?

A. Yes.

MS. WOLKE: Object to form.

BY MS. UMAR:

Q. Have any of those challenges been successful?

A. Yes.

MS. WOLKE: Object to form.

BY MS. UMAR:

Q. What are those cases?

A. Just Freddie Mac. Freddie Mac securities litigation is the only case where

Page 51

my economic opinion was challenged and the judge excluded it under Daubert.

Q. And what was the opinion that you offered in that case --

MS. WOLKE: Object to form.

BY MS. UMAR:

Q. -- or that you attempted to offer?

A. Oh, it was three opinions, as I recall, that Freddie Mac stock traded in an efficient market.

(Stenographer clarification.)

THE WITNESS: In an efficient market. So, yes, efficient. In an efficient market.

Thanks for clarifying because sometimes that's hard to hear.

A. That there was a common damage methodology that could be applied commonly and was feasible and that plaintiffs had not proved that there was no price impact -- I mean -- I'm sorry -- the defendants, that defendants had not proved that there was no

Page 52

price impact of the alleged misrepresentations and omissions.

BY MS. UMAR:

Q. Okay. And you said, sir, that the defendants' Daubert challenge to your opinions was successful in that case, correct?

A. Yes.

Q. Let's leave aside the Freddie Mac case in which the Daubert challenge to your opinions was successful.

Have there been cases in which a court criticized or excluded portions of your opinions?

MS. WOLKE: Object to form.

A. Yeah, there are cases where the judge wouldn't agree with everything I've opined to, I mean, for a variety of reasons, yes.

BY MS. UMAR:

Q. And what are some of those cases, sir?

A. Okay. So in the Vale case, the judge agreed with my opinion that Vale securities traded in efficient markets but -- and accepted all of my analysis related to all of the camera factors except for the empirical

Page 53

factor but had some criticism of the empirical test, ultimately concluding that it wasn't necessary and that my opinion was valid and accepted by the court, and the case was certified. The class was certified but gave no weight to the empirical support for market efficiency in that case, Vale.

Q. Sir, are there any other cases in which the court criticized your opinions besides the Vale case?

MS. WOLKE: Object to form.

A. Yes, some. I mean, a few. I mean, 200 cases over 30 years, there were a few. And, of course, those are the ones I will remember.

So way back in turn of the century, Liberty Digital case was a value -- an appraisal hearing in Delaware chancery court, and the judge criticized my valuation of a new economy, essentially Internet-type commerce company, which was a new concept at the time. And let me think.

Oh, Kirkland Gold, the -- that one puzzles me still. But nonetheless, the judge

14 (Pages 50 - 53)

Page 54

said I -- in that case, the defendants sought to prove that there was no price impact, and I offered that a nonstatistically significant price movement doesn't prove that the price was not impacted.

That was -- with respect to that particular event, that was my opinion, but the judge said that I misunderstood how that fits into an argument for price impact and ultimately agreed with defendants that they had proved there was no price impact.

BY MS. UMAR:

Q. Sir, you mentioned that the Liberty Digital case was one in which you attempted to offer a valuation opinion, correct?

A. That's right.

Q. What valuation technique or techniques did you endeavor to use in that case?

A. Well, I --

MS. WOLKE: Object to the form.

A. I -- I -- that was a long time ago. I know the part that was -- I know I definitely relied on analyst valuations at the time because this was the Internet bubble, I guess

Page 55

you would call it, I mean, and analysts were offering their opinion about what the stock was worth, and my opinion was consistent with what the analysts were saying.

So I definitely referred to analyst opinions and their valuation models, but I'm pretty sure I also did a discounted cash flow valuation at the time, and I think also a price earnings multiple, but my memory's a little sketchy. That was over 20 years ago.

BY MS. UMAR:

Q. And the court criticized your valuation opinions, correct?

A. Yes, yes.

Q. Okay.

A. I do want to add, just to be complete, you said criticized or excluded. There was recently a case where I wrote a paragraph contrasting two different cases, and the judge complimented my economic analysis and all my opinions throughout the report but said that that paragraph was essentially a legal conclusion and excluded on the basis of being a legal conclusion, not on the basis of it

Page 56

being wrong or not reliable analysis but on the basis of it being a legal conclusion.

Q. And what case was that, sir?

A. Prestamos.

Q. Any other instances in which a judge has criticized you for offering improperly a legal conclusion?

A. Not that I recall.

Q. Okay.

A. Well, I don't want to even say improperly. I mean, I don't think the judge said I did anything improper. I'll leave it at that.

Q. Let me rephrase, sir.

Do you recall any other cases beyond the one that you just mentioned in which the court criticized you for offering what was ultimately a legal opinion?

A. Well, I wouldn't even say the judge criticized me in this case. The judge acknowledged or noted that I did good analysis, but that paragraph was a legal opinion. I'm not a lawyer. So, I mean, I'll answer the questions I'm asked. Said that

Page 57

plaintiffs couldn't use that paragraph because it was a legal conclusion. I don't think it was a criticism of me. But that's -- you know, that's for lawyers and judges to decide. I'll let it stand and let it -- let the opinion read for itself.

Q. Sir, are there any other cases beyond the one you just mentioned in which the court characterized portions of your opinion as legal conclusions?

A. Not that I can recall.

And I want to add that Prestamos was not a securities case. So when I said not all off my cases are securities cases, Prestamos was not a securities case.

Q. What kind of case was that, sir?

A. It was a class action, but it involved PPP loans and people, firms borrowing under the PPP program.

Q. How much time did you spend preparing your report?

A. I just looked it up. About 50 hours.

Q. How about Crowninshield? How much time did Crowninshield spent assisting you

15 (Pages 54 - 57)

Page 58

with your report?

A. It's typically a three-to-one ratio, and in this case, it was consistent with what's typical.

Q. Three-to-one, meaning they spent three times as much time as you did?

A. Right. So if you add up their hours, it was about 150 hours, and mine was 50 approximately.

Q. Did you keep records of the time you spent preparing your report?

A. Yes.

Q. And did you submit those to plaintiffs' counsel?

A. Yes.

Q. Do you bill by the hour?

A. Yes.

Q. And your hourly rate is listed within your report as $1,150. Is that still correct, sir?

A. That is.

Q. At what rate does your team from Crowninshield bill?

MS. WOLKE: Object to form.

Page 59

A. It's a range of rates between 300 and 550 per hour.

BY MS. UMAR:

Q. Have you been paid in connection with your work on this matter?

A. Yes.

Q. And by whom have you been paid?

A. The Glancy firm.

Q. What did you do to prepare for today's deposition?

A. Reviewed my report. I reviewed the complaint. I reviewed the judge's order in the motion to dismiss. I reviewed some of the documents cited in my report, some analyst reports. I looked at defendants' motion to dismiss brief. And I met with my team and plaintiffs' counsel yesterday.

Q. How did you select which documents to review?

MS. WOLKE: Object to form.

A. Well, I mean, there's a certain standard analysis for a market efficiency -- oh, you mean in preparation for the --

BY MS. UMAR:

Page 60

Q. Correct, sir.

A. -- for today or for the report?

Q. In preparation for today's deposition specifically, sir.

A. Oh, well, I try to anticipate what questions you might ask and what I would need to have -- what information I would need to have fresh in my mind in order to answer them. I mean, essentially, it's the same thing that -- as how I would prepare to teach a class. You know, I know the subject matter. I know what the usual questions are when -- that students have, and I want to come prepared to answer their questions.

Q. Which analyst reports did you look at specifically?

A. Actually, so I put on the screen -- I and my team put on the screen a list of all the analyst reports. They're arranged alphabetically and the titles are -- the titles of the files have the date of the report. And I did essentially almost a random selection of three or four from each of the dates that are listed on page 35 of my

Page 61

report.

Then also including September 26, 2023. So three or four reports randomly selected from eight different dates. All of them are cited to in the docs considered list in this report.

Q. You mentioned that you met with your team and plaintiffs' counsel in preparation for today's deposition, correct?

A. Yes.

Q. On how many occasions did you meet with your team?

A. Well, I mean, we see each other every day but to talk about this case, just yesterday.

Q. And you're saying you only met once yesterday with your team to prepare for this deposition?

A. That's what I'm saying.

Q. And how much time did you spend with your team?

A. From 9:00 to 6:00 p.m.

Q. And were attorneys from Glancy present during that meeting?

16 (Pages 58 - 61)

Page 62

A.  Only through part of it.

Q.  And approximately how many hours did you spend meeting with attorneys from Glancy in preparation for today's deposition, sir?

A.  About two and a half hours.  That would be from 2:30 to 5:00.

Q.  And again, did you meet with them in preparation for today's deposition other than yesterday's meeting from 2:30 to 5:00?

A.  No.

Q.  Now, you mentioned meetings with your team and with Glancy in preparation for today's deposition.  Leaving those aside, about how much time did you spend preparing for the deposition today?

A.  Well, leaving yesterday aside?

Q.  Correct.

A.  That was 9 hours yesterday.  I would think maybe 11 hours otherwise.

Q.  By the way, sir, if at any point you need a break, feel free to speak up.  I'm okay to keep going, but if you would like to take a break, feel free to let me know.

A.  I'll take a break.

Page 63

MS. UMAR:  Can we go off the record, please.

THE VIDEOGRAPHER:  The time is 10:05.  We're going off the record.

(Recess taken from 10:05 a.m. to 10:21 a.m.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 10:21.

BY MS. UMAR:

Q.  Sir, I'd like to direct your attention back to your report that we marked as Exhibit 1 for today, and specifically, I wanted to turn your attention to what is labeled as Exhibit 1 within your report.  So that starts at page 62.  The heading is "Documents and other information considered."

Do you see that?

A.  I'm there, yes.

Q.  Are there any other materials you considered beyond those listed herein?

A.  No.

Q.  The first heading here is "Case legal

Page 64

documents," correct?

A.  Yes.

Q.  And there are two documents listed, the first being the second amended class action complaint and the second being the court's September 13, 2024 opinion and order, correct?

A.  Yes.

Q.  You're aware that there are other pleadings in this case, correct?

MS. WOLKE:  Object to form.

A.  No.

BY MS. UMAR:

Q.  Well --

A.  I mean, as I sit here now, I couldn't name any, and I haven't reviewed any.

Q.  Sir, you mentioned in preparation for today's deposition that you read a brief filed by defendants --

A.  Right.

Q.  -- correct?

A.  Yes.  That one, yes, I would have, defendants' motion to dismiss.

Q.  Correct.  And so you are aware of

Page 65

other documents from this case, correct?

A.  Just that one.

MS. WOLKE:  Object to form.

A.  Just that one.

BY MS. UMAR:

Q.  Why didn't you list defendants' motion to dismiss brief as one of the matters that you considered?

MS. WOLKE:  Object to form.

A.  Well, at the time that I wrote the report, I did not consider it.

BY MS. UMAR:

Q.  Why did you consider it only subsequent to writing your report?

MS. WOLKE:  Object to form.

A.  To get a sense of what you might ask today and what you think the major issues are.  I mean, I could write a market efficiency report even if there's no lawsuit.

BY MS. UMAR:

Q.  Sir, how did you identify these particular case documents?

MS. WOLKE:  Object to form.

A.  Well, over the years, I've discovered

17 (Pages 62 - 65)

Page 66

that there's a certain set of documents and data that are necessary for evaluating market efficiency and the question of a damage methodology. So I've established a general practice that I apply every -- in every case involving market efficiency and damage model analysis.

I followed that process and found that that process fit this case well. I call it the data dump. We executed the usual data dump that we always do for these sorts of cases.

BY MS. UMAR:

Q. You mentioned earlier that you don't even need a case to be filed in order to offer an opinion on market efficiency, correct?

A. Well, to do the analysis and arrive at an opinion, yes.

Q. So why did you want to look at the complaint and the court's opinion and order in particular here?

MS. WOLKE: Object to form.

A. Well, the complaint is -- for one thing, it spells out what the time period is

Page 67

that's relevant for assessing market efficiency. And one would need to have some sense of what the allegations are and what the alleged facts are in order to opine on whether a common damage methodology exists and is feasible.

BY MS. UMAR:

Q. And do you, in fact, have a sense of what the allegations and the facts are in this case?

MS. WOLKE: Object to form.

A. Yes. Well, the allegations and the alleged facts, and then, of course, I read numerous accounts of facts in the analysts' reports and the news articles.

BY MS. UMAR:

Q. And why did you choose to look at the court's opinion?

A. Well, that's -- again, if the question is is there a common damage methodology, one would want to know if any of the allegations have been dismissed, for example. That's the main reason, but actually, there's one more reason. I found that judges are usually very

Page 68

good at succinctly summarizing a case, and that helps me understand what the case is about, seeing another perspective aside from the plaintiffs' complaint.

Q. The next heading within this list is "News Articles and Press Releases," correct?

A. Yes.

Q. And this first entry here under that says, "Factiva news articles: 2,248," correct?

A. Yes.

Q. And that search within Factiva was for articles from December 8, 2020 to September, 2024, correct?

A. Yes.

Q. How did you determine that time frame?

A. Standard general operating procedure. I usually take the class period and add a year to both sides. So I would see the articles that are published during the proposed class period but also have enough articles before and after for context.

Q. And you identified 1,194 articles from

Page 69

within the class period, correct?

A. I know where I --

MS. WOLKE: Object to form.

BY MS. UMAR:

Q. Excuse me. 1,191, correct?

A. You're reading from inside the report, right?

Q. I am. That's Paragraph 80, sir.

A. Yes. That's what it says, and that's what I found.

Q. Did you read all 2,248 articles?

MS. WOLKE: Object to form.

A. I skimmed them, as I always do.

BY MS. UMAR:

Q. You're saying you skimmed all of the 2,248 articles?

MS. WOLKE: Object to form.

A. Sure. They're arranged in files, and I scroll through the files to see what the news was essentially. And it's usually a very fast procedure. It takes -- and I skim -- I skim through the -- I scroll through the files to see what the news is. And when I see what looks like major news, I'll slow down and read

18 (Pages 66 - 69)

Page 70

the article more carefully. And that's what I did in this case.

BY MS. UMAR:

Q. How many articles did you slow down and read more carefully?

A. I don't recall. Several, a couple dozen, maybe.

Q. How much time did you spend reviewing these 2,248 articles?

MS. WOLKE: Object to form.

A. Less than a day. Maybe half a day.

BY MS. UMAR:

Q. So within half a day, you skimmed 2,248 articles?

MS. WOLKE: Object to the form.

A. That's what I do. That's what I did.

BY MS. UMAR:

Q. Now, you said that you -- in connection with the articles that you slowed down and read more carefully, you recall doing so with respect to several, a couple dozen, correct?

A. That's right.

Q. Did you --

Page 71

A. Approximately.

Q. And did you keep track of which articles you read more carefully?

A. No, it wasn't really necessary for the opinions that I offered in the report. That was more for background knowledge to understand what the case is about and what the experience of the company was. But for purposes of assessing market efficiency, the count was more important.

Q. How did you identify which articles to read more carefully?

MS. WOLKE: Object to the form.

A. Well, you know, I have a background in finance, and I'm a trained financial analyst. When I saw news that looked like it was major news in the life of the company, I would stop and have a close look at it.

BY MS. UMAR:

Q. And by "major news," what do you mean?

MS. WOLKE: Object to form.

A. It varies from case to case. In this case, it was the earnings announcements mostly

Page 72

when the company would report their results and talk to the public.

BY MS. UMAR:

Q. Did anyone else recommend to you which articles to read?

A. No.

Q. Did anyone assist you in reading the 2,248 articles?

MS. WOLKE: Object to form.

A. Well, yes, in the sense that they downloaded them for me. And my assistants would also do a similar scan, and then we would discuss whether or not -- whether we agreed on what the important news was.

BY MS. UMAR:

Q. Do you have the capability of doing a text search within the articles that you pulled up?

A. Sure.

Q. Did you conduct such a text search here?

A. On these articles?

Q. Correct --

A. No.

Page 73

Q. -- the two -- set of 2,248 articles?

A. No, no.

Q. Now, you list additional articles from "Bloomberg News," correct?

A. Yes.

Q. Were these captured within the Factiva search?

A. I don't think so.

Q. How did you obtain these articles?

A. I was looking for evidence that either there was an active or was not an active options market for UNFI options. These articles indicated that there was an active market.

Q. And how did you go about locating these articles?

A. I think I asked my assistants to look for articles on Bloomberg that mentioned option volume.

Q. And is this the full set of articles that your assistants provided you regarding options volume?

A. Yes.

MS. WOLKE: Object to form.

19 (Pages 70 - 73)

Page 74

A. Yes.

BY MS. UMAR:

Q. Okay. And moving on within this page, the third headline is "Analyst Reports," correct?

THE WITNESS: Wait a minute. Could you ask the last question again. Could I hear the last question about is this the full set.

THE STENOGRAPHER: Do you want me to read it?

THE WITNESS: Yes, please.

*(Question read.)

A. Yes, it is.

BY MS. UMAR:

Q. Okay. Now, sir, moving on within this exhibit, the next section is "Analyst Reports," correct?

A. Right.

Q. And you obtained these reports from plaintiffs' counsel, correct?

MS. WOLKE: Object to the form.

Page 75

A. Yes.

BY MS. UMAR:

Q. Did you request these reports from plaintiffs' counsel?

A. Not these specific ones. I asked for all the analyst reports that they had in their possession.

Q. And this was what was provided to you, sir?

A. Yes.

Q. Did plaintiffs' counsel direct you to certain reports from within this set?

A. No.

Q. Did you read all of these reports?

MS. WOLKE: Object to form.

A. Same process. I skimmed them.

BY MS. UMAR:

Q. And how much time did you spend skimming these?

A. It was probably another half a day. And then I -- I -- I returned to that process a few times in the course of the engagement. So I think maybe fours hours initially, and then later when I would be more interested in

Page 76

a particular day, I would go back and look at the analyst reports from a particular day.

But that was more for preparation for the deposition than in preparation for the report.

Q. Did anyone send you summaries of these analyst reports?

A. No.

Q. Were there any analyst reports that you read more closely than others?

MS. WOLKE: Object to the form.

A. At the time I wrote the report, you mean?

BY MS. UMAR:

Q. Correct.

A. No.

Q. Okay. And then just jumping ahead to page 66, the next heading is "SEC Filings," correct?

A. Yes.

Q. How did you decide which SEC filings to consider?

A. I think this is all of them for this time period. I mean, 8-Ks, 10-Qs, 10-Ks. I

Page 77

believe -- I'm pretty sure this is all of them, all of their filings over this period.

Q. Did you read all of the filings within this list?

MS. WOLKE: Object to form.

A. I looked at -- no, no, I wouldn't -- I didn't do that. But I considered them and looked to see what they covered.

BY MS. UMAR:

Q. How did you consider them if you didn't read them?

MS. WOLKE: Object to form.

A. Well, I considered whether it was important to read them and then decided that -- after a quick examination, that it wasn't necessary to read them.

BY MS. UMAR:

Q. Which ones did you deem important enough to read?

MS. WOLKE: Object to form.

A. The 10-Qs and the 10-Ks.

BY MS. UMAR:

Q. And how much time --

A. Actually, I want to be more clear than

20 (Pages 74 - 77)

Page 78

that. The 10-Qs and 10-Ks from the class period, not so much before and after.

Q. And approximately how much time did you spend reviewing the 10-Qs and 10-Ks from within the putative class period?

A. A couple hours maybe.

Q. And did you review those documents in full?

MS. WOLKE: Object to form.

A. No. I know how to look for the -- I mean, there's -- they're long. I didn't read every word of the documents, no.

BY MS. UMAR:

Q. What did you focus on?

A. Well, management's discussion, introduction, the date. I wanted to see the -- I remember I was very interested in the date when -- the dates when they were actually filed whether they mentioned procurement gains.

Q. Do you have an understanding of that term, "procurement gains"?

A. Yes.

MS. WOLKE: Object to form.

Page 79

BY MS. UMAR:

Q. What do you understand that to mean?

A. Well, I mean, there's -- it could mean a couple of different things. I mean, there's inflation-driven procurement gains where -- do you want me to describe the practice?

Q. Yes, please. Yes.

A. Oh, well, that's one of the -- it's the practice that was alleged to have been undisclosed, the extent to which the company engaged in it during the class period. It's where they would buy, knowing that the price -- price increase was imminent or announced by much more quantity than demand called for. And then when supplying that same product or inventory to their customers, they would charge the higher price and thereby increase their margins and increase their gross profit accordingly. That's -- that's inflation-driven procurement gain.

There's also promotion-driven procurement gains where they would load up on inventory because there's a promotion, buy at the cheap price, and sell at the higher price

Page 80

in order to reap profits.

Q. Okay. Sir, you mentioned inflation-driven procurement gains and promotion-driven procurement gains.

Are you aware of any other types of procurement gains as it relates to this case?

MS. WOLKE: Object to the form.

A. No, those are the main ones. And I -- those are the main ones that I saw when I did the search for procurement gains.

BY MS. UMAR:

Q. Okay. And when you say when you did the search for procurement gains, you're saying when you read the -- the company's public filings?

A. Yeah. But for the -- for that, I did a textual search.

Q. Okay. So what you're saying is you ran the search term "procurement gains" from within the company's public filings during the class period, correct?

A. "Procurement" and "gains."

Q. "Procurement" and "gains."

Page 81

A. And "inflation" and some other words as well.

Q. Okay. So you mentioned "procurement" and "gains" and "inflation."

Any other search terms that you ran?

A. No, I think that's it. Procurement gains -- procurement, procurement gains, inflation, that's what I recall.

Q. Okay.

A. Again, it was not really even necessary for the market efficiency opinion. But having read the other documents, I was interested.

Q. The next heading here is "Academic and Professional Literature," correct? And that's on page 68, sir.

A. Yes.

Q. How did you identify which academic and professional literature to include?

MS. WOLKE: Object to form.

A. Well, I've been working in this area for decades, and I know what the seminal articles are that relate to the kinds of market efficiency tests that I ran. And over

21 (Pages 78 - 81)

Page 82

the years, these are the articles I identified as being the seminal articles and determined there was -- they applied to this case as well as previous cases I've done.

BY MS. UMAR:

Q. Okay. Let's jump ahead to page 70. Do you see the heading "Data and Databases"?

A. Yes.

Q. And listed below that are the data and databases that you used in forming your opinions, correct?

A. That's right.

Q. The first item listed is Bloomberg, and earlier we had looked at a set of Bloomberg articles.

Did you access the Bloomberg database to obtain information beyond the Bloomberg articles we discussed earlier?

A. Yes -- well, I or my team did. I would direct them to get certain data. They're very skilled at knowing where to get the data in.

Q. What data did you collect from the Bloomberg database?

Page 83

A. Well, it's -- I'll tell you where it's listed. So if we go to Exhibit 4, we have to go to the end of Exhibit 4, and we're going to have to do this for every one of these exhibits.

Okay. So at the end of, like I say, Exhibit 4, this data came from CRSP, that's the Center for Research and Security Prices, at the University of Chicago. So Exhibit 4 did not come from Bloomberg. But if we go to Exhibit 5, we go to the end, well, we see that the institutional ownership came from LSEG Workspace.

(Stenographer clarification.)

THE WITNESS: LSEG, L-S-E-G, just the initials L-S-E-G Workspace.

A. So that did not come from Bloomberg. If we go to Exhibit 6, now we see that short interest did come from Bloomberg. So the short interest numbers were provided by Bloomberg. That's on page 121.

Should I keep going to show you the

Page 84

process?

BY MS. UMAR:

Q. No, this is helpful.

A. Okay.

Q. So to the extent that you obtained particular data from one of these databases, that data identifies the database from which you pulled it, correct?

A. These exhibits identify the data and the database, that's right.

Q. Okay. Let's go back to page 71 of your report, and that's still within your materials considered list.

A. Okay.

Q. Do you see how the heading on this page is "Legal Cases"?

A. Yes.

Q. How did you identify which legal cases to consider?

MS. WOLKE: Object to form.

A. Well, so some of these are seminal cases that inform both lawyers but also informed forensic financial economists about what the court -- how the court defined

Page 85

certain terms and what kind of evidence the court would consider, what kind of tests and evidence that a financial economist could provide the court has previously considered important or compelling.

So this list was amassed over years of following my cases as well as other cases that dealt with market efficiency and the damage methodology in 10b-5 security cases.

BY MS. UMAR:

Q. Did Glancy suggest to you any cases that you should consider?

A. No.

Q. Did you consider any legal cases not listed here?

MS. WOLKE: Object to form.

A. No.

BY MS. UMAR:

Q. Okay. The last heading here is "Other."

Do you see that?

A. Yes.

Q. How did you identify the items under this heading?

22 (Pages 82 - 85)

Page 86

A.  I just -- I think these -- each of these items refers to a particular fact that I might mention in the report that I would feel needed a citation so that someone can look and verify the fact that I cited.  I don't think any of these were found specifically for this case, but they referred to arguments or analysis that is similar in this case that has also been addressed in other cases.

I mean, just to give an example, the last one, that says, "Revisions to the eligibility requirements for S-3."  So the -- I know that S-3 registration is a Cammer factor.  The eligibility for S-3 registration is a Cammer factor, but the rules have changed.  I explained that the rules changed.  This is the cite -- the citation that explains how the rules changed for S-3 registration eligibility.

Q.  Sir, your counsel produced to us some earnings call transcripts from UNFI when asked to produce the set of materials that you considered, and those transcripts are not listed here.  Do you know why that is?

Page 87

A.  No, they are listed here.  I'll show you why and where.

So on page 62, it says "Factiva news articles."  But if we then go to -- I'll show you where -- page 20 -- well, it was actually the paragraph that you cited just a moment ago, 1191.

Here it is.  Anyway, they're included in the Factiva.  The Factiva database, what's returned from Factiva includes those transcripts.

Q.  And --
A.  And --
Q.  I'm sorry.  Go ahead.
A.  I'm sure it's here.
(Witness reviews document.)
Well, it says the articles I obtained from Factiva include published news articles and press releases.  It also includes the conference call transcripts, the Factiva database return.

Q.  So although the report doesn't say that you refer to articles from the Factiva database, you were referring to news articles,

Page 88

press releases, and earnings call transcripts?
A.  That's right.
Q.  And to the extent that you reviewed earnings call transcripts, which ones did you review?
A.  All of them.
Q.  All of them?
A.  All of them during the class period.  Well, there was seven during the class period and one immediately after.
Q.  Sir, you mentioned that you reviewed defendants' motion to dismiss after you submitted your report.  Are there any other documents you considered after you submitted your report that are not listed herein?
A.  No.
Q.  Did you request any materials from plaintiffs' counsel that you did not obtain?
A.  No.
Q.  Sir, I'm going to direct your attention to the body of your report, and if you could, please turn to page 4, Paragraph 18.
A.  Okay.

Page 89

Q.  And Paragraph 18 states, "UNFI common stock and the UNFI options traded in efficient markets throughout the class period," correct?
A.  Yes.
Q.  This is the first of the opinions that you're offering in your report, correct?
A.  Yes.
Q.  And then if you would, please turn to page 6, Paragraph 24.
A.  Okay.
Q.  And Paragraph 24 states, "Section 10(b) and Section 20(a), damages in this method can be computed for all class members and all UNFI securities using a common methodology for each cause of action that is consistent with plaintiffs' theory of liability, specifically the out-of-pocket damages model which is used in virtually all Section 10(b) and 20(a) class action securities cases is appropriate and applicable here for both causes of action."

Did I read that correctly?
A.  I think you -- I think where it says

23 (Pages 86 - 89)

Page 90

"matter" on the first line, did you say "matter" or "method"? I heard "method."

MS. WOLKE: I think she did.

BY MS. UMAR:

Q. I think you're correct that I did misstate that. So let's -- leaving aside the one instance in which I said "method" other than "matter" -- and it should have said "matter" -- to be clear for the record --

A. Okay.

Q. -- did I state that correctly?

A. Yes.

Q. And that's the second of the opinions that you're offering in your report, correct?

A. Yes.

Q. And the first opinion and the second opinion we just talked about are the two opinions that you're offering in your report, correct?

A. Yes.

Q. You're not offering other opinions in your report, correct?

MS. WOLKE: Object to form.

A. Well, I mean, those are the

Page 91

conclusions and conclusory opinions, but findings along the way, I don't know if you would semantically call those opinions. But, I mean, clearly there's an implicit opinion that my methodology is valid and correct and generally accepted and widely used. But these are the stated opinions that -- the conclusory opinions.

BY MS. UMAR:

Q. So Items 1 and 2 that we mentioned are the two summary opinions that you're offering, correct?

MS. WOLKE: Object to form.

A. I would say "conclusory" rather than "summary."

BY MS. UMAR:

Q. Well -- okay. So let me rephrase that. Those are the two conclusions that you are offering in your report, correct?

A. Yes.

MS. WOLKE: Object to form.

BY MS. UMAR:

Q. And you're not offering other conclusions, correct?

Page 92

MS. WOLKE: Object to form.

A. Correct.

BY MS. UMAR:

Q. You have a section in your report entitled "Summary of Plaintiffs' Allegations," and that starts at page 9 of your report, correct?

A. Yes.

Q. You're not offering any opinions about whether the assertions you make in that section of your report are true, correct?

A. I don't make any assertions.

Q. And -- okay.

A. I didn't make any assertions in this section except for that plaintiffs are alleging these things. I'm not alleging them, and I'm not asserting them.

Q. So let me rephrase that. You're not offering any opinions about whether the matters that plaintiffs assert are true, correct?

MS. WOLKE: Object to form.

A. That's correct.

BY MS. UMAR:

Page 93

Q. Okay. And in forming your opinions, you assume that plaintiffs' allegations are true, correct?

A. I did not need to do that for this case -- for this report. I mean, I -- it wouldn't hurt to do it, but it also wouldn't help.

Q. So for purposes of your report, you didn't assess one way or the other whether plaintiffs' assertions in this litigation are true, correct?

A. That's correct.

Q. And you haven't done your own analysis to determine whether plaintiffs' allegations are true, correct?

A. That's true. That's correct.

Q. Now, you mentioned earlier that you have a general understanding that plaintiffs challenged UNFI's disclosures about procurement gains, correct?

MS. WOLKE: Object to form.

A. Disclosures or omissions, yes.

BY MS. UMAR:

Q. And you're not giving an opinion about

24 (Pages 90 - 93)

Page 94

whether any statement challenged by plaintiffs is false or misleading, correct?

A. Correct. I am not offering that opinion in this report.

Q. And you haven't formed a conclusion on that one way or the other, correct?

A. That's correct.

Q. Sir, you're not holding yourself out as an expert in procurement gains, correct?

A. Well, I'm not an industry expert. I am a financial analyst, and financial analysts are trained, as I am, to be able to evaluate a wide variety of companies and to learn how to consume the information that is produced by a company.

So in that sense, I have some expertise in knowing what the term means and what the implications are for financial analysis and valuation, but I'm not an industry expert. I'm not a grocery distribution industry expert. I'm not an expert in how to conduct procurement gains or how to record them for proper accounting purposes.

Page 95

Q. Okay. Sir, are you familiar with the term "corrective disclosure"?

A. Yes.

Q. And what is your understanding of that term?

A. Well, this is a -- that is a forensic finance term. It would be an announcement or an event that in some way informs the marketplace about something they previously did not know because it was concealed or did not understand correctly because it was misrepresented, or -- "or" is an important thing here -- it reverses any artificial price inflation that may have been introduced or maintained on account of misrepresentations or omissions.

So the word "corrective" could either mean it corrects the information or it corrects the valuation and stock price implications of the misrepresentation or omission.

Q. You mentioned that there's three separate categories, right? You said that a corrective disclosure could be something that

Page 96

revealed information that was concealed, it revealed information that previously had been misrepresented, or it reversed artificial price inflation, correct?

MS. WOLKE: Object to form.

A. Right. And that -- or -- or to dissipate the inflation. Those aren't mutually exclusive. I mean, it could do all of those things or some of them, a corrective disclosure.

BY MS. UMAR:

Q. How could a corrective disclosure dissipate price inflation if it did not reveal information that was not concealed or misrepresented?

MS. WOLKE: Object to form and to the extent it calls for a legal conclusion.

A. Well, just as a matter of financial analytics, if it -- if the misrepresentation or omission caused the stock price to be inflated and there was never an announcement about specific -- there was never an admission, like a mirror image admission from

Page 97

any party, from either a third party or the company itself or the defendants themselves that what they said was wrong but some other implications that the -- if it becomes the case that implications that would have been fully anticipated or better anticipated had the full truth been told occur, if certain developments occur and because of the misrepresentations or omissions those developments are surprises and they would not have been surprises, that kind of events -- that kind of disclosure event can dissipate the inflation even if the market does not became aware of the truth that they were deprived of.

Q. Can you give me an example, sir.

MS. WOLKE: Object to form.

A. Well, let's say there's a ship that's launched. Let's say the Titanic. And the investors ask, Are there enough lifeboats? -- no, that's not -- the investors say, Was every precaution taken in order to make sure that this is going to be a safe voyage? and -- and they're told, Yes, every possible precaution

25 (Pages 94 - 97)

Page 98

was taken. Tests were run -- tests were run to make sure that this ship won't sink. Then the ship sinks.

The market might never find out that the tests were never run, and yet whatever price inflation was introduced by the misleading statement will be dissipated when the ship sinks. People will learn that the ship sank. They won't -- they won't learn that it sank because the tests weren't run, but they will -- but the value of a seaworthy ship will be removed from the value of the company.

That's what I mean -- maybe I can think of a better one, you know, tonight. But as I sit here now, that is the kind of thing -- sometimes, you know, the company can learn -- the investors can learn by seeing as well as learn by being told what they were misled about. They can see the truth unfold in front of them rather than have -- hear an admission that they were previously lied to.

BY MS. UMAR:

Q. Sir, just to take your example, the

Page 99

sinking of a ship does not necessarily mean that tests were not run, correct?

MS. WOLKE: Object to form.

A. That's right. That's right. And that's why the market might not know that the tests weren't run. Yet, the inflation that was built into the stock price because they thought the tests were run will be dissipated nonetheless. So the market will not learn the truth, that the tests weren't run, yet the economic impact of the misrepresentation will be dissipated.

BY MS. UMAR:

Q. Well, sir, let's assume that tests were run.

A. Okay.

Q. In that example, the sinking of the ship would not relate back to the allegedly false statement, correct?

MS. WOLKE: Object to form. Incomplete hypothetical.

A. Well, that's -- you're changing the hypothetical. You agree you're changing the hypothetical?

Page 100

BY MS. UMAR:

Q. Correct. I'm asking you to assume an instance in which tests were run.

A. Right. So if proved -- but if it's proved that the tests were not run and if it's proved that the market had been told the tests were not run, the price would have been lower. The stock price of the company that owns the ship would have been lower. And if it was -- if it was proved that if the market had been told the tests were not run, they would have anticipated -- they would have appreciated a much higher risk of sinking. Even if they don't learn that the tests were not run later, the ship -- the sinking of the ship will remove that inflation.

Q. Sir, I want you to stick with my example which is let's assume that the tests were run.

A. Okay. So that there's no misrepresentation?

Q. Well, correct, right? The sinking of the ship then would not relate back to the misrepresentation -- to the alleged

Page 101

misrepresentation, correct?

A. In that scenario -- that's an alternative hypothetical scenario in which there may not have been any misrepresentation. In that case, there also would not have been any inflation.

Q. Okay. Now let's take a different example. Let's assume that tests were run. Some were positive; some were negative.

A. This is getting confusing. Okay.

Q. Okay. I mean, let's just assume --

A. Sure.

Q. -- mixed results.

A. So we have another hypothetical where they ran some tests, and some were positive; some were negative. Got it.

Q. Now, in that case, let's assume that the stock price declined after the ship sinks.

A. Well, before we assume that, what are we assuming about what the investors were told --

Q. Well, let's --

A. -- about the tests.

Q. Let's take your example, that the

26 (Pages 98 - 101)

Page 102

investors were told tests were run, period.

A. Were they told that some were positive and some were negative?

Q. No. Let's just assume that they were told tests were run.

A. So they were told tests were run, and it was concealed from them that some were negative?

Q. Correct.

A. Oh, in that scenario, usually there would be some sort of artificial inflation.

Q. And how do you measure that artificial inflation, sir?

MS. WOLKE: Object to form.

A. Well, there's a lot of different ways. I mean --

(Stenographer clarification.)

MS. WOLKE: Incomplete hypothetical.

A. Are you asking how do I know that there would be inflation, or how do I measure it when I'm doing a loss causation on damages

Page 103

analysis?

BY MS. UMAR:

Q. Let's -- let's take each of those questions. I'm curious about your answer on both of those things.

First of all, how do you know that there is artificial inflation simply from a stock price decline after the sinking of a ship?

MS. WOLKE: Object to form.

A. That's not why I would know it. I would know it because we would know that tests were run and some were negative, and the negative tests were concealed from the public. If that could be proved based on analysis and reference to generally accepted economic principles and commentary from the company and commentary from analysts, if it could be proved that that was material -- economically material information, that would -- in an efficient market, that omission would inflate the stock price.

BY MS. UMAR:

Q. But how do you measure that

Page 104

inflation?

MS. WOLKE: Object to form.

A. That's a separate question.

BY MS. UMAR:

Q. How would you measure that information in the stock price?

MS. WOLKE: Object to form.

A. Well, you can assess with valuation tools how much lower the stock price would have been if the truth had been told.

BY MS. UMAR:

Q. And then?

A. And then -- and then observe that the stock price declined when the ship sinks removes that component of inflation. That some of the stock price drop would be related to the market being unaware that the -- some tests had failed.

Q. Sir, you said some of that stock price drop would be attributable to the market being aware that some tests had failed, correct?

A. Well, it's --

MS. WOLKE: Object to form.

A. -- case -- it's -- it depends on the

Page 105

case. Sometimes all, sometimes some.

BY MS. UMAR:

Q. How do you know?

MS. WOLKE: Object to the form.

A. Valuation analysis. We can measure what impact -- what was the specific impact of the information that was concealed from the investors.

BY MS. UMAR:

Q. And how do you measure what is the specific impact of the information that was concealed from investors?

MS. WOLKE: Object to the form.

A. There's a wide variety of techniques that are used. It's valuation analysis. Analysts -- equity analysts, investment analysts run scenario analyses all the time. We see a lot of them in their -- in their published reports where they'll say -- well, I mean, it could be that -- we'll see how -- you know, analysts -- there is a number of tools that are used, and it could be observed oftentimes however the market participants are using these tools.

27 (Pages 102 - 105)

Page 106

But clearly, if there is an undisclosed risk and it's a material risk, stock price will be inflated. And when the risk materializes, that inflation dissipates.

BY MS. UMAR:

Q. Well, what tools would you use to measure how much the stock price was inflated due to specifically that issue that we're talking about?

MS. WOLKE: Object to form. Incomplete hypothetical.

A. It really depends on the facts and circumstances of the specific case. There's some kind of -- it might involve, not always, but it might involve an assessment of how -- to what extent would the market have anticipated the disclosure event, in this case the sinking of the ship, if they had known -- if they had assigned a zero probability to it but it was actually 100 percent probability, well, then all of the stock price drop would be related to what was concealed from them.

If -- you know, that is one example.

Q. What if they assumed a zero percent

Page 107

probability but it was actually a 10 percent probability? Then how much of the stock price decline would be attributable to the alleged concealment of information?

MS. WOLKE: Object to form.

A. Well, it's not -- sometimes -- I mean, if it's -- if you could -- well, there's an economic principle that says that investors on average aren't wrong. This is an economic principle called rational expectations. It says when provided with accurate information, on average, investors don't make systematic mistakes.

So as the forensic analyst looking back to assess what investors at the time would have assessed -- so it's not just my assessment of the risk, but I'm assessing how they would have assessed the risk -- I could assume that they would have -- based on certain facts that may or may not be present, it may be appropriate to assume that they would have anticipated a problem. They would question why was the company hiding this information? Why did the company not want us

Page 108

to know that these tests failed? What else are they hiding from us?

These are the kind of things that would be involved in an assessment of how much artificial inflation was introduced and how much of the price decline at the back end related to that artificial inflation.

There is also -- there's a whole theory of -- a set of -- a set of principles in economics called asymmetric information that relates to game theory, and there were two Nobel Prizes awarded for this -- this line of research where the scholars and thought leaders who worked in this area pointed out that when investors or one party of a negotiation is aware that the other side is lying to them, so -- is lying to them, they would often assume the very worst, the very worst case because knowing that the -- it's game theory, so -- knowing that the other side would know that, they would assume the very worst case. Unless the very worst case was the actual existing condition, it would be beneficial for them to reveal the negative

Page 109

information.

So this asymmetric information research says that if you become aware that something's being concealed from you, you will price your stock -- you will price the item being negotiated as if the very worst outcome is the one that's likely to happen.

So that might be appropriate in a case. We're talking generally, not this case.

BY MS. UMAR:

Q. I understand, sir.

A. It might be; it might not be. I'd have to -- I haven't done the loss causation and damages analysis in this case yet to know.

Q. Okay. So let's stick with our hypothetical then, again, if you will.

But let's assume that -- taking the hypothetical that we've been talking about, investors priced the risk of tests failing as zero percent, and, in fact -- and, in actuality, the failure rate was 10 percent.

A. Uh-huh.

Q. In that case, a stock price decline after the ship sinks may be fully attributable

28 (Pages 106 - 109)

Page 110

to the alleged concealment of information, but it may not be, right?

MS. WOLKE:  Object to form. Incomplete hypothetical.

A.  Because it's an incomplete hypothetical, there's a range of possible conclusions you might arrive at.

BY MS. UMAR:

Q.  Exactly.  That's the point.

There's a range of possible conclusions in that case --

A.  Depending on the specifics.  Why didn't the -- why didn't the company tell the investors that there was a 10 percent chance of the ship sinking?

Q.  And --

A.  Why didn't they tell them that?  That would be interesting -- that would be material information in itself.  Not just the substance of the omission but the fact of the omission becomes important information.

Q.  In connection with evaluating what the stock price impact was of the alleged concealment of a 10 percent test failure rate,

Page 111

there's not one specific technique that would always be used, right?

MS. WOLKE:  Object to form.

A.  I think there would be a best technique given the specific facts and circumstances.

BY MS. UMAR:

Q.  And what technique would that be?

A.  I don't know.  It depends on the facts and circumstances.

Q.  And so there's not one that would apply across the board.  You'd have to look at the facts and circumstances, correct?

A.  That's fair.

But having done that, one will emerge as being the best technique.

And I do want to point out also that one important factor that might differ from one case to another is whether what's being concealed is something that is an existing condition or a potential development that may or may not occur in the future.  The analysis is much easier if it's an existing condition that's being concealed.

Page 112

Q.  And if it's a potential condition, explain to me why that's much more -- a much more difficult analysis?

A.  I didn't say it was much more.  It would just involve -- it may involve some of what we've been talking about whereas existing conditions probably wouldn't.

Q.  And -- okay.  So --

A.  I'll tell you what.  I mean, instead of it being a 10 percent chance of the ship sinking, we would be talking about a binary zero or 100 percent of what the conditions are today.

So if someone proves that this ship was not seaworthy with 100 percent chance or 100 -- you know, it's a fact, not a probabilistic determination but a fact, then you don't have to -- then the forensic analyst doesn't have to estimate -- it becomes -- he doesn't have to estimate what investors would have thought had they been -- the forensic analyst doesn't have to assess what investors at the time themselves might have had to assess about an uncertain situation.  The

Page 113

forensic analyst can say, Had there been full disclosure, I know that investors would have known X, Y, and Z.

Q.  Okay.  So you just talked -- this is very helpful.

So you just talked about the need to differentiate between factual information versus probabilistic information.

Am I -- am I describing it accurately?

MS. WOLKE:  Object to form.

A.  No.  What I said is that -- well, you said I'm describing the need to do that.  I was trying to give more color to the fact that the hypothetical was incomplete, and these sort of factors would be helpful to know to complete the hypothetical.

BY MS. UMAR:

Q.  Okay.  But suffice it to say that the analysis would be more complicated when what you are talking about is the risk of probabilistic future events as opposed to current events, correct?

A.  Well, current conditions -- current

29 (Pages 110 - 113)

Page 114

conditions as they exist. I mean, a valuation is always forward-looking, but valuation -- but what a forward-looking valuation takes into account is the current condition of the entity.

Q. Okay. But -- but probabilities of future conditions are more difficult to estimate, correct, in terms of how investors would have evaluated the impact of that information had they known it at the time?

MS. WOLKE: Object to form.

A. Sometimes, not always. Sometimes it can be but not always.

BY MS. UMAR:

Q. And what types of methodologies would you use in order to determine how investors may have evaluated probabilistic future events had they known the information at the time?

MS. WOLKE: Object to form.

A. It depends on the facts and circumstances of the case.

BY MS. UMAR:

Q. Could reasonable people differ on an appropriate methodology to be used in

Page 115

connection with measuring probabilistic future events and how investors would have evaluated that information had they known it?

MS. WOLKE: Object to form. Calls for speculation.

A. I think there's a -- there's a best methodology given each set of facts. Sometimes reasonable people get it wrong, but I think -- I think, given a certain set of facts, there would be -- at least I will arrive at an assessment of what the best methodology is for calculating the damages.

BY MS. UMAR:

Q. And it's possible someone could disagree with you, correct?

MS. WOLKE: Object to form.

A. Oh, yeah. I mean, almost every case there's someone who could disagree with my conclusions, and then, you know, ultimately I'll point out why they're wrong.

BY MS. UMAR:

Q. Okay. Let's take a different hypothetical.

Let's assume that the ship hits an

Page 116

iceberg and it sinks and that could not have been prevented by running any test. Okay?

Do you have that hypothetical in mind?

A. Well, if we're talking about the Titanic, I don't think that's the correct set of facts.

Q. Well, understood.

And we're taking --

A. There were design flaws in the Titanic --

Q. Let's --

A. -- that made it susceptible to an iceberg strike.

Q. Well, let's make up my own ship.

A. Okay.

Q. And let's assume that my ship hits an iceberg and it sinks and the appropriate testing that -- you know, state-of-the-art testing available before my ship was launched would not have evaluated the risks associated with hitting an iceberg.

Do you have that in mind?

A. I do.

Q. Okay. Now, let's say the ship does

Page 117

sink, and the stock price declines. That wouldn't be attributable to any statements that were made about testing that was run, correct?

MS. WOLKE: Object to the form.

A. I would have to think about it. I really -- I would have to think about that specific hypothetical. It may or may not. I mean, as I sit here now, I would want to think about it some more.

BY MS. UMAR:

Q. How could it?

MS. WOLKE: Object to form.

A. Well, I think -- I mean, I think there's actually some case law about situations like that. But as an economist, I'd just have to think about it some more.

BY MS. UMAR:

Q. So your position is if that ship sinks and testing could not have evaluated the possibility of that happening, it's possible that a stock price decline might still relate back --

30 (Pages 114 - 117)

Page 118

A. No.

MS. WOLKE: Object to form.

BY MS. UMAR:

Q. -- to statements about testing?

A. I said that I haven't arrived at a conclusion or opinion to offer in response to that question, as I sit here now.

I mean, the damage methodology that I wrote about is one would measure how much the inflation -- how much the stock was inflated at the time investors purchased the stock and how much the stock was still inflated when investors sold the stock or some period after the case is filed. And the difference between those two inflations measures how much they overpaid for the -- for the security and were not ultimately later reimbursed for, and that's the basis of the out-of-pocket damage methodology.

I mean, that is the opinion I offered in the report.

Some of these other -- you know, these complicated hypotheticals, I would have to think them through to see if they apply to

Page 119

this case at all. I'm not sure they do.

Q. Well, let's take my hypothetical again.

How would you evaluate in the instance that the stock price declined, you know, in the events that we're talking about in my hypothetical whether that related back to disclosure about testing?

MS. WOLKE: Object to form.

A. Well, I mean, either I or someone would have to make an evaluation. Did people overpay for the stock because of the testing, and was the loss -- did the loss dissipate that artificial inflation? The loss, when it occurred, did it dissipate the artificial inflation?

And I have to be careful not to -- not to wander into a legal debate, but I think this might be an area where a forensic economist would take some guidance from the court because I understand there's some disagreement from the Dura case, how the Dura case precedent is applied.

The way I -- again, I want to make

Page 120

sure -- I want to make sure it's real clear I'm not offering a legal opinion here. I'm just offering some observations I've had from being involved in these cases. But I've heard it described like this. You have a company whose stock price is artificially inflated because of some misrepresentations and omissions, and then an asteroid comes and destroys the entire company.

So clearly the inflation is gone now, but what triggered the dissipation of inflation was not a disclosure of the truth. It was the asteroid.

Whether investors are entitled to how much they overpaid for the stock is actually a legal question. I mean, as a finance expert, I can explain how much they overpaid for the stock. I can explain how much they lost when the asteroid hit, but, you know, whether they're entitled from a legal perspective for the amount they overpaid is more of a legal question than an economics question.

BY MS. UMAR:

Q. How do you figure out how much they

Page 121

overpaid for the stock, though?

MS. WOLKE: Object to form.

A. Well, that's financial analysis. That's scenario analysis. That's valuation analysis. What would someone have valued the stock with the full set of information versus what would they have valued the stock with the incomplete or misrepresented information? That is -- that is in the wheelhouse of financial economics.

BY MS. UMAR:

Q. I mean, just to -- following up on your most recent example about this asteroid, in your opinion, would the losses suffered by the investors be attributable to the alleged misstatement?

MS. WOLKE: Object to the form.

A. Well, they overpaid. I mean, this is -- I mean, it would be indisputable, given this set of facts, that the investors overpaid. It's a legal question whether they're entitled to that overpayment or not to be compensated for how much they overpaid.

BY MS. UMAR:

31 (Pages 118 - 121)

Page 122

Q. Why did they overpay?

MS. WOLKE: Object to form.

A. Well, because the -- the scenario, the hypothetical story was that there were misrepresentations and omissions that inflated the value of the company, that inflated the market price of the company. So anybody who bought it was paying more than they would have bought if the full truth were disclosed.

But what triggered the dissipation was not -- in this hypothetical was not a corrective disclosure that informed them of the truth. It was instead an event that destroyed all value in the company.

I think -- again, I -- I'm not offering a legal opinion. I'm just offering some observations of how various legal observers and authors have addressed this question. Some will say that they would have suffered that loss -- that sort of a benefit of the bargain argument that even -- if the truth had been as was represented, they would have lost the same amount of money. That's the argument to say that they don't get

Page 123

compensated.

Then the other argument is, yeah, but if the truth were told, they would have lost less money. That's the argument that they should be compensated, but I'm not offering a legal opinion. I'm just offering what I know about the legal argument that I've heard tossed back and forth by lawyers who are experts.

Q. Understood. And I am interested in the financial economics piece off this, not the legal opinion piece of this. So just sticking with this asteroid example, in order to know that the stock price was inflated, you have to evaluate that based on the fact that there was dissipation in the stock price, correct?

A. No.

MS. WOLKE: Object to the form.

A. No.

BY MS. UMAR:

Q. You don't need any dissipation in the stock price to know that the stock price was inflated?

Page 124

A. You can arrive at that conclusion under -- again, this is hypothetically speaking now. But the way I understand your hypothetical is you can do valuation analysis to determine what would the stock have been priced at if the full truth were out versus -- that's the but-for price, and what would -- was the stock evaluated at by the market with the misrepresentations and omissions. The difference is the artificial inflation.

Q. Correct. And how do you measure that artificial inflation?

A. With valuation analysis. Like, you would run a scenario analysis according to valuation models. With the full truth, what would the stock price have been? With misrepresented facts, what was the stock price at? The difference is inflation.

Q. Sir, how do you gauge the artificial inflation attributable specifically to the failure to make a -- the -- so you're talking about a but-for statement, correct? A but-for statement is something that, you know, you describe as causing inflation in a company's

Page 125

stock price, correct?

MS. WOLKE: Object to form.

A. Yes.

I want to add something to my previous answer. I'm saying that's the only way to measure inflation. I just want to -- it's a way you can measure inflation.

I think maybe what's confusing here oftentimes people will look at the back end corrective event to measure the inflation, but I want to point out it's not the only way to measure inflation. It might be a good way, depending on the facts of the case. It's not the only way. There are many ways.

BY MS. UMAR:

Q. If you don't look at the -- have you conducted analysis in this case as to whether valuation techniques beyond looking at the back-end corrective event are appropriate?

A. No. But let me just add something. Let's say you go to buy a car. You go to buy a used car, and they tell you that it's a 2020 model, and there's a blue book price for the 2020 model. And -- but it turns out it's

32 (Pages 122 - 125)

Page 126

actually a 2019 model, and it's got a lower blue book price. And they mislead you. They told you it was 2020 car. It's actually a 2019 car.

By looking at these two blue book numbers, you know how much you overpaid at the outset. You know how much the car was artificially inflated -- how much its price was artificially inflated. In that particular scenario, you wouldn't have to then go to the market and try to sell the car to learn that you were defrauded or to measure how much you were defrauded by. You can -- you can tell from analysis on the front end. So that's an example of how you don't always need to measure inflation from the back end.

Now, I want to point out that it's not exclusive. That's not the only way to measure inflation because when you do bring the car to a dealer to sell it and they tell you, Hey, this is a 2019 car and I'm going to give you less money for it, that's another way to learn what the inflation was and how much you were defrauded.

Page 127

So even in your hypothetical, there are other -- there are different methods that determine that are based on what actually happened.

THE WITNESS: Can we take a break, or is there a question?

MS. UMAR: Yes, we can take a break. Can we take five minutes, please. Let's go off the record.

THE VIDEOGRAPHER: The time is 11:25. We're going off the record.

(Recess taken from 11:25 a.m. to 11:38 a.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 11:38.

BY MS. UMAR:

Q. Sir, you're not providing any opinions on loss causation currently, are you?

A. That's correct.

Q. Sir, I'd like to direct your attention to Paragraph 45 of your report, which is at page 11.

Page 128

A. Okay.

Q. Paragraph 45 defines "market efficiency" to mean that "Material public information is not ignored by the market but rather is considered by market participants and is incorporated and reflected in the trading prices of securities with reasonable promptness," correct?

A. Yes.

Q. And is this the definition of "market efficiency" that you applied in reaching your opinions?

A. Actually, I thought the ending -- the second to the last paragraph of this section is the definition, but they're consistent. 52 says -- Paragraph 52 says -- you can see what it says -- an efficient market, as defined and discussed by all these folks in authorities, is "A market in which publicly available information is incorporated into the price of a security such that the trading price reflects publicly available information with reasonable promptness."

Q. Okay.

Page 129

A. That's the definition.

Q. Is market efficiency a concept that you teach at Babson?

A. Yes.

Q. And is this definition available in Paragraph 52 of your report the same definition you use in your classes?

A. Yes. I mean, there are different forms of market efficiency, but I explain this form. This is the -- as it says here -- well, what I wrote here acknowledges that there are different forms, and this is the definition that's relevant for a securities case.

Q. And so my understanding is that what you set forth here is the definition of a semistrong efficient market; is that correct?

A. Semistrong form, but also informational rather than fundamental efficiency.

Q. And in teaching your classes at Babson, is this the definition you use in connection with semistrong form and informational markets?

33 (Pages 126 - 129)

Page 130

A. Yes.

Q. Sir, you've published articles that discuss market efficiency, correct?

A. Yes.

Q. And in discussing this type of efficient market, have you used the same definition in those articles?

A. I think so.

MS. WOLKE: Object to form.

A. I think so. I mean, the verbiage might be a bit different, but the concept's the same.

BY MS. UMAR:

Q. Sir, in Paragraphs 46 through 47, you quote Nobel Laureate Eugene Fama, I think, as saying "A market in which prices always fully reflect available information is called efficient," correct?

A. Yes, but then I point out that he tempered the definition somewhat to conform to economic realities rather than the perfect ideal, as I explain in Paragraph 47.

Q. Well, let's switch to a slightly different subject.

Page 131

In Paragraph 46, you quote Alan Bromberg and Lewis Lowenfels, who are quoted in the Cammer case as saying, "An efficient market is one which rapidly reflects new information and price," right?

A. That's right.

Q. And you agree with that statement, correct?

A. Yes.

Q. Is there a difference between rapidly reflecting new information and reflecting new information with reasonable promptness?

MS. WOLKE: Object to form.

A. Well, I think having both perspectives conveys that there's not only one standard for rapidly or promptness --

BY MS. UMAR:

Q. Do those --

A. -- for speed. There's not just one standard for speed. And that's been recognized over and over again in the literature.

Q. Do those terms mean different things?

Page 132

MS. WOLKE: Object to the form.

A. Well, as they relate here, no. I mean, as -- they're both -- they both accommodate that an efficient market, depending on the information, absorbs information not always at the same speed, depending on the nature of the information and the nature of the announcement.

BY MS. UMAR:

Q. So as those terms relate to market efficiency here, "rapid" and "reasonably prompt" are the same thing, correct?

MS. WOLKE: Object to form.

A. Well, I think they -- they're different words obviously, but I think the fact that different words are used by different commentators and thought leaders teaches that there's not just one standard for speed in an efficient market.

BY MS. UMAR:

Q. But my question is different. As they relate to an efficient market here, "rapid" and "reasonably prompt" do not mean different things, correct?

Page 133

MS. WOLKE: Object to form.

A. Correct. They both accommodate variation, depending on the nature of the news.

BY MS. UMAR:

Q. What does "rapid" mean?

MS. WOLKE: Object to form.

A. It's an adverb related to speed.

BY MS. UMAR:

Q. And what increments of time does "rapid" refer to in connection with an efficient market?

MS. WOLKE: Object to form.

A. I answered that question two questions ago that the word accommodates a variation of speed. It's not just one standard of speed for all information releases.

BY MS. UMAR:

Q. What's the range of the variation?

MS. WOLKE: Object to form.

A. For some kinds of information it's very, very quick, like 15 minutes.

For some types of information and some types of announcements, I've seen

Veritext Legal Solutions

www.veritext.com                    888-391-3376

Page 134

announcements that people studying it have discovered it could take five days, and analysts are still evaluating what the meaning of the information is. So, I mean, I'm not saying that is the entire range, 15 minutes to five days, but I've seen both described as the functioning of an efficient market.

BY MS. UMAR:

Q. What's an example of an efficient market in which a piece of information took five days to incorporate?

MS. WOLKE: Object to the form.

A. Well, one case that I testified in in court was this -- it was the Apollo Group, which is the parent company of University of Phoenix. And there was an announcement that the department of education was going to fine the company for having violated recruiting rules, and the stock fell. But it took five days for an analyst to point out that really the implications of that news was not just the dollar magnitude of the fine but rather that the company was going to have to change its recruiting standards, and that would have a

Page 135

much more severe impact on the price. And the stock fell again.

So the fact that the analysts were still grappling with how to interpret and how to incorporate that information in the news -- they didn't ignore it -- they didn't ignore it, but some information is harder than others to fully evaluate. It took the market five days to get the news incorporated fully.

So I think what's important is that usually the market begins right away trying to incorporate the news, but it doesn't finish within any specific standard of time.

BY MS. UMAR:

Q. Is five days rapid?

MS. WOLKE: Object to form.

A. Depending on the nature of the news, yes. I mean, the market didn't -- I mean, that was an efficient market. The market did not ignore the news. And as soon as they figured it out -- what the implications of that news were, the stock price responded.

BY MS. UMAR:

Q. Was the -- in that case, was the stock

Page 136

price decline following the analyst commentary five days after the company's news was published something as to which damages were recoverable?

MS. WOLKE: Object to form.

A. The jury thought so. I -- I agreed with them -- they agreed with me.

BY MS. UMAR:

Q. Now, your study uses daily returns, right?

A. Yes.

Q. Why would you use daily returns if you didn't expect information to be incorporated within one day?

MS. WOLKE: Object to form.

A. Well, what I said just now in the last few answers I gave to you is that the -- depending on the nature of the news, the market might not finish within one day, but usually they begin within one day, and for many different kinds of announcements, the reaction is completed within one day. So one day is a reasonable choice, and it's widely used for event-study analysis.

Page 137

BY MS. UMAR:

Q. Have you seen any information in this case that would not be incorporated within one day?

MS. WOLKE: Object to form.

A. I haven't formed an opinion about that. I looked at the information. I know the history and experience of the company. I have not -- well, I did the event studies, and the event studies indicated, to a very high degree of statistical certainty, that the market reacted in one day, but it didn't necessarily prove that it was -- that the reaction didn't also extend to the next day. It was for purposes of establishing market efficiency. I didn't -- that wasn't necessary.

BY MS. UMAR:

Q. Let's focus specifically on earnings where guidance news that's released premarket.

Do you understand what I'm saying?

A. Yes.

Q. How quickly would you expect price to incorporate that type of news?

35 (Pages 134 - 137)

Page 138

MS. WOLKE:  Object to form.

A.  Well, there are academic studies on that.  Earnings announcements about earnings tend to be the most quickly absorbed.  I mean, and there's -- the literature explains why, but I still think even in -- even in the seminal articles that draw that conclusion.

Patel and Wilson, for example, they point out that it might actually continue on to next day.  You might have to look at more than one day.  But I think the generally accepted principle among finance academics and practitioners is that kind of news, guidance and earnings, is among the most rapidly digested information.

BY MS. UMAR:

Q.  What kind of tests would you conduct to evaluate whether that type of news took any longer than one day to be incorporated?

MS. WOLKE:  Object to form.

A.  Well, you can't ignore what happens the next day.  You might want to look at it.  And if there's a significant movement the next day, the second day, you would want to see was

Page 139

there some other news that came out that would explain a new drop -- a new drop or a new rise responding to new information.  There's some analysis and judgment involved.  I mean, you want to see if there is a significant movement the second day and if there's some other explanation for that significant movement aside from there being an extended reaction to the first day's announcement.

I think -- oh, also, there's other things you might look at too.  You might want to look to see if analysts are still publishing about it.  I mean, sometimes there will be an announcement on the morning of Monday, and you'll have a number of analyst reports that come out on Monday or even after the close on Monday, and there's -- some of the same analysts will revise their valuations as of Tuesday morning, which could make what ordinarily would have been a one-day reaction into a two-day reaction.

MS. UMAR:  I want to show you a document.

Page 140

(Exhibit No. 2 marked for identification.)

MS. UMAR:  This will be Exhibit 2.

BY MS. UMAR:

Q.  Sir, I'm showing you a document that I've marked as Exhibit 2.

Do you see that this contains the company's -- UNFI's March 8, 2011 earnings release?

A.  (Witness reviews document.)

Well, it's not all of it because the 10-Q was released the same day.  But this has some of it.

Q.  Yes, sir.

And I'm talking specifically about the press release regarding the company's earnings.

A.  I see.  That's what this contains.  But there was also a 10-Q and conference call the same day.

Q.  Okay.  Understood.

Page 141

And so on this day, an earnings press release was issued as well as a Form 10-Q and a conference call took place, correct?

A.  That's right.

Q.  Now, have you analyzed whether the information disclosed on March 8 by the company was incorporated within the company's stock price on March 8?

A.  Well, I ran an event study, and I found that the market reacted with a statistically significant drop in the price on March 8.  That's -- that's what I found.  I did not proceed to do a loss causation or damages analysis or even -- for that reason.

Q.  Did you evaluate whether it took any longer than March 8 in order for the market to incorporate the information disclosed on March 8th?

A.  No.  It wasn't necessary to do that for establishing or testing market efficiency.

Q.  Now, the company also announced earnings on June 7, 2023 and issued a Form 10-Q and had an earnings call that day, correct?

36 (Pages 138 - 141)

Page 142

A. June 7, 2023, yes.

But, one moment, let me just -- I'd like to refer to the list of earnings announcements on page 35.

Q. Sure.

A. So you're asking about June 7, 2023?

Q. Correct.

MS. WOLKE: Well, there's both. You said 22, I think, but there's also June 7, 2023. Right?

MS. UMAR: No, I was asking about 2023.

MS. WOLKE: Okay.

MS. UMAR: Actually, I think I stated it correctly that time.

MS. WOLKE: Sorry. My fault.

MS. UMAR: That's okay.

MS. WOLKE: Okay.

THE WITNESS: All right. The answer is, yes, I looked at that day.

BY MS. UMAR:

Q. Okay. And did you evaluate whether the market took longer than June 7, 2023 to incorporate the information that was disclosed

Page 143

on that day?

MS. WOLKE: Object to form.

A. Well, the test, as I explained, was to see whether there was a significant reaction on that day to the news informing us that the market began at least -- at least began immediately to process the news and react to the news, and I found that it did.

There is -- I did look at all other days, and we can look in -- look at -- well, Exhibit 21 would work for this purpose. We can look at -- it's here in the report. We can look at June 7, 20- -- yeah, we can look at -- it's page 301. There are significant declines on June 7th, June 8th, and June 9th.

BY MS. UMAR:

Q. Did you conduct an analysis of how long it took for the market to incorporate the information disclosed on June 7?

MS. WOLKE: Object to form.

A. No, that wasn't necessary. I mean, what was necessary for the purpose of the test, and I articulated how the test works, was to test the earnings announcement and to

Page 144

test all the earnings announcements and see whether the stock has statistically significant movements more frequently on earnings announcement days than other days.

Now, the literature says that when there's very surprising news that causes investors to reevaluate their fundamental assumptions about the future of the company, that there will be more protracted reactions, which may be what's happening here, as we see on page 301. But the fact that it reacted immediately on June 7th with a statistically significant drop is a demonstration of market efficiency.

BY MS. UMAR:

Q. Okay. So --

A. But the fact that it went on for two more days doesn't disprove market efficiency is what I want to say.

Q. Okay. But you have not analyzed how long it took for the market to incorporate the information disclosed on June 7, 2023, correct?

MS. WOLKE: Object to form.

Page 145

A. What -- what I've stated in the report and what we see on page 301 is the market reacted immediately to this news. It may have continued processing the news on the next two days, but I haven't formed an opinion about that.

And that -- and if it was continuing to process the information because it was such a surprising announcement, that would not in any way affect the results of the test or the conclusion of market efficiency.

BY MS. UMAR:

Q. Okay. And you said, sir, that you have not formed an opinion about that, correct?

A. Correct.

Q. Okay. In Paragraph 50, you quote the Supreme Court's Amgen decision as saying that the price of a security traded in an efficient market will reflect all publicly available information about a company, correct?

A. I'm sorry. What paragraph are you on?

Q. That is Paragraph 50, sir.

A. Yes.

Veritext Legal Solutions

www.veritext.com                                              888-391-3376

Page 146

Q.   Now, in your definitions, you reference material public information instead of all information.

Why is that?

MS. WOLKE:  Object to form.

A.   Where are you looking for the definition?

BY MS. UMAR:

Q.   It's Paragraph 50 -- I was looking at Paragraph 45, but I think you've now moved to a different definition in Paragraph 52.

A.   Oh, well, right.  I mean, 45 says that if information is economically material, it's not going to be ignored.  52 doesn't have the word "material" in it.  It says an efficient market, as defined -- as defined by all these folks summarizing and consolidating their -- their definitions, is a market in which publicly available information is incorporated into the price of the -- of a security.

I mean, for some information -- some public information might not have any effect, in which case not having an effect is the appropriate way to incorporate it.

Page 147

Q.   Okay.  Let's move to something else.

In forming your conclusions, you applied the five Cammer factors, correct, among other things?

A.   I examined them.

Q.   Okay.  And the fifth Cammer factor is empirical evidence that the stock price reacts to new company-specific information, correct?

A.   Yes.

Q.   Okay.  In providing opinions about the fifth Cammer factor, you're not giving an opinion on whether stock price movement on any specific day was caused by a particular company disclosure, correct?

MS. WOLKE:  Object to form.

A.   Correct.  In this report, I explain that for this purpose.  For loss causation and damages, I would evaluate specifically which information the price was reacting to.  For market efficiency, it doesn't matter whether it's reacting to allocation-related information or something else.

BY MS. UMAR:

Page 148

Q.   Okay.  And so today you're not giving an opinion on whether stock price movement on any specific day was caused by any specific company disclosure, correct?

A.   That's right.

MS. WOLKE:  Object to form.

BY MS. UMAR:

Q.   Now, we talked about how the fifth Cammer factor causes you to examine whether stock price reacts to new company-specific information, right?

A.   Well, I mean, it --

Q.   Let me --

A.   -- it requires a test to see --

Q.   Let me restate that question because I think I stated that inartfully.

A.   Okay.

Q.   In applying the fifth Cammer factor, you examined whether the company's stock price reacted to new company-specific information, correct?

A.   Yes.

Q.   Okay.  And in Paragraph 117 -- that's on page 30, sir -- you state that an event

Page 149

study measures how much a stock price rises or falls in response to new company-specific information, correct?

A.   We're looking at 117?

An event study does that.  That's right.

Q.   Yes.  That's the first sentence of Paragraph 117.

A.   Right.

Q.   Now, new information is information that was not previously known to the market, right?

MS. WOLKE:  Object to form.

A.   Yes.

BY MS. UMAR:

Q.   And the reason that the fifth Cammer factor focuses on new information is because, in an efficient market, information that was previously available would already have been incorporated into the company's stock price, correct?

A.   Yes, but it's important to evaluate whether it truly is stale information as opposed to new information.  Sometimes the

38 (Pages 146 - 149)

Page 150

repetition of information from a new source might look like old information, but being from a new source, it's new information.

So if there is no new information content to an announcement whatsoever, that would be considered stale information, and the stock would not be expected to necessarily move significantly in response to it.

Q. Okay. So in connection with the disclosure of stale information, the stock price would not be expected to move, correct?

MS. WOLKE: Object to form.

A. Well, it's kind of a contradiction in terms to say the disclosure of stale information.

The repetition of stale information, if there truly is no new content -- no new information content, you can't expect it to necessarily elicit a significant price reaction.

BY MS. UMAR:

Q. Okay. So let me rephrase.

The repetition of stale information

Page 151

would not be expected to cause a company's stock price to move, correct?

A. As -- as long as you're absolutely sure that it truly is stale information.

Q. If there were market reaction to stale information, that would suggest market inefficiency, correct?

MS. WOLKE: Object to form.

A. I've seen people make the mistake of opining that, not realizing that what they thought was stale information actually had some new information content. But like I said before, if it truly is, you know, stale information that has no new informative content, it wouldn't -- it shouldn't move the stock price significantly.

I mean, it might be coincident with something else that happens that moves the stock price significantly. But, in theory, information that has already had its price impact won't have another price impact.

BY MS. UMAR:

Q. So you are -- you're differentiating between information that may not truly be

Page 152

stale and stale information, right?

A. Yeah. I just want to point out that oftentimes people will say that I think we found a market inefficiency. The market is reacting to stale information. And the flaw in some of these studies or opinions is that the information wasn't really stale, or the repetition by a new source was considered by the market to be validation or verification that had an impact.

Q. Okay. But the new information disclosed would have to be material to have a stock price impact, correct?

A. Well, that's --

MS. WOLKE: Object to form.

A. Yes, I would agree that new material information will have a price impact in an efficient market, and that --

(Stenographer clarification.)

A. -- in an efficient market. And stale information that's immaterial, you shouldn't.

BY MS. UMAR:

Page 153

Q. Well, even new information that's immaterial shouldn't, correct?

MS. WOLKE: Object to form.

A. In theory. I mean, we have to be careful when we have this discussion because, you know, in theory, in an ideal world, I would have to agree that that -- that would be true.

But when you start doing empirical work, it becomes a question of is the information really stale? Is it really immaterial? Maybe they're -- maybe the market considered it material for some nonobvious reason. So you would have to do some analysis before you drew the -- any conclusions.

But, in theory, right, new material information moves the stock prices. Old information that's already been incorporated in the stock price won't move the stock price again.

BY MS. UMAR:

Q. Correct.

And immaterial information, even if it is new, should not move the stock price

39 (Pages 150 - 153)

Page 154

either, correct?

A. As long as everyone can agree that it truly is immaterial.

Q. Okay. But that's what the theory is, correct?

A. Yes.

Q. That's an economic principle, correct?

A. Yes.

Q. Now, sir, you say in Paragraph 113 at page 30 that "Significant stock price reactions to new valuation-relevant information demonstrate market efficiency."

Do you see that?

A. Yes.

Q. What is "valuation-relevant information"?

A. Well, according to generally accepted valuation principles, it's the kind of information that would change a valuation.

Q. And what kind of information would change a valuation under generally accepted principles.

A. There's a wide range. I mean, there's

Page 155

textbooks written on valuation, 400-page textbooks, and there's new articles published every day with -- that evaluate other factors that impact valuation. You want me to give examples of some?

Q. Yes, I would ask you to set forth your definition of value-relevant information.

A. Well, I --

MS. WOLKE: Object to form.

A. That would take us at least a semester, of course. I mean, there's -- a lot of information is valuation-relevant. Cash flows are relevant. Earnings are relevant. Margins are relevant. Gross profit, net profit, these things are relevant.

What I teach my students is that some metrics that are relevant for some industries are not relevant for others, and then some seemingly -- well, yeah, the example I often give is that in retail, same-store sales is a metric that the market hangs on with bated breath whereas you don't see that mentioned in a pharmaceutical company generally.

So what's the valuation relevant for

Page 156

one company or one industry might not be valuation relevant for another. But there are -- there's a list. There's a list of variables that are generally accepted to be relevant for all stocks.

Q. In an efficient market, the stock price would not be expected to change if information disclosed is not value-relevant, correct?

A. Well, that's the same thing as saying immaterial or economically immaterial. And then it might be a matter of opinion about whether it truly is valuation relevant or not.

Q. Okay. But economic theory holds that if information is not value relevant, it would not be expected to impact a company's stock price, correct?

A. It's a tautology. What they mean -- if it's not valuation relevant, that means it would not be expected to impact the stock price.

Q. Let's talk about your event study. An event study looks at stock price changes that

Page 157

aren't attributable to market and industry factors and considers whether they could be explained as random fluctuations, correct?

A. That's right.

Q. And your event study analyzed UNFI common stock during the putative class period, correct?

A. That's right.

Q. And you used daily stock price data for UNFI common stock, correct?

A. Correct.

Q. And you specifically analyzed seven dates on which UNFI announced earnings during the proposed class period, correct?

A. That's right.

Q. Why did you --

A. Well, actually that's not entirely correct. I looked at every single day in the entire class period. I divided every single day in the entire class period into two groups. One group was an earnings announcements. The other group was all other days. But I examined every single day in the class period.

40 (Pages 154 - 157)

Page 158

Q. But you conducted a separate analysis focused specifically on the seven days during the class period?

A. That's not true. I ran event studies on every single day in the class period to see whether the frequency of statistically significant movements was greater in the earnings announcement group as opposed to the group of all other days in the class period.

Q. Well, you conducted additional analysis on seven dates within the class period, correct?

MS. WOLKE: Object to form.

A. No, that's not correct. I performed the same analysis on the earnings announcements as on the nonearnings announcements and then tested to see whether the frequency of statistically significant movements in the earnings announcement group was the same, greater, or less than the frequency in the group of all other days.

BY MS. UMAR:

Q. So let me ask a different question. You conducted incident rates of statistical

Page 159

significance looking specifically at seven earnings release dates, didn't you?

MS. WOLKE: Object to the form.

A. I calculated the incidence rate for the group of earnings announcements. I also calculated an incidence rate for all other days that were not earnings announcements.

BY MS. UMAR:

Q. I understand that. I'm simply asking -- what I am simply asking you to verify is that you did -- you looked at two datasets. You looked at all of the dates, and you looked also at seven earnings release dates, correct?

A. I separated all of the dates into two groups.

Q. Okay. Why did you -- why did you separate the data into those two groups?

MS. WOLKE: Object to form.

A. I explain that in my report. I explain that, according to the literature, earnings announcement dates are generally understood to have higher information flow. So by separating them into two groups, I have

Page 160

a group of dates with high information flow and a group of dates where on average there's less information flow. If there's a difference between the two, we can attribute it to the information.

BY MS. UMAR:

Q. For each trading date analyzed, you used data from the one year of data preceding that day, correct?

MS. WOLKE: Object to form.

A. For purposes of running the regression, that allows me and any researcher or observer to separate out market effects, industry sector effects, and assess reasonably contemporaneous volatility.

BY MS. UMAR:

Q. Correct. And that's called a rolling regression, right?

A. That's right.

Q. In running your rolling regression, why did you choose the prior year of data?

A. I explain that here. I mean, the answer is because it's a generally accepted methodology, but I cite to it, I say

Page 161

specifically. It's in a footnote where I cite to an article that recognizes that to be generally accepted methodology. One moment, please.

(Witness reviews document.)

It's going to be somewhere around 39 -- 37, 38, 39.

Footnote 65 attaches to Paragraph 144. "The choice of using data preceding the event dates for the regression estimation period is a widely used and generally accepted practice in event study analysis." And that's -- we can look at Tabak and Dunbar for support for that.

Q. Looking at alternative windows is also generally accepted, correct?

MS. WOLKE: Object to form.

A. Yeah, yeah. So it wouldn't be wrong to look at a window that straddles the date or follows the date. But leading up to the date, I think it's the most common method used, but it's -- and it's generally accepted.

BY MS. UMAR:

Q. Did you evaluate whether to use a

41 (Pages 158 - 161)

Page 162

period that straddles the date?

A. No.

Q. Did you evaluate whether to use a period that follows the date?

A. For what reason? I mean, just to -- for robustness or for -- I mean, this is a general -- this is how the test is run. This is how I always run the test when the data is available to run it this way.

I think, if anything, running it different ways like that would just raise questions as to why the standard methodology wasn't being used. So I used the standard methodology that I always run, that I always use if the data is available.

Q. Are there any circumstances in which using a window of data that straddles the date or follows the date may be more appropriate?

MS. WOLKE: Object to form.

A. Oh, yeah, yeah. If it's a recent IPO, for example, and there is not a year's worth of data before a particular date, that's one example. That's one example where I've used data that follows the event rather than

Page 163

precedes the event.

BY MS. UMAR:

Q. Are there any other examples?

MS. WOLKE: Object to form.

A. Yes. There might be. If a -- sometimes if there's clear evidence of a structural break, you might want to use data that's either all, you know, on one side of the structural break. But I don't engage in data mining as some people do. If there's a generally accepted methodology and I've used it before and it's -- and the facts and circumstances call for that generally accepted methodology without change, I use the generally accepted methodology.

BY MS. UMAR:

Q. Did you evaluate the specific facts and circumstances here to determine whether they called for that methodology versus another?

A. Yes.

MS. WOLKE: Object to form.

A. Yeah, that was part of the news review, understanding experience of the

Page 164

company.

BY MS. UMAR:

Q. Now, you mentioned that you've previously used a different evaluation period in connection with companies that have recently gone through an IPO.

Have you used a different evaluation period in connection with any other fact pattern?

A. Yes. If the class period is like one year or roughly one year, I'll oftentimes just run one regression for the class period.

Q. Is that the only other circumstances in which you have a used an alternative evaluation period?

MS. WOLKE: Object to form.

A. As I sit here now, that's what comes to mind. I'd have to look at -- I mean, part of the job is to look at the data, see what the data call for. But I'm sure there may have been other cases where, for some reason, a nonstandard or alternative estimation period was called for. I can't name every single one for you or every single type of reason.

Page 165

BY MS. UMAR:

Q. Now, in computing the residual return for each date in the putative class period, one of pieces of data you used was each day's market index, correct?

A. That's right.

Q. And the purpose of that was to control for market-wide effects, correct?

A. That's right.

Q. And then you also ran calculations using both the S&P SmallCap 600 Food Distributors Index and the S&P Composite 1500 Food Distributors Index, right?

A. That's right.

Q. And the reason you did that was to control for industrywide effects, correct?

A. Well, the reason to have an industry index in the regression is to control for industry sector effects.

Q. Okay.

A. If a sector goes in or out of favor, it could have an impact on UNFI's stock, for example, independent of any specific UNFI news. So you want to control for that.

42 (Pages 162 - 165)

Page 166

Q.  So you run it to control for sector-specific effects, correct?

A.  That's right.

Q.  And the reason that you ran sector-specific analysis across two different indices is because UNFI's market capitalization is larger than those of the three other participants in the S&P SmallCap 600 Food Distributors Index, right?

A.  Not quite.  That's not quite the reason.

Q.  Can you --

A.  I mean, it's in the report.  I articulate it in the report pretty clearly.  I can either read it to you or explain it.

Q.  Yes, why don't you explain it to me.

A.  Well, my general approach to choosing a sector index which I think is the correct one is to use the same sector index that the company uses to identify their sector.

And there's an SEC regulation that requires a company to identify an index against which investors can compare the company's stock returns to see how they're

Page 167

doing against its peer companies.  And so most publicly traded companies in the U.S., if you look in their financial filings, they'll identify what they believe is the best sector index.  So I almost always go with that.

In this particular case, UNF- -- so I did that.  I just want to say I did that.  But the sector index that they identified -- it was the 600, the...

I just want to get the exact name.

(Witness reviews document.)

Here it is.  Paragraph 138.  The S&P SmallCap 600 Food Distributors Index, that is the index that UNFI identified.  So I did the test with that index.  But I had a concern, which is that we know that UNFI is not a small cap company.  Its market capitalization is in the upper -- you know, above -- well above the median.  I think the report explains that it's bigger than most other companies publicly traded in the United States.

So I wanted to see if my result that I was finding, was it robust to choosing a different index.  S&P offers a broader Food

Page 168

Distributors Index that includes more companies, and that's the S&P 1500 described on page -- in Paragraph 156, the S&P Composite 1500 Food Distributors Index.  I ran the test -- I ran everything again exactly the same way, just using that additional index and found that my results were absolutely robust, unchanged results from -- the results do not depend on -- on the index.  So that's why I did it.

Q.  So you talked about how the other participants in the S&P SmallCap 600 Food Distributors Index generally have a much smaller market capitalization than UNFI, correct?

A.  That's right, the constituents.  They call them constituents.  So what happened is UNFI grew -- I think that's probably why they were still in that SmallCap 600 Index, is they had grown.  And S&P -- I'm just surmising that S&P didn't want to lose, you know, I think it was one of four constituents and hadn't gotten around to moving UNFI out of that index, and the company hadn't gotten around to changing

Page 169

who they identify for SEC purposes as their appropriate index.

But I -- I thought that probably the composite 1500 would be a reasonable, if not better, index.  I just wanted to see if it made any difference, and it made no difference.

Q.  So just focusing on the SmallCap 600 food index --

A.  Right.

Q.  -- there are four constituents in that index, right?

A.  That's right.

Q.  One of them is UNFI, correct?

A.  That's right.

Q.  And UNFI has a much larger market capitalization than the other constituents within that index, correct?

A.  That's right.

Q.  And then let's talk about the Composite 1500 Food Distributors Index --

A.  Sure.

Q.  -- that you also ran analysis on.

A.  Right.

43 (Pages 166 - 169)

Page 170

Q. Now, what did you do to evaluate whether the participants in that index were appropriate comparators to UNFI?

A. Well, I relied on S&P's judgment. S&P puts together an index that they believe are appropriate representatives of the food distributors' sector.

Q. But you didn't conduct any independent analysis as to whether the constituents within that index were appropriate comparators to UNFI, correct?

MS. WOLKE: Object to form.

A. Sure I did. I mean, that's how the index is constructed. These are food distribution companies. The 1500 comprises the 600 but then adds in additional ones, so bookending the analysis by having the 600 index and the 1500 index and finding that the results made no difference whatsoever, I was comfortable that either index would be satisfactory.

BY MS. UMAR:

Q. Okay. But I'm asking a different question, sir, which is as it relates to that

Page 171

1500 Index, did you personally evaluate the companies within that index and evaluate their characteristics to consider whether they are appropriate comparators to UNFI?

MS. WOLKE: Object to form.

A. I relied on Standard & Poor's for doing that. That's their job. They're world-renowned for doing that, for constructing indices, for making those comparisons. We paid for this index. I paid them to do that, and it was reasonable to rely on S&P, which almost all market participants do to some extent.

BY MS. UMAR:

Q. You're saying you paid to obtain S&P data, correct?

A. Right. This is what -- this is their business is putting together what they believe are appropriate sector indices. It made sense to rely on them to do their job for which they are well-known and highly regarded.

Q. But you're not saying you paid S&P to conduct an analysis for this case specifically, correct?

Page 172

A. Oh, it's not -- I mean, the index is not constructed for this case specifically. The index is constructed in order to represent the food distributor sector.

Q. Exactly. And --

A. And I believe it does because they believe it does.

Q. But you believe it does because they believe it does. You didn't do your own analysis on that, correct?

MS. WOLKE: Object to form.

A. Yes.

BY MS. UMAR:

Q. Okay.

A. I mean, no, I don't want to say I didn't do my own analysis. I did plenty of analyses. In fact, I mean, I tried -- I used both indices and realized that the results were the same. That's analysis that shows that the results are robust to the choice of index.

I started with the S&P 600 Index because the company chose it. It shows up in their financial -- their SEC filings as their

Page 173

opinion about what is an appropriate index. I don't want to say I didn't do any analysis. That's analysis.

The company picked this index. S&P constructed this index. I did the econometrics, and the choice of index made no difference. I did a lot of analyses to support that this is an appropriate choice of index.

Q. Sir, I think we're talking past each other.

As to that 1500 index that we've been talking about, you relied on S&P's inclusion of the companies within that index as opposed to conducting your own analysis as to whether the constituents within that index are appropriate comparators to UNFI, correct?

MS. WOLKE: Object to the form.

A. Well, no, I -- it's not just S&P. Recall that the company itself did an analysis and decided that a S&P 600 Index was appropriate. I used that index. I used the same index that the company itself picked, but then to see if it -- if the results were

44 (Pages 170 - 173)

Page 174

robust to a broader, more comprehensive index, I also ran the test using the 1500 Index.

BY MS. UMAR:

Q. But I'm not asking about the 600 index. I'm asking about the 1500 index. And let's focus specifically on that 1500 index.

A. Well, it includes, it comprises the 600 index.

Q. Okay. But I'm asking about the 1500 index. As to that 1500 index, you did not conduct an independent analysis as to whether the constituents within that index are appropriate comparators to UNFI, correct?

MS. WOLKE: Object to form.

A. I relied on S&P for doing what they're well known to do well.

BY MS. UMAR:

Q. Now, food distributors might be subject to different industry issues, depending on their customer base, right?

MS. WOLKE: Object to form. Speculation.

A. I have no reason to disagree.

Page 175

BY MS. UMAR:

Q. And food distributors might be subject to different industry issues, depending on the types of products they distribute, right?

MS. WOLKE: Object to form.

A. Well, every company is going to have its own unique characteristics and its own unique niche. I mean, that's how companies survive is by being differentiated from the other companies in their space. So I -- given that, I can accept what you said.

BY MS. UMAR:

Q. Well, I mean, let's just make up an example. Some food distributors distribute organic food, correct?

A. Okay. Yes.

Q. And some distribute processed food, correct?

MS. WOLKE: Object to form.

A. And some distribute both, like UNFI did.

BY MS. UMAR:

Q. Okay. But there may be multiple companies that distribute both, correct?

Page 176

A. That's right.

Q. And there may be multiple companies that distribute solely organic foods?

MS. WOLKE: Object to form.

A. And then within those organic food companies, there will be some that might be located west of the Mississippi, and some are located east of the Mississippi.

So the reason for taking a well-diversified portfolio of constituents is to get a representation of the industry sector tower as a whole, and that's what S&P is known to do well.

BY MS. UMAR:

Q. Okay. And I'm going to stick with my example.

A. Okay.

Q. Companies that distribute solely organic foods may be susceptible to different industry factors than companies that distribute both organic and inorganic foods, correct?

MS. WOLKE: Object to form.

A. I haven't --

Page 177

(Parties speaking simultaneously.)

MS. WOLKE: Object to form.

A. I don't know if I could agree with that. I haven't conducted that analysis.

MS. UMAR: Counsel, is this a good time to take a lunch break?

MS. WOLKE: Yes.

MS. UMAR: Let's go off the record, please.

THE VIDEOGRAPHER: The time is 12:31. We are going off the record.

(Recess taken from 12:31 p.m. to 1:19 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 1:19.

BY MS. UMAR:

Q. Sir, welcome back from lunch. You conducted your event study regressions using ordinary least squares, right?

45 (Pages 174 - 177)

Veritext Legal Solutions
www.veritext.com                              888-391-3376

Page 178

A. Initially. That, and Newey-West ultimately.

Q. Can you describe what the ordinary least squares method is.

A. Well, it's the most commonly used regression methodology. It seeks to estimate the relationship between dependence variables and independent variables by minimizing the deviations from the -- from the proposed relationship or from the estimated relationship and the data. And what -- it finds the linear relationship that most closely fits the data.

Q. And you acknowledge that a prerequisite for the validity of an ordinary least squares regression is that the residual returns have the same volatility throughout the entire estimation period, right?

A. Right. I wrote that in my report.

Q. Okay. And that's called homoscedasticity?

A. Correct.

Q. And if residual volatility isn't constant, that's called heteroscedasticity,

Page 179

right?

A. That's right.

Q. And that requires a more advanced methodology, correct?

A. Such as the Newey-West procedure that I employed.

Q. And you found that out of 451 trading days in the putative class period, 57 of them appeared to have significant heteroscedasticity, right?

A. Like, 12 percent, 12.6 percent.

Q. And you said that to accommodate that, you reran the regressions employing the Newey-West regression estimation procedure?

A. Which provides valid t-statistics even in the -- well, it corrects for heteroscedasticity to provide for valid t-statistics. Turns out there was no difference in the results.

Q. We talked about ordinary least squares. There's also a methodology called generalized least squares, right?

A. Right.

Q. And generalized least squares is

Page 180

considered an accepted model for correcting heteroscedasticity, right?

MS. WOLKE: Object to form.

A. Depending on the structure of heteroscedasticity. It requires assumptions about what is causing the heteroscedasticity.

BY MS. UMAR:

Q. Did you consider using that instead of the Newey-West method?

MS. WOLKE: Object to the form.

A. I considered it, but Newey-West is -- doesn't require the strong assumptions that GLS requires.

BY MS. UMAR:

Q. Doesn't GLS provide for a better methodology if you can use an appropriate assumption?

MS. WOLKE: Object to form.

A. What do you mean "can use an appropriate assumption"?

BY MS. UMAR:

Q. If there's -- you said that generalized least squares requires an assumption to be made, correct?

Page 181

A. Assumptions about the structure of the heteroscedasticity, as in what it's related to, what's causing the volatility to change? Is it a time-series process? And if it is a time-series process, what lags are causing volatility to not be constant?

Q. And if one can make such assumptions, generalized least squares can be a more precise method than Newey-West, correct?

MS. WOLKE: Object to form.

A. Not necessarily. I think -- I think Newey-West will give you the same results as GLS most of the time.

BY MS. UMAR:

Q. Well, will it give you the same results as GLS all of the time?

MS. WOLKE: Object to form.

A. I don't think so. I'm not sure, but I don't think so.

BY MS. UMAR:

Q. Did you have the information available to you in order to make the assumptions needed for GLS?

A. Yeah, but --

46 (Pages 178 - 181)

Page 182

MS. WOLKE: Object to form.

A. For the reasons I just described, I think Newey-West is better -- a better correction.

BY MS. UMAR:

Q. And it's a better correction notwithstanding that you had the data available to you to make the assumptions needed for GLS?

MS. WOLKE: Object to the form.

A. No. The assumptions are independent of the data. These are ad hoc -- not ad hoc, but you have to make assumptions in order to say that -- you have to assume basically that GLS is appropriate.

BY MS. UMAR:

Q. But you said before that you chose not to use GLS because you have to make assumptions, correct?

A. Right. And you don't with Newey-West.

Q. But you say that you would have been able to make the assumptions needed for GLS, correct?

MS. WOLKE: Object to the form.

Page 183

A. You're always able to make assumptions, but the question is are they valid?

BY MS. UMAR:

Q. Do you have the information available to you to know whether the assumptions needed for GLS would have been valid?

A. Possibly. I -- possibly. But given that there's a method that doesn't require that analysis and doesn't require assumptions, I thought Newey-West was better.

Q. What kinds of assumptions do you need to make to employ GLS?

MS. WOLKE: Object to the form.

A. You need assumptions about the structure of the heteroscedasticity, what process is volatility on a day-to-day basis following.

BY MS. UMAR:

Q. And in conducting your event-study analysis, did you analyze the contents of any of the alleged corrective disclosures?

MS. WOLKE: Object to form.

A. To some extent, yes. I explained that

Page 184

in my report as well.

BY MS. UMAR:

Q. To what extent did you analyze the contents of those alleged corrective disclosures?

A. I verified that they were high news information flow dates.

Q. Okay.

A. There was a lot of information, more than average, more than typical on those days.

Q. Got it. But you did not evaluate the substance of those alleged corrective disclosures to draw a conclusion as to whether they were actually corrective?

MS. WOLKE: Object to form.

BY MS. UMAR:

Q. Right?

A. That's correct. I mean, I did not do a loss causation or damages analysis. I picked the days because they were high information flow days, not because they were alleged to be corrective dates.

Q. And you didn't form any opinion on whether the contents of the disclosures on

Page 185

those dates, in fact, corrected the alleged false or misleading statements, correct?

A. That's right.

Q. Now, the earnings announcements in this case contained multiple pieces of information, right?

A. That's right.

MS. WOLKE: Object to form.

BY MS. UMAR:

Q. A statistically significant price change in the presence of multiple pieces of information does not necessarily prove stock movement as a result of each of those pieces of information, correct?

MS. WOLKE: Object to form.

A. That's correct. Additional analysis would be called for that can contribute or, in concert with the event study, arrive at that conclusion or refute that conclusion.

BY MS. UMAR:

Q. And you haven't conducted that additional analysis, correct?

A. That's right.

Q. And you also haven't analyzed whether

47 (Pages 182 - 185)

Page 186

any specific piece of information moved the company's stock price, correct?

MS. WOLKE: Object to form.

A. You mean -- from among the company information, I haven't picked out one item.

BY MS. UMAR:

Q. Exactly. That is what I mean. So --

A. I mean --

Q. -- as against all of the information that the company might have disclosed, you haven't evaluated individual pieces of information to evaluate whether those individual pieces of information moved the company's stock price, correct?

A. I'll say that's correct. But I just want to point out that in reading the news and the annals' reports for those announcement dates, it's inescapable that at least once the company said primary driver, and they pointed to what they believed was the primary driver of the bad news. But I'm still going to say I have not conducted a loss causation or damages analysis.

Q. You also opined that the market for

Page 187

UNFI options is efficient, correct?

A. That's right.

Q. And it's your opinion that if the underlying stock trades in an efficient market, it follows that the options that are tied to the stock also reflect the same public company information that determines the stock price, correct?

MS. WOLKE: Object to form.

A. If you can establish that there's a connection between the -- if you can -- well, in an efficient market, the options will respond to the same information as the stock because the stock -- the options will be responding to the stock.

BY MS. UMAR:

Q. Can there be instances where the stock trades in an efficient market but options do not?

MS. WOLKE: Object to form.

A. Yeah, that's possible, but that's why I ran the test to see that that's not what's going on here.

BY MS. UMAR:

Page 188

Q. Have you done any analysis on whether the options holders of UNFI options exhibit different characteristics than the company stockholders do?

MS. WOLKE: Object to form.

A. Oh, you mean like they have different risk tolerances?

BY MS. UMAR:

Q. Correct.

A. No, no. I looked at prices for the market as a whole and not tied to any individual investor.

Q. How many different option series did UNFI have during the class period?

A. Many. I don't remember the exact number.

Q. Did you evaluate the characteristics of those various options classes?

A. I did.

MS. WOLKE: Object to form.

A. I did.

BY MS. UMAR:

Q. And what did you do to evaluate them?

A. Well, I analyzed it. I saw that they

Page 189

varied in terms of strike price and expiration date, and then there's the puts versus the calls. But they all have in common that they're tied to the price of the underlying stock, which is the UNFI stock.

Q. Did you look at any of those categories separately?

MS. WOLKE: Object to form.

A. Well, no. I did the test collectively to -- I mean, economic theory -- economic principles, principles of option pricing dictate that the options are designed to move with the stock, and I did collective tests to show that for the market for UNFI's options, that principle is supported or compelled by the empirical results, and that principle would then apply to all the individual option series. But the tests were run collectively.

BY MS. UMAR:

Q. But isn't it possible that different option series may behave differently?

MS. WOLKE: Object to form.

A. Well, anything's possible, but in -- certainly unlikely given that what ties

48 (Pages 186 - 189)

Page 190

options to stocks is replication and arbitrage. And the tests that I did run established that that enforcement mechanism is working in this market.

BY MS. UMAR:

Q. But the test that you ran considered the options data collectively, correct?

A. That's right.

Q. You didn't run any testing on option series individually, correct?

A. That's right. I did the tests collectively, but the results apply to all the options. They establish that it's a well-functioning market, and the options are tied to the stock, by design. I mean, there's no way that you would get 90 -- a high 90 percent correlation between the options and the stock if those principles weren't operative in this market.

Q. How can you know that with certainty as to each individual option series?

A. Well, the tests have to be run collectively just because of the nature of how the data arrives and how the dynamics of

Page 191

options change from day to day, depending on whether they're in the money or out of the money. But once you test collectively and find that there's a strong bond between the options collectively and the stock, that suggests, if not compels, that the mechanism that ties options to stocks is operative in that market which would apply to all the stock -- all the options in that market.

Q. Okay. But you don't know that with certainty, though, right?

MS. WOLKE: Object to form.

A. Well, I know with certainty collectively.

BY MS. UMAR:

Q. You know that collectively, but you don't know that with respect to each -- with respect to any specific individual option series, correct?

MS. WOLKE: Object to form.

A. It would be unlikely for most of the options to be trading not only efficiently but bound by arbitrage to the stock and then for there to be an exception. I think that would

Page 192

be unrealistic. So I think it's reasonable to draw the conclusion from the collective empirical tests that the principle that binds options to stocks was operative throughout the market.

BY MS. UMAR:

Q. Well, you say it's unlikely, but can you say it's impossible?

A. No.

MS. WOLKE: Object to form.

BY MS. UMAR:

Q. In your opinion, would there ever be a case where damages could not be computed on a classwide basis in a 10(b) claim?

MS. WOLKE: Object to form. Calls for speculation.

A. Well, I need to -- I need some clarification on your question. Are you saying that there's no model that fits liability or that the facts of the case are such that the model is just infeasible?

BY MS. UMAR:

Q. Well, why don't we take that in pieces.

Page 193

In your opinion, could there ever be a case where there isn't a model that would allow damages to be computed on a classwide basis in a 10(b) claim?

MS. WOLKE: Same objections.

A. I'm glad you said model, because I think the out-of-pocket model, in principle, can be applied to any 10(b) case. I mean, because it just says -- what it says is that you will find how much the stock -- how much investors overpaid for the stock and how much of that overpayment they may have ever recovered, if any. And the difference between the two is damages.

So in theory or in principle, that model does exist and is recognized to exist and, as far as I can tell, should be applicable to every -- every class action security 10b-5-type case.

BY MS. UMAR:

Q. Is there a difference between a model and a methodology?

A. I think there is. I think there is. I know that in Comcast they used the word

Page 194

"methodology."

I think a model talks about, you know, the structure of where damages are coming from and where you might -- you know, what kind of calculations you might do to get -- get those damages whereas methodology is the rubrics of operationalizing the model.

Q. Is out-of-pocket damages a model or a methodology?

A. It's both. The terms come to mean both.

I don't think -- frankly, I don't know of anyone else who makes the distinction the way I am making it, so I think most people would -- you know, it would be synonymous. But at least with respect to the out-of-pocket methodology or model, I think it qualifies as both under my definitions.

Q. In what sense is out-of-pocket damages a model?

A. Well --

MS. WOLKE: Objection. Asked and answered.

A. It doesn't necessarily tell you how

Page 195

you're going to operationalize it. It tells you what you're going to look for and what -- you know, what -- what you're going to calculate in order to calculate damages, what -- what the structure of damages is, why investors were hurt, if they were hurt, and how you would measure it is what, as a model, it tells you.

BY MS. UMAR:

Q. And how is it a methodology?

A. Well, as -- as it's come to represent, it's -- you calculate the artificial inflation using all available tools at the time the investor buys the security. That's how that part of the model is operationalized. You do the same thing for other days during the class period and construct an inflation ribbon. The out-of-pocket methodology, as a methodology, has been described that way, and I describe it that way.

And then for any buy/sell dates, you can look at the difference -- or you would have already calculated the difference between inflation, and you take the difference in

Page 196

those inflation numbers, and that would produce a damage estimate.

Q. You said that it's a methodology in that you calculate artificial inflation using all available tools, correct?

A. That's right.

Q. Out-of-pocket damages does not specify which of the tools would be used, correct?

A. Well, as a model, it doesn't. And I think, as a methodology, it accommodates -- it would incorporate all of the available tools.

Q. What do you mean by "all of the available tools"?

A. Well, whatever it takes to calculate how much the stock was artificially inflated. There's -- there's a whole discipline, security valuation. There's -- there's a toolkit of tools that can be used for valuing the security in the but-for world, and you compare that to the actual world, and the difference is artificial inflation.

Q. What's within that toolkit of tools?

A. Oh, I articulate that here.

Again, like I said, there's -- there

Page 197

are thick tomes, you know, textbooks on valuation methodologies, and I have a quick summary of some of these tools -- these valuation tools that you would use to operationalize the model such that it's a feasible methodology. And I give a list in my report, Paragraph 210.

Among the commonly used valuation tools that are available to investors and analysts in real time and forensic analysts when computing damages are, for example, valuation multiple models such as those based on earnings, EBITDA, revenue, book value, and cash flow.

There are also discounted cash flow models known as DCF models.

There's scenario analysis and, in this case, generally accepted option pricing formulas such as the binomial model or the Black-Scholes model.

And then there's a whole literature on various effects, how certain sometimes nonquantifiable factors impact the stock price, things like reputation, transparency,

50 (Pages 194 - 197)

Page 198

governance, and the quality of internal controls.

Q. Does this Paragraph 210 list the entirety of the tools that you say are available under the out-of-pocket methodology?

MS. WOLKE: Object to form.

A. No, but it lists the most commonly used tools.

BY MS. UMAR:

Q. And so your position is there are other tools available that aren't included within this list?

A. Possibly. Yeah, I mean, there are. There are other models.

Q. And you haven't done an evaluation on any of these tools, correct?

MS. WOLKE: Object to form.

A. What do you mean by "an evaluation"?

BY MS. UMAR:

Q. You haven't studied any of these tools listed in -- within Paragraph 210 or otherwise and endeavored to consider whether they apply to the circumstances of this case, correct?

Page 199

A. That's not correct.

Q. Which of these tools have you looked at?

A. Well, what I --

MS. WOLKE: Object to form.

A. I looked at the analysts' reports and saw that they were using these tools. So I know that because analysts were able to use these tools to value the company under a wide array of circumstances, almost 100 percent certainty. So could I or whoever is doing the calculation of damages.

BY MS. UMAR:

Q. I'm not asking what analysts did. I'm asking what you did, sir.

Have you applied any of these tools and considered whether they allowed the computation of damages on a classwide basis consistent with plaintiffs' theory of liability?

MS. WOLKE: Object to form.

A. And I answered yes.

I observed that, for the valuation component of the out-of-pocket damage

Page 200

methodology, it may be necessary to value the stock under alternative scenarios. And then I observed that analysts were doing the same thing using these tools.

BY MS. UMAR:

Q. You said that you have observed that analysts have done that, correct?

A. Analysts were valuing the stock using these tools. That's why I know that these tools can be applied in this case to value the stock just as they did under an array of different scenarios.

Q. I'm not asking what you know, sir. I'm asking what you did.

Have you actually applied any of these tools to compute damages on a classwide basis consistent with plaintiffs' theory of liability?

A. In this case?

Q. Correct.

MS. WOLKE: Object to form.

A. Well, you know, I answered that question earlier today.

I have not conducted the loss

Page 201

causation or damages analysis, but I have opined that it absolutely can be done because I see analysts using the same valuation tools one would need to operationalize the out-of-pocket damage model is being used by analysts.

BY MS. UMAR:

Q. When you say that you see analysts using these tools, have you seen any analyst try to compute classwide damages consistent with plaintiffs' theory of liability in this case?

A. You know the answer to that.

MS. WOLKE: Objection.

A. I mean, of course, there's no analyst calculating damages for this case. Nobody's calculated damages for this case yet.

But what we were talking about, the way we got to this question is there's a model that indicates what needs to be calculated in order to compute damages. That model exists. It's commonly used. It's used in almost every securities case.

To operationalize it, you need to be

51 (Pages 198 - 201)

Page 202

able to value the stock under different alternative scenarios, and that, I see analysts doing successfully with these tools.

BY MS. UMAR:

Q. So your position is simply because analysts have used some of these tools to value the stock under different scenarios for different purposes, those tools necessarily can be used to compute classwide damages here consistent with plaintiffs' theory of liability?

MS. WOLKE: Object to form. Misstates testimony.

A. Those tools can be used to calculate the valuation of the stock under the but-for scenario, which is the computation necessary to operationalize the out-of-pocket damage model, which is consistent with plaintiffs' theory of liability.

BY MS. UMAR:

Q. Have you seen any analyst use any of these tools to calculate the valuation of the stock under the but-for scenario?

MS. WOLKE: Object to form.

Page 203

A. They may have. I don't recall as I sit here now, but I have seen them value the stock under alternative scenarios, period.

BY MS. UMAR:

Q. Sitting here today, you are not aware of any analyst who used any of these tools to calculate the value of the stock under the but-for scenario, correct?

MS. WOLKE: Object to the form.

A. Well, the but-for scenario would be the scenario where they were told that gross margin was being increased via large-scale and undisclosed inflation-driven forward buying.

I did see them value the stock when they learned that that was the truth, so I think the answer is, at least to that extent, yes.

BY MS. UMAR:

Q. Have you prepared a preliminary damages calculation?

A. No.

Q. And we've talked today about how you describe in your report an event study that you prepared to analyze market efficiency,

Page 204

right?

A. What?

MS. WOLKE: I'm sorry. I didn't understand you either.

MS. UMAR: I'm a fast talker.

BY MS. UMAR:

Q. You describe -- we've talked about how you've described in your report an event study that you used to evaluate market efficiency, correct?

A. Yes.

Q. Do you intend to use that same event study for purposes of doing a loss causation analysis?

MS. WOLKE: Object to form. Calls for speculation.

A. I've never been asked to do a loss causation analysis in this case.

BY MS. UMAR:

Q. If you were asked to do a loss causation analysis in this case, would you use this event study for purposes of doing that analysis?

MS. WOLKE: Same objection.

Page 205

A. I would probably -- I'd almost certainly do an event study. I don't know at this stage if it would be the exact same model. There might be -- I mean, it really depends on what discovery turns up and how the record is established.

BY MS. UMAR:

Q. Well, what are the factors that you would review and reassess in terms of whether to use this event study for purposes of doing a loss causation analysis?

MS. WOLKE: Object to form. Foundation. Speculation.

A. Well, I'm open-minded to see what your expert says about the econometrics. I'll certainly consider that. I don't know what I'll conclude, but I'll certainly consider it.

I would be interested to hear -- I mean, I'm confident I made the right decisions and the right choices, but I'm interested to see what they say about the peer index. I hope they don't do data mining because then that would make their entire analysis unreliable, but it's possible that we'll get a

52 (Pages 202 - 205)

Page 206

legitimate critique that I can benefit from and the court could benefit from. It's possible.

I would want to see if there are additional dates besides the earnings announcements that are determined to be atypical, abnormal days in the life of this company. My screen for what days to control for as being atypical was just the days that we knew had high information flow because there were earnings announcements. There might be other days that need to be controlled for as well.

Those are the kind of things I would be looking for. So I'm open-minded, and if the facts present themselves such that some modification to the models make it more precise is called for, I'll make those changes.

BY MS. UMAR:

Q. Do you typically use the same event study model for loss causation as you do in opining on market efficiency?

MS. WOLKE: Object to form.

Page 207

A. That's an interesting question.

I think, more often than not, I do. Then sometimes I don't for the reasons I just gave, that if there's -- something becomes apparent that would call for a change, I'm open-minded and will incorporate the call for a change.

Q. Can you give a rough percentage of the time where you have changed it?

MS. WOLKE: Object to the form.

A. No. I know I've done it. I think even in a recent case, I did.

BY MS. UMAR:

Q. Now, you said more often than not you use the same model.

Would you say that that's in the vast majority of cases?

MS. WOLKE: Object to form.

A. I don't know. I never did a count.

I know that I keep an open mind, and if -- and if -- I mean, I do careful analysis to determine that the model I run for the early stages of a case is a legitimate model. So because I usually get the right answer the

Page 208

first time, that would be a reason for not changing.

But there are times when I've seen compelling factors that would -- that would call for a modification.

BY MS. UMAR:

Q. Can you think of any examples offhand?

A. No.

MS. WOLKE: Object to the form.

A. I was trying to, but I can't, but I know I've done it.

BY MS. UMAR:

Q. Now, you say that out-of-pocket damages -- you say that the out-of-pocket damages methodology is consistent with plaintiffs' theory of liability and can be applied commonly across all class members to compute their respective damages, right?

A. That's right.

Q. And you opine that out-of-pocket damages can be applied commonly to compute damages for both stock and options investors, correct?

A. Yes.

Page 209

The way to operationalize it will have to be a little different, and I explain that for -- the way you would calculate artificial inflation for an option and the inflation ribbon for an option is different than it would be for a stock. But it's one mathematical formula that would be used for all option investors.

Q. Out-of-pocket damages doesn't tell you how actually to calculate the amount of stock price inflation at purchase and the amount of inflation in the stock price at sale or at the end of the class period that's attributable to a specific piece of information, right?

MS. WOLKE: Object to form.

A. Well, that's what I was describing before. The model, as a model, tells you what you need to calculate, but as a methodology, it does. I mean, as a methodology, it tells you, you know, how you would go about it.

BY MS. UMAR:

Q. It tells you how you would go about it in terms of applying one of the several tools you listed, correct?

53 (Pages 206 - 209)

Page 210

A. That's right. You use the appropriate tool for valuing the stock under the but-for scenario, and you compare the but-for prices to the actual price that's observable to measure the inflation. And then the model says take the difference between the inflation at the time of purchase and inflation at the time of sale.

Q. So -- but again, as we talked about, it doesn't specify the tool to use, correct?

A. Well, it can't, and it shouldn't because the correct tool depends on what industry the company is in and what are the facts in the but-for scenario. So sometimes a discounted cash flow model is -- a discounted cash flow valuation tool is the appropriate valuation tool, and sometimes a price earnings ratio valuation tool is the appropriate tool to use. It depends on the facts and circumstances.

So the model doesn't constrain you to use an inappropriate tool. The model accommodates that you will -- the appropriate tool when it's -- whatever the appropriate

Page 211

tool might be given the facts and circumstances of the case.

Q. We talked about how you haven't evaluated any of the those facts and circumstances, correct?

A. No.

MS. WOLKE: Object to form.

A. Well, we've talked about it, and I told you that I have. I told you that I observed that analysts. Many analysts were valuing the stock throughout the entire class period even before the class period. Subsequent to the class period, they were using these tools, and they were also considering alternative scenarios.

So I have evaluated that there's not going to be a problem to value the stock under alternative scenarios.

BY MS. UMAR:

Q. Which of these tools were analysts using?

MS. WOLKE: Object to form.

A. Oh, I don't recall. I'm pretty sure -- well, the multiple model and a DCF

Page 212

model, but I don't remember the specifics.

BY MS. UMAR:

Q. Did you conclude that a multiple model can appropriately be used in this case to compute classwide damages commonly across class members consistent with plaintiffs' theory of liability?

MS. WOLKE: Object to the form.

A. No. That's not what I even testified to earlier. The valuation model would be applied in order to calculate the inflation ribbon that is -- that is -- on which the out-of-pocket damage methodology is based.

BY MS. UMAR:

Q. Have you made a determination that a multiple model would -- can appropriately be applied here in order to calculate the inflation ribbon such that you can compute damages on a classwide basis consistent with plaintiffs' theory of liability?

MS. WOLKE: Object to the form.

A. Well, my conclusion is that either that damage -- either that valuation approach or a different valuation approach is feasible

Page 213

and can be done, and the reason I say that is because I've seen it done. I don't know which one -- which ones the analysts were using, but I checked to see they all had price targets and they all had valuation sections in their reports.

BY MS. UMAR:

Q. The analysts were not analyzing plaintiffs' theory of liability here, correct?

MS. WOLKE: Object to form.

A. Well, we weren't talking about plaintiffs' theory of liability or even the calculation of damages. We were talking about the valuation of the stock under a wide variety of scenarios.

BY MS. UMAR:

Q. No, that's precisely what I asked, sir. I think you're not understanding my question.

My question was -- and I'll read it back to you -- have you made a determination that a multiple model can appropriately be applied here in order to calculate the inflation ribbon such that you can compute

54 (Pages 210 - 213)

Page 214

damages on a classwide basis consistent with plaintiffs' theory of liability?

A. Well --

MS. WOLKE: Object to form.

A. -- pretty that's long question.

But what I heard in that question was have I made a determination that plaintiffs' valuation approaches can be used to value the stock. And then you said such that someone could take valuations and put it into the out-of-pocket damage model. And the answer to that is, yes, I've done that determination.

I see that they do valuations, therefore, I know that the valuation part of operationalizing the out-of-pocket damage model is feasible.

BY MS. UMAR:

Q. Sir, you're answering your own question, and I'm asking you to answer my question, which is have you made a determination that a multiple model can be applied here in order to calculate the inflation ribbon so that you can compute damages here on a classwide basis consistent

Page 215

with plaintiffs' theory of liability?

MS. WOLKE: Objection. Asked and answered.

A. I made a determination that the models analysts use can be used for that purpose. And I don't recall specifically which models they used, but I saw them using -- evaluate -- not damage models but valuation models. I saw them using the valuation models, so I know that the answer is yes, their valuation tools can be applied for that purpose.

BY MS. UMAR:

Q. Sir, you concede that plaintiffs were not us- -- excuse me. You concede that analysts were not using those tools to compute classwide damages, correct?

A. I do. And it doesn't -- that doesn't have to be the purpose of their valuation in order to know that the valuation necessary for the out-of-pocket damage methodology can be accomplished using those same tools.

Q. Sir, you --

A. They calc- -- they value the stock for one purpose, but a forensic analyst is valuing

Page 216

the stock for another purpose. They can use the same tools for valuing the stock, and you would know that the valuation -- that the forensic analyst valuing the stock for damages purposes can value the stock if they see -- if he and we see that the analysts are also valuing the stock for their own purposes.

Q. Sir, is your position that a valuation tool used for any alternative purpose can then be used by someone conducting a forensic damages analysis for the purpose of forensic damages analysis simply because someone else used it?

MS. WOLKE: Object to form.

A. I can't think of an exception. I would like to say yes, but, you know, I haven't considered every possible potential exception to your hypothetical. But for the most part, yes.

If you can value the stock, then you can calculate a but-for price. Then you can calculate an inflation ribbon. Then you can calculate damages.

BY MS. UMAR:

Page 217

Q. And my question is specifically about damages on a classwide basis consistent with the plaintiffs' theory of liability --

A. Well, that's what --

Q. -- just because -- yes, let me -- let me ask my entire question, sir.

A. Sure.

Q. Any valuation tool that can be used for any purpose can also be used, according to you, to compute classwide damages across all class members consistent with plaintiffs' theory of liability?

MS. WOLKE: Object to form. Argumentative. And asked and answered.

A. Well, in order to calculate damages, one would need to value the stock in a but-for scenario. And if we see analysts valuing the stock using tools that they believe are appropriate, that's compelling evidence that that part of the damages methodology is feasible.

BY MS. UMAR:

Q. So --

A. I'm tempted to say yes, but I haven't

Page 218

thought of every possible exception, but for the most part, yes.

Q. Sir, I --

A. If they can value the stock so they can tell their investors what they think the stock is worth, how they value the stock can also be used by a forensic analyst to value the stock for purposes of calculating damages.

Q. Sir, I'm not asking if it's feasible. I am asking whether it should be used. And so have you concluded that any of these tools can appropriately actually be used here to compute classwide damages consistent with plaintiffs' theory of liability?

MS. WOLKE: Objection. Form. Asked and answered.

Counsel, this is multiple times you've asked this, and he's answered it. And you seem to be fishing for a different answer, but he has answered this question repeatedly.

MS. UMAR: His answer was that it's feasible. That's not responsive to my question.

BY MS. UMAR:

Page 219

Q. So I'm asking the question again to get my question answered.

I'm not asking whether it's feasible, sir.

MS. WOLKE: Are you asking him if he's picked a tool to use or if he is --

MS. UMAR: I'm asking whether he's --

(Parties speaking simultaneously.)

MS. WOLKE: I've lost track of what you're even trying to get at.

MS. UMAR: I'm not asking whether it's theoretically feasible to use one of these tools. I am asking whether he has actually confirmed that any of these tools can appropriately be used here to compute classwide damages --

MS. WOLKE: He has answered that.

MS. UMAR: -- consistent with plaintiffs' theory of liability.

MS. WOLKE: He has answered

Page 220

that.

MS. UMAR: Let me -- let me hear his answer, Counsel. He is the one testifying.

A. Well, your question is ambiguous, and I'll point out how it is. When you say such -- you know, did analysts use these tools such that they can be used for damages, are you saying implicitly that analysts used the tool for calculating damages?

BY MS. UMAR:

Q. Sir, that's not the question I asked.

A. Well, then, I didn't understand the question, and I need clarification.

Q. Let me ask this again. Have you actually confirmed that any of the tools we have been talking about can appropriately be used here to compute classwide damages?

MS. WOLKE: Object to form.

A. Well, a valuation tool produces a valuation. A damage model produces damages. Part of the damage model is to do a valuation, but the valuation tool by itself is not going to calculate the damages. So the answer is

Page 221

either yes or no, depending on what you meant by the question.

A valuation -- a valuation exercise will produce a valuation. A valuation is not a damage calculation. You would have to run it through the damage -- the out-of-pocket model to make it into a damage calculation.

BY MS. UMAR:

Q. Sir, which tool can appropriately be used here to compute classwide damages consistent with plaintiffs' theory of liability?

MS. WOLKE: Object to form.

A. Well, there are a lot of valuation tools that are used by market participants to value the stock. So we know that tools exist that value the stock. And I would make a determination, if I were calculating damages, as to what the most appropriate tool was. I can't do that at this junction. But I know that it's feasible to calculate value with these valuation tools because I see many experienced, professional equity analysts following UNFI doing exactly that.

56 (Pages 218 - 221)

Page 222

BY MS. UMAR:

Q. You haven't yet made that determination as to what the most appropriate tool is, correct?

A. That's right. But I know that at least one of them will work. I mean, probably more because I see valuation analysts doing it.

Q. Well, your answer concedes that some tools may be more appropriate than others, correct?

MS. WOLKE: Object to form.

A. That's right. And I have not yet made the determination as to which is the most appropriate valuation tool.

BY MS. UMAR:

Q. Sir, you're aware that plaintiffs allege corrective disclosures on four dates, correct?

A. It's five dates.

Q. And what are those five dates, sir?

A. No, you're right, it's four. December 7, 2022; March 8, 2023; June 7, 2023; and September 26, 2023.

Page 223

Q. How would you determine whether the stock price declined on any of those dates due to a disclosure of corrective information?

MS. WOLKE: Object to form.

A. Well, first, I would rule out -- first of all, I would see if, in fact, the stock declined, and then with the regression analysis, I would eliminate how much of the decline was caused by market -- generally marketwide factors, also sector -- industry sector factors.

I can then use the volatility estimated -- the background volatility estimate from the regression to see if we can rule out volatility. If all those things are ruled out, what's left over is called the residual return, which identifies how much of the stock price movement was caused by company information.

Then I would examine the information that came out that day to determine what's valuation relevant and what's not. And if -- well, then -- then it depends on what we find at that point. If the only information that's

Page 224

value relevant that's negative that came out that day is allegation-related information, that would be a strong basis for concluding that it was the allegation-related disclosure that drove down the stock price.

If on the other hand there was confounding information, another piece of unrelated negative information, there's a number of things one can do. This is common analysis that's done in virtually every case by almost every forensic analyst analyzing securities cases.

You value the confounding information using valuation tools, or sometimes you can see what analysts are saying about the other information. You can see what the company said about the other information. But essentially, it becomes a valuation analysis to determine how much of the drop was caused by the allegation-related information instead of the confounding information.

BY MS. UMAR:

Q. Have you proposed the out-of-pocket model in all of your prior reports in which

Page 225

you've opined on a damages methodology in a Section 10(b) case?

A. I think so.

Q. And how many reports is that?

A. Close to -- I don't know. Close to -- somewhere up to 200 approximately. I write in the report it's the generally accepted methodology for calculating damages in a 10b-5 class action securities case.

Q. Is it possible that an appropriate method for computing damages in one securities case is inappropriate in a different case?

MS. WOLKE: Object to form.

A. It is, which is why I evaluated this case. I read the complaint. I conducted the other analysis we talked about today to see if there's anything especially unique about this case that would call for a different methodology, and I found nothing of the sort.

BY MS. UMAR:

Q. And you said that you've never found in the 200-some-odd reports that you've submitted on this topic a case as to which

57 (Pages 222 - 225)

Page 226

out-of-pocket damages was not the appropriate methodology, correct?

MS. WOLKE: Objection. And you're misstating his testimony. There's 10b-5 securities cases, and there's other kinds of securities cases which will have other methodologies for damages. So insider trading is different. So why don't we focus on 10(b) cases.

BY MS. UMAR:

Q. You said of all the 10(b) cases in which you've submitted reports you've opined that out-of-pocket damages is the appropriate methodology, correct?

A. I think so. I believe that's the case.

Q. You've -- you haven't found any unique facts or circumstances in any of those over 100 cases, correct?

MS. WOLKE: Object to form.

A. Well, I mean, there's a -- literature on this. There's a -- there's law journal literature on this that concurs. I mean, there are -- there have been other damage

Page 227

models proposed but -- through judicial decisions and case law and so forth. They're not the ones -- they're -- they've been deemed not to be appropriate.

The one that's been deemed to be appropriate in Section 10b-5, I'm not -- is always -- I should say virtually always, but you would be hard-pressed to find an exception. It's the out-of-pocket model. The meaning of out-of-pocket has also changed over the years and, you know, out-of-pocket as I mean it now is out-of-pocket as it's described in this report.

BY MS. UMAR:

Q. You haven't found any unique facts or circumstances in any of the over 100 10(b) cases in which you submitted a report that would indicate that a methodology other than out-of-pocket damages was appropriate, correct?

A. Well, I'll say correct, but I want to add to it that that might -- I mean, that might have something to do with how 10b-5 cases are pled. I would -- I would think

Page 228

that -- yeah, let me just leave it at that, that the way they are pled seems to comport with damages being computed using the out-of-pocket damage methodology.

Essentially, they're pled that investors overpaid because of misrepresentations and omissions and lost money because they overpaid. If those are the facts of the case, which is almost always the facts of a 10b-5 securities case, then the out-of-pocket damage methodology was built to explain that and measure that.

Q. And I'm not sure that's answering my specific question because I'm not asking about what people plead generally. I'm asking about the cases in which you've submitted reports in 10(b) cases.

In all of the over 100 cases in which you have submitted reports in 10(b) cases, you haven't found any unique facts or circumstances that have led you to conclude that a methodology other than out-of-pocket damages was appropriate, correct?

A. That's right.

Page 229

Q. Your report doesn't include any analysis of what information was allegedly disclosed to correct alleged misrepresentations and omissions, correct?

MS. WOLKE: Object to form.

A. (Witness reviews document.)

Paragraph 43 basically says that the answer to your question is incorrect. "Plaintiffs allege that announcements near and at the end of the class period constituted corrective disclosures as the company reported poor financial performance, lower guidance, and revealed that the prior good performance which had led the market to expect further good performance was due in large part to the unsustainable procurement gains from forward buying."

Q. Well, fair enough. Let me restate my question because I think I was unclear.

We talked about how you personally have not analyzed the content of any purported curative disclosures, correct?

MS. WOLKE: Object to the form.

A. Well, I think I told you I did analyze

58 (Pages 226 - 229)

Page 230

the content of the earnings announcements. I did read the earnings announcement and 10-Qs and 10-Ks and the conference calls, which are alleged to be the corrective disclosures. So we can't say that I have never looked at them and that I never analyzed them. I did. I didn't analyze them for the purpose of loss causation and damages calculation because I have not done a loss causation or damage calculation. But it's not like I'm unaware of what the corrective disclosures are alleged to be.

BY MS. UMAR:

Q. Okay. And that's not -- I'm not trying to suggest otherwise, sir. I'm asking a different question. So let me restate my question so that I'm more precise.

We talked about how you haven't analyzed the alleged corrective disclosures to undertake and valuation of whether they, in fact, were corrective, right?

A. That's correct. I have not done a loss causation analysis yet. I haven't been asked to. My report is about market

Page 231

efficiency and the appropriate damage model.

Q. If significant but unrelated information is disclosed by a company on the same day that an alleged corrective disclosure took place, the impact of that unrelated information would need to be taken into account in quantifying any artificial inflation in the stock price, right?

MS. WOLKE: Object to form.

A. Maybe. Not always. I mean, if it was unrelated positive information, you could arrive at a conservative measure of damages by not accounting for the impact of the positive offsetting countervailing confounding information.

BY MS. UMAR:

Q. Well, let's assume that it's significant but unrelated negative information.

A. Okay.

Q. If significant but unrelated negative information is disclosed by a company on the same day that an alleged corrective disclosure took place, the impact of that unrelated

Page 232

negative information would need to be taken into account in quantifying any artificial inflation in the company's stock price, correct?

MS. WOLKE: Object to the form.

A. Well, in order to calculate how much artificial inflation dissipated.

BY MS. UMAR:

Q. Okay. But it would need to be taken into account in calculating how much artificial inflation dissipated, correct?

A. Yes.

MS. WOLKE: Object to form.

A. Yes.

BY MS. UMAR:

Q. Out-of-pocket damages does not specify a tool for doing that, correct?

A. Well, the out-of-pocket damage methodology says you should do that and then leaves it open to the forensic analyst to choose the right tool to do it. The model is fully specified in terms of how to implement it. I think the model allows for correct discretion given the facts and circumstances

Page 233

of each case, which are different.

Q. Out-of-pocket damages says you should do that, but it doesn't say how you should do that, correct?

A. It doesn't specify exactly which is the best tool because I think it understands or accommodates or acknowledges that the best tool will depend on the facts and circumstances which might not even -- which preclass certification might not even be established yet.

Q. In instances where a plaintiff argues that a risk was understated in calculating the stock price inflation attributable to that understated risk, one would have to distinguish between the understatement of the risk and materialization of that risk, right?

MS. WOLKE: Object to form.

A. Well, we're talking hypothetically now that if there's a case where misrepresentations and omissions obscured a risk or caused people not to appreciate the full magnitude of the risk? Is that what you

59 (Pages 230 - 233)

Page 234

mean?

BY MS. UMAR:

Q. Yes. The risk allegedly was understated in some way.

A. Okay. So I guess what you're saying is that even if there had been full disclosure, then there would still be some decline when the risk materializes because it would not have been -- in that particular hypothetical, it would not have been known with certainty that the risk was going to materialize.

Q. Correct. In my hypothetical, it's not known with certainty that the risk would materialize because the issue, according to the plaintiffs in this hypothetical, is understatement of risk.

So let's go back to my question, then, now understanding what I'm asking.

A. Uh-huh.

Q. In instances where a plaintiff argues that a risk was understated, in calculating the stock price inflation attributable to the understatement of the risk, one would have to

Page 235

distinguish between the understatement of the risk and the materialization of the risk, correct?

MS. WOLKE: Object to form.

A. The way you phrased it is a little troubling. Let me think about it.

You would -- you would -- in that hypothetical where it wasn't -- where even in the but-for world it was not certain that the risk would materialize, the damages would depend on how much more risk the market would have been aware of and the quantification of how much more risk the market would have been aware of versus what they were aware of in the actual world.

BY MS. UMAR:

Q. Well, the stock price inflation attributable to the understatement of the risk may be different from the stock price impact attributable to the materialization of the risk, right?

MS. WOLKE: Object to form.

A. Well, that would be true if the condition of the company at the time the

Page 236

misrepresentations and omissions were made was not such that the materialization was inevitable.

BY MS. UMAR

Q. Is your position that if the materialization was inevitable, that the stock price inflation is therefore indistinguishable?

A. Well, if it was inevitable and the market would have known it was inevitable, the entire drop would occur when disclosures were made -- the but-for disclosures were made. And because the stock price would have already fallen to account for that inevitability, it would not fall again when the risk materialized.

Q. What about an instance where it's not inevitable?

MS. WOLKE: Object to form. Incomplete hypothetical.

A. The appropriate calculation of inflation would take into account how much lower the stock price would be in the but-for world when the market learned the truth that

Page 237

was being concealed or obscured and that the company had intended to deceive them.

BY MS. UMAR:

Q. In an instance where the materialization of the risk is not inevitable, the stock price inflation attributable to the understatement of the risk may be different from the stock price impact attributable to the materialization of the risk, correct?

MS. WOLKE: Object to form.

A. That's right. That depends -- so that calls for a case-specific analysis.

BY MS. UMAR:

Q. Out-of-pocket damages does not specify a tool for conducting that type of analysis, correct?

MS. WOLKE: Object to form.

A. Well, it -- it acknowledges that a wide variety of tools are -- may be available, and the most appropriate one should be depending on the facts and circumstances, and what has to be calculated would be selected.

BY MS. UMAR:

Q. But out-of-pocket damages in and of

60 (Pages 234 - 237)

Page 238

itself does not specify a tool for differentiating between any stock price inflation from understatement of a risk versus materialization of a risk, correct?

MS. WOLKE: Object to form.

A. I mean, out-of-pocket damages -- oh, gosh. The way you're phrasing it is a little confusing.

The -- I think the -- well, the way -- let's go back to the -- the scope of my engagement was to present the model and the methodology. But, you know, it's -- it says in the report, and I'll testify here as well, that the idiosyncratic details of the implementation can't be decided on in advance because the model -- because that implementation of those idiosyncratic details depend on the specific facts and circumstances of each case.

So in order for the model to be widely used, it would have to allow for that kind of flexibility to be made when the model is used -- implemented. I mean, until someone is doing the loss causation analysis and

Page 239

analyzing the facts of the case, that would compel the choice of a particular valuation tool or disaggregation tool or attribution tool. You can't specificity in advance, and it would be imprudent to constrain the model to a tool that may be -- to a particular detail that would be inappropriate for that case.

Q. And so you agree that out-of-pocket damages does not specify a tool for differentiating between any stock price inflation from understatement of a risk versus materialization of a risk?

MS. WOLKE: Object to form.

A. I would say it differently. I would say that the model accommodates correct choices that might differ from case to case.

BY MS. UMAR:

Q. But the model doesn't specify which choice needs to be made in order to differentiate between understatement of a risk versus materialization of a risk, does it?

MS. WOLKE: Objection. Asked and answered.

Page 240

A. The model doesn't specify a specific dollar amount of damages.

BY MS. UMAR:

Q. That's not what I'm asking, sir.

A. Well, I think it's the appropriate way to answer your question. The model accommodates appropriate outcomes from the analysis when the model is implemented.

Q. Sir, I'm going to move to strike your answer as nonresponsive. I'm asking you to focus on my question.

Out-of-pocket damages does not specify a tool for differentiating between any stock price inflation from understatement of a risk versus materialization of a risk, correct?

MS. WOLKE: Objection. Asked and answered. And this is the -- you have an answer to this.

MS. UMAR: He did not answer the question, Counsel.

MS. WOLKE: He said -- this is a quote -- but the model doesn't specify which choice needs to be made in order to differentiate between -- sorry. He said, "I

Page 241

would say it to you differently. I would say that the model accommodates correct choices that might differ from case to case." That was at line 1 through 4 of the current page.

MS. UMAR: I'm not asking whether it accommodates choices, Counsel. That has nothing to do with my question. I'm not asking whether it accommodates choices. I'm asking whether --

MS. WOLKE: He's not accepting the premise of your question, and he doesn't have to accept the premise of your question.

MS. UMAR: Well, then, he can explain why he can't answer it.

MS. WOLKE: He did multiple times, Counsel.

MS. UMAR: He didn't. All he's doing is answering the question he wants to answer, which isn't my question.

We can take this up with the judge if we need to because this is a very simple question, and I think he knows what the answer is, and he doesn't want to give it because he wants to answer his own question.

61 (Pages 238 - 241)

Page 242

Now I'm --

MS. WOLKE:  No.  He has told you it does not specify the tool.

MS. UMAR:  He didn't.

MS. WOLKE:  Yes, he did.  That's what he said.

BY MS. UMAR:

Q.  Sir, is that what you said, out-of-pocket damages does not specify the tool that --

MS. WOLKE:  That must be used.

BY MS. UMAR:

Q.  -- that must be used to differentiate between stock price inflation from understatement of a risk versus materialization of a risk?

A.  It accommodates different correct choices depending on what the correct choice is.  It doesn't make it a different model if, because of the facts and circumstances of one case, you would use a PE ratio whereas the facts and circumstances of a different case you should use a DCF model.

Q.  But, sir, I'm --

Page 243

A.  It would still be an out-of pocket damage methodology.  And it's still a methodology that says you calculate what the value of the stock would be in the but-for world, compare it to the value of the stock in the actual world.  The difference is artificial inflation, and the change in artificial inflation over the holding period is damages.

Q.  Sir, I'm not asking whether it's still out-of-pocket damages or not.  That's not my question.

My question is does out-of-pocket damages specify which tool you use to differentiate between stock price inflation from understatement of a risk versus materialization of a risk?

MS. WOLKE:  Object to form.

A.  The model is not constrained to any specific tool that might be the inappropriate tool in a particular circumstance.

BY MS. UMAR:

Q.  And when you say it's not --

A.  The model accommodates the correct

Page 244

choice given the facts and circumstances.

Q.  And when you say it's not constrained to a specific tool, that means it doesn't specify a particular tool, right?

A.  It means it's not contained to a specific tool.  It will still be out-of-pocket damages even if the tool for Case A is different from the tool for Case B for valuing the stock or doing the attribution analysis.

Q.  Now, you're saying that out-of-pocket damages doesn't -- it accommodates a whole range of tools because it's intended to be widely used and flexible, correct?

A.  The valuation tools I mean, yeah.  So it's -- it allows for -- it's not constrained to use a particular valuation formula.  It's not constrained to use a particular valuation formula.  It accommodates whatever valuation formula is deemed to be correct for the case at hand.

Q.  And out-of-pocket damages is intended to be flexible enough that it can encompass the facts and circumstances of every case, correct?

Page 245

MS. WOLKE:  Object to the form.

A.  No, I didn't say that.  I said -- that's not what I said before.  What I said before is I haven't yet encountered a 10b-5 case where it wasn't the appropriate model.

Can we take a break now?  There's no question pending, right?

MS. UMAR:  We can go off the record for five minutes.

THE VIDEOGRAPHER:  The time is 2:25.  We're going off the record.

(Recess taken from 2:25 p.m. to 2:45 p.m.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 2:45.

BY MS. UMAR:

Q.  Sir, earlier you testified that out-of-pocket damages accommodates whether a valuation formula is deemed to be correct for the case at hand.  Do you remember that?

MS. WOLKE:  Object to form.

A.  Well, which formula is deemed to be

62 (Pages 242 - 245)

Page 246

correct, yes.

BY MS. UMAR:

Q. Okay.

A. Which valuation tool for valuing the stock?

Q. You haven't evaluated which valuation formula is deemed to be correct for this case, correct?

MS. WOLKE: Object to form.

A. That's correct. But as I said before, I saw -- I know that analysts have done that, and each of them has proposed a formula they believe is correct.

BY MS. UMAR:

Q. Okay. But as we talked about before, the analysts were not evaluating damages in connection with this litigation, correct?

MS. WOLKE: Object to form. Asked and answered.

A. And I think what I said at the time is essentially that it doesn't matter, that a valuation is a valuation.

BY MS. UMAR:

Q. And so just to make sure that we're

Page 247

clear, you haven't evaluated which valuation formula is deemed to be correct for this case?

MS. WOLKE: Object to form. Asked and answered.

A. That's right. I'm going to make that decision if and when I do the loss causation and damages analysis. It would be imprudent to lock myself into a formula now, having not yet done the analysis -- having not yet done the loss causation and damages analysis.

BY MS. UMAR:

Q. Sir, I'm going to show you a document.

(Exhibit No. 3 marked for identification.)

BY MS. UMAR:

Q. Madam Court Reporter is handing a document that we marked as Exhibit 3 for today's deposition.

A. Yes.

Q. And I'm going to ask you to turn to -- this is a court filing from another case.

Do you see that?

Page 248

A. I do.

Q. I'm going to ask you to turn within this document. Do you see that this document has page numbers at the top starting with 1 of 153?

A. Yes.

Q. I'm going to ask you to turn to 23 of 153.

A. Okay.

Q. Do you see that this is a document labeled Exhibit E?

A. Yes.

Q. And then if you turn to the next page, you can see that this is a document with a title "Report on Market Efficiency," Professor Steven Feinstein, June 7, 2017.

A. I see that.

Q. This is a report that you submitted in a different litigation matter, correct?

A. That's right.

Q. I'm going to ask you to turn to Paragraph 152 of this report. Just let me know when you're there.

A. I'm there.

Page 249

Q. Keep that open please, if you will. And I'm going to ask you to also now open your report for this case and turn to Paragraph 211.

A. One moment.

Okay.

Q. Okay, sir. I'm going to ask you to compare Paragraph 152 in -- you know, from this Federal Home Loan Mortgage Corporation case to Paragraph 211 from your report in this case.

A. Well, I'll -- I'll do that, but I think we also have to look at Paragraph 210 in the UNFI case and Paragraph 209 in the UNFI case for context for Paragraph 211 in this case, which -- and then there's no such similar paragraph or paragraphs in the Freddie Mac case report.

Q. Is that the primary distinction between Paragraph 211 in this case and Paragraph 152 in the Federal Home Loan case?

A. Right.

MS. WOLKE: Object to form.

A. And in the instant case, I lay out the

63 (Pages 246 - 249)

Page 250

array of financial valuation tools that are often used and explain that valuation analysis is undertaken continuously every day for virtually every public security, and these tools address the various complexities that could potentially be encountered in the course of computing artificial inflation and damages in this case, and that was not explained in the Freddie Mac case.

BY MS. UMAR:

Q. And leaving aside your explanations in Paragraphs 209 and 210 of this report, Paragraph 211 of this report uses substantially similar, and in some cases identical, language as Paragraph 152 of the Federal Home Loan case, correct?

MS. WOLKE: Object to the form.

A. Well, similar, that's right.

BY MS. UMAR:

Q. Let's look at Paragraph 155 --

A. Well, wait. I really need to point out on Numerette 3 in the report for this case where it says "Supplementing Events," the results. "The full array of generally

Page 251

accepted and widely used valuation tools can be applied, if necessary, to calculate the but-for security price under the assumption of prior full disclosure. This analysis would also apply in a classwide basis."

I don't think that -- yeah, that was not in the Freddie Mac report, and that's a major distinguishing paragraph.

Q. Is that the primary distinguishing paragraph as between Paragraph 211 of this report and Paragraph 152 of the Federal Home Loan report?

MS. WOLKE: Object to form.

A. Well, no. I think Paragraph 209 is a distinguishing characteristic, and so is 210, and so is Numerette 3, essentially that I layout the valuation tools that the out-of-pocket model can use in my report in this current case.

BY MS. UMAR:

Q. But you agree that the paragraph that you mentioned are the primary differentiators, and otherwise, the language is substantially similar, correct?

Page 252

MS. WOLKE: Object to form.

A. No. There are many more differences.

BY MS. UMAR:

Q. What are those differences, sir?

A. Well, notice how there are three numerettes in the Freddie Mac case, description of the out-of-pocket damage methodology. Whereas in the UNFI report, I've got -- one, two, three, four, five, six, seven, eight, nine -- nine paragraph numerettes explaining in more detail the methodology.

Q. You're describing the same methodology, however, correct?

MS. WOLKE: Object to form.

A. It's more fulsome in the current report, UNFI.

BY MS. UMAR:

Q. But the methodology you're describing is the same, correct?

MS. WOLKE: Object to form.

A. That's right. I think in Freddie Mac I was faltered for the description more than the methodology, and the methodology is much

Page 253

more fulsome in the UNFI case, rectifying that issue.

BY MS. UMAR:

Q. Well, the methodology is not more fulsome in the UNFI case. But your position is that the explanation of it is, correct?

MS. WOLKE: Object to form.

A. Well, the explanation points out that the methodology is more fulsome, and it's a more fulsome description of that methodology.

BY MS. UMAR:

Q. How is the methodology itself any different in the UNFI case?

A. Well, I've laid out the tools. I mean, that's what the judge -- well, can we look at the judge's order in Freddie Mac? I'll point out what the issue was.

Q. No, I don't have the --

A. She basically pointed out that it was a problem with the description, not the methodology. So the description is now better.

Q. Sir, look at Paragraph 155 of the Federal Home Loan report. Please let me know

64 (Pages 250 - 253)

Page 254

when you have that in front of you.

A. Yes, it's there.

Q. Okay. Now I'd like you to compare that to Paragraph 210 of your report in this case.

Paragraph 155 of your report in the Federal Home Loan case is substantially similar to Paragraph 210 of your report in this case, isn't it?

A. No.

MS. WOLKE: No. Wait. What -- 155 and 210? We might be looking at different numbers.

MS. UMAR: Correct.

A. They're different.

BY MS. UMAR:

Q. Isn't the primary difference simply that you give examples of valuation techniques here?

A. Well, I lay them out, what valuation techniques could be used to implement the out-of-pocket damages methodology, and that was the judge's criticism in the Freddie Mac case, that I didn't do that.

Page 255

Q. But again, you don't specify which of those valuation techniques would be appropriate here?

MS. WOLKE: Object to form.

A. Well, I do explain that there certainly is an appropriate valuation tool because I explain that scenario valuations are done virtually every day by many analysts for virtually every security. I explain that also in the UNFI case. So I explain that from this list, there will be an appropriate choice.

BY MS. UMAR:

Q. But you don't make that choice, correct?

A. It would be imprudent to predetermine the right choice before the loss causation damages -- the loss causation and damages analysis is even embarked upon. That decision is part of the implementation of the out-of-pocket damage methodology. The out-of-pocket damage methodology is fully specified and calls for that determination when it's implemented.

Q. I'll ask again. You haven't made that

Page 256

choice, correct?

MS. WOLKE: Object to form. Asked and answered.

A. The question doesn't make sense. I have not done a loss causation analysis. I'll answer that way.

The choice belongs to the loss causation and damages analysis. I have not done the loss causation and damages analysis yet.

BY MS. UMAR:

Q. Let's talk about options. You say formulas such as the binomial model or Black-Scholes formula can be used to calculate artificial inflation, correct?

A. That's right.

Q. Which model do you intend to apply?

A. Well, one of the two. Either one or the other. I explain that also in my published paper. They're probably going to give similar answers or even maybe identical answers, especially because UNFI stock did not pay dividends. That's usually the major difference between the two.

Page 257

Q. You have not decided which model you intend to apply, correct?

MS. WOLKE: Object to form. Asked and answered.

A. Part of implement- -- no. Model? Formula. Do you mean formula or model? I'm going to use the out-of-pocket damage --

BY MS. UMAR:

Q. Okay. Well, let me --

A. -- model if I'm going to calculate damages.

But which option pricing formula I'll use within the implementation of the out-of-pocket damage model is a decision that the out-of-pocket damage model implementation calls for when it's implemented.

Q. You have not decided which option pricing formula you -- excuse me. Let me start again.

You have not decided which formula you will use to calculate artificial inflation with respect to options, correct?

MS. WOLKE: Object to form.

A. Well, I don't even know if I'm going

65 (Pages 254 - 257)

Page 258

to be doing a loss causation analysis, so it doesn't make sense to make those decisions if I'm not even doing the analysis.

BY MS. UMAR:

Q. You have not offered an opinion on which of these two formulas should be used to calculate artificial inflation for options on a classwide basis consistent with plaintiffs' theory of liability, correct?

A. No. Well, the model that's consistent with plaintiffs' theory of liability is the out-of-pocket damage model. And the implementation when it comes to options requires a calculation of a but-for option price, and that can be done with a binomial model or a Black-Scholes model.

I can tell you that my coauthor in the published paper says we should use the binomial model. That's what he says. He might be right. He's probably right. But there are some advantages to the Black-Scholes model, so I would want to reserve that judgment until actually conducting the analysis, if I were asked to even do that

Page 259

analysis.

Q. Now, before, you quibbled with me when I called it a model, and you said it's a formula. Now you're calling it a model.

A. I made a mistake.

Q. Is it a model, or is it a formula?

MS. WOLKE: Object to form.

A. It's a formula. It's a formula.

BY MS. UMAR:

Q. So I'm going to ask again. You haven't -- you have not made a determination as between the Black-Scholes formula or the binomial formula in terms of which of those two should be used to the calculate artificial inflation for options on a classwide basis consistent with plaintiffs' theory of liability, correct?

MS. WOLKE: Object to form.

A. Well, neither model is going to calculate artificial inflation. Each model will calculate a but-for option price, and then the out-of-pocket damage model will take that but-for price and calculate inflation and the damages.

Page 260

BY MS. UMAR:

Q. You have not made a determination as to which of those two formulas should be used to calculate the but-for option price, correct?

MS. WOLKE: Object to form. Asked and answered.

A. Well, I haven't done the loss causation and damages analysis, and that decision is part of the loss causation and damages analysis.

Q. Okay. I --

A. I anticipate -- I mean, it's -- like I said before, I mean, it's probably going to be binomial model, but it might not be -- formula, formula. Okay. I'm sorry. Binomial formula, but it might not be.

BY MS. UMAR:

Q. So you haven't made a decision as to which of those formulas should be used, correct?

A. No. I -- one of those formulas should be used definitely. Definitely one of those formulas should be used. Maybe both of those

Page 261

formulas should be used, but choosing which formula is part of implementing the out-of-pocket damage model, and I haven't done that because I haven't been asked to calculate damages.

Q. Now, each of the Black-Scholes formula and the binomial formula require several inputs, correct?

A. That's right.

Q. And one of those inputs is expected stock price volatility, correct?

A. That's right.

Q. How would you quantify each of the inputs into the -- into these formulas that we're talking about?

MS. WOLKE: Object to form.

A. There's a number of different ways. You know, you can calculate a but-for volatility forecast just like you can calculate a but-for stock price. But what I explained in my -- well, in previous cases and also in the published article is that, you know, you could either use the -- you could produce a conservative measure of damages by

66 (Pages 258 - 261)

Page 262

choosing either of the market's forecast of volatility before the disclosure or the market's forecast of volatility after the disclosure, which are observable as implied volatilities, and you can choose the one that produces the more conservative measure of damages. That is the methodology I -- that's the implementation methodology that I explained in the published paper.

BY MS. UMAR:

Q. And so you said, sir, that you could look at the volatility of the company's stock price before the disclosure or after the disclosure, correct?

A. It's called the implied volatility.

Q. Okay.

A. The volatility forecast, that you can read out of traded option prices, and you can observe that, what the market is forecasting both before the disclosure and after the disclosure. And if it's not obvious or clear which is the more appropriate forecast to use for the calculation of the but-for option price, one approach is to choose the

Page 263

volatility forecast that would produce the lower measure of damages and produce a conservative measure of damages.

Q. And you're saying that the more conservative of those implied volatility figures would be the appropriate to -- one to use?

MS. WOLKE: Object to the form.

A. No, that's not actually what I said. What I said is you can do that if it's not obvious which one is superior.

BY MS. UMAR:

Q. And in what circumstances would it be obvious which one is superior?

MS. WOLKE: Object to form. Calls for speculation.

A. Well, there may be -- what circumstances? I mean, things that would weigh into the decision is if there's any commentary about the volatility. If there's someone else in real time who's commenting on the volatility, that would be something to take into account, for example.

BY MS. UMAR:

Page 264

Q. And in your view, if someone is commenting on the volatility, that might make a measure -- an implied measure of volatility superior?

A. One or the other. If they're saying you have a choice between A and B and someone said, We believe A is the better measure, that would be perhaps a -- perhaps appropriate.

There are also forecasting techniques that can be used. And that's something also that can be used for that detail of the binomial or Black-Scholes formula.

Q. What are those forecasting techniques?

A. Oh, there's time series forecasts, for example. You can do comparisons to other periods. You can look at relationships between marketwide volatility forecasts and company-specific forecasts. There's a variety of volatility forecasting techniques that could be considered.

Q. Now, you mentioned earlier looking at the implied volatility in a company's stock price before disclosure and after a

Page 265

disclosure.

A. Right.

Q. Over what time period would you be looking at that?

MS. WOLKE: Object to form.

A. Prior to the disclosure -- just prior to the disclosure. Maybe the closing price just prior to disclosure and compare that to the closing price volatility forecast just after the disclosure.

BY MS. UMAR:

Q. And --

A. Usually, what happens is when a -- well, usually what happens is when a stock price goes down, the volatility forecast goes up. So one would check to see if that's the case, and that would also help inform the decision.

Q. And by "just before a disclosure," what do you mean?

A. The day -- the closing price the day before the disclosure. Just like you would look at the closing price of a stock just before the disclosure to see what the stock

67 (Pages 262 - 265)

Page 266

price was before there was full information or fuller information.

Q. And the same with the stock price -- the implied stock price -- excuse me -- same with the implied volatility after the disclosure, you would look the day after the disclosure?

A. Or maybe the closing -- the closing option prices and the closing implied volatility after the disclosure of the -- you know, on the day of the disclosure, the close that day.

Q. Okay.

A. I'm not -- it would be imprudent to say that that's absolutely the decision I'll arrive at, but it's possible, if not probable.

Q. If the volatility of UNFI stock price increased as a result of the alleged corrective disclosure, wouldn't that affect the price of UNFI's options, according to the option price models that you proposed?

MS. WOLKE: Object to the form.

A. Yeah, that would be taken into account by the formulas. Formula has a relationship

Page 267

between volatility forecast and option price.

BY MS. UMAR:

Q. And can you explain to me how you would account for that in your formulas.

A. The formula is a formula of five variables: stock price, strike price, time to expiration, interest rate, and volatility. You plug the variables in. The formula gives you an output equal to an option valuation.

Q. And the stock price volatility is built in specifically to the volatility variable within the formula?

A. Yes.

Q. Okay.

A. Wait. What did you -- you said the option price?

Q. No. So I am asking -- let's go back to my question, which was doesn't stock price volatility also increase the price of UNFI's options?

A. Yes, it does.

Q. And so you said that that's taken into account in your formula, and I said --

A. Right.

Page 268

Q. -- is that under the variable that relates to volatility?

A. Absolutely correct.

Q. Okay. So you say in Paragraph 211 of your report, Romanette V, that the formulas you describe related stock prices to option prices.

Do you see that?

A. Yes.

Q. Does that suggest that you would hold any inputs constant as between your stock inflation model and your option inflation model?

MS. WOLKE: Object to form.

A. Well, you wouldn't hold the stock price constant. That's the whole idea.

BY MS. UMAR:

Q. What about any other inputs?

A. Well, the question is hard to follow because it doesn't quite make sense. Time -- I mean, you would know what the time to expiration of the option is. That's a variable that determines option price, and it does not determine stock prices. I mean, you

Page 269

would know what the market interest rate is.

I don't understand -- I mean, the other variables are observable. The stock price would be -- well, time to expiration is observable, and the interest rate is observable, and the strike price is observable, and the stock price is what -- is the major variable that you're changing, the stock price with inflation versus the stock price without inflation. So feeding that into the model will tell you how the option price changes when the stock price changes.

And then I guess the question you raised is what do you do about volatility? If volatility changes if -- if the disclosure not only changes the stock price but also changes the volatility, there are ways to deal with that. One way is to pick whichever volatility from before and after the disclosure gives you the lower damages. That's a conservative choice.

Q. Stock price volatility is also an input in your stock inflation model, correct?

68 (Pages 266 - 269)

Page 270

MS. WOLKE:  Object to form.

A.  I don't think so, no.  Generally, no. I mean, it's not -- it would not be an input in a price earnings model or a price cash flow model formula or, you know, price EBITDA formula.  It wouldn't be in any of those.

BY MS. UMAR:

Q.  Have you proposed the binomial formula or the Black-Scholes formula in other cases?

A.  Yes.

Q.  How many times?

A.  At least two.  I mean, I know Apple was a recent big case.  And I think I proposed Black-Scholes and another expert, Don Chance, proposed binomial.  And since then, we've written an article together where we proposed both, so -- but I agree with him that binomial should be considered.  And I know there's others.  There have been a couple others since the Apple case even.

Q.  Have you proposed one of those two formulas in every case in which there's an options class?

MS. WOLKE:  Object to the form.

Page 271

A.  I think I would have to see that wording in my reports.  I think usually I would say -- well, actually, I probably used language like this here.  "Applying a generally accepted and widely used option pricing formula such as Binomial or Black-Scholes."

So I just don't -- you know, just like with the stock valuation questions we've had today, it's just imprudent to lock into a constraint to use a particular formula one over the other before the loss causation and damages analysis even begins.

BY MS. UMAR:

Q.  Are there formulas where models other than the binomial formula or the Black-Scholes formula that could be used to construct an inflation ribbon for an options class?

A.  There are, but they're far less commonly used.  These are the two that are most commonly used, by far.

Q.  Let me ask you another question. Let's stick with Paragraph 211 of your report and let's look at 211, Romanette v.  And you

Page 272

see that you say in the first sentence here, "Third, the measure of per-security damages generally applied in Section 10(b) cases is the reduction and the inflation ribbon over an investor's holding period, the economic/inflation loss."

Do you see that?

A.  Yes.

Q.  What do you mean by "per-security damages"?

A.  Oh, well, damages can be calculated on a per-share basis for stocks or a per-option basis for options rather than an aggregate for the entire market.

Q.  And you agree that damages should be calculated for individual options on a per-option basis, correct?

A.  Yes.

MS. WOLKE:  Object to form.

A.  Yes.

BY MS. UMAR:

Q.  Isn't it true that among all option holders, only investors who bought call options or sold put options were actually

Page 273

damaged?

A.  I haven't calculated any damages yet in this case.

Q.  How could -- how could investors -- well, how could option holders other than the investors who bought call options or sold put options have been damaged under the theory of liability here?

MS. WOLKE:  Object to form.

A.  That is a different question.  Yeah, under the theory of liability, it would be purchasers of call options when the stock was artificially inflated.  They may be the people who are damaged.  And sellers of puts would be the ones who are damaged when it comes to put.

BY MS. UMAR:

Q.  Okay.  Damages could be different for individual UNFI options given option-specific features like strike price and time to maturity, correct?

MS. WOLKE:  Object to form.

A.  Time to expiration, but, yes, correct.

BY MS. UMAR:

Q.  If the same investor purchased two

69 (Pages 270 - 273)

Page 274

different UNFI option series, should damages be calculated for each of those option series separately?

A. As opposed to netting?

MS. WOLKE: Object to form.

BY MS. UMAR:

Q. Correct.

A. Well, I mean, to some extent, we're -- now we're wandering into the legal realm. I mean, if they suffer damages on both, it would make sense to add the damages from each. If they have an offsetting profit in one and loss in another, that's a legal question that different courts have arrived at different judgments about.

Q. But in calculating damages for different option series, one needs to look at the unique features of that option, correct?

MS. WOLKE: Object to form.

A. The unique features are all accommodated for in the common option pricing formula. What -- the only thing that differs one option from another are the expiration date, the strike price, and whether it's a put

Page 275

or a call and, you know, for UNFI options that are exchange traded. And the formula has those variables in it, so the formula accommodates those differences.

BY MS. UMAR:

Q. Let me show you a different document.

(Exhibit No. 4 marked for identification.)

BY MS. UMAR:

Q. Sir, Madam Court Reporter has handed you what we've marked as Exhibit 4 for today's deposition.

A. Okay.

Q. And, sir, if you turn to the second page of this document, do you see that this is a submission from a different case In Re: Apple, Inc. Securities Litigation, and the document is entitled "Report on Market Efficiency," Professor Steven Feinstein, Ph.D., CFA, dated May 5, 2021?

A. Yes.

Q. And this is a report you offered in

Page 276

another case, right?

A. That's right.

Q. Sir, I would like you to turn to Paragraph 187 within the Apple report. I believe that's at page 52.

And just let me know when you're there, sir.

A. I'm there.

Q. And if you could, just please keep that open. I want you now to look at your report from this case and focus on Paragraph 207.

A. Okay.

Q. Are you there, sir?

A. I am there.

Q. Now, you used substantially similar language in Paragraphs 187 of the Apple report and Paragraph 207 of the report in this case, correct?

MS. WOLKE: Object to form.

A. There's some similarities; there's some differences.

BY MS. UMAR:

Q. What are the differences, sir?

Page 277

A. Well, in the UNFI report, it says "such as the binomial American option pricing formula, the binomial formula, or the Black-Scholes formula," whereas the Apple one said "such as the Black-Scholes formula."

Q. Are there any other significant differences that you identify?

MS. WOLKE: Object to form.

A. (Witness reviews document.)

There's an additional sentence about "The formulas will also tell you how much artificial inflation or artificial depression dissipated from call options or put options respectively on corrective disclosure dates."

Q. Anything else?

MS. WOLKE: Object to form.

A. The name of the case is the only other difference: Apple in one, UNFI in the other.

MS. UMAR: Can we go off the record for five minutes, please.

THE VIDEOGRAPHER: The time is 3:20. We are going off the record.

70 (Pages 274 - 277)

Page 278

(Recess taken from 3:20 p.m. to 3:38 p.m.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 3:38.

MS. UMAR:  Professor Feinstein, I have no further questions for you at this time.  Thank you.

MS. WOLKE:  I have nothing.

THE VIDEOGRAPHER:  The time is 3:38.  We are going off the record.  This is the end of the -- today's deposition of Steven P. Feinstein.

THE STENOGRAPHER:  Let me just ask.  Both sides are getting a rough draft?

MS. WOLKE:  No, we don't need a rough draft.  Standard delivery is fine.

MS. UMAR:  We need a rough and expedited.

(Deposition concluded at 3:39 p.m.)

Page 279

CERTIFICATION

I, DARLENE M. COPPOLA, a Notary Public, do hereby certify that STEVEN P. FEINSTEIN, PH.D., after having satisfactorily identifying himself, came before me on the 9th day of May, 2025, in Boston, Massachusetts, and was by me duly sworn to testify to the truth and nothing but the truth as to his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined upon his oath and said examination reduced to writing by me; and that the statement is a true record of the testimony given by the witness, to the best of my knowledge and ability.

I further certify that I am not a relative or employee of counsel/attorney for any of the parties, nor a relative or employee of such parties, nor am I financially interested in the outcome of the action.

WITNESS MY HAND THIS 13th day of May, 2025.

*Darlene M. Coppola*

DARLENE M. COPPOLA          My commission expires:
NOTARY PUBLIC                       November 2, 2029
REGISTERED MERIT REPORTER
CERTIFIED REALTIME REPORTER

Page 280

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

May 14, 2025

To: Ms. Wolke

Case Name: Sills, Dan Et Al. v. United Natural Foods, Inc. Et Al.

Veritext Reference Number: 7325358

Witness:  Steven P. Feinstein , Ph.D      Deposition Date:  5/9/2025

Dear Madam:

Enclosed please find a deposition transcript.  Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change.  Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,
Production Department

NO NOTARY REQUIRED IN CA

Page 281

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7325358
CASE NAME: Sills, Dan Et Al. v. United Natural Foods, Inc. Et Al.
DATE OF DEPOSITION: 5/9/2025
WITNESS' NAME: Steven P. Feinstein , Ph.D

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

_____   _____
Date                        Steven P. Feinstein , Ph.D

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this _____ day of_____, 20____.

_____
Notary Public

_____
Commission Expiration Date

71 (Pages 278 - 281)

Page 282

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7325358
CASE NAME: Sills, Dan Et Al. v. United Natural Foods, Inc. Et Al.
DATE OF DEPOSITION: 5/9/2025
WITNESS' NAME: Steven P. Feinstein , Ph.D
In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.
I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).
I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.
_____     _____
Date                      Steven P. Feinstein , Ph.D

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:
    They have read the transcript;
    They have listed all of their corrections
        in the appended Errata Sheet;
    They signed the foregoing Sworn
        Statement; and
    Their execution of this Statement is of
        their free act and deed.
    I have affixed my name and official seal
this _____ day of_____, 20____.
    _____
    Notary Public

    _____
    Commission Expiration Date

Page 283

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
    ASSIGNMENT NO: 7325358
PAGE/LINE(S) /      CHANGE      /REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_____     _____
Date                      Steven P. Feinstein , Ph.D
SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
DAY OF _____, 20_____ .
    _____
    Notary Public

    _____
    Commission Expiration Date

72 (Pages 282 - 283)

**[& - 207]**                                                                    Page 1

| **&** | 199:10 226:19 | **150**  58:8 | **20**  17:24 49:6 |
|---|---|---|---|
| **&**  2:3 5:23 6:2 6:5 171:6 | 227:16 228:18 | **1500**  165:12 | 55:10 87:5 |
| **0** | **10:05**  63:4,6 | 168:2,4 169:4 | 89:13,20 |
| **02364**  1:8 | **10:21**  63:7,10 | 169:21 170:15 | 143:13 281:16 |
| **1** | **10b**  85:9 | 170:18 171:1 | 282:22 283:22 |

**&**

**&**  2:3 5:23 6:2 6:5 171:6

**0**

**02364**  1:8

**1**

**1**  4:9 7:19,21 8:7,8 15:5,12 63:14,16 91:10 241:4 248:4

**1,150**  58:19

**1,191**  69:5

**1,194**  68:24

**10**  49:6,18 76:24,24 77:21 77:21 78:1,1,4 78:4 89:13,20 107:1 109:21 110:14,24 112:10 140:15 140:22 141:2 141:23 192:14 193:4,8 225:2 226:9,11 227:16 228:17 228:19 230:2,3 272:3

**100**  24:13,14,17 24:19 25:8,19 26:17 27:2 106:20 112:12 112:15,16

199:10 226:19 227:16 228:18

**10:05**  63:4,6

**10:21**  63:7,10

**10b**  85:9 193:19 225:8 226:5 227:6,23 228:10 245:4

**11**  62:19 127:24

**1100**  280:1

**113**  154:10

**117**  148:23 149:4,8

**1191**  87:7

**11:25**  127:11 127:13

**11:38**  127:14 127:17

**12**  33:17,20 34:7 179:11

**12.6**  179:11

**121**  83:23

**12:31**  177:13 177:15

**13**  64:6

**138**  167:12

**13th**  279:17

**14**  280:4

**140**  4:10

**144**  161:8

**15**  133:22 134:5

**150**  58:8

**1500**  165:12 168:2,4 169:4 169:21 170:15 170:18 171:1 173:12 174:2,5 174:6,10,11

**152**  248:22 249:8,21 250:15 251:11

**153**  248:5,8

**155**  250:20 253:23 254:6 254:12

**156**  168:3

**16**  19:9,21

**18**  88:23 89:1

**1820**  280:2

**187**  276:4,17

**19**  38:18

**1925**  2:4

**1996**  19:7 38:12,20 39:6

**1:19**  177:16,19

**1:23**  1:8

**2**

**2**  4:10 15:5,13 91:10 140:2,6 140:9 279:22

**2,248**  68:9 69:11,16 70:9 70:14 72:8 73:1

**20**  17:24 49:6 55:10 87:5 89:13,20 143:13 281:16 282:22 283:22

**200**  19:10,20 20:24 21:6,7 22:3 24:1,5,10 24:11 53:13 225:6,23

**2008**  38:12,20 39:6

**2011**  140:11

**2017**  248:16

**2019**  126:1,4,21

**2020**  68:13 125:22,24 126:3

**2021**  4:15 275:22

**2022**  222:23

**2023**  61:3 141:22 142:1,6 142:10,12,23 144:22 222:23 222:23,24

**2024**  64:6 68:14

**2025**  1:21 5:9 279:5,17 280:4

**2029**  279:22

**20471**  279:20

**207**  276:12,18

**[209 - 8th]**                                                   Page 2

**209**   249:14
   250:12 251:14
**21**   8:8 143:11
**210**   197:7
   198:3,22
   249:13 250:12
   251:15 254:4,8
   254:12
**2100**   2:5
**211**   249:4,10,15
   249:20 250:13
   251:10 268:4
   271:23,24
**216-523-1313**
   280:3
**22**   142:9
**23**   248:7
**24**   89:10,12
**247**   4:12
**26**   61:2 222:24
**275**   4:13
**2:25**   245:11,13
**2:30**   62:6,9
**2:45**   245:14,17

**3**

**3**   4:12 16:19
   17:12,15,19
   41:15 86:12,13
   86:14,18
   247:14,19
   250:22 251:16
**30**   17:24 19:8
   19:10 53:13

148:24 154:11
**300**   59:1
**301**   143:14
   144:11 145:2
**310.201.9150**
   2:10
**312.853.7579**
   2:20
**35**   60:24 142:4
**37**   161:7
**38**   161:7
**39**   161:7,7
**3:20**   277:22
   278:1
**3:38**   278:2,5,11
**3:39**   278:21

**4**

**4**   4:13 83:2,3,7
   83:9 88:22
   241:4 275:8,13
**400**   155:1
**43**   229:7
**44114**   280:2
**45**   127:23
   128:2 146:10
   146:12
**451**   179:7
**46**   130:14
   131:1
**47**   130:14,22

**5**

**5**   4:15 83:11
   85:9 193:19
   225:8 226:5
   227:6,23
   228:10 245:4
   275:22
**5/9/2025**   280:8
   281:3 282:3
**50**   48:23 49:1,1
   57:22 58:8
   145:17,23
   146:9
**52**   128:15,16
   129:6 146:11
   146:14 276:5
**550**   59:2
**57**   179:8
**5:00**   62:6,9

**6**

**6**   4:5 83:20
   89:10
**60**   1:19 5:11
   8:4
**600**   165:11
   166:9 167:9,13
   168:12,19
   169:8 170:16
   170:18 172:22
   173:21 174:5,9
**60603**   2:17
**62**   63:17 87:3

**65**   161:8
**66**   76:18
**68**   81:16
**6:00**   61:22

**7**

**7**   4:9 141:22
   142:1,6,9,23
   143:13,19
   144:22 222:23
   222:23 248:16
**70**   48:23 82:6
**71**   84:11
**72**   30:14 41:6
**73**   30:19
**7325358**   280:7
   281:2 282:2
   283:2
**76**   41:6
**7th**   143:15
   144:12

**8**

**8**   68:13 76:24
   140:11 141:6,8
   141:12,16
   222:23
**80**   30:14 69:8
**81**   16:20 41:16
**84**   45:24
**85**   16:20 41:16
**8th**   141:18
   143:15

**[9 - additional]**

| 9 | | | |
|---|---|---|---|

**9**  1:21 5:9
   62:18 92:6
**90**  32:24 33:4,4
   39:20 190:16
   190:16
**90067**  2:6
**95**  39:20
**96**  40:11
**97**  40:11
**9:00**  61:22
**9:06**  1:21 5:3
   5:10
**9th**  143:15
   279:5

| a | | | |
|---|---|---|---|

**a.m.**  1:21 5:3
   5:10 63:6,7
   127:13,14
**ability**  279:12
**able**  30:7 94:12
   182:22 183:1
   199:8 202:1
**abnormal**
   206:7
**above**  167:18
   167:18 280:17
**absolutely**
   151:3 168:7
   201:2 266:15
   268:3
**absorbed**  138:4

**absorbs**  132:5
**academic**  81:14
   81:18 138:2
**academics**
   138:12
**accept**  175:11
   241:12
**accepted**  52:23
   53:4 91:6
   103:16 138:12
   154:18,22
   156:4 160:23
   161:3,11,16,22
   163:11,13,15
   180:1 197:18
   225:7 251:1
   271:5
**accepting**
   241:10
**access**  82:16
**accommodate**
   132:4 133:2
   179:12
**accommodated**
   274:21
**accommodates**
   133:15 196:10
   210:23 233:7
   239:16 240:7
   241:2,6,8
   242:17 243:24
   244:11,18
   245:20 275:4

**accomplished**
   215:21
**accordance**
   281:5 282:5
**account**  95:15
   114:4 231:7
   232:2,10
   236:14,22
   263:23 266:23
   267:4,23
**accounting**
   94:23 231:13
**accounts**  67:14
**accurate**  35:13
   107:11
**accurately**  27:1
   113:10
**acknowledge**
   178:14 281:11
   282:16
**acknowledged**
   56:21
**acknowledges**
   129:11 233:7
   237:18
**act**  281:14
   282:20
**action**  49:9,15
   57:17 64:5
   89:16,20,22
   193:18 225:9
   279:16
**actions**  50:1

**active**  73:11,11
   73:13
**actual**  43:22
   108:23 196:20
   210:4 235:15
   243:6
**actuality**
   109:21
**actually**  19:5
   20:17 22:6
   24:13 29:2
   38:9 60:17
   67:23 77:24
   78:18 87:5
   106:20 107:1
   117:16 120:15
   126:1,3 127:3
   128:13 138:9
   142:14 151:11
   157:17 184:14
   200:15 209:10
   218:12 219:17
   220:16 258:23
   263:9 271:3
   272:24
**ad**  182:12,12
**adapt**  37:17
**add**  17:6 41:9
   55:16 57:12
   58:7 68:19
   125:4,20
   227:22 274:11
**additional**
   41:22 73:3

158:10 168:6
170:16 185:16
185:22 206:5
277:10
**address**  250:5
280:15
**addressed**  86:9
122:18
**adds**  170:16
**adjust**  37:17
**admission**
96:24,24 98:22
**advance**  238:15
239:4
**advanced**
179:3
**advantages**
258:21
**adverb**  133:8
**affect**  145:10
266:19
**affiliate**  34:15
**affiliates**  33:18
**affixed**  281:15
282:21
**aggregate**
272:13
**ago**  7:7 17:4,5
42:2 44:7,14
44:17 46:16
54:21 55:10
87:7 133:15
**agree**  7:9 52:16
99:23 131:7

152:16 153:7
154:2 177:5
239:9 251:21
270:17 272:15
**agreed**  52:21
54:10 72:14
136:6,7
**ahead**  43:14
76:17 82:6
87:14
**al**  5:14,15
280:6,6 281:3
281:3 282:3,3
**alan**  131:1
**alexander**  1:10
**allegation**
224:2,4,20
**allegations**
67:3,9,12,21
92:5 93:2,14
**allege**  222:18
229:9
**alleged**  52:1
67:4,13 79:9
100:24 107:3
110:1,23
121:15 183:22
184:4,12,22
185:1 229:3
230:4,11,19
231:4,23
266:18
**allegedly**  99:18
229:2 234:3

**alleging**  92:16
92:16
**allocation**
147:22
**allow**  30:8 48:8
193:3 238:21
**allowed**  199:17
**allows**  160:12
232:23 244:15
**alphabetically**
60:20
**alternative**
101:3 161:15
164:14,22
200:2 202:2
203:3 211:15
211:18 216:9
**amassed**  85:6
**ambiguous**
220:5
**amend**  8:16
**amended**  64:4
**american**  277:2
**amgen**  145:18
**amount**  120:21
122:23 209:10
209:11 240:2
**analyses**
105:17 172:17
173:7
**analysis**  12:1
12:17,19,20,24
13:23 19:7
20:18 29:9

31:24 38:4,8
52:23 55:20
56:1,22 59:22
66:7,17 86:8
93:13 94:19
103:1,15 105:5
105:15 109:14
111:22 112:3
113:20 121:3,4
121:5 124:4,13
124:14 125:17
126:14 136:24
139:4 141:14
143:17 153:14
158:1,11,15
161:12 166:5
169:23 170:9
170:17 171:23
172:10,16,19
173:2,3,15,20
174:12 177:6
183:10,21
184:19 185:16
185:22 186:23
188:1 197:17
201:1 204:14
204:18,21,23
205:11,23
207:21 216:11
216:12 223:8
224:10,18
225:16 229:2
230:23 237:12
237:15 238:24

Page 5

240:8 244:9
247:7,9,10
250:2 251:4
255:18 256:5,8
256:9 258:1,3
258:24 259:1
260:9,11
271:13
**analyst**   34:17
36:5 54:23
55:5 59:14
60:15,19 71:15
74:4,19 75:6
76:2,7,9 94:11
107:14 112:18
112:22 113:1
134:20 136:1
139:15 201:9
201:15 202:21
203:6 215:24
216:4 218:7
224:11 232:20
**analysts**   55:1,4
67:14 94:11
103:18 105:16
105:16,17,21
134:3 135:3
139:12,18
197:10,10
199:6,8,14
200:3,7,8
201:3,6,8
202:3,6 211:10
211:10,20

213:3,8 215:5
215:15 216:6
217:17 220:7,9
221:23 222:7
224:15 246:11
246:16 255:8
**analytics**   96:20
**analyze**   29:14
48:18 183:21
184:3 203:24
229:24 230:7
**analyzed**   141:5
144:20 157:5
157:12 160:7
185:24 188:24
229:21 230:6
230:19
**analyzing**
213:8 224:11
239:1
**angeles**   2:6
**annals**   186:17
**announced**
79:14 141:21
157:13
**announcement**
95:7 96:22
132:8 134:16
139:9,14
143:24 144:4
145:9 150:5
158:8,19
159:22 186:17
230:2

**announcements**
71:24 133:24
134:1 136:21
138:3 142:4
144:1 157:22
158:16,17
159:5,7 185:4
206:6,11 229:9
230:1
**answer**   11:2,12
11:12,23 12:20
13:23 18:16
26:8,12 35:12
56:24 60:8,14
103:4 125:5
142:20 160:23
201:13 203:16
207:24 214:11
214:19 215:10
218:19,21
220:3,24 222:9
229:8 240:6,10
240:18,19
241:14,19,23
241:24 256:6
**answered**
22:24 28:1
133:14 194:23
199:22 200:22
215:3 217:14
218:16,18,20
219:2,20,24
239:24 240:17
246:19 247:4

256:3 257:4
260:7
**answering**
214:18 228:13
241:18
**answers**   11:14
12:22 136:17
256:21,22
**anticipate**
36:22 60:5
260:13
**anticipated**
97:6,6 100:12
106:17 107:22
**anybody**   122:7
**anything's**
189:23
**anyway**   87:8
**apollo**   134:14
**apologies**   25:6
**apparent**   207:5
**apparently**
46:12
**appear**   281:11
282:15
**appearances**
2:1
**appeared**   179:9
**appended**
282:11,18
**appendix**   8:8
**apple**   270:12
270:20 275:19
276:4,17 277:4

**[apple - aside]** Page 6

277:18
**applicable**
89:21 193:18
**applied** 15:8
51:20 82:3
119:23 128:11
147:3 193:8
199:16 200:10
200:15 208:17
208:21 212:11
212:17 213:23
214:22 215:11
251:2 272:3
**apply** 17:10
66:5 111:12
118:24 189:17
190:12 191:8
198:23 251:5
256:17 257:2
**applying**
148:18 209:23
271:4
**appraisal** 53:18
**appreciate**
26:23 233:23
**appreciated**
100:12
**approach**
166:17 212:23
212:24 262:24
**approaches**
214:8
**appropriate**
89:21 107:21

109:8 114:24
116:17 125:19
146:24 162:18
169:2 170:3,6
170:10 171:4
171:19 173:1,8
173:17,22
174:14 180:16
180:20 182:15
210:1,16,18,23
210:24 217:19
221:19 222:3
222:10,15
225:10 226:1
226:13 227:4,6
227:19 228:23
231:1 236:21
237:20 240:5,7
245:5 255:3,6
255:11 262:22
263:6 264:8
**appropriately**
212:4,16
213:22 218:12
219:18 220:17
221:9
**approximate**
47:20
**approximately**
19:11 20:2
22:18 24:1
28:9 29:13
47:7 48:2,9
58:9 62:2 71:1

78:3 225:6
**arbitrage** 190:2
191:23
**area** 81:21
108:14 119:19
**argues** 233:12
234:21
**argument** 54:9
122:21,24
123:2,4,7
**argumentative**
217:14
**arguments**
9:20 86:7
**arises** 19:17
**arranged** 60:19
69:18
**array** 199:10
200:11 250:1
250:24
**arrive** 66:17
110:7 115:11
124:1 185:18
231:12 266:16
**arrived** 118:5
274:14
**arrives** 190:24
**art** 116:18
**article** 30:21
41:13 70:1
161:2 261:22
270:16
**articles** 67:15
68:6,9,13,20,22

68:24 69:11,16
70:4,9,14,19
71:3,11 72:5,8
72:17,22 73:1
73:3,9,13,16,18
73:20 81:23
82:1,2,15,18
87:4,17,18,23
87:24 130:2,7
138:7 155:2
**articulate**
166:14 196:23
**articulated**
143:23
**artificial** 95:13
96:3 102:11,12
103:7 108:5,7
119:14,15
124:10,12,19
195:12 196:4
196:21 209:3
231:7 232:2,7
232:11 243:7,8
250:7 256:15
257:21 258:7
259:14,20
277:12,12
**artificially**
120:6 126:8,9
196:15 273:13
**ashton** 5:8
**aside** 17:18
52:8 62:13,16
68:3 90:6

139:8 250:11
**asked** 11:24
  12:8,19 13:20
  13:24 21:17,22
  22:8 27:24
  31:21 48:17,24
  56:24 73:17
  75:5 86:21
  194:22 204:17
  204:20 213:17
  215:2 217:14
  218:16,18
  220:12 230:24
  239:23 240:16
  246:19 247:4
  256:3 257:4
  258:24 260:7
  261:4
**asking** 11:4
  14:6 22:13
  27:14,21 42:11
  42:17 100:2
  102:22 142:6
  142:11 159:10
  159:10 170:23
  174:4,5,10
  199:14,15
  200:13,14
  214:19 218:9
  218:10 219:1,3
  219:5,7,14,16
  228:14,15
  230:15 234:19
  240:4,10 241:5

241:8,9 243:10
  267:17
**aspects** 32:11
**assert** 92:20
**asserting** 92:17
**assertions**
  92:10,12,14
  93:10
**assess** 93:9
  104:8 107:15
  112:22,24
  160:14
**assessed** 107:16
  107:18
**assessing** 67:1
  71:9 107:17
**assessment**
  106:15 107:17
  108:4 115:11
**assigned**
  106:19
**assignment**
  281:2 282:2
  283:2
**assist** 32:6,7,7
  72:7
**assistants**
  72:11 73:17,21
**assisted** 35:17
  38:1
**assisting** 57:24
**associated**
  116:20

**assume** 93:2
  99:14 100:2,18
  101:8,11,17,19
  102:4 107:19
  107:21 108:18
  108:21 109:17
  115:24 116:16
  182:14 231:17
**assumed**
  106:24
**assuming**
  101:20
**assumption**
  180:17,20,24
  251:3
**assumptions**
  144:8 180:5,12
  181:1,7,22
  182:8,11,13,19
  182:22 183:2,6
  183:10,12,15
**asteroid** 120:8
  120:13,19
  121:13 123:13
**asymmetric**
  108:10 109:2
**attached** 282:7
**attaches** 161:8
**attempted** 51:7
  54:14
**attention** 63:12
  63:15 88:21
  127:22

**attorney** 13:14
  13:18 279:14
**attorneys** 15:21
  15:23,24 16:4
  61:23 62:3
**attributable**
  104:20 107:3
  109:24 117:2
  121:15 124:20
  157:1 209:13
  233:14 234:23
  235:18,20
  237:6,8
**attribute** 160:4
**attribution**
  239:3 244:9
**atypical** 206:7
  206:9
**augment** 9:22
**austin** 1:18
  5:10,19,21
**authorities**
  128:18
**authorize**
  282:11
**authors** 122:18
**autsin** 2:15
**available**
  116:19 128:19
  128:22 129:5
  130:17 145:20
  146:19 149:19
  162:9,15
  181:21 182:8

183:5 195:13 196:5,11,13 197:9 198:5,12 237:19

**ave** 280:1

**average** 107:9 107:12 160:2 184:10

**awarded** 108:12

**aware** 9:21 31:2 50:7 64:9 64:24 80:5 97:14 104:21 108:16 109:3 203:5 222:17 235:12,14,14

**b**

**b** 49:6,18 89:13 89:20 192:14 193:4,8 225:2 226:9,11 227:16 228:17 228:19 244:8 264:6 272:3

**babson** 31:7 129:3,22

**back** 17:24 26:4,5 29:3 30:12 41:5 47:3 53:16 63:9,13 76:1 84:11 99:18

100:23 107:15 108:6 117:24 119:7 123:8 125:9,19 126:16 127:16 177:18,21 213:21 234:18 238:10 245:16 267:17 278:4 280:15

**background** 71:6,14 223:13

**bad** 186:21

**bargain** 122:21

**base** 174:21

**based** 8:15 11:13 12:20 103:15 107:19 123:15 127:3 197:12 212:13

**basic** 11:21

**basically** 38:5 182:14 229:7 253:19

**basis** 8:23 47:7 55:23,24 56:2 118:18 183:17 192:14 193:4 199:18 200:16 212:19 214:1 214:24 217:2 224:3 251:5 258:8 259:15 272:12,13,17

**bated** 155:21

**began** 143:6,6

**beginning** 37:13

**begins** 135:11 271:13

**behalf** 1:6 5:21 6:5

**behave** 189:21

**belief** 19:18

**believe** 9:2 13:14 16:24 25:10 37:24 42:2 77:1 167:4 170:5 171:18 172:6,7 172:8,9 217:18 226:15 246:13 264:7 276:5

**believed** 186:20

**belongs** 256:7

**beneficial** 108:24

**benefit** 122:20 206:1,2

**best** 11:2 18:21 111:4,16 115:6 115:11 167:4 233:6,7 279:12

**bettencourt** 34:16 35:1,22 38:1

**better** 97:6 98:15 169:5

180:15 182:3,3 182:6 183:11 253:22 264:7

**beyond** 14:7 30:24 31:17 44:24 45:1 48:16 56:15 57:7 63:22 82:17 125:18

**big** 270:13

**bigger** 167:20

**bill** 58:16,23

**binary** 112:11

**binds** 192:3

**binomial** 197:19 256:13 258:15,19 259:13 260:15 260:16 261:7 264:12 270:8 270:15,17 271:6,16 277:2 277:3

**biogen** 41:23 41:23 42:5,10 42:18 43:3

**bit** 130:11

**black** 197:20 256:14 258:16 258:21 259:12 261:6 264:12 270:9,14 271:7 271:16 277:4,5

bloomberg 73:4,18 82:13 82:15,16,17,24 83:10,19,21,23

blue 125:23 126:2,5

board 111:12

body 88:21

bond 191:4

book 125:23 126:2,5 197:13

bookending 170:17

borrowing 57:18

boston 1:20 5:11 279:5

bought 122:8,9 272:23 273:6

bound 191:23

brain 45:8

break 62:21,23 62:24 127:6,8 163:7,9 177:8 245:6

breath 155:22

brief 59:16 64:18 65:7

bring 126:19

broader 167:24 174:1

bromberg 131:2

brought 48:14

bubble 54:24

built 99:7 228:11 267:11

business 30:21 171:18

buy 79:12,23 125:21,21 195:21

buying 203:13 229:17

buys 195:14

**c**

c 5:1

ca 2:6 280:24

calc 215:23

calculate 15:9 195:4,4,12 196:4,14 202:14,22 203:7 209:3,10 209:18 212:11 212:17 213:23 214:22 216:21 216:22,23 217:15 220:24 221:21 232:6 243:3 251:2 256:14 257:10 257:21 258:7 259:14,20,21 259:23 260:4 261:4,18,20

calculated 159:4,6 195:23 201:17,20 237:22 272:11 272:16 273:2 274:2

calculating 115:12 201:16 218:8 220:10 221:18 225:8 232:10 233:13 234:22 274:16

calculation 199:12 203:20 213:13 221:5,7 230:8,10 236:21 258:14 262:23

calculations 165:10 194:5

call 13:15 14:15 15:21 55:1 66:9 86:21 87:20 88:1,4 91:3 140:22 141:3 141:23 163:13 164:20 168:17 207:5,6 208:5 225:18 272:23 273:6,12 275:1 277:13

called 6:12 31:10 79:15

107:10 108:10 130:17 160:17 163:19 164:23 178:20,24 179:21 185:17 206:18 223:16 259:3 262:15

calling 259:4

calls 96:17 115:5 189:3 192:16 204:16 230:3 237:12 255:22 257:16 263:16

camera 52:24

cammer 86:13 86:15 131:3 147:3,6,12 148:9,18 149:16

cap 167:17

capability 72:16

capitalization 166:7 167:17 168:14 169:17

captured 73:6

car 125:21,22 126:3,4,7,11,19 126:21

careful 119:17 153:5 207:21

carefully 70:1,5 70:20 71:3,12

**[carry - causes]**                                                          Page 10

| | | | |
|---|---|---|---|
| **carry** 47:19 | 129:13 131:3 | 270:13,20,22 | 261:21 270:9 |
| **case** 12:5 14:1 | 134:13 135:24 | 273:3 275:18 | 272:3 |
| 16:5 17:8,8,17 | 137:3 146:23 | 276:1,11,18 | **casey** 2:9 6:4 |
| 22:9,10 29:21 | 167:6 171:23 | 277:17 280:6 | **cash** 55:7 |
| 36:23 37:1,17 | 172:2 185:5 | 281:3 282:3 | 155:12 197:14 |
| 38:4 40:8 | 192:13,20 | **cases** 17:4,11 | 197:15 210:15 |
| 41:22 42:5,10 | 193:2,8,19 | 17:14,19,19 | 210:16 270:4 |
| 42:18 44:5 | 197:18 198:24 | 18:22 19:10,20 | **categories** |
| 45:1 48:15 | 200:10,19 | 20:3 21:7,12 | 95:23 189:7 |
| 49:18 50:7,10 | 201:12,16,17 | 21:23 22:3,14 | **causation** |
| 50:24 51:4 | 201:23 204:18 | 22:16,18 23:11 | 48:10,15,18 |
| 52:6,8,20 53:4 | 204:21 207:12 | 23:19 24:1,15 | 49:2 102:24 |
| 53:7,10,17 | 207:23 211:2 | 25:19 27:21 | 109:13 127:20 |
| 54:1,14,18 | 212:4 224:10 | 28:9 29:6,8,13 | 141:13 147:18 |
| 55:18 56:3,20 | 225:2,9,12,12 | 33:2 35:2 | 184:19 186:22 |
| 57:13,15,16 | 225:15,18,24 | 40:13,19,20 | 201:1 204:13 |
| 58:3 61:14 | 226:16 227:2 | 41:1,17 42:3,8 | 204:18,21 |
| 63:24 64:10 | 228:9,10 233:1 | 42:15,17,20 | 205:11 206:22 |
| 65:1,22 66:5,9 | 233:21 237:12 | 43:9,17 45:2,7 | 230:8,9,23 |
| 66:15 67:10 | 238:19 239:1,8 | 45:14,16 46:19 | 238:24 247:6 |
| 68:1,2 70:2 | 239:17,17 | 50:22 52:11,15 | 247:10 255:16 |
| 71:7,23,23,24 | 241:3,3 242:21 | 52:19 53:8,13 | 255:17 256:5,8 |
| 80:7 82:3 86:7 | 242:22 244:7,8 | 55:19 56:15 | 256:9 258:1 |
| 86:8 93:5 97:5 | 244:19,23 | 57:7,14,14 | 260:9,10 |
| 101:5,17 | 245:5,22 246:7 | 66:12 82:4 | 271:12 |
| 104:24 105:1 | 247:2,23 249:3 | 84:16,18,22 | **cause** 9:22 49:9 |
| 106:13,17 | 249:10,11,14 | 85:7,7,9,11,14 | 89:16 151:1 |
| 108:19,22,22 | 249:15,16,18 | 86:9 89:21 | 279:8 |
| 109:9,9,14,23 | 249:20,21,24 | 120:4 164:21 | **caused** 96:21 |
| 110:11 111:19 | 250:8,9,16,22 | 207:17 224:12 | 147:14 148:3 |
| 114:21 115:17 | 251:19 252:6 | 226:5,6,9,11,19 | 223:9,18 |
| 117:16 118:14 | 253:1,5,13 | 227:17,24 | 224:19 233:23 |
| 119:1,22,23 | 254:5,7,9,24 | 228:16,17,18 | **causes** 89:22 |
| 125:13,17 | 255:10 265:17 | 228:19 250:14 | 144:6 148:9 |

causing 124:24 180:6 181:3,5
caveat 35:11
center 83:8
century 2:4 53:16
certain 17:13 36:8,15,15,16 36:21 59:21 66:1 75:12 82:20 85:1 97:7 107:20 115:9 197:22 235:9
certainly 19:9 24:15 48:12,21 189:24 205:2 205:16,17 255:6
certainty 137:11 190:20 191:11,13 199:11 234:11 234:14
certificate 282:11
certification 12:11 14:1 15:3 47:22 48:17 233:10 279:1 281:1 282:1
certified 53:5,5 279:24

certify 279:3,13
cfa 4:14 275:22
challenge 52:5 52:9
challenged 50:13 51:1 93:19 94:1
challenges 50:17
chance 110:14 112:10,15 270:14
chancery 53:18
change 9:22 30:18 134:23 154:20,22 156:7 163:14 181:3 185:11 191:1 207:5,7 243:7 280:13 280:14 282:8 283:3
changed 86:16 86:16,18 207:9 227:10
changes 26:10 32:23 33:15 156:24 206:19 269:12,12,15 269:16,16 280:12 281:7 282:7,9
changing 99:22 99:23 168:24

208:2 269:8
characteristic 251:15
characteristics 171:3 175:7 188:3,17
characterize 27:1
characterized 57:9
charge 79:17
cheap 79:24
check 38:5 265:16
checked 213:4
chicago 2:17 83:9
chief 34:16
choice 136:23 161:9 172:20 173:6,8 239:2 239:20 240:23 242:18 244:1 255:11,13,16 256:1,7 264:6 269:21
choices 205:20 239:17 241:2,6 241:8 242:18
choose 67:17 160:21 232:21 262:5,24
choosing 166:17 167:23

261:1 262:1
chose 172:23 182:17
christopher 1:11
circumstance 243:21
circumstances 106:13 111:6 111:10,13 114:21 162:16 163:13,18 164:13 198:24 199:10 210:20 211:2,5 226:18 227:16 228:21 232:24 233:9 237:21 238:18 242:20,22 244:1,23 263:13,18
citation 86:4,17
cite 50:2 86:17 160:24 161:1
cited 10:12 59:14 61:5 86:5 87:6
cites 9:6
civil 281:5 282:5
claim 192:14 193:4
clarification 20:8 27:8

51:12 83:15 102:18 152:20 192:18 220:14

**clarified** 21:9

**clarify** 26:23 48:8

**clarifying** 51:17

**class** 12:11 15:3,9 47:21 48:16 49:7 50:1 53:5 57:17 60:11 64:4 68:19,21 69:1 78:1,5 79:11 80:22 88:8,9 89:3,14 89:20 157:6,14 157:19,20,24 158:3,5,9,11 164:10,12 165:3 179:8 188:14 193:18 195:16 208:17 209:13 211:11 211:12,13 212:6 217:11 225:9 229:10 270:23 271:18

**classes** 129:7 129:21 188:18

**classwide** 49:14 50:8 192:14 193:3 199:18

200:16 201:10 202:9 212:5,19 214:1,24 215:16 217:2 217:10 218:13 219:19 220:18 221:10 251:5 258:8 259:15

**clear** 77:24 90:9 120:1 163:6 247:1 262:21

**clearly** 19:13 91:4 106:1 120:10 166:14

**cleveland** 280:2

**close** 24:11 71:18 139:17 225:5,5 266:11

**closely** 76:10 178:13

**closer** 48:24 49:1

**closing** 265:7,9 265:21,23 266:8,8,9

**coauthor** 258:17

**cocounsel** 17:8 17:16

**coincident** 151:17

**collaborate** 36:12,14

**collaborative** 36:13

**collect** 82:23

**collective** 36:23 36:24 189:13 192:2

**collectively** 189:9,18 190:7 190:12,23 191:3,5,14,16

**college** 31:7

**color** 113:14

**comcast** 193:24

**come** 35:12 60:13 83:10,19 83:21 139:16 194:10 195:11

**comes** 33:8 120:8 164:17 258:13 273:15

**comfortable** 170:20

**coming** 194:3

**commencing** 5:3

**commentary** 32:8 103:17,18 136:1 263:20

**commentators** 132:17

**commenting** 263:21 264:2

**commerce** 53:20

**commission** 279:21 281:19 282:25 283:25

**common** 49:8 51:19 67:5,20 89:1,15 157:6 157:10 161:21 189:3 224:9 274:21

**commonly** 15:8 51:20 178:5 197:8 198:8 201:22 208:17 208:21 212:5 271:20,21

**communicati...** 14:7 16:12

**companies** 94:13 164:5 167:1,2,20 168:2 170:15 171:2 173:14 175:8,10,24 176:2,6,18,20

**company** 41:3 45:10 53:21 71:8,17 72:1 79:10 94:15 97:2 98:13,17 100:8 103:17 107:23,24 110:13 120:5,9 122:6,7,14 134:15,18,23

**[company - conclusory]**

137:8 141:7,21
144:8 145:21
147:8,15 148:4
148:10,20
149:2 155:23
156:1 164:1
166:20,22
167:17 168:24
172:23 173:4
173:20,23
175:6 186:4,10
186:19 187:7
188:3 199:9
206:8 210:13
223:18 224:16
229:11 231:3
231:22 235:24
237:2 264:19
**company's**
80:15,21
124:24 136:2
140:11,19
141:7 148:19
149:20 151:1
156:17 166:24
186:2,14 232:3
262:12 264:23
**comparators**
170:3,10 171:4
173:17 174:14
**compare**
166:23 196:20
210:3 243:5
249:8 254:3

265:8
**compared**  24:1
**comparisons**
171:10 264:16
**compel**  239:2
**compelled**
189:15
**compelling**
85:5 208:4
217:19
**compels**  191:6
**compensated**
121:23 123:1,5
**complaint**
59:12 64:5
66:20,23 68:4
225:15
**complete**  8:19
55:16 113:17
**completed**
136:22 280:15
**complexities**
250:5
**complicated**
113:20 118:23
**complimented**
55:20
**component**
104:15 199:24
**comport**  228:2
**composite**
165:12 168:3
169:4,21

**comprehensive**
174:1
**comprises**
170:15 174:8
**computation**
199:18 202:16
**compute**
200:16 201:10
201:21 202:9
208:18,21
212:5,18
213:24 214:23
215:15 217:10
218:12 219:18
220:18 221:10
**computed**  49:7
89:14 192:13
193:3 228:3
**computing**
165:2 197:11
225:11 250:7
**concealed**
95:10 96:1,14
102:7 103:14
105:7,12
106:22 109:4
111:20,24
237:1
**concealment**
107:4 110:1,24
**concede**  215:13
215:14
**concedes**  222:9

**concept**  53:21
129:2
**concept's**
130:11
**concern**  167:15
**concerning**
279:8
**concert**  185:18
**conclude**  20:7
205:17 212:3
228:21
**concluded**
218:11 278:21
**concluding**
53:2 224:3
**conclusion**
23:13,14 25:11
29:22 55:23,24
56:2,7 57:2
94:5 96:18
118:6 124:1
138:7 145:11
184:13 185:19
185:19 192:2
212:22
**conclusions**
13:1 20:14
57:10 91:1,18
91:24 110:7,11
115:19 147:2
153:15
**conclusory**
91:1,7,14

**[concur - content]**

concur  50:3
concurs  226:23
condition
  108:23 111:21
  111:23 112:1
  114:4 235:24
conditions
  112:7,12
  113:24 114:1,7
conduct  12:17
  12:19 13:23
  29:9 72:20
  94:22 138:17
  143:17 170:8
  171:23 174:12
conducted
  125:17 158:1
  158:10,24
  177:6,22
  185:21 186:22
  200:24 225:15
conducting
  173:15 183:20
  216:10 237:15
  258:23
conference
  87:20 140:22
  141:3 230:3
confident
  205:19
confidently
  30:9
confirmed
  219:17 220:16

conform
  130:20
confounding
  224:7,13,21
  231:14
confusing
  101:10 125:8
  238:8
connection
  13:4,19 32:18
  59:4 70:19
  110:22 115:1
  129:23 133:11
  150:9 164:5,8
  187:11 246:17
conrad  2:19
  5:20,20
conservative
  231:12 261:24
  262:6 263:3,5
  269:20
consider  13:22
  34:5 65:11,13
  76:22 77:10
  84:19 85:2,12
  85:14 171:3
  180:8 198:23
  205:16,17
considered  9:5
  9:8 15:3 61:5
  63:18,22 65:8
  77:7,13 84:13
  85:4 86:23
  88:14 128:5

  150:6 152:8
  153:13 180:1
  180:11 190:6
  199:17 216:17
  264:21 270:18
considering
  211:15
considers  157:2
consistent
  15:10 49:10
  55:3 58:3
  89:17 128:15
  199:19 200:17
  201:10 202:10
  202:18 208:15
  212:6,19 214:1
  214:24 217:2
  217:11 218:13
  219:22 221:11
  258:8,10
  259:16
consolidating
  146:17
constant
  178:24 181:6
  268:11,16
constituents
  168:16,17,22
  169:11,17
  170:9 173:16
  174:13 176:10
constituted
  229:10

constrain
  210:21 239:5
constrained
  243:19 244:2
  244:15,17
constraint
  271:11
construct
  195:17 271:17
constructed
  170:14 172:2,3
  173:5
constructing
  171:9
consulting
  31:10,14,19
  32:17 39:11
consume  94:14
contact  15:19
contacted  13:8
  13:13,17
contain  8:19,23
  9:4 10:8,8,10
  10:14
contained
  10:20 11:9,21
  25:23 185:5
  244:5
contains  30:15
  140:10,21
contemporan...
  160:15
content  150:5
  150:18,19

| | | | |
|---|---|---|---|
| 151:12,15 229:21 230:1 | **corporation** 249:9 | 111:13 113:23 114:8 115:15 | 182:23 184:18 185:2,14,16,22 |
| **contents** 36:12 183:21 184:4 184:24 | **correct** 8:5,8 10:13,21 11:10 11:11 12:16 | 116:5 117:4 123:17 124:11 124:22 125:1 | 186:2,14,15 187:1,8 188:9 190:7,10 |
| **context** 68:23 249:15 | 19:4 24:11 25:15 26:15,17 | 127:21 128:8 129:17 130:3 | 191:19 196:5,8 198:17,24 |
| **continue** 48:17 138:9 | 27:7 29:11 30:15 31:4,5,7 | 130:18 131:8 132:12,24 | 199:1 200:7,20 203:8 204:10 |
| **continued** 145:4 | 31:11,15 38:21 39:8,12 41:7,8 | 133:2 141:3,24 142:7 144:23 | 208:23 209:24 210:10,12 |
| **continuing** 145:7 | 41:19 49:11,24 50:10,11 52:6 | 145:15,16,21 147:3,9,15,17 | 211:5 213:9 215:16 222:4 |
| **continuously** 250:3 | 54:15 55:13 58:19 60:1 | 148:4,21 149:3 149:21 150:12 | 222:11,19 226:2,14,19 |
| **contours** 14:19 | 61:9 62:17 | 151:2,7 152:13 | 227:20,21 |
| **contradiction** 150:14 | 64:1,7,10,21,24 65:1 66:16 | 153:2,22 154:1 154:5,8 156:9 | 228:23 229:3,4 229:22 230:22 |
| **contrasting** 55:19 | 68:6,10,14 69:1,5 70:22 | 156:18 157:3,7 157:10,11,14 | 232:4,11,17,23 233:4 234:13 |
| **contribute** 185:17 | 72:23 73:4 74:5,20,23 | 157:18 158:12 158:14 159:14 | 235:3 237:9,16 238:4 239:16 |
| **control** 165:7 165:16,18,24 166:1 206:8 | 76:15,19 80:22 81:15 82:11 84:8 89:4,7 | 160:9,17 161:16 165:5,8 165:16 166:2 | 240:15 241:2 242:17,18 243:24 244:13 |
| **controlled** 206:12 | 90:5,14,19,22 91:5,12,19,24 | 166:18 168:15 169:14,18 | 244:19,24 245:21 246:1,7 |
| **controls** 198:2 | 92:2,7,11,21,23 93:3,11,12,15 | 170:11 171:16 171:24 172:10 | 246:8,10,13,17 247:2 248:19 |
| **controversy** 279:8 | 93:16,20 94:2 94:3,6,7,9 96:4 | 173:17 174:14 175:15,18,24 | 250:16 251:24 252:14,20 |
| **conveys** 131:15 | 99:2,19 100:2 100:22 101:1 | 176:22 178:22 179:4 180:24 | 253:6 254:14 255:14 256:1 |
| **coppola** 1:24 6:8 279:2,21 | 102:9 104:21 | 181:9 182:19 | 256:15 257:2 |

**[correct - damage]**

257:22 258:9 259:17 260:5 260:21 261:8 261:11 262:14 268:3 269:24 272:17 273:20 273:22 274:7 274:18 276:19

**corrected** 185:1

**correcting** 180:1

**correction** 182:4,6

**corrections** 280:12 282:17

**corrective** 95:2 95:17,24 96:9 96:12 122:12 125:10,19 183:22 184:4 184:12,14,22 222:18 223:3 229:11 230:4 230:11,19,21 231:4,23 266:19 277:14

**correctly** 38:14 89:23 90:11 95:11 142:15

**corrects** 95:18 95:19 179:16

**correlation** 190:17

**counsel** 5:16 6:13 17:21 46:22 58:14 59:17 61:8 74:23 75:4,11 86:20 88:18 177:7 218:17 220:3 240:20 241:6,16 279:14

**count** 23:22 33:17 47:3 71:10 207:19

**countervailing** 231:14

**counting** 43:22

**county** 281:10 282:15

**couple** 7:7 20:5 23:23,24 33:19 70:6,21 78:6 79:4 270:19

**course** 23:17 32:24 53:14 67:13 75:22 155:11 201:15 250:6

**court** 1:1 4:12 6:8 20:11,17 20:20 21:3,15 22:1,4,19 23:4 23:12,16,20 24:20 25:3,9 25:20,23 26:13

27:3 29:7,11 29:16 35:4 42:21 46:24,24 47:11 52:11 53:4,9,18 55:12 56:17 57:8 84:24,24 85:2,4 119:21 134:14 206:2 247:18,23 275:12 281:7

**court's** 64:6 66:20 67:18 145:18

**courts** 274:14

**covered** 77:8

**creates** 37:18

**criticism** 53:1 57:3 254:23

**criticized** 52:12 53:9,19 55:12 55:17 56:6,17 56:20

**critique** 206:1

**crowninshield** 31:10,18 32:16 33:14 34:8,12 35:17 57:23,24 58:23

**crowninshiel...** 32:21 33:7

**crr** 1:24

**crsp** 83:7

**csadler** 2:13

**curative** 229:22

**curious** 103:4

**current** 30:23 113:23,24,24 114:4 241:4 251:19 252:16

**currently** 8:21 18:20 31:6 34:11,11 127:20

**customer** 174:21

**customers** 79:16

**cv** 1:8 30:15

**d**

**d** 5:1

**daily** 136:9,12 157:9

**damage** 15:7 46:7 51:19 66:3,6 67:5,20 85:8 118:8,18 196:2 199:24 201:5 202:17 212:13,23 214:11,15 215:8,20 220:21,22 221:5,6,7 226:24 228:4 228:11 230:9

**[damage - day]**

231:1 232:18
243:2 252:7
255:20,21
257:7,14,15
258:12 259:22
261:3
**damaged** 273:1
273:7,14,15
**damages** 15:9
46:6,6 49:6,15
50:9 89:13,19
102:24 109:14
115:12 136:3
141:14 147:19
184:19 186:22
192:13 193:3
193:14 194:3,6
194:8,19 195:4
195:5 196:7
197:11 199:12
199:18 200:16
201:1,10,16,17
201:21 202:9
203:20 208:14
208:15,18,21
208:22 209:9
212:5,19
213:13 214:1
214:24 215:16
216:4,11,12,23
217:2,10,15,20
218:8,13
219:19 220:8
220:10,18,21

220:24 221:10
221:18 225:1,8
225:11 226:1,7
226:13 227:19
228:3,23 230:8
231:12 232:16
233:2 235:10
237:14,24
238:6 239:10
240:2,12 242:9
243:9,11,14
244:7,11,21
245:20 246:16
247:7,10 250:7
254:22 255:17
255:17 256:8,9
257:11 259:24
260:9,11 261:5
261:24 262:7
263:2,3 269:20
271:13 272:2
272:10,11,15
273:2,17 274:1
274:10,11,16
**dan** 1:5 5:13
16:10 34:16
35:1,10,22
37:24 280:6
281:3 282:3
**darlene** 1:24
6:8 279:2,21
**data** 9:4,6,7
25:12 30:8
36:7,8 66:2,10

66:10 82:7,9
82:20,22,23
83:7 84:6,7,9
157:9 159:18
160:8,8,21
161:9 162:8,15
162:17,22,24
163:7,10
164:19,20
165:4 171:16
178:11,13
182:7,12 190:7
190:24 205:22
**database** 82:16
82:24 84:7,10
87:9,21,24
**databases** 82:7
82:10 84:6
**datasets** 159:12
**date** 5:9 12:1
41:21 60:21
78:16,18 160:7
161:19,20,20
162:1,4,17,18
162:22 165:3
189:2 274:24
280:8 281:3,9
281:19 282:3
282:13,25
283:20,25
**dated** 4:14
275:22
**dates** 38:19
60:24 61:4

78:18 157:13
158:11 159:2
159:12,14,15
159:22 160:1,2
161:10 184:7
184:22 185:1
186:18 195:21
206:5 222:18
222:20,21
223:2 277:14
**daubert** 51:2
52:5,9
**day** 45:13
61:14 70:11,11
70:13 75:20
76:1,2 136:14
136:19,20,22
136:23 137:4
137:12,14
138:10,11,19
138:22,24,24
139:6,20,21
140:15,23
141:1,23
142:20 143:1,5
147:14 148:3
155:3 157:18
157:20,23
158:5 160:9
183:17,17
191:1,1 223:21
224:2 231:4,23
250:3 255:8
265:21,21

266:6,11,12 279:5,17 281:16 282:22 283:22
**day's** 139:9 165:4
**days** 134:2,6,11 134:20 135:9 135:15 136:2 143:10 144:4,4 144:18 145:5 157:23 158:2,9 158:21 159:7 179:8 184:10 184:20,21 195:16 206:7,8 206:9,12 280:18
**dcf** 197:16 211:24 242:23
**deal** 269:17
**dealer** 126:20
**dealings** 16:9
**dealt** 85:8
**dear** 280:10
**dearborn** 2:16
**debate** 119:18
**decades** 81:22
**deceive** 237:2
**december** 13:11,11 68:13 222:23
**decide** 57:4 76:21

**decided** 77:14 173:21 238:15 257:1,17,20
**decision** 145:18 247:6 255:18 257:14 260:10 260:19 263:19 265:18 266:15
**decisions** 205:19 227:2 258:2
**decline** 103:8 107:3 108:6 109:23 117:23 136:1 223:9 234:8
**declined** 101:18 104:14 119:5 223:2,7
**declines** 117:1 143:15
**deed** 281:14 282:20
**deem** 77:18
**deemed** 227:3,5 244:19 245:21 245:24 246:7 247:2 280:19
**defendants** 1:12 2:14 5:19 5:21 6:13 12:9 40:4,7,16,18,21 49:21 51:23,24 52:5 54:1,10

59:15 64:19,23 65:6 88:12 97:2
**defined** 84:24 128:17 146:16 146:16
**defines** 128:2
**definitely** 54:22 55:5 260:23,23
**definition** 128:10,15 129:1,5,7,12,15 129:22 130:7 130:20 146:7 146:11 155:7
**definitions** 146:1,18 194:18
**defrauded** 126:12,13,24
**degree** 137:11
**delaware** 53:18
**delivery** 278:17
**delve** 14:10
**demand** 79:14
**demonstrate** 154:13
**demonstration** 144:13
**department** 134:17 280:22
**depend** 168:9 233:8 235:11 238:18

**dependence** 178:7
**depending** 110:12 125:13 132:5,7 133:3 135:17 136:18 174:21 175:3 180:4 191:1 221:1 237:21 242:18
**depends** 10:23 104:24 106:12 111:9 114:20 205:5 210:12 210:19 223:23 237:11
**deposed** 7:4
**deposition** 1:16 5:12 7:6,19 12:6 42:6,21 43:11,17 59:10 60:3 61:9,18 62:4,8,13,15 64:18 76:4 247:20 275:14 278:12,21 280:8,11 281:1 281:3 282:1,3
**depositions** 7:9
**depression** 277:12
**deprived** 97:15
**describe** 13:5 37:12 79:6

**[describe - disagree]**                                    Page 19

124:24 178:3
195:19 203:23
204:7 268:6
**described** 14:5
120:5 134:6
168:2 182:2
195:19 204:8
227:12
**describes** 14:8
**describing**
113:9,13
209:16 252:13
252:19
**description** 4:8
12:24 15:15
36:22,24 252:7
252:23 253:10
253:20,21
**design** 116:9
190:15
**designed**
189:12
**destroyed**
122:14
**destroys** 120:9
**detail** 239:7
252:11 264:11
**details** 238:14
238:17
**determination**
112:17 212:15
213:21 214:7
214:12,21
215:4 221:18

222:3,14
255:22 259:11
260:2
**determine**
68:16 93:14
114:16 124:5
127:3 163:18
207:22 223:1
223:21 224:19
268:24
**determined**
82:2 206:6
**determines**
187:7 268:23
**development**
111:21
**developments**
97:8,10
**deviations**
178:9
**dick** 1:5 16:10
**dictate** 189:12
**differ** 111:18
114:23 239:17
241:3
**difference**
118:14 124:10
124:18 131:10
160:4 169:6,7
170:19 173:7
179:19 193:13
193:21 195:22
195:23,24
196:21 210:6

243:6 254:17
256:24 277:18
**differences**
252:2,4 275:4
276:22,24
277:7
**different** 17:9
28:21 55:19
61:4 79:4
101:7 102:15
115:22 127:2
129:8,12
130:11,24
131:23 132:15
132:16,17,21
132:23 136:21
146:11 158:23
162:11 164:4,7
166:5 167:24
170:23 174:20
175:3 176:19
188:3,6,13
189:20 200:12
202:1,7,8
209:2,5 212:24
218:19 225:12
225:18 226:8
230:16 233:1
235:19 237:7
242:17,19,22
244:8 248:19
253:13 254:12
254:15 261:17
273:10,17

274:1,14,14,17
275:6,18
**differentiate**
29:6 113:7
239:21 240:24
242:13 243:15
**differentiated**
175:9
**differentiating**
151:23 238:2
239:11 240:13
**differentiators**
251:22
**differently**
189:21 239:15
241:1
**differs** 274:22
**difficult** 112:3
114:7
**digested** 138:15
**digit** 33:11
**digital** 53:17
54:14
**digits** 40:5,16
**direct** 4:5 6:22
36:14 63:12
75:11 82:20
88:20 127:22
**direction** 37:21
38:10
**disaggregation**
239:3
**disagree**
115:15,18

174:24
**disagreement** 119:22
**discipline** 196:16
**disclosed** 122:9 141:6,17 142:24 143:19 144:22 152:12 156:8 186:10 229:3 231:3,22
**disclosure** 95:2 95:24 96:10,12 97:12 106:17 113:2 119:8 120:12 122:12 147:15 148:4 150:10,15 223:3 224:4 231:4,23 234:7 251:4 262:2,4 262:13,14,20 262:21 264:24 265:1,6,7,8,10 265:19,22,24 266:6,7,10,11 266:19 269:15 269:19 277:14
**disclosures** 93:19,22 183:22 184:5 184:13,24 222:18 229:11 229:22 230:4

230:11,19 236:11,12
**discounted** 55:7 197:15 210:15,15
**discovered** 65:24 134:2
**discovery** 9:19 205:5
**discretion** 232:24
**discuss** 36:11 36:17,19 38:4 72:13 130:3
**discussed** 82:18 128:18
**discussing** 130:5
**discussion** 78:15 153:5
**dismiss** 59:13 59:16 64:23 65:7 88:12
**dismissed** 67:22
**dispense** 7:9
**disprove** 144:18
**dissipate** 96:7 96:13 97:12 119:13,15
**dissipated** 98:7 99:8,12 232:7 232:11 277:13

**dissipates** 106:4
**dissipation** 120:11 122:10 123:16,22
**distinction** 194:13 249:19
**distinguish** 233:16 235:1
**distinguishing** 251:8,9,15
**distrct** 1:1
**distribute** 175:4,14,17,20 175:24 176:3 176:18,21
**distribution** 94:21 170:15
**distributor** 172:4
**distributors** 165:12,13 166:9 167:13 168:1,4,13 169:21 170:7 174:19 175:2 175:14
**district** 1:2
**diversified** 176:10
**divided** 157:19
**dividends** 256:23

**docs** 61:5
**document** 7:18 44:12 87:16 139:23 140:8 140:13 161:5 167:11 229:6 247:12,19 248:3,3,10,14 275:6,17,20 277:9
**documents** 9:6 9:8 30:8 36:9 36:16 59:14,18 63:18 64:1,3 65:1,22 66:1 78:7,12 81:12 88:14
**doing** 19:6 35:11 70:20 72:16 102:24 153:9 167:1 171:7,8 174:16 199:11 200:3 202:3 204:13 204:22 205:10 221:24 222:7 232:17 238:24 241:18 244:9 258:1,3
**dollar** 134:22 240:2
**don** 270:14
**douglas** 1:10

| | | | |
|---|---|---|---|
| **download** 36:7 | **earlier** 20:5 | 103:16 107:8,9 | 53:7 59:22 |
| **downloaded** | 21:22 66:14 | 130:21 154:7 | 65:18 66:3,6 |
| 72:11 | 82:14,18 93:17 | 156:15 189:10 | 66:16 67:2 |
| **dozen** 70:7,21 | 200:23 212:10 | 189:10 272:6 | 71:9 81:11,24 |
| **draft** 12:16 | 245:19 264:22 | **economically** | 85:8 128:3,11 |
| 278:15,17 | **early** 40:9,10 | 103:19 146:13 | 129:2,9,20 |
| **drafted** 37:8 | 40:17 207:23 | 156:11 | 130:3 132:11 |
| **draw** 138:7 | **earnings** 4:10 | **economics** | 137:16 141:20 |
| 184:13 192:2 | 55:9 71:24 | 108:10 120:22 | 144:14,18 |
| **drew** 153:15 | 86:21 88:1,4 | 121:10 123:11 | 145:11 147:21 |
| **driven** 79:5,20 | 137:19 138:3,3 | **economist** 85:3 | 154:13 203:24 |
| 79:21 80:3,4 | 138:14 140:11 | 117:17 119:20 | 204:9 206:23 |
| 203:13 | 140:20 141:1 | **economists** | 231:1 248:15 |
| **driver** 186:19 | 141:22,23 | 84:23 | 275:21 |
| 186:20 | 142:3 143:24 | **economy** 53:20 | **efficient** 15:7 |
| **driver's** 6:15 | 144:1,4 155:13 | **education** | 18:12 20:7,13 |
| **drop** 104:16,20 | 157:13,21 | 134:17 | 20:15,15 23:6 |
| 106:21 139:2,2 | 158:8,15,19 | **effect** 146:22 | 23:12,15,18,21 |
| 141:11 144:13 | 159:2,5,7,13,22 | 146:23 | 24:24 25:5,15 |
| 224:19 236:11 | 185:4 197:13 | **effects** 160:13 | 26:1,14 27:7 |
| **drove** 224:5 | 206:5,11 | 160:14 165:8 | 27:16,19 30:6 |
| **due** 106:8 | 210:17 230:1,2 | 165:16,19 | 35:6 51:10,14 |
| 223:2 229:15 | 270:4 | 166:2 197:22 | 51:15,15 52:22 |
| **duly** 6:15 279:6 | **easier** 111:23 | **efficiencies** | 89:2 103:21 |
| **dump** 66:10,11 | **east** 2:4 176:8 | 25:21 37:18 | 128:17 129:16 |
| **dunbar** 161:13 | **ebitda** 197:13 | **efficiency** 4:13 | 130:6,18 131:3 |
| **dura** 119:22,22 | 270:5 | 18:7 19:12,22 | 132:4,19,22 |
| **dynamics** | **econometrics** | 21:2,6,15,24 | 133:12 134:7,9 |
| 190:24 | 36:6 173:6 | 22:5,10,20 | 135:19 145:19 |
| | 205:15 | 24:3,6,21 | 146:15 149:18 |
| **e** | **economic** 13:23 | 25:10 27:4,10 | 152:18,22 |
| **e** 2:9,11,21 5:1 | 19:7 31:13,24 | 27:13,15 28:11 | 156:6 187:1,4 |
| 5:1 83:17,18 | 32:11 51:1 | 29:8,10,15 | 187:12,18 |
| 248:11 | 55:20 99:11 | 48:20 49:3 | |

**[efficiently - evaluate]** Page 22

efficiently
  191:22
effort 26:23
eight 61:4
  252:10
either 13:11
  42:21 73:10
  95:17 97:1
  119:10 154:1
  163:8 166:15
  170:20 204:4
  212:22,23
  221:1 256:18
  261:23 262:1
elicit 150:20
eligibility 86:12
  86:14,19
eliminate 223:8
eludes 45:12
email 280:17
embarked
  255:18
emerge 111:15
empirical 52:24
  53:1,6 147:7
  153:9 189:16
  192:3
employ 183:13
employed
  34:11 179:6
employee
  279:14,15
employing
  179:13

enclosed
  280:11
encompass
  244:22
encountered
  245:4 250:6
endeavor 7:14
  11:12 54:18
endeavored
  198:23
enforcement
  190:3
engage 13:4
  163:9
engaged 13:3
  17:9,17,20
  18:23 19:20
  21:13 22:11,17
  28:23 29:8,14
  29:21 32:5,6,8
  32:16 40:3,14
  40:18,20 46:21
  79:11
engagement
  12:18 13:19
  14:5,12,19
  23:17 29:19
  35:18 38:2
  75:22 238:11
engagements
  20:3 21:1
  39:15 40:3
  44:22 47:9,17
  47:18

engaging 20:19
entered 282:9
entire 120:9
  134:5 157:19
  157:20 178:18
  205:23 211:11
  217:6 236:11
  272:14 281:5
  282:5
entirely 157:17
entirety 198:4
entitled 14:23
  92:5 120:14,20
  121:22 275:20
entity 114:5
entry 68:8
equal 267:9
equity 105:16
  221:23
errata 280:13
  280:18 282:7
  282:10,18
  283:1
especially
  225:17 256:22
esquire 2:7,8,9
  2:18,19
essentially 32:7
  34:16,24 53:20
  55:22 60:9,22
  69:20 224:18
  228:5 246:21
  251:16

establish
  187:10 190:13
established
  66:4 190:3
  205:6 233:11
establishing
  137:15 141:20
estimate
  112:19,20
  114:8 178:6
  196:2 223:14
estimated
  178:10 223:13
estimating
  47:13
estimation
  161:10 164:22
  178:18 179:14
et 5:14,14
  280:6,6 281:3
  281:3 282:3,3
eugene 130:15
evaluate 32:5
  36:18 94:12
  119:4 123:15
  135:8 138:18
  141:15 142:22
  147:19 149:22
  155:3 161:24
  162:3 163:17
  170:1 171:1,2
  184:11 186:12
  188:17,23
  204:9 215:7

**evaluated**
114:9,17 115:2
116:20 117:21
124:8 186:11
211:4,16
225:14 246:6
247:1
**evaluating** 66:2
110:22 134:3
246:16
**evaluation**
34:22 119:11
164:4,7,15
198:16,19
**event** 12:9 54:7
95:8 97:12
106:17 122:13
125:10,19
136:24 137:9
137:10 141:9
148:24 149:5
156:23,24
157:5 158:4
161:9,12
162:24 163:1
177:22 183:20
185:18 203:23
204:8,12,22
205:2,10
206:21
**events** 97:11
113:22,23
114:17 115:2
119:6 250:23

**everybody**
35:20
**evidence** 73:10
85:1,3 147:7
163:6 217:19
**evidentiary**
46:7
**exact** 23:22
26:4,6 167:10
188:15 205:3
**exactly** 110:9
168:5 172:5
186:7 221:24
233:5
**examination**
4:2 6:12,22
77:15 279:10
**examine** 148:9
223:20
**examined** 6:16
147:5 148:19
157:23 279:9
**example** 31:20
67:22 86:10
97:16 98:24
99:17 100:18
101:8,24
106:23 121:13
123:13 126:15
134:9 138:8
155:19 162:21
162:23,23
165:23 175:14
176:16 197:11

263:23 264:16
**examples** 155:5
163:3 208:7
254:18
**except** 52:24
92:15
**exception** 50:4
191:24 216:15
216:18 218:1
227:9
**exceptions** 20:5
39:24
**exchange** 275:2
**excluded** 51:2
52:12 55:17,23
**exclusive** 96:8
126:18
**excuse** 32:14
69:5 215:14
257:18 266:4
**executed** 66:10
282:10
**execution**
281:14 282:19
**exercise** 221:3
**exhibit** 4:8,9,10
4:12,13 7:19
7:21 9:7 16:19
16:23 17:12,15
17:19 41:15
63:14,16 74:19
83:2,3,7,9,11
83:20 140:2,6
140:9 143:11

188:2 247:14
247:19 248:11
275:8,13
**exhibits** 4:7 8:7
9:9 10:4,11,15
83:5 84:9
**exist** 114:1
193:16,16
221:16
**existing** 108:23
111:20,23
112:6
**exists** 67:5
201:21
**expect** 136:13
137:23 150:19
229:14
**expectations**
107:10
**expected** 150:7
150:11 151:1
156:7,17,21
261:10
**expedited**
278:19
**experience** 7:8
71:8 137:8
163:24
**experienced**
221:23
**expert** 4:9 7:4
8:1 12:10
18:23 21:13
22:17 31:13,19

**[expert - federal]**                                    Page 24

32:17 33:21
36:5 38:13,21
39:7,11,14
40:4,7,16
41:18 42:4,9
42:15 44:22
45:15 46:17
47:10 48:2
49:13 50:8
94:9,10,20,21
94:22 120:16
205:15 270:14
**expertise** 94:17
**experts** 33:24
34:1,4,5,9
49:20 123:9
**expiration**
189:1 267:7
268:22 269:4
273:22 274:23
281:19 282:25
283:25
**expires** 279:21
**explain** 112:2
120:17,18
129:9 130:22
139:2 147:17
159:20,21
160:22 166:15
166:16 209:2
228:12 241:14
250:2 255:5,7
255:9,10
256:19 267:3

**explained**
86:16 143:3
157:3 183:24
250:8 261:21
262:9
**explaining**
252:11
**explains** 86:17
138:5 167:19
**explanation**
139:7 253:6,8
**explanations**
250:11
**extend** 137:14
**extended** 139:8
**extent** 11:19
14:6 79:10
84:5 88:3
96:17 106:16
171:13 183:24
184:3 203:16
274:8

**f**

**fact** 15:16
27:20 67:8
86:2,5 109:20
110:20 112:16
112:17 113:14
123:15 132:16
135:3 144:11
144:17 164:8
172:17 185:1
223:6 230:21

**factiva** 68:9,12
73:6 87:3,9,9
87:10,18,20,23
**factor** 53:1
86:14,15
111:18 147:6
147:12 148:9
148:18 149:17
**factors** 52:24
113:16 147:3
155:3 157:2
176:20 197:23
205:8 208:4
223:10,11
**facts** 9:4 29:19
67:4,9,13,14
106:12 107:20
111:5,9,13
114:20 115:7
115:10 116:6
121:20 124:17
125:13 163:12
163:17 192:20
206:16 210:14
210:19 211:1,4
226:18 227:15
228:9,10,20
232:24 233:8
237:21 238:18
239:1 242:20
242:22 244:1
244:23
**factual** 113:7

**failed** 104:18
104:21 108:1
**failing** 109:19
**failure** 109:21
110:24 124:21
**fair** 13:2 15:15
26:16 111:14
229:18
**fairly** 29:24
30:2
**fall** 236:15
**fallen** 236:14
**falls** 149:2
**false** 94:2 99:19
185:2
**faltered** 252:23
**fama** 130:15
**familiar** 95:1
**far** 193:17
271:19,21
**fast** 69:21
204:5
**fault** 142:16
**favor** 165:21
**feasible** 51:21
67:6 197:6
212:24 214:16
217:21 218:9
218:22 219:3
219:15 221:21
**features** 273:19
274:18,20
**federal** 249:9
249:21 250:16

**[federal - food]**                                                    Page 25

251:11 253:24 254:7

**feeding** 269:10

**feel** 14:15 62:21 62:23 86:3

**feinstein** 1:17 4:4,9,14 5:13 6:11 7:2 248:16 275:21 278:6,13 279:3 280:8 281:4,9 282:4,13 283:20

**fell** 134:19 135:2

**fewer** 48:19

**fifth** 147:6,12 148:8,18 149:16

**figure** 120:24

**figured** 135:21

**figures** 263:6

**file** 12:10

**filed** 8:11 64:18 66:15 78:19 118:14

**files** 60:21 69:18,19,22

**filing** 4:12 247:23

**filings** 76:18,21 77:2,3 80:16 80:21 167:3 172:24

**finance** 19:7 31:6 71:15 95:7 120:16 138:12

**financial** 31:10 71:15 84:23 85:3 94:11,11 94:18 96:19 121:3,10 123:11 167:3 172:24 229:12 250:1

**financially** 279:16

**find** 41:16 44:2 98:4 191:4 193:10 223:23 227:8 280:11

**finding** 167:23 170:18

**findings** 91:2

**finds** 178:12

**fine** 134:17,22 278:17

**finish** 135:12 136:19

**finished** 44:9

**firm** 12:15 17:9 17:15,17,20,21 18:20 31:10,13 32:5,8 33:8 59:8

**firms** 47:10 57:18

**first** 6:15 13:8 19:6 21:5 63:24 64:4 68:8 82:13 89:6 90:1,16 103:6 139:9 149:7 208:1 223:5,5 272:1

**fishing** 218:19

**fit** 66:9

**fits** 54:8 178:13 192:19

**five** 18:2 28:5,8 33:11 47:13,20 48:10 127:8 134:2,6,11,19 135:8,15 136:2 147:3 222:20 222:21 245:9 252:9 267:5 277:20

**flaw** 152:5

**flaws** 116:9

**flexibility** 238:22

**flexible** 244:13 244:22

**flow** 55:7 159:23 160:1,3 184:7,21 197:14,15 206:10 210:15 210:16 270:4

**flows** 155:13

**fluctuations** 157:3

**focus** 10:1 11:5 14:21 34:3 78:14 137:19 174:6 226:8 240:11 276:11

**focused** 21:24 158:2

**focuses** 149:17

**focusing** 13:2 169:8

**folks** 128:18 146:17

**follow** 268:19

**followed** 66:8

**following** 85:7 121:12 136:1 183:18 221:24

**follows** 6:17 161:20 162:4 162:18,24 187:5

**food** 32:19 165:11,13 166:9 167:13 167:24 168:4 168:12 169:9 169:21 170:6 170:14 172:4 174:19 175:2 175:14,15,17 176:5

**foods** 1:10 5:14
28:24 176:3,19
176:21 280:6
281:3 282:3
**footnote** 161:1
161:8
**forecast** 261:19
262:1,3,17,22
263:1 265:9,15
267:1
**forecasting**
262:19 264:9
264:13,20
**forecasts**
264:15,18,19
**foregoing**
281:13 282:18
**forensic** 19:6
84:23 95:6
107:14 112:18
112:21 113:1
119:19 197:10
215:24 216:4
216:10,11
218:7 224:11
232:20
**forgot** 29:3
**form** 9:1,12
10:7,22 12:12
13:21 16:7
18:13 19:2,23
21:4,16 22:7
22:22 23:7
24:4 25:16

29:17 31:1
33:3,9,23
34:21 35:7
36:3 37:9
39:16,22 45:4
46:20 47:12,23
48:4,11 49:16
50:15,20 51:5
52:14 53:11
54:20 58:24
59:20 64:11
65:3,9,15,23
66:22 67:11
69:3,12,17
70:10,15 71:13
71:22 72:9
73:24 74:24
75:15 76:11
77:5,12,20
78:9,24 80:8
81:20 84:20
85:16 90:23
91:13,21 92:1
92:22 93:21
96:5,16 97:17
99:3,20 102:14
103:10 104:2,7
104:23 105:4
105:13 106:10
107:5 110:3
111:3 113:11
114:11,19
115:4,16 117:6
117:14 118:2

119:9 121:2,17
122:2 123:19
125:2 129:10
129:18,23
130:9 131:13
132:1,13 133:1
133:7,13,20
134:12 135:16
136:5,15 137:5
138:1,20 141:2
141:22 143:2
143:20 144:24
146:5 147:16
148:6 149:13
150:13 151:8
152:15 153:3
155:9 158:13
159:3,19
160:10 161:17
162:19 163:4
163:22 164:16
170:12 171:5
172:11 173:18
174:15,22
175:5,19 176:4
176:23 177:4
180:3,10,18
181:10,17
182:1,10,24
183:14,23
184:15,23
185:8,15 186:3
187:9,20 188:5
188:20 189:8

189:22 191:12
191:20 192:10
192:15 198:7
198:18 199:5
199:21 200:21
202:12,24
203:9 204:15
205:12 206:24
207:10,18
208:9 209:15
211:7,22 212:8
212:21 213:10
214:4 216:14
217:13 218:15
220:19 221:13
222:12 223:4
225:13 226:20
229:5,23 231:9
232:5,13
233:19 235:4
235:22 236:19
237:10,17
238:5 239:14
243:18 245:1
245:23 246:9
246:18 247:3
249:23 250:17
251:13 252:1
252:15,21
253:7 255:4
256:2 257:3,23
259:7,18 260:6
261:16 263:8
263:15 265:5

**[form - generally]**

266:22 268:14 270:1,24 272:19 273:9 273:21 274:5 274:19 276:20 277:8,16

**formed** 94:5 137:6 145:5,14

**forming** 82:10 93:1 147:2

**forms** 129:9,12

**formula** 209:7 244:16,18,19 245:21,24 246:7,12 247:2 247:8 256:14 257:6,6,12,18 257:20 259:4,6 259:8,8,12,13 260:16,16,17 261:2,6,7 264:12 266:24 267:5,5,8,12,23 270:5,6,8,9 271:6,11,16,17 274:22 275:2,3 277:3,3,4,5

**formulas** 197:19 256:13 258:6 260:3,20 260:22,24 261:1,14 266:24 267:4 268:5 270:22

271:15 277:11

**forth** 123:8 129:15 155:6 227:2

**forthcoming** 30:22

**forward** 42:11 114:2,3 203:13 229:16 280:15

**found** 50:4 66:8 67:24 69:10 86:6 141:10,12 143:8 152:4 168:7 179:7 225:19,22 226:17 227:15 228:20

**foundation** 18:14 35:8 205:13

**four** 16:24 17:1 17:5 41:18 42:5,9,16 43:11,23,24 44:6,14,17,19 44:24 45:15 46:13,16 60:23 61:3 168:22 169:11 222:18 222:22 252:9

**fours** 75:23

**frame** 40:12 68:17

**frankly** 15:20 194:12

**freddie** 50:23 50:23 51:9 52:8 249:18 250:9 251:7 252:6,22 253:16 254:23

**free** 62:21,23 281:14 282:20

**frequency** 158:6,18,21

**frequent** 38:3

**frequently** 29:24 30:2 144:3

**fresh** 60:8

**front** 98:21 126:14 254:1

**full** 7:1 23:15 73:20 74:9 78:8 97:7 113:1 121:6 122:9 124:6,15 233:24 234:6 250:24 251:4 266:1

**fuller** 266:2

**fully** 97:6 109:24 130:16 135:8,9 232:22 255:21

**fulsome** 252:16 253:1,5,9,10

**functioning** 134:7 190:14

**fundamental** 129:19 144:7

**further** 229:14 278:7 279:13

**future** 111:22 113:22 114:7 114:17 115:1 144:8

---

**g**

**g** 5:1 83:17,18

**gain** 79:20

**gains** 78:20,22 79:5,22 80:3,4 80:6,11,14,20 80:23,24 81:4 81:7,7 93:20 94:9,22 229:16

**game** 108:11,20

**gauge** 124:19

**gayle** 5:8

**gears** 30:11

**general** 44:22 66:4 68:18 93:18 162:7 166:17

**generalized** 179:22,24 180:23 181:8

**generally** 91:6 103:16 109:9 138:11 154:18

154:22 155:23 156:4 159:22 160:23 161:3 161:11,16,22 163:11,13,15 168:13 197:18 223:9 225:7 228:15 250:24 270:2 271:5 272:3

**george** 1:5 16:10

**getting** 101:10 278:15

**give** 18:1 28:14 86:10 97:16 113:14 126:21 155:4,20 181:12,15 197:6 207:8 241:23 254:18 256:21

**given** 7:8 42:6 49:13 111:5 115:7,9 121:19 175:10 183:8 189:24 211:1 232:24 244:1 273:18 279:11

**gives** 47:4 267:8 269:19

**giving** 93:24 147:12 148:1

**glad** 193:6

**glancy** 2:3 5:23 6:2,5 12:15 13:4,13,18 15:19 16:4,15 17:1,15,20,21 18:20 33:8 59:8 61:23 62:3,12 85:11

**glancylaw.com** 2:11,12,13

**gls** 180:13,15 181:13,16,23 182:9,15,18,22 183:7,13

**go** 17:23 29:2 43:14 44:8 45:20 47:3 63:1 73:15 76:1 83:2,3,10 83:11,20 84:11 87:4,14 125:21 125:21 126:10 127:9 167:5 177:10 209:20 209:22 234:18 238:10 245:8 267:17 277:19

**goes** 48:16 165:21 265:15 265:15

**going** 7:17,18 39:4 42:11,14 42:24 62:22

63:4 83:3,24 88:20 97:23 126:21 127:11 134:17,23 146:14 161:6 175:6 176:15 177:13 186:21 187:23 195:1,2 195:3 211:17 220:23 234:11 240:9 245:11 247:5,12,22 248:2,7,21 249:2,7 256:20 257:7,10,24 259:10,19 260:14 277:22 278:11

**gold** 53:23

**good** 5:5 6:24 47:4 56:21 68:1 125:12 177:8 229:13 229:15

**gosh** 41:2,3 238:7

**gotten** 168:22 168:24

**governance** 198:1

**government** 32:1,2,4,9,11 32:18

**grappling** 135:4

**greater** 158:7 158:20

**grew** 168:18

**grocery** 94:20

**gross** 79:19 155:14 203:11

**group** 38:14,21 39:7,10 134:14 157:21,22 158:8,9,19,21 159:5 160:1,2

**groups** 157:21 159:16,18,24

**grown** 168:20

**gu** 35:23

**guess** 40:5 54:24 234:5 269:13

**guessing** 48:23

**guidance** 119:20 137:20 138:13 229:12

**h**

**h** 2:19

**half** 62:5 70:11 70:13 75:20

**hampshire** 41:3

**hand** 7:18 224:6 244:20 245:22 279:17

**handed** 275:12
**handful** 18:2
24:22 25:11,22
27:4 28:2,4
40:5,15
**handing** 247:18
**hangs** 155:21
**happen** 109:7
**happened**
127:4 168:17
**happening**
117:22 144:10
**happens** 29:23
29:24 138:21
151:18 265:13
265:14
**hard** 51:18
227:8 268:19
**harder** 135:7
**heading** 63:17
63:24 68:5
76:18 81:14
82:7 84:15
85:19,24
**headline** 74:4
**hear** 51:18 74:8
98:21 205:18
220:2
**heard** 22:23
90:2 120:4
123:7 214:6
**hearing** 45:17
46:4,8 53:18

**hearings** 43:23
**help** 37:5 93:7
265:17
**helped** 35:24
**helpful** 84:3
113:5,16
**helps** 35:20
68:2
**hemani** 35:22
**heteroscedast...**
178:24 179:10
179:17 180:2,5
180:6 181:2
183:16
**hey** 126:20
**hiding** 107:23
108:2
**high** 37:22
137:10 160:1
184:6,20
190:16 206:10
**higher** 79:17,24
100:13 159:23
**highly** 171:21
**hired** 12:15
**history** 137:8
**hit** 120:19
**hits** 115:24
116:16
**hitting** 116:21
**hoc** 182:12,12
**hold** 268:10,15
**holders** 188:2
272:23 273:5

**holding** 94:8
243:8 272:5
**holds** 156:15
**home** 249:9,21
250:16 251:11
253:24 254:7
**homoscedasti...**
178:21
**hope** 9:23
38:13 205:22
**hour** 58:16
59:2
**hourly** 58:18
**hours** 57:22
58:7,8 62:2,5
62:18,19 75:23
78:6
**howard** 1:11
**hsbc** 41:4
**huh** 109:22
234:20
**hundred** 28:9
**hurt** 93:6 195:6
195:6
**hypothetical**
99:21,23,24
101:3,14
102:21 106:11
109:16,18
110:4,6 113:15
113:17 115:23
116:3 117:9
119:2,7 122:4
122:11 124:4

127:1 216:18
234:10,13,16
235:8 236:20
**hypothetically**
124:2 233:20
**hypotheticals**
118:23

**i**

**iceberg** 116:1
116:13,17,21
**idea** 47:4
268:16
**ideal** 130:22
153:6
**identical**
250:15 256:21
**identification**
7:22 140:3
247:15 275:9
**identified** 6:14
68:24 82:1
167:8,14
**identifies** 84:7
223:17
**identify** 45:21
65:21 71:11
81:18 84:9,18
85:23 166:20
166:22 167:4
169:1 277:7
**identifying**
279:4

**idiosyncratic** 238:14,17

**ignore** 135:6,6 135:20 138:21

**ignored** 128:4 146:14

**il** 2:17

**image** 96:24

**immaterial** 152:23 153:2 153:12,23 154:3 156:11 156:11

**immediately** 88:10 143:7 144:12 145:3

**imminent** 79:13

**impact** 51:22 52:1 54:2,9,11 99:11 105:6,6 105:11 110:23 114:9 135:1 151:21,21 152:10,13,17 155:4 156:17 156:21 165:22 197:23 231:5 231:13,24 235:19 237:8

**impacted** 54:5

**implement** 232:22 254:21 257:5

**implementati...** 238:15,17 255:19 257:13 257:15 258:13 262:8

**implemented** 238:23 240:8 255:23 257:16

**implementing** 261:2

**implications** 94:18 95:20 97:4,5 134:21 135:21

**implicit** 91:4

**implicitly** 220:9

**implied** 262:4 262:15 263:5 264:3,23 266:4 266:5,9

**important** 19:16 71:10 72:14 77:14,18 85:5 95:12 110:21 111:18 135:10 149:22

**impossible** 192:8

**improper** 56:12

**improperly** 56:6,11

**imprudent** 239:5 247:7

255:15 266:14 271:10

**inadmissible** 50:13

**inappropriate** 210:22 225:12 239:7 243:20

**inartfully** 148:16

**incidence** 159:4 159:6

**incident** 158:24

**include** 9:9 10:4 81:19 87:18 229:1

**included** 87:8 198:12 280:13

**includes** 8:7 87:10,19 168:1 174:8

**including** 33:18 37:3 43:3 61:2

**inclusion** 173:13

**incomplete** 99:21 102:20 106:11 110:4,5 113:15 121:8 236:20

**incorporate** 134:11 135:5 135:12 137:24 141:17 142:24 143:18 144:21

146:24 196:11 207:6

**incorporated** 128:6,20 135:9 136:13 137:3 138:19 141:7 146:19 149:20 153:18 282:12

**incorrect** 25:17 229:8

**increase** 79:13 79:18,18 267:19

**increased** 203:12 266:18

**increments** 133:10

**independent** 38:7 165:23 170:8 174:12 178:8 182:11

**index** 4:1 165:5 165:12,13,18 166:9,18,19,22 167:5,8,13,14 167:15,24 168:1,4,6,9,13 168:19,23 169:2,5,9,12,18 169:21 170:2,5 170:10,14,18 170:18,20 171:1,2,10 172:1,3,21,22

173:1,4,5,6,9
173:12,14,16
173:21,22,23
174:1,2,5,5,7,9
174:11,11,13
205:21
**indicate**   227:18
**indicated**   73:13
137:10
**indicates**
201:20
**indicating**
280:13
**indices**   166:6
171:9,19
172:18
**indisputable**
121:19
**indistinguish...**
236:8
**individual**
186:11,13
188:12 189:17
190:21 191:18
272:16 273:18
**individually**
1:6 190:10
**individuals**
34:14,20 36:1
**industries**
155:17
**industry**   32:19
94:10,20,21
156:1 157:1

160:14 165:17
165:19 174:20
175:3 176:11
176:20 210:13
223:10
**industrywide**
165:16
**inefficiency**
151:7 152:4
**inescapable**
186:18
**inevitability**
236:14
**inevitable**
236:3,6,9,10,18
237:5
**infeasible**
192:21
**inflate**   103:21
**inflated**   96:22
106:3,7 118:10
118:12 120:6
122:5,6 123:14
123:24 126:8,9
196:15 273:13
**inflation**   79:5
79:20 80:3
81:1,4,8 95:14
96:4,7,13
97:13 98:6
99:6 100:16
101:6 102:11
102:13,23
103:7 104:1,15

106:4 108:5,7
118:10 119:14
119:16 120:10
120:12 124:10
124:12,18,20
124:24 125:6,7
125:10,12
126:16,19,23
195:12,17,24
196:1,4,21
203:13 209:4,4
209:11,12
210:5,6,7
212:11,18
213:24 214:23
216:22 231:8
232:3,7,11
233:14 234:23
235:17 236:7
236:22 237:6
238:3 239:12
240:14 242:14
243:7,8,15
250:7 256:15
257:21 258:7
259:15,20,23
268:12,12
269:9,10,23
271:18 272:4,6
277:12
**inflations**
118:15
**inform**   84:22
265:17

**information**
9:20 14:16
60:7 63:18
82:17 94:14
95:18 96:1,2
96:14 103:20
104:5 105:7,11
107:4,11,24
108:10 109:1,2
110:1,19,21
113:7,8 114:10
114:18 115:3
121:6,8 128:4
128:20,22
130:17 131:5
131:11,12
132:5,6,7
133:17,21,23
134:4,10 135:5
135:7 136:13
137:2,7 138:15
139:3 141:6,17
142:24 143:19
144:22 145:8
145:21 146:2,3
146:13,19,21
146:22 147:8
147:20,23
148:11,20
149:3,10,10,17
149:18,23,24
150:1,2,3,4,6
150:10,16,17
150:19,24

151:4,6,11,12
151:14,20,24
152:1,5,7,11,17
152:23 153:1
153:11,17,18
153:23 154:13
154:17,20,21
155:7,12 156:8
156:16 159:23
160:1,3,5
181:21 183:5
184:7,9,21
185:6,12,14
186:1,5,9,12,13
187:7,13
206:10 209:14
223:3,19,20,24
224:2,7,8,13,16
224:17,20,21
229:2 231:3,6
231:11,15,19
231:22 232:1
266:1,2
**informational**
  129:19,24
**informative**
  151:14
**informed**  84:23
  122:12
**informing**
  143:5
**informs**  95:8
**initially**  75:23
  178:1

**initials**  83:18
**inorganic**
  176:21
**input**  269:23
  270:3
**inputs**  261:8,10
  261:14 268:11
  268:18
**inside**  69:6
**insider**  226:7
**instance**  90:7
  100:3 119:4
  236:17 237:4
**instances**  23:3
  27:5,14 56:5
  187:17 233:12
  234:21
**instant**  249:24
**institutional**
  83:12
**instructions**
  7:10
**intend**  11:8
  204:12 256:17
  257:2
**intended**  237:2
  244:12,21
**intending**
  14:10
**interest**  83:21
  83:22 267:7
  269:1,5
**interested**
  75:24 78:17

81:13 123:10
205:18,20
279:16
**interesting**
  110:18 207:1
**internal**  198:1
**internet**  53:20
  54:24
**interpret**  135:4
**interrupt**  44:11
**introduce**  5:16
**introduced**
  95:14 98:6
  108:5
**introduction**
  78:16
**inventory**
  79:16,23
**investment**
  105:16
**investor**  188:12
  195:14 273:24
**investor's**
  272:5
**investors**  97:20
  97:21 98:18
  101:20 102:1
  105:8,12 107:8
  107:12,15
  108:15 109:19
  110:14 112:20
  112:22 113:2
  114:8,16 115:2
  118:11,13

120:14 121:15
121:20 144:7
166:23 193:11
195:6 197:9
208:22 209:8
218:5 228:6
272:23 273:4,6
**involve**  17:15
  106:14,15
  112:5,5
**involved**  34:23
  35:2 57:17
  108:4 120:4
  139:4
**involving**  28:23
  29:9 32:1 41:4
  66:6
**ipo**  162:20
  164:6
**issue**  15:6 25:4
  26:1,13 27:6
  27:18 106:8
  234:15 253:2
  253:17
**issued**  141:2,22
**issues**  65:17
  174:20 175:3
**item**  82:13
  109:5 186:5
**items**  85:23
  86:2 91:10

**j**

**j** 1:10
**james** 34:18,22
**janos** 34:18,22
**january** 13:11
13:12
**jglc** 1:8
**job** 164:19
171:7,20
**john** 1:11
**journal** 30:20
226:22
**journals** 49:24
**judge** 51:2
52:15,20 53:19
53:24 54:8
55:19 56:5,11
56:19,20
241:21 253:15
**judge's** 59:12
253:16 254:23
**judges** 57:4
67:24
**judgment**
139:4 170:4
258:23
**judgments**
274:15
**judicial** 227:1
**jump** 82:6
**jumping** 76:17
**junction**
221:20

**june** 141:22
142:1,6,9,23
143:13,15,15
143:15,19
144:12,22
222:23 248:16
**jury** 136:6

**k**

**kara** 2:7 5:22
**keep** 37:22
58:10 62:22
71:2 83:24
207:20 249:1
276:9
**kind** 37:19
57:16 85:1,2
97:11,12 98:16
106:14 108:3
138:13,17
150:14 154:19
154:21 194:4
206:14 238:21
**kinds** 81:23
133:21 136:21
183:12 226:6
**kirkland** 53:23
**knew** 206:10
**know** 7:14 9:13
9:15,19 11:1
14:14 17:23
24:12,13 28:5
36:16 40:14
44:10 48:5,21

48:22 54:22,22
57:4 60:11,11
60:12 62:23
67:21 69:2
71:14 78:10
81:22 86:13,24
91:2 95:10
98:15,17 99:5
102:22 103:6
103:11,12,12
105:3,21
106:23 108:1
108:21 109:14
111:9 112:16
113:2,16
115:19 116:18
118:22 119:5
120:19 123:6
123:14,23
124:23 126:6,7
137:7 151:13
153:6 163:8
167:16,18
168:21 177:5
183:6 190:20
191:10,13,16
191:17 193:24
194:2,4,12,15
195:3 197:1
199:8 200:9,13
200:22 201:13
205:2,16
207:11,19,20
208:11 209:20

213:2 214:14
215:9,19 216:3
216:16 220:7
221:16,20
222:5 225:5
227:11 238:12
246:11 248:23
249:8 253:24
257:24 261:18
261:23 266:11
268:21 269:1
270:5,12,18
271:8 275:1
276:6
**knowing** 79:12
82:21 94:17
108:19,20
**knowledge**
18:21 71:6
279:7,12
**known** 106:18
113:3 114:10
114:18 115:3
149:11 171:21
174:17 176:12
197:16 234:10
234:14 236:10
**knows** 241:22
**ks** 76:24,24
77:21 78:1,4
230:3
**kwolke** 2:11

**l**

**l** 83:17,18
**labeled** 16:19
  63:16 248:11
**lags** 181:5
**laid** 253:14
**language**
  250:15 251:23
  271:4 276:17
**large** 203:12
  229:15
**larger** 166:7
  169:16
**latest** 33:17
**launched** 97:19
  116:19
**laureate** 130:15
**law** 17:9 30:21
  117:16 226:22
  227:2
**lawsuit** 65:19
**lawyer** 31:4
  56:23
**lawyers** 16:5
  57:4 84:22
  123:8
**lay** 249:24
  254:20
**layout** 251:17
**lead** 17:21
**leaders** 108:14
  132:17

**leading** 161:20
**learn** 94:13
  98:8,9,18,18,19
  99:9 100:14
  126:11,22
**learned** 203:15
  236:24
**leave** 17:18
  52:8 56:12
  228:1
**leaves** 232:20
**leaving** 62:13
  62:16 90:6
  250:11
**led** 13:1 228:21
  229:14
**left** 223:16
**legal** 5:8 55:22
  55:24 56:2,7
  56:18,22 57:2
  57:10 63:24
  84:16,18 85:14
  96:17 119:18
  120:2,16,20,21
  121:21 122:16
  122:17 123:6,7
  123:12 274:9
  274:13 280:1
  283:1
**legitimate**
  206:1 207:23
**letter** 29:19
  280:19

**level** 42:12
**lewis** 131:2
**liability** 15:11
  49:11 89:18
  192:20 199:20
  200:18 201:11
  202:11,19
  208:16 212:7
  212:20 213:9
  213:12 214:2
  215:1 217:3,12
  218:14 219:23
  221:12 258:9
  258:11 259:17
  273:8,11
**liberty** 53:17
  54:13
**license** 6:15
**lied** 98:22
**life** 71:17 206:7
**lifeboats** 97:20
**likely** 109:7
**line** 90:1
  108:12 241:4
  280:13 282:7
  283:3
**linear** 178:12
**list** 41:6,10
  42:20 43:1,16
  44:3,16 45:20
  45:21 46:10,14
  47:4 60:18
  61:5 65:6 68:5
  73:3 77:4

  84:13 85:6
  142:3 156:3,3
  197:6 198:3,13
  255:11
**listed** 16:18,22
  17:7,11,14
  19:20 58:18
  60:24 63:22
  64:3 82:9,13
  83:2 85:15
  86:24 87:1
  88:15 198:22
  209:24 282:7
  282:17
**listing** 282:7
**lists** 9:7 41:17
  198:8
**literature**
  81:15,19
  131:22 138:5
  144:5 159:21
  197:21 226:21
  226:23
**litigation** 19:16
  19:17 31:14,18
  32:22 33:1
  34:23 39:12
  40:21 41:23
  46:2 50:24
  93:10 246:17
  248:19 275:19
**little** 33:10
  55:10 209:2
  235:5 238:7

**llp** 1:18 2:3,15
**load** 79:22
**loan** 249:9,21
  250:16 251:12
  253:24 254:7
**loans** 57:18
**located** 176:7,8
**locating** 73:15
**lock** 247:8
  271:10
**long** 54:21
  78:11 143:18
  144:21 151:3
  154:2 214:5
**longer** 17:4
  138:19 141:16
  142:23
**look** 18:15
  36:16 44:7
  60:15 66:19
  67:17 71:18
  73:17 76:1
  78:10 86:4
  111:12 125:9
  125:16 138:10
  138:22 139:11
  139:12 143:9
  143:10,10,12
  143:13,13
  150:2 161:13
  161:19 164:18
  164:19 167:3
  189:6 195:2,22
  249:13 250:20

253:16,23
262:12 264:17
265:23 266:6
271:24 274:17
276:10
**looked** 57:22
  59:15 71:16
  77:6,8 82:14
  137:7 142:20
  157:18 159:11
  159:12,13
  188:10 199:2,6
  230:5
**looking** 44:9
  46:11 73:10
  107:14 114:2,3
  125:18 126:5
  146:6,9 149:4
  159:1 161:15
  206:15 254:12
  264:22 265:4
**looks** 69:24
  156:24
**los** 2:6
**lose** 168:21
**loss** 48:10,14
  48:18 49:2
  102:24 109:13
  119:13,13,14
  122:20 127:20
  141:13 147:18
  184:19 186:22
  200:24 204:13
  204:17,20

205:11 206:22
230:7,9,23
238:24 247:6
247:10 255:16
255:17 256:5,7
256:9 258:1
260:8,10
271:12 272:6
274:12
**losses** 121:14
**lost** 120:18
  122:23 123:3
  219:12 228:7
**lot** 102:15
  105:18 155:11
  173:7 184:9
  221:14
**lowenfels** 131:2
**lower** 100:7,9
  104:9 126:1
  229:12 236:23
  263:2 269:20
**lseg** 83:12,17
**luke** 34:15 35:1
  35:9
**lunch** 177:8,21
**lying** 108:17,17

| m |
| --- |

**m** 1:24 279:2
  279:21
**mac** 50:23,23
  51:9 52:8
  249:18 250:9

251:7 252:6,22
253:16 254:23
**madam** 247:18
  275:12 280:10
**made** 116:12
  117:3 169:6,6
  170:19 171:19
  173:6 180:24
  205:19 212:15
  213:21 214:7
  214:20 215:4
  222:2,13 236:1
  236:12,12
  238:22 239:20
  240:23 255:24
  259:5,11 260:2
  260:19 281:7
**magnitude**
  18:1 26:21
  134:22 233:24
**main** 67:23
  80:9,10
**maintained**
  95:15
**major** 65:17
  69:24 71:16,20
  251:8 256:23
  269:8
**majority** 19:13
  19:19,24 21:7
  21:18 24:10
  39:23 207:17
**make** 11:18
  20:22 21:20

26:21 38:5,6
38:19 43:2
92:10,12,14
97:22 98:2
107:12 116:14
119:11,24
120:1 124:21
139:19 151:9
175:13 181:7
181:22 182:8
182:13,18,22
183:1,13
205:23 206:17
206:18 221:7
221:17 242:19
246:24 247:5
255:13 256:4
258:2,2 264:2
268:20 274:11
**makes** 194:13
**making** 171:9
194:14
**management's**
78:15
**manner** 15:10
26:10
**march** 140:11
141:6,8,12,16
141:18 222:23
**margin** 203:12
**margins** 79:18
155:14
**mark** 7:18

**marked** 7:21
63:13 140:2,9
247:14,19
275:8,13
**market** 4:13
15:7 18:7,11
19:12,22 20:7
20:12 21:2,6
21:15,23 22:5
22:10,20 23:5
23:12,20 24:3
24:6,21,24
25:10,13,21
27:4,10,12,15
27:16 28:10
29:7,9,14 30:6
35:5 48:20
49:3 51:10,15
51:16 53:6
59:22 65:18
66:2,6,16 67:1
71:9 73:12,14
81:11,24 85:8
97:13 98:4
99:5,9 100:6
100:10 103:21
104:17,20
105:23 106:16
122:7 124:8
126:11 128:2,4
128:5,10,17,19
129:2,9,16
130:3,6,16
131:4 132:4,10

132:19,22
133:12 134:7
134:10 135:8
135:11,18,19
135:19 136:19
137:12,15
141:10,16,20
142:23 143:6
143:18 144:13
144:18,21
145:2,11,20
146:16,18
147:21 149:11
149:18 151:5,6
152:4,4,9,18,22
153:12 154:13
155:21 156:6
157:1 160:13
165:5,8 166:6
167:17 168:14
169:16 171:12
186:24 187:5
187:12,18
188:11 189:14
190:4,14,19
191:8,9 192:5
203:24 204:9
206:23 221:15
223:9 229:14
230:24 235:11
235:13 236:10
236:24 248:15
262:19 269:1
272:14 275:20

**market's** 262:1
262:3
**marketplace**
95:9
**markets** 52:22
89:3 129:24
**marketwide**
223:10 264:18
**massachusetts**
1:20 5:11
279:5
**material**
103:19,20
106:2 110:18
128:3 146:2,13
146:15 152:12
152:16 153:13
153:16
**materialization**
233:17 235:2
235:20 236:2,6
237:5,9 238:4
239:13,22
240:15 242:16
243:17
**materialize**
234:12,15
235:10
**materialized**
236:16
**materializes**
106:4 234:8
**materials** 63:21
84:13 86:22

88:17
**mathematical** 209:7
**matter** 5:13 8:2
13:9 22:4 24:3
24:21 25:9,21
27:3 28:22
34:22 49:7
59:5 60:11
90:1,2,8,9
96:19 147:21
156:12 246:21
248:19
**matters** 16:16
16:18,22 18:8
18:11,19 19:19
20:6,10 28:23
31:15,17 32:22
34:19 39:12
65:7 92:20
279:8
**maturity** 273:20
**mean** 10:10,23
12:17 18:3
20:9 27:10,11
28:4 29:18
30:3 31:20
32:2 33:24
40:13,22 44:11
47:2,3 48:5
49:17 51:23
52:17 53:12,12
55:1 56:11,23

59:21,23 60:9
61:13 64:15
65:18 71:21
76:13,24 78:11
79:2,3,3,4
86:10 90:24
91:4 93:5
95:18 96:8
98:14 99:1
101:11 102:16
105:20 107:6
112:9 114:1
115:17 117:10
117:15 118:8
118:20 119:10
120:16 121:12
121:18,19
128:3 129:8
130:10 131:23
132:3,23 133:6
134:4 135:18
135:18 138:4
139:4,13
143:21 146:12
146:21 148:12
151:17 153:4
154:24 155:11
156:19 160:22
162:5,6 164:18
166:13 170:13
172:1,15,17
175:8,13
180:19 184:18
186:4,7,8

188:6 189:10
190:15 193:8
194:10 196:12
198:14,19
201:15 205:4
205:19 207:21
209:19 222:6
226:21,23
227:12,22
231:10 234:1
238:6,23
244:14 253:15
257:6 260:13
260:14 263:18
265:20 268:21
268:24 269:2
270:3,12 272:9
274:8,10
**meaning** 26:10
58:5 134:3
227:10
**means** 14:18
47:17 94:17
156:20 244:3,5
**meant** 40:15
221:1
**measure**
102:12,23
103:24 104:5
105:5,10 106:7
118:9 124:11
125:6,7,10,12
126:12,16,18
195:7 210:5

228:12 231:12
261:24 262:6
263:2,3 264:3
264:3,7 272:2
**measures**
118:15 149:1
**measuring**
49:15 50:9
115:1
**mechanism**
190:3 191:6
**median** 167:19
**mediations**
49:23
**meet** 61:11
62:7
**meeting** 61:24
62:3,9
**meetings** 38:3
62:11
**melissa** 2:8 6:1
**members** 15:9
49:8 89:14
208:17 212:6
217:11
**memory** 17:10
35:11
**memory's** 55:9
**mention** 86:3
**mentioned** 29:5
37:24 54:13
56:16 57:8
61:7 62:11
64:17 66:14

73:18 78:19 80:2 81:3 88:11 91:10 93:17 95:22 155:22 164:3 251:22 264:22

**merit** 279:23

**merits** 48:3,6

**met** 59:16 61:7 61:16

**method** 89:14 90:2,2,7 161:21 178:4 180:9 181:9 183:9 225:11

**methodologies** 114:15 197:2 226:7

**methodology** 15:8 46:7 49:9 49:14 50:9 51:20 66:4 67:5,20 85:9 89:16 91:5 114:24 115:7 115:12 118:8 118:19 160:24 161:3 162:12 162:14 163:11 163:14,15,19 178:6 179:4,21 180:16 193:22 194:1,6,9,17 195:10,18,18

196:3,10 197:6 198:6 200:1 208:15 209:18 209:19 212:13 215:20 217:20 225:1,8,19 226:2,14 227:18 228:4 228:11,22 232:19 238:12 243:2,3 252:8 252:12,14,19 252:24,24 253:4,9,10,12 253:21 254:22 255:20,21 262:7,8

**methods** 127:2

**metric** 155:21

**metrics** 155:17

**michael** 39:7 39:10

**michel** 38:13 38:15,16,21,23 39:3

**midwest** 280:17 283:1

**miguel** 35:23 36:4

**miller** 1:10

**mind** 60:8 116:3,22 164:18 207:20

**minded** 205:14 206:15 207:6

**mine** 37:10 58:8

**minimizing** 178:8

**mining** 163:10 205:22

**minute** 74:6

**minutes** 127:8 133:22 134:5 245:9 277:20

**mirror** 96:24

**mislead** 126:2

**misleading** 94:2 98:7 185:2

**misled** 98:20

**misrepresent...** 95:20 96:20 99:11 100:21 100:24 101:1,4

**misrepresent...** 52:1 95:15 97:9 120:7 122:5 124:9 228:7 229:4 233:22 236:1

**misrepresented** 95:12 96:3,15 121:8 124:17

**mississippi** 176:7,8

**misstate** 26:19 90:6

**misstatement** 121:16

**misstates** 202:13

**misstating** 25:7 226:4

**mistake** 39:4 151:9 259:5

**mistaken** 17:2

**mistakes** 38:6 107:13

**misunderstood** 54:8

**mixed** 101:13

**model** 49:19,20 49:21,24 66:6 89:19 125:23 125:24 126:1 180:1 192:19 192:21 193:2,6 193:7,16,21 194:2,7,8,17,20 195:7,15 196:9 197:5,19,20 201:5,19,21 202:18 205:4 206:22 207:15 207:22,23 209:17,17 210:5,15,21,22 211:24 212:1,3 212:10,16

213:22 214:11 214:16,21 220:21,22 221:7 224:24 227:9 231:1 232:21,23 238:11,16,20 238:22 239:5 239:16,19 240:1,6,8,22 241:2 242:19 242:23 243:19 243:24 245:5 251:18 256:13 256:17 257:1,5 257:6,10,14,15 258:10,12,16 258:16,19,22 259:3,4,6,19,20 259:22 260:15 261:3 268:12 268:13 269:11 269:23 270:4,5

**models** 55:6 124:15 197:12 197:16,16 198:15 206:17 215:4,6,8,8,9 227:1 266:21 271:15

**modification** 206:17 208:5

**modify** 37:5,16

**moment** 87:6 142:2 161:3 249:5

**monday** 139:15 139:16,17

**money** 122:23 123:4 126:22 191:2,3 228:8

**morning** 5:5 6:24 139:14,19

**mortgage** 249:9

**motion** 12:11 59:13,15 64:23 65:6 88:12

**move** 28:20 147:1 150:8,11 151:2,15 153:19,24 189:12 240:9

**moved** 146:10 186:1,13

**movement** 54:4 138:23 139:5,7 147:13 148:2 185:13 223:18

**movements** 144:3 158:7,19

**moves** 151:18 153:17

**moving** 74:3,18 168:23

**multiple** 55:9 175:23 176:2

185:5,11 197:12 211:24 212:3,16 213:22 214:21 218:17 241:15

**murray** 2:3 5:23 6:2,5

**mutually** 96:8

**mwright** 2:12

**n**

**n** 5:1

**name** 4:3 7:1 45:11 64:16 164:23 167:10 277:17 280:6 281:3,4,15 282:3,4,21

**natural** 1:10 5:14 28:24 280:6 281:3 282:3

**nature** 132:7,8 133:3 135:17 136:18 190:23

**nconrad** 2:22

**near** 229:9

**necessarily** 99:1 137:13 150:7,20 181:11 185:12 194:24 202:8

**necessary** 53:3 66:2 71:4

77:16 81:11 137:17 141:19 143:21,22 200:1 202:16 215:19 251:2

**need** 8:16 20:8 27:8 29:6 30:17 36:9 60:6,7 62:21 66:15 67:2 93:4 113:6,13 123:22 126:15 183:12,15 192:17,17 201:4,24 206:12 209:18 217:16 220:14 231:6 232:1,9 241:21 250:21 278:16,18

**needed** 86:4 181:22 182:9 182:22 183:6

**needs** 201:20 239:20 240:23 274:17

**negative** 101:9 101:16 102:3,8 103:13,14 108:24 224:1,8 231:18,21 232:1

**negotiate** 49:22

**negotiated**
  109:6
**negotiation**
  108:16
**neil**  2:19 5:20
**neither**  259:19
**net**  155:14
**netting**  274:4
**never**  23:13
  96:22,23 98:4
  98:5 204:17
  207:19 225:22
  230:5,6
**new**  1:2 41:3
  47:17 53:19,21
  131:4,11,11
  139:2,2,2,3
  147:8 148:10
  148:20 149:2
  149:10,17,24
  150:1,3,3,4,18
  150:18 151:12
  151:14 152:8
  152:11,16
  153:1,16,24
  154:12 155:2
**newey**  178:1
  179:5,14 180:9
  180:11 181:9
  181:12 182:3
  182:20 183:11
**news**  67:15
  68:6,9 69:20
  69:23,24 71:16

71:17,20 72:14
73:4 87:3,18
87:24 133:4
134:21 135:5,9
135:12,17,20
135:22 136:2
136:18 137:20
137:24 138:13
138:18 139:1
143:5,7,8
144:6 145:3,4
163:23 165:24
184:6 186:16
186:21
**niche**  175:8
**nilofer**  2:18
  5:18
**nine**  252:10,10
**nobel**  108:12
  130:15
**nobody's**
  201:16
**nonearnings**
  158:16
**nonobvious**
  153:13
**nonquantifia...**
  197:23
**nonresponsive**
  240:10
**nonstandard**
  164:22
**nonstatistically**
  54:3

**notarized**
  280:14
**notary**  6:16
  279:2,22
  280:24 281:10
  281:18 282:15
  282:23 283:23
**note**  280:12
**noted**  56:21
**notice**  252:5
**notwithstandi...**
  182:7
**november**
  279:22
**numar**  2:21
**number**  24:16
  48:20 105:21
  139:15 188:16
  224:9 261:17
  280:7,13
**numbers**  83:22
  126:6 196:1
  248:4 254:13
  282:7
**numerette**
  250:22 251:16
**numerettes**
  252:6,11
**numerous**
  67:14

|  |  |  |
|---|---|---|
| **o** | | |

**o**  5:1

**oath**  279:9
**object**  9:1,12
  10:7,22 12:12
  13:21 16:7
  18:13 19:2
  21:4,16 22:7
  22:22 23:7
  24:4 25:16
  29:17 31:1
  33:3,9,23
  34:21 35:7
  36:3 37:9
  39:16,22 45:4
  46:20 47:12,23
  48:4,11 49:16
  50:15,20 51:5
  52:14 53:11
  54:20 58:24
  59:20 64:11
  65:3,9,15,23
  66:22 67:11
  69:3,12,17
  70:10,15 71:13
  71:22 72:9
  73:24 74:24
  75:15 76:11
  77:5,12,20
  78:9,24 80:8
  81:20 84:20
  85:16 90:23
  91:13,21 92:1
  92:22 93:21
  96:5,16 97:17
  99:3,20 102:14

**[object - offering]**

| | | | |
|---|---|---|---|
| 103:10 104:2,7 | 182:1,10,24 | 252:15,21 | **observers** |
| 104:23 105:4 | 183:14,23 | 253:7 255:4 | 122:18 |
| 105:13 106:10 | 184:15 185:8 | 256:2 257:3,23 | **obtain** 73:9 |
| 107:5 110:3 | 185:15 186:3 | 259:7,18 260:6 | 82:17 88:18 |
| 111:3 113:11 | 187:9,20 188:5 | 261:16 263:8 | 171:15 |
| 114:11,19 | 188:20 189:8 | 263:15 265:5 | **obtained** 74:22 |
| 115:4,16 117:5 | 189:22 191:12 | 266:22 268:14 | 84:5 87:17 |
| 117:14 118:2 | 191:20 192:10 | 270:1,24 | **obvious** 262:21 |
| 119:9 121:2,17 | 192:15 198:7 | 272:19 273:9 | 263:11,14 |
| 122:2 123:19 | 198:18 199:5 | 273:21 274:5 | **obviously** |
| 125:2 130:9 | 199:21 200:21 | 274:19 276:20 | 132:15 |
| 131:13 132:1 | 202:12,24 | 277:8,16 | **occasions** 61:11 |
| 132:13 133:1,7 | 203:9 204:15 | **objection** 19:23 | **occur** 97:7,8 |
| 133:13,20 | 205:12 206:24 | 27:24 28:12,15 | 111:22 236:11 |
| 134:12 135:16 | 207:10,18 | 194:22 201:14 | **occurred** 27:22 |
| 136:5,15 137:5 | 208:9 209:15 | 204:24 215:2 | 119:15 |
| 138:1,20 143:2 | 211:7,22 212:8 | 218:15 226:3 | **odd** 20:24 |
| 143:20 144:24 | 212:21 213:10 | 239:23 240:16 | 225:23 |
| 146:5 147:16 | 214:4 216:14 | **objections** | **offer** 11:9 |
| 148:6 149:13 | 217:13 220:19 | 193:5 | 18:10 30:9 |
| 150:13 151:8 | 221:13 222:12 | **obscured** | 32:8 35:4 51:7 |
| 152:15 153:3 | 223:4 225:13 | 233:22 237:1 | 54:15 66:15 |
| 155:9 158:13 | 226:20 229:5 | **observable** | 118:6 |
| 159:3,19 | 229:23 231:9 | 210:4 262:4 | **offered** 21:23 |
| 160:10 161:17 | 232:5,13 | 269:3,5,6,7 | 51:4 54:3 71:5 |
| 162:19 163:4 | 233:19 235:4 | **observations** | 118:20 258:5 |
| 163:22 164:16 | 235:22 236:19 | 120:3 122:17 | 275:24 |
| 170:12 171:5 | 237:10,17 | **observe** 104:13 | **offering** 8:21 |
| 172:11 173:18 | 238:5 239:14 | 262:19 | 9:5 10:2,20 |
| 174:15,22 | 243:18 245:1 | **observed** | 11:6,20 30:23 |
| 175:5,19 176:4 | 245:23 246:9 | 105:22 199:23 | 55:2 56:6,17 |
| 176:23 177:4 | 246:18 247:3 | 200:3,6 211:10 | 89:7 90:14,18 |
| 180:3,10,18 | 249:23 250:17 | **observer** | 90:21 91:11,19 |
| 181:10,17 | 251:13 252:1 | 160:13 | 91:23 92:9,19 |

**[offering - opined]**

| | | | |
|---|---|---|---|
| 94:3 120:2,3 122:16,16 123:5,6 | 18:5 21:5 22:13 23:3 24:18 25:2 27:8,17 28:8 | 142:17,18,22 144:16,20 145:13,17 147:1,6,11 | **once** 61:16 186:18 191:3 **ones** 29:13 45:23 53:14 |
| **offers** 167:24 | 28:18 30:11 | 148:1,17,23 | 75:5 77:18 |
| **offhand** 208:7 | 33:16 34:10 | 150:9,23 | 80:9,10 88:4 |
| **office** 32:4 | 35:16 38:18 | 152:11 154:4 | 170:16 213:3 |
| **officer** 34:17 | 39:2,4,10,14 | 156:15 159:17 | 227:3 273:15 |
| **official** 281:15 282:21 | 40:6,24 41:12 42:3,20 43:6,7 | 165:20 170:23 172:14 174:10 | **ongoing** 9:19 **open** 205:14 |
| **offsetting** 231:14 274:12 | 43:15,19 44:8 44:10,18,21,23 | 175:16,23 176:15,17 | 206:15 207:6 207:20 232:20 |
| **oftentimes** 48:15 105:23 | 45:24 47:6,16 47:20 48:8 | 178:20 184:8 191:10 230:14 | 249:1,2 276:10 **operating** |
| 125:9 152:3 164:11 | 49:5 50:6,12 52:4,20 55:15 | 231:20 232:9 234:5 246:3,15 | 34:17 68:18 **operationalize** |
| **oh** 15:20 19:5 31:20 34:17 | 56:9 62:21 74:3,18 76:17 | 248:9 249:6,7 254:3 257:9 | 195:1 197:5 201:4,24 |
| 38:24 40:22 41:2,3,4 42:7 | 80:2,13,19 81:3,9 82:6 | 260:12,16 262:16 266:13 | 202:17 209:1 **operationalized** |
| 43:4 44:10 45:18 51:8 | 83:6 84:4,11 84:14 85:19 | 267:14 268:4 273:17 275:15 | 195:15 **operationaliz...** |
| 53:23 59:23 60:5 79:8 | 88:24 89:11 90:10 91:17 | 276:13 **old** 47:18 150:2 | 194:7 214:15 **operative** |
| 102:10 115:17 139:10 146:12 | 92:13 93:1 95:1 99:16 | 153:17 **omission** 95:21 | 190:19 191:7 192:4 |
| 162:20 172:1 188:6 196:23 | 100:20 101:7 101:10,11 | 96:21 103:21 110:20,20 | **opine** 18:7 19:12 23:5 |
| 211:23 238:6 264:15 272:11 | 109:15 112:8 113:4,19 114:6 | **omissions** 52:2 93:22 95:16 | 24:23 25:24 29:20 49:5 |
| **ohio** 280:2 **okay** 7:8 10:19 | 115:22 116:2 116:15,24 | 97:9 120:8 122:5 124:9 | 67:4 208:20 **opined** 20:12 |
| 11:4,24 12:23 13:8 14:13,20 | 128:1,24 140:24 142:13 | 228:7 229:4 233:22 236:1 | 27:15 28:10 52:16 186:24 |
| 15:23 17:3,18 | | | |

201:2 225:1
226:12
**opining**  151:10
206:23
**opinion**  9:23
18:10 19:21
20:19 21:14,23
22:4,17 24:23
25:4,23 26:13
27:5,13,17
30:9 40:7
49:13 50:8
51:1,3 52:21
53:3 54:7,15
55:2,3 56:18
56:23 57:6,9
64:6 66:16,18
66:20 67:18
81:11 90:16,17
91:4 93:24
94:4 118:6,20
120:2 121:14
122:16 123:6
123:12 137:6
145:5,14
147:13 148:2
156:12 173:1
184:23 187:3
192:12 193:1
258:5
**opinions**  8:20
8:24 9:5,11,18
9:22 10:1,6,17
10:19 11:5,8

11:20,20 12:22
21:2 22:9 35:4
50:12 51:8
52:5,10,13
53:9 55:6,13
55:21 71:5
82:11 89:6
90:13,18,21
91:1,3,7,8,11
92:9,19 93:1
127:19 128:12
147:11 152:6
**opportunity**
9:24
**opposed**  113:22
149:24 158:8
173:14 274:4
**opposition**
12:10
**option**  73:19
188:13 189:11
189:17,21
190:9,21
191:18 197:18
209:4,5,8
257:12,17
258:14 259:21
260:4 262:18
262:23 266:9
266:21 267:1,9
267:16 268:6
268:12,22,23
269:11 271:5
272:12,17,22

273:5,18 274:1
274:2,17,18,21
274:23 277:2
**options**  41:4
73:12,12,22
89:2 187:1,5
187:12,14,18
188:2,2,18
189:12,14
190:1,7,13,14
190:17 191:1,5
191:7,9,22
192:4 208:22
256:12 257:22
258:7,13
259:15 266:20
267:20 270:23
271:18 272:13
272:16,24,24
273:6,7,12,18
275:1 277:13
277:13
**order**  18:1
25:12 59:12
60:8 64:6
66:15,20 67:4
80:1 97:22
114:16 123:13
141:16 172:3
181:22 182:13
195:4 201:21
212:11,17
213:23 214:22
215:19 217:15

232:6 238:20
239:20 240:23
253:16
**orders**  26:20
**ordinarily**
139:20
**ordinary**
177:23 178:3
178:15 179:20
**organic**  175:15
176:3,5,19,21
**outcome**  109:6
279:16
**outcomes**  240:7
**output**  267:9
**outset**  126:7
**overall**  43:1
**overpaid**
118:16 120:15
120:17,21
121:1,18,21,23
126:6 193:11
228:6,8
**overpay**  119:12
122:1
**overpayment**
121:22 193:12
**own**  93:13
116:14 172:9
172:16 173:15
175:7,7 214:18
216:7 241:24
**owner**  31:9

**[ownership - percent]**

| | | | |
|---|---|---|---|
| **ownership** 83:12 | **pages** 16:20 30:14 41:6,16 | **paragraphs** 15:5,12 130:14 | **party** 20:18 97:1,1 108:15 |
| **owns** 100:8 | **paid** 59:4,7 | 249:17 250:12 | **past** 18:24 42:9 |
| **p** | 171:10,10,15 | 276:17 | 43:10 44:24 |
| **p** 1:11,17 4:4,9 | 171:22 | **parent** 45:9 | 45:15 173:10 |
| 5:1,13 6:11 | **paper** 256:20 | 134:15 | **patel** 138:8 |
| 278:13 279:3 | 258:18 262:9 | **park** 2:4 | **pattern** 164:9 |
| 280:8 281:4,9 | **papers** 41:6 | **part** 54:22 62:1 | **pavithra** 3:2 |
| 282:4,13 | **paragraph** | 163:23 164:18 | **pay** 256:23 |
| 283:20 | 19:9,21 55:18 | 195:15 214:14 | **paying** 122:8 |
| **p.m.** 61:22 | 55:22 56:22 | 216:19 217:20 | **pe** 242:21 |
| 177:15,16 | 57:1 69:8 87:6 | 218:2 220:22 | **peer** 167:1 |
| 245:13,14 | 88:23 89:1,10 | 229:15 255:19 | 205:21 |
| 278:1,2,21 | 89:12 127:23 | 257:5 260:10 | **pending** 245:7 |
| **page** 4:3,8 8:4 | 128:2,14,16 | 261:2 282:9 | **pennsylvania** |
| 20:23 28:18 | 129:6 130:22 | **parth** 35:22 | 30:20 |
| 30:19 45:24 | 131:1 145:17 | 36:7 | **people** 33:14,20 |
| 60:24 63:17 | 145:22,23 | **participants** | 34:7,10 35:16 |
| 74:3 76:18 | 146:9,10,11 | 105:23 128:5 | 35:21,24 57:18 |
| 81:16 82:6 | 148:23 149:8 | 166:8 168:12 | 98:8 114:23 |
| 83:23 84:11,16 | 154:10 161:8 | 170:2 171:12 | 115:8 119:11 |
| 87:3,5 88:22 | 167:12 168:3 | 221:15 | 125:9 134:1 |
| 89:10 92:6 | 197:7 198:3,22 | **particular** 54:7 | 151:9 152:3 |
| 127:24 142:4 | 229:7 248:22 | 65:22 66:21 | 163:10 194:14 |
| 143:14 144:11 | 249:4,8,10,13 | 76:1,2 84:6 | 228:15 233:23 |
| 145:2 148:24 | 249:14,15,17 | 86:2 126:9 | 273:13 |
| 154:11 155:1 | 249:20,21 | 147:14 162:22 | **people's** 31:23 |
| 168:3 241:4 | 250:13,15,20 | 167:6 234:9 | 31:24 |
| 248:4,13 | 251:8,10,10,11 | 239:2,6 243:21 | **percent** 26:17 |
| 275:17 276:5 | 251:14,21 | 244:4,16,17 | 39:20,20 48:23 |
| 280:13,15 | 252:10 253:23 | 271:11 | 49:1 106:20,24 |
| 282:7 283:3 | 254:4,6,8 | **parties** 177:2 | 107:1 109:20 |
| | 268:4 271:23 | 219:10 279:14 | 109:21 110:14 |
| | 276:4,11,18 | 279:15 | 110:24 112:10 |

112:12,15
179:11,11
190:17 199:10
**percentage**
32:21 33:7,11
48:22 207:8
**perfect** 130:21
**perform** 38:7
**performance**
229:12,13,15
**performed**
158:14
**period** 23:15
66:24 68:19,22
69:1 76:24
77:2 78:2,5
79:11 80:22
88:8,9 89:3
102:1 118:13
157:6,14,19,20
157:24 158:3,5
158:9,12
161:10 162:1,4
164:4,8,10,12
164:15,22
165:3 178:18
179:8 188:14
195:17 203:3
209:13 211:12
211:12,13
229:10 243:8
265:3 272:5
**periods** 264:17

**personally**
171:1 229:20
281:11 282:15
**perspective**
68:3 120:20
**perspectives**
131:14
**ph.d** 280:8
281:4,9 282:4
282:13 283:20
**ph.d.** 1:17 4:4,9
4:14 6:11
33:18 36:4
275:22 279:3
**pharmaceutical**
155:23
**philip** 7:2
**phoenix** 45:9
45:10 134:16
**phone** 15:22
280:3
**phrased** 235:5
**phrasing** 238:7
**pick** 269:18
**picked** 173:4
173:23 184:20
186:5 219:6
**piece** 123:11,12
134:10 186:1
209:14 224:7
**pieces** 20:21
165:4 185:5,11
185:13 186:11
186:13 192:24

**place** 141:3
231:5,24
**plaintiff** 5:23
6:2 17:22
233:12 234:21
**plaintiff's** 20:3
**plaintiffs** 1:7
2:2 6:6 12:11
16:4,10 39:15
46:18,22 47:9
49:10,22 51:21
57:1 58:14
59:17 61:8
68:4 74:23
75:4,11 88:18
89:17 92:5,15
92:20 93:2,10
93:14,18 94:1
199:19 200:17
201:11 202:10
202:18 208:16
212:6,20 213:9
213:12 214:2,7
215:1,13 217:3
217:11 218:13
219:23 221:11
222:17 229:9
234:16 258:8
258:11 259:16
**plead** 228:15
**pleadings**
64:10
**please** 5:16 6:8
6:24 7:14 26:5

28:16 42:7
63:2 74:12
79:7 88:22
89:9 127:8
161:4 177:11
249:1 253:24
276:9 277:20
280:11,11
**pled** 227:24
228:2,5
**plenty** 172:16
**plug** 267:8
**plus** 42:5,10,18
**pocket** 89:18
118:18 193:7
194:8,16,19
195:18 196:7
198:5 199:24
201:5 202:17
208:13,14,20
209:9 212:13
214:11,15
215:20 221:6
224:23 226:1
226:13 227:9
227:10,11,12
227:19 228:4
228:11,22
232:16,18
233:2 237:14
237:24 238:6
239:9 240:12
242:9 243:1,11
243:13 244:6

**[pocket - price]** Page 46

244:10,21
245:20 251:18
252:7 254:22
255:20,21
257:7,14,15
258:12 259:22
261:3
**point** 15:18
44:5 62:20
110:9 111:17
115:20 125:11
126:17 130:19
134:20 138:9
152:2 186:16
220:6 223:24
250:21 253:17
**pointed** 108:14
186:19 253:19
**points** 253:8
**policies** 32:12
32:18
**policy** 32:1,3,6
32:9
**poor** 229:12
**poor's** 171:6
**portfolio**
176:10
**portions** 52:12
57:9
**pose** 7:12
**position** 27:1
117:20 198:11
202:5 216:8
236:5 253:5

**positive** 101:9
101:15 102:2
231:11,13
**possession** 75:7
**possibility**
117:22
**possible** 97:24
110:6,10
115:14 117:22
187:21 189:20
189:23 205:24
206:3 216:17
218:1 225:10
266:16
**possibly** 30:19
183:8,8 198:14
**potential** 13:19
111:21 112:1
216:17
**potentially**
250:6
**ppp** 57:18,19
**practice** 66:5
79:6,9 161:11
**practitioners**
138:13
**precaution**
97:22,24
**precedent**
119:23
**precedes** 163:1
**preceding**
160:8 161:9

**precise** 181:9
206:18 230:17
**precisely** 27:11
213:17
**preclass** 14:1
233:10
**predetermine**
255:15
**preliminary**
203:19
**premarket**
137:20
**premise** 241:11
241:12
**preparation**
59:23 60:3
61:8 62:4,8,12
64:17 76:3,4
**prepare** 12:8
46:17 59:9
60:10 61:17
**prepared** 8:2
35:12 60:14
203:19,24
**preparing** 12:6
46:23,23 57:20
58:11 62:14
**prerequisite**
178:15
**presence**
185:11
**present** 3:1
16:1 61:23
107:20 206:16

238:11
**press** 4:10 68:6
87:19 88:1
140:19 141:1
**pressed** 227:8
**presstek** 41:2
**prestamos** 56:4
57:12,14
**pretty** 35:9,10
55:7 77:1
166:14 211:23
214:5
**prevented**
116:2
**previous** 37:1
37:14,15 82:4
125:4 261:21
**previously** 85:4
95:9 96:2
98:22 149:11
149:19 164:4
**price** 51:22
52:1 54:2,4,4,9
54:11 55:9
79:13,13,17,24
79:24 95:13,19
96:4,13,21
98:6 99:7
100:7,8 101:18
103:8,22 104:6
104:9,14,16,19
106:3,7,21
107:2 108:6
109:5,5,23

**[price - procurement]**

110:23 117:1
117:23 119:5
120:6 122:7
123:14,16,23
123:23 124:7
124:16,17
125:1,23 126:2
126:8 128:20
128:21 131:5
135:1,22 136:1
137:23 141:8
141:11 145:19
146:20 147:7
147:13,20
148:2,10,19
149:1,20
150:11,20
151:2,16,19,20
151:21 152:13
152:17 153:19
153:19,24
154:11 156:7
156:18,22,24
157:9 185:10
186:2,14 187:8
189:1,4 197:24
209:11,12
210:4,17 213:4
216:21 223:2
223:18 224:5
231:8 232:3
233:14 234:23
235:17,19
236:7,13,23

237:6,8 238:2
239:11 240:14
242:14 243:15
251:3 258:15
259:21,23
260:4 261:11
261:20 262:13
262:24 264:24
265:7,9,15,21
265:23 266:1,3
266:4,17,20,21
267:1,6,6,10,16
267:18,19
268:16,23
269:4,6,7,9,10
269:11,12,16
269:22 270:4,4
270:5 273:19
274:24
**priced**  109:19
    124:6
**prices**  83:8
    128:7 130:16
    153:17 188:10
    210:3 262:18
    266:9 268:6,7
    268:24
**pricing**  189:11
    197:18 257:12
    257:18 271:6
    274:21 277:2
**primarily**
    31:22

**primary**  15:18
    27:11 35:21,24
    186:19,20
    249:19 251:9
    251:22 254:17
**principle**  107:8
    107:10 138:12
    154:7 189:15
    189:16 192:3
    193:7,15
**principles**
    103:17 108:9
    154:19,23
    189:11,11
    190:18
**print**  30:21
    41:14
**printing**  41:2
**prior**  160:21
    224:24 229:13
    251:4 265:6,6
    265:8
**privilege**  14:10
**privileged**
    14:16
**prizes**  108:12
**probabilistic**
    112:17 113:8
    113:22 114:17
    115:1
**probabilities**
    114:6
**probability**
    106:19,20

107:1,2
**probable**
    266:16
**probably**  18:3
    18:9,16 24:14
    24:16,19 44:4
    47:4 75:20
    112:7 168:18
    169:3 205:1
    222:6 256:20
    258:20 260:14
    271:3
**problem**
    107:22 211:17
    253:20
**procedure**  36:8
    68:18 69:21
    179:5,14 281:5
    282:5
**proceed**  6:20
    141:13
**process**  36:13
    37:12 66:8,9
    75:16,21 84:1
    143:7 145:8
    181:4,5 183:17
**processed**
    175:17
**processing**
    145:4
**procurement**
    78:19,22 79:5
    79:20,22 80:3
    80:4,6,11,14,20

80:23,24 81:3
81:6,7,7 93:20
94:9,22 229:16
**produce** 86:22
196:2 221:4
261:24 263:1,2
**produced**
86:20 94:14
**produces**
220:20,21
262:6
**product** 79:16
**production**
6:14 280:15,17
280:22
**products** 175:4
**professional**
81:15,19
221:23
**professor** 4:13
8:1 31:7
248:15 275:21
278:6
**profit** 79:19
155:14,15
274:12
**profits** 80:1
**program** 57:19
**promotion**
79:21,23 80:4
**prompt** 132:12
132:23
**promptness**
128:8,23

131:12,16
**prongay** 2:3
5:23 6:2,5
**pronounce**
38:15,17,22
**pronouncing**
38:14
**proofread**
35:21
**proper** 94:23
**proposed** 68:21
157:14 178:9
224:23 227:1
246:12 266:21
270:8,13,15,16
270:21
**protracted**
144:9
**prove** 54:2,4
137:13 185:12
**proved** 20:14
20:15 23:15,18
23:20 25:5
26:1,14 27:6
27:18 29:20,23
30:9 51:22,24
54:11 100:4,5
100:6,10
103:15,19
**proven** 25:14
**proves** 112:14
**provide** 18:23
20:18 21:13
22:17 32:17

40:7 41:24
45:16 47:10
85:4 179:17
180:15
**provided** 16:24
21:1 22:19
40:18 42:4,9
42:15,21 43:10
43:11,17,20
45:2 46:5
73:21 75:8
83:22 107:11
**provides** 31:13
31:18 39:11
179:15
**providing**
127:19 147:11
**public** 6:16
72:2 80:16,21
103:14 128:3
146:2,22 187:6
250:4 279:2,22
281:10,18
282:15,23
283:23
**publications**
41:7
**publicly** 128:19
128:22 145:20
146:19 167:2
167:20
**published**
68:21 87:18
105:19 130:2

136:3 155:2
256:20 258:18
261:22 262:9
**publishing**
139:13
**pulled** 72:18
84:8
**puma** 44:2,5,13
44:13,15 45:1
45:8
**purchase**
209:11 210:7
**purchased**
118:11 273:24
**purchasers**
273:12
**purported**
229:21
**purpose** 143:11
143:22 147:18
165:7 215:5,11
215:18,24
216:1,9,11
217:9 230:7
**purposes** 71:9
93:8 94:24
137:15 160:11
169:1 202:8
204:13,22
205:10 216:5,7
218:8
**put** 60:17,18
214:10 272:24
273:6,15

**[put - reaction]** Page 49

274:24 277:13
**putative** 78:5
157:6 165:3
179:8
**puts** 170:5
189:2 273:14
**putting** 171:18
**puzzles** 53:24

**q**

**qs** 76:24 77:21
78:1,4 230:2
**qualifies**
194:17
**quality** 37:22
198:1
**quantification**
235:12
**quantify**
261:13
**quantifying**
231:7 232:2
**quantitative**
36:5
**quantity** 79:14
**question** 7:12
11:1,22 19:16
20:9 21:10
22:24 23:1
27:9 29:3
35:13 66:3
67:19 74:7,8
74:14 104:3
107:23 118:7

120:16,22,22
121:21 122:19
127:6 132:21
133:14 148:15
153:10 158:23
170:24 183:2
192:18 200:23
201:19 207:1
213:19,20
214:5,6,19,20
217:1,6 218:20
218:23 219:1,2
220:5,12,14
221:2 228:14
229:8,19
230:16,17
234:18 240:6
240:11,20
241:7,11,12,18
241:19,22,24
243:12,13
245:7 256:4
267:18 268:19
269:13 271:22
273:10 274:13
**questions** 11:12
12:20 13:24
14:15,24 15:2
26:9 30:13
31:24 42:11,14
43:1 56:24
60:6,12,14
103:4 133:14
162:12 271:9

278:7
**quibbled** 259:2
**quick** 77:15
133:22 197:2
**quickly** 137:23
138:4
**quite** 166:10,10
268:20
**quote** 130:15
131:1 145:17
240:22
**quoted** 131:2

**r**

**r** 5:1
**racking** 45:8
**raise** 162:11
**raised** 9:16
269:14
**rajesh** 3:2
**ran** 80:20 81:5
81:24 101:15
141:9 158:4
165:10 166:4
168:4,5 169:23
174:2 187:22
190:6
**random** 60:22
157:3
**randomly** 61:3
**range** 59:1
110:6,10
133:19 134:5
154:24 244:12

**rapid** 132:11
132:22 133:6
133:11 135:15
**rapidly** 131:4
131:10,16
138:14
**rate** 58:18,22
109:21 110:24
159:4,6 267:7
269:1,5
**rates** 59:1
158:24
**rather** 91:14
98:21 128:5
129:19 130:21
134:22 162:24
272:13
**ratio** 58:2
210:18 242:21
**rational** 107:10
**reached** 20:13
23:13,14 24:22
25:11 27:5,17
29:22
**reaching**
128:11
**react** 143:7
**reacted** 137:12
141:10 144:11
145:3 148:20
**reacting** 147:20
147:22 152:5
**reaction** 136:22
137:14 139:8

139:20,21
143:4 150:21
151:5
**reactions** 144:9
154:12
**reacts** 147:7
148:10
**read** 36:17,18
57:6 64:18
67:13 69:11,24
70:5,20 71:3
71:12 72:5
74:11,14 75:14
76:10 77:3,11
77:14,16,19
78:11 80:15
81:12 89:23
166:15 213:20
225:15 230:2
262:18 281:5,6
281:12 282:5,6
282:17
**reading** 69:6
72:7 186:16
280:19
**ready** 36:17
**real** 120:1
197:10 263:21
**realities** 130:21
**realized** 172:18
**realizing**
151:10
**really** 26:19
71:4 81:10

106:12 117:8
134:20 152:7
153:11,11
205:4 250:21
**realm** 274:9
**realtime** 3:2
279:24
**reap** 80:1
**reason** 67:23
67:24 141:14
149:16 153:14
162:5 164:21
164:24 165:15
165:17 166:4
166:11 174:24
176:9 208:1
213:1 280:14
282:8 283:3
**reasonable**
114:23 115:8
128:7,23
131:12 136:23
169:4 171:11
192:1
**reasonably**
132:11,23
160:14
**reasons** 8:24
52:17 182:2
207:3
**reassess** 205:9
**rebuttal** 12:9
**recall** 13:16
17:4 18:9 45:1

51:9 56:8,15
57:11 70:6,20
81:8 173:20
203:1 211:23
215:6
**receipt** 280:18
**recent** 7:6 8:13
41:13 44:16
47:2,6 121:13
162:20 207:12
270:13
**recently** 55:18
164:6
**recess** 63:6
127:13 177:15
245:13 278:1
**recognized**
131:21 193:16
**recognizes**
161:2
**recommend**
72:4
**record** 5:6,17
7:1 28:15 63:2
63:4,10 90:9
94:23 127:9,11
127:17 177:11
177:13,19
205:6 245:9,11
245:17 277:20
277:22 278:5
278:11 279:11
282:9

**records** 58:10
**recoverable**
136:4
**recovered**
193:13
**recruiting**
134:18,24
**rectifying**
253:1
**reduced** 279:10
**reduction**
272:4
**reevaluate**
144:7
**refer** 10:10
87:23 133:11
142:3
**reference** 10:14
103:16 146:2
280:7 281:2
282:2
**referenced**
281:11 282:15
**referred** 55:5
86:7
**referring** 46:1
87:24
**refers** 86:2
**reflect** 130:17
145:20 187:6
**reflected** 128:6
**reflecting**
131:11,11

**reflects** 128:22 131:4
**refute** 185:19
**regarded** 171:21
**regarding** 73:21 140:19
**registered** 279:23
**registration** 86:13,14,18
**regression** 160:12,18,20 161:10 164:12 165:18 178:6 178:16 179:14 223:7,14
**regressions** 177:23 179:13
**regulation** 166:21
**reimbursed** 118:17
**reiterate** 23:1
**relate** 32:10 48:10,13 81:23 99:18 100:23 117:23 132:2 132:10,22
**related** 52:23 104:16 106:22 108:7 119:7 133:8 147:22 181:2 224:2,4

224:20 268:6
**relates** 80:6 108:11 170:24 268:2
**relating** 32:18
**relationship** 178:7,10,11,12 266:24
**relationships** 264:17
**relative** 279:13 279:15
**release** 4:11 140:12,19 141:2 159:2,13
**released** 137:20 140:15
**releases** 68:6 87:19 88:1 133:17
**relevant** 67:1 129:13 154:12 154:16 155:7 155:12,13,13 155:14,15,17 155:18,24 156:2,5,8,13,16 156:20 223:22 224:1
**reliable** 56:1
**relied** 54:23 170:4 171:6 173:13 174:16

**rely** 171:11,20
**remember** 53:15 78:17 188:15 212:1 245:22
**remote** 3:2
**remove** 100:16
**removed** 98:12
**removes** 104:15
**rendered** 19:21
**renowned** 171:8
**repeat** 26:5
**repeatedly** 218:20
**repeating** 26:3 26:11
**repetition** 150:1,17,24 152:8
**rephrase** 7:15 32:15 56:14 91:17 92:18 150:23
**rephrasing** 26:9
**replication** 190:1
**report** 4:9,13 8:1,7,10,19 9:18,20 10:12 10:12,21 11:2 11:6,10,13,14 11:21 12:2,5,9

12:10,16,19,21 13:6 14:6,21 15:5 16:20 19:6,9 20:12 21:3,14 22:1 22:19 23:4,11 27:12,13 29:7 29:11,15 30:12 30:15 35:20 37:2,7,14,16 38:11 41:5,15 41:21 47:10 49:5 50:3 55:21 57:21 58:1,11,19 59:11,14 60:2 60:22 61:1,6 63:13,16 65:11 65:14,19 69:6 71:5 72:1 76:5 76:12 84:12 86:3 87:22 88:13,15,21 89:7 90:14,18 90:22 91:19 92:4,6,11 93:5 93:8 94:4 118:21 127:23 129:6 143:12 145:1 147:17 159:20 166:13 166:14 167:19 178:19 184:1 197:7 203:23

**[report - reviews]**

204:8 225:7 227:13,17 229:1 230:24 238:13 248:15 248:18,22 249:3,10,18 250:12,13,22 251:7,11,12,18 252:8,17 253:24 254:4,6 254:8 268:5 271:23 275:20 275:24 276:4 276:11,17,18 277:1

**reported** 229:11

**reporter** 6:8 247:18 275:12 279:23,24 281:7

**reports** 18:15 20:11,11 21:6 24:2,6,19 25:8 25:20 27:2,9 27:19 37:4 46:17 47:21 48:3,20 59:15 60:15,19 61:3 67:15 74:4,20 74:22 75:3,6 75:12,14 76:2 76:7,9 105:19 139:16 186:17

199:6 213:6 224:24 225:4 225:23 226:12 228:16,19 271:2

**represent** 172:3 195:11

**representation** 176:11

**representatives** 170:6

**represented** 122:22

**representing** 2:2,14

**reputation** 197:24

**request** 75:3 88:17 282:9,11

**require** 180:12 183:9,10 261:7

**required** 280:24

**requirements** 86:12

**requires** 148:14 166:22 179:3 180:5,13 180:23 258:14

**reran** 179:13

**research** 31:11 83:8 108:13 109:3

**researcher** 160:12

**reserve** 258:22

**residual** 165:2 178:16,23 223:17

**respect** 54:6 70:21 191:17 191:18 194:16 257:22

**respective** 208:18

**respectively** 277:14

**respond** 9:17 187:13

**responded** 135:22

**responding** 139:3 187:15

**response** 118:6 149:2 150:8

**responsive** 218:22

**rest** 21:10

**restate** 148:15 229:18 230:16

**result** 167:22 185:13 266:18

**results** 20:17 72:1 101:13 145:10 168:7,8 168:8 170:19 172:18,20

173:24 179:19 181:12,16 189:16 190:12 250:24

**retail** 155:20

**retained** 40:6

**return** 87:21 165:2 223:17

**returned** 75:21 87:10 280:18

**returns** 136:9 136:12 166:24 178:17

**reveal** 96:13 108:24

**revealed** 96:1,2 229:13

**revenue** 197:13

**reversed** 96:3

**reverses** 95:13

**review** 8:13,15 29:18 31:23 59:19 78:7 88:5 163:24 205:9 280:12 281:1 282:1

**reviewed** 8:10 59:11,11,12,13 64:16 88:3,11

**reviewing** 36:11 70:8 78:4

**reviews** 44:12 87:16 140:13

161:5 167:11
229:6 277:9
**revise** 9:18
139:18
**revisions** 86:11
**ribbon** 195:17
209:5 212:12
212:18 213:24
214:23 216:22
271:18 272:4
**right** 11:7
28:13,13,20
29:12 31:8,16
38:19 39:5,13
43:9 44:13
45:12 46:15
54:16 58:7
64:20 69:7
70:23 74:21
82:12 84:10
88:2 95:23
96:6 99:4,4
100:4,22 110:2
111:2 131:5,6
135:11 136:10
141:4 142:10
142:19 146:12
148:5,11 149:6
149:9,12 152:1
153:16 157:4,8
157:15 160:18
160:19 165:6,9
165:13,14
166:3,9 168:16

169:10,12,13
169:15,19,24
171:17 174:21
175:4 176:1
177:24 178:18
178:19 179:1,2
179:10,22,23
180:2 182:20
184:17 185:3,6
185:7,23 187:2
190:8,11
191:11 196:6
204:1 205:19
205:20 207:24
208:18,19
209:14 210:1
222:5,13,22
228:24 230:21
231:8 232:21
233:18 235:21
237:11 244:4
245:7 247:5
248:20 249:22
250:18 252:22
255:16 256:16
258:20,20
261:9,12 265:2
267:24 276:1,2
**rise** 139:2
**rises** 149:1
**risk** 100:13
106:2,2,4
107:17,18
109:19 113:21

188:7 233:13
233:15,17,17
233:23,24
234:3,8,11,14
234:17,22,24
235:2,2,10,11
235:13,18,21
236:15 237:5,7
237:9 238:3,4
239:12,13,21
239:22 240:14
240:15 242:15
242:16 243:16
243:17
**risks** 116:20
**rmr** 1:24
**robust** 167:23
168:7 172:20
174:1
**robustness**
162:6
**rolling** 160:17
160:20
**romanette**
268:5 271:24
**room** 10:3 11:8
16:1
**rough** 207:8
278:15,17,18
**roughly** 164:11
**rpr** 1:24
**rubrics** 194:6
**rule** 223:5,15

**ruled** 223:16
**rules** 86:15,16
86:18 134:19
281:5 282:5
**run** 36:15 98:1
98:1,5,10 99:2
99:6,8,10,15
100:3,5,7,11,14
100:19 101:8
102:1,5,6
103:13 105:17
117:3 124:14
162:7,8,9,14
164:12 166:1
189:18 190:2,9
190:22 207:22
221:5
**running** 116:2
160:11,20
162:10

**s**

**s** 83:17,18
86:12,13,14,18
280:15 282:8,8
283:3
**s&p** 165:11,12
166:8 167:12
167:24 168:2,3
168:12,20,21
170:4 171:12
171:15,22
172:22 173:4
173:19,21

174:16 176:12
**s&p's** 170:4
  173:13
**s.a.** 46:2
**sadler** 2:9 6:4,4
**safe** 97:23
**sale** 209:12
  210:8
**sales** 155:20
**samer** 3:3
**sank** 98:9,10
**satisfactorily**
  6:14 279:4
**satisfactory**
  170:21
**saw** 71:16
  80:10 188:24
  199:7 215:7,8
  246:11
**saying** 22:2
  23:24 24:21
  55:4 61:16,19
  69:15 80:15,19
  125:5 130:16
  131:3 134:5
  137:21 145:18
  156:10 171:15
  171:22 192:19
  220:9 224:15
  234:5 244:10
  263:4 264:5
**says** 15:12
  30:22 68:9
  69:9 86:11

87:3,17 89:24
107:8,11 109:3
128:16,16,17
129:10 144:5
146:12,15
193:9,9 205:15
210:6 229:7
232:19 233:2
238:12 243:3
250:23 258:18
258:19 277:1
**scale** 203:12
**scan** 72:12
**scenario** 101:2
  101:3 102:10
  105:17 121:4
  122:3 124:14
  126:10 197:17
  202:16,23
  203:8,10,11
  210:3,14
  217:17 255:7
**scenarios** 200:2
  200:12 202:2,7
  203:3 211:15
  211:18 213:15
**scholarly** 49:23
**scholars** 108:13
**scholes** 197:20
  256:14 258:16
  258:21 259:12
  261:6 264:12
  270:9,14 271:7
  271:16 277:4,5

**scope** 12:18
  14:5,11 27:12
  238:10
**screen** 60:17,18
  206:8
**scroll** 69:19,22
**seal** 281:15
  282:21
**search** 68:12
  72:17,20 73:7
  80:11,14,18,20
  81:5
**seaworthy**
  98:11 112:15
**sec** 76:18,21
  166:21 169:1
  172:24
**second** 28:15
  64:4,5 90:13
  90:16 128:14
  138:24 139:6
  275:16
**section** 49:6,6
  74:19 89:12,13
  89:20 92:4,11
  92:15 128:14
  225:2 227:6
  272:3
**sections** 36:21
  37:3 213:5
**sector** 160:14
  165:19,21
  166:2,5,18,19
  166:20 167:4,8

170:7 171:19
172:4 176:11
223:10,11
**securing** 36:8
**securities** 14:1
  15:6 19:15,17
  25:4,13,14,24
  26:13 27:6
  33:2 35:2 40:8
  40:19,21 41:23
  46:2,19 49:8
  49:15 50:1,10
  50:24 52:21
  57:13,14,15
  89:15,21 128:7
  129:13 201:23
  224:12 225:9
  225:11 226:5,6
  228:10 275:19
**security** 23:17
  27:18 30:5
  49:18 83:8
  85:9 118:16
  128:21 145:19
  146:20 193:19
  195:14 196:17
  196:19 250:4
  251:3 255:9
  272:2,9
**see** 17:7 43:19
  46:9,13 61:13
  63:19 68:20
  69:19,23,23
  77:8 78:16

82:7 83:11,20 84:15 85:21 98:20 105:18 105:20 118:24 128:16 138:24 139:5,12 140:10,21 143:4 144:1,10 145:2 148:14 154:14 155:22 158:5,17 164:19 166:24 167:22 169:5 173:24 187:22 201:3,8 202:2 203:14 205:14 205:21 206:4 213:4 214:13 216:5,6 217:17 221:22 222:7 223:6,14 224:15,16 225:16 247:24 248:3,10,14,17 265:16,24 268:8 271:1 272:1,7 275:17

**seeing** 68:3 98:18

**seeks** 178:6

**seem** 218:19

**seemingly** 155:19

**seems** 228:2

**seen** 133:24 134:6 137:2 151:9 201:9 202:21 203:2 208:3 213:2

**select** 59:18

**selected** 61:4 237:22

**selection** 60:23

**sell** 79:24 126:11,20 195:21

**sellers** 273:14

**semann** 3:3

**semantically** 91:3

**semester** 155:11

**seminal** 81:22 82:2 84:21 138:7

**semistrong** 129:16,18,23

**send** 76:6

**senior** 34:17 36:5

**sense** 65:16 67:3,8 72:10 94:16 171:19 194:19 256:4 258:2 268:20 274:11

**sentence** 149:7 272:1 277:10

**separate** 95:23 104:3 158:1 159:18 160:13

**separated** 159:15

**separately** 189:7 274:3

**separating** 159:24

**september** 61:2 64:6 68:13 222:24

**series** 181:4,5 188:13 189:18 189:21 190:10 190:21 191:19 264:15 274:1,2 274:17

**services** 31:14 31:19 32:17 39:11

**set** 42:13 43:5 66:1 73:1,20 74:9 75:12 82:14 86:22 108:9,9 115:7 115:9 116:5 121:6,20 129:15 155:6

**setting** 37:2

**settle** 48:16

**seven** 88:9 157:12 158:2 158:11 159:1 159:13 252:10

**several** 30:4 45:18,18 70:6 70:21 209:23 261:7

**severe** 135:1

**shaked** 38:14 38:15,16,21 39:1,3,7,10

**share** 272:12

**sheet** 280:13 282:7,10,18 283:1

**ship** 97:18 98:2 98:3,8,9,12 99:1,18 100:9 100:15,15,23 101:18 103:9 104:14 106:18 109:24 110:15 112:10,14 115:24 116:14 116:16,19,24 117:20

**short** 83:20,22

**show** 83:24 87:1,4 139:22 189:14 247:12 275:6

**showing** 140:8

shown   280:16
shows   172:19
  172:23
side   20:3 46:18
  108:16,20
  163:8
sides   68:20
  278:15
sidley   1:18 2:15
  5:10,19,21
sidley.com   2:21
  2:22
signature   8:5
  279:20 280:14
signed   281:13
  282:18
significance
  159:1
significant   54:3
  138:23 139:5,7
  141:11 143:4
  143:14 144:3
  144:13 150:20
  154:11 158:7
  158:18 179:9
  185:10 231:2
  231:18,21
  277:6
significantly
  150:8 151:16
  151:19
signing   280:19
sills   1:5 5:14
  16:10 280:6

281:3 282:3
similar   36:24
  72:12 86:8
  249:17 250:14
  250:18 251:24
  254:8 256:21
  276:16
similarities
  276:21
similarly   1:6
simple   241:22
simply   11:4,18
  103:7 159:9,10
  202:5 216:12
  254:17
simultaneously
  177:2 219:10
sincerely
  280:21
single   33:11
  40:5,15 157:18
  157:19,23
  158:5 164:23
  164:24
sink   98:2 117:1
sinking   99:1,17
  100:13,15,22
  103:8 106:18
  110:15 112:11
sinks   98:3,8
  101:18 104:14
  109:24 116:1
  116:17 117:20

sir   6:24 7:3,17
  9:15 11:5,16
  13:3 15:2
  18:22 21:20
  22:13 24:9
  25:2 26:3,19
  27:14 28:4
  29:2,5 30:14
  34:14 40:14
  41:1,5 42:1
  44:10 45:7,23
  46:10 52:4,19
  53:8 54:13
  56:3,14 57:7
  57:16 58:20
  60:1,4 62:4,20
  63:12 64:17
  65:21 69:8
  74:18 75:9
  80:2 81:16
  86:20 88:11,20
  94:8 95:1
  97:16 98:24
  99:14 100:17
  102:13 104:19
  109:11 124:19
  127:19,22
  130:2,14 140:8
  140:17 145:13
  145:23 148:24
  154:10 170:24
  173:10 177:21
  199:15 200:13
  213:18 214:18

215:13,22
  216:8 217:6
  218:3,9 219:4
  220:12 221:9
  222:17,21
  230:15 240:4,9
  242:8,24
  243:10 245:19
  247:12 249:7
  252:4 253:23
  262:11 275:12
  275:16 276:3,7
  276:14,24
sit   64:15 98:16
  117:10 118:7
  164:17 203:2
sits   35:20
sitting   10:2
  11:7,19 17:13
  50:6 203:5
situated   1:6
situation
  112:24
situations
  117:17
six   47:14,21
  48:10 252:9
skeleton   37:2
sketchy   55:10
skilled   82:21
skim   69:21,22
skimmed   69:13
  69:15 70:13
  75:16

**[skimming - stated]**                                    Page 57

**skimming**
  75:19
**slightly** 130:23
**slow** 69:24 70:4
**slowed** 70:19
**small** 167:16
**smallcap**
  165:11 166:8
  167:13 168:12
  168:19 169:8
**smaller** 168:14
**sold** 118:13
  272:24 273:6
**sole** 31:9
**solely** 176:3,18
**solutions** 5:8
  280:1 283:1
**something's**
  109:4
**somewhat**
  130:20
**soon** 135:20
**sorry** 34:18
  38:24 51:23
  87:14 142:16
  145:22 204:3
  240:24 260:16
**sort** 36:19
  102:11 113:16
  122:20 225:20
**sorts** 66:11
**sought** 54:1
**source** 150:1,3
  152:8

**south** 2:16
**southern** 1:2
**space** 175:10
**speak** 62:21
**speaking** 5:7
  124:3 177:2
  219:10
**specialty** 19:15
**specific** 75:5
  96:23 105:6,11
  106:13 111:1,5
  117:9 135:13
  147:8,14 148:3
  148:3,10,20
  149:2 163:17
  165:23 166:2,5
  186:1 191:18
  209:14 228:14
  237:12 238:18
  240:1 243:20
  244:3,6 264:19
  273:18
**specifically**
  13:16 19:14
  21:24 60:4,16
  63:14 86:6
  89:18 106:8
  124:20 137:19
  140:18 147:19
  157:12 158:2
  159:1 161:1
  171:24 172:2
  174:6 215:6
  217:1 267:11

**specificity**
  239:4
**specifics**
  110:12 212:1
**specified**
  232:22 255:22
**specify** 196:7
  210:10 232:16
  233:5 237:14
  238:1 239:10
  239:19 240:1
  240:12,22
  242:3,9 243:14
  244:4 255:1
**speculation**
  115:5 174:23
  192:16 204:16
  205:13 263:16
**speed** 131:19
  131:20 132:6
  132:19 133:8
  133:16,16
**spelled** 15:4
**spells** 66:24
**spend** 37:20,20
  57:20 61:20
  62:3,14 70:8
  75:18 78:4
**spent** 57:24
  58:5,11
**squares** 177:23
  178:4,16
  179:21,22,24
  180:23 181:8

**stage** 47:22
  48:15 205:3
**stages** 207:23
**stale** 149:23
  150:6,10,15,17
  150:24 151:4,5
  151:11,13
  152:1,1,5,7,22
  153:11
**stand** 57:5
**standard** 59:22
  68:18 131:15
  131:20 132:18
  133:16 135:13
  162:12,13
  171:6 278:17
**standards**
  134:24
**start** 36:10
  37:2 43:24
  153:9 257:19
**started** 19:6
  172:22
**starting** 248:4
**starts** 63:17
  92:6
**state** 1:19 5:11
  7:1 19:5 90:11
  116:18 148:24
  281:10 282:15
**stated** 23:16,19
  27:19 91:7
  142:15 145:1
  148:16

**[statement - structure]**

**statement** 8:20 94:1 98:7 99:19 124:22 124:23 131:7 279:11 281:13 281:14 282:19 282:19

**statements** 117:2 118:4 185:2

**states** 1:1 89:1 89:12 167:21

**statistical** 137:11 158:24

**statistically** 141:11 144:2 144:12 158:6 158:18 185:10

**statistics** 179:15,18

**stein** 34:15 35:1

**stenographer** 6:19 28:14 51:12 74:10 83:15 102:18 152:20 278:14

**steven** 1:17 4:4 4:9,14 5:13 6:11 7:2 248:16 275:21 278:12 279:3 280:8 281:4,9 282:4,13

283:20

**stick** 100:17 109:15 176:15 271:23

**sticking** 123:13

**stock** 51:9 55:2 89:2 95:19 96:21 99:7 100:8 101:18 103:8,22 104:6 104:9,14,16,19 106:3,7,21 107:2 109:5,23 110:23 117:1 117:23 118:10 118:11,12,13 119:5,12 120:6 120:15,18 121:1,6,7 123:14,16,23 123:23 124:5,8 124:16,17 125:1 134:19 135:2,22,24 141:8 144:2 147:7,13 148:2 148:10,19 149:1,20 150:7 150:10 151:2 151:16,19 152:13 153:17 153:19,19,24 154:11 156:6 156:17,21,24

157:6,9,10 165:22 166:24 185:12 186:2 186:14 187:4,6 187:7,13,14,15 187:17 189:5,5 189:13 190:15 190:18 191:5,9 191:23 193:10 193:11 196:15 197:23 200:2,8 200:11 202:1,7 202:15,23 203:3,7,14 208:22 209:6 209:10,12 210:2 211:11 211:17 213:14 214:9 215:23 216:1,2,4,5,7 216:20 217:16 217:18 218:4,6 218:6,8 221:16 221:17 223:2,6 223:18 224:5 231:8 232:3 233:14 234:23 235:17,19 236:6,13,23 237:6,8 238:2 239:11 240:13 242:14 243:4,5 243:15 244:9 246:5 256:22

261:11,20 262:12 264:23 265:14,23,24 266:3,4,17 267:6,10,18 268:6,11,15,24 269:3,7,9,9,12 269:16,22,23 271:9 273:12

**stockholders** 188:4

**stocks** 156:5 190:1 191:7 192:4 272:12

**stop** 23:15 71:17

**store** 155:20

**story** 122:4

**straddles** 161:19 162:1 162:17

**street** 1:19 5:11

**strike** 116:13 189:1 240:9 267:6 269:6 273:19 274:24

**strong** 180:12 191:4 224:3

**structural** 163:7,9

**structure** 180:4 181:1 183:16 194:3 195:5

students 60:13
155:16
studied 198:21
studies 137:9
137:10 138:2
152:6 158:4
study 136:9,24
141:9 149:1,5
156:23,24
157:5 161:12
177:22 183:20
185:18 203:23
204:8,13,22
205:2,10
206:22
studying 134:1
subject 22:4,19
24:3,20 25:9
25:21 27:3,9
28:10 35:5
60:11 130:24
174:20 175:2
submission
275:18
submit 21:6
23:11 29:10,15
46:24 58:13
submitted 12:5
20:10,12,16,20
21:3,14 22:3,9
22:15 23:4
24:2,5,9,20
25:3,9,20,22
26:12 27:3

29:7 88:13,14
225:24 226:12
227:17 228:16
228:19 248:18
submitting
22:1
subscribed
281:10 282:14
283:21
subsequent
65:14 211:13
substance
110:19 184:12
substantial
48:21
substantially
250:14 251:23
254:7 276:16
successful
50:18 52:6,10
successfully
202:3
succinctly 68:1
suffer 274:10
suffered 121:14
122:20
suffice 113:19
sufficient 25:12
suggest 85:11
151:6 230:15
268:10
suggesting
11:17

suggests 191:6
suite 2:5 280:2
summaries
76:6
summarize
9:10 10:5,16
summarizing
68:1 146:17
summary 91:11
91:15 92:5
197:3
superior
263:11,14
264:4 280:1
supplement
8:17 9:18
supplementing
250:23
supplying
79:15
support 9:10
10:5,16 12:22
53:6 161:13
173:8
supported
189:15
supreme
145:18
sure 7:11 11:18
17:23 18:9,17
19:13 20:22
21:20 26:21
35:9,10 38:5
38:19 43:2,4

45:12 55:7
69:18 72:19
77:1 87:15
97:22 98:2
101:12 119:1
120:1,1 142:5
151:4 164:20
169:22 170:13
181:18 211:24
217:7 228:13
246:24
surmising
168:20
surprises 97:10
97:11
surprising
144:6 145:9
survive 175:9
susceptible
116:12 176:19
swear 6:8
switch 30:11
130:23
sworn 6:16
279:6 281:10
281:13 282:14
282:18 283:21
synonymous
194:15
systematic
107:12

**[t - tests]**

| t | | | |
|---|---|---|---|
| **t**  2:10,20 179:15,18 | 210:9 211:3,8 225:16 229:20 230:18 246:15 | **techniques** 54:17 105:14 125:18 254:18 | 167:15 168:5 174:2 187:22 189:9 190:6 |
| **tabak**  161:13 | **talker**  204:5 | 254:21 255:2 | 191:3 |
| **take**  5:12 20:21 24:16 62:22,24 68:19 98:24 101:7,24 103:3 115:22 119:2 119:20 127:5,7 127:8 134:2 155:10 177:8 192:23 195:24 210:6 214:10 236:22 241:20 245:6 259:22 263:23 | **talking**  15:24 20:23 21:21 26:22 28:8 39:19 106:9 109:9,18 112:6 112:11 113:21 116:4 119:6 124:21 140:18 173:10,13 201:18 213:11 213:13 220:17 233:20 261:15 | 264:9,14,20 **tell**  17:10 19:14 83:1 110:13,17 112:9 125:22 126:13,20 193:17 194:24 209:9 218:5 258:17 269:11 277:11 **tells**  195:1,8 209:17,19,22 | **testa**  1:11 **tested**  158:17 **testified**  6:17 27:20 34:13,18 34:20 41:17 45:15 134:13 212:9 245:19 **testify**  238:13 279:6 **testifying**  34:1 34:4,8 220:4 |
| **taken**  63:6 97:22 98:1 127:13 177:15 231:6 232:1,9 245:13 266:23 267:22 278:1 | **talks**  194:2 **targets**  213:4 **tasks**  36:15 **tautology** 156:19 **teach**  60:10 129:3 155:16 | **tempered** 130:20 **tempted**  217:24 **tend**  138:4 **term**  78:22 80:20 94:17 95:2,5,7 | **testimony** 16:23 18:23 26:20 42:1,4,6 42:9,16,21 43:10,12,17,21 44:19 45:3,17 46:5 202:13 |
| **takes**  69:21 114:3 196:14 | **teaches**  132:18 **teaching** | **terms**  81:5 85:1 114:8 131:23 | 226:4 279:11 281:6,7 282:6 |
| **talk**  14:16 44:21 61:14 72:2 156:23 169:20 256:12 | 129:21 **team**  58:22 59:16 60:18 61:8,12,17,21 62:12 82:19 | 132:10 150:15 189:1 194:10 205:9 209:23 232:22 259:13 **test**  36:23 37:1 | 282:9,12 **testing**  116:18 116:19 117:3 117:21 118:4 119:8,12 141:20 190:9 |
| **talked**  90:17 113:4,6 148:8 168:11 179:20 203:22 204:7 | **technique** 54:17 111:1,5 111:8,16 | 38:10 53:2 110:24 116:2 143:3,23,23,24 144:1 145:10 148:14 162:7,8 | **tests**  36:15 81:24 85:2 98:1,1,5,10 99:2,6,8,10,14 |

**[tests - time]**

| | | | |
|---|---|---|---|
| 100:3,5,6,11,14 | 221:11 258:9 | 111:4 115:6,9 | 270:13 271:1,2 |
| 100:18 101:8 | 258:11 259:16 | 115:9 116:5 | **thinking** 13:10 |
| 101:15,23 | 273:7,11 | 117:7,8,10,15 | 44:4 |
| 102:1,5,6 | **thick** 197:1 | 117:15,18 | **third** 45:11 |
| 103:12,14 | **thing** 20:23 | 118:24 119:18 | 74:4 97:1 |
| 104:18,21 | 21:21 26:22 | 122:15 125:8 | 272:2 |
| 108:1 109:19 | 60:10 66:24 | 130:8,10,15 | **thirty** 280:18 |
| 138:17 189:13 | 95:13 98:17 | 131:14 132:14 | **thought** 22:23 |
| 189:18 190:2 | 132:12 156:10 | 132:15 135:10 | 22:24 99:8 |
| 190:11,22 | 195:16 200:4 | 138:6,11 | 108:13 112:21 |
| 192:3 | 274:22 | 139:10 142:9 | 128:13 132:17 |
| **text** 72:17,20 | **things** 79:4 | 142:14 146:10 | 136:6 151:11 |
| **textbooks** | 92:16 96:9 | 148:16 152:3 | 169:3 183:11 |
| 155:1,2 197:1 | 103:5 108:3 | 161:21 162:10 | 218:1 |
| **textual** 80:18 | 131:24 132:24 | 166:18 167:19 | **three** 15:20,23 |
| **thank** 6:19 | 139:11 147:4 | 168:18,21 | 51:8 58:2,5,5 |
| 278:8 | 155:15 197:24 | 173:10 181:11 | 60:23 61:3 |
| **thanks** 51:17 | 206:14 223:15 | 181:11,18,19 | 95:22 166:8 |
| **theoretically** | 224:9 263:18 | 182:3 191:24 | 252:5,9 |
| 219:15 | **think** 10:24 | 192:1 193:7,23 | **tied** 187:6 |
| **theory** 15:10 | 11:11,23 20:16 | 193:23 194:2 | 188:11 189:4 |
| 49:10 89:17 | 24:5,8 28:18 | 194:12,14,17 | 190:15 |
| 108:9,11,20 | 30:6,7 33:17 | 196:10 203:16 | **ties** 189:24 |
| 151:19 153:4,6 | 35:13 40:23 | 207:2,11 208:7 | 191:7 |
| 153:16 154:4 | 44:2,15 45:12 | 213:18 216:15 | **time** 5:9 13:23 |
| 156:15 189:10 | 47:4,13 48:24 | 218:5 225:3 | 32:23,23 33:15 |
| 193:15 199:19 | 49:17 53:22 | 226:15 227:24 | 33:15 37:20,20 |
| 200:17 201:11 | 55:8 56:11 | 229:19,24 | 39:5 40:11 |
| 202:10,19 | 57:2 62:19 | 232:23 233:6 | 53:21 54:21,23 |
| 208:16 212:7 | 65:17 73:8,17 | 235:6 238:9 | 55:8 57:20,24 |
| 212:20 213:9 | 75:23 76:23 | 240:5 241:22 | 58:6,10 61:20 |
| 213:12 214:2 | 81:6 86:1,5 | 246:20 249:13 | 62:14 63:3,10 |
| 215:1 217:3,12 | 89:24,24 90:3 | 251:6,14 | 65:10 66:24 |
| 218:14 219:23 | 90:5 98:15 | 252:22 270:2 | 68:16 70:8 |

75:18 76:12,24
77:23 78:3
105:17 107:15
112:23 114:10
114:18 118:11
127:10,17
133:10 135:13
142:15 177:8
177:12,19
181:4,5,13,16
195:13 197:10
207:9 208:1
210:7,8 235:24
245:10,17
246:20 263:21
264:15 265:3
267:6 268:20
268:21 269:4
273:19,22
277:21 278:5,8
278:10
**times** 7:3 21:6
30:4 47:8 58:6
75:22 208:3
218:17 241:16
270:11
**tina** 35:23 36:7
**titanic** 97:19
116:5,10
**title** 248:15
**titles** 60:20,21
**today** 9:17 10:2
10:16,20 11:19
16:1 17:14

50:6 60:2
62:15 63:14
65:17 112:13
148:1 200:23
203:5,22
225:16 271:10
**today's** 5:9
7:19 59:9 60:3
61:9 62:4,8,13
64:18 247:20
275:13 278:12
**together** 36:6
36:19 170:5
171:18 270:16
**told** 97:7,24
98:19 100:6,11
101:21 102:1,2
102:5,6 104:10
123:3 126:3
203:11 211:9,9
229:24 242:2
**tolerances**
188:7
**tomes** 197:1
**tonight** 98:15
**took** 134:10,19
135:8 138:18
141:3,15
142:23 143:18
144:21 231:5
231:24
**tool** 210:2,10
210:12,16,17
210:18,18,22

210:24 211:1
216:9 217:8
219:6 220:10
220:20,23
221:9,19 222:4
222:15 232:17
232:21 233:6,8
237:15 238:1
239:3,3,4,6,10
240:13 242:3
242:10 243:14
243:20,21
244:3,4,6,7,8
246:4 255:6
**toolkit** 196:18
196:22
**tools** 104:9
105:21,24
106:6 195:13
196:5,8,11,13
196:18,22
197:3,4,9
198:4,9,12,17
198:21 199:2,7
199:9,16 200:4
200:9,10,16
201:3,9 202:3
202:6,8,14,22
203:6 209:23
211:14,20
215:10,15,21
216:2 217:18
218:11 219:16
219:17 220:7

220:16 221:15
221:16,22
222:10 224:14
237:19 244:12
244:14 250:1,5
251:1,17
253:14
**top** 248:4
**topic** 28:21
225:24
**tossed** 123:8
**touching** 279:7
**tower** 176:12
**track** 71:2
219:12
**trade** 15:6
**traded** 51:9
52:22 89:2
145:19 167:2
167:21 262:18
275:2
**trades** 187:4,18
**trading** 30:5
128:7,21 160:7
179:7 191:22
226:8
**trained** 71:15
94:12
**transcribed**
281:7
**transcript**
26:24 280:11
280:12 281:5
281:12 282:5

282:11,17
**transcripts**
86:21,23 87:11
87:20 88:1,4
**transparency**
197:24
**trial** 43:20,22
44:19 45:2,11
**tried** 172:17
**triggered**
120:11 122:10
**troubling** 235:6
**true** 26:2 48:13
92:11,20 93:3
93:11,15,16
153:8 158:4
235:23 272:22
279:11
**truly** 149:23
150:18 151:4
151:13,24
154:3 156:13
**truth** 97:7,14
98:20 99:10
104:10 120:12
122:9,13,22
123:3 124:6,15
203:15 236:24
279:6,7
**try** 22:15 25:6
26:18 60:5
126:11 201:10
**trying** 14:11,17
14:18 26:7,8

26:19,20 42:23
113:14 135:11
208:10 219:13
230:15
**tuesday** 139:19
**turn** 8:4 35:19
53:16 63:15
88:22 89:9
247:22 248:2,7
248:13,21
249:3 275:16
276:3
**turning** 41:5
**turns** 125:24
179:18 205:5
**two** 34:12
40:23,24 42:2
55:19 62:5
64:3 73:1
90:17 91:11,18
108:12 118:15
126:5 133:14
139:21 144:17
145:4 157:20
159:11,15,18
159:24 160:4
166:5 193:14
252:9 256:18
256:24 258:6
259:14 260:3
270:12,21
271:20 273:24
**type** 53:20
130:5 137:24

138:18 164:24
193:19 237:15
**types** 80:5
114:15 133:23
133:24 175:4
**typical** 7:10
15:2 58:4
184:10
**typically** 58:2
206:21

**u**

**u.s.** 167:2
**uh** 109:22
234:20
**ultimately**
20:20 29:10
35:19 38:10
53:2 54:10
56:18 115:19
118:17 178:2
**umar** 2:18 4:5
5:18,18 6:23
7:24 9:3,14
11:3 12:14
14:2,9,14,23
15:1,14 16:8
18:18 19:3
20:1 21:11,19
22:12 23:2,9
24:7 25:18
28:3,17 30:1
31:3 33:5,13
34:2 35:3,15

37:23 39:18
40:1 43:18
45:6 47:5,15
48:1,7 49:4
50:5,16,21
51:6 52:3,18
54:12 55:11
59:3,24 63:1
63:11 64:13
65:5,12,20
66:13 67:7,16
69:4,14 70:3
70:12,17 71:19
72:3,15 74:2
74:17 75:2,17
76:14 77:9,17
77:22 78:13
79:1 80:12
82:5 84:2
85:10,18 90:4
91:9,16,22
92:3,24 93:23
96:11 98:23
99:13 100:1
103:2,23 104:4
104:11 105:2,9
106:5 109:10
110:8 111:7
113:18 114:14
114:22 115:13
115:21 117:12
117:19 118:3
120:23 121:11
121:24 123:21

**[umar - understood]**                                                      Page 64

| | | | |
|---|---|---|---|
| 125:15 127:7 | 191:15 192:6 | 251:20 252:3 | 251:3 268:1 |
| 127:18 130:13 | 192:11,22 | 252:18 253:3 | 273:7,11 |
| 131:17 132:9 | 193:20 195:9 | 253:11 254:14 | **underlying** |
| 132:20 133:5,9 | 198:10,20 | 254:16 255:12 | 187:4 189:4 |
| 133:18 134:8 | 199:13 200:5 | 256:11 257:8 | **understand** |
| 135:14,23 | 201:7 202:4,20 | 258:4 259:9 | 7:13 34:4 |
| 136:8 137:1,18 | 203:4,18 204:5 | 260:1,18 | 42:19,23,24 |
| 138:16 139:22 | 204:6,19 205:7 | 262:10 263:12 | 43:2 68:2 71:7 |
| 140:5,7 142:11 | 206:20 207:13 | 263:24 265:11 | 79:2 95:11 |
| 142:14,17,21 | 208:6,12 | 267:2 268:17 | 109:11 119:21 |
| 143:16 144:15 | 209:21 211:19 | 270:7 271:14 | 124:3 137:21 |
| 145:12 146:8 | 212:2,14 213:7 | 272:21 273:16 | 159:9 204:4 |
| 147:24 148:7 | 213:16 214:17 | 273:23 274:6 | 220:13 269:2 |
| 149:15 150:22 | 215:12 216:24 | 275:5,11 | **understanding** |
| 151:22 152:24 | 217:22 218:21 | 276:23 277:19 | 78:21 93:18 |
| 153:21 158:22 | 218:24 219:7 | 278:6,18 | 95:4 129:14 |
| 159:8 160:6,16 | 219:14,22 | **unaware** | 163:24 213:18 |
| 161:23 163:2 | 220:2,11 221:8 | 104:17 230:10 | 234:19 |
| 163:16 164:2 | 222:1,16 | **uncertain** | **understands** |
| 165:1 170:22 | 224:22 225:21 | 112:24 | 233:6 |
| 171:14 172:13 | 226:10 227:14 | **unchanged** | **understated** |
| 174:3,18 175:1 | 230:13 231:16 | 168:8 | 233:13,15 |
| 175:12,22 | 232:8,15 234:2 | **unclear**   26:24 | 234:4,22 |
| 176:14 177:7 | 235:16 236:4 | 229:19 | **understatement** |
| 177:10,20 | 237:3,13,23 | **under**   37:21 | 233:16 234:17 |
| 180:7,14,21 | 239:18 240:3 | 38:10 51:2 | 234:24 235:1 |
| 181:14,20 | 240:19 241:5 | 57:18 68:8 | 235:18 237:7 |
| 182:5,16 183:4 | 241:13,17 | 85:23 124:2 | 238:3 239:12 |
| 183:19 184:2 | 242:4,7,12 | 154:22 194:18 | 239:21 240:14 |
| 184:16 185:9 | 243:22 245:8 | 198:5 199:9 | 242:15 243:16 |
| 185:20 186:6 | 245:18 246:2 | 200:2,11 202:1 | **understood** |
| 187:16,24 | 246:14,23 | 202:7,15,23 | 33:6 116:7 |
| 188:8,22 | 247:11,17 | 203:3,7 210:2 | 123:10 140:24 |
| 189:19 190:5 | 250:10,19 | 211:17 213:14 | 159:23 |

undertake 12:1 230:20
undertaken 250:3
undisclosed 79:10 106:2 203:13
unf 167:6
unfi 4:10 49:8 73:12 86:21 89:1,2,15 157:5,10,13 165:23 167:14 167:16 168:14 168:18,23 169:14,16 170:3,11 171:4 173:17 174:14 175:20 187:1 188:2,14 189:5 221:24 249:14 249:14 252:8 252:17 253:1,5 253:13 255:10 256:22 266:17 273:18 274:1 275:1 277:1,18
unfi's 93:19 140:11 165:22 166:6 189:14 266:20 267:19
unfold 98:20
unique 47:9 175:7,8 225:17

226:17 227:15 228:20 274:18 274:20
united 1:1,10 5:14 28:23 167:21 280:6 281:3 282:3
university 30:20 45:9,10 83:9 134:15
unrealistic 192:1
unrelated 224:8 231:2,5 231:11,18,21 231:24
unreliable 205:24
unsustainable 229:16
upper 167:18
uptick 47:2
use 9:17 54:18 57:1 106:6 114:16 129:7 129:22 136:12 161:24 162:3 162:15 163:7 163:14 166:19 180:16,19 182:18 197:4 199:8 202:21 204:12,21 205:10 206:21

207:15 210:1 210:10,19,22 215:5 216:1 219:6,15 220:7 223:12 242:21 242:23 243:14 244:16,17 251:18 257:7 257:13,21 258:18 261:23 262:22 263:7 271:11
used 9:10 10:15 49:19,20,21 82:10 89:19 91:6 105:15,22 111:2 114:24 125:22 130:6 132:16 136:24 157:9 160:8 161:11,21 162:13,13,23 163:11 164:4,7 164:14 165:4 172:17 173:22 173:22 178:5 193:24 196:8 196:18 197:8 198:9 201:5,22 201:22 202:6,9 202:14 203:6 204:9 209:7 212:4 214:8 215:5,7 216:9

216:10,13 217:8,9 218:7 218:10,12 219:18 220:8,9 220:18 221:10 221:15 238:21 238:23 242:11 242:13 244:13 250:2 251:1 254:21 256:14 258:6 259:14 260:3,20,23,24 261:1 264:10 264:11 271:3,5 271:17,20,21 276:16
uses 136:9 166:20 250:13
using 10:5,16 49:8 89:15 105:24 161:9 162:17 165:11 168:6 174:2 177:23 180:8 195:13 196:4 199:7 200:4,8 201:3,9 211:14 211:21 213:3 215:7,9,15,21 217:18 224:14 228:3
usual 13:24 60:12 66:10

**[usually - videographer]**                                    Page 66

**usually**  15:5
  29:23 46:21
  50:2 67:24
  68:19 69:20
  102:10 135:11
  136:20 207:24
  256:23 265:13
  265:14 271:2

**v**

**v**  268:5 271:24
  280:6 281:3
  282:3
**vale**  52:20,21
  53:7,10
**valet**  45:24
  46:1
**valid**  53:3 91:5
  179:15,17
  183:3,7
**validation**
  152:9
**validity**  178:15
**valuation**  34:24
  53:19 54:15,17
  55:6,8,13
  94:19 95:19
  104:8 105:5,15
  114:1,2,3
  121:4 124:4,13
  124:15 125:18
  154:12,16,19
  154:20,22
  155:1,4,12,24

156:2,13,20
196:17 197:2,4
197:8,12
199:23 201:3
202:15,22
210:16,17,18
212:10,23,24
213:5,14 214:8
214:14 215:8,9
215:10,18,19
216:3,8 217:8
220:20,21,22
220:23 221:3,3
221:4,4,14,22
222:7,15
223:22 224:14
224:18 230:20
239:2 244:14
244:16,17,18
245:21 246:4,6
246:22,22
247:1 250:1,2
251:1,17
254:18,20
255:2,6 267:9
271:9
**valuations**
  31:20,21,23
  54:23 139:18
  214:10,13
  255:7
**value**  53:17
  98:11,12 122:6
  122:14 155:7

156:8,16
197:13 199:9
200:1,10 202:1
202:7 203:2,7
203:14 211:17
214:8 215:23
216:5,20
217:16 218:4,6
218:7 221:16
221:17,21
224:1,13 243:4
243:5
**valued**  121:5,7
**valuing**  196:18
  200:8 210:2
  211:11 215:24
  216:2,4,7
  217:17 244:8
  246:4
**variable**  267:12
  268:1,23 269:8
**variables**  156:4
  178:7,8 267:6
  267:8 269:3
  275:3
**variation**  133:3
  133:15,19
**varied**  189:1
**varies**  47:1
  71:23
**variety**  52:17
  94:13 105:14
  213:15 237:19
  264:19

**various**  32:11
  122:17 188:18
  197:22 250:5
**vast**  39:21,23
  207:16
**verbiage**
  130:10
**verification**
  152:9
**verified**  184:6
**verify**  86:5
  159:11
**veritext**  5:8
  280:1,7 283:1
**veritext.com.**
  280:17
**versus**  5:14
  37:8 113:8
  121:6 124:6
  163:19 189:2
  235:14 238:3
  239:12,22
  240:15 242:15
  243:16 269:9
**vf**  1:8
**video**  5:12
**videographer**
  5:5,7 6:7 63:3
  63:9 127:10,16
  177:12,18
  245:10,16
  277:21 278:4
  278:10

**[videotaped - witness]**

**videotaped** 1:16
**view** 264:1
**villanueva** 35:23
**violated** 134:18
**virtually** 20:4 22:2 89:19 224:10 227:7 250:4 255:8,9
**volatilities** 262:5
**volatility** 160:15 178:17 178:23 181:3,6 183:17 223:12 223:13,15 261:11,19 262:2,3,12,15 262:17 263:1,5 263:20,22 264:2,3,18,20 264:23 265:9 265:15 266:5 266:10,17 267:1,7,10,11 267:19 268:2 269:14,15,17 269:18,22
**volume** 73:19 73:22
**voyage** 97:23
**vs** 1:8

**w**

**w** 1:11
**wait** 74:6 250:21 254:11 267:15
**waived** 280:19
**wander** 119:18
**wandering** 274:9
**want** 9:17 11:15,18 14:4 21:20 26:21,24 29:2 30:12 38:18 43:2 55:16 56:10 57:12 60:13 66:19 67:21 74:10 77:24 79:6 100:17 107:24 111:17 117:10 119:24 120:1 125:4,6 125:11 126:17 138:22,24 139:5,11,22 144:19 152:2 155:4 163:7 165:24 167:7 167:10 168:21 172:15 173:2 186:16 206:4 227:21 241:23 258:22 276:10

**wanted** 63:15 78:16 167:22 169:5
**wants** 241:18 241:24
**way** 34:6 53:16 62:20 91:2 93:9 94:6 95:8 119:24 124:3 125:5,7,11,12 125:14 126:18 126:22 145:10 146:24 162:9 168:6 190:16 194:14 195:19 195:20 201:19 209:1,3 228:2 234:4 235:5 238:7,9 240:5 256:6 269:18
**ways** 102:15 125:14 162:11 261:17 269:17
**we've** 31:21 32:6 37:1 109:18 112:6 173:12 203:22 204:7 211:8 270:15 271:9 275:13
**wears** 45:13
**weeks** 7:7 42:2
**weigh** 263:19

**weight** 53:6
**welcome** 177:21
**went** 144:17
**west** 176:7 178:1 179:5,14 180:9,11 181:9 181:12 182:3 182:20 183:11
**whatsoever** 150:5 170:19
**wheelhouse** 121:9
**whichever** 269:18
**wide** 94:13 105:14 154:24 165:8 199:9 213:14 237:19
**widely** 91:6 136:23 161:11 238:20 244:13 251:1 271:5
**wilson** 138:8
**window** 161:19 162:17
**windows** 161:15
**witness** 2:2 4:3 5:24 6:3,6,9,12 44:12 51:14 74:6,12 83:17 87:16 127:5 140:13 142:19

161:5 167:11
229:6 277:9
279:12,17
280:8,11 281:1
281:4,11 282:1
282:4,15
**witness'** 280:14
**wolke** 2:7 5:22
5:22 7:17 9:1
9:12 10:7,22
12:12 13:14,18
13:21 14:4,13
14:20 16:7
18:13 19:2,23
21:4,16 22:7
22:22 23:7
24:4 25:16
27:24 28:12
29:17 31:1
33:3,9,23
34:21 35:7
36:3 37:9
39:16,22 43:14
45:4 46:20
47:12,23 48:4
48:11 49:16
50:15,20 51:5
52:14 53:11
54:20 58:24
59:20 64:11
65:3,9,15,23
66:22 67:11
69:3,12,17
70:10,15 71:13

71:22 72:9
73:24 74:24
75:15 76:11
77:5,12,20
78:9,24 80:8
81:20 84:20
85:16 90:3,23
91:13,21 92:1
92:22 93:21
96:5,16 97:17
99:3,20 102:14
102:20 103:10
104:2,7,23
105:4,13
106:10 107:5
110:3 111:3
113:11 114:11
114:19 115:4
115:16 117:5
117:14 118:2
119:9 121:2,17
122:2 123:19
125:2 130:9
131:13 132:1
132:13 133:1,7
133:13,20
134:12 135:16
136:5,15 137:5
138:1,20 142:8
142:13,16,18
143:2,20
144:24 146:5
147:16 148:6
149:13 150:13

151:8 152:15
153:3 155:9
158:13 159:3
159:19 160:10
161:17 162:19
163:4,22
164:16 170:12
171:5 172:11
173:18 174:15
174:22 175:5
175:19 176:4
176:23 177:4,9
180:3,10,18
181:10,17
182:1,10,24
183:14,23
184:15 185:8
185:15 186:3
187:9,20 188:5
188:20 189:8
189:22 191:12
191:20 192:10
192:15 193:5
194:22 198:7
198:18 199:5
199:21 200:21
201:14 202:12
202:24 203:9
204:3,15,24
205:12 206:24
207:10,18
208:9 209:15
211:7,22 212:8
212:21 213:10

214:4 215:2
216:14 217:13
218:15 219:5
219:12,20,24
220:19 221:13
222:12 223:4
225:13 226:3
226:20 229:5
229:23 231:9
232:5,13
233:19 235:4
235:22 236:19
237:10,17
238:5 239:14
239:23 240:16
240:21 241:10
241:15 242:2,5
242:11 243:18
245:1,23 246:9
246:18 247:3
249:23 250:17
251:13 252:1
252:15,21
253:7 254:11
255:4 256:2
257:3,23 259:7
259:18 260:6
261:16 263:8
263:15 265:5
266:22 268:14
270:1,24
272:19 273:9
273:21 274:5
274:19 276:20

277:8,16 278:9
278:16 280:5
**word** 38:11
78:12 95:17
133:15 146:15
193:24
**wording** 271:2
**words** 26:4,6
37:11,14,15
81:1 132:15,16
**work** 12:4 13:5
17:17 32:22
33:1,8,14 34:7
36:20 37:19
40:17 48:18
49:2,3 59:5
143:11 153:10
222:6
**worked** 16:3,15
17:1 36:6
108:14
**working** 18:20
81:21 190:4
**works** 143:23
**workspace**
83:13,18
**world** 153:6
171:8 196:19
196:20 235:9
235:15 236:24
243:5,6
**worst** 108:18
108:19,22,22
109:6

**worth** 55:3
162:21 218:6
**wright** 2:8 6:1
6:1
**write** 12:21
65:18 225:6
**writing** 65:14
279:10
**written** 12:18
37:4,14 49:23
155:1 270:16
**wrong** 56:1
97:3 107:9
115:8,20
161:18
**wrote** 19:8
55:18 65:10
76:12 118:9
129:11 178:19

**x**

**x** 113:3

**y**

**y** 113:3
**yeah** 14:9
22:21 31:21
33:24 52:15
80:17 115:17
123:2 143:13
152:2 155:19
161:18,18
162:20,20
163:23 181:24
187:21 198:14

228:1 244:14
251:6 266:23
273:10
**year** 30:4 46:18
47:1,1,7,19
68:19 160:8,21
164:11,11
**year's** 162:21
**years** 16:24
17:2,5,24 19:8
19:10 33:12
41:18 42:5,10
42:16 43:11,23
44:1,6,14,17,20
44:24 45:15
46:13,16 47:2
47:6 53:13
55:10 65:24
82:1 85:6
227:11
**yesterday** 8:14
59:17 61:15,17
62:16,18
**yesterday's**
62:9
**york** 1:2

**z**

**z** 113:3
**zero** 40:23
48:21 106:19
106:24 109:20
112:12

**zoom** 3:3

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.