# Exhibit M

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

DAN SILLS and GEORGE DICK,            )
individually and on Behalf of    )
All Others Similarly Situated    )
                                 )
            Plaintiffs,           ) No.
                                 ) 1:23-cv-02364-JGLC
vs.                              ) -VF
                                 )
UNITED NATURAL FOODS, INC.;      )
J. ALEXANDER; MILLER DOUGLAS;    )
JOHN W. HOWARD; and              )
CHRISTOPHER P. TESTA,            )
                                 )
            Defendants.           )

The videotaped deposition of

PAUL ZUREK

taken before JO ANN LOSOYA, CSR, RPR, CRR, at One South Dearborn, Chicago, Illinois commencing at 8:55 A.M. on August 5, 2025.

Page 1

PRESENT:

GLANCY PRONGAY & MURRAY LLP
GREGORY LINKH Esq
230 Park Avenue
Suite 358
New York, NY 10169
(212) 682-5340
Glinkh@glancylaw.com

and

GLANCY PRONGAY & MURRAY LLP
PAVITHRA RAJESH
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
Prajesh@glancylaw.com
        Appeared on behalf of Plaintiffs.


SIDLEY AUSTIN LLP
NILOFER UMAR
CLAIRE LEE
1 South Dearborn,
Chicago, Illinois 60603
Numar@sidley.com
Claire.lee@sidley.com
        Appeared on behalf of Defendants.

VIDEOGRAPHER:  BEN DIXON, CLVS

STENOGRAPHICALLY REPORTED BY:
JO ANN LOSOYA, CSR, RPR, CRR
LICENSE #:  084-002437

EXAMINATION

| Witness | Page | Line |
|---|---|---|
| PAUL ZUREK Ph.D. | | |
| By Mr. Linkh | 7 | 6 |

* * * * * * * * * * * * * *

Page 3

INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Report of Dr. Paul Zurek | 8 |
| Exhibit 2 | Report on Market Efficiency and Damages Methodology by Professor Steven P. Feinstein | 11 |
| Exhibit 3 | Report from CL King, UNFI-0070113 | 76 |
| Exhibit 4 | Guggenheim report, UNFI-0069688 | 78 |
| Exhibit 5 | Dentsply Sirona Expert Report by Paul Zurek Ph.D. | 131 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 8:55 a.m. on August 5th, 2025.

Please note that the microphones are sensitive and may pick up whispering and private conversations.  Please mute your phones at this time.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Paul Zurek, PhD, taken by counsel for plaintiff in the matter of Dan Sills, et al., versus United Natural Foods, Inc., et al., filed in the United States District Court, Southern District of New York, Case No. 1:23-cv-02364-JGLC-VF.

The location of the deposition is One South Dearborn, Chicago, Illinois.

My name is Ben Dixon, CLVS, representing Veritext Legal Solutions, and I am the videographer.  The court reporter is JoAnn Losoya, from the firm Veritext Legal Solutions.

I am not related to any party in this action, nor am I financially interested in the

Page 5

outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present, including remotely, will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. LINKH:  Good morning.  My name is Greg Linkh.  I'm from the law firm Glancy Prongay & Murray, and I'm here today with my partner Pavithra Rajesh.

MS. UMAR:  This is Nilofer Umar of Sidley Austin for the witness and defendants, and with me is my colleague Claire Lee.

THE VIDEOGRAPHER:  And online.

MR. LINKH:  Daniel Bettencourt is online as well.

THE VIDEOGRAPHER:  Very good.

Will the court reporter swear in the witness, and then counsel may proceed.

(Witness sworn at 8:57 a.m.)

Page 6

WHEREUPON:

PAUL ZUREK, PH.D.,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

E X A M I N A T I O N

BY MR. LINKH:

Q.   Good morning, Dr. Zurek.  Again, my name is Greg Linkh.  I represent the plaintiffs.

A.   Good morning.

Q.   So I'll be asking you some questions today.  I know you're familiar with how a deposition works.  I'll just give you my top three asks, you know.

First, your counsel may object to certain questions I may ask on the record, and unless she instructs you not to answer, I would just ask that you answer those questions.

Second one is if I ask you a question you don't understand, either you don't understand the substance of it or you can't hear me properly, just ask me to rephrase and I'll do my best.

And third, if you ever want a break at any time, please feel free to ask me for one.  I would only ask if there's a question pending, that you ask that -- that you answer that question first.

Page 7

And so is there any reason why you can't give full or truthful testimony today?

A.    No, there is not.

Q.    Great.

I would like to introduce as Exhibit 1 the expert report of Paul Zurek, PhD, dated June 13, 2025.

(Deposition Exhibit 1 was marked for identification.)

BY MR. LINKH:

Q.    Dr. Zurek, can you tell me what that document is.

A.    This appears to be the report that I submitted in this matter.

Q.    Did you prepare that report entirely by yourself?

A.    No.  I was assisted by a research team at my firm, Cornerstone Research.

Q.    Great.

Can you briefly tell me who is part of that research team?

A.    Yes.  There are a number of individuals. The ones I have directly interacted with are Filipe Lacerda, L-A-C-E-R-D-A; Alexander Aganin, A-G-A-N-I-N; and Samer, S-A-M-E-R, Semaan,

Page 8

S-E-M-A-A-N.

Q.    Can you just briefly tell me what kind of tasks those three individuals would do?

A.    So, they have generally assisted with the research process.  As I was identifying relevant analyses, they would help procure data.  They would identify documents that were relevant on a given topic.  Others helped to fill in citations in the report.  For example, if I put in a quote from the complaint, I often don't have a paragraph citation, so those would be added.  I discuss analyses with them and so on.

Q.    Did any of these write any sections of your report?

A.    I would say no.  So this report is primarily drafted by me.  Obviously, as I said, they may have added paragraph references, help with editing, but this is primarily drafted by myself.

Some of the material here about the market efficiency, for example, is something that appears in prior reports that I have also drafted.  So ultimately, I drafted the vast majority of this, and obviously, carefully reviewed any suggested edits and so on, such that all the opinions expressed here are my opinions and all the words are

Page 9

ultimately my words because I either wrote them or adopted them if they were suggested -- suggestions for edits and so on.

Q.    Great.

Did counsel ever provide you with a list of assumptions or facts to accept as true for purposes of your report?

A.    So, yes, there are some assumptions that I received from counsel.

Q.    Can you just tell me what those were.

A.    So, certainly they would have all been identified in the report, but the two that I specifically recall, one is to assume that the market for UNFI securities was an efficient market as I understand plaintiffs contend, and the second has to do with a defined term, the Alleged Truth, which is defined in the report.  And while that assumption is consistent with my understanding of the case, it is ultimately an assumption.

Q.    You reviewed Dr. Feinstein's report, correct?

A.    Yes.

Q.    And in his report you saw that he himself relied on a bunch of other materials, including pleadings and news articles and press releases.

Page 10

Did you see that?

A.    Yes.

Q.    Did you read every document that Dr. Feinstein mentioned in Exhibit 1 of his report?

A.    So, if you could just tell me what Exhibit 1 is.  I'm assuming you're talking about materials he considered but --

Q.    We're probably going to be looking at it in more detail.  I might as well introduce it now so you have it in front of you.

For the record, I'd would like to introduce as Exhibit P2 the report on market efficiency and damages methodology from Professor Steven Feinstein, PhD, CFA, dated March 7,2025.

Again, I was referring to Exhibit 1 of his report.

(Deposition Exhibit 2 was marked for identification.)

BY THE WITNESS:

A.    Exhibit 1 appears to be his Documents and Other Information Considered list.  And so I would have considered these documents, I would not have necessarily reviewed every single one of the documents that he considered.

Q.    We're going to talk a little bit about

Page 11

your report today, Exhibit 1.  And before I ask any questions, is there anything that you would wish to change about it after looking at it since you have filed the report?

A.    No, there's nothing that comes to mind.

Q.    And before I really go into the substance, I just noted in Page 2 of your CV it -- so you are a lecturer at Stanford Law School?

A.    Yes.  That's -- I mean, that's accurate. I don't know if you have a specific question about the CV.

Q.    Well, I had a quick question about -- so it says there that you teach a class called Corporate Finance and Valuation?

A.    I believe that's the title.  I don't recall right now.

Q.    I was just actually wondering.  I just had a couple of quick questions about it.  One was that's one class, not two?

A.    That is one course, yes.

Q.    And does that class -- in that class, do you teach the valuation of individual securities?

A.    Yes.

Q.    Okay.  And do you teach the valuation of options?

Page 12

A.    Options are current as part of that class, yes.

Q.    And I guess we're going to talk a little bit about United Natural Foods, Inc.  I just like to sort of shorthand refer to that as UNFI.  Does that work for you if I use that shorthand?

A.    Yes, that's the shorthand that I have been using.  That is also, I believe, their stock ticker.

Q.    Right.

Do UNFI securities trade in an efficient market?

A.    So that's not an opinion that I have affirmatively expressed.  As I mentioned, I am making an assumption for the purposes of my report consistent with plaintiffs' claims and Dr. Feinstein's analysis that they do and then rely on the implications of market efficiency, but I have myself not expressed an affirmative opinion on this topic.

Q.    So when you say you assume I -- is that referring to Paragraph 35 of your report?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    Paragraph 35 states, "For the purposes of

Page 13

my analysis in this report, I have been asked by counsel to assume that UNFI securities traded in efficient markets during the proposed class period as Dr. Feinstein claims."

Q.    For that assumption about UNFI securities trading in efficient markets, that includes UNFI options, correct?

A.    That assumption includes UNFI options as well, yes.

Q.    And are you familiar with something called -- what's been colloquially referred to as the "Cammer factors"?

A.    Yes, I am.  I am.

Q.    Are you familiar with something that's been called the "Krogman factors"?

A.    Yes, I am.

MR. LINKH:  Just for the record, that is spelled K-R-O-G-M-A-N.

BY MR. LINKH:

Q.    And did you conduct any analysis of the Cammer factors?

A.    I did not.  I'm aware that Dr. Feinstein -- is it Feinstein or Feinstein?

Q.    I have been saying Feinstein.

A.    I'll try to stick with that.

Page 14

I am aware of having read Dr. Feinstein's report that he analyzed certainly the Cammer factors. I don't recall if he looked at the Krogman factors. He probably did.

Q. And so do you have any reason to believe that UNFI did not meet any of the Cammer factors?

MS. UMAR: Object to form.

BY THE WITNESS:

A. No, because it's not an analysis that I have independently conducted. And certainly for the equity securities, for the options, I don't remember whether he's analyzed all these same factors or not.

Q. And do you have any reason to believe that UNFI did not meet any of the Krogman factors?

A. Not one way or another, yes, because I haven't analyzed it so I have no reason to say one way or another.

Q. I want to go over a couple of those factors, if you could indulge me for just a few minutes.

So you're aware that UNFI is listed on the New York Stock Exchange, correct?

A. That's correct.

Q. And so do you -- would you agree that listing on the NYSE is evidence that the stock

Page 15

trades in an efficient market?

A.    Not stated in the way you did.  I am of the view that there may be securities traded on a major exchange that are not efficiently traded.  And in financial economics, efficiency, as it's most commonly understood, has to do with how information is incorporated into prices, and that's what determines efficiency.  It is possible for shares to be traded on the NYSE and yet not be traded in the an efficient manner.

Q.    So have you ever seen an example of an NYSE-listed stock that was found to trade in an inefficient market during the period it was listed on the New York Stock Exchange?

A.    I don't -- I don't recall.  I recall -- it may have been a NASDAQ stock which is another major exchange.  It was a matter I worked on where it did not appear to trade efficiently, and I think I'm generally aware that with some of the meme stocks that there have been findings of lack of efficiency but I can't recall specific examples.

Q.    When you say "findings of lack of efficiency," is that a court finding of lack of efficiency?

A.    So I think courts would find -- my

Page 16

understanding is, and I'm not a lawyer so this is just my lay understanding of the law, is that plaintiffs have the burden of demonstrating efficiency.  So a court -- my understanding is if the court may find that plaintiffs have not met that burden of demonstrating efficiency, that may be slightly different than an affirmative finding inefficiency.

Q.   I'd like to point you to Paragraph 68 or your --

A.   68.

Q.   I'm sorry.  68 of Dr. Feinstein's report.

A.   I'm there.

Q.   Do you see there's a sentence that says, "During the class period, the average weekly trading volume of UNFI stock was 2.86 million shares, or 4.87 percent of shares outstanding"?

          Do you see that?

A.   I do.

Q.   Okay.  Do you have any reason to disagree with that finding?

A.   I do not.  I have not verified his calculation.

Q.   Have you ever seen a case where stock average weekly trading volume exceeded 4.87 shares

Page 17

outstanding but the market still found that stock to be trading inefficiently?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    I don't know that I would recall specific thresholds or specific numbers like that.  So the answer to your question is no, I can't recall one way or another.

Q.    I'd like to move you a little bit forward to Paragraph 70.

Do you see where he states that "securities analysts facilitate the flow of information and the digestion of information within the marketplace"?

Do you see that?

A.    It's in the middle of the paragraph.

Q.    Yes, it is.

A.    I see that.  Yes.

Q.    Would you agree that in an efficient market, information contained in analysts' reports is likely to be reflected in UNFI stock price?

A.    So I would agree that information that is in analysts' reports that is found to be value relevant by the market, if the market is efficient would be part of that -- would be incorporated into

Page 18

the price in whatever way it's value-relevant. There may be information in analysts' reports that is not necessarily value-relevant and would not form the basis on which the stock is priced.

Q. Just so we're clear, do you have a -- when you're saying "value-relevant," what do you mean by that?

A. At a high level, and it may vary with circumstances, but at a high level a piece of information is value-relevant if the first disclosure of that information to the market, so once it becomes public would change the market participant's assessment of the value and it would change the price of the security.

Q. Have you ever seen an example of a stock where multiple major investment banks published analysts' reports but the market still found that stock did trade inefficiently?

A. I think that may have been the case with some of the -- with some of the meme stocks, and I recall there was litigation around those. I wasn't involved in that litigation, but I seem to recall that there were issues of efficiency and there may have been such a finding but I just -- I just -- I don't recall.

Page 19

Q.   Just to be clear, when you say "there may have been such a finding," was that a finding by a court that plaintiffs failed to demonstrate efficiency or was it a finding by an expert?

A.   So I'm fairly sure there was a finding by an expert on this, I seem to recall, but I could be wrong.  You are asking me a broad question well outside the scope of kind of the analysis that I have done here.  I thought some of the courts have agreed with that, but I -- I -- I don't specifically recall.  That's sort of a vague general awareness, and I could be wrong on this.

Q.   That's fine.  I understand it's not in your report per se.

Taking a step back, why do analysts write reports?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.   Well, so analysts are typically part of larger institutions that also engage in trading and other services to clients.  Analysts' reports in and of themselves -- well, if you and I need to access an analyst's report, we may need to pay for it and sometimes there's a substantial fee associated with that.  For corporate clients, they will -- they may

Page 20

even receive these reports for free.  In -- and the bank is -- the business cases that the bank would earn other business, so in exchange for providing reports, which presumably various clients may find valuable and to contain valuable information.

Q.   And what do analysts generally write about in these reports?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.   That would depend on what the analysts is covering.  Are they covering equity securities that something else, what company, and so on?

Q.   Would you agree that analysts often write about information that is new to the market in these reports?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.   I would agree that analysts often write about recently released information.  Once you -- we start talking about new, it's possible for an analyst to issue a report several days after an event.  In an efficient market, that information is -- is not new in -- in the efficient market sense, right, but it might be fresh information colloquially.  But generally news events, regarding

Page 21

companies is -- is one of the items that analysts will cover.

Q.    I want to point you to Dr. Feinstein's report at Paragraph 87.  And do you see there how it says, "According to Bloomberg, there were 93 market makers active in UNFI stock between December 2021 and September 2023"?

Do you see that?

A.    I do.

Q.    Do you have any reason to disagree with that finding?

A.    No, because I have not verified it.

Q.    Okay.  Have you ever seen a case where a stock had 93 active market makers but the market for that stock was still determined to be inefficient?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    I don't specifically recall.  I mean, that would require an analysis.  It is similar to your other questions that would ultimately require some analysis of all the different rulings and then a comparison to how many market makers there were and how many analysts there were and so on.  I haven't conducted such an analysis.

Again, as I said early on, I am

Page 22

assuming that the market for UNFI shares and options in this case is efficient, so it just isn't something that I needed to focus on.

Q.   Are you aware whether UNFI was eligible to file Form S-3?

A.   I haven't done the analysis.  Based on my understanding of that, I know Dr. Feinstein states that they were, and I have no reason to disagree.

Q.   Okay.  And again, have you ever seen an example of a company that satisfied all the Form S-3 eligibility requirements throughout a class period but whose stock was still found to trade in an inefficient market?

A.   It would really be the same answer I already gave.  I'm not aware of such a case.  It just wasn't relevant to my analysis because I have assumed efficiency.

Q.   If I could have you turn to Paragraph 151.  Great.

So Paragraph 151, do you see where Dr. Feinstein states "The class period comprised 451 trading days, of which seven days were earnings announcement event days.  UNFI's stock return was statistically significant on five of the seven event days.  This is an instant rate of 71.4 percent"?

Page 23

Do you see that?

A.    Yes.

Q.    I assume you will have no reason to disagree with this finding?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    If by "this finding" you mean -- I mean, this is a statement about the number of trading days.  I have no reason to disagree about that. There's a particular definition here of an earnings announcement days that Dr. Feinstein uses and conditional in that he examines statistical significance and comes up with a number, 71.4 percent statistical significant, I have no reason to disagree with that calculation.

Q.    Okay.  And again, have you ever seen a case where 71.4 percent of earnings announcements result in statistical significant price movements but the market was still found to operate inefficiently?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    Not that I recall.  Knowing one way or another, whether such cases exist, will require a systematic analysis of other cases out there which

Page 24

was well outside the scope of my opinion here given that I have assumed market efficiency.

Q.    And I want to actually return you back to Paragraph 102.

Do you see there it states "Over the course of the Class Period, the market capitalization for UNFI stock ranged between 1.05 billion and 3.23 billion, averaging 2.12 billion"?

Do you see that?

A.    Yes.

Q.    And do you have any reason to disagree with this finding?

A.    As an empirical finding, no.

Q.    And have you ever encountered a stock with an average market capitalization of 2.12 billion that was found to trade inefficiently?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    I am not aware of any specific instance for the reasons I gave.  This is an analysis that would need to be conducted.  I -- and I am assuming efficiency in this case.

Q.    Again, just moving back up to Paragraph 105, do you see where he states "On

Page 25

average during the Class Period, there were 58.68 million shares outstanding, of which 57.94 million (98.7 percent) were in float"?

Do you see that?

A.    I do see that.

Q.    And do you have any reason to disagree with that finding?

A.    I have no reason to disagree with a numerical calculation there.  I don't know one way or another because I have assumed efficiency.

Q.    And have you ever seen a stock where 98.7 percent of shares were in float but the market was determined to be inefficient?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    In terms of a court determination, for the reason I mentioned, I'm not aware of a case. Doesn't mean that such a case doesn't exist.  As an economic matter, having a high float does not necessarily guarantee that the shares are traded in an efficient market.

But here in this case, I have made the assumption that UNFI securities traded in efficient markets for the purposes of my report.

Q.    Okay.  And I'd like to turn you to

Page 26

Paragraph 108.

And you see at Paragraph 108 he states that "The average bid-ask spread for UNFI stock over the course of the Class Period was 0.05 percent"?

Do you see that?

A.    Yes.

Q.    And again, do you have any reason to disagree with this finding?

A.    No.  I have no reason to disagree because this is not an analysis I myself have conducted.

Q.    Have you ever encountered a stock with an average bid-ask spread of only 0.05 percent that was found to trade in an inefficient market?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    For the same reasons we've been discussing with the other findings, I have not conducted any systemic analysis of this question about how courts ruled on this issue, and I don't recall a specific instance with a specific number, so I don't recall.

Q.    You also see on Paragraph 108 he states that "According to SEC filing compiled and reported by LSEG Workspace, at least 601 major institutions

Page 27

owned UNFI stock during the Class Period"?

Do you see that?

A.   I'm sorry.  Did you go to a different paragraph?  I thought you said in the same paragraph.

Q.   In Paragraph 108, is that -- that's on Paragraph 108, correct?  Let me --

A.   I don't see it.

MS. UMAR:  I'm not seeing that on Paragraph 108.

MR. LINKH:  Give me a second on this.

BY MR. LINKH:

Q.   And reason for that is that I gave you the wrong paragraph.  It was actually 78.  I'll repeat that for you.

It is going from Page 21 to 22.  And do you see where it says, "According to SEC filings compiled and reported by LSEG Workspace, at least 601 major institutions owned UNFI stock during the Class Period"?

Now do you see that?

A.   I do see that language.

Q.   And do you have any reason to disagree with that finding?

A.   I do not.  I have not looked at this.  I

Page 28

don't know what Dr. Feinstein means by "major institutions."  So -- but I have no reason to disagree with the finding.

Q.   Have you ever seen a case where at least 601 major institutions owned a stock but the market still found that stock to be -- the market for that stock was still found to be inefficient?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.   No, I can't recall a specific case.  I have never conducted such an analysis, and I don't recall any specific case.

Q.   All right.  Now, maybe we can turn to your report as opposed to Dr. Feinstein's.

And we discussed this briefly before but -- so you used the term "alleged truth," alleged truth in caps throughout your report, correct?

A.   Yes.

Q.   Okay.  And I think you said, but I just wanted to confirm, that's a defined term?

A.   Yes.  I have a definition for it in my report.

Q.   And would that definition be the definition at Paragraph 28?

A.   Correct, Paragraph 28 contains the

Page 29

definition of the alleged truth.

Q.    And can you tell me how you created this definition?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    So this is an assumption that was provided to me by counsel.

Q.    Okay.  So did you have any -- any role in crafting that presumption?

A.    So I don't recall specifically.  I do know that I reviewed the complaint.  I reviewed the motion to dismiss order, and I also reviewed Dr. Feinstein's deposition testimony where he described what the company allegedly should have disclosed.  I know this is consistent.

I don't recall exactly how the specific language came to be.  It was ultimately counsel was -- provided the language and this definition to me as an assumption.

Q.    So did you do anything to independently verify that the formulation of this alleged truth definition aligns with plaintiffs' allegations?

A.    I did.  What I just described.  I carefully reviewed the complaint, the motion to dismiss order.  I looked at Dr. Feinstein's

Page  30

deposition testimony. And based on my review of those documents -- again, I'm not a lawyer, but based on my review of those as an economist, this -- the alleged truth, the assumption of the alleged truth is consistent to me with how I understand plaintiffs' allegations.

Q. Could any of your conclusions in your report change if the term "alleged truth" were more narrowly defined or broadly defined?

A. So whether my conclusions would be affected or not would, in theory, depend on the alternative, what the alternative definition was. So at a high level, it is possible that my conclusions would be affected.

I thought about this as I was considering this assumption, and it's -- based on what I have read, it's hard for me to think of an alternative definition that would likely impact my conclusions. But ultimately, as I said, I mean, it depends on how the alleged truth is defined.

Q. So do you see the second part of the definition? If you look on Page 28, it says that "Inflation-related, forward-buying opportunities were a significant but temporary driver of improvements in" the UNFI -- "in UNFI's gross

Page 31

margin."

Do you see that?

A.   I do.

Q.   And what did you mean by "temporary" in that definition?

A.   Well, temporary means -- to me means something that does not persist permanently.

Q.   And I just wanted to point you up to the paragraph above, Paragraph 27.

Do you see Paragraph 27?

A.   Yes.

Q.   I take it in Paragraph 27 sort of serves as a -- you're taking certain of Dr. Feinstein's own statements from his report, correct?

MS. UMAR:   Object to form.

BY THE WITNESS:

A.   Yes.   And then deposition towards the bottom of the paragraph.   So I -- well, the paragraph says what it says, and it includes quotes from Dr. Feinstein's reports -- report and deposition.

Q.   Okay.   And do you see the second sentence in Paragraph 27 says "In the Feinstein report, Dr. Feinstein states that according to plaintiffs, defendants did not disclose that the company's

Page 32

profitability depended heavily on unsustainable and atypical procurement gains"?

Do you see that?

A.    Yes.

Q.    And then later on he says -- he uses the term "elevated and transitory procurement gains."

Do you see that?

A.    I do.

Q.    And you -- would you view the word "temporary" as synonym for unsustainable or transitory in this context?

MS. UMAR:   Object to form.

BY THE WITNESS:

A.    I think context is relevant.  It is -- you have to -- and what I do, in my report, is I analyze market commentary, and implications on -- that may be drawn on the company's valuation based on the disclosure.  So that's the lens through which one needs to look at this.

And in my view, these are equivalent disclosures from that perspective.  I -- I didn't try to kind of parse the linguistical implications of the words, but in their use and in terms of market expectations, I -- as I said, I think the alleged truth is consistent with -- I believe is

Page 33

consistent with how Dr. Feinstein described it.

Q.   So if instead of when you -- when you used the term "significant but temporary driver," you changed it to "significant but unsustainable driver," would that be synonymous?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.   Sitting here today, I believe that the market reaction would be substantially similar.  I think that's the gist of what the market understood.  I mean, analysts use different terms for these same concepts so I don't think that would make a difference to my conclusions.

Q.   Just to be clear, if we're talking about the defined term "alleged truth," if instead of using the term "significant but temporary driver" we used "significant but unsustainable driver," your conclusions would all remain the same?

A.   I believe they would.  I think the market understood on the relevant date here, which is March 8, 2023, that the -- that this phenomenon was not sustainable.

Q.   Actually getting to that, would your analysis change if the alleged truth included the impact of procurement gains until September 28 --

Page 34

I'm sorry -- September 26, 2023?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    I'm not sure I understand what you're asking.

Q.    Do you agree that if your definition of the alleged truth did not fully match plaintiffs' allegations that your analysis might require some revision?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    I think as a general proposition, if the alleged truth were something else than what I have assumed, right, I would -- beyond what we're discussing and based on the analysis that I have already conducted, I can tell you that I don't think it would change.

As a theoretical matter, defining it differently might require me to think about it more and see if my conclusions would change.

As I said, it's hard for me to come up with a logical alternative that would -- that would change the conclusion, but obviously I don't know what you have in mind by the alternative.

I understand that plaintiffs were

Page 35

asked this question by defendants and did not provide an answer so what I went with here, this assumption is consistent with all the independent reading that I have done of the pleadings of the court's order and I understood Dr. Feinstein's report and testimony.

Q.   Okay.  So would you agree that plaintiffs' fraud theory isn't just about whether forward-buying occurred but about the impact on gross margins, correct?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.   So I think the fact that inflation-related, forward-buying was occurring in principle is something that was known to the market, and I think the fact that that was known is consistent with plaintiffs' allegations so it -- I would agree that plaintiffs and -- characterize the allegations as being more than just that.

Q.   Okay.  Would you say that plaintiffs' allegations were more than -- strike that.

Do you understand that plaintiffs alleged that the truth regarding the procurement gains was not fully revealed until September 26, 2023?

Page 36

A.     That is consistent -- the allegation that the truth was not revealed until the final alleged corrective disclosure is what plaintiffs alleged.  I think that's a different question than what I'm looking at, which is an analysis of price impact based on what the alternative disclosure or the alleged truth would have been.

Q.     Plaintiffs allege four corrective disclosures, right?

A.     That is my understanding of what's in the complaint, yes, four dates on which corrective information allegedly came to light.

Q.     And maybe I can orient you to Page 25 of your report, Footnote 89.

And so, you -- so you see that paragraph or that footnote discusses the four corrective disclosure dates, correct?

A.     Footnote 89 is about returns and residual returns.

Q.     Okay.  Is a residual return on -- is the residual return on December 7, 2022, a statistically significant price decrease?

A.     That's what's stated here, at the 95 percent confidence level the residual return -- is statistically significant.  Importantly that does

Page 37

not demonstrate price impact.  That requires further analysis.  All this states is that the price movement on that date was statistically distinguishable from zero.

Q.   Okay.  And same for March 8, 2023, was that a statistically significant price decrease?

A.   At the 95 percent confidence level, it was, which, again, doesn't speak to the reason for the decrease or price impact and so on.

Q.   And again, for June 7, 2023, was there a statistically significant price decrease?

A.   Yes.  There was a significant price decrease on June 7, 2023, at the 95 percent confidence level.  Again, that is not -- I go into detail in this in my report.  That does not demonstrate price impact of the alleged -- of the alleged misstatements.

Q.   And for September 26, 2023, was that a statistically significant price decrease?

A.   According to my event study model, it was statistically significant at the 95 percent confidence level.  And again, for the reasons described in a lot of detail in my report, that does not represent evidence of price impact of the alleged misstatements.

Page 38

Q.    So September 26, 2023, that was a 23.99 percent drop?  Is that your understanding.

A.    That answer depends on a particular event study model.  The actual -- when you say "drop," sometimes people think of the observed decline in share price.  This is talking about residual returns which, in turn, depend on the model used.

Q.    To be more artful, there was 23 point -- a negative 23.99 percent residual return on September 26, 2023, correct?

A.    That is accurate using my -- using my model.  Dr. Feinstein's model may result in a -- in a different residual.

Q.    That was one of the largest declines, -- one-day declines during the class period, correct?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    I have not checked that so, I couldn't say.

Q.    At the start of the class period on December 8, 2021, was there a statistically significant price increase at the start of the class period?

MS. UMAR:  Object to form.

Page 39

BY THE WITNESS:

A.    I would need to check that.  I'm not sure.

Q.    Maybe what I can do is I can bring you back to the Feinstein report, Exhibit 17.

You can take your time.  I know it is a lot.

A.    I'm there.

Q.    You would agree, at least according to Dr. Feinstein, there was a statistically significant price increase at the start of the class period; is that correct?

A.    He reports an 11.55 percent logarithmic residual and, according to his calculation, it is statistically significant at the 99 percent confidence level.  That's in that footnote there.

Q.    Have you done your own analysis of that day?

A.    So my model could be used to examine that.  I may have looked at it at one point.  But I just -- I don't recall.

Again, I would add just like for the others, this does not demonstrate that there was price impact as following the March 8 disclosure.

