**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

DAN SILLS *and* GEORGE DICK, *individually and on behalf of all others similarly situated*,

                      Plaintiffs,

   vs.

UNITED NATURAL FOODS, INC., J. ALEXANDER MILLER DOUGLAS, JOHN W. HOWARD, *and* CHRISTOPHER P. TESTA,

                      Defendants.

---

No. 1:23-CV-02364-JGLC

ORAL ARGUMENT REQUESTED

 

**DEFENDANTS' SUR-REPLY IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND**
**<u>APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 3

I.      Plaintiffs Have Not Satisfied *Comcast*'s Requirements. ...................................................... 3

II.     Applying the Wrong Standards, Plaintiffs Fail to Refute Defendants' Price Impact Arguments. .......................................................................................................................... 8

        A.     Plaintiffs Have Rebutted the *Basic* Presumption With Respect to the June and September Alleged Corrective Disclosures. ...................................................... 9

        B.     Plaintiffs' Remaining Arguments Fail. ................................................................ 15

                1.     A Statistically Significant Price Drop on the Date of an Alleged Corrective Disclosure Does Not Establish Price Impact. ......................... 15

                2.     Defendants' Price Impact Argument Is Not an Improper Loss Causation Argument. ................................................................................. 16

                3.     The Court Should Consider Corrective Disclosures Individually. ........... 17

                4.     The "Law of the Case" Doctrine Does Not Preclude Defendants' Price Impact Argument. ...................................................................................... 18

        C.     The *Affiliated Ute* Presumption Does Not Apply Either. .................................... 18

III.    Plaintiffs' Adequacy and Typicality Arguments Fail. ....................................................... 19

CONCLUSION.................................................................................................................. 21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)........................................................................................14

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
623 F. Supp. 3d 470 (E.D. Pa. 2022) .........................................................................13

*In re Allstate Corp. Sec. Litig.*,
966 F.3d 595 (7th Cir. 2020) ................................................................................15, 16

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
663 F. Supp. 3d 334 (S.D.N.Y. 2023)........................................................................19

*In re Aluminum Warehousing Antitrust Litig.*,
336 F.R.D. 5 (S.D.N.Y. 2020) .....................................................................................8

*In re Apache Corp. Sec. Litig.*,
2024 WL 532315 (S.D. Tex. Feb. 9, 2024) ..........................................................13, 17

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
77 F.4th 74 (2d Cir. 2023) ................................................................................ *passim*

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
879 F.3d 474 (2d Cir. 2018)........................................................................................16

*Baliga v. Link Motion, Inc.*,
2022 WL 16707361 (S.D.N.Y. Nov. 4, 2022)............................................................19

*Basic v. Levinson*,
485 U.S. 224 (1988).................................................................................................1, 18

*Boston Ret. Sys. v. Alexion Pharma., Inc.*,
2023 WL 2932485 (D. Conn. Apr. 13, 2023 .............................................................17

*In re BP p.l.c. Sec. Litig.*,
2013 WL 6388408 (S.D. Tex. Dec. 6, 2013)................................................................6

*In re BP p.l.c. Sec. Litig.*,
2014 WL 2112823 (S.D. Tex. May 20, 2014) ..............................................................4

*Bratya SPRL v. Bed Bath & Beyond Corp.*,
2025 WL 721770 (D.D.C. Mar. 6, 2025)...................................................................17

ii

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    310 F.R.D. 69 (S.D.N.Y. 2015) ...................................................................................13

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
    2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019), *R&R adopted in part*, 2020 WL
    1329354 (S.D.N.Y. Mar. 23, 2020) ...........................................................................17

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) .................................................................................................3, 7

*County of Suffolk v. Stone & Webster Eng'g Corp.*,
    106 F.3d 1112 (2d Cir. 1997) ....................................................................................18

*In re Deloitte & Touche LLP*,
    No. 24-258 (4th Cir. Feb. 13, 2025) .............................................................................7

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    309 F.R.D. 251 (N.D. Tex. 2015) ..............................................................................14

*In re FirstEnergy Corp. Sec. Litig.*,
    149 F.4th 587 (6th Cir. 2025) .............................................................................4, 6, 7

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
    301 F.R.D. 116 (S.D.N.Y. 2014) .................................................................................8

*George v. China Auto. Sys., Inc.*,
    2013 WL 3357170 (S.D.N.Y. July 3, 2013) ..........................................................20, 21

*Goldman Sachs Grp. Inc. v. Ark. Tchr. Ret. Sys.*,
    594 U.S. 113 (2021) ........................................................................................... *passim*

*Gordon v. Sonar Cap. Mgmt. LLC*,
    92 F. Supp. 3d 193 (S.D.N.Y. 2015) ..........................................................................20

*Hevesi v. Citigroup Inc.*,
    366 F.3d 70 (2d Cir. 2004) .........................................................................................3

*In re Intuitive Surgical Sec. Litig.*,
    2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) .............................................................13

*Kamerman v. Ockap Corp.*,
    2 F.R.D. 195 (S.D.N.Y. 1986) ..................................................................................20

*In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig.*,
    2013 WL 396117 (D.N.J. Jan. 30, 2013) ....................................................................18

*Monroe Cnty. Emps.' Ret. Sys. v. Southern Co.*,
    332 F.R.D. 370 (N.D. Ga. 2019) ..........................................................................16, 17

iii

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
  2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ........................................................................8

*Owens v. FirstEnergy Corp.*,
  No. 23-0303 (6th Cir. Nov. 16, 2023) ....................................................................................7

*In re Petrobras Sec. Litig.*,
  862 F.3d 250 (2d Cir. 2017) ...................................................................................................6

*Puddu v. NYGG (Asia) Ltd.*,
  2022 WL 2304248 (S.D.N.Y. June 27, 2022) .......................................................................19

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
  349 F.R.D. 606 (S.D.N.Y. 2025) ............................................................................................7

*Scott v. N.Y.C. Dist. Council of Carpenters Pension Plan*,
  224 F.R.D. 353 (S.D.N.Y. 2004) ..........................................................................................19

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
  341 F.R.D. 542 (S.D.N.Y. 2022) ..........................................................................................17

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
  2025 WL 2554474 (S.D.N.Y. Sept. 4, 2025) ...................................................................13, 16

*Strougo v. Barclays PLC*,
  312 F.R.D. 307 (S.D.N.Y. 2016) ..........................................................................................18

