# Exhibit 23

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAN SILLS and GEORGE DICK, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED NATURAL FOODS, INC., J. ALEXANDER MILLER DOUGLAS, JOHN W. HOWARD, and CHRISTOPHER P. TESTA,<br><br>Defendants. | Case No. 1:23-cv-02364-JGLC |

**SUR-REPLY EXPERT REPORT OF PAUL ZUREK, PH.D.**

**October 6, 2025**

# Table of Contents

I.    Qualifications, Assignment, and Compensation ................................................................. 1

II.    Summary of Opinions ........................................................................................................ 2

III.    Dr. Feinstein Mischaracterizes My Analysis of Economic Evidence Regarding the Impact, If Any, of the Challenged Statements After March 8, 2023, and Offers an Unsupported Claim of Price Impact ...................................................................................... 3

    A.    Dr. Feinstein Wrongly Speculates as to the Significance of the Language I Used to Describe My Opinion Regarding the Lack of Price Impact of the Challenged Statements After March 8, 2023 ............................................................ 3

    B.    Dr. Feinstein Offers No Meaningful Rebuttal to My Opinion That, Under the Alleged Truth in the Zurek Report, Economic Evidence Shows That the Challenged Statements Had No Impact on the Prices of UNFI Securities After March 8, 2023 .............................................................................. 4

    C.    Dr. Feinstein Fails to Demonstrate Based on "Logic [and] Economic Analysis" That Observed Price Declines on June 7, 2023 and September 26, 2023 Can Be Used to Reliably Infer That the Challenged Statements Impacted the Prices of UNFI Securities After March 8, 2023 .................................... 10

    D.    Dr. Feinstein Misleadingly Claims the Alleged Truth Does Not Include the Extent of Inflation-Related Forward Buying ..................................................... 16

    E.    Even Under His Alternative View That UNFI Should Have Disclosed "Dollar Amounts" or "Percentage Points" to Quantify Extent, Dr. Feinstein Fails to Establish That Economic Evidence Would Support a Finding of Price Impact After March 8, 2023 ............................................................ 19

        1.    Dr. Feinstein Ignores That, in an Efficient Market, the Prices of UNFI Securities Would Reflect Economic Implications of All Publicly Available Information About the Extent of Inflation-Related Forward Buying ....... 19

        2.    Dr. Feinstein Fails to Establish That Economic Evidence Would Support a Finding of Price Impact After March 8, 2023 Under His View That Plaintiffs Allege That Additional Quantitative Disclosure Was Required 28

IV.    Dr. Feinstein Still Fails to Provide a Class-Wide Methodology Capable of Measuring Damages for Members of the Proposed Class in a Manner Consistent with Plaintiffs' Theory of Liability .................................................................................................................. 33

    A.    Dr. Feinstein's Claim That I Questioned Whether Out-of-Pocket Damages, as a Definitional Concept, Are Consistent with Plaintiffs' Theory of Liability Is False and Misleading .................................................................................. 33

    B.    Dr. Feinstein Creates a Strawman Version of My Criticism That He Has Provided No Specificity Regarding the Damages Methodology That He Would Use Here, and Fails to Meaningfully Address My Actual Criticism ................................... 33

C.       Dr. Feinstein Has Not Meaningfully Addressed My Opinion That He Has Not Identified a Damages Methodology for UNFI Common Stock ............................ 35

D.       Dr. Feinstein Fails to Address My Criticisms of His Option Damages Approach and Appears to Wrongly Claim That But-For Volatility, a Critical Input to the Calculation of Damages, Is Somehow Observable ................................................ 39

V.      Other Mischaracterizations of My Opinions by Plaintiffs and Dr. Feinstein ................... 42

A.       Dr. Feinstein Mischaracterizes the Zurek Report to Misleadingly Claim That Price Impact Before March 8, 2023 Is "Undisputed" ..................................................... 42

B.       Dr. Feinstein Mischaracterizes My Opinions and Falsely Claims That I Inappropriately Opined That Defendants Disclosed All They Could ................... 44

C.       Plaintiffs' Criticism of My Analysis of the "Title or Lead Paragraph" of Analyst Reports Is Misleading and Mischaracterizes My Analysis .................................. 45

D.       Plaintiffs' Claim That My Opinions "Were Recently Squarely Rejected" in the *Dentsply* Matter Is Misleading ............................................................................... 46

## I.    Qualifications, Assignment, and Compensation

1.    I am a Vice President at Cornerstone Research, a financial and economic consulting firm. My qualifications are laid out in the Expert Report of Paul Zurek, Ph.D., dated June 13, 2025 ("Zurek Report"[1]).  A copy of my curriculum vitae and list of my prior testimony are attached as **Appendix A**.

2.    I have been asked by counsel for Defendants to review the Reply Report of Professor Steven P. Feinstein, Ph.D., CFA ("Dr. Feinstein") dated August 22, 2025 ("Feinstein Reply Report") and Plaintiffs' Reply in Support of Their Motion for Class Certification and Appointment of Class Representatives and Class Counsel dated August 22, 2025 ("Plaintiffs' Reply"), and to address the claims made by Dr. Feinstein and by Plaintiffs about the Zurek Report as well as the new opinions and claims expressed in the Feinstein Reply Report and Plaintiffs' Reply, respectively, in response to my opinions in the Zurek Report.

3.    As discussed in the Zurek Report, as part of my analysis in this case, I have examined various materials, including legal pleadings in this litigation, discovery responses and deposition transcripts, academic literature, securities analyst reports, public press articles, and various other public sources, including data from data providers.  A list of incremental (to those disclosed in the Zurek Report) materials that I have considered in forming my opinions expressed in this report is attached as **Appendix B**.

4.    I have been assisted in the preparation of this report by staff of Cornerstone Research, who worked under my direction.  Cornerstone Research is being compensated for my work in this matter at an hourly rate of $1,200.  My compensation is not dependent on the outcome of this matter or the opinions I reach.  My work in this matter is ongoing, and I reserve the right to supplement my opinions if additional information becomes available and/or if Dr. Feinstein offers additional opinions in this matter.

---

[1] Terms that are defined in the Zurek Report retain their meaning in this report.

## II.    Summary of Opinions

5.    Dr. Feinstein has mischaracterized a number of my opinions.  Nothing in the Feinstein Reply Report causes me to change any of the opinions I reached in the Zurek Report.

6.    A summary of my specific responses to claims in the Feinstein Reply Report and Plaintiffs' Reply is as follows.

    a.    *First*, Dr. Feinstein fails to offer any meaningful rebuttal to my opinion that, under the Alleged Truth in the Zurek Report, economic evidence shows that the Challenged Statements had no impact on the prices of UNFI Securities after March 8, 2023.  Dr. Feinstein's entire critique in the Feinstein Reply Report appears to be premised on the information allegedly omitted by UNFI being different from the Alleged Truth in the Zurek Report.

    b.    *Second*, Dr. Feinstein is incorrect to claim that "logic [and] economic analysis" imply that price impact after March 8, 2023 can be inferred based on statistically significant stock price declines on June 7, 2023 and September 26, 2023 because they followed the revelation of "information related to the alleged misrepresentations" and information that analysts "would have wanted to know." As an economic matter, price impact can be inferred by showing that price declines were caused by the revelation of new information comprising the allegedly concealed truth.  Neither statistical significance alone nor the more general concept of "relatedness" or what analysts "would have wanted to know" is sufficient to draw price impact conclusions as an economic matter, because neither shows that a price decline was necessarily attributable to new information comprising the allegedly concealed truth.

    c.    *Third*, Dr. Feinstein mischaracterizes the Alleged Truth in the Zurek Report.  That Alleged Truth is consistent with what I understand to be Plaintiffs' allegations and the Court's MTD Ruling.  Dr. Feinstein wrongly claims that my analysis focuses solely on the disclosure of the existence, but not the extent, of inflation-related forward buying opportunities.

    d.    *Fourth*, Dr. Feinstein ignores economic evidence that UNFI's Q2 2023 disclosures provided quantitative information about the extent of inflation-related

forward buying (in addition to the fact that they were "significant"), and therefore Dr. Feinstein fails to establish that economic evidence would support a finding of price impact after March 8, 2023.

e. *Fifth*, Dr. Feinstein effectively ignores the substance of my rebuttal to the opinion he expressed in the Feinstein Report[2] regarding damages and still fails to articulate a class-wide methodology that is capable of measuring damages for members of the proposed class in a manner consistent with Plaintiffs' theory of liability.

## III.    Dr. Feinstein Mischaracterizes My Analysis of Economic Evidence Regarding the Impact, If Any, of the Challenged Statements After March 8, 2023, and Offers an Unsupported Claim of Price Impact

### A.    Dr. Feinstein Wrongly Speculates as to the Significance of the Language I Used to Describe My Opinion Regarding the Lack of Price Impact of the Challenged Statements After March 8, 2023

7.    Dr. Feinstein claims that the language used in the Zurek Report to describe my opinions on the issue of price impact, namely, my finding that "economic evidence is consistent with the Challenged Statements having had no impact on the prices of UNFI Securities following the alleged corrective disclosure on March 8, 2023,"[3] results from my not "ha[ving] found that the evidence or analysis definitively disproved price impact."[4] Dr. Feinstein mischaracterizes my opinion and is speculating as to the reason for the language I used. Indeed, he points to no statement in the Zurek Report or during my deposition that would support his claim. Moreover, he identifies no economic evidence in the Zurek Report or otherwise that would undermine a finding that the Challenged Statements had no impact on the prices of UNFI Securities after March 8, 2023.

8.    For avoidance of doubt, I am of the opinion that, as an economic matter, the Challenged Statements had no impact on the prices of UNFI Securities after March 8, 2023. Dr. Feinstein's speculation regarding the intended limits of my opinion is simply incorrect. The specific

---

[2] Expert Report of Steven P. Feinstein, Ph.D., dated March 7, 2025 ("Feinstein Report").
[3] Zurek Report, ¶ 9.
[4] Feinstein Reply Report, ¶ 18.

language in the Zurek Report was not intended to limit the scope of my economic opinions about price impact.

**B.      Dr. Feinstein Offers No Meaningful Rebuttal to My Opinion That, Under the Alleged Truth in the Zurek Report, Economic Evidence Shows That the Challenged Statements Had No Impact on the Prices of UNFI Securities After March 8, 2023**

9.       As discussed in the Zurek Report, the Alleged Truth that inflation-related forward buying had been a significant but temporary driver of improvements in UNFI's gross margin during the Proposed Class Period was publicly available information by March 8, 2023.  This is because, by March 8, 2023, information comprising the Alleged Truth was publicly available and this information was discussed by securities analysts, consistent with the fact that it was public.[5]  For example, UNFI executives stated during the Q2 2023 earnings conference call that:

> Our reduced profitability this quarter was primarily driven by a lower gross profit rate, as *we did not repeat the level of **significant** procurement and inventory gains experienced last year*.  …[W]e expect to see similar trends in profitability for our results for the remainder of the year, as we *continue to lap periods of **significant** benefits from procurement gains as price increase activity further decelerates*.[6]

10.      Moreover, as discussed in the Zurek Report, securities analysts' commentary after the Q2 2023 earnings announcement echoed UNFI's disclosure that inflation-related forward buying had been a *significant but temporary* driver of improvements in UNFI's gross margin.  For example:

> (*Goldman Sachs, March 8, 2023*)  Gross margin declined -70 bps y/y to 14.0% primarily *due to elevated procurement gains in the prior year related to inventory buying ahead of rising inflation, which is **not repeatable in the current disinflationary environment*** while management noted limited visibility previously given legacy digital infrastructure.[7]

> (*Seaport, March 9, 2023*)  The primary factor driving lower earnings during [Q2 2023] and over the next 12 months is the *lapping of **significant** inventory gains*

---

[5] *See* Zurek Report, ¶ 10.
[6] UNFI Q2 2023 Earnings Call, p. 3 (emphasis added).  *See also* Zurek Report, ¶ 55.
[7] "Margin Profile Reset Lower; Reiterate Neutral," *Goldman Sachs*, March 8, 2023 (emphasis added).  *See also* Zurek Report, ¶¶ 65, 67.

*from surging procurement inflation during [FY 2022]*.  Inflation is now decelerating rapidly, and large, incremental procurement income is not repeatable going forward.[8]

(*Guggenheim, March 12, 2023*)  The substantial [Q2 2023] bottom-line miss and guide-down … was driven by a gross margin shortfall as *meaningful inflation related "inventory profit" was cycled*.[9]

(*UBS, March 13, 2023*)  We downgrade UNFI following several developments, incl. 1) *challenges lapping higher than anticipated procurement & inventory gains in the year ago period (contributing to our expectations of 55-60 bps of GM pressure in [the second half of FY 2023])*….  UNFI is *likely to face profitability headwinds in [the second half of FY 2023] as it cycles past "significant" procurement gains*.[10]

11.    As discussed in the Zurek Report, from an economic perspective, when a piece of information—here, the Alleged Truth underlying the Challenged Statements—first becomes public in an efficient market, any security price change attributable to the revelation of that information is rapid.  As a consequence, there is no further price impact of the alleged failure to disclose the Alleged Truth once it has been disclosed.[11]  Therefore, if the markets for UNFI Securities were efficient throughout the Proposed Class Period, as Plaintiffs allege and Dr. Feinstein opines,[12] the Alleged Truth would have been fully incorporated into prices of UNFI Securities on March 8, 2023 and could not have impacted the prices of UNFI Securities thereafter.

12.    In the Feinstein Reply Report, Dr. Feinstein offers no meaningful rebuttal to my opinion.  To do so, at a minimum, he would have to establish that new information revealing the Alleged Truth was disclosed for the first time after March 8, 2023.  But it was not, as discussed in the Zurek Report, and nothing in the Feinstein Reply Report suggests otherwise.  Indeed, in the Feinstein Reply Report, Dr. Feinstein does not identify any evidence or provide any reason to dispute my opinion that, under the Alleged Truth in the Zurek Report, economic evidence shows

---

[8] "Disappointing Q2F23, Guidance Lowered, Reducing F23/F24 Estimates," *Seaport*, March 9, 2023 (emphasis added).  *See also* Zurek Report, ¶ 66.

[9] "UNFI - A Rare Significant EBITDA Miss Impacts N-T Confidence But Shouldn't Alter the Algo—Lower Estimates, Stay NEUTRAL Rated Despite Modest Multiple," *Guggenheim*, March 12, 2023 (emphasis added).

[10] "The Path to Value Will Likely Take Time: Downgrade to Neutral," *UBS*, March 13, 2023 (emphasis added).  *See also* Zurek Report, ¶¶ 65, 67.

[11] *See* Zurek Report, Section VI.

[12] Complaint, ¶¶ 260, 263, 265; Feinstein Report, ¶¶ 18, 23.

that the Challenged Statements had no impact on the prices of UNFI Securities after March 8, 2023.

13.     At Dr. Feinstein's second deposition, in response to the question whether he performed any analysis to dispute my opinion that, under the Alleged Truth in the Zurek Report, economic evidence shows that the Challenged Statements had no impact on the prices of UNFI Securities after March 8, 2023, Dr. Feinstein pointed to his discussion of the June 7, 2023 and September 26, 2023 disclosures in the Feinstein Reply Report claiming "that the significance of procurement gains was not fully revealed to the market until September 2023."[13]  Specifically:

> Q.  … If you assume that the Alleged Truth is as Dr. Zurek has defined it, you have not done any analysis to show that Dr. Zurek's opinions are wrong, correct?…
> A.  I think that's false.  I've shown that the significance of procurement gains was not fully revealed to the market until September 2023, and Dr. Zurek ignores that fact.[14]
>
> Q.  … [I]s there any evidence you can point to in your report that if the [A]lleged [T]ruth is as Dr. Zurek defines it, that there was still a price impact on [June 7, 2023] or [September 26, 2023?]
> A.  Right.  I explain in my report that the market did not know -- it was -- it was information that the market was deprived of, they did not know the significance of procurement gains in producing the [C]ompany's profits and profitability in [Q1 2022 and Q2 2022] and [Q4 2023] [sic] until September of 2023.  They did not know that significance.  And the announcements the [C]ompany made on September 2[6], 2023, told the market the significance of prior procurement gains….  And it was -- and if the market had known the significance of prior procurement gains -- I explain this in my report -- the announcements that were made that day would not have been surprising and would not have driven the stock price down.  Therefore, the evidence is compelling that they -- they -- that they had caused inflation, those misrepresentations and omissions, and that they were responsible for the losses that were realized on that day.[15]

14.     However, Dr. Feinstein's response does not mention evidence to support his claims if they pertain to the Alleged Truth.  As discussed in the Zurek Report, any UNFI Securities price changes following the Alleged Corrective Disclosures on June 7, 2023 and September 26, 2023

---

[13] Deposition of Stephen P. Feinstein, Ph.D., dated September 17, 2025 ("Feinstein Second Deposition"), 100:12–14.
[14] Feinstein Second Deposition, 100:3–15.
[15] Feinstein Second Deposition, 101:10–102:17.

provide no economic evidence of price impact.  First, it was publicly available information by March 8, 2023 that inflation-related forward buying had been a significant but temporary driver of improvements in UNFI's gross margin.  Second, any UNFI Securities price changes following the Alleged Corrective Disclosures on June 7, 2023 and September 26, 2023 are consistent with factors other than the revelation of information underlying the Alleged Truth, namely, below-consensus Q3 2023 financial results and the downward revision to FY 2023 financial guidance on June 7, 2023, and below-consensus FY 2024 financial guidance on September 26, 2023.

