# Exhibit 24

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - x

DAN SILLS and GEORGE DICK,

individually and on behalf of all others

similarly situated

    Plaintiffs

vs.                          No. 1:23-cv-02364-JGLC-VF

UNITED NATURAL FOODS, INC.;

J. ALEXANDER MILLER DOUGLAS;

JOHN W. HOWARD; and

CHRISTOPHER P. TESTA

    Defendant

- - - - - - - - - - - - - - - - - - - - - x


    VIDEO DEPOSITION of STEVEN P. FEINSTEIN, PhD

    Wednesday, September 17, 2025 - 9:43 a.m.

    Sidley Austin LLP

    60 State Street

    Boston, Massachusetts




Reporter:  Jill K. Ruggieri, RPR, RMR, FCRR, CRR

Page 2

APPEARANCES:

Glancy Prongay & Murray LLP
  Kara M. Wolke, Esq.
  Melissa Wright, Esq.
  1925 Century Park East, Suite 2100
  Los Angeles, California 90067
  310.201.9150
  kwolke@glancylaw.com
  mwright@glancylaw.com
  Counsel for plaintiffs and the deponent

Sidley Austin LLP
  Nilofer Umar, Esq.
  Claire G. Lee, Esq.
  Neil H. Conrad, Esq.
  Chicago, Illinois 60603
  312.853.7000
  numar@sidley.com
  claire.lee@sidley.com
  nconrad@sidley.com
  Counsel for defendants

Videographer:  Deane Carstensen

Page 3

INDEX

WITNESS:

STEVEN P. FEINSTEIN, PhD
  Examination by Ms. Umar          6

EXHIBITS

Exhibit 1   Exhibit 1 - Report on Market          7
            Efficiency and Damages
            Methodology, Professor
            Steven P. Feinstein, PhD,
            CFA, 3/7/25
Exhibit 2   Exhibit 17 - Deposition          8
            transcript of Steven P.
            Feinstein, PhD, 5/9/25
Exhibit 3   Exhibit B - Reply Report,          9
            Steven P. Feinstein, PhD
Exhibit 4   Exhibit 15 - Expert Report          75
            of Paul Zurek, PhD, 6/13/25
Exhibit 5   Exhibit M - Deposition          76
            transcript of Paul Zurek,
            8/5/25
Exhibit 6   Handwritten notes          113

Page 4

Exhibit 7   UNFI Form 8-K          117
Exhibit 8   UNFI Form 10-K          127
Exhibit 9   Refinitiv Streetevents          131
            Edited Transcript, Q1 2023
            United Natural Foods, Inc.,
            Earnings Call transcript
Exhibit 10  UNFI Third Quarter Fiscal          143
            2023 Earnings Conference
            Call transcript
Exhibit 11  UNFI Second Quarter Fiscal          150
            2023 Earnings Conference
            Call transcript

Page 5

PROCEEDINGS

THE VIDEOGRAPHER:  Good morning. We are going on the record at 9:43 a.m. Eastern Time on September 17, 2025.  Please note that the microphones are sensitive and they may pick up whispering and private conversations. Please mute your phones at this time.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Professor Steven P. Feinstein in the matter of Dan Sills and George Dick, individually, and on behalf of all others similarly situated v. United Natural Foods Inc. et al., filed in the United States District Court, Southern District of New York, Case No. 23-CV-2364 (JGLC).

The location of this deposition is Sidley Austin LLP, 60 State Street, Boston, Massachusetts.  My name is Deane Carstensen representing Veritext.  I'm the videographer today.  I'm not authorized to administer an oath, I am not related to any party in this action, nor am I financially interested in the

2 (Pages 2 - 5)

Page 6

outcome.

If there are any objections to proceeding, please state them at the time of your appearance. Counsel and all present, including remotely, please now state your appearance and affiliation for the record.

MS. UMAR: Nilofer Umar of Sidley Austin for defendants, and with me is my colleague, Claire Lee.

MS. WOLKE: Kara Wolke and Melissa Wright from Glancy Prongay & Murray.

STEVEN P. FEINSTEIN, PhD, a witness having been duly sworn, on oath deposes and says as follows:

EXAMINATION

BY MS. UMAR:

Q   Sir, can you please state your full name for the record.

A   Steven Philip Feinstein.

Q   Now, sir, given that this is the second time you're sitting for a deposition in this case, I'm going to dispense with most of the formalities and the typical instructions,

Page 7

except that I ask that if I at any time pose a question to you that you don't understand, can you please let me know, and I'll endeavor to rephrase it?

A   Yes.

Q   Okay.

Sir, I'm going to hand you a document. I'm going to mark this as Exhibit 1 for today's deposition.

(Exhibit 1 marked for identification.)

BY MS. UMAR:

Q   Sir, is this the expert report that you prepared in connection with the plaintiffs' reply brief for class certification?

MS. LEE: This is the opening.

Q   Is this the opening expert report that you prepared, sir?

A   This is the first report I prepared and submitted in this matter, the report on market efficiency and damages, damages methodology.

Q   Have you altered any opinions offered in your initial report?

A   I don't think so.

Page 8

Q   You can just set that to the side, sir. I'm going to hand you another document.

MS. UMAR: I'm going to hand you a document that I'm marking as Exhibit 2.

(Exhibit 2 marked for identification.)

BY MS. UMAR:

Q   Sir, this is the transcript from the first day of your class certification deposition, which occurred on May 9th.

Have you reviewed this transcript?

A   Yes.

Q   Do you stand by the testimony you offered?

MS. WOLKE: Object to form.

A   There were some corrections made in the errata, I believe.

Q   Okay.

A   Aside from that, yes.

Q   All right, sir.

So standing aside from the corrections you made in your errata, you stand by your testimony, correct?

MS. WOLKE: Object to form.

Page 9

A   Yes.

Q   Okay.

I'm going to hand you another document. I'll mark this one as Exhibit 3.

(Exhibit 3 marked for identification.)

BY MS. UMAR:

Q   Now, sir, is this the expert reply report that you prepared in connection with class certification in this matter?

A   It is.

Q   And on page 73, that's your signature, sir?

A   Yes, it is.

Q   Now, I'm going to refer to this report as your reply report for purposes of today's deposition.

Do you understand that the reply report is the report that we're going to be focused on today?

A   I'll take your word for it. My understanding was we're focused on issues of price impact today.

Q   That's correct, sir.

And I'm just asking for your

3 (Pages 6 - 9)

Page 10

understanding, if I refer to the "reply report," you'll understand that I'm referring to Exhibit 3 before you today?

A  Okay.

Q  Okay.

And the reply report includes Exhibits 1 through 3, correct?

A  Yes.

Q  And it's 79 pages in total?

A  Correct.

Q  Have you reviewed this reply report since it was filed?

A  Oh, yes.

Q  And when did you review it?

A  Well, to some extent, yesterday.  I read through it entirely on Saturday.

Q  And based on your review, is there anything you need to amend or supplement?

A  No.

Q  Does this reply report contain all of your opinions related to price impact in this matter?

MS. WOLKE:  Object to form.

A  All the opinions that I've arrived at so far, yes, I'd say so.

Page 11

Q  So there are no reports -- excuse me.  There are no opinions related to price impact that you presently intend to offer that are not contained in this report, correct?

A  That's correct.

Q  Have you been asked to undertake any additional analysis since the date of this report?

MS. WOLKE:  Object to form.

A  No.

Q  Have you done any work on this case since you submitted the report other than preparing for this deposition?

A  No, no, I mean, I just want to point out that this report is dated August 22, so it's less than a month ago.  I just want to point that out, and the answer is no.

Q  Okay.

And Exhibit 1 to this reply report includes all of the documents and the information that you considered in addition to those materials cited in your opening report, correct?

A  That's correct.

Q  And Exhibit 2 lists all of the

Page 12

testimony that you've given as an expert since the date of your original report, correct?

A  That is correct.

Q  You've provided expert testimony in six different --

A  Wait, wait, I'm sorry.  One moment.

(The deponent read the document.)

A  The answer is yes.  What I said was correct.  I just wanted to check.

Q  Okay.

Now, sir, you've provided expert testimony in six different securities cases, including this one, since March 7, 2025, correct?

A  That's right.

Q  And you were the plaintiffs' expert in each of these cases, correct?

A  You can characterize it that way.  I was engaged by plaintiffs.

Q  Leaving aside this matter, did you provide opinions or testimony on price impact in any of the other lawsuits listed here?

A  I don't recall.  I'd have to think about each case specifically.

Page 13

Q  Well, sir, it's five cases.

Did you do so in the Biogen matter?

A  I really would have -- I don't think I can give you a reliable answer without reviewing each of these cases and my reports in them.

Q  So you're not --

A  I just can't do that from memory.

Q  So you're uncertain whether you provided an expert opinion on price impact in any matter since March 7, 2025?

MS. WOLKE:  Object to form.

A  Well, I think it's likely that I have.  I just couldn't tell you which cases I did and which cases I did not.

Q  Well, in any of the cases in which you have, did you conclude that price impact had not been established?

MS. WOLKE:  Object to form.

A  I don't recall.  I'd have to look at each of these cases.

Q  Sir, you can't recall opinions you've offered in just the past few months?

MS. WOLKE:  Object to form.

4 (Pages 10 - 13)

Page 14

Argumentative.

A   I don't like to rely on just my memory, especially when there's six different cases involved.

I mean, I can tell you I haven't opined that there were -- there was no price impact whatsoever from some alleged misrepresentations and omissions, but from time to time I do opine that a particular alleged misrepresentation or omission had no price impact, and I might have done that.

I would have to review each of these six cases in order to let you know for sure.

Q   You're uncertain one way or the other whether you did offer an opinion that a particular alleged misrepresentation or omission had no price impact?

A   That's right.

Q   Sir, who wrote your reply report?

A   I did.

Q   And what was your process for preparing your reply report?

MS. WOLKE:  Object to form.

A   It was the process I usually follow

Page 15

with a reply report.  I gathered my team together, and we sat in the conference room and we read in this case Dr. Zurek's report carefully, line by line, letting anyone at the table interrupt if they had a comment or a thought.  Important points we wrote on the blackboard.

We discussed whether his arguments were valid or not valid.  We discussed why they were either valid or not valid.  And from that discussion, I made an outline of what a reply report should contain.

Sections of it I asked my assistant to, you know, do a rough-out of, you know, certain words, but basically add some -- a little more depth to the outline that I constructed.  And then we sat together and wrote it.

There were -- there were -- when I arrived at a final draft -- not a final draft, but when I arrived at a complete draft, we read that together, my team and I.  We also sent a draft to the attorneys, plaintiffs' attorneys, and then I did some substantial editing and rewriting based on the feedback I

Page 16

got from my team.  And -- not just my team but additional thoughts I had in the interim.

Q   Sir, when you make reference to your "team," to whom are you referring?

A   In this case, it was Parth Hemani, Tina Gu, and Dan Bettencourt.  It's a subset of the team that worked on the original report, but those are the folks that helped me the most on this report, on the reply report.

Q   Did plaintiffs' counsel assist you in preparing your reply report?

MS. WOLKE:  Object to form.

A   They told me which sections they didn't understand or any paragraphs or words that were unclear to them so that I had the opportunity to clarify.  So in that sense yes.

Q   Did they --

A   They didn't change any opinions or content.  Just commented on whether my articulation was clear.

Q   How much time did you spend preparing your reply report?

A   I -- I really don't remember.  It was over a period of weeks, so I just don't remember for sure.

Page 17

Q   Fifty hours, roughly?

A   Could be.

Q   What did you do to prepare for today's deposition?

A   I read four docs: the complaint, my original report, Dr. Zurek's report and my reply report.

Then I met with plaintiffs' counsel, Attorneys Wright and Wolke, with the same team that I mentioned before -- actually, no, Tina's on vacation so it was just -- when I met with the attorneys, it was with Dan Bettencourt and Parth Hemani.  That's it.

Q   And when did you conduct that meeting?

A   Yesterday.

Q   And for how long did you meet?

A   About two hours.

Q   Aside from the four documents you listed, did you review any additional documents in preparation for today's deposition?

A   Yes.  At yesterday's meeting, I looked at some analyst reports and -- and the judge's order.  I looked again at the judge's order, the motion to dismiss order.

5 (Pages 14 - 17)

Page 18

Q   And which analyst reports did you look at, sir?

A   Oh, quite a number of them.  Almost a random sampling from each of the corrective disclosure dates.  One that I recall specifically was Goldman Sachs on March 8, 2023.

Q   And were all of the documents you reviewed listed either within your Exhibit 1 of documents and information considered in connection with your reply report, or in connection with the same exhibit related to your opening report?

A   Yes.

Q   Okay.

Sir, in your reply report, you offered new opinions related to price impact in response to the arguments and conclusions in the expert report of Dr. Zurek, correct?

MS. WOLKE:  Object to form.

A   That's correct.

Q   And you mentioned earlier you've reviewed the Zurek report, correct?

A   Yes.

Q   And it's your opinion that there was

Page 19

a price impact on the dates of the June and September 2023 alleged corrective disclosures, correct?

(The deponent read the document.)

A   That's not how I expressed it in my report.  I think it's highly likely there was price impact.  The evidence indicates price impact on those dates.

I know that price impact was not ruled out or disproved by Dr. Zurek.  Those are my opinions.

Q   Okay.

So, sir, the opinion you're offering today is that the -- according to you, the evidence indicates there was price impact on the dates of the June and September 2023 alleged corrective disclosures, correct?

MS. WOLKE:  Object to form.

A   It's highly likely that there was price impact, extremely likely.  And that high likelihood has not been validly disproved or challenged by Dr. Zurek or anyone.

The evidence is quite compelling that there was price impact.

Page 20

Q   Sitting here today, your opinion is not that the evidence is definitive that there was a price impact on the dates of the June and September 2023 alleged corrective disclosures, correct?

MS. WOLKE:  Object to form.

A   Well, the way I describe it in paragraphs 14 through 25, where I say "summary of conclusions and opinions," that's correct.  Let me have a look -- let me just refresh my memory here.

(The deponent read the document.)

A   Actually, could I hear your question again?  Did you say -- you're talking about just those dates, June and September?  Is that what you asked?

Q   Correct.

A   Okay.

(The deponent read the document.)

A   So I note where I expressed my conclusions, that's -- I've described it correctly, but the evidence was so compelling in some areas that I might have used a little

Page 21

more affirmative language later in the report.

But where I summarize my conclusions, my conclusions are that he did not prove there was no price impact and that the evidence is very compelling that there was price impact.  But it wasn't within the scope of my engagement to prove affirmatively price impact but I did -- I do believe I've affirmatively proved that Dr. Zurek has not disproved price impact on those days.

And he doesn't even challenge that there was price impact on the first two corrective disclosure dates.

Q   And, sir, I'm asking a different question.

You're not offering an opinion today that the evidence is definitive that there was price impact on the June and September alleged corrective disclosure dates, correct?

MS. WOLKE:  Object to form.

A   I think that's fair to say.  But I would say I am offering an opinion that the evidence is compelling.  And Dr. Zurek's opinion was that the evidence was compelling

6 (Pages 18 - 21)

Page 22

the other way, so I'm disagreeing with his conclusion and asserting an opposite conclusion, that the evidence is compelling that there was price impact.

Q   Did you look at the question of whether the evidence is definitive that there was price impact on the June and September corrective disclosure dates?

MS. WOLKE:  Object to form.

A   Well, the scope of the engagement was to respond to Dr. Zurek's opinion and his analysis, and my understanding is that -- well -- that it's not plaintiffs' burden to prove price impact, and that's why my scope didn't include that I should assess definitively whether there was price impact, but rather to assess whether defendants and defendants' expert have disproved price impact.

Q   You simply did what was within the scope of your engagement, correct?

A   That's fair.

MS. WOLKE:  Object to form.

A   That's fair to say.

Q   Sir, what does it mean for there to have been a price impact on the dates of the

Page 23

June and September 2023 alleged corrective disclosure dates?

A   Oh, that the --

MS. WOLKE:  Object to form.

A   I think it means that the change -- the movements of the prices were affected by the fact that there were alleged misrepresentations and omissions.  Both of those days had statistically significant stock price declines for UNFI stock, and price impact would mean that that decline was in some way contributed to or precipitated by information related to the alleged misrepresentations and omissions.

Q   Sir, you're not attempting to affirmatively prove that there was price impact on any date, correct?

MS. WOLKE:  Object to form.

A   Well, I mean, if that were the scope of the engagement, I can do the research for that, to assess that and offer an opinion there.

But the scope was not that, and -- so I guess the answer to your question is that wasn't within the scope of my

Page 24

engagement.  That's not what I did.

Q   Okay.

A   But I do want to point out that even Dr. Zurek never said there was no price impact.  He said -- he said it was about the evidence, that the evidence -- in his opinion, it indicated no price impact or was consistent with no price impact.

And I think I forcefully and effectively disproved that, proved that he was wrong about that.

Q   Again, sir, I'm focusing on what you did.

A   Yeah.

Q   So you did not perform analysis attempting to affirmatively prove that there was price impact on any date, correct?

MS. WOLKE:  Object to form.

A   Well, I wouldn't attempt to prove there was.  I would attempt to assess if I were going to do a price -- that kind of analysis.  But no, my opinion is not an affirmative opinion that there was price impact, and my research was not directed at -- yeah, that was -- that's not my opinion, that there

Page 25

definitely was price impact.

My opinion is that he certainly has not proved no price impact.  The evidence is compelling that there was price impact.  It's highly likely that there was price impact, and that likelihood has not been challenged effectively by anyone in this case.

Q   Sir, are you familiar with the Supreme Court's 2021 decision in Goldman Sachs Group v. Arkansas Teacher Retirement System?

MS. WOLKE:  Object to form.

A   Yes.

Q   Now, you don't cite that decision in your report or your rebuttal report or include it in your materials considered list; why is that?

MS. WOLKE:  Object to form.

A   I did an economic analysis, not a legal analysis.

Q   And you're not a lawyer, correct?

A   That's right.

Q   Are you aware that Goldman holds that a defendant may rebut the presumption of reliance through any showing that severs the link between the alleged misrepresentation and

7 (Pages 22 - 25)

Page 26

either the price revealed -- excuse me, the price received or paid by the plaintiff or his decision to trade at a fair market price?

MS. WOLKE: Object to form.

A   I'm not going to offer a legal opinion here. If I said yes or no, that would be a legal opinion.

Q   I'm simply asking if you're aware of what Goldman holds.

MS. WOLKE: Object to form.

A   I'd have to think about it some more if I was going to agree or disagree with your legal opinion.

Q   And I'm not offering -- I'm not offering an opinion -- a legal opinion on anything, sir. I'm simply asking if you're aware of what the Goldman case says.

Are you aware that the Goldman case says a defendant may rebut the presumption of reliance through any showing that severs the link between the alleged misrepresentation and either the price received or paid by the plaintiff or his decision to trade at a fair market price?

A   That --

Page 27

MS. WOLKE: Object to form.

A   That language sounds familiar, but I certainly don't have the Goldman opinion memorized.

Q   But that sounds familiar to you, you're saying.

A   Yeah.

Q   Okay.

And are you familiar with the phrase "inflation maintenance theory"?

A   Yes.

Q   What's your understanding of an inflation maintenance theory?

A   Well, the concept of inflation maintenance is that a misrepresentation or an omission may have price impact not only by causing the stock price to rise or fall but by keeping the stock price from moving, and therefore, if there were inflation previously, a misrepresentation or omission can have price impact by keeping that inflation from dissipating, thereby maintaining inflation.

Q   Do you understand plaintiffs in this case to be relying on an inflation maintenance theory?

Page 28

MS. WOLKE: Object to form.

A   No, I -- I didn't think about it -- well, I mean, I never thought about it exactly in those terms. I mean, it didn't come up in the analysis -- the way you phrased it didn't come up specifically as something I needed to address head-on. It wasn't something we wrote on the blackboard when -- when we were writing down the points that Dr. Zurek made that I would need to assess.

But coming to think of it, I do know that they allege that there was inflation introduced on the first day of the class period. There were I think five instances of misrepresentations and omissions between the first misrepresentation and the first corrective disclosure. So it sounds reasonable that -- that they would be alleging that those misrepresentations between the first one and the first corrective disclosure would be maintaining inflation. I just didn't analyze it that way.

Q   So, sir, is your answer "yes," that you do understand plaintiffs to be asserting an inflation maintenance theory?

Page 29

MS. WOLKE: Object to form.

A   No, I -- I didn't need to characterize their allegations in any particular way related to that for the work that I did.

Q   I'm not --

A   As I sit here now, I just walked you through. I was kind of thinking out loud, you know, the facts of the case suggest that that might be what they're doing, but I hadn't thought about it before today in those terms.

Q   And, sir, I'm not asking how you characterized their theory in your report. I'm simply asking for your understanding.

Is that your understanding, that plaintiffs are asserting an inflation maintenance theory in this action?

MS. WOLKE: Object to form.

A   No, my understanding is that they are alleging that misrepresentations and omissions inflated the stock price and that corrective disclosures caused -- dissipated the inflation, causing investor losses.

That's how I thought about it.

Q   And, again, I'm asking about your

8 (Pages 26 - 29)

Page 30

understanding of the inflation -- of an inflation maintenance theory as you've articulated it.

As you've articulated the concept of an inflation maintenance theory, do you have an understanding as to whether plaintiffs in this case are making allegations consistent with that?

MS. WOLKE: Object -- object to form. Asked and answered.

A    Until now, I haven't needed to, nor did I characterize the case specifically in those terms.

Q    I'm not asking about your characterization --

A    So I -- I mean, it sounds reasonable. I'm not going to say no, but I'm also not going to say yes, because it wasn't part of the engagement, and it wasn't a necessary part of my analysis.

I mean, what I did see is that when information came out that was alleged to have been concealed, the stock price fell, suggesting in a compelling manner that there was price impact.  Or, rather, let's say it a

Page 31

different way, that the misrepresentations and omissions impacted the stock price both on the corrective disclosure dates and prior to those dates.  That's in my report.

Whether you want to call that an inflation maintenance theory because it categorizes it in the -- you know, under the heading of some legal theory, I'm not a legal expert, so I didn't do that.

Q    Okay.

So as to whether plaintiffs are asserting an inflation maintenance theory in this case, you're saying that your answer is neither no or yes; you don't have an understanding?

MS. WOLKE: Object to form.

A    I have a lot of understanding.  I just don't have enough to offer an affirmative opinion in response to your question.

Q    Sir, what's your understanding of the Supreme Court's holding in the Goldman case?

MS. WOLKE: Object to form.

A    I'm not a legal expert.  I mean, I would -- that sounds like a great question for a -- for a law professor.

Page 32

Q    I'm not asking you for a legal opinion, sir.  I am asking you what your understanding of what the Supreme Court said in the Goldman case is?

MS. WOLKE: Object to form. Nilofer, that's incredibly broad.  I couldn't even answer that question.

MS. UMAR:  Well, I'm just asking him, does he have any understanding of what the Supreme Court's decision stood for in that case.

MS. WOLKE: Object to form.

A    Yeah, I've read the case.

Q    And what is your understanding, sir?

MS. WOLKE: Object to form.

A    Well, it has to do with whether or not statements can be so generic that they might not have price impact, whether there's a mismatch between alleged misrepresentations and omissions and the corrective disclosures that allegedly corrected them, and how those issues should be considered when determining if in fact there was price impact.

(Pause.)

Q    Sir, do you understand that to --

Page 33

I'll get there.

Now, sir, you didn't analyze whether there was a price impact on the date of each alleged misrepresentation, correct?

MS. WOLKE: Object to form.

A    I don't know.  The way you phrased question is a little bit ambiguous.

I analyzed the news on the misrepresentation dates, and I analyzed stock price movements on every date, but, as I said before, the way I understood the scope of the engagement, I was not asked to assess affirmatively whether there was price impact, just whether it's been disproved instead.

So I studied things that were certainly relevant to that question and I have findings that are relevant to that question, and I expressed those in my report.

So I can't say that I didn't do any of -- of -- any price impact analysis.  I certainly did price impact analysis, but not with an objective of being able to formulate an opinion that there either was or was not price impact.  Rather, the objective was to determine whether it's been disproved.

9 (Pages 30 - 33)

Veritext Legal Solutions

www.veritext.com                                    888-391-3376

Page 34

Q   Did you conduct an analysis of price impact as to each alleged misrepresentation?

MS. WOLKE:  Object to form.

A   No, it wasn't necessary.  I mean, for someone to say there was no price impact, they would have to say that none of the misrepresentations had any price impact.

So if I can show that the evidence compels that some of the misrepresentations definitely did have some price impact, or that it has -- or that it's reasonable that they did or likely that they did, it hasn't been ruled out that they did, that would be sufficient to then opine that price impact has not been disproved.

Q   Did you conduct an analysis of price impact as to any specific alleged misrepresentations?

MS. WOLKE:  Object to form.

A   Yes, all of them.  I mean, I know that there were five categories of misrepresentations.  Two were dismissed.  There were three surviving categories, and the information that came out on the corrective disclosures was related to what had been

Page 35

allegedly concealed.

Q   Now, sir, I'm struggling to understand your answer, because when I asked you whether you conducted an analysis of price impact as to each alleged misrepresentation, you said no, that wasn't necessary.

And then when I asked whether you conducted an analysis of price impact as to any specific alleged misrepresentation, you said all of them.  Which is it, sir?

MS. WOLKE:  Object to form.

A   Well, I would -- maybe I just didn't understand your question, so let's put it on the record that I did not understand your question.

Can you tell me what you mean by an analysis of price impact, because what you mean and what I mean appear to be two different things.

Q   I'm asking, sir -- you're using the word "analysis" of price impact.

A   No, no, you did.

Q   I'm asking, sir, what did you do?  Did you -- you said at the beginning of our deposition, sir, that you are not opining that

Page 36

there affirmatively was price impact, that you simply conducted an analysis of evidence regarding price impact.

Is that correct, sir?

A   No, I think my words speak for themselves.  I think I said it better than that.

I conducted an analysis that indicated that the evidence compels a conclusion that there was price impact, but it wasn't within my scope to offer an affirmative opinion, so I didn't.

But I did -- about that, you know, that there was definitely price impact.

On the other hand, I did prove that Dr. Zurek has not disproved price impact for any of the misrepresentations and omissions or any of the corrective disclosure dates, full stop.

Q   And, sir, I -- now, you just used the word "analysis" to refer to the work you did.  I am asking within that analysis, as you are using that word --

A   Oh.

Q   -- did you look -- did you evaluate

Page 37

whether any specific misrepresent- -- whether there was price impact as to any specific misrepresentation?

MS. WOLKE:  Object to form.

A   I just want to point out that that was kind of the basis for our misunderstanding.

I said "analysis," and you've been saying a "price impact analysis."

So if you're referring to all the work I did as being a price impact analysis -- would that be correct?  Is that how I should interpret your question?

Q   Sir, yes.  I'm talking about the work that you did in this assignment, and so --

A   Okay.

And you want to call that a "price impact analysis"?

Q   Correct.

A   Okay.  You're calling it that, not me, but I'll accept your definition.

Q   I'm adopting your phrasing.

A   No, it's your phrasing.

Q   You used the word "analysis," and I'm simply repeating your word "analysis."

A   Okay.  So we'll -- from now on, we'll

10 (Pages 34 - 37)

Page 38

say "analysis," but we won't say "price impact analysis," fair enough?

Q   Fine, fine.

A   Okay.

Yes.  In my analysis, I looked at the misrepresentations and omissions carefully, all of them.  I also looked at all of the corrective disclosures, all of them, and I looked at Dr. Zurek's analysis of the connection between them, and I drew conclusions.

Q   And you're saying, sir, that you did -- you looked at each alleged misrepresentation to analyze whether there was price impact on the date of each alleged misrepresentation?

MS. WOLKE:  Object to form.

A   Did I say that?  I don't think I said that.

Q   I'm asking you a question, sir.

Did you look at each alleged misrepresentation to consider whether there was evidence of price impact as to the date of each alleged misrepresentation?

MS. WOLKE:  Object to form.

Page 39

A   I looked at the misrepresentations and omissions holistically.  I didn't -- I didn't disaggregate and look at them on an individualized basis.  I looked at them collectively.

Q   And is that because you understand plaintiffs are attempting to show price impact in this case by reference to stock price declines on the day of the alleged corrective disclosures rather than on the day of any of the alleged misstatements?

MS. WOLKE:  Object to form.

A   No.

Q   Then why is it that it's appropriate to simply look at the alleged misstatements in the aggregate?

A   Well, because an opinion that there was no price impact, either ever or on any particular day, means that none of the -- would mean that none of the misrepresentations and omissions had price impact.

So if I can show collectively, I can do a collective analysis to disprove that, if, in fact, the evidence supports that conclusion.  I wouldn't have to look at them

Page 40

individualize -- individually in order to opine that price impact was not disproved.

Q   Now, I'm trying to understand the collective analysis that you're referencing, sir.

You're attempting to reason backwards from the stock price decline on the day of the alleged corrective disclosures as a way to show price impact indirectly, correct?

A   No, it's not at all what I did.

