# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————— x

MARK LEONE, Individually and on Behalf of All
Others Similarly Situated,

                    Plaintiff,                                    24-cv-9253 (CM)

      -against-

ASP ISOTOPES INC., PAUL E. MANN, and
HEATHER KIESSLING,

                    Defendants.

—————————————————————————— x

## ORDER AND OPINION

McMahon, J.:

Lead Plaintiff Mark Leone and plaintiffs Alexander Corredor Prada and Ivan Agapchev (together, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against ASP Isotopes, Inc. ("ASPI"), a publicly traded, South Africa–based company engaged in developing and commercializing uranium enrichment technologies; Paul E. Mann, ASPI's co-founder, Chairman, and Chief Executive Officer; and Heather Kiessling, ASPI's Chief Financial Officer (together, "Defendants"). Plaintiffs allege that Defendants made materially false and misleading statements concerning ASPI's ability to enrich uranium using proprietary technology acquired from a foreign research entity, in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and SEC Rule 10b-5 promulgated thereunder. Before the Court

1

are (1) Defendants' motion to dismiss for failure to state a claim pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), as well as the PSLRA, 15 U.S.C. §§ 78u-4, 78u-5, Dkt. No. 41, and (2) Plaintiffs' motion for class certification, Dkt. No. 37. For the following reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part, and Plaintiffs' motion for class certification is GRANTED.

## I. Background

### A. Overview of Uranium Enrichment

Uranium enrichment is a process by which different isotopes of the same element are separated based on their physical properties. Dkt. No. 28, at 9. Naturally occurring uranium consists primarily of uranium-238, which is not capable of sustaining a nuclear chain reaction, and a small fraction of uranium-235, which can support such reactions and is essential for commercial nuclear applications, including the generation of nuclear power and the production of nuclear weapons. *Id.* The enrichment process is a necessary step in transforming mined uranium into fuel that can be used in civilian nuclear reactors and other high-value commercial and national-security applications. *See id.*

However, because uranium-235 and uranium-238 are isotopes of the same element, they exhibit nearly identical chemical behavior and differ only slightly in mass. *Id.* As a result, separating them is technically demanding and capital-intensive, requiring highly specialized and large-scale industrial methods. *See id.* at 9–11. One established commercial technique is gas-centrifuge enrichment, in which uranium hexafluoride gas is spun at high speeds so that heavier isotopes move toward the centrifuge wall while lighter, reactor-fuel isotopes like uranium-235 accumulate near the center. *Id.* at 9. Successful enrichment typically requires large, commercial-

2

scale cascades of centrifuges operating in sequence to achieve sufficient levels of enrichment for downstream nuclear applications. *See id.* at 9–11.

The technological and financial barriers to entry have historically limited the uranium enrichment industry to a small number of large, government-backed entities, which control the global supply of enriched uranium and shape the competitive landscape for potential new market entrants. *Id.* at 10. ASPI sought to break through these systemic barriers by acquiring a private South Africa–based company, Klydon, which was in the process of developing proprietary isotope separation technologies using its Aerodynamic Separation Process ("ASP"), which could potentially be applied to uranium enrichment. *See id.* at 10.

### B. ASPI Acquires Klydon, an R&D-Stage Isotope Separation Company

ASPI believed that Klydon's ASP technology had the potential to significantly reduce the costs of entry into the uranium enrichment market by streamlining the enrichment process. *See* Dkt. No. 28, at 10. To pursue this opportunity, ASPI was incorporated in Delaware in September 2021 for the purpose of acquiring Klydon's assets and licensing its intellectual property. At the time of its acquisition, Klydon was financially distressed. *Id.* In fact, ASPI acquired certain Klydon assets through a "business rescue" process, which is described by ASPI CEO Defendant Mann as "basically the South African version of bankruptcy." *Id.* at 11.

As early as September 2019, Klydon was investigated by a forensic accountant on behalf of an investor, who determined that the company's operations had largely ceased, stating that "very little was happening. The project had effectively stopped – which is why [the investor] wanted an investigation done there." *Id.* In January 2022, ASPI licensed from Klydon the intellectual property rights to produce uranium-235 using its ASP technology; and by July 2022, ASPI had

licensed rights for the production of all isotopes using ASP. *Id.* at 12. By 2023, ASPI had acquired all of Klydon's assets and business interests and consolidated control over the company and its technology. *Id.*

### C. ASPI's Financial Condition

Plaintiffs allege that, since its inception in September 2021, ASPI has generated little or no revenue and has incurred substantial and growing losses. *See* Dkt. No. 28, at 13. According to Plaintiffs, the company's reported revenue beginning in 2023 did not come from isotope production, but from its ownership interest in PET Labs Pharmaceuticals, a radiopharmaceutical company. *Id.* ASPI admitted in SEC filings that it "has not generated any revenue to date attributable to isotopes (and only limited revenues attributable to PET Labs), and [it] continue[s] to incur significant research and development and other expenses related to our ongoing operations. As a result, we are not profitable and have incurred losses since our inception." *Id.* at 14. ASPI's auditor similarly stated that recurring operating losses and negative cash flows "raise substantial doubt about its ability to continue as a going concern." *Id.* To fund its operations, ASPI sold stock, warrants, and convertible notes and relied on promotional and investor awareness campaigns. *Id.*

### D. Events Preceding the Class Period

Despite not generating revenue from isotope production, Defendants emphasized uranium enrichment as a central part of ASPI's business. In an SEC-filed investor presentation on September 26, 2024, ASPI identified "Nuclear Energy," specifically uranium enrichment, as one of three primary areas of focus, alongside nuclear medicine and silicon-28 enrichment for semiconductor applications. *Id.* at 15–16. The presentation highlighted projected increases in global demand for enriched uranium, stating that uranium supply had been in a "state of sustained

4

deficit since 2018" and showing that prices for enrichment had more than doubled over the prior four years. *Id.* at 16.

On the same day, Defendant Mann reiterated on a conference call that ASPI operated in three industries – the medical, semiconductor, and nuclear energy sectors – and described its subsidiary, Quantum Leap Energy, as focused on nuclear fuels for the future, "specifically high assay low enriched uranium" ("HALEU") for small modular nuclear reactors ("SMR"). *Id.* at 16. SMRs are a newer generation of nuclear plants that are smaller in scale and designed to be deployed faster and with lower capital costs than traditional reactors. *See id.* at 16–17. Mann stated that most investors were "more excited about the nuclear energy opportunity" and that ASPI had signed two memoranda of understanding with large U.S.-based SMR companies, collectively requiring approximately $37 billion of HALEU material through 2037. *Id.* at 16.

Defendants also highlighted the potential of ASPI's so-called "Quantum Enrichment Process," a laser-based isotope enrichment method under development. A September 28, 2023 press release stated that Quantum Leap Energy would focus on producing HALEU material for SMRs, asserting that the process would achieve low production costs, reduced capital expenditure, and shorter and more predictable construction timelines, making it suitable for meeting market demands, especially compared to existing isotope enrichers that "rely on a more extensive and slower process." *Id.* at 16–17. ASPI was strategically focused on supplying fuel to the emerging SMR and advanced nuclear markets. *See id.*

### E. Defendants' Alleged Material Misrepresentations During the Class Period

Plaintiffs allege that, between September 26, 2024 and November 26, 2024 (the "Class Period"), Defendants materially misled investors regarding the maturity and capabilities of ASPI's

5

laser-based Quantum Enrichment ("QE") technology. *Id.* at 17.  Plaintiffs identify sixteen separate instances during the Class Period in which they allege Defendants made material misrepresentations.  These alleged misrepresentations appeared in a September 26, 2024 SEC-filed investor presentation; an ASPI investor conference call on the same day; an October 17, 2024 press release regarding the commissioning of a Quantum Enrichment plant; an October 30, 2024 press release regarding an executed term sheet with TerraPower, LLC for the construction of a HALEU facility; an October 30, 2024 ASPI conference call; a November 19, 2024 POWER Magazine interview; and a November 22, 2024 revised investor presentation, which closely mirrored the September 26, 2024 presentation.  *Id.* at 21–30.

According to Plaintiff, Defendants repeatedly suggested that ASPI and its predecessor, Klydon, had experience enriching uranium and had achieved results comparable to existing uranium enrichment methods, while failing to disclose that neither company had ever tested or operated the QE technology on uranium at any scale.  *Id.*

Plaintiff further alleges that former ASPI employees confirmed that, during their tenure, uranium enrichment had not progressed beyond theoretical planning and laboratory design.  *Id.* at 18.  As one former ASPI employee stated regarding ASPI's QE technology, at the time she left, "They were only planning it.  They were working on the theory behind the experiments, and on the design for the test facility."  *Id.*  She further explained that "If a project is not even, on a laboratory scale, proved, then it's a long time before it can be used in a plant."  *Id.*  Plaintiff contends that, internally, the Company had never demonstrated either economic feasibility or any operational deployment capability.  *Id.*

**F.  ASPI's Sale of $18.6 Million of Its Own Stock During the Class Period**

Plaintiffs allege that ASPI capitalized on the materially misleading statements to raise substantial funds from investors.  *Id.* at 21.  Because ASPI had minimal revenue and rapidly increasing multi-million-dollar losses during the Class Period, and because its plans required spending hundreds of millions of dollars on research and development ("R&D") and the construction of isotope enrichment facilities, the Company needed to obtain correspondingly large amounts of funding from investors.  *Id.*  Plaintiffs allege that just prior to the beginning of the Class Period, on September 25, 2024, ASPI's stock closed at $2.83 per share.  *Id.*

According to Plaintiffs, as Defendants made misleading statements regarding ASPI's uranium enrichment capabilities, the stock price increased dramatically, including a 15% single-day gain on October 17, 2024, when ASPI announced the commissioning of its first Quantum Enrichment plant, and a further 20% single-day gain on October 30, 2024, when ASPI announced a term sheet with TerraPower for the construction of another uranium enrichment facility – despite the fact that neither ASPI nor Klydon had ever tested or operated the Quantum Enrichment technology on uranium at any meaningful scale.  *Id.*

Plaintiffs allege that ASPI took advantage of this artificially inflated stock price for its own financial benefit.  *Id.*  On October 31, 2024, ASPI filed with the SEC a preliminary prospectus supplement for the sale of its common stock.  *Id.*  On November 1, 2024, ASPI and Canaccord Genuity LLC entered into an underwriting agreement for the sale, signed by Defendant Mann on behalf of ASPI.  *Id.*  On November 4, 2024, ASPI filed the final prospectus supplement with the SEC and announced that it had completed the sale of 2,754,250 shares of common stock at a public offering price of $6.75 per share – up from $2.83 per share prior to the Class Period – raising gross proceeds of $18.6 million.  *Id.*

7

### G. The Alleged "Truth" Emerges

According to Plaintiffs, on November 26–27, 2024, previously concealed information regarding ASPI's uranium enrichment technology was revealed, leading to a substantial decline in the Company's stock price. On November 26, 2024, Fuzzy Panda Research, an independent research firm that identifies adverse issues with publicly traded companies, particularly in the microcap and small-cap sector, *see* Dkt. No. 28-5, at 25, published a report titled "ASP Isotopes (ASPI): Failed Tech + Paid Stock Promotion + 'Microcap Fraudsters' = Nuclear Meltdown," Dkt. No. 28, at 31. The report discussed deficiencies in ASPI's QE technology, highlighting that the technology had never been successfully tested on uranium. *Id.* It cited interviews with industry experts, former Klydon employees, and a physicist who explained the scientific challenges inherent in laser-based uranium enrichment. *Id.* at 32.

The report also revealed that ASPI's QE technology appeared to be based on Atomic Vapor Laser Isotope Separation ("AVLIS"), a method previously pursued by both governments, (including the government of United States,) and private entities, which had failed despite billions of dollars in investment. The fundamental problem with AVLIS, according to the report, was that it required uranium metal as a feedstock, which must be vaporized at extremely high temperatures – around 3,400°C – to enable isotope separation of uranium-235 from uranium-238. *Id.* at 33. These conditions are highly corrosive and have historically destroyed separation equipment, making the process costly and impractical. *Id.* The report further noted that ASPI's illustrations of QE technology were largely replications of older, now-discontinued AVLIS diagrams published in a 2008 United States Nuclear Regulatory Commission module, and that the company had not demonstrated any meaningful progress in overcoming these longstanding

8

technical challenges.  A side-by-side comparison of the two diagrams is reproduced below:





Dkt. No. 28-5, at 17.

According to the report, the core architecture of ASPI's purported laser enrichment system mirrored traditional AVLIS designs rather than reflecting any materially novel proprietary configuration.  The report quotes Dr. Michael Goldsworthy, CEO of Silex Systems Limited, as stating: "I can't see any different way to do AVLIS . . . AVLIS will take lots of time and money to do again . . . I have very low hopes for ASPI."  Dkt. No. 28 at 33.

Following publication of the Fuzzy Panda Research report, ASPI's stock fell 23.5% to close at $5.85 per share on November 26, 2024.

The following day, on November 27, 2024, Defendant Mann gave an interview with Canaccord Genuity, during which he confirmed that ASPI had never tested its Quantum Enrichment technology on uranium, had not yet obtained the necessary licenses to do so, and had

not solved the technical challenges that had caused historical AVLIS efforts to fail. *See id.* at 34–37. According to Plaintiffs, Mann's statements included vague references to improvements in laser components, but he did not provide any evidence that ASPI had successfully overcome the extreme-temperature issues or demonstrated uranium enrichment at any scale. *Id.* at 37–38.

On this news, ASPI's stock fell an additional 14.2% to close at $5.02 per share. *Id.* at 38.

This lawsuit followed.

## II.     Legal Standards

### A.  Rule 12(b)(6) Standard

To survive dismissal, a complaint must plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted). Nevertheless, the Court must accept the complaint's well-pleaded factual allegations as true – even if doubtful – and draw all reasonable inferences in the plaintiff's favor. *Twombly*, 550 U.S. at 555–56. If a plaintiff fails to nudge his claims "across the line from conceivable to plausible," the complaint "must be dismissed." *Id.* at 569.

### B.  Rule 9(b) & PSLRA Heightened Pleading Standards

Claims under Section 10(b) of the Exchange Act and Rule 10b-5 are subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). Rule 9(b) requires that a complaint "state with particularity

the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy that requirement, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citation omitted).

The PSLRA imposes similar requirements, providing that a securities fraud complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," and if any allegation is made on information and belief, the plaintiff must "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In addition, the PSLRA requires the complaint to "state with particularity facts giving rise to a strong inference" that the defendant acted with the required scienter as to each alleged misstatement or omission. 15 U.S.C. § 78u-4(b)(2)(A). A complaint meets that burden "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

### C.  Rule 23 Class Certification Standard

A district court may certify a class only after determining that the proposed Class satisfies the requirements of Federal Rule of Civil Procedure 23(a). *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015). Those requirements are that: (1) "the class is so numerous that joinder of all members is impracticable"; (2) "there are questions of law and fact common to the class"; (3) "the claims or defenses of the representative parties are typical' of those of the class"; and (4) "the representative parties will fairly and adequately protect the interests of the class." *Id.* (quoting Fed. R. Civ. P. 23(a)).

Additionally, the district court must ensure that the proposed Class is appropriate under at least one subsection of Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). At issue here, Rule 23(b)(3) permits certification if both (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Although "a court's class-certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim," courts may consider merits questions only to the extent "that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013). The party seeking class certification bears the burden of establishing, by a preponderance of the evidence, that each of Rule 23's requirements has been met. *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).

## III.   Discussion

### A.  Defendants Cannot Establish Truth on the Market

Defendants' core argument for dismissal is that ASPI had disclosed the very information Plaintiffs allege was concealed. According to Defendants, ASPI had already publicly disclosed, in its SEC Form 10-K for Fiscal Year 2023 ("FY 2023 Form 10-K"), filed on April 29, 2024, that (1) ASPI had never tested or used QE to enrich uranium, and that (2) ASPI had not yet obtained the necessary regulatory approvals to enrich uranium. ASPI's FY 2023 Form 10-K states, in relevant part:

> We plan to begin research and development for the enrichment of uranium to demonstrate our capability to produce HALEU using Quantum Enrichment

technology. . . . We are currently in discussions with both the UK Atomic Energy Authority, UK Office of Nuclear Regulation (ONR), Nuclear Energy Corporation of South Africa (NECSA) as well as the South African Department of Mineral Resources and Energy (DMRE) pursuing an approval to conduct nuclear research in either of these countries. *We would need to obtain approval from one of these regulatory bodies in order to proceed with our nuclear research.*

Dkt. No. 43-1, FY 2023 Form 10-K, at 5 (emphasis added). The same Form 10-K further explains that ASPI was still "awaiting the approvals necessary awaiting the approvals necessary to conduct early research and development efforts for isotopes such as Uranium-235 utilizing the Quantum Enrichment process," and noted that the "approvals may take a significant amount of time and may . . . fail to materialize," which could prevent ASPI from "enter[ing] into the nuclear energy space" altogether. *Id.* at 7. The Form 10-K also states:

> Quantum enrichment has never been used to produce isotopes at a commercial scale and . . . there is no proof that this technology has ever been used to enrich uranium. There are significant regulatory hurdles associated with enabling our research and development efforts to enter the nuclear energy market. Multiple regulatory agencies need to provide approvals to allow us to proceed with the research and development necessary to show proof of concept to the market. If we demonstrate proof of concept, we anticipate that there will be further approvals needed to expand to a larger footprint to support commercial demand. We may not ever obtain these approvals. If we are unable to advance our future isotopes in development, obtain applicable regulatory approval and ultimately commercialize our future isotopes (assuming receipt of applicable regulatory approvals), or experience significant delays in doing so, our business will be materially harmed.