Q.    Are you opining that all relevant

Page  40

information about UNFI's forward-buying was known to the market by March 8, 2023?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    I don't understand fully what you mean by "all relevant information."

Q.    You used the term earlier.  Was it -- I should have written it down -- price relevant or market relevant when we were talking about analysts' reports.

A.    I think I mentioned the term "value-relevant."

Q.    Value-relevant.  Let me write that down.

Are you opining at all value-relevant information about UNFI's forward-buying was known to the market by March 8, 2023?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    I am opining that the value implications of the alleged truth were known to the market and, because under the assumption of market efficiency, public information is incorporated into prices, that those would be incorporated into UNFI's securities prices on March 8.

Value-relevant, generally speaking,

Page 41

is a very -- is a broad term, and what's at issue here is what was allegedly undisclosed, and so that may be all the value-relevant information, it may be a subset of it, but what is at issue is information that is allegedly undisclosed.

Q.    I'd like to point you to Paragraph 20 of your report.

Do you see at the second sentence it says, "For example, several securities analysts commented that the high inflationary period in 2021 and 2022 was positively impacting UNFI, including through the opportunity to take advantage of forward-buying opportunities"?

Do you see that?

A.    I do.

Q.    In these reports, did these analysts' reports say that UNFI was actually engaging in forward-buying?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    So I don't know what you mean by "actually engaging in forward-buying."  I think these analysts are talking about that practice.  I think the company disclosed that inflation was affecting its margin.

Page 42

Q.   Okay.   I guess when you describe this as the opportunity to take advantage of forward-buying opportunities, I guess I would be viewing that as an opportunity versus what they actually did.   For example, I have the opportunity to jump out of the window right here but that doesn't mean that I actually would.

A.   I think that's a very extreme example that doesn't --

MS. UMAR:   Object to form.

BY THE WITNESS:

A.   -- apply under the circumstances.   I think it's clear from the totality of the analysts' commentary and the company's disclosures that it was known that the company was engaging in these opportunities.   I think I haven't seen any analyst at any point saying that they did not realize that there was at least some amount of inflation-related, forward-buying going on, so I would, I guess, strongly disagree with your example as being relevant.

Q.   Fine.

Did any of these analysts' reports mentioned in Paragraph 20 quantify forward-buying's impact on UNFI's margins?

Page 43

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    It's not apparent from these quotes. It's possible.  For example, Wells Fargo is talking about impact on earnings once inflation decelerates. I don't know what modeling they have done.  I would have to go and check.  Not -- what I cite in the report does not, unless I'm missing it, which is also possible.  There are a bunch of quotes here bunch.

Q.    Feel free to take your time.  This isn't a memory test.

A.    Having looked at the quotes here, and just to put this in context, the quotes were included to illustrate the notion that it was understood by the analysts that inflation-related forward-buying was occurring.

These quotes don't specifically quantify the effects.  They do talk about earnings and impact on earnings.  I don't know what quantification exists under that, and the actual -- in the actual reports -- in the actual analysts' reports.

But the quotes that I have specifically listed here don't have -- don't appear

Page  44

to have any specific quantification of the -- of the -- these pre-March 8, 2023, quotes don't appear to have any quantification specifically of the impact of inflation-related forward-buying on gross margins specifically.

Q.    Are you aware of any analysts' reports that were issued prior to March 8, 2023, that might contradict your interpretation of what was in the reports you cited?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    What interpretation are we talking about here?  Are you talking about the alleged truth or something else?

Q.    I'll start off with alleged truth.  Are you aware of any reports that contradict your interpretation of what the alleged truth would have been?

A.    No.  I'm not aware of any such reports.

Q.    Okay.  Do you have an understanding of what a partial corrective disclosure is?

A.    Generally speaking, I think so.  I mean, it's a legal term.  It's found in complaints.  But I have a working understanding of it.

Q.    Perhaps I could start with do you have an

Page 45

understanding what the term corrective disclosure means?

A.    Generally speaking, that understanding includes that in different jurisdictions, that meaning may be -- there may be nuances to the definition.

MS. UMAR:  I'm sorry to interrupt.  When you're finished with this line of questioning, can we break?

MR. LINKH:  Sure.  On that note, I have two more questions and then I was planning doing that myself.

BY MR. LINKH:

Q.    So I guess just in layman's terms, do you have a layman's definition of a collective disclosure?

A.    I'll give you a very high-level definition with the caveat that when actually performing the analysis, it would be important to understand the specific legal definition, but my -- not being a lawyer, as an economist, my high-level understanding of a corrective disclosure is that in matters -- in 10b-5 matters, there are allegations that there is some information that is withheld from the market, either through a misstatement or an

Page 46

omission, and that information is alleged to later come to light or become public, revealing the -- effectively the falsity of the prior statements, if it's a misstatement case.  That's a high-level understanding.

Q.    With the caveat, you know, as a high-level understanding, do you have an understanding of what a partial corrective disclosure is?

A.    Yes.  Again, not -- I'm not a lawyer, but when I see this in plaintiffs' complaints, it refers to the -- to the idea that the falsity of the statements is revealed not through one disclosure but multiple disclosures.

Q.    Okay.  And so in that case, would you agree that a partial disclosure might reduce the artificial inflation but not eliminate it?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    That is theoretically -- all sorts of assumptions, efficient market, and so on, that is theoretically possible.  It's an empirical question, right, which is why I conduct the analysis that I did in my report, but it is ultimately an empirical question.

Page  47

Q.    Would you agree that -- that in an efficient market, if the truth about a topic isn't disclosed fully, artificial inflation still might persist in the stock?

MS. UMAR:   Object to form.

BY THE WITNESS:

A.    That would depend on the total mix of information that the market has available.  So it could conceivably persist.  It may not.

From the perspective of price impact in this case, which is what I have analyzed, I have concluded that there is no further price impact following March 8, 2023.

Q.    Before we break, one thing I just wanted to follow up on is you talked about -- we talked about the term "value-relevant information."  And we also talked about -- I believe you used the term "value implications"?

Can you just tell me what you meant by "value implications"?

A.    So value implications of -- I think, you know, unless you want to give me the question back, but what I mean by the term generally is what is the -- what is the impact on value, right, on assessed value?  Or price.  It would depend on the

Page  48

circumstances, right?  Those may be equivalent, it may be different.  It would depend on the circumstances.

MR. LINKH:  All right.  Now is a good time for a break.

THE VIDEOGRAPHER:  This marks the end of Media No. 1.  The time is 10:02 a.m.  We are off the record.

(Break in the proceedings taken at 10:02 a.m.)

THE VIDEOGRAPHER:  This marks the beginning of Media No. 2.  The time is 10:13 a.m. We are on the record.

BY MR. LINKH:

Q.    Dr. Zurek, would you agree that March 8 was the first time UNFI itself acknowledged that prior margins were supported by significant procurement gains?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    So I have not conducted that analysis specifically.  My assignment was to examine price impact starting with the March 8 disclosure, that was the primary focus of my analysis.  Everything else is -- is background for that opinion.

Page 49

And my opinion is that as of March 8, given that disclosure, that the company's disclosure on that date was consistent with the alleged truth. Now, whether to what extent there were discussions of this earlier, I would have to consider all the earnings transcripts, all the prior disclosures in more detail to be able to have a reasoned view on that. I just don't know.

Q. On March 8, the stock dropped over 20 percent, 28 percent, correct?

A. Again, this is the same question. If you're talking about the raw drop, I would have to find it. I have the residual return in front of me.

Q. I'm being a little sloppy with that. There was a residual return, a negative residual return of over 28 percent, correct?

A. So it was under, just under 28 or less negative than 28 percent according to my event study, and in log terms using Dr. Feinstein's event study, it was a slightly different number.

Q. Okay. But you would agree that under either analysis that was a statistically significant number, correct?

A. So those are the residual returns. It is important to specify a threshold here. I'm using

Page 50

95 percent.  At that confidence threshold, the residual returns are statistically -- on March 8 are statistically significant.

Q.    Would you agree that, I guess before March 8, UNFI's management had not explicitly disclosed or qualified the role of procurement gains?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    As I said, it is just not an analysis that I focused on, given that the starting point of my analysis was really March 8, 2023.  I know they certainly talked about inflation.  But to what extent they did and how they did, I didn't specifically focus on so I couldn't say sitting here today right now.

Q.    Did you conduct an analysis into the factors that caused the stock price drop on March 8?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    I did not perform a disaggregation analysis.  The premise of my analysis is that even if one were to assume -- and as I said, I haven't done this analysis.  But if I were one to hypothetically assume that the only piece of

Page 51

information disclosed was the alleged -- the alleged truth and that caused the decline, which I have not established, then past that date there would be no further price impact of that information. That is my opinion.

And so I haven't -- there was -- it was an earnings call -- earnings release followed by an earnings call. There may have been other information that could later be found responsible for that -- for that decline.

Q. So I believe you used the term "disaggregation analysis"; is that correct?

A. So I haven't quantified -- right. And what I mean by that is I haven't quantified a specific percent of return that would be associated with -- with a -- you know, with a specific piece of information, some piece of the alleged truth or others. Right? I do discuss in my report, and I refer you to, you know, Section 7, I believe -- no, Section 8, does discuss the March disclosure and how the market reacted, how the analysts reacted, how it is portrayed in the complaint, and those observations, the analysis of that disclosure, then forms the basis of my opinion.

Q. You haven't done, like, a formal analysis

Page 52

as to say 40 percent of this drop was due to management statements versus 20 percent was due to other factors, something like that?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    Not that specific analysis.  That sounds to me like a -- what's sometimes referred as a loss causation analysis.  I performed a price impact analysis.  So I have looked at that disclosure.  I looked at the market reaction to the March 8 disclosure very carefully in terms of commentary and the analysts' reports and the press, the information that was disclosed.  I then assessed that against the alleged truth, and reached a price impact opinion.

Q.    Okay.  I wanted to point you to, like, Paragraph 54 and 55 in your report.

I take it in those paragraphs, you're discussing the substance of the March 8, 2023, disclosure by UNFI management; is that correct?

A.    So these paragraphs, and 56 -- or at least portions of 56 at least focus on the -- on what management and the filings disclosed.

Q.    Okay.  Is it your opinion that the March 8, 2023, disclosure revealed all

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

price-relevant, information-related procurement gains, at least as to their impact on UNFI's margins?

A.   That's not a -- the way I understand price impact in the allegations here, all relevant information is not the object of interest.  The object of interest is information that was allegedly withheld from the market earlier that forms the basis of the securities lawsuit.

There may very well be other information about inflation-related forward-buying that is not part of the allegations that that information was inappropriately withheld from the market and so that wouldn't be relevant, even if that information were value-relevant.  So what I have concluded is that all the -- all of the alleged truth was disclosed on March 8.

Q.   So you're familiar with the March 8, 2023, disclosures, correct, as set forth in Paragraphs 54 and 55 and some of 56?

A.   I would agree with that.  I have looked at those disclosures and the other disclosures following the March 8 disclosure and in some level of detail, certainly.

Q.   Okay.  In looking at those disclosures,

Page 54

were you able to identify any spots where UNFI management quantified the impact of forward-buying on the Q3 2022 financial results?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.   You are asking -- just to make sure I have this right, you are asking about the June -- you said Q3?

Q.   Yes.

A.   So you are asking about --

Q.   Q3 2022.

A.   '22.

Q.   Yes.

A.   So what -- so that would have been June of 2022, right?  Just to make sure --

Q.   Yes.

A.   -- I have this right.

And I'm sorry.  Now that we have the date right, what is the -- what is the question about that disclosure?

Q.   Were you able to identify in any of the information surrounding March 8, 2023, if there was any disclosure by UNFI management quantifying the impact of forward-buying on Q3 2022 results?

MS. UMAR:  Object to form.

Page 55

BY THE WITNESS:

A.    I'm not sure whether I have seen that. The March 2023 disclosure disclosed the impact on the results in Q2 '23, which would be the most recently available information.  Right?  That would be -- to the extent it was value-relevant, it would be that information, the most recently available.

I'm not sure -- I'm not sure that on March or some other date -- it's possible but I'm not recalling a specific disclosure regarding the earlier quarters, in terms of -- actually, I'm sorry.  I may be misunderstanding -- I may be misunderstanding your question.  Because the margins were clearly -- were clearly disclosed for Q2 2022, just as they were disclosed ultimately for Q2 2023, and the fact that historically, inflation-related forward-buying was a significant driver was disclosed on March 8, 2023.

So I guess having thought about your question, it's not clear to me what it is that -- incrementally that could have been disclosed.  In the margins -- the actual margins were disclosed and the fact that they were -- that there was a substantial impact of inflation-related forward-buying was disclosed.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Q.    But was it -- was it actually quantified as to specifically Q3 2022?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    Well, the margin was.  Right?  The margin was disclosed.  And the fact that it was -- that inflation-related forward-buying was a substantial -- was a substantial driver of that.

Q.    Well, I guess the same question as -- were you able to specifically identify anything in the March 8, 2023, disclosure about UNFI's management quantifying the decline in forward-buying opportunities for the rest of fiscal 2023?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    As of March 8, 2023?

Q.    Correct.

A.    So the company disclosed the -- that the impact historically had been significant, stated that.  There was a revision to guidance and there was discussion about visibility and the possibility -- and I think I have this in my report, the possibility of continued negative impact.

Q.    Was there any quantification of what that possibility would be?

Page 57

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    So the guidance that was provided, that was certainly quantitative.  I would have to go back -- I don't remember.  We would have to look at what was said exactly.  Certainly I think the guidance was a -- by definition a quantitative metric.

Q.    Do you recall if the guidance provided any actual hard numbers?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    So I think the complaint has a -- has a table with that.  Yeah, there was -- the numerical guidance provided for -- so 2024 guidance was withdrawn, on March 8, 2023, in the context of the uncertainty, and there was revised guidance for 2023.

Q.    But I guess if there was some discussion of quantification of a decline in forward-buying opportunities in the March 8 disclosure, would you have included that in your report?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    It's possible I would have.  I would have

Page 58

to go back and check.  The alleged -- what I focused on was the alleged truth, which revealed that -- and it certainly was public by March 8, right, with that disclosure that inflation-related forward-buying where a significant but temporary driver, what was disclosed was the decrease in margin, something like a 70-basis point decrease in margin, so that was a quantitative disclosure, and I discuss that in my report.  And the company, my recollection is, attributed -- effectively said substantially that the decline was substantial driven by the disappearance of inflation-related, forward-buying opportunities.

Q.    But do you recall any hard numbers or percentages about what that decline would be?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    I mean, I think I have a table in this -- in my exhibits.  I think it was something like 71 basis points.  So that's a -- that's a number.  That's a quantitative disclosure.  It's in Exhibit 3.  3A and 3B.  So it's -- it's 70 -- it's a 70-basis point year-over-year change that was disclosed in the margin, and that was attributed primarily to the disappearance of inflation-related,

Page 59

forward-buying opportunities.

Q.    I think we discussed this previously but you agree that UNFI had a statistically significant price decrease on June 7, 2023, correct?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    So we did have that discussion.  We talked about the residual returns, the results of the event study, and levels of statistically significant, all the caveats around how that's calculated, and that -- that does not indicate, as I opined in my report, that there was price impact of the alleged truth.

Q.    I guess I could have been a little sharper.  So would you agree that UNFI stock price had a statistically significant decrease in residual return on June 7, 2023?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    At the 95 percent level confidence threshold, using my event study, that residual return is statistically significant, but it is not based on my analysis caused by any revelation of the alleged truth.

Q.    So you would say that this decrease was

Page 60

in no way due to any new information concerning forward-buying impact on margins.

Is that a fair statement?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    What I said was that this decline in residual return is not caused by the revelation of the alleged truth.  I discuss the possible causes of that decline in my report.

Q.    Can you just tell me briefly what those were?

A.    Right, and just to be precise, it's right in my summary of opinions in Paragraph 11.  And since we're talking about June 7, 2023, UNFI, the Q3 '23 disclosure, I list the factors in Paragraph 11(a) and subsequently in Section 8(b)(i).  And what I stated here is it was a reaction to the financial performance for that quarter for Q3, and that was below -- the financial results were below consensus and -- and were consistent with materializations of previously known risks of various types as well as other information such as increased shrink and so on.

Q.    So just so we're on the same page, I guess I want to make sure that we're looking at

Page 61

11(a), and then at the end of 11(a), there is three romanettes.

A. I think it is all of 11. It gives context to what is driving the below-consensus financial results.

Q. Sure.

Have you done any disaggregation analysis as to how these factors caused the stock price to fall on June 7?

A. I have not allocated across these factors what financial economics definitively tells us that it was -- there was zero contribution from the alleged truth because the alleged truth had already been known as of March 8, 2023.

Q. Just to be clear there, you're saying because 100 percent of the alleged truth was known as of March 8, that mathematically means that zero percent could have been revealed on June 7?

MS. UMAR: Object to form.

BY THE WITNESS:

A. That is one way to put it in an efficient market, because in efficient markets, once information becomes public, so the alleged truth on March 8, 2023, that would be incorporated into prices. And so if for whatever reason that alleged

Page 62

truth is repeated, it would not have any impact on the price on a subsequent date if the market is efficient.

Q.   I guess for September 26, 2023, so you agree that UNFI stock price had a statistically significant residual return on that date, correct?

A.   According to my event study model at 95 percent confidence level, it is statistically significant for the reasons I discuss in the report. That is not -- that does not indicate that there was price impact of the alleged truth.

Q.   And look to, like, Paragraph 11(b) on your report.  That lists the various factors that you claim contributed to the stock price drop that day, correct?

A.   At a high level, they're discussed in more detail in Section 8(b)(ii) which is called out here.  But at a high level, it was the reintroduction of guidance for 2024 that most analysts focused on for that date.  Something that I understand the court has dismissed and is not part of the allegations.

Q.   Have you done any analysis as to a disaggregation of those factors concerning the price drop?

Page 63

MS. UMAR: Object to form.

BY THE WITNESS:

A. So financial guidance is one factor. What I have listed later in the paragraph are some reasons why the guidance disclosure for 2024 was a surprise to the market. And so, I -- just like I do for June '23, I list a number of factors here for September 2023. I did not assign specific percentages to these because -- but I can definitively say based on financial economic theory that the alleged truth had no impact, had zero impact on this date.

Q. And just going back a bit, do you have an opinion on whether the March 8, 2023, disclosure had a price impact?

MS. UMAR: Object to form.

BY THE WITNESS:

A. So price impact necessarily implies the impact of corrective information that is corrective. I have not performed an analysis to determine whether prior to March 8 the market was, in fact -- in the absence, plaintiffs alleged that certain information was undisclosed. Whether that had price impact prior to March 8, 2023, is -- is a question that is -- that I have not analyzed at this point.

Page 64

And so it's -- without that, it's impossible to tell whether the decline on March 8 was due to corrective information, right, or whether it was due to materialization of risks that were already known to the market.

There would be additional analysis to be able to make that -- require to make that determination. What I can say is that after March 8, after that disclosure, in an efficient market there would be no further price impact.

Q. So is it your opinion that the -- neither the June 7, 2023, or September 26, 2023, disclosures discussed any new value-relevant information about forward-buying?

MS. UMAR: Object to form.

BY THE WITNESS:

A. My opinion is that those disclosures did not reveal the alleged truth because that had already been revealed.

Q. But I guess that wasn't quite exactly what I asked.

Was there any value-relevant information about forward-buying that was revealed in those disclosures?

MS. UMAR: Object to form.

Page 65

BY THE WITNESS:

A.   So, the company attributed -- on March 8, 2023, the company disclosed that there would be further -- likely would be further negative impact as inflation-related forward-buying dissipated over time.  Then you have those additional quarters occurring.  So there's new information about what happened in the market.  I don't mean equity market but the market in which UNFI operates.  So the goods market, right, and the product they sell.  There were developments there, right?

Those affected those results, and I think the company disclosed that those new results for those quarters were -- certainly I think for June, had to do with, at least in part, with inflation-related forward-buying during that quarter, right?  But that doesn't mean that that information was in some sense corrective in revealing the alleged truth.  That can't be because the alleged truth was already disclosed.  It was information about what happened during that quarter.

Q.   So if there were disclosures in June or September that further clarified forward-buying significance, would that be inconsistent with your claim that the information about forward-buying was

Page 66

fully priced in by March?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    So if -- in the context of a price impact analysis, the alleged truth has to be something that is disclosable, and to the extent that information comes to light later that wasn't known.  So if there's new information in June, that the company doesn't have in March because it reflects developments that occur during the quarter that's in the future to March, it reflects new developments, I don't see how that would change my analysis because it couldn't be part of the alleged truth just like it couldn't have been disclosed earlier, say in the first day of the class period.

Q.    So would you agree that at least plaintiffs allege that the June 20 -- June 7, 2023, disclosure was a corrective disclosure, right?

A.    I think in the complaint, plaintiffs alleged that this was a corrective disclosure. That's why I'm conducting an economic analysis of price impact to determine whether that allegation means that there's a price impact or not.  And I find that after March 8 there is no further price impact to the extent there was prior.

Page 67

Q.    All right.  So I wanted to point you to Paragraph 32 of your report.

Do you see that?

What I would like to point you down -- you see how there's a cite to -- I believe that you're citing to plaintiffs' complaint; is that correct?

A.    In Paragraph 32 there's a block quote and that cites to -- it is Footnote 58.  I believe it's the complaint.  Yes, it is Paragraph 216 of the complaint.

Q.    I wanted to point you down about eight lines in that quote.  And do you see where it says, "Among other things, this further revealed the extent to which UNFI's prior results had been benefitted by UNFI's strategic forward-buying and the extent to which the benefit had masked other problems impacting UNFI's profitability"?

Do you see that?

A.    Yes.

Q.    So are you aware that plaintiffs alleged that this information corrected the misrepresentations and omissions?

MS. UMAR:  Object to form.

Page 68

BY THE WITNESS:

A.    So I'm not -- I don't think I'm disputing what plaintiffs allege.  I think this is a quote from the complaint, and I'm included it in any report.  What I'm analyzing is whether plaintiffs' allegations as embedded in the alleged truth had price impact at different points in time.

Q.    All right.  I'd like to point you to -- it is Paragraph 67 on your -- on your report.

And so, am I correct in saying that you're opining that the analysts' forecasts for fiscal 2023 and fiscal 2024 profitability reflect that the alleged truth was revealed on March 8, 2023?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    So this is part of a broader analysis.  In this section I take the alleged truth and I compare it to what was the disclosed.  The company stated that inflation-related forward-buying was a significant driver.  I then discuss the -- how the complaint characterizes this disclosure.  I then talk about the analysts, which is this section, the securities analysts' discussion.  And I mention here that securities analysts revised their estimates

Page 69

of -- financial estimates following this disclosure. In fact, revise them -- revised them downwards.

Q. Some of these analysts, they made estimates in the report, correct?

A. I think a number of the analysts are making estimates of -- for the future financial performance.

Q. And were these analysts' reports -- were these analysts' estimates ultimately correct?

A. I don't -- I'm not trying to be difficult but I don't know what you mean by "correct." They were presumably made with the information that was available. You can have a perfectly fine estimate that in retrospect turns out to be not the right estimate because reality turns out to be different as new events come to light as conditions -- market conditions change and so on.

Q. Maybe to be more specific. Were any of these analysts' estimates -- did any of these analysts' estimates later turn out not to be the right estimate?

MS. UMAR: Object to form.

BY THE WITNESS:

A. Let me maybe rephrase this. Are you asking me whether these ex ante estimates turned out

Page 70

not to match the ex post financial reality of the company?

Q. That's correct.

A. So we're looking at March 8 here, so we're looking at Q2. In Q3, when UNFI announced its results, I think the general view was that those results were for 2023 -- there was no 2024 guidance at that point, but for 2023 were below analysts' estimates, and I discuss the reasons for that. This hearkens back to our earlier discussion, you know, why the results were below expectations. But they turn out -- the results in Q3 2023, turn out to be, broadly speaking, below analysts' consensus expectations.

Q. Turning to September 26. You're aware that plaintiffs allege that the September 26, 2023, disclosure was a corrective disclosure, correct?

A. I'm aware that plaintiffs alleged that in the complaint, that that disclosure was about guidance. I understand guidance was dismissed from the case. But based on your questioning, I'm assuming that that continues to be the allegation.

Q. And just to orient you to what we cite, this is discussed -- do you see Paragraph 33?

A. Yeah, this is a block quote from the

Page 71

complaint that covers the September 26, 2023, disclosure. I'm sure there's more in the complaint, but that's the quote I included here and it's from Paragraph 217 in the complaint which is the second amended complaint.

Q. For example, like at the end of that quote, you see how it says "Defendants' disclosures on September 26, 2023, further corrected the misleading impression" that -- "created by defendants' false and misleading statements during the proposed class period and/or caused a partial materialization of the risks concealed by those false and misleading statements"?

Do you see that?

A. Yes, I see that that's what's alleged. My analysis I think shows as an economic matter at least that this allegation is ultimately unsupported.

Q. Okay. So is it your understanding that -- is it just the existence of inflation-related forward-buying or is it also the extent of the impact of that inflation-related forward-buying on gross margins that is what plaintiffs are alleging as misleading?

MS. UMAR: Object to form.

BY THE WITNESS:

A.   I mean, I think it would be most accurate to look to the definition of the alleged truth which is that inflation-related forward-buying was a significant but temporary driver of the company's financial results at the time that the alleged misstatements were made.

Q.   So would you agree that if -- strike that.

Would you agree that news related to forward-buying impacted the stock price on September 26, 2023?

MS. UMAR:   Object to form.

BY THE WITNESS:

A.   I think it's more -- it's much more complicated than that because on September 26, what appears to be driving the market's reaction is the reintroduction of 2024 guidance, and how that -- the level of that reintroduced guidance relative to what the market had expected prior to September 26, 2023. And so that would be driven by obviously all the factors that affect the company's profitability going forward.

And so at that point, I think, as we discussed, it was fully known that inflation-related

Page 73

forward-buying, while it was a significant driver historically, it was -- it was temporary. The company disclosed on March 8 that it would not continue, or something along the lines that it would not continue or it was not repeatable under the current environment. So the question is what -- what ultimately drove the -- not the revision, but the level of reintroduced guidance? And it seems like there were a number of different factors at play there that the company -- a number of issues the company was facing.

Q. If plaintiffs were able to demonstrate a connection between the alleged misstatements, omissions, and the change in guidance, during those disclosures, the June disclosure and September disclosure, would that be considered a price impact?

MS. UMAR: Object to form.

BY THE WITNESS:

A. Would you mind -- and maybe if I could either get this repeated -- I just want to make sure I get the -- establish -- that you said establish a connection between the alleged misstatements or...

Q. I'll return to that in a few.

I want to point you to Paragraph 100.

A. Of my -- we're still in my --

Page 74

Q. Yes, of your report. Yes.

So that -- that paragraph discusses several analysts' reports, correct?

A. Yes, it makes a statement about the analysts' reports. I'm just trying to orient myself where we are in the report. But this is Q4 2023, so September -- the September 2023, disclosure, and I say that most securities analysts covering UNFI that published reports within one week of that disclosure specifically stated in their title or lead paragraph or focus discussed UNFI's 2024 financial guidance.

Q. Did you read all the -- all the content of each of those reports?

A. Yes, at one point as I was preparing my report.

Q. And actually, turning to, like, Appendix B of your report.

Have you -- and Appendix B would be the documents considered by Paul Zurek, PhD, correct?

A. Correct.

Q. There's a subheading for analysts' reports.

Do you see that starting on, like, Page 2 of that?

Page 75

A.    Yes.

Q.    Okay.  And have you personally read each of those analysts' reports cited there?

A.    If not all of them, the vast majority of them.  And by "reading," I mean, there's a skill to reading analysts' reports, right?  You don't necessarily spend time on every single number and every single table, but certainly to get the gist of what the analyst was talking about as it related to this case, that was my goal.

Q.    Okay.  I'd like to introduce as Exhibit P3.

                    (Deposition Exhibit 3 was marked
                     for identification.)

MR. LINKH:  And for the record, that's a September 26, 2023, report from CLK.

BY MR. LINKH:

Q.    Are you familiar --

MS. UMAR:  The date I'm seeing on this, Greg, is September 27.

MR. LINKH:  September 27, 2023.  Close enough.

BY MR. LINKH:

Q.    And are you familiar with this report?

A.    I mean, right now it is kind of hard to

Page 76

remember a report specifically.  But if it's on my list of documents considered, I very likely reviewed it.

Q.    Did you discuss this report in your opinion -- did you in your report?

A.    Let's check.  Let me see.  I believe so. I believe -- I mean, if I had it, it would have been part of that paragraph that we looked at where I count how many analysts discussed guidance in their lead paragraph, which this one does.

Yeah, it looks like it's the fourth one up on Page 4 of Appendix B.  From CLK.

Q.    I take it that you're familiar with it?

A.    Yeah.

Q.    But did you discuss it in any substance in your report other than stuff you have considered?

A.    I mean, I would have to check to see if it's -- well, it's part of that count so I think it is very much part of the substance because I say -- what was it, Paragraph 60 -- so this is part of the analysis in Paragraph 100, and I believe it's cited in that footnote.

Q.    I'd like to introduce another analyst's report.  All right.  P4.

Page 77

(Deposition Exhibit 4 was marked for identification.)

MR. LINKH:  Just for the record, it Exhibit P4 which is a March 12, 2023, Guggenheim report.

BY MR. LINKH:

Q.    Are you familiar with this report?

A.    Yes, I think I cited different a later report in my report, but I do recall looking at this report.

Q.    And did you discuss this report in your opinion?

A.    I'm not sure whether I do or not.  I think this report may also be discussed in the complaint.  Just taking a quick look.

I recall this report.  It appears at least I just read the -- reread the lead paragraph. It appears consistent with my analysis.  In terms of it doesn't in any way contradict the conclusions that I reached.

Q.    I guess going back to June 7.  The stock price declined on that day, right?

A.    Yes.  And in absolute terms, certainly the stock price declined.

Q.    So that price decline, that affected all

Page 78

UNFI shareholders who held stock on those dates equally, correct?