*In re The Boeing Co. Sec. Litig.*,
  No. 25-135 (4th Cir. May 2, 2025) .........................................................................................7

*In re Vale S.A. Sec. Litig.*,
  2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) .......................................................................14

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017) ...................................................................................................19

*Wilson v. LSB Indus., Inc.*,
  2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018) .......................................................................16

iv

**INTRODUCTION**

Plaintiffs' Reply invites this Court to disregard recent Supreme Court authority on when securities fraud claims may be maintained as class actions. Plaintiffs argue that class certification is a foregone conclusion because, for example, some courts in the past have not rigorously analyzed whether securities plaintiffs set forth an appropriate damages methodology. Plaintiffs also argue "case closed" because *Basic v. Levinson*, 485 U.S. 224 (1988), permits securities plaintiffs to rely on a rebuttable presumption of classwide reliance—notwithstanding that Defendants have rebutted the presumption here. But subsequent Supreme Court and Second Circuit cases have made clear that Plaintiffs—and the Court—must seriously grapple with both of these issues at the class certification stage. Rather than doing so, Plaintiffs fall back on outdated and misguided arguments, failing to address the deficiencies with their proposed class.

*First*, *Comcast* requires Plaintiffs to offer "evidentiary proof" of a methodology capable of measuring damages on a classwide basis consistent with their theory of liability. But rather than doing so, Plaintiffs ask the Court to kick the can down the road. They rely on an expert who continues to admit that he has not provided a specific methodology—or even confirmed that one exists—that would allow damages to be calculated consistent with Plaintiffs' theory of liability in this case. Plaintiffs' and their expert's promise that they will be able to come up with such a methodology *eventually* does not satisfy *Comcast*'s requirements. Without evidentiary proof of a damages methodology that satisfies *Comcast*, class certification must be denied.

*Second*, to the extent some class is certified, the class period must end on March 8, 2023, because no alleged misstatement could have affected the price of UNFI common stock after that date and thus classwide reliance cannot be presumed after that. Plaintiffs do not dispute that the presumption of classwide reliance can be extended beyond March 8 only if there was information that was both new and corrective—i.e., new information that revealed the prior

1

falsity of some prior misstatement. Nor can they escape the fact that on March 8, UNFI disclosed that its profitability was driven by substantial procurement gains associated with inflation-related forward buying that were not repeatable. Indeed, Plaintiffs filed their original complaint in this action—which asserted the exact same theory of liability that Plaintiffs still allege now—shortly after the March 8 disclosure, underscoring that Plaintiffs themselves plainly knew about the purportedly "concealed" issues no later than that date.

Instead, Plaintiffs grasp at excuses to extend the putative class period in a transparent effort to inflate their claimed damages. Plaintiffs first claim that the June and September corrective disclosures disclosed new details about the "extent" of UNFI's procurement gains in prior quarters. But the March 8 disclosure revealed the "extent," because it stated that the procurement gains had been the "primary" driver of UNFI's profitability. Given that inescapable fact, Plaintiffs also make the alternative argument that the June and September disclosures revealed something "quantitative" about the extent of the procurement gains. That is not accurate, as explained below. But even if it were, Plaintiffs' theory fails under *Goldman* because it creates a "mismatch" between the alleged misstatements and the alleged corrective disclosures: none of the alleged misstatements disclosed anything quantitative, such as specific dollar amounts, regarding the contribution of procurement gains or any other driver to UNFI's margin. The Supreme Court has held that such a mismatch rebuts the presumption that the stock price was impacted by the correction of an allegedly false statement. But Plaintiffs and their expert ignore this issue altogether, with their expert admitting that he conducted no matching analysis.

*Finally*, Plaintiffs fail to engage with the arguments about Lead Plaintiff Dan Sills's and Additional Plaintiff George Dick's adequacy and typicality. The record shows that neither Plaintiff has adequately supervised this lawyer-driven litigation and that Sills is subject to a

2

unique defense that renders him atypical. Plaintiffs' conclusory and boilerplate statements to the contrary do not wrestle with this evidence.

Courts have recognized the serious consequences of not grappling with class certification arguments at the appropriate stage, noting that improper class certification can place "hydraulic pressure on defendants to settle" even non-meritorious claims. *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 80-81 (2d Cir. 2004). Under binding Supreme Court and Second Circuit caselaw, the time for this Court to address these numerous issues is now. Class certification should be denied.

## ARGUMENT

### I.    Plaintiffs Have Not Satisfied *Comcast*'s Requirements.

The Supreme Court held in *Comcast* that a plaintiff cannot satisfy Rule 23(b)(3)'s requirement that common issues predominate over individualized issues without "evidentiary proof" of a classwide damages methodology consistent with their theory of liability. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33, 35 (2013). Plaintiffs concede that the Second Circuit "require[s] plaintiffs to be able to show that their damages stemmed from the defendant's actions that created the legal liability." Reply 13. But Plaintiffs refuse to engage with any of Defendants' numerous arguments as to why there are clear issues with operationalizing "out of pocket damages"—a legal definition of damages, and not a methodology—*on the facts in this case* to capture only those damages stemming from Plaintiffs' theory of liability. Instead, Plaintiffs repeatedly ask the Court to take their word for it that they will deal with these issues down the line. In doing so, they fail to meet their burden under *Comcast*.

*First*, as discussed in the Opposition, where, as here, a plaintiff alleges a "materialization of risk" theory—i.e., that the occurrence of an allegedly concealed risk revealed the alleged misstatements to be false—measuring artificial inflation by reference to the full stock price decline when the risk materializes will overstate any alleged inflation. Opp. 11-12 (citing Dkt.

3

113-15, Ex. 15, Zurek Report ¶¶ 126-27). This is because a company's stock price declines when an adverse outcome materializes *even if* that risk was previously disclosed. *Id.* As a result, damages will be overstated by including price declines *not* attributable to plaintiffs' theory of liability, i.e., those that would have occurred even if the risk was previously fully disclosed. *Id.*

Plaintiffs and their expert still fail to address whether it is even possible for *any* model to account for the overstatement of damages. They say that it is an "unsupported conclusion" that Plaintiffs have not "established that a methodology accounting for this issue is … possible," but they and Dr. Feinstein offer no support to the contrary, leaving the Court with no more than "a conclusory assertion that damages will be calculated on a classwide basis." *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *12 (S.D. Tex. May 20, 2014);[1] *see also* Reply 16; Ex. 23, Zurek Sur-Reply Report ¶¶ 59-65 (explaining that Dr. Feinstein offers no analytical support for his assertion that accounting for understated risk appears "straightforward").