15.    Thus, either Dr. Feinstein is suggesting that the repetition of the previously disclosed Alleged Truth caused UNFI Securities price changes on those dates, which is inconsistent with his claim that UNFI Securities traded in efficient markets during the Proposed Class Period, or he is using a definition of the allegedly concealed truth that is different from the Alleged Truth, which in turn means he is effectively *not* disputing my conclusion based on the Alleged Truth in the Zurek Report.  In other words, the only way Dr. Feinstein can simultaneously claim that the markets for UNFI Securities were efficient and that the stock price declines on June 7, 2023 and September 26, 2023 provide economic evidence of price impact is by assuming a different allegedly concealed truth than the Alleged Truth in the Zurek Report such that new, value-relevant information comprising that different allegedly concealed truth was revealed on June 7, 2023 and September 26, 2023.

16.    As quoted above, Dr. Feinstein also asserted in his second deposition that "if the market had known the significance of prior procurement gains[, the Q4 2023 disclosures on September 26, 2023] would not have been surprising and would not have driven the stock price down."[16] However, he provides no evidence to support the assertion that the alleged revelation of "the significance of prior procurement gains" is what caused the stock price decline on that day. Indeed, as discussed above, new information disclosed on this day (e.g., below-consensus FY 2024 financial guidance) is not part of, and could not reveal for the first time, the Alleged Truth (because it was already publicly available) and it is the revelation of that new information that is consistent with the observed price declines.  Thus, Dr. Feinstein has no basis to claim that the UNFI stock price would not have declined on September 26, 2023 "if the market had known the

---

[16] Feinstein Second Deposition, 102:8–13.

significance of prior procurement gains."[17]  In fact, as documented extensively in the Zurek Report, the market already did have that information.

17.      Instead of offering a meaningful rebuttal to my opinion, Dr. Feinstein mischaracterizes my definition of the Alleged Truth by stating that the Zurek Report "limits the allegation to concealment of the *existence* of prior procurement gains and that the procurement gains had *some impact* on profits and profitability."[18]  That is incorrect.  The Alleged Truth is that "inflation-related forward buying opportunities were *a **_significant but temporary_** driver* of improvements in UNFI's gross margin" during the Proposed Class Period.[19]  As an economic matter, a disclosure of *significant impact* provides more information than merely disclosing the "existence" or stating that there was "some impact."  A disclosure that inflation-related forward buying had been *a significant but temporary driver* of improvements in UNFI's gross margin during the Proposed Class Period is informative of extent, in other words, that inflation-related forward buying impacted UNFI's reported financial results to a "significant" extent in the past and is also informative that this financial impact was temporary.  There is simply no logical basis to justify Dr. Feinstein's incorrect claim that "Dr. Zurek replaces Plaintiffs' actual allegations with a severely limited alternative mischaracterization."[20]  There is also no logical basis to justify Dr. Feinstein's incorrect claim that I "leave[] out [from the Alleged Truth] the significance, [that is,] how significant procurement gains were to the Company's profits and profitability."[21]  The fact that "procurement gains" were "significant" is how the Alleged Truth is defined, namely, that inflation-related forward buying had been a significant but temporary driver of improvements in UNFI's gross margin during the Proposed Class Period.  As shown in the Zurek Report and above, UNFI's disclosures discussing the "significant" impact and analyst commentary reacting to those disclosures demonstrate that the Alleged Truth was publicly available by March 8, 2023.

---

[17] Feinstein Second Deposition, 102:8–10.

[18] Feinstein Reply Report, ¶ 55 (emphasis added).  *See also* Feinstein Reply Report, ¶ 52 (emphasis added; emphasis in original removed) ("Dr. Zurek misinterprets Plaintiffs' allegations to comprise only that the Company concealed the *existence* of procurement gains and that procurement gains had *some impact* on the Company's profits and profitability, but he omits that the Company also concealed the magnitude of the procurement gains and how much the procurement gains had boosted profits and profitability during the [Proposed] Class Period.").

[19] Zurek Report, ¶ 28 (emphasis added).

[20] Feinstein Reply Report, ¶ 20.

[21] *See* Feinstein Second Deposition, 117:6–14 ("Q.  Now, sir, in -- well, I guess -- We talked about earlier how you opine Dr. Zurek's view of the Alleged Truth is narrower than [P]laintiffs' allegations, correct?  A.  Right.  He leaves out the significance, how significant procurement gains were to the [C]ompany's profits and profitability.").

18.     Furthermore, in an attempt to argue that the June 7, 2023 and September 26, 2023 Alleged Corrective Disclosures somehow demonstrate that the Challenged Statements continued to impact the prices of UNFI Securities after March 8, 2023, Dr. Feinstein discusses his understanding that the Court did not state in the MTD Ruling that financial guidance statements could not be corrective disclosures.[22]  It is not clear why Dr. Feinstein would point to the dismissed guidance *statements* as alleged corrective disclosures.  Instead, Dr. Feinstein may be referencing (i) UNFI's disclosures on June 7, 2023 of the Company's below-consensus Q3 2023 financial results and FY 2023 earnings guidance revision or (ii) its disclosures on September 26, 2023 announcing lower-than-expected (by securities analysts covering UNFI) FY 2024 guidance (which had previously been withdrawn).  In order for these disclosures to provide evidence that the prices of UNFI Securities remained impacted after March 8, 2023 by the Challenged Statements as an economic matter, however, Dr. Feinstein would need to establish a causal link between the guidance misses and any remaining (after March 8, 2023) undisclosed information. He has not done that in the Feinstein Reply Report.  And, as shown in the Zurek Report, there is no such economic causal link because the Alleged Truth was already disclosed on March 8, 2023, and the subsequent disclosures by the Company were instead consistent with factors that did not reveal new information underlying the Alleged Truth, namely (i) the materialization of previously disclosed risks that increased macroeconomic pressures from moderating inflation or deflation would reduce the benefits to profitability from inflation-related forward buying opportunities achieved in prior quarters; (ii) the materialization of previously known risks that UNFI's financial results and financial guidance would be realized below expectations due to UNFI's lack of visibility into its future performance due to legacy data management system limitations; and (iii) factors other than inflation-related forward buying, including shrink, changes in consumer spending, and weak supplier promotional activity.[23]

---

[22] Feinstein Reply Report, ¶ 147 ("[A]lthough the Court dismissed guidance statements as being actionable misrepresentations, my understanding is that the Court did not rule that guidance statements could not be corrective disclosures.").
[23] Zurek Report, ¶¶ 11, 74.

**C.    Dr. Feinstein Fails to Demonstrate Based on "Logic [and] Economic Analysis" That Observed Price Declines on June 7, 2023 and September 26, 2023 Can Be Used to Reliably Infer That the Challenged Statements Impacted the Prices of UNFI Securities After March 8, 2023**

19.    Dr. Feinstein stated in his second deposition that he thinks it is "highly likely there was price impact" on June 7, 2023 and September 26, 2023.[24]  To the extent he is referring to continuing (after March 8, 2023) price impact of the Challenged Statements, he appears to reach his conclusion based on his assertion that statistically significant UNFI stock price declines on those dates followed the disclosure of "information related to the alleged misrepresentations."[25]  He also claims that his approach is derived from "logic [and] economic analysis."[26]  However, as explained below, logic and economic analysis provide no basis to infer price impact from security price changes caused by the release of information that is not part of the allegedly concealed truth.  Indeed, Dr. Feinstein's concept of "information related to the alleged misrepresentations" disclosed on June 7, 2023 and September 26, 2023 goes beyond the allegedly concealed truth, as I understand it.  In other words, just because some development can be considered "related" to information that was allegedly concealed from the market, it does not, as an economic matter, necessarily imply that the development reveals the allegedly concealed truth.  Thus, Dr. Feinstein is incorrect in characterizing his approach to analyzing price impact on

---

[24] *See, e.g.*, Feinstein Second Deposition, 18:25–19:25 ("Q.  And it's your opinion that there was a price impact on the dates of the June and September 2023 alleged corrective disclosures, correct?  A. … I think it's highly likely there was price impact.  The evidence indicates price impact on those dates….  It's highly likely that there was price impact, extremely likely.  And that high likelihood has not been validly disproved or challenged by Dr. Zurek or anyone.  The evidence is quite compelling that there was price impact."); Feinstein Reply Report, ¶ 22 ("[T]he price impact of the actually alleged misrepresentations [on June 7, 2023 and September 26, 2023] escapes Dr. Zurek's notice.").

[25] *See, e.g.*, Feinstein Second Deposition, 22:24–23:14 ("Q.  Sir, what does it mean for there to have been a price impact on the dates of the June and September 2023 alleged corrective disclosure dates?  A.  I think it means that the change -- the movements of the prices were affected by the fact that there were alleged misrepresentations and omissions.  Both of those days had statistically significant stock price declines for UNFI stock, and price impact would mean that that decline … in some way [attributed] to or [was] precipitated by information related to the alleged misrepresentations and omissions"), 54:15–25 ("…I looked at the misrepresentations and omissions collectively and holistically.  There was -- there was -- I was able to assess what the market knew and what the market didn't know throughout the course of the [Proposed Class Period] leading up to the corrective disclosures, and I observed that what the market learned on the corrective disclosure dates was related to the allegations, and the evidence compels that it either caused or contributed to the stock price declines on those days."); Feinstein Reply Report, ¶ 105.

[26] Feinstein Second Deposition, 58:11.  Although the Feinstein Second Deposition transcript states "logic in economic analysis," I understand that Dr. Feinstein in fact said "logic and economic analysis."  Whether Dr. Feinstein said "logic and economic analysis" or "logic in economic analysis" does not change my analysis or opinions.

June 7, 2023 and September 26, 2023 as being derived from "logic [and] economic analysis."[27] To provide evidence of price impact, as an economic matter, the alleged corrective disclosure should reveal for the first time the allegedly concealed truth that plaintiffs claim to have rendered the alleged misrepresentations false and/or misleading;[28] otherwise, there is no economic basis to infer from any observed price decline that the alleged misrepresentations had caused the stock to be (or to remain) inflated prior to the alleged corrective disclosure based on the stock price movement that followed it.

20.    As an economic matter, assessing whether a statistically significant stock price decline provides economic evidence of price impact requires an articulation of the allegedly concealed truth that would have been known to the market absent the alleged misrepresentations.  This is so for two reasons.  First, the economic determination of price impact refers to whether a security's price would have differed if an allegedly truthful statement was made, absent the alleged misrepresentations,[29] and that amount depends, as an economic matter, on what would have been disclosed absent the alleged misrepresentations, that is, it depends on the allegedly concealed truth.  Second, in an efficient market, statistically significant price declines can only be attributed to the arrival of new information; not information that was already publicly available, and therefore already fully incorporated into the stock price.  Thus, in order to assess whether a statistically significant stock price decline is evidence of price impact, it is necessary to compare only the new information disclosed on the relevant day to the allegedly concealed truth.

21.    For example, a statistically significant stock price decline occurring months after the allegedly concealed truth was revealed would not be economic evidence of price impact of the previously allegedly concealed truth in an efficient market, even if the stock price decline was caused by new information somehow broadly related to the allegedly concealed truth.  In other words, as applied to this case, the market could in fact be fully aware that inflation-related forward buying had been a significant but temporary driver of improvements in gross margin

---

[27] Feinstein Second Deposition, 58:11.

[28] I understand that the revelation need not necessarily be the "mirror image" of the allegedly concealed truth, but must nevertheless reveal the allegedly concealed truth.

[29] I understand that this is consistent with how the Supreme Court explained the concept of price impact in *Goldman.  See Goldman Sachs Group, Inc., et al., Petitioners v. Arkansas Teacher Retirement System, et al.*, 141 S.Ct. 1951 (2021) ("*Goldman*") ("'[P]rice impact' is the amount of price inflation maintained by an alleged misrepresentation—in other words, the amount that the stock's price would have fallen without the false statement.").

historically and fully aware that such opportunities might eventually disappear in a future quarter. When the opportunities do eventually disappear, the exact timing and nature of such disappearance can be surprising to the market and lead to a stock price decline. Indeed, commentary about the disappearance when it happens in a future quarter can even refer to inflation-related forward buying historically. Such commentary could be considered to be "related" to inflation-related forward buying. But it would be inappropriate to conclude that the disappearance of opportunities in a future quarter somehow reveals for the first time the fact that inflation-related forward buying had been a significant but temporary driver of improvements in gross margin historically if that fact is already known. It would be equally inappropriate to simply conclude that information about inflation-related forward buying having been a significant but temporary driver of improvements in gross margin historically is responsible for any price decline when the opportunities disappear. This is the case even if this information is discussed by market participants in the context of some future disclosures. In an efficient market, such information would not be responsible for price declines, because that information would have already been incorporated into the price when it first became public. New information about the disappearance of the opportunities in a future quarter could, however, cause a price decline, but this information would not be economic evidence that the market was not aware that inflation-related forward buying had been a significant but temporary driver of improvements in gross margin in the past under the circumstances described above. In other words, as an economic matter, a price decline in the future quarter after the allegedly concealed truth was already previously revealed—even a statistically significant one and even on a day when a disclosure contained information "related" to inflation-related forward buying historically—would not be economic evidence of price impact of the previously allegedly concealed truth.

22.     Consistent with the above logic, in this matter, my economic analysis of price impact in the Zurek Report started from a definition of the Alleged Truth that I understand Plaintiffs allege UNFI should have disclosed during the Proposed Class Period at the time the Challenged Statements were made. This Alleged Truth is that inflation-related forward buying opportunities were a significant but temporary driver of improvements in UNFI's gross margin. Given this

Alleged Truth, I then compared its content to the information disclosed in the Alleged Corrective Disclosures on June 7, 2023 and September 26, 2023 and concluded that:

> **[A]ny UNFI Securities price changes following the alleged corrective disclosures on June 7, 2023 and September 26, 2023 are consistent with factors other than the revelation of information underlying the Alleged Truth**, namely, below-consensus Q3 2023 financial results and the downward revision to FY 2023 financial guidance for the Q3 2023 disclosures on June 7, 2023, and below-consensus FY 2024 financial guidance for the Q4 2023 disclosures on September 26, 2023. Moreover, the reported reasons for the below-consensus financial results and financial guidance for FY 2023 and FY 2024 are consistent with factors that did not reveal new information underlying the Alleged Truth, namely (i) the materialization of previously disclosed risks that increased macroeconomic pressures from moderating inflation or deflation would reduce the benefits to profitability from inflation-related forward buying opportunities achieved in prior quarters; (ii) the materialization of previously known risks that UNFI's financial results and financial guidance would be realized below expectations due to UNFI's lack of visibility into its future performance due to legacy data management system limitations; and (iii) factors other than inflation-related forward buying, including shrink, changes in consumer spending, and weak supplier promotional activity. **None of these reported reasons revealed new information underlying the Alleged Truth because it was already public information that inflation-related forward buying had been a significant but temporary driver of UNFI's gross margin**.[30]

23.     Dr. Feinstein appears to have followed a different approach to reach his conclusions, which is ultimately incorrect, as an economic matter, under the circumstances here. Instead of grounding his analysis based on a definition of the allegedly concealed truth, he appears to have asked whether any new information revealed on Alleged Corrective Disclosure dates was "related to the allegations" and something that analysts "would have wanted to know." During his deposition, he stated:

> I was able to assess what the market knew and what the market didn't know throughout the course of the [Proposed Class Period] leading up to the corrective disclosures, and **I observed that what the market learned on the corrective disclosure dates was related to the allegations, and the evidence compels that it either caused or contributed to the stock price declines on those days**.[31]

---

[30] Zurek Report, ¶ 74 (emphasis added).
[31] Feinstein Second Deposition, 54:17–25 (emphasis added).

Q. … So your position is that UNFI could have disclosed and should have disclosed according to [P]laintiffs the dollar amount of gross profits from inflation-related forward buying within that quarter?…

A. That would -- well, once they start talking about what's driving profits and profitability, which is what the [C]ompany did in that earnings announcement conference call, an analyst would have -- who wanted the full truth would have wanted to know that, too. ***How much of the [C]ompany's reported profits, adjusted EBITDA, and how much of the gross margin that was reported was attributable to procurement gains. That's what an analyst would have wanted to know*** and --

Q. I'm not asking --

A. And I believe that's what [P]laintiffs are saying should have been disclosed once the [C]ompany started talking about the causes of their profits and profitability.[32]

24.    Thus, Dr. Feinstein's approach to analyzing price impact does not appear to limit inferences of price impact to security price changes that follow the revelation only of information that is part of the allegedly concealed truth. Instead, his approach allows, as an economic matter incorrectly, for an inference of price impact based on a potentially broader information set, namely, information that is broadly "related to the allegations"[33] and that analysts "would have wanted to know."[34]  However, just because certain information relates to the same general topic as the allegations and is something analysts "would have wanted to know" does not mean it necessarily reveals the allegedly concealed truth that plaintiffs claim rendered the alleged misrepresentations false or misleading, because that truth could already be known information.