Q   Then explain to me in your words what you did.

A   Well, I looked at the corrective disclosure dates that Dr. Zurek focused on, the dates that he said there was no corrective information that would cause the significant stock price declines that we both agree occurred.

And then I showed that, in fact, there was corrective information on those days, and therefore, his conclusion has to be wrong.

Q   Okay.

So --

A   I mean, we -- both he and I agree there were statistically significant declines

Page 41

on all of the alleged corrective disclosure dates, so I'm not reasoning --

You know, his -- and then his opinion was for corrective disclosures 3 and 4, there was no corrective information.  I pointed out that there was.

Q   Sir, I think we're speaking past each other again.

Your opinion is based on -- your opinion is based on your view that there is evidence of price impact on the alleged corrective disclosure dates, correct?

MS. WOLKE:  Object to form.

A   Well, that's part of my opinion.  It's not based on that.  That's part of my finding.  That was a finding --

Q   Okay.

But sir --

A   -- in the course of the analysis, that there was corrective information on the alleged corrective disclosure dates, all four of them.

Q   Okay.

So when you refer to your collective analysis -- again, I'm using your

11 (Pages 38 - 41)

Page 42

words --

A   I never said I did a collective analysis. I have to interrupt. I'm sorry.

I never said I did a collective analysis. I said I looked -- I said I looked at the misrepresentations and omissions holistically. It was not necessary to look at them individually given the scope of my engagement. That's what I --

Q   Sir, I'm reading back -- I have your words right here --

A   All right. Can you --

Q   -- on the screen.

A   Go ahead, read them, please.

Q   "A. Well, because an opinion that there was no price impact either ever or on a particular day means that none of the -- would mean that none of the misrepresentations and omissions had price impact. So if I can show collectively, I can do a collective analysis to disprove that, if in fact the evidence supports that conclusion."

A   Okay, so --

Q   Those are your words.

A   Okay. All right.

Page 43

Q   So I am using your words, sir.

Now, you talk about a collective analysis. Again, I'm repeating verbatim what you said.

A   Okay.

Q   The collective analysis that you say that you did was based simply on looking at the alleged corrective disclosure dates, correct?

A   No.

MS. WOLKE:  Object to form.

A   It required looking at the alleged misrepresentations and omissions and what they were.

Q   Okay.

But in doing so, you say that you looked at those collectively and not individually?

A   Right. Holistically. I mean, "holistically" is a better word.

I didn't have to look at -- okay. Leave it at that.

Q   Sir, you opined that there was price impact on the date of each of the four corrective disclosures -- alleged corrective disclosures in this case, correct?

Page 44

A   I think the word I used was that there was price impact evident on each of those days.

Q   Okay.

MS. WOLKE:  Nilofer, real quick. Sorry. We lost our realtime. Can you --

MS. UMAR:  Can we go off the record for a moment, please.

THE VIDEOGRAPHER:  We are now going off the record. The time is 10:26 a.m.

(Recess.)

THE VIDEOGRAPHER:

Okay. We are now back on the record. The time is 10:38 a.m.

BY MS. UMAR:

Q   Sir, I'd like to direct your attention to paragraph 57 of your reply report. That was the document we previously marked as Exhibit 3.

A   Okay.

Q   Okay.

Sir, under the second -- it's in the third sentence of that paragraph, you write, "It is because of this error that he" -- referring to Dr. Zurek -- "then overlooks how

Page 45

the earnings announcements on 7 June 2023 and 26 September 2023 were corrective disclosures, and that the statistically significant price declines on those dates comprised price impacts of the alleged misrepresentations and omissions."

That's what you wrote, right?

A   That's right.

Q   And so you're offering an opinion that the price declines on the two aforementioned dates comprised price impacts, correct?

A   Actually, the opinion here is that Dr. Zurek overlooked that, that he overlooked that this is what the evidence compels. It's not my --

Q   I'm just reading your words.

A   Yeah, I know.

Q   You said -- you write that he overlooked that the earnings announcements on those dates had statistically significant price declines that did comprise price impacts. That's what you wrote, correct?

A   Doesn't say "did." He didn't consider this. He didn't consider this channel

12 (Pages 42 - 45)

Page 46

of price impact.  He overlooked it.

Q    And what you say he overlooked is that, according to you, the statistically significant price declines in June and September of 2023 comprised price impacts, correct?

A    Yes.

Q    Now, sir, you did not actually attempt to measure any front-end price increase from the alleged misrepresentations, correct?

MS. WOLKE:  Object to form.

A    Well, I didn't do a loss -- I didn't do a loss causation or a damages analysis.  What you're describing is what goes into a damages analysis, specific quantification.

I did observe that there was a statistically significant increase in the UNFI stock price at the front end when the company came out with good results and told people that those good results were due to everything -- good execution, and didn't mention procurement gains at all.

Q    Sir, in offering the opinions that you do on price impact, you did not actually attempt to measure any front-end price increase

Page 47

from the alleged misrepresentations, correct?

MS. WOLKE:  Object to form.

A    I didn't quantify inflation anywhere in my report or in my analysis.  I showed that it was evident and compelled by the evidence, but a quantification is a damages analysis.

Q    Well, let's leave aside the issue of quantification.

In offering the opinions that you do on price impact, you did not actually reach a conclusion of any front-end price increase from the alleged misrepresentations, correct?

MS. WOLKE:  Object to form. Misstates testimony.

A    Well, again, it wasn't my task to affirmatively prove price impact.  My task was to determine whether Dr. Zurek had disproved it, and he -- oh, yeah, I remember.  This is part of what we discussed around the round table at my firm.

He did not challenge that there was price impact evident on the first two corrective disclosures.  Therefore, it wasn't necessary for me to address how much inflation

Page 48

or that there was inflation introduced on the first day.  He conceded that.

He conceded that, essentially, by not challenging the price impact on the first two corrective disclosure dates.

Q    Sir, I'm not asking for what Dr. Zurek did.  I'm asking about what you did.

In offering the opinions that you do on price impact, you didn't reach a conclusion of any front-end price increase from any of the alleged misrepresentations, correct?

MS. WOLKE:  Object to form.

A    I didn't independently set out to prove that there was because he accepted that there was, and my scope was to respond to his report.

Q    Okay.

So the answer is no, you did not, correct?

MS. WOLKE:  Object to form.

A    Well, I don't -- I don't want the record to give the impression that I did nothing.  I mean, I did look to see that there was a statistically significant increase on that day, and I explained that today as well as

Page 49

elsewhere.

Q    Sir, I'm just asking about the conclusions that you reached in offering your opinions on price impact.

A    Mm-hmm.

Q    In reaching the opinions that you do on price impact, you did not conclude that there was a front-end price increase from the alleged misrepresentations, correct?

MS. WOLKE:  Object to form. Misstates testimony.

A    Could I just hear the last few words?  I did not conclude or I did not reach a conclusion?

What did you say?

Q    In reaching the opinions that you do on price impact, you did not conclude that there was a front-end price increase from the alleged misrepresentations, correct?

A    I think there was.

Q    Where --

A    I think there had to have been.  I mean, that's what's the allegation.  Dr. Zurek was tasked with assessing price impact, and he didn't challenge that.

13 (Pages 46 - 49)

Page 50

So I think it's established.

Q   So that's an opinion you're offering today?

A   No.

Q   Sir, I don't understand your testimony.

A   You asked a question, and I answered it.

Q   So you are offering the opinion that there was a front-end price increase from the alleged misrepresentations?

MS. WOLKE:  Object to form.

A   I'm pointing out that that's what was alleged, and nobody has disputed it.

Q   And is that your opinion, sir?

A   I'm of that opinion.  It's not one that I'm proffering at the moment, but I'm of that opinion.  I mean, it was alleged.  He had the opportunity to address it, and he didn't.  It's indisputed.  It's an undisputed allegation.

So I'm of that opinion.  It's not one that I wrote up as one of my conclusions in this report.

Q   Was it an analysis that you

Page 51

conducted, sir?

MS. WOLKE:  Object to form.

A   Well, I did conduct some analysis.  I saw that there was -- I as well as Dr. Zurek saw that there was a statistically significant increase on the first day of the class period.  I saw that.  That's consistent with this conclusion.

Q   And was part of your scope to conduct that analysis?

MS. WOLKE:  Object to form.

A   No, because -- specifically, no -- no -- in a sense yes, and in a sense no.

My -- the scope was to address Dr. Zurek, and I observed that he didn't challenge that.  In my initial work in this case, I began to do something like that until I realized, wait a minute, that's unnecessary.  He doesn't dispute that there's price impact evident in the first two corrective disclosures so he's not disputing that there was an introduction of inflation before then.

That's why I -- because it's undisputed, it wasn't -- that's why it fell out of the scope of this report.

Page 52

Q   Now, when you say that your scope was to address Dr. Zurek -- the work that you did was based on drawing inferences from the back-end price declines on the alleged corrective disclosure dates, correct?

MS. WOLKE:  Object to form.

A   Wait, I -- hold on a -- I'm pretty sure in this report I do point out what's not disputed, and so, you know, everything I gave in my prior answer, that is in my report.

You know, he doesn't dispute price impact with respect to the first two corrective disclosures dates, and therefore he doesn't dispute that there was price impact on the days before that.

So that is actually in this report.

Okay.  That's what I'm -- sorry, that's what I was thinking about when you were asking your next question.

So then your next question was what?

Q   Okay.

I'm going to leave aside your characterization of what Dr. Zurek did or did

Page 53

not do.  We'll get back to that.

Your opinion -- again, I'm focusing on your opinion.  Your opinion is based entirely on inferences drawn from the back-end price declines on the alleged corrective disclosure dates, correct?

A   False.

Q   What is it based on?

A   I told you.  You asked exactly that question, and I told you earlier.  It does consider that the stock price did fall significantly on the third and fourth corrective disclosures.

It's also based on what information was provided to the market on those days.  I explained that in my report.  And it's based on my analysis of Dr. Zurek's analysis where he excludes that information -- that corrective information from his characterization of the allegations.

So it's not just a statistical analysis.  I've put the pieces together to see that he hasn't proved that there was no price impact on those days.

Q   Sir, you understand that plaintiffs

14 (Pages 50 - 53)

Page 54

have alleged misrepresentations on dates after the first day of the putative class period, correct?

A   Yeah, I spoke to that earlier.  There were about five or so different dates.

Q   For any date after the first day of the putative class period, did you analyze whether any of the alleged misrepresentations had price impact?

MS. WOLKE:  Object to form. Asked and answered.

A   I didn't have to break down when the inflation was introduced.  No, I -- hmm.

I mean, that goes back to the fact that I looked at the misrepresentations and omissions collectively and holistically. There was -- there was -- I was able to assess what the market knew and what the market didn't know throughout the course of the class period leading up to the corrective disclosures, and I observed that what the market learned on the corrective disclosure dates was related to the allegations, and the evidence compels that it either caused or contributed to the stock price declines on those days.

Page 55

Q   Okay.

I'm going to ask you to put aside the corrective disclosure dates.  I'm focused on the alleged misrepresentations at the time they were made.

For any date after the first day of the putative class period, did you analyze whether any of the alleged misrepresentations had price impact?

MS. WOLKE:  Object to form. Asked and answered.

A   Well, they're all part and parcel of the same alleged fraud, of the same -- of the alleged -- of the same alleged deception. There was an opening deception and then subsequent misrepresentations and omissions that supported it.

So they don't disaggregate neatly, and it wasn't necessarily to disaggregate them neatly.

Q   Sir, so it's your position, no, you did not evaluate those alleged misrepresentations after the first alleged misrepresentation individually to evaluate whether they had price impact?

Page 56

MS. WOLKE:  Object to form.

A   Well, right, I did not analyze them individually.  I analyzed them holistically and collectively.

Q   Now, sir, you're aware that the inference that a back-end price drop equals front-end inflation breaks down when there's a mismatch between the contents of the misrepresentation and the corrective disclosure, right?

MS. WOLKE:  Object to form.

A   Say it again, please.

Q   You are --

A   It was a long sentence.

Q   You are aware that the inference that a back-end price drop equals front-end inflation breaks down when there's a mismatch between the contents of the misrepresentation and the corrective disclosure, correct?

MS. WOLKE:  Object to form.

A   Right.  The quantifications might be different.  The quantifications might be different.  That's true.  Right.

But qualitatively, it's still possible if there's -- unless there's a

Page 57

complete mismatch.  I proved that there wasn't a complete mismatch.

Q   So in -- according to you, in order for the inference to break down, there has to be a complete mismatch?

MS. WOLKE:  Object to form.

A   It depends on whether you're quantifying inflation that way or assessing price impact.

If you're assessing price impact, there's -- if the corrective disclosure is informing the marketplace of what the misrepresentations and omissions had concealed from the marketplace, or if the corrective disclosures within the zone of risk that was understated on account of the misrepresentations and omissions, even if there's some mismatch, that would still be compelling evidence of price impact if the corrective information caused the price to go down and the corrective information was related to the misrepresentations and omissions in the way I described.

Q   So it's your position, sir, that the information has to be completely unrelated in

15 (Pages 54 - 57)

Page 58

order for there to be a mismatch?

MS. WOLKE: Object to form. Misstates testimony.

A Well, in order to say that the drop cannot possibly be considered evidence of price impact, the -- you would have to prove that the drop was caused by something entirely different from the misrepresentations and omissions.

Q From where did you derive that understanding?

A It's logic in economic analysis.

Q Now, sir, you understand that in conducting a matching analysis, that must be done for each alleged corrective disclosure, correct?

MS. WOLKE: Object to form. Foundation.

A One more time, please.

Q You -- you are aware that in conducting a matching analysis, that must be done with regard to each alleged corrective disclosure, correct?

MS. WOLKE: Same objections.

A What do you mean by a "matching analysis"?

Page 59

Q In evaluating whether there is a sufficient match between a back-end price drop and -- and front-end -- and a front-end alleged misstatement, you need to do that with regard to each alleged corrective disclosure individually, correct?

MS. WOLKE: Object to form.

A Well, I mean, if your question is -- if the question you're analyzing is is this event date, this corrective disclosure date, evidence of price impact, you would have to analyze that corrective disclosure date and what information came out on that corrective disclosure date, and then compare it to what the market did or didn't know on account of the alleged misrepresentations and omissions holistically.

Q You agree that the contents of the alleged misstatements and the alleged corrective disclosures must be considered in determining whether there's an adequate connection to support an inference of price impact, correct?

MS. WOLKE: Object to form.

A Right, that's what I did. In fact,

Page 60

that's what I criticized Dr. Zurek for not having done.

I compared the information that came out on the corrective disclosure dates to the information that was alleged to have been concealed from the marketplace and found a connection, and I explained it in my report.

He says he did it. He doesn't say there's no connection. He says that he thinks or he was directed by defendants' counsel to assume that the corrective information is outside the allegations, outside his -- the confines of how he characterizes the allegations.

But we actually agree on what was said on the corrective disclosure dates.

Q Okay.

Sir, again, I'm going to focus on what you did versus your view of what Dr. Zurek did or did not do.

Did your reply report analyze the contents of the alleged misstatements and the alleged corrective disclosures to see if they matched?

A Oh, yes.

Page 61

Q How did you do that?

A I did exactly what you said, and -- here, I'll show you. Let's go to the table of contents.

Notice that in the table of contents, I have -- Section IV is about the allegations, Part A, review of plaintiffs' allegations and related facts. And Part B, Dr. Zurek adopts an alternative interpretation.

So pages 11 through 19 are all about my analysis of the misrepresentations and omissions and what was alleged to have been concealed or misrepresented to the marketplace.

Then, for every one of these events -- Roman numeral V is about March 8th, Roman numeral VI is about June 7th, Roman numeral VII is about September 26th -- I look at what information came out in those announcements and how it relates directly back to what was misrepresented.

Q In conducting your matching analysis, did you compare the alleged misstatements to an equally generic corrective disclosure?

MS. WOLKE: Object to form.

A I don't -- I don't really know

16 (Pages 58 - 61)

Page 62

exactly what that means. Frankly, I don't think anybody really knows exactly what that means. That's what's being hashed out now with cases based on Goldman.

I mean, it wasn't -- look, it wasn't a generic misrepresentation that's alleged in this case.

In this case what's alleged is that it was false when the company did not -- attributed its good success at the start of the class period to a variety of factors that did not include procurement gains, and that they subsequently concealed specific numbers about the significance of transitory procurement gains.

Q   Sir, so your position is you don't understand what the concept of "equally generic" means?

MS. WOLKE:  Object to form. Misstates his testimony.

A   Well, I -- I guess I could talk about it, but it was irrelevant for this case, because there's nothing generic about the alleged misrepresentations in this case.  They were very specific about conditions at the

Page 63

company that had occurred.

Q   When you say "they" were very specific about the conditions that occurred, you're referring to the alleged misstatements or plaintiffs' allegations?

A   The alleged misstatements were -- the alleged misstatements and plaintiffs' allegations are not about generic statements made by the company.  They were about what the company said were the causes of its success at the beginning of the class period, and about what specifically was concealed about the impact of procurement gains on profitability -- procurement gains that had occurred on profitability and profits, adjusted EBITDA.

Q   What were the specific misstatements that you say that the company made?

MS. WOLKE:  Objection.  The complaint speaks for itself.

A   Right.

Q   Can you give me some examples of specific misstatements that the company made regarding the specific numbers regarding procurement gains?

A   These aren't --

Page 64

MS. WOLKE:  Object to form.

A   These aren't my allegations.  I mean, these are the plaintiffs' allegations.

I mean, Dr. Zurek characterized it as -- he says that the allegations were about that there was a significant and transitory procurement gains, so to what -- you know, how significant these things were, these procurement gains were, was not disclosed to the marketplace until the last corrective disclosure.

Q   I'm not asking about what Dr. Zurek did or did not do, again.  I'm asking you, what was the alleged -- give me an example of an alleged misstatement that was made that you say was specific regarding information that was concealed from the market.

MS. WOLKE:  Object to form.

A   Okay.

(The deponent read the document.)

In paragraph 39 of my report, I'll read it into the record.  It's from paragraph 207 and 208 of the complaint.

"First, Defendants failed to

Page 65

disclose both the number and the magnitude of 'strategic' and 'substantial' undisclosed forward buying opportunities during the Class Period.  This was a material trend that Defendants belatedly revealed at the end of the Class Period and was substantial.  The number and the magnitude of strategic forward buying opportunities was information that was known to Defendants during the Class Period."

So they're alleging there was important information that was concealed.

The next block, "Importantly, Defendant Howard effectively admitted that the Individual Defendants had access to information sufficient to understand the extent of UNFI's strategic forward buying practices during the Class Period."

Q   Okay.

A   So there's two examples.  There's others.

Q   I'm not asking you what the complaint alleges.  I'm asking did you look at the specific statements that defendants in this action made that plaintiffs characterize as misstatements and identify any examples in

17 (Pages 62 - 65)

Page 66

which those alleged misstatements made specific characterizations of the -- as you put it, the number and the magnitude of forward buying gains?

MS. WOLKE: Object to form.

A I thought you were specifically asking me what was in the complaint.

Q I'm asking you about specific alleged misstatements. I'm not asking about plaintiffs' characterization of statements that the defendants made.

A Oh.

Q I'm asking about actual misstatements attributed to the defendants in this case.

A I just want to point out before I answer that that there's three more quotes in paragraph 41 where the defendant -- or the plaintiffs specifically say that it was extent, not just existence of procurement gains, that was concealed from the marketplace, and my opinion is based on what was in the complaint.

But I think I have -- I don't think I have the specific misstatements in this report, but they might be in the other report. Let me have a look.

Page 67

(The deponent read the document.)

A I also based my understanding of plaintiffs' allegations on the judge's synopsis of the allegations in the motion to dismiss order, which is consistent with what I've been saying all along here, and is also written into my reply report.

Q Okay.

And, sir, I'm asking you a very different question. You keep referring me to plaintiffs' allegations. I'm asking you about the matching analysis that you did. And in conducting that matching analysis, did you look at the actual alleged misstatements attributed to the defendants, or did you simply look at plaintiffs' allegations regarding those alleged misstatements?

MS. WOLKE: Object to form.

A I looked at both. I also looked at how the Court characterized the allegations. I think that was very important. And I also looked at how Dr. Zurek characterized the allegations.

Q Show me any of those alleged

Page 68

misstatements that you looked at in your report.

A Well, they're in the complaint.

(The deponent read the document.)

I think -- I think they're also -- we may have talked about them in the last deposition. But the list of specific -- actually, the Court's order -- can I see the Court's order? The Court goes through each of the specific misrepresentations and points out what they mean.

So I remember -- I read that. It's cited in my report. I don't think I excerpted the specific misrepresentations into my report but I certainly considered them.

And if you want me to read them back to you, I would like to read them from either the complaint or the Court's order.

Q I'm asking you what you did, sir, in putting together this report.

So when you did your matching analysis, what did you look at?

MS. WOLKE: Objection. Asked and answered.

Page 69

A Yeah, I did answer that. I looked at the entire complaint and the Court's order. I looked at all of the misrepresentations and omissions that were alleged and how the plaintiffs characterized them and how the Court characterized them and how Dr. Zurek characterized them.

Q So --

A And determined that what the plaintiffs are alleging was concealed from the marketplace was not disclosed entirely until September 26, 2023.

Q So your matching analysis focuses on the plaintiffs' interpretation of those alleged misstatements, correct?

MS. WOLKE: Object to form.

Nilofer, that grossly mischaracterizes what he said. If you want to have his testimony --

MS. UMAR: If it --

MS. WOLKE: -- he just said it.

MS. UMAR: If it does, then he can provide an answer clarifying.

MS. WOLKE: He never said it focuses on. And you say that and then say

18 (Pages 66 - 69)

Page 70

"correct?" He just said what his analysis was.

MS. UMAR: Kara, I'm trying to understand what his -- because -- here, I'll read back his answer.

THE DEPONENT: Please.

MS. UMAR: "I looked at the entire complaint and the Court's order" --

MS. WOLKE: There you go.

(Simultaneous speech.)

MS. UMAR: -- "and misrepresentations and omissions that were alleged and how the plaintiffs characterized them."

MS. WOLKE: Right, and then you changed that to "focused to," and I'm not going to allow you to sit here and change his testimony in a way to try to get a "gotcha."

MS. UMAR: I'm not trying to change his testimony. I'm simply trying to understand what his testimony is.

MS. WOLKE: His testimony is --

BY ms.u:

Q   Did your matching analysis --

MS. WOLKE: -- the answer you just read, Nilofer.

Page 71

MS. UMAR: Kara, please stop interrupting me and allow me to ask my questions.

If I am mischaracterizing what the witness said, he can answer that and clarify what his testimony is. I'm not trying to trick him. I'm not putting words into his mouth. I'm asking questions. That's how a deposition goes. I'm going to --

MS. WOLKE: That was the definition --

MS. UMAR: If you keep interrupting me, I'm going to ask for my time back.

MS. WOLKE: Definition of putting words in his mouth.

MS. UMAR: It is not.

MS. WOLKE: Just reread that answer to yourself, Nilofer.

MS. UMAR: It is not.

MS. WOLKE: That was his answer. Reread it to him, please.

MS. UMAR: You know what? If an answer I'm getting is gobbledygook, the question is going to be gobbledygook when I'm

Page 72

trying to understand what the witness is saying.

Now please stop interrupting me and let me proceed.

BY MS. UMAR:

Q   Now, Dr. Feinstein, your matching analysis was based on how the plaintiffs characterized the alleged misstatements, correct?

MS. WOLKE: Object to form.

A   Only in part. Also on the misrepresentations and omissions themselves, and the Court's characterization of them, and also Dr. Zurek's characterization of them.

Q   Did you ever look at the primary sources that contained the alleged misrepresentations?

A   Yes.

Q   Did you look at them in connection with conducting the matching analysis in your reply report?

A   Yes.

Q   Now, Dr. Feinstein, we talked about how your opinions about price impact are offered in response to Dr. Zurek's price impact

Page 73

opinions, correct?

A   That's why it's called a reply report.

Q   Okay.

So the answer is yes?

A   Yes.

Q   And you state -- you state in paragraph 17 of your reply report that Dr. Zurek's opinion about price impact relates only to the period after the March 8, 2023 disclosure, right?

A   You said paragraph 17?

Q   Correct.

A   Yes.

Q   Okay.

So Dr. Zurek offers no opinion about the price impact or lack thereof of the December and March disclosures, correct?

A   It seems that way.

Q   Okay.

And so evaluating -- Dr. Zurek says that evaluating price impact on December 7, 2022, or March 8, 2023, was not part of his assignment, as defined in the Zurek report, correct?

19 (Pages 70 - 73)

Page 74

MS. WOLKE: I'm sorry, did you -- did you read that from somewhere?

MS. UMAR: Well --

MS. WOLKE: You said Dr. Zurek says that. I'm just wondering if you read that from somewhere.

MS. UMAR: Why don't I rephrase the question, Kara.

MS. WOLKE: Okay.

BY MS. UMAR:

Q Evaluating price impact on December 7, 2022, or March 8, 2023, was not part of Dr. Zurek's assignment --

MS. WOLKE: Object --

Q -- as defined in the Zurek report, correct?

MS. WOLKE: Object to form.

A Right. I -- but I also address that in my paragraph 18, what the implications of that are.

Q Okay.

But it wasn't part of his assignment, correct?

MS. WOLKE: Object to form. Calls for speculation.

Page 75

A Well --

MS. UMAR: I'm just simply asking him --

A Can I see his report?

MS. UMAR: -- what his understanding is based on how Dr. Zurek sets forth the scope of his assignment.

Q Sure, you can see his report. Why don't we mark that as an exhibit.

MS. WOLKE: The scope of his assignment and what he opined on are not necessarily the same thing.

MS. UMAR: I'm just asking Dr. Feinstein for his understanding as to the scope of Dr. Zurek's assignment.

Let's mark this as an exhibit, please.

MS. WOLKE: Okay. And that calls for speculation, but yeah, let's look at the report.

MS. UMAR: I'm not asking him to speculate. I'm asking him what his understanding is.

(Exhibit 4 marked for identification.)

Page 76

THE DEPONENT: Well, I --

BY MS. UMAR:

Q I can point you to paragraph 5 of Dr. Zurek's report as an example.

A Right. Yeah. I wrote about it in paragraph 9 of my report. I have an excerpt from his report. He says he was retained by counsel for defendants to do the following: "Assess economic evidence regarding the impact, if any" -- I'll skip a few lines -- "following the alleged corrective disclosure on March 8, 2023."

Q Correct.

And so as he sets forth the scope of his assignment, it does not include evaluating price impact on December 7, 2022, or March 8, 2023, correct?

A That's right.

Q Okay.

A So it remains undisputed or un- -- yeah. Price impact is undisputed for dates prior to --

Q Well, it's correct to say that he simply doesn't address it because it wasn't within the scope of his assignment, correct?

Page 77

A That makes it undisputed, yes.

Q Those are your words, sir, but he doesn't -- the fact is it wasn't within the scope of his assignment, correct?

MS. WOLKE: Object to form.

A That's right.

Q Now, you also reviewed Dr. Zurek's deposition transcript in this case, correct?

A I did.

Q I'm going to mark a copy of that deposition transcript as Exhibit 5.

(Exhibit 5 marked for identification.)

BY MS. UMAR:

Q And I'll direct you to page 64, lines 13, through page 65, line 10.

A Okay.

Q Are you there, sir?

A Yes.

Q And do you see there that Dr. Zurek testified that he has not analyzed whether the decline on March 8th was due to corrective information, right, or whether it was due to materialization of risks that were already known to the market?

20 (Pages 74 - 77)

Page 78

MS. WOLKE: Object to form.

A   It's my understanding that he, for whatever reason, did not study that.

Q   Okay.

Okay. Now, you can leave that to the side, sir, and I want to direct you to paragraph 16 of your report.

Okay. Are you there, sir?

A   I'm there.

Q   Now, you assert at paragraph 16 that Dr. Zurek acknowledges and does not challenge that corrective disclosures on 7 December 2022 and 8 March 2023 reasonably caused or contributed to the statistically significant UNFI stock price declines that occurred those days, correct?

A   Yes.

Q   Where does Dr. Zurek acknowledge that corrective disclosures on 7 December 2022 and 8 March 2023 reasonably caused or contributed to the statistically significant UNFI stock price declines that occurred on those days?

MS. WOLKE: Object to form.

(The deponent read the document.)

Page 79

A   He -- it's here. He said that the basis for his opinion that there was no price impact in the June disclosure or the September disclosure was that all the information that was corrective had come out in March. And that information that came out in March -- so he does accept that there is information that could be corrective. That's his definition of alleged truth.

And he says that alleged truth came out in March, and when that alleged truth came out in March, it caused a statistically significant stock price decline.

So that's his acknowledgment that a disclosure of what he calls the alleged truth had price impact.

Q   Where does he say in his report that there was price impact on March 8th?

MS. WOLKE: Object to form.

A   I don't think he says exactly those words but he says -- and you know it's there -- he says the alleged truth was disclosed and fully disclosed on March 8.

Q   Sir, that's --

A   And -- and that disclosure caused the

Page 80

stock price to drop.