*Id.* at 9.

Accordingly, Defendants argue that the Fuzzy Panda report, which itself cites ASPI's FY 2023 Form 10-K, "reveals" nothing because ASPI's lack of prior testing or operation of QE technology on uranium was already known, as a matter of public record. *See* Dkt. No. 42, Defs.' Mem. Supp. Mot. to Dismiss, at 15–16; Dkt. No. 53, Defs.' Reply Supp. Mot. to Dismiss, at 6. In essence, Defendants assert a truth-on-the-market defense.

Under the truth-on-the-market defense, "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000). The core of this defense is that defendants' misrepresentations could not have affected the stock price because the truth was already known.

But the defense has a demanding standard. To establish the truth-on-the-market defense, the corrective information must be communicated to the public with sufficient "intensity and credibility" to "counter-balance effectively any misleading information created by the alleged misstatements." *Id.* The Second Circuit has cautioned that the truth-on-the-market defense "is intensely fact-specific and is rarely an appropriate basis for dismissing a Section 10(b) complaint for failure to plead materiality." *Id.*

This case is no exception. Dismissal is particularly improper where, as here, Plaintiffs plausibly allege that statements made by ASPI after the appearance of the FY 2023 10-K superseded, contradicted, or undermined the earlier, cautionary disclosures. *Cf. In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 582 (S.D.N.Y. 2010) (finding public disclosures undermined by later misstatements). Although companies are not required to include in every later statement "the full roster of disclosures detailed in [its] securities filings," *In re Curaleaf Holdings, Inc. Sec. Litig.*, 519 F. Supp. 3d 99, 108 (E.D.N.Y. 2021), a company may not make new statements reasonably implying that previously disclosed contingencies have been resolved when no such change has occurred.

A reasonable investor is not required to treat earlier warnings as controlling if later statements reasonably suggest that the previously disclosed risks have been eliminated or overcome. ASPI's Form 10-K anticipated potential future progress in obtaining regulatory

14

approvals, but warned that uranium enrichment research remained contingent on future approvals and proof-of-concept work.  If, as Plaintiffs allege, ASPI's Class Period statements indicated that such approvals had already been obtained or that uranium enrichment had already occurred, the earlier disclosures do not insulate those later statements.

Under settled law, later affirmative representations can supersede or nullify earlier warnings when they create a contrary or misleading impression that is not later corrected with sufficient "intensity and credibility."  *See Ganino*, 228 F.3d at 167.  Once a company elects to speak, it must not mislead, regardless of what it has previously disclosed.  *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016).  Thus, courts must independently evaluate whether later statements materially altered the "total mix" of information.  *See id.*

This principle was recently reaffirmed in *SEC v. Farnsworth*, 692 F. Supp. 3d 157 (S.D.N.Y. 2023), which is instructive here.  In *Farnsworth*, the SEC brought an enforcement action against MoviePass, Inc. and its executives for allegedly making material misrepresentations regarding profitability and the commercial reasonableness of its "tested like crazy" $9.95 subscription price point.  692 F. Supp. 3d at 170–71.  As in this case, the defendants argued that prior SEC filings had already disclosed the risks the SEC claimed were misrepresented.

The level of prior disclosure in *Farnsworth* was substantial.  As the court explained, MoviePass's first public disclosure of "speed bumps" in its profitability path appeared in a publicly-filed SEC Form 8-K, which disclosed that MoviePass "currently spends more to retain a subscriber than the revenue derived from that subscriber" and had a "negative gross profit margin." *Id.*  Additionally, MoviePass faced "limited operating history," a "risk of non-acceptance by

15

market participants and studios," risks concerning ticket-usage patterns, and "scaling issues." *Id.* Thus, the market had already been told that the business model was unprofitable and risky.

Nonetheless, the *Farnsworth* court rejected defendants' argument that these prior filings insulated the executives from liability. It emphasized that the existence of prior disclosures "does not render extrinsic statements immaterial as a matter of law" and that subsequent statements must be evaluated from the perspective of "a reasonable investor at the time." *Id.* The relevant question is whether a reasonable investor could view later statements as conveying new information suggesting changed circumstances "not included in [] prior filings." *Id.* The court found that several post-filing statements were plausibly materially misleading precisely because they appeared to update or supersede earlier risk disclosures. *Id.* at 184–85.

For example, although the Form 8-K disclosed MoviePass's negative gross margins, the CEO's later references to a "wealth of historical data" supporting profitability could reasonably be understood as implying additional favorable information previously unknown to investors. *Id.* at 183–84. Likewise, statements about "incoming revenue streams" and extended access to capital could be taken to reflect recent improvements, even though the previously disclosed financial information showed no such developments. *Id.* at 184–85. According to the court in *Farnsworth*, the existence of prior disclosures in securities filings "did not obviate the potential relevance of [later] statements," because "a reasonable investor could understand those statements to reflect changes in circumstances since the time of the most recent filings, or information not captured in those filings." *Id.* at 184.

*Farnsworth*'s reasoning applies with full force here. Under *Farnsworth*, later affirmative representations can materially alter the total mix of information even when earlier filings warned

16

of the very risks at issue. *See id.* at 183–85. That is exactly what Plaintiffs have alleged here.

According to Plaintiffs, Defendants' subsequent statements materially misled investors into believing that ASPI had (1) obtained uranium-related regulatory approvals and (2) successfully enriched uranium. Dkt. No. 28, ¶¶ 57, 60, 62, 66, 68 73, 80, 83, 87. In April 2024, ASPI disclosed that it was still seeking regulatory approval to conduct uranium enrichment research. Dkt. No. 43-1, at 5. Nearly half a year later, however, ASPI issued an investor presentation titled "Quantum Enrichment: Real Work Experience," which stated that "Our team *have* [sic] used lasers to enrich many different metals," and expressly listed "Uranium" among them. Dkt. No. 28-4, at 30 (emphasis added). The slide is reproduced below:



*Id.* at 30. By placing uranium in a list of metals the team had already enriched, ASPI did not convey a forward-looking aspiration – it made a factual assertion of present capabilities. Nothing in the presentation suggested that uranium enrichment remained pending, conditional, or

speculative.  A reasonable investor could only conclude that, in the time between the FY 2023 Form 10-K was filed and when the investor presentation was later filed with the SEC, ASPI had acquired the necessary approvals and successfully conducted uranium enrichment.  That even Canaccord's financial analyst, who has twenty-four years of experience specializing in the renewable energy industry, believed that ASPI had enriched uranium only reinforces this conclusion.  *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991).

Defendants attempt to downplay the significance of this explicit listing by pointing to "Lithium," which is subsequently used as an illustrative example of the quantum enrichment process.  But the presence of a fuller lithium example does nothing to diminish the effect of uranium's inclusion in the same list.  The observation that lithium is "the only isotope[] where results have been published" does not negate the implication of uranium's inclusion either, because having enriched uranium does not require the publication of those results – particularly when ASPI would have strong strategic, regulatory, and commercial reasons to keep the results confidential. Dkt. No. 28-4, at 30.

Accordingly, the slide illustrates how "a reasonable investor" could have easily been misled into believing that ASPI had successfully enriched uranium and had meaningfully progressed beyond merely seeking regulatory approval, even though the April 2024 Form 10-K indicated otherwise.  *See Farnsworth*, 692 F. Supp. 3d at 183–185.  That is more than enough at the pleading stage to render the earlier disclosures insufficiently "intense or credible" to "counter-balance effectively" ASPI's later statements.  *See Ganino*, 228 F.3d at 167.

If the truth-on-the-market defense is rarely suitable even at summary judgment, it is certainly not a proper basis for dismissal at the pleading stage.  *See id.* (stating that "summary

18

judgment based on the 'truth-on-the-market' doctrine is appropriate only if defendants show that no rational jury could find that the market was misled").  Accordingly, the truth-on-the-market defense cannot provide a basis for dismissal, because Plaintiffs have adequately alleged that ASPI's later statements superseded earlier disclosures in the Form 10-K filed nearly half a year earlier.  That alone defeats dismissal under a truth-on-the-market theory.

Defendants insist in their reply that they do not assert a truth-on-the-market defense in the first instance.  Dkt. No. 53, at 14.  But Defendants' argument fails regardless of how they style it.  Their argument is still premised on the notion that ASPI's prior disclosures immunize its later public statements.  That premise is wrong as a matter of law.  A company that discloses risks, contingencies, or incomplete progress in an earlier filing does not gain a perpetual safe harbor to make subsequent statements that create the misimpression that those risks have been resolved.  *See Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251–52 (2d Cir. 2014).

The federal securities laws impose a continuing obligation: once a company chooses to speak, it must do so truthfully and in a way that does not mislead in light of the "total mix" of information available at the time.  *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 258.  Thus, even absent a formal truth-on-the-market defense, ASPI cannot rely on its prior SEC filings to retroactively "cure" later statements that reasonably suggested changed circumstances.  *See Farnsworth*, 692 F. Supp. 3d at 183–185.

### B.  Plaintiffs State Plausible Claims under Section 10(b) of the Exchange Act and Rule 10b-5(b)

Section 10(b) of the Exchange Act provides that it is unlawful "to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules

19

and regulations" that the SEC "may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Likewise, SEC Rule 10b-5 prohibits "mak[ing] any untrue statement of a material fact or . . . omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

In short, to state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plausibly allege: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005). At issue are the first two elements of Plaintiffs' Section 10(b) claim.

#### 1. Material Misrepresentations or Omissions

#### a. Legal Standard

To satisfy the first element, a plaintiff must allege that a defendant made actionable material misrepresentations or omissions under Rule 10b-5. A statement is materially misleading and actionable if "the defendants' representations, taken together and in context, would have misled a reasonable investor." *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991) (citation modified). Put differently, a misstatement is material where there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision. *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009). Moreover, once a company chooses to speak – even absent any independent legal duty to do so – it undertakes "a duty to be both accurate and complete." *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002). Thus, even statements that

20

are "literally true" may still be actionable if they nonetheless "create a materially misleading impression." *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd and remanded on other grounds*, 568 U.S. 442 (2013).

At bottom, whether alleged misrepresentations or omissions are material "requires an examination of defendants' representations, taken together and in context." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (citation omitted). Materiality is "inherently fact-specific," *Basic Inc. v. Levinson*, 485 U.S. 224, 236 (1988), and "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences," *TSC Indus., Inc.*, 426 U.S. at 450. Consequently, a complaint may not be dismissed unless the alleged misrepresentations and omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *JP Morgan*, 553 F.3d at 197.

### i. Statements of Opinion

Generally, statements of opinion that do not relate to an existing fact are not actionable. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). Such statements are "subjective statements that reflect judgments as to values that [are] not objectively determinable." *In re Gen. Elec. Co. Sec. Litig.*, 856 F.Supp. 2d 645, 653 (S.D.N.Y. 2012) (internal quotation marks and citation omitted). Indeed, the Supreme Court in *Omnicare* stressed that while an opinion can form the basis of a securities fraud claim, achieving liability is "no small task." 575 U.S. at 194.

To state a claim, an investor must "identify particular (and material) facts going to the basis for the issuer's opinion – facts about the inquiry the issuer did or did not conduct or the knowledge

21

it did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* Liability under this theory is based on the understanding that opinions often "rest on a weighing of competing facts," and whether an issuer's omission of a competing fact "cutting the other way" is materially misleading "always depends on context." *Id.* at 190. Accordingly, absent a well-pleaded omission of facts showing that the opinion was objectively unreasonable or misleading, statements of opinion cannot support a securities fraud claim. The core question is whether the omitted facts would "conflict with what a reasonable investor would take from the statement itself." *Id.* at 189; *accord Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016).

### ii.    Corporate Optimism and Puffery

General statements of corporate optimism and puffery are nonactionable under federal securities laws because they are not "sufficiently specific that a reasonable investor could rely on [them] as a 'guarantee of some concrete fact or outcome.'" *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014). Even "misguided optimism is not a cause of action, and does not support an inference of fraud" because the Second Circuit has "rejected the legitimacy of 'alleging fraud by hindsight.'" *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (citing *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978)). Allegations that a defendant should have been "more alert and more skeptical" are insufficient, as speakers are "not required to take a gloomy, fearful or defeatist view of the future." *Shields*, 25 F.3d at 1129–30.

Like opinion statements, however, statements of optimism and puffery can be actionable where they "contradict facts that are known to a defendant," *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 537 (S.D.N.Y. 2016), or where they amount to "'misrepresentations

22

of existing facts' that were made even though the speaker 'knew that the contrary was true,'" *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 298 (S.D.N.Y. 2018) (quoting *Novak v. Kasak*, 216 F.3d 300, 315 (2d Cir. 2000)).

### b. Application

Plaintiffs allege that Defendants made a total of fifteen[1] material misrepresentations between September 26, 2024 and November 26, 2024 (the "Class Period"). Dkt. No. 28, Am. Compl., ¶¶ 59, 61, 63, 65, 67, 70, 71, 75–78, 82, 85, 86, 89. Defendants, for clarity, label each challenged statement numerically, *see* Dkt. No. 42-1, Appendix of Alleged Misstatements, and argue that several statements are inactionable expressions of opinion or puffery. Defendants do not argue that the alleged misstatements fall within the PSLRA's safe-harbor provision for forward-looking statements. 15 U.S.C. § 78u–5(c).

The Court addresses these alleged opinion statements first and will then turn to the remaining challenged statements. The Court ultimately concludes that Statements 2, 3, 5, 6, 13, 14, and 15 are actionable.

### Statement 1 is Not Actionable

Plaintiffs allege that ASPI's SEC-filed, September 26, 2024 investor presentation titled "ASP Isotopes Corporate Overview" contained numerous material misrepresentations. A slide in the presentation, with the heading "HALEU Supply: A Growing Concern for SMRs," states: "We believe that our proprietary Single Stage Quantum Enrichment Technology provides an ideal

---

[1] The Complaint alleges sixteen material misstatements. Because the November 22, 2024 revised investor presentation is identical to the September 26, 2024 version, except for the removal of a single slide titled "QE Technology: Illustrative Laser System," the Court does not analyze it separately, as doing so would be duplicative.

solution." Dkt. No. 28, ¶ 59. On the same day, Defendant Mann stated in a conference call, "we think our quantum enrichment technology is perfect for enriching uranium." *Id.*

This statement is not actionable because it is a pure statement of opinion, rather than an assertion of existing fact. "To be 'material' within the meaning of § 10(b), the alleged misstatement must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome." *City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014). *Omnicare* clarifies that an opinion is actionable only if the issuer omits material facts that "conflict" with the basis for the opinion, such that a reasonable investor would be misled. 575 U.S. at 189–90.

Here, neither statements guarantee nor imply any particular "outcome," nor do they assert – or even allude to – any objective or verifiable "concrete fact." Terms like "perfect" and "ideal" are inherently subjective, admit multiple interpretations, and are incapable of objective measurement. Any basis for these descriptors is thus insufficiently specific to support a claim that a reasonable investor could be misled. *See City of Pontiac Policemen's and Firemen's Ret. Sys.*, 752 F.3d at 185.

Although Plaintiffs argue that Defendants had no reasonable basis for the belief that their QE technology provides an "ideal" or "perfect" solution for enriching uranium because it had not yet been tested on uranium and lacked the requisite regulatory approvals, no reasonable investor could interpret these statements as asserting that ASPI had already obtained those approvals. Indeed, the context of the slide itself reinforces this point, as it projects demand for enriched uranium as far into the future as 2034. In this long-term context, the characterization of ASPI's QE technology as "ideal" or "perfect" could not reasonably be understood as promising an

24

immediate solution or representing that ASPI had obtained necessary regulatory approvals. Statement 1 is therefore a pure statement of opinion and is inactionable.