A.   If they only had long positions, in the shares, as opposed to, you know, maybe some were hedged.  Putting aside any hedging, if someone held a long position, it would cause a -- for some class member a -- potentially a temporary impact, right, if they held shares after that.  And depending on what happened to the stock price, for some shareholders, it would have had -- if they sold, may have had realized capital loss impact as relative to the value of the shares on the date prior.  So...

Q.   But just to confirm, you know, it's not the case that on June -- on June 7, Shareholder A may have had a stock price decline of $2 but Shareholder B had a common stock decline of $3, correct?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.   I think if you're looking at the same security and you have multiple individuals or entities holding the same security, they will observe the same price movement on that security in an efficient and liquid market.

Q.   That would be the same for September 26,

Page 79

2023, correct?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    To the extent someone held UNFI equity securities and the daily decline on those securities on that day would be -- would be one decline, right.

Q.    And so you are not contending that an individual investor would need to approve that they specifically relied on or read disclosures on June 7 or September 26 to recover losses for those dates, correct?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    So my understanding -- and again, I'm not a lawyer, but my understanding is that plaintiffs are seeking a class-wide presumption of reliance and so, the alleged misstatements are not -- are not subject to individualized proof in the sense that every class member would have to show that they read every financial disclosure or attended the earnings call or the read the transcript and so on.

Now here you are asking about corrective disclosures, and so I'm not sure what that -- what the context is.  It seems like we may have moved outside of price impact or are we -- I'm

Page 80

just not sure the -- what exactly you are asking for.

For price impact and for misstatements, I understand plaintiffs are invoking the presumption of reliance, but you asked me about corrective disclosures.

Q.   In your understanding, if -- if somebody wants to recover for losses in a class-action securities litigation, do they have to represent to the court or whoever that they actually read disclosures on a certain date in order to recover from losses from that date?

MS. UMAR:   Object to form.

BY THE WITNESS:

A.   So assuming there are recoverable losses and recoverable losses are proven and that's adjudicated, in order to claim, I think one would have to provide evidence of ownership, in relevant times and when shares were sold and if they were held.

My understanding is, but again, I'm not a lawyer, that an individual shareholder during the claims process need not produce evidence that they read -- read particular disclosures.  I mean, that would be -- assuming a class is certified and

Page 81

that all the issues are adjudicated, that already would be established.

Q. Okay. To the extent there's information about -- other than stuff relating to forward-buying that entered the market on June 7 or September 26, that was unrelated, you know, unrelated to plaintiffs' allegations, that would apply uniformly to all class members, correct, in calculating damages?

MS. UMAR: Object to form.

BY THE WITNESS:

A. So it's -- I don't think the question is whether information is related to plaintiffs' allegations. It's rather whether it's -- related is not a well-defined term necessarily in the context of damages. I think it has to -- the relevant question for damages is whether there's a revelation of the allegedly withheld truth or the alleged truth in this case. Right?

So a discussion of inflation -- of inflation may be related in some sense of plaintiffs' allegations but it doesn't mean that it is corrective and would give rise to the calculation of damages.

Q. I guess there could be -- if there's a

Page 82

revelation of truth or not, it applies to all class members, would it be the case that a certain class member has the truth revealed to them and another class mechanic does not?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.   It's possible.  That would depend on the circumstances because presumably someone could be aware of the information earlier.

Q.   Would that be relevant to a damages analysis?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.   Again, I think it potentially might be. If there was evidence that a shareholder was aware of the alleged fraud, they may not be able to recover damages.  But again, I'm not a lawyer. That's a legal question.

Q.   So let's say your opinion is correct, and there is no price impact on June 7, that would affect all UNFI investors, right?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.   So the way I would characterize my opinion is if I'm -- if the court finds my -- agrees

Page 83

with these findings and ultimately concludes -- which is a separate legal question. I have an economic analysis. But if the court concludes as a legal matter that there is no price impact of the alleged misstatements beyond March 8, then I -- I'm just not sure how you proceed on a -- on a class-wide basis such that the question of damages arises for those later dates. That's what is confusing me.

Q. Would it be the case that these issues are not something that can be determined on an investor-by-investor basis?

A. So my understanding, and this is an understanding of a legal concept, is that the class members here are seeking class certification based on the concept of common reliance. And in price impact is a manner in which that can be -- that -- even if the market is efficient, that presumption can be rebutted, and so then you would not have a class -- this is again a legal understanding of the law, but you wouldn't certify a class if there's no price impact.

Q. So for the price -- so for the residual returns on June 7 and September 26, would you -- under your opinion, would you be opining that those

Page 84

declines were not driven -- were driven by new information but information that was not related to plaintiffs' allegations?

A.    You said --

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    -- June and September 2023?

Q.    Yes.

A.    My opinion, and that's in my report, they're not driven by the revelation of the alleged truth.

Q.    But it's driven by new information that came into the market, correct?

A.    Yes.  If the market -- if the market reacted, which it did, and the market is efficient, that would be in response to some new information, and my opinion is that that new information is not the alleged truth.

Q.    Gotcha.

I've got about five more minutes.  Is that good for everybody?  Five or seven for this section.

MS. UMAR:  Is that good?

THE WITNESS:  That's fine.

Page 85

BY MR. LINKH:

Q.   And so, your support for that would come from statements by UNFI management, in part, on those dates?

A.   It's -- well, my support for the fact that the alleged truth was disclosed on March 8.

Q.   Yes.

A.   It comes from a combination of factors. Certainly the company's disclosures, both in the earnings disclosure but also subsequent commentary.

I also analyze analysts' commentary, how analysts responded.  I analyzed the quantitative impact of the information that was disclosed about margin, that 70-basis-point decline in margin, and how that compared to other periods historically that had seen increases.  And I also look at how analysts not only qualitatively but how they quantitatively analyzed the impact on their views, right, on forward-looking performance in terms of their projections for the company's future earnings.

So I think that -- that in conjunction with -- I do briefly discuss the complaint and the allegations in the complaint, but that's more, from my perspective, confirmatory to the other pieces of analysis.

Page 86

Q.    And just to be -- just to be clear, you were discussing qualitative versus quantitative, analyst by analyst.  Can you just give me a distinction?

A.    Yes.

For that question, what I had in mind is -- just because it's discussed slightly separately, I talk about the words that the analysts use in their reports, but then I also have a comparison of their expected earnings before and after the March 8 disclosure.  So that's -- I think, in this question, that's the distinction I was making.

Q.    As a matter of economic theory, are you aware that sometimes corrective disclosures can occur in multiple steps?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    So economic theory does not generally speak about corrective disclosures.  That's a legal concept.  It is true that economic analysis is applied in this context.  So I really -- I don't think there's economic theory or an article in a finance journal that talks about corrective disclosures occurring over time, but -- so in that

Page 87

sense, I'm not sure it's possible.

Q. Would you agree, maybe it's not a matter of economic theory but, that there's situations where you could have a partial corrective disclosure that reveals certain truth and has a certain price impact on one day and then another disclosure that has other elements of that revealing other elements of the truth and that also has a price impact on another day?

MS. UMAR: Object to form.

BY THE WITNESS:

A. That's certainly logically possible and in an economic theory outside of the context of corrective disclosures but concepts such as resolution of uncertainty, that can occur over time. So logically what you're describing is -- is possible. Whether it applies in any given case depends on the circumstances.

Q. And on a given day, the presence of one piece of news about a company doesn't preclude there is another piece of news that could have caused part of the stock price drop, right?

MS. UMAR: Object to form.

BY THE WITNESS:

A. To make sure I get your question right --

Page 88

maybe let me just say this. If there are multiple pieces of information on a given day that are disclosed, just -- and we also observe a price decline. Right? If the market is efficient, the price decline should be attributed to the overall tautology of the information disclosed, but you don't know just based on that, right, without conducting an analysis whether one piece caused the decline, the other piece, or both in combination.

Here, based on the analysis in my report, we do know that for June and September 2023, it was not the alleged truth.

Q. Well, just to be clear, you have not done any type of disaggregation analysis for June 7 or September 26, correct?

A. Well, so I have done that analysis with respect to the question of the alleged truth. I am of the opinion, and this is I think clear in my report, that the alleged truth played no part in -- in the declines observed on -- in June and September 2023, if the market is efficient.

Q. But have you done an actual disaggregation analysis as to what actually caused the drops on those days?

A. No. I have not. It wasn't something

Page 89

that was necessary for my opinion, and certainly if the entirety of the alleged truth is disclosed in March, there is effectively no reason from the perspective of a price impact analysis certainly to disaggregate the other causes for -- that exist for those two dates.

Q.   Are there any analysts' reports on UNFI from the June 2023 time frame that you reviewed that weren't included in the report?

A.   By "included," I guess my -- I would like to clarify whether you're talking about Appendix B or something that is specifically cited in the report.

Q.   Maybe I'll break that down into two.

Is there any that you reviewed that were not included in Appendix B?

A.   If such a report exists, that would be unintentional.  The goal was to include reports that I had available and reviewed.

Q.   So, if even -- even if you didn't discuss it substantively in the report, you included it if you had read it?

A.   Yes.  I mean, it's a disclosure of materials considered.  So, yes.  So, that was -- at least that was the goal.

Page 90

Q.   So there's no analysts' reports on UNFI that you're aware of either for June 2023 or September 2023, that you're aware of that discussed issues relevant to the extent of forward-buying or procurement gains that aren't addressed in your report?

MS. UMAR:   Object to form.

BY THE WITNESS:

A.   Well, there aren't -- I'm not aware of additional reports that are not listed in appendix -- in Appendix B based on the -- you know, on the sources from which I obtained these reports.

MR. LINKH:   Okay.   I think now is a good time to take a break.

THE VIDEOGRAPHER:   This marks the end of Media No. 2.   The time is 11:21 a.m.   We are off the record.

(Break in the proceedings taken at 11:21 a.m.)

THE VIDEOGRAPHER:   This marks the beginning of Media No. 3.   The time is 11:36 a.m. We are on the record.

BY MR. LINKH:

Q.   Dr. Zurek, are you opining on whether Dr. Feinstein needs to do a damages analysis at the

Page 91

class certification stage?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    So my general high-level understanding of the legal standard is that plaintiffs are required to proffer a damages model.  That is distinct from doing an actual specific damages calculation, so saying what damages would be per share based on when different investors bought and sold, which is in my experience done at the merit stage.

But I do think there is -- or at least not think, I understand that there is a legal requirement with respect to damages.  And what I'm opining on is what's in my report, but it's effectively that I reviewed what Dr. Feinstein did in his report, and he has not articulated, in my opinion, from the perspective of an economist a damages methodology.

Q.    So, you are not opining that Dr. Feinstein needs to provide a completed damages analysis at this stage, at the class certification stage, correct?

A.    That's correct.  I'm not opining that. My opinions are what's in my report.

Q.    So is it fair to say that you're

Page  92

criticizing Dr. Feinstein for not adequately demonstrating the methodology that you would use to prove damages at this point?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    So I'm noting that in my view, he hasn't articulated any methodology.  So I guess that implies no methodology if one is required, is -- is -- that that would give rise to the criticism, as I discussed in my report.

Q.    And just to be clear, you are not stating that at this juncture, he has to know every calculation that will ultimately be carried out when he is actually proving damages?

A.    That's correct.  I don't think he needs to articulate every single calculation that will be done.  Right.  But what's missing from -- based on my reading of his opinion, what's missing is any sort of idea as to what methodologies would actually be used.  Putting aside whether inputs to those methodologies would be available and certainly putting aside actually performing any calculation which, as I said, a specific declaration at this point in my understanding is not required.

Q.    And you yourself have not developed your

Page 93

own methodology to calculate damages in this case, correct?

A.    That is correct.  I haven't been asked to do.  So I have only been asked to evaluate what Dr. Feinstein said about damages.

Q.    So you don't have an opinion as to what tool -- valuation tools are appropriate when you're considering the facts and circumstances of this case?

A.    I don't have an opinion as to what specific tool or tools would be appropriate given the allegations.  I do have an opinion about event studies and that in cases such as this one, where the alleged corrective disclosure represent materialization of risk, an event study is certainly insufficient to calculating the amount of inflation that was removed from the share price on the dates of the alleged corrective disclosures.

Q.    Are you familiar with what's called an out-of-pocket damages theory?

A.    I'm familiar with out-of-pocket damages. It's a legal concept, so my familiarity is only in the context of being an expert witness.  It's not a term of art in economics, but I'm familiar with it.

Q.    So you don't dispute that out-of-pocket

Page 94

damages methodologies are commonly used in securities class actions to calculate damages?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    I don't -- I don't dispute that.  I haven't performed a systematic analysis, but in my experience, I have seen out-of-pocket damages proposed, as the measure of damages at the class certification stage, yes.

Q.    Are there any specific issues that are unique to UNFI's stock that make the standard out-of-pocket damages methodology impracticable or unreliable here?

A.    So, I think in this question you moved on from the concept of out-of-pocket damages to a methodology.  My opinion as an economist who has seen some of the considerations that come into play and actually calculating damages, my view is that out-of-pocket is a legal standard.  It effectively states that damages are based on a measure of inflation, but out-of-pocket doesn't tell you how to calculate inflation.

So when I used the word "methodology" in the context of this case, it's is there some methodology through which one can calculate

Page 95

inflation and then ultimately implement the out-of-pocket formula which depends on inflation.

Q.    Just to be clear, you are not claiming that, like, a loss causation or damages analysis is impossible to do in this case, correct?

MS. UMAR:    Object to form.

BY THE WITNESS:

A.    I am not opining that it is impossible. It may be.  I mean, I don't know.  If one were to do all the -- all the work required to develop a methodology, it's possible that one would conclude that there's really no good methodology here, but that's not my affirmative opinion.  My opinion is in response to Dr. Feinstein's discussion of damages and his claim that there's nothing unique about this case and I -- that would complicate the calculation of damages.  Putting aside whether that's sufficient for having a methodology, that's a legal question, there's just no basis -- no economic basis in his report for him to draw those conclusions, based on what he's disclosed.

Q.    Which, to be clear, you are not saying it is impossible for any expert to ever opine on a damages analysis on this model due to the specific factors of this case?

Page 96

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    I am not saying that there isn't some expert out there who could calculate -- who could calculate out-of-pocket damages, but I'm also not saying that there is such an expert.  I think the analysis required to make that determination just hasn't been performed by Dr. Feinstein.

Q.    Okay.  I want to point you to Paragraph 14 in your report.

Do you see at the beginning it states, "Dr. Feinstein's assertion lacks any disclosed analytical support and therefore cannot be replicated or tested against the circumstances of the present litigation"?

Do you see that?

A.    I do.

Q.    Had you investigated the circumstances of the present litigation that would prevent Dr. Feinstein from determining that out-of-pocket damages -- that the out-of-pocket damages methodology is consistent with plaintiffs' theory of liability?

MS. UMAR:  Object to form.

Page 97

BY THE WITNESS:

A.   So as I already said, I am not contesting that out-of-pocket damages aren't applicable here. That's a legal question.  What is the relevant standard of damages?  My opinions are about the methodology or lack thereof in Dr. Feinstein's report.

Q.   So what's necessary at this stage for there to be analytical support in calculating damages assuming that an event study that's proposed is sufficient?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.   I mean, at a high level of generality, one way to do this would be to articulate some methodology that takes what's alleged based on some articulation of the alleged truth, and is a model for actually calculating inflation.

What is -- what would not be a model -- and I know Dr. Feinstein mentions an event study that might be applied on dates of alleged corrective disclosures, he doesn't go as far as to say, as far as I understand, that that would be a measure of inflationary move.  I believe, if I remember correctly, plaintiffs' motion for class

certification does.

But given that this case is premised on the materialization of risks, as I discuss in my report, just using an event study we know is inefficient so there would need to be an additional methodologies that would take into account the risks that were allegedly concealed, stemming from the alleged lack of disclosure regarding the impact of inflation-related, forward-buying opportunities.

So there would need to be some methodology.  So that's at a high level.  There could be multiple methodologies that could be a single one that works or there could be none. That's what I expected Dr. Feinstein to have done.

Q.    Stepping aside for a little bit, in general, if you're trying to estimate damages, using an entirety of a stock prices drop after disclosure, do you have to have 100 percent certainty that the company's misrepresentation caused the inflation generally?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    So I'm not sure what you're asking.  When you say "certainty," my understanding is -- and to the extent you are asking about burden of proof, my

Page 99

understanding of the standard is the preponderance of evidence, not certainty.  But I'm really not sure what you mean by "certainty" that the alleged misstatements caused inflation.

Q.   Okay.  I want to turn you to, let's see, like Paragraph 126 and 127 of your report.

So you talk about back-end price drops, right?

A.   Yes.  So these paragraphs discuss why the back-end price drop -- I assume we both understand what that means.  It's a price drop on the date of an alleged corrective disclosure.  Right?  And this paragraph deals with the issue -- is that, once you observe that back-end price drop, is that -- is that a measure of inflation earlier during the class period.  That's what I'm discussing in these paragraphs.

Q.   Okay.  In preparing your report, did you conduct any investigation into any UNFI internal documents to find out what defendants knew internally about the risks associated with forward-buying or procurement gains?

A.   I did not.

Q.   Okay.

A.   It's -- and the reason is that -- well,

Page 100

for my price impact analysis, it really was about what was disclosed to the market.  And here the issue is the methodology, broadly, as -- as opposed to specific -- you know, do you want to take into account specific facts or circumstances very effectively for analyzing a damages methodology?  I think I'm assuming the allegations as -- that they will ultimately be proven and then based on the allegations, is there a methodology to calculate damages.

Q.   Does Dr. Feinstein -- in your opinion, does he create a case-specific and class-wide damages methodology that would quantify damage that stemmed only from the risks that may have been understated by defendants?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.   So I -- I can't speak to the -- to what the standard is.  Certainly the class certification stage, that's a legal question.  So what he must do, I -- that I -- I can't answer.

I -- I can tell you what, and the court, what he did not do, and what's not in -- in his -- in his report.

My understanding is that ultimately,

Page 101

there needs to be a model that's -- that reliably measures the impact of the alleged inflation. That's my understanding of out-of-pocket damages.

Q. So for Dr. Feinstein's proposed methodology, would he have to consider, like, for example, the incremental release of under-disclosure risks if that happened in several stages?

MS. UMAR: Object to form.

BY THE WITNESS:

A. So again, I can't answer what he would have to consider. I think a model, I can talk about what a model would need to take into account and that's one of the factors that I discuss in my report is if there is an undisclosed risk, right, it's -- is the -- is that risk revealed over time, and then how does that interact with the -- that risk materializing over time, which is another dimension.

So the question would be is there a model that can apply under those circumstances? It wouldn't be at this stage, you know, what is the exact number or what is the exact input into the model. It would more generally be is there a particular model and, you know, do I expect to be able to identify the relevant inputs to that model.

Page 102

That's my understanding of what might be required. But again, that's a legal -- it is up -- my -- it is up to the -- to the court to decide what the legal standard is.

Q.    And so for Dr. Feinstein's proposed methodology, would he have to consider confounding information that was outside of plaintiffs' theory of liability?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    I would think that in order to have a model, you want to be reasonably confident that that model can take into account confounding information if it exists.  So depending on what that information and that -- you know, I talk about it in my report, it is available, in -- from -- from public information, if I were developing a model, even just for the purposes of developing a model but not actually doing the hard calculations, I would consider the nature of the confounding information or the likely nature of the confounding information and ask the question, is the model that I have selected capable of measuring that in order to exclude it from the calculation of damages, assuming that I'm effectively using the declines on the dates

Page 103

of the alleged corrective disclosure as a measure of inflation.  That's not necessarily the only way to do it, but if that were the path, can I take into account confounding information.  It wouldn't be, my understanding is at this stage, actually saying confounding information is 5 percent or 10 percent or 20 percent of the observed declined.

Q.   Okay.  So if Dr. Feinstein was considering the confounding information, would it have to be removed from the quantification of the damages stemming from under-disclosed risks?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.   So, by definition, and this is effectively a tautology about the confounding information, so meaning information that is not revealing of the alleged fraud, should not be counted as part of any measure of inflation.  So in that sense, if one is somehow counting it, then one needs to remove it in order to have a reliable measure of inflation?  I think, I don't know if you are asking me more, but to me that's a tautology.

Q.   Did the realization of an under-disclosed risk contribute to the stock price reaction on June 7?

Page 104

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    So I mean, we're talking about damages here.  For the purposes of my damages analysis -- as I said, a couple of questions ago, I am assuming that this is plaintiffs' allegations as they are in the complaint and I'm assuming they will be proven and that the only remaining question is the quantification of damages.  So the discussion that I have in this section of the report allows for the possibility that it will be shown by plaintiffs at a later stage that the risks were under disclosed. That's the damages discussion.  This is what we're talking about right now.

I also have an opinion regarding price impact.  And based on my price impact findings, I think they're inconsistent with the notion that by March 8, 2023, there were remaining undisclosed risks.  So the two opinions I think are different, that's why I'm just trying to give a complete answer.

Is that -- for purposes of discussing whether there is an articulated damages model from an economic perspective, I'm allowing for that possibility.

Page 105

Q.    That would be the same for the September 26?

A.    Correct.

Q.    I want to point you -- can you start looking at Dr. Feinstein's report.  I'll point you to -- to Paragraph 211.

A.    And.

Q.    Do you see on romanette i, Dr. Feinstein states that, you know, "First, valuation tools, which would include event study analysis, and potentially other financial analyses, if necessary, would be used to establish if corrective disclosures caused the price of UNFI Securities to fall."

Do you see that?

A.    I do see that written there, yes.

Q.    Okay.  And so would you agree that event study analyses, especially if combined with other financial analyses, could be used to determine whether a corrective disclosure cause UNFI stock price to fall?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    It's possible.  It's not in my experience guaranteed.  In the case of confounding information, that's -- which I guess is -- in the remainder of

Page 106

the paragraph, Dr. Feinstein talks about confounding information. And so in the presence of that, it it's not guaranteed, assuming there's an appropriate methodology, right, out of the -- all the possible financial valuation tools that Dr. Feinstein has in mind.

It may be the case that there is an appropriate tool. There may be a case that there isn't. That's why the crux of my opinion is that from an economic perspective, what is in this section of Dr. Feinstein's report is not a methodology.

Q. Okay. Would you agree that an event study analysis is a widely accepted tool to assess whether a corrective disclosure causes a stock price drop, assuming that's a -- the study controls for market factors and industry factors?

MS. UMAR: Object to form.

BY THE WITNESS:

A. So an event study by itself will -- if it's properly specified, will let you distinguish -- so given a price decline, an observed raw price decline, it will let you distinguish the portion of that decline that is caused by market and industry factors from company-specific factors that do not

Page 107

arise from the correlation between the stock price and market and industry price levels. But that's -- an event study will go only as far as that. Right? Whether that company-specific portion of the decline represents corrective information is a separate -- would be a separate -- potentially a separate question.

Q. Okay. But would you agree that in securities class actions like this, event studies are commonly used tools?

A. I think that's a -- that's a relatively fair characterization. Event studies as a tool are commonly used. They're used in assessing market efficiency. They're used for other purposes.

To me that statement doesn't answer the relevant question, which is, in this case, would an event study analysis be a reliable tool for calculating inflation? To me, that remains a -- unanswered, apart from any -- any conclusion whether an event study is commonly used or not for many different purposes.

Q. Okay. So going on a little bit after that, you know, you see the sentence that says, "This analysis, after controlling for potentially non-fraud-related information, would establish

Page 108

whether the fraud had caused the security price to be artificially inflated, and if corrective disclosures caused that artificial inflation to dissipate, in turn, causing investor losses."

Do you see that?

A.    Yes.

Q.    So do you agree that if this analysis controlled for potentially non-fraud-related information, that it could establish whether the alleged fraud caused the stock price to be artificially inflated?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    So there -- if you were interested in the impact of a piece of information, and you established that that piece of information is new and corrective information, and you observe when that information release happens, you control for any confounding information.  Right?  You have established market efficiency.  And you take that residual, remove the impact of any confounding information, then you reach the conclusion that the piece of information you're interested in is what caused the price decline in an efficient market, and whether that can be done is an open question.

Page 109

Q.    So do you also agree that an event study analysis like this could also determine whether corrective disclosures caused the artificial inflation to dissipate, again, you know, controlling for non-fraud-related information?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    It could under some circumstances speak to the removal of inflation.  I think that becomes much more complicated when you have a risk that materializes because then you're really not measuring the removal of inflation, you're measuring the risk having materialized.  So that depends on having appropriate compatibility between what's being disclosed, and -- and what could have been disclosed earlier.

Q.    Okay.  So this event study analysis, this would apply on a class-wide basis, correct?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    I mean, I don't know what it means for an event study to be applied on a class-wide basis.  If one is using an event study, it will yield a set of conclusions that either speak to the relevant question or they don't.  But it -- so, to me

Page 110

class-wide is -- like, it doesn't make sense to say an event study is class-wide.

Q. But if you're conducting a -- you know, an event study, it wouldn't apply to one investor and not another, correct?

MS. UMAR: Object to form.

BY THE WITNESS:

A. It depends on the damages standard and how damages are ultimately calculated or what it's being used for.

Q. For an event study, in a securities litigation, putative class action.

MS. UMAR: Object to form.

BY MR. LINKH:

Q. Would you agree that an event study wouldn't assess potential damages on an individual basis?

MS. UMAR: Object to form.

BY THE WITNESS:

A. So, I mean, I think if a class is certified, right, and investors proceed on a class-wide basis, and inflation is calculated in a reasonable manner, right, using whatever methodology, right, and that that measure of inflation is applied to all investors, in the same

Page 111

manner, potentially accounting for timing of purchases and sales, then I think by definition, that is a common inflation band, right, that's being applied for the whole class, right?  But that's -- that's -- that to me is almost a tautology.  If you're going to apply the same methodology to every one, then by definition that is a class-wide calculation.  Whether that's appropriate or not and whether that can be done, those are additional questions.

Q.   Just to be clear, you are not opining that there's no valuation tool that can be used to determine if the corrective disclosures caused the price of UNFI securities to fall, right?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.   I'm not saying that this would be impossible.  I point out some -- and I think very meaningful in the case of materialization of risk and some of the other considerations, factors that would make this challenging, and potentially impossible, but I'm not saying it couldn't be done.

Q.   Are you familiar with the term inflation-driven?

A.   Yes, I believe I just used it in a couple

Page 112

of sentences.

Q.  Yeah.  So what is your understanding of the word inflation-driven?

A.  So that -- it's generally a -- you know, whether it's a graph or a schedule of the amount of inflation present in the stock price on different dates during the class period.  Because investors purchase shares, presumably there may be a new class member on every single day of the class period, not necessarily but -- but that could happen, you need to know inflation on every single day.

Q.  So would you agree that construction of an inflation ribbon is something that's generally done among -- you know, that economists generally do in securities litigation?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.  So at the merit stage, I think it's typically experts, who are retained by plaintiffs, given the -- what I understand to be the burden of proof, will attempt to construct an inflation ribbon as we have defined it.

And so -- but again, for the purposes of my opinions in this report, they're not about whether an inflation ribbon is applicable or not.

Page 113

They're about whether Dr. Feinstein has established and -- and articulated some economic methodology to be able to calculate that inflation ribbon at a later date.  That's part of the questions that I'm asking and noting that, indeed, given the facts and circumstances of this case, given what I understand to be the alleged theory of liability, he has not done.

Q.    Have you ever created an inflation ribbon?

A.    I have worked with inflation ribbons and I think, yes.  I think the answer is yes.

Q.    Can you tell me the particular circumstance, if you recall?

A.    So I have assessed inflation ribbons that were put forward by experts who are retained by plaintiffs in various litigations.  I have also considered what inflation ribbons might look like in engagements that involved assessing potential exposure in a securities lawsuit.

Q.    So you are not disputing that inflation ribbons generally cannot be used in these types of cases, correct?

MS. UMAR:  Object to form.

Page 114

BY THE WITNESS:

A.    I mean, if out-of-pocket damages are appropriate, if the court finds that out-of-pocket damages are appropriate, which I'm in no way disputing, that's a legal question, those are based on inflation.  An inflation ribbon is just a schedule of inflation over time.  So it would be something that's required to calculate out-of-pocket damages, and the question is, is there -- is there a methodology to actually do that.

Q.    I wanted to point you to romanette iii.  You see where it says -- I'll just read it into the record here.  "Supplementing event study results, the full array of generally accepted and widely used valuation tools can be applied, if necessary, to calculate the but-for security price under the assumption of prior full disclosure."

Do you see that?

A.    Yes.

Q.    Do you disagree with the principle that economists may supplement event study results with other generally accepted valuation tools to estimate the price of a security?

MS. UMAR:  Object to form.

Page 115

BY THE WITNESS:

A.    I mean, I -- I'm certainly not objecting to the idea that if some calculation, whatever calculation it is, requires refinement and you use an array of different tools and arrive at a reasonable declaration, then, I -- I don't think that's objectionable.  What's at question here is -- and it's right there in little romanette iii, you have to calculate as Dr. Feinstein recognizes the but-for security price.

So the but-for security price is the market price that would have prevailed under the assumption in his words of prior full disclosure. Right?  So, the question from my perspective is what is that array of generally accepted valuation tools and which ones are actually going to answer that question, which is a very specific question.  It's not about can someone perform some valuation.  It's about can one reliably estimate the but-for security price, which is required to then determine inflation.

Q.    So, could, like, a regression model be used for but-for security pricing?

MS. UMAR:  Object to form.

Page 116

BY THE WITNESS:

A.    Regression model is an extremely broad term that encompasses -- I mean, it is a component of an event study analysis.  It can be used for other applications.  So, as a general proposition, a regression analysis may be useful in some form or fashion in performing a damages calculation.  I think that's -- that's correct.  But again, that says nothing about whether a regression analysis, let alone what's -- you know, what kind of a regression analysis, would actually be useful in this case.

Q.    A discounted cash flow analysis can be used to determine the but-for security price?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    In theory, that's -- that's possible.  I will note, and this is -- this goes back to what I said about what it means to have a but-for security price, it's a hypothetical market price.