Instead of providing any explanation as to how—or whether it is even possible—for "out of pocket damages" to avoid overstatement of damages under a materialization of risk theory, Plaintiffs dodge their own allegations altogether, contending that this theory does not preclude certification because it is not their "sole basis for alleging loss causation." Reply 16-17. That misses the point. Plaintiffs concede that the "materialization of risk" theory continues to be one of their bases for seeking liability across the putative class period. Plaintiffs' failure to propose a methodology that avoids overstating damages under their theory requires denial of their motion.

---

[1] Plaintiffs' attempts to distinguish *BP* fall flat. They contend that case involved "two classes, each with a different theory of liability," while Plaintiffs "allege a single theory of liability," but *Comcast*'s requirements apply equally to cases alleging multiple theories of liability and a single theory of liability. *In re FirstEnergy Corp. Sec. Litig.*, 149 F.4th 587, 620-21 (6th Cir. 2025). Moreover, Plaintiffs admit that "[t]he district court declined to certify the pre-spill subclass because plaintiffs' 'materialization of the risk' theory was inconsistent with their specific proffered damages model, which could not account for the fact that the underlying risk of a future oil spill changed throughout the class period." Reply 17-18. As Defendants' expert explained, the same issue—that Plaintiffs' model cannot account for the fact that the underlying risk changed throughout the class period—is present here. Opp. 11-12.

4

*Second*, Plaintiffs and Dr. Feinstein do not even try to address how their purported "methodology" would (or even if it could) account for the fact that Plaintiffs themselves acknowledge that the relevant "risk"—i.e., that the Company's margin had been driven by inflation-related procurement gains that would not be repeated—was disclosed in a series of what Plaintiffs describe as partial corrective disclosures, rather than one disclosure. Ex. 23, Zurek Sur-Reply Report ¶¶ 64-65. As discussed in Defendants' Opposition, the disclosure of additional information affects the market's assessment of risk over time—here, the market's assessment of the "risk" obviously would have changed after the March 8, 2023 disclosure of the very information Plaintiffs claim was concealed—and thus a model's failure to account for this fact overstates damages. Opp. 12-13. Rather than address this argument, Plaintiffs attack a straw man, arguing that *Comcast* does not require damages calculations to be "so precise as to account for variations in inflation over time." Reply 18. But Defendants' argument has nothing to do with variations in inflation. Plaintiffs must present a damages model that isolates the amount of alleged artificial inflation, if any, that remained in the stock price after March 8; if they do not, damages will be overstated. Plaintiffs do not even try to explain how their "model" would allow them to account for this issue, and thus they again fail to offer a methodology capable of calculating only those damages attributable to their theory of liability.

*Third*, Plaintiffs do not explain how out-of-pocket damages would eliminate the impact of confounding news—i.e., the disclosure of information *unrelated* to the alleged fraud. Opp. 13 (discussing Dkt. 113-15, Ex. 15, Zurek Report ¶ 130); *see also* Ex. 23, Zurek Sur-Reply Report ¶ 61. Instead, they merely quote Dr. Feinstein's conclusory assertion that "[t]his approach … enable[s] computation [] even in cases where there is confounding information." Reply 18. Once again, Plaintiffs ask the Court to take their word for it that they will address this problem down

5

the line. But "take our word for it" is not a *methodology* that limits damages to Plaintiffs' theory of liability, which is what Plaintiffs are required to put forward *now* under *Comcast*.

*Fourth*, Dr. Feinstein still fails to explain how he could measure stock price volatility—a critical input in estimating the value of UNFI options. Although Plaintiffs and their expert assert for the first time on Reply that they would calculate this using *observed* volatility, that is not adequate. *Id.* at 19 (citing Dkt. 131-2, Ex. B, Feinstein Reply Report ¶¶ 191-92). As Dr. Zurek already explained, options formulas require volatility to be measured in a world where the allegedly-withheld information had been disclosed. *See* Opp. 13-14 (discussing Ex. 113-15, Ex. 15, Zurek Report ¶¶ 133-46); Dkt. 131-13, Ex. M, Zurek Dep. Tr. 138:6-139:16. Plaintiffs and Dr. Feinstein still do not explain how to measure that. Ex. 23, Zurek Sur-Reply Report ¶¶ 66-70.

Rather than meaningfully address any of these issues, Plaintiffs try to distract from them by citing cases where district courts did not conduct the requisite analysis under *Comcast*. *See* Reply 13 (relying on such cases). But those cases conflict with recent Supreme Court and appellate court reminders that *Comcast* cannot be ignored: "Following *Comcast*, circuit and district courts have *rigorously examined* proposed damages methodologies in putative class action cases for disconnects between damages and liability. … Plaintiffs cannot avoid this hard look by refusing to provide the specifics of their proposed methodology." *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013) (emphasis added; collecting cases); *see also, e.g.*, *In re Petrobras Sec. Litig.*, 862 F.3d 250, 279 (2d Cir. 2017) (underscoring the rigorous analysis courts must conduct); *In re FirstEnergy Corp. Sec. Litig.*, 149 F.4th 587, 621 (6th Cir. 2025) (quoting *Comcast* and emphasizing same).

That district courts may not sidestep *Comcast* in securities cases is underscored by several appellate courts having recently certified for interlocutory appeal the question of what

6

"evidentiary proof" is needed for securities plaintiffs to satisfy *Comcast*. *See, e.g.*, *In re The Boeing Co. Sec. Litig.*, No. 25-135 (4th Cir. May 2, 2025); *In re Deloitte & Touche LLP*, No. 24-258 (4th Cir. Feb. 13, 2025); *Owens v. FirstEnergy Corp.*, No. 23-0303 (6th Cir. Nov. 16, 2023). The Sixth Circuit recently decided one of these appeals, reversing and remanding a grant of class certification because the district court "overlooked *Comcast*'s classwide-damages requirement." *In re FirstEnergy*, 149 F.4th at 620-22. The court emphasized that "[t]hough the classwide-damages calculation need not be exact, at both class certification and trial courts must conduct a rigorous analysis to determine whether a plaintiff's damages case is consistent with its liability case." *Id.* at 620 (cleaned up). As the Sixth Circuit explained, "*in all cases*—involving single *or multiple theories of liability*—[*Comcast*] require[s] a rigorous analysis." *Id.* at 621.