25.    Dr. Feinstein purported to justify his approach by claiming that "logic [and] economic analysis" imply that if the alleged corrective disclosures are not "entirely different from the misrepresentations and omissions," then security price changes following the disclosures can be evidence of price impact. Specifically, he states:

Q. So it's your position, sir, that the information has to be completely unrelated in order for there to be a mismatch?…

A. Well, in order to say that the drop cannot possibly be considered evidence of price impact, the -- you would have to prove that the drop was caused by something entirely different from the misrepresentations and omissions.

Q. From where did you derive that understanding?

---

[32] Feinstein Second Deposition, 115:2–25 (emphasis added).
[33] Feinstein Second Deposition, 23:5–14, 54:14–25.
[34] Feinstein Second Deposition, 115:12–14.

A.  It's logic [and] economic analysis.[35]

26.    However, "logic [and] economic analysis" do not support Dr. Feinstein's approach.  As discussed above, as an economic matter, quantifying the price impact, if any, of the Challenged Statements requires consideration of the allegedly concealed truth.  Any security price declines caused by information that is not part of the allegedly concealed truth, even information broadly "related to the allegations" and something that analysts "would have wanted to know," are not necessarily evidence of price impact and are not evidence of price impact if the allegedly concealed truth had already been disclosed.  Indeed, "logic [and] economic analysis" support Dr. Feinstein's approach only if the allegedly concealed truth is part of the new information disclosed on the relevant day.  Otherwise, "logic [and] economic analysis" in an efficient market support the opposite conclusion, i.e., no evidence of prior price impact.  That is the case here if the allegedly concealed truth is the Alleged Truth, as explained above, because the Alleged Truth was already public information months before the June 7, 2023 and September 26, 2023 disclosures.

27.    Consistent with economic reasoning in the Zurek Report and above, I understand that the relevant legal standard for assessing whether a statistically significant price decline is evidence of price impact is based on whether it resulted from the revelation of the allegedly concealed truth, rather than whether it resulted from the revelation of new information that is simply broadly "related to the allegations" or information that analysts "would have wanted to know." Therefore, to the extent Dr. Feinstein is purporting to define the allegedly concealed truth as any information broadly "related to the allegations" and something that analysts "would have wanted to know," I understand that is not the relevant legal standard for assessing price impact.[36]

28.    Because Dr. Feinstein appears to evaluate whether a price decline is evidence of price impact based on information "related to the allegations" and that analysts "would have wanted to know," he falls into a logical trap.  Specifically, he fails to evaluate whether there is a mismatch between the Alleged Corrective Disclosures and the contents of the allegedly concealed truth.[37]

---

[35] Feinstein Second Deposition, 57:24–58:11.

[36] For example, I understand from the MTD Ruling that "'[t]here is no duty to disclose a fact … merely because a reasonable investor would very much like to know that fact[.]'"  *See* MTD Ruling, p. 14.

[37] *Goldman* (emphasis added) ("Plaintiffs typically try to prove the amount of inflation indirectly:  They point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the

Dr. Feinstein ignores the mismatch between information about gross margin contribution historically on the one hand (the allegedly concealed truth), and the impact on the Company's financial performance of the disappearance of inflation-related buying opportunities on a future date as a result of a previously disclosed risk materializing. As a result, he incorrectly concludes that the statistically significant UNFI stock price declines on June 7, 2023 and September 26, 2023 is economic evidence of price impact.

29. Finally, Plaintiffs' Reply claims that "statistically significant" price declines following each of the Alleged Corrective Disclosures "constitute[s] direct evidence of price impact."[38] However, at least as an economic matter, including for the reasons explained above, price impact of the allegedly concealed information (as opposed to price reactions to all, possibly confounding, information disclosed on a given day) cannot be inferred from statistically significant price changes alone. As explained above, as an economic matter, in order to provide economic evidence of price impact, price declines must be causally linked to the revelation of new information revealing the allegedly concealed truth. And as explained in the Zurek Report, in efficient markets, no UNFI Securities price changes after March 8, 2023 were caused by revelation of the Alleged Truth because the Alleged Truth was already public information. It is entirely possible for there to be a statistically significant price decline in response to information that is confounding, and not new information revealing the allegedly concealed truth, which means that price impact of the allegedly concealed truth could not be inferred from such a price decline.

### D. Dr. Feinstein Misleadingly Claims the Alleged Truth Does Not Include the Extent of Inflation-Related Forward Buying

30. As a purported criticism of the Alleged Truth in the Zurek Report, Dr. Feinstein states that "[t]he allegation is not merely that the Company concealed that it had availed itself of the opportunity to reap procurement gains – that is, the *existence* of procurement gains – but also that the Company concealed the *amount* of the procurement gains and the *extent* to which profits

---

earlier misrepresentation.… But *that final inference—that the back-end price drop equals front-end inflation— starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure*.").

[38] Plaintiffs' Reply, pp. 2–3.

and profitability depended on them."[39]  Dr. Feinstein's claims are misleading, and he mischaracterizes the Alleged Truth in the Zurek Report.[40]  In fact, contrary to Dr. Feinstein's mischaracterization, the conclusions reached in the Zurek Report reflect an Alleged Truth that includes information about the ***extent*** of inflation-related forward buying and is consistent with what I understand to be Plaintiffs' allegations and the Court's MTD Ruling.

31.      As an initial matter, the Alleged Truth that I was asked to assume—that inflation-related forward buying was a significant but temporary driver of UNFI's gross margin during the Proposed Class Period—is consistent with my understanding of the Complaint and the MTD Ruling.  As I discussed in the Zurek Report, based on the MTD Ruling, I understand that the Challenged Statements[41] include (i) profit driver statements that "failed to disclose that ***forward buying was a significant and aberrational driver*** of [UNFI's] profit margins;"[42] (ii) profit sustainability statements that "spoke to the impact of a deflationary environment on UNFI's margins and whether the causes of a decline in margins were temporary" but omitted that "[procurement] gains were a significant and unsustainable driver [of] profit margins;"[43] and (iii) risk factor statements that "did not mention the … risk of decreased opportunities for inflation-

---

[39] Feinstein Reply Report, ¶ 39.

[40] Dr. Feinstein testified at his deposition that he not only disagrees with the definition of the Alleged Truth, but also stated that I misapplied the Alleged Truth under my definition.  Specifically, Dr. Feinstein stated:  "[T]he problem is [Dr. Zurek] defined [the Alleged Truth] this way, but then ignored the word 'significant.'  So it's not just how he defined it.  It's how he used it."  *See* Feinstein Second Deposition, 103:1–5.  However, as discussed in **Section III.B**, the Company disclosed on March 8, 2023 that inflation-related forward buying opportunities were "significant" historically.

[41] As discussed in the Zurek Report, the Challenged Statements are the three categories of alleged misrepresentations during the Proposed Class Period that survived Defendants' motion to dismiss, including profit driver statements, profit sustainability statements, and risk factor statements.  *See* Zurek Report, ¶¶ 23–24; MTD Ruling, pp. 16–18.

[42] MTD Ruling, pp. 16–17 (emphasis added).  *See also* Complaint, ¶¶ 69–70 ("From the start of the [Proposed] Class Period until March 8, 2023, Defendants knowingly and/or recklessly failed to disclose that UNFI's financial results benefited 'significantly' from forward buying in advance of known price increases; [and] that these 'significant' benefits masked the effects of other challenges the Company was facing, including labor challenges and wage inflation….  Instead of acknowledging this crucial driver of the Company's profitability, Defendants misleadingly attributed the Company's outperformance during the [Proposed] Class Period to inflationary gains (the profit that results merely from continually increasing prices) and to the operational efficiencies generated by the Value Path initiative."); Zurek Report, ¶ 23.

[43] MTD Ruling, p. 17.  *See also* Complaint, ¶ 89 (internal citations omitted) ("Defendants still did not disclose the root of the problem, which was that the extremely elevated level of forward buying and atypical procurement gains that had been sustaining the Company's gross margins for more than a year was beginning to decline.  During [Q1 2023], inflation eased, and as a result, the number of price increases started to decline, thereby reducing the number of forward buying opportunities and procurement gains."); Zurek Report, ¶ 23.

related forward buying."[44]  Moreover, the Court's MTD Ruling states that the Challenged Statements "commented on the drivers of the Company's margins ***but never disclosed the Company's <u>substantial</u> reliance on gains from <u>unsustainable</u> inflation-based forward buying***" and that "[b]y listing potentially positive trends and downplaying potentially negative ones as temporary or discrete, while omitting the elephant in the room, these statements were plausibly misleading."[45]  Therefore, it is not clear how, in Dr. Feinstein's view, the Alleged Truth (that inflation-related forward buying was a significant but temporary driver of UNFI's gross margin during the Proposed Class Period) differs from what I understand to be the Court's description.

32.      Moreover, as discussed and contrary to what Dr. Feinstein states in the Feinstein Reply Report, the Alleged Truth includes the ***extent*** of inflation-related forward buying opportunities, and is responsive to the allegation that "Defendants concealed the ***extent*** to which UNFI's profitability was driven by unsustainable forward buying."[46]  Specifically, as discussed in the Zurek Report and in **Section III.B** above, on March 8, 2023, the Company disclosed that inflation-related forward buying had been a significant but temporary driver of improvements to UNFI's gross margin during the Proposed Class Period.[47]  UNFI's disclosure that the contribution of inflation-related forward buying had been "significant" is, as an economic matter, information about the ***extent*** to which UNFI's profitability was driven by allegedly unsustainable inflation-related forward buying.  The fact that the particular statement did not quantify the specific historical gross margin contribution of inflation-related forward buying does not mean it failed to disclose the extent to which it impacted the Company's historical profitability.

33.      I also understand the above economic logic to be consistent with the Court's MTD Ruling, which states that "UNFI's stock price tumbled when in March 2023, UNFI revealed the ***extent*** to which its profits had been driven by no-longer-sustainable forward buying gains the prior year."[48]

---

[44] MTD Ruling, pp. 17–18.  *See also* Complaint, ¶ 69 ("From the start of the [Proposed] Class Period until March 8, 2023, Defendants knowingly and/or recklessly failed to disclose that … there was a risk that the forward buying opportunities would return to normal if/when inflation started to subside, which would in turn materially reduce the Company's profitability back to normal."); Zurek Report, ¶ 23.

[45] MTD Ruling, p. 14 (emphasis added).

[46] Plaintiffs' Reply, p. 5 (emphasis in original).

[47] *See* Zurek Report, Section VIII.A.

[48] MTD Ruling, p. 1 (emphasis added).

E.     **Even Under His Alternative View That UNFI Should Have Disclosed "Dollar Amounts" or "Percentage Points" to Quantify Extent, Dr. Feinstein Fails to Establish That Economic Evidence Would Support a Finding of Price Impact After March 8, 2023**

1.     **Dr. Feinstein Ignores That, in an Efficient Market, the Prices of UNFI Securities Would Reflect Economic Implications of All Publicly Available Information About the Extent of Inflation-Related Forward Buying**

34.     Dr. Feinstein appears to suggest that the only way to make the Challenged Statements not false and misleading would have been for the Company to provide a quantitative disclosure of the amount of the impact on gross margins from inflation-related forward buying opportunities during the Proposed Class Period.  Specifically, he claims that I "omit[] from [the] definition [of the Alleged Truth] that Plaintiffs also allege that the misrepresentations and omissions concealed *the magnitude of the procurement gains and the extent to which the procurement gains had boosted prior profits and profitability*."[49]  During his deposition, Dr. Feinstein stated that for the Challenged Statements to no longer be false and misleading, UNFI should have disclosed during the Proposed Class Period "some factual indication" of the gross margin contribution of inflation-related forward buying, which he appears to suggest includes "dollar amounts" or "specific percentage points … [a]s best they could."[50]

35.     Dr. Feinstein claims that the Alleged Truth that inflation-related forward buying was a significant but temporary driver of improvements to UNFI's gross margin during the Proposed Class Period was not a "full corrective disclosure"[51] on March 8, 2023, because, as of that date, the Company had not quantified the impact of inflation-related forward buying on UNFI's gross margin in each of the prior quarters.  In particular, Dr. Feinstein claims that "the Company did not disclose until [September 26, 2023] that the Company had reaped 'at least $275 million' of

---

[49] Feinstein Reply Report, ¶ 20 (emphasis added).  *See also* Feinstein Reply Report, ¶ 52 (emphasis in original removed) ("Dr. Zurek … omits that the Company also concealed the magnitude of the procurement gains and how much the procurement gains had boosted profits and profitability during the Class Period.").

[50] *See* Feinstein Second Deposition, 116:5–24 ("Q.  And your understanding is that [P]laintiffs allege that UNFI should have disclosed the precise dollar amount and contribution to margin in percentage points from inflation-related forward buying within that quarter?…  A.  I didn't say 'precise,' I mean, but some factual indication.  Q. What do you mean by 'factual indication'?  A.  What do you mean by 'precise'?  Q.  Dollar amounts, specific percentage points?  A.  As best they could, yeah.  I mean, that's what the analysts are going to be working with in their evaluation models, is how much profit is recurring and how much is nonrecurring.").

[51] *See, e.g.*, Feinstein Reply Report, ¶¶ 35, 66, 70.

procurement gains between [January 30, 2022 and January 28, 2023] ('the one year period spanning the second half of [FY] 2022 through the first half of [FY] 2023')."[52]  He also states that "[t]he [March 8, 2023] announcements did not reveal the magnitude of prior procurement gains, and they did not fully inform the market of the extent to which procurement gains had previously boosted profitability [because this] magnitude and this extent were not revealed until [September 26, 2023]."[53]  Dr. Feinstein's claim, however, that this alternative allegedly concealed truth that "the Company had reaped 'at least $275 million' of procurement gains" was not disclosed until September 26, 2023[54] is a red herring.

36.     As an initial matter, based on my review, the Company itself did not disclose the $275 million figure on which Dr. Feinstein relies.  Rather, the $275 million figure appears to be based on Plaintiffs' claim in the Complaint that $275 million is a lower bound for the amount of inflation-related forward buying gains between January 30, 2022 and January 28, 2023 (i.e., for the one-year period spanning Q3 2022 through Q2 2023[55]) that was, according to Plaintiffs, allegedly only revealed in the June 7, 2023 and September 26, 2023 disclosures.[56]  As explained below, this figure, however, appears to be an estimate and not a measure of the actual historical impact on gross margin from inflation-related forward buying opportunities at the time when the Challenged Statements were disclosed by the Company.  Plaintiffs derive the estimate largely based on the Company's disclosures of its actual performance in Q3 2023 and Q4 2023, which would not have been known information until Q3 2023 and Q4 2023, and on the Company's financial guidance reflecting anticipated performance for FY 2024, which presumably also reflected information that was available in September 2023 and cannot be presumed to have been available earlier.  Specifically, according to the Complaint, Plaintiffs calculate the $275 million figure by summing what they claim are estimates of the lower bound of procurement gains for

---

[52] Feinstein Reply Report, ¶ 42, citing to Complaint, ¶¶ 127, 132, and footnote 14.

[53] Feinstein Reply Report, ¶ 69, citing to Complaint, ¶¶ 213, 217.  *See also* Feinstein Reply Report, ¶ 100 ("Dr. Zurek disregards that analysts likely overestimated the Company's profit margin because they were still deprived of the information about the magnitude of procurement gains earned in FY 2022 and the impact of those procurement gains on the Company's previously reported profit margin.  He does not account for this channel of price impact."), ¶ 125 ("This information about the unsustainable magnitude and impact of UNFI's procurement gains during the 'out-of-pattern' market environment of FY 2022 had never been divulged to the public before.").

[54] Feinstein Reply Report, ¶ 42, citing to Complaint, ¶¶ 127, 132, and footnote 14.

[55] *See, e.g.*, Feinstein Reply Report, ¶ 42, citing to Complaint, ¶¶ 127, 132, and footnote 14.

[56] *See* Complaint, ¶ 132 ("Given that [Q3 2022] procurement gains exceeded $50 million, [Q4 2022] procurement gains exceeded $100 million, and first half of [FY 2023] procurement gains exceeded $125 million[], the procurement gains exceeded $275 million during the one year period encompassing the second half [FY 2022] and first half of [FY 2023].").

Q3 2022 ($50 million), Q4 2022 ($100 million), and the first half of FY 2022 ($125 million).[57] Specifically, these estimates appear to be based on several assumptions:

a. Plaintiffs' estimate of the lower bound for Q3 2022 procurement gains is based on the Company's financial results a year later, in Q3 2023. Specifically, Plaintiffs' estimate is the portion of the reported (on June 7, 2023) year-over-year decline in Q3 2023 adjusted EBITDA (compared to Q3 2022) that the Company described "was primarily due to the $50 million decline in 'Wholesale Gross Margin Including Forward Buy.'"[58] That is, Plaintiffs claim that the entire reduction in adjusted EBITDA from Q3 2022 to Q3 2023 "primarily" due to a lower gross margin [in Q3 2023] (that included "forward buy") represents the historical contribution to adjusted EBITDA from inflation-related forward buying a year prior in Q3 2022. Plaintiffs' estimate apparently does not adjust for the impact of other factors that impacted UNFI's Q3 2023 gross margin, such as weak supplier promotional activity, shrink, and changes in consumer spending, as discussed in the Zurek Report.[59] Further, the estimate is derived from the Company's actual performance in Q3 2023, which had not occurred as of March 8, 2023.

b. Plaintiffs' estimate of the lower bound for Q4 2022 procurement gains is based on the Company's financial results a year later, in Q4 2023. It is based on a portion of the year-over-year decline in gross profit from Q4 2022 to Q4 2023 of "more than $100 million" due to "lower levels of procurement gain opportunities resulting from decelerating inflation" that the Company disclosed on September

---

[57] *See, e.g.*, Complaint, footnote 14 ("UNFI's belated disclosures revealed that there had been at least $275 million of abnormal procurement gains throughout [FY] 2022 (*i.e.*, at least $125 million in the first two quarters, at least $50 million in [Q3 2022], and at least $100 million in [Q4 2022].")), ¶ 132 ("Given that [Q3 2022] procurement gains exceeded $50 million, [Q4 2022] procurement gains exceeded $100 million, and first half of [FY 2023] procurement gains exceeded $125 million[], the procurement gains exceeded $275 million during the one year period encompassing the second half [of FY 2022] and first half of [FY 2023].").