Q   Isn't there a difference between saying that information comprising what plaintiffs believe to be the alleged truth was disclosed on a date versus that there was price impact on that date?

MS. WOLKE: Object to form.

A   Well, yeah, if you stop right there. No, wait. Could I hear the question again? What are we comparing?

Q   Isn't there a difference between saying that information comprising what plaintiffs to be -- believe to be the alleged truth was disclosed on a date versus that there was price impact on that date?

MS. WOLKE: Object to form, and you're misstating what his report says.

A   So Dr. Zurek does say the first part of that. He does say that this alleged truth was disclosed on March 8th. And he does agree that the stock price fell on March 8. And I'm pretty sure he says, "in response to that information."

Q   Where does he say "in response to that information"?

Page 81

A   Okay. Well, he acknowledges that the stock price did fall significantly on that day. That's for sure.

Q   Sir, we're focusing on where does he say it was "in response to that information"?

MS. WOLKE: Object to form.

(The deponent read the document.)

A   Okay. Well, the first sentence of paragraph 50 at least establishes that he agrees, or he said so, that he believes that the alleged truth was disclosed by March 8th.

Q   Where does he say --

A   Wait, wait. I'm not done.

So the first half of this analysis is at least clear in paragraph 50 of his report. And I'm not done.

Okay, the next -- in the first full sentence on the top of 26, it's not just before March 8th, he actually says it's on March 8th. "As I show below, on March 8, 2023, UNFI disclosed information comprising the alleged truth."

So now he has acknowledged that at least what he believes to be part of what

21 (Pages 78 - 81)

Page 82

was concealed by the misrepresentations and omissions was revealed on March 8th.

I'm not done. He then says that it was -- we're assuming it's an efficient market, "value-relevant information is quickly and fully incorporated into security prices. Therefore, the alleged truth would have been fully incorporated into the prices of UNFI securities soon after the March 8, 2023, alleged corrective disclosure."

I think that says it. That's where he acknowledges that the alleged truth caused the price to change.

Q   Where does he say that it caused the statistically significant UNFI stock price decline on that day?

MS. WOLKE:  Object to form.

A   He says that the information was efficiently incorporated into the security price that day, and we know -- and elsewhere he says that day the stock price fell significantly.

Q   Where does he say that that specific information caused the stock price decline?

MS. WOLKE:  Object to form.

Page 83

A   He says -- it's here in paragraph 50. You probably won't ever agree with my interpretation of this or my reading of it, but it says -- I'll read it again.

He says, "As I show below, on March 8, 2023, UNFI disclosed information comprising the alleged truth. This information was then also discussed by security analysts, consistent with the fact that this information was publicly available by that date. In efficient markets, value-relevant information is quickly and fully incorporated into security prices, as discussed in Section 6. Therefore, the alleged truth would have been fully incorporated into the prices of UNFI securities soon after the March 8, 2023, alleged corrective disclosure."

I don't think there's any backpedaling from that. He's saying there was price impact evident on that day.

Q   Sir, do you agree with the notion that in an efficient market, information that is not new would not be expected to move the company's stock price?

A   Depending on how you define "new,"

Page 84

but yes. But it would have to be really stale information and even the source of it --

Q   So --

A   I'd like a moment to read paragraph 51, so just one moment, please.

Q   Is there a question pending that relates to that, sir?

A   Yeah, it is. I might amend my last answer.

(The deponent read the document.)

Okay. I'm fine.

Q   Now, sir, in an efficient market, if information is disclosed that is not new, one could say that an efficient market would incorporate that information without that causing a stock price to decline or increase, correct?

MS. WOLKE:  Object to form.

A   Okay.

Q   Okay.

And in paragraph 50, Dr. Zurek is simply saying that on March 8th, the information that was disclosed in an efficient market would have been expected to be

Page 85

incorporated into the stock price, correct?

A   That's right.

Q   He's not --

A   No, it's not simply that; he said it was also discussed by security analysts. We all know that the security analysts discussed it that day, and we also know that the stock price fell that day.

Q   He never says anything about a stock price decline on that day, does he, in this paragraph?

MS. WOLKE:  Object to form.

A   Well, not in this paragraph, but elsewhere, he does.

Q   And nowhere does he say that this specific information we're talking about caused the stock price decline on that day, does he?

MS. WOLKE:  Object to form.

A   I think he does. I think that's what's in paragraph 50.

Q   Didn't we just talk about how in an efficient market, information that is not new can be incorporated without moving the stock price?

MS. WOLKE:  Objection to form.

22 (Pages 82 - 85)

Page 86

A    But there was new information that day.

Q    Where does he say that this was new information?

A    UNF -- he says it: "UNFI disclosed information comprising the alleged truth." He doesn't say repeated information disclosing -- you know, comprising the alleged truth, or reiterated information. He says UNFI disclosed information comprising the alleged truth.

Q    He doesn't use the word "new" anywhere, does he?

MS. WOLKE:  Objection.

A    I think "disclosed" means new.  I think he --

Q    Can you read his mind?

MS. WOLKE:  Object to form.

A    I can read his words.

MS. WOLKE:  Object to form.

Q    And in your -- according to you, "disclosed" always means new information?

A    Well, in this case, it --

MS. WOLKE:  Object to form.

A    In this case, it does.

Page 87

Q    So according to you, "disclosed" means new, always?

MS. WOLKE:  Object to form.

Q    When you're talking about disclosures.

A    I think in this case, it does.  I mean, those are the words he chose, UNFI disclosed -- he says "on March 8, 2023, UNFI disclosed information comprising the alleged truth."

Q    Where in anywhere in Dr. Zurek's report does he acknowledge that corrective disclosures on 7 December 2022 reasonably caused or contributed to the statistically significant UNFI stock price decline on that day?

MS. WOLKE:  Object to form.

A    Well, we can certainly all agree he doesn't challenge it.  Whether he acknowledges it, I believe he does, because his argument is that after March 8, corrective disclosures could not have been responding to disclosures -- to corrective disclosures because the market had responded earlier. That's how I read his report.

Page 88

Let's see if I can be a little more specific, though.

(The deponent read the document.)

A    I'm getting this mixed up.  Here we are. Well, in his report, he does have characterization of what happened on those days.  Well...

(The deponent read the document.)

A    All right.  I -- paragraph 31 of my report speaks to his discussion of those days. I have a footnote 54 which cites to paragraph 213 of his report, paragraphs 29, 48 and 89, and his deposition transcript, pages 37 and 38, so I'll take the time to go through those if you like.

Q    We've been sitting here for nearly three minutes, sir.  We can look at paragraph 213 of Dr. -- which paragraph?

(Counsel conferred.)

Q    Paragraph 213 of the complaint, that's what you're relying on?

A    No.

Page 89

Q    What are you relying on for your statement that Dr. Zurek acknowledges, in your words, that the corrective disclosures on 7 December 2022 reasonably caused or contributed to the statistically significant UNFI stock price decline on that day?  Where does Dr. Zurek acknowledge that?

MS. WOLKE:  Object to form.

(The deponent read the document.)

A    Okay.

(The deponent read the document.)

Q    Now, sir, I don't have all day.

A    Yeah.

Q    Can you find anything?  I'm going to let the record reflect I asked the question nearly six minutes ago.  You've been looking at the document in the meantime.

A    Yeah, I'm looking at his report.  I think he does.  He agrees with me on what was said.  He agrees with me -- we both agree, rather, on what the announcements were. We both agree that they were

23 (Pages 86 - 89)

Page 90

related to the allegations, and we both agree that the stock price fell statistically significantly. And I'm pretty sure elsewhere in his report he says that this was a materialization of a -- you know, should be characterized that way, as materialization of a risk, essentially saying that these developments are what caused the stock price to fall. But --

Q   Sir, you haven't been able --

A   -- like I said, on page 10, I've got a lot of footnoting. I'd have to go through each of those to find the smoking gun, as it were.

Q   You haven't been able to identify any such smoking gun in your past six minutes of review of Dr. Zurek's report, have you?

A   Fair enough. But I -- but it's clear that he doesn't dispute -- he doesn't dispute that the drops that -- on December and March were caused by corrective disclosure. That's clear.

Q   Well, he simply doesn't address it because it's not within the scope of his assignment, correct?

Page 91

MS. WOLKE:  Object to form.

A   Well, if you look at these footnotes on page 10 of mine, and you go to each of these sources, he does address those days in numerous places. So he does address those days.

Q   Let's look --

A   And he accepts what was said those days and he accepts that the stock price fell significantly and that the market was efficient.

Q   Sir --

A   And he even characterizes those announcements as being materializations of risk.

So I think -- I think what I said is fair.

Q   Sir, where does Dr. Zurek affirmatively opine that on December 7th there was a materialization of risk?

MS. WOLKE:  Object to form.

Q   I'm asking where does he opine that as opposed to simply reciting what the plaintiffs' allegation is.

A   I'm not sure. So you're right, I've been looking at it for six minutes. I would

Page 92

need more time.

Q   Not addressing something is not the same thing as acknowledging it, correct?

MS. WOLKE:  Object to form.

A   The gist of his entire argument is that the impact of the misrepresentations and omissions had already occurred by the end of March 8.

I think it's an implication that he's therefore acknowledging that those drops were caused by the disclosures.

Q   Sir --

A   Well, he'll testify --

Q   Can't you acknowledge that there's a difference between saying there was no inflation in the stock price, artificial inflation in the stock price after March 8 versus that a specific statement on 7 December 2022 caused a statistically significant stock price decline on that day?

A   I lost you. I --

Q   Can't you acknowledge that there's a difference between opining that there was no artificial inflation in a stock price after March 8 is not the same thing as offering an

Page 93

affirmative opinion that on 7 December 2022, a specific statement caused a statistically significant stock price decline?

Those are different things, aren't they?

MS. WOLKE:  Object to form.

A   Not -- not in his argument.

His argument is that all of the stock price impact that would have been felt had already occurred by March 8th because all of the truth had come out by March 8th.

I mean, that is his argument. And then when he -- if you look at his report to see what does he say about when that information came out, he says it's on the two -- corrective disclosure 1 and corrective disclosure 2.

So I mean, it's an implication of his argument that I -- you know, I understand you want to back away from, but it is his argument.

Q   Sir, where does Dr. Zurek opine that the statement on 7 December 2022 is in his opinion a corrective disclosure?

MS. WOLKE:  Object to form.

24 (Pages 90 - 93)

Page 94

A   Of course he's not using those words, but he says that the alleged truth -- I mean, he says that there's an -- the alleged truth is the body of facts that are alleged to have been concealed, and he says it was disclosed on those days.

I did review that sentence.  He acknowledges that it was disclosed -- fully disclosed by -- his opinion is that it was disclosed on March 8th.

Q   Dr. Zurek never says that was new information, does he?

MS. WOLKE:  Objection.

A   We already went through this.  He uses the word "disclosed."  He doesn't say "reiterated."  He doesn't say "recapped."  He says "disclosed."

Q   But he doesn't say it was new, does he?

A   Yeah, he --

MS. WOLKE:  Object to form.

A   If you want to argue that, feel free.  But my understanding of the word "disclose" is that -- in this context, it means something new.

Page 95

Q   That's your understanding, correct?

A   Oh, that's my understanding.

Q   And you haven't spoken with Dr. Zurek to confirm that's his understanding, right?

MS. WOLKE:  Object to form.

A   I haven't spoken to Dr. Zurek.

Q   You can't read Dr. Zurek's mind, obviously, right?

A   I can read his words, and he used the word "disclosed."

Q   I'm not asking whether you can -- whether he used the word "disclosed."  I'm asking whether you can read his mind to know whether he believes the word "disclosed" means something new.

MS. WOLKE:  Object to form.

A   I guess that's why there's judges and juries.  We'll see what the word "disclosed" means.

Q   I'm asking whether you know what he had in his mind.

MS. WOLKE:  Object to form.

A   I can only read the words he uses, and he used the word "disclosed."

Q   Let's move on, sir.

Page 96

Now, the "alleged truth" is a defined term used in your report to defer -- excuse me.

The "alleged truth" is a defined term used in your report to refer to Dr. Zurek's definition of the information that plaintiffs allege was concealed.

MS. WOLKE:  Object --

Q   And that plaintiffs contend the alleged corrective disclosures revealed to the market, correct?

MS. WOLKE:  Object to form.

A   Dr. Zurek constructs the term "alleged truth" and defines it.  I refer to his construction.

Q   Correct.  That's simply all I'm asking.

And in paragraph 53, you quote Dr. Zurek as defining "the alleged truth" to be that inflation-related forward buying opportunities were a significant but temporary driver of improvements in UNFI's gross margin, correct?

A   I quote -- I -- I have an excerpt there quoting from Dr. Zurek's report where he

Page 97

says that --

(The deponent read the document.)

A   -- that that's what plaintiffs according -- that's what plaintiffs alleged should have been disclosed during the proposed class period.

Q   Yes.  That's all I'm asking.

And as we'll discuss in a minute, you disagree with how Dr. Zurek defined the "alleged truth," correct?

A   That's correct -- well, yeah, what he confines it to.

Q   So let's set that criticism aside for a moment.

Now, hypothetically, if you assume that the "alleged truth" was correctly defined by Dr. Zurek, you don't dispute Dr. Zurek's opinions, correct?

MS. WOLKE:  Object to form.  What opinions?

Q   Well, if the alleged truth is as defined in the Zurek report, is it your opinion that there was still price impact on 7 June 2023?

25 (Pages 94 - 97)

Page 98

MS. WOLKE: Object to form.

A   Reasonably, that there -- that the evidence is compelling and that one reasonably can draw that conclusion. That's what I wrote in the report.

Yes, I would still say so, because even in his words, he says that what was concealed is that inflation-related forward buying opportunities were a significant but temporary driver of improvements in UNFI's gross margin. And how significant they were -- the significance, rather, the significance of the forward buying did not become apparent to the market until the last corrective disclosure in September of 2023.

Q   So when -- according to you, even if the alleged truth is as defined in the Zurek report, your opinion is that there was still price impact on 7 June because UNFI needed to disclose that forward buying had been significant?

MS. WOLKE: Object to form.

A   Yeah, the significance of the forward buying was not disclosed until September of 2023.

Page 99

I mean he -- all right.

Q   Where in your report do you challenge Dr. Zurek's opinions as premised on the alleged truth?

MS. WOLKE: Object to form.

A   Right here on the page we're looking at. For example -- I mean, numerous places.

Q   Which page --

A   I really think that's the fatal flaw in his argument, the major fatal flaw.

But my paragraph 54 says, "It is my understanding that Dr. Zurek's alternative 'alleged Truth'" -- quote/unquote, "Alleged Truth" -- "differs markedly from what Plaintiffs actually allege is inconsistent with the Court's motion to dismiss order, and, contrary to Dr. Zurek's contention, is not what I testified to in my deposition," and then I go on.

"Dr. Zurek's alternative alleged truth falls short of capturing the totality of plaintiffs' allegations."

Elsewhere in my report -- I mean, I can keep on reading. But elsewhere in my report, I specifically say that the chief

Page 100

reason he arrives at erroneous conclusions is because how he defines the alleged truth.

Q   Sir, you're misunderstanding my question, so I'm going to ask you to focus on my question.

If you assume that the alleged truth is as Dr. Zurek has defined it, you have not done any analysis to show that Dr. Zurek's opinions are wrong, correct?

MS. WOLKE: Object to form.

A   I think that's false. I've shown that the significance of procurement gains was not fully revealed to the market until September 2023, and Dr. Zurek ignores that fact.

Q   So according to you, you have done analysis to show that Dr. Zurek's opinions are wrong even if you accept his definition of the alleged truth?

A   Well, you would have to accept his definition and how he's interpreting his definition.

He's misunderstanding -- he did use the word "significant," but he ignores the fact that the significance wasn't revealed when

Page 101

he says it was revealed.

Look, I mean, his opinion -- I think we can all agree -- I mean, he had a deposition. He can speak for himself.

His opinion is that what came out in June and September was not -- was not related to the alleged allegation -- to the allegations, the alleged misrepresentations and omissions. And my opinion is that they were.

Q   I'm not asking what your opinion is, sir. I'm asking, is there any evidence you can point to in your report that if the alleged truth is as Dr. Zurek defines it, that there was still a price impact on 7 June 2023 or 26 September 2023?

MS. WOLKE: Object to form. Asked and answered.

A   Right. I explain in my report that the market did not know -- it was -- it was information that the market was deprived of, they did not know the significance of procurement gains in producing the company's profits and profitability in the first two quarters of fiscal year 2022 and the fourth quarter of 2023 until September of 2023. They

26 (Pages 98 - 101)

Page 102

did not know that significance.

And the announcements the company made on September 25, 2023, told the market the significance of prior procurement gains.

Q   Okay.

So --

A   And it was -- and if the market had known the significance of prior procurement gains -- I explain this in my report -- the announcements that were made that day would not have been surprising and would not have driven the stock price down.  Therefore, the evidence is compelling that they -- they -- that they had caused inflation, those misrepresentations and omissions, and that they were responsible for the losses that were realized on that day.

Q   Okay.  So your --

A   Or the day after that.

Q   Your position is that it doesn't matter whether the alleged truth is as Dr. Zurek defines it or as you define it; you're still going to reach the same conclusions?

MS. WOLKE:  Object to form.

Page 103

A   Well, see, the problem is he defined it this way, but then he ignored the word "significant."

So it's not just how he defined it.  It's how he used it.  So I disagree with how he defined the alleged truth and then how he used his definition.

Q   Okay.  But I'm not asking that question, sir.  I'm going to repeat my question again.

Your position is that it doesn't matter whether the alleged truth is as Dr. Zurek defined it or as you define it; you're still going to reach the same conclusions, correct?

MS. WOLKE:  Object to form.  Asked and answered.

A   Well, "defined" and "used."  It's -- I mean, the way he uses the definition tells you he's defining it differently from what the words say.

Q   Sir --

A   So I would -- I mean, I can --

Q   Focus on my question.

A   I can accept those words -- I can

Page 104

accept the words he used.  I just can't accept the use of those words as -- that he put them to.

Q   So you're saying you can't accept Dr. Zurek's definition?

A   I don't accept his definition.

Q   You just said you can.

MS. WOLKE:  Under your hypothetical, Nilofer.

A   Right.  But I don't.

Q   Okay.

Now, sir, you offer your own view of the information plaintiffs allege defendants concealed, correct?

A   Say it --

MS. WOLKE:  Object to form.

A   Say it again, please.

Q   You offered your own view of the information plaintiffs allege defendants concealed, correct?

A   I have like six pages explaining what plaintiffs' allegations are based on what's in the complaint, based on what the judge said, and even based on what Dr. Zurek said.

Q   Okay.

Page 105

So the answer is yes?

MS. WOLKE:  Object to form.  No.  Nilofer, do not mischaracterize his testimony.

MS. UMAR:  Well, when I ask him a question, he can't answer it.  He just provides his own -- whatever he wants to say.

BY MS. UMAR:

Q   You're offering your own alternative formulation of the information plaintiffs allege defendants concealed, correct?

MS. WOLKE:  Object to form.

A   Well, I have a section in my report -- this is responsive to your question --

(The deponent read the document.)

Paragraph 36, I write, "To illuminate the disconnect between plaintiffs' allegations and Dr. Zurek's mischaracterization, I next review plaintiffs' allegations."

So yes, I am saying that my understanding of the allegations is different from Dr. Zurek's.

Q   Okay.  So that's -- that's all we're

27 (Pages 102 - 105)

Page 106

trying to get at.

So I -- if I refer to your understanding of the allegations -- and I want to differentiate them from Dr. Zurek's alleged truth, I'm going to refer to your view as the alternative disclosure.

Can we just keep that in mind so I don't have to use as many words?

A   Disclosure or allegation?

MS. WOLKE:  Object to form.

Q   Well, the allegations relate to what was allegedly concealed from the market, correct?

A   That's right.  But even Dr. Zurek and I agree on what was disclosed.

Q   Okay.

And what -- what -- I'm simply trying to get at a concept of the information that plaintiffs believe should have been disclosed at the earliest possible opportunity in order to reveal the alleged truth.

That's all I'm getting at.  Do you understand what I have in mind?

A   I do.

MS. WOLKE:  Object to form.

Page 107

Q   And I'm going to refer to that as the alternative disclosure.  Does that make sense?

MS. WOLKE:  Object to form.

A   It doesn't.  Alternative to what?

Q   An alternative to what plaintiffs say actually was disclosed.

MS. WOLKE:  Object to form.

A   Oh, you mean prior to disclosure dates.

Q   Yes.

A   Well, then I don't think we can call them disclosures.

Q   Sir, I'm simply --

A   That would be -- that would be confusing.

Q   Sir, what I'm trying to get at is the -- okay.

Do you understand that Dr. Zurek has a concept called the alleged truth, correct?

A   Yes.

Q   And your belief is that the alleged truth is underinclusive, correct?

A   That's right.

Q   And so what I'm trying to get at is

Page 108

just a phrasing to capture your understanding of what the alleged truth should have been had it captured whatever additional information you believe it should have captured.

MS. WOLKE:  Object to form.

A   I write about that extensively in my report.

Q   Okay.

And so --

A   It's -- anyway -- it's -- it's not just the existence of procurement gains.  It's the extent and impact of the procurement gains had to have been disclosed.

Q   I'm simply asking what do you want to call that.  Do you want to call that the alternative truth instead of the alleged truth?

A   I'd like to call it plaintiffs' allegations.

Q   Okay.  Let's talk about it as plaintiffs' allegations.

A   Okay.

Q   Now, in paragraph 20, you opine that plaintiffs also allege that the misrepresentations and omissions concealed the magnitude of the procurement gains and the

Page 109

extent to which procurement gains have boosted prior profits and profitability; do you see that?

A   Yes.

Q   Okay.

So your view of plaintiffs' allegations is that defendants should have disclosed the magnitude and extent of inflation-related forward buying, correct?

MS. WOLKE:  Object to form.

A   I'm not saying they -- I'm saying that plaintiffs are alleging that, yes, that that information was concealed, that once the company was talking about what was driving their profits and profitability, that information would have been important to investors.

Q   Okay.

And it's your opinion that the four alleged corrective disclosures together fully revealed the magnitude and extent of inflation-related forward buying, right?

A   Well, enough so that the stock price would not be inflated any more.

Q   Okay.

Veritext Legal Solutions

www.veritext.com                                              888-391-3376

Page 110

Now, is it your opinion that UNFI could have disclosed the information in plaintiffs' allegations at the time of the first alleged misstatement?

MS. WOLKE: Object to form.

A   Well, as of the time of the first alleged misstatement, they could have told the market that procurement gains had boosted profits and profitability, and the market would have understood that that component of profits and profitability was transitory and not permanent.

So that's what could have been disclosed on the first day.

Q   And what is that based on?

MS. WOLKE: Object to form.

A   A combination of what plaintiffs are alleging and what I saw ultimately disclosed.

Q   Okay.

But you have no independent information based on internal company documents to support the view that the company could have disclosed that on that date?

A   Right.  I'm not -- I'm not a fact -- I know there's some contesting there.  I know

Page 111

that the judge dismissed or just disagreed with the contention that the market was -- that the company was ignorant of their own activities.

So taking that -- that's -- part of my understanding comes from the judge's order.

Q   You agree that UNFI could not have disclosed something it did not know, correct?

MS. WOLKE: Object to form.

A   In theory, yeah, as a theoretical principle, you can't disclose something you don't know.

Maybe someone could think of some philosophical exception, but generally, no.

Q   Now, you said that the company could have disclosed that procurement gains -- inflation-related procurement gains boosted profitability and were transitory, correct?

A   Oh, no.  It's an economic principle that they would be transitory.  It's plaintiffs' allegation that they could have disclosed it.

Q   Okay.

But you didn't mention that they

Page 112

could have disclosed at the earliest disclosure date that the procurement gains were significant.

Do you believe that the company could have disclosed that?

MS. WOLKE: Object to form.

A   Well, I don't -- it's not what I believe.  I mean, I believe that that's plaintiffs' allegation.  I didn't independently check those facts.

Q   Okay.

So your understanding of plaintiffs' allegation is that the company could have disclosed at the earliest disclosure date that inflation-related procurement gains were significant, that they boosted profitability, and that they were transitory, correct?

A   I'm sorry, are we talking about December of 2021 or December of 2022?

Q   Well, we're talking about the time of the first alleged misstatements.

A   Okay.

Q   So that's December 2021.

A   Right.  Okay.  You said disclosure

Page 113

date, so that -- the start of the class period, the first misrepresentation date that's alleged.

Q   Correct.

A   That's their allegation, that they could have disclosed -- well, partial -- they could have disclosed -- let's see.

So...

(Pause.)

I -- can I actually have a piece of paper and a pencil?  I mean, the dates here are hard to keep track of.  You can make it an exhibit if you want.  I'd just like a -- some paper to keep track of the dates.

MS. UMAR:  Why don't we mark this as Exhibit -- what are we on, 6? -- Exhibit 6.

(Exhibit 6 marked for identification.)

A   All right.  So we have...

(Pause.)

Q   Sir, are you almost done there?

A   I've just got to think about something.  All right.  Sure.

Actually, wait, one second.

29 (Pages 110 - 113)

Page 114

(Pause.)

A   Oh, I see the mistake I made.

(Pause.)

A   Okay.  All right.

Q   Okay.

Now I'm going to go back to my question again.

Your view regarding what plaintiffs allege that UNFI could have disclosed at the time of the first alleged misstatement is that inflation-related procurement gains boosted profitability, that they were significant, and they were transitory, correct?

A   Right.

Q   Okay.

Anything else?

MS. WOLKE:  Object to form.

A   Well, how significant -- yeah, how significant, to what extent they boosted the gains.

Q   And what would that disclosure have required?

MS. WOLKE:  Object to form.

A   A quantification of what -- of how

Page 115

much procurement gains there were.

Q   Okay.

So your position is that UNFI could have disclosed and should have disclosed according to plaintiffs the dollar amount of gross profits from inflation-related forward buying within that quarter?

MS. WOLKE:  Object to form.

A   That would -- well, once they start talking about what's driving profits and profitability, which is what the company did in that earnings announcement conference call, an analyst would have -- who wanted the full truth would have wanted to know that, too.  How much of the company's reported profits, adjusted EBITDA, and how much of the gross margin that was reported was attributable to procurement gains.

That's what an analyst would have wanted to know and --

Q   I'm not asking --

A   And I believe that's what plaintiffs are saying should have been disclosed once the company started talking about the causes of their profits and profitability.

Page 116

Q   That's what I'm focused on.  Not what analysts would have wanted, what you understand plaintiffs allege UNFI should have disclosed.

A   Right.

Q   And your understanding is that plaintiffs allege that UNFI should have disclosed the precise dollar amount and contribution to margin in percentage points from inflation-related forward buying within that quarter?

A   Well, I don't --

MS. WOLKE:  Object to form.

A   I didn't say "precise," I mean, but some factual indication.

Q   What do you mean by "factual indication"?

A   What do you mean by "precise"?

Q   Dollar amounts, specific percentage points?

A   As best they could, yeah.

I mean, that's what the analysts are going to be working with in their evaluation models, is how much profit is recurring and how much is nonrecurring.

Q   And I'm not asking about analysts;

Page 117

I'm asking what you understand plaintiffs allege UNFI should have disclosed.

We're not talking about analysts whatsoever.

MS. WOLKE:  Object to form.

Q   Now, sir, in -- well, I guess --

We talked earlier about how you opine that Dr. Zurek's view of the alleged truth is narrower than plaintiffs' allegations, correct?

A   Right.  He leaves out the significance, how significant procurement gains were to the company's profits and profitability.

MS. UMAR:  Okay.

Actually, before we keep going, why don't we go off the record and take a break?

THE VIDEOGRAPHER:  We are now going off the record.  The time is 12:00 p.m.

(Recess.)

THE VIDEOGRAPHER:  Okay.  We are now back on the record.  The time is 12:23 p.m.

BY MS. UMAR:

Q   Okay.

30 (Pages 114 - 117)

Page 118

Dr. Feinstein, I'm going to hand you a document that I'm marking as Exhibit 7.

(Exhibit 7 marked for identification.)

BY MS. UMAR:

Q    This is the company's December 8, 2021 earnings release.

I'm going to ask you to turn to the paragraph that starts with "Gross margin rate in the first quarter."

It should be just a few pages into this document under the heading "First Quarter Fiscal 2022 Summary."

Do you see that?

A    I do.

Q    Okay.

Now, can you read that paragraph?

A    "Gross margin rate in the first quarter of fiscal 2022 was 14.89 percent of net sales compared to 14.51 percent of net sales for the first quarter of fiscal 2021.  The increase in gross margin rate was driven by improvements in the wholesale segment margin rate, including the impact of inflation and the

Page 119

company's value path initiative.  Retail gross margin rate declined modestly compared to last year."

Q    Okay.

Now, Dr. Feinstein, one of the disclosed drivers of margin was the impact of inflation, right?

A    That's right.

Q    And another disclosed driver was the value path initiative, right?

A    Yes.

Q    UNFI did not quantify the impact of any of those drivers of margin that it disclosed, correct?