**Statements 4, 7, and 8 Are Not Actionable**

*Statement 4.*   Plaintiffs allege that a slide contained in the September 26, 2024 investor presentation, with the heading "Potential to Close the Loop on Nuclear Waste," is materially misleading.  Dkt. No. 28, ¶ 65.  The challenged statement reads as follows:

> Depleted tails from other uranium enrichers produce nuclear waste.  The management of this waste is becoming a problem.  We believe that our technology can process this waste into HALEU – Potentially providing a solution to this growing environmental problem.  If we can secure access to this nuclear waste at an attractive cost, we should be able to produce HALEU at highly competitive prices.

Dkt. No. 28-4, at 33.

*Statement 7.*   Plaintiffs also challenge statements contained in an October 17, 2024 ASPI press release titled, "ASP Isotopes Inc. Enriches Ytterbium-176 During Commissioning Phase of First Quantum Enrichment Facility and Expects to Offer Highly Enriched Ytterbium-176 for Commercial Sale in 2025."  The press release states:

> The Company believes that this proprietary technology is not only more efficient and scalable than other enrichment technologies, but also has considerable advantages with respect to capital efficiency and industrial pollution.  Additionally, ASP Isotopes believes that because of this milestone achievement it is likely that other important isotopes can be produced using the Quantum Enrichment technology with the same benefits.

Dkt. No. 28, ¶ 70.

*Statement 8.*   The press release further states that "ASPI believe [sic] its Quantum Enrichment process will be able to produce HALEU (High Assay Low Enriched Uranium) at an

attractive price, allowing new nuclear energy to become available at a 'green discount' to carbon-intensive electricity production processes." *Id.*, ¶ 71.

Under *Omnicare*, these statements are paradigmatic expressions of opinion and belief, framed expressly as what Defendants "believe" their technology can achieve, and thus are not actionable absent particularized allegations that Defendants omitted concrete facts showing their expressed beliefs lacked any reasonable basis.  Plaintiffs offer no such facts.  The single omitted fact Plaintiff identifies – *i.e.*, that ASPI has not yet tested QE on uranium – does not "conflict" with Defendants' "beliefs" as to what QE will achieve in enriching uranium, including processing nuclear waste into HALEU, Dkt. No. 28, ¶ 65, and enriching uranium "at an attractive price," *id.*, ¶ 71.  Nothing about the absence of completed uranium testing renders those statements misleading to a reasonable investor reading them in context.

For example, Statement 4 never claims that the technology had already been proven to process depleted tails into HALEU.  Instead, it uses conditional and forward-looking phrasing, such as "potentially," "we believe," and "should be able to," and expressly notes that achieving competitive pricing depends on future contingencies – most notably securing access to nuclear waste at a favorable cost.  No reasonable investor could interpret such qualifiers as asserting that uranium testing had already been completed or that commercial feasibility had already been established.

Statements 7 and 8 are even more limited in scope.  The press release was issued in connection with a milestone involving enrichment of Ytterbium-176, not uranium, and states only that this development makes it "likely that other important isotopes can be produced" using QE with similar benefits.  Dkt. No. 28, ¶ 70.  This is a paradigmatic statement of opinion regarding

26

future technological potential – not an assurance that uranium enrichment had already been successfully demonstrated.  Likewise, ASPI's assertion in Statement 8 that it "believes" its QE "will be able to produce HALEU at an attractive price" and deliver a "green discount" is framed entirely as a forward-looking projection of future commercial advantages.  *Id.*, ¶ 71.  It is not a statement that the company had already achieved such pricing, completed uranium testing, or obtained regulatory approval.  A reasonable investor would read it as a view about anticipated competitive positioning, not an assertion of present fact.

Plaintiffs' only alleged omission – that ASPI had not yet tested QE on uranium – therefore does not contradict or undermine what a reasonable investor would take from the challenged statements.  None of them represent that uranium testing had occurred, that the technology had already proven commercially viable for uranium enrichment, or that the regulatory pathway was complete.  They describe expectations, possibilities, and projected advantages conditioned on future developments.  Plaintiffs thus identify no omitted fact that "conflicts with what a reasonable investor would take from the statement itself." *Omnicare*, 575 U.S. at 189.  Absent a specific, material omission showing that Defendants' expressed views lacked any reasonable basis, Plaintiffs cannot convert aspirational and predictive statements of opinion into actionable securities fraud.  Statements 4, 7, and 8 are not actionable.

**Statements 9–12 Are Not Actionable**

*Statement 9.*  Plaintiffs challenge various statements contained in an October 30, 2024 ASPI press release titled, "ASP Isotopes Inc. enters into Term Sheet with TerraPower, LLC for Construction of a HALEU Production Facility."  The press release states that ASPI "has entered into a term sheet with TerraPower, a nuclear innovation company and advanced nuclear energy

developer, related to the construction of a uranium enrichment facility capable of producing High Assay Low-Enriched Uranium (HALEU) and the future supply of HALEU to TerraPower, as a customer of Quantum Leap Energy LLC (QLE)."  Dkt. No. 28, ¶ 75.

*Statement 10.*  The same press release goes on to state that "the parties anticipate entering into a long-term supply agreement for the HALEU expected to be produced at this facility pursuant to which the customer would purchase all the HALEU produced at the facility over a 10-year period after the expected completion of the facility."  *Id.*, ¶ 76.

*Statement 11.*  The same press release also states that ASPI "believes that its enrichment technologies can be deployed in a new HALEU facility for considerably lower capital costs, and in much less time, compared to the construction of an enrichment facility using a traditional centrifuge process of HALEU production."  *Id.*, ¶ 77.

*Statement 12.*  The press release also quotes Defendant Mann as stating, "Over the last several decades, the scientists at ASP Isotopes have developed some of the world's most advanced isotope enrichment technologies.  This term sheet is further validation of our belief that ASP Isotopes can offer scalable and capital efficient technology solutions to the supply challenges which exist in global isotope markets."  *Id.*, ¶ 78.

Plaintiffs challenge these statements only to the extent that "there was no reasonable basis for [Defendants'] purported belief that ASPI could construct a commercially viable HALEU facility, and would produce commercial quantities of HALEU" because ASPI had never tested its technology on uranium.  *Id.*, ¶ 80; *see also* Dkt. No. 46, at 12–13.  Defendants argue that these are classic expressions of opinion and corporate optimism under *Omnicare*, reflecting conditional, forward-looking beliefs rather than any assertion that ASPI had already conducted uranium testing.

Statement 9 is not a classic expression of opinion. It is not an opinion at all. The only issue with respect to Statement 9 is whether the parties had signed a term sheet relating to the matters described in the press release. If they did – and apparently, they did – then the statement is true. Whether there was a reasonable basis to believe that the term sheet would result in a final contract (term sheets, by nature, are preliminary agreements that often differ materially from a final executed contract and do not commit to construction timelines), or whether there was a reasonable basis to believe that anything would ultimately come of the project contemplated by the term sheet, is of no relevance to whether Statement 9 – a plain, garden-variety statement of fact ("ASPI has entered into a term sheet with TerraPower") – is or is not true. Plaintiffs do not allege that the term sheet did not exist. Instead, they challenge Statement 9 solely on the ground that Defendants lacked a reasonable basis to believe that anything would come of the preliminary term sheet. That argument does not render false a factual statement that the parties had entered into a term sheet. Defendants' argument that Statement 9 is an expression of opinion fails and so does Plaintiffs' challenge to its veracity. Statement 9 is not actionable.

However, Statements 10, 11, and 12 are different. These are statements of opinion. The press release omits any indication of when construction would begin, which underscores that any future HALEU production remained contingent on regulatory approvals and other developments. The repeated use of "believes" and "can" signals that the statements express conditional, forward-looking potential rather than guarantees. Although such terms are not "magic words" offering a "virtual *carte blanche*" to make potentially misleading statements, *Omnicare*, 575 U.S. at 193, Plaintiffs must specifically challenge ASPI's basis for offering the opinion, *id.* at 194. They do not, particularly given the preliminary and aspirational context in which the statements were made.

29

The absence of uranium testing does not "conflict" with the basis for these beliefs or render them misleading. *See Omnicare*, 575 U.S. at 189.

The facts in this case are materially different from those in *SEC v. Schiffer*, 1998 WL 307375 (S.D.N.Y. June 11, 1998). In *Schiffer*, the defendant – CEO of Phoenix Laser Systems, Inc. ("Phoenix"), a now defunct company that purported to develop laser workstations for eye-surgery procedures – made concrete and false representations about the company's regulatory approval status, product orders, and expected revenue, even though Phoenix lacked any marketable product. 1998 WL 307375, at *2. The SEC showed that Phoenix's CEO affirmatively misstated that three FDA IDE applications for clinical testing were pending and that "preliminary FDA action . . . [was] expected shortly," even though, at the time of the filing, two of those applications had already been disapproved and the third withdrawn. *Id.* Phoenix also represented that it had 30 firm orders in 1989 and 48 "conditional orders" in 1990, with shipping to begin within 60–90 days and revenue of nearly $3.9 million expected from the backlog. *Id.* But employees testified that Phoenix had not even developed a working prototype of its laser workstation, rendering the supposed orders and projected revenue fictitious. *Id.* The court found these misstatements material because they conveyed imminent commercial viability and regulatory progress that did not exist, misleading investors into believing that Phoenix was on the cusp of market entry.

By contrast, nothing comparable is alleged here. Plaintiffs do not claim that ASPI misstated any regulatory approval status, represented that it had received or filled product orders, or projected specific revenue or delivery timelines. Nor do Plaintiffs allege that ASPI suggested in these statements that it had an immediately market-ready HALEU enrichment product. Statements 10–12 reflect conditional, forward-looking beliefs about what ASPI "believes" it "can" achieve in a future facility – beliefs framed in connection with a preliminary term sheet that did not include

30

a construction start date or any representation of imminent commercialization.  Unlike in *Schiffer*, there is no discrepancy alleged between ASPI's public statements and its internal reality; there are no false assertions of regulatory action, no fabricated backlog of orders, and no assurances of near-term revenue from a product that did not exist.

Plaintiffs' reliance on *In re Vaxart, Inc. Securities Litigation*, 576 F. Supp. 3d 663 (N.D. Cal. 2021) is similarly misplaced.  In *Vaxart*, the court held that Vaxart, Inc., a vaccine developer, "created the materially misleading impression that [it] stood at the precipice of pioneering a successful coronavirus vaccine."  576 F. Supp. 3d at 670.  Vaxart's press releases positioned the company alongside Moderna, Pfizer, and Johnson & Johnson, lauded its vaccine as having the "potential to offer better protection than injectables," and represented that manufacturing infrastructure was already "in place."  *Id.*  Taken together, these statements conveyed imminent technological and commercial success.  Critically, the company also made explicit assertions about production capacity, claiming that it could produce one billion doses per year, and its statements suggested that its partners had the regulatory capacity, personnel, and resources to deliver – when, in fact, they did not.  *Id.*  The court found that, through the eyes of a reasonable investor, Vaxart had turned potentials into perceived near-term realities, materially altering the "total mix" of information.  *Id.*

In comparison, Statements 10–12 reflect conditional optimism about what ASPI *might* be able to achieve in a potential future facility.  Unlike Vaxart, ASPI did not claim that HALEU could be produced immediately, that any partner had already fulfilled regulatory or operational requirements, or make any ambitious projections about its production capacity.  Defendant Mann, for his part, merely states that it was his "belief" that ASPI "can offer scalable and capital efficient technology solutions to the supply challenges in the global isotopes markets" at some undefined

31

future point in time.  Dkt. No. 28, ¶ 78.  No reasonable investor could interpret these statements as conveying the certainty or immediacy of achievement that the court found actionable in *Vaxart*.

In sum, Plaintiffs identify only that ASPI had not yet tested QE on uranium – a fact that does not "conflict" with the basis for Defendants' beliefs.  Rather, Statements 9–12 reflect reasonable expressions of hope and optimism regarding what their QE technology could achieve in a potential future HALEU facility with TerraPower, subject to both research, commercial, and regulatory contingencies.  Defendants are "not required to take a gloomy, fearful or defeatist view of the future."  *Shields*, 25 F.3d at 1129–30.  Statements 9–12 are not actionable.

## **Statement 13 Is Actionable**

Plaintiffs challenge Defendant Mann's statements in an October 30, 2024 conference call.  During the question-and-answer session, the host asked, "Is criticality an issue with your QE process enriching U-235?"  Dkt. No. 28, ¶ 82.  Criticality refers to the point at which a nuclear chain reaction becomes self-sustaining, which is dangerous because it can give rise to a destructive release of energy.  *Id.*, ¶ 82 n.10.  Mann replied:

> So, criticality is the problem in any enrichment process involving U-235.  You have to demonstrate to the regulators and to the people who provide your license you'll never going to be able to hit criticality.  One of the advantages of our QE process is that we do it in batches, so rather than having a continuous process of hundreds of kilograms of product inside the plant at a time, you only have a small amount of product being enriched at a time.  And so we believe we can demonstrate very clearly to regulators that there's no chance of hitting criticality.

Dkt. No. 28, ¶ 82.

Mann's statements are phrased in the present tense and appear to describe ASPI's current uranium enrichment operations.  By stating that ASPI conducts the QE process "in batches" and that there is "no chance of hitting criticality," Mann represented to investors that ASPI was already

32

using QE to enrich uranium in a manner sufficiently safe and mature to satisfy regulators, reinforcing the misimpression – created by prior statements, *see supra* Section III(A) – that ASPI had current QE uranium enrichment capabilities. *See In re Arqit Quantum Inc. Sec. Litig.*, 774 F. Supp. 3d 505, 536, 544 (E.D.N.Y. 2025) (finding that present-tense statements about capabilities of undeveloped technology were misleading). These present-tense statements suggest that uranium testing was underway when in fact it had not yet begun.

Defendants argue that Mann's "do[ing] it in batches" statement refers only to non-uranium elements, rendering it literally true. But that reading is untenable and ignores context. The question put to Mann expressly and unambiguously concerned ASPI's "QE process enriching U-235," not enrichment in the abstract. Mann began his answer by stating, "criticality is the problem in any enrichment process involving U-235," thereby framing the entirety of his response around uranium enrichment. And the subject of "criticality" has no relevance to the enrichment of non-fissile materials; it is a safety concern only in the enrichment of fissile uranium because only such material can approach a self-sustaining chain reaction. Thus, every component of Mann's answer – from the question asked, to his introductory framing, to the technical issue discussed – concerned uranium enrichment and could not logically have referred to the processing of other elements. In this context, no reasonable investor could understand Mann to be discussing anything other than ASPI's purported use of QE to enrich uranium.

Defendants further contend that Mann's final sentence – "we believe we can demonstrate very clearly to regulators that there's no chance of hitting criticality" – is merely a statement of opinion. *See* Dkt. No. 42, at 21–22. This characterization fails. Mann was speaking in the present tense and grounding his conclusion in claimed current capabilities: that ASPI's enrichment process already "do[es] it in batches," with quantities sufficiently small to avoid criticality. In other words,

Mann did not state an optimistic projection about what ASPI hoped to achieve in the future; he represented that ASPI already possessed an operational process with features that ensured regulatory safety. Such a statement plainly "convey[s] facts about how the speaker has formed the opinion" and affirmatively represents the present existence of facts supporting it. *See Omnicare*, 575 U.S. at 188.

Even if characterized as an opinion, Statement 13 is still actionable because "contain[s] one or more embedded factual statements that can be proven false." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020). In *Abramson*, the Second Circuit explained:

> A statement structured, "I believe that x is so because y has occurred," contains the factual and falsifiable statement, "y has occurred." If y has in fact not occurred, the statement of opinion is actionable because an embedded but complete "statement of a material fact" under the first part of Rule 10b-5 can be proven false.

*Id.* Applying this formulation, Mann's statement can be structured as follows:

- X = ASPI can show regulators there is no chance of criticality;

- Y = ASPI's QE process is already enriching uranium "in batches" with quantities small enough to avoid criticality.

If, as Plaintiffs allege, ASPI was not enriching uranium at all, Dkt. No. 28, ¶ 83, then the embedded factual premise (Y) is false – rendering the statement actionable under *Abramson*. Accepting Plaintiffs' well-pleaded factually allegations as true, *Twombly*, 550 U.S. at 555–56, Statement 13 is a plausibly misleading assertion of presently existing fact and is actionable.

Having addressed each of Defendants' opinion-based challenges, the Court turns to the remaining Statements 2, 3, 5, 6, 9, 10, 14, and 15.