In practice, discounted cash flow analyses may not actually yield, putting aside the notion of a hypothetical disclosure, under the prevailing reality when one is valuing a company, and uses available data about the disclosed state of

Page 117

the company, not any hypothetical state, such a valuation may yield an estimate that is wildly different from the market price.  And so it would be necessary to ascertain if one were to propose using a discounted cash flow analysis whether such an analysis would indeed approximate market prices, because what you're after in this context is the but-for security price which is a hypothetical market price.

Q.    But would you -- would you agree that a discounted cash flow analysis is a tool that could be used in this exercise?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    So I would refer you back to my prior answer.  It is a tool -- it is a tool for conducting valuations.  It is possible that some version of this tool could apply.  It's possible that it may be impossible to come up with the right inputs to reasonably approximate market prices, and so that's a question that would need to be answered.  But in -- it is theoretically possible.

Q.    How about using a -- could you use -- a, could you use comparative multiples to estimate damages -- estimate a but-for damages?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

MS. UMAR:  Object to form.

BY THE WITNESS:

A.     So I'll talk about multiples generally. I mean, there are different -- there are different terms used.  I mean, comparative multiples that -- I think I know what you're -- what you're referring to.  I think they're called comparable company -- sometimes referred to as comparable company analysis or multiple analysis.

And again, it's -- it really depends, ultimately whether that's an appropriate methodology.  It would depend on what your -- what the allegations are and what exactly you need to measure in order to calculate inflation.

So is it possible?  It may be possible.  It may not be.  The method of multiples sometimes, again, can yield estimates that are very different from observed market prices.  So that's an issue that would have to be dealt with.  And I think more generally with all these questions, Dr. Feinstein has just included effectively a laundry list of techniques for -- for conducting a valuation.  And the way I understand his argument is, because there are a lot of tools out there that different people may use, that means that someone

Page 119

can at a later date necessarily calculate damages, to me that's the crux of his argument, and what I'm pointing out is that that is not a methodology.

Q.    But you wouldn't disagree that comparative multiples can be used in these contexts, correct?

MS. UMAR:    Object to form.

BY THE WITNESS:

A.    In theory, a multiple-based analysis may be applicable, but it may also not be applicable. One can't say based on the analysis that's been conducted and disclosed by Dr. Feinstein.    He claims that there's nothing that would prevent this from happening, but that's just effectively because he has not disclosed his thought process relating to that in any analysis he conducted.    That's effectively his say-so.    I don't think there's support for that in his report.

Q.    Do you disagree that these valuation tools, the regression models or the discounted cash flow analysis or the comparative multiples, do you disagree that they could be applied on a class-wide basis?

MS. UMAR:    Object to form.

Page 120

BY THE WITNESS:

A.    So, again, I'm not sure what it means to apply a tool on a class-wide basis.  I think inflation -- one in theory can calculate, of course, inflation on a class-wide basis and apply the same inflation band to every class member.  The question to me is are these tools actually useful in calculating the inflation band as I articulated?  I don't know what it means to apply a particular tool on a class-wide basis.

Q.    I want to point you to romanette iv.

MS. UMAR:  Greg, whenever is a good time, maybe we can break.

MR. LINKH:  That sounds like a plan.

THE VIDEOGRAPHER:  This marks the end of Media No. 3.  The time is 12:19 p.m.  We are off the record.

(Break in the proceedings taken at 12:19 p.m.)

THE VIDEOGRAPHER:  This marks the beginning of Media No. 4.  The time is 12:58 p.m. We are on the record.

BY MR. LINKH:

Q.    Dr. Zurek, I think before the break we were taking a look at Paragraph 211 and I was going

Page 121

to point you to romanette iv.

Do you see that?

A.   I do.

Q.   So, do you see where Dr. Feinstein states, quote, "This approach and analysis enable computation of the artificial inflation ribbon even in cases where there is confounding information, changes in the concealed information, and changes in the value of the concealed information, among other potential complexities"?

Do you see that?

A.   I do see that.

Q.   Do you disagree with this approach?

MS. UMAR:   Object to form.

BY THE WITNESS:

A.   I mean, the way I read this statement, Dr. Feinstein is saying, no matter what the complications, it can be done using the above approach.  I'm not sure that I agree with that, as kind of a general proposition.

But in this case, in particular, I think that's really the relevant question, is there an analysis, a methodology that Dr. Feinstein has proposed that would actually work in this case? It's not -- the question is not could something in

Page 122

theory work.  It's rather is there an approach and what is that approach that would work here, and this is -- and that's not in Dr. Feinstein's report. This is just a conclusory statement without really any support for it.

Q.    Do you disagree with the principle that event studies and supplement evaluation tools could be used to estimate artificial inflation even when there's confounding information on a disclosure date?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    Again, whether they could be used under some circumstances to me is not the relevant question.  I don't disagree with the proposition that it is possible in some circumstances to use these tools.  To me the question, the way I understood, what needs to be assessed is, is there, in fact, a particular set of tools that would constitute a methodology to calculate damages in this particular case.

Q.    Do you disagree with the assertion that the approach described by Dr. Feinstein in romanette iv could be applied on a class-wide basis?

MS. UMAR:  Object to form.

Page 123

BY THE WITNESS:

A.    So again, there's the could versus could in general versus could here.  Right?  And that would really depend on what the methodology is.  Right?

The March disclosure was a disclosure of a risk that had -- under plaintiffs' allegations a risk that had materialized.  It was associated with a price decline in the securities.  Analysts revised their forecasts on March 8, and -- and my understanding is that this securities litigation was originally filed within a couple of weeks of the March 8 disclosure.  So at least lead plaintiff here apparently recognized that he was of the view that there was a securities fraud.

And now I don't know what Dr. Feinstein would ultimately do with class members who purchased after March 8.  Is he going to calculate the same inflation for those as -- as purchasers before the March 8 disclosure?  It's so -- it's very difficult to say will this be a class-wide measure that would apply to everybody equally and also be compatible with plaintiffs' allegations?

Q.    Let's say there are purchasers that

Page 124

purchased on March 9, the day after the March 8 disclosure, would they be -- would there be individual difference among them in how damages are calculated?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    By "among them," you mean the purchasers after March 9, right?

Q.    Yes.

A.    I don't know.  I don't know what the -- what the proposed methodology is ultimately going to be.  I can imagine there may be individualized questions.  You know, did they -- were they aware of the complaints?  Did they contact -- typically there's some sort of an announcement of a lawsuit, did they contact the law firm?  There could be lots of questions, but we just don't know because there is no -- like, I can't possibly evaluate that without knowing what the methodology would be.

Q.    In terms of a damages analysis, would there be individual issues raised where somebody that bought that 12:00 p.m. on March 9 would have greater damages than another person that also purchased that identical minute on March 9?

A.    For the reasons I just described,

Page 125

possibly.  It's just -- it's hard to know at this point given -- like if there was an actual methodology that Dr. Feinstein articulated then, one could ask that question and maybe the answer is no, maybe it is all class-wide, maybe there are individualized issues, but that depends on the methodology.  This is not a methodology.  This is just a bunch -- of a bunch of different tools that, as I said, in theory, in some litigations, may be applicable.  Are they applicable here?  We don't know that because that's not in Dr. Feinstein's report.

Q.   I want to point you down a couple of sentences to that same romanette iv, where -- do you see where it says, "My reading of Plaintiffs' allegations and my review of the experience of the Company over the course of the Class Period uncovered no facts or circumstances that are extraordinarily unusual or might make application of this methodology exceptionally difficult"?

Do you see that?

A.   I do see that.

Q.   Are there any specific facts or features of this case that you think would make application of a methodology extraordinarily difficult?

Page 126

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    I don't know what extraordinarily difficult means as opposed to difficult.  I -- first of all, I'm assessing what Dr. Feinstein did, and there is absolutely no support in his report for the this statement.  This is a conclusory statement he makes without actually discussing the allegations and how they relate to the methodology without -- what experience of the company over the course of the class period, what that even means.  So this statement in and of itself is, in my view, completely unsupported by Dr. Feinstein.

I do point to certain aspects of this litigation -- the fact that plaintiffs allege that risks have materialized, there are multiple corrective disclosures here, the fact that there is confounding news -- that do complicate the calculation -- the potential calculation of damages which is, in my view, why you need to take a step back and -- actually, as an expert analyzing this question, one would need to take a step back and ask the question, is there a methodology and what is that methodology.  What is here is not a methodology.

Page 127

Q.    I wanted to talk a little bit about materialization of risk.

Would you agree that in securities fraud cases that a decline in stock price can be caused by either a direct corrective disclosure or by the materialization of risk that had been previously concealed?

A.    I would agree that those are two types of allegations that I have seen.  Could there be something else?  Possibly.  I'm not sure.  I haven't -- I hadn't thought about that, but that's certainly these two.

Q.    Okay.  Are you aware that courts recognized that loss causation can be established by the materialization of concealed risks even in situations where the company never explicitly admits any type of fraud?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    So that's a legal question.  I have seen and agree on whether a risk had materialized that was previously misrepresented to -- allegedly misrepresented to investors as part of a loss causation analysis but you are asking me a legal question.  I think -- I'm generally aware that that

Page 128

might be one avenue through which -- loss causation, which I understand is plaintiffs' burden to demonstrate ultimately, that may be used to demonstrate it.

Q.    Okay.  Is there any difference, like economically speaking, between a stock price that's caused by a corrective disclosure versus a stock price that is caused by the materialization of a risk?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    Yes, there's a fundamental difference economically speaking, especially economically speaking, when the relevant question is the measurement of inflation earlier during the class period, so the construction of the inflation ribbon.

And the reasons for that are described in my report in those paragraphs we looked at previously.

Q.    Are you contending that at the class certification stage, Dr. Feinstein would need to consider an analysis of whether -- you know, the extent to which risks were understated versus fully disclosed at the class certification?

MS. UMAR:  Object to form.

Page 129

BY THE WITNESS:

A.    My understanding is he would not need to answer that question one way or another whether they were fully disclosed or understated, but if the allegations are -- and the allegations have to be that they were understated.  The allegations can't be they were fully disclosed because otherwise they understand there would be no basis for the securities claim.

So if the allegations are that they're understated, I think what would need to be considered is what methodology will allow one to measure that understatement and the impact of that understatement on -- on inflation at any given point in time.

Q.    So your theory of the case -- or I guess your theory of the alleged fraud is that the disclosures were pure materializations of risk and no revelation of previously concealed information, correct?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    I don't think I say that in my report anywhere nor would that change the fundamental issue that to the extent that the alleged disclosures

Page 130

represent, let's say in part, a materialization of risks in addition to other components -- and I think that's very consistent with what is in the complaint when discussing each alleged corrective disclosure. So as long as there is some amount of a risk materializing that is alleged to have been under-disclosed, then the issue identified in my report, and we just talked about, would apply.  So I don't think this would change -- this would change the analysis and ultimately that would need to be performed.

(Deposition Exhibit 5 was marked for identification.)

BY MR. LINKH:

Q.    I'd like to introduce as Exhibit P5 -- I'll just start do you recognize this document?

A.    Just give me one second.

Q.    Take your time.

A.    I do recognize this document.

Q.    Can you tell me what it is?

A.    Is it an expert report that I submitted in the Dentsply Sirona matter.

Q.    And that was a securities class action, correct?

A.    That was a securities class action, yes.

Page 131

Q.    Was the opposing expert Matt Cain?

A.    It was.

Q.    And this was created for purposes of class certification?

A.    This was submitted -- this document was submitted attached to a -- to the defendants' opposition to class certification.

Q.    Yes.

A.    I just want to be precise.

Q.    You weren't on our side?

A.    I was retained by defendants, yes.

Q.    If you could go back to your report in UNFI, as opposed to Dentsply.  The one to your left, yes.

Just if I can point you to Paragraph 14 in the UNFI report.

And do you see how in Paragraph 14 you state, "From the perspective of a financial economist calculating damages, out-of-pocket damages and inflation are definitional concepts that must ultimately be calculated using some methodology that Dr. Feinstein does not apply"?

Do you see that?

A.    Yes.

Q.    That's basically what we have been

Page 132

talking about a lot of this deposition?

A.   Yes.

Q.   And if you go to Paragraph 39 on the Dentsply report, which would be I guess to your right.

And do you see there how it states, "From the perspective of a financial economist, out-of-pocket damages and inflation are definitional concepts, i.e., they must" be ultimately calculated -- I'm sorry -- they must ultimately be calculated as the output of some specific methodology"?

Do you see that?

A.   Yes.

Q.   In regards to your discussion of out-of-pocket damages and inflation, is there any meaningful difference between the analysis that Dr. Cain provided in Dentsply and the one that Dr. Feinstein is applying here?

MS. UMAR:   Object to form.

BY THE WITNESS:

A.   I couldn't say.  I mean, I think this report was filed right before Christmas last year. It's been -- it's been eight months and I just don't -- sitting here right now, I don't remember

Page 133

exactly what Dr. Cain did.

Q.   So understanding that it's been a -- you know, it's been a few months, are there any -- strike that.

Do you recall if there's any specific -- you know, is there any specific respect to which Dr. Feinstein's articulation of a class-wide damages methodology is less developed than what Dr. Cain's was?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.   I think it would be fair to say from the perspective of my opinion, at a high level in my opinion was that Dr. Cain did not demonstrate what the methodology to calculate damages would be. There are different cases, different allegations. There's obviously a price impact element in the present matter.

So I think I have a general recollection of my opinion there.  I just don't recall the specifics of Dr. Cain's opinion here. And then I know there was a rebuttal or a reply report, I guess, later, and I just don't recall what he said there, to what extent he's provided additional detail, and so on.

Page 134

Q.   Okay.  I guess as you're sitting here today, is there anything you can recall about Dr. Cain's report that -- or Dr. -- that made it more reliable than Dr. Feinstein's report in this case?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.   I can't make that assessment.  I had an opinion from a -- from an economic standpoint and I don't know -- first of all, I don't recall his opinion there, and -- and I'm not sure that I assessed reliability as opposed to existence of a damages methodology.

Q.   Okay.  You can put Dr. Cain's report aside.

I just wanted to talk a little bit about options.  And just to be clear, you are not offering an opinion that UNFI options traded in an inefficient market during the class period, correct?

A.   That is -- that is correct.  I mean, I did look at what Dr. Feinstein did in terms of assessing efficiency.  I think I have more questions there than I do regarding the equity, in terms of his analysis and the way he considers effectively the average price implied from the parity.  Just to

Page 135

be clear, I have not been asked to opine on the efficiency of options in this case. I have assumed that they are efficient for the purposes of my analysis.

Q. Would you agree that options prices are a function of the underlying stock price?

A. So when -- if you're talking about actual option prices, assuming market efficiency, there is a relationship between equity prices and option prices, but the crucial piece there is assuming market efficiency, which I have for the purposes of the damages analysis.

Q. So, like, when an underlying -- when the common stock price rises and if all -- if all else is equal, then would the call price also increase?

MS. UMAR: Object to form.

BY THE WITNESS:

A. So, directionally for a call option, I mean, the correct statement is the mathematical derivative of the option price with respect to the underlying stock price is positive, but I think that all else equal is -- is the -- you know, very important because, you know, other things can be going on.

Q. So, you know, if an underlying -- if a

common stock price falls and all else being equal, what would the put price do?

A.    All else equal, the put contract is -- effectively the writer of the put contract is the providing insurance.  So the put price would -- from the -- sorry, I'm getting confused.

From the -- from the perspective of the holder of the put option, when the share price you said goes --

Q.    If it goes down.  If the common stock price goes down.

A.    If -- if the common stock price goes down and the put option becomes more -- it's an insurance contract so it becomes more valuable.  Did I get that right?  Sorry.  For some reason I --

Q.    First of all, I get confused on call and put options all the time.  But, yes, I believe that is the case.

A.    It must be the after-lunch hour because I'm generally not confused.

Q.    So I wanted to point you to Exhibit 6 on your report.  And actually final -- at least for me it's the last page of your report.  The last -- the last real page of your report.

A.    Okay.

Page 137

Q.    Just to be clear, for this -- for this Exhibit 6, this is you charting the implied volatility of each option throughout the proposed class period using Dr. Feinstein's backup materials; is that correct?

A.    In his backup material -- and this may not be all the outstanding option series -- he does some amount of filtering there.  But for the ones he provides data for, on each day, for each option, there's an associated implied volatility, and that's calculated based on the data provider typically.

I don't think Dr. Feinstein calculated these.  It's calculated based on the observed -- on the observed option price and the stock price, and it's effectively a measure of volatility that when you plug it into the pricing model, it equates the option price with its theoretical price.

Q.    So you are able to, you know, see his data and follow his data, and, you know, track the changes in implied volatility across at least the UNFI options that he supplied, correct?

A.    Correct, and this is the -- the actual implied volatility.  This is based on actual option prices on the various dates because in my report, I

Page 138

discuss but for a hypothetical volatility.  That's different.  That's not what that is.  This is actual implied volatility.

Q.    Okay.  So would this analysis, would this make the market's estimate of volatility for UNFI an observable variable that could be used as an input for an option pricing formula?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    So the actual -- and this goes to the distinction that I just mentioned.  The actual implied volatility given an option pricing model is observable.  What's not observable is the hypothetical, what I call the but-for volatility, which is what my report focuses on, and that would be a key input in doing a damages calculation.

Q.    Just real quickly, how do you calculate an options price?

A.    Well, so option prices, in general, if we haven't -- well, regardless of whether the market is efficient or not, option prices may be observable because there could be transaction actions or broker quotes.  There are also option pricing models which, assuming effectively a rational relationship between stock prices and option prices and some other

Page 139

inputs, yield a -- yield what the option price should be.  And I say rational assumptions, that means effectively in an efficient market.

So, for example, the Black-Scholes formula is a formula that had given a number of inputs, such as volatility of the stock price, the stock price, and so on, yields an option price, and as a theoretical matter, the model -- the Black-Scholes model requires an input as to the volatility of the stock price.  But empirically, if that's what you do, if you just estimate the volatility of the underlying stock price and use that model, you actually get very poor predictions of option prices.  Empirically it turns out that different options trade with different implied volatilities, which is a violation of the Black-Scholes assumptions, but in practice that's what happens.

Q.   Has the Black-Scholes model been used in -- to your knowledge, in class -- in securities class actions to determine damages from options?

A.   So when damages are actually calculated, I can't recall if I have seen that at the merit stage.  There are different approaches, though, that plaintiff experts have proposed that I have seen at

Page 140

the class certification stage.  Relying on option pricing models is one of those approaches, although that's not a -- that in and of itself is not a fully specified approach because it's not without additional detail.  It's just saying I'm going to use an option pricing model.  It's not clear how inflation would be calculated.

Q.    Using the Black-Scholes model, would an input be the substance of the news that is revealed on a certain day?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    So, inputs, to say the Black-Scholes formula, are the stock price, the volatility, option characteristics such as option expiration, and the strike price of the option as well as the risk-free rate.  So option characteristics presumably don't change with the disclosure.  In most cases neither with the risk-free rate, unless it is something extremely unusual as the disclosure.

So in some ways the combination of stock price and volatility would capture the impact -- the company-specific impact of the news that's disclosed.

Q.    Would you agree that volatility is a

Page 141

common input affecting all market participants of --
all market participants of a certain option equally?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    I'm not quite sure what that question means because, I mean, different options will have different implied volatilities.  Right?  I think you asked about a single option.  So we're already kind of moving or abstracting away from the fact that different options trade based on difference in practice.  Their prices are determined, traded prices, using different implied volatilities, if you're using the Black-Scholes model.

But for a given option series, I mean, I would say, option holders of a given option series are impacted by the same price.  To the extent that the volatility is -- is dictating the price, then -- then indirectly, yes, they would be -- holders of options would be impacted by -- of a given option series would be impacted by changes in applied volatility.  But if -- you know, if you're getting at some sort of, okay, is this the class-wide measure of damages, I don't think we can answer that.

Q.    Okay.  Just to play around with the

Page 142

Black-Scholes, for example.  So let's say you have an adequately specified stock inflation ribbon and you have an adjusted volatility input, options can be valued using Black-Scholes, correct?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    Well, so, I think you're talking about something more specific than just options being valued.  You're talking about -- or are you asking about the calculation of a but-for option price or --

Q.    Exactly.  But-for option price using a stock inflation ribbon from common stock.

A.    So if you had an option pricing model that you can demonstrate works in the actual world and actually recovers actual option prices given stock price and volatility inputs, the Black-Scholes model, if you are not careful about what volatility measure is used, will not do that.

So I think your starting point, that model doesn't work unless you can measure volatility correctly for each option.  But assuming that you have correctly -- you have correctly measured inflation from the perspective of my opinion here, assuming that you have a methodology that can at a

Page 143

future date be used to reliably calculate inflation, which my opinion is that that hasn't been established, if you have a methodology to calculate the but-for hypothetical volatility, at a future date, again, my opinion is very much that that hasn't been demonstrated.  If you had those inputs and you had a model that's demonstrated to work well in terms of recovering option prices, that -- that can lead -- yield an estimate of the but-for price. But, again, fundamentally those are not in my view the circumstances under which we're here.

Q.    So just to be clear, you are not suggesting that, like, investor-specific factors, you know, like an investor's risk tolerance or a motive in purchasing, impacts the damages calculations for options, correct?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.    Unless there are some individualized reliance issues that would come up that would prevent recovery.  So, for example, if you're -- if you're buying put options because you believe the share prices were overvalued because you believe that there has been securities fraud, that might create a reliance issue.  But, you know -- but

Page 144

putting that aside, the calculation, as you have described it, and the calculation, that I think very much has not been proven, would work here, under the circumstances, given the lack of methodology, would yield for each option series a single but-for price estimate.

Q.   So, you wouldn't argue that applying the Black-Scholes model would require an individualized input for class member, it would be just be for the option series, correct?

MS. UMAR:  Object to form.

BY THE WITNESS:

A.   So, I think I would give the same answer I gave with respect to stock.  I would need to see what the model is, because there may be concerns around class-wide measurement that arise from something specific in the model.  It would be -- just taking the Black-Scholes formula, and if you have a unique set of inputs, then it will yield a single output.  That's a mathematical truism about that formula.

MR. LINKH:  I'm thinking maybe we can take a break now.

THE VIDEOGRAPHER:  We are off the record at 1:34 p.m.

Page 145

(Break in the proceedings taken at 1:34 p.m.)

THE VIDEOGRAPHER:  We are back on the record at 1:53 p.m.

MR. LINKH:  Dr. Zurek, thank you very much for your time.  On behalf of plaintiffs, I have no further questions at this time.

MS. UMAR:  No questions.  Thank you.

THE VIDEOGRAPHER:  We are off the record at 1:53 p.m. and this concludes today's testimony given by Paul Zurek, PhD.

The total number of media units used was four and will be retained by Veritext Legal Solutions.

(Off the record at 1:53 p.m.)

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

REPORTER CERTIFICATE

I, JO ANN LOSOYA, a Certified Shorthand Reporter within and for the State of Illinois, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein; That the foregoing deposition transcript was reported stenographically by me, and the foregoing constitutes a true record of the testimony given and the proceedings had; That the said deposition was taken before me at the time and place specified; That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand this day, August 5, 2025.

JO ANN LOSOYA, CSR, RPR, CRR
C.S.R. 84-002437

Page 147

NILOFER UMAR

Numar@sidley.com

August 11, 2025

RE: Sills v. United Natural Foods

8/5/2025, Paul Zurek PhD, (#7490617).

The above-referenced transcript has been

completed by Veritext Legal Solutions and

review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

to schedule a time to review the original transcript at

a Veritext office.

_XX_ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

Transcript - The witness should review the transcript and

make any necessary corrections on the errata pages included

below, notating the page and line number of the corrections.

The witness should then sign and date the errata and penalty

of perjury pages and return the completed pages to all

appearing counsel within the period of time determined at

the deposition or provided by the Code of Civil Procedure.

Contact Veritext when the sealed original is required.

__ Waiving the CA Code of Civil Procedure per Stipulation of

Counsel - Original transcript to be released for signature

as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the

time of the deposition.

Page 148

__ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF

Transcript - The witness should review the transcript and

make any necessary corrections on the errata pages included

below, notating the page and line number of the corrections.

The witness should then sign and date the errata and penalty

of perjury pages and return the completed pages to all

appearing counsel within the period of time determined at

the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not

requested before the completion of the deposition.

Page 149

Sills v. United Natural Foods

Paul Zurek PhD (#7490617)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____


_____    _____

     (Paul Zurek PhD)                    Date

Page 150

Sills v. United Natural Foods

Paul Zurek PhD (#7490617)

ACKNOWLEDGEMENT OF DEPONENT

I, Paul Zurek PhD, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____     _____

Paul Zurek PhD                              Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20____.

_____

NOTARY PUBLIC

Page 151

**[& - 3.23]**

| **&** | **11:36** 91:21 | 55:15,24 56:14 | **21** 28:16 |
|---|---|---|---|
| **&** 2:2,7 6:10 148:24 149:9 | **12** 78:4 | 57:2 | **2100** 2:9 |
| | **126** 100:6 | **2023** 22:7 | **211** 106:6 |

**&**

**&** 2:2,7 6:10
148:24 149:9

**0**

**0.05** 27:5,13
**0069688** 4:9
**0070113** 4:8
**02364** 1:6 5:17
**084-002437**
2:19

**1**

**1** 2:14 4:3 5:11
8:6,8 11:4,6,15
11:20 12:1
49:7 149:1
**1.05** 25:8
**10** 104:6
**100** 62:16
74:24 77:21
99:18
**10169** 2:4
**102** 25:4
**105** 25:25
**108** 27:1,2,23
28:6,7,10
**10:02** 49:7,10
**10:13** 49:12
**10b** 46:23
**11** 4:4 61:13,16
62:1,1,3 63:12
148:3
**11.55** 40:13
**11:21** 91:16,19

**11:36** 91:21
**12** 78:4
**126** 100:6
**127** 100:6
**12:00** 125:22
**12:19** 121:16
121:19
**12:58** 121:21
**13** 8:7
**131** 4:10
**14** 97:10
132:16,17
**151** 23:19,20
**17** 40:5
**1925** 2:8
**1:23** 1:6 5:17
**1:34** 145:25
146:2
**1:53** 146:4,10
146:15

**2**

**2** 4:4 11:17
12:7 49:12
75:25 79:15
91:16
**2.12** 25:9,17
**2.86** 17:16
**20** 42:6 43:24
50:10 53:2
67:17 104:7
151:15
**2021** 22:6
39:21 42:10
**2022** 37:21
42:11 55:3,11

55:15,24 56:14
57:2
**2023** 22:7
34:21 35:1
36:25 38:5,10
38:13,18 39:1
39:10 41:2,16
45:2,7 48:13
51:12 53:19,25
54:19 55:22
56:3,15,18
57:11,13,16
58:16,18 60:4
60:17 61:14
62:14,24 63:4
64:8,14,24
65:12,12 66:3
67:17 69:12,14
71:7,8,12,16
72:1,8 73:12
73:20 75:6,7
76:16,21 78:4
80:1 85:7
89:11,21 90:8
91:2,3 105:18
**2024** 58:15
63:19 64:5
69:12 71:7
73:18 75:11
**2025** 1:16 5:3
8:7 147:21
148:3
**2025.520** 148:9
148:12

**21** 28:16
**2100** 2:9
**211** 106:6
121:25
**212** 2:5
**216** 68:10
**2166** 147:23
**217** 72:4
**22** 28:16 55:12
**23** 39:8 56:4
61:15 64:7
**23.99** 39:2,9
**230** 2:3
**25** 37:13
**26** 35:1 36:24
38:18 39:1,10
63:4 65:12
71:15,16 72:1
72:8 73:12,16
73:20 76:16
79:25 80:10
82:5 84:24
89:15 106:2
**27** 32:9,10,12
32:23 76:20,21
**28** 29:24,25
31:22 34:25
50:10,16,17,18

**3**

**3** 4:7 23:5,10
59:22 76:13
79:16 91:21
121:16
**3.23** 25:8

**[30 - actions]**

**30** 149:1
**32** 68:2,8
**33** 71:24
**35** 13:22,25
**358** 2:4
**39** 133:3
**3a** 59:22
**3b** 59:22

**4**

**4** 4:9 77:12 78:1 121:21
**4.87** 17:17,25
**40** 53:1
**451** 23:22

**5**

**5** 1:16 4:10 46:23 104:6 131:12 147:21
**54** 53:17 54:20
**55** 53:17 54:20
**56** 53:21,22 54:20
**57.94** 26:3
**58** 68:9
**58.68** 26:2
**5th** 5:2

**6**

**6** 3:4 137:21 138:2
**60** 77:20
**601** 27:25 28:19 29:5
**60603** 2:14

**67** 69:9
**68** 17:9,11,12
**682-5340** 2:5

**7**

**7** 3:4 37:21 38:10,13 52:19 60:4,17 61:14 62:9,18 65:12 67:17 78:21 79:14 80:9 82:5 83:20 84:24 89:14 104:25
**7,2025** 11:14
**70** 18:10 59:7 59:22,23 86:14
**71** 59:20
**71.4** 23:25 24:14,17
**7490617** 148:5 150:2 151:2
**76** 4:7
**78** 4:9 28:14

**8**

**8** 4:3 34:21 38:5 39:21 40:24 41:2,16 41:24 45:2,7 48:13 49:15,23 50:1,9 51:2,5 51:12,18 52:20 53:10,19,25 54:17,18,23 55:22 56:18

57:11,16 58:16 58:21 59:3 61:16 62:14,17 62:24 63:17 64:14,21,24 65:2,9 66:2 67:24 69:13 71:4 74:3 84:5 86:6 87:11 105:18 124:10 124:13,18,20 125:1
**8/5/2025** 148:5
**84-002437** 147:24
**87** 22:4
**89** 37:14,18
**8:57** 6:22

**9**

**9** 125:1,8,22,24
**90067** 2:9
**93** 22:5,14
**95** 37:24 38:7 38:13,21 51:1 60:20 63:8
**98.7** 26:3,12
**99** 40:15