Plaintiffs' remaining retorts are unavailing. Plaintiffs first claim that Defendants "demand[] … *implementation* of a model." Reply 14-15. Not so. Defendants merely expect Plaintiffs to comply with their legal obligation to provide evidentiary proof of a methodology capable of calculating damages consistent with Plaintiffs' theory of liability. Instead, all Plaintiffs provide is a promise that their expert will derive a methodology *eventually*. Allowing a class to be certified on such a promise does not satisfy a "rigorous analysis" and would "reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Comcast*, 569 U.S. at 36.

Second, Plaintiffs argue that *Comcast* precludes certification only where "the proffered model raises individualized issues." Reply 12-13. For this, they rely on *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 349 F.R.D. 606, 611 (S.D.N.Y. 2025) (concluding there are only a "few exceptions" where *Comcast* precludes certification, including "that plaintiffs' approach to damages leads to different outcomes for different purchasers or reveals that purchasers suffering no injury are intermingled with those properly in the class"). It is

7

incorrect to read *Comcast* so narrowly.[2] But even under this narrow reading, Plaintiffs' theory *does* lead to different outcomes for different purchasers. Ex. 23, Zurek Sur-Reply Report ¶ 65. Those who purchased UNFI securities after March 8, 2023 acquired stock at a price that already incorporated the allegedly concealed information—that inflation-related forward buying was a significant but temporary driver of margin. *Id.* If all class members were treated exactly the same without regard to this disclosure, those who purchased after March 8 would be overcompensated and effectively awarded insurance against already-known negative outcomes and risks. *Id.*

Plaintiffs still do not present a methodology capable of measuring damages on a classwide basis consistent with their theory of liability. Dr. Feinstein's continued speculation that he *might* be able to do it later does not satisfy *Comcast*'s "rigorous analysis."

## II.     Applying the Wrong Standards, Plaintiffs Fail to Refute Defendants' Price Impact Arguments.

Plaintiffs also fail to refute Defendants' argument that the allegedly false or misleading statements could not have impacted the Company's stock price after March 8, 2023. In their Opposition, Defendants explained the legal framework governing price impact. Opp. 16-19. Where, as here, a plaintiff is attempting to draw an inference that an alleged misstatement had price impact because the stock price declined on the date of an alleged corrective disclosure, that alleged corrective disclosure must contain *new* information that is actually *corrective*—i.e., it must newly reveal the information Plaintiffs claim was concealed. *Id.* at 18-19. In assessing

---

[2] Not only does *Comcast* not impose such a requirement, courts around the country have denied class certification for reasons beyond the plaintiff's liability theory having raised individualized issues. *See, e.g.*, *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 141-42 (S.D.N.Y. 2014) (faulting methodology for relying solely on expert's "say-so" and not providing "specificity as to the methodology that [would] be used"); *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *19 (N.D. Ohio Aug. 14, 2018) (declining to certify class where plaintiff "present[ed] a damages model that [wa]s vague, indefinite, and unspecific"); *see also In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 46 (S.D.N.Y. 2020) (rejecting argument that flaws in plaintiffs' methodology that were "common to the entire class" could be dealt with later, because *Comcast* requires "rigorous[] examin[ation of] the soundness of that model at the class certification stage").

whether an alleged corrective disclosure actually is corrective, courts must compare the specificity of the alleged misrepresentation and the alleged corrective disclosure to ensure they match. *Id.* If there is a "mismatch," the inference the plaintiff seeks "starts to break down" and the presumption of classwide reliance has been rebutted. *Goldman Sachs Grp. Inc. v. Ark Tchr. Ret. Sys.*, 594 U.S. 113, 123 (2021).

Plaintiffs do not dispute that an alleged corrective disclosure must contain information that is both new and corrective. *See* Reply 3-11. Instead, Plaintiffs again invite the Court to defer ruling on the price impact issue, largely based on pre-*Goldman* caselaw. But Plaintiffs' "kick the can" approach is as unavailing on price impact as it is on the *Comcast* damages methodology issue. When Plaintiffs finally get to the heart of the matter, they contend that the June and September 2023 alleged corrective disclosures *did* contain new and corrective information because those disclosures, unlike the March disclosure, revealed the "extent to which UNFI's profitability was driven by unsustainable forward buying" by "quantif[ying]" previously unknown forward-buying gains in fiscal 2022. *Id.* at 5-7. Plaintiffs' argument fails. Contrary to what Plaintiffs claim, the Company did not quantify the historical contribution of forward-buying gains during fiscal year 2022 in June and September. And the purportedly "new" information they hang their hat on was not corrective, because it was much more specific than the alleged misstatements, which provided no such quantification. There is thus a gap in specificity between the alleged misstatements and the June and September disclosures. Accordingly, Defendants have successfully rebutted the presumption of classwide reliance for these alleged corrective disclosures, and any class should not extend beyond March 8, 2023.

A.    **Plaintiffs Have Rebutted the *Basic* Presumption With Respect to the June and September Alleged Corrective Disclosures.**

As this Court recognized in its motion to dismiss ruling, Plaintiffs' theory of fraud is that

9

Defendants misled investors when UNFI "put the drivers of its margins in play by speaking on the issue" while failing "to disclose that forward buying was a significant and aberrational driver of its profit margins." Dkt. 66 at 16. This allegedly concealed information was fully disclosed by March 8, 2023. On that day, UNFI disclosed that the Company's reduced profitability for the prior quarter "was primarily driven by a lower gross profit rate, as [it] did not repeat the level of significant procurement and inventory gains experienced last year." Dkt. 113-9, Ex. 9, Q2 2023 Earnings Call Tr. 4; *see also* Dkt. 113-8, Ex. 8, Q2 2023 Earnings Release 1 ("Profits were challenged as [the Company] did not repeat the significant level of procurement gains from rapidly accelerating inflation and inventory gains."). That same day, UNFI also disclosed that this issue would persist: UNFI disclosed that the procurement gains it had experienced in the prior year "[we]re not repeatable in the current environment," and that the Company "expect[ed] to see similar trends in profitability … for the remainder of the year." Dkt. 113-9, Ex. 9, Q2 2023 Earnings Call Tr. 4-5. UNFI executives specifically warned that "the third and fourth quarters will also be adversely impacted by these declining inflation dynamics." *Id.* at 6.