[58] Complaint, ¶ 118 ("In connection with the [Q3 2023] Earnings Call, Defendants released a presentation for the [Q3 2023] financial results, which showed that procurement gains in [Q3 2022] accounted for at least $50 million (or 25.5%) of the reported $196 million in adjusted EBITDA[]. Specifically, the $37 million decline in adjusted EBITDA from [Q3 2022 to Q3 2023] was primarily due to the $50 million decline in 'Wholesale Gross Margin Including Forward Buy,' *i.e.* procurement gains."); Feinstein Reply Report, ¶¶ 47, 88, 91. *See also* UNFI Q3 2023 Earnings Conference Call Slides, June 7, 2023, p. 9.

[59] *See* Zurek Report, Section VIII.B.1.

26, 2023.[60]  Specifically, during the Q4 2023 earnings call, UNFI management stated that "the biggest driver for the decline in Q4 [2023] year-over-year profitability was lower levels of procurement gain opportunities resulting from decelerating inflation [which] resulted in a reduction in[] gross profit rate prior to the LIFO charge in both years of approximately 175 basis points or more than $100 million."[61]  Plaintiffs claim that this amount, $100 million, represents a lower bound for the amount of procurement gains a year prior, in Q4 2022.[62, 63] This estimate is derived from the Company's actual performance in Q4 2023, which had not occurred as of March 8, 2023.

c.  Plaintiffs arrive at their estimate of $125 million procurement gains for the first half of FY 2022 (Q1 2022–Q2 2022) based on the Company's FY 2024 financial guidance and by making two assumptions.[64]  First, the Company stated during the Q4 2023 earnings call that it "expect[s] [FY 2024] adjusted EBITDA to be in [the] $450 million to $550 million range … [which] primarily reflects approximately $125 million in lower anticipated procurement gains, primarily in [Q1 2023 and Q2 2023] resulting from the continued decline in the number of supplier price increases compared to the first half of [FY 2023]."[65]  Based on this,

---

[60] Complaint, ¶ 125.  *See also* Feinstein Reply Report, ¶ 120 (internal citations omitted) ("In the slide deck accompanying the conference call, the Company explained that 'Wholesale Gross Profit' declined by $94 million from Q4 2022 to Q4 2023, on account of 'reduced Wholesale procurement gains.'  This meant that procurement gains in Q4 2022 had been at least $94 million, or at least 44.1% of the reported $213 million in adjusted EBITDA earned in that quarter.  This $94 million quantification had never been disclosed to the market before.")

[61] UNFI Q4 2023 Earnings Call, p. 5.  According to the Q4 2023 earnings call presentation, UNFI's wholesale gross profit excluding the non-cash LIFO charge declined year-over-year by $94 million in Q4 2023.  *See* UNFI Q4 2023 Earnings Conference Call Slides, September 26, 2023, p. 10.

[62] *See* Complaint, ¶ 125 ("In the [Q4 2023] Press Release, Defendant Douglas stated that 'profitability declined primarily due to a decrease in inflation driven procurement gains and elevated shrink.'  During the [Q4 2023] earnings call held on September 26, 2023 (the '[Q4 2023] Earnings Call'), Defendant Howard stated that 'more than $100 million' of the year-over-year decline in gross profit in [Q4 2023] was attributable to 'lower levels of procurement gain opportunities resulting from decelerating inflation,' which revealed that [Q4 2022] procurement gains exceeded $100 million and constituted nearly 47% of adjusted EBITDA reported for [Q4 2022].").

[63] According to the Complaint, Plaintiffs also provide a separate lower bound for Q4 2022 procurement gains which is the portion of the reported (on September 26, 2023) year-over-year decline in Q4 2023 adjusted EBITDA (compared to Q4 2022) that "was primarily due to the $94 million decline in 'Wholesale Gross Margin exc[luding] LIFO,' which in turn was 'driven by [lower gross margin rate resulting from] reduced Wholesale procurement gains.'"  *See* Complaint, ¶ 130.

[64] *See* Complaint, ¶ 127.

[65] UNFI Q4 2023 Earnings Call, September 26, 2023, p. 6.  *See also* UNFI Q4 2023 Earnings Call, September 26, 2023, p. 8 ("[T]o put some numbers around that [FY 2023 to FY 2024] impact.  It's going to be about $125 million that we've, of course, factored into our guidance.  And most of that is going to be in the first 2 quarters of [FY 2024]

Plaintiffs claim that "procurement gains in the first half of [FY 2023] exceeded $125 million."[66] That is, Plaintiffs assume that the reduction in FY 2024 adjusted EBITDA guidance due to "lower anticipated procurement gains" represents the historical amount of procurement gains in the first half of FY 2023. This component of the calculation relies on the Company's disclosure in September 2023 of its anticipated performance in (guidance for) FY 2024. Second, Plaintiffs claim that "because the significant extent of procurement gains in the first half of [FY 2022] w[as] 'not repeatable' during [FY 2023], the procurement gains during first half of [FY 2022] must have [also] far exceeded $125 million."[67] Here, Plaintiffs appear to extrapolate their estimate of procurement gains in the first half of FY 2023 to the first half of FY 2022. That is, Plaintiffs claim that procurement gains in Q1 2023 and Q2 2023, estimated from the Company's FY 2024 financial guidance, provide a lower bound estimate for procurement gains in Q1 2022 and Q2 2022. However, Plaintiffs do not reconcile their claim with UNFI's statement that it had seen "an out-of-pattern increase in procurement gains beginning in January [2022, i.e., the last month of Q2 2022],"[68] which would seem to imply that procurement gains had not been "out-of-pattern" in Q1 2022.

37.    As discussed above, the Q3 2023 and Q4 2023 disclosures on June 7, 2023 and September 26, 2023, respectively, do not contain a direct disclosure by the Company of the impact of inflation-related forward buying on UNFI's gross margin in each of the prior quarters in the Proposed Class Period. Instead, they appear to be estimates and largely based on the difference between historical performance in the prior quarters and subsequent performance when inflation-related forward buying began to disappear due to changes in inflation and when other factors (e.g., shrink) also impacted UNFI's profitability. In other words, (i) the Company did not directly disclose the specific historical contribution of inflation-related forward buying on June 7, 2023 and September 26, 2023, and (ii) Plaintiffs' figures are estimates based on

---

as we cycle those gains that were still happening in the first half of [FY 2023]."). The Company appears to be saying that FY 2024 financial guidance reflects the loss of approximately $125 million in inflation-related forward buying opportunities that had been available in Q1 2023 and Q2 2023, but were not expected to be available in Q1 2024 and Q2 2024.

[66] Complaint, ¶ 127.
[67] Complaint, ¶ 127 (emphasis removed).
[68] UNFI Q4 2023 Earnings Call, p. 7.

differences in financial performance over time that do not, for example, appear to remove all relevant factors besides inflation-related forward buying such as shrink that could be responsible for the decline in performance.  Importantly, as explained below, information was available <u>as of March 8, 2023</u> that could also have been used to derive estimates of the impact of inflation-related forward buying generally in line with Plaintiffs' $275 million estimate.  In efficient markets, such information and its implications would have been incorporated into UNFI Securities prices following the March 8, 2023 disclosure.

38.    As discussed in the Zurek Report, in an efficient market, value-relevant implications of public information are incorporated into a security's price quickly after the information is released.[69]  This happens because, in an efficient market, investors gather and analyze information as it becomes available such that the information and its implications are rapidly incorporated in security prices.  In other words, in an efficient market, market participants routinely analyze publicly available information, including company disclosures, and consider the implications of publicly available information that are value-relevant and informative about a company's expected future cash flows and risks.[70]  Therefore, in an efficient market, security prices reflect all inferences that can be made from all publicly available information.[71]

39.    Assuming that Plaintiffs' allegations about the "extent" of inflation-related forward buying historically should be interpreted as requiring disclosure of the quantity of inflation-related forward buying historically and such information was value-relevant to the market, it would follow from Plaintiffs' allegations that, on and after March 8, 2023, to the extent it was relevant to the assessment of the value-implications of the Alleged Truth and other disclosures on that date, in an efficient market, market participants would have revised their assessments of the historical amount of inflation-related forward buying as well as the anticipated timing and magnitude of future losses of inflation-related forward buying opportunities.  Such revised assessments would incorporate all information that was publicly available at the time.

---

[69] *See* Zurek Report, Section VI.

[70] *See* Zurek Report, ¶ 41 ("Notably, the existence of an efficient market does not require all investors to access, analyze, and trade on publicly available information.  It is sufficient for some (potentially the most sophisticated) investors to identify and trade on newly disclosed public information such that it is rapidly reflected in market prices.").

[71] *See, e.g.*, Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2 (1970): 383–417.

40.     In the remainder of this section, I discuss examples of inferences that can be made based on the Company's disclosures on March 8, 2023 to assess the historical magnitude of gross margin gains from inflation-related forward buying. I provide examples of different possible assessments of the historical contribution of inflation-related forward buying, which generate estimates that are generally in line with the $275 million that Dr. Feinstein appears to claim was the historical magnitude of gains from inflation-related forward buying.[72] The analysis below illustrates that such inferences could have been made based on information that was already publicly available on March 8, 2023, and, therefore, would have been incorporated into the price of UNFI Securities following that date if the markets for UNFI Securities were efficient, as Plaintiffs allege and Dr. Feinstein opines.[73]

41.     First, on March 8, 2023, UNFI reported a year-over-year reduction in quarterly gross margin in Q2 2023 relative to Q2 2022 equal to 0.70 percentage points and attributed that reduction "primarily" to the loss of "significant" inflation-related forward buying opportunities that had benefited gross margin over the prior year.[74] Applying that full reduction in gross margin to UNFI's net sales[75] over the prior four fiscal quarters (i.e., from Q3 2022 to Q2 2023)[76]

---

[72] *See* Feinstein Reply Report, ¶¶ 42, 50.

[73] Complaint, ¶¶ 260, 263, 265; Feinstein Report, ¶¶ 18, 23.

[74] *See* Zurek Report, Section VIII.A.1; Exhibit 3. As noted in the Zurek Report, UNFI appears to report rounded figures in its Q2 2023 earnings release as UNFI reported gross margin of 14.0% for Q2 2023 compared to 14.8% for Q2 2022, and a year-over-year reduction of 0.80 percentage points. *See* UNFI Q2 2023 Earnings Release, p. 2.

[75] As discussed in the Zurek Report, gross margin is measured as "Gross profit as a percentage of Net sales." *See, e.g.*, UNFI 2022 10-K, pp. 11, 35, 53.

[76] This calculation assumes that the loss of "significant" inflation-related forward buying opportunities would continue beyond Q2 2023 as noted by the Company. *See, e.g.*, UNFI Q2 2023 Earnings Call, pp. 4–5 ("[O]ur expectation is that [Q3 2023 and Q4 2023] will also be adversely impacted by these declining inflation dynamics."). This is also consistent with data on consumer price inflation available as of March 8, 2023 that show year-over-year increases in the consumer price index ("CPI") for the period from February 2022 through January 2023 (i.e., during the period covering UNFI's Q3 2022 through Q2 2023) ranged between 6.3% and 9.0%. Note that inflation for the period from February 2023 through January 2024 ranged between 3.1% and 6.0%, highlighting a decelerated rate of inflation for that period. *See* Federal Reserve Economic Data *(FRED)*, Federal Reserve Bank of St. Louis (Consumer Price Index for All Urban Consumers: All Items in U.S. City Average (CPIAUCSL)). Moreover, analyst commentary following UNFI's Q2 2023 disclosures on March 8, 2023 also discussed that the loss of "significant" inflation-related forward buying opportunities would continue to impact UNFI's profitability beyond Q2 2023. *See, e.g.*, "Disappointing Q2F23, Guidance Lowered, Reducing F23/F24 Estimates," *Seaport*, March 9, 2023 ("The primary factor driving lower earnings during [Q2 2023] and over the next 12 months is the lapping of significant inventory gains from surging procurement inflation during [FY 2022]."); "United Natural Foods (UNFI) - Guidance Slashed as Inflation Decelerates…," *Wolfe Research*, March 8, 2023 ("The procurement headwinds are expected to persist through [FY 2023], which caused management to cut guidance (EPS down -28% at the midpoint) and widen the guided range of outcomes."); "UNFI: Downgrading to Neutral, Cutting Estimates; Proprietary Analysis Shows that Gross Margin Issues that Caused Q2 Earnings Miss Most Likely to Persist for Three More Quarters," *CL King*, March 9, 2023 ("We forecast that the quarterly sequential change in the year-over-year inflation differential will remain meaningfully negative for the next three quarters (through [Q1 2024]), which, based on the 56% correlation,

of $29.9 billion[77] yields an estimate of the impact on profitability (gross profit) of inflation-related forward buying of approximately $209 million.[78, 79]

42. Moreover, as discussed in the Zurek Report, UNFI management stated on March 8, 2023 that the price increases that had generated forward buying opportunities in prior quarters had decreased by two-thirds relative to Q2 2022 (i.e., implying that a third still remained),[80] implying that the year-over-year reduction in gross margin that UNFI disclosed in Q2 2023 understated the gross margin impact of a complete loss of any inflation-related forward buying opportunities over a full quarter. Thus, if, as an alternative, one were to assume that a complete loss of inflation-related forward buying opportunities would have led to a proportionately higher reduction in gross margin, then the implied impact on profitability of inflation-related forward buying would be approximately $314 million over the period from Q3 2022 through Q2 2023.[81] This is the same period over which Dr. Feinstein claims procurement gains amounted to $275 million.

43. Second, as another example of the implications that can be derived from the Company's disclosures, UNFI disclosed on March 8, 2023 a downward revision to its FY 2023 guidance. Specifically, the Company announced that FY 2023 adjusted EBITDA was guided to be in the range of $715–$785 million compared to the range of $850–$880 million it had previously disclosed on September 27, 2022 and previously reaffirmed on December 7, 2022,[82] a reduction of $115 million at the midpoint. I understand from UNFI's Q2 2023 disclosures that the revised

---

should have negative implications for gross margin performance through [Q1 2024].”); “The Path to Value Will Likely Take Time: Downgrade to Neutral,” *UBS*, March 13, 2023 (“UNFI is likely to face profitability headwinds in [the second half of FY 2023] as it cycles past ‘significant’ procurement gains.”).

[77] UNFI Q2 2023 Earnings Release, p. 6; UNFI FY 2022 Earnings Release, p. 6.

[78] $209 million = 0.70% * $29,863 million. Note that, if one assumes that the reconciliation line items from gross profit to adjusted EBITDA (e.g., operating expenses (excluding certain line items such as depreciation and amortization and LIFO charge) and expenses related to restructuring, acquisition, and integration) are held constant (i.e., not impacted by inflation-related forward buying opportunities), this estimate can also be viewed as an estimate of the impact on adjusted EBITDA.

[79] Similarly, if one uses the annualized Q2 2022 net sales ($7,416 million * 4) instead of UNFI's net sales from Q3 2022 through Q2 2023 to estimate the impact of inflation-related forward buying in this scenario, the impact would be approximately $208 million ($208 million = 0.70% * $7,416 million * 4). *See* UNFI Q2 2023 Earnings Release, p. 6.

[80] *See* Zurek Report, ¶ 57.

[81] $314 million = 0.70% * $29,863 million / (2/3). Similarly, if one uses the annualized Q2 2022 net sales ($7,416 million * 4) instead of net sales from Q3 2022 through Q2 2023 to estimate the impact of inflation-related forward buying in this scenario, the impact would be approximately $311 million ($311 million = 0.70% * $7,416 million * 4 / (2/3)). *See* UNFI Q2 2023 Earnings Release, p. 6.

[82] UNFI Q2 2023 Earnings Release, p. 3; UNFI FY 2022 Earnings Release, p. 3; UNFI Q1 2023 Earnings Release, p. 3. *See also* Zurek Report, ¶ 54.

FY 2023 guidance incorporated the loss of inflation-related forward buying opportunities that had occurred starting in January 2023[83] and that was expected to occur for the remainder of FY 2023 through July 2023. In other words, the guidance revision reflected loss of inflation-related forward buying over at most a seven-month period. Grossing up this reduction of $115 million proportionately to reflect impact of a full fiscal year[84] yields an impact on adjusted EBITDA of approximately $197 million.[85] To the extent UNFI's financial guidance for the remainder of FY 2023 still reflected some amount of inflation-related forward buying (given UNFI's statement that price increases had gone down by two-thirds rather than having disappeared entirely[86]) and some substitution of inflation-related forward buying for promotional forward buying (the two forms of forward buying that were described by UNFI as substitutes[87]), even larger estimates of the contribution of inflation-related forward buying can be inferred.