A    No, but there was also some discussion of the sources of the improvement in the company's conference call.  There was a more fulsome list that the company provided of drivers of improvement.

Q    Okay.  I'm focusing on this document.

In this document, the company did not quantify the impact, if any, of those drivers of margin that it disclosed, correct?

A    That's correct.

Q    Now, you opined that in revealing the

Page 120

truth, UNFI should have disclosed the magnitude and extent of inflation-related forward buying, right?

MS. WOLKE:  Object to form.

A    I never said that.

Q    Well, your understanding of plaintiffs' allegations is that in revealing the truth, UNFI should have disclosed the magnitude and extent of inflation-related forward buying, right?

MS. WOLKE:  Object to form.

A    That's not quite right either.

Q    What is right then?

A    Well, it's plaintiffs' allegation, not mine, and the allegation is that had the company here and -- or in the conference call when they -- when they addressed this issue again, told the marketplace the significance of procurement gains, that would have been important information to the market and would have essentially kept the market from overestimating profit and profitability going forward a year later.

Q    Is your understanding of plaintiffs' obligations that UNFI had to disclose the

Page 121

significance of procurement gains to avoid misleading the market?

MS. WOLKE:  Object to form.

A    No.

Q    Then what is your understanding of what UNFI, according to plaintiffs, was obligated to disclose to avoid making a false statement or omitting material information?

MS. WOLKE:  Object to form.  Asked and answered.

A    Well, I'm not a lawyer and I'm not an expert in regulation, but as a financial analyst, I know that had the market been informed about the significance of procurement gains, the market would not have been deceived about what was transitory versus what was a permanent or recurring impact on profit and profitability going forward.

Q    Okay.

What I'm trying to get at, Dr. Feinstein, is that you say that Dr. Zurek is underinclusive when he talks about the alleged truth, correct?

A    Right.

Q    And so what I'm trying to get at is

31 (Pages 118 - 121)

Page 122

the alternative to Dr. Zurek's alleged truth. Why don't we called that the Feinstein alleged truth?

MS. WOLKE: Object to form.

A I'd rather not.

Q Well, let's call it plaintiffs' alleged truth, if that makes you feel better.

MS. WOLKE: Object to form.

A It does.

Q So when we talk about plaintiffs' alleged truth, what do plaintiffs -- according -- what's your understanding of what plaintiffs understand that UNFI should have disclosed in addition to what was disclosed here?

MS. WOLKE: Object to form.

A I'm not an expert in regulation. I know a lot about regulation but I think there are people that are probably better regulatory experts than me. And what I can say from the perspective of financial principles is that had the market been informed about the significance of procurement gains in producing the surprisingly good profit and profitability results, such that the market would have known

Page 123

how significant was the nonrecurring, unsustainable component, the market would not have been deceived and would not have been -- would not have made under- -- overestimates of profit and profitability going forward.

Q Okay.

So -- Dr. Feinstein, I'm just simply trying to understand, you criticize Dr. Zurek for misunderstanding what plaintiffs believe the alleged truth ought to have been, correct?

A Well --

Q What --

A -- yes, he thinks everything was fully disclosed by the end of -- by March 8, 2023. And I -- a careful reading of the documents I told you about, the complaint and the motion to dismiss order, indicates that additional relevant information was only disclosed after March 8, 2023.

Q And what precisely is that additional relevant information that was only disclosed after March 8, 2023, according to you?

MS. WOLKE: Object to form.

A The impact of the procurement gains

Page 124

on profit and profitability. The extent of the activity and the impact it had on profit and profitability.

Q If UNFI had disclosed the extent and the impact on profit and profitability of forward buying in December of 2021, that disclosure would have been more specific than the alleged misstatement we just looked at, correct?

MS. WOLKE: Object to form.

A Yeah. But I do want to point out that there -- the company did -- the answer's yes, and the company spoke again about profit and profitability and the drivers thereof in its conference call, gave a longer list of drivers, and that longer list did not include procurement gains.

Q Sir, I'm focusing on this statement, so we're just looking at this document, this December 2021 document that's in front of you here.

And so the answer is if UNFI had disclosed the impact on profit and profitability and the extent of inflation-related forward buying gains, that

Page 125

information would have been more specific than the disclosure we just looked at in what I've marked as Exhibit 7, correct?

A I have a little trouble with the word "specific." It would have been more information than what was here.

Q Well, UNFI in this statement doesn't quantify the impact of inflation, does it?

A No, they don't even mention procurement gains. There's different kinds of inflation impacts. Procurement gain is one of them, and they don't even mention it, when it in fact turned out to be a major driver.

Q In this disclosure, UNFI does not quantify the impact of the value path initiative, does it?

A That's right.

Q So if UNFI had then disclosed the impact on profit and profitability and the extent of inflation-related forward buying, that would have been more specific than the information here, correct?

A It would have been more complete.

Q It also would have been more specific, correct?

32 (Pages 122 - 125)

Page 126

MS. WOLKE:  Object to form.

A    I don't know why you -- I don't like the word "specific."  I would use the word "complete."  I don't -- I mean, "specific," there's something funny about that.  I mean, to say that -- you know, specificity about something that's being concealed is a tough concept to get my head around.

Q    Sir, when you say UNFI should have disclosed the impact on profit and profitability and the extent of inflation-related forward buying, what do you mean by "extent"?

MS. WOLKE:  Object to form.

A    I don't think I said they should have.  If I did, I misspoke.  They could have, is what the plaintiffs are alleging, and if they would have, it would have informed the market in a manner that would not have been as misleading as what happened.

So I'm not saying they should -- I mean, "should" is like a legal determination, I guess, or a regulatory determination --

Q    When --

A    -- and I'm not offering a legal or

Page 127

regulatory opinion.

Q    Sir, when you say that your understanding of plaintiffs' allegations is that UNFI could have disclosed the impact on profit and profitability and extent of inflation-related forward buying, what do you mean by "extent"?

MS. WOLKE:  Object to form.

A    How much of this improvement from 14.51 to 14.89 was caused by procurement gains.  Some indication.

I mean, here, it's not even mentioned, procurement gains.  Any indication or any mention of procurement gains would have been more complete than this.

Q    So your view is that that information is needed to make this, in your words, more complete?

A    That information would have made the disclosure more complete and less deceptive.

Q    Let's --

A    Less misleading.

Q    I'm going to show you another document, which I'm marking as Exhibit 8.

(Exhibit 8 marked for

Page 128

identification.)

MS. UMAR:  I'm marking this one as Exhibit 8.

BY MS. UMAR:

Q    Okay.

Sir, I'm going to ask you to turn to page 27, the section on forward-looking statements.  This is UNFI's fiscal year 2022 10-K earnings release.

A    Okay, September 2022, right, the date of this?  Where's the date?

September 2022.

Okay.  Which page should I go to?

Q    This is page 27, sir.

Okay.  And I'm in the section on forward-looking statements.

Do you see where it says, "Our actual results could differ materially from those anticipated in these forward-looking statements as a result of various factors"?

A    Not yet.  Where's that?

Q    So this is in the second paragraph, the very last sentence.

A    "Our actual results could differ."

Page 129

Okay.  I see it.

Q    Okay.

And then it goes on to say, "including but not limited to."

A    Yes.

Q    And then -- and then on the next page, the second bullet is "moderated supplier promotional activity including decreased forward buying opportunities."

Do you see that?

A    I see that.

Q    Now, this is one of the challenged risk factor statements set forth in plaintiffs' complaint, correct?

MS. WOLKE:  Object to form.

A    I don't recall.  I'll take your word for it.

Q    Okay.

This risk factor statement does not quantify the impact of this risk factor, does it?

A    No.

Q    In fact, none of these risk factors that are set forth here on pages 27 through 28 quantify the risk factors, correct?

33 (Pages 126 - 129)

Page 130

MS. WOLKE: Object to form.

A That's correct. I think. Wait.

(The deponent read the document.)

Yeah, that's right.

Q Okay.

So when you say that your understanding of plaintiffs' allegations is that UNFI should have disclosed the impact on profit and profitability and the extent of inflation-related forward buying, that disclosure would be more specific than the alleged misstatement we just looked at, correct?

MS. WOLKE: Object to form.

A I never said they should have disclosed anything. I said that if they would have disclosed more, it would have been less misleading or maybe even not misleading at all to the marketplace.

Q Okay. Let me repeat the question, because I'm -- again, I couch this in terms of your understanding of plaintiffs' allegations. I'm not sure what the problem is, but I'll rephrase it.

Page 131

When you say that your understanding of plaintiffs' allegations is that UNFI would and could have --

A That's right.

Q -- disclosed the impact on profit and profitability and the extent of inflation-related forward buying, that disclosure would be more specific than the alleged misstatement we just looked at, correct?

A More complete and less misleading.

Q Okay.

Now, let's look at another document. I'm going to mark this one as Exhibit 9.

(Exhibit 9 marked for identification.)

MS. UMAR: Marking this one as Exhibit 9.

BY MS. UMAR:

Q And this one is the transcript from UNFI's December 7, 2022 earnings call.

Do you see that?

A Yes.

Q Okay. I am going to ask you to turn

Page 132

to page 8, sir.

Okay. And then do you see at the top of that page where it says -- this is a continuation of an answer that started on the prior page: "And so there will be some fluctuation, but I would describe what you saw in the first quarter as minor and just more a function of the temporary growth drivers in our customer file"?

Do you see that?

A Yeah, I need to see the whole question and answer, though, to understand it.

(The deponent read the document.)

Okay. I see it.

Q Okay.

And this was one of the statements that plaintiffs challenge as false or misleading, correct?

A Right.

MS. WOLKE: Object to form.

A Right.

Q Now, that statement doesn't quantify any of the drivers of margin either, correct?

A It kind of does.

Page 133

Q Where?

A Well, it -- it excludes procurement gains, so it's quantifying it at essentially zero.

Q Where does it exclude procurement gains?

A Well, the question was what do you attribute this decline to. Leah Dianne Jordan from Goldman Sachs asked, "Is there anything specific about this quarter we should keep in mind?"

Actually, let's start from the beginning of her question. "First, I wanted to start off on gross margins. I saw they were down a little bit in the quarter. You called out the mixed-- the mix shift to larger customers."

So she's pointing out that that's the explanation the company gave for the margin decrease.

Then she goes on. "Should we think about that pressure kind of persisting throughout the year or is there anything specific about this quarter that we should keep in mind?"

34 (Pages 130 - 133)

Page 134

Now, before I go on to the answer, plaintiffs are alleging that the correct answer would have been yes, we've lapped a period of significant procurement gains, boosting our profit and profitability, and you can expect to see that unsustainable effect abating.

That would have been the correct answer according to what plaintiffs allege.

But the answer that Mr. Douglas gave instead was, "Thanks, Leah, for the question. I mean, effectively, we're focused on driving healthy growth and gross profit dollars. And the reason for that is that we look at every single one of our customer agreements with a disciplined eye for economic returns. A lot of our growth in the first quarter came with some of our bigger customers. But over time, I think you saw that all of our channels grew. And so there will be some fluctuation, but I would expect what you saw in the first quarter as minor and just more a function of the temporary growth drivers in our customer file."

He's attributing zero. That's a

Page 135

quantification, zero, of the disappointment to procurement gains.

Q    Does he say --
A    That's a quantification.
Q    Does he say here that 100 percent of the decline in gross margin was attributable to mix shift?
MS. WOLKE:  Object to form.
A    He completely excludes procurement gains, so he's attributing 100 percent to other stuff.
Q    Does he quantify the relative contribution of the "other stuff"?
A    Yeah.
Q    Where?
A    Yeah, he excludes -- the other stuff is 100 percent if procurement gains is zero.
Q    But I'm talking about within that other stuff. One of the examples of the other stuff is mix shift, correct?
A    He doesn't break it out, but he excludes procurement gains.
Q    But that's my question. Does he break down what the drivers of the decline in gross margin are?

Page 136

MS. WOLKE:  Object to form.
A    When you say "break down," you mean like provide a percentage for each of the other drivers?
Q    Correct.
A    No, he doesn't do that, but he assigns nothing to procurement gain abatement.
Q    I'm not asking about procurement gain abatement. I'm asking about the drivers of the decline in gross margin.

He doesn't quantify those, does he?
MS. WOLKE:  Object to form.
A    Well, when you say that question, now, you are asking about procurement gains if you're asking about the decline in gross margin. At least that's what plaintiffs' allegation is.
Q    I'm talking about his statement taken at face value.

When he is talking about the drivers of the decline in gross margin within that quarter, he does not quantify the relative contribution of any of those drivers, does he?
A    So you're saying notwithstanding that

Page 137

he assigned a quantification of zero to procurement gains, which is what this case is about, looking at the other drivers, does he break them out and give percentages?

So if that's the way I should understand your question, the answer is he doesn't do that either.
Q    Yeah. And if he had added procurement gains, would that have made the statement not misleading in your view?
MS. WOLKE:  Object to form.
A    Depends what he would have said about procurement gains.
Q    What, according to you, would he have needed to say?
MS. WOLKE:  Object to form.
A    I -- I can't -- again, I'm not a regulation expert. But if he had disclosed how much procurement gains had been in the first quarter of 2022, and in the quarter subsequent to that, the market would have been -- would not have been as misled as they were.
Q    If Mr. Douglas had said how much procurement gains would have been in Q1 of 2022, is that an equally generic disclosure as

35 (Pages 134 - 137)

Page 138

what he's providing here?

MS. WOLKE: Object to form. Calls for a legal conclusion.

A   I -- I guess that's a legal question now, what's considered generic given the Goldman Sachs precedent.

I can speak to it from a financial point of view. I -- I can tell you that analysts were clamoring for more information throughout this class period, especially as the corrective disclosures transpired.

If he had been fully -- if he had -- if he had -- if he had told what the company knew about procurement gain -- if he had told the market everything there was -- everything they knew about procurement gains as of that point in time, we probably wouldn't be sitting here today.

Q   Sir, I'm not asking about what analysts might have wanted in your view.

You offer an impact that -- you offer an opinion that there was evidence of price impact --

A   Right.

Page 139

Q   -- on various dates, correct?

A   Right.

Q   Now, your understanding of the Goldman case is that there must be a match between an alleged misstatement and an alleged corrective disclosure, correct?

MS. WOLKE: Object to form.

A   Not a mirror-image match. I mean, I think there's plenty of cases where they said the match doesn't have to be a mirror image.

Q   And you do understand, however, that one of the concepts in conducting a matching analysis is that statements must be equally generic in nature, correct?

MS. WOLKE: Object to form. Misstates the case law.

A   Listen, I can speak to financial analysis and conclusions from economic and financial analysis. You know, I don't think anyone's looking to me to -- to interpret for this court the Goldman case. I can -- my opinion is that if the company had disclosed at that point in time what it knew about procurement gains, we probably would not be sitting here today.

Page 140

Q   Did you evaluate whether the alleged -- the plaintiff alternative truth which we've been talking about is equally generic to this statement that we just looked at from the December 2022 earnings call transcript?

A   Well, you're going --

MS. WOLKE: Object to form.

A   You're going to have to explain to me how this is a generic statement.

Q   I'm just -- I'm not --

A   What does generic mean?

Q   I'm not the individual testifying here. I'm asking what you did in your analysis.

A   Well --

Q   Was one of the things that you did in your analysis compare the plaintiff alternative truth to this statement to evaluate whether they were equally generic in nature?

MS. WOLKE: Object to form.

A   Well, this is not a corrective disclosure. That's actually an alleged misrepresentation, what we're reading here. And I did compare plaintiffs' allegations to

Page 141

corrective disclosures to see if the information that came out in the corrective disclosures addressed what was alleged to have been concealed or misrepresented by the misrepresentations and omissions. I did that comparison.

Q   And you're not answering my question, so I'm going to ask my question again, and I'll just read it out loud, because I didn't say whether it was a corrective disclosure. I didn't say whether it was a misstatement. I didn't say any of those things, so let's focus on my question.

Was one of the things that you did in your analysis to compare the plaintiff alternative truth to this statement to evaluate whether they were equally generic in nature?

MS. WOLKE: Object to form.

A   Can you please tell me -- I need to understand your question better, and I don't understand it the way you read it.

How are you defining "generic"?

Q   I'm not providing any definition, sir. Use whatever definition you have of that word.

36 (Pages 138 - 141)

Page 142

Have you heard the word "generic" before?

A   I've heard the word, but I can't answer your question that you asked me if you can't define the terms in your question.

Q   Well, sir, you define it how you want to.

A   I told you how I conducted my analysis.

I compared the allegations, including what was alleged to have been concealed from the marketplace, including what misled the marketplace, to the corrective disclosures.

And I saw that what was disclosed on all four of the corrective disclosure dates was partially corrective of the alleged misrepresentations and omissions.

I didn't use the word "generic." I don't think the word "generic" even shows up in my report.

Your question is asking about generic.  And so if you want me to answer a question about generic, it may be something I did, it might not be something I did, depending

Page 143

on how you are defining generic.

Q   Okay.  So let me ask a different question.

Was one of the things that you did in your analysis to compare the plaintiff alternative truth to this statement to evaluate whether they contained a similar level of detail?

MS. WOLKE:  Object to form.

A   I don't understand that question either.  I told you what I did do.  I don't know if I can characterize it within the rubric you're constructing.

I looked at what was alleged to have been concealed or misrepresented, and I looked to see when that concealment and misrepresentation was corrected.  Period.

Q   Is it your view that the federal securities laws require companies to disclose everything investors want to know?

MS. WOLKE:  Object to form.

A   I've already answered that I'm not an expert in regulation.  I can tell you that as a professor who teaches investments and as a financial analyst, chartered financial analyst,

Page 144

I would want as much information as I could get.  More information would be helpful.

Q   Is that the rubric through which you evaluated the alleged misstatements here?

MS. WOLKE:  Object to form.

A   No.

(Pause.)

MS. UMAR:  I'm marking this one Exhibit 10.

(Exhibit 10 marked for identification.)

BY MS. UMAR:

Q   Sir, one of the opinions you offer is that UNFI for the first time quantified the size of procurement gains, likely at least 50 million in Q3 2022, only as of June 7, 2023, correct?

MS. WOLKE:  Are you reading from a paragraph?

MS. UMAR:  Yeah, that's -- it's paragraph 91 of his report.  And so it's just -- his sentence -- I'll just read his sentence so that I'm not misstating.

THE DEPONENT:  If you can wait for me to catch up.

Page 145

Paragraph 91?

BY MS. UMAR:

Q   Yes.

A   Okay.

Q   Okay.

Do you see that, sir, you write in your second --

MS. WOLKE:  Oh, you're in the wrong -- the reply report.

A   So Exhibit 2?

Q   Yeah, so I think this is what we had marked as Exhibit 3.

MS. WOLKE:  Yes.

A   Something's missing.  Oh, is this it?  All right.

Q   Okay.

So it's --

A   Paragraph 91?

Q   Yeah, paragraph 91.  And you write, "Although UNFI previously acknowledged on 8 March 2023 that it had reached procurement gains in FY 2022, the 7 June 2023 earnings announcement marked the first time defendants quantified the size of those gains, likely at least $50 million in Q3 2022, or 25.5 percent

37 (Pages 142 - 145)

Page 146

of adjusted EBITDA for that quarter."

Do you see that?

A   I do.

Q   And then you cite in footnote 154 the company's presentation for its earnings call?

A   Yes.

Q   Okay.

So now in -- now we're going to put that to the side, and we're going to look at the presentation for the earnings call that you cite.  And I want to direct your attention to page 9 of that presentation.

A   Okay.

Q   Okay.

Okay, sir, now, you see on page 9 there's a bridge of adjusted EBITDA between Q3 fiscal year 2022 and Q3 of fiscal 2023?

A   One moment.

(The deponent read the document.)

Say that again?  There's a what?

Q   There's a bridge of adjusted EBITDA between --

A   Bridge?  You said "bridge"?

Page 147

Q   -- Q3 2023 and Q3 of the prior year?

MS. WOLKE:  Object to form.

A   Right, right, right.

Q   Yeah.

And do you see that Q3 2022 adjusted EBITDA is listed as $196 million?

A   Yes, I see that.

Q   And then the adjusted EBITDA for Q3 of the subsequent year 2023 is listed as $159 million?

A   That's right.

Q   Okay.

And then this bridge shows how the difference between those two numbers is broken down, correct?

A   Yes.

Q   Okay.

And one of the categories on the bridge that breaks down the difference between the two is wholesale gross margin, including forward buy, correct?

A   Yes.

Q   And that shows a $50 million decline in wholesale gross margin, including forward buy, between Q3 2022 and Q3 2023?

Page 148

A   Yes.

Q   Okay.

Now, sir, this bridge does not break down what portion of that $50 million was attributable to forward buying, does it?

MS. WOLKE:  Object to form.

A   It says, "Natural and reduced procurement gains."  So you're right, it doesn't -- it's not as clear a disclosure as it could be, but it's the first time we have some hard numbers to work with.

Q   Okay.

But at no point does UNFI attribute the entire decrease in wholesale gross margin to forward buying, correct?

MS. WOLKE:  Object to form.

A   Right.  But we get an idea for the first time of the order of magnitude.

Q   We cannot conclude based on this deck that UNFI quantified inflation-related forward buying in Q3 fiscal year 2022 at $50 million, correct?

MS. WOLKE:  Object to form.

A   Right.  We don't know for -- that's why I said at least 50.  So we don't know if it

Page 149

went from 50 to 51 or 60 to 10, but we finally have -- the market finally has an idea of the order of magnitude and that it's in the neighborhood of 50, and that it's probably at least 50, which is a large amount.

Q   Okay.

And I'm not -- I'm not asking for that.  I'm just asking what we know about -- based on what UNFI disclosed.

A   That's right.

Q   So UNFI is not disclosing anything beyond $50 million of wholesale gross margin decline, which includes forward buying, correct?

MS. WOLKE:  Object to form.

A   It says natural and reduced procurement gains.  It's fair what you're saying, so -- it's the first time the market has some numbers to work with and get an idea of how much the procurement gains had been.

Q   Okay.

Now, in your paragraph 91 where you say "likely at least $50 million in Q3 of 2022" --

A   Yes.

Veritext Legal Solutions

www.veritext.com                                          888-391-3376

Page 150

Q   -- you're simply just looking at this difference between wholesale gross margin for fiscal 2022 versus 2023, correct?

MS. WOLKE:  Object to form.

A   I'm looking at that number that says 50 million, yes.

Q   Yes.  That's the exercise we just walked through, right?

A   Yes.

Q   Didn't UNFI disclose information like this every quarter?

MS. WOLKE:  Object to form.

A   I didn't see it.

Q   Well, let's look at another document.

MS. UMAR:  I'm going to mark this one Exhibit 11.

(Exhibit 11 marked for identification.)

BY MS. UMAR:

Q   And, sir, I'll direct your attention to page 21.

Okay.  Now, sir, you see that this lists adjusted EBITDA by segment, broken out by quarter, correct?

MS. WOLKE:  Object to form.

Page 151

A   Yes.

Q   Okay.

And if you look at the column entitled "Q3 FY 2022," the row for adjusted EBITDA is $196 million, correct?

A   Right.

Q   That's the same number we just looked at when we were looking at the Q through -- Q3 fiscal year 2023 earnings release, correct?

A   Right.

Q   And similar to the Q3 fiscal year 2023 earnings release, this chart breaks down what portion of adjusted EBITDA is attributable to various factors, so that includes wholesale, retail, just like that prior document we looked at, right?

A   No.

MS. WOLKE:  No.  Object to form.

(Laughter.)

MS. WOLKE:  Wait.  You're completely mischaracterizing this document, Nilofer, and it's entirely improper.

BY MS. UMAR:

Q   Well, let's look at the two side by side.

Page 152

MS. WOLKE:  Are we looking at the right thing, just before I --

MS. UMAR:  We are looking at the same thing.

MS. WOLKE:  Okay.

BY MS. UMAR:

Q   Do you see that there's a row here for wholesale?

A   Yes.

Q   On Exhibit -- and -- what I just marked as Exhibit 11?

And it shows the difference between EBITDA for wholesale for each quarter, correct?

A   Yes.

Q   Now, we look back at the prior document --

A   And there's a footnote that explains that the change is driven by reduced procurement gains.

Q   Okay.

But I'm asking about from a quantitative exercise.  Let's look back at Exhibit 10.

A   Exhibit 10.  Which one's that?  Okay.

Page 153

Q   When we looked at this bridge, that $50 million is simply the difference in adjusted EBITDA for the wholesale segment, correct?

MS. WOLKE:  Object to form.

A   Okay.

Q   When I --

A   And there's an explanation for it that's not in the earlier document.

Q   Well, it says, "wholesale including forward-buy."

We just talked about that, right?

A   It doesn't say just that.  It has a footnote, and then you go to the bottom of the -- there's a bullet point that says "Adjusted EBITDA decline driven by lower gross margin rate, primarily in natural and reduced procurement gains."

Q   But it doesn't --

A   There's your corrective disclosure, and that corrective disclosure is not in the earlier March document.

Q   Sir, does this --

A   Partially corrective disclosure.

39 (Pages 150 - 153)

Page 154

Q   Sir, does this quantify anything beyond the decline in EBITDA for the wholesale gross margin?

A   Yes.

MS. WOLKE:  Object to form.

Q   Where?

A   Well, it gives you the 50 number, and it tells you that the 50 number is primarily driven by reduction in natural and reduced procurement gains.

So the first time we have a quantification of the order of magnitude of procurement gains.

Q   But it doesn't break down that $50 million between procurement gains versus other factors, correct?

MS. WOLKE:  Object to form.

A   Well, it says that the -- it attributes.  It doesn't break it down but it attributes it to -- primarily to procurement gains.

Q   And I'm asking about the number here, the $50 million number.

The $50 million number does not purport to do anything beyond list the

Page 155

difference between Q3 2022 and Q3 2023 wholesale gross margin, correct?

MS. WOLKE:  Object to form. Misstates the document.

A   I mean, you might as well ask me does the numeral 5 have any independent meaning, independent of the fact that there's a zero after it and a dollar sign before it.

I mean, the $50 million decline is attributed to reduced procurement gains here, so of course it --

Q   It's not attributed solely to reduced procurement gains, is it?

MS. WOLKE:  Object to form.

A   It says adjusted EBITDA decline driven by lower gross margin rate, primarily in natural and reduced procurement gains.

So there's a lot of information there that's not in the $50 million number by itself.  The $50 million number together with that explanation is a partially corrective disclosure.

Q   I'm simply asking what the $50 million number itself stands for.  The $50 million number itself is simply the decline

Page 156

in gross margin for wholesale, correct?

MS. WOLKE:  Object to form.

A   Why would you -- I -- it doesn't make sense to me.  Your question makes no sense.

Why would you look at the 50 million and choose to close your eyes to the attribution that's also on the same page?

Q   I'm not asking you to do so, sir. I'm just asking in terms of numbers that are provided, there's only one number provided here for wholesale gross margin, correct?

A   For the decline.  There's a number given for the decline in wholesale gross margin.

Q   Yes.  And that number is $50 million, correct?

A   Right.  And it's attributed, there's an attribution on this page.

Q   But it's not attributed solely to reduced procurement gains, correct?

MS. WOLKE:  Object to form.

A   Well, I mean, it could have been a little more informative, but this is the first -- like I said, this is -- this is a partially corrective disclosure.  It's the

Page 157

first time we have an idea about the magnitude of UNFI's procurement gains.

It's attributed -- okay, the decline is driven by lower gross margin rate, so the dollar amount is driven by the margin rate, and the margin rate is attributed primarily to procurement gains.

Q   But not solely to procurement gains?

MS. WOLKE:  Object to form.

A   Well, we have -- "primarily" and "driven" are words that are important here. You're right, it's not solely --

Q   Sir, focus on my question.

A   I --

Q   We don't need to argue about things where, you know, there's no reason to argue.

It's not attributed solely to a decline in procurement gains, is it?

MS. WOLKE:  Object to form.

A   It's attributed primarily to reduced procurement gains, so...

Q   Okay.  But we're just trying to understand what the $50 million is.  The $50 million is a decline in gross margin for the wholesale segment, correct?

40 (Pages 154 - 157)

Page 158

A   Yes.

Q   If I look now at Exhibit 11, I can also identify what the decline in EBITDA is for the wholesale segment by looking at this information on a quarter-to-quarter basis, correct?

A   You wouldn't know what it's primarily driven by.

Q   I'm not asking that.

A   I know. That's the problem. That's --

Q   When I look at --

A   That's why your question is misleading.

Q   Sir, I'm the one asking the questions. You don't tell me what questions to ask, sir, with all due respect. I'm asking about my questions, so let's focus on my question.

If you want to answer your own questions, we get more time.

MS. WOLKE:  Nilofer, he's answering your questions.

MS. UMAR:  He's not.

Q   And so let's focus on my question.

Page 159

If I look at Exhibit 11, I can also see what the changes in adjusted EBITDA for the wholesale segment each quarter, correct?

MS. WOLKE:  Object -- object to form.

A   You can see that.

Q   Okay.

A   Without attribution.

MS. UMAR:  Why don't we go off the record.