**Statement 2 Is Actionable**

Plaintiffs allege that a slide in ASPI's September 26, 2024 investor presentation with the heading "Comparing and Contrasting Enrichment Methods," was materially misleading. The slide is reproduced below:

## Comparing and Contrasting Enrichment Methods

|  | Gaseous Diffusion | Centrifugation | Atomic Vapor laser Isotope Seperation (AVLIS) | Separation of Isotopes by Laser Excitation | Quantum Leap Energy |
|---|---|---|---|---|---|
| Cost | High Capital Cost | Capital 1/10 of Diffusion | Low Capital, Small Size | Low Capital, Small Size | Low Capital, Small Size |
| Speed | High Pressure | High Speed | U Metal 3000K | Adiabatic expansion nozzles (10-20K) | U Metal 3000K |
| Technology Notes | High Technology | Rotor Design & Material | Selective Photoionization | Laser Excitation Transamission by Skimmer | Enhanced Resonant Multiphoton Ionization |
| Selectivity | Selectivity α ≥ 1.003 | Selectivity α ≥ 1.15 | Selectivity α ≥ 10-50 | Selectivity α ≥ 2-20 | Selectivity α ≥ 50 |
| SWU | 2500 kWh/SWU | 50 kWh/SWU | 40 kWh/SWU | Estimate < 50 kWh/SWU | 40 kWh/SWU |
| Stages Required | 500 Stages to reactor grade | 50 Stages | 1-2 Stages | 1-2 Stages | Single Stage |

Dkt. No. 28-4, at 29. This slide compares multiple uranium enrichment technologies – Gaseous Diffusion, Centrifugation, AVLIS, Separation of Isotopes by Laser Excitation, and Quantum Leap Energy, the latter being a subsidiary of ASPI – across several performance metrics. The chart reports, for each method: (i) relative capital cost; (ii) operating speed; (iii) key technological characteristics; (iv) "Selectivity," *i.e.*, the enrichment factor achieved in a single pass; (v) energy consumed per separative work unit ("SWU"); and (vi) the approximate number of stages required to reach reactor-grade enrichment. ¶¶ 61–62. Quantum Leap Energy's enrichment technology is represented as outperforming all other listed methods, with very high single-pass selectivity (α ≥

50), energy usage around 40 kWh per SWU, and requiring only a single enrichment stage. The chart also indicates that Quantum Leap Energy operates on vaporized metallic uranium ("U Metal 3000K"). In explaining this slide during the conference call on the same day, Defendant Mann stated:

> This kind of contrasts and compares different types of enrichment and you'll see *the most important line here is the selectivity line, the alpha line*, and so the selectivity for centrifuge, it's about 1.15. And so that's good, and . . . when you put it into a cascade, you compound that 1.15 across the cascade, and that gives you your desired enrichment. But *for quantum leap or quantum enrichment, selectivity is greater than 50.*

Dkt. No. 28, ¶ 61 (emphases added).

ASPI explicitly marked the energy-per-SWU figure for Separation of Isotopes by Laser Excitation as an "estimate," while making no such qualification for QE, thereby implying that the figures presented for QE were not estimates at all. *See id.* Mann reinforced this impression in his accompanying remarks, asserting that "selectivity is greater than 50" – a statement in sharp contrast with his end-of-Class-Period admission that "until we've actually tried the process out with uranium and worked out an enrichment factor . . . [it is] difficult for us to know exact numbers." *Id*, ¶ 104. Taken together, the slide and Defendant Mann's remarks would plausibly lead a reasonable investor to believe that ASPI had operational, tested QE uranium enrichment capabilities, when in fact it did not.

Defendants rejoin that the table was not misleading because the word "uranium" does not appear on the slide. Dkt. No. 42, at 19. This argument is specious. The table expressly refers to "U Metal 3000K," using uranium's chemical symbol, "U," and referencing the temperature of 3,000 degrees Kelvin at which solid uranium vaporizes into gas. Dkt. No. 28, ¶ 61 n.8, 109–110. It also references "reactor grade," the level of enrichment required to produce nuclear reactor fuel.

36

And in context, the table clearly referred to uranium enrichment, as that portion of the presentation was focused on using QE to produce HALEU for the nuclear energy industry.  Dkt. No. 25-4, at 24–28; *see Iwa Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 145 (2d Cir. 2021) (holding that statements must be evaluated "by context and manner of presentation").  Moreover, Defendants' post-hoc claim that these statements related only to lithium enrichment is flatly contradicted by the slide itself and the surrounding manner of presentation.  Lithium is incapable of sustaining nuclear reactions and therefore could not plausibly be the subject of these nuclear enrichment claims.  Statement 2 is actionable.

**Statement 3 Is Actionable**

The "Real World Experience" slide is plausibly misleading for the same reasons discussed in Section III(A).  Although ASPI previously disclosed in April 2024 that it was still seeking regulatory approval to conduct uranium enrichment, the slide explicitly listed "Uranium" among metals the team had already enriched, presenting a factual assertion of present capabilities rather than a forward-looking plan.  Dkt. No. 28, ¶ 63 ("Our team have [*sic*] used lasers to enrich" metals, including "Uranium.").  A reasonable investor could therefore conclude that ASPI had successfully enriched uranium since its prior SEC filing.  Defendants' subsequent references to lithium as an illustrative example and to published results regarding lithium do not negate uranium's inclusion in a list of metals that ASPI had already enriched.  Statement 3 is actionable.

**<u>Statements 5 and 6 Are Actionable</u>**

*Statement 5.* Plaintiffs allege that a chart contained in ASPI's September 26, 2024 investor presentation indicating that ASPI's work on uranium-235 was at that point in the "R&D Stage" was materially misleading.  Dkt. No. 28, ¶ 65.  The slide is reproduced below:

## Potential to Close the Loop on Nuclear Waste





Depleted tails from other uranium enrichers produce nuclear waste. The management of this waste is becoming a problem.

We believe that our technology can process this waste into HALEU - **Potentially providing a solution to this growing environmental problem.**

If we can secure access to this nuclear waste at an attractive cost, we should be able to **produce HALEU at highly competitive prices**.



*Depleted UF6 Tails stored in Ohio, USA*

| Isotopes | End-Market | R&D Stage | R&D Evaluation | Under Construction | Anticipated Market Entry | Technology |
|---|---|---|---|---|---|---|
| Chlorine-37 | | ✓ | -- | -- | TBD | ASP |
| Lithium-6 | Nuclear Energy | ✓ | -- | -- | TBD | QE |
| Uranium-235 | | ✓ | -- | -- | TBD | QE and ASP |

Dkt. No. 28-4, at 33.  According to Plaintiffs, the slide is materially misleading because "ASPI's quantum enrichment and ASP technologies as applied to uranium-235 were entirely theoretical and lacked any real-world research and development."  Dkt. No. 28, ¶ 66.

*Statement 6.* Another slide in the same investor presentation, under the heading "Proven Proprietary Technology," states that "ASPI's advanced technologies leverage 20 years of R&D history to enrich isotopes in varying levels of atomic mass, allowing it to meet the growing demand in the Nuclear Medicine, Semiconductors, and Nuclear Energy industries."  *Id.*, ¶ 67; Dkt. No. 28-4, at 33.

The designation of QE for Uranium-235 as being in the "R&D Stage" must be considered in the full context of the presentation. A reasonable investor could interpret this label to mean that ASPI had at least begun laboratory-scale testing on uranium-235, not merely engaged in preliminary theoretical work. Defendants resist this interpretation, asserting that the "R&D Stage" could include purely theoretical efforts. However, this interpretation is inconsistent with the presentation itself, which shows that QE work on Lithium-6 was also labeled "R&D Stage" while contemporaneously reporting actual test results for Lithium-6 enrichment. *Id.*, ¶ 61; *see also* Dkt. No. 28-4, at 30.

By placing Uranium-235 QE in the same stage as Lithium-6 QE, the slide reasonably conveys that experimental work on U-235 had begun. A reasonable investor could plausibly have been misled, particularly in light of the representation that ASPI had "20 years of R&D history . . . enrich[ing] isotopes," and the deck's prior assertion that "our team have [*sic*] used lasers to enrich many different metals," including "Uranium," which collectively reinforce the impression of active, real-world experimentation on uranium-235. Dkt. No. 28-4, at 30. Defendants' narrow interpretation of "R&D" conflicts with a reasonable investor's interpretation, particularly when the slide deck itself draws explicit analogies to completed experiments. Moreover, how a reasonable investor would interpret "R&D Stage" in the specialized context of nuclear enrichment is inherently fact-intensive, precluding resolution on a motion to dismiss. *See, e.g.*, *Barton v. Pret A Manger (USA) Ltd.*, 535 F. Supp. 3d 225, 239 (S.D.N.Y. 2021) (collecting cases).

Here, a reasonable investor reading the slide in the context of the entire presentation – including the Lithium-6 experimental results and references to completed laser

enrichment of uranium – could have understood "R&D Stage" as representing actual experimental work rather than purely theoretical efforts.  Accordingly, Statements 5 and 6 are actionable.

**<u>Statements 14 and 15 Are Actionable.</u>**

Plaintiffs allege that ASPI's Vice-President of Fundraising and Business Development Viktor Petkov's remarks during an interview with POWER magazine, published online in an article titled, "Mobility, Flexibility, Scalability: SMRs Forging Nuclear's Future," were materially misleading.

*Statement 14.*  The interviewer asked Petkov, "What current technology is your company working on with regard to supporting the market for SMRs?"  Dkt. No. 28, ¶ 85.  Petkov replied:

> ASP Isotopes (ASPI) is focusing on producing critical nuclear fuels necessary for the operation of small modular reactors.  These include HALEU (High-Assay Low-Enriched Uranium), Lithium-6 and Lithium-7, Chlorine-37, and Thorium Fluoride.

*Id.*

*Statement 15.*  The interviewer also asked Petkov, "Do you have a timeline for commercial operation of your technology?"  *Id.*, ¶ 86.  Petkov replied:

> Our technology is fully prepared for deployment, pending the necessary approvals to operate an isotope enrichment facility.  We are targeting 2025/2026 for the production of Lithium-6 and Lithium-7.  ASPI is actively engaged in discussions with multiple governments to secure authorization for the construction of a uranium enrichment plant, which will produce HALEU.  Once the required permits are obtained, we anticipate that the facility could be operational within 12 to 18 months.

*Id.*

The Court has little difficulty concluding that Plaintiffs plausibly allege that Statement 14 materially misrepresented ASPI's technological capabilities, particularly when considered together with Statement 15.

Only HALEU is a nuclear fuel capable of sustaining a fission chain reaction.  Lithium-6, Lithium-7, Chlorine-37, and Thorium fluoride are not nuclear fuels, as they cannot undergo fission or, by themselves, sustain nuclear reactions.  Thus, Defendants' presentation of these materials collectively as "critical nuclear fuels" for SMRs risked misleading a reasonable investor into believing that ASPI could commercially produce multiple reactor fuels comparable to enriched uranium, when in fact ASPI had not even begun testing its QE technology on uranium.  The Second Circuit has long held that a statement is actionable if it is "either 'untrue' outright or 'misleading' by virtue of what it omits to state."  *See, e.g.*, *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016).  Plaintiffs allege exactly that here.  Dkt. No. 28, ¶ 87 ("The statements identified in paragraphs 85-86 were materially false and/or misleading . . . because, as Defendants knew or recklessly disregarded, ASPI was not currently working on uranium with its technology and never had, so its technology was not prepared for commercial deployment.").

Statement 15 compounds this misrepresentation.  By asserting that ASPI's "technology is fully prepared for deployment," Petkov made a present-tense factual claim about technological readiness.  Although Petkov mentions that lithium production is "targeted" for 2025/2026, this temporal reference does not limit ASPI's broader assertion of readiness.  Indeed, because Statement 14 expressly placed HALEU, lithium, chlorine-37, and thorium fluoride in the same category of "critical nuclear fuels" that ASPI was "focusing on producing," an investor would have no reason to assume that Petkov's later representation of ASPI's technology as "fully prepared for deployment" applied only to lithium production.  The two statements together could be read to communicate that the entire suite of SMR "fuel" technologies – including uranium enrichment – was at the same stage of readiness.  A reasonable investor could therefore plausibly infer that

41

uranium enrichment, like lithium production, was "fully prepared for deployment" and awaiting only routine regulatory approvals.

Moreover, Petkov's statement that "once the required permits are obtained, we anticipate that the facility could be operational within 12 to 18 months" further misleads investors into believing that the only impediment to commercializing uranium was regulatory approval, and that uranium enrichment was otherwise ready for immediate production.    This inference is demonstrably false.  As Defendants themselves recognize, ASPI has never successfully enriched uranium using QE and lacked the regulatory approvals to even test its QE technology, much less operate a uranium enrichment facility.  *See, e.g.*, Dkt. No. 53, at 7, 12.

Under Second Circuit precedent, present-tense portions of mixed statements are actionable when false at the time they are made.  *See In re Vivendi*, 838 F.3d at 246.  Because ASPI's QE of uranium was nowhere near "fully prepared for deployment," Statements 14 and 15 are actionable.

At the pleading stage, Plaintiffs need only plausibly allege that a reasonable investor would have been misled, and that is satisfied here.  *See Ganino*, 228 F.3d at 167.  Based on the foregoing, the Court concludes that Statements 2, 3, 5, 6, 13, 14, and 15 are actionable.

### 2.   Plaintiffs Plausibly Allege Scienter

A complaint adequately pleads scienter where, considering the allegations in their entirety, a reasonable person would find the inference of scienter "at least as strong as any opposing inference."  *Tellabs*, 551 U.S. at 325.  To establish scienter, Plaintiffs must either plausibly allege "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *JP Morgan*, 553 F.3d at 198.  To plead a "motive and opportunity to commit fraud," Plaintiffs must allege that Defendants "benefitted in

42

some concrete and personal way from the purported fraud." *JP Morgan*, 553 F.3d at 198 (citation omitted).  This standard is typically satisfied where corporate insiders misstate material facts about a company's performance or prospects "in order to keep the stock price artificially high while they [sell] their own shares at a profit."  *Novak*, 216 F.3d 300, 308 (2d Cir. 2000).

Alternatively, Plaintiffs may establish scienter by alleging "conscious misbehavior or recklessness," meaning conduct "that is highly unreasonable and represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *In Re Carter-Wallace Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (citation omitted).  This standard is generally satisfied when plaintiffs specifically allege "defendants' knowledge of facts or access to information contradicting their public statements."  *Novak*, 216 F.3d at 308.

### a. Motive and Opportunity

As an initial matter, corporate officers and directors are presumed to have the opportunity to commit fraud.  *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F.Supp.2d 163, 181 (S.D.N.Y. 2006).  Thus, the inquiry is whether Plaintiffs adequately plead motive.  Courts often find allegations of motive adequate when a company is in dire need of funds for survival.  *See, e.g.*, *Skiadas v. Acer Therapeutics Inc.*, No. 1:19-CV-6137-GHW, 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020).  In *Skiadas*, the court held that a strong inference of scienter arose where the company faced serious financial distress and the defendants stood to personally benefit from stock sales.  *Id.*  Specifically, Acer admitted in its SEC filings that there was "substantial doubt about the Company's ability to continue as a going concern within one year," and that it needed to raise capital to remain viable.  *Id.*  The court explained that these circumstances created a concrete motive for defendants to make misleading statements designed

43

to keep the stock price artificially high while securing the funding necessary to sustain the company. *Id.*

The same reasoning applies here. ASPI's SEC filings made clear that the company had no meaningful revenue, incurred massive recurring losses, and remained operational only so long as it could raise additional capital:

> Until such time as we can generate significant revenue from sales of our future isotopes or nuclear medical doses for PET scanning, if ever, we expect to finance our cash needs through public or private equity or debt financings or other capital sources, including potential collaborations, licenses and other similar arrangements. *However, we may be unable to raise additional funds or enter into such other arrangements when needed on favorable terms or at all.*

Dkt. No. 28, ¶ 35 (emphasis added). Plaintiffs allege that ASPI had incurred annual losses in the tens of millions of dollars and generated minimal revenue, making it dependent on stock sales to fund its operations. *Id.*, ¶¶ 32–34, 37. ASPI's financials illustrate this reliance:

|  | **2021** | **2022** | **2023** | **2024** |
|---|---|---|---|---|
| **Revenue** | $0 | $0 | $433,026 | $3,944,226 |
| **Net Loss** | $2,607,927 | $4,945,139 | $16,286,234 | $35,113,240 |

*Id.*, ¶ 32. ASPI also admitted in SEC filings that it had "not generated any revenue to date attributable to isotopes (and only limited revenues attributable to PET Labs), and [it] continue[s] to incur significant research and development and other expenses related to our ongoing operations. As a result, *we are not profitable and have incurred losses since our inception in September 2021*." *Id.*, ¶ 33 (emphasis added). ASPI's multiyear losses, minimal revenue, and continued operational dependence on equity offerings plainly establish a concrete financial motive to inflate the stock price in order to fund operations. As in *Skiadas*, Plaintiffs do far more than merely allege a generic desire to maintain "the appearance of corporate profitability." *See Sfiraiala*

*v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55, 57 (2d Cir. 2018) (citing *Novak*, 216 F.3d at 307).