**a**

**a.m.** 1:16 5:2 6:22 49:7,10 49:12 91:16,19 91:21
**able** 50:7 55:1 55:21 57:10

65:7 74:12 83:16 102:25 114:3 138:19
**above** 32:9 122:18 148:6 151:7
**absence** 64:22
**absolute** 78:23
**absolutely** 127:6
**abstracting** 142:9
**accept** 10:6
**accepted** 107:14 115:14 115:22 116:15
**access** 20:22
**account** 99:6 101:5 102:12 103:13 104:4
**accounting** 112:1
**accurate** 12:9 39:11 73:2
**acknowledged** 49:16
**acknowledge...** 151:3
**action** 5:25 81:8 111:12 131:23,25 147:19
**actions** 95:2 108:9 139:22 140:21

**[active - alleging]**

active  22:6,14
actual  39:4
  44:21,22,22
  56:22 58:10
  89:22 92:7
  126:2 136:7
  138:23,24
  139:2,10,11
  143:15,16
actually  12:17
  25:3 28:14
  34:23 42:17,22
  43:4,7 46:18
  56:11 57:1
  75:16 81:10
  89:23 93:14,19
  93:22 95:18
  98:18 103:19
  104:5 115:10
  116:16 117:11
  117:22 121:7
  122:24 127:8
  127:21 137:22
  140:13,22
  143:16
add  40:22
added  9:11,17
addition  131:2
additional  65:6
  66:6 91:10
  99:5 112:9
  134:25 141:5
additions  151:6
addressed  91:5

adequately
  93:1 143:2
adjudicated
  81:17 82:1
adjusted  143:3
admits  128:16
adopted  10:2
advantage
  42:12 43:2
affect  73:22
  83:21
affected  31:11
  31:14 66:12
  78:25
affecting  42:25
  142:1
affiliations  6:7
affirmative
  13:19 17:7
  96:13
affirmatively
  13:14
aganin  8:24
ago  105:5
agree  5:9 15:24
  18:19,22 21:13
  21:18 35:6
  36:7,18 40:9
  47:16 48:1
  49:15 50:21
  51:4 54:21
  60:3,15 63:5
  67:16 73:8,10
  88:2 106:16
  107:13 108:8

109:7 110:1
  111:15 113:12
  118:10 122:19
  128:3,8,21
  136:5 141:25
agreed  20:10
agrees  83:25
al  5:14,14
alexander  1:8
  8:24
aligns  30:22
allegation  37:1
  67:22 71:22
  72:17
allegations
  30:22 31:6
  35:8 36:17,19
  36:21 46:23
  54:5,12 63:22
  69:6 82:7,14
  82:22 85:3
  86:23 94:12
  101:7,9 105:6
  119:13 124:7
  124:24 126:16
  127:8 128:9
  130:5,5,6,10
  134:16
allege  37:8
  67:17 69:3
  71:16 127:15
alleged  10:16
  29:16,16 30:1
  30:21 31:4,4,8
  31:20 33:25

34:15,24 35:7
  35:13 36:23
  37:2,3,7 38:16
  38:17,25 41:20
  45:13,15,17
  47:1 50:3 52:1
  52:1,17 53:14
  54:16 59:1,2
  60:13,24 61:8
  62:13,13,16,23
  62:25 63:11
  64:11,22 65:18
  66:19,20 67:5
  67:13,20 68:21
  69:6,13,18
  71:18 72:15
  73:3,6 74:13
  74:22 80:17
  82:18 83:16
  84:5 85:10,18
  86:6 89:12,17
  89:19 90:2
  94:14,18 98:16
  98:17,21 99:8
  100:3,12 102:2
  104:1,17
  109:10 114:7
  130:17,25
  131:4,6
allegedly  30:14
  37:12 42:2,5
  54:7 82:18
  99:7 128:22
alleging  72:24

**[allocated - applications]**

**allocated** 62:10
**allow** 130:12
**allowing** 105:24
**allows** 105:10
**alternative** 31:12,12,18 35:22,24 37:6
**amended** 72:5
**amount** 43:18 94:16 113:5 131:5 138:8
**analyses** 9:6,11 106:11,17,18 117:22
**analysis** 13:17 14:1,20 15:9 20:8 22:19,21 22:24 23:6,16 24:25 25:21 27:11,19 29:11 34:24 35:8,15 37:5 38:2 40:17 46:19 47:23 49:21,24 50:22 51:10,12 51:17,22,22,24 52:12,23,25 53:6,8,9 60:23 62:8 63:23 64:20 65:6 67:5,12,21 69:17 72:16 77:21 78:18 83:11 84:3

86:25 87:21 89:8,10,14,16 89:23 90:4 91:25 92:21 95:6 96:4,24 97:7 101:1 105:4 106:10 107:14 108:17 108:24 109:7 110:2,17 117:4 117:6,9,11,13 118:5,6,11 119:8,9 120:9 120:11,16,21 122:5,23 125:20 128:24 129:22 131:10 133:17 135:24 136:4,12 139:4
**analyst** 21:21 43:16 76:9 87:3,3
**analyst's** 20:23 77:23
**analysts** 18:12 18:20,23 19:2 19:17 20:15,19 20:21 21:6,10 21:13,18 22:1 22:23 34:11 41:9 42:9,16 42:23 43:13,23 44:16,22 45:6 52:21 53:12 63:20 69:11,23

69:24,25 70:3 70:5,8,9,19,20 71:8,13 75:3,5 75:8,22 76:3,6 77:9 86:11,12 86:16 87:8 90:7 91:1 124:9
**analytical** 97:13 98:9
**analyze** 33:16 86:11
**analyzed** 15:2 15:12,16 48:11 64:25 86:12,18
**analyzing** 69:5 101:6 127:21
**angeles** 2:9
**ann** 1:14 2:19 147:4,23
**announced** 71:5
**announcement** 23:23 24:11 125:15
**announcements** 24:17
**answer** 7:16,17 7:25 18:7 23:14 36:2 39:3 101:21 102:10 105:21 108:15 114:12 116:16 118:16 126:4 130:3

142:24 145:13
**answered** 118:21
**ante** 70:25
**apart** 108:19
**apparent** 44:3
**apparently** 124:14
**appear** 16:18 44:25 45:2
**appearance** 6:4
**appearances** 6:6
**appeared** 2:10 2:16
**appearing** 148:18 149:7
**appears** 8:13 9:21 11:20 73:17 78:16,18
**appended** 151:7
**appendix** 75:17 75:18 77:12 90:11,16 91:11 91:11
**applicable** 98:3 113:25 120:10 120:10 126:10 126:10
**application** 126:19,24
**applications** 117:5

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[applied - avenue]**

| | | | |
|---|---|---|---|
| **applied** 87:22 98:21 110:22 111:25 112:4 115:15 120:22 123:24 142:21 | **array** 115:14 116:5,15 | 104:22 114:5 128:24 143:9 | 98:10 101:7 103:24 105:5,7 107:3,16 136:8 136:10 139:24 143:22,25 |
| | **arrive** 116:5 | **asks** 7:12 | |
| | **art** 94:24 | **aspects** 127:14 | |
| | **artful** 39:8 | **assertion** 97:12 123:22 | |
| **applies** 83:1 88:17 | **article** 87:23 | | **assumption** 10:18,19 13:15 14:5,8 26:23 30:6,19 31:4 31:16 36:3 41:21 115:17 116:13 |
| | **articles** 10:25 | **assess** 107:14 111:16 | |
| **apply** 43:12 82:7 102:20 110:18 111:4 112:6 118:18 121:3,5,9 124:22 131:8 132:22 | **articulate** 93:16 98:15 | **assessed** 48:25 53:13 114:15 123:18 135:12 | |
| | **articulated** 92:16 93:7 105:23 114:2 121:8 126:3 | **assessing** 108:13 114:19 127:5 135:22 | |
| | | | **assumptions** 10:6,8 47:21 140:2,17 |
| | **articulation** 98:17 134:7 | **assessment** 19:13 135:8 | |
| **applying** 133:19 145:7 | **artificial** 47:17 48:3 109:3 110:3 122:6 123:8 | **assign** 64:8 | **attached** 132:6 |
| | | **assignment** 49:22 | **attempt** 113:21 |
| **approach** 122:5,13,19 123:1,2,23 141:4 | | | **attended** 80:20 |
| | **artificially** 109:2,11 | **assisted** 8:17 9:4 | **attorney** 6:8 147:16,17 |
| | **ascertain** 118:4 | **associated** 20:24 52:15 100:21 124:8 138:10 | **attributed** 59:10,24 66:2 89:5 |
| **approaches** 140:24 141:2 | **aside** 79:5 93:20,22 96:17 99:15 117:22 135:15 145:1 | | |
| **appropriate** 94:7,11 107:3 107:8 110:14 112:8 115:3,4 119:11 | | | **atypical** 33:2 |
| | | **assume** 10:13 13:21 14:2 24:3 51:23,25 100:10 | **audio** 5:8 |
| | **asked** 14:1 36:1 65:21 81:5 94:3,4 136:1 142:8 | | **august** 1:16 5:2 147:21 148:3 |
| | | | **austin** 2:12 6:14 |
| **approve** 80:8 | | **assumed** 23:17 25:2 26:10 35:14 136:2 | **available** 48:8 56:5,7 70:13 90:19 93:21 103:16 117:25 |
| **approximate** 118:6,20 | **asking** 7:10 20:7 35:5 55:6 55:7,10 70:25 80:22 81:1 99:23,25 | | |
| **argue** 145:7 | | | |
| **argument** 119:23 120:2 | | **assuming** 11:6 23:1 25:22 71:22 81:15,25 | **avenue** 2:3 129:1 |
| **arises** 84:8 | | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[average - buying]**

| | | | |
|---|---|---|---|
| **average** 17:15 17:25 25:16 26:1 27:3,13 135:25 | **backup** 138:4,6 **band** 112:3 121:6,8 | **believe** 12:15 13:8 15:5,13 33:25 34:8,19 | **bottom** 32:18 **bought** 92:9 125:22 |

average 17:15 17:25 25:16 26:1 27:3,13 135:25
averaging 25:8
aware 14:22 15:1,21 16:19 23:4,15 25:20 26:17 45:6,16 45:19 68:21 71:15,18 83:9 83:15 87:15 91:2,3,9 125:13 128:13 128:25
awareness 20:11

**b**

b 61:16 63:12 63:17 75:17,18 77:12 79:16 90:11,16 91:11 149:1
back 20:15 25:3,24 40:5 48:22 58:5 59:1 64:13 71:10 78:21 100:7,10,14 117:18 118:15 127:21,22 132:12 146:3
background 49:25

backup 138:4,6
band 112:3 121:6,8
bank 21:2,2
banks 19:16
based 23:6 31:1 31:3,16 33:17 35:15 37:6 60:23 64:10 71:21 84:15 89:7,10 91:11 92:8 93:17 95:20 96:20 98:16 101:8 105:16 115:5 120:9,11 138:11,13,24 142:10
basically 132:25
basis 19:4 52:24 54:9 59:7,20,23 84:7,12 86:14 96:19,19 110:18,22 111:17,22 120:23 121:3,5 121:10 123:24 130:8
beginning 6:7 49:12 91:21 97:11 121:21
behalf 1:4 2:10 2:16 146:6

believe 12:15 13:8 15:5,13 33:25 34:8,19 48:17 52:11,19 68:5,9 77:6,7 77:21 98:24 112:25 137:17 144:22,23
ben 2:17 5:20
benefit 68:17
benefitted 68:16
best 7:21
bettencourt 6:17
beyond 35:14 84:5
bid 27:3,13
billion 25:8,8,9 25:17
bit 11:25 13:4 18:9 64:13 99:15 108:22 128:1 135:16
black 140:4,9 140:17,19 141:8,13 142:13 143:1,4 143:17 145:8 145:18
block 68:8 71:25
bloomberg 22:5

bottom 32:18
bought 92:9 125:22
break 7:22 46:9 48:14 49:5,9 90:14 91:14,18 121:13,18,24 145:23 146:1
briefly 8:20 9:2 29:15 61:10 86:22
bring 40:4
broad 20:7 42:1 117:2
broader 69:17
broadly 31:9 71:13 101:3
broker 139:22
bunch 10:24 44:9,10 126:8 126:8
burden 17:3,6 99:25 113:20 129:2
business 21:2,3
buying 31:23 36:9,14 41:1 41:15 42:13,18 42:22 43:2,19 44:17 45:4 54:11 55:2,24 56:17,25 57:7 57:12 58:20 59:4,12 60:1 61:2 65:14,23

**[buying - certification]**

66:5,16,23,25
68:16 69:20
72:21,23 73:4
73:11 74:1
82:4 91:4 99:9
100:22 144:22
**buying's** 43:24

**c**

**c** 8:24
**c.s.r.** 147:24
**ca** 2:9 148:9,12
148:21
**cain** 132:1
133:18 134:1
134:14
**cain's** 134:9,21
135:3,14
**calculate** 94:1
95:2,22,25
97:4,5 101:9
114:3 115:8,16
116:9 119:14
120:1 121:4
123:20 124:19
134:15 139:17
144:1,3
**calculated**
60:11 111:9,22
125:4 132:21
133:10,11
138:11,13,13
140:22 141:7
**calculating**
82:8 94:16
95:18 98:9,18

108:18 121:8
132:19
**calculation**
17:23 24:15
26:9 40:14
82:23 92:7
93:13,16,22
96:16 103:24
112:8 116:3,4
117:7 127:19
127:19 139:16
143:10 145:1,2
**calculations**
103:19 144:16
**call** 52:7,8
80:21 136:15
136:18 137:16
139:14
**called** 7:3 12:13
14:11,15 63:17
94:19 119:7
**cammer** 14:12
14:21 15:3,6
**capable** 103:23
**capital** 79:11
**capitalization**
25:7,16
**caps** 29:17
**capture** 141:22
**careful** 143:18
**carefully** 9:23
30:24 53:11
**carried** 93:13
**case** 5:16 10:19
17:24 19:19

22:13 23:2,15
24:17 25:23
26:17,18,22
29:4,10,12
47:4,15 48:11
71:21 76:10
79:14 82:19
83:2 84:10
88:17 94:1,9
95:24 96:5,16
96:25 99:2
101:12 106:24
107:7,8 108:16
112:19 114:6
117:12 122:21
122:24 123:21
126:24 130:16
135:5 136:2
137:18
**cases** 21:2
24:24,25 94:13
114:23 122:7
128:4 134:16
141:18
**cash** 117:13,21
118:5,11
120:20
**causation** 53:8
96:4 128:14,24
129:1
**cause** 79:6
106:19
**caused** 51:18
52:2 60:23
61:7 62:8

72:11 88:21
89:8,23 99:19
100:4 106:13
107:24 109:1,3
109:10,24
110:3 112:13
128:5 129:7,8
**causes** 61:8
90:5 107:15
**causing** 109:4
**caveat** 46:18
47:6
**caveats** 60:10
**ccp** 148:9,12
**century** 2:8
**certain** 7:15
32:13 64:22
81:11 83:2
88:5,5 127:14
141:10 142:2
**certainly** 10:11
15:2,10 51:13
54:24 58:4,6
59:3 66:14
76:8 78:23
86:9 88:12
90:1,4 93:21
94:15 101:19
116:2 128:12
**certainty** 99:18
99:24 100:2,3
**certificate**
147:2
**certification**
84:15 92:1,21

Page 7

**[certification - commencement]**

| | | | |
|---|---|---|---|
| 95:9 99:1 101:19 129:21 129:24 132:4,7 141:1 | **checked** 39:18 | **claire** 2:13 6:15 | **clear** 19:5 20:1 34:14 43:13 |
| **certified** 81:25 111:21 147:4 | **chicago** 1:15 2:14 5:19 | **claire.lee** 2:15 | 56:20 62:15 |
| **certify** 84:21 147:6 | **christmas** 133:23 | **clarified** 66:23 | 87:1 89:13,18 |
| **cfa** 11:14 | **christopher** 1:9 | **clarify** 90:11 | 93:11 96:3,22 |
| **challenging** 112:21 | **circumstance** 114:14 | **class** 12:13,19 12:21,21 13:2 | 112:11 135:17 |
| **change** 12:3 | **circumstances** 19:9 43:12 | 14:3 17:15 | 136:1 138:1 |
| 19:12,14 31:8 | 49:1,3 83:8 | 23:11,21 25:6 | 141:6 144:12 |
| 34:24 35:17,20 | 88:18 94:8 | 26:1 27:4 28:1 | **clearly** 56:14 |
| 35:23 59:23 | 97:14,18 101:5 | 28:20 39:15,20 | 56:14 |
| 67:12 70:17 | 102:20 110:8 | 39:22 40:11 | **clients** 20:21,25 |
| 74:14 130:24 | 114:6 123:14 | 67:15 72:11 | 21:4 |
| 131:9,9 141:18 | 123:16 126:18 | 79:6 80:16,19 | **clk** 76:16 77:12 |
| 150:4,7,10,13 | 144:11 145:4 | 81:8,25 82:8 | **close** 76:21 |
| 150:16,19 | **citation** 9:10 | 83:1,2,4 84:7 | **clvs** 2:17 5:20 |
| **changed** 34:4 | **citations** 9:8 | 84:14,15,20,21 | **code** 148:9,12 |
| **changes** 122:8 | **cite** 44:7 68:5 | 92:1,21 95:2,8 | 148:19,21 |
| 122:8 138:21 | 71:23 | 98:25 100:15 | **colleague** 6:15 |
| 142:20 151:6 | **cited** 45:9 76:3 | 101:12,19 | **collective** 46:15 |
| **characteristics** | 77:21 78:8 | 108:9 110:18 | **colloquially** |
| 141:15,17 | 90:12 | 110:22 111:1,2 | 14:11 21:25 |
| **characterizati...** | **cites** 68:9 | 111:12,20,22 | **combination** |
| 108:12 | **citing** 68:6 | 112:4,7 113:7 | 86:8 89:9 |
| **characterize** | **civil** 148:19,21 | 113:8,9 120:22 | 141:21 |
| 36:18 83:24 | **cl** 4:7 | 121:3,5,6,10 | **combined** |
| **characterizes** | **claim** 63:14 | 123:24 124:17 | 106:17 |
| 69:22 | 66:25 81:17 | 124:22 126:5 | **come** 35:21 |
| **charting** 138:2 | 96:15 130:9 | 126:17 127:11 | 47:2 70:16 |
| **check** 40:2 44:7 | **claiming** 96:3 | 129:15,20,24 | 86:2 95:17 |
| 59:1 77:6,17 | **claims** 13:16 | 131:23,25 | 118:19 144:20 |
| | 14:4 81:23 | 132:4,7 134:8 | **comes** 12:5 |
| | 120:12 | 135:19 138:4 | 24:13 67:7 |
| | | 140:20,21 | 86:8 |
| | | 141:1 142:23 | **commencem...** |
| | | 145:9,16 | 147:7 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[commencing - confidence]**

**commencing**
  1:15
**commentary**
  33:16 43:14
  53:11 86:10,11
**commented**
  42:10
**common** 79:16
  84:16 112:3
  136:14 137:1
  137:10,12
  142:1 143:13
**commonly** 16:6
  95:1 108:10,13
  108:20
**companies** 22:1
**company** 21:12
  23:10 30:14
  42:24 43:15
  57:18 59:9
  66:2,3,13 67:8
  69:19 71:2
  74:3,10,11
  88:20 107:25
  108:4 117:24
  118:1 119:7,8
  126:17 127:10
  128:16 141:23
**company's**
  32:25 33:17
  43:14 50:2
  73:5,22 86:9
  86:20 99:19
**comparable**
  119:7,8

**comparative**
  118:24 119:5
  120:5,21
**compare** 69:19
**compared**
  86:15
**comparison**
  22:22 87:10
**compatibility**
  110:14
**compatible**
  124:23
**compiled** 27:24
  28:18
**complaint** 9:10
  30:11,24 37:11
  52:22 58:13
  67:19 68:6,10
  68:11 69:4,22
  71:19 72:1,2,4
  72:5 78:15
  86:23,23 105:7
  131:3
**complaints**
  45:23 47:11
  125:14
**complete**
  105:21 151:8
**completed**
  92:20 148:7,17
  149:6
**completely**
  127:13
**completion**
  149:10

**complexities**
  122:10
**complicate**
  96:16 127:18
**complicated**
  73:16 110:10
**complications**
  122:18
**component**
  117:3
**components**
  131:2
**comprised**
  23:21
**computation**
  122:6
**concealed**
  72:12 99:7
  122:8,9 128:7
  128:15 130:19
**conceivably**
  48:9
**concept** 84:14
  84:16 87:21
  94:22 95:15
**concepts** 34:12
  88:14 132:20
  133:9
**concerning**
  61:1 63:24
  147:9
**concerns**
  145:15
**conclude** 96:11

**concluded**
  48:12 54:16
**concludes** 84:1
  84:3 146:10
**conclusion**
  35:23 108:19
  109:22
**conclusions**
  31:7,10,14,19
  34:13,18 35:20
  78:19 96:20
  110:24
**conclusory**
  123:4 127:7
**conditional**
  24:12
**conditions**
  70:16,17
**conduct** 14:20
  47:23 51:17
  100:19
**conducted**
  15:10 22:24
  25:22 27:11,19
  29:11 35:16
  49:21 120:12
  120:16
**conducting**
  67:21 89:8
  111:3 118:16
  119:22
**confidence**
  37:24 38:7,14
  38:22 40:16
  51:1 60:20

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[confidence - corrective]**

63:8
**confident**
103:12
**confirm** 29:20
79:13
**confirmatory**
86:24
**confounding**
103:6,13,20,21
104:4,6,9,15
106:24 107:1
109:19,21
122:7 123:9
127:18
**confused** 137:6
137:16,20
**confusing** 84:9
**conjunction**
86:22
**connection**
74:13,22
**consensus**
61:20 62:4
71:13
**consider** 50:5
102:5,11 103:6
103:20 129:22
**considerations**
95:17 112:20
**considered**
11:7,21,22,24
74:16 75:19
77:2,16 90:24
114:18 130:12

**considering**
31:16 94:8
104:9
**considers**
135:24
**consistent**
10:18 13:16
30:15 31:5
33:25 34:1
36:3,17 37:1
50:3 61:20
78:18 97:22
131:3
**constitute**
123:20
**constitutes**
147:12
**construct**
113:21
**construction**
113:12 129:16
**contact** 125:14
125:16 148:9
148:20
**contain** 21:5
**contained**
18:20
**contains** 29:25
**contend** 10:15
**contending**
80:7 129:20
**content** 75:12
**contesting** 98:2
**context** 33:11
33:14 44:14

58:16 62:4
67:4 80:24
82:15 87:22
88:13 94:23
95:24 118:7
**contexts** 120:5
**continue** 5:9
74:4,5
**continued**
57:23
**continues**
71:22
**contract** 137:3
137:4,14
**contradict** 45:8
45:16 78:19
**contribute**
104:24
**contributed**
63:14
**contribution**
62:12
**control** 109:18
**controlled**
109:8
**controlling**
108:24 110:4
**controls** 107:16
**conversations**
5:6
**cornerstone**
8:18
**corporate**
12:14 20:25

**correct** 10:21
14:7 15:22,23
28:7 29:17,25
32:14 36:10
37:17 39:10,15
40:12 50:10,16
50:23 52:12
53:20 54:19
57:17 60:4
63:6,15 68:7
69:10 70:4,9
70:11 71:3,17
75:3,20,21
79:2,17 80:1
80:11 82:8
83:19 85:13
89:15 92:22,23
93:15 94:2,3
96:5 106:3
110:18 111:5
114:23 117:8
120:6 130:20
131:24 135:19
135:20 136:19
138:5,22,23
143:4 144:16
145:10 151:8
**corrected** 68:22
72:8
**corrections**
148:14,15
149:3,4 151:6
**corrective** 37:3
37:8,11,17
45:21 46:1,22

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[corrective - days]

47:8 64:19,19 65:2 66:18 67:18,20 71:17 80:23 81:6 82:23 87:15,20 87:24 88:4,14 94:14,18 98:22 100:12 104:1 106:12,19 107:15 108:5 109:2,17 110:3 112:13 127:17 128:5 129:7 131:4

**correctly** 98:25 143:22,23,23

**correlation** 108:1

**counsel** 5:13 6:5,21 7:14 10:5,9 14:2 30:7,18 147:16 147:17 148:18 148:22 149:7

**count** 77:9,18

**counted** 104:18

**counting** 104:19

**couple** 12:18 15:18 105:5 112:25 124:12 126:13

**course** 12:20 25:6 27:4 121:4 126:17

127:10

**court** 1:1 5:15 5:22 6:20 16:23 17:4,5 20:3 26:16 63:21 81:10 83:25 84:3 101:23 103:3 115:3

**court's** 36:5

**courts** 16:25 20:9 27:20 128:13

**cover** 22:2

**covering** 21:11 21:11 75:8

**covers** 72:1

**crafting** 30:9

**create** 101:12 144:25

**created** 30:2 72:9 114:9 132:3

**criticism** 93:9

**criticizing** 93:1

**crr** 1:14 2:19 147:23

**crucial** 136:10

**crux** 107:9 120:2

**csr** 1:14 2:19 147:23

**current** 13:1 74:6

**cv** 1:6 5:17 12:7 12:11

**d**

**d** 8:24

**daily** 80:5

**damage** 101:13

**damages** 4:5 11:13 82:9,16 82:17,24 83:10 83:17 84:7 91:25 92:6,7,8 92:13,18,20 93:3,14 94:1,5 94:20,21 95:1 95:2,7,8,12,15 95:18,20 96:4 96:14,17,24 97:5,21,21 98:3,5,10 99:16 101:6,10 101:13 102:3 103:24 104:11 105:3,4,9,13,23 111:8,9,16 115:2,4,9 117:7 118:25 118:25 120:1 123:20 125:3 125:20,23 127:19 132:19 132:19 133:8 133:16 134:8 134:15 135:13 136:12 139:16 140:21,22

142:23 144:15

**dan** 1:3 5:13

**daniel** 6:17

**data** 9:6 117:25 138:9,11,20,20

**date** 34:20 38:3 50:3 52:3 55:19 56:9 63:2,6,20 64:12 76:19 79:12 81:11,12 100:11 114:4 120:1 123:10 144:1,5 148:16 149:5 150:24 151:12