Contrary to Plaintiffs' assertions, these disclosures did not just reveal the "mere *existence* of prior forward buying." Reply 5. They also revealed (1) the magnitude of forward buying's impact on the Company's financial performance by stating repeatedly that the level of procurement gains experienced during the prior year was "significant," (2) that those significant gains were not repeatable, and (3) that the significant decline in procurement gains would continue to negatively affect the Company's profitability going forward. This is the exact "truth" that Plaintiffs allege Defendants concealed earlier in the class period, *see, e.g.*, Dkt. 39 ¶¶ 6, 11, 69-70, and it was fully disclosed on March 8, 2023.

Faced with this undeniable evidence, Plaintiffs attempt to pivot to a new theory: they say

10

that the June and September disclosures contained new information because those disclosures "*quantified*" the "previously unknown forward buying gains in fiscal 2022." Reply 6. This mischaracterizes those disclosures. In June and September, UNFI simply disclosed what the gross profit rate was for that quarter compared to the gross profit rate from that same quarter of FY2022—information that UNFI *previously and accurately disclosed* in FY2022.[3] UNFI explained that the decline was largely—but not exclusively—due to declining procurement gains,[4] but UNFI did *not* quantify procurement gains for prior quarters; instead, it quantified only the gross profit rate.[5] In September, UNFI also provided guidance for the *next* year, FY2024. Thus, contrary to Plaintiffs' suggestion, UNFI did not "quantify" "previously unknown forward buying gains in fiscal 2022."

Moreover, the notion that the Company should have quantified actual margin performance for Q3 FY2023 and Q4 FY2023 earlier makes no sense, because that performance obviously depended on developments within those quarters, including macroeconomic factors outside the Company's control such as the rate of inflation. Moreover, the Company already had

---

[3] *See* Dkt. 113-5, Ex. 5, Q3 2022 Earnings Release 2 ("Gross margin rate in the third quarter of fiscal 2022 was 14.0% of net sales … ."); Dkt. 113-6, Ex. 6, Q4 2022 Earnings Release 2 ("Gross margin rate in the fourth quarter of fiscal 2022 was 14.5% of net sales … ."). Plaintiffs do not and cannot dispute that the Company accurately disclosed its gross profit rate in Q3 and Q4 FY2022: indeed, the Company has never restated its FY2022 financial statements. Rather, Plaintiffs simply argue that the Company purportedly did not disclose that procurement gains were a significant but non-repeatable *driver* of the gross profit rate.

[4] *See* Dkt. 113-10, Ex. 10, Q3 2023 Earnings Release 2 ("The gross profit rate in the third quarter of fiscal 2023 was 13.3% of net sales … . Gross profit rate in the third quarter of fiscal 2022 was 14.0% of net sales … . The decrease in gross profit rate … was primarily driven by the volatile macroeconomic environment, which led to lower inflationary benefits and reduced procurement gains. Gross profit also reflects higher levels of shrink and costs related to operational improvements."); Dkt. 113-12, Ex. 12, Q4 2023 Earnings Release 2 ("Excluding this non-cash charge, gross profit rate was 13.5% of net sales [in the fourth quarter of fiscal 2023] compared to a gross profit rate of 15.2% of net sales in the fourth quarter of fiscal 2022. The decrease in gross profit rate … was primarily driven by lower levels of procurement gains, reduced benefits from inflation and higher levels of shrink.").

[5] Plaintiffs cite analyst reports that they say express "surprise" and attempt to quantify UNFI's procurement gains from prior periods. Reply 8-9. Those reports do not express "surprise" at new, corrective information. Ex. 23, Zurek Sur-Reply Report ¶¶ 51-53, 78-80. Moreover, those are not disclosures by the Company, and Plaintiffs have never alleged that they are corrective disclosures. In any event, market "commentary touching upon only the same subject matter … cannot be enough" to establish that investors "relied on [the alleged misstatements]." *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 103-04 (2d Cir. 2023) ("*ATRS*"); *see also infra* at 13-15.

withdrawn its prior FY2024 guidance in March 2023—thus, the Company had no obligation to provide new FY2024 guidance any earlier than it did, because there was nothing left to correct. Opp. 26-27. To the extent Plaintiffs are arguing that the Company should have done a better job *predicting* its future financial performance earlier in the putative class period, that is merely a complaint about the Company's forward-looking guidance statements, which already have been dismissed from the case. *See* Dkt. 66 at 18-19. [6]

Even if the June and September disclosures did contain some new incremental information regarding the precise margin dollars or percentage attributable to *prior* procurement gains (which they did not), such new information would not establish price impact because it would create a mismatch between the alleged misstatements and the alleged corrective disclosures. *None* of the alleged misstatements *quantified* the contribution of *any* driver to the Company's financial performance. *See* Dkt. 112-1, Appendix I. Thus, even accepting Plaintiffs' erroneous argument that the June and September disclosures disclosed something more specific about the precise contribution of procurement gains to UNFI's margin than what already was disclosed on March 8, Plaintiffs still have a problem: the alleged corrective disclosures would be far more specific than the alleged misstatements. And that gap in specificity undermines any inference that the alleged misstatements continued to have price impact after March 8, 2023.

The Second Circuit's decision in *ATRS* squarely rejects what Plaintiffs are trying to do here. As the Second Circuit explained, "a plaintiff cannot (a) identify a specific back-end, price-dropping event, (b) find a front-end disclosure bearing on the same subject, and then (c) assert securities fraud, *unless the front-end disclosure is sufficiently detailed in the first place.*" *ATRS*,

---

[6] Plaintiffs' Exhibits K and L (*see* Reply 10) show that UNFI *lacked* the knowledge to disclose additional quantitative information of the type sought by Plaintiffs in March 2023.

77 F.4th at 102 (emphasis added). Rather, to permit the inference of price impact, the alleged misstatement and corrective disclosure must "stand on equal footing; a mismatch in specificity between the two undercuts a plaintiff's theory that investors would have expected more from the front-end disclosure." *Id.*; *see also Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 2025 WL 2554474, at \*5 (S.D.N.Y. Sept. 4, 2025) ("A mismatch could occur, for instance, where a misrepresentation is generic and the later corrective disclosure is specific, because it is less likely that the specific disclosure actually corrected the generic misrepresentation … ." (cleaned up)). Put simply, Plaintiffs cannot "beef up a generic disclosure with a healthy dose of detail and thereby transform it into something that, as then consumed by investors, it was not."[7] *ATRS*, 77 F.4th at 102.