44.     As shown in the examples above, UNFI's March 8, 2023 disclosures imply estimates of the historical contribution of inflation-related forward buying that are generally in line with the $275 million that Dr. Feinstein appears to claim was the historical magnitude of gains from inflation-related forward buying.[88] Thus, if the markets for UNFI Securities were efficient as Dr.

---

[83] As discussed in the Zurek Report, ¶ 57, "the reduction in forward buying opportunities had only become apparent more recently (during the last month of [Q2 2023, which ended in January 2023]; i.e., earlier in the quarter those opportunities were still largely present)[.]"

[84] As discussed in footnote 76 above, this calculation assumes that the loss of "significant" inflation-related forward buying opportunities would continue beyond Q2 2023.

[85] $197 million = $115 million / (7/12).

[86] See Zurek Report, ¶ 57 ("UNFI's disclosures on March 8, 2023 further imply that the year-over-year reduction in gross margin that UNFI disclosed in Q2 2023 understates the gross margin impact of a complete loss of any inflation-related forward buying opportunities over a full quarter. This is because UNFI management noted that the price increases that had generated forward buying opportunities in prior quarters had decreased by two-thirds relative to Q2 2022 (i.e., a third still remained).").

[87] During the Q4 2023 earnings call, the UNFI CEO stated, "You've got really two things going on there. You've got actual price increase events, both the frequency and depth and then you have promotions. And we saw a decline in promotions while prices were going way up. What we expect to happen is that as price increase events decline, we expect promotions to come back, although they've done so very slowly." See UNFI Q4 2023 Earnings Call, p. 7.

[88] Dr. Feinstein claims that the "magnitude of procurement gains and the extent to which they had driven previously reported profits and profitability were not disclosed on [March 8, 2023], and remained undisclosed until September 26, 2023]." See Feinstein Reply Report, ¶ 42, citing to Complaint, ¶¶ 127, 132, and footnote 14. To support his claim, Dr. Feinstein points to the Complaint that states that "UNFI's belated disclosures revealed that there had been at least $275 million of abnormal procurement gains throughout [FY 2022] (i.e., at least $125 million in the first two quarters, at least $50 million in [Q3 2022], and at least $100 million in [Q4 2022]2])." See, e.g., Feinstein Reply Report, ¶ 42, citing to Complaint, ¶¶ 127, 132, and footnote 14; Feinstein Reply Report, ¶ 69, citing to Complaint, ¶¶ 213, 217. Dr. Feinstein also points to a Guggenheim report published on September 26, 2023 that commented on the total magnitude of the impact of inflation-related forward buying on gross margin, stating "the magnitude of the procurement gains [by the analysts'] estimate … totaled $250 million during [the second half of FY 2022/first half of FY 2023] and ha[s] shrunk to virtually nothing." See "UNFI - Cycling $250M of Procurement Gains While Transforming the Business—Lowering Our 2024 EBITDA Estimate by ~20%; Stay Neutral Rated,"

Feinstein claims, and if the historical contribution of inflation-related forward buying was value-relevant, these estimates would have been incorporated into the prices of UNFI Securities no later than March 8, 2023.

> **2.    Dr. Feinstein Fails to Establish That Economic Evidence Would Support a Finding of Price Impact After March 8, 2023 Under His View That Plaintiffs Allege That Additional Quantitative Disclosure Was Required**

45.    Dr. Feinstein appears to suggest that, if UNFI had further quantified the actual impact on its gross margin from inflation-related forward buying opportunities, on and after March 8, 2023 the market would have been more skeptical of the Company's publicly announced FY 2023 guidance, such that the market would have had a more muted reaction to UNFI's Q3 2023 and Q4 2023 disclosures on June 7, 2023 and September 26, 2023, respectively, because those developments would have been, at least to a degree, anticipated.[89]  However, this suggestion by Dr. Feinstein is pure conjecture and is not supported by any reliable analysis or evidence discussed in the Feinstein Reply Report.

46.    Establishing the existence of continuing price impact of the Challenged Statements after March 8, 2023 would require establishing that a hypothetical additional disclosure of the historical impact of inflation-related forward buying opportunities (that Dr. Feinstein says was not disclosed) would have caused the market to anticipate in advance UNFI's financial performance after March 8, 2023.  To do so, one would need to establish that the market would have assessed the value implications of the Company's financial guidance differently (and more pessimistically) based on (i) this disclosure Dr. Feinstein is claiming should have been made

---

*Guggenheim*, September 26, 2023.  As shown in this section, estimates based on UNFI's disclosures on March 8, 2023 are generally in line with the "magnitude of procurement gains and the extent to which they had driven previously reported profits and profitability [that] remained undisclosed until September 26, 2023." *See* Feinstein Reply Report, ¶ 42, citing to Complaint, ¶¶ 127, 132, and footnote 14.  Note that as discussed in the Zurek Report and in **Section III.D.2** below, the reported reasons for the year-over-year decline in adjusted EBITDA in Q3 2023 and Q4 2023 are also consistent with factors other than inflation-related forward buying, including shrink, changes in consumer spending, and weak recovery in supplier promotional activity.

[89] Feinstein Reply Report, ¶ 41 ("Plaintiffs contend that if the magnitudes of FY 2022 procurement gains had been disclosed rather than concealed by misrepresentations and omissions, the market would not have been as surprised by the deterioration of profits and profitability announced for [Q3 2023] and Q4 2023 on [June 7, 2023 and September 26, 2023] respectively"), ¶ 146 ("Plaintiffs do allege that had the full truth been told – including the scale and financial impact of procurement gains – the FY 2024 guidance would not have come as such a surprise to the market.").

compared to (ii) the actual disclosures on March 8, 2023. As discussed in the Zurek Report, by March 8, 2023 it was disclosed, among other things, that the revised FY 2023 guidance was being provided on the heels of a significant (70 bps impact to gross margin) decline in inflation-related forward buying opportunities, and statements by the Company that further negative impact was expected and that the Company had limited visibility into that impact.[90]

47.     Dr. Feinstein has not provided any reliable evidence to support his claim.  In fact, the economic evidence below indicates that the market already was discounting the Company's guidance, as demonstrated by analyst estimates.  In addition, as discussed in the Zurek Report,[91] analysts at Roth MKM stated on March 8, 2023 that they were "discouraged by the lack of visibility on costs and worr[ied] that even after the reset, the risk of over-earning remains."[92] Similarly, analysts at Wells Fargo stated on March 8, 2023 that "[g]iven management's admitted lack of visibility, [they] are taking [their FY] 2023 estimate to the low end of guidance."[93]

48.     **Exhibit 1** shows changes before and after the March 8, 2023 Q2 2023 earnings announcement in analyst estimates of UNFI's FY 2023 adjusted EBITDA relative to the Company's public financial guidance.  As shown in the exhibit, prior to the Q2 2023 disclosures, the average estimate across securities analysts covering UNFI ($861 million) was -0.5% lower than the midpoint of the public financial guidance by the Company ($865 million), with three analysts above and seven below the midpoint.  However, consistent with the notion that analysts discounted the Company's guidance following the Q2 2023 disclosures, all 10 analyst estimates after March 8, 2023 were lower than the midpoint of the revised FY 2023 adjusted EBITDA guidance ($750 million), with the average estimate ($732 million) being approximately 2.4% lower than the midpoint.

---

[90] *See* Zurek Report, ¶ 55 (internal citations omitted) ("In its Q2 2023 earnings release, UNFI reported gross margin of 14.0% for Q2 2023 compared to 14.8% for Q2 2022, a year-over-year reduction of 0.8 percentage points and attributed that reduction mostly to the loss of 'significant' inflation-related forward buying opportunities that had benefited gross margin over the prior year."), ¶ 60 ("[T]he Company 'expect[s] to see similar trends in profitability … for the remainder of the year, as [the Company] continue[s] to lap periods of significant benefits from procurement gains as price increase activity further decelerates.'"), ¶ 70 ("Even with these adjustments to their forecasts, securities analysts noted that the loss of procurement gains from inflation-related forward buying could further accelerate in subsequent quarters given concerns about management's limited visibility into the impact of inflation-related forward buying on its profitability.").

[91] Zurek Report, ¶ 70.

[92] "UNFI: Visibility Not There - Downgrade to Neutral," *Roth MKM*, March 8, 2023.  *See also* Zurek Report, ¶ 70.

[93] "UNFI: Q2 Disappoints as End of Historic Inflation Cycle Begins to Show Its Challenges," *Wells Fargo*, March 8, 2023.  *See also* Zurek Report, ¶ 70.

49.     In analyzing whether the Q3 2023 and Q4 2023 disclosures provide economic evidence consistent with a finding that the Challenged Statements continued to have price impact after March 8, 2023 under Dr. Feinstein's alternative definition of the allegedly concealed truth based on additional quantitative disclosure (as already explained in the Zurek Report, they do not under the Alleged Truth[94]), one would need to take into account that the disappointing results and financial guidance disclosed on those dates could reflect some combination of four potential factors:

    a.   The market's realization that its assessment of the Company's guidance was overly optimistic after March 8, 2023, and the extent this would have been anticipated had the Company disclosed what Dr. Feinstein claims it should have.

    b.   The materialization of previously disclosed risks that increased macroeconomic pressures from moderating inflation or deflation would reduce the benefits to profitability from inflation-related forward buying opportunities achieved in prior quarters.[95]

    c.   The materialization of previously known risks that UNFI's financial results and financial guidance would be realized below expectations due to UNFI's lack of visibility into its future performance due to legacy data management system limitations.[96]

    d.   Negative factors other than inflation-related forward buying, including the slower-than-expected return of supplier promotional forward buying and shrink.[97]

50.     As discussed in the Zurek Report, the reported reasons for the below-consensus financial results and financial guidance for FY 2023 and FY 2024 are consistent with factors (b), (c), and (d) above.[98]

51.     Thus, establishing that economic evidence would support a finding that the Challenged Statements continued to have price impact after March 8, 2023 under Dr. Feinstein's alternative

---

[94] *See* Zurek Report, Sections III.A, VIII.B.

[95] *See* Zurek Report, Section VIII.B.1.b)(1) regarding the Q3 2023 disclosures, and Section VIII.B.2.b)(1) regarding the Q4 2023 disclosures.

[96] *See* Zurek Report, Section VIII.B.1.b)(2) regarding the Q3 2023 disclosures, and Section VIII.B.2.b)(2) regarding the Q4 2023 disclosures.

[97] *See* Zurek Report, Section VIII.B.1.b)(3) regarding the Q3 2023 disclosures, and Section VIII.B.2.b)(3) regarding the Q4 2023 disclosures.

[98] Zurek Report, ¶ 74.

definition of the allegedly concealed truth would require establishing that factor (a) contributed to the disappointing reported financial results and announced financial guidance on June 7, 2023 and September 26, 2023.  Dr. Feinstein has not done this analysis or established that the market's assessment of the value-implications of the Company's financial guidance would have been more pessimistic on March 8, 2023 under the disclosure Dr. Feinstein claims should have been made than it was under the Alleged Truth.  Such a conclusion by Dr. Feinstein would appear to be inconsistent with the analysis, discussed above, showing that securities analysts were already discounting the Company's guidance following the March 8, 2023 disclosure.

52.    Moreover, Dr. Feinstein appears to mischaracterize analyst commentary following UNFI's Q3 2023 and Q4 2023 disclosures.[99]  Regarding the Q3 2023 disclosures, Dr. Feinstein claims that "the market learned from the [June 7, 2023] disclosures that the market's expectations for the Q3 2023 gross profit rate were inflated due to previously concealed outsized procurement gains in FY 2022"[100] and that "[a]nalysts expressed surprise at the severity of the negative impact that the subsiding of procurement gains had on the Company's performance."[101] While analysts may have been surprised by the Company's reported results, as discussed in the Zurek Report, the reported reasons for the below-consensus Q3 2023 financial results and the downward revision to FY 2023 financial guidance are consistent with factors (b), (c), and (d) described above.  Dr. Feinstein claims that "some analysts attempted to estimate the size, impact, and sustainability of procurement gains using available information" following the Q3 2023 disclosures, citing to a CL King report published on June 8, 2023.[102]  However, analysts at CL King already performed a similar analysis of the relationship between inflation and UNFI's quarterly gross margin in a report published on March 9, 2023 following the Q2 2023 disclosures,[103] consistent with the notion that in an efficient market, security prices reflect market participants' inferences regarding the value-relevant implications of all information that was publicly available at the time.

---

[99] See Zurek Report, Section VIII.B.1.b) regarding the Q3 2023 disclosures, and Section VIII.B.2.b) regarding the Q4 2023 disclosures.

[100] Feinstein Reply Report, ¶ 98.

[101] Feinstein Reply Report, ¶ 101.

[102] Feinstein Reply Report, ¶ 102.  See also "UNFI: Q3 Adjusted EBITDA in Line with Our Forecast, but Missed Consensus by 5%; FY23 Earnings Guidance Cut as Lower Inventory Holding Gains Persist," CL King, June 8, 2023.

[103] See "UNFI: Downgrading to Neutral, Cutting Estimates; Proprietary Analysis Shows that Gross Margin Issues that Caused Q2 Earnings Miss Most Likely to Persist for Three More Quarters," CL King, March 9, 2023.

53.     Regarding the Q4 2023 disclosures, Dr. Feinstein claims that analysts "were surprised by the unexpected scale of profit margin degradation and adjusted EBITDA, which the Company attributed to lapping prior quarters that had high levels of procurement gains."[104]  Dr. Feinstein also claims that the "market learned on [September 26, 2023] that adjusted EBITDA going forward would be far less than the market had expected due to the abatement of procurement gains."[105]  However, as I discussed above, the reported reasons for the below-consensus financial guidance are consistent with factors (b), (c), and (d) above.  Dr. Feinstein quotes a September 26, 2023 report by analysts at Guggenheim which stated that the analysts "continue[d] to be very surprised by the magnitude of the procurement gains [and by their] estimate, they totaled $250 million during [the second half of FY 2022/first half of FY 2023] and have shrunk to virtually nothing."[106]  While the Guggenheim report does not discuss how it arrived at that estimate,[107] the estimate itself is in line with the examples of estimates generated based on different possible assessments of the historical contribution of inflation-related forward buying implied by the Q2 2023 disclosures on March 8, 2023, as discussed in **Section III.E.1**.  Thus, the estimate in the Guggenheim report by itself is insufficient to demonstrate there was new, value-relevant information about the historical magnitude of inflation-related forward buying opportunities because similar estimates were implied by previously available public disclosures by UNFI.

---

[104] Feinstein Reply Report, ¶ 133.

[105] Feinstein Reply Report, ¶ 134.

[106] Feinstein Reply Report, ¶ 133.  *See also* "UNFI - Cycling $250M of Procurement Gains While Transforming the Business—Lowering Our 2024 EBITDA Estimate By ~20%; Stay Neutral Rated," *Guggenheim*, September 26, 2023; Zurek Report, ¶ 108.

[107] During the Q4 2023 earnings conference call, in response to one of the Guggenheim analysts questioning whether procurement gains "got up to $250 million to $300 million at the peak," UNFI management stated that "we saw an out-of-pattern increase in procurement gains beginning in January of [2022].  And that last year before the year-over-year disinflation started and that generated numbers in line with your estimates.  And that was the out-of-pattern part.  You've got really two things going on there.  You've got actual price increase events, both the frequency and depth and then you have promotions.  And we saw a decline in promotions while prices were going way up.  What we expect to happen is that as price increase events decline, we expect promotions to come back, although they've done so very slowly.  But as we look forward and we see units continuing to be soft, the consumer to be stressed and inflation now returning to lower levels.  We definitely expect consumer products companies to start promoting more.  They'll need to in order to drive sales."  *See* UNFI Q4 2023 Earnings Call, p. 7.

**IV.    Dr. Feinstein Still Fails to Provide a Class-Wide Methodology Capable of Measuring Damages for Members of the Proposed Class in a Manner Consistent with Plaintiffs' Theory of Liability**

      **A.    Dr. Feinstein's Claim That I Questioned Whether Out-of-Pocket Damages, as a Definitional Concept, Are Consistent with Plaintiffs' Theory of Liability Is False and Misleading**

54.    Dr. Feinstein states that I "question[ed] whether the out-of-pocket damages methodology is consistent with the Plaintiffs' theory of liability in the instant matter."[108]  I opined nothing of the sort, and Dr. Feinstein fails to identify any statement to that effect in the Zurek Report or in my deposition.  Instead, I explained that "'out-of-pocket' damages and inflation are definitional concepts that must ultimately be calculated using some methodology,"[109] and that Dr. Feinstein has not identified such methodology for UNFI Securities "beyond his high-level assertions regarding the use of an event study and 'commonly used' valuation tools."[110]  Indeed, describing the out-of-pocket damages formula as a methodology is equivalent to saying that one will calculate the difference between actual and but-for prices of UNFI Securities using the difference between actual and but-for prices of UNFI Securities.  It is a tautology without having articulated a reliable methodology to perform the calculation.