THE VIDEOGRAPHER:  We are now going off the record. The time is 1:07 p.m.

(Recess.)

THE VIDEOGRAPHER:  Okay. We are back on the record. The time is 1:23 p.m.

BY MS. UMAR:

Q   Dr. Feinstein, I don't have any further questions for you, pending any questions that your -- plaintiffs' counsel may have.

MS. WOLKE:  I do not have any questions.

MS. UMAR:  Thank you for your time, sir.

Page 160

THE VIDEOGRAPHER:  This concludes today's deposition. We are going off the record at 1:24 p.m. Eastern Time. Total run time of media units was two hours, 51 minutes, and will be retained by Veritext.

MS. WOLKE:  Rough draft, yes, please, but we don't need an expedite.

(Whereupon, the proceedings adjourned.)

Page 161

C E R T I F I C A T E

I, Jill K. Ruggieri, Registered Merit Reporter and Certified Realtime Reporter, do certify that the deposition of STEVEN P. FEINSTEIN, PhD, in the above-captioned matter, on September 17, 2025, was stenographically recorded by me; that the witness provided satisfactory evidence of identification, as prescribed by Executive Order 455 (03-13) issued by the Governor of the Commonwealth of Massachusetts, before being sworn by me, a Notary Public in and for the Commonwealth of Massachusetts; that the transcript produced by me is a true record and accurate record of the proceedings to the best of my ability; that I am neither counsel for, related to, nor employed by any of the parties to the above action; and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or other                          me of the action.

Jill K. Ruggieri, RPR, RMR, FCRR, CRR

Transcript review was requested of the reporter.

41 (Pages 158 - 161)

Page 162

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

September 22, 2025

To: Kara M. Wolke, Esq.

Case Name: Sills, Dan Et Al. v. United Natural Foods, Inc. Et Al.

Veritext Reference Number: 7586959

Witness: Steven P. Feinstein , PhD      Deposition Date: 9/17/2025

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,
Production Department

NO NOTARY REQUIRED IN CA

Page 163

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7586959
CASE NAME: Sills, Dan Et Al. v. United Natural Foods, Inc. Et Al.
DATE OF DEPOSITION: 9/17/2025
WITNESS' NAME: Steven P. Feinstein , PhD
In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.
I have made no changes to the testimony as transcribed by the court reporter.

_____
Date             Steven P. Feinstein , PhD
Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this _____ day of_____, 20____.

_____
Notary Public
_____
Commission Expiration Date

Page 164

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7586959
CASE NAME: Sills, Dan Et Al. v. United Natural Foods, Inc. Et Al.
DATE OF DEPOSITION: 9/17/2025
WITNESS' NAME: Steven P. Feinstein , PhD
In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.
I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).
I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_____
Date             Steven P. Feinstein , PhD

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:
They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.
I have affixed my name and official seal

this _____ day of_____, 20____.

_____
Notary Public

_____
Commission Expiration Date

Page 165

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
ASSIGNMENT NO: 7586959
PAGE/LINE(S) /      CHANGE      /REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_____    _____
Date             Steven P. Feinstein , PhD
SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
DAY OF _____, 20_____ .
_____
Notary Public

_____
Commission Expiration Date

42 (Pages 162 - 165)

**[& - 310.201.9150]**                                          Page 1

### &

**&**  2:3 6:11

### 0

**02364**  1:8
**03-13**  161:9

### 1

**1**  3:10,10 5:11 7:8,10 10:7 11:19 18:9 93:16
**10**  4:2,7 77:16 90:11 91:3 128:9 144:9,10 149:1 152:24 152:25
**100**  135:5,10,17
**10:26**  44:10
**10:38**  44:14
**11**  4:10 61:10 150:16,17 152:11 158:2 159:1
**1100**  162:1
**113**  3:25
**117**  4:1
**127**  4:2
**12:00**  117:20
**12:23**  117:23
**13**  77:16
**131**  4:3
**14**  20:8

**14.51**  118:21 127:10
**14.89**  118:20 127:10
**143**  4:7
**14726**  161:21
**15**  3:20
**150**  4:10
**154**  146:4
**159**  147:10
**16**  78:7,10
**17**  1:17 3:15 5:5 73:8,12 161:5
**18**  74:19
**1820**  162:2
**19**  61:10
**1925**  2:6
**196**  147:6 151:5
**1:07**  159:13
**1:23**  1:8 159:16
**1:24**  160:3

### 2

**2**  3:15 8:4,5 11:25 93:17 145:10
**20**  108:22 163:16 164:22 165:22
**2021**  25:9 112:20,24 118:7,22 124:6

124:20
**2022**  73:23 74:12 76:16 78:12,19 87:13 89:4 92:19 93:1,23 101:24 112:20 118:13 118:20 128:8 128:10,12 131:22 137:20 137:25 140:5 144:16 145:22 145:25 146:17 147:5,25 148:21 149:24 150:3 151:4 155:1
**2023**  4:4,8,11 18:7 19:2,17 20:4 23:1 45:1 45:2 46:5 69:12 73:10,23 74:12 76:12,17 78:13,20 81:21 82:9 83:6,16 87:8 97:25 98:15,25 100:14 101:14 101:15,25,25 102:3 123:16 123:20,23 144:16 145:21 145:22 146:18 147:1,9,25

150:3 151:9,12 155:1
**2025**  1:17 5:5 12:14 13:12 161:5 162:4
**207**  64:24
**208**  64:24
**21**  150:21
**2100**  2:6
**213**  88:15,21,23
**216-523-1313**  162:3
**22**  11:15 162:4
**23**  5:18
**2364**  5:18
**25**  20:8 102:3
**25.5**  145:25
**26**  45:2 69:12 81:19 101:14
**26th**  61:17
**27**  128:7,15 129:24
**28**  129:24
**29**  88:15

### 3

**3**  3:18 9:4,5 10:3,7 41:4 44:19 145:12
**3/7/25**  3:14
**31**  88:12
**310.201.9150**  2:8

**[312.853.7000 - acknowledges]**

**312.853.7000**
2:18
**36** 105:17
**37** 88:16
**38** 88:17
**39** 64:22

**4**

**4** 3:20 41:4
75:24
**41** 66:17
**44114** 162:2
**455** 161:8
**48** 88:15

**5**

**5** 3:22 76:3
77:11,12 155:6
**5/9/25** 3:17
**50** 81:10,16
83:1 84:22
85:20 144:16
145:25 147:23
148:4,21,25
149:1,4,5,12,23
150:6 153:2
154:7,8,15,23
154:24 155:9
155:19,20,24
155:25 156:6
156:15 157:23
157:24
**51** 84:5 149:1
160:5

**53** 96:18
**54** 88:14 99:11
**57** 44:17

**6**

**6** 3:6,25 83:13
113:16,17,18
**6/13/25** 3:21
**60** 1:19 5:20
149:1
**60603** 2:17
**64** 77:15
**65** 77:16

**7**

**7** 3:10 4:1
12:14 13:12
45:1 73:23
74:12 76:16
78:12,19 87:13
89:3 92:18
93:1,23 97:24
98:19 101:14
118:2,3 125:3
131:22 144:16
145:22
**73** 9:12
**75** 3:20
**7586959** 162:7
163:2 164:2
165:2
**76** 3:22
**79** 10:9
**7th** 61:16 91:18

**8**

**8** 3:15 4:1,2
18:6 73:10,23
74:12 76:11,17
78:13,19 79:23
80:21 81:21
82:9 83:6,16
87:8,21 92:8
92:17,25 118:6
123:15,20,23
127:24,25
128:3 132:1
145:21
**8/5/25** 3:24
**89** 88:16
**8th** 61:15 77:22
79:18 80:20
81:12,20,21
82:2 84:23
93:10,11 94:10

**9**

**9** 3:18 4:3 76:6
131:15,16,19
146:12,16
**9/17/2025**
162:8 163:3
164:3
**90067** 2:7
**91** 144:21
145:1,18,19
149:22
**9:43** 1:17 5:4

**9th** 8:10

**a**

**a.m.** 1:17 5:4
44:10,14
**abatement**
136:7,9
**abating** 134:7
**ability** 161:14
**able** 33:22
54:17 90:10,15
**above** 161:5,16
162:17
**accept** 37:20
79:7 100:18,20
103:25 104:1,1
104:4,6
**accepted** 48:14
**accepts** 91:7,8
**access** 65:14
**accordance**
163:5 164:5
**account** 57:16
59:15
**accurate**
161:13
**acknowledge**
78:18 87:12
89:7 92:14,22
163:11 164:16
**acknowledged**
81:24 145:20
**acknowledges**
78:11 81:1

**[acknowledges - alleged]**

82:12 87:19 89:2 94:8

**acknowledging** 92:3,10

**acknowledg...** 79:14

**act** 163:14 164:20

**action** 5:25 29:17 65:24 161:16,19

**activities** 111:3

**activity** 124:2 129:8

**actual** 66:13 67:15 128:19 128:25

**actually** 17:10 20:14 45:13 46:8,24 47:10 52:16 60:15 68:9 81:20 99:15 107:6 113:10,25 117:16 133:12 140:23

**add** 15:15

**added** 137:8

**addition** 11:21 122:14

**additional** 11:7 16:2 17:20 108:3 123:19 123:21

**address** 28:7 47:25 50:19 51:14 52:2 74:18 76:24 90:23 91:4,5 162:15

**addressed** 120:17 141:3

**addressing** 92:2

**adequate** 59:21

**adjourned** 160:9

**adjusted** 63:15 115:15 146:1 146:16,23 147:6,8 150:23 151:4,13 153:3 153:17 155:15 159:2

**administer** 5:23

**admitted** 65:13

**adopting** 37:21

**adopts** 61:9

**affected** 23:6

**affiliation** 6:6

**affirmative** 21:1 24:22 31:18 36:11 93:1

**affirmatively** 21:7,9 23:16 24:16 33:13

36:1 47:17 91:18

**affixed** 163:15 164:21

**aforemention...** 45:11

**aggregate** 39:16

**ago** 11:16 89:19

**agree** 5:10 26:12 40:17,24 59:18 60:15 80:20 83:2,21 87:18 89:23,25 90:1 101:3 106:15 111:7

**agreements** 134:16

**agrees** 81:11 89:22,23

**ahead** 42:14

**al** 5:16 162:6,6 163:3,3 164:3 164:3

**alexander** 1:10

**allegation** 49:23 50:21 91:23 101:7 106:9 111:22 112:9,13 113:5 120:14,15 136:18

**allegations** 29:3 30:7 53:20 54:23 60:12,14 61:7 61:8 63:5,8 64:2,3,5 67:4,5 67:12,17,21,24 90:1 99:22 101:8 104:22 105:19,21,23 106:3,11 108:18,20 109:7 110:3 117:9 120:7 127:3 130:8,23 131:2 140:25 142:10

**allege** 28:12 96:7 99:15 104:13,19 105:10 108:23 114:9 116:3,6 117:2 134:9

**alleged** 14:7,9 14:17 19:2,18 20:4 21:19 23:1,7,13 25:25 26:21 30:22 32:19 33:4 34:2,17 35:5,9 38:13 38:15,21,24 39:9,11,15 40:8 41:1,11

**[alleged - answer]**

41:21 43:8,11
43:24 45:5
46:10 47:1,12
48:11 49:9,19
50:11,14,18
52:4 53:5 54:1
54:8 55:4,8,13
55:14,14,22,23
58:14,21 59:3
59:5,16,19,19
60:5,22,23
61:12,22 62:7
62:8,24 63:4,6
63:7 64:14,15
66:1,8 67:15
67:17,25 69:4
69:14 70:12
72:8,16 76:11
79:9,10,11,15
79:22 80:4,13
80:19 81:12,23
82:7,10,12
83:7,14,16
86:6,9,11 87:9
94:2,3,4 96:1,4
96:10,14,19
97:5,11,17,22
98:17 99:3,13
99:13,20 100:2
100:6,19 101:7
101:8,12
102:21 103:6
103:12 106:4
106:21 107:19

107:22 108:2
108:16 109:20
110:4,7 112:22
113:3 114:10
117:8 121:23
122:1,2,7,11
123:10 124:8
130:13 131:9
139:5,5 140:2
140:23 141:3
142:11,18
143:14 144:4
**allegedly** 32:21
35:1 106:12
**alleges** 65:22
**alleging** 28:18
29:20 65:10
69:10 109:12
110:18 126:17
134:2
**allow** 70:16
71:2
**altered** 7:23
**alternative**
61:9 99:12,20
105:8 106:6
107:2,4,5
108:16 122:1
140:2,18
141:16 143:6
**ambiguous**
33:7
**amend** 10:18
84:8

**amount** 115:5
116:7 149:5
157:5
**amounts**
116:18
**analysis** 11:7
22:12 24:15,21
25:18,19 28:5
30:20 33:20,21
34:1,16 35:4,8
35:17,21 36:2
36:8,21,22
37:7,8,11,17,23
37:24 38:1,2,5
38:9 39:23
40:4 41:19,25
42:3,5,20 43:3
43:6 46:13,15
47:4,6 50:25
51:3,10 53:17
53:17,22 58:11
58:13,20,25
61:11,21 67:13
67:14 68:23
69:13 70:1,23
72:7,20 81:16
100:8,17
139:13,18,19
140:15,18
141:15 142:9
143:5
**analyst** 17:23
18:1 115:13,19
121:13 143:25

143:25
**analysts** 83:8
85:5,6 116:2
116:21,25
117:3 138:9,21
**analyze** 28:21
33:2 38:14
54:7 55:7 56:2
59:12 60:21
**analyzed** 33:8
33:9 56:3
77:21
**analyzing** 59:9
**angeles** 2:7
**announcement**
115:12 145:23
**announcements**
45:1,20 61:19
89:24 91:13
102:2,11
**answer** 11:17
12:9 13:5
23:24 28:23
31:13 32:7
35:3 48:18
52:10 66:16
69:1,23 70:4
70:24 71:5,19
71:21,24 73:5
84:9 105:1,5
124:22 132:4
132:12 134:2,3
134:9,10 137:6
142:4,23

158:20

**answer's** 124:12

**answered** 30:10 50:7 54:11 55:11 68:25 101:17 103:17 121:10 143:22

**answering** 141:7 158:23

**anticipated** 128:20

**anybody** 62:2

**anyone's** 139:20

**anyway** 108:10

**apparent** 98:13

**appear** 35:18 163:11 164:15

**appearance** 6:4 6:6

**appearances** 2:1

**appended** 164:11,18

**appropriate** 39:14

**areas** 20:25

**argue** 94:22 157:15,16

**argument** 87:20 92:5 93:7,8,12,19,21

99:10

**argumentative** 14:1

**arguments** 15:9 18:18

**arkansas** 25:10

**arrived** 10:24 15:20,21

**arrives** 100:1

**articulated** 30:3,4

**articulation** 16:20

**artificial** 92:16 92:24

**aside** 8:20,22 12:21 17:19 47:7 52:24 55:3 97:14

**asked** 11:6 15:13 20:17 30:10 33:12 35:3,7 50:7 53:9 54:11 55:11 68:24 89:18 101:17 103:17 121:10 133:9 142:4

**asking** 9:25 21:14 26:8,16 29:12,14,25 30:14 32:1,2,8 35:20,23 36:22 38:20 48:6,7

49:2 52:20 64:12,13 65:21 65:22 66:7,8,9 66:13 67:10,12 68:20 71:8 75:3,13,21,22 91:21 95:11,13 95:20 96:17 97:8 101:10,11 103:8 108:14 115:21 116:25 117:1 136:8,9 136:15,16 138:20 140:14 142:22 149:7,8 152:22 154:22 155:23 156:8,9 158:9,15,17

**assert** 78:10

**asserting** 22:2 28:24 29:16 31:12

**assess** 22:15,17 23:21 24:20 28:10 33:12 54:17 76:9

**assessing** 49:24 57:8,10

**assigned** 137:1

**assignment** 37:14 73:24 74:13,23 75:7 75:11,15 76:15 76:25 77:4

90:25 163:2 164:2 165:2

**assigns** 136:7

**assist** 16:10

**assistant** 15:14

**assume** 60:11 97:17 100:6

**assuming** 82:4

**attached** 164:7

**attempt** 24:19 24:20 46:9,25

**attempting** 23:15 24:16 39:7 40:6

**attention** 44:17 146:11 150:20

**attorney** 161:17

**attorneys** 15:23 15:24 17:9,12

**attributable** 115:17 135:6 148:5 151:13

**attribute** 133:8 148:14

**attributed** 62:10 66:14 67:15 155:10 155:12 156:17 156:19 157:3,6 157:17,20

**attributes** 154:19,20

**attributing** 134:25 135:10
**attribution** 156:7,18 159:9
**audio** 5:8
**august** 11:15
**austin** 1:18 2:13 5:20 6:8
**authorize** 164:11
**authorized** 5:23
**available** 83:10
**ave** 162:1
**avoid** 121:1,7
**aware** 25:22 26:8,17,18 56:5,15 58:19

**b**

**b** 3:8,18 61:8
**back** 42:10 44:13 52:4 53:1,5 54:14 56:6,16 59:2 61:19 68:18 70:4 71:14 93:20 114:6 117:23 152:16 152:23 159:16 162:15
**backpedaling** 83:19

**backwards** 40:7
**based** 10:17 15:25 41:9,10 41:15 43:7 52:3 53:4,8,14 53:17 62:4 66:21 67:3 72:7 75:6 104:22,23,24 110:15,21 148:19 149:9
**basically** 15:15
**basis** 37:6 39:4 79:2 158:5
**began** 51:17
**beginning** 35:24 63:11 133:13
**behalf** 1:5 5:14
**belatedly** 65:5
**belief** 107:22
**believe** 8:18 21:8 80:4,13 87:20 106:19 108:4 112:4,8 112:8 115:22 123:10
**believes** 81:11 81:25 95:14
**best** 116:20 161:13
**bettencourt** 16:6 17:13

**better** 36:6 43:19 122:7,19 141:20
**beyond** 149:12 154:2,25
**bigger** 134:18
**biogen** 13:2
**bit** 33:7 133:15
**blackboard** 15:7 28:8
**block** 65:12
**body** 94:4
**boosted** 109:1 110:8 111:18 112:16 114:12 114:20
**boosting** 134:5
**boston** 1:20 5:20
**bottom** 153:15
**break** 54:12 57:4 117:18 135:21,24 136:2 137:4 148:4 154:14 154:19
**breaks** 56:7,17 147:19 151:12
**bridge** 146:16 146:23,25,25 147:13,19 148:3 153:1
**brief** 7:15

**broad** 32:6
**broken** 147:15 150:23
**bullet** 129:7 153:16
**burden** 22:13
**buy** 147:21,25 153:11
**buying** 65:3,7 65:16 66:3 96:20 98:9,13 98:20,24 109:9 109:22 115:7 116:9 120:2,10 124:6,25 125:20 126:12 127:6 129:9 130:11 131:7 148:5,15,21 149:13

**c**

**c** 5:1 161:1,1
**ca** 162:25
**california** 2:7
**call** 4:6,9,12 31:5 37:16 107:11 108:15 108:15,17 115:12 119:17 120:16 122:6 124:15 131:22 140:5 146:5,10

called 73:2 107:19 122:2 133:15
calling 37:19
calls 74:25 75:19 79:15 138:3
captioned 161:5
capture 108:1
captured 108:3 108:4
capturing 99:21
careful 123:16
carefully 15:4 38:7
carstensen 2:24 5:21
case 5:18 6:24 11:11 12:25 15:3 16:5 25:7 26:17,19 27:24 29:9 30:7,12 31:13,21 32:4 32:11,13 39:8 43:25 51:17 62:7,8,22,24 66:14 77:8 86:23,25 87:6 137:2 139:4,16 139:21 162:6 163:3 164:3

cases 12:13,18 13:1,6,15,16,17 13:22 14:4,13 62:4 139:9
catch 144:25
categories 34:21,23 147:18
categorizes 31:7
causation 46:13
cause 40:16
caused 29:22 54:24 57:20 58:7 78:13,20 79:12,25 82:13 82:14,24 85:16 87:14 89:4 90:8,21 92:11 92:19 93:2 102:15 127:10
causes 63:10 115:24
causing 27:17 29:23 84:17
century 2:6
certain 15:15
certainly 25:2 27:3 33:16,21 68:16 87:18
certificate 164:11

certification 7:15 8:9 9:10 163:1 164:1
certified 161:3
certify 161:3
cfa 3:14
challenge 21:11 47:22 49:25 51:16 78:11 87:19 99:2 132:18
challenged 19:23 25:6 129:12
challenging 48:4
change 16:18 23:5 70:16,19 82:13 152:19 162:13,14 164:8 165:3
changed 70:15
changes 159:2 162:12 163:7 164:7,9
channel 45:25
channels 134:20
characterizati... 30:15 52:25 53:20 66:10 72:13,14 88:8
characterizati... 66:2

characterize 12:19 29:3 30:12 65:24 143:12
characterized 29:13 64:4 67:21,23 69:5 69:6,7 70:12 72:8 90:6
characterizes 60:13 91:12
chart 151:12
chartered 143:25
check 12:10 112:10
chicago 2:17
chief 99:25
choose 156:6
chose 87:7
christopher 1:12
cite 25:13 146:4 146:11
cited 11:22 68:14
cites 88:14
civil 163:5 164:5
claire 2:15 6:9
claire.lee 2:20
clamoring 138:9

**[clarify - conclude]**                                                    Page 8

clarify   16:16
  71:6
clarifying
  69:23
class   7:15 8:9
  9:10 28:13
  51:6 54:2,7,19
  55:7 62:11
  63:11 65:3,6,9
  65:17 97:7
  113:1 138:10
clear   16:20
  81:16 90:18,22
  148:9
cleveland   162:2
close   156:6
colleague   6:9
collective   39:23
  40:4 41:25
  42:2,4,20 43:2
  43:6
collectively
  39:5,22 42:20
  43:16 54:16
  56:4
column   151:3
combination
  110:17
come   28:4,6
  79:5 93:11
comes   111:5
coming   28:11
comment   15:5

commented
  16:19
commission
  163:19 164:25
  165:25
commonwealth
  161:9,11
companies
  143:19
company   46:18
  62:9 63:1,9,10
  63:17,22 102:3
  109:14 110:21
  110:22 111:3
  111:16 112:4
  112:13 115:11
  115:24 119:18
  119:21 120:16
  124:12,13
  133:19 138:15
  139:22
company's
  83:24 101:22
  115:15 117:13
  118:6 119:1,17
  146:5
compare   59:14
  61:22 140:18
  140:25 141:15
  143:5
compared   60:3
  118:21 119:2
  142:10

comparing
  80:10
comparison
  141:6
compelled   47:5
compelling
  19:24 20:24
  21:5,24,25
  22:3 25:4
  30:24 57:19
  98:3 102:14
compels   34:9
  36:9 45:15
  54:23
complaint   17:5
  63:19 64:24
  65:21 66:7,21
  68:3,19 69:2
  70:7 88:23
  104:23 123:17
  129:14
complete   15:21
  57:1,2,5
  125:23 126:4
  127:15,18,20
  131:11
completed
  162:15
completely
  57:25 135:9
  151:21
component
  110:10 123:2

comprise   45:22
comprised   45:4
  45:11 46:5
comprising
  80:3,12 81:22
  83:7 86:6,8,10
  87:9
concealed
  30:23 35:1
  57:13 60:6
  61:13 62:13
  63:12 64:17
  65:11 66:20
  69:10 82:1
  94:5 96:7 98:8
  104:14,20
  105:10 106:12
  108:24 109:13
  126:7 141:4
  142:12 143:15
concealment
  143:16
conceded   48:2
  48:3
concept   27:14
  30:5 62:17
  106:18 107:19
  126:8
concepts
  139:12
conclude   13:18
  49:7,13,17
  148:19

**[concludes - correct]**                                                    Page 9

**concludes**
  160:2
**conclusion**  22:2
  22:3 36:10
  39:25 40:21
  42:22 47:11
  48:10 49:14
  51:8 98:4
  138:3
**conclusions**
  18:18 20:9,23
  21:3,3 38:11
  49:3 50:24
  100:1 102:24
  103:15 139:18
**conditions**
  62:25 63:3
**conduct**  17:14
  34:1,16 51:3,9
**conducted**  35:4
  35:8 36:2,8
  51:1 142:8
**conducting**
  58:13,20 61:21
  67:14 72:20
  139:12
**conference**  4:8
  4:11 15:2
  115:12 119:17
  120:16 124:15
**conferred**
  88:22
**confines**  60:13
  97:13

**confirm**  95:4
**confusing**
  107:15
**connection**
  7:14 9:9 18:11
  18:12 38:10
  59:22 60:7,9
  72:19
**conrad**  2:16
**consider**  38:22
  45:25,25 53:11
**considered**
  11:21 18:10
  25:15 32:22
  58:5 59:20
  68:16 138:5
**consistent**  24:7
  30:8 51:7 67:6
  83:9
**constructed**
  15:17
**constructing**
  143:13
**construction**
  96:15
**constructs**
  96:13
**contain**  10:20
  15:12
**contained**  11:4
  72:16 143:7
**contend**  96:9
**content**  16:19

**contention**
  99:17 111:2
**contents**  56:8
  56:18 59:18
  60:22 61:4,6
**contesting**
  110:25
**context**  94:24
**continuation**
  132:4
**continue**  5:9
**contrary**  99:17
**contributed**
  23:12 54:24
  78:14,20 87:14
  89:4
**contribution**
  116:8 135:13
  136:24
**conversations**
  5:7
**copy**  77:10
**correct**  8:24
  9:24 10:7,10
  11:4,5,23,24
  12:2,3,10,15,18
  18:19,21,23
  19:3,18 20:5,9
  20:18 21:20
  22:20 23:17
  24:17 25:20
  33:4 36:4
  37:11,18 40:9
  41:12 43:8,25

  45:12,23 46:6
  46:10 47:1,13
  48:11,19 49:9
  49:19 52:5
  53:6 54:3
  56:19 58:15,22
  59:6,23 69:15
  70:1 72:9 73:1
  73:13,18,25
  74:16,23 76:13
  76:17,23,25
  77:4,8 78:16
  84:18 85:1
  90:25 92:3
  95:1 96:11,16
  96:23 97:11,12
  97:19 100:9
  103:15 104:14
  104:20 105:10
  106:13 107:20
  107:23 109:9
  111:8,19
  112:18 113:4
  114:14 117:10
  119:14,23,24
  121:23 123:11
  124:9 125:3,22
  125:25 129:14
  129:25 130:2
  130:14 131:10
  132:19,24
  134:3,8 135:20
  136:5 139:1,6
  139:14 144:17

**[correct - day]**

147:15,21
148:15,22
149:14 150:3
150:24 151:5,9
152:14 153:4
154:16 155:2
156:1,11,16,20
157:25 158:6
159:4
**corrected** 32:21
143:17
**corrections**
8:17,23 162:12
164:17
**corrective** 18:4
19:2,18 20:4
21:13,19 22:8
23:1 28:17,20
29:21 31:3
32:20 34:24
36:18 38:8
39:9 40:8,13
40:15,20 41:1
41:4,5,12,20,21
43:8,24,24
45:2 47:24
48:5 51:20
52:5,13 53:6
53:13,19 54:20
54:22 55:3
56:9,19 57:11
57:14,20,21
58:14,21 59:5
59:10,12,13,20

60:4,11,16,23
61:23 64:10
76:11 77:22
78:12,19 79:5
79:8 82:10
83:17 87:12,21
87:23 89:3
90:21 93:16,16
93:24 96:10
98:14 109:20
138:11 139:6
140:22 141:1,2
141:10 142:13
142:16,17
153:21,22,25
155:21 156:25
**correctly** 20:24
97:17
**couch** 130:22
**counsel** 2:11,22
6:4 16:10 17:9
60:11 76:8
88:22 159:20
161:14,17
**county** 163:10
164:15
**course** 41:19
54:19 94:1
155:11
**court** 1:1 5:17
32:3 67:21
68:10 69:5
139:21 163:7

**court's** 25:9
31:21 32:10
68:9,10,19
69:2 70:7
72:13 99:16
**criticism** 97:14
**criticize** 123:8
**criticized** 60:1
**crr** 1:23 161:22
**customer** 132:9
134:15,24
**customers**
133:17 134:18
**cv** 1:8 5:18

**d**

**d** 3:1 5:1
**damages** 3:11
7:21,21 46:13
46:15 47:6
**dan** 1:4 5:13
16:6 17:12
162:6 163:3
164:3
**date** 11:7 12:2
23:17 24:17
33:3,10 38:15
38:23 43:23
54:6 55:6
59:10,10,12,14
80:5,6,14,15
83:10 110:23
112:2,15 113:1
113:2 128:10

128:11 162:8
163:3,9,19
164:3,13,25
165:20,25
**dated** 11:15
**dates** 18:5 19:1
19:9,17 20:3
20:16 21:13,19
22:8,25 23:2
31:3,4 33:9
36:18 40:14,15
41:2,12,21
43:8 45:4,11
45:21 48:5
52:5,13 53:6
54:1,5,22 55:3
60:4,16 76:21
107:9 113:11
113:14 139:1
142:17
**day** 8:9 28:13
39:9,10,19
40:8 42:17
48:2,25 51:6
54:2,6 55:6
81:2 82:16,20
82:21 83:20
85:7,8,10,17
86:2 87:16
89:6,15 92:20
102:11,17,19
110:14 163:16
164:22 165:22