Plaintiffs also plausibly allege that ASPI seized the opportunity to act on this motive. Before the Class Period, ASPI's stock closed at $2.83 per share. Plaintiffs allege that a series of materially misleading statements about ASPI's technological capabilities and uranium enrichment operations drove sharp price increases, including a 15% single-day gain on October 17, 2024, when ASPI announced the commissioning of its first quantum enrichment facility, and a 20% single-day gain on October 30, 2024, when ASPI announced a term sheet with TerraPower for construction of a uranium enrichment facility. *Id.,* ¶ 55.

Critically, within days of these alleged misrepresentations, ASPI executed a substantial equity transaction: filing a preliminary prospectus on October 31, entering an underwriting agreement on November 1, and selling more than 2.75 million shares at $6.75 on November 4, which raised $18.6 million. *Id*, ¶ 56. The temporal proximity between the alleged misrepresentations that inflated ASPI's share price, and the multimillion-dollar stock sale by a financially distressed company, is highly probative of both motive and opportunity.

This pattern mirrors the type of "unusual" and suspiciously timed trading activity that courts regularly hold sufficient to support scienter. In *In re Initial Public Offering Securities Litigation*, 241 F. Supp. 2d 281, 366 (S.D.N.Y. 2003), the court sustained scienter allegations where insider stock sales occurred soon after the alleged misrepresentations and were "unusual" in either timing or magnitude. For fifty-one defendants, detailed allegations regarding the number of shares owned, number sold, and significant proceeds "plainly satisfied" the motive prong at the pleading stage when those trades followed swiftly after an IPO. *Id.* And even where plaintiffs

alleged only proceeds – but of significant size (from $220,000 to $40 million) – the court held that the magnitude itself permitted an inference that the trades were "unusual," and therefore probative of scienter. *Id. Initial Public Offering Securities Litigation* thus confirms that where, as here, a defendant makes statements that inflate the stock price and immediately executes a substantial equity transaction generating millions of dollars in proceeds, the timing and scale of the transaction strongly support an inference of scienter. ASPI's $18.6 million raise immediately after its alleged inflationary statements fits squarely within this framework.

Defendants insist that corporate stock sales, without more, are insufficient to establish scienter. Dkt. No. 42, at 28 (citing *In re Lottery.com, Inc. Sec. Litig.*, 765 F. Supp. 3d 303, 347 (S.D.N.Y. 2025); *In re Plug Power, Inc. Sec. Litig.*, 2022 WL 4631892, at *12 (S.D.N.Y. Sept. 29, 2022)). But this argument ignores the fact-intensive nature of the scienter inquiry, which is often "better left to the trier of fact to determine." *Lehman Bros. Com. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 167 (S.D.N.Y. 2001). Neither *Lottery.com* nor *Plug Power* announces a categorical rule foreclosing reliance on stock sales. To the contrary, both cases reaffirm that stock sales do support scienter where they are suspicious in timing or amount, and where the surrounding factual context indicates a concrete financial motive. *See Lottery.com*, 765 F. Supp. 3d at 347–48 (recognizing that "Stock sales may support allegations of scienter when those trades are suspicious in timing or amount" (citation omitted)); *Plug Power*, 2022 WL 4631892, at *12 (stating that pleading scienter is "extremely contextual"). Moreover, unlike *Lottery.com* and *Plug Power*, where plaintiffs alleged only generic motives and defendants faced no acute financial distress, ASPI's liquidity crisis, minimal revenue, and massive losses exceeding $35 million in 2024 place this case at the opposite end of the spectrum. *See Lottery.com*, 765 F. Supp. 3d at 347–48; *Plug Power*, 2022 WL 4631892, at *12. Here, the stock sales immediately

46

followed alleged material misrepresentations that inflated ASPI's stock price, resulting in net proceeds of $18.6 million – an unusually large and timely financial benefit to the distressed company and its insiders.

At the pleading stage, Plaintiffs plausibly allege that Defendants received a "concrete and personal benefit" from the alleged misrepresentations. *See JP Morgan*, 553 F.3d at 198. When viewed holistically, as *Tellabs* requires, 551 U.S. at 322, the combination of ASPI's dire financial condition, the alleged inflationary statements, and the suspiciously timed equity raise strongly supports a cogent and compelling inference of scienter.

### b. Conscious Recklessness

Plaintiffs also plausibly allege scienter by alleging conscious recklessness on the part of Defendant Mann. The scienter of Defendant Mann, as CEO of ASPI, can be attributed to ASPI. *See Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008); *see also In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 90 (S.D.N.Y. 2017) (stating that "scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants"). Conscious recklessness requires conduct "that is highly unreasonable and represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In Re Carter-Wallace Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (citation omitted). This standard is typically satisfied where a plaintiff alleges that defendants had knowledge of facts or access to information contradicting their public statements. *Novak*, 216 F.3d at 308. Plaintiffs allege exactly that.

*First,* Defendant Mann admitted on November 27, 2024 that ASPI hadn't "actually enriched uranium." Dkt. No. 28, ¶ 104. The Class Period had begun only two months earlier. The

only plausible inference is that Mann knew this fact at the time he made the challenged statements.

Defendants do not dispute that Mann knew ASPI had never enriched uranium; on the contrary,

they argue that this fact was publicly "disclosed," a position that necessarily concedes awareness.

Defendants cannot simultaneously claim prior disclosure while denying contemporaneous

knowledge.  *See MBIA*, 700 F. Supp. 2d at 591.

*Second,* Mann's executive roles confirm his knowledge of the true state of ASPI's

enrichment capabilities.   Mann was not only ASPI's CEO, but also CEO and Chairman of

Quantum Leap Energy, the subsidiary formed specifically for uranium enrichment and responsible

for all QE operations.  Dkt. No. 28, ¶ 15.  Here, Plaintiffs plausibly allege Mann was aware that:

- ASPI had never tested QE on uranium;

- ASPI lacked the regulatory approvals required to conduct uranium enrichment testing;

- Quantum Leap Energy LLC had no licensed facility capable of enriching uranium and no Nuclear Regulatory Commission authorization to handle nuclear material; and

- ASPI's 2023 Form 10-K expressly warned that any enrichment remained contingent on securing government approvals and constructing compliant facilities.

*Id.*, ¶¶ 103–110.  These facts go to the heart of ASPI's claimed technological capability.  As CEO

and Chairman of Quantum Leap Energy, the entity formed solely for the purpose of conducting

uranium enrichment, Mann necessarily had access to this information.  What is more, Mann

repeatedly held himself out as deeply knowledgeable about ASPI's uranium enrichment efforts

48

and QE technology.  *Id.*, ¶¶ 42–43, 58–59, 61, 78, 81–82, 103–110.  Courts regularly treat such "self-portrayals" as compelling evidence of scienter.  *See, e.g.*, *Goldman v. Belden*, 754 F.2d 1059, 1070 (2d Cir. 1985).

*Third,* the core operations doctrine reinforces a finding of scienter.  Under the core operations doctrine, facts critical to a business's core operations are sufficiently apparent that senior officers can be presumed to know them.  *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989).  Although allegations of this kind cannot independently establish scienter post-enactment of the PSLRA, they may nonetheless serve as additional evidence of scienter.  *See, e.g.*, *In re Ferrellgas Partners, L.P., Sec. Litig.*, No. 16-CV-7840 (RJS), 2018 WL 2081859, at \*19 (S.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. Appx 127 (2d Cir. 2019).  Uranium enrichment was, by Defendants' own account, at the core of ASPI's business objective and the foundation of its "multi-billion-dollar" business model.  Dkt. No. 28-4 at 4; Dkt. No. 28, ¶¶ 39–46, 58–90.  Whether ASPI had ever enriched uranium was therefore central to ASPI's "long-term viability." *See In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at \*26 (S.D.N.Y. Dec. 2, 2013) (citation omitted).  It is implausible that Mann, CEO of both ASPI and its uranium enrichment subsidiary, could have been unaware of whether ASPI had ever enriched uranium.  The Court has little difficulty concluding that Plaintiffs plausibly allege that Mann knew ASPI had never conducted tests of its QE technology on uranium.

As Plaintiffs allege, ASPI publicly led investors to believe that its team had already enriched uranium, even though regulatory approvals had not been obtained, no licensed facility existed, and prior 10-K filings warned that enrichment remained merely contingent.  The stark contrast between ASPI's earlier contingent SEC disclosures and its Class Period statements

49

presenting uranium enrichment as an accomplished fact supports a strong inference of an extreme departure from ordinary care, satisfying the conscious recklessness standard.

Taken together, the combination of (1) motive and opportunity and (2) conscious recklessness creates a strong inference that Defendants acted with the required state of mind for securities fraud. Based on the "entirety of the complaint," the Court concludes that Plaintiffs have adequately alleged that Defendants acted with scienter because a reasonable person would find the inference of scienter "at least as strong as any opposing inference." *Tellabs*, 551 U.S. at 325. Defendants, for their part, identify no competing inference that is remotely as compelling. The strongest alternative they offer is the suggestion that their statements were merely "sloppy, contradictory and poorly drafted" – a characterization they somehow simultaneously disavow. Dkt. No. 42, at 30. Plaintiffs' allegations present a far more compelling and cogent inference of scienter.

### 3. Plaintiffs Adequately Plead Loss Causation

Loss causation is an essential element of a Section 10(b) and Rule 10b–5 claim, but it is not a heavy burden at the pleading stage. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346–47 (2005). To survive dismissal, a plaintiff must allege some causal connection between the alleged misconduct and the resulting economic loss. *Id.* at 347. Specifically, a plaintiff need only allege either (i) facts to support an inference that it was a defendant's fraud, instead of some intervening event, that caused plaintiff's loss, or (ii) facts that would allow a factfinder to ascribe some rough proportion of the loss to defendant's alleged misconduct. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005).

Here, Plaintiffs allege that Defendants' misstatements and omissions concealed from the market that ASPI had never successfully enriched uranium and lacked the necessary regulatory approvals. When the truth about ASPI's capabilities and regulatory status became public, the market reacted sharply, causing ASPI's stock to fall 23.5% on November 26, 2024, following the publication of the Fuzzy Panda report, and another 14.2% on November 27, 2024, after Defendant Mann's interview with Canaccord Genuity. Dkt. No. 28, ¶¶116–118. These allegations plausibly establish a direct link between the corrective disclosures and the market reaction to satisfy loss causation at this early stage.

Although already public information cannot constitute a corrective disclosure for loss causation purposes, *see In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511–12 (2d Cir. 2010), Plaintiffs have sufficiently alleged that Defendants' later statements materially contradicted prior disclosures, *see supra* Section III(A), and that the market reacted accordingly, *see Dura Pharm.*, 544 U.S. at 347. Defendants' arguments regarding alternative explanations for the market decline go to the weight of the evidence, not the sufficiency of the pleadings. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 187, 189 (2d Cir. 2015) ("The purpose of the loss causation element is to require a plaintiff 'to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind,' not to make a conclusive proof of that causal link." (citation omitted)). Accordingly, Plaintiffs adequately plead loss causation.

## C. Leave to Amend

Defendants' motion to dismiss is granted in part, and Plaintiffs' request for leave to amend is denied with respect to the statements the Court has determined are inactionable under Section 10(b). Although "The court should freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15(a)(2), a court may deny leave "for good reason, including futility, bad faith, undue

delay, or undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (citation omitted).

Here, amendment would be futile. The deficiencies the Court identifies with respect to the challenged statements stem not from insufficiently detailed pleading but from the nature of the statements themselves, which are inactionable as a matter of law. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). The Court cannot conceive of any amendment that would render these statements actionable. Accordingly, the Court denies Plaintiffs' request for leave to amend as to these dismissed claims.

## D. Plaintiffs State a Plausible Claim under Section 20(a)of the Exchange Act

Section 20(a) of the Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). In order to establish a prima facie case of liability under Section 20(a), a plaintiff must show: "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Barclays*, 750 F.3d at 236. "Section 20(a)'s culpable participation requirement is similar to the scienter requirement of Section 10(b)." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 661 (S.D.N.Y. 2007); *see also In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011) (stating that "§ 15 and § 20(a) are roughly parallel control person provisions"). Control over a primary violator may be established by showing that the defendant possessed "the power to direct or cause the direction of the management and policies

52

of a person, whether through the ownership of voting securities, by contract, or otherwise." *Sec. & Exch. Comm'n v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472–73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2).

Defendants do not dispute that Defendant Mann exercised control over ASPI for purposes of Section 20(a).  *See* Dkt. No. 42, at 31.  Instead, they argue only that Plaintiffs have failed to plead a primary violation under Section 10(b).  For the reasons discussed above, Plaintiffs adequately allege both primary violations and scienter as to ASPI and Mann.  *See* Sections III(A) & (B).  Plaintiffs therefore sufficiently plead control-person liability against Defendant Mann.

Plaintiffs' Section 20(a) claim against Defendant Kiessling, however, cannot proceed. Kiessling's name does not appear anywhere in the Complaint, nor do Plaintiffs mention her in their opposition to the motion to dismiss.  Plaintiffs therefore allege no facts suggesting that Kiessling exercised control over ASPI in connection with the challenged statements or that she acted with a culpable state of mind.  Accordingly, Plaintiffs'' Section 20(a) claim against Defendant Kiessling is dismissed.  *See In re Deutsche Telekom AG Sec. Litig.*, No. 00 CIV 9475 SHS, 2002 WL 244597, at *6 (S.D.N.Y. Feb. 20, 2002).

### E.  Plaintiffs Satisfy the Rule 23(a) Requirements for Class Certification

Plaintiffs move for class certification under Federal Rule of Civil Procedure 23.  Dkt. No. 37.  They seek certification of the following Class:

> All persons and entities who purchased the publicly traded common stock of ASP Isotopes Inc. ("ASPI") between September 26, 2024 and November 26, 2024, both dates inclusive, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of ASPI, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, any entity in which Defendants have or had a controlling interest, and any trust of which Defendant Mann is the settler or which is for the benefit of Defendant Mann and/or member(s) of his immediate family.

Dkt. No. 37.  Plaintiffs also seek the appointment of Lead Plaintiff Mark Leone and additional plaintiff Ivan Agapchev as Class Representatives and appointment of Glancy Prongay & Murray LLP ("GPM") as Lead Counsel.  *Id.*

### 1.  Numerosity

Numerosity may be presumed where a proposed Class consists of forty or more members, *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995), but plaintiffs need not allege the exact class size or identity of class members to satisfy the numerosity requirement since a court may make common sense assumptions to support a finding of numerosity, *Royal Park Invs. SA/NV v. Wells Fargo Bank, N.A.*, 2018 WL 739580, at *9 (S.D.N.Y. Jan. 10, 2018).  "In a securities class action, numerosity can be demonstrated by showing that a large number of shares were outstanding and traded during the class period."  *Martinek v. AmTrust Fin. Servs., Inc.*, 2022 WL 326320, at *5 (S.D.N.Y. Feb. 3, 2022).

Although Plaintiffs do not estimate the proposed Class's exact size, the Court concludes that the numerosity requirement is satisfied given the substantial trading volume of ASPI common stock.  During the Class Period, ASPI common stock was actively traded on the Nasdaq Capital Market ("NASDAQ"), with an average of 68.8 million shares outstanding and an average turnover of 40.96% per week.  Dkt. No. 39-1, Expert Report of Zahn Bozanic, Ph.D. ("Bozanic Report"), ¶¶ 30, 67; *see In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *8 (S.D.N.Y. July 10, 2019).  Given that ASPI stock was widely held and actively traded throughout the Class Period, the Court reasonably infers that the Class numbers in the thousands, thereby satisfying Rule 23(a)(1)'s numerosity requirement.

### 2.   Common Questions of Law and Fact

Commonality "does not mean that all issues must be identical to each [class] member," rather, it requires only that a plaintiff "identify some unifying thread among the members' claims that warrants class treatment."  *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 153 (S.D.N.Y. 2002).  In securities fraud cases, where putative class members are injured by similar material misrepresentations, the commonality requirement is satisfied.  *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 44 (S.D.N.Y. 2012).

Plaintiffs' central claim is that Defendants' alleged misrepresentations regarding whether it had successfully enriched uranium caused injury to all holders of ASPI common stock by artificially inflating the stocks prices.  Common questions of law and fact include: (i) whether Defendants' statements were materially false and misleading; (ii) whether the underlying misrepresentations and omissions were made with scienter; (iii) whether ASPI's stock was artificially inflated during the Class Period; (iv) whether Defendants' misrepresentations caused Class members to suffer economic losses; and (v) whether Defendant Mann was a "controlling person" of ASPI within the meaning of § 20(a) of the Exchange Act.

Under these circumstances, courts consistently find that commonality is satisfied.  *See, e.g.*, *Tsereteli v. Residential Asset Securitization Tr. 2006-A8*, 283 F.R.D. 199, 206 (S.D.N.Y. 2012) ("Commonality is plainly satisfied . . . [because] the existence and materiality of such misrepresentations obviously present important common issues.") (internal quotation marks and citations omitted); *Velez v. Majik Cleaning Serv., Inc.*, 2005 WL 106895, at *2 (S.D.N.Y. Jan. 19, 2005) ("A single common question may be sufficient to satisfy the commonality requirement.").  Plaintiffs have demonstrated by a preponderance of the evidence that several common questions of law and fact exist.