**dated** 8:7 11:14

**dates** 37:11,17 79:1 80:10 84:8 86:4 90:6 94:17 98:21 103:25 113:7 138:25

**day** 39:15 40:18 63:15 67:15 78:22 80:6 88:6,9,19 89:2 113:9,11 125:1 138:9 141:10 147:21 151:15

**days** 21:21 23:22,22,23,25 24:9,11 89:24

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[deals - difference]

| | | | |
|---|---|---|---|
| **deals** 100:13 | 72:7,10 100:20 | **depend** 21:10 | **description** 4:2 |
| **dealt** 119:19 | 101:15 132:6 | 31:11 39:7 | **detail** 11:9 |
| **dearborn** 1:15 | 132:11 | 48:7,25 49:2 | 38:15,23 50:7 |
| 2:14 5:19 | **defined** 10:16 | 83:7 119:12 | 54:24 63:17 |
| **decelerates** | 10:17 29:20 | 124:4 | 134:25 141:5 |
| 44:5 | 31:9,9,20 | **depended** 33:1 | **determination** |
| **december** 22:6 | 34:15 82:15 | **depending** 79:8 | 26:16 65:8 |
| 37:21 39:21 | 113:22 | 103:14 | 97:7 |
| **decide** 103:3 | **defining** 35:18 | **depends** 31:20 | **determine** |
| **declaration** | **definition** | 39:3 88:18 | 64:20 67:22 |
| 93:23 116:6 | 24:10 29:21,23 | 96:2 110:13 | 106:18 110:2 |
| **declare** 151:4 | 29:24 30:1,3 | 111:8 119:10 | 112:13 116:20 |
| **decline** 39:5 | 30:19,22 31:12 | 126:6 | 117:14 140:21 |
| 52:2,10 57:12 | 31:18,22 32:5 | **deponent** 151:3 | **determined** |
| 58:20 59:11,15 | 35:6 46:6,15 | **deposition** 1:12 | 22:15 26:13 |
| 61:6,9 65:2 | 46:18,20 58:7 | 5:12,18 7:11 | 84:11 142:11 |
| 78:25 79:15,16 | 73:3 104:14 | 8:8 11:17 | 148:18,23 |
| 80:5,6 86:14 | 112:2,7 | 30:13 31:1 | 149:7 |
| 89:4,5,9 | **definitional** | 32:17,21 76:13 | **determines** |
| 107:22,23,24 | 132:20 133:8 | 78:1 131:12 | 16:8 |
| 108:4 109:24 | **definitively** | 133:1 147:10 | **determining** |
| 124:9 128:4 | 62:11 64:10 | 147:14 148:19 | 97:20 |
| **declined** 78:22 | **demonstrate** | 148:23,25 | **develop** 96:10 |
| 78:24 104:7 | 20:3 38:1,16 | 149:8,10 | **developed** |
| **declines** 39:14 | 40:23 74:12 | **derivative** | 93:25 134:8 |
| 39:15 85:1 | 129:3,4 134:14 | 136:20 | **developing** |
| 89:20 103:25 | 143:15 | **describe** 43:1 | 103:17,18 |
| **decrease** 37:22 | **demonstrated** | **described** | **developments** |
| 38:6,9,11,13,19 | 144:6,7 | 30:14,23 34:1 | 66:11 67:10,11 |
| 59:6,7 60:4,16 | **demonstrating** | 38:23 123:23 | **dick** 1:3 |
| 60:25 | 17:3,6 93:2 | 125:25 129:18 | **dictating** |
| **deemed** 151:6 | **dentsply** 4:10 | 145:2 | 142:17 |
| **defendants** | 131:22 132:13 | **describing** | **difference** |
| 1:10 2:16 6:14 | 133:4,18 | 88:16 | 34:13 125:3 |
| 32:25 36:1 | | | 129:5,12 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[difference - discussing]**

| | | | |
|---|---|---|---|
| 133:17 142:10 | **disagree** 17:20 | **disclosure** | 54:22,25 65:12 |
| **different** 17:7 | 22:10 23:8 | 19:11 33:18 | 65:17,24 66:22 |
| 22:21 28:3 | 24:4,9,15 | 37:3,6,17 | 72:7 74:15 |
| 34:11 37:4 | 25:12 26:6,8 | 40:24 45:21 | 80:9,23 81:6 |
| 39:13 46:4 | 27:9,10 28:23 | 46:1,16,22 | 81:11,24 86:9 |
| 49:2 50:20 | 29:3 43:20 | 47:9,13,16 | 87:15,20,25 |
| 69:7 70:15 | 115:20 120:4 | 49:23 50:2,2 | 88:14 94:18 |
| 74:9 78:8 92:9 | 120:19,22 | 52:20,23 53:9 | 98:22 106:12 |
| 105:20 108:21 | 122:13 123:6 | 53:11,20,25 | 109:3 110:3 |
| 113:6 116:5 | 123:15,22 | 54:23 55:20,23 | 112:13 127:17 |
| 118:3 119:4,4 | **disappearance** | 56:3,10 57:11 | 130:18,25 |
| 119:18,25 | 59:12,25 | 58:21 59:4,8 | **discounted** |
| 126:8 134:16 | **disclosable** | 59:21 61:15 | 117:13,21 |
| 134:16 139:2 | 67:6 | 64:5,14 65:9 | 118:5,11 |
| 140:15,15,24 | **disclose** 32:25 | 67:18,18,20 | 120:20 |
| 142:6,7,10,12 | **disclosed** 30:15 | 69:22 70:1 | **discuss** 9:11 |
| **differently** | 42:24 48:3 | 71:17,17,19 | 52:18,20 59:8 |
| 35:19 | 51:6 52:1 | 72:2 74:15,16 | 61:8 63:9 |
| **difficult** 70:10 | 53:13,23 54:17 | 75:7,9 80:20 | 69:21 71:9 |
| 124:21 126:20 | 56:3,14,15,18 | 86:10 87:11 | 77:4,15 78:11 |
| 126:25 127:4,4 | 56:21,22,25 | 88:4,6 90:23 | 86:22 90:20 |
| **digestion** 18:13 | 57:6,18 59:6 | 94:14 99:8,17 | 99:3 100:9 |
| **dimension** | 59:24 66:3,13 | 100:12 102:6 | 102:13 139:1 |
| 102:18 | 66:20 67:14 | 104:1 106:19 | **discussed** 29:15 |
| **direct** 128:5 | 69:19 74:3 | 107:15 115:17 | 60:2 63:16 |
| **directionally** | 86:6,13 89:3,6 | 116:13 117:23 | 65:13 71:24 |
| 136:18 | 90:2 96:21 | 123:9 124:6,6 | 73:25 75:11 |
| **directly** 8:23 | 97:13 101:2 | 124:13,20 | 77:9 78:14 |
| 147:18 | 104:11,23 | 125:2 128:5 | 87:7 91:3 |
| **disaggregate** | 105:12 110:15 | 129:7 131:4 | 93:10 |
| 90:5 | 110:16 117:25 | 141:18,20 | **discusses** 37:16 |
| **disaggregation** | 120:12,15 | **disclosures** | 75:2 |
| 51:21 52:12 | 129:24 130:4,7 | 33:21 37:9 | **discussing** |
| 62:7 63:24 | 131:7 141:24 | 43:14 47:14 | 27:18 35:15 |
| 89:14,23 | | 50:6 54:19,22 | 53:19 87:2 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[discussing - economist]**

| | | | |
|---|---|---|---|
| 100:16 105:22 127:8 131:4 | **documents** 9:7 11:20,22,24 31:2 75:19 77:2 100:20 | 127:13 129:21 132:22 133:18 133:19 134:1,7 134:9,14,21 135:3,3,4,14,21 138:4,12 146:5 | **e** |
| **discussion** 57:21 58:19 60:7 69:24 71:10 82:20 96:14 105:9,13 133:15 | **doing** 46:11 92:7 103:19 139:16 | | **e** 7:5 8:24,25 9:1 148:9,12 149:1 150:3,3 150:3 |
| **discussions** 50:4 | **douglas** 1:8 **downwards** 70:2 | **drafted** 9:16,18 9:21,22 | **earlier** 41:7 50:5 54:8 56:11 67:14 71:10 83:9 100:15 110:16 129:15 |
| **dismiss** 30:12 30:25 | **dr** 4:3 7:7 8:11 10:20 11:4 13:17 14:4,23 15:2 17:12 22:3 23:7,21 24:11 29:1,14 30:13,25 32:13 32:20,24 34:1 36:5 39:12 40:10 49:15 50:19 91:24,25 92:15,20 93:1 94:5 96:14 97:8,12,20 98:6,20 99:14 101:11 102:4 103:5 104:8 106:5,8 107:1 107:5,11 114:1 116:9 119:21 120:12 121:24 122:4,17,23 123:3,23 124:17 126:3 126:11 127:5 | **draw** 96:20 **drawn** 33:17 **driven** 59:11 73:21 85:1,1 85:10,12 112:24 113:3 | **early** 22:25 |
| **dismissed** 63:21 71:20 | | **driver** 31:24 34:3,5,16,17 56:17 57:8 59:5 69:21 73:5 74:1 | **earn** 21:3 **earnings** 23:22 24:10,17 44:5 44:19,20 50:6 52:7,7,8 80:20 86:10,20 87:10 |
| **dispute** 94:25 95:5 | | **driving** 62:4 73:17 | **east** 2:8 |
| **disputing** 69:2 114:21 115:5 | | | **economic** 26:19 64:10 67:21 72:16 84:3 87:14,19,21,23 88:3,13 96:19 105:24 107:10 114:2 135:9 |
| **dissipate** 109:4 110:4 | | **drop** 39:2,4 50:12 51:18 53:1 63:14,25 88:22 99:17 100:10,11,14 107:16 | |
| **dissipated** 66:5 | | | |
| **distinct** 92:6 | | | |
| **distinction** 87:4 87:12 139:11 | | | |
| **distinguish** 107:21,23 | | | **economically** 129:6,13,13 |
| **distinguishable** 38:4 | | **dropped** 50:9 **drops** 89:24 100:8 | **economics** 16:5 62:11 94:24 |
| **district** 1:1,2 5:15,16 | | **drove** 74:7 | **economist** 31:3 46:21 92:17 95:16 132:19 133:7 |
| **dixon** 2:17 5:20 | | **due** 53:1,2 61:1 65:2,3 96:24 | |
| **document** 8:12 11:3 131:16,19 132:5 | | **duly** 7:3 147:9 | |

**[economists - exactly]**

**economists**
113:14 115:21
**editing** 9:18
**edits** 9:24 10:3
**effectively** 47:3
59:10 90:3
92:15 95:19
101:6 103:25
104:15 119:21
120:14,17
135:24 137:4
138:15 139:24
140:3
**effects** 44:19
**efficiency** 4:4
9:20 11:13
13:18 16:5,8
16:21,23,24
17:4,6 19:23
20:4 23:17
25:2,23 26:10
41:21 108:14
109:20 135:22
136:2,8,11
**efficient** 10:14
13:12 14:3,6
16:1,10 18:19
18:24 21:22,23
23:2 26:21,24
47:21 48:2
62:21,22 63:3
65:9 79:24
84:18 85:15
89:4,21 109:24
136:3 139:21

140:3
**efficiently** 16:4
16:18
**eight** 68:12
133:24
**either** 7:19 10:1
46:25 50:22
74:20 91:2
110:24 128:5
**element** 134:17
**elements** 88:7,7
**elevated** 33:6
**eligibility** 23:11
**eligible** 23:4
**eliminate** 47:17
**embedded** 69:6
**empirical** 25:14
47:22,24
**empirically**
140:10,14
**employee**
147:16,17
**enable** 122:5
**encompasses**
117:3
**encountered**
25:15 27:12
**engage** 20:20
**engagements**
114:19
**engaging** 42:17
42:22 43:15
**entered** 82:5
**entirely** 8:15

**entirety** 90:2
99:17
**entities** 79:22
**environment**
74:6
**equal** 136:15
136:22 137:1,3
**equally** 79:2
124:23 142:2
**equates** 138:17
**equity** 15:11
21:11 66:8
80:4 135:23
136:9
**equivalent**
33:20 49:1
**errata** 148:14
148:16 149:3,5
**especially**
106:17 129:13
**esq** 2:3
**establish** 74:21
74:21 106:12
108:25 109:9
**established**
52:3 82:2
109:16,20
114:1 128:14
144:3
**estimate** 70:13
70:15,21 99:16
115:22 116:19
118:2,24,25
123:8 139:5
140:11 144:9

145:6
**estimates** 69:25
70:1,4,6,9,19
70:20,25 71:9
119:17
**et** 5:14,14
**evaluate** 94:4
125:18
**evaluation**
123:7
**event** 21:22
23:23,24 38:20
39:3 50:18,19
60:9,21 63:7
94:12,15 98:10
98:20 99:4
106:10,16
107:13,20
108:3,9,12,17
108:20 110:1
110:17,22,23
111:2,4,11,15
115:13,21
117:4 123:7
**events** 21:25
70:16
**everybody**
85:21 124:22
**evidence** 15:25
38:24 81:18,23
83:15 100:2
**ex** 70:25 71:1
**exact** 102:22,22
**exactly** 30:16
58:6 65:20

**[exactly - feinstein]**

81:1 119:13 134:1 143:12
**examination** 3:1 147:8
**examine** 40:19 49:22
**examined** 7:4
**examines** 24:12
**example** 9:9,20 16:11 19:15 23:10 42:9 43:5,8,20 44:4 72:6 102:6 140:4 143:1 144:21
**examples** 16:21
**exceeded** 17:25
**exceptionally** 126:20
**exchange** 15:22 16:4,14,17 21:3
**exclude** 103:24
**exercise** 118:12
**exhibit** 4:2,3,4 4:7,9,10 8:6,8 11:4,6,12,15,17 11:20 12:1 40:5 59:22 76:11,13 78:1 78:4 131:12,15 137:21 138:2
**exhibits** 4:1 59:19

**exist** 24:24 26:18 90:5
**existence** 72:20 135:12
**exists** 44:21 90:17 103:14
**expect** 102:24
**expectations** 33:24 71:11,14
**expected** 73:20 87:10 99:14
**experience** 92:10 95:7 106:23 126:16 127:10
**expert** 4:10 8:6 20:4,6 94:23 96:23 97:4,6 127:21 131:21 132:1
**experts** 113:19 114:16 140:25
**expiration** 141:15
**explicitly** 51:5 128:16
**exposure** 114:20
**expressed** 9:25 13:14,19
**extent** 50:4 51:14 56:6 67:6,25 68:15 68:17 72:22 80:4 82:3 91:4

99:25 129:23 130:25 134:24 142:17
**extraordinarily** 126:19,25 127:3
**extreme** 43:8
**extremely** 117:2 141:20

**f**

**facilitate** 18:12
**facing** 74:11
**fact** 36:13,16 56:16,23 57:6 64:21 70:2 86:5 123:19 127:15,17 142:9
**factor** 64:3
**factors** 14:12 14:15,21 15:3 15:4,6,12,14,19 51:18 53:3 61:15 62:8,10 63:13,24 64:7 73:22 74:9 86:8 96:25 102:13 107:17 107:17,25,25 112:20 144:13
**facts** 10:6 94:8 101:5 114:5 126:18,23
**failed** 20:3

**fair** 61:3 92:25 108:12 134:12
**fairly** 20:5
**fall** 62:9 106:13 106:20 112:14
**falls** 137:1
**false** 72:10,13
**falsity** 47:3,12
**familiar** 7:11 14:10,14 54:18 76:18,24 77:13 78:7 94:19,21 94:24 112:23
**familiarity** 94:22
**far** 98:22,23 108:3
**fargo** 44:4
**fashion** 117:7
**features** 126:23
**federal** 149:1,8 149:9
**fee** 20:24
**feel** 7:23 44:11
**feinstein** 4:6 11:4,14 14:4 14:23,23,23,24 23:7,21 24:11 29:1 32:23,24 34:1 40:5,10 91:25 92:15,20 93:1 94:5 97:8 97:20 98:20 99:14 101:11 104:8 106:8

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[feinstein - form]

| | | | |
|---|---|---|---|
| 107:1,5 114:1 116:9 119:21 120:12 122:4 122:17,23 123:23 124:17 126:3 127:5,13 129:21 132:22 133:19 135:21 138:12 | **financial** 16:5 55:3 61:18,19 62:5,11 64:3 64:10 70:1,6 71:1 73:6 75:11 80:20 106:11,18 107:5 132:18 133:7 | 137:16 **fiscal** 57:13 69:12,12 **five** 23:24 85:20,21 **float** 26:3,12,19 **flow** 18:12 117:13,21 118:5,11 120:21 | **form** 13:23 15:7 18:3 19:3 20:17 21:8,16 22:16 23:5,10 24:5,21 25:18 26:14 27:15 29:8 30:4 32:15 33:12 34:6 35:2,10 |
| **feinstein's** 10:20 13:17 15:2 17:12 22:3 29:14 30:13,25 32:13 32:20 36:5 39:12 50:19 96:14 97:12 98:6 102:4 103:5 106:5 107:11 123:3 126:11 134:7 135:4 138:4 | **financially** 5:25 **find** 16:25 17:5 21:4 50:13 67:24 100:20 **finding** 16:23 17:7,21 19:24 20:2,2,4,5 22:11 24:4,7 25:13,14 26:7 27:9 28:24 29:3 | **focus** 23:3 49:24 51:15 53:22 75:11 **focused** 51:11 59:1 63:20 **focuses** 139:15 **follow** 48:15 138:20 **followed** 52:7 **following** 40:24 48:13 54:23 70:1 | 36:11 39:16,24 41:3,17 42:19 43:10 44:1 45:10 47:18 48:5 49:19 51:8,19 53:4 55:4,25 57:3 57:14 58:1,11 58:23 59:16 60:5,18 61:4 62:19 64:1,16 65:15,25 67:2 68:24 69:15 |
| **file** 23:5 **filed** 5:15 12:4 124:12 133:23 **filing** 27:24 **filings** 28:17 53:23 **filipe** 8:23 **fill** 9:8 **filtering** 138:8 **final** 37:2 137:22 **finance** 12:14 87:24 | **findings** 16:20 16:22 27:18 84:1 105:17 **finds** 83:25 115:3 **fine** 20:13 43:22 70:13 85:24 **finished** 46:8 **firm** 5:23 6:10 8:18 125:16 **first** 7:3,14,25 19:10 49:16 67:15 106:9 127:4 135:10 | **follows** 7:4 148:8 **foods** 1:7 5:14 13:4 148:4 150:1 151:1 **footnote** 37:14 37:16,18 40:16 68:9 77:22 **forecasts** 69:11 124:10 **foregoing** 147:10,12 151:5 | 70:22 72:25 73:13 74:17 79:18 80:2,12 81:13 82:10 83:5,12,22 85:5 87:17 88:10,23 91:7 92:2 93:4 95:3 96:6 97:1,24 98:12 99:21 101:16 102:8 103:9 104:12 105:1 106:21 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[form - gives]

107:18 109:12
110:6,19 111:6
111:13,18
112:15 113:16
114:24 115:24
116:24 117:6
117:15 118:13
119:1 120:7,24
122:14 123:11
123:25 125:5
127:1 128:18
129:10,25
130:21 133:20
134:10 135:6
136:16 139:8
141:11 142:3
143:5 144:17
145:11
**formal** 52:25
**forms** 52:24
  54:8
**formula** 96:2
  139:7 140:5,5
  141:14 145:18
  145:21
**formulation**
  30:21
**forth** 54:19
**forward** 18:9
  31:23 36:9,14
  41:1,15 42:13
  42:18,22 43:2
  43:19,24 44:17
  45:4 54:11
  55:2,24 56:17

56:25 57:7,12
58:20 59:4,12
60:1 61:2
65:14,23 66:5
66:16,23,25
68:16 69:20
72:21,23 73:4
73:11,23 74:1
82:4 86:19
91:4 99:9
100:22 114:16
**found** 16:12
  18:1,23 19:17
  23:12 24:19
  25:17 27:14
  29:6,7 45:23
  52:9
**four** 37:8,11,16
  146:13
**fourth** 77:11
**frame** 90:8
**fraud** 36:8
  83:16 104:17
  108:25 109:1,8
  109:10 110:5
  124:15 128:4
  128:17 130:17
  144:24
**frcp** 149:1
**free** 7:23 21:1
  44:11 141:16
  141:19
**fresh** 21:24
**front** 11:10
  50:13

**full** 8:2 115:14
  115:17 116:13
**fully** 35:7 36:24
  41:5 48:3 67:1
  73:25 129:23
  130:4,7 141:3
**function** 136:6
**fundamental**
  129:12 130:24
**fundamentally**
  144:10
**further** 38:1
  48:12 52:4
  65:10 66:4,4
  66:23 67:24
  68:14 72:8
  146:7
**future** 67:11
  70:6 86:20
  144:1,4

| g |
| --- |

**g** 8:25 14:18
**gains** 33:2,6
  34:25 36:24
  49:18 51:7
  54:2 91:5
  100:22
**general** 20:11
  35:12 71:6
  92:4 99:16
  117:5 122:20
  124:3 134:19
  139:19
**generality**
  98:14

**generally** 9:4
  16:19 21:6,25
  41:25 45:22
  46:3 48:23
  87:19 99:20
  102:23 113:4
  113:13,14
  114:22 115:14
  115:22 116:15
  119:3,20
  128:25 137:20
**george** 1:3
**getting** 34:23
  137:6 142:22
**gist** 34:10 76:8
**give** 7:12 8:2
  28:11 46:17
  48:22 82:23
  87:3 93:9
  105:20 131:17
  145:13
**given** 9:7 25:1
  50:2 51:11
  88:17,19 89:2
  94:11 99:2
  107:22 113:20
  114:5,6 126:2
  130:14 139:12
  140:5 142:14
  142:15,20
  143:16 145:4
  146:11 147:13
  151:9
**gives** 62:3

Page 18

**[glancy - illinois]**

**glancy** 2:2,7 6:10
**glancylaw.com** 2:5,10
**glinkh** 2:5
**go** 5:10 12:6 15:18 28:3 38:14 44:7 58:4 59:1 98:22 108:3 132:12 133:3
**goal** 76:10 90:18,25
**goes** 117:18 137:9,10,11,12 139:10
**going** 5:2 11:8 11:25 13:3 28:16 43:19 64:13 73:23 78:21 108:22 112:6 116:16 121:25 124:18 125:11 136:24 141:5
**good** 5:1 6:9,19 7:7,9 49:4 85:21,23 91:13 96:12 121:12
**goods** 66:9
**gotcha** 85:19
**graph** 113:5
**great** 8:4,19 10:4 23:19

**greater** 125:23
**greg** 6:10 7:8 76:20 121:12
**gregory** 2:3
**gross** 31:25 36:10 45:4 72:23
**guarantee** 26:20
**guaranteed** 106:24 107:3
**guess** 13:3 43:1 43:3,19 46:14 51:4 56:19 57:9 58:19 60:14 61:25 63:4 65:20 78:21 82:25 90:10 93:7 106:25 130:16 133:4 134:23 135:1
**guggenheim** 4:9 78:4
**guidance** 57:20 58:3,7,9,15,15 58:17 63:19 64:3,5 71:7,20 71:20 73:18,19 74:8,14 75:11 77:9

**h**

**h** 150:3
**hand** 147:21

**handled** 148:8
**happen** 113:10
**happened** 66:8 66:21 79:9 102:7
**happening** 120:14
**happens** 109:18 140:18
**hard** 31:17 35:21 58:10 59:14 76:25 103:19 126:1
**hear** 7:20
**hearkens** 71:10
**heavily** 33:1
**hedged** 79:5
**hedging** 79:5
**held** 79:1,5,8 80:4 81:20
**help** 9:6,17
**helped** 9:8
**hereto** 147:18 151:7
**hereunto** 147:20
**high** 19:8,9 26:19 31:13 42:10 46:17,21 47:4,7 63:16 63:18 92:4 98:14 99:11 134:13
**historically** 56:16 57:19

74:2 86:15
**holder** 137:8
**holders** 142:15 142:19
**holding** 79:22
**hour** 137:19
**howard** 1:8
**hypothetical** 117:20,23 118:1,8 139:1 139:14 144:4
**hypothetically** 51:25

**i**

**i.e.** 133:9
**idea** 47:12 93:19 116:3
**identical** 125:24
**identification** 8:9 11:18 76:14 78:2 131:13
**identified** 10:12 131:7
**identify** 9:7 55:1,21 57:10 102:25
**identifying** 9:5
**ii** 63:17
**iii** 115:11 116:8
**illinois** 1:15 2:14 5:19 147:5

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[illustrate - inflation]

illustrate 44:15
imagine 125:12
impact 31:18
  34:25 36:9
  37:5 38:1,9,16
  38:24 40:24
  43:25 44:5,20
  45:4 48:10,12
  48:24 49:23
  52:4 53:8,14
  54:2,5 55:2,24
  56:3,24 57:19
  57:23 60:12
  61:2 63:1,11
  64:11,12,15,18
  64:19,24 65:10
  66:4 67:4,22
  67:23,25 69:7
  72:22 74:16
  79:7,11 80:25
  81:3 83:20
  84:4,17,22
  86:13,18 88:6
  88:8 90:4 99:8
  101:1 102:2
  105:16,16
  109:15,21
  130:13 134:17
  141:23,23
impacted 73:11
  142:16,19,20
impacting
  42:11 68:18
impacts 144:15

implement 96:1
implications
  13:18 33:16,22
  41:19 48:18,20
  48:21
implied 135:25
  138:2,10,21,24
  139:3,12
  140:15 142:7
  142:12
implies 64:18
  93:8
important
  46:19 50:25
  136:23
importantly
  37:25
impossible 65:1
  96:5,8,23
  112:18,22
  118:19
impracticable
  95:12
impression
  72:9
improvements
  31:25
inappropriately
  54:13
include 90:18
  106:10
included 34:24
  44:15 58:22
  69:4 72:3 90:9
  90:10,16,21

119:21 148:14
  149:3
includes 14:6,8
  32:19 46:4
including 6:5
  10:24 42:11
inconsistent
  66:24 105:17
incorporated
  16:7 18:25
  41:22,23 62:24
increase 39:22
  40:11 136:15
increased
  61:23
increases 86:16
incremental
  102:6
incrementally
  56:21
independent
  36:3
independently
  15:10 30:20
index 4:1
indicate 60:11
  63:10
indirectly
  142:18 147:19
individual
  12:22 80:8
  81:22 111:16
  125:3,21
individualized
  80:18 125:12

126:6 144:19
  145:8
individually
  1:4
individuals
  8:22 9:3 79:21
indulge 15:19
industry
  107:17,24
  108:2
inefficiency
  17:8
inefficient
  16:13 22:15
  23:13 26:13
  27:14 29:7
  99:5 135:19
inefficiently
  18:2 19:18
  24:20 25:17
inflated 109:2
  109:11
inflation 31:23
  36:14 42:24
  43:18 44:5,16
  45:4 47:17
  48:3 51:13
  54:11 56:16,24
  57:7 59:4,12
  59:25 66:5,16
  69:20 72:21,22
  73:4,25 82:20
  82:21 94:16
  95:21,22 96:1
  96:2 98:18

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[inflation - june]**

99:9,19 100:4
100:15 102:2
104:2,18,21
108:18 109:3
110:4,9,12
111:22,25
112:3,24 113:3
113:6,11,13,21
113:25 114:3,9
114:11,15,18
114:21 115:6,6
115:7 116:21
119:14 121:4,5
121:6,8 122:6
123:8 124:19
129:15,16
130:14 132:20
133:8,16 141:7
143:2,13,24
144:1
**inflationary**
42:10 98:24
**information**
11:21 16:6
18:13,13,20,22
19:2,10,11
21:5,14,19,22
21:24 37:12
41:1,6,15,22
42:3,4 46:24
47:1 48:8,16
52:1,4,9,17
53:12 54:1,6,7
54:11,13,15
55:22 56:5,7

61:1,22 62:23
64:19,23 65:3
65:13,23 66:7
66:18,21,25
67:6,8 68:22
70:12 82:3,13
83:9 85:2,2,12
85:16,17 86:13
89:2,6 103:7
103:13,14,17
103:20,21
104:4,6,9,16,16
106:24 107:2
108:5,25 109:9
109:15,16,17
109:18,19,22
109:23 110:5
122:7,8,9
123:9 130:19
**input**  102:22
139:6,16 140:9
141:9 142:1
143:3 145:9
**inputs**  93:20
102:25 118:19
140:1,6 141:13
143:17 144:6
145:19
**instance**  25:20
27:21
**instant**  23:25
**institutions**
20:20 27:25
28:19 29:2,5

**instructs**  7:16
**insufficient**
94:16
**insurance**
137:5,13
**interact**  102:16
**interacted**  8:23
**interest**  54:6,7
**interested**  5:25
109:14,23
147:18
**internal**  100:19
**internally**
100:21
**interpretation**
45:8,12,17
**interrupt**  46:7
**introduce**  8:5
11:9,12 76:11
77:23 131:15
**investigated**
97:18
**investigation**
100:19
**investment**
19:16
**investor**  80:8
84:12,12 109:4
111:4 144:13
**investor's**
144:14
**investors**  83:21
92:9 111:21,25
113:7 128:23

**invoking**  81:4
**involved**  19:22
114:19
**issue**  21:21
27:20 42:1,4
100:13 101:3
119:19 130:24
131:7 144:25
**issued**  45:7
**issues**  19:23
74:10 82:1
84:10 91:4
95:10 125:21
126:6 144:20
**items**  22:1
**iv**  121:11 122:1
123:24 126:14

**j**

**j**  1:8
**jglc**  1:6 5:17
**jo**  1:14 2:19
147:4,23
**joann**  5:22
**john**  1:8
**journal**  87:24
**jump**  43:5
**juncture**  93:12
**june**  8:7 38:10
38:13 55:7,14
60:4,17 61:14
62:9,18 64:7
65:12 66:15,22
67:8,17,17
74:15 78:21
79:14,14 80:9

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[june - liquid]

82:5 83:20 84:24 85:7 89:11,14,20 90:8 91:2 104:25

**jurisdictions** 46:4

**k**

**k** 14:18
**key** 139:16
**kind** 9:2 20:8 33:22 76:25 117:10 122:20 142:8
**king** 4:7
**knew** 100:20
**know** 7:11,13 12:10 18:5 23:7 26:9 29:1 30:11,15 35:24 40:6 42:21 44:6,20 47:6 48:22 50:8 51:12 52:16,19 70:11 71:10 79:4,13 82:6 89:7,11 91:11 93:12 96:9 98:20 99:4 101:4 102:21 102:24 103:15 104:21 106:9 108:23 110:4 110:21 111:3 113:4,11,14

117:10 119:6 121:9 124:16 125:10,10,13 125:17 126:1 126:11 127:3 129:22 134:3,6 134:22 135:10 136:22,23,25 138:19,20 142:21 144:14 144:25
**knowing** 24:23 125:19
**knowledge** 140:20
**known** 36:15 36:16 41:1,15 41:20 43:15 61:21 62:14,16 65:4 67:7 73:25
**krogman** 14:15 15:4,14

**l**

**l** 8:24
**lacerda** 8:24
**lack** 16:20,22 16:23 98:6 99:8 145:4
**lacks** 97:12
**language** 28:22 30:17,18
**larger** 20:20
**largest** 39:14

**laundry** 119:22
**law** 6:10 12:8 17:2 84:21 125:16
**lawsuit** 54:9 114:20 125:15
**lawyer** 17:1 31:2 46:21 47:10 80:15 81:22 83:17
**lay** 17:2
**layman's** 46:14 46:15
**lead** 75:10 77:10 78:17 124:13 144:9
**lecturer** 12:8
**lee** 2:13 6:15
**left** 132:13
**legal** 5:21,23 45:23 46:20 83:18 84:2,4 84:14,20 87:20 92:5,12 94:22 95:19 96:18 98:4 101:20 103:2,3 115:5 128:20,24 146:13 148:7
**lens** 33:18
**level** 19:8,9 31:13 37:24 38:7,14,22 40:16 46:17,21 47:4,7 54:23

60:20 63:8,16 63:18 73:19 74:8 92:4 98:14 99:11 134:13
**levels** 60:9 108:2
**liability** 97:23 103:8 114:7
**license** 2:19
**light** 37:12 47:2 67:7 70:16
**likely** 18:21 31:18 66:4 77:2 103:21
**line** 3:2 46:8 148:15 149:4 150:4,7,10,13 150:16,19
**lines** 68:13 74:4
**linguistical** 33:22
**linkh** 2:3 3:4 6:9,10,17 7:6,8 8:10 14:17,19 28:11,12 46:10 46:13 49:4,14 76:15,17,21,23 78:3,6 86:1 91:13,23 111:14 121:14 121:23 131:14 145:22 146:5
**liquid** 79:24

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[list - market]**

list   10:6 11:21
  61:15 64:7
  77:2 119:22
listed   15:21
  16:12,13 44:25
  64:4 91:10
listing   15:25
lists   63:13
litigation   19:21
  19:22 81:9
  97:15,19
  111:12 113:15
  124:11 127:15
litigations
  114:17 126:9
little   11:25 13:3
  18:9 50:14
  60:14 99:15
  108:22 116:8
  128:1 135:16
llp   2:2,7,12
location   5:18
locked   148:12
  149:1
log   50:19
logarithmic
  40:13
logical   35:22
logically   88:12
  88:16
long   79:3,6
  131:5
look   31:22
  33:19 58:5
  63:12 73:3

78:15 86:16
  114:18 121:25
  135:21
looked   15:3
  28:25 30:25
  40:20 44:13
  53:9,10 54:21
  77:8 129:18
looking   11:8
  12:3 37:5
  54:25 61:25
  71:4,5 78:9
  79:20 86:19
  106:5
looks   77:11
los   2:9
losoya   1:14
  2:19 5:22
  147:4,23
loss   53:7 79:11
  96:4 128:14,23
  129:1
losses   80:10
  81:8,12,15,16
  109:4
lot   38:23 40:7
  119:24 133:1
lots   125:16
lseg   27:25
  28:18
lunch   137:19