Tellingly, neither Plaintiffs nor their expert have attempted to conduct a statement-by-statement comparison of the information in the alleged misstatements and the June and September disclosures, as the Second Circuit requires. *Compare ATRS*, 77 F.4th at 94-96 (conducting mismatch analysis for each category of statement), *with* Ex. 24, Feinstein Dep. Tr. 38:20-39:5, 43:15-19, 55:21-56:4, 61:21-62:4, 62:16-22 (admitting that he did not conduct a statement-by-statement matching analysis, that he "[didn't] really know exactly what that means" when asked if he had compared the alleged misstatements to an "equally generic corrective disclosure," and that he believed such an analysis "was irrelevant for this case").[8]

---

[7] Plaintiffs misunderstand the issue when they say this Court "already held that the challenged statements were sufficiently specific." Reply 11. That the challenged statements were "sufficiently specific" to avoid being dismissed on the ground that they were corporate puffery or not plausibly false or misleading says nothing about their degree of fit with the alleged corrective disclosures. The motion to dismiss ruling did not purport to compare the content of the alleged misstatements with the content of the alleged corrective disclosures.

[8] *See also Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 623 F. Supp. 3d 470, 509 (E.D. Pa. 2022) ("[C]lass certification is claim specific and … the alleged misrepresentations define the [securities fraud] claims raised."); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 69 (S.D.N.Y. 2015) ("In the case of a securities fraud class action, … a class period ends when the truth has been disseminated to the market."); *In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at \*7-14 (S.D. Tex. Feb. 9, 2024) (price impact rebutted as to three alleged corrective disclosures); *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at \*14-17 (N.D. Cal. Dec. 22,

Instead, Plaintiffs simply assert that "there is a sufficiently close fit between the challenged statements and the corrective disclosures" because they all "center on UNFI's forward buying." Reply 11. As *Goldman* and *ATRS* hold, this type of loose subject-matter match is not enough to show that the "corrective disclosures" newly revealed the falsity of prior misstatements.

*Goldman*'s facts illustrate the point, because *Goldman* itself involved a subject-matter match. There, the plaintiffs alleged that "Goldman maintained an inflated stock price by making repeated misrepresentations about its conflict-of-interest policies," and the stock dropped when the "market learned the truth about Goldman's conflicts." 594 U.S. at 120. Both the misrepresentations and the disclosures concerned the same subject matter—Goldman's conflicts. That was not enough for the Supreme Court. *Id.* at 121-24. And on remand, the Second Circuit concluded "it was clear error for the district court to rely on [a] subject-matter match" to grant certification. *ATRS*, 77 F.4th at 93, 104-05. After "a searching review" of the "contents," the Second Circuit found an "insufficient link between the corrective disclosures and the alleged misrepresentations" even though they related to "the same subject matter." *Id.* at 80, 104-05. Plaintiffs are inviting this Court to make the same error made by the district court in *ATRS*.

The cases Plaintiffs cite to defend their general-subject-matter-test do not support them. *See* Reply 11. Both *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020), and *In re Vale S.A. Securities Litigation*, 2017 WL 1102666, at *29 (S.D.N.Y. Mar. 23, 2017), concerned loss causation, not price impact; were considering a motion to dismiss, not a motion for class certification; and were decided before *Goldman* and *ATRS*. As the Second Circuit has since explained, "the question here—whether there is a basis to infer that the back-end price equals front-end inflation—is a different question than loss causation, and, in light of *Goldman*,

---

2016) (price impact rebutted as to two alleged corrective disclosures); *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 269-80 (N.D. Tex. 2015) (price impact rebutted as to five alleged corrective disclosures).

14

*requires a closer fit* (even if not precise) between the front- and back-end statements." *ATRS*, 77 F.4th at 99 n.11 (emphasis added). Here, that "closer fit" does not exist.

### B.    Plaintiffs' Remaining Arguments Fail.

Unable to show a sufficient match between the contents of the alleged misstatements and the June and September disclosures, Plaintiffs' last resort is to try to convince this Court it need not grapple with Defendants' price impact arguments now. These arguments all fail.

> 1.    *A Statistically Significant Price Drop on the Date of an Alleged Corrective Disclosure Does Not Establish Price Impact.*

Plaintiffs argue that because Defendants have not contested statistically significant price drops on the dates of the alleged corrective disclosures, Defendants have failed to rebut the *Basic* presumption. Reply 2-3. This arguments rests on a fundamental misunderstanding of price impact: it conflates "price *reaction*"—the simple movement of the stock price—with "the legal concept of price *impact*." *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 612 (7th Cir. 2020) (emphasis in original). Statistical significance indicates only that UNFI's stock price movement was caused by the release of new, company-specific information that day—i.e., that there was a price *reaction*. It does not demonstrate that any company-specific information was *corrective*—i.e., that the company-specific information newly revealed the allegedly concealed information—as is required to show price *impact*. Ex. 23, Zurek Sur-Reply Report ¶¶ 19-21, 29; *ATRS*, 77 F.4th at 86 n.5 (statistical significance suggests only that the price movement was caused by "company-specific information" as opposed to "typical random stock price fluctuations"). That is why *Goldman* directs courts to consider "*all* evidence relevant to price impact"—not just statistical significance—including the "contents" of the alleged misrepresentation and the alleged corrective disclosure. *Goldman*, 594 U.S. at 122-23.

Plaintiffs' argument is belied by *Goldman* itself and numerous other cases in which

15

courts held certain disclosures had no price impact, notwithstanding statistically significant price declines on the alleged corrective disclosure dates in all of those cases. *See, e.g.*, *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 479-80 & n.2 (2d Cir. 2018) (three of the alleged corrective disclosures occurred on days with statistically significant price declines); *Sjunde AP-Fonden*, 2025 WL 2554474, at *17-19, 31-32 (no price impact as to eleven alleged misstatements despite statistically significant price movement).[9]

> 2.    *Defendants' Price Impact Argument Is Not an Improper Loss Causation Argument.*

Plaintiffs also argue that Defendants' price impact argument is an improper "loss causation" argument that should be deferred to the merits phase. Reply 3-4. Not so. The Supreme Court in *Goldman* could not have been clearer: price impact and other merits issues involve "overlapping concepts," and price impact analysis "will almost always be relevant to the other" merits issues as well. 594 U.S. at 122 n.2. Despite any overlap, courts "must use the evidence to decide the price impact issue [at class certification]"; put simply, courts "'may not use the overlap to refuse to consider the evidence.'" *Id.* (quoting *Allstate*, 966 F.3d at 608-09); *see also Allstate*, 966 F.3d at 606-09 (further detailing the overlap between price impact, materiality, and loss causation, and reversing district court for refusing to decide price impact issue).