55.    Ultimately, I understand that whether out-of-pocket damages are the relevant damages measure that would be appropriate to apply in this case is a legal question, and it would be inappropriate for me or Dr. Feinstein to opine on a legal question.  It is the case, however, that, as an economic matter, Dr. Feinstein has not articulated a methodology to calculate such out-of-pocket damages.

      **B.    Dr. Feinstein Creates a Strawman Version of My Criticism That He Has Provided No Specificity Regarding the Damages Methodology That He Would Use Here, and Fails to Meaningfully Address My Actual Criticism**

56.    Dr. Feinstein asserts that I "apparently would be unsatisfied with any description of the damages methodology that is unaccompanied by the completed analysis"[111] and that "the degree

---

[108] Feinstein Reply Report, ¶ 153.
[109] Zurek Report, ¶ 116.
[110] Zurek Report, ¶ 118.
[111] Feinstein Reply Report, ¶ 158.

of specificity Dr. Zurek desires about how hypothetical complexities that potentially may be encountered would be handled cannot be provided until damages are actually computed."[112]  This is a strawman argument and does not accurately describe my opinion.

57.    As reflected in the Zurek Report,[113] I understand that Plaintiffs and Dr. Feinstein are not required to actually calculate damages at this stage in the litigation, and nowhere in the Zurek Report or my deposition do I state that Dr. Feinstein has failed to perform such calculation. Instead, my understanding is that Plaintiffs are required instead to provide a methodology that would, in the future, reliably calculate damages on a class-wide basis consistent with Plaintiffs' theory of liability.  That is what Dr. Feinstein has failed to do.  He provides no specificity at all in the Feinstein Report or the Feinstein Reply Report as to the methodology that he would utilize in this matter.  Nor does he explain how and why any such hypothetical methodology could be reliably applied to the specific facts of this case.  Thus, even putting aside whether Dr. Feinstein needed to have developed a methodology at this stage, it is not even possible to evaluate from his generic discussion whether it will be possible, at a later stage, to calculate damages on a class-wide basis consistent with Plaintiffs' theory of liability using *any* methodology.  As I stated in my deposition:

> [M]y general high-level understanding of the legal standard is that plaintiffs are required to proffer a damages model [and that] is distinct from doing an actual specific damages calculation, so saying what damages would be per share based on when different investors bought and sold, which is in my experience done at the merit[s] stage….  I understand that there is a legal requirement with respect to damages.  And what I'm opining on is what's in my report, but it's effectively that I reviewed what Dr. Feinstein did in his report, and he has not articulated, in my opinion, from the perspective of an economist[,] a damages methodology.[114]

58.    In the Zurek Report, I identified from Plaintiffs' allegations in the Complaint several specific complexities that are present in this case (as Dr. Feinstein could have easily done as well without any reliance on, for example, discovery material) and for which Dr. Feinstein provided no specificity as to what methodology he would use to account for them and why such a hypothetical methodology would reliably work.  For example, I explained that Dr. Feinstein

---

[112] Feinstein Reply Report, ¶ 58.
[113] *See* Zurek Report, ¶¶ 117, 121.
[114] Deposition of Paul Zurek, Ph.D., dated August 5, 2025 ("Zurek Deposition"), 92:4–18.

"failed in particular to provide a methodology that can measure stock price inflation, if any, from under-disclosed risks regarding the impact of inflation-related forward buying on UNFI's gross margin."[115]  As discussed below, Dr. Feinstein still fails to address any of those complexities in a meaningful way and simply asserts, without economic basis, and claims, based purely on his say-so, that he will be capable of addressing them at a later stage.

###### C.    Dr. Feinstein Has Not Meaningfully Addressed My Opinion That He Has Not Identified a Damages Methodology for UNFI Common Stock

59.    In the Feinstein Reply Report, Dr. Feinstein essentially repeats the generic arguments from the Feinstein Report.  Specifically, he reiterates that he will use the "out-of-pocket damages methodology"[116] incorporating "the same procedures and valuation tools that analysts applied and described in their reports when they valued UNFI" and "event study results to see precisely how the UNFI Securities' prices changed when corrective disclosures occurred."[117]  However, as explained in the Zurek Report, this falls short of providing a damages methodology consistent with Plaintiffs' theory of liability.  Indeed, in the Feinstein Reply Report and in response to the Zurek Report, Dr. Feinstein makes several claims regarding the analysis of damages in this matter that demonstrate his lack of having provided an actual methodology.

60.    *First*, rather than offering specific solutions to address my criticisms, the only assurance Dr. Feinstein provides that he will be able to calculate damages using these tools is that "valuations under alternative scenarios of the sort necessary to compute but-for prices and artificial inflation, are routinely conducted every day, by legions of financial analysts, for virtually every publicly traded security."[118]  But this claim is misleading.  Even a cursory review of analyst reports shows that the valuations provided by analysts do not necessarily match security prices at the time the analyst reports are issued.  But matching hypothetical security prices that would have prevailed assuming the Challenged Statements were allegedly false and misleading is a necessary input when calculating inflation.  For example, following the Q2 2023 disclosures, UNFI's share price closed at $29.47 on March 8, 2023, and five analysts issued

---

[115] Zurek Report, ¶ 14.
[116] Feinstein Reply Report, ¶ 149.
[117] Feinstein Reply Report, ¶ 151.
[118] Feinstein Reply Report, ¶ 157.

reports on the same day with price targets of $28, $28, $30, $34, and $35, respectively, some greater and some lower than the closing price on that date.[119]  Thus, the valuation parameters used by analysts are not guaranteed to (and in fact may not) coincide with the valuation parameters that one would need to estimate in order to calculate but-for prices that would have hypothetically prevailed in the market.  As explained in the Zurek Report, to establish that a methodology exists to calculate damages, Dr. Feinstein would need to show that there is a methodology to "estimat[e] various valuation model parameters that would have been consistent with market expectations had the alleged proper disclosures been made."[120]  Dr. Feinstein still has not shown that such a methodology exists.

61.  *Second*, Dr. Feinstein offers a stylized example of how he would handle confounding information, but describes no specific methodology to quantify the effect of confounding information even within that example, which illustrates his lack of having provided a methodology.  Specifically, he provides an example where, out of a $35 per share stock price decline, he attributes $4 to market and industry effects based on an event study, and $1 to "a fire destroy[ing] a company factory" based on purported "valuation analysis."[121]  He then claims that, given that the factory fire was confounding information, an "event study in concert with additional valuation analysis finds that the fraud removed $30 per share of artificial inflation."[122]  While his example describes the final arithmetic step of removing confounding information, nowhere does he provide any specifics as to what methodology he would use to calculate the valuation effect of "a fire destroy[ing] a company factory" of $1 and why that methodology would be reliable.  In fact, this example illustrates the very issue with his claims about a damages methodology in this case—that he has not actually articulated a methodology that can be implemented in practice and applied to the circumstances of this case.

62.  *Third*, Dr. Feinstein conjectures without any analytical support that the analysis of UNFI stock price inflation from allegedly understated risks would eventually be "straightforward."  Dr. Feinstein asserts that "the specific information that Plaintiffs allege investors were deprived of in

[119] "Lowering Target Price Following Profit Reset; Risks Remain," *BMO*, March 8, 2023; "UNFI: Q2 Disappoints as End of Historic Inflation Cycle Begins to Show Its Challenges," *Wells Fargo*, March 8, 2023; "Margin Profile Reset Lower; Reiterate Neutral," *Goldman Sachs*, March 8, 2023; "UNFI: Visibility Not There - Downgrade to Neutral," *Roth MKM*, March 8, 2023; "Sour Systems Spoil the Quarter," *Deutsche Bank*, March 8, 2023.
[120] Zurek Report, ¶ 128.
[121] Feinstein Reply Report, ¶ 184.
[122] Feinstein Reply Report, ¶ 184.

this case, which would inform analysts and investors as to how much of the Company's FY 2022 and [FY] 2023 EBITDA was likely nonrecurring income rather than recurring, fits neatly into the valuation models analysts presented into [*sic*] their published reports.  The valuation exercise necessary to compute the but-for prices in the instant case appears to be straightforward."[123] However, other than his own conclusory assertion, he provides no analytical support for this claim.

63.    Dr. Feinstein also fails to explain what methodology he would use to evaluate how the revelation of the allegedly concealed truth would translate into changes in "analysts['] and investors[' assessment] as to how much of the Company's FY 2022 and [FY] 2023 EBITDA was likely nonrecurring income rather than recurring."[124]  He fails to identify which "valuation models analysts presented into [*sic*] their published reports"[125] he would choose and the methodology he would follow to make that choice.  Further, entirely absent from his discussion is the complexity that how the market would have reacted to a revelation of the extent of inflation-related forward buying would depend on (i) market expectations as to how long inflation was expected to last, and (ii) how those expectations would have evolved over time during the Proposed Class Period.  Thus, it is speculative for Dr. Feinstein to label the analysis of UNFI stock price inflation from allegedly understated risks as "straightforward."[126]

64.    *Fourth*, Dr. Feinstein dismisses the need to provide an actual methodology to take into account allegations of understated risks by pointing to the possibility that UNFI residual declines from an event study could turn out, in some circumstances, to measure inflation from understated risks.  However, he does not analyze the likelihood that such circumstances actually describe those of the current litigation.  Dr. Feinstein does not dispute that, all else being equal, valuation effects of risk disclosures differ from valuation effects of risk materializations.  Instead, he appears to claim that it is premature to consider that issue because it is possible that the risk was 100% certain to materialize,[127] or because the market's perceptions of the potential distribution of risk outcomes earlier in the Proposed Class Period may have been different from the market's

---

[123] Feinstein Reply Report, ¶ 176.
[124] Feinstein Reply Report, ¶ 176.
[125] Feinstein Reply Report, ¶ 176.
[126] Feinstein Reply Report, ¶ 176.
[127] Feinstein Reply Report, ¶ 172 ("Investors may have fully anticipated the poor performance and guidance announcements that occurred in this case if there were no misrepresentations and omissions.").

perceptions of the potential distribution of risk outcomes later in the Proposed Class Period such that the valuation effect of the materialization of risk later in the Proposed Class Period would understate the valuation effect from the risk disclosure earlier in the Proposed Class Period, leading to a conservative calculation.[128] But hoping that fact discovery will turn out in such a way that the analysis of inflation may be simple falls short of identifying a methodology that can handle the potential complexities that fact discovery may reveal. While Dr. Feinstein may hypothetically be able to avoid the issue I identified in the Zurek Report if the probability of the risk materializing is ultimately determined to be 100%, he would need some methodology (that he has not articulated) if the probability of the risk materializing is any number lower than 100% (e.g., 50% or 80%).

65.    _Finally_, Dr. Feinstein states that "Dr. Zurek's concerns for the potential adjustments to the inflation ribbon to accommodate valuation complexities acknowledge the existence of the damages methodology and that it would be commonly applied for all Class members."[129] My understanding is that a damages methodology must not only be class-wide but also consistent with Plaintiffs' theory of liability. A methodology that does not comport with Plaintiffs' allegations is not a valid methodology as an economic matter even if it is class-wide. With respect to whether a methodology is class-wide, there is an additional complication here that Dr. Feinstein does not address. Purchasers after March 8, 2023 would have purchased at a price that incorporated the information that inflation-related forward buying opportunities were significant historically but were not repeatable and that the Company was guiding the market about its future performance in light of also having disclosed that it lacked desired visibility. There is a risk that applying some class-wide, but unspecified, methodology to all members of the proposed class, including those who purchased after March 8, 2023, may overcompensate the later purchasers by effectively providing them with insurance against negative outcomes despite the relevant risks (e.g., knowledge of the disappearance of inflation-related forward buying opportunities and management's lack of visibility into its future performance due to legacy data management system limitations) being publicly known and incorporated in the stock price. This is why an ex-ante articulation of a methodology (and not just conclusory statements that any

---

[128] Feinstein Reply Report, ¶ 173 ("Analysis and the application of generally accepted valuation principles may indicate that investors would have forecasted a worse outcome than what ultimately did occur….").
[129] Feinstein Reply Report, ¶ 161.

complications can be dealt with later on) is particularly important in this case for an economist to be able to conclude that class-wide damages can be calculated consistently with Plaintiffs' alleged theory of liability.

> **D.      Dr. Feinstein Fails to Address My Criticisms of His Option Damages Approach and Appears to Wrongly Claim That But-For Volatility, a Critical Input to the Calculation of Damages, Is Somehow Observable**

66.      In the Feinstein Reply Report, Dr. Feinstein claims that "it is always possible to compute option damages, commonly for all option investors, with the out-of-pocket damages methodology."[130]  However, he does not provide any analysis to support this far-reaching assertion.  For the reasons provided in the Zurek Report and further discussed in the prior section, Dr. Feinstein has failed to provide a methodology to reliably measure inflation, if any, in the price of UNFI stock, which is a key input to the calculation of option damages.[131]  In addition, as discussed in the Zurek Report and further below, even after reviewing the Feinstein Reply Report, it is still my opinion that Dr. Feinstein has failed to provide a methodology to estimate but-for volatility, a critical input to the calculation of option damages.

67.      Dr. Feinstein recognizes that "[t]he [option pricing] formula also calls for a stock volatility parameter that takes into account all of the information concealed by the alleged misrepresentations and omissions."[132]  This means that the but-for option price calculation requires a volatility input under a hypothetical assumption of no alleged concealment of information by UNFI.  The discussion of option damages in the Feinstein Report included no discussion of a methodology that could be used to quantify but-for volatility.  In the Feinstein Reply Report, Dr. Feinstein claims that if "evidence of changing volatility is encountered, for example, the indicated changed volatility will be incorporated into the but-for option valuation" and that "[t]he out-of-pocket damages methodology would neatly and commonly accommodate it."[133]  However, he does not articulate how he will determine whether there is "evidence of changing volatility" and how "changed volatility will be incorporated."  His opinion that a

---

[130] Feinstein Reply Report, ¶ 196.
[131] Zurek Report, ¶ 15.
[132] Feinstein Reply Report, ¶ 190.
[133] Feinstein Reply Report, ¶ 24.

methodology would "neatly and commonly accommodate it" is simply Dr. Feinstein's unsupported say-so.

68.    Dr. Feinstein claims that "[t]o the extent that corrective disclosures change this volatility parameter, that change is observable and can be incorporated into the option valuation formula."[134]  He appears to be suggesting, wrongly, that but-for volatility is observable from calculations of implied volatility in publicly available databases.  However, but-for implied volatility is not observable even if actual volatility is—in the same way that but-for stock prices cannot be obtained from the publicly published historical prices.  For example, as discussed in the Zurek Report, but-for volatility would depend on the market's assessment of the allegedly understated risks arising from a hypothetical disclosure of inflation-related forward buying opportunities being a significant but temporary driver of UNFI's gross margin.[135]  But, Dr. Feinstein has not explained how he will measure but-for volatility based on the market's hypothetical assessment of the allegedly understated risks given a hypothetical earlier disclosure of allegedly concealed information.

69.    Dr. Feinstein also appears to suggest that "[a] post-disclosure implied volatility is the market's requisite assessment of volatility accounting for full disclosure."[136]  But he has no basis for this claim, and there are a number of reasons why this would not be the case, as discussed in the Zurek Report.[137]  To purportedly support the use of "post-disclosure implied volatility," Dr. Feinstein states:

> In the instant case, ignorance was not bliss.  Had the market known how much of the Company's profits were recurring and how much were non-recurring because they derived from unsustainable procurement gains, the market would have been better able to forecast future profits and profitability, not less able.  Investors would have had more confidence in their forecasts.  In fact, throughout the [Proposed] Class Period, investors clamored for more transparency from the Company, not less.  With more transparency and less uncertainty, the volatility parameter for the but-for scenario would not have been greater than it was both

---

[134] Feinstein Reply Report, ¶ 25.
[135] Zurek Report, ¶¶ 140–146.
[136] Feinstein Reply Report, ¶ 191.
[137] Zurek Report, ¶¶ 140–146.

pre- and post-disclosure, but rather would have been consistent with the observed post-disclosure implied volatility.[138]

70.    Again, this amounts to unsupported speculation.  First, Dr. Feinstein does not explain why it would be relevant to the assessment of but-for volatility whether "the market would have been better able to forecast future profits and profitability" absent the alleged misrepresentations. The relevant question in assessing but-for volatility is not whether the market's forecast of future profits and profitability would have been more accurate, or closer to the actual outcome (i.e., more accurate *ex post*).  Instead, the relevant question is whether the market's forecast on each day of the Proposed Class Period (i.e., *ex ante*) would have reflected a more volatile distribution of future outcomes absent the alleged misrepresentations than in the actual world given the allegation of understated risks.  Second, Dr. Feinstein provides no support for his claim that "[i]nvestors would have had more confidence in their forecasts"[139] absent the alleged misrepresentations.  He does not demonstrate why a disclosure of allegedly understated risks regarding UNFI's gross profit would have led investors to have "more confidence in their forecasts."  Third, Dr. Feinstein provides no support for his assertion that "[w]ith more transparency and less uncertainty, the volatility parameter for the but-for scenario … would have been consistent with the observed post-disclosure implied volatility."[140]  Dr. Feinstein does not explain how a disclosure of allegedly understated risks regarding UNFI's gross profit would have led to the same level of expected volatility as the disclosure of the materialization of those risks.[141]

---

[138] Feinstein Reply Report, ¶ 194.