**days** 21:10 23:9 40:20 44:3 52:15 53:16,24 54:25 78:16,22 88:9,13 91:4,5 91:8 94:6 162:18

**deane** 2:24 5:21

**dear** 162:10

**deceived** 121:15 123:3

**december** 73:18,23 74:12 76:16 78:12,19 87:13 89:4 90:20 91:18 92:18 93:1,23 112:20,20,24 118:6 124:6,20 131:22 140:5

**deception** 55:14,15

**deceptive** 127:20

**decision** 25:9 25:13 26:3,23 32:10

**deck** 148:19

**decline** 23:11 40:7 77:22 79:13 82:16,24 84:17 85:10,17 87:15 89:6 92:20 93:3

133:8 135:6,24 136:10,16,22 147:23 149:13 153:17 154:2 155:9,15,25 156:12,13 157:4,18,24 158:3

**declined** 119:2

**declines** 23:10 39:9 40:17,25 45:4,10,22 46:4 52:4 53:5 54:25 78:15,22

**decrease** 133:20 148:14

**decreased** 129:8

**deed** 163:14 164:20

**deemed** 162:19

**defendant** 1:13 25:23 26:19 65:13 66:17

**defendants** 2:22 6:8 22:17 22:18 60:10 64:25 65:5,9 65:14,23 66:11 66:14 67:16 76:8 104:14,19 105:10 109:7 145:23

**defer** 96:2

**define** 83:25 102:22 103:13 142:5,6

**defined** 73:24 74:15 96:2,4 97:10,18,23 98:17 100:7 103:1,4,6,13,18

**defines** 96:14 100:2 101:13 102:22

**defining** 96:19 103:20 141:22 143:1

**definitely** 25:1 34:10 36:14

**definition** 37:20 71:11,15 79:8 96:6 100:18,21,22 103:7,19 104:5 104:6 141:23 141:24

**definitive** 20:2 21:17 22:6

**definitively** 22:16

**department** 162:22

**depending** 83:25 142:25

**depends** 57:7 137:12

**deponent** 2:11 12:7 19:4 20:12,20 64:20 67:1 68:4 70:5 76:1 78:24 81:7 84:10 88:3,10 89:10 89:13 97:2 105:15 130:3 132:13 144:24 146:20

**deposes** 6:14

**deposition** 1:16 3:15,22 5:12 5:19 6:23 7:9 8:10 9:17 11:13 17:4,21 35:25 68:8 71:9 77:8,11 88:16 99:18 101:4 160:2 161:4 162:8,11 163:1,3 164:1 164:3

**deprived** 101:20

**depth** 15:16

**derive** 58:9

**describe** 20:7 132:6

**described** 20:23 57:23

**describing** 46:14

**detail** 143:8
**determination**
  126:22,23
**determine**
  33:24 47:18
**determined**
  69:9
**determining**
  32:22 59:21
**developments**
  90:8
**dianne** 133:8
**dick** 1:4 5:14
**differ** 128:19
  128:25
**difference** 80:2
  80:11 92:15,23
  147:14,19
  150:2 152:12
  153:2 155:1
**different** 12:5
  12:13 14:3
  21:14 31:1
  35:18 54:5
  56:22,23 58:7
  67:11 93:4
  105:23 125:10
  143:2
**differentiate**
  106:4
**differently**
  103:20
**differs** 99:14

**direct** 44:16
  77:15 78:6
  146:11 150:20
**directed** 24:24
  60:10
**directly** 61:19
**disaggregate**
  39:3 55:18,20
**disagree** 26:12
  97:10 103:5
**disagreed**
  111:1
**disagreeing**
  22:1
**disappointment**
  135:1
**disciplined**
  134:16
**disclose** 65:1
  94:23 98:20
  111:11 120:25
  121:7 143:19
  150:10
**disclosed** 64:9
  69:11 79:22,23
  80:5,14,20
  81:12,22 83:6
  84:14,24 86:5
  86:10,15,22
  87:1,8,9 94:5,8
  94:9,10,15,17
  95:10,12,14,18
  95:24 97:6
  98:24 106:15

106:20 107:6
108:13 109:8
110:2,14,18,23
111:8,17,23
112:1,5,14
113:6,7 114:10
115:4,4,23
116:3,7 117:2
119:6,9,14,23
120:1,8 122:14
122:14 123:15
123:20,22
124:4,23
125:18 126:10
127:4 130:9,17
130:18 131:5
137:18 139:22
142:16 149:9
**disclosing** 86:8
  149:11
**disclosure** 18:5
  21:13,19 22:8
  23:2 28:17,20
  31:3 36:18
  40:14 41:1,12
  41:21 43:8
  48:5 52:5 53:6
  54:22 55:3
  56:10,19 57:11
  58:14,22 59:5
  59:10,12,14
  60:4,16 61:23
  64:11 73:11
  76:11 79:3,4

79:15,25 82:10
83:17 90:21
93:16,17,24
98:14 106:6,9
107:2,8 112:1
112:14,25
114:22 124:7
125:2,14
127:20 130:12
131:8 137:25
139:6 140:23
141:10 142:17
148:9 153:21
153:22,25
155:22 156:25
**disclosures**
  19:2,18 20:4
  29:22 32:20
  34:25 38:8
  39:10 40:8
  41:4 43:24,25
  45:2 47:24
  51:20 52:13
  53:13 54:20
  57:15 59:20
  60:23 73:18
  78:12,19 87:5
  87:13,21,23,23
  89:3 92:11
  96:10 107:12
  109:20 138:11
  141:1,3 142:14
**disconnect**
  105:18

**[discuss - duly]**

| | | | |
|---|---|---|---|
| **discuss** 97:9 | **docs** 17:5 | 24:4 28:9 | **draft** 15:20,21 |
| **discussed** 15:8 | **document** 7:8 | 36:16 38:9 | 15:21,23 160:6 |
| 15:10 47:20 | 8:2,4 9:4 12:8 | 40:14 44:25 | **draw** 98:4 |
| 83:8,13 85:5,6 | 19:5 20:13,21 | 45:14 47:18 | **drawing** 52:3 |
| **discussion** | 44:18 64:21 | 48:7 49:23 | **drawn** 53:4 |
| 15:11 88:13 | 67:2 68:5 | 51:4,15 52:2 | **drew** 38:10 |
| 119:16 | 78:25 81:8 | 52:25 53:17 | **driven** 102:12 |
| **dismiss** 17:25 | 84:11 88:4,11 | 60:1,20 61:9 | 118:23 152:19 |
| 67:5 99:16 | 89:11,14,20 | 64:4,12 67:23 | 153:17 154:9 |
| 123:18 | 97:3 105:16 | 69:6 72:6,14 | 155:16 157:4,5 |
| **dismissed** | 118:2,12 | 72:23,25 73:9 | 157:11 158:8 |
| 34:22 111:1 | 119:20,21 | 73:16,21 74:4 | **driver** 96:22 |
| **dispense** 6:24 | 124:19,20 | 74:13 75:6,14 | 98:10 119:9 |
| **disprove** 39:23 | 127:24 130:4 | 75:15 76:4 | 125:13 |
| 42:21 | 131:14 132:14 | 77:7,20 78:11 | **drivers** 119:6 |
| **disproved** | 146:21 150:14 | 78:18 80:18 | 119:13,19,23 |
| 19:11,22 21:10 | 151:15,21 | 84:22 87:11 | 124:14,16 |
| 22:18 24:10 | 152:17 153:9 | 88:21 89:2,7 | 132:8,24 |
| 33:14,25 34:15 | 153:23 155:4 | 90:17 91:17 | 134:23 135:24 |
| 36:16 40:2 | **documents** | 93:22 94:11 | 136:4,9,22,24 |
| 47:18 | 11:20 17:19,20 | 95:3,6,7 96:6 | 137:3 |
| **dispute** 51:19 | 18:8,10 110:21 | 96:13,19,25 | **driving** 109:14 |
| 52:11,14 90:19 | 123:17 | 97:10,18,19 | 115:10 134:13 |
| 90:19 97:18 | **doing** 29:10 | 99:3,12,17,20 | **drop** 56:6,16 |
| **disputed** 50:14 | 43:15 | 100:7,8,14,17 | 58:4,7 59:2 |
| 52:9 | **dollar** 115:5 | 101:13 102:22 | 80:1 |
| **disputing** 51:21 | 116:7,18 155:8 | 103:13 104:5 | **drops** 90:20 |
| **dissipated** | 157:5 | 104:24 105:19 | 92:10 |
| 29:22 | **dollars** 134:14 | 105:24 106:4 | **due** 46:20 |
| **dissipating** | **douglas** 1:10 | 106:14 107:18 | 77:22,23 |
| 27:22 | 134:10 137:23 | 117:8 118:1 | 158:17 |
| **district** 1:1,2 | **dr** 15:3 17:6 | 119:5 121:21 | **duly** 6:14 |
| 5:17,17 | 18:19 19:11,23 | 121:21 122:1 | |
| | 21:9,24 22:11 | 123:7,9 159:18 | |

[e - exactly]

| e | | | |
|---|---|---|---|
| **e** 3:1,8 5:1,1 161:1,1 | **edited** 4:4 | 42:9 | 164:3 |
| **earlier** 18:22 53:10 54:4 87:24 117:7 153:9,23 | **editing** 15:25 | **entered** 164:9 | **evaluate** 36:25 55:22,24 140:1 140:19 141:16 143:6 |
| **earliest** 106:20 112:1,14 | **effect** 134:7 | **entire** 69:2 70:7 92:5 148:14 163:5 164:5 | **evaluated** 144:4 |
| **earnings** 4:6,8 4:11 45:1,20 115:12 118:7 128:9 131:22 140:5 145:22 146:5,10 151:9 151:12 | **effectively** 24:10 25:7 65:13 134:12 | **entirely** 10:16 53:4 58:7 69:11 151:22 | **evaluating** 59:1 73:21,22 74:11 76:16 |
| **east** 2:6 | **efficiency** 3:11 7:21 | **entitled** 151:4 | **evaluation** 116:23 |
| **eastern** 5:4 160:3 | **efficient** 82:4 83:11,22 84:13 84:15,24 85:22 91:10 | **equally** 61:23 62:17 137:25 139:13 140:3 140:20 141:17 | **event** 59:10 |
| **ebitda** 63:15 115:16 146:1 146:16,23 147:6,8 150:23 151:5,13 152:13 153:3 153:17 154:2 155:15 158:3 159:2 | **efficiently** 82:19 | **equals** 56:6,16 | **events** 61:15 |
| | **either** 15:10 18:9 26:1,22 33:23 39:18 42:16 54:24 68:19 120:12 132:24 137:7 143:11 | **errata** 8:18,23 162:13,18 164:7,10,18 165:1 | **evidence** 19:8 19:16,24 20:2 20:24 21:5,17 21:24,25 22:3 22:6 24:5,6 25:3 34:9 36:2 36:9 38:23 39:24 41:11 42:21 45:15 47:5 54:23 57:19 58:5 59:11 76:9 98:3 101:11 102:13 138:23 161:7 |
| | **email** 162:17 | **erroneous** 100:1 | |
| | **employed** 161:15,18 | **error** 44:24 | |
| **economic** 25:18 58:11 76:9 111:20 134:16 139:18 | **employee** 161:17 | **especially** 14:3 138:11 | |
| | **enclosed** 162:11 | **esq** 2:4,5,14,15 2:16 162:5 | |
| | **endeavor** 7:3 | **essentially** 48:3 90:7 120:21 133:3 | |
| | **engaged** 12:20 | **established** 13:19 50:1 | **evident** 44:2 47:5,23 51:20 83:20 |
| | **engagement** 21:7 22:10,20 23:20 24:1 30:19 33:12 | **establishes** 81:10 | **exactly** 28:3 53:9 61:2 62:1 |
| | | **et** 5:16 162:6,6 163:3,3 164:3 | |

**[exactly - fatal]** Page 15

62:2 79:20
**examination**
 3:6 6:17
**example** 64:14
 76:4 99:7
**examples** 63:21
 65:19,25
 135:19
**except** 7:1
**exception**
 111:14
**excerpt** 76:6
 96:24
**excerpted**
 68:15
**exclude** 133:5
**excludes** 53:18
 133:2 135:9,16
 135:22
**excuse** 11:1
 26:1 96:3
**executed**
 164:10
**execution**
 46:21 163:14
 164:19
**executive** 161:8
**exercise** 150:7
 152:23
**exhibit** 3:10,10
 3:15,15,18,18
 3:20,20,22,22
 3:25 4:1,2,3,7
 4:10 7:8,10 8:4

8:5 9:4,5 10:3
 11:19,25 18:9
 18:12 44:19
 75:9,16,24
 77:11,12
 113:13,16,17
 113:18 118:2,3
 125:3 127:24
 127:25 128:3
 131:15,16,19
 144:9,10
 145:10,12
 150:16,17
 152:10,11,24
 152:25 158:2
 159:1
**exhibits** 10:7
**existence** 66:19
 108:11
**expect** 134:6,21
**expected** 83:23
 84:25
**expedite** 160:7
**expert** 3:20
 7:13,17 9:8
 12:1,4,12,17
 13:11 18:19
 22:18 31:9,23
 121:12 122:17
 137:18 143:23
**experts** 122:20
**expiration**
 163:19 164:25
 165:25

**explain** 40:11
 101:18 102:10
 140:9
**explained**
 48:25 53:16
 60:7
**explaining**
 104:21
**explains** 152:18
**explanation**
 133:19 153:8
 155:21
**expressed** 19:6
 20:22 33:18
**extensively**
 108:6
**extent** 10:15
 65:15 66:18
 108:12 109:1,8
 109:21 114:20
 120:2,9 124:1
 124:4,24
 125:20 126:11
 126:13 127:5,7
 130:10 131:6
**extremely**
 19:21
**eye** 134:16
**eyes** 156:6

**f**

**f** 161:1
**face** 136:20

**fact** 23:7 32:23
 39:24 40:19
 42:21 54:15
 59:25 77:3
 83:9 100:15,25
 110:24 125:13
 129:23 155:7
**factor** 129:13
 129:19,20
**factors** 62:11
 128:21 129:23
 129:25 151:14
 154:16
**facts** 29:9 61:8
 94:4 112:10
**factual** 116:14
 116:15
**failed** 64:25
**fair** 21:22
 22:21,23 26:3
 26:23 38:2
 90:18 91:16
 149:17
**fall** 27:17 53:11
 81:2 90:9
**falls** 99:21
**false** 53:7 62:9
 100:11 121:7
 132:18
**familiar** 25:8
 27:2,5,9
**far** 10:25
**fatal** 99:9,10

**fcrr** 1:23 161:22
**federal** 143:18
**feedback** 15:25
**feel** 94:22 122:7
**feinstein** 1:16 3:5,13,17,19 5:13 6:13,21 72:6,23 75:14 118:1 119:5 121:21 122:2 123:7 159:18 161:4 162:8 163:4,9 164:4 164:13 165:20
**fell** 30:23 51:24 80:21 82:21 85:8 90:2 91:8
**felt** 93:9
**fifty** 17:1
**file** 132:9 134:24
**filed** 5:16 10:12
**final** 15:20,20
**finally** 149:1,2
**financial** 121:12 122:21 138:8 139:17 139:19 143:25 143:25
**financially** 5:25 161:18
**find** 89:17 90:13 162:11

**finding** 41:16 41:16
**findings** 33:17
**fine** 38:3,3 84:12
**firm** 47:21
**first** 7:19 8:9 21:12 28:13,16 28:16,19,20 47:23 48:2,5 51:6,20 52:12 54:2,6 55:6,23 64:25 80:18 81:9,15,18 101:23 110:4,6 110:14 112:22 113:2 114:10 118:10,12,19 118:22 132:7 133:13 134:17 134:22 137:19 144:14 145:23 148:10,18 149:18 154:11 156:24 157:1
**fiscal** 4:7,10 101:24 118:13 118:20,22 128:8 146:17 146:17 148:21 150:3 151:9,11
**five** 13:1 28:14 34:21 54:5

**flaw** 99:9,10
**fluctuation** 132:6 134:21
**focus** 60:18 100:4 103:24 141:12 157:13 158:18,25
**focused** 9:20,22 40:14 55:4 70:15 116:1 134:12
**focuses** 69:13 69:25
**focusing** 24:12 53:3 81:4 119:20 124:18
**folks** 16:8
**follow** 14:25
**following** 76:8 76:10
**follows** 6:15
**foods** 1:9 4:5 5:16 162:6 163:3 164:3
**footnote** 88:14 146:4 152:18 153:15
**footnotes** 91:2
**footnoting** 90:12
**forcefully** 24:9
**foregoing** 163:13 164:18

**form** 4:1,2 8:16 8:25 10:23 11:9 13:13,20 13:25 14:24 16:12 18:20 19:19 20:6 21:21 22:9,22 23:4,18 24:18 25:11,17 26:4 26:10 27:1 28:1 29:1,18 30:10 31:16,22 32:5,12,15 33:5 34:3,19 35:11 37:4 38:17,25 39:12 41:13 43:10 46:11 47:2,14 48:12,20 49:10 50:12 51:2,11 52:6 54:10 55:10 56:1,11 56:20 57:6 58:2,16 59:7 59:24 61:24 62:19 64:1,18 66:5 67:19 69:16 72:10 74:17,24 77:5 78:1,23 79:19 80:7,16 81:6 82:17,25 84:19 85:12,18,25 86:18,20,24

87:3,17 89:9
91:1,20 92:4
93:6,25 94:21
95:5,16,22
96:12 97:20
98:1,22 99:5
100:10 101:16
102:25 103:16
104:16 105:2
105:11 106:10
106:25 107:3,7
108:5 109:10
110:5,16 111:9
112:6 114:18
114:24 115:8
116:12 117:5
120:4,11 121:3
121:9 122:4,8
122:16 123:24
124:10 126:1
126:14 127:8
129:15 130:1
130:15 132:21
135:8 136:1,13
137:11,16
138:2 139:7,15
140:8,21
141:18 143:9
143:21 144:5
147:2 148:6,16
148:23 149:15
150:4,12,25
151:18 153:5
154:5,17 155:3

155:14 156:2
156:21 157:9
157:19 159:6
**formalities**
6:25
**formulate**
33:22
**formulation**
105:9
**forth** 75:7
76:14 129:13
129:24
**forward** 65:3,7
65:16 66:3
96:20 98:8,13
98:20,23 109:9
109:22 115:6
116:9 120:2,10
120:23 121:18
123:5 124:6,25
125:20 126:12
127:6 128:7,17
128:20 129:9
130:11 131:7
147:21,24
148:5,15,20
149:13 153:11
162:15
**found** 60:6
**foundation**
58:17
**four** 17:5,19
41:21 43:23
109:20 142:16

**fourth** 53:12
101:24
**frankly** 62:1
**fraud** 55:13
**free** 94:22
163:14 164:20
**front** 46:9,18
46:25 47:11
48:10 49:8,18
50:10 56:7,16
59:3,3 124:20
**full** 6:19 36:18
81:19 115:13
**fully** 79:23 82:6
82:8 83:12,14
94:8 100:13
109:21 123:15
138:13
**fulsome** 119:18
**function** 132:8
134:23
**funny** 126:5
**further** 159:19
161:16
**fy** 145:22 151:4

**g**

**g** 2:15 5:1
**gain** 125:11
136:7,8 138:15
**gains** 46:22
62:12,15 63:13
63:14,24 64:7
64:9 66:4,19

100:12 101:22
102:5,10
108:11,12,25
109:1 110:8
111:17,18
112:2,15
114:12,21
115:1,18
117:12 120:19
121:1,15
122:23 123:25
124:17,25
125:10 127:10
127:13,14
133:3,6 134:5
135:2,10,17,22
136:15 137:2,9
137:13,19,24
138:17 139:24
144:15 145:22
145:24 148:8
149:17,20
152:20 153:19
154:10,13,15
154:21 155:10
155:13,17
156:20 157:2,7
157:8,18,21
**gathered** 15:1
**generally**
111:14
**generic** 32:17
61:23 62:6,18
62:23 63:8

137:25 138:5 139:14 140:4 140:10,12,20 141:17,22 142:2,19,20,23 142:24 143:1

**george** 1:4 5:14

**getting** 71:24 88:5 106:22

**gist** 92:5

**give** 13:5 48:22 63:21 64:14 137:4

**given** 6:22 12:1 42:8 138:5 156:13

**gives** 154:7

**glancy** 2:3 6:11

**glancylaw.com** 2:9,10

**go** 5:10 42:14 44:7 57:20 61:3 70:8 88:17 90:12 91:3 99:18 114:6 117:17 128:13 134:1 153:15 159:10

**gobbledygook** 71:24,25

**goes** 46:14 54:14 68:10 71:9 129:3 133:21

**going** 5:4 6:24 7:7,8 8:2,3 9:3 9:15,19 24:21 26:5,12 30:17 30:17 44:10 52:24 55:2 60:18 70:15 71:9,13,25 77:10 89:17 100:4 102:23 103:9,14 106:5 107:1 114:6 116:22 117:16 117:20 118:1,8 120:22 121:18 123:5 127:23 128:6 131:14 131:25 140:7,9 141:8 146:8,9 150:15 159:13 160:2

**goldman** 18:6 25:9,22 26:9 26:17,18 27:3 31:21 32:4 62:4 133:9 138:6 139:4,21

**good** 5:3 46:19 46:20,21 62:10 122:24

**gotcha** 70:17

**governor** 161:9

**great** 31:24

**grew** 134:20

**gross** 96:22 98:11 115:6,16 118:9,19,23 119:1 133:14 134:13 135:6 135:25 136:10 136:16,22 147:20,24 148:15 149:12 150:2 153:17 154:3 155:2,16 156:1,11,13 157:4,24

**grossly** 69:17

**group** 25:10

**growth** 132:8 134:13,17,23

**gu** 16:6

**guess** 23:24 62:21 95:17 117:6 126:23 138:4

**gun** 90:13,16

---

**h**

**h** 2:16 3:8

**half** 81:15

**hand** 7:7 8:2,3 9:3 36:15 118:1

**handwritten** 3:25

**happened** 88:8 126:20

**hard** 113:12 148:11

**hashed** 62:3

**he'll** 92:13

**head** 28:7 126:8

**heading** 31:8 118:12

**healthy** 134:13

**hear** 20:14 49:12 80:9

**heard** 142:1,3

**helped** 16:8

**helpful** 144:2

**hemani** 16:5 17:13

**high** 19:21

**highly** 19:7,20 25:5

**hmm** 49:5 54:13

**hold** 52:7

**holding** 31:21

**holds** 25:22 26:9

**holistically** 39:2 42:7 43:18,19 54:16 56:3 59:17

**hours** 17:1,18 160:4

**howard** 1:11 65:13

**hypothetical** 104:9

**hypothetically** 97:16

**i**

**idea** 148:17 149:2,19 157:1

**identification** 7:11 8:6 9:6 75:25 77:13 113:19 118:4 128:1 131:17 144:11 150:18 161:8

**identify** 65:25 90:15 158:3

**ignorant** 111:3

**ignored** 103:2

**ignores** 100:14 100:24

**illinois** 2:17

**illuminate** 105:18

**image** 139:8,10

**impact** 9:23 10:21 11:2 12:22 13:11,18 14:7,11,18 18:17 19:1,8,9 19:10,16,21,25 20:3 21:4,6,8

21:10,12,18 22:4,7,14,16,18 22:25 23:10,16 24:4,7,8,17,23 25:1,3,4,5 27:16,21 30:25 32:18,23 33:3 33:13,20,21,24 34:2,5,7,11,15 34:17 35:5,8 35:17,21 36:1 36:3,10,14,16 37:2,8,10,17 38:1,15,23 39:7,18,21 40:2,9 41:11 42:16,19 43:23 44:2 46:1,24 47:10,17,23 48:4,9 49:4,7 49:17,24 51:19 52:12,14 53:24 54:9 55:9,25 57:9,11,19 58:6 59:11,23 63:13 72:24,25 73:9,17,22 74:11 76:9,16 76:21 79:3,16 79:18 80:6,15 83:20 92:6 93:9 97:24 98:19 101:14 108:12 118:25

119:6,12,22 121:17 123:25 124:2,5,23 125:8,15,19 126:10 127:4 129:20 130:9 131:5 138:22 138:24

**impacted** 31:2

**impacts** 45:4 45:11,22 46:5 125:11

**implication** 92:9 93:18

**implications** 74:19

**important** 15:6 65:11 67:22 109:16 120:20 157:11

**importantly** 65:12

**impression** 48:22

**improper** 151:22

**improvement** 119:16,19 127:9

**improvements** 96:22 98:10 118:24

**include** 22:15 25:14 62:12

76:15 124:16

**included** 162:13

**includes** 10:6 11:20 149:13 151:14

**including** 6:5 12:14 118:25 129:4,8 142:11 142:12 147:20 147:24 153:10

**inconsistent** 99:15

**incorporate** 84:16

**incorporated** 82:6,8,19 83:12,15 85:1 85:23 164:12

**increase** 46:9 46:17,25 47:12 48:10,24 49:8 49:18 50:10 51:6 84:17 118:23

**incredibly** 32:6

**independent** 110:20 155:6,7

**independently** 48:13 112:9

**indicated** 24:7 36:9

**indicates** 19:8 19:16 123:18

**indicating**
162:13
**indication**
116:14,16
127:11,13
**indirectly** 40:9
**indisputed**
50:20
**individual**
65:14 140:13
**individualize**
40:1
**individualized**
39:4
**individually**
1:5 5:14 40:1
42:8 43:17
55:24 56:3
59:6
**inference** 56:6
56:15 57:4
59:22
**inferences** 52:3
53:4
**inflated** 29:21
109:24
**inflation** 27:10
27:13,14,19,21
27:22,24 28:12
28:21,25 29:16
29:22 30:1,2,5
31:6,12 47:3
47:25 48:1
51:22 54:13

56:7,17 57:8
92:16,17,24
96:20 98:8
102:15 109:9
109:22 111:18
112:15 114:11
115:6 116:9
118:25 119:7
120:2,9 124:25
125:8,11,20
126:12 127:6
130:11 131:7
148:20
**information**
11:21 18:10
23:12 30:22
34:24 40:16,20
41:5,20 53:15
53:18,19 57:20
57:21,25 59:13
60:3,5,12
61:18 64:16
65:8,11,14
77:23 79:4,6,7
80:3,12,23,25
81:5,22 82:5
82:18,24 83:6
83:7,9,11,22
84:2,14,16,24
85:16,22 86:1
86:4,6,8,9,10
86:22 87:9
93:15 94:12
96:6 101:20

104:13,19
105:9 106:18
108:3 109:13
109:16 110:2
110:21 120:20
121:8 123:19
123:22 125:1,6
125:22 127:16
127:19 138:10
141:2 144:1,2
150:10 155:18
158:5
**informative**
156:23
**informed**
121:14 122:22
126:18
**informing**
57:12
**initial** 7:24
51:16
**initiative** 119:1
119:10 125:16
**instances** 28:14
**instructions**
6:25
**intend** 11:3
**interested** 5:25
161:19
**interim** 16:2
**internal** 110:21
**interpret** 37:12
139:20

**interpretation**
61:9 69:14
83:3
**interpreting**
100:21
**interrupt** 15:5
42:3
**interrupting**
71:2,13 72:3
**introduced**
28:13 48:1
54:13
**introduction**
51:22
**investments**
143:24
**investor** 29:23
**investors**
109:17 143:20
**involved** 14:4
**irrelevant**
62:22
**issue** 47:7
120:17
**issued** 161:9
**issues** 9:22
32:21
**iv** 61:6

| j |
| --- |

**j** 1:10
**jglc** 1:8 5:18
**jill** 1:23 161:2
161:22

**john** 1:11
**jordan** 133:8
**judge** 104:23
  111:1
**judge's** 17:24
  17:24 67:4
  111:5
**judges** 95:17
**june** 19:1,17
  20:3,16 21:18
  22:7 23:1 45:1
  46:4 61:16
  79:3 97:24
  98:19 101:6,14
  144:16 145:22
**juries** 95:18

**k**

**k** 1:23 4:1,2
  128:9 161:2,22
**kara** 2:4 6:10
  70:2 71:1 74:8
  162:5
**keep** 67:11
  71:12 99:24
  106:7 113:12
  113:14 117:16
  133:10,24
**keeping** 27:18
  27:21
**kept** 120:21
**kind** 24:21 29:8
  37:6 132:25
  133:22