### 3.  Typicality

A plaintiff's claims are "typical" under Rule 23(a)(3) when they arise from the same course of events as the class members' claims and rely on similar legal theories to establish the defendant's liability. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). In securities class actions, plaintiffs generally need to develop evidence concerning the dissemination of the allegedly false or misleading statements at issue.  As a result, the nature of the claims and the evidence often suffice to establish typicality.  *In re Allergan PLC Sec. Litig.*, 2021 WL 4077942, at *6 (S.D.N.Y. Sept. 8, 2021).  Typicality is satisfied even where there are "minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani,* 987 F.2d 931, 936–37 (2d Cir. 1993) (citations omitted).  The commonality and typicality requirements of Rule 23(a) often merge.  *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 158 n.13 (1982).

Plaintiffs' claims are typical of those of the proposed Class.  Their claims arise from the same alleged course of conduct – namely, that Defendants artificially inflated ASPI's stock price by making materially misleading statements concerning the Company's ability to use QE technology to enrich uranium.  All Class members will rely on the same core body of evidence to establish liability.  *See Allergan*, 2021 WL 4077942, at *7.

Moreover, minor factual differences among class members, such as variations in the dates on which they acquired ASPI's stock, the prices they paid, or the manner in which they purchased the stock, do not defeat typicality so long as their injuries stem from the same alleged misrepresentations and fraudulent course of conduct.  *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *10 (S.D.N.Y. Dec. 23, 2009).  Because Plaintiffs' claims arise from the same alleged material misrepresentations and will have to be proven through the same evidence

56

as the claims of all other Class members, the typicality requirement is satisfied. *See In re Bank of Am. Corp. Sec.*, 281 F.R.D. 134, 139 (S.D.N.Y. 2012).

### 4.  Adequacy of Representation

The final element of Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  In assessing adequacy, the Court considers (1) whether Plaintiffs' attorneys are qualified, experienced, and able to conduct the litigation and (2) whether Plaintiffs' interests are antagonistic to those of the proposed Class. *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).

*First,* the Court finds that Glancy Prongay & Murray LLP is qualified, experienced, and fully capable of serving as Class Counsel.  The firm has substantial experience in securities class actions, including in this District, and has been found adequate in numerous cases. *See, e.g.*, *Venkataraman v. Kandi Techs. Grp., Inc.*, 2024 WL 4345571, at *3 (S.D.N.Y. Sept. 30, 2024) ("Glancy Prongay & Murray LLP is qualified, experienced and generally able to conduct the litigation"); *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *18 (S.D.N.Y. Aug. 13, 2018). Having reviewed GPM's firm résumé, Dkt. No. 39-4, the Court finds that Plaintiffs' chosen counsel will adequately and effectively represent the interests of the Class.  For substantially the same reasons, the Court also concludes that GPM satisfies the Rule 23(g) prerequisites for appointment as Class Counsel.

*Second,* Lead Plaintiff Leone's interests are not antagonistic to those of the proposed Class. To the contrary, Mr. Leone "possess[es] the same interest and suffer[s] the same injury as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 (1997) (citation omitted).  Mr. Leone, like all Class members, alleges that he was harmed by purchasing ASPI stock at artificially

inflated prices as a result of Defendants' alleged misrepresentations.  Mr. Leone has participated in this litigation, communicated with counsel, expressed his willingness to serve, and understands his obligations as Class Representative.  *See* Dkt. No. 39-2, Leone Decl., ¶¶ 7–8, 11.

Defendants argue that errors in Mr. Leone's PSLRA certifications raise concerns about his diligence and candor.  Dkt. No. 44. at 17–20.  They contend that Mr. Leone submitted multiple certifications omitting significant transactions and that such omissions suggest inattention or obfuscation.  According to Defendants, these omissions call into question his attention to detail, diligence, and candor, and suggest that he either failed to carefully review the certifications or actively obfuscated information relevant to the litigation.  Defendants further note that Mr. Leone's explanations, including allegedly blaming the omission on a "miscommunication" with counsel and a lack of recollection, do not adequately dispel these concerns and highlight risks that he may not faithfully represent the interests of the Class.  *Id.* at 19.

These criticisms lack merit.  Mr. Leone's initial certification, submitted with his lead plaintiff motion, inadvertently listed only his brokerage account trades for November 25–26, 2024.  Dkt. No. 7-2.  Upon discovering the oversight, he corrected it in his certification accompanying the amended complaint, including the full set of brokerage account trades as well as the three previously omitted IRA transactions.  Dkt. No. 28-1; Dkt. No. 39-2, ¶ 3.  The vast majority of Leone's ASPI trades, both in number and dollar value, were in his brokerage account, with the remaining IRA trades comprising less than 2% of his total holdings.  *See* Dkt. No. 28-1; Dkt. No. 39-2, ¶ 3.

Defendants' claim that the omission of these three IRA transactions constitutes evidence of bad faith is plainly incorrect.  They argue that Mr. Leone attempted to obfuscate the fact that he

was "in and out of the stock on the eve of the alleged corrective disclosure." Dkt. No. 44, at 18. This argument is specious. The omitted IRA trades occurred well before the alleged corrective disclosures on November 26–27, 2024, and Mr. Leone retained these shares in his IRA through the end of the Class Period:

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 11/5/2024 | Buy | 1,000 | $7.29 |
| 11/5/2024 | Buy | 1,373 | $7.4071 |
| 11/15/2024 | Buy | 18 | $8.31 |

Dkt. No. 39-2, ¶ 3. Because these trades occurred several days to weeks before the alleged disclosures and were never sold, they cannot reasonably be construed as evidence of "in-and-out trading" or bad faith.

These minor certification errors, without evidence of bad faith, do not disqualify Mr. Leone from serving as lead plaintiff or class representative. *See In re SLM Corp. Sec. Litig.*, 2012 WL 209095, at *8–9 (S.D.N.Y. Jan. 24, 2012); *see also In re Apple Inc. Sec. Litig.*, 2022 WL 354785, at *4–5 (N.D. Cal. Feb. 4, 2022). For example, in *Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 537 (S.D.N.Y. 2015), this Court approved a lead plaintiff despite a comparable certification error, describing it as a "tempest in a teacup" because the plaintiff admitted the mistake, voluntarily corrected it, and remained committed to representing the class. Here, too, the Court concludes that whatever minor errors were contained in Leone's initial certification were corrected and do not affect his adequacy.

59

Moreover, Mr. Leone's corrected certifications do not affect which movant has the largest financial interest in the litigation. The initial certification's reported losses of $208,049 included other trades but did not yet account for certain omissions, including the three IRA trades. Dkt. No. 6, at 7. After accounting for those trades, Mr. Leone's total Class Period losses are $154,998, still larger than all other movants combined. Docket Nos. 9-3 ($11,528.63 loss), 12-2, ($6,947.70 loss), 15-2 ($19,921.67 loss). Thus, Mr. Leone remains the most adequate plaintiff to serve as Lead Plaintiff and Class Representative. *See Tai Jan Bao v. SolarCity Corp.*, 2014 WL 3945879, at *3 (N.D. Cal. Aug. 11, 2014) (corrections harmless where plaintiff retained largest financial interest).

Defendants also misstate Mr. Leone's testimony regarding reliance. In fact, he testified that after hearing the Canaccord interview and reviewing the Fuzzy Panda report, he believed the report "was pretty accurate," noting, for example, that ASPI had falsely touted "old technology that didn't work." Dkt. No. 45-2, at 132:9–133:4. Mr. Leone stated that when he saw that ASPI's illustrations of QE technology were largely replications of discontinued AVLIS diagrams taken from a 2008 United States Nuclear Regulatory Commission publication, *see* Dkt. No. 28-5, at 17, his "heart sunk" because "it looked like somebody was cheating in high school on a test," Dkt. No. 45-2, at 132:9–132:24. He then purchased additional shares to reduce his average purchase price, explaining: "When it was dropping, yeah, I was trying to buy it up to lower my price, to lower my average, so if it did make a comeback I had a better chance of recovering my money." *Id.* at 130:5–13. This testimony indicates that Mr. Leone relied on the integrity of public disclosures and acted like a typical Class member reacting to market information. *See Hasthantra v. CleanSpark, Inc.*, No. 21-cv-511 (LAP), 2025 WL 2717308, at *5 (S.D.N.Y. Sept. 24, 2025) (holding that post-disclosure trading did not negate reliance or typicality).

Finally, none of Mr. Leone's post-disclosure purchases undermines his reliance during the Class Period.  *See, e.g.*, *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *9 (S.D.N.Y. Jan. 26, 2021) (collecting cases); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, No. 15CV1249, 2017 WL 2062985, at *3 (S.D.N.Y. May 15, 2017).  What Mr. Leone chose to do after the alleged corrective disclosures is not probative of his reliance during the Class Period, which, like all Class members, is based on the common legal theory that Defendants misrepresented ASPI's ability to enrich uranium.  Even if he had temporarily exited some of his positions during the Class Period, unlike typical "in-and-out" traders, Mr. Leone held ASPI shares through the alleged corrective disclosures on November 26–27, 2024, and has plausibly pleaded loss causation.  *See supra* Section III(B)(3); *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *6 (S.D.N.Y. Aug. 13, 2018).  Because he purchased ASPI stock during the Class Period and held stock through the alleged corrective disclosures, his losses remain attributable to the same misrepresentation theory as all Class members.

In sum, Mr. Leone voluntarily corrected minor certification errors, maintains the largest financial stake among all movants, has demonstrated a willingness and capacity to represent the Class, and relied on market information consistent with typical Class members.  On this record, there is no credible evidence that he lacks diligence, candor, or adequacy.  Accordingly, the Court concludes that Mark Leone is an adequate Class Representative.

Defendants also challenge Mr. Agapchev's adequacy as a Class Representative, contending that his involvement demonstrates that this action is "lawyer-driven" rather than client-directed. The PSLRA was enacted precisely to avoid such arrangements.  As Judge Miriam Cedarbaum

explained decades ago in *In re Donnkenny Inc. Securities Litigation*, 171 F.R.D. 156, 157–58 (S.D.N.Y. 1997):

> To allow an aggregation of unrelated plaintiffs to serve as lead plaintiffs defeats the purpose of choosing a lead plaintiff.  One of the principal legislative purposes of the PSLRA was to prevent lawyer-driven litigation.  Appointing lead plaintiff on the basis of financial interest, rather than on a "first come, first serve" basis, was intended to ensure that institutional plaintiffs with expertise in the securities market and real financial interests in the integrity of the market would control the litigation, not lawyers . . . .  To allow lawyers to designate unrelated plaintiffs as a "group" and aggregate their financial stakes would allow and encourage lawyers to direct the litigation.  Congress hoped that the lead plaintiff would seek the lawyers, rather than having the lawyers seek the lead plaintiff.

Relying on this principle, Defendants argue that the circumstances surrounding Mr. Agapchev's involvement reflect the very concerns identified in *Donnkenny*.  As articulated in *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F.Supp.2d 388, 392 (S.D.N.Y. 2008), the underlying question is whether "the unrelated members of a group will be able to function cohesively and to effectively manage the litigation apart from their lawyers."  In considering Mr. Agapchev's adequacy to serve as Class Representative, the Court addresses each of the five *Varghese* factors.

*(1) Pre-litigation relationship.*  Mr. Leone and Mr. Agapchev had no pre-existing relationship.  They do not appear to have communicated with one another before the May 28, 2025 filing of the amended complaint, which added both Mr. Leone and Mr. Agapchev as plaintiffs.  Based on the record, their communications have been infrequent, arranged, and attended by counsel, and they have rarely spoken outside counsel's presence.  *See* Dkt. No. 45-4, Agapchev Dep. Tr., at 62:6–11 ("I did speak one time with Mr. Leone . . . It was only one time we spoke.").  Mr. Agapchev also confirms that he "participated in a call with Mr. Leone and [counsel] on June 19, 2025" and otherwise communicates with Mr. Leone only "through GPM."  *Id.* at 64:12–25.  These facts strongly suggest that the plaintiffs were effectively brought together by counsel, rather

than having developed an independent working relationship, and this factor weighs against cohesiveness.

*(2) Involvement in the litigation to date.*  Mr. Agapchev has taken some steps consistent with a committed class representative.  He has reviewed filings, preserved and produced documents, communicated regularly with counsel, and sat for a deposition.  *See* Agapchev Decl. ¶¶ 7–11 (describing supervising the case, receiving updates, coordinating document production, preparing for deposition).  These facts weigh in favor of adequacy.

*(3) Plans for cooperation.*  Mr. Leone and Mr. Agapchev's joint declaration reflects that, in addition to their initial June 19, 2025 call, they participated in a second call with each other and counsel on July 31, 2025, and a third call on August 7, 2025 without counsel present, during which they discussed how they would jointly supervise the case going forward.  *See* Dkt. No. 56-2, Joint Decl., ¶¶ 2–3.  They attest that they have exchanged phone numbers and email addresses and "plan to remain in contact about significant developments in this lawsuit."  *Id.* ¶ 2.  They also state that they are seeking joint appointment as Class Representatives to ensure continuity of class leadership should one representative become unable to serve.  *Id.* ¶ 3.

These assurances are conclusory and reflect only minimal coordination, largely initiated and structured by counsel.  There is no indication that the Plaintiffs have developed an independent plan for managing the litigation or have engaged in meaningful decision-making together outside of counsel's direction.  In this context, where the group appears to have been assembled by counsel, the Court finds that these planned communications are insufficient to demonstrate the ability to effectively manage the litigation.  Accordingly, this factor is neutral at best.  *See Khunt*, 102 F. Supp. 3d at 533.

*(4) Sophistication of members.*  Although Plaintiffs describe Mr. Leone and Mr. Agapchev as "educated and experienced investors, entrepreneurs and managers, well capable of overseeing the litigation," Dkt. No. 55, at 11, Defendants point to countervailing deposition testimony in which both individuals describe responding to an online advertisement and signing documents without clear recollection of their purposes, *see also* Dkt. No. 45-2 at 104:14–105:2 ("There were several advertisements and I just happened to pick his."); Dkt. No. 45-4 at 66:2–9 ("So I saw on Webull app there was like an advertisement about the stock that basically saying people who suffered loss can contact us about this matter."). When asked about where this case currently stood, Mr. Agapchev responded, "I'm not really from that kind of – like I don't have any experience with lawsuit cases.  So I don't know where we at right now." Dkt. No. 45-4, 70:4–8. These statements raise some concern about Mr. Agapchev's ability to supervise counsel with the level of attentiveness typically expected of a Class Representative.

*(5) Whether the members chose counsel, rather than counsel choosing them*.  There is no evidence that the members independently selected counsel.  Defendants highlight that both Mr. Leone and Mr. Agapchev became involved only after responding to online solicitations.  *See* Agapchev Dep. Tr. 66:2–9; Leone Dep. Tr. 104:20–105:2.  Moreover, Mr. Leone alone moved for appointment as Lead Plaintiff and testified that he did not know why additional plaintiffs, including Mr. Agapchev, were added.  Dkt. No. 45-2, Leone Dep. 113:9–17.  These facts strongly indicate that counsel orchestrated the formation of this group, rather than the Plaintiffs initiating or controlling it, supporting the conclusion that the litigation is being driven by counsel, not the putative Class Representatives.

Taken together, the *Varghese* factors reflect the concerns underlying *Donnkenny*.  The absence of any prior relationship, minimal direct communication, lack of demonstrated

coordination, and counsel-driven recruitment all indicate that Mr. Agapchev cannot adequately represent the Class under Rule 23(a)(4). *See Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 532–33 (S.D.N.Y. 2015). For these reasons, Mr. Agapchev's participation in what appears to be a lawyer-assembled group undermines his adequacy, and the Court declines to appoint him as Class Representative. The Court perceives no immediate need or justification for an additional Class Representative at this time. If, for some reason it is later determined by the Court that Class Representative Marke Leone is inadequate, the Court retains the discretion to appoint a replacement plaintiff to serve as Class Representative. *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 253 (2d Cir. 2011).

### 5. Ascertainability

In addition to Rule 23(a)'s explicit textual requirements, the Second Circuit also recognizes an implied "ascertainability" requirement, which requires that a proposed class be "defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017). As the Second Circuit articulated in *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015),

> The touchstone of ascertainability is whether the class is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member. A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case.

Although neither party addresses this requirement in their briefing, the Court finds that it is satisfied here. The proposed Class comprises investors who purchased ASPI common stock on the NASDAQ between September 26, 2024, and November 26, 2024. Dkt. No. 38, at 8. These criteria are sufficiently objective to render the Class ascertainable. Accordingly, Plaintiffs have satisfied each of the Rule 23(a) requirements.