**m**

m   7:5 8:25 9:1
  14:18

made   26:22
  70:3,12 73:7
  135:3 151:5
major   16:4,17
  19:16 27:25
  28:19 29:1,5
majority   9:22
  76:4
make   34:12
  55:6,15 61:25
  65:7,7 74:20
  88:25 95:11
  97:7 111:1
  112:21 126:19
  126:24 135:8
  139:5 148:14
  149:3
makers   22:6,14
  22:22
makes   75:4
  127:8
making   13:15
  70:6 87:13
management
  51:5 53:2,20
  53:23 55:2,23
  57:12 86:3
manner   16:10
  84:17 111:23
  112:1
march   11:14
  34:21 38:5
  40:24 41:2,16
  41:24 45:2,7
  48:13 49:15,23

50:1,9 51:2,5
  51:12,18 52:20
  53:10,19,25
  54:17,18,23
  55:22 56:3,9
  56:18 57:11,16
  58:16,21 59:3
  62:14,17,24
  64:14,21,24
  65:2,9 66:2
  67:1,9,11,24
  69:13 71:4
  74:3 78:4 84:5
  86:6 87:11
  90:3 105:18
  124:6,10,13,18
  124:20 125:1,1
  125:8,22,24
margin   32:1
  42:25 57:5,5
  59:6,7,24
  86:14,14
margins   36:10
  43:25 45:5
  49:17 54:3
  56:13,22,22
  61:2 72:23
marked   8:8
  11:17 76:13
  78:1 131:12
market   4:4
  9:20 10:14,14
  11:12 13:12,18
  16:1,13 18:1
  18:20,24,24

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[market - members]

19:11,12,17
21:14,22,23
22:5,14,14,22
23:1,13 24:19
25:2,6,16
26:12,21 27:14
29:5,6 33:16
33:24 34:9,10
34:19 36:15
41:2,9,16,20,21
46:25 47:21
48:2,8 52:21
53:10 54:8,14
62:22 63:2
64:6,21 65:5
65:10 66:8,8,9
66:10 70:16
73:20 79:24
82:5 84:18
85:13,14,14,15
89:4,21 101:2
107:17,24
108:2,13
109:20,24
116:12 117:20
118:3,6,9,20
119:18 135:19
136:8,11
139:20 140:3
142:1,2
**market's** 73:17
139:5
**marketplace**
18:14

**markets** 14:3,6
26:24 62:22
**marks** 49:6,11
91:15,20
121:15,20
**masked** 68:17
**match** 35:7
71:1
**material** 9:19
138:6
**materialization**
65:4 72:12
94:15 99:3
112:19 128:2,6
128:15 129:8
131:1
**materializati...**
61:21 130:18
**materialized**
110:13 124:8
127:16 128:21
**materializes**
110:11
**materializing**
102:17 131:6
**materials** 10:24
11:7 90:24
138:4
**mathematical**
136:19 145:20
**mathematically**
62:17
**matt** 132:1
**matter** 5:13
8:14 16:17

26:19 35:18
72:16 84:4
87:14 88:2
122:17 131:22
134:18 140:8
**matters** 46:23
46:23 147:10
**mean** 12:9 19:7
22:18 24:7,7
26:18 31:19
32:4 34:11
41:5 42:21
43:6 45:22
48:23 52:14
59:18 66:8,17
70:11 73:2
76:5,25 77:7
77:17 81:24
82:22 90:23
96:9 98:14
100:3 105:3
110:21 111:20
115:2 116:2
117:3 119:4,5
122:16 125:7
133:22 135:20
136:19 142:6
142:15
**meaning** 46:5
104:16
**meaningful**
112:19 133:17
**means** 29:1
32:6,6 46:2
62:17 67:23

100:11 110:21
117:19 119:25
121:2,9 127:4
127:11 140:3
142:6
**meant** 48:19
**measure** 95:8
95:20 98:24
100:15 104:1
104:18,21
111:24 119:14
124:22 130:13
138:15 142:23
143:19,21
**measured**
143:23
**measurement**
129:15 145:16
**measures** 102:2
**measuring**
103:23 110:12
110:12
**mechanic** 83:4
**media** 5:11
49:7,12 91:16
91:21 121:16
121:21 146:12
**meet** 15:6,14
**member** 79:7
80:19 83:3
113:9 121:6
145:9
**members** 82:8
83:2 84:15
124:17

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[meme - necessarily]**

| | | | |
|---|---|---|---|
| **meme** 16:19 19:20 | 133:12 134:8 134:15 135:13 143:25 144:3 145:4 | **misunderstan...** 56:12,13 | **movement** 38:3 79:23 |
| **memory** 44:12 | | **mix** 48:7 | **movements** 24:18 |
| **mention** 69:24 | **metric** 58:8 | **model** 38:20 39:4,7,12,12 | **moving** 25:24 142:9 |
| **mentioned** 11:4 13:14 26:17 41:11 43:24 139:11 | **microphones** 5:4 | 40:19 63:7 92:6 96:24 98:17,20 102:1 102:11,12,20 102:23,24,25 103:12,13,17 103:18,22 105:23 116:22 117:2 138:17 139:12 140:8,9 140:13,19 141:6,8 142:13 143:14,18,21 144:7 145:8,15 145:17 | **multiple** 19:16 47:14 79:21 87:16 89:1 99:12 119:9 120:9 127:16 |
| | **middle** 18:16 | | |
| **mentions** 98:20 | **miller** 1:8 | | **multiples** 118:24 119:3,5 119:16 120:5 120:21 |
| **merit** 92:10 113:18 140:23 | **million** 17:16 26:2,3 | | |
| **met** 17:5 | **mind** 12:5 35:24 74:19 87:6 107:6 | | **murray** 2:2,7 6:11 |
| **method** 119:16 | | | **mute** 5:6 |
| **methodologies** 93:19,21 95:1 99:6,12 | **minute** 125:24 | | **n** |
| | **minutes** 15:20 85:20 | **modeling** 44:6 | |
| **methodology** 4:5 11:13 92:18 93:2,7,8 94:1 95:12,16 95:23,25 96:11 96:12,18 97:22 98:6,16 99:11 101:3,6,9,13 102:5 103:6 107:4,12 111:24 112:6 114:2 115:10 119:12 120:3 122:23 123:20 124:4 125:11 125:19 126:3,7 126:7,20,25 127:9,23,24,25 130:12 132:21 | **misleading** 72:9,10,13,24 | **models** 120:20 139:23 141:2 | **n** 7:5,5 8:25,25 9:1 14:18 |
| | **misrepresent...** 99:19 | **months** 133:24 134:3 | **name** 5:20 6:9 7:7 |
| | **misrepresent...** 68:23 | **morning** 5:1 6:9 7:7,9 | **narrowly** 31:9 |
| | **misrepresented** 128:22,23 | **motion** 30:12 30:24 98:25 | **nasdaq** 16:16 |
| | **missing** 44:8 93:17,18 | **motive** 144:15 | **natural** 1:7 5:14 13:4 148:4 150:1 151:1 |
| | **misstatement** 46:25 47:4 | **move** 18:9 98:24 | **nature** 103:20 103:21 |
| | **misstatements** 38:17,25 73:7 74:13,22 80:17 81:4 84:5 100:4 | **moved** 80:25 95:14 | **necessarily** 11:23 19:3 26:20 64:18 76:7 82:15 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[necessarily - observations]

104:2 113:10 120:1

**necessary** 90:1 98:8 106:11 115:15 118:4 148:14 149:3 151:6

**need** 20:22,23 25:22 40:2 80:8 81:23 99:5,10 102:12 113:10 118:21 119:13 127:20 127:22 129:21 130:2,11 131:10 145:14

**needed** 23:3

**needs** 33:19 91:25 92:20 93:15 102:1 104:20 123:18

**negative** 39:9 50:15,18 57:23 66:4

**neither** 65:11 141:18

**never** 29:11 128:16

**new** 1:2 2:4 5:16 15:22 16:14 21:14,20 21:23 61:1 65:13 66:7,13 67:8,11 70:16 85:1,12,16,17

109:16 113:8

**news** 10:25 21:25 73:10 88:20,21 127:18 141:9 141:23

**nilofer** 2:13 6:13 148:1

**non** 108:25 109:8 110:5

**notary** 151:13 151:19

**notating** 148:15 149:4

**note** 5:4 46:10 117:18

**noted** 12:7 151:7

**noticing** 6:8

**noting** 93:6 114:5

**notion** 44:15 105:18 117:23

**nuances** 46:5

**numar** 2:15 148:2

**number** 8:22 24:8,14 27:21 50:20,23 59:20 64:7 70:5 74:9 74:10 76:7 102:22 140:5 146:12 148:15 149:4

**numbers** 18:6 58:10 59:14

**numerical** 26:9 58:14

**ny** 2:4

**nyse** 15:25 16:9 16:12

**o**

**o** 7:5 14:18

**object** 7:14 13:23 15:7 18:3 20:17 21:8,16 22:16 24:5,21 25:18 26:14 27:15 29:8 30:4 32:15 33:12 34:6 35:2,10 36:11 39:16,24 41:3,17 42:19 43:10 44:1 45:10 47:18 48:5 49:19 51:8,19 53:4 54:6,7 55:4,25 57:3,14 58:1 58:11,23 59:16 60:5,18 61:4 62:19 64:1,16 65:15,25 67:2 68:24 69:15 70:22 72:25 73:13 74:17 79:18 80:2,12 81:13 82:10

83:5,12,22 85:5 87:17 88:10,23 91:7 92:2 93:4 95:3 96:6 97:1,24 98:12 99:21 101:16 102:8 103:9 104:12 105:1 106:21 107:18 109:12 110:6,19 111:6 111:13,18 112:15 113:16 114:24 115:24 116:24 117:15 118:13 119:1 120:7,24 122:14 123:11 123:25 125:5 127:1 128:18 129:10,25 130:21 133:20 134:10 135:6 136:16 139:8 141:11 142:3 143:5 144:17 145:11

**objecting** 116:2

**objectionable** 116:7

**objections** 6:2

**observable** 139:6,13,13,21

**observations** 52:23

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[observe - outstanding]**

| | | | |
|---|---|---|---|
| **observe** 79:23 89:3 100:14 109:17 | 128:13 129:5 135:1,14 137:25 139:4 142:22,25 | 95:16 96:13,13 101:11 105:15 107:9 134:13 134:14,20,21 | 142:15,20 143:10,12,14 143:16,22 144:8 145:5,10 |
| **observed** 39:5 89:20 104:7 107:22 119:18 138:14,14 | **omission** 47:1 **omissions** 68:23 74:14 | 135:9,11,18 143:24 144:2,5 **opinions** 9:24 9:25 61:13 | **options** 12:25 13:1 14:7,8 15:11 23:1 135:17,18 |
| **obtained** 91:12 | **once** 19:12 | 92:24 98:5 | 136:2,5 137:17 |
| **obviously** 9:16 9:23 35:23 73:21 134:17 | 21:19 44:5 62:22 100:13 **ones** 8:23 | 105:19 113:24 **opportunities** 31:23 42:13 | 138:22 139:18 140:15,21 142:6,10,19 |
| **occur** 67:10 87:16 88:15 | 116:16 138:8 **online** 6:16,17 | 43:3,16 57:13 58:21 59:13 | 143:3,8 144:16 144:22 |
| **occurred** 36:9 | **open** 109:25 | 60:1 99:9 | **order** 30:12,25 |
| **occurring** 36:14 44:17 66:7 87:25 | **operate** 24:19 **operates** 66:9 **opine** 96:23 | **opportunity** 42:12 43:2,4,5 **opposed** 29:14 | 36:5 81:11,17 103:11,23 104:20 119:14 |
| **offering** 135:18 | 136:1 | 79:4 101:3 | **orient** 37:13 |
| **office** 148:11 | **opined** 60:12 | 127:4 132:13 | 71:23 75:5 |
| **okay** 12:24 17:20 22:13 | **opining** 40:25 41:14,19 69:11 | 135:12 **opposing** 132:1 | **original** 148:10 148:20,22 |
| 23:9 24:16 26:25 29:19 | 84:25 91:24 92:14,19,23 | **opposition** 132:7 | **originally** 124:12 |
| 30:8 32:22 36:7,20 37:20 | 96:8 112:11 **opinion** 13:13 | **option** 136:8,9 136:18,20 | **outcome** 6:1 147:19 |
| 38:5 43:1 45:20 47:15 | 13:19 25:1 49:25 50:1 | 137:8,13 138:3 138:7,9,14,17 | **output** 133:11 145:20 |
| 50:21 53:16,24 54:25 72:19 | 52:5,24 53:15 53:24 64:14 | 138:24 139:7 139:12,19,21 | **outside** 20:8 25:1 80:25 |
| 76:2,11 82:3 91:13 97:9 | 65:11,17 77:5 78:12 83:19,25 | 139:23,25 140:1,7,14 | 88:13 103:7 **outstanding** |
| 100:5,18,24 104:8 106:16 | 84:25 85:9,17 89:18 90:1 | 141:1,6,14,15 141:16,17 | 17:17 18:1 26:2 138:7 |
| 107:13 108:8 108:22 110:17 | 92:17 93:18 94:6,10,12 | 142:2,8,14,15 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[overall - period]**

**overall** 89:5
**overvalued** 144:23
**own** 32:13 40:17 94:1
**owned** 28:1,19 29:5
**ownership** 81:18

**p**

**p** 1:9 4:6
**p.m.** 121:16,19 121:21 125:22 145:25 146:2,4 146:10,15
**p2** 11:12
**p3** 76:12
**p4** 77:24 78:4
**p5** 131:15
**page** 3:2 4:2 12:7 28:16 31:22 37:13 61:24 75:25 77:12 137:23 137:24 148:15 149:4 150:4,7 150:10,13,16 150:19
**pages** 148:14 148:17,17 149:3,6,6
**paragraph** 9:10,17 13:22 13:25 17:9 18:10,16 22:4

23:19,20 25:4 25:25 27:1,2 27:23 28:4,5,6 28:7,10,14 29:24,25 32:9 32:9,10,12,18 32:19,23 37:16 42:6 43:24 53:17 61:13,16 63:12 64:4 68:2,8,10 69:9 71:24 72:4 74:24 75:2,10 77:8,10,20,21 78:17 97:10 100:6,13 106:6 107:1 121:25 132:16,17 133:3
**paragraphs** 53:18,21 54:20 100:9,17 129:18
**parity** 135:25
**park** 2:3,8
**parse** 33:22
**part** 8:20 13:1 18:25 20:19 31:21 54:12 63:21 66:15 67:13 69:17 77:8,18,19,20 86:3 88:21 89:19 104:18 114:4 128:23

131:1
**partial** 45:21 47:8,16 72:11 88:4
**participant's** 19:13
**participants** 142:1,2
**particular** 24:10 39:3 81:24 102:24 114:13 121:9 122:21 123:19 123:21
**parties** 5:9 147:18
**partner** 6:11
**party** 5:24
**past** 52:3
**path** 104:3
**paul** 1:13 3:3 4:3,11 5:12 7:2 8:6 75:19 146:11 148:5 150:2,24 151:2 151:4,12
**pavithra** 2:8 6:11
**pay** 20:23
**pdf** 148:12 149:1
**penalty** 148:16 149:5
**pending** 7:24

**people** 39:5 119:25
**percent** 17:17 23:25 24:14,17 26:3,12 27:5 27:13 37:24 38:7,13,21 39:2,9 40:13 40:15 50:10,10 50:16,18 51:1 52:15 53:1,2 60:20 62:16,18 63:8 99:18 104:6,6,7
**percentages** 59:15 64:9
**perfectly** 70:13
**perform** 51:21 116:18
**performance** 61:18 70:7 86:19
**performed** 53:8 64:20 95:6 97:8 131:11
**performing** 46:19 93:22 117:7
**period** 14:3 16:13 17:15 23:11,21 25:6 26:1 27:4 28:1 28:20 39:15,20 39:23 40:11 42:10 67:15

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[period - potentially]**

72:11 100:16
113:7,9 126:17
127:11 129:16
135:19 138:4
148:18 149:7
**periods** 86:15
**perjury** 148:17
149:6
**permanently**
32:7
**persist** 32:7
48:4,9
**person** 125:23
**personally** 76:2
**perspective**
33:21 48:10
86:24 90:4
92:17 105:24
107:10 116:14
132:18 133:7
134:13 137:7
143:24
**ph.d.** 3:3 4:11
7:2
**phd** 5:12 8:6
11:14 75:19
146:11 148:5
150:2,24 151:2
151:4,12
**phenomenon**
34:21
**phones** 5:6
**pick** 5:5
**piece** 19:9
51:25 52:16,17

88:20,21 89:8
89:9 109:15,16
109:23 136:10
**pieces** 86:25
89:2
**place** 5:9
147:15
**plaintiff** 5:13
124:13 140:25
**plaintiffs** 1:5
2:10 7:8 10:15
13:16 17:3,5
20:3 30:22
31:6 32:24
35:7,25 36:8
36:17,18,20,22
37:3,8 47:11
64:22 67:17,19
68:6,21 69:3,5
71:16,18 72:24
74:12 80:15
81:4 82:7,13
82:22 85:3
92:5 97:22
98:25 103:7
105:6,11
113:19 114:17
124:7,23
126:15 127:15
129:2 146:6
**plan** 121:14
**planning** 46:11
**play** 74:10
95:17 142:25

**played** 89:19
**pleadings**
10:25 36:4
**please** 5:4,6 6:3
7:23
**plug** 138:16
**pocket** 94:20
94:21,25 95:7
95:12,15,19,21
96:2 97:5,20
97:21 98:3
102:3 115:2,3
115:8 132:19
133:8,16
**point** 17:9 22:3
32:8 39:8
40:20 42:6
43:17 51:11
53:16 59:7,23
64:25 68:1,4
68:12 69:8
71:8 73:24
74:24 75:14
86:14 93:3,24
97:9 106:4,5
112:18 115:11
121:11 122:1
126:2,13
127:14 130:14
132:15 137:21
143:20
**pointing** 120:3
**points** 59:20
69:7

**poor** 140:13
**portion** 107:23
108:4
**portions** 53:22
**portrayed**
52:22
**position** 79:6
**positions** 79:3
**positive** 136:21
**positively**
42:11
**possibility**
57:22,23,25
105:11,25
**possible** 16:8
21:20 31:13
44:4,9 47:22
56:9 58:25
61:8 83:7 88:1
88:12,17 96:11
106:23 107:4
117:17 118:17
118:18,22
119:15,16
123:16
**possibly** 125:18
126:1 128:10
**post** 71:1
**potential**
111:16 114:19
122:10 127:19
**potentially**
79:7 83:14
106:11 108:6
108:24 109:8

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[potentially - procurement]**

| | | | |
|---|---|---|---|
| 112:1,21 | **prevailing** | 106:13,20 | 144:8,23 |
| **practice** 42:23 | 117:24 | 107:15,22,22 | **pricing** 116:23 |
| 117:21 140:17 | **prevent** 97:19 | 108:1,2 109:1 | 138:16 139:7 |
| 142:11 | 120:13 144:21 | 109:10,24 | 139:12,23 |
| **prajesh** 2:10 | **previous** 147:7 | 112:14 113:6 | 141:2,6 143:14 |
| **pre** 45:2 | **previously** 60:2 | 115:16,23 | **primarily** 9:16 |
| **precise** 61:12 | 61:21 128:7,22 | 116:10,11,12 | 9:18 59:25 |
| 132:9 | 129:19 130:19 | 116:20 117:14 | **primary** 49:24 |
| **preclude** 88:20 | **price** 18:21 | 117:20,20 | **principle** 36:15 |
| **predictions** | 19:1,14 24:18 | 118:3,8,9 | 115:20 123:6 |
| 140:13 | 37:5,22 38:1,2 | 124:9 128:4 | **prior** 9:21 45:7 |
| **premise** 51:22 | 38:6,9,11,12,16 | 129:6,8 134:17 | 47:3 49:17 |
| **premised** 99:2 | 38:19,24 39:6 | 135:25 136:6 | 50:6 64:21,24 |
| **prepare** 8:15 | 39:22 40:11,24 | 136:14,15,20 | 67:25 68:15 |
| **preparing** | 41:8 48:10,12 | 136:21 137:1,2 | 73:20 79:12 |
| 75:14 100:18 | 48:25 49:22 | 137:5,8,11,12 | 115:17 116:13 |
| **preponderance** | 51:18 52:4 | 138:14,15,17 | 118:15 |
| 100:1 | 53:8,14 54:1,5 | 138:18 139:18 | **private** 5:5 |
| **presence** 88:19 | 60:4,12,15 | 140:1,6,7,7,10 | **probably** 11:8 |
| 107:2 | 62:9 63:2,5,11 | 140:12 141:14 | 15:4 |
| **present** 2:1 6:5 | 63:14,24 64:15 | 141:16,22 | **problems** 68:18 |
| 97:15,19 113:6 | 64:18,23 65:10 | 142:16,18 | **procedure** |
| 134:18 | 67:4,22,23,24 | 143:10,12,17 | 148:19,21 |
| **press** 10:25 | 69:7 73:11 | 144:9 145:5 | **proceed** 6:21 |
| 53:12 | 74:16 78:22,24 | **priced** 19:4 | 84:6 111:21 |
| **presumably** | 78:25 79:9,15 | 67:1 | **proceeding** 6:3 |
| 21:4 70:12 | 79:23 80:25 | **prices** 16:7 | **proceedings** |
| 83:8 113:8 | 81:3 83:20 | 41:22,24 62:25 | 49:9 91:18 |
| 141:17 | 84:4,16,22,23 | 99:17 118:6,20 | 121:18 146:1 |
| **presumption** | 88:5,8,22 89:3 | 119:18 136:5,8 | 147:13 |
| 30:9 80:16 | 89:5 90:4 | 136:9,10 | **process** 9:5 |
| 81:5 84:18 | 94:17 100:7,10 | 138:25 139:19 | 81:23 120:15 |
| **prevailed** | 100:11,14 | 139:21,25,25 | **procure** 9:6 |
| 116:12 | 101:1 104:24 | 140:14 142:11 | **procurement** |
| | 105:16,16 | 142:12 143:16 | 33:2,6 34:25 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[procurement - questioning]

36:23 49:18
51:6 54:1 91:5
100:22
**produce**  81:23
**product**  66:10
**professor**  4:6
11:13
**proffer**  92:6
**profitability**
33:1 68:18
69:12 73:22
**projections**
86:20
**prongay**  2:2,7
6:10
**proof**  80:18
99:25 113:21
**properly**  7:20
107:21
**propose**  118:4
**proposed**  14:3
72:11 95:8
98:10 102:4
103:5 122:24
125:11 138:3
140:25
**proposition**
35:12 117:5
122:20 123:15
**prove**  93:3
**proven**  81:16
101:8 105:7
145:3
**provide**  10:5
36:2 81:18

92:20
**provided**  30:7
30:18 58:3,9
58:15 133:18
134:24 148:19
149:8
**provider**
138:11
**provides**  138:9
**providing**  21:3
137:5
**proving**  93:14
**public**  19:12
41:22 47:2
59:3 62:23
103:16 151:19
**published**
19:16 75:9
**purchase**  113:8
**purchased**
124:18 125:1
125:24
**purchasers**
124:20,25
125:7
**purchases**
112:2
**purchasing**
144:15
**pure**  130:18
**purposes**  10:7
13:15,25 26:24
103:18 105:4
105:22 108:14
108:21 113:23

132:3 136:3,11
**put**  9:9 44:14
62:21 114:16
135:14 137:2,3
137:4,5,8,13,17
144:22
**putative**  111:12
**putting**  79:5
93:20,22 96:17
117:22 145:1

**q**

**q2**  56:4,14,15
71:5
**q3**  55:3,8,11,24
57:2 61:14,18
71:5,12
**q4**  75:6
**qualified**  51:6
**qualitative**
87:2
**qualitatively**
86:17
**quantification**
44:21 45:1,3
57:24 58:20
104:10 105:9
**quantified**
52:13,14 55:2
57:1
**quantify**  43:24
44:19 101:13
**quantifying**
55:23 57:12
**quantitative**
58:4,7 59:8,21

86:12 87:2
**quantitatively**
86:17
**quarter**  61:18
66:17,21 67:10
**quarters**  56:11
66:6,14
**question**  7:18
7:24,25 12:10
12:12 18:7
20:7 27:19
36:1 37:4
47:22,25 48:22
50:11 55:19
56:13,20 57:9
64:24 74:6
82:12,17 83:18
84:2,7 87:6,12
88:25 89:17
95:14 96:18
98:4 101:20
102:19 103:22
105:8 108:7,16
109:25 110:25
115:5,9 116:7
116:14,17,17
118:21 121:6
122:22,25
123:15,17
126:4 127:22
127:23 128:20
128:25 129:14
130:3 142:5
**questioning**
46:8 71:21

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[questions - recovers]**

| | | | |
|---|---|---|---|
| **questions** 7:10 7:15,17 12:2 12:18 22:20 46:11 105:5 112:10 114:4 119:20 125:13 125:17 135:22 146:7,8 | **raw** 50:12 107:22 | 124:4 | 134:5,21,23 135:2,10 140:23 |
| | **reach** 109:22 | **reason** 8:1 15:5 15:13,16 17:20 22:10 23:8 24:3,9,15 25:12 26:6,8 26:17 27:8,10 28:13,23 29:2 38:8 62:25 90:3 100:25 137:15 150:6,9 150:12,15,18 150:21 | **recalling** 56:10 |
| | **reached** 53:14 78:20 | | **receive** 21:1 |
| | **reacted** 52:21 52:21 85:15 | | **received** 10:9 |
| | **reaction** 34:9 53:10 61:17 73:17 104:24 | | **recently** 21:19 56:5,7 |
| | | | **recognize** 131:16,19 |
| **quick** 12:12,18 78:15 | **read** 11:3 15:1 31:17 75:12 76:2 78:17 80:9,19,21 81:10,24,24 90:22 115:12 122:16 151:5 | | **recognized** 124:14 128:14 |
| **quickly** 139:17 | | **reasonable** 111:23 116:6 | **recognizes** 116:9 |
| **quite** 65:20 142:5 | | **reasonably** 103:12 118:20 | **recollection** 59:9 134:20 |
| **quote** 9:9 68:8 68:13 69:3 71:25 72:3,7 122:5 | | **reasoned** 50:7 | **record** 5:2,10 6:7 7:15 11:11 14:17 49:8,13 76:15 78:3 91:17,22 115:13 121:17 121:22 145:24 146:4,9,15 147:12 |
| | **reading** 36:4 76:5,6 93:18 126:15 148:24 149:9 | **reasons** 25:21 27:17 38:22 63:9 64:5 71:9 125:25 129:17 | |
| **quotes** 32:19 44:3,9,13,14,18 44:24 45:2 139:23 | | | |
| | | **rebuttal** 134:22 | |
| | **real** 137:24 139:17 | **rebutted** 84:19 | |
| **r** | | **recall** 10:13 12:16 15:3 16:15,15,21 18:5,7 19:21 19:22,25 20:6 20:11 22:18 24:23 27:21,22 29:10,12 30:10 30:16 40:21 58:9 59:14 78:9,16 114:14 | |
| **r** 8:24,25 14:18 150:3,3 | **reality** 70:15 71:1 117:24 | | **recorded** 5:12 |
| **r&s** 149:1,9 | **realization** 104:23 | | **recording** 5:8 |
| **raised** 125:21 | **realize** 43:17 | | **recover** 80:10 81:8,11 83:17 |
| **rajesh** 2:8 6:12 | **realized** 79:11 | | **recoverable** 81:15,16 |
| **ranged** 25:7 | **really** 12:6 23:14 51:12 87:22 96:12 100:2 101:1 110:11 119:10 122:22 123:4 | | **recovering** 144:8 |
| **rate** 23:25 141:17,19 | | | |
| **rather** 82:14 123:1 | | | **recovers** 143:16 |
| **rational** 139:24 140:2 | | | |

**[recovery - report]**

recovery
144:21
reduce 47:16
refer 13:5
52:19 118:15
referenced
148:6
references 9:17
referred 14:11
53:7 119:8
referring 11:15
13:22 119:6
refers 47:11
refinement
116:4
reflect 69:12
reflected 18:21
reflects 67:9,11
regarding
21:25 36:23
56:10 99:8
105:15 135:23
regardless
139:20
regards 133:15
regression
116:22 117:2,6
117:9,11
120:20
reintroduced
73:19 74:8
reintroduction
63:19 73:18
relate 127:9

related 5:24
31:23 36:14
43:18 44:16
45:4 54:1,11
56:16,24 57:7
59:4,12,25
66:5,16 69:20
72:21,22 73:4
73:10,25 76:9
82:13,14,21
85:2 99:9
108:25 109:8
110:5
relating 82:4
120:15
relationship
136:9 139:24
relative 73:19
79:11 147:15
147:16
relatively
108:11
release 52:7
102:6 109:18
released 21:19
148:22
releases 10:25
relevant 9:5,7
18:24 19:1,3,6
19:10 23:16
33:14 34:20
40:25 41:6,8,9
41:12,13,14,25
42:3 43:21
48:16 54:1,5

54:14,15 56:6
65:13,22 81:18
82:16 83:10
91:4 98:4
102:25 108:16
110:24 122:22
123:14 129:14
reliability
135:12
reliable 104:20
108:17 135:4
reliably 102:1
116:19 144:1
reliance 80:16
81:5 84:16
144:20,25
relied 10:24
80:9
rely 13:17
relying 141:1
remain 34:18
remainder
106:25
remaining
105:8,18
remains 108:18
remember
15:11 58:5
77:1 98:25
133:25
remotely 6:6
removal 110:9
110:12
remove 104:20
109:21

removed 94:17
104:10
repeat 28:15
repeatable 74:5
repeated 63:1
74:20
rephrase 7:21
70:24
replicated
97:14
reply 134:22
report 4:3,4,7,9
4:10 8:6,13,15
9:9,14,15 10:7
10:12,17,20,23
11:4,12,16
12:1,4 13:15
13:22 14:1
15:2 17:12
20:14,23 21:21
22:4 26:24
29:14,17,22
31:8 32:14,20
32:23 33:15
36:6 37:14
38:15,23 40:5
42:7 44:8
47:24 52:18
53:17 57:22
58:22 59:9
60:12 61:9
63:9,13 68:2
69:5,9 70:4
75:1,6,15,17
76:16,24 77:1