Even though Defendants' price impact evidence might *also* be relevant to loss causation, this Court must still consider that evidence for the price impact issue now.[10] *See Goldman*, 594

---

[9] Plaintiffs assert they have "shown front-end price impact with a statistically significant price increase on [the] first day of [the] Class Period." Reply 3 n.4. As explained above, statistical significance alone does not establish price impact. Moreover, that an alleged misstatement might have had price impact at the beginning of the putative class period does not establish that it continued to have price impact after March 8, 2023, when the Company disclosed the information Plaintiffs claim was concealed.

[10] All but one of Plaintiffs' cited cases on this point pre-date *Goldman* and used the overlap with the merits to justify deferring an issue, contrary to *Goldman*'s clear command. *See Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *18-20 (S.D.N.Y. Aug. 13, 2018) (did not even address price impact); *Monroe Cnty. Emps.' Ret. Sys. v. Southern Co.*, 332 F.R.D. 370, 395-96 (N.D. Ga. 2019) (rejecting defendants' argument because it was a "merits question").

U.S. at 122 & n.2; *see also, e.g.*, *In re Apache Sec. Litig.*, 2024 WL 532315, at \*10 (S.D. Tex.

Feb. 9, 2024) (rejecting plaintiffs' argument that price impact was an "improper loss causation

argument"; *Goldman* requires district courts to consider "all evidence of price impact" regardless

of overlap); *Bratya SPRL v. Bed Bath & Beyond Corp.*, 2025 WL 721770, at \*7 (D.D.C. Mar. 6,

2025) (same, further noting that mismatch analysis was "a perfect question for the class

certification stage, even if the evidence is similar to that used for issues at the merits stage").

    3.  *The Court Should Consider Corrective Disclosures Individually.*

  Plaintiffs argue that the Court should not analyze individual alleged corrective

disclosures so long as Plaintiffs establish price impact for *one* alleged corrective disclosure.

Reply 2-3. That is inconsistent with logic and precedent: Plaintiffs' argument is refuted by the

many cases that analyze *each* corrective disclosure individually.[11] *See supra* at 13 & n.8.

  Here, Plaintiffs attempt to use the alleged corrective disclosures in June and September to

expand the putative class well beyond March 8, 2023. They cannot then avoid the consequences

of their own class certification request by dodging the question of whether the *Basic* presumption

of classwide reliance—which is the basis for Plaintiffs' request for class treatment—applies

beyond that date. *See Goldman*, 594 U.S. at 119 ("If a misrepresentation had no price impact,

then *Basic*'s fundamental premise completely collapses, rendering class certification

---

The one post-*Goldman* decision did not cite or discuss the Supreme Court's decision. *See Sjunde AP-Fonden v. Gen. Elec. Co.*, 341 F.R.D. 542, 549 (S.D.N.Y. 2022).

[11] *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019), *R&R adopted in part*, 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020), is not to the contrary. *See* Reply 2. There, the court analyzed individual corrective disclosures, finding that the defendants had rebutted price impact with respect to one. 2019 WL 5287980, at \*24-40. Plaintiffs also cite *Boston Retirement System v. Alexion Pharma., Inc.*, but that case relied on reasoning that *Goldman* expressly rejected. *See* 2023 WL 2932485, at \*12 (D. Conn. Apr. 13, 2023) (citing *Southern Co.*, 332 F.R.D. 370); *accord Southern Co.*, 332 F.R.D. at 395 ("This concession dooms Defendants' attempt to rebut the presumption of reliance because the inquiry is whether Defendants have proven a complete lack of price impact during the Class Period, not whether the stock price decline following individual corrective disclosures was caused by the alleged misrepresentations, *which is a loss causation analysis not appropriate at this stage*." (emphasis added)).

inappropriate." (cleaned up)). For the reasons discussed above, the *Basic* presumption may not be extended beyond March 8, 2023 because the June and September disclosures did not reveal information that was both new and corrective.

4.      *The "Law of the Case" Doctrine Does Not Preclude Defendants' Price Impact Argument.*

Finally, Plaintiffs argue that the "law of the case" precludes Defendants' price impact argument because Defendants did not attempt to challenge the June and September alleged corrective disclosures at the motion-to-dismiss stage. Reply 4-5. This borders on the frivolous. The law of the case doctrine applies only when a court has ruled on an issue earlier in the case. *See, e.g.*, *County of Suffolk v. Stone & Webster Eng'g Corp.*, 106 F.3d 1112, 1117 (2d Cir. 1997) ("Under that doctrine, a decision made at a previous stage of litigation … becomes the law of the case."). Here, there has been no ruling on price impact—a class certification issue. And, unlike Plaintiffs' cases (*see* Reply 4-5), Defendants are not attempting to dismiss alleged misrepresentations; they are challenging the length of the putative class period by rebutting the *Basic* presumption with respect to certain alleged corrective disclosures after March 8, 2023.[12]

**C.      The *Affiliated Ute* Presumption Does Not Apply Either.**

Plaintiffs continue to claim that the *Affiliated Ute* presumption provides an "independent basis" to certify the class. Reply 12. To support this, they incorrectly claim that the *Affiliated Ute* presumption applies because "none of Defendants' statements are outright lies, which would be affirmative misstatements." *Id*. That is wrong. As Defendants explained, the *Affiliated Ute* presumption applies only in cases where plaintiffs allege *only pure omissions*. Opp. 28. Where,

---

[12] Neither case cited by Plaintiffs (Reply 4-5) involved the law-of-the-case doctrine or price impact. *See In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig.*, 2013 WL 396117, at *14 (D.N.J. Jan. 30, 2013) (defendants sought dismissal of alleged misrepresentations, not alleged corrective disclosures, based on scienter argument); *Strougo v. Barclays PLC*, 312 F.R.D. 307, 328 (S.D.N.Y. 2016) (defendants sought dismissal of alleged misrepresentations, not alleged corrective disclosures, based on materiality argument).

as here, plaintiffs allege "half truths," *Affiliated Ute* does not apply. *See id.* at 28-29; Dkt. 66 at 14 ("The challenged statements in the first, second and third categories are actionable because they are plausibly misleading half-truths … ."); *Waggoner v. Barclays PLC*, 875 F.3d 79, 96 (2d Cir. 2017) ("The *Affiliated Ute* presumption does not apply to … 'half-truths' … ."); *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 663 F. Supp. 3d 334, 366 n.18 (S.D.N.Y. 2023) ("Second Circuit precedent has limited [*Affiliated Ute*] solely to pure-omission cases.").

Plaintiffs ignore the "half truths" they have alleged and this controlling authority, instead relying on inapposite authority. *Baliga v. Link Motion, Inc.* was decided at the pleadings stage, not class certification. 2022 WL 16707361, at *11 (S.D.N.Y. Nov. 4, 2022). In *Puddu v. NYGG (Asia) Ltd.*, no affirmative statements were alleged during the class period. 2022 WL 2304248, at *4 (S.D.N.Y. June 27, 2022). But here, Plaintiffs *do* allege affirmative statements during the class period. *See, e.g.*, Dkt. 66 at 12 ("Plaintiffs' core allegation is that Defendants' challenged statements were misleading … *during the Class Period*." (emphasis added)).

## III.    Plaintiffs' Adequacy and Typicality Arguments Fail.

Plaintiffs do not dispute the key facts that make Sills and Dick inadequate and atypical.

*First*, Plaintiffs concede that class representatives are inadequate where they "display an alarming unfamiliarity with the suit … ." Reply 19; *see also Scott v. N.Y.C. Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 355-57 (S.D.N.Y. 2004) (requiring a class representative to have at least "a minimal degree of knowledge regarding the action … and also have a general understanding of the nature of class-action litigation"). That is exactly what Defendants have shown. Contrary to Plaintiffs' boilerplate assertions (Reply 19-20), at their depositions, neither Sills nor Dick could answer basic questions about the suit. They repeatedly admitted that they did not independently verify or investigate the allegations, know when the complaints were filed, or even why their attorneys expanded the class period. Opp. 30-31 (citing

19

testimony). Neither had heard of Plaintiffs' expert, and Dick, admitting he has "no role in any motions made," did not know whether Defendants filed a motion to dismiss and has never seen Plaintiffs' motion for class certification. *Id.* at 30-31 (citing testimony).

Instead, as both testified, they let their attorneys handle the litigation, and simply sign where they are asked. *Id.* (citing Dkt. 113-21, Ex. 21, Dick Dep. Tr. 191:6-21 (testifying that he lets the "attorneys handle the legal matters on this, and where I was asked to sign, I signed"); *id.* at 204:19-21 ("A: My legal team prepared it. Q: And you just signed off on it? A: Yes."); Dkt. 113-16, Ex. 16, Sills Dep. Tr. 113:14-16 (testifying he never authorized corrections to his list of transactions in UNFI securities, despite Plaintiffs filing two erratas correcting that list)). Because Plaintiffs lack familiarity with the action, they are unable to adequately protect the interests of the putative class. *See, e.g.*, *Gordon v. Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193, 200 (S.D.N.Y. 2015) (inadequate class representative unfamiliar with "key events"—such as motions to dismiss and amended complaints—and displayed a "lack of independent judgment").

*Second*, Plaintiffs misconstrue the applicability of the unique reliance defense to Lead Plaintiff Sills. They wrongly assert that "Defendants' own cited cases show the defense of non-reliance only applies where the proposed class representative invested while in possession of material, ***non-public*** information." Reply 20. This limitation appears nowhere in the caselaw. In *Kamerman v. Ockap Corp.*—which Plaintiffs mischaracterize for this point—the court explained that the plaintiff relied upon information gleaned from his "review [of] various ***public*** records" instead of the alleged misstatements. 112 F.R.D. 195, 197-98 (S.D.N.Y. 1986) (emphasis added). Similarly, there is no indication that the plaintiffs in *George v. China Automotive Systems, Inc.* had access to material, non-public information. 2013 WL 3357170 (S.D.N.Y. July 3, 2013). Instead, the court explained that "all three named plaintiffs continued to make purchases of the

20

securities at issue following the alleged 'truthful' disclosure" and "[a] named plaintiff who has engaged in post-disclosure purchase is subject to the defense that the alleged misstatements or omissions were really not a factor in the purchasing decision but rather that other investment considerations drove the decision." *Id.* at *6.

This principle applies here. It is undisputed that Sills made substantial purchases—at least 9,500 shares of UNFI stock valued at nearly $250,000—after the March 8, 2023 disclosure, with additional purchases after the end of the putative class period. *See* Opp. 32-33; Reply 21 (acknowledging post-disclosure purchases). Those purchases, combined with Sills's contemporaneous post-disclosure statements—that Plaintiffs do not acknowledge—recognizing that inflationary forward buying was a major driver of margin and that UNFI's financial performance would continue to decline, make him atypical. Opp. 33 (discussing Dkt. 113-20, Ex. 20 at PLTF_UNFI_003870 (writing that UNFI was experiencing "a margin reset driven by inflation and pricing that they won't get" in the future, that would cause "issues for some time"—"[a]t least" a "couple quarters").[13] Defendants have shown that Sills is subject to a unique defense that threatens to become a focus of this litigation.

## CONCLUSION

Plaintiffs' Motion should be denied. If any class is to be certified, it should be limited to the period from December 8, 2021 to March 8, 2023 and Sills and Dick should not be appointed class representatives.

---

[13] Instead, Plaintiffs mischaracterize the record, asserting that "Defendants incorrectly claim that Sills believed the UNFI stock price was manipulated by short sellers. … In fact, Sills testified that *insider trading* could have manipulated the stock price." Reply 21. Sills's own testimony, that Defendants cited, proves otherwise. Opp. 33 (citing, among other passages, Dkt. 113-16, Ex. 16, Sills Dep. Tr. 261:11-17 ("Q: So this is an example where you thought short sellers were manipulating UNFI stock price, correct?" "A. Yes. We were trying to drive the price down."), 302:24-303:4 ("Q: Is this a reference to short sellers manipulating the price of UNFI stock that we talked about previously?" … "A. That's what I'm referencing.")).

Dated: October 6, 2025
    Chicago, Illinois

Respectfully submitted,

*/s/ Nilofer I. Umar*
Francesca Brody
Vincent Margiotta
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
fbrody@sidley.com
vmargiotta@sidley.com

Nilofer I. Umar (admitted *pro hac vice*)
Neil H. Conrad (admitted *pro hac vice*)
William J. Lawrence (admitted *pro hac vice*)
Claire G. Lee (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
numar@sidley.com
nconrad@sidley.com
bill.lawrence@sidley.com
claire.lee@sidley.com

*Attorneys for Defendants*

22