[139] Feinstein Reply Report, ¶ 194.

[140] Feinstein Reply Report, ¶ 194.

[141] For example, according to the data on UNFI options obtained from Dr. Feinstein's backup materials that he produced with the Feinstein Report, the median (average) implied volatility across UNFI call and put options on December 6, 2022 (the first trading day preceding the first Alleged Corrective Disclosure, i.e., the day before Plaintiffs allege any of the allegedly concealed truth was revealed) was 47% (56%), while the median (average) implied volatility on September 27, 2023 (the first trading day following the last Alleged Corrective Disclosure, i.e., the day after Plaintiffs allege all of the allegedly concealed truth was revealed) was 52% (58%).  *See* UNFI_FEINSTEIN_016778.  That is, the post-disclosure median (average) implied volatility across UNFI call and put options was *higher* than the median (average) implied volatility before any Alleged Corrective Disclosures.  To the extent that Dr. Feinstein plans to use "the observed post-disclosure implied volatility" as the but-for volatility to compute option damages, he does not explain why "more transparency and less uncertainty" would have led to *higher* post-disclosure volatility compared to pre-disclosure.  Moreover, Dr. Feinstein's data on UNFI options also show that implied volatility for UNFI options changed around each Alleged Corrective Disclosure, and that the changes varied in both magnitude and direction across options.  *See* UNFI_FEINSTEIN_016778.  Dr. Feinstein does not explain why "more transparency and less uncertainty" would have impacted post-disclosure volatility compared

## V.    Other Mischaracterizations of My Opinions by Plaintiffs and Dr. Feinstein

### A.    Dr. Feinstein Mischaracterizes the Zurek Report to Misleadingly Claim That Price Impact Before March 8, 2023 Is "Undisputed"

71.    Dr. Feinstein misleadingly claims that it is "undisputed" that the Challenged Statements impacted the prices of UNFI Securities prior to March 8, 2023.[142]  In the Feinstein Reply Report, Dr. Feinstein claims that "Dr. Zurek *acknowledges* and does not challenge that corrective disclosures on [December 7, 2022 and March 8, 2023] reasonably caused or contributed to the statistically significant UNFI stock price declines that occurred on those days [and thus,] he does not challenge that the alleged misrepresentations and omissions impacted the prices of the UNFI Securities prior to and on those days."[143]  These claims mischaracterize the Zurek Report.

72.    As stated in the Zurek Report, I was asked to "assess economic evidence regarding the impact, if any, of the actionable alleged misrepresentations … on the prices of UNFI [Securities] *following the alleged corrective disclosure on March 8, 2023*, assuming those securities traded in efficient markets."[144]  I was not asked to analyze whether there is economic evidence of price impact of the Challenged Statements prior to the March 8, 2023 Alleged Corrective Disclosure. Dr. Feinstein acknowledged this in his second deposition.[145]

73.    As I explained at my deposition, additional analysis would be required to analyze whether there is economic evidence of price impact of the Challenged Statements prior to the

---

to pre-disclosure volatility differently for different options, or how he would reconcile different magnitudes and directions of implied volatility changes with his proposed option damages approach.

[142] *See* Feinstein Second Deposition, 76:13–18 ("Q.  Correct.  And so as he sets forth the scope of his assignment, it does not include evaluating price impact on December 7, 2022, or March 8, 2023, correct?  A.  That's right."), 76:23–77:6 ("Q.  [I]t's correct to say that he simply doesn't address it because it wasn't within the scope of his assignment, correct?  A.  That makes it undisputed, yes.  Q.  Those are your words, sir, but … the fact is it wasn't within the scope of his assignment, correct? … A.  That's right.").

[143] Feinstein Reply Report, ¶ 16 (emphasis added).

[144] Zurek Report, ¶ 5.a (emphasis added).

[145] *See* Feinstein Second Deposition, 74:11–18 ("Q.  [E]valuating price impact on December 7, 2022, or March 8, 2023, was not part of Dr. Zurek's assignment … as defined in the Zurek Report, correct?  A.  Right."), 73:15–19 ("Q.  Okay.  So Dr. Zurek offers no opinion about the price impact or lack thereof of the [December 7, 2022 and March 8, 2023] disclosures, correct?  A.  It seems that way."), 76:13–18 ("Q.  Correct.  And so as he sets forth the scope of his assignment, it does not include evaluating price impact on December 7, 2022, or March 8, 2023, correct?  A.  That's right."), 76:23–77:6 ("Q.  [I]t's correct to say that he simply doesn't address it because it wasn't within the scope of his assignment, correct?  A.  That makes it undisputed, yes.  Q.  Those are your words, sir, but … the fact is it wasn't within the scope of his assignment, correct? … A.  That's right.").

March 8, 2023 Alleged Corrective Disclosure.[146]  Such analysis could include, for example, an examination of public information regarding the impact of inflation-related forward buying on UNFI's profitability that was publicly available before March 8, 2023, and comparing the known information to the Alleged Truth to ascertain the extent to which the Alleged Truth was publicly available as of different points in time.  Even to the extent the Alleged Truth was not publicly available, the value-relevance of its omission would need to be assessed.  I have not performed a comprehensive analysis of this in preparing the Zurek Report because it was outside the scope of my assignment.

74.     Furthermore, Dr. Feinstein claims that it is undisputed that the Challenged Statements caused changes in the prices of UNFI Securities at the time they were made, that is, on the "front-end," because "that's what was alleged, and nobody has disputed it."[147]  When asked whether he performed any analysis to support this opinion, Dr. Feinstein stated that "[he] as well as Dr. Zurek saw there was a statistically significant [stock price] increase on the first date of the [Proposed Class Period, which is] consistent with this conclusion."[148]  However, from an economic perspective, a finding of a statistically significant positive residual return following an alleged misrepresentation alone is insufficient to reliably establish price impact of the alleged

---

[146] In response to the question whether I "have an opinion on whether the March 8, 2023, disclosure had a price impact," I stated at my deposition (Zurek Deposition, 64:13–65:10 (emphasis added)):

> So price impact necessarily implies the impact of corrective information that is corrective.  ***I have not performed an analysis to determine whether prior to [March 8, 2023] the market was, in fact -- in the absence, plaintiffs alleged that certain information was undisclosed.  Whether that had price impact prior to March 8, 2023, is -- is a question that is -- that I have not analyzed at this point***.  And so it's -- without that, it's impossible to tell whether the decline on [March 8, 2023] was due to corrective information, right, or whether it was due to materialization of risks that were already known to the market.  ***There would be additional analysis to be able to make that – require[d] to make that determination***.  What I can say is that after [March 8, 2023,] after that disclosure, in an efficient market there would be no further price impact.

[147] Feinstein Second Deposition, 50:9–14.  Specifically, Dr. Feinstein stated during his second deposition (Feinstein Second Deposition, 49:16–50:24):

> Q. In reaching the opinions that you do on price impact, you did not conclude that there was a front-end price increase from the alleged misrepresentations, correct?
> A. I think there was.…  I'm of that opinion.  It's not one that I'm proffering at the moment, but I'm of that opinion.  I mean, it was alleged.  [Dr. Zurek] had the opportunity to address it, and he didn't.  It's indisputed [*sic*].  It's an undisputed allegation.  So I'm of that opinion.  It's not one that I wrote up as one of my conclusions in this report.

[148] Feinstein Second Deposition, 51:4–8.

misrepresentation.[149]  Without further analysis, such a claim is unsupported.  For example, and at a minimum, Dr. Feinstein would need to analyze whether the statistically significant positive UNFI stock residual return was caused by confounding information as opposed to the statement at issue.

### B.    Dr. Feinstein Mischaracterizes My Opinions and Falsely Claims That I Inappropriately Opined That Defendants Disclosed All They Could

75.    Dr. Feinstein falsely claims that I reached an opinion that "UNFI lacked visibility into the magnitude of its procurement gains due to limitations in its legacy data management system, and thus the Company possessed no additional information to reveal"[150] as of March 8, 2023, and states that "Dr. Zurek's assertion is not economic analysis, but rather is simply an inappropriate rejection of Plaintiffs' factual allegations."[151]  As purported support for his claim, he points to ¶¶ 88–89 in the Zurek Report.

76.    Dr. Feinstein mischaracterizes my opinions.  Even a cursory inspection of ¶¶ 88–89 in the Zurek Report shows that what I stated in those paragraphs, in the context of analyzing UNFI Securities price changes on June 7, 2023, is that "[t]he impact of limited visibility into UNFI's future performance due to legacy data management system limitations [disclosed on June 7, 2023] is consistent with the materialization of a risk disclosed on March 8, 2023."[152]  Nowhere in the Zurek Report do I offer any opinion as to the accuracy of Plaintiffs' "factual allegations," and I am not offering such opinions now either.

77.    In the same paragraph of the Feinstein Reply Report in which Dr. Feinstein incorrectly claims that I reached an opinion that "UNFI lacked visibility into the magnitude of its procurement gains due to limitations in its legacy data management system, and thus the Company possessed no additional information to reveal,"[153] Dr. Feinstein goes on to state that "Plaintiffs specifically allege that Defendants 'were aware of and had visibility into UNFI's

---

[149] *See, e.g.*, Zurek Deposition, 40:22–24 ("Again, I would add just like for the [Alleged Corrective Disclosure dates], this does not demonstrate that there was price impact as following the March 8 disclosure."), 37:25–38:4 ("Importantly [a statistically significant residual return] does not demonstrate price impact.  That requires further analysis.  All this states is that the price movement on that date was statistically distinguishable from zero.").
[150] Feinstein Reply Report, ¶ 70.
[151] Feinstein Reply Report, ¶ 70.
[152] Zurek Report, ¶ 88.
[153] Feinstein Reply Report, ¶ 70.

undisclosed 'substantial' 'strategic' forward buying during the [Proposed] Class Period."[154]  Dr. Feinstein's description of Plaintiffs' allegations is in fact consistent with the Alleged Truth addressed in the Zurek Report that "inflation-related forward buying opportunities had been a significant but temporary driver of improvements in UNFI's gross margin."[155]

### C.    Plaintiffs' Criticism of My Analysis of the "Title or Lead Paragraph" of Analyst Reports Is Misleading and Mischaracterizes My Analysis

78.    Plaintiffs claim that "Dr. Zurek misleadingly focuses only on the 'title or lead paragraph' of analyst reports and concludes that analysts already understood from the [March 8, 2023] disclosure that the loss of procurement gains would impact UNFI, and even 'accelerate,' during the rest of 2023."[156]  Plaintiffs appear to imply that I somehow disregarded the totality of analyst commentary to reach my conclusion that "the Alleged Truth that inflation-related forward buying had been a significant but temporary driver of improvements in UNFI's gross margin during the Proposed Class Period was publicly available information by March 8, 2023."[157]

79.    That is false.  In reaching my overall conclusions, I took into account the totality of analyst commentary following the Alleged Corrective Disclosures.  For example, in discussing analyst reactions to the Q2 2023 disclosures, I referenced in Exhibit 4 of the Zurek Report analyst commentary on inflation-related forward buying and procurement gains following the Q2 2023 disclosures, examples of which are included in ¶¶ 65–67 of the Zurek Report.  These quotes are not just taken from titles and lead paragraphs.[158]  Instead, they reflect quotes from a

---

[154] Feinstein Reply Report, ¶ 70.

[155] Zurek Report, ¶ 28.

[156] Plaintiffs' Reply, footnote 12.

[157] Zurek Report, ¶ 10.

[158] In Exhibit 4 of the Zurek Report, I provided sample analyst commentary from 12 contributors (14 analyst reports in total), and I included at least one quote that is not taken from titles or lead paragraphs from reports published by each of the 12 contributors. *See, e.g.*, "The Bottom Falls Out; Moderating Inflation Drives Significant Gross Margin Miss, Largely Contained to Non-Perishables; Remain Neutral," *BTIG*, March 8, 2023 ("Put simply, UNFI benefited from strategically purchasing inventory (mostly non-perishables) ahead of scheduled price hikes over the past 12-18 months, and is now lapping those gains."); "Margin Profile Reset Lower; Reiterate Neutral," *Goldman Sachs*, March 8, 2023 ("Gross margin declined -70 bps y/y to 14.0% primarily due to elevated procurement gains in the prior year related to inventory buying ahead of rising inflation, which is not repeatable in the current disinflationary environment while management noted limited visibility previously given legacy digital infrastructure."); "UNFI: Q2 Disappoints as End of Historic Inflation Cycle Begins to Show Its Challenges," *Wells Fargo*, March 8, 2023 ("Given management's admitted lack of visibility, we are taking our [FY 2023] estimate to the low end of guidance. We project a decline in [FY 2024] earnings, which incorporates the full lap of the procurement gains."); "The Path to Value Will Likely Take Time: Downgrade to Neutral," *UBS*, March 13, 2023 ("UNFI is likely to face profitability headwinds in [the second half of FY 2023] as it cycles past 'significant' procurement gains.").

review of the full text of available analyst reports.[159]  The same is true for my summaries of analyst commentary following UNFI's Q3 2023 and Q4 2023 disclosures.[160]

80.    Plaintiffs point to ¶¶ 69–70 of the Zurek Report as purported support for their claim, but those paragraphs make no reference to (and are not based on a review of only) titles or lead paragraphs of analyst reports.[161]  My actual references to the title or lead paragraph of analyst reports (which Plaintiffs also point to) are in the context of discussing the simple observations that I make in the Zurek Report that "the majority of securities analysts covering UNFI that published reports within one week of UNFI's Q3 2023 disclosures focused specifically in their title or lead paragraph on either UNFI's below-consensus earnings for Q3 2023, UNFI's FY 2023 financial guidance, or both,"[162] and that "[m]ost securities analysts covering UNFI that published reports within one week of UNFI's Q4 2023 disclosures focused specifically in their title or lead paragraph on UNFI's FY 2024 financial guidance."[163]  Notably, the Feinstein Reply Report does not provide any evidence that these observations were somehow misleading in light of the totality of analyst commentary (and not just the headlines and lead paragraphs).

### D.    Plaintiffs' Claim That My Opinions "Were Recently Squarely Rejected" in the *Dentsply* Matter Is Misleading

81.    Plaintiffs note that I "was the defendants' expert in Dentsply" and assert that "many of [my] baseless positions were recently squarely rejected" in that case.[164]

82.    As an initial matter, contrary to what Plaintiffs appear to imply, I understand that the Court in *Dentsply* did not characterize my economic opinions with respect to damages as "baseless positions," and I understand that it is also not accurate to state that the Court "squarely rejected" them.  Instead, I understand that the Court found that in its view the litigation was not one where "plaintiffs' damages model won't be up to snuff for anyone" and thus the issues raised

---

[159] *See* Zurek Report, Appendix B.
[160] Zurek Report, Sections VIII.B.1.b) (¶¶ 81–93) and VIII.B.2.b) (¶¶ 99–109).
[161] Plaintiffs' Reply, footnote 12.
[162] Zurek Report, ¶ 82.
[163] Zurek Report, ¶ 100.
[164] Plaintiffs' Reply, p. 16.

by defendants in that matter would be "an argument for summary judgment, not class certification."[165]

83.　　In any case, I understand the Court in *Dentsply* to be addressing defendants' arguments made in their briefing, and the Court did not in fact reference my analysis or my report at all in its ruling.  Moreover, I note that my analysis in *Dentsply* did not involve an economic analysis of price impact as is the case in the present matter.

Executed this 6th day of October, 2025

Paul Zurek, Ph.D.

---

[165] Opinion and Order, *San Antonio Fire and Police Pension Fund et al. v. Dentsply Sirona Inc. et al.*, Case No. 1:22-cv-06339-AS, July 10, 2025 ("*Dentsply*"), p. 4.

**Appendix A**

# PAUL ZUREK, Ph.D.
## Vice President

**Cornerstone Research**
Two Embarcadero Center, 20th Floor • San Francisco, CA 94111
415.229.8225 • mobile 917.434.7602
pzurek@cornerstone.com

## ACADEMIC BACKGROUND

| | | |
|---|---|---|
| 2002 – 2008 | **The Wharton School, University of Pennsylvania** | Philadelphia, Pennsylvania |

*Ph.D. and M.A. in Finance*

Research interests include valuation, asset pricing, financial econometrics and financial institutions risk management.

| | | |
|---|---|---|
| 1998 – 2002 | **The Wharton School, University of Pennsylvania** | Philadelphia, Pennsylvania |

*B.S. in Economics, Concentration in Finance, Minor in Mathematics, Summa Cum Laude*

## PROFESSIONAL EXPERIENCE

| | | |
|---|---|---|
| 7/08 – Present | **Cornerstone Research, Inc.** | New York and San Francisco |

*Vice President*

Experience conducting financial and economic analysis for financial institution and other corporate and individual clients in complex litigation, including securities, valuation, appraisal, market structure, market manipulation, hedge funds, PE and investment management, international arbitration, financial fraud, risk management, and government investigations.  Design and oversee development of quantitative analysis models. Provide testimony and presentation of findings to regulators and arbitration panels.

| | | |
|---|---|---|
| 2023 – Present | **Stanford University Law School** | Palo Alto, California |

Lecturer in Law, teaching Corporate Finance and Valuation

| | | |
|---|---|---|
| 6/10 – 03/11 | **United Poles Federal Credit Union** | Perth Amboy, New Jersey |

*Director and ALCO Committee Member*
Member of the Board of Directors.  Advised on issues of strategy and risk.

| | | |
|---|---|---|
| 9/02 – 12/07 | **Kimberton International Associates – The Banking Group** | Kimberton, Pennsylvania |

*Senior Consultant*
Designed executive education programs for banking and financial services.  Taught seminars on financial institutions risk management, macroeconomics, banking, and general business management.  Worked with clients in the United States, Europe and Latin America.

| | | |
|---|---|---|
| 5/01 – 8/01 | **Credit Suisse First Boston** | San Francisco, California |

*Mergers & Acquisitions Summer Analyst*
Assisted in transactions during both preparatory and due-diligence stages.  Performed financial statement, precedent transaction and comparable company analysis.  Updated league tables and analyzed revenue, market share and headcount trends in the Technology M&A Group.

**Appendix A**

---

## TEACHING EXPERIENCE

Stanford Law School                                                                              2023, 2024, 2025
*Lecturer, teaching Corporate Finance and Valuation*

Wharton / Ping An Bank Executive Education Program                                    2015
*Taught global economics and credit risk modeling in Beijing, China.*

Wharton China Asset Management Company Executive Development Program        2011
*Taught global financial markets and market microstructure.*

Risk Management Association and Wharton Advanced Risk Management Program    2007 – 2009
*Instructor (2007–2009) and Academic Co-Director (2009)*

Wharton Hana Financial Hana Leaders Academy Global Course                    2008
*Instructor in Risk Management*

Merrill Lynch Investment Banking Institute                                          2006, 2007
*Teaching Assistant*

Investment Management, Derivative Securities, International Banking,            2002 – 2008
Venture Capital, Corporate Finance, Macroeconomics, Microeconomics
*Teaching Assistant*

## RESEARCH AND PUBLICATIONS

"Momentum and Long-Run Risks," Working Paper, *The Wharton School*, November 2007.
"Essays on Asset Pricing," Doctoral Dissertation, *The University of Pennsylvania*, 2008.
The Guide to Damages in International Arbitration. Chapter 16:  Market Approach or Comparables (with José Alberro), 1st Edition, November 2016, 2nd Edition, December 2017, 3rd Edition, November 2018.
Commodities:  Markets, Performance, Strategies. Chapter 14:  Commodity Mutual Funds (with Gustavo Camilo and Janko Cizel), Oxford University Press 2018.
"Collateralized loan obligations in the age of COVID-19" (with Yan Cao and Manuel Vasconcelos), Thomson Reuters Westlaw Expert Analysis, June 22, 2020.

## HONORS AND AWARDS

Outstanding Doctoral Student Paper Award at the Southern Finance Association
Annual Meeting, Western Finance Association Doctoral Student Travel Grant        2008

Weiss Center for International Financial Research Summer Fellowship            2007

Dean's Fellowship for Distinguished Merit                                        2002

Class of 1939 Fellowship                                                          2002

**Appendix A**

**INVITED AND CONFERENCE PRESENTATIONS, SPEAKING ENGAGEMENTS**

| | |
|---|---|
| "Delaware Shareholder Litigation," invited lecture, Corporate Finance, Professor Prasad Krishnamurthy, Berkeley Law School | 2023 |
| "Securities Litigation Trends in 2022: Notable Developments and Challenges" webcast, The Knowledge Group | 2022 |
| "The Rise of Special Purpose Acquisition Companies (SPACs): How to Minimize Securities Litigation Risks" webcast, The Knowledge Group | 2021 |
| "Trends and Updates on Class Action Litigation: Hot Buttons During the COVID-19 Crisis," webcast, The Knowledge Group | 2020 |
| "Discussion: Loss Causation in a Bear Market: The Economists' Perspective," Chicago Bar Association Securities Law Committee | 2020 |
| "The Evolving Securities Litigation Landscape:  Recent Trends and Updates You Need to Know," webcast, The Knowledge Group | 2020 |
| "Effective Use of Statistical Evidence in Class Action Litigation: Practical Guide in 2019," webcast, The Knowledge Group | 2019 |
| "Securities Litigation in 2019:  Winning Tips and Strategies," webcast, The Knowledge Group | 2019 |
| "Proving and Determining Damages in International Arbitration: Methods, Trends and Best Practices," webcast, The Knowledge Group | 2019 |
| Cambridge Forums Forum on Securities Litigation, panel speaker. | 2019 |
| Western Finance Association Annual Meeting, Southern Finance Association Annual Meeting, Drexel University, Ohio State University, University of Iowa, University of Minnesota, University of Notre Dame, Virginia Polytechnic Institute and State University | 2008 |
| The Wharton School | 2007 |

**CONFERENCE PARTICIPATION**

| | |
|---|---|
| Wharton Rodney L. White Center for Financial Research Conference on Financial Decisions and Asset Markets[*] | 2019 |
| American Finance Association Annual Meeting | 2008, 2009, 2011 – 2020 |
| Western Finance Association Annual Meeting[*] | 2008, 2016 – 2018 |
| NYU Five Star Conference in Finance | 2012 |
| Wharton FIC and Oliver Wyman's Risk Roundtable | 2003, 2011 |
| Southern Finance Association Annual Meeting[*], Mid-Atlantic Research Conference in Finance[*] | 2008 |
| Mid-Atlantic Research Conference in Finance[*], Wharton FIC and Oliver Wyman's Risk Roundtable | 2007 |
| NBER's Asset Pricing Program Meeting | 2006 |
| The Philadelphia Fed Policy Forum | 2003 |
| NSF/NBER Time Series Conference | 2002 |

* Paper Discussant or Presenter

## OTHER PAST ACTIVITIES

Referee for the Journal of Economic Dynamics and Control and Finance Research Letters.  Fellow at the Wharton Financial Institutions Center.

**Appendix A**

**TESTIMONY AND EXPERT REPORTS**

In the Matter of Deutsche Bank Securities, Inc. (SEC administrative proceeding 3-17730), presentation to the SEC and NY AG, June 2015.

Pattelli v. Lending Club Corporation (American Arbitration Association), testimony, January 2016.

In Re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation (MDL No. 2672 CRB (JSC), USDC ND California), expert declaration, August 2016.

Confidential expert reports submitted to the SEC regarding execution quality in FX markets, September 2016 and October 2016.

B.K. et al v. Gregory McKay (2:15-cv-00185, USDC District of Arizona), expert report, December 2017.

MidCoast Council and Division CCMF Ltd. v. Fitch Ratings, Inc., Federal Court of Australia, New South Wales (NSD995 of 2014), expert reports, June 2018 and February 2019, expert conclave and joint expert report, June 2019.

In Re: RH Securities Litigation (4:17-cv-00554, USDC ND California), expert report, August 2018, deposition, September 2018.

Public Employees' Retirement System of Mississippi v. Treehouse Foods, Inc. et al (1:16-cv-10632, USDC ND Illinois), expert report, October 2018, deposition, April 2019.

Aaron Booth and Cody Tucker on behalf of themselves and all others similarly situated v. Galveston County, Texas, et al (3:18-cv-104, USDC SD Texas), two expert declarations and deposition, January 2019.

Brian C. Schartz, On Behalf of Himself and All Others Similarly Situated and Derivatively on Behalf of Nominal Defendant The Female Health Company v. O.B. Parrish, et al (2016CH14488 and 2016CH13815, Circuit Court of Cook Country, Illinois, County Department, Chancery Division), expert report, February 2019, deposition, March 2019.

In Re: Spectrum Pharmaceuticals, Inc. Securities Litigation (2:16-cv-02279, USDC District of Nevada), expert report, March 2019.

Trevor Mild, Individually and on Behalf of All Others Similarly Situated v. PPG Industries, Inc., Michael H. McGarry, Vincent J. Morales, and Mark C. Kelly (2:18-cv-04231, USDC CD California), expert report and deposition, April 2019.

In Re:  Novo Nordisk Securities Litigation (3:17-cv-00209, USDC District of New Jersey), expert report, June 2019, deposition July 2019.

Christakis Vrakas et al v. United States Steel Corporation et al (2:17-cv-00579, USDC WD Pennsylvania), expert report and deposition, June 2019.

Margaret Tinsley, et al v. Michael Faust, et al (2:15-cv-00185, USDC District of Arizona), expert reports, October and November 2019, deposition, January 2020.

In re Health Insurance Innovations Securities Litigation (8:17-cv-02186, USDC MD Florida), expert report, January 2020, deposition, February 2020.

Frederic Haghebaert, Individually and On Behalf of All Others Similarly Situated v. Tandy Leather Factory, Inc., Janet Carr, Tina L. Castillo, and Shannon L. Greene (4:19-cv-01000, USDC ND Texas), expert declaration, February 2020.

Matt Karinski v. Stamps.com, Inc. et al (2:19-cv-01828, USDC CD California), expert report, August 2020, deposition, October 2020.

**Appendix A**

Matt Wolther, individually and on behalf of all others similarly situated v. Shubham Maheshwari et al (18CV329690, Superior Court of the State of California, County of Santa Clara), expert report, February 2021.

Cambridge Retirement System, Individually and On Behalf of All Others Similarly Situated v. Amneal Pharmaceuticals, Inc. et al (SOM-L-1701-19, Superior Court of New Jersey, Law Division, Somerset County), expert report, March 2021.

Indiana Public Retirement System, Individually and on Behalf of All Others Similarly Situated v. Michael T. Cartwright, Kirk R. Manz, and Andrew W. McWilliams (3:19-cv-00407, USDC MD Tennessee), expert report, September 2021, deposition June 2022.

Shela Camenisch and Dale Dean; Luna Baron; and Eva King, Individually and as Trustee of the Eva M. King Trust, individually and on behalf of all others similarly situated v. Umpqua Bank (3:20-cv-5905-RS, USDC ND California), expert report, March 2022, deposition, April 2022.

Lewis Stein, Individually and on Behalf of All Others Similarly Situated v. U.S. Xpress Enterprises, Inc. et al (1:19-cv-00098, USDC ED Tennessee), expert report, October 2022, deposition, November 2022.

In Re Maxar Technologies, Inc. Shareholder Litigation (19CV357070, Superior Court of the State of California, County of Santa Clara), expert report, December 2022.

In Re Jernigan Capital, Inc. Securities Litigation (1:20-cv-09575, USDC SD New York), expert report, February 2023, deposition, March 2023.

In Re Fibrogen Inc. Securities Litigation (3:21-cv-02623, USDC ND California), expert report, May 2023, deposition June 2023.

RSBIX Corp. v. Eris Exchange LLC and Eris Clearing LLC (American Arbitration Association), expert report, May 2023, hearing testimony, June 2023.

Barbara Strougo, individually and on behalf of all others similarly situated v. Mallinckrodt Public Limited Company et al (3:20-cv-10100, USDC District of New Jersey), expert report, June 2023, deposition, August 2023.

L-5 Healthcare Partners, LLC v. Alphatec Holdings, Inc. (2019-0412-NAC, Court of Chancery of the State of Delaware), expert report, September 2023 and October 2023, deposition, November 2023, trial testimony, January 2024.

Virgo Ventures Liquidating Trust et al v. Daniel Rosenberg et al (2019 L 011889, Circuit Court of Cook County, Illinois, Country Department, Law Division), expert report, December 2023, March 2024.

Michael Pardi, individually and on behalf of all others similarly situated v. Tricida, Inc. and Gerritt Klaerner (4:21-cv-00076, USDC ND California), expert report, July 2024.

David Hall and Marta Hall v. Jeffrey Vetter, Michael Dee, Anand Gopalan, James Graf, Andrew Hamer, Julie Levenson, Michael Vella, and Does 1 through 30 (JAMS Arbitration), expert report, December 2024, deposition January 2025.

San Antonio Fire and Police Pension Fund v. Dentsply Sirona Inc. et al (1:22-cv-06339, USDC SD New York), expert report, December 2024.

Dan Sills and George Dick, individually and on behalf of all others similarly situated v. United Natural Foods, Inc. et al (1:23-cv-02364, USDC SD New York), expert report, June 2025, deposition August 2025.

In Re NVIDIA Corporation Securities Litigation (4:18-cv-07669, USDC ND California), expert report, September 2025.

**Appendix B**

# Documents Considered by Paul Zurek, Ph.D.

**Data**

- Federal Reserve Economic Data (*FRED*), Federal Reserve Bank of St. Louis (Consumer Price Index for All Urban Consumers: All Items in U.S. City Average (CPIAUCSL))

**Depositions**

- Deposition of Paul Zurek, Ph.D., dated August 5, 2025
- Deposition of Steven P. Feinstein, Ph.D., dated September 17, 2025

**Expert Reports**

- Expert Report of Paul Zurek, Ph.D., dated June 13, 2025, including all documents cited therein and backup materials
- Reply Report of Professor Steven P. Feinstein, Ph.D., CFA, dated August 22, 2025, including all documents cited therein

**Legal Documents and Pleadings**

- *Goldman Sachs Group, Inc., et al., Petitioners v. Arkansas Teacher Retirement System, et al.*, 141 S.Ct. 1951 (2021)
- Opinion and Order, *San Antonio Fire and Police Pension Fund et al., vs. Dentsply Sirona Inc. et al.*, Case No. 1:22-cv-06339-AS, July 10, 2025
- Plaintiffs' Reply in Support of Their Motion for Class Certification and Appointment of Class Representatives and Class Counsel, *Dan Sills and George Dick v. United Natural Foods, Inc., et al.*, Case No. 1:23-cv-02364-JGLC-VF, August 22, 2025

**All documents cited and referenced in this report and exhibit, as well as materials listed in Appendix B of the Zurek Report.**

**Exhibit 1**

# United Natural Foods, Inc.
# FY 2023 Adjusted EBITDA:  Analyst Estimates Compared to UNFI Guidance
# Before and After Q2 2023 Earnings Announcement[1]

*($ in millions)*

| UNFI FY 2023 Guidance Issued on 9/27/22 and Reiterated on 12/7/22 | UNFI Revised FY 2023 Guidance Issued on 3/8/23 |
|---|---|
| UNFI FY 2023 Adjusted EBITDA Guidance Range: $850.0 – $880.0 | UNFI FY 2023 Adjusted EBITDA Guidance Range: $715.0 – $785.0 |
| UNFI FY 2023 Adjusted EBITDA Midpoint of Guidance: $865.0 | UNFI FY 2023 Adjusted EBITDA Midpoint of Guidance: $750.0 |

| | Analyst Estimate Before 3/8/23 | | | | First Analyst Estimate on or After 3/8/23 | | | |
|---|---|---|---|---|---|---|---|---|
| Contributor | Report Date | FY 2023 Adjusted EBITDA | Dollar Deviation from Midpoint of UNFI Guidance | Percent Deviation from Midpoint of UNFI Guidance | Report Date | FY 2023 Adjusted EBITDA | Dollar Deviation from Midpoint of UNFI Guidance | Percent Deviation from Midpoint of UNFI Guidance |
| BMO | 12/7/22 | $856.0 | -$9.0 | -1.0% | 3/8/23 | $737.0 | -$13.0 | -1.7% |
| BTIG | 12/7/22 | $862.5 | -$2.5 | -0.3% | 3/8/23 | $748.3 | -$1.7 | -0.2% |
| CL King | 3/7/23 | $867.9 | $2.9 | 0.3% | 3/9/23 | $730.0 | -$20.0 | -2.7% |
| Deutsche Bank | 3/7/23 | $854.2 | -$10.8 | -1.2% | 3/8/23 | $719.5 | -$30.5 | -4.1% |
| Guggenheim | 12/8/22 | $860.1 | -$4.9 | -0.6% | 3/12/23 | $743.5 | -$6.5 | -0.9% |
| R5 Capital | 12/9/22 | $870.0 | $5.0 | 0.6% | 3/14/23 | $724.0 | -$26.0 | -3.5% |
| Roth MKM | 12/8/22 | $873.0 | $8.0 | 0.9% | 3/8/23 | $725.0 | -$25.0 | -3.3% |
| Seaport | 12/8/22 | $854.0 | -$11.0 | -1.3% | 3/9/23 | $744.6 | -$5.4 | -0.7% |
| UBS | 12/7/22 | $858.0 | -$7.0 | -0.8% | 3/13/23 | $739.6 | -$10.4 | -1.4% |
| Wells Fargo | 12/7/22 | $854.7 | -$10.3 | -1.2% | 3/8/23 | $709.3 | -$40.7 | -5.4% |
| **Average** | | **$861.0** | **-$4.0** | **-0.5%** | | **$732.1** | **-$17.9** | **-2.4%** |

Source:  UNFI FY 2022 Earnings Release; UNFI Q1 2023 Earnings Release; UNFI Q2 2023 Earnings Release; Analyst Reports

Note:
[1]  The analyst estimate of FY 2023 adjusted EBITDA before 3/8/23 is based on the most recent report by a given contributor after the Q1 2023 earnings announcement on 12/7/22 and prior to 3/8/23 that included an estimate of FY 2023 adjusted EBITDA.  The analyst estimate on or after 3/8/23 is based upon the first report for a given contributor within one week following UNFI's Q2 2023 earnings announcement that included an estimate of FY 2023 adjusted EBITDA.