**kinds** 125:10
**knew** 54:18
  138:15,17
  139:23
**know** 7:3 14:13
  15:14,15 19:10
  28:12 29:9
  31:7 33:6
  34:20 36:14
  41:3 45:18
  52:9,11 54:19
  59:15 61:25
  64:8 71:23
  79:21 82:20
  85:6,7 86:8
  90:5 93:19
  95:13,20
  101:19,21
  102:1 110:25
  110:25 111:8
  111:12 115:14
  115:20 121:13
  122:18 126:2,6
  139:19 143:12
  143:20 148:24
  148:25 149:8
  157:16 158:7
  158:10
**known** 65:8
  77:25 102:9
  122:25
**knows** 62:2
**kwolke** 2:9

**l**

**lack** 73:17
**language** 21:1
  27:2
**lapped** 134:4
**large** 149:5
**larger** 133:16
**laughter**
  151:19
**law** 31:25
  139:16
**laws** 143:19
**lawsuits** 12:23
**lawyer** 25:20
  121:11
**leading** 54:20
**leah** 133:8
  134:11
**learned** 54:21
**leave** 43:21
  47:7 52:24
  78:5
**leaves** 117:11
**leaving** 12:21
**lee** 2:15 6:9
  7:16
**legal** 25:19
  26:5,7,13,15
  31:8,8,23 32:1
  126:22,25
  138:3,4 162:1
  165:1

**letter** 162:19
**letting** 15:4
**level** 143:7
**likelihood**
  19:22 25:6
**likely** 13:14
  19:7,20,21
  25:5 34:12
  144:15 145:24
  149:23
**limited** 129:4
**line** 15:4,4
  77:16 162:13
  164:7 165:3
**lines** 76:10
  77:15
**link** 25:25
  26:21
**list** 25:15 68:8
  119:18 124:15
  124:16 154:25
**listed** 12:23
  17:20 18:9
  147:6,9 164:7
  164:17
**listen** 139:17
**listing** 164:7
**lists** 11:25
  150:23
**little** 15:16
  20:25 33:7
  88:1 125:4
  133:15 156:23

**[llp - markedly]** Page 22

**llp** 1:18 2:3,13
  5:20
**location** 5:19
**logic** 58:11
**long** 17:17
  56:14
**longer** 124:15
  124:16
**look** 13:21 18:2
  20:10 22:5
  36:25 38:21
  39:3,15,25
  42:7 43:20
  48:23 61:17
  62:5 65:22
  66:25 67:14,16
  68:23 72:15,19
  75:19 88:20
  91:2,6 93:13
  101:2 131:13
  134:15 146:9
  150:14 151:3
  151:24 152:16
  152:23 156:5
  158:2,12 159:1
**looked** 17:23
  17:24 38:5,7,9
  38:13 39:1,4
  40:13 42:5,5
  43:16 54:15
  67:20,20,23
  68:1 69:1,3
  70:6 124:8
  125:2 130:13

131:9 140:4
  143:14,16
  151:7,15 153:1
**looking** 43:7,11
  89:19,21 91:25
  99:6 124:19
  128:7,17,20
  137:3 139:20
  150:1,5 151:8
  152:1,3 158:4
**los** 2:7
**loss** 46:12,13
**losses** 29:23
  102:17
**lost** 44:6 92:21
**lot** 31:17 90:12
  122:18 134:17
  155:18
**loud** 29:8 141:9
**lower** 153:17
  155:16 157:4

**m**

**m** 2:4 3:22
  162:5
**madam** 162:10
**made** 8:17,23
  15:11 28:9
  55:5 63:9,17
  63:22 64:15
  65:24 66:1,11
  102:3,11 114:2
  123:4 127:19
  137:9 163:7

**magnitude**
  65:1,7 66:3
  108:25 109:8
  109:21 120:1,9
  148:18 149:3
  154:12 157:1
**maintaining**
  27:22 28:21
**maintenance**
  27:10,13,15,24
  28:25 29:17
  30:2,5 31:6,12
**major** 99:10
  125:13
**make** 16:3
  107:2 113:12
  127:17 156:3
**makes** 77:1
  122:7 156:4
**making** 30:7
  121:7
**manner** 30:24
  126:19
**march** 12:14
  13:12 18:6
  61:15 73:10,18
  73:23 74:12
  76:11,17 77:22
  78:13,20 79:5
  79:6,11,12,18
  79:23 80:20,21
  81:12,20,21,21
  82:2,9 83:6,16
  84:23 87:8,21

90:20 92:8,17
  92:25 93:10,11
  94:10 123:15
  123:20,23
  145:21 153:23
**margin** 96:22
  98:11 115:16
  116:8 118:9,19
  118:23,24
  119:2,6,13,23
  132:24 133:20
  135:6,25
  136:10,17,22
  147:20,24
  148:15 149:12
  150:2 153:18
  154:3 155:2,16
  156:1,11,14
  157:4,5,6,24
**margins** 133:14
**mark** 7:8 9:4
  75:9,16 77:10
  113:15 131:14
  150:15
**marked** 7:10
  8:5 9:5 44:18
  75:24 77:12
  113:18 118:3
  125:3 127:25
  131:16 144:10
  145:12,23
  150:17 152:11
**markedly**
  99:14

**market** 3:10 7:21 26:3,24 53:15 54:18,18 54:21 59:15 64:17 77:25 82:5 83:22 84:13,15,25 85:22 87:24 91:9 96:11 98:14 100:13 101:19,20 102:4,8 106:12 110:8,9 111:2 120:20,21 121:2,13,15 122:22,25 123:2 126:19 137:21 138:16 149:2,18

**marketplace** 57:12,14 60:6 61:13 64:10 66:20 69:11 120:18 130:20 142:12,13

**markets** 83:11

**marking** 8:4 118:2 127:24 128:2 131:18 144:8

**massachusetts** 1:20 5:21 161:10,11

**match** 59:2 139:4,8,10

**matched** 60:24

**matching** 58:13 58:20,24 61:21 67:13,14 68:22 69:13 70:23 72:6,20 139:12

**material** 65:4 121:8

**materialization** 77:24 90:5,6 91:19

**materializati...** 91:13

**materially** 128:19

**materials** 11:22 25:15

**matter** 5:13 7:20 9:10 10:22 12:21 13:3,12 102:21 103:12 161:5

**mean** 11:14 14:5 22:24 23:11,19 28:3 28:4 30:16,21 31:23 34:4,20 35:16,18,18 39:20 40:24 42:18 43:18 48:23 49:23 50:18 54:14

58:24 59:8 62:5 64:2,4 68:12 87:7 93:12,18 94:2 99:1,7,24 101:2,3 103:19 103:23 107:8 112:8 113:11 116:13,15,17 116:21 126:4,5 126:13,22 127:7,12 134:12 136:2 139:8 140:12 155:5,9 156:22

**meaning** 155:6

**means** 23:5 39:19 42:17 62:1,3,18 86:15,22 87:2 94:24 95:14,19

**measure** 46:9 46:25

**media** 5:11 160:4

**meet** 17:17

**meeting** 17:15 17:22

**melissa** 2:5 6:11

**memorized** 27:4

**memory** 13:9 14:3 20:11

**mention** 46:21 111:25 125:9 125:12 127:14

**mentioned** 17:10 18:22 127:13

**merit** 161:2

**met** 17:8,12

**methodology** 3:12 7:22

**microphones** 5:6

**midwest** 162:17 165:1

**miller** 1:10

**million** 144:16 145:25 147:6 147:10,23 148:4,21 149:12,23 150:6 151:5 153:2 154:15 154:23,24 155:9,19,20,24 155:25 156:6 156:15 157:23 157:24

**mind** 86:17 95:7,13,21 106:7,23 133:11,25

**mine** 91:3 120:15

**minor** 132:7
 134:22
**minute** 51:18
 97:10
**minutes** 88:20
 89:19 90:16
 91:25 160:5
**mirror** 139:8
 139:10
**mischaracteri...**
 105:20
**mischaracteri...**
 105:3
**mischaracteri...**
 69:18
**mischaracteri...**
 71:4 151:21
**misleading**
 121:2 126:20
 127:22 130:19
 130:19 131:11
 132:19 137:10
 158:14
**misled** 137:22
 142:13
**mismatch**
 32:19 56:8,17
 57:1,2,5,18
 58:1
**misrepresent**
 37:1
**misrepresent...**
 14:10,17 25:25
 26:21 27:15,20

28:16 33:4,9
 34:2 35:5,9
 37:3 38:14,16
 38:22,24 55:24
 56:9,18 62:6
 113:2 140:24
 143:17
**misrepresent...**
 14:8 23:8,13
 28:15,19 29:20
 31:1 32:19
 34:7,10,18,22
 36:17 38:6
 39:1,20 42:6
 42:18 43:12
 45:5 46:10
 47:1,12 48:11
 49:9,19 50:11
 54:1,8,15 55:4
 55:8,16,23
 57:13,17,22
 58:8 59:16
 61:11 62:24
 68:11,15 69:3
 70:11 72:12,17
 82:1 92:6
 101:8 102:15
 108:24 141:5
 142:18
**misrepresented**
 61:13,20 141:4
 143:15
**missing** 145:14

**misspoke**
 126:16
**misstatement**
 59:4 64:15
 110:4,7 114:11
 124:8 130:13
 131:9 139:5
 141:11
**misstatements**
 39:11,15 59:19
 60:22 61:22
 63:4,6,7,16,22
 65:25 66:1,9
 66:13,23 67:15
 67:18 68:1
 69:15 72:8
 112:22 144:4
**misstates** 47:15
 49:11 58:3
 62:20 139:16
 155:4
**misstating**
 80:17 144:23
**mistake** 114:2
**misunderstan...**
 37:6 100:3,23
 123:9
**mix** 133:16
 135:7,20
**mixed** 88:5
 133:16
**mm** 49:5
**models** 116:23

**moderated**
 129:7
**modestly** 119:2
**moment** 12:6
 44:8 50:17
 84:4,5 97:15
 146:19
**month** 11:16
**months** 13:24
**morning** 5:3
**motion** 17:25
 67:5 99:16
 123:18
**mouth** 71:8,16
**move** 83:23
 95:25
**movements**
 23:6 33:10
**moving** 27:18
 85:23
**ms.u** 70:22
**murray** 2:3
 6:11
**mute** 5:8
**mwright** 2:10

**n**

**n** 3:1 5:1
**name** 5:21 6:20
 162:6 163:3,4
 163:15 164:3,4
 164:21
**narrower**
 117:9

**[natural - object]**

**natural** 1:9 4:5 5:15 148:7 149:16 153:18 154:9 155:17 162:6 163:3 164:3

**nature** 139:14 140:20 141:17

**nconrad** 2:21

**nearly** 88:19 89:19

**neatly** 55:19,20

**necessarily** 55:19 75:12

**necessary** 30:19 34:4 35:6 42:7 47:25

**need** 10:18 28:10 29:2 59:4 92:1 132:11 141:19 157:15 160:7

**needed** 28:6 30:11 98:19 127:17 137:15

**neighborhood** 149:4

**neil** 2:16

**neither** 31:14 161:14

**net** 118:20,21

**never** 24:4 28:3 42:2,4 69:24

85:9 94:11 120:5 130:16

**new** 1:2 5:17 18:17 83:23,25 84:14 85:22 86:1,3,12,15,22 87:2 94:11,18 94:25 95:15

**news** 33:8

**nilofer** 2:14 6:7 32:6 44:5 69:17 70:25 71:19 104:9 105:3 151:22 158:22

**nonrecurring** 116:24 123:1

**notarized** 162:14

**notary** 161:10 162:25 163:10 163:18 164:15 164:23 165:23

**note** 5:5 20:22 162:12

**notes** 3:25

**notice** 61:5

**notion** 83:21

**notwithstandi...** 136:25

**numar** 2:19

**number** 18:3 65:1,6 66:3 150:5 151:7

154:7,8,22,23 154:24 155:19 155:20,24,25 156:10,12,15 162:7,13

**numbers** 62:13 63:23 147:14 148:11 149:19 156:9 164:7

**numeral** 61:15 61:16,17 155:6

**numerous** 91:4 99:7

**o**

**o** 5:1

**oath** 5:24 6:14

**object** 8:16,25 10:23 11:9 13:13,20,25 14:24 16:12 18:20 19:19 20:6 21:21 22:9,22 23:4 23:18 24:18 25:11,17 26:4 26:10 27:1 28:1 29:1,18 30:9,9 31:16 31:22 32:5,12 32:15 33:5 34:3,19 35:11 37:4 38:17,25 39:12 41:13

43:10 46:11 47:2,14 48:12 48:20 49:10 50:12 51:2,11 52:6 54:10 55:10 56:1,11 56:20 57:6 58:2,16 59:7 59:24 61:24 62:19 64:1,18 66:5 67:19 69:16 72:10 74:14,17,24 77:5 78:1,23 79:19 80:7,16 81:6 82:17,25 84:19 85:12,18 86:18,20,24 87:3,17 89:9 91:1,20 92:4 93:6,25 94:21 95:5,16,22 96:8,12 97:20 98:1,22 99:5 100:10 101:16 102:25 103:16 104:16 105:2 105:11 106:10 106:25 107:3,7 108:5 109:10 110:5,16 111:9 112:6 114:18 114:24 115:8 116:12 117:5

120:4,11 121:3 121:9 122:4,8 122:16 123:24 124:10 126:1 126:14 127:8 129:15 130:1 130:15 132:21 135:8 136:1,13 137:11,16 138:2 139:7,15 140:8,21 141:18 143:9 143:21 144:5 147:2 148:6,16 148:23 149:15 150:4,12,25 151:18 153:5 154:5,17 155:3 155:14 156:2 156:21 157:9 157:19 159:5,5

**objection** 63:18 68:24 85:25 86:14 94:13

**objections** 6:2 58:23

**objective** 33:22 33:24

**obligated** 121:7

**obligations** 120:25

**observe** 46:16

**observed** 51:15 54:21

**obviously** 95:8

**occurred** 8:10 40:18 63:1,3 63:14 78:15,22 92:7 93:10

**offer** 11:3 14:16 23:21 26:5 31:18 36:11 104:12 138:22,23 144:13

**offered** 7:23 8:15 13:24 18:17 72:25 104:18

**offering** 19:15 21:16,23 26:14 26:15 45:9 46:23 47:9 48:8 49:3 50:2 50:9 92:25 105:8 126:25

**offers** 73:16

**official** 163:15 164:21

**oh** 10:13 18:3 23:3 36:24 47:19 60:25 66:12 95:2 107:8 111:20 114:2 145:8,14

**ohio** 162:2

**okay** 7:6 8:19 9:2 10:4,5

11:18 12:11 18:15 19:13 20:19 24:2 27:8 31:10 37:15,19,25 38:4 40:22 41:17,23 42:23 42:25 43:5,14 43:21 44:4,13 44:20,21 48:17 52:18,23 55:1 60:17 64:19 65:18 67:9 73:4,15,20 74:9,21 75:18 76:19 77:17 78:4,5,8 81:1,9 81:18 84:12,20 84:21 89:12 102:6,18 103:8 104:11,25 105:25 106:16 107:17 108:8 108:19,21 109:5,18,25 110:19 111:24 112:11,23,25 114:4,5,16 115:2 117:15 117:22,25 118:16 119:4 119:20 121:19 123:6 128:5,10 128:13,16

129:1,2,18 130:6,21 131:12,25 132:2,15,16 143:2 145:4,5 145:16 146:7 146:13,14,15 147:12,17 148:2,12 149:6 149:21 150:22 151:2 152:5,21 152:25 153:6 157:3,22 159:8 159:15

**omission** 14:10 14:18 27:16,20

**omissions** 14:8 23:8,14 28:15 29:20 31:2 32:20 36:17 38:6 39:2,21 42:6,19 43:12 45:6 54:16 55:16 57:13,17 57:22 58:8 59:16 61:12 69:4 70:11 72:12 82:2 92:7 101:9 102:16 108:24 141:5 142:18

**omitting** 121:8

**once** 109:13 115:9,23

**one's** 152:25
**opening** 7:16
 7:17 11:22
 18:13 55:15
**opine** 14:9
 34:14 40:1
 91:18,21 93:22
 108:22 117:8
**opined** 14:6
 43:22 75:11
 119:25
**opining** 35:25
 92:23
**opinion** 13:11
 14:16 18:25
 19:14 20:1
 21:16,23,25
 22:11 23:21
 24:6,22,23,25
 25:2 26:6,7,13
 26:15,15 27:3
 31:19 32:2
 33:23 36:12
 39:17 41:4,9
 41:10,14 42:15
 45:9,13 50:2,9
 50:15,16,18,22
 53:2,3,3 66:21
 73:9,16 79:2
 93:1,24 94:9
 97:23 98:18
 101:2,5,9,10
 109:19 110:1
 127:1 138:23

 139:22
**opinions** 7:23
 10:21,24 11:2
 12:22 13:23
 16:18 18:17
 19:12 20:9
 46:23 47:9
 48:8 49:4,6,16
 72:24 73:1
 97:19,21 99:3
 100:9,17
 144:13
**opportunities**
 65:3,8 96:21
 98:9 129:9
**opportunity**
 16:16 50:19
 106:20
**opposed** 91:22
**opposite** 22:2
**order** 14:13
 17:24,25,25
 40:1 57:3 58:1
 58:4 67:6 68:9
 68:10,19 69:2
 70:7 99:16
 106:21 111:6
 123:18 148:18
 149:3 154:12
 161:8
**original** 12:2
 16:7 17:6
**ought** 123:10

**outcome** 6:1
 161:19
**outline** 15:12
 15:16
**outside** 60:12
 60:12
**overestimates**
 123:4
**overestimating**
 120:22
**overlooked**
 45:14,14,20
 46:1,2
**overlooks**
 44:25
**own** 104:12,18
 105:6,8 111:3
 158:20

**p**

**p** 1:12,16 3:5
 3:13,16,19 5:1
 5:13 6:13
 161:4 162:8
 163:4,9 164:4
 164:13 165:20
**p.m.** 117:20,23
 159:13,16
 160:3
**page** 9:12
 77:15,16 90:11
 91:3 99:6,8
 128:7,13,15
 129:7 132:1,3

 132:5 146:12
 146:16 150:21
 156:7,18
 162:13,15
 164:7 165:3
**pages** 10:9
 61:10 88:16
 104:21 118:11
 129:24
**paid** 26:2,22
**paper** 113:11
 113:14
**paragraph**
 44:17,23 64:22
 64:24 66:17
 73:8,12 74:19
 76:3,6 78:7,10
 81:10,16 83:1
 84:5,22 85:11
 85:13,20 88:12
 88:15,21,21,23
 96:18 99:11
 105:17 108:22
 118:9,18
 128:23 144:19
 144:21 145:1
 145:18,19
 149:22
**paragraphs**
 16:14 20:8
 88:15
**parcel** 55:12
**park** 2:6

**[part - point]** Page 28

| | | | |
|---|---|---|---|
| **part** 30:18,19 41:14,15 47:20 51:9 55:12 61:7,8 72:11 73:24 74:13,22 80:18 81:25 111:4 164:9 | 135:10,17 145:25 | **phones** 5:8 | 106:19 107:5 108:17,20,23 109:6,12 110:3 110:17 111:22 112:9,13 114:9 115:5,22 116:3 116:6 117:1,9 |
| | **percentage** 116:8,18 136:3 | **phrase** 27:10 | |
| | | **phrased** 28:5 33:6 | |
| | **percentages** 137:4 | **phrasing** 37:21 37:22 108:1 | |
| **parth** 16:5 17:13 | **perform** 24:15 | **pick** 5:6 | 120:7,14,24 |
| **partial** 113:6 | **period** 16:24 28:14 51:6 54:2,7,19 55:7 62:11 63:11 65:4,6,9,17 73:10 97:7 113:1 134:4 138:10 143:17 | **piece** 113:10 | 121:6 122:6,10 122:11,13 123:9 126:17 127:3 129:13 130:8,23 131:2 132:18 134:2,9 136:17 140:25 159:20 |
| **partially** 142:17 153:25 155:21 156:25 | | **pieces** 53:22 | |
| | | **place** 5:9 | |
| | | **places** 91:5 99:7 | |
| **particular** 14:9 14:17 29:4 39:19 42:17 | | **plaintiff** 26:2 26:23 140:2,18 141:15 143:5 | |
| **parties** 5:10 161:15,18 | **permanent** 110:12 121:17 | **plaintiffs** 1:7 2:11 7:14 12:17,20 15:23 16:10 17:8 22:13 27:23 28:24 29:16 30:7 31:11 39:7 53:25 61:7 63:5,7 64:3 65:24 66:10,18 67:4 67:12,17 69:5 69:10,14 70:12 72:7 80:4,13 91:23 96:7,9 97:4,5 99:15 99:22 104:13 104:19,22 105:9,18,20 | **please** 5:5,8 6:3 6:5,19 7:3 42:14 44:8 56:12 58:18 70:5 71:1,22 72:3 75:17 84:5 104:17 141:19 160:7 162:11,11 |
| **party** 5:24 | **persisting** 133:22 | | |
| **past** 13:24 41:7 90:16 | **personally** 163:11 164:15 | | |
| **path** 119:1,10 125:15 | **perspective** 122:21 | | |
| **paul** 3:21,23 | **phd** 1:16 3:5,13 3:17,19,21 6:13 161:4 162:8 163:4,9 164:4,13 165:20 | | **plenty** 139:9 |
| **pause** 32:24 113:9,21 114:1 114:3 144:7 | | | **point** 11:14,17 24:3 37:5 52:8 66:15 76:3 101:12 124:11 138:8,18 139:23 148:13 153:16 |
| **pencil** 113:11 | | | |
| **pending** 84:6 159:19 | **philip** 6:21 | | |
| **people** 46:19 122:19 | **philosophical** 111:14 | | |
| **percent** 118:20 118:21 135:5 | **phone** 162:3 | | |

**[pointed - proceed]**

**pointed**  41:5
**pointing**  50:13
  133:18
**points**  15:6
  28:9 68:11
  116:8,19
**portion**  148:4
  151:13
**pose**  7:1
**position**  55:21
  57:24 62:16
  102:20 103:11
  115:3
**possible**  56:25
  106:20
**possibly**  58:5
**practices**  65:16
**precedent**
  138:6
**precipitated**
  23:12
**precise**  116:7
  116:13,17
**precisely**
  123:21
**premised**  99:3
**preparation**
  17:21
**prepare**  17:3
**prepared**  7:14
  7:18,19 9:9
**preparing**
  11:13 14:23
  16:11,21

**prescribed**
  161:8
**present**  6:4
**presentation**
  146:5,10,12
**presently**  11:3
**pressure**
  133:22
**presumption**
  25:23 26:19
**pretty**  52:7
  80:22 90:3
**previously**
  27:19 44:18
  145:20
**price**  9:23
  10:21 11:2
  12:22 13:11,18
  14:6,10,18
  18:17 19:1,8,8
  19:10,16,21,25
  20:3 21:4,6,7
  21:10,12,18
  22:4,7,14,16,18
  22:25 23:10,10
  23:16 24:4,7,8
  24:17,21,23
  25:1,3,4,5 26:1
  26:2,3,22,24
  27:16,17,18,20
  29:21 30:23,25
  31:2 32:18,23
  33:3,10,13,20
  33:21,23 34:1

  34:5,7,11,15,16
  35:4,8,17,21
  36:1,3,10,14,16
  37:2,8,10,17
  38:1,15,23
  39:7,8,18,21
  40:2,7,9,17
  41:11 42:16,19
  43:22 44:2
  45:3,4,10,11,21
  45:22 46:1,4,5
  46:9,18,24,25
  47:10,11,17,23
  48:4,9,10 49:4
  49:7,8,17,18,24
  50:10 51:19
  52:4,12,14
  53:5,11,23
  54:9,24 55:9
  55:25 56:6,16
  57:9,10,19,20
  58:5 59:2,11
  59:22 72:24,25
  73:9,17,22
  74:11 76:16,21
  78:15,21 79:2
  79:13,16,18
  80:1,5,15,21
  81:2 82:13,15
  82:20,21,24
  83:20,24 84:17
  85:1,8,10,17,24
  87:15 89:6
  90:2,8 91:8

  92:16,17,20,24
  93:3,9 97:24
  98:19 101:14
  102:13 109:23
  138:24
**prices**  23:6
  82:6,8 83:13
  83:15
**primarily**
  153:18 154:8
  154:20 155:16
  157:7,10,20
  158:7
**primary**  72:15
**principle**
  111:11,20
**principles**
  122:21
**prior**  31:3
  52:10 76:22
  102:4,9 107:8
  109:2 132:5
  147:1 151:15
  152:16
**private**  5:7
**probably**  83:2
  122:19 138:18
  139:24 149:4
**problem**  103:1
  130:24 158:10
**procedure**
  163:5 164:5
**proceed**  72:4

**[proceeding - quantify]**

**proceeding** 6:3
**proceedings**
  160:8 161:13
**process** 14:22
  14:25
**procurement**
  46:21 62:12,14
  63:13,14,24
  64:7,9 66:19
  100:12 101:22
  102:4,9 108:11
  108:12,25
  109:1 110:8
  111:17,18
  112:2,15
  114:12 115:1
  115:17 117:12
  120:19 121:1
  121:14 122:23
  123:25 124:17
  125:10,11
  127:10,13,14
  133:2,5 134:4
  135:2,9,17,22
  136:7,8,15
  137:2,9,13,19
  137:24 138:15
  138:17 139:24
  144:15 145:21
  148:8 149:17
  149:20 152:20
  153:19 154:10
  154:13,15,20
  155:10,13,17

156:20 157:2,7
  157:8,18,21
**produced**
  161:12
**producing**
  101:22 122:23
**production**
  162:15,17,22
**professor** 3:12
  5:12 31:25
  143:24
**proffering**
  50:17
**profit** 116:23
  120:22 121:17
  122:24 123:5
  124:1,2,5,13,23
  125:19 126:10
  127:5 130:10
  131:5 134:5,13
**profitability**
  63:13,15
  101:23 109:2
  109:15 110:9
  110:11 111:19
  112:17 114:12
  115:11,25
  117:14 120:22
  121:18 122:24
  123:5 124:1,3
  124:5,14,24
  125:19 126:11
  127:5 130:10
  131:6 134:5

**profits** 63:15
  101:23 109:2
  109:15 110:9
  110:10 115:6
  115:10,15,25
  117:13
**promotional**
  129:8
**prongay** 2:3
  6:11
**proposed** 97:6
**prove** 21:4,7
  22:14 23:16
  24:16,19 36:15
  47:17 48:14
  58:6
**proved** 21:9
  24:10 25:3
  53:23 57:1
**provide** 12:22
  69:23 136:3
**provided** 12:4
  12:12 13:11
  53:15 119:18
  156:10,10
  161:7
**provides** 105:6
**providing**
  138:1 141:23
**public** 161:11
  163:10,18
  164:15,23
  165:23

**publicly** 83:10
**purport** 154:25
**purposes** 9:16
**put** 35:13 53:22
  55:2 66:2
  104:2 146:9
**putative** 54:2,7
  55:7
**putting** 68:21
  71:7,16

**q**

**q1** 4:4 137:24
**q3** 144:16
  145:25 146:17
  146:17 147:1,1
  147:5,8,25,25
  148:21 149:23
  151:4,8,11
  155:1,1
**qualitatively**
  56:24
**quantification**
  46:15 47:6,8
  114:25 135:1,4
  137:1 154:12
**quantifications**
  56:21,22
**quantified**
  144:14 145:24
  148:20
**quantify** 47:3
  119:12,22
  125:8,15

129:20,25
132:23 135:12
136:11,23
154:1
**quantifying**
57:8 133:3
**quantitative**
152:23
**quarter** 4:7,10
101:25 115:7
116:10 118:10
118:13,20,22
132:7 133:10
133:15,24
134:18,22
136:23 137:20
137:20 146:1
150:11,24
152:13 158:5,5
159:3
**quarters**
101:24
**question** 7:2
20:14 21:15
22:5 23:24
31:19,24 32:7
33:7,16,17
35:13,15 37:12
38:20 50:7
52:20,21 53:10
59:8,9 67:11
71:25 74:8
80:9 84:6
89:18 100:4,5

103:9,9,24
105:5,14 114:7
130:21 132:12
133:7,13
134:12 135:23
136:14 137:6
138:4 141:7,8
141:13,20
142:4,5,22,24
143:3,10 156:4
157:13 158:13
158:19,25
**questions** 71:3
71:8 158:16,16
158:18,21,23
159:19,20,23
**quick** 44:5
**quickly** 82:5
83:12
**quite** 18:3
19:24 120:12
**quote** 96:18,24
99:13
**quotes** 66:16
**quoting** 96:25

**r**

**r** 5:1 161:1
**random** 18:4
**rate** 118:10,19
118:23,25
119:2 153:18
155:16 157:4,6
157:6

**rather** 22:17
30:25 33:24
39:10 89:24
98:12 122:5
**reach** 47:11
48:9 49:13
102:23 103:14
**reached** 49:3
145:21
**reaching** 49:6
49:16
**read** 10:16 12:7
15:3,22 17:5
19:4 20:12,20
32:13 42:14
64:20,23 67:1
68:4,13,17,18
70:4,25 74:2,5
78:24 81:7
83:4 84:4,10
86:17,19 87:25
88:3,10 89:10
89:13 95:7,9
95:13,23 97:2
105:15 118:17
130:3 132:13
141:9,21
144:22 146:20
163:5,6,12
164:5,6,17
**reading** 42:10
45:17 83:3
99:24 123:16
140:24 144:18

162:19
**real** 44:5
**realized** 51:18
102:17
**really** 13:4
16:23 61:25
62:2 84:1 99:9
**realtime** 44:6
161:3
**reason** 40:6
78:3 100:1
134:14 157:16
162:14 164:8
165:3
**reasonable**
28:17 30:16
34:12
**reasonably**
78:13,20 87:13
89:4 98:2,3
**reasoning** 41:2
**rebut** 25:23
26:19
**rebuttal** 25:14
**recall** 12:24
13:21,23 18:5
129:16
**recapped** 94:16
**receipt** 162:18
**received** 26:2
26:22
**recess** 44:11
117:21 159:14

**[reciting - report]**

reciting  91:22

record  5:4,10
6:6,20 35:14
44:8,10,14
48:22 64:23
89:18 117:17
117:20,23
159:11,13,16
160:3 161:12
161:13 164:9

recorded  5:12
161:6

recording  5:9

recurring
116:24 121:17

reduced  148:7
149:16 152:19
153:18 154:9
155:10,12,17
156:20 157:20

reduction
154:9

refer  9:15 10:1
36:21 41:24
96:5,14 106:2
106:5 107:1

reference  16:3
39:8 162:7
163:2 164:2

referenced
163:11 164:15

referencing
40:4

referring  10:2
16:4 37:9
44:25 63:4
67:11

refinitiv  4:3

reflect  89:18

refresh  20:10

regard  58:21
59:4

regarding  36:3
63:23,23 64:16
67:17 76:9
114:8

registered
161:2

regulation
121:12 122:17
122:18 137:18
143:23

regulatory
122:19 126:23
127:1

reiterated  86:9
94:16

relate  106:11

related  5:24
10:21 11:2
18:12,17 23:13
29:4 34:25
54:22 57:21
61:8 90:1
96:20 98:8
101:7 109:9,22
111:18 112:15

114:11 115:6
116:9 120:2,9
124:25 125:20
126:12 127:6
130:11 131:7
148:20 161:15

relates  61:19
73:9 84:7

relative  135:12
136:23 161:17

release  118:7
128:9 151:9,12

relevant  33:16
33:17 82:5
83:11 123:19
123:22

reliable  13:5

reliance  25:24
26:20

rely  14:2

relying  27:24
88:24 89:1

remains  76:20

remember
16:23,25 47:19
68:13

remotely  6:5

repeat  103:9
130:21

repeated  86:7

repeating
37:24 43:3

rephrase  7:4
74:7 130:25

reply  3:18 7:15
9:8,16,18 10:1
10:6,11,20
11:19 14:20,23
15:1,12 16:9
16:11,22 17:7
18:11,16 44:17
60:21 67:8
72:21 73:2,8
145:9

report  3:10,18
3:20 7:13,17
7:19,20,24 9:9
9:16,16,19,19
10:2,6,11,20
11:4,8,12,15,20
11:22 12:2
14:20,23 15:1
15:3,12 16:7,9
16:9,11,22
17:6,6,7 18:11
18:13,16,19,23
19:7 21:1
25:14,14 29:13
31:4 33:18
44:17 47:4
48:16 50:24
51:25 52:8,10
52:17 53:16
60:7,21 64:22
66:24,24 67:8
68:2,14,16,21
72:21 73:3,8
73:25 74:15

75:4,8,20 76:4
76:6,7 78:7
79:17 80:17
81:17 87:12,25
88:7,13,15
89:21 90:4,17
93:13 96:2,5
96:25 97:23
98:5,18 99:2
99:23,25
101:12,18
102:10 105:13
108:7 142:21
144:21 145:9
**reported**
115:15,17
**reporter** 1:23
161:3,3,24
163:7
**reports** 11:1
13:6 17:23
18:1
**representing**
5:22
**request** 164:9
164:11
**requested**
161:24
**require** 143:19
**required** 43:11
114:23 162:25
**reread** 71:18
71:22

**research** 23:20
24:24
**respect** 52:12
158:17
**respond** 22:11
48:15
**responded**
87:24
**responding**
87:22
**response** 18:18
31:19 72:25
80:22,24 81:5
**responsible**
102:16
**responsive**
105:13
**result** 128:21
**results** 46:19
46:20 122:25
128:19,25
**retail** 119:1
151:15
**retained** 76:7
160:5
**retirement**
25:10
**returned**
162:18
**returns** 134:17
**reveal** 106:21
**revealed** 26:1
65:5 82:2
96:10 100:13

100:25 101:1
109:21
**revealing**
119:25 120:7
**review** 10:14
10:17 14:12
17:20 61:7
90:17 94:7
105:20 161:24
162:12 163:1
164:1
**reviewed** 8:11
10:11 18:9,23
77:7
**reviewing** 13:6
**rewriting** 15:25
**right** 8:21
12:16 14:19
25:21 42:11,12
42:25 43:18
45:7,8 56:2,10
56:21,23 59:25
63:20 70:14
73:11 74:18
76:5,18 77:6
77:23 80:8
85:2 88:12
91:24 95:4,8
99:1,6 101:18
104:10 106:14
107:24 109:22
110:24 112:25
113:20,24
114:4,15 116:4

117:11 119:7,8
119:10 120:3
120:10,12,13
121:24 125:17
128:10 130:5
131:4 132:20
132:22 138:25
139:2 145:15
147:3,3,3,11
148:8,17,24
149:10 150:8
151:6,10,16
152:2 153:13
156:17 157:12
**rise** 27:17
**risk** 57:15 90:7
91:14,19
129:13,19,20
129:23,25
**risks** 77:24
**rmr** 1:23
161:22
**roman** 61:15
61:16,16
**room** 15:2
**rough** 15:14
160:6
**roughly** 17:1
**round** 47:20
**row** 151:4
152:7
**rpr** 1:23 161:22
**rubric** 143:12
144:3

**[ruggieri - short]** Page 34

**ruggieri** 1:23 161:2,22
**ruled** 19:11 34:13
**rules** 163:5 164:5
**run** 160:4

**s**

**s** 3:8 5:1 162:15 164:8,8 165:3
**sachs** 18:6 25:9 133:9 138:6
**sales** 118:21,21
**sampling** 18:4
**sat** 15:2,17
**satisfactory** 161:7
**saturday** 10:16
**saw** 51:4,5,7 110:18 132:6 133:14 134:19 134:21 142:15
**saying** 27:6 31:13 37:8 38:12 67:7 72:2 80:3,12 83:19 84:23 90:7 92:15 104:4 105:22 109:11,11 115:23 126:21 136:25 149:18

**says** 6:15 26:17 26:19 60:8,9 64:5 73:22 74:5 76:7 79:10,20,21,22 80:17,22 81:20 82:3,11,18,21 83:1,4,5 85:9 86:5,10 87:8 90:4 93:15 94:2,3,5,11,17 97:1 98:7 99:11 101:1 128:18 132:3 148:7 149:16 150:5 153:10 153:16 154:18 155:15
**scope** 21:6 22:10,14,20 23:19,23,25 33:11 36:11 42:8 48:15 51:9,14,25 52:1 75:7,10 75:15 76:15,25 77:4 90:24
**screen** 42:13
**seal** 163:15 164:21
**second** 4:10 6:23 44:22 113:25 128:23 129:7 145:7

**section** 61:6 83:13 105:12 128:7,16
**sections** 15:13 16:13
**securities** 12:13 82:9 83:15 143:19
**security** 82:6 82:19 83:8,12 85:5,6
**see** 30:21 48:23 53:22 60:23 68:9 75:4,8 77:20 88:1 93:14 95:18 103:1 109:2 113:7 114:2 118:14 128:18 129:1,10,11 131:23 132:2 132:10,11,15 134:6 141:1 143:16 145:6 146:2,15 147:5 147:7 150:13 150:22 152:7 159:2,7
**seems** 73:19
**segment** 118:24 150:23 153:3 157:25 158:4 159:3

**sense** 16:16 51:13,13 107:2 156:4,4
**sensitive** 5:6
**sent** 15:23
**sentence** 44:23 56:14 81:9,19 94:7 128:24 144:22,23
**september** 1:17 5:5 19:2,17 20:4,16 21:19 22:7 23:1 45:2 46:5 61:17 69:12 79:3 98:15,24 100:14 101:6 101:15,25 102:3 128:10 128:12 161:5 162:4
**set** 8:1 48:13 97:14 129:13 129:24
**sets** 75:6 76:14
**severs** 25:24 26:20
**sheet** 162:13 164:7,10,18 165:1
**shift** 133:16 135:7,20
**short** 99:21

show   34:8 39:7
  39:22 40:9
  42:19 61:3
  67:25 81:21
  83:5 100:8,17
  127:23
showed   40:19
  47:4
showing   25:24
  26:20
shown   100:11
  162:16
shows   142:20
  147:13,23
  152:12
side   8:1 78:6
  146:9 151:24
  151:25
sidley   1:18 2:13
  5:20 6:8
sidley.com   2:19
  2:20,21
sign   155:8
signature   9:13
  161:21 162:14
signed   163:13
  164:18
significance
  62:14 98:12,12
  98:23 100:12
  100:25 101:21
  102:1,4,9
  117:12 120:18
  121:1,14

122:22
significant   23:9
  40:16,25 45:3
  45:21 46:4,17
  48:24 51:5
  64:6,8 78:14
  78:21 79:13
  82:15 87:15
  89:5 92:19
  93:3 96:21
  98:9,11,21
  100:24 103:3
  112:3,16
  114:13,19,20
  117:12 123:1
  134:4
significantly
  53:12 81:2
  82:22 90:3
  91:9
signing   162:19
sills   1:4 5:13
  162:6 163:3
  164:3
similar   143:7
  151:11
similarly   1:6
  5:15
simply   22:19
  26:8,16 29:14
  36:2 37:24
  39:15 43:7
  67:16 70:19
  75:2 76:24

84:23 85:4
  90:23 91:22
  96:16 106:17
  107:13 108:14
  123:8 150:1
  153:2 155:23
  155:25
simultaneous
  70:9
sincerely
  162:21
single   134:15
sir   6:19,22 7:7
  7:13,18 8:2,8
  8:21 9:8,13,24
  12:12 13:1,23
  14:20 16:3
  18:2,16 19:14
  21:14 22:24
  23:15 24:12
  25:8 26:16
  28:23 29:12
  31:20 32:2,14
  32:25 33:2
  35:2,10,20,23
  35:25 36:4,20
  37:13 38:12,20
  40:5 41:7,18
  42:10 43:1,22
  44:16,22 46:8
  46:23 48:6
  49:2 50:5,15
  51:1 53:25
  55:21 56:5

57:24 58:12
  60:18 62:16
  67:10 68:20
  77:2,18 78:6,8
  79:24 81:4
  83:21 84:7,13
  88:20 89:15
  90:10 91:11,17
  92:12 93:22
  95:25 100:3
  101:11 103:9
  103:22 104:12
  107:13,16
  113:22 117:6
  124:18 126:9
  127:2 128:6,15
  132:1 138:20
  141:24 142:6
  144:13 145:6
  146:15 148:3
  150:20,22
  153:24 154:1
  156:8 157:13
  158:15,17
  159:25 162:10
sit   29:7 70:16
sitting   6:23
  20:1 88:19
  138:19 139:25
situated   1:6
  5:15
six   12:5,13 14:3
  14:13 89:19
  90:16 91:25

**[six - struggling]**

104:21

**size** 144:15 145:24

**skip** 76:10

**smoking** 90:13 90:16

**solely** 155:12 156:19 157:8 157:12,17

**solutions** 162:1 165:1

**something's** 145:14

**soon** 82:9 83:16

**sorry** 12:6 42:3 44:6 52:18 74:1 112:19

**sounds** 27:2,5 28:17 30:16 31:24

**source** 84:2

**sources** 72:16 91:4 119:16

**southern** 1:2 5:17

**speak** 36:5 101:4 138:7 139:17

**speaking** 41:7

**speaks** 63:19 88:13

**specific** 34:17 35:9 37:1,2 46:15 62:13,25

63:3,16,22,23 64:16 65:23 66:1,8,23 68:8 68:11,15 82:23 85:16 88:2 92:18 93:2 116:18 124:7 125:1,5,21,25 126:3,4 130:12 131:8 133:10 133:24

**specifically** 12:25 18:6 28:6 30:12 51:12 63:12 66:6,18 99:25

**specificity** 126:6

**speculate** 75:22

**speculation** 74:25 75:19

**speech** 70:9

**spend** 16:21

**spoke** 54:4 124:13

**spoken** 95:3,6

**stale** 84:1

**stand** 8:14,23

**standing** 8:22

**stands** 155:24

**start** 62:10 113:1 115:9 133:12,14

**started** 115:24 132:4

**starts** 118:9

**state** 1:19 5:20 6:3,5,19 73:7,7 163:10 164:15

**statement** 89:2 92:18 93:2,23 121:8 124:18 125:7 129:19 132:23 136:19 137:10 140:4 140:10,19 141:16 143:6 163:13,14 164:19,19

**statements** 32:17 63:8 65:23 66:10 128:8,17,21 129:13 132:18 139:13

**states** 1:1 5:16

**statistical** 53:21

**statistically** 23:9 40:25 45:3,21 46:3 46:17 48:24 51:5 78:14,21 79:12 82:15 87:14 89:5 90:2 92:19 93:2

**stenographic...** 161:6

**steven** 1:16 3:5 3:13,16,19 5:12 6:13,21 161:4 162:8 163:4,9 164:4 164:13 165:20

**stock** 23:9,10 27:17,18 29:21 30:23 31:2 33:9 39:8 40:7 40:17 46:18 53:11 54:24 78:15,21 79:13 80:1,21 81:2 82:15,21,24 83:24 84:17 85:1,7,9,17,23 87:15 89:5 90:2,8 91:8 92:16,17,19,24 93:3,9 102:13 109:23

**stood** 32:10

**stop** 36:19 71:1 72:3 80:8

**strategic** 65:2,7 65:16

**street** 1:19 5:20

**streetevents** 4:3

**struggling** 35:2

studied  33:15
study  78:3
stuff  135:11,13
  135:16,19,20
submitted  7:20
  11:12
subscribed
  163:10 164:14
  165:21
subsequent
  55:16 137:20
  147:9
subsequently
  62:13
subset  16:6
substantial
  15:24 65:2,6
success  62:10
  63:10
sufficient  34:14
  59:2 65:15
suggest  29:9
suggesting
  30:24
suite  2:6 162:2
summarize
  21:2
summary  20:8
  118:13
superior  162:1
supplement
  10:18
supplier  129:7

support  59:22
  110:22
supported
  55:17
supports  39:24
  42:21
supreme  25:9
  31:21 32:3,10
sure  14:14
  16:25 52:8
  75:8 80:22
  81:3 90:3
  91:24 113:24
  130:24
surprising
  102:12
surprisingly
  122:24
surviving  34:23
sworn  6:14
  161:10 163:10
  163:13 164:14
  164:18 165:21
synopsis  67:4
system  25:10

t

t  3:8 161:1,1
table  15:5
  47:21 61:3,5
take  5:9 9:21
  88:17 117:17
  129:16

taken  136:19
talk  43:2 62:21
  85:21 108:19
  122:10
talked  68:7
  72:23 117:7
  153:12
talking  20:15
  37:13 85:16
  87:4 109:14
  112:19,21
  115:10,24
  117:3 135:18
  136:19,21
  140:3
talks  121:22
task  47:16,17
tasked  49:24
teacher  25:10
teaches  143:24
team  15:1,22
  16:1,1,4,7
  17:10
tell  13:15 14:5
  35:16 138:8
  141:19 143:23
  158:16
tells  103:19
  154:8
temporary
  96:21 98:10
  132:8 134:23
term  96:2,5,13

terms  28:4
  29:11 30:13
  130:22 142:5
  156:9
testa  1:12
testified  77:21
  99:18
testify  92:13
testifying
  140:13
testimony  8:14
  8:24 12:1,4,13
  12:22 47:15
  49:11 50:6
  58:3 62:20
  69:19 70:17,19
  70:20,21 71:6
  105:3 163:6,7
  164:6,9,12
thank  159:24
thanks  134:11
theoretical
  111:10
theory  27:10,13
  27:25 28:25
  29:13,17 30:2
  30:5 31:6,8,12
  111:10
thereof  73:17
  124:14
thereto  161:18
thing  75:12
  92:3,25 152:2
  152:4

**[things - trying]**

| things  33:15 | thirty  162:18 | together  15:2 | trend  65:4 |
|---|---|---|---|
| 35:19 64:8 | thought  15:6 | 15:17,22 53:22 | trick  71:7 |
| 93:4 140:17 | 28:3 29:11,24 | 68:21 109:20 | trouble  125:4 |
| 141:12,14 | 66:6 | 155:20 | true  56:23 |
| 143:4 157:15 | thoughts  16:2 | told  16:13 | 161:12 |
| think  7:25 | three  34:23 | 46:19 53:9,10 | truth  79:9,10 |
| 12:24 13:4,14 | 66:16 88:20 | 102:3 110:7 | 79:11,16,22 |
| 19:7 21:22 | time  5:5,8 6:3 | 120:18 123:17 | 80:4,14,19 |
| 23:5 24:9 | 6:23 7:1 14:8,9 | 138:14,16 | 81:12,23 82:7 |
| 26:11 28:2,11 | 16:21 44:10,14 | 142:8 143:11 | 82:12 83:7,14 |
| 28:14 36:5,6 | 55:5 58:18 | top  81:19 132:3 | 86:6,9,11 |
| 38:18 41:7 | 71:13 88:17 | total  10:9 160:3 | 87:10 93:11 |
| 44:1 49:20,22 | 92:1 110:3,6 | totality  99:21 | 94:2,3 96:1,4 |
| 50:1 62:2 | 112:21 114:10 | tough  126:7 | 96:14,19 97:11 |
| 66:22,23 67:22 | 117:20,23 | track  113:12,14 | 97:17,22 98:17 |
| 68:6,6,14 | 134:19 138:18 | trade  26:3,23 | 99:4,13,14,21 |
| 79:20 82:11 | 139:23 144:14 | transcribed | 100:2,7,19 |
| 83:18 85:19,19 | 145:23 148:10 | 163:7 | 101:13 102:21 |
| 86:15,16 87:6 | 148:18 149:18 | transcript  3:16 | 103:6,12 106:5 |
| 89:22 91:15,15 | 154:11 157:1 | 3:23 4:4,6,9,12 | 106:21 107:19 |
| 92:9 99:9 | 158:21 159:13 | 8:8,12 77:8,11 | 107:23 108:2 |
| 100:11 101:3 | 159:16,25 | 88:16 131:21 | 108:16,16 |
| 107:11 111:13 | 160:3,4 | 140:6 161:12 | 115:13 117:9 |
| 113:23 122:18 | tina  16:6 | 161:24 162:11 | 120:1,8 121:23 |
| 126:15 130:2 | tina's  17:11 | 162:12 163:5 | 122:1,3,7,11 |
| 133:22 134:19 | today  5:23 9:20 | 163:12 164:5 | 123:10 140:2 |
| 139:9,19 | 9:23 10:3 | 164:11,17 | 140:19 141:16 |
| 142:20 145:11 | 19:15 20:1 | transitory | 143:6 |
| thinking  29:8 | 21:17 29:11 | 62:14 64:7 | try  70:17 |
| 52:19 | 48:25 50:3 | 110:11 111:19 | trying  40:3 |
| thinks  60:10 | 138:19 139:25 | 111:21 112:17 | 70:2,18,19 |
| 123:14 | today's  7:9 | 114:14 121:16 | 71:6 72:1 |
| third  4:7 44:23 | 9:17 17:4,21 | transpired | 106:1,18 |
| 53:12 | 160:2 | 138:12 | 107:16,25 |

121:20,25
123:8 157:22
**turn** 118:8
128:7 131:25
**turned** 125:13
**two** 17:18
21:12 34:22
35:18 45:10
47:23 48:5
51:20 52:12
65:19 93:16
101:23 147:14
147:20 151:24
160:4
**typical** 6:25

**u**

**ultimately**
110:18
**umar** 2:14 3:6
6:7,7,18 7:12
8:3,7 9:7 32:8
44:7,15 69:20
69:22 70:2,6
70:10,18 71:1
71:12,17,20,23
72:5 74:3,7,10
75:2,5,13,21
76:2 77:14
105:4,7 113:15
117:15,24
118:5 128:2,4
131:18,20
144:8,12,20

145:2 150:15
150:19 151:23
152:3,6 158:24
159:10,17,24
**un** 76:20
**uncertain**
13:10 14:15
**unclear** 16:15
**under** 31:7
44:22 104:8
118:12 123:4
**underinclusive**
107:23 121:22
**understand** 7:2
9:18 10:2
16:14 27:23
28:24 32:25
35:3,13,14
39:6 40:3 50:5
53:25 58:12
62:17 65:15
70:3,20 72:1
93:20 106:23
107:18 116:2
117:1 122:13
123:8 132:12
137:6 139:11
141:20,21
143:10 157:23
**understanding**
9:22 10:1
22:12 27:12
29:14,15,19
30:1,6 31:15

31:17,20 32:3
32:9,14 58:10
67:3 75:6,14
75:23 78:2
94:23 95:1,2,4
99:12 105:23
106:3 108:1
111:5 112:12
116:5 120:6,24
121:5 122:12
127:3 130:8,23
131:2 139:3
**understated**
57:16
**understood**
33:11 110:10
**undertake** 11:6
**undisclosed**
65:2
**undisputed**
50:20 51:24
76:20,21 77:1
**unf** 86:5
**unfi** 4:1,2,7,10
23:10 46:17
78:15,21 81:22
82:8,15 83:6
83:15 86:5,10
87:7,8,15 89:5
98:19 110:2
111:7 114:9
115:3 116:3,6
117:2 119:12
120:1,8,25

121:6 122:13
124:4,22 125:7
125:14,18
126:9 127:4
130:9 131:3
144:14 145:20
148:13,20
149:9,11
150:10
**unfi's** 65:15
96:22 98:10
128:8 131:22
157:2
**unit** 5:11
**united** 1:1,9 4:5
5:15,16 162:6
163:3 164:3
**units** 160:4
**unnecessary**
51:18
**unquote** 99:13
**unrelated**
57:25
**unsustainable**
123:2 134:6
**use** 86:12
100:24 104:2
106:8 126:3
141:24 142:19
**used** 20:25
36:20 37:23
44:1 95:9,12
95:24 96:2,5
103:5,7,18

104:1
**uses** 94:15
95:23 103:19
**using** 35:20
36:23 41:25
43:1 94:1
**usually** 14:25

**v**

**v** 5:15 25:10
61:15 162:6
163:3 164:3
**vacation** 17:11
**valid** 15:9,9,10
15:11
**validly** 19:22
**value** 82:5
83:11 119:1,10
125:15 136:20
**variety** 62:11
**various** 128:21
139:1 151:14
**verbatim** 43:3
**veritext** 5:22
160:5 162:1,7
165:1
**veritext.com.**
162:17
**versus** 60:19
80:5,14 92:18
121:16 150:3
154:15
**vf** 1:8

**vi** 61:16
**video** 1:16 5:9
5:12
**videographer**
2:24 5:3,22
44:9,12 117:19
117:22 159:12
159:15 160:1
**view** 41:10
60:19 104:13
104:18 106:5
109:6 110:22
114:8 117:8
127:16 137:10
138:8,21
143:18
**vii** 61:17
**vs** 1:8

**w**

**w** 1:11
**wait** 12:6,6
51:18 52:7
80:9 81:14,14
113:25 130:2
144:24 151:20
**waived** 162:19
**walked** 29:7
150:8
**want** 11:14,16
24:3 31:5 37:5
37:16 48:21
66:15 68:17
69:18 78:6

93:20 94:22
106:3 108:14
108:15 113:13
124:11 142:6
142:23 143:20
144:1 146:11
158:20
**wanted** 12:10
115:13,14,20
116:2 133:13
138:21
**wants** 105:6
**way** 12:19
14:15 20:7
22:1 23:11
28:5,22 29:4
31:1 33:6,11
40:9 57:8,23
70:17 73:19
90:6 103:2,19
137:5 141:21
**we've** 88:19
134:3 140:3
**wednesday**
1:17
**weeks** 16:24
**went** 94:14
149:1
**whatsoever**
14:7 117:4
**whispering** 5:7
**wholesale**
118:24 147:20
147:24 148:14

149:12 150:2
151:14 152:8
152:13 153:3
153:10 154:2
155:2 156:1,11
156:13 157:25
158:4 159:3
**witness** 3:3
6:14 71:5 72:1
161:7 162:8,11
163:1,4,11
164:1,4,15
**witness'** 162:14
**wolke** 2:4 6:10
6:10 8:16,25
10:23 11:9
13:13,20,25
14:24 16:12
17:9 18:20
19:19 20:6
21:21 22:9,22
23:4,18 24:18
25:11,17 26:4
26:10 27:1
28:1 29:1,18
30:9 31:16,22
32:5,12,15
33:5 34:3,19
35:11 37:4
38:17,25 39:12
41:13 43:10
44:5 46:11
47:2,14 48:12
48:20 49:10

50:12 51:2,11
52:6 54:10
55:10 56:1,11
56:20 57:6
58:2,16,23
59:7,24 61:24
62:19 63:18
64:1,18 66:5
67:19 68:24
69:16,21,24
70:8,14,21,24
71:10,15,18,21
72:10 74:1,4,9
74:14,17,24
75:10,18 77:5
78:1,23 79:19
80:7,16 81:6
82:17,25 84:19
85:12,18,25
86:14,18,20,24
87:3,17 89:9
91:1,20 92:4
93:6,25 94:13
94:21 95:5,16
95:22 96:8,12
97:20 98:1,22
99:5 100:10
101:16 102:25
103:16 104:8
104:16 105:2
105:11 106:10
106:25 107:3,7
108:5 109:10
110:5,16 111:9

112:6 114:18
114:24 115:8
116:12 117:5
120:4,11 121:3
121:9 122:4,8
122:16 123:24
124:10 126:1
126:14 127:8
129:15 130:1
130:15 132:21
135:8 136:1,13
137:11,16
138:2 139:7,15
140:8,21
141:18 143:9
143:21 144:5
144:18 145:8
145:13 147:2
148:6,16,23
149:15 150:4
150:12,25
151:18,20
152:1,5 153:5
154:5,17 155:3
155:14 156:2
156:21 157:9
157:19 158:22
159:5,22 160:6
162:5
**wondering**
74:5
**word** 9:21
35:21 36:21,23
37:23,24 43:19

44:1 86:12
94:15,23 95:10
95:12,14,18,24
100:24 103:2
125:4 126:3,3
129:16 141:25
142:1,3,19,20
**words** 15:15
16:14 36:5
40:11 42:1,11
42:24 43:1
45:17 49:12
71:7,16 77:2
79:21 86:19
87:7 89:3 94:1
95:9,23 98:7
103:21,25
104:1,2 106:8
127:17 157:11
**work** 11:11
29:4 36:21
37:10,13 51:16
52:2 148:11
149:19
**worked** 16:7
**working**
116:22
**wright** 2:5 6:11
17:9
**write** 44:24
45:19 105:17
108:6 145:6,19
**writing** 28:8

**written** 67:7
**wrong** 24:11
40:21 100:9,18
145:9
**wrote** 14:20
15:6,18 28:7
45:7,23 50:23
76:5 98:4

**x**

**x** 1:3,14 3:1,8

**y**

**yeah** 24:14,24
27:7 32:13
45:18 47:19
54:4 69:1
75:19 76:5,21
80:8 84:8
89:16,21 94:20
97:12 98:23
111:10 114:19
116:20 124:11
130:5 132:11
135:14,16
137:8 144:20
145:11,19
147:4
**year** 101:24
119:3 120:23
128:8 133:23
146:17 147:1,9
148:21 151:9
151:11

**yesterday**
  10:15 17:16
**yesterday's**
  17:22
**york**  1:2 5:17

**z**

**zero**  133:4
  134:25 135:1
  135:17 137:1
  155:7
**zone**  57:15
**zurek**  3:21,23
  18:19,23 19:11
  19:23 21:9
  24:4 28:9
  36:16 40:14
  44:25 45:14
  47:18 48:7
  49:23 51:4,15
  52:2,25 60:1
  60:20 61:9
  64:4,12 67:23
  69:6 73:16,21
  73:24 74:4,15
  75:6 77:20
  78:11,18 80:18
  84:22 89:2,7
  91:17 93:22
  94:11 95:3,6
  96:13,19 97:10
  97:18,23 98:17
  100:7,14
  101:13 102:22

103:13 104:24
106:14 107:18
121:21 123:9
**zurek's**  15:3
  17:6 21:24
  22:11 38:9
  53:17 72:14,25
  73:9 74:13
  75:15 76:4
  77:7 87:11
  90:17 95:7
  96:6,25 97:19
  99:3,12,17,20
  100:8,17 104:5
  105:19,24
  106:4 117:8
  122:1

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.