### F. Plaintiffs Satisfy the Rule 23(b)(3) Requirements for Class Certification

Federal Rule of Civil Procedure 23(b)(3) requires that (1) common questions of law or fact predominate over individual questions and that (2) a class action is superior to other available methods of adjudication.

#### 1. Plaintiffs Satisfy Rule 23(b)(3)'s Predominance Requirement

Predominance is often "readily met" in cases alleging securities fraud. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). This element demands that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole . . . predominate over those issues that are subject only to individualized proof." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir.2001) (internal quotation marks omitted), *abrogated on other grounds by Miles v. Merrill Lynch & Co.*, 471 F.3d 24 (2d Cir. 2006). The inquiry centers on whether "liability can be determined on a class-wide basis, even when there are some individualized damage issues." *Id.* at 139. The predominance requirement is satisfied when plaintiffs are unified by a common legal theory. *Clark v. Ecolab Inc.*, 2010 WL 1948198, at *4 (S.D.N.Y. May 11, 2010).

Plaintiffs will seek to prove the elements of their § 10(b) and § 20(a) claims with the Class members based on a common legal theory of reliance. The elements of a § 10(b), and Rule 10b–5, claim are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008). At the class certification stage, Plaintiffs need not prove that the alleged misrepresentations and omissions were material. *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 119 (2021). Instead, whether

66

common questions of law or fact predominate in a securities fraud action often turns on the element of reliance. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) (*Halliburton I*); *see Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 462 (2013) (stating that the fraud-on-the-market theory of reliance "has particular significance in securities-fraud class actions").

The reliance element ensures that there is a proper "connection between a defendant's misrepresentation and a plaintiff's injury." *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988). The traditional way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and purchased a security based on that specific misrepresentation. The Supreme Court recognized in *Basic*, however, that "Requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would" prevent such plaintiffs "from proceeding with a class action, since individual issues" would "overwhelm[] the common ones." *Id.* at 242. The Court in *Basic* sought to alleviate that concern and held that a plaintiff may invoke a rebuttable presumption of reliance based on the "fraud-on-the-market" theory. *Id.* at 241–47.

a. Plaintiffs Satisfy the Requirements for the *Basic* Presumption of Reliance Under the Fraud-on-the-Market Theory

Under the fraud-on-the-market theory, an investor is presumed to rely on a misrepresentation when it is reflected in the market price at the time of the transaction. *Halliburton I*, 563 U.S. at 813. To invoke *Basic*'s presumption of reliance, a plaintiff must show that: (1) the alleged material misrepresentation was publicly known, (2) the stock traded in an efficient market, and (3) the plaintiff traded the stock between the time the misrepresentation was made and the time the truth was revealed. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) (*Halliburton II*).

67

To succeed, defendants must demonstrate, by a preponderance of the evidence, that the misrepresentations "did not actually affect the stock's market price." *Halliburton II*, 573 U.S. at 282. Although a plaintiff's satisfaction of the Basic presumption serves as an "indirect proxy" for price impact, a defendant may attempt to rebut the presumption with "direct, more salient evidence." *Id.* at 281–82; *see also Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 125 (2021) (holding that defendants must "sever[] the link between the alleged misrepresentation and . . . the price"). Such rebuttal typically requires empirical evidence, often in the form of an event study, demonstrating that other factors explain the entire price movement. *Allergan*, 2021 WL 4077942, at *10.

Courts in this District have recognized that attempts at rebuttal "will not ordinarily present a serious obstacle to class certification." *Strougo v. Barclays PLC*, 312 F.R.D. 307, 324 (S.D.N.Y. 2016), *aff'd sub nom. Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017). Here, Defendants have submitted no expert report, no event study, and no other evidence to challenge price impact. They have therefore failed to carry their burden to rebut the *Basic* presumption. *Barclays*, 310 F.R.D. at 94.

Before addressing Defendants' specific rebuttal arguments, the Court first considers Defendants' separate contention that Plaintiffs cannot rely on the fraud-on-the-market presumption because they have not demonstrated that the November 27, 2024 Canaccord Interview was publicly available.

### i.   The November 27, 2024 Canaccord Interview Is Not Subject to *Basic*'s Public Dissemination Requirement

To invoke the *Basic* presumption, the *alleged misrepresentation* must have been publicly disseminated. *Halliburton II*, 573 U.S. at 268. Information is public either: (1) "when disclosed

68

'to achieve a broad dissemination to the investing public generally and without favoring any special person or group,'" *S.E.C. v. Mayhew*, 121 F.3d 44, 50 (2d Cir. 1997) (citing *Dirks v. SEC*, 463 U.S. 646, 653 n.12 (1983)); or (2) "when, although known only by a few persons, their trading on it 'has caused the information to be fully impounded into the price of the particular stock,'" *id.* (citing *United States v. Libera*, 989 F.2d 596, 601 (2d Cir. 1993)).  Accordingly, even information not disseminated through traditional public channels, such as press releases, SEC filings, or newspapers, can still be considered public if conveyed to the market in a manner reasonably calculated to reach investors.  *Libera*, 989 F.2d at 601 (recognizing that "information may be considered public for Section 10(b) purposes even though there has been no public announcement and only a small number of people know of it.").

Here, however, Plaintiffs do not rely on the November 27, 2024 Canaccord interview as an alleged misrepresentation.  Instead, they rely on the interview as a corrective disclosure, and the structure of the Amended Complaint reflects as much: the Canaccord interview appears not in the section identifying Defendants' alleged misstatements, but in the portion alleging when the truth was revealed.  *See* Dkt. No. 28, Am. Compl., ¶¶ 103–112.

Under the applicable standard, a corrective disclosure need not itself have been publicly disseminated in the manner required for an actionable misrepresentation.  To plead a corrective disclosure, "plaintiffs must plausibly allege a disclosure of the fraud by which the available public information regarding the company's financial condition was corrected."  *Barclays*, 750 F.3d at 233.  Notably absent from this standard is any requirement that the corrective disclosure be disseminated through a particular channel or meet any specific threshold of publicity.

This standard – rooted in loss-causation principles, not the fraud-on-the-market reliance inquiry – focuses on whether the disclosure plausibly revealed the truth to the market. *See, e.g.*, *Lentell*, 396 F.3d at 175. In determining whether a plaintiff has established loss causation, the relevant focus is whether the corrective disclosure plausibly revealed the truth to the market. As one court explained, "there is no requirement that the disclosure take a particular form or be of a particular quality." *In re Winstar Commc'ns*, 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006). Instead, "it is the inherent veracity of the information that is of paramount concern." *Id.* And here, the court has already held that Plaintiffs have sufficiently alleged that Defendants' later statements materially contradicted prior disclosures and that the market reacted to the alleged truth accordingly. *See supra* Section III(A), Loss Causation (citing *Dura Pharm.*, 544 U.S. at 347).

The Court rejects Defendants' contention that Plaintiffs were required to demonstrate that the November 27, 2024 Canaccord interview was publicly disseminated in order to rely on it as a corrective disclosure. Nothing in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), supports such a requirement, and Defendants identify no authority, nor is the Court aware of any, that merges the corrective disclosure standards within the loss causation inquiry with *Basic*'s public dissemination requirement for alleged misrepresentations. Corrective disclosure principles arise from the loss-causation inquiry, which is analytically distinct from the reliance inquiry governed by *Basic*. *See Basic*, 485 U.S. at 241–49 (fraud-on-the-market presumption addresses reliance); *Dura*, 544 U.S. at 341–46 (2005) (plaintiffs must plead a causal connection between the alleged misrepresentation and their economic loss). For this reason, the Court rejects Defendants' efforts to import loss causation requirements into the *Basic* presumption. *Basic*'s public dissemination requirement applies to alleged misrepresentations, not corrective disclosures.

### ii.     The November 27, 2024 Stock Price Decline Was Statistically Significant

Defendants argue that Plaintiffs failed to carry their burden to plausibly allege that ASPI's

stock traded in an efficient market and therefore cannot invoke the fraud-on-the-market

presumption.  They contend that Plaintiffs' expert improperly excluded November 27, 2024, the

date of the Canaccord interview, from his analysis.  According to Defendants, Plaintiffs have

offered no evidence that the decline was statistically significant, no proof tying the price movement

to the interview, and no analysis of confounding news.

In determining whether the stock traded in an efficient market, courts routinely apply the

five factors established in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286–87 (D.N.J. 1989).  The five

*Cammer* factors are:

> (1) a large weekly trading volume; (2) the existence of a significant number of
> analyst reports; (3) the existence of market makers and arbitrageurs in the security;
> (4) the eligibility of the company to file an S–3 registration statement; and (5) a
> history of immediate movement of stock price caused by unexpected corporate
> events or financial releases.

*Cammer v. Bloom*, 711 F. Supp. 1264, 1286 (D.N.J. 1989).

Courts also consider three additional factors established in *Krogman v. Sterritt*, 202 F.R.D.

467, 478 (N.D. Tex. 2001) to determine efficiency.  *Waggoner v. Barclays PLC*, 875 F.3d 79, 95

(2d Cir. 2017).  The three *Krogman* factors are:

> (1) the company's market capitalization; (2) the relative size of the bid-ask spread
> for the security; and (3) the company's float, or the degree to which shares of the
> security are held by the public, rather than insiders.

*McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014) (citing

*Krogman*, 202 F.R.D. at 477–78 (N.D. Tex. 2001)).  The Court understands Defendants' argument

to be directed at the fifth factor under *Cammer v. Bloom*, 711 F. Supp. 1264, 1286, 1287 (D.N.J.

1989), which asks whether there is a cause-and-effect relationship between "unexpected corporate events or financial releases and an immediate response in the stock price" as part of the market-efficiency inquiry.

Defendants' argument fails for several reasons.

*First,* Plaintiffs need not prove the statistical significance of the November 27, 2024 stock-price decline in order to invoke the *Basic* presumption. The fifth *Cammer* factor "is not dispositive of market efficiency." *Barclays*, 310 F.R.D. at 82. The Second Circuit has consistently refused to adopt a particular test for market efficiency. *See, e.g., Waggoner*, 875 F.3d at 94; *Petrobras*, 862 F.3d at 278.

The Supreme Court, for its part, has consistently declined to prescribe a specific evidentiary standard for establishing market efficiency and has indicated that the burden on plaintiffs to invoke the *Basic* presumption is relatively modest. In *Halliburton II*, 573 U.S. at 272, the Court observed that "even the foremost critics of the efficient-capital-markets hypothesis acknowledge that public information generally affects stock prices." The Court explained that debates about the precise degree to which stock prices reflect public information are "largely beside the point." *Id.* Justice Ginsburg, concurring, stressed that it is "incumbent upon the defendant to show the absence of price impact," and stated that the Court's holding, in which she joined, imposed "no heavy toll on securities-fraud plaintiffs with tenable claims." *Id.* at 284. In this context, Defendants' argument that Plaintiffs allegedly fail to satisfy one of the five *Cammer* factors is not compelling evidence that ASPI's stock did not trade in an efficient market. Defendants do not dispute, and therefore concede, Plaintiffs' expert Dr. Bozanic's analyses of the remaining *Cammer*/*Krogman* factors, all of which support a finding that ASPI's stock traded in an efficient market.

*Second,* Defendants' arguments still fail, even if Plaintiffs were required to produce definite proof of statistical significance to show that ASPI's stock traded in an efficient market. Dr. Bozanic conducted an event study analyzing ASPI's stock price movements during the Class Period (September 26 to November 26, 2024), using an Analysis Period beginning one year prior. Dkt. No. 39-1, Bozanic Report ¶¶ 48–56. The study employed regression analysis to measure ASPI's stock returns relative to market-wide and industry-wide factors, isolating "abnormal" returns not explained by broader market or industry movements. *Id.* Using 21 identified "News Days" during the Analysis Period, the expert compared stock returns and trading volume on these days to 189 "No News Days" with minimal company-specific information. *Id.*, ¶ 63. The results showed that 33.33% of News Days had statistically significant stock price movements at the 95% level, compared to only 3.17% of No News Days. *Id.* This difference was statistically significant at the 99% level. *Id.* News Days also exhibited higher average abnormal returns and greater trading volume. *Id.* These findings demonstrate a clear cause-and-effect relationship between new, value-relevant information and ASPI's stock price movements, providing strong evidence that ASPI's stock traded in an efficient market during the Class Period.

Defendants do not challenge Dr. Bozanic's methodology itself, only that the November 27, 2024 alleged corrective disclosure fell outside the Analysis Period. Dr. Bozanic has since analyzed the November 27 price movement. In his Reply Report, Dr. Bozanic confirms that the November 27, 2024 Canaccord interview, like the November 26 Fuzzy Panda disclosure, was followed by a statistically significant abnormal price decline even after controlling for market and industry effects. Dkt. No. 56-1, Bozanic Reply Report, ¶¶ 16–17. His event study shows that the November 27 disclosure produced a 12.62% abnormal decrease in ASPI's stock price, with a p-value of 0.020 and statistical significance at the 98% level. *Id.* Trading volume that day was also at least three

73

times higher than the Class Period average. *Id.* These results parallel the prior day's 23.64% abnormal decline (significant at the 99.9% level), and together demonstrate that both alleged corrective disclosures were followed by statistically significant negative abnormal returns. This analysis, which encompasses the alleged November 27, 2024 corrective disclosure, provides strong evidence that the alleged misrepresentations had a price impact on ASPI's stock. Thus, contrary to Defendants' assertion, the analysis encompasses the November 27, 2024 disclosure, and the results reinforce market efficiency and price impact.

*Third,* Defendants' speculation that "other news" might have contributed to the decline likewise provides no basis to deny the presumption. They identify no particular confounding information, and mere speculation about unspecified alternative causes is legally insufficient. At this stage, Plaintiffs are not required to show that any observed price impact resulted solely from the alleged misrepresentations. *Allergan*, 2021 WL 4077942, at \*15. Thus, even if Defendants had identified particular, contemporaneous news, merely suggesting that another factor also contributed to the price movement does not negate price impact or defeat the *Basic* presumption. *See Signet Jewelers*, 2019 WL 3001084, at \*17. Rebutting the *Basic* presumption of reliance requires evidence, not conjecture, and Defendants offer none.

Because Plaintiffs have submitted empirical evidence demonstrating that the market reacted to the November 27 disclosure in a statistically significant manner, and because Defendants' alternative-cause theory is both unsupported and legally insufficient, their challenge to the *Basic* presumption fails.

### iii.    The Remaining *Cammer*/*Krogman* Factors Confirm Market Efficiency

*Cammer* Factors

*1.  Average Weekly Trading Volume*

A large weekly trading volume suggests a more efficient market because it reflects significant investor interest and, consequently, a higher likelihood that trades incorporate newly available public information.  *Cammer*, 711 F. Supp. at 1286.

During the Class Period, ASPI common stock had an average weekly turnover of 40.96% of outstanding shares, Bozanic Report ¶ 30, far surpassing the 2% threshold identified in *Cammer* as giving rise to a strong presumption of market efficiency.  *See Cammer*, 711 F. Supp. at 1286; *see also Allergan*, 2021 WL 4077942, at *10 (finding 3.9% weekly turnover sufficient to indicate market efficiency).  Plaintiffs further note that ASPI's daily turnover rate of 8.03% during the Class Period places it well above the 95th percentile of NASDAQ and NYSE-listed companies over 2016–2018.  Bozanic Report ¶ 31.  Accordingly, ASPI's trading volume strongly supports a presumption that its common stock traded in an efficient market.

*2.  Coverage by Securities Analysts*

A significant number of securities analysts covering a security suggests a more efficient market because their analysis helps incorporate newly available information into the price of a security more quickly.  *Cammer*, 711 F. Supp. at 1286.  Moreover, the presence of analyst coverage "supports a finding of market efficiency because it permits an inference that financial statements relating to a security are closely watched by investment professionals, who in turn inject their views on the company and the security into the market."  *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 446 (S.D.N.Y. 2013).  This factor is typically measured by the number of analysts covering the company or the number of reports they issue.  *See, e.g.*, *McIntire*, 38 F. Supp. 3d at

75

431.     Courts also consider analyst coverage alongside related factors, including news dissemination and institutional ownership.  *See, e.g.*, *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 514–15 (1st Cir. 2005); *Todd v. STAAR Surgical Co.*, No. CV-14-05263-MWF-RZ, 2017 WL 821662, at *7 (C.D. Cal. Jan. 5, 2017).

Here, at least seven analyst firms, including Canaccord Genuity and H.C. Wainwright & Co., published 47 reports on ASPI from September 26, 2023 (one year before the Class Period) through November 26, 2024, and at least five analyst firms issued 13 reports during the Class Period itself.  Bozanic Report ¶ 34 & n.30.  Courts have repeatedly found that comparable or lesser levels of analyst coverage support market efficiency.  *See, e.g.*, *Wilson*, 2018 WL 3913115, at *11 (five analysts issuing 45 reports over a year).  Plaintiffs highlight that coverage by seven analysts during the Analysis Period places ASPI between the 50th and 75th percentiles of NASDAQ- and NYSE-listed companies for 2016–2018.  Bozanic Report ¶ 36.

Institutional ownership further reinforces that ASPI's stock traded in an efficient market.  At least 128 unique institutional investors, including sophisticated market participants such as Vanguard, BlackRock, and State Street, held ASPI shares throughout the Class Period.  Bozanic Report ¶ 76.  On average, 43.37% of ASPI's outstanding common stock was held by institutions, placing ASPI between the 25th and 50th percentiles of NYSE- and NASDAQ-listed companies for 2016–2018.  *Id.*

The Court concludes that the combination of robust analyst coverage and institutional ownership support a finding that ASPI's common stock traded in an efficient market.  *Winstar*, 290 F.R.D. at 446; Bozanic Report ¶ 38.

*3. Market Makers*

The existence of numerous market makers transacting a security suggests a more efficient market because market makers "react swiftly to company news and reported financial results by buying or selling stock," thereby driving the market to incorporate new information more quickly. *Cammer*, 711 F. Supp. at 1287.  The SEC defines "market maker" as

> a dealer who, with respect to a particular security, (i) regularly publishes bona fide, competitive bid and offer quotations in a recognized interdealer quotation system; or (ii) furnishes bona fide competitive bid and offer quotations on request; and, (iii) is ready, willing and able to effect transactions in reasonable quantities at his quoted prices with other brokers or dealers.

17 C.F.R. § 240.15c3–1(c)8 (2025).  Courts recognize that "anywhere between six and twenty market makers is sufficient to support a finding of market efficiency." *Barclays*, 310 F.R.D. at 92. The *Cammer* court likewise held that ten market makers justify a "substantial presumption" of efficiency, while even five justify a "modest presumption." *Cammer*, 711 F. Supp. at 1293.  This factor is particularly probative for securities, including those traded on major exchanges, because market makers are "presumably knowledgeable about the issuing company and the stocks' supply and demand conditions," and a larger number increases the amount of information available and the speed with which it is incorporated into price.  Barber, Griffin & Lev, *Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. Corp. L. 285, 291 (1994).

Dr. Bozanic's report reflects that ASPI's common stock had at least 65 market makers or brokers performing similar liquidity-provision functions during the Class Period, including financial institutions such as Morgan Stanley, UBS, and J.P. Morgan.  Bozanic Report ¶ 42. Consistent with *Cammer* and subsequent authority, the presence of more than ten market makers gives rise to a substantial presumption of market efficiency, and the participation of more than

sixty exceeds what courts have found sufficient.  *See Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *6 (N.D. Cal. Dec. 22, 2016).

The participation of a large number of market makers further supports the conclusion that ASPI's stock traded in an efficient market throughout the Class Period.

### 4.  Eligibility to File Registration Statement SEC Form S–3

The SEC permits certain issuers to use Form S–3, a short-form registration statement, based on the Commission's judgment that the market for those securities is already reasonably efficient at processing information.  As *Cammer* emphasized, the Form S–3 is "*predicated on the Commission's belief that the market operates efficiently for these companies* [that file Form S–3s], *i.e., that the disclosure in Exchange Act reports and other communications by the registrant, such as press releases, has already been disseminated and accounted for by the market place.*"  *Id.* at 1284 (quoting SEC Securities Act Release No. 6331, 46 Fed. Reg. 41,902 (1981) (emphasis in original)).  Therefore, a company's eligibility to file a SEC Form S–3 Registration Statement in connection with a security "is an important factor weighing in favor of a finding that a market is efficient."  *Id.* at 1285, 1287.

Form S–3 eligibility requires, among other criteria, that the registrant: (1) has a class of securities registered under the Exchange Act; (2) has timely filed all required SEC reports for the preceding twelve months; (3) maintains a public float of at least $75 million; and (4) has not defaulted on material obligations.  *See* SEC Form S-3, Instruction I.A, available at https://www.sec.gov/files/forms-3.pdf.  The rationale, as *Cammer* observed, is that issuers meeting these requirements have demonstrated reliable, timely, and regular disclosure to the market, enabling investors and analysts to access current information efficiently.

ASPI satisfied all Form S-3 eligibility requirements during the Class Period. Bozanic Report ¶ 45. ASPI filed all required SEC reports for at least the preceding twelve months, maintained a float ranging between $129 million and $468 million, well above the $75 million minimum, and met the remaining eligibility conditions. *Id.* In addition, ASPI filed an actual Form S-3 registration statement during the Class Period, reinforcing that the SEC deemed ASPI's disclosure practices and market environment consistent with Form S-3's efficiency-based framework. *See ASPI Form S-3*, SEC EDGAR, No. 1921865 (filed May 24, 2024), available at https://www.sec.gov/Archives/edgar/data/1921865/000147793225007536/aspi_s3asr.htm.

Because ASPI was both eligible to file, and in fact filed, a Form S–3 registration statement during the Class Period, this factor strongly supports the conclusion that its stock traded in an efficient market.

### *Krogman* Factors

In addition to the *Cammer* factors, each of the three *Krogman* factors provides further support that ASPI's stock traded in an efficient market.

*1. Market Capitalization*

A high market capitalization support market efficiency because "there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman*, 202 F.R.D. at 478. Courts have likewise recognized that "the number of shares traded and value of shares outstanding" indicate whether a security trades in an efficient market. *Cammer*, 711 F. Supp. at 1287.

ASPI's market capitalization falls within the range associated with market efficiency. Its average market capitalization during the Class Period was $377.2 million, placing it between the

25th and 50th percentiles of all NASDAQ- and NYSE-listed companies from 2016–2018. Bozanic Report ¶ 67. In addition, ASPI had an average of 68.8 million shares outstanding during the Class Period, a level of capitalization consistent with an actively traded security whose price is likely to reflect available information.

Taken together, ASPI's market capitalization and its substantial number of shares outstanding support the conclusion that its common stock traded in an efficient market during the Class Period.

### 2. *Relative Size of the Bid-Ask Spread*

A small bid-ask spread – "the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares," *Krogman*, 202 F.R.D. at 478 – indicates low transaction costs and a more informationally efficient market. By contrast, a larger spread suggests higher costs, reduced liquidity, and slower price discovery. A narrow bid-ask spread therefore supports a finding that a stock traded in an efficient market.

ASPI's Common Stock exhibited a small average spread of 0.24% during the Class Period. Bozanic Report ¶ 70. Plaintiffs note that ASPI's spread places it between the 50th and 75th percentiles of all NASDAQ- and NYSE-listed companies from 2016–2018, percentile ranges associated with highly liquid securities. *Id.*, ¶ 71.

ASPI's bid–ask spread supports the conclusion that its stock traded in an efficient market throughout the Class Period.

*3. Float, or the Degree to Which ASPI's Stock Are Held by the Public*

Public float refers to the notional value of a security that is not held by corporate insiders. *See Krogman*, 202 F.R.D. at 478.  A high ratio of public float to total notional value outstanding indicates that a large portion of the bond is held by public investors and therefore can be traded without restrictions, thus supporting a finding of market efficiency.  *See id.*

ASPI insiders held roughly 32.64% of ASPI's stock during the Class Period.  Bozanic Report ¶ 74.  Accordingly, approximately 67.36% of the Company's Common Stock was held and freely tradeable by outside investors during the Class Period.  This figure indicates that a significant portion of ASPI shares were available for unrestricted trading, which facilitates active trading and the incorporation of information into the stock price.  ASPI's public float supports the conclusion that ASPI's stock traded in an efficient market throughout the Class Period.

Each *Cammer* and *Krogman* factor supports the Court's conclusion that ASPI's stock traded in an efficient market.

### iv.    Defendants' Reliance on *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System* Is Misplaced, and Their "Mismatch" Argument Fails to Defeat the Basic Presumption

Defendants insist that *Basic* presumption does not apply for an additional reason.  They argue that the Fuzzy Panda Report did not actually "reveal" the alleged truth that ASPI had never tested its QE technology on uranium.  They contend that the report's reference to publicly available SEC-filed Form 10-K showing ASPI lacked the required licenses demonstrates that the report did not "correct" any misrepresentation.  According to Defendants, this creates a "mismatch" between the challenged statements and the purported disclosure, thereby placing this case within the framework of *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 594 U.S. 113 (2021), and requiring a "searching" price-impact inquiry.

81

This mismatch theory is merely a repackaged truth-on-the-market defense that the Court has already rejected. *See supra* Section III(A). As the Court explained, Defendants' reliance on ASPI's April 2024 Form 10-K does not defeat Plaintiffs' allegations because Plaintiffs plausibly allege that ASPI's later Class Period statements, such as representing that its team "used lasers to enrich . . . Uranium" and suggesting that its technology was "fully prepared for deployment," reasonably conveyed that previously disclosed uncertainties had been resolved. Under settled law, once a company elects to speak, earlier cautionary disclosures do not immunize later statements that materially alter the "total mix" of information or create the impression of progress that has not occurred. *See Farnsworth*, 692 F. Supp. 3d at 183–185. For the reasons already discussed, Defendants' asserted "disclosures" were not sufficiently "intense or credible" to "counterbalance" the contrary impressions created by their later alleged affirmative representations. *See Ganino*, 228 F.3d at 167.

The Supreme Court's decision in *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 594 U.S. 113 (2021) highlights the circumstances under which a "mismatch" between a misrepresentation and a subsequent corrective disclosure can weaken the typical inference of price impact under the *Basic* presumption. There, the Court emphasized that the inference "that the back-end price drop equals front-end inflation[] starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Goldman Sachs*, 594 U.S. at 123. The misstatements at issue were generic statements about Goldman Sachs' internal controls and ability to manage conflicts of interest, such as, "Our clients' interests always come first" and "We have extensive procedures and controls that are designed to identify and address conflicts of interest." *Id.* at 120. By contrast, the corrective disclosures were specific revelations of particular conflicts and risk management failures. *Id.* at 123. Because the

misrepresentations were generic and the disclosure was specific, the Court found it "less likely that the specific disclosure actually corrected the generic misrepresentation," thereby weakening the standard inference that a post-disclosure stock price drop reflects prior inflation from the misrepresentation. *Id.*

Here, unlike in *Goldman Sachs*, there is no mismatch. The alleged misstatements were specific assertions regarding ASPI's current uranium enrichment capabilities, including statements that ASPI had already enriched uranium, that its QE technology was fully operational and safe, and that it was prepared for commercial deployment. The Fuzzy Panda Report was similarly specific, explicitly revealing that ASPI's QE technology had never been successfully tested on uranium, relied on AVLIS methods known to fail despite billions in prior investment, and faced extreme technical obstacles such as vaporizing uranium at 3,400°C, which had historically destroyed equipment. Dkt. No. 28, at 31–33; Dkt. No. 28-5, at 17, 25. It highlighted that ASPI's illustrations mirrored outdated AVLIS diagrams commissioned decades ago by the United States Nuclear Regulatory Commission and that the company had not demonstrated meaningful progress toward overcoming long-standing technical challenges. *Id.* The report also quoted an industry expert stating: "I have very low hopes for ASPI." *Id.* at 33.

The report directly addresses the "contents of the misrepresentations." Plaintiffs have identified seven actionable statements, each of which is contradicted or undermined by the report:

- **Statement 2 (Sept. 26, 2024 investor presentation slide "Comparing and Contrasting Enrichment Methods")**: Mann presented QE as outperforming other technologies, with high selectivity and vaporization of uranium metal. The report demonstrates that ASPI had no operational uranium enrichment technology, making the slide's claims materially misleading.

- **Statement 3 ("Real World Experience" slide):** The slide indicated ASPI had already enriched uranium. The Fuzzy Panda Report confirms QE had never been

83

successfully tested on uranium, contradicting the implied claim of real-world uranium enrichment.

- **Statements 5 & 6 (R&D Stage and Proven Proprietary Technology slides):** The slides suggested that U-235 QE work had progressed in parallel with Lithium-6 testing. The report shows that QE remained entirely theoretical, with no laboratory-scale uranium experiments completed, undermining any impression of practical research progress.

- **Statement 13 (Mann, Oct. 30, 2024 conference call):** Mann claimed ASPI could enrich uranium "in batches" with no risk of criticality. The report shows ASPI had not begun uranium enrichment at all and faced fundamental technical challenges that made such enrichment impossible. This directly contradicts Mann's representation of current operational capability.

- **Statements 14 & 15 (Petkov interview in POWER magazine):** Petkov described multiple isotopes, including HALEU, as "critical nuclear fuels" and claimed ASPI's technology was "fully prepared for deployment." The report shows ASPI had not tested QE on uranium or HALEU, and technical and scientific obstacles remained unresolved, directly contradicting these statements

Having mapped each alleged misstatement to the report's factual findings, the Court concludes that the purported mismatch is unfounded. The Fuzzy Panda Report did more than cite prior filings: it provided new, detailed, and specific information about ASPI's lack of uranium enrichment, technological limitations, reliance on outdated AVLIS designs, and fundamental technical obstacles. Each actionable statement identified by Plaintiffs is directly addressed by the report, which plausibly corrected the market's understanding. Courts have deemed similarly aligned disclosures sufficiently particularized to qualify as corrective. *See, e.g.*, *In re NIO, Inc. Sec. Litig.*, 2023 WL 5048615, at 14–16 (E.D.N.Y. Aug. 8, 2023). To the extent Defendants demand even greater specificity in the Fuzzy Panda Report, there is no requirement that a corrective disclosure be a "mirror image" of prior misstatements to establish loss causation in a securities fraud action. *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010).

84

In short, accepting Plaintiffs' well-pleaded allegations as true, the Fuzzy Panda Report's findings – demonstrating that ASPI had never tested QE on uranium, relied on failed AVLIS methods, replicated outdated diagrams, and made no meaningful progress – directly addressed and undermined the core representations at issue.  Contrary to Defendants' argument, there is no "mismatch" between the alleged misstatements and the Fuzzy Panda Report.  As alleged, the report provided the market with a clear corrective disclosure, and the *Basic* presumption of reliance therefore applies without limitation.

## 2.   Plaintiffs Satisfy the Rule 23(b)(3)'s Superiority Requirement

Federal Rule of Civil Procedure 23(b)(3) also requires a showing that "a class action is superior to other available methods for fairly and efficiently adjudicating" Plaintiffs' claims.  Fed. R. Civ. P. 23(b)(3).  The relevant considerations include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D).  In general, securities actions "easily satisfy the superiority requirement of Rule 23."  *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 132 (S.D.N.Y. 2008) (citation omitted).  This is because securities violations "inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible."  *Id.*

Because Defendants do contest superiority, the Court concludes that this case, like many

other securities actions, would be best adjudicated as a class action. There is no indication that members of the Class would prefer to prosecute individual claims, and the Court is not aware of any other case involving the same claims. Trying this case collectively will allow for a cost-effective adjudication of common disputes, avoid the impracticality and expense of duplicative litigation, and will minimize the risk of disparate results among Class Members. *See In re Interpublic Sec. Litig.*, 2003 WL 22509414, at \*4 (S.D.N.Y. Nov. 6, 2003); *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 117 (S.D.N.Y. 2010). Moreover, given the potentially thousands of Class members, *see supra* Numerosity, Section III(E)(1), class treatment promotes both efficiency and fairness.

Accordingly, a class action is the superior method for adjudicating the Class's claims. The Court concludes that Plaintiffs have satisfied the predominance and superiority requirements of Federal Rule of Civil Procedure 23(b)(3).

## Conclusion

For the foregoing reasons, Defendants' motion to dismiss in GRANTED and DENIED in part, and Plaintiff's motion for class certification is GRANTED. The Court orders as follows:

1. This action is certified as a class action and the Class is defined as:

> All persons and entities who purchased the publicly traded common stock of ASP Isotopes Inc. ("ASPI") between September 26, 2024 and November 26, 2024, both dates inclusive, and who were damaged thereby.

> Excluded from the Class are Defendants, the officers and directors of ASPI, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, any entity in which Defendants have or had a controlling interest, and any trust of which Defendant Mann is the settler or which is for the benefit of Defendant Mann and/or member(s) of his immediate family.

2. Lead Plaintiff Mark Leone is hereby appointed as Class Representative.

3.  Glancy Prongay & Murray LLP is hereby appointed as Class Counsel.

The Clerk of Court is directed to remove the motions located at Docket Entry Numbers 37

and 41 from the Court's list of open motions.

This constitutes the decision and order of the Court.  It is a written decision.


Dated: December 4, 2025


_____

U.S.D.J.


BY ECF TO ALL COUNSEL