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[report - revise]**

77:4,5,16,24
78:5,7,9,9,10
78:11,14,16
85:9 89:11,19
90:9,13,17,21
91:6 92:14,16
92:24 93:10
96:20 97:10
98:7 99:4
100:6,18
101:24 102:14
103:15 105:10
106:5 107:11
113:24 120:18
123:3 126:12
127:6 129:18
130:23 131:8
131:21 132:12
132:16 133:4
133:23 134:23
135:3,4,14
137:22,23,24
138:25 139:15
**reported**  2:18
27:24 28:18
147:11
**reporter**  5:22
6:20 147:2,5
**reports**  9:21
18:20,23 19:2
19:17 20:16,21
21:1,4,7,15
32:20 40:13
41:10 42:16,17
43:23 44:22,23

45:6,9,16,19
53:12 70:8
75:3,5,9,13,23
76:3,6 87:9
90:7,18 91:1
91:10,12
**represent**  7:8
38:24 81:9
94:14 131:1
**representing**
5:21
**represents**
108:5
**requested**
149:1,9,10
**require**  22:19
22:20 24:24
35:8,19 65:7
145:8
**required**  92:5
93:8,24 96:10
97:7 103:1
115:8 116:20
148:20 151:13
**requirement**
92:13
**requirements**
23:11
**requires**  38:1
116:4 140:9
**reread**  78:17
**research**  8:17
8:18,21 9:5
**residual**  37:18
37:20,21,24

39:6,9,13
40:14 50:13,15
50:15,24 51:2
60:8,16,21
61:7 63:6
84:23 109:21
**resolution**
88:15
**respect**  89:17
92:13 134:6
136:20 145:14
**responded**
86:12
**response**  85:16
96:14
**responsible**
52:9
**rest**  57:13
**result**  24:18
39:12
**results**  55:3,24
56:4 60:8
61:19 62:5
66:12,13 68:15
71:6,7,11,12
73:6 115:13,21
**retained**
113:19 114:16
132:11 146:13
**retrospect**
70:14
**return**  23:23
25:3 37:20,21
37:24 39:9
50:13,15,16

52:15 60:17,22
61:7 63:6
74:23 148:17
149:6
**returns**  37:18
37:19 39:6
50:24 51:2
60:8 84:24
**reveal**  65:18
**revealed**  36:24
37:2 47:13
53:25 59:2
62:18 65:19,23
68:14 69:13
83:3 102:15
141:9
**revealing**  47:2
66:19 88:7
104:17
**reveals**  88:5
**revelation**
60:23 61:7
82:17 83:1
85:10 130:19
**review**  31:1,3
126:16 148:8
148:10,13
149:2
**reviewed**  9:23
10:20 11:23
30:11,11,12,24
77:2 90:8,15
90:19 92:15
**revise**  70:2

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[revised - security]**

revised 58:17 69:25 70:2 124:10
revision 35:9 57:20 74:7
ribbon 113:13 113:21,25 114:3,10 115:6 122:6 129:16 143:2,13
ribbons 114:11 114:15,18,22
right 12:16 13:10 21:24 29:13 35:14 37:9 43:6 47:23 48:24 49:1,4 51:16 52:13,18 55:7 55:15,17,19 56:5 57:5 59:3 61:12,12 65:3 66:10,11,17 67:18 68:1 69:8 70:14,21 76:6,25 77:24 78:22 79:7 80:6 82:19 83:21 86:18 88:22,25 89:4 89:7 93:17 100:8,12 102:14 105:14 107:4 108:3 109:19 111:21

111:23,24 112:3,4,14 116:8,14 118:19 124:3,5 125:8 133:5,23 133:25 137:15 142:7
rise 82:23 93:9
rises 136:14
risk 94:15 102:14,15,17 104:24 110:10 110:13 112:19 124:7,8 128:2 128:6,21 129:9 130:18 131:5 141:16,19 144:14
risks 61:21 65:4 72:12 99:3,6 100:21 101:14 102:7 104:11 105:12 105:19 127:16 128:15 129:23 131:2
role 30:8 51:6
romanette 106:8 115:11 116:8 121:11 122:1 123:24 126:14
romanettes 62:2

rpr 1:14 2:19 147:23
ruled 27:20
rules 149:8
rulings 22:21

**s**

s 8:25 9:1 23:5 23:10 150:3
sales 112:2
samer 8:25
satisfied 23:10
saw 10:23
saying 14:24 19:6 43:17 62:15 69:10 92:8 96:22 97:3,6 104:5 112:17,22 122:17 141:5
says 12:13 17:14 22:5 28:17 31:22 32:19,19,23 33:5 42:9 68:13 72:7 108:23 115:12 117:9 126:15
schedule 113:5 115:7 148:10
scholes 140:4,9 140:17,19 141:8,13 142:13 143:1,4 143:17 145:8 145:18

school 12:8
scope 20:8 25:1
se 20:14
sealed 148:20
sec 27:24 28:17
second 7:18 10:15 28:11 31:21 32:22 42:8 72:4 131:17
section 52:19 52:20 61:16 63:17 69:18,23 85:22 105:10 107:11
sections 9:13
securities 10:14 12:22 13:11 14:2,5 15:11 16:3 18:12 21:11 26:23 41:23 42:9 54:9 69:24,25 75:8 80:5,5 81:9 95:2 106:13 108:9 111:11 112:14 113:15 114:20 124:9,11,15 128:3 130:9 131:23,25 140:20 144:24
security 19:14 79:21,22,23 109:1 115:16

Page 35

[security - sills]

115:23 116:10
116:11,19,23
117:14,19
118:8
see  11:1 17:14
  17:18 18:11,15
  18:18 22:4,8
  23:20 24:1
  25:5,10,25
  26:4,5 27:2,6
  27:23 28:2,8
  28:17,21,22
  31:21 32:2,10
  32:22 33:3,7
  35:20 37:15
  42:8,14 47:11
  67:12 68:3,5
  68:13,19 71:24
  72:7,14,15
  75:24 77:6,17
  97:11,16 100:5
  106:8,14,15
  108:23 109:5
  115:12,18
  122:2,4,11,12
  126:15,21,22
  132:17,23
  133:6,13
  138:19 145:14
seeing  28:9
  76:19
seeking  80:16
  84:15
seem  19:22
  20:6

seems  74:8
  80:24
seen  16:11
  17:24 19:15
  22:13 23:9
  24:16 26:11
  29:4 43:16
  56:2 86:16
  95:7,17 128:9
  128:20 140:23
  140:25
selected  103:23
sell  66:10
semaan  8:25
sense  21:24
  66:18 80:18
  82:21 88:1
  104:19 111:1
sensitive  5:5
sentence  17:14
  32:22 42:8
  108:23
sentences  113:1
  126:14
separate  84:2
  108:5,6,6
separately  87:8
september  22:7
  34:25 35:1
  36:24 38:18
  39:1,10 63:4
  64:8 65:12
  66:23 71:15,16
  72:1,8 73:12
  73:16,20 74:15

75:7,7 76:16
  76:20,21 79:25
  80:10 82:5
  84:24 85:7
  89:11,15,21
  91:3 106:2
series  138:7
  142:14,16,20
  145:5,10
serves  32:12
services  20:21
set  54:19
  110:23 123:19
  145:19 147:20
seven  23:22,24
  85:21
several  21:21
  42:9 75:3
  102:7
share  39:6 92:8
  94:17 137:8
  144:23
shareholder
  79:14,16 81:22
  83:15
shareholders
  79:1,10
shares  16:8
  17:16,17,25
  23:1 26:2,12
  26:20 79:4,8
  79:12 81:19
  113:8
sharper  60:15

shorthand  13:5
  13:6,7 147:4
show  80:19
shown  105:11
shows  72:16
shrink  61:23
side  132:10
sidley  2:12 6:13
sidley.com  2:15
  2:15 148:2
sign  148:16
  149:5
signature
  147:23 148:22
  148:24,24
  149:9
significance
  24:13 66:24
significant
  23:24 24:14,18
  31:24 34:3,4
  34:16,17 37:22
  37:25 38:6,11
  38:12,19,21
  39:22 40:10,15
  49:17 50:22
  51:3 56:17
  57:19 59:5
  60:3,10,16,22
  63:6,9 69:21
  73:5 74:1
sills  1:3 5:13
  148:4 150:1
  151:1

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[similar - statistically]**

| | | | |
|---|---|---|---|
| **similar** 22:19 34:9 | **sorts** 47:20 | 45:5 49:22 | 143:20 |
| **similarly** 1:4 | **sounds** 53:6 121:14 | 51:15 57:2,10 | **state** 6:3,6 |
| **single** 11:23 | **sources** 91:12 | 75:10 77:1 | 117:25 118:1 |
| 76:7,8 93:16 | **south** 1:15 2:14 | 80:9 90:12 | 132:18 147:5 |
| 99:13 113:9,11 | 5:19 | **specifics** | 148:9,12 |
| 142:8 145:5,20 | **southern** 1:2 | 134:21 | **stated** 16:2 |
| **sirona** 4:10 | 5:15 | **specified** | 37:23 57:19 |
| 131:22 | **speak** 38:8 | 107:21 141:4 | 61:17 69:20 |
| **sitting** 34:8 | 87:20 101:18 | 143:2 147:15 | 75:10 |
| 51:15 133:25 | 110:8,24 | **specify** 50:25 | **statement** 24:8 |
| 135:1 | **speaking** 41:25 | **spelled** 14:18 | 61:3 75:4 |
| **situated** 1:4 | 45:22 46:3 | **spend** 76:7 | 108:15 122:16 |
| **situations** 88:3 | 71:13 129:6,13 | **spots** 55:1 | 123:4 127:7,7 |
| 128:16 | 129:14 | **spread** 27:3,13 | 127:12 136:19 |
| **skill** 76:5 | **specific** 12:10 | **stage** 92:1,10 | **statements** |
| **slightly** 17:7 | 16:21 18:5,6 | 92:21,22 95:9 | 32:14 47:3,13 |
| 50:20 87:7 | 25:20 27:21,21 | 98:8 101:20 | 53:2 72:10,13 |
| **sloppy** 50:14 | 29:10,12 30:17 | 102:21 104:5 | 86:3 |
| **sold** 79:10 | 45:1 46:20 | 105:12 113:18 | **states** 1:1 5:15 |
| 81:19 92:9 | 52:15,16 53:6 | 129:21 140:24 | 13:25 18:11 |
| **solutions** 5:21 | 56:10 64:8 | 141:1 | 23:7,21 25:5 |
| 5:23 146:14 | 70:18 92:7 | **stages** 102:7 | 25:25 27:3,23 |
| 148:7 | 93:23 94:11 | **standard** 92:5 | 32:24 38:2 |
| **somebody** 81:7 | 95:10 96:24 | 95:11,19 98:5 | 95:20 97:12 |
| 125:21 | 101:4,5,12 | 100:1 101:19 | 106:9 122:5 |
| **sorry** 17:12 | 107:25 108:4 | 103:4 111:8 | 133:6 |
| 28:3 35:1 46:7 | 116:17 126:23 | **standpoint** | **stating** 93:11 |
| 55:18 56:12 | 133:11 134:6,6 | 135:9 | **statistical** |
| 133:10 137:6 | 141:23 143:8 | **stanford** 12:8 | 24:12,14,18 |
| 137:15 | 144:13 145:17 | **start** 21:20 | **statistically** |
| **sort** 13:5 20:11 | **specifically** | 39:20,22 40:11 | 23:24 37:21,25 |
| 32:12 93:19 | 10:13 20:10 | 45:15,25 106:4 | 38:3,6,11,19,21 |
| 125:15 142:22 | 22:18 30:10 | 131:16 | 39:21 40:10,15 |
| | 44:18,25 45:3 | **starting** 49:23 | 50:22 51:2,3 |
| | | 51:11 75:24 | 60:3,9,16,22 |

**[statistically - table]**

| | | | |
|---|---|---|---|
| 63:5,8 | 113:6 128:4 | **subscribed** | 120:18 123:5 |
| **stemmed** | 129:6,7 136:6 | 151:14 | 127:6 |
| 101:14 | 136:14,21 | **subsequent** | **supported** |
| **stemming**  99:7 | 137:1,10,12 | 63:2 86:10 | 49:17 |
| 104:11 | 138:15 139:25 | **subsequently** | **sure**  20:5 35:4 |
| **stenographic...** | 140:6,7,10,12 | 61:16 | 40:3 46:10 |
| 2:18 147:11 | 141:14,22 | **subset**  42:4 | 55:6,15 56:2,8 |
| **step**  20:15 | 143:2,13,13,17 | **substance**  7:20 | 56:8 61:25 |
| 127:20,22 | 145:14 | 12:7 53:19 | 62:6 72:2 |
| **stepping**  99:15 | **stocks**  16:20 | 77:15,19 141:9 | 74:20 78:13 |
| **steps**  87:16 | 19:20 | **substantial** | 80:23 81:1 |
| **steven**  4:6 | **strategic**  68:16 | 20:24 56:24 | 84:6 88:1,25 |
| 11:14 | **strike**  36:21 | 57:8,8 59:11 | 99:23 100:2 |
| **stick**  14:25 | 73:8 134:4 | **substantially** | 121:2 122:19 |
| **stipulation** | 141:16 | 34:9 59:10 | 128:10 135:11 |
| 148:21 | **strongly**  43:20 | **substantively** | 142:5 |
| **stock**  13:8 | **studies**  94:13 | 90:21 | **surprise**  64:6 |
| 15:22,25 16:12 | 108:9,12 123:7 | **sufficient**  96:17 | **surrounding** |
| 16:14,16 17:16 | **study**  38:20 | 98:11 | 55:22 |
| 17:24 18:1,21 | 39:4 50:19,20 | **suggested**  9:23 | **sustainable** |
| 19:4,15,18 | 60:9,21 63:7 | 10:2 | 34:22 |
| 22:6,14,15 | 94:15 98:10,21 | **suggesting** | **swear**  6:20 |
| 23:12,23 25:7 | 99:4 106:10,17 | 144:13 | **sworn**  6:22 7:4 |
| 25:15 26:11 | 107:14,16,20 | **suggestions** | 147:9 151:14 |
| 27:4,12 28:1 | 108:3,17,20 | 10:2 | **synonym**  33:10 |
| 28:19 29:5,6,7 | 110:1,17,22,23 | **suite**  2:4,9 | **synonymous** |
| 48:4 50:9 | 111:2,4,11,15 | **summary**  61:13 | 34:5 |
| 51:18 60:15 | 115:13,21 | **supplement** | **systematic** |
| 62:8 63:5,14 | 117:4 | 115:21 123:7 | 24:25 95:6 |
| 73:11 78:21,24 | **stuff**  77:16 82:4 | **supplementing** | **systemic**  27:19 |
| 79:1,9,15,16 | **subheading** | 115:13 | **t** |
| 88:22 95:11 | 75:22 | **supplied** | **t**  7:5 150:3,3 |
| 99:17 104:24 | **subject**  80:18 | 138:22 | **table**  58:14 |
| 106:19 107:15 | **submitted**  8:14 | **support**  86:2,5 | 59:18 76:8 |
| 108:1 109:10 | 131:21 132:5,6 | 97:13 98:9 | |

Page 38

**[take - think]**

| | | | |
|---|---|---|---|
| **take** 5:9 32:12 40:6 42:12 43:2 44:11 53:18 69:18 77:13 91:14 99:6 101:4 102:12 103:13 104:3 109:20 127:20,22 131:18 145:23 | **tasks** 9:3 | 78:18,23 86:19 119:5 125:20 135:21,23 144:8 | 31:17 33:14,24 34:10,12,19 35:12,16,19 36:13,16 37:4 39:5 41:11 42:22,24 43:8 43:13,16 45:22 48:21 57:22 58:6,13 59:18 59:19 60:2 62:3 66:13,14 67:19 69:2,3 70:5 71:6 72:16 73:2,15 73:24 77:18 78:8,14 79:20 81:17 82:12,16 83:14 86:21 87:11,23 89:18 91:13 92:11,12 93:15 95:14 97:6 101:7 102:11 103:11 104:21 105:17 105:19 108:11 110:9 111:20 112:2,18 113:18 114:12 114:12 116:6 117:8 119:6,7 119:19 120:17 121:3,24 122:22 126:24 128:25 130:11 130:23 131:2,9 |

**[think - type]**

133:22 134:12
134:19 135:22
136:21 138:12
142:7,23 143:7
143:20 145:2
145:13
**thinking**
145:22
**third** 7:22
**thought** 20:9
28:4 31:15
56:19 120:15
128:11
**three** 7:12 9:3
62:1
**threshold**
50:25 51:1
60:21
**thresholds** 18:6
**ticker** 13:9
**time** 5:7 6:3
7:23 40:6
44:11 49:5,7
49:12,16 66:6
69:7 73:6 76:7
87:25 88:15
90:8 91:14,16
91:21 102:15
102:17 115:7
121:12,16,21
130:15 131:18
137:17 146:6,7
147:14 148:10
148:18,25
149:7

**times** 81:19
**timing** 112:1
**title** 12:15
75:10
**today** 6:11 7:11
8:2 12:1 34:8
51:16 135:2
**today's** 146:10
**tolerance**
144:14
**tool** 94:7,11
107:8,14
108:12,17
112:12 118:11
118:16,16,18
121:3,9
**tools** 94:7,11
106:9 107:5
108:10 115:15
115:22 116:5
116:15 119:24
120:20 121:7
123:7,17,19
126:8
**top** 7:12
**topic** 9:8 13:20
48:2
**total** 48:7
146:12
**totality** 43:13
**towards** 32:17
**track** 138:20
**trade** 13:11
16:12,18 19:18
23:12 25:17

27:14 140:15
142:10
**traded** 14:2
16:3,4,9,9
26:20,23
135:18 142:11
**trades** 16:1
**trading** 14:6
17:15,25 18:2
20:20 23:22
24:8
**transaction**
139:22
**transcript**
80:21 147:11
148:6,8,10,13
148:13,22
149:2,2 151:5
151:8
**transcripts**
50:6
**transitory** 33:6
33:11
**true** 10:6 87:21
147:12 151:8
**truism** 145:20
**truth** 10:16
29:16,17 30:1
30:21 31:4,5,8
31:20 33:25
34:15,24 35:7
35:13 36:23
37:2,7 41:20
45:13,15,17
48:2 50:3 52:2

52:17 53:14
54:17 59:2
60:13,24 61:8
62:13,13,16,23
63:1,11 64:11
65:18 66:19,20
67:5,13 69:6
69:13,18 73:3
82:18,18 83:1
83:3 85:11,18
86:6 88:5,8
89:12,17,19
90:2 98:17
147:9
**truthful** 8:2
**try** 14:25 33:22
**trying** 70:10
75:5 99:16
105:20
**turn** 23:18
26:25 29:13
39:7 70:20
71:12,12 100:5
109:4
**turned** 70:25
**turning** 71:15
75:16
**turns** 70:14,15
140:14
**two** 10:12
12:19 46:11
90:6,14 105:19
128:8,12
**type** 89:14
128:17

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[types - unfi]**

| | | | |
|---|---|---|---|
| **types** 61:22 114:22 128:8 | 57:3,14 58:1 58:11,23 59:16 60:5,18 61:4 | 139:8 141:11 142:3 143:5 144:17 145:11 | **understanding** 10:18 17:1,2,4 23:7 37:10 |

**types**  61:22
  114:22 128:8
**typically**  20:19
  113:19 125:14
  138:11

**u**

**ultimately**  9:22
  10:1,19 22:20
  30:17 31:19
  47:24 56:15
  70:9 72:17
  74:7 84:1
  93:13 96:1
  101:8,25 111:9
  119:11 124:17
  125:11 129:3
  131:10 132:21
  133:9,10
**umar**  2:13 6:13
  6:13 13:23
  15:7 18:3
  20:17 21:8,16
  22:16 24:5,21
  25:18 26:14
  27:15 28:9
  29:8 30:4
  32:15 33:12
  34:6 35:2,10
  36:11 39:16,24
  41:3,17 42:19
  43:10 44:1
  45:10 46:7
  47:18 48:5
  49:19 51:8,19
  53:4 55:4,25

57:3,14 58:1
58:11,23 59:16
60:5,18 61:4
62:19 64:1,16
65:15,25 67:2
68:24 69:15
70:22 72:25
73:13 74:17
76:19 79:18
80:2,12 81:13
82:10 83:5,12
83:22 85:5,23
87:17 88:10,23
91:7 92:2 93:4
95:3 96:6 97:1
97:24 98:12
99:21 101:16
102:8 103:9
104:12 105:1
106:21 107:18
109:12 110:6
110:19 111:6
111:13,18
112:15 113:16
114:24 115:24
116:24 117:15
118:13 119:1
120:7,24
121:12 122:14
123:11,25
125:5 127:1
128:18 129:10
129:25 130:21
133:20 134:10
135:6 136:16

139:8 141:11
142:3 143:5
144:17 145:11
146:8 148:1
**unanswered**
  108:19
**uncertainty**
  58:17 88:15
**uncovered**
  126:18
**under**  41:21
  43:12 44:21
  50:17,17,21
  74:5 84:25
  102:6,20
  104:11,23
  105:12 110:8
  115:16 116:12
  117:23 123:13
  124:7 131:7
  144:11 145:3
**underlying**
  136:6,13,21,25
  140:12
**understand**
  7:19,19 10:15
  20:13 31:5
  35:4,25 36:22
  41:5 46:20
  54:4 63:21
  71:20 81:4
  92:12 98:23
  100:10 113:20
  114:6 119:23
  129:2 130:8

**understanding**
  10:18 17:1,2,4
  23:7 37:10
  39:2 45:20,24
  46:1,3,22 47:5
  47:7,8 72:19
  80:14,15 81:7
  81:21 84:13,14
  84:20 92:4
  93:24 99:24
  100:1 101:25
  102:3 103:1
  104:5 113:2
  124:11 130:2
  134:2
**understated**
  101:15 129:23
  130:4,6,11
**understatement**
  130:13,14
**understood**
  16:6 34:10,20
  36:5 44:16
  123:18
**undisclosed**
  42:2,5 64:23
  102:14 105:19
**unfi**  4:8,9 10:14
  13:5,11 14:2,5
  14:6,8 15:6,14
  15:21 17:16
  18:21 22:6
  23:1,4 25:7
  26:23 27:3
  28:1,19 31:25

Page 41

**[unfi - view]**

| | | | |
|---|---|---|---|
| 42:11,17 49:16 53:20 55:1,23 60:3,15 61:14 63:5 66:9 71:5 75:8 79:1 80:4 83:21 86:3 90:7 91:1 100:19 106:13 106:19 112:14 132:13,16 135:18 138:22 139:5 | **unsupported** 72:18 127:13 **unsustainable** 33:1,10 34:4 34:17 **unusual** 126:19 141:20 **use** 13:6 33:23 34:11 87:9 93:2 116:4 118:23,24 119:25 123:16 140:12 141:6 | **using** 13:8 34:16 39:11,11 50:19,25 60:21 99:4,16 103:25 110:23 111:23 118:4,23 122:18 132:21 138:4 141:8 142:12,13 143:4,12 | **valued** 143:4,9 **valuing** 117:24 **variable** 139:6 **various** 21:4 61:22 63:13 114:17 138:25 **vary** 19:8 **vast** 9:22 76:4 **verified** 17:22 22:12 **verify** 30:21 |

**unfi's** 23:23 31:25 41:1,15 41:23 43:25 51:5 54:2 57:11 68:15,16 68:18 75:11 95:11
**uniformly** 82:7
**unintentional** 90:18
**unique** 95:11 96:15 145:19
**unit** 5:11
**united** 1:1,7 5:14,15 13:4 148:4 150:1 151:1
**units** 146:12
**unrelated** 82:6 82:6
**unreliable** 95:13

**used** 29:16 34:3 34:17 39:7 40:19 41:7 48:17 52:11 93:20 95:1,23 106:12,18 108:10,13,13 108:14,20 111:10 112:12 112:25 114:22 115:14 116:23 117:4,14 118:12 119:5 120:5 123:8,13 129:3 139:6 140:19 143:19 144:1 146:12
**useful** 117:6,11 121:7
**uses** 24:11 33:5 117:25

**v**

**v** 148:4 150:1 151:1
**vague** 20:11
**valuable** 21:5,5 137:14
**valuation** 12:14 12:22,24 33:17 94:7 106:9 107:5 112:12 115:15,22 116:15,18 118:2 119:23 120:19
**valuations** 118:17
**value** 18:23 19:1,3,6,10,13 41:12,13,14,19 41:25 42:3 48:16,18,20,21 48:24,25 54:15 56:6 65:13,22 79:12 122:9

**veritext** 5:21,23 146:13 148:7,9 148:11,20
**version** 118:17
**versus** 5:14 43:4 53:2 87:2 124:2,3 129:7 129:23
**vf** 1:6 5:17
**video** 5:8,12
**videographer** 2:17 5:1,22 6:16,19 49:6 49:11 91:15,20 121:15,20 145:24 146:3,9
**videotaped** 1:12
**view** 16:3 33:9 33:20 50:7 71:6 93:6 95:18 124:14 127:12,20 144:10

**[viewing - words]**

| | | | |
|---|---|---|---|
| **viewing** 43:3 | 53:16 68:1,12 | **wildly** 118:2 | 83:23 85:6,24 |
| **views** 86:18 | 115:11 128:1 | **window** 43:6 | 87:18 88:11,24 |
| **violation** | 135:16 137:21 | **wish** 12:2 | 91:8 92:3 93:5 |
| 140:16 | **wants** 81:8 | **withdrawn** | 94:23 95:4 |
| **visibility** 57:21 | **way** 15:15,17 | 58:16 | 96:7 97:2 98:1 |
| **volatilities** | 16:2 18:8 19:1 | **withheld** 46:24 | 98:13 99:22 |
| 140:16 142:7 | 24:23 26:9 | 54:8,13 82:18 | 101:17 102:9 |
| 142:12 | 54:4 61:1 | **witness** 3:2 | 103:10 104:13 |
| **volatility** 138:3 | 62:21 78:19 | 6:14,21,22 7:3 | 105:2 106:22 |
| 138:10,16,21 | 83:24 98:15 | 11:19 13:24 | 107:19 109:13 |
| 138:24 139:1,3 | 104:2 115:4 | 15:8 18:4 | 110:7,20 111:7 |
| 139:5,12,14 | 119:23 122:16 | 20:18 21:9,17 | 111:19 112:16 |
| 140:6,10,12 | 123:17 130:3 | 22:17 24:6,22 | 113:17 115:1 |
| 141:14,22,25 | 135:24 | 25:19 26:15 | 116:1 117:1,16 |
| 142:17,21 | **ways** 141:21 | 27:16 29:9 | 118:14 119:2 |
| 143:3,17,18,21 | **we've** 27:17 | 30:5 32:16 | 120:8 121:1 |
| 144:4 | **week** 75:9 | 33:13 34:7 | 122:15 123:12 |
| **volume** 17:16 | **weekly** 17:15 | 35:3,11 36:12 | 124:1 125:6 |
| 17:25 | 17:25 | 39:17 40:1 | 127:2 128:19 |
| **vs** 1:6 | **weeks** 124:12 | 41:4,18 42:20 | 129:11 130:1 |
| | **wells** 44:4 | 43:11 44:2 | 130:22 133:21 |
| **w** | **went** 36:2 | 45:11 47:19 | 134:11 135:7 |
| **w** 1:8 | **whereof** 147:20 | 48:6 49:20 | 136:17 139:9 |
| **waived** 148:24 | **whispering** 5:5 | 51:9,20 53:5 | 141:12 142:4 |
| 148:24 | **wide** 80:16 | 55:5 56:1 57:4 | 143:6 144:18 |
| **waiving** 148:21 | 84:7 101:12 | 57:15 58:2,12 | 145:12 147:8,8 |
| **want** 7:22 | 110:18,22 | 58:24 59:17 | 147:20 148:13 |
| 15:18 22:3 | 111:1,2,22 | 60:6,19 61:5 | 148:16 149:2,5 |
| 25:3 48:22 | 112:7 120:22 | 62:20 64:2,17 | **wondering** |
| 61:25 74:20,24 | 121:3,5,10 | 65:16 66:1 | 12:17 |
| 97:9 100:5 | 123:24 124:22 | 67:3 69:1,16 | **word** 33:9 |
| 101:4 103:12 | 126:5 134:8 | 70:23 73:1,14 | 95:23 113:3 |
| 106:4 121:11 | 142:23 145:16 | 74:18 79:19 | **words** 9:25 |
| 126:13 132:9 | **widely** 107:14 | 80:3,13 81:14 | 10:1 33:23 |
| **wanted** 29:20 | 115:14 | 82:11 83:6,13 | 87:8 116:13 |
| 32:8 48:14 | | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[work - zurek]**

| | |
|---|---|
| **work** 13:6 96:10 122:24 123:1,2 143:21 144:7 145:3 | **yields** 140:7 |
| **worked** 16:17 114:11 | **york** 1:2 2:4 5:16 15:22 16:14 |
| **working** 45:24 | **z** |
| **works** 7:12 99:13 143:15 | **zero** 38:4 62:12 62:18 64:11 |
| **workspace** 27:25 28:18 | **zurek** 1:13 3:3 4:3,11 5:12 7:2 7:7 8:6,11 49:15 75:19 91:24 121:24 146:5,11 148:5 150:2,24 151:2 151:4,12 |
| **world** 143:15 | |
| **write** 9:13 20:16 21:6,13 21:18 41:13 | |
| **writer** 137:4 | |
| **written** 41:8 106:15 | |
| **wrong** 20:7,12 28:14 | |
| **wrote** 10:1 | |
| **x** | |
| **x** 7:5 | |
| **xx** 148:12 | |
| **y** | |
| **yeah** 58:14 71:25 77:11,14 113:2 | |
| **year** 59:23,23 133:23 | |
| **yield** 110:23 117:22 118:2 119:17 140:1,1 144:9 145:5,19 | |

Page 